# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA
### NORTHERN DIVISION

2007 AUG 17  P 9: 38

PROFESSIONAL FACILITIES            )
MANAGEMENT, INC.,                  )    DEBRA P. HACKETT, CLK
Plaintiff,                         )    U.S. DISTRICT COURT
                                   )    MIDDLE DISTRICT ALA
                                   )
v.                                 )    Civil Action No. 2:06CV1136-MHT
                                   )
EMCOR FACILITIES SERVICES,  INC.,  )
Defendant.                         )

## SUBMISSION OF EVIDENCE
## IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT

Defendant EMCOR Facilities Services, Inc. ("EMCOR"), submits the following evidence

in support of its Motion for Summary Judgment filed contemporaneously herewith.

EXHIBIT:

A.    July 13, 2005, Agreement between EMCOR and plaintiff Professional Facilities

Management, Inc. (""PFMI").

B.    Deposition Transcript of PFMI President, Greg Littlefield.

C.    Plaintiff PFMI's Complaint.

D.    Deposition Transcript of PFMI Vice President, James Wohlers.

E.    Deposition Transcript of Sean Brookings, PFMI  Employee.

F.    Report of plaintiff PFMI's Expert.

JACK OWEN  (ASB-4805-N66C)
Attorney for Defendant
Emcor Facilities Services, Inc.

OF COUNSEL:
BALL, BALL, MATTHEWS & NOVAK, P.A.
Post Office Box 2148
Montgomery, Alabama  36102-2148
(334) 387-7680
(334) 387-3222 (Fax)
Email: CCOWEN@BALL-BALL.COM

and
Benjamin H. Sawyer
SUTHERLAND, ASBILL & BRENNAN, LLP
999 Peachtree Street, N.E.
Atlanta, GA 30309
(404) 853-8188
Email: BENJAMIN.SAWYER@SABLAW.COM

---

## CERTIFICATE OF SERVICE

I hereby certify that on August 17, 2007, I mailed a copy of the foregoing to counsel for the plaintiff, by placing the same in the U. S. Mail, first class Postage prepaid and properly addressed as shown below.

_____
OF COUNSEL

Mr. Rhon E. Jones
Ms. Scarlette M. Tuley
BEASLEY, ALLEN, CROW, METHVIN, PORTIS & MILES, P.C.
P.O. Box 4160
Montgomery, AL 36103-4160
Email:  RHON.JONES@BEASLEYALLEN.COM
Email:  SCARLETTE.TULEY@BEASLEYALLEN.COM

# Exhibit A

12/07/2006 10:13 FAX 2038497880          EMCOR GROUP INC.                    ☑012/013



**EMCOR** *Facilities Services*

EMCOR Facilities Services, Inc.
320 23rd Street, South, Suite 100
Arlington, VA 22202

July 13, 2005

Mr. Greg Littlefield
President/CEO
PFMI
4164 Troy Highway
Montgomery, AL 36116

Dear Greg:

    This letter of intent will confirm our discussions as follows with respect to the proposed provision by Professional Facilities Management, Inc. (PFMI) to EMCOR Facilities Services (EFS) of certain facilities services (the "Services") at the Branch Banking and Trust (BB&T) branch facilities (the "Facilities").

    1.    EFS and PFMI shall promptly proceed to negotiate a mutually satisfactory definitive Contractor Agreement (the "Definitive Agreement"), based on PFMI's proposed scope and pricing, as incorporated in EFS' proposal to BB&T. The form of agreement (the "Form") attached hereto as Exhibit A shall be the basis for the negotiation of the Definitive Agreement. EFS and PFMI shall each be entitled to propose changes in the terms, conditions and pricing from those contained in the form. If EFS and PFMI fail to agree neither EFS nor PFMI shall be obligated to enter into any agreement with respect to the provision of Services.

    2.    The Contract for services between EMCOR Facilities Services, Inc and BB&T has been executed as of July 12, 2005. EFS and PFMI intend to execute a Definitive Agreement, which incorporates the applicable terms, conditions and pricing contained in such contract. It is anticipated that PFMI will begin to transition its services beginning July 12, 2005, with full implementation by September 6, 2005. PFMI hereby agrees on July 12, 2005 to commence providing facilities services to be mutually agreed upon by EFS and PFMI (the "Interim Services") at the Facilities. PFMI shall be paid for services provided during the this period, in accordance with the approved pricing provided by PFMI to EFS, payable monthly within 30 days of EFS' receipt of an invoice for such Interim Services. Notwithstanding the foregoing, until a Definitive Agreement is executed, either party may terminate such Interim Services at any time upon 30 days notice.



3.  This letter of intent constitutes the entire understanding of the parties hereto with respect to the subject matter hereof and supercedes all prior agreements or understandings between the parties with respect to such subject matter. This letter of intent shall be governed by the domestic substantive laws of the State of Virginia, without regard to conflicts of laws rules. This letter of intent may be signed in multiple counterparts, all of which shall constitute the same agreement.

4.  This letter of intent represents a non-binding statement of our intentions with respect to the provision of Services (other than Interim Services) and does not constitute a firm or final agreement or Definitive Agreement for the provision of the Services (other than Interim Services) by PFMI. No party shall be bound to the other with respect to the provision of Services (other than Interim Services) until a Definitive Agreement shall have been prepared, executed and delivered.

If the foregoing is in accordance with your understanding, please sign this letter of intent in the space provided below and return it to my attention by facsimile no later than July 18, 2005. Please also send an original executed counterpart of this letter to me by overnight courier. The proposal contained herein will expire unless we have received this letter of intent signed by you within the time period provided above or if sooner rejected.

Very truly yours,

**EMCOR FACILITIES SERVICES, INC.**

By:  _Deborah F. Crosby_

Name:  _Deborah F. Crosby_

Title:  _Vice President_

The foregoing is hereby confirmed
and agreed to by:

**PROFESSIONAL FACILITIES MANAGEMENT, INC.**

By:  _Greg D. Littlefield_

Name:  _Greg L Littlefield_

Title:  _CEU_

G:\DOC\DCARRIS.2005\EMCOR\PFMFLOI17_13_05.Final.doc

# Exhibit B

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

PROFESSIONAL FACILITIES
MANAGEMENT, INC.,

    Plaintiff,

                  CASE NUMBER
    vs.              2:06CV1136-MHT

EMCOR FACILITIES SERVICES,
INC.; and A, B, and C, as
fictitious parties,

    Defendants.


   *    *    *    *    *    *    *    *


    DEPOSITION OF GREG LITTLEFIELD,

taken pursuant to stipulation and

agreement before Barbara A. Howell,

Court Reporter and Commissioner for the

State of Alabama at Large, in the Law

Offices of Beasley, Allen, Crow,

Methvin, Portis & Miles, P.C., 250

Commerce Street, Montgomery, Alabama, on

Thursday, August 9, 2007, commencing at

approximately 9:25 a.m.

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

| | |
|---|---|
| **Page 2** | **Page 4** |

**Page 2**

1        APPEARANCES
2

FOR THE PLAINTIFF:

3

Ms. Scarlette M. Tuley
4   BEASLEY, ALLEN, CROW, METHVIN,
PORTIS & MILES, P.C.
5   Attorneys at Law
250 Commerce Street
6   Montgomery, Alabama 36104
7

FOR THE DEFENDANTS:

8

Mr. Benjamin H. Sawyer
9   SUTHERLAND, ASBILL & BRENNAN, LLP
Attorneys at Law
10   999 Peachtree Street, NE
Atlanta, Georgia 30309
11
12   ALSO PRESENT:
13   Mr. Jim Wohlers
14
15
16
17
18
19
20
21
22
23

**Page 4**

1        STIPULATIONS
2      It is hereby stipulated and agreed
3   by and between counsel representing the
4   parties that the deposition of GREG
5   LITTLEFIELD is taken pursuant to the
6   Federal Rules of Civil Procedure and
7   that said deposition may be taken before
8   Barbara A. Howell, Court Reporter and
9   Commissioner for the State of Alabama at
10   Large, without the formality of a
11   commission; that objections to questions
12   other than objections as to the form of
13   the questions need not be made at this
14   time but may be reserved for a ruling at
15   such time as the deposition may be
16   offered in evidence or used for any
17   other purpose as provided for by the
18   Federal Rules of Civil Procedure.
19      It is further stipulated and agreed
20   by and between counsel representing the
21   parties in this case that said
22   deposition may be introduced at the
23   trial of this case or used in any manner

| | |
|---|---|
| **Page 3** | **Page 5** |

**Page 3**

1       INDEX
2   EXAMINATION BY:       PAGE
3   MR. SAWYER........................   5
4

EXHIBITS       PAGE

5

JOINT EXHIBIT #14.................   64
6

JOINT EXHIBIT #15.................   65
7

JOINT EXHIBIT #16.................   85
8

JOINT EXHIBIT #17.................   145
9

JOINT EXHIBIT #18.................   173
10

JOINT EXHIBIT #19.................   177
11

JOINT EXHIBIT #20.................   180
12

JOINT EXHIBIT #21.................   183
13
14
15
16
17
18
19
20
21
22
23

**Page 5**

1   by either party hereto provided for by
2   the Federal Rules of Civil Procedure.
3
4    *   *   *   *   *   *   *   *
5
6       GREG LITTLEFIELD
7   The witness, having first been duly
8   sworn or affirmed to speak the truth,
9   the whole truth, and nothing but the
10   truth, testified as follows:
11      THE REPORTER: Usual
12      stipulations?
13      MS. TULEY: I'd like to read
14      and sign.
15      MR. SAWYER: Is it thirty
16      days?
17      MS. TULEY: I think.
18      EXAMINATION
19   BY MR. SAWYER:
20   Q. Good morning, Mr. Littlefield. My name
21   is Ben Sawyer. And I represent EMCOR
22   Facility Services. How do you do
23   today?

2 (Pages 2 to 5)

6c35e358-8cbe-4642-b782-f0632955f3c9

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 6

1  A. Good.
2  Q. Let me ask you, have you ever been
3     deposed before?
4  A. Once.
5  Q. What case was that?
6  A. It was a case where a competitor
7     claimed we took confidential
8     information to secure an account.
9  Q. Who was the competitor?
10 A. I could -- it was so long ago, I
11    couldn't tell you who it was. It was a
12    small company in LaGrange, Georgia.
13 Q. How long ago was the case?
14 A. I would assume probably seven, eight
15    years ago.
16 Q. You said you assume. Do you know
17    whether it was after 2000?
18 A. I don't know, without going back and
19    checking.
20 Q. But it was a company in LaGrange,
21    Georgia; correct?
22 A. Uh-huh.
23 Q. As I understand your testimony, it was

Page 7

1     a dispute concerning whether you had
2     taken -- or I'm sorry. Let me let you
3     explain it. What was the dispute
4     regarding?
5  A. I think I said dispute was regarding
6     the -- a company in LaGrange claimed we
7     took confidential information and used
8     it in order to gain a new account in
9     LaGrange. But the case never went to
10    court. His attorney dropped it after
11    the deposition.
12 Q. What confidential information did they
13    allege that you took?
14 A. Alleged that we knew his pricing and we
15    based our pricing on his pricing.
16 Q. So that you took his trade secrets or
17    he alleged that you took his trade
18    secrets?
19 A. Alleged we knew his price and undercut
20    his price. And as I stated, once the
21    deposition was completed, his attorney
22    dropped all charges.
23 Q. Was it a civil suit?

Page 8

1  A. I couldn't tell you.
2  Q. Do you know whether it was a criminal
3     suit?
4  A. I don't know.
5  Q. Was it you personally or was it your
6     present company, PFMI?
7  A. I would assume it was PFMI.
8  Q. Do you know one way or the other?
9  A. I don't.
10 Q. Were you personally ever indicted?
11 A. No. Explain "indicted."
12 Q. Charged with a crime.
13 A. No.
14 Q. With respect to this particular issue.
15 A. No.
16 Q. Was PFMI ever indicted?
17 A. No. As I said, it never went to court
18    and his attorney dropped all his
19    charges after the day of the
20    deposition.
21 Q. But it was an attorney for this
22    LaGrange company?
23 A. That's correct.

Page 9

1  Q. Was it a district attorney or was it an
2     officer of the state?
3  A. It was -- it was -- it was just his
4     company's attorney.
5  Q. Was there ever a settlement agreement
6     between this LaGrange, Georgia,
7     company?
8  A. No. It was never a proposed settlement
9     agreement.
10 Q. As you sit here today, to the best of
11    your recollection, that was
12    approximately six, seven years ago?
13 A. I believe that's what I said.
14 Q. But you don't recall whether you
15    personally were being sued or PFMI was
16    being sued?
17 A. Correct.
18 Q. Well, that's been a couple years ago,
19    so I'm going to refresh your
20    recollection as far as the rules of a
21    deposition. I know you sat here
22    yesterday and listened to Mr. Brookins
23    testify, and Ms. Tuley did a wonderful

3 (Pages 6 to 9)

6c35e358-8cbe-4642-b782-f0632955f3c9

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 10

1  job explaining those rules. But
2  everything today is being taken down by
3  the court reporter here; and as such,
4  we have to give verbal answers so that
5  it shows up on the record. Do you
6  understand that?
7  A. Yes.
8  Q. So I know in common -- when we're
9  having a conversation, we'll nod or
10  shake our head. On the record, we have
11  to say either yes, no, or provide a
12  verbal answer. Is that fair to you?
13  A. Yes.
14  Q. Is there anything today that would
15  prevent you from offering truthful and
16  accurate testimony?
17  A. Nothing.
18  Q. And you know it's important to tell the
19  truth today because the judge or, in
20  this case, the jury is ultimately going
21  to be relying on what you say.
22  A. Yes.
23  Q. I don't think I had you state your

Page 11

1  address. Could you please do that for
2  the record.
3  A. 860 Meriwether Road, Pike Road, Alabama
4  36064.
5  Q. Okay, Mr. Littlefield. What is your
6  education?
7  A. High school.
8  Q. Where did you go to high school?
9  A. Dixie Academy.
10  Q. Is that here in Alabama?
11  A. Uh-huh. Yes.
12  Q. Any education after high school?
13  A. No formal college.
14  Q. Have you taken any courses which teach
15  a particular skill?
16  A. No, other than just general business
17  through the companies I had worked for
18  in the past.
19  Q. Are those actual courses or just --
20  what are you saying?
21  A. Seminars, certificate programs.
22  Q. Did you give seminars or attend
23  seminars?

Page 12

1  A. I've done both.
2  Q. What are some of those seminars in
3  which you've participated?
4  A. In giving or receiving?
5  Q. In giving.
6  A. In giving? I've been a speaker at BOMA
7  International --
8  Q. Could you spell that?
9  A. B-O-M-A. That stands for Building
10  Owner Manager Association. -- at their
11  annual convention in Toronto, Canada.
12  I've spoken numerous times to upwards
13  of two thousand service companies on
14  behalf of BSCAI; that's Building
15  Service Contractors Association
16  International. I was on the board --
17  elected to the board of BSCAI and
18  served on that board for five years,
19  and was president of the national
20  association -- international
21  association -- in 2005.
22  Q. International Association of BSCAI?
23  A. BSCAI.

Page 13

1  Q. How long were you president?
2  A. One year. It's a one-year term.
3  Q. Where is that association actually
4  located?
5  A. It was located in Washington, D.C.,
6  Frederick, Maryland. And it's now
7  headquartered in Chicago.
8  Q. Other than what you've already
9  testified to, is there any other
10  training or experience, I guess, that
11  you've done in the last twenty years
12  related to facility services?
13     MS. TULEY: Object to form.
14  Q. You can answer.
15  A. Seminars through BSCAI and the building
16  service contracting industry would be,
17  you know, there again, numerous, almost
18  annually, CEO conferences to teach
19  proper skills of running this type of
20  business for -- attended annually for
21  seven years, eight years, every
22  January. In September for the last
23  eight or nine years, I've attended

4 (Pages 10 to 13)

6c35e358-8cbe-4642-b782-f0632955f3c9

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

| Page 14 | Page 16 |
|---|---|
| 1   executive management seminar through<br>2   BSCAI. For approximately eight or nine<br>3   years, I've attended an annual<br>4   convention where many seminars were<br>5   presented and sat in on those.<br>6   Q. And I believe you just said -- and the<br>7    record will say whatever it says -- but<br>8    that you actually presented to other<br>9    people, telling them how to run this<br>10   business. I assume you're referring to<br>11   the facility service business?<br>12 A. Facility service business.<br>13 Q. I'm not going to ask you to<br>14   recapitulate the seminar that you<br>15   presented. But to the best of your<br>16   recollection, what were some of the<br>17   topics you discussed when you gave this<br>18   seminar?<br>19 A. Plateaus of growth.<br>20 Q. What is that?<br>21 A. Growing a business from a small<br>22   business to a larger janitorial<br>23   business and different plateaus and | 1 A. Did I have?<br>2 Q. No. We're in the seminar. We'll get<br>3   to that later.<br>4 A. We would -- I would have to get the<br>5   book and see what the book said.<br>6 Q. Would it have been less than five?<br>7 A. Without -- without seeing what they<br>8   instructed, I could not tell you.<br>9 Q. I believe I stopped you at the one-<br>10   million-dollar level. What goes on<br>11   after that?<br>12 A. Well, it -- it went on through<br>13   different plateaus up to ten-million-<br>14   plus company.<br>15 Q. How many people attended the seminar?<br>16 A. Which one?<br>17 Q. The one we were just referring to where<br>18   you presented on how to run this<br>19   business. And I believe it was --<br>20   correct me, now, if I'm incorrect --<br>21   but I think it was the BSCAI.<br>22 A. Uh-huh.<br>23 Q. Okay. |

| Page 15 | Page 17 |
|---|---|
| 1   stages of that growth; supervision<br>2   seminars where you teach -- instruct<br>3   supervisors on how to manage people.<br>4 Q. Could you explain for me what plateaus<br>5   of growth are?<br>6 A. As a company starts, it's at one<br>7   plateau. As it grows from, say, a<br>8   company that's doing two hundred<br>9   thousand dollars a year revenue and<br>10   grows to a million, would be a plateau<br>11   and the company structure would change.<br>12   Then growing --<br>13 Q. Let me stop you right there. How would<br>14   it change?<br>15 A. By the number of people you would be<br>16   hiring, how you would start adding<br>17   management structure in your company,<br>18   becoming more of a one-man show, to<br>19   hiring managers to help manage.<br>20 Q. At the two thousand -- I guess the<br>21   one-million-dollar phase, the kind of<br>22   level you just gave, how many managers<br>23   did you have? | 1 A. This particular plateaus of growth<br>2   would have been in Atlanta for area<br>3   contractors in the Atlanta market and<br>4   would be approximately twenty-five to<br>5   thirty companies represented there.<br>6 Q. How many people were in the room, to<br>7   the best of your knowledge?<br>8 A. Best of my knowledge, twenty-five to<br>9   thirty.<br>10 Q. What were some of the contractors<br>11   around the Atlanta area that were<br>12   there?<br>13 A. I couldn't recall, couldn't tell you<br>14   that.<br>15 Q. Do you participate -- and I believe<br>16   you've mentioned some: BOMA, BSCAI.<br>17   Are there any other organizations that<br>18   you've recently been a part of or are<br>19   now?<br>20 A. No.<br>21 Q. Any civic organizations that you're a<br>22   part of?<br>23 A. No. |

5 (Pages 14 to 17)

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 18

1  Q. All right. After you finished high
2     school -- well, let me back up. Please
3     tell me your first work experience.
4  A. My first work experience?
5  Q. Mine was in a cotton mill. So go
6     ahead.
7  A. Was pulling weeds out of a peanut
8     field.
9  Q. Were you in Georgia, sir?
10 A. No. I was in Alabama.
11       (Brief phone interruption)
12 Q. After pulling weeds, what did you do,
13    sir?
14 A. Well, I went back to school. That was
15    about the fourth or fifth grade, I
16    guess.
17 Q. After high school, what was your first
18    work experience?
19 A. My first job after high school was with
20    Coca-Cola Bottling Company, for
21    approximately five years.
22 Q. What did you do for Coke?
23 A. I was a route salesman.

Page 19

1  Q. Did you work out of Atlanta?
2  A. Worked out of Dothan, Alabama, which I
3     think reported to Atlanta.
4  Q. Why did you leave Coke?
5  A. To further advance my opportunities in
6     sales with a 3M distributor.
7  Q. What did you do for 3M?
8  A. I was a salesman for the first couple
9     of years.
10 Q. Were you still in Dothan, Alabama?
11 A. Yes.
12 Q. And I believe you just testified that
13    for the first couple of years, you were
14    a salesman. What products were you
15    selling?
16 A. Office equipment.
17 Q. Did your role at 3M ever change?
18 A. It did.
19 Q. How did it change?
20 A. It changed from a salesman to a sales
21    manager.
22 Q. So you got a promotion?
23 A. Yes.

Page 20

1  Q. How many people did you manage?
2  A. To begin with, approximately five to
3     six.
4  Q. Did it increase?
5  A. Once I got another promotion, it did.
6  Q. So after you were -- after your
7     position as sales manager, you were
8     promoted; correct?
9  A. Correct.
10 Q. What was your position after that?
11 A. I was promoted to a district branch
12    manager here in Montgomery, Alabama.
13 Q. What was the scope of your job
14    responsibilities as district branch
15    manager in Montgomery, Alabama?
16 A. Can I back up?
17 Q. Sure.
18 A. There's a stop in between.
19 Q. Sure.
20 A. My next stop was district sales
21    manager, and that was in Nashville,
22    Tennessee. Then promoted to
23    Montgomery, Alabama, as district branch

Page 21

1     manager.
2  Q. As district sales manager in Nashville,
3     what was your job?
4  A. To manage a larger sales organization.
5  Q. And as district branch manager, when
6     you came back to or -- I'm sorry -- you
7     went to Montgomery, what was your job?
8  A. District branch manager.
9  Q. What did that involve?
10 A. It involved managing sales, service,
11    and administration.
12 Q. How many people did you manage?
13 A. Approximately forty to fifty.
14 Q. And that's essentially just selling 3M
15    products?
16 A. Right. Correct.
17 Q. How long were you district branch
18    manager in Montgomery?
19 A. Approximately one year.
20 Q. Did you leave 3M?
21 A. No. I had an opportunity to move with
22    the 3M distributor to Columbus, Ohio,
23    to manage a larger market.

6 (Pages 18 to 21)

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

| Page 22 | Page 24 |
|---|---|
| 1  Q. Who was the distributor? | 1    structure in which I was paid, to |
| 2  A. 3M.  Oh, Modern Office Methods is the | 2    change the structure, which would |
| 3     name of the distributor, which was the | 3    decrease my income. |
| 4     same as in all the other locations. | 4  Q. How did they change the structure?  Let |
| 5  Q. What was your job in Columbus? | 5    me give you, I guess, a little |
| 6  A. I was a branch manager there, also, but | 6    foundation.  Was it based on bonuses |
| 7     a much larger market. | 7    and were they taking those away? |
| 8  Q. Were you a district branch manager in | 8  A. It was based on -- the pay program was |
| 9     Columbus? | 9    based on the increase in sales that I |
| 10  A. Branch manager.  District branch | 10   generated for them over the previous |
| 11    manager was the title, was the same. | 11   year, and it was also based on net |
| 12  Q. Was it a lateral move or was it a | 12   profit that I produced.  And they were |
| 13    demotion? | 13   going to change that to a lower |
| 14  A. It was a lateral move but a much larger | 14   percentage. |
| 15    market and a start-up market for this | 15  Q. At Berney's Office Automation -- am I |
| 16    company. | 16   saying that correctly? |
| 17  Q. How big was the market? | 17  A. Uh-huh. |
| 18  A. Compared to? | 18  Q. I believe you testified you were a |
| 19  Q. Well, you testified that it was a much | 19   sales manager? |
| 20    larger market. | 20  A. Correct. |
| 21  A. Well, Columbus, Ohio, and the | 21  Q. How many people did you manage? |
| 22    surrounding areas are much larger than | 22  A. Approximately eight. |
| 23    Montgomery, Alabama. | 23  Q. What was the scope of your |

| Page 23 | Page 25 |
|---|---|
| 1  Q. Population-wise? | 1    responsibilities at this new job? |
| 2  A. Yes.  Business-wise. | 2  A. Managing salespeople and ultimately |
| 3  Q. How long did you work in Columbus? | 3    production of -- sales. |
| 4  A. About a year and a half. | 4  Q. And I assume by the name, it's office |
| 5  Q. What was your next employment? | 5    supplies? |
| 6  A. It was -- moved back to Montgomery, | 6  A. Equipment. |
| 7     Alabama.  I was employed with another | 7  Q. What kind of equipment? |
| 8     office products distributor in | 8  A. Copiers, fax, computers, laser |
| 9     Montgomery. | 9    printers, shipping systems. |
| 10  Q. Who was that? | 10  Q. How long did you work for Berney's? |
| 11  A. Berney Office Automation. | 11  A. Approximately four years. |
| 12  Q. What was your job title at Berney | 12  Q. Why did you leave? |
| 13    Office Automation? | 13  A. To start my own business. |
| 14  A. My job title was sales manager. | 14  Q. What business did you start? |
| 15  Q. Back up for a second.  Why did you | 15  A. I started a moving -- local moving and |
| 16    leave Columbus, Ohio? | 16   storage business and also a janitorial |
| 17  A. Because I was making too much money and | 17   business. |
| 18    the company was going to change my pay | 18  Q. Did you do this with anybody else? |
| 19    plan. | 19  A. No. |
| 20  Q. And when you say you were making too | 20  Q. Did it all by yourself? |
| 21    much money, they were going to decrease | 21  A. Well, I -- the company was -- was -- I |
| 22    the amount of money that you received? | 22   mean, I had no partner. |
| 23  A. They were going to decrease the | 23  Q. And there were two companies; correct? |

7 (Pages 22 to 25)

6c35e358-8cbe-4642-b782-f0632955f3c9

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 26

1   A. Correct.
2   Q. Why a moving and storage business?
3   A. Because the opportunity presented
4      itself at the right time.
5   Q. What was that opportunity and how did
6      it present itself to you?
7   A. There was a local -- small local
8      company for sale, and I knew it would
9      give instant cash flow.
10  Q. How did you know that?
11  A. Well, you -- you move someone from one
12     house to another house in the same day
13     and when you get done, they pay you.
14  Q. How much did you pay for the business?
15  A. I don't -- I don't recollect.
16  Q. Was it ten million dollars?
17  A. It was not two million dollars.
18  Q. Ballpark, was it a hundred thousand
19     dollars?
20  A. Ballpark, sixty thousand.
21  Q. And you also testified that you started
22     a janitorial business.
23  A. Right. Correct.

Page 27

1   Q. How did that opportunity present itself
2      to you?
3   A. Small local company for sale.
4   Q. And I tracked the years a little bit,
5      but in time, what year are we when you
6      left --
7   A. We are in approximately June-July of
8      '89.
9   Q. Let me back you up for a second. I
10     know we talked about your education and
11     you've given seminars and you've
12     completed high school. Have you ever
13     taken any accounting classes?
14  A. No formal accounting classes.
15  Q. Any informal accounting classes?
16  A. None other than through -- through
17     business being taught, how to put
18     together budgets, how to read P&Ls and
19     manage a profit and loss statement. As
20     I told you, that's how I was paid
21     through most of these jobs.
22  Q. Jobs as sales manager?
23  A. As sales -- primarily as the branch

Page 28

1      managers, because I was paid based on a
2      profit and loss.
3   Q. Going back up to, I guess, your job
4      when you were sales manager, what kind
5      of documents, I guess, would you have
6      to review in order to complete your
7      job? Strike that. That's a pretty --
8      let me form a better question for you.
9         When you were a branch sales
10     manager, at the end of the day, was it
11     your job to analyze how the business
12     was doing?
13  A. No.
14  Q. Whose job would that have been?
15  A. At the end of the day?
16  Q. Yes.
17  A. I'm not sure that at the end of each
18     day you can analyze how the business
19     was doing.
20  Q. But you said that you reviewed profit
21     and loss statements; correct?
22  A. Yes. As a district or branch manager.
23  Q. Did you review any other statements as

Page 29

1      a business or -- I'm sorry -- a branch
2      manager?
3   A. As a branch manager?
4   Q. Yes.
5   A. Any other statements, any other -- I
6      don't understand what you're asking.
7   Q. Sure. Did you review accounts payable?
8   A. Yes.
9   Q. Did you review accounts receivable?
10  A. Yes.
11  Q. Did you review general ledgers?
12  A. Yes.
13  Q. Was it within the scope of your
14     responsibility to deal with those
15     documents?
16  A. As district branch manager, there was
17     administrative people that reported
18     that information to me.
19  Q. They reported it to you. Did you
20     report to anyone else concerning
21     accounts payable, accounts receivable,
22     general ledger?
23  A. All -- yes. All that was set up

8 (Pages 26 to 29)

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

| Page 30 | Page 32 |
|---|---|
| 1   electronically in the corporate office;<br>2   was reported there on a daily, weekly,<br>3   monthly basis.<br>4   Q. Prior to buying the -- by the way, what<br>5      was the name of the moving company?<br>6   A. First Class Movers.<br>7   Q. What was the name of the janitorial<br>8      company you bought?<br>9   A. Mr. Janitor.<br>10  Q. Do you recall who you bought it from?<br>11  A. I believe the gentleman's name was<br>12     Darrell Acord, Acord.<br>13  Q. Prior to buying this, had you ever had<br>14     any involvement with janitorial<br>15     services?<br>16  A. I had not.<br>17  Q. Prior to your purchasing of<br>18     Mr. Janitor, had you ever prepared bids<br>19     or estimates concerning janitorial<br>20     services?<br>21  A. I had not.<br>22  Q. And I believe you bought this in 1989;<br>23     correct? | 1   A. That's correct.<br>2   Q. What was your annual revenue, I guess,<br>3      in 1989?<br>4   A. Approximately thirty thousand annually.<br>5   Q. Were they primarily around the<br>6      Montgomery area?<br>7   A. Yes.<br>8   Q. What became of the moving and storage<br>9      business, first?<br>10  A. I sold it after approximately three to<br>11     four years.<br>12  Q. What became of the janitorial -- what<br>13     became of the janitorial business that<br>14     you bought?<br>15  A. It's now known as Professional<br>16     Facilities Management, Inc.<br>17  Q. When did you change the name?<br>18  A. Approximately within the first six<br>19     months.<br>20         MR. SAWYER: Off the record.<br>21         (Off-the-record discussion)<br>22         MR. SAWYER: Back on.<br>23  A. I need a restroom break. |

| Page 31 | Page 33 |
|---|---|
| 1   A. That's correct, thereabout.<br>2   Q. How much did you pay for it?<br>3   A. Approximately fifty to sixty thousand.<br>4   Q. How many employees did it have at that<br>5      time?<br>6   A. Best of my recollection, four or five<br>7      part-time cleaners.<br>8   Q. In the purchase, did you buy their<br>9      accounts receivable?<br>10  A. No.<br>11  Q. Did you purchase their client list?<br>12  A. The contracts that the company had in<br>13     place and the revenue stream went --<br>14     went to me, yes.<br>15  Q. Did you hire any management at that<br>16     time?<br>17  A. No.<br>18  Q. Did you handle it yourself?<br>19  A. That's correct.<br>20  Q. Were these direct -- these four, I<br>21     guess, five part-times, were these<br>22     direct employees to Mr. Janitor, your<br>23     new company? | 1   Q. While we're still on the record, any<br>2      time you need a break, just let me<br>3      know.<br>4         (Brief recess)<br>5         MR. SAWYER: Back on the<br>6      record.<br>7   Q. I believe where we were headed,<br>8      Mr. Littlefield, is you had just<br>9      purchased a janitorial company and<br>10     renamed it PFMI; is that correct?<br>11  A. That's correct.<br>12  Q. And that's the same PFMI that's the<br>13     plaintiff in this action; correct?<br>14  A. Correct.<br>15  Q. What types of projects does PFMI<br>16     perform?<br>17  A. What type of projects does PFMI<br>18     perform? We perform janitorial,<br>19     landscape, general maintenance<br>20     projects.<br>21  Q. Do you do HVAC work?<br>22  A. We subcontract HVAC work.<br>23  Q. How many current employees does PFMI |

9 (Pages 30 to 33)

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 34

1   have?
2   A. Current employees?
3   Q. Yes.
4   A. Approximately -- and I don't keep up
5      with this on a day-to-day basis. It
6      depends on how contracts -- you know,
7      the number of contracts you have at the
8      time. But I would assume the six
9      hundred range, direct employees.
10  Q. And those are paid by PFMI?
11  A. That's correct.
12  Q. How many states?
13  A. Those direct employees would be in
14     approximately five or six states.
15  Q. And I don't think I did this yet, but
16     for the record, what's your position
17     with PFMI?
18  A. My position is president/CEO.
19  Q. Have you always been president and CEO?
20  A. That's correct.
21  Q. Since 1989?
22  A. That's correct.
23  Q. What are your job responsibilities for

Page 35

1   PFMI?
2   A. My job responsibility would be to
3      oversee the -- the company as a whole
4      at a top level.
5   Q. What's involved with that?
6   A. It's having regular meetings with VPs,
7      reviewing budgets and P&Ls, and
8      occasionally cleaning a toilet if it
9      needs to be done.
10  Q. Anything else?
11  A. No. Well, let me back up. It could be
12     other things as -- as they come up, but
13     to name everything, I couldn't name
14     everything.
15  Q. Would you also try to get business?
16  A. Would I try to get business? Our
17     company would, yes.
18  Q. Are you involved with sales?
19  A. I'm involved to some part all aspects
20     of the business. But yes, I'm -- I
21     also would be involved in the sales
22     side.
23  Q. Were you involved with obtaining the

Page 36

1   contract with EMCOR?
2   A. Yes, I was.
3   Q. How were you involved?
4   A. I was the direct contact.
5   Q. By "direct contact," what do you mean?
6   A. I was -- I was the direct person that
7      dealt with EMCOR on the initial process
8      of being selected and putting together
9      an agreement with EMCOR.
10  Q. Who at EMCOR did you deal with?
11  A. I dealt with -- who did I deal with,
12     who did I have contact with?
13  Q. Sure. Who did you have contact with at
14     EMCOR related to the BB&T account?
15  A. Okay. I had contact with Alan Cristal.
16     I had contact with Debi Crosby, which
17     was Alan Cristal's boss or which was
18     the -- who was the head of this BB&T
19     project. I dealt with Mark Smith and
20     also had contact with Bill Rogers.
21  Q. Anyone else from EMCOR?
22  A. There could have been other -- there
23     was other people on their team, but I

Page 37

1   couldn't, you know, recall the names.
2   Q. So there could have been other people,
3      but you just don't remember right now?
4   A. There was other people.
5   Q. There were other people that --
6   A. There were other people that I would
7      have had contact. But specific names,
8      I -- at this time -- these were the
9      major -- major players.
10  Q. How did you first hear about the BB&T
11     account?
12  A. We were contacted by Alan Cristal.
13  Q. When was that?
14  A. If my -- it would have been
15     approximately January-February of '05.
16     Have I got that year correct? '05.
17  Q. How did he contact you?
18  A. By phone, I believe, the first time.
19  Q. What did he say?
20  A. I can't recall the actual conversation,
21     but obviously it was to ask us to -- if
22     we'd be interested in a possible
23     project that EMCOR would possibly have

Page 38

1  coming up. The first conversation, I
2  don't think they knew for sure if they
3  were going to be selected to bid or
4  not.
5  Q. How do you know Alan Cristal or --
6  strike that. Did you know Alan Cristal
7  before he called you in January-
8  February '05?
9  A. I had met Alan and had conversation
10  with him before then.
11  Q. When did you first meet Alan Cristal?
12  A. There again, approximately maybe a year
13  before.
14  Q. Prior to Alan Cristal calling you in
15  January-February of 2005, did you ever
16  employ him?
17  A. No.
18  Q. Did you ever later employ him?
19  A. Yes.
20  Q. How did you meet him to begin with?
21  A. I believe it was through one of our
22  managers, Buz Campbell, that they
23  somehow met in the field and actually

Page 39

1  worked a bid -- a couple of accounts
2  together.
3  Q. At that time, was Mr. Cristal, to your
4  knowledge, employed by EMCOR?
5  A. To my knowledge, he was.
6  Q. And I believe you just testified that
7  you met Mr. Cristal with Buz
8  Campbell --
9  A. Through Buz Campbell, one of our
10  managers.
11  Q. Is Buz Campbell currently a manager for
12  PFMI?
13  A. He is.
14  Q. Did you ever have any dealings with
15  Alan Cristal after you met him
16  approximately a year ago and before
17  he -- I'm sorry. Strike that. Did you
18  ever have any dealings with Alan
19  Cristal after you met him and before he
20  contacted you regarding the BB&T
21  account?
22  A. Yes. I believe I stated that -- that
23  Buz and Alan worked on a couple or

Page 40

1  several bids together.
2  Q. But my question was a little different.
3  It was whether you did, whether you had
4  dealings with Alan after meeting him
5  and before him contacting you about the
6  BB&T account.
7  A. I would have had dealings, yes,
8  through -- through Buz or at
9  presentations that was given to these
10  possible bids.
11  Q. What were the bids that you and Alan
12  Cristal and Buz Campbell worked on with
13  Alan Cristal?
14  A. Could we say bids or presentations?
15  Q. Fare enough.
16  A. One particular was Russell Corporation.
17  And others by name, I -- I couldn't
18  recall.
19  Q. What was the contract or -- I'm
20  sorry -- proposal amount for the
21  Russell Corporation bid or proposal?
22  A. I don't think we ever got to a bid. We
23  gave a presentation and they elected

Page 41

1  not to pursue.
2  Q. Were you ever awarded any other
3  contracts in conjunction with
4  Mr. Cristal prior to him contacting you
5  in January-February of 2005?
6  A. No.
7  Q. So after Mr. Cristal contacted you in
8  January-February of 2005 regarding the
9  BB&T account, what happened next?
10  A. At some point, we were -- we were
11  contacted again and was asked if we
12  would be interested in putting --
13  putting together a quote for them. And
14  it was explained to us it was -- the
15  approximate number of locations,
16  approximate number of square footage,
17  that the janitorial part of it was a
18  very important piece, and that they had
19  lost -- had not gained several
20  contracts because they were not
21  competitive enough on the janitorial
22  side, and asked us to research the
23  market, see what banks on average were

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

| Page 42 | Page 44 |
|---|---|
| 1   paying, what other contractors were | 1   handicap contracts, you really don't |
| 2   doing, and to put together a proposed | 2   have to provide a competitive price? |
| 3   program. | 3   A. I don't think I said that. |
| 4   Q. I believe -- and the record will show | 4   Q. I want to make sure I'm clear. |
| 5   what it shows. But I believe you just | 5   A. I said for set-aside contracts for |
| 6   said that you came to an understanding | 6   those particular groups. |
| 7   that EMCOR informed you that the | 7   Q. So for set-aside contracts for the |
| 8   janitorial component was important. Is | 8   government; right? |
| 9   that a fair statement? | 9   A. Certain government contracts set aside, |
| 10  A. They informed me that they had not | 10  yes. |
| 11  gained business because they were not | 11  Q. And for set-aside contracts for |
| 12  competitive enough and needed to put | 12  minorities, your price doesn't have to |
| 13  together a very competitive janitorial | 13  be competitive; right? |
| 14  program -- | 14  A. It doesn't matter what your price is if |
| 15  Q. Who informed you that? | 15  you don't fall into those categories to |
| 16  A. -- in terms of pricing. Alan Cristal. | 16  get -- to get the business. |
| 17  Q. Alan Cristal informed you that the | 17  Q. Okay. |
| 18  pricing had to be competitive; correct? | 18  A. And that could probably be better |
| 19  A. Correct. | 19  explained by calling a government |
| 20  Q. Are you aware of other projects where | 20  agency and procurement and gathering |
| 21  the pricing does not have to be | 21  that information. |
| 22  competitive? | 22  Q. I'm sorry. I'm just trying to |
| 23  A. Yes. | 23  understand. If you do a -- if you do a |

| Page 43 | Page 45 |
|---|---|
| 1   Q. What projects? | 1   proposal for a set-aside contract for |
| 2   A. 8(a) stand-alone. | 2   the government, right, are you saying |
| 3   Q. Sorry. What's 8(a)? | 3   it doesn't have to be competitively |
| 4   A. It's set-aside contracts. | 4   bid? |
| 5   Q. What are set-aside contracts? | 5   A. I'm saying I can bid it cheaper or more |
| 6   A. That would be contracts that would be | 6   competitive and not be able to secure |
| 7   set aside for special groups. | 7   that business because it was a set- |
| 8   Q. I'm sorry. You've forgotten more than | 8   aside contract, yes. |
| 9   I'll ever know about set-aside | 9   Q. So you could bid it cheaper? What do |
| 10  contracts. Could you explain what | 10  you mean by that? |
| 11  exactly that is? | 11  A. Less price. |
| 12  A. Well, we don't -- we don't have any. | 12  Q. Wouldn't that be more competitive? |
| 13  But I'll explain to the best of my | 13  A. Yeah. I would be more competitive and |
| 14  knowledge. It's contracts that | 14  not get it. |
| 15  possibly the government would set aside | 15      MS. TULEY: Off the record. |
| 16  for minority groups; and in some cases, | 16      (Off-the-record discussion) |
| 17  even large corporations set aside | 17      MR. SAWYER: Go back on the |
| 18  certain portions of their business to | 18      record. |
| 19  go to minorities and handicapped/ | 19  Q. (By Mr. Sawyer) So we're clear, with |
| 20  disability companies. In these cases, | 20  respect to set-aside contracts, I |
| 21  oftentimes they pay -- pay more than | 21  believe your point is that no matter |
| 22  the competitive price. | 22  how competitive you bid it for |
| 23  Q. So for government, minority, or | 23  government contracts, minority |

12 (Pages 42 to 45)

6c35e358-8cbe-4642-b782-f0632955f3c9

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

| Page 46 | Page 48 |
|---|---|
| 1   contracts, or handicapped or disabled | 1   have been a company called Kimco out of |
| 2   or people-with-disabilities contracts, | 2   Chicago. |
| 3   no matter how competitive you bid it, | 3   Q. The BB&T account, to the best of your |
| 4   you're likely or may not get the | 4   recollection, how many locations were |
| 5   contract. Is that a fair statement? | 5   in Illinois? |
| 6   A. That's a fair statement with a set- | 6   A. I don't believe any were in Illinois. |
| 7   aside contract. | 7   Q. Who else did you contact regarding -- |
| 8   Q. For other contracts, to the best of | 8   or what were the other regional |
| 9   your knowledge, you almost always have | 9   janitorial companies that you |
| 10  to competitively bid them; correct? | 10  contacted? |
| 11  A. Competitively, yes. | 11  A. We contacted a company by the name of |
| 12  Q. Because in order to get the work, your | 12  4M -- |
| 13  price has to be lower than the other | 13  Q. Where are they out of? |
| 14  guy; correct? | 14  A. Based out of St. Louis. -- and |
| 15      MS. TULEY: Object to form. | 15  gathered what their average price for |
| 16  A. No, that's incorrect. | 16  bank cleaning was. |
| 17  Q. Explain. | 17  Q. Did you contact anyone else? |
| 18  A. Your price does not always have to be | 18  A. We contacted a company out of Michigan. |
| 19  lower. | 19  Q. What was that company's name? |
| 20  Q. In most cases, it would have to be | 20  A. New Image. |
| 21  lower; correct? | 21  Q. Anyone else? |
| 22  A. Not if -- not if you showed value and | 22  A. Contacted a company by the name of |
| 23  they chose to choose you over the value | 23  Varsity. |

| Page 47 | Page 49 |
|---|---|
| 1   that you're presenting. | 1   Q. Where are they located? |
| 2   Q. Do you have a general practice of not | 2   A. Their corporate based out of Pocatello, |
| 3   competitively bidding your prices? | 3   Idaho. |
| 4   A. We generally bid based on our cost and | 4   Q. Did you contact anyone else? |
| 5   an average markup. | 5   A. We contacted a company out of |
| 6   Q. And when you bid based on your cost and | 6   Maryland/D.C. market by the name of |
| 7   your actual markup, do you find that | 7   Mr. Clean. |
| 8   those are competitive or not | 8   Q. No relation to Mr. Janitor? |
| 9   competitive prices? | 9   A. No relation. |
| 10  A. Generally competitive. | 10  Q. Anyone else? |
| 11  Q. After Mr. Cristal contacted you | 11  A. We contacted a company by the name of |
| 12  regarding the opportunity to | 12  FMI. |
| 13  potentially work on the BB&T account, | 13  Q. Where are they located? |
| 14  did you start -- what did you do? | 14  A. Their home base now is in Charlotte -- |
| 15  A. We started contacting other regional | 15  no -- Charleston, South Carolina. |
| 16  janitorial companies that were very | 16  Q. Have you been sued by FMI? |
| 17  reputable in the industry and | 17  A. No. |
| 18  surveying, based on the business they | 18  Q. Have you reached any settlement |
| 19  were doing, what the average bank -- | 19  agreements with FMI? |
| 20  bank cost was for janitorial cleaning. | 20  A. Yes. |
| 21  Q. Who were those other regional | 21  Q. When did you reach a settlement |
| 22  janitorial companies? | 22  agreement with FMI? |
| 23  A. I believe some -- some of those would | 23  A. I would say approximately three -- |

13 (Pages 46 to 49)

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

| Page 50 | Page 52 |
|---|---|
| 1  three months ago. | 1  check and we'll have a |
| 2  Q. Did you receive assignment of any | 2  discussion as to whether |
| 3  claims of FMI? | 3  we'll produce them or |
| 4  A. I'm -- I don't know. | 4  they'll be produced or |
| 5  Q. How much did you pay FMI under the | 5  we can, I guess, go to |
| 6  terms of the settlement? | 6  the judge. |
| 7  A. I would have to refer to whatever | 7  MS. TULEY:  I can check with |
| 8  documentation we have on that. | 8  their corporate |
| 9  Q. Was it more than ten thousand dollars? | 9  attorney -- that is not |
| 10  A. Yes, it would be. | 10  something I have |
| 11  Q. Was it more than a hundred thousand | 11  handled -- and see what |
| 12  dollars? | 12  the status is on those |
| 13  A. I would assume it would be. | 13  and confer with him on |
| 14  Q. Do you know one way or -- you believe | 14  whether or not those can |
| 15  it's more than one hundred thousand | 15  be disclosed or not. |
| 16  dollars? | 16  And then I'll report |
| 17  A. Yes. | 17  back to you on whether |
| 18  MR. SAWYER:  Off the record. | 18  or not that information |
| 19  (Off-the-record discussion) | 19  can be disclosed. |
| 20  MR. SAWYER:  Back on the | 20  MR. SAWYER:  Appreciate |
| 21  record. | 21  that. |
| 22  Q. Do you recall one way or the other | 22  Q. (By Mr. Sawyer) After you contacted FMI |
| 23  whether the settlement agreement was | 23  concerning prices in the region, did |

| Page 51 | Page 53 |
|---|---|
| 1  confidential? | 1  you contact -- |
| 2  A. I do not. | 2  A. Now, I didn't say it was pricing in the |
| 3  (Brief pause) | 3  region. I said contacted regional |
| 4  Q. Have you entered into any other | 4  companies to -- because some of these |
| 5  settlement agreements with vendors? | 5  are more than just regional companies; |
| 6  A. At this point, we do have verbal or | 6  some of these are national companies -- |
| 7  written agreement with all our vendors, | 7  to get a good feel of national pricing. |
| 8  to the best of my knowledge. | 8  Q. And this national pricing for what? |
| 9  Q. How much has PFMI paid these vendors as | 9  A. For banking. |
| 10  a result of settlement negotiations? | 10  Q. Did you contact anyone else? |
| 11  A. I -- I couldn't tell you without | 11  A. There could have been others that, you |
| 12  reflecting back, going back to our | 12  know, offline that I had talked to, but |
| 13  documentation. | 13  none that I specifically know that I |
| 14  MR. SAWYER:  And I guess I | 14  called and asked specifically about |
| 15  should cut this short. | 15  that. |
| 16  I conferred with | 16  Q. So far you've contacted Kimco.  And |
| 17  counsel, and she's going | 17  I've got K-I-M-C-O? |
| 18  to check regarding the | 18  A. (Witness nodded.) |
| 19  status of these.  And to | 19  Q. 4M? |
| 20  the extent they're -- | 20  A. (Witness nodded.) |
| 21  whatever portion is | 21  Q. New Image? |
| 22  nonconfidential, it is | 22  A. (Witness nodded.) |
| 23  my understanding you'll | 23  Q. Varsity? |

14  (Pages 50 to 53)

6c35e358-8cbe-4642-b782-f0632955f3c9

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

| Page 54 |
| --- |

1  A. (Witness nodded.)
2  Q. Mr. Clean?
3  A. (Witness nodded.)
4  Q. FMI?
5  A. (Witness nodded.)
6  Q. And there could be others; but as you
7     sit here today, you don't recall
8     others?
9  A. Right.
10 Q. Did anyone assist you in this endeavor?
11 A. No.
12 Q. So Greg Littlefield made all the calls
13    to these people?
14 A. Yeah.
15 Q. What time frame were these calls made?
16 A. I'm assuming it would have been in
17    February-March-April time frame, plus
18    or minus a week or so.
19 Q. What information did you obtain from
20    them? And when I say "them," I'm
21    referring to other regional janitorial
22    companies that you contacted.
23 A. I asked them what type of book of

| Page 55 |
| --- |

1     business -- most of these I contacted
2     because I knew they had -- had or
3     previously had a large amount of branch
4     bank locations.
5  Q. And by "book of business," what do you
6     mean?
7  A. That they were cleaning or managing the
8     cleaning of branch -- branch banks.
9  Q. How did they price the work? And when
10    I say "they," I'm referring to -- can
11    we have an agreement that I'm referring
12    to these companies that you contacted
13    after receiving notice that you might
14    be involved with the -- or might have
15    the opportunity to be involved with the
16    BB&T account?
17 A. Most of it was broken down to come out
18    to a monthly -- monthly amount per --
19    per branch, which could come back to a
20    square-footage price.
21 Q. When you say "could come back to a
22    square-footage price," could you
23    explain that for me?

| Page 56 |
| --- |

1  A. Well, any time you -- if you take X
2     amount per month and divide it by the
3     square footage of the building, it
4     gives you the square-foot price.
5  Q. What is your understanding of gross
6     square footage?
7        MS. TULEY: Object to form.
8  A. Total square footage.
9  Q. How long have you worked in this
10    industry?
11 A. I think the record reflects since '89.
12 Q. I'm sorry. Higher math. I guess
13    eighteen years now?
14 A. (Witness nodded.)
15 Q. How do you calculate gross square
16    footage? Do you just take the
17    footprint of the building?
18 A. Yes.
19 Q. Is that from exterior wall or interior
20    wall?
21 A. Exterior.
22 Q. Do you have an understanding of what
23    net cleanable square footage is? Well,

| Page 57 |
| --- |

1     let me first ask you, have you ever
2     heard that term before?
3  A. Yes.
4  Q. What does that term mean as you
5     understand it?
6  A. Net cleanable can -- can mean different
7     things to different people. But the
8     net amount of space that is cleanable.
9  Q. What's the difference between gross
10    square footage and net cleanable square
11    footage?
12 A. Could be an empty floor in a building,
13    that you never went into.
14 Q. Any other differences?
15 A. Could be partial empty floor.
16 Q. Anything else?
17 A. No.
18 Q. So when you contacted these other
19    regional janitorial companies, they
20    were essentially giving you -- and
21    correct me if I misstate anything --
22    average cost per unit per month?
23 A. Well, they gave me their average

15 (Pages 54 to 57)

6c35e358-8cbe-4642-b782-f0632955f3c9

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

| Page 58 | Page 60 |
|---|---|
| 1  charge. And it could have come to me<br>2  in different ways. But I assimilated<br>3  it to come up with an average parameter<br>4  of -- to see what the market was<br>5  paying.<br>6  Q. And by "the market," what are you<br>7  referring to?<br>8  A. Just what -- what these groups -- what<br>9  would be competitive for cleaning<br>10  branch banks.<br>11  Q. Nationally?<br>12  A. Yes. And there's also publications<br>13  from BOMA that would indicate square --<br>14  average square-foot prices for -- for<br>15  certain types of buildings.<br>16  Q. Did you consult any publications from<br>17  BOMA when you were doing this exercise?<br>18  A. I did but I don't think I found branch<br>19  banks specifically in their<br>20  publications.<br>21  Q. On other projects, do you ever have<br>22  occasion to rely on publications from<br>23  BOMA? | 1  A. To the best of my recollection, as far<br>2  as the square-foot number, I -- I --<br>3  obviously with our -- the price that we<br>4  arrived at, it was competitive in what<br>5  I received back from them.<br>6  Q. Was it unusual that they would just<br>7  provide the -- strike that.<br>8  Did you find it unusual that<br>9  they would just provide their pricing<br>10  for branch banking installations?<br>11  A. Well, they didn't give me the names of<br>12  installations.<br>13  Q. What did they give you?<br>14  A. Just how they would price branch banking<br>15  locations.<br>16  Q. How would they price it?<br>17  A. Some was a flat monthly charge. Some<br>18  was based on square footage, which I<br>19  think I stated earlier which -- either<br>20  a monthly charge, you can turn that<br>21  back into a square-footage charge to<br>22  check the average square foot per, you<br>23  know, locations out there. |

| Page 59 | Page 61 |
|---|---|
| 1  A. Not rely on publications from BOMA, no.<br>2  Q. Is it a good source of information?<br>3  A. It's information that -- it's a source<br>4  of information that we don't readily<br>5  use.<br>6  Q. But in this case, you did consult it?<br>7  A. I didn't say I consulted it. We<br>8  checked it.<br>9  Q. But you didn't find anything concerning<br>10  branch banks; right?<br>11  A. Correct.<br>12  Q. Well, after you conducted this exercise<br>13  regarding contacting other regional<br>14  janitorial companies, what did you do<br>15  next?<br>16  A. I think we probably didn't do anything<br>17  till we received information from EMCOR<br>18  in regards to the bid.<br>19  Q. Let me back up one second. What was<br>20  the -- what were some of the numbers<br>21  you were getting back from these<br>22  individuals or these firms, to the best<br>23  of your recollection? | 1  Q. How did you use that information?<br>2  A. To see how competitive we would have to<br>3  be to put together a competitive<br>4  pricing program for EMCOR.<br>5  Q. And do you recall --<br>6  A. Based on their request.<br>7  Q. I'm sorry. I didn't know that you<br>8  weren't finished.<br>9  A. Yeah.<br>10  Q. Do you recall the numbers you were<br>11  getting back as far as cost per square<br>12  foot from these individuals?<br>13  A. I think you just asked me that<br>14  question, and I think my response was I<br>15  didn't recall the exact numbers but the<br>16  price that we put together must have<br>17  been -- must have been similar because<br>18  that was the intent, to find out what<br>19  the market was paying.<br>20  Q. Do you recall whether it was more than<br>21  a dollar?<br>22  A. I don't recall any of the specific<br>23  pricing. |

16 (Pages 58 to 61)

6c35e358-8cbe-4642-b782-f0632955f3c9

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 62

1 Q. After you finished this exercise, what
2   did you do next? And when I say "this
3   exercise," I'm referring to contacting
4   other regional companies to get their
5   prices. What did you do after that?
6 A. I -- there again, I think you asked me
7   that question, and I think I stated
8   that we didn't do anything until we got
9   a package request from EMCOR officially
10  to bid, to give them a quote on the
11  project.
12 Q. Who provided -- strike that.
13       What was provided to you from
14  EMCOR?
15 A. It was a package that I'm pretty sure
16  would have already been, you know,
17  provided. You should have -- have that
18  information. But I couldn't tell you
19  what all was in it, but it was requests
20  to bid on, give them a price on all
21  those locations.
22 Q. And we'll get to it later, but if
23  there's a -- well, strike that.

Page 63

1       Who provided that to you from
2   EMCOR?
3 A. It would have been Alan Cristal or Debi
4   Crosby or possibly a gentleman by the
5   name of Steven King, which was their
6   pricing -- I think he did EMCOR's
7   pricing, if I'm correct. I need
8   another break.
9 Q. Sure.
10      (Brief recess)
11 Q. (By Mr. Sawyer) Mr. Littlefield, I'll
12  represent to you that I'm handing you
13  what will be marked as the next exhibit
14  in order. I believe it's #14.
15       MS. TULEY: Do you want to
16       keep going on mine or do
17       you want to start your
18       own numbers? because
19       I've been calling them
20       plaintiff's exhibits in
21       the last deposition.
22       MR. SAWYER: I think it
23       makes sense to call just

Page 64

1       call them joint exhibits
2   so we can go one through
3   whatever. Is that fair?
4       MS. TULEY: That's fine with
5       me.
6       MR. SAWYER: All right.
7       This will be the next
8       exhibit in order.
9       (Joint Exhibit #14 was
10      marked for identification.)
11 Q. (By Mr. Sawyer) Mr. Littlefield, I'm
12  handing you what's been marked as -- I
13  guess what we're going to call Joint
14  Exhibit #14, which is the first exhibit
15  to your deposition. Could you take a
16  look at that for me?
17 A. The entire package?
18 Q. Yes. I'll represent to you that this
19  was produced to us in a folder entitled
20  Bid Package. But it's my understanding
21  that, from counsel, that your attorneys
22  put it in that folder, not you.
23 A. This is entitled Bid Package?

Page 65

1 Q. It was in a folder entitled Bid
2   Package.
3       (Brief pause while witness
4       reviews document)
5       (Joint Exhibit #15 was
6       marked for identification.)
7 A. Okay.
8 Q. After having reviewed what's been
9   marked as Exhibit #14, can you identify
10  it?
11 A. Can I identify it?
12 Q. What's been marked as Exhibit #14 to
13  your deposition.
14 A. I can identify it, yes.
15 Q. Okay. What is it?
16 A. It appears to be the bid request from
17  BB&T to EMCOR.
18 Q. If you'll turn to the first page. And
19  I'm just trying to understand
20  whether -- to try to shorten this up,
21  I'm trying to understand whether this
22  was the package that was provided by --
23      (Cell phone interruption)

17 (Pages 62 to 65)

6c35e358-8cbe-4642-b782-f0632955f3c9

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 66

1  Q. I'm trying to understand whether this
2     is the package that was provided by
3     EMCOR to you.
4  A. It appears to be the package, yes, that
5     EMCOR provided to us. But I would say
6     that there could be an exhibit in here,
7     some type of exhibit, that may not
8     have -- I can't say that every exhibit
9     that's in this right now was the
10    original that came from EMCOR.
11 Q. Do you have the original?
12 A. Well, this -- this would have been the
13    original. But what I'm saying is there
14    could have been a later exhibit that
15    came after the fact that could have
16    been added.
17 Q. So I understand your testimony, an
18    exhibit could have been provided later;
19    but as far as the original package
20    coming from EMCOR to PFMI, to the best
21    of your recollection, this would be it?
22 A. Yes.
23 Q. After you received this package from

Page 67

1     EMCOR -- and I believe your testimony,
2     it was either Alan, Debi, or Steven
3     King?
4  A. Right.
5  Q. -- what did you do?
6  A. We reviewed it and probably, you know,
7     we looked at scope, looked at locations
8     and started determining what vendors
9     might be a good fit to perform the
10    services, and to gather pricing from
11    those vendors.
12 Q. And when you refer to reviewing scope,
13    what in particular about Exhibit #14
14    are you referring to?
15 A. The janitorial, what would be -- the
16    whole package includes more than
17    janitorial, so we focused on the
18    janitorial section.
19 Q. Did you understand that if you were
20    awarded the contract that that would be
21    what your scope of work would be
22    comprised of?
23 A. Well, there was discussions at meetings

Page 68

1     that the scope -- yes, it was our
2     understanding.
3  Q. So if you got the job, this was the
4     scope of work that you would have to
5     perform?
6  A. Yes.
7  Q. I believe you also said that you
8     started to contemplate what vendors
9     would be a good fit.
10 A. Uh-huh.
11 Q. Did PFMI contemplate self-performing
12    this work?
13 A. No.
14 Q. At no time?
15 A. At no time.
16 Q. Does PFMI in this time frame
17    self-perform -- and when I say "in this
18    time frame," when you received the bid
19    which is marked as Exhibit #14 -- did
20    it self-perform work?
21 A. Yes.
22 Q. How much did it self-perform?
23 A. I would say 70 percent.

Page 69

1  Q. Was that just for janitorial?
2  A. Yes.
3  Q. Landscaping, do you normally
4     subcontract that out?
5  A. Not necessarily.
6  Q. So PFMI does self-perform some
7     landscaping?
8  A. Yes.
9  Q. How much?
10 A. Landscaping?
11 Q. Yes.
12 A. How much in terms of --
13 Q. Percentage.
14 A. -- percentage? Everything that's
15    within a certain geographical area, we
16    self-perform all of it. Anything
17    outside of a geographical area, we
18    subcontract.
19 Q. In what geographical area do you
20    self-perform?
21 A. Landscape?
22 Q. Yes.
23 A. Montgomery, Alabama.

18  (Pages 66 to 69)

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

| Page 70 |
| --- |

1  Q. Anywhere else?
2  A. Huntsville, Alabama; Destin, Florida.
3  Q. Did you prepare any calculations or
4      estimates based upon -- can we call
5      Exhibit #14 the BB&T bid?
6  A. Yes.
7  Q. What types of estimates did you
8      perform?
9  A. Estimates in terms of what? I'm not
10     sure what you're asking.
11 Q. Pricing.
12 A. Pricing? We provided at the
13     appropriate time a square-foot price to
14     EMCOR for five-day-per-week service,
15     six-day-per-week service, and
16     three-day-per-week service.
17 Q. Prior to providing that to EMCOR, did
18     you internally prepare estimates of the
19     cost of the work?
20 A. Yes.
21 Q. Where did you keep those estimates?
22 A. It was a simple process after we
23     selected the vendors that would be the

| Page 71 |
| --- |

1      alliance group. They priced a
2      square-foot price, and we added our
3      markup, which would have been on the
4      average of 18 to 21 cents per square
5      foot annually. And that was the
6      calculation.
7  Q. Who is the alliance group?
8  A. It's the group that we proposed to
9      EMCOR that would be providing the
10     services.
11 Q. What other companies in the alliance
12     group?
13 A. The group for this project was PFMI,
14     was Varsity cleaners, was FMI, was
15     Galley Services, and Patton.
16 Q. Was Goka ever involved?
17 A. Goka was a subcontractor, not an
18     alliance partner.
19 Q. Any other alliance partners?
20 A. No.
21 Q. What time frame did you prepare these
22     estimates?
23 A. I think, as I said earlier, it was

| Page 72 |
| --- |

1      between the time frame of February-
2      March-April. Probably the actual
3      pricing back to them was probably more
4      toward the mid-April range.
5  Q. So to the best of your recollection, it
6      would have been mid April when you were
7      getting these prices from members of
8      the alliance group?
9  A. Yes.
10 Q. During this time frame, did you have
11     any communications with BB&T personnel
12     directly?
13 A. I don't believe so, no.
14 Q. So that I understand your testimony,
15     you received prices from members of the
16     alliance group per square foot;
17     correct?
18 A. Correct.
19 Q. And that would have been Varsity, FMI,
20     Galley Services, and Patton. Is that
21     accurate?
22 A. Uh-huh. Yes.
23 Q. And you marked those up by 18 to 21

| Page 73 |
| --- |

1      percent -- strike that -- 18 to 21
2      cents?
3  A. Correct.
4  Q. Do you know offhand what percentage
5      that would have been on the square-foot
6      cost you were getting?
7  A. I guess it would have been from 12 to
8      18 percent.
9  Q. Do you have any understanding who
10     created what's been marked as
11     Exhibit #14?
12 A. I have no understanding. I would
13     assume it would be BB&T.
14 Q. Why would you assume that?
15 A. Well, it's got BB&T's name on it.
16 Q. Did you provide this document to your
17     subcontractors?
18 A. We provided -- I would assume we
19     provided the scope -- the scope of
20     work. Not the entire document, no.
21 Q. And when you say "scope of work," which
22     portions of Exhibit #14 are you
23     referring to?

19 (Pages 70 to 73)

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

| Page 74 | Page 76 |
|---|---|
| 1    (Brief pause while witness | 1  A. I'm saying -- I'm saying all -- all |
| 2       reviews document) | 2     those that you listed there may not |
| 3  A. Exhibit S1 and Exhibit A, that was | 3     have came up with a square-foot price. |
| 4     provided to us, which shows the gross | 4     Some -- some came up with a square-foot |
| 5     square feet and then shows their | 5     price and submitted it back to us, and |
| 6     adjusted square feet. | 6     some we may have said these three |
| 7  Q. Was anyone else involved with this | 7     vendors are doing it in this price |
| 8     process of coming up with the price for | 8     range, can you do this region, would |
| 9     what I'm calling -- what we've been | 9     you want to do this region in this |
| 10    calling the BB&T bid? Anyone -- | 10    price range. So that's how. |
| 11 A. The -- | 11 Q. I think I understand your testimony. |
| 12 Q. -- else -- | 12    Well, let me ask it this way. Each one |
| 13 A. -- pricing, no. | 13    of the vendors that you contacted, how |
| 14 Q. I'm sorry. I'm talking over you. | 14    did they price their work? Was it -- |
| 15    Anyone else in PFMI? | 15    let me ask it differently. Did you |
| 16 A. No. | 16    receive lump-sum proposals? |
| 17 Q. It was -- | 17 A. Any that we received a price from would |
| 18 A. Not in determining the pricing. | 18    have been based on square footage, |
| 19 Q. And if I understand your testimony | 19    because that's how we would have asked |
| 20    correctly, the actual vendors came up | 20    for it. |
| 21    with the unit price; correct? | 21 Q. And why did you ask for it based on |
| 22 A. With their price. | 22    square footage? |
| 23 Q. And all PFMI did was simply take that | 23 A. Because that's how we were asked to |

| Page 75 | Page 77 |
|---|---|
| 1     price and add its profit on top of it, | 1     provide it from EMCOR. |
| 2     which I believe you testified is 18 | 2  Q. Who at EMCOR asked you to provide it |
| 3     percent -- 18 cents or 21 cents per | 3     that way? |
| 4     square foot? | 4  A. I'm not sure if the documentations in |
| 5  A. In that average range, yes. I will not | 5     here asked for it that way. But it |
| 6     testify that each -- each vendor | 6     would have been Alan Cristal, Debi |
| 7     submitted a price to us. In some | 7     Crosby, or Steven King. |
| 8     cases, we may have collected a certain | 8  Q. Was the pricing to be based on gross |
| 9     amount of prices and when we chose, | 9     square footage? |
| 10    say, a Patton Services, we told them | 10 A. Pricing was to be based on square |
| 11    this is the average pricing and would | 11    footage. And they gave us an estimated |
| 12    you do it at this price. But I cannot | 12    square footage of, I think, between |
| 13    tell you which ones we got the price | 13    seven and seven million square feet. |
| 14    from and which ones we told this will | 14 Q. When you say "they," who gave you -- |
| 15    be the pricing. | 15    estimated between six and seven million |
| 16 Q. Do you know what the members of the | 16    square feet? |
| 17    alliance group based their price per | 17 A. That was the conversations between -- |
| 18    square foot on? | 18    it was understood between PFMI and |
| 19 A. I don't understand your question. | 19    EMCOR. Plus, on their document that |
| 20 Q. Well, they came up with a unit price | 20    they furnished us here, they gave us |
| 21    for square footage; correct? | 21    the adjusted gross square footage. |
| 22 A. (Witness nodded.) | 22    They gave us a gross and then an |
| 23 Q. Is that correct? | 23    adjusted. And that's the terms that |

6c35e358-8cbe-4642-b782-f0632955f3c9

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

| Page 78 |
|---|
| 1  were used here. And so we based it on |
| 2  the adjusted square feet, which I think |
| 3  shows here 6.7 million square feet. |
| 4  Q. Did you instruct your vendors to base |
| 5  their pricing on adjusted square feet? |
| 6  A. Yes. |
| 7  Q. Why did you do that? |
| 8  A. Because that's the way EMCOR said to do |
| 9  it. |
| 10  Q. Who from EMCOR said that? |
| 11  A. Well, I don't know if the documents -- |
| 12  we can read back through all the |
| 13  documents and see if it tells us, you |
| 14  know, tells us to do that in here. But |
| 15  in conversations, it would have been |
| 16  from Alan Cristal or Debi Crosby or |
| 17  Steven King. |
| 18  Q. Do you recall whether within -- and you |
| 19  can look back through this. Do you |
| 20  recall was it ever part of your work -- |
| 21  and when I say "your," I mean PFMI's |
| 22  work -- to conduct field measurements |
| 23  of units? |

| Page 79 |
|---|
| 1  A. There was nothing in the documents. |
| 2  But we were asked to, within the first |
| 3  ninety days, to conduct field |
| 4  measurements. Before the contract |
| 5  started, EMCOR met with PFMI and all |
| 6  its alliance partners in Atlanta to go |
| 7  over all the details of the contract. |
| 8  And at this point in time, part of the |
| 9  discussion was the measurements that we |
| 10  would, within the first ninety days, |
| 11  provide a measurement of the |
| 12  facilities. And they were instructed |
| 13  to -- how to measure it. |
| 14  Q. Who was at this -- strike that. Who |
| 15  individually from the alliance group |
| 16  members attended this conference? |
| 17  A. Varsity representative was Scott |
| 18  Steven -- Scott Evans, was Steve |
| 19  Schwartz. FMI was Mark Campbell. |
| 20  Galley Services was Leroy Dock. If you |
| 21  contact him, don't call him Leroy; call |
| 22  him Leroy. Patton Services was Mark |
| 23  Patton. And I believe that rounds out |

| Page 80 |
|---|
| 1  the alliance. And from EMCOR was Sean |
| 2  Brookins and Alan Cristal. |
| 3  Q. Did Mr. -- strike that. Did anyone |
| 4  from PFMI attend with you? |
| 5  A. Jim Wohlers. I think our regional |
| 6  managers that we hired from |
| 7  Winston-Salem, John Sauter and probably |
| 8  Keith Blackburn, and there could have |
| 9  been someone else, but that -- that's |
| 10  who I recall. |
| 11  Q. Now, you testified that this was before |
| 12  the signing of the contract; correct? |
| 13  A. It was before -- well, actually, I |
| 14  don't know if it was before the signing |
| 15  of the contract with EMCOR and BB&T, |
| 16  because I don't know when their |
| 17  contract was physically signed. |
| 18  Q. Was it before the signing of the |
| 19  contract between PFMI and EMCOR? |
| 20  A. It would not have been before the |
| 21  letter of intent. |
| 22  Q. It would not have been before the |
| 23  letter of intent? |

| Page 81 |
|---|
| 1  A. I don't think it would have been before |
| 2  the letter of intent. It could have |
| 3  been. It was approaching a time that |
| 4  it was agreed upon that PFMI and its |
| 5  alliance partners was the one that had |
| 6  been chosen. And it was to meet and |
| 7  cover in person from EMCOR the details |
| 8  of the contract to the alliance |
| 9  partners. |
| 10  Q. But as you sit here today, you don't |
| 11  recall whether the meeting, what I -- |
| 12  to discuss the contract, the meeting |
| 13  that occurred in Atlanta, whether it |
| 14  occurred before the signing of the |
| 15  letter of intent or after? |
| 16  A. Ben, I don't. The purpose of the |
| 17  meeting was not to still propose. It |
| 18  was a meeting that we were chosen and |
| 19  to make plans to implement. |
| 20  (Brief pause) |
| 21  Q. Mr. Littlefield, I'm just going to show |
| 22  you what was marked yesterday as |
| 23  Exhibit #1 to the deposition of Sean |

21 (Pages 78 to 81)

6c35e358-8cbe-4642-b782-f0632955f3c9

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 82

1  Brookins. I'll just first ask you, is
2  that your signature?
3  A. It is.
4  Q. Does it appear that the letter of
5  intent, what I'm calling the contract,
6  was signed, I guess, July 13th?
7  A. Yes.
8  Q. And I believe you testified that at
9  this meeting in Atlanta, the topic of
10 actually field-measuring the BB&T
11 locations was discussed; is that
12 correct?
13 A. Yes.
14 Q. Who participated in those discussions?
15 A. Everyone at that meeting. And that was
16 not the only discussion, but it would
17 have been a discussion.
18 Q. And --
19 A. But EMCOR participated, PFMI, and the
20 alliance partners participated.
21 Q. Were you informed why field
22 measurements would be taken?
23 A. Yes. To verify square footages.

Page 83

1  Q. Were you informed why you were to
2  verify square footages?
3  A. Yes. For new billing purposes.
4  Q. You said "new billing purposes." How
5  was it different?
6  A. Can you explain your question? How
7  was --
8  Q. Sure.
9  A. How was what different?
10 Q. Sure. You just, I guess, testified
11 that you were going or -- strike
12 that -- that EMCOR informed you that
13 there would be a verification of square
14 footages and that this was for new
15 billing purposes. What was the old
16 billing?
17 A. I can't testify if we were billing off
18 of the adjusted or the gross, but we
19 were billing off of what EMCOR had
20 instructed us to bill from.
21 Q. At the time of the meeting, had any
22 billing occurred?
23 A. No.

Page 84

1  Q. After the meeting, did PFMI bill from
2  the adjusted or the gross?
3  A. I don't know. We'd have to look on the
4  document to see, on a billing master
5  list. But we billed based upon EMCOR's
6  instructions.
7  Q. And whether it's gross or adjusted, the
8  documents will reflect that; correct?
9  A. That's correct.
10 Q. Who from EMCOR instructed you to bill
11 from gross or adjusted?
12 A. I couldn't testify as to who
13 specifically instructed us to do that.
14 My assumption would be whoever was in
15 charge of that contract. That would
16 have been Sean Brookins.
17 Q. And the reason you would assume that is
18 because he's in charge of the contract?
19 A. Correct.
20 Q. Would there be some document reflecting
21 that?
22 A. Reflecting . . .
23 Q. How PFMI should conduct this billing

Page 85

1  practice.
2  A. I was not involved in the day-to-day
3  details of the actual billing. So Jim
4  Wohlers would probably be more capable
5  of answering that question.
6      MR. SAWYER: Y'all want to
7        go eat?
8      MS. TULEY: I never say no
9        to that. Do you want to
10       go off the record?
11     MR. SAWYER: Sure.
12     (Lunch recess)
13     (Mr. Wohlers not present.)
14     MR. SAWYER: Let's go back
15       on the record. I'd like
16       to mark this as the next
17       in order.
18     (Joint Exhibit #16 was
19       marked for identification.)
20 Q. (By Mr. Sawyer) Mr. Littlefield, can
21 you identify what the court reporter
22 has just handed you?
23 A. Could you explain to me what it is?

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 86

1  Q. Yeah, let me do that. What the court
2     reporter has just handed you as
3     Exhibit #16 is a 30(b)(6) deposition
4     notice. Have you ever seen that
5     before?
6  A. I believe I have.
7  Q. If you could, turn back a couple of
8     pages.
9  A. Okay.
10 Q. Now, I'm having you turn to Exhibit A
11    of the 30(b)(6) deposition notice.
12    With conversations with counsel, it's
13    my understanding that you are being
14    presented today as the corporate
15    representative of PFMI for Topics of
16    Examination 6, 7, 9, 13, and 14?
17 A. Correct. Correct.
18 Q. So if you would, take a look at Topic
19    No. 6, which is the preparation of
20    PFMI's bid for the BB&T services
21    contract. Today you are testifying as
22    PFMI's corporate representative and
23    person most knowledgeable for that

Page 87

1     topic of examination; correct?
2  A. That's correct.
3  Q. And we discussed that at, I guess, some
4     length this morning, and I'd just like
5     to recap it so my understanding is
6     clear. As far as the preparation of
7     PFMI's bid, what I understand is that
8     initially, you contacted regional
9     facilities -- regional and national
10    facilities companies to obtain
11    information and pricing.
12         MS. TULEY: Object to form.
13 Q. Is that correct?
14         MS. TULEY: Go ahead.
15 A. That's correct.
16         MS. TULEY: That's just a
17            lawyer thing. You can
18            answer his question.
19 Q. Is that correct?
20 A. That's correct.
21 Q. After you did that -- after that point
22    in time, you received what we've
23    referred to as the BB&T bid, which is

Page 88

1     marked as Exhibit #14, I believe.
2  A. That's correct.
3  Q. After receipt of the BB&T bid, you
4     contacted other subcontractors or other
5     vendors that might perform the work
6     identified in Exhibit #14, the BB&T
7     bid?
8  A. That's correct.
9  Q. And those contractors were in what
10    we've referred to as the alliance
11    group?
12 A. Yes.
13 Q. And the contractors that comprised the
14    alliance group were Varsity -- help me
15    out here.
16 A. Was Varsity Services, was FMI Services.
17 Q. Patton?
18 A. Was Patton; and a company from the D.C.
19    market, Leroy Dock's company, Galley
20    Services.
21 Q. And you did provide the BB&T bid
22    documents to each of these individual
23    vendors; correct?

Page 89

1         MS. TULEY: Object to form.
2  A. We provided scope of work. We provided
3     a location list, which would be
4     identified here as Exhibit A.
5  Q. But as far as providing or -- did you
6     have any involvement with the vendors'
7     pricing of that work?
8  A. We did not have any involvement in
9     their pricing of that work.
10 Q. So after you received, I guess, quotes
11    from these vendors to perform certain
12    areas, I believe the testimony was you
13    marked it up 18 to 21 cents -- and I
14    apologize if I say percent; what I mean
15    is 18 to 21 cents -- for PFMI?
16 A. That's correct.
17 Q. How did you come up with that markup?
18 A. Based on an average 5 to 8 percent
19    overhead and a profit of 12 or so
20    percent after overhead costs.
21 Q. What's included in the 5-percent
22    overhead cost?
23 A. It's insurance, liability, workers'

23 (Pages 86 to 89)

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

| | Page 90 |
|---|---|
| 1 | comp, corporate cost, my time, |
| 2 | corporate staff cost, accounting, |
| 3 | administration. |
| 4 | Q. Any other general or administrative |
| 5 | costs that would go into that |
| 6 | 5 percent -- |
| 7 | A. No. |
| 8 | Q. -- markup? |
| 9 | A. That would be the bulk of it. |
| 10 | Q. And I guess you've expressed that in |
| 11 | terms of percent, but it would be, I |
| 12 | guess, five cents per square foot for |
| 13 | overhead and 12 cents per square foot |
| 14 | for profit? |
| 15 | MS. TULEY: Object to form. |
| 16 | A. No. That's based more on percentages |
| 17 | of revenue. |
| 18 | Q. I think I understand your testimony. |
| 19 | If it's -- was it an 18-percent markup |
| 20 | just on the revenue you anticipated |
| 21 | achieving? |
| 22 | A. I'd like to refer back to the record. |
| 23 | I answered that earlier this morning |

| | Page 91 |
|---|---|
| 1 | and gave you a range of what it should |
| 2 | have been in. |
| 3 | Q. Do you recall what that was? I mean, |
| 4 | the record will say what it says. |
| 5 | A. Yeah, the record will say what it says. |
| 6 | I don't want to -- you know, that 18- |
| 7 | to 20-percent range, I'm assuming. |
| 8 | MS. TULEY: I object to the |
| 9 | form to the extent that |
| 10 | it mischaracterizes |
| 11 | previous testimony. |
| 12 | Q. Take a look at that Exhibit A, which is |
| 13 | in what we've been calling the BB&T |
| 14 | bid. And I believe you said there were |
| 15 | a couple of columns referring to gross |
| 16 | square footage? |
| 17 | A. There's one column referring to gross |
| 18 | square footage. |
| 19 | Q. I'm sorry. There's one column |
| 20 | referring to gross square footage and, |
| 21 | I believe, another for adjusted square |
| 22 | footage. |
| 23 | A. Correct. |

| | Page 92 |
|---|---|
| 1 | Q. Did you ever ask anyone from EMCOR what |
| 2 | adjusted square footage meant? |
| 3 | A. Well, it shows, when they knew they had |
| 4 | vacant space, they deducted it out of |
| 5 | the column that says current vacant |
| 6 | square footage. |
| 7 | Q. My question is a little different. My |
| 8 | question is, did you ever ask anyone |
| 9 | from EMCOR what adjusted square footage |
| 10 | meant? |
| 11 | A. Now, there was -- I can't recall a |
| 12 | specific meeting to meet and discuss |
| 13 | what adjusted square footage meant. |
| 14 | You know, I didn't ask them, either, |
| 15 | what lease type meant on here, either. |
| 16 | Some things are -- could be assumed. |
| 17 | It says adjusted. Adjusted means |
| 18 | adjusted. And that's how we would be |
| 19 | paid, based on what we would bill. |
| 20 | Whether -- and I told you this morning |
| 21 | I didn't know if we billed based on |
| 22 | adjusted or gross, but we billed based |
| 23 | upon EMCOR's direction. |

| | Page 93 |
|---|---|
| 1 | Q. Did you ever or do you have a |
| 2 | recollection of ever asking anyone from |
| 3 | EMCOR questions about this bid? |
| 4 | A. Questions about this bid? |
| 5 | Q. Yes. |
| 6 | A. Definitely. |
| 7 | Q. What were some of the questions that |
| 8 | you asked EMCOR? |
| 9 | A. Two weeks before -- Exhibit A was |
| 10 | produced to us; we produced this |
| 11 | information to our alliance group. Two |
| 12 | weeks prior to start of the contract, |
| 13 | actual servicing the locations, I got a |
| 14 | call from Sean Brookins. And he was |
| 15 | very upset with a practice he alleged |
| 16 | that one of our subcontractors was |
| 17 | doing. He said that he'd gotten word |
| 18 | that they'd reduced their square |
| 19 | footage by 20 percent and was trying to |
| 20 | get local, smaller subcontractors to do |
| 21 | the work for 20 percent less a square |
| 22 | footage. |
| 23 | So I immediately called that |

24 (Pages 90 to 93)

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 94

1  subcontractor to find out what was
2  going on. And what I found was there
3  was another exhibit that had been
4  produced that now had another column
5  that said -- well, it's Exhibit C. I'm
6  not sure what the column said, but it
7  was clearly that 20 percent -- it was
8  showing from EMCOR and BB&T that
9  20-percent square footage had been
10  deducted from the gross. So that
11  contractor had assumed that that's how
12  he was going to get paid, based on the
13  20-percent reduction. So he was trying
14  to hire cleaners and/or subcontractors
15  to do the work for that.
16      We had never seen that document.
17  Immediately I knew that if EMCOR or
18  BB&T expected PFMI or their subs,
19  alliance partners, to perform the work
20  at 20 cent -- at 20 percent less a
21  square footage, that it couldn't be
22  done and wouldn't be done.
23      So I immediately called Sean

Page 95

1  Brookins, because it was two weeks
2  before start of the contract, and asked
3  him where this came from and told him
4  if -- you know, we've got to be very
5  clear on this matter -- if BB&T or
6  EMCOR is expecting us to perform this
7  contract at 20 percent less based on
8  those numbers that was in that column,
9  that we couldn't do it, that now was
10  the time, that we couldn't move
11  forward.
12      He got Steven King involved and
13  told us that there was no intent to
14  reduce the square footages down by 20
15  percent. And the E-mail we received
16  back from Steven King was not to worry
17  about it, that it was for budget
18  purposes only. That was a -- I
19  believe -- would you repeat the
20  question that you asked me?
21 Q. To be honest with you, I don't remember
22  what the question was.
23      MR. SAWYER: Could the court

Page 96

1      reporter read it back
2      for me?
3 A. I believe it was what conversations did
4  we have with EMCOR about the contract.
5 Q. My recollection is that it was did you
6  ever ask any questions about --
7 A. Did I ever ask any questions. So we
8  asked the question of what this
9  20-percent reduction meant, that we --
10  and told him we couldn't do the work if
11  it was going to be a 20-percent
12  reduction, and to get us some firm
13  answers on what it was all about. And
14  the E-mail we got from Steven King was
15  not to worry about it, it was for
16  budgeted purposes only. So we informed
17  our contractor to go back to the gross
18  or adjusted square footage.
19      Another question that was asked
20  during the term of preparing the
21  contract was in reference to trash.
22  And on a conference call with Sean
23  Brookins, Debi Crosby, and possibly

Page 97

1  other EMCOR representatives and myself
2  and Jim Wohlers, the question of trash
3  removal was brought up. And at this
4  time, EMCOR had found out that BB&T was
5  removing dumpsters from locations prior
6  to start of the physical work.
7      And at that point in time, we
8  addressed the issue that if dumpsters
9  were removed, that was going to be an
10  extra expense -- after we've already
11  negotiated the price -- an extra
12  expense to remove trash in 900-plus
13  locations. And on that conference
14  call, Debi Crosby asked me -- well, she
15  asked me, first of all, that -- Greg,
16  that would be an additional cost for
17  you to do that, wouldn't it. Yes, Debi
18  it would. Then BB&T will have to pay
19  for it. So we moved forward with
20  taking care of that with anticipation
21  of being reimbursed for those incurred
22  costs.
23 Q. Did you ask him --

25 (Pages 94 to 97)

6c35e358-8cbe-4642-b782-f0632955f3c9

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 98

1  A. Those are two -- two questions that I
2     know was asked before the start of the
3     physical contract that we got
4     clarification from EMCOR on.
5  Q. So you asked about the trash removal
6     and would the square footage be reduced
7     20 percent; correct?
8  A. Correct.
9  Q. And I believe it's your testimony that
10    Steven King informed you that it
11    wouldn't be reduced 20 percent?
12 A. He produced an E-mail to us that -- and
13    the E-mail will reflect, obviously,
14    what he said.
15 Q. And Greg Littlefield told him that you
16    couldn't do it for 20 percent less
17    square footage; correct?
18 A. That's correct.
19 Q. Because the actual square -- the actual
20    work doesn't change, does it?
21 A. The actual work does not change.
22 Q. But as a product of math, the amount of
23    money would change; correct?

Page 99

1  A. That is definitely correct.
2  Q. At that point in time, could you have
3     increased your unit price?
4  A. EMCOR did not give us an opportunity to
5     increase the unit price.
6  Q. Prior to execution of the letter of
7     intent, is it your recollection that
8     Mr. King informed you that the square
9     footage or net square footage would be
10    a nonissue since PFMI would be
11    performing actual measurements of
12    cleanable space during the first ninety
13    days?
14 A. I believe that's -- I can't see what
15    you're reading there, but I think
16    that's the E-mail I was referring to.
17         MR. SAWYER: Off the record.
18         (Off-the-record discussion)
19         MR. SAWYER: Back on the
20         record.
21 Q. Was it your agreement that the cost
22    going forth would be based on the
23    actual measurements performed during

Page 100

1     the first ninety days?
2  A. Repeat your question.
3  Q. Sure. Was it PFMI's agreement that
4     contract price would be based upon
5     whatever your unit prices were times
6     the actual amount of cleanable square
7     footage out there that was going to be
8     taken care of by PFMI during the first
9     ninety days?
10 A. That is correct.
11 Q. Did PFMI conduct those measurements
12    during the first ninety days?
13 A. PFMI conducted measurements within the
14    first ninety days and supplied that
15    information to EMCOR. There was one
16    vendor who had not completed theirs, so
17    we met with EMCOR and extended it a
18    matter of a week or two. PFMI reviewed
19    those measurements and, upon sending
20    them up to EMCOR or delivering them to
21    EMCOR, upon review of them, indicated
22    there was a number that we were not
23    comfortable with that was correct so we

Page 101

1     wanted to go back and remeasure. It
2     was a certain percentage, say, we felt,
3     60-70 percent of them we had a good
4     feel for; the rest not.
5         At that point in time, as PFMI
6     was receiving surveys back, we adjusted
7     our billing to reflect the new numbers
8     coming in and was instructed by EMCOR
9     not to do that. On several occasions,
10    we tried to adjust the numbers moving
11    forward so it could be more accurate;
12    and EMCOR continued to instruct us not
13    to reduce or increase if we got a
14    survey that showed an increase in
15    square footage.
16 Q. Now, was PFMI actually doing these
17    surveys or was it a vendor of PFMI?
18 A. It was the vendors.
19 Q. Was it 100 percent performed by the
20    vendors or did Jim or some other
21    representative from PFMI go out there
22    to conduct measurements?
23 A. It would have been whoever company was

26 (Pages 98 to 101)

6c35e358-8cbe-4642-b782-f0632955f3c9

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

| Page 102 |
| --- |

1  responsible for -- for that branch.
2  Q. So the vendors that we've been talking
3    about, I guess -- FMI, Varsity, Patton,
4    and the other vendors in the alliance
5    group; correct?
6  A. That's correct.
7  Q. And whoever their subtier contractors
8    might be?
9  A. I can't answer to that. Can't answer
10    that.
11  Q. Did any representative from PFMI ever
12    perform any field measurements?
13  A. I can't answer that, Ben. Jim would be
14    better to answer that.
15  Q. Jim would know?
16  A. (Witness nodded.)
17  Q. And I believe you testified you tried
18    to reduce your billings based on the
19    numbers that were coming back in
20  A. We tried if measurements came back in
21    that was less, yes; if there was a
22    building that would reflect more square
23    footage, then -- there was much fewer

| Page 103 |
| --- |

1  of those than reduction. And we tried
2  to -- we tried to do that even within
3  the first sixty days.
4  Q. Do you recall a time frame when you got
5    all the surveys in from your vendors?
6  A. I don't think I can speak on exactly.
7    But during the -- during the time that
8    was allotted, we had them all in except
9    a portion of them and was allotted an
10    additional amount of time to complete
11    that. But before that was completed,
12    EMCOR told us they were not going to
13    use any of our surveys.
14  Q. And I think you said you were
15    comfortable with about 60 or 70 percent
16    of those surveys?
17  A. I would say that's a, you know, good
18    number to use.
19  Q. For the ones you weren't comfortable
20    with, which is either 40 or 30 percent
21    rough numbers, why weren't you
22    comfortable with those numbers?
23  A. Because a particular vendor -- most of

| Page 104 |
| --- |

1  it was FMI -- had not completed or a
2  good number of them was coming back as
3  the same -- exact same number.
4  Q. Exact same number as what?
5  A. As the adjusted or gross.
6  Q. I guess you knew that probably couldn't
7    be right.
8  A. For the most part, yes.
9  Q. Correct me if I'm wrong, but what I'm
10    hearing you tell me is that there was
11    never an issue that PFMI was going to
12    be paid based on its unit price times
13    the gross square footage.
14  A. Never an issue that PFMI was not going
15    to be paid upon an agreed-upon
16    cleanable square footage. When
17    measurements were done, it was agreed
18    between PFMI and EMCOR that both
19    parties would agree on that square
20    footage. In other words, if -- if
21    EMCOR didn't agree with the square
22    footages that PFMI turned in, they
23    would spot-check them. If EMCOR went

| Page 105 |
| --- |

1  back and measured before any
2  adjustments were made, we would have an
3  opportunity to go with them and check
4  the measurements and make sure that
5  everybody was measuring buildings the
6  same way. PFMI never got that
7  opportunity.
8  Q. Why not?
9  A. You'll have to ask EMCOR why not.
10  Q. Did PFMI ever ask to go, I guess,
11    remeasure any sites with EMCOR?
12  A. We were told before any adjustments
13    would be made that we'd have an
14    opportunity to go with them and
15    remeasure and agree upon a percentage
16    before any deductions were made. That
17    did not happen. Deductions were
18    made -- started being made prior to BB
19    and EMCOR completing their
20    measurements.
21  Q. What time frame was that?
22  A. Was what?
23  Q. Deductions.

27  (Pages 102 to 105)

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 106

1   A.  We actually gave a credit in January
2       for December's.  And then in April, I
3       think, EMCOR started deducting 20
4       percent of our March -- from our
5       March -- now, this could be -- I could
6       be off a month or a billing cycle, but
7       in that time frame.
8   Q.  Why did you give a credit to EMCOR in
9       January?
10  A.  Because they -- we knew that there
11      would be some adjustments that would
12      need to be made, and we gave an agreed-
13      upon amount to satisfy BB&T for
14      December.
15  Q.  For December work, credit, I believe,
16      was given in January.  What amount of
17      credit did you give?  What was the
18      number?
19  A.  I believe it was twenty-six,
20      twenty-nine thousand dollars.
21  Q.  And I believe it's your testimony that,
22      I guess, all the measurements were
23      supposed to be taken care of in the

Page 107

1       first ninety days; correct?
2   A.  That was -- correct.
3   Q.  But the deductions that began -- and I
4       believe they were 20-percent
5       deductions?
6   A.  (Witness nodded.)
7   Q.  That didn't happen until April, to the
8       best of your knowledge; correct?
9   A.  To the best of my knowledge.
10  Q.  Does the ninety days begin from July
11      when the contract is executed or from
12      September when you started work?
13  A.  When we started work.
14  Q.  So the ninety days would have run from
15      September forward; correct?
16  A.  That's correct.
17  Q.  So hypothetically in a perfect world,
18      all these measurements were supposed to
19      be done -- and I'm referring to field
20      measurements of these BB&T branch
21      banks -- sometime in November; correct?
22  A.  Correct.
23  Q.  But FMI had not completed all of them

Page 108

1       by that time; correct?
2   A.  That's correct.
3   Q.  Had other vendors not completed as well
4       by November?
5   A.  I do not believe so.  But Jim would be
6       able to speak more on their behalf.
7   Q.  Certainly.  But simply put, the deal
8       was not gross; it's whatever is
9       cleanable out there, and there were
10      going to be measurements taken within
11      the ninety days to find that out; is
12      that right?
13  A.  That's correct.
14  Q.  So as for Topic No. 7 on that
15      exhibit --
16  A.  Can we take a quick break?
17  Q.  Absolutely.
18          (Brief recess)
19          MR. SAWYER:  Back on the
20      record.
21  Q.  (By Mr. Sawyer) Mr. Littlefield, I
22      believe today we've discussed in detail
23      PFMI's preparation of this bid.  Fair

Page 109

1       statement?
2   A.  We have discussed that.
3   Q.  And that's Topic No. 6.  Topic No. 7 is
4       PFMI's estimated cost to perform the
5       work pursuant to its agreement with
6       EMCOR.  Did I read that accurately?
7   A.  PFMI's estimated cost to perform its
8       work pursuant to its agreement with
9       EMCOR.
10  Q.  Are there any documents that I could
11      look at which would show how PFMI came
12      to prepare its estimated cost to
13      perform the work?
14  A.  There's no documents.
15  Q.  It's just an 18- to 20-percent markup?
16          MS. TULEY:  Object to form.
17          You said percent.
18  A.  That -- that was . . .
19  Q.  I'm sorry.  Go ahead.
20  A.  That was the markup.  But that was not
21      the cost incurred to do the work.  When
22      you say "cost incurred," define cost
23      incurred.

28 (Pages 106 to 109)

6c35e358-8cbe-4642-b782-f0632955f3c9

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 110

1  Q. Well, since PFMI wasn't self-performing
2      anything, right, and didn't anticipate
3      self-performing this contract; correct?
4  A. (Witness nodded.)
5  Q. Okay. The costs would be, I guess, the
6      overhead.
7  A. (Witness nodded.)
8  Q. Fair statement?
9  A. The cost would be the people we hired
10     for the contract and -- plus overhead.
11 Q. And, yeah, not including the vendor
12     cost. Well, vendor cost, I guess,
13     could also be considered.
14 A. Right. Yeah, vendor cost, but then you
15     had people that we hired directly for
16     the EMCOR/BB&T contract.
17 Q. Who did you hire directly for the
18     EMCOR/BB&T contract?
19 A. In addition to our present staff, there
20     was approximately three field managers.
21 Q. When did you hire them?
22 A. They were hired approximately, you
23     know, before -- thirty days to two

Page 111

1      weeks before start of the contract.
2      And approximately three to four
3      administrative, plus an administrative
4      person to work out of BB&T's corporate
5      headquarters or their facilities
6      headquarters.
7  Q. And that's in addition to the three or
8      four administrative people?
9  A. Correct.
10 Q. Who were the field managers that you
11     hired?
12 A. Keith Blackburn was the project
13     manager.
14 Q. Who were the others?
15 A. John Sauter.
16 Q. Okay.
17 A. And Ken Law.
18 Q. Were those people all hired before
19     execution of the EMCOR/PFMI contract?
20 A. I know at least two was hired prior to
21     the start of the physical work and Ken
22     soon after, if not about the same time.
23 Q. Did those people work solely on this

Page 112

1      account?
2  A. Yes.
3  Q. Did there come a point in time where
4      you had to hire additional supervision?
5  A. There -- there did not.
6  Q. And when you were analyzing, I guess --
7      well, strike that. Let me ask it this
8      way. Did you do an analysis of the
9      estimated costs that you would incur in
10     taking on this BB&T contract?
11 A. I did. Obviously I did.
12 Q. Are there any documents showing -- I
13     know I asked a different question
14     earlier. But are there any documents
15     showing the analysis you performed in
16     coming up with your estimated costs?
17 A. There -- there would be no documents.
18     But, you know, each individuals that we
19     knew we would be hiring, there was a
20     cost factor and calculated. So, you
21     know, I know a cost that I associated
22     to -- to that.
23 Q. How much did PFMI pay these people?

Page 113

1      And I'm referring to Keith Blackburn,
2      John Sauter, Ken Law.
3  A. I would -- I would have to look -- go
4      into a payroll record to find out.
5      But, you know, the total anticipated
6      cost for, you know, field personnel and
7      expenses was -- to run the account was
8      approximately in the four-hundred-
9      thousand-dollar-a-year range. I would
10     say three -- three to four range.
11     Anticipated billing based on the square
12     footage and numbers, anticipated gross
13     profit, would have been a million two
14     to a million three for in-scope work.
15     I mean, it's simple math of square
16     footage times 18 to 20 percent.
17 Q. In the estimated costs, do you include
18     yourself and Jim?
19 A. No. That would be considered an
20     overhead cost.
21 Q. So that would have been excluded from
22     the estimated costs that you
23     considered, because it definitely

29 (Pages 110 to 113)

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

| Page 114 | Page 116 |
|---|---|
| 1     wasn't the only project that you worked<br>2     on; right?<br>3  A. That's correct.<br>4  Q. Was any allocation of your costs<br>5     included in what you anticipated<br>6     incurring?<br>7  A. No.<br>8  Q. I guess the way you calculated your<br>9     anticipated gross profit was simply --<br>10     I believe the -- I think the markups<br>11     were 5 percent and 12 percent times the<br>12     gross square-footage number; is that<br>13     right?<br>14  A. It was 18-20 cents.<br>15  Q. Cents.<br>16  A. So, quick math, 20 cents times six and<br>17     a half million square feet, a million<br>18     three, less anticipated three to<br>19     hundred thousand of cost, is a net of<br>20     nine hundred thousand.<br>21  Q. And whatever the burden of labor for<br>22     those three project managers? I don't<br>23     think you testified they were all | 1  Q. Was some allocation, I guess, of that<br>2     cost a portion for what your estimated<br>3     costs were in here?<br>4  A. It's included in that generally what we<br>5     consider 5 percent overhead cost.<br>6         I would assume some of this<br>7     information would be confidential --<br>8  Q. You mean like --<br>9  A. -- information on how we bid contracts<br>10     and our company's overhead costs<br>11     associated that obviously we wouldn't<br>12     want published to competitors or any<br>13     way we would want a competitor to find<br>14     out how we structure our price.<br>15        MS. TULEY: If I feel like<br>16           something needs to be<br>17           made confidential, we'll<br>18           discuss that.<br>19  Q. There are ways to protect for that.<br>20        MS. TULEY: We can protect<br>21           it.<br>22  Q. Whatever you're concerned about, we'll<br>23     work out. |

| Page 115 | Page 117 |
|---|---|
| 1     project managers. Keith Blackburn was<br>2     a project manager; right?<br>3  A. Right. And the other two reported to<br>4     Keith.<br>5  Q. And whatever the burden labor of that<br>6     would be, would be shown on the payroll<br>7     record?<br>8  A. Right.<br>9  Q. Did you have a commercial general<br>10     liability policy on this job?<br>11  A. We have a standard general liability<br>12     policy.<br>13  Q. Does it float all over your projects?<br>14  A. Right.<br>15  Q. How much does that cost?<br>16  A. It's based on annual calculation that<br>17     the insurance company does based on<br>18     annual revenues and/or payroll.<br>19  Q. During the time of the project, how<br>20     much did you have to pay, I guess, for<br>21     your CGL policy?<br>22  A. I couldn't speak to exact amount of<br>23     that. | 1        As far as Topic No. 9, PFMI's<br>2     anticipated profit, I believe it's your<br>3     testimony -- correct me if I'm wrong --<br>4     it's just an amount that per square<br>5     foot that you thought you could<br>6     achieve; is that correct?<br>7  A. Well, which comes to approximately nine<br>8     hundred thousand dollars annually for<br>9     in-scope work. That excludes<br>10     out-of-scope work that we would do and<br>11     make a profit on.<br>12  Q. How much did you mark up out-of-scope<br>13     work?<br>14  A. I can't speak to that. That was -- Jim<br>15     would be better, because that was<br>16     after -- after the execution of the<br>17     contract and -- and after work had<br>18     started.<br>19  Q. So with respect to out-of-scope work,<br>20     Jim would probably be better to answer<br>21     what profit was actually charged?<br>22  A. I think so, yes.<br>23  Q. And what PFMI anticipated charging? |

6c35e358-8cbe-4642-b782-f0632955f3c9

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 118

1  A. (Witness nodded.)
2  Q. Let me ask, did you anticipate doing
3    out-of-scope work when you entered into
4    this contract?
5  A. Generally, based on industry average,
6    there's generally about 25 percent more
7    work or revenue anticipated to receive.
8  Q. Take a look at Topic No. 14. And it
9    reads -- the topic of examination
10   reads: All alleged, quote,
11   misrepresentations PFMI contends were
12   made by EMCOR to PFMI. PFMI's
13   designated representative should be
14   prepared to identify the individual
15   making the misrepresentation, the time
16   of the misrepresentation, any documents
17   that contain an alleged
18   misrepresentation, and the amount of
19   damages PFMI is seeking for any alleged
20   misrepresentations. Did I read that
21   correctly?
22 A. Yes.
23 Q. In Exhibit #14, which we've been

Page 119

1    referring to, I guess, as the BB&T bid,
2    what did EMCOR misrepresent?
3  A. One issue is square footage. In our
4    findings that later there was a
5    document produced, Exhibit C, that
6    showed 20 percent less square footage
7    and we asked them about it two weeks
8    prior to start-up and told them then if
9    there was going to be that type of
10   reduced square footage, then we
11   couldn't do the project. The E-mail
12   that came back to really disregard or
13   not pay any attention to that, it's for
14   budgeted purposes anyway. And the fact
15   that EMCOR did not allow us to confirm
16   that -- that they had agreed that
17   before any deductions were made that we
18   both would agree on it. That --
19   deductions happened before they even
20   agreed with BB&T on square footages.
21     It was represented to us in the
22   process of measuring, Sean Brookins
23   went from -- from his office to a bank

Page 120

1    in the parking lot and did a
2    measurement and told us that in his
3    calculations, it was about 4 percent
4    less square footage and that he felt
5    overall it wouldn't be any more than
6    4 or 5 percent, if not a wash. We were
7    also told in meetings with EMCOR and
8    BB&T that -- not to worry about square
9    footages that was going to be under 500
10   square feet, plus or minus. All those
11   were misrepresentations.
12     The trash, we were told, in
13   this -- in a document here, it tells us
14   that, as we're preparing our bid,
15   that -- from EMCOR -- that the trash,
16   nonconfidential trash, would be
17   disposed of, how it was to be disposed
18   of, consolidated by site, or how it is
19   to -- or how it is consolidated between
20   sites, the size of the dumpsters,
21   frequency of collection, and said that
22   they were going to provide us either
23   with a dumpster on site or a designated

Page 121

1    location to take trash. And that was
2    never provided.
3  Q. Is that what that document says?
4  A. I'll read the document. It says, Trash
5    removal. BB&T will establish with
6    selected supplier the most efficient
7    method for collection and disposal of
8    nonconfidential trash. This will
9    include defining what is to disposed of
10   and how it is consolidated by site, how
11   it is consolidated between sites, the
12   size of containers, dumpsters, and
13   frequency of collection and/or removal
14   to a licensed disposal facility.
15     And the scope of work, it also
16   states: Collect all nonconfidential
17   trash from site, deposit in onsite
18   container or remove to designated
19   off-site location. EMCOR never
20   provided a designated off-site
21   location.
22     When EMCOR found out that BB&T
23   were removing more dumpsters, as

31 (Pages 118 to 121)

6c35e358-8cbe-4642-b782-f0632955f3c9

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

| Page 122 |
| --- |

1  already on record, we told EMCOR that
2  that would be an additional charge,
3  additional cost of labor to do that.
4  Debi Crosby said, Then you'll be paid
5  for it. Sean Brookins later -- we were
6  never paid for it. Sean Brookins later
7  told us to bill trash disposal as out
8  of scope. We -- we did bill some as
9  out of scope. Some -- some were paid.
10  Then he came back and said no, we
11  won't -- won't do that anymore. We're
12  negotiating with BB&T on how we're
13  going to handle that.
14  Q. How much were paid?
15  A. We'd have to go back to an invoice,
16  invoices, to see. But it -- it -- it
17  would not be any that we would be
18  claiming had not been paid.
19  Q. Sure. I'm just saying, ballpark, how
20  many -- or dollar amount, how much was
21  paid for trash removal?
22  A. I don't know. I would -- we would have
23  to calculate that for you.

| Page 123 |
| --- |

1  Q. And that would be in PFMI's invoices --
2  A. Right.
3  Q. -- I would imagine.
4  A. Invoices to EMCOR. So EMCOR
5  misrepresented the issue of trash and
6  the payments of trash. Certain vendors
7  that we were told by EMCOR/BB&T to
8  hire, some of those vendors they paid
9  for trash removal; so they selected who
10  they would pay and wouldn't pay. But
11  in some cases, they paid certain
12  vendors and they -- and they didn't pay
13  in other ways.
14  Q. For trash removal?
15  A. For trash removal.
16  (Brief pause)
17  A. Also, in reference to trash removal,
18  there was -- there was meetings with
19  BB&T that EMCOR held in reference to a
20  solution of trash removal knowing that
21  it was an additional burden and cost to
22  us to do it, knowing that -- that it
23  also caused higher turnover in

| Page 124 |
| --- |

1  employees by having to put trash in the
2  trunk of their car and carry all around
3  town. Mark Smith also indicated for us
4  to produce him a total bill for trash
5  removal and he would present it to
6  BB&T.
7  Q. As EMCOR's designated -- I'm sorry.
8  Strike that. As PFMI's designated
9  corporate representative, are there any
10  other misrepresentations that you are
11  aware of?
12  A. Is there any in the claim that I didn't
13  mention?
14  MS. TULEY: I don't think
15  you can ask that.
16  THE WITNESS: I can't ask
17  that question?
18  MS. TULEY: No. You just
19  have to tell him if
20  that's all you remember
21  or not.
22  A. At this point, I wouldn't say that is
23  all. That's all that -- that -- to

| Page 125 |
| --- |

1  memory at this point.
2  Q. So to recap, one is EMCOR didn't allow
3  you to confirm square-footage numbers
4  or remeasure; correct? That's one
5  misrepresentation?
6  A. That is one.
7  Q. And they told you they would; right?
8  A. That was confirmed.
9  Q. Who told you that?
10  A. It was -- it was told by Sean Brookins
11  and we confirmed that phone
12  conversation back to him with a letter.
13  Q. But the square-footage numbers that
14  PFMI's vendors were supposed to provide
15  came in roughly in December; correct?
16  MS. TULEY: Object to form.
17  Asked and answered. You
18  can go ahead and answer.
19  A. They came in probably from mid October
20  through December. And as they came in,
21  we tried to adjust the billing
22  accordingly so that the billing would
23  be more accurate, which would allow us

32 (Pages 122 to 125)

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

| Page 126 |
| --- |

1    to adjust payments back to our vendors
2    at that time and was told not to adjust
3    it, to leave the billing like it was.
4    Q. And I believe it's your testimony you
5        don't know whether PFMI was billing off
6        of gross square footage or adjusted
7        square footage?
8    A. It was the adjusted -- Exhibit A was
9        either adjusted or gross.
10   Q. But you don't know which one?
11   A. Right. But the difference on that is
12       about 300,000 square feet.
13   Q. And the 20 percent reductions, I guess,
14       came in April?
15           MS. TULEY: Object to form.
16   Q. And what I'm referring to is when
17       PFMI's billings were reduced by 20
18       percent. That happened in April;
19       correct?
20   A. We gave a credit in January for
21       December. And if my timing is right,
22       the deductions started in late March or
23       in April. But the deductions started

| Page 127 |
| --- |

1    after a conversation -- a conference
2    with Greg Swanberg, Mark Smith, after
3    we had talked to our partners and told
4    them that the reports we were getting
5    back -- nothing official, no one had
6    gotten us any documentation, no one
7    has -- still has not given us any final
8    numbers of square footage. But it was
9    relayed back to us at this time that
10   the numbers -- that the square footage
11   that, after remeasuring several times,
12   could be as much as 20 percent.
13       We informed our vendors, our
14   alliance partners; and it was decided
15   to tell EMCOR that once again -- we
16   already told them if it was going to be
17   a 20 percent from the beginning, that
18   we couldn't do the project. Now we're
19   getting -- months later, we're getting
20   reports, Well, it looks like it may be
21   17-20 percent. Collectively, we went
22   back and told them, If that's going to
23   be the reductions, we're not going to

| Page 128 |
| --- |

1    be able to stay in the game with you.
2        It was after this -- it was
3    after we told them, is when they
4    started deducting. And I believe that
5    conversation was at the end of March or
6    the first part of April. And after
7    that conversation is when the
8    deductions started without us agreeing
9    to deductions.
10   Q. Between December and April when the
11       deductions happened, how many
12       facilities did PFMI remeasure?
13   A. How many did we remeasure after -- ask
14       me that question again. I'm not
15       following you on it, Ben.
16   Q. The surveys, the measurements, were
17       supposed to come back in ninety days.
18       Ultimately they came back -- or many of
19       them came back -- in December. Between
20       December when the original numbers came
21       out and April when the deductions
22       happened, how many locations did PFMI
23       go and remeasure?

| Page 129 |
| --- |

1    A. We were instructed by EMCOR not to
2        measure any more.
3    Q. Who instructed PFMI not to measure any
4        more?
5    A. It would have been Sean Brookins as
6        the -- they said that they would be
7        sending their techs out to measure and
8        that they would have it completed and
9        we'd be able to agree upon numbers by
10       the end of March. It was communicated
11       back to us that the first round of ever
12       how many branches they measured came
13       back in and BB&T didn't like the
14       numbers, so they sent them back again
15       to measure again, then a third
16       measurement by them with a BB&T -- in
17       some cases, we were told that an EMCOR
18       representative went to the same
19       location up to three times to
20       remeasure.
21   Q. Who told you that?
22   A. I believe Sean Brookins had indicated
23       that they had to send their people back

33 (Pages 126 to 129)

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 130

1    out, some cases twice by themselves and
2    then the third would be with a BB&T
3    representative. And we were under the
4    impression that they were remeasuring
5    all locations, versus a sampling of
6    locations.
7    Q. How did you get that understanding?
8    A. Based on that they were going to go out
9       and remeasure. And as I stated, we
10      never, to date, to my knowledge, never
11      got a complete list of facilities with
12      the remeasuring. It seemed that they
13      just started deducting and continued to
14      deduct unless there was nothing else to
15      deduct.
16   Q. Did PFMI ever receive any results or
17      measurements performed by EMCOR?
18   A. The only measurements I recall we
19      received -- there was no actual
20      document showing how the facility
21      measured or a measurement form per
22      facility. But when we discussed
23      negotiating a new contract for certain

Page 131

1    regions that we would assume
2    responsibility, for they provided us --
3    I'm saying it would probably have been
4    toward the end of May -- square
5    footages for those locations. But to
6    my knowledge, we've never been supplied
7    with a complete list of facilities and
8    the findings that they made of square
9    footages.
10      (Brief pause)
11   Q. Did PFMI ever incur the cost or make
12      any effort to go and measure or
13      remeasure to confirm the accuracy of
14      the square footages for locations in
15      the BB&T contract?
16   A. PFMI did send representatives to
17      remeasure certain locations, to
18      spot-check.
19   Q. Do you recall what locations?
20   A. I do not.
21   Q. Do you recall how many?
22   A. I do not. At this point, we were told
23      they would remeasure; when the

Page 132

1    remeasurements came in, they would be
2    presented to us to spot-check and agree
3    or disagree. But we never received
4    square footages for those locations, as
5    indicated prior. In fact, it was at --
6    at some point, even though we had
7    agreed that we would receive square
8    footages, be able to go out, check on,
9    then agree or disagree, and go back
10      together to measure -- to measure. As
11      I indicated, we never received that
12      information. But in questioning Greg
13      Swanberg after many deductions had been
14      made about the square footage, it was
15      told to me that that issue's over, that
16      EMCOR had already resolved it with
17      BB&T, and that there would be no more
18      discussions of it.
19   Q. As far as remeasuring?
20   A. As far as remeasuring, that they had
21      closed that issue out, that EMCOR had
22      closed that issue out with BB&T and it
23      wouldn't be open again.

Page 133

1    Q. It was going to be based on the new
2       numbers that were done by EMCOR's field
3       techs?
4    A. It was based on -- I don't know what
5       numbers it was based on.
6          (Brief pause)
7    Q. Between September and April, September
8       of 2005 and April of 2006, PFMI was
9       billing off of what's Exhibit A, what
10      we've been referring to as the BB&T
11      contract; is that correct?
12   A. It's correct that PFMI had been billing
13      off of Exhibit A but had tried to bill
14      off of new surveyed numbers as they had
15      come in and was informed by EMCOR not
16      to do that.
17   Q. Did they tell you why?
18   A. They said not to do that.
19   Q. Did you ask why?
20   A. I'll have to defer that to Jim Wohlers,
21      because he was doing the billing.
22   Q. So did a guy -- did a representative
23      from EMCOR inform you not to bill from

34 (Pages 130 to 133)

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 134

1    surveyed numbers?
2    A. He informed Jim Wohlers.
3    Q. And Jim told you?
4    A. Correct.
5    Q. What about Exhibit #14, which is the
6       BB&T bid, what about it is false, if
7       anything?
8           MS. TULEY: Object to form.
9    A. The trash issue is false. They did not
10      provide designated locations.
11   Q. What would be involved in providing a
12      designated location?
13   A. I'm assuming you'd have to ask EMCOR
14      that since this was their document.
15   Q. Well, did you ask EMCOR that?
16   A. Yeah.
17   Q. What did they tell you?
18   A. That -- that there would be dumpsters
19      or there would be a designated location
20      supplied to take trash to.
21   Q. Did you ever find a list of designated
22      locations or . . .
23   A. There was never a list given to us.

Page 135

1    Q. Did you ask for one?
2    A. Yes.
3    Q. And what were you told?
4    A. There were meetings with BB&T to
5       discuss trash issues.
6    Q. How about these square-footage numbers,
7       are they false?
8    A. The square-footage numbers, it's false
9       compared to what we were paid, yes.
10   Q. But you don't know as you sit here
11      whether you were billing off the gross
12      or the adjusted; is that right?
13   A. It was -- it's an issue that can be
14      cleared up very quickly by asking our
15      billing person.
16   Q. Sure.
17   A. But it was one or the other. But PFMI
18      was not paid based -- based on these
19      two numbers, because there was
20      deductions.
21   Q. You were not paid based on either the
22      adjusted or the gross?
23   A. Not after the deductions.

Page 136

1    Q. Okay. You're referring to April;
2       correct?
3    A. December -- January and April, because
4       we gave a credit.
5    Q. Correct. You gave that twenty-six-
6       thousand-dollar credit in January;
7       right?
8    A. That's right.
9    Q. But the 20-percent deductions which
10      were instituted by BB&T didn't start
11      until April; correct?
12   A. Correct.
13   Q. So from the start of the contract in
14      September, in September, October,
15      November, December, January there's a
16      credit. But for February up until
17      maybe March, to the best of your
18      recollection, are you billing off of
19      one of those two numbers?
20   A. That's correct. But we tried to bill
21      on the number -- survey numbers and
22      EMCOR refused that.
23   Q. And that's the whole issue that Jim

Page 137

1    will have or Jim Wohlers will have more
2    knowledge about that because we had
3    those dealings with EMCOR personnel;
4    correct?
5    A. That's correct.
6    Q. But it was always understood, I guess,
7       that there would be measurements done.
8       And PFMI, its vendors, ultimately
9       EMCOR, spent a heck of a lot of time
10      going out and measuring these
11      locations; correct?
12   A. I'm not sure how much time they spent.
13      I'm not sure how many they physically
14      measured. We have no reports to know.
15   Q. Sure. Are you sure that, you know,
16      your vendors actually went out and
17      measured?
18   A. On a portion of them that we told -- we
19      were up front and said that, no, we
20      were not comfortable. And we were very
21      upfront and proactive in that.
22   Q. And I believe the number you gave us
23      was 60-70 percent you were confident in

35 (Pages 134 to 137)

6c35e358-8cbe-4642-b782-f0632955f3c9

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

| | Page 138 |
|---|---|
| 1 | or comfortable with? |
| 2 | A. I think that's -- the record will |
| 3 | reflect that statement. |
| 4 | Q. Is it a fair statement that -- I'm |
| 5 | sorry. Let me just cut through all |
| 6 | this. But there was always going to be |
| 7 | an adjustment made; it was just not |
| 8 | clear what adjustment was going to be |
| 9 | made; correct? |
| 10 | A. There was -- there was -- we never |
| 11 | claim that there was not an agreement |
| 12 | that there would be a, as EMCOR calls |
| 13 | it, a true-up, is their terminology I |
| 14 | think they use, but an adjustment based |
| 15 | on square footage. But it -- but based |
| 16 | on our findings before we started the |
| 17 | contract, that there was a document |
| 18 | between EMCOR and BB&T that showed a |
| 19 | 20-percent deduction in square footage |
| 20 | and that in April, 20 percent started |
| 21 | being deducted from PFMI. So -- |
| 22 | Q. Let me stop you. But until April, I |
| 23 | guess, except for the twenty-six- |

| | Page 139 |
|---|---|
| 1 | thousand-dollar credit, you had been |
| 2 | billing for 100 percent of the square |
| 3 | foot, hadn't you? |
| 4 | A. That is correct. |
| 5 | Q. And it's either the adjusted or the |
| 6 | gross. And if it's the gross, it's 6.9 |
| 7 | million; correct? |
| 8 | A. Uh-huh. |
| 9 | Q. So for all those months, you had got to |
| 10 | bill 100 percent based on those |
| 11 | numbers. |
| 12 | A. We were told to bill. We didn't get to |
| 13 | bill. We tried to adjust it. And we |
| 14 | were instructed not to adjust it. If |
| 15 | we had adjusted it, it could have |
| 16 | prevented or would have prevented much |
| 17 | of the problems that we're encountering |
| 18 | now. |
| 19 | Q. Do you recall the percentage adjustment |
| 20 | that you were trying to make? |
| 21 | A. It wasn't a set percentage. It was |
| 22 | based on the surveys as they came in. |
| 23 | Q. Was it based on the ones you were |

| | Page 140 |
|---|---|
| 1 | confident on? |
| 2 | A. Yes. |
| 3 | Q. What did you do with the ones that you |
| 4 | weren't confident with? How did you |
| 5 | handle that? |
| 6 | A. You have to ask Mr. Wohlers. |
| 7 | Q. Mr. Wohlers is going to know that? |
| 8 | A. (Witness nodded.) |
| 9 | Q. What actions did EMCOR take to -- did |
| 10 | EMCOR ever tell PFMI that it couldn't |
| 11 | participate or that it was -- it |
| 12 | couldn't challenge any surveys that |
| 13 | were performed by EMCOR |
| 14 | representatives? |
| 15 | A. EMCOR never produced any surveys |
| 16 | produced by EMCOR representatives to us |
| 17 | to challenge. |
| 18 | Q. I understand that's your testimony. |
| 19 | A. They only -- they only deducted 20 |
| 20 | percent. |
| 21 | Q. Okay. My question is different. My |
| 22 | question is, did EMCOR ever tell you |
| 23 | that you could not challenge whatever |

| | Page 141 |
|---|---|
| 1 | remeasurements were done? |
| 2 | A. EMCOR agreed that we would be able to |
| 3 | agree upon the square footage. And we |
| 4 | were never given the opportunity to do |
| 5 | that simply because they started |
| 6 | deducting 20 percent and they never |
| 7 | gave us a complete list of measurements |
| 8 | for us to spot-check. So in that case, |
| 9 | they did deny it. |
| 10 | Q. But you agree that 30-40 percent of |
| 11 | these just probably weren't right? |
| 12 | A. Thirty or 40 percent of what they |
| 13 | measured? |
| 14 | Q. When I say "these," I'm talking about |
| 15 | the original measurements that you got |
| 16 | for the square footages for the BB&T |
| 17 | locations from your vendors. |
| 18 | A. I would say 30 or 40 percent could have |
| 19 | been questionable. I don't know that |
| 20 | they were not right. |
| 21 | Q. And you don't know because PFMI didn't |
| 22 | perform any of the measurements; |
| 23 | correct? |

36  (Pages 138 to 141)

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 142

1  A. We didn't know because we didn't go
2     back and measure any of them.
3  Q. Did you measure any of the ones that
4     were 60 or 70 percent that you felt
5     confident in?
6  A. First measurement?
7  Q. Correct.
8  A. Very few, if any, Ben. But I don't --
9     I couldn't testify to exact.
10 Q. Sure. But, you know, PFMI's accusing
11    my client of misrepresentation and
12    essentially making false statements.
13    Is that document right there that
14    you're looking at, which is
15    Exhibit #14, is that a
16    misrepresentation when it has gross and
17    adjusted square footage numbers? Is
18    that a misrepresentation?
19       MS. TULEY: Object to form.
20          Asked and answered. Go
21          ahead.
22 A. When they don't give us Exhibit C with
23    it that shows 20-percent reduction of a

Page 143

1     form that's between EMCOR and BB&T and
2     somehow gets sent out for us to see and
3     then we question them on it, yes. And
4     the trash, when it states that -- that
5     we would be provided the means of
6     disposing the trash and if we had to
7     remove it, we would get paid, that's
8     definitely misrepresentation.
9        MR. SAWYER: Off the record.
10          (Off-the-record discussion)
11          (Brief recess)
12       MR. SAWYER: Let's go back
13          on the record.
14 Q. (By Mr. Sawyer) Currently, do you have
15    any ownership interest in any of the
16    subcontractors that performed work on
17    this project?
18 A. Any ownership interest of any of the
19    subcontractors. No.
20 Q. During the project, did you have any
21    ownership -- you or PFMI have any
22    ownership interest in any of the
23    subcontractors?

Page 144

1  A. No.
2  Q. FMI is just a coincidence; right?
3  A. Correct.
4        (Brief pause)
5  Q. I'm looking, I guess, at paragraph 45
6     of the Complaint that your company has
7     filed against my client, EMCOR. It
8     says -- I'll just read it verbatim --
9     EFS knew or should have known that the
10    square footage numbers they'd placed in
11    the bid package provided to PFMI were
12    false. I'll let you just --
13       MR. SAWYER: I'm letting the
14          witness take a look at
15          it.
16 A. In 45? Knew or should have known the
17    square footage numbers they placed in
18    the bid package provided. Okay.
19 Q. I'm just trying -- it's kind of hard to
20    get my arms around. The deal was
21    always that PFMI would go out and
22    measure the locations; right?
23 A. That was what we agreed to do.

Page 145

1  Q. If it was PFMI's job to go out and
2     measure what the square footages
3     actually were, isn't it -- you know,
4     it's obvious that BB&T, EMCOR, whoever
5     it was, didn't have a firm
6     square-footage number.
7  A. But they had an estimated square
8     footage number based on Exhibit C that
9     they did not provide to us.
10 Q. And this has got my highlighting and I
11    apologize. But I'll mark this as the
12    next in order.
13          (Joint Exhibit #17 was
14          marked for identification.)
15 Q. We've been talking about an Exhibit C
16    that wasn't provided, I guess, to you.
17    Well, why don't you take a look at
18    Exhibit #17 and tell me what it is.
19       MS. TULEY: Off the record
20          for just a second while
21          he looks.
22          (Off-the-record discussion)
23       MR. SAWYER: Back on the

37 (Pages 142 to 145)

6c35e358-8cbe-4642-b782-f0632955f3c9

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

| | Page 146 |
|---|---|
| 1 | record. |
| 2 | Q. Have you had the opportunity to take a |
| 3 | look at what's been marked as |
| 4 | Exhibit #17? |
| 5 | A. I have. |
| 6 | Q. Do you recall the document? |
| 7 | A. I recall the E-mail, yes. |
| 8 | Q. Is that the E-mail you've been |
| 9 | referring to in this deposition, the |
| 10 | E-mail from Steven King? |
| 11 | A. Correct. |
| 12 | Q. The spreadsheet that's attached to the |
| 13 | E-mail, did it come with that E-mail? |
| 14 | A. I could not -- I don't know. |
| 15 | Q. Well, I can represent to you that it |
| 16 | was produced in PFMI's documents. The |
| 17 | question is, well, do you know one way |
| 18 | or the other whether -- at some point |
| 19 | in time, PFMI had it because I got it |
| 20 | from PFMI. Do you know when PFMI got |
| 21 | that? |
| 22 | A. I would assume we got it after we |
| 23 | questioned the 20 percent, because it |

| | Page 147 |
|---|---|
| 1 | was not in the original documents or |
| 2 | bid request. |
| 3 | Q. And the E-mail that you're looking at |
| 4 | right there which is marked as |
| 5 | Exhibit #17 -- |
| 6 | MR. SAWYER: And for the |
| 7 | record, it's a |
| 8 | July 11th, 2005, E-mail |
| 9 | from Steven King to Jim |
| 10 | Wohlers at 12:02 p.m. |
| 11 | A. Uh-huh. |
| 12 | Q. Does that refresh your recollection, |
| 13 | now that you've looked at that, one way |
| 14 | or the other as to whether EMCOR |
| 15 | provided an Exhibit C which showed 5.4 |
| 16 | million estimated square feet? |
| 17 | A. I do know it was provided after we |
| 18 | requested the -- we questioned it. |
| 19 | Whether it was provided before, I can't |
| 20 | testify to that or exactly when it was |
| 21 | provided. |
| 22 | Q. And didn't Mr. King in that E-mail |
| 23 | which you're looking at, which is |

| | Page 148 |
|---|---|
| 1 | Exhibit #17, say it doesn't matter -- |
| 2 | MS. TULEY: Flip it around |
| 3 | so he can read it. |
| 4 | Q. And I apologize, Mr. Littlefield. |
| 5 | A. That's all right. |
| 6 | Q. Well, I'll read from the document. |
| 7 | Bullet Point No. 2 says: The listed |
| 8 | square footage on this exhibit has |
| 9 | changed from total to estimated |
| 10 | cleanable, which results in a reduction |
| 11 | of the estimated annual cost. No. 3 |
| 12 | says: No. 2 above is a nonissue since |
| 13 | PFMI will be performing actual |
| 14 | measurements of cleanable space during |
| 15 | the first ninety days. |
| 16 | A. Okay. |
| 17 | Q. So the point is, that it didn't matter |
| 18 | what the estimated cost would be |
| 19 | because PFMI and its representatives |
| 20 | were going to be performing the |
| 21 | measurements; right? |
| 22 | A. Well, it matters that it's saying that |
| 23 | square footages on this exhibit had |

| | Page 149 |
|---|---|
| 1 | changed from total to estimated, which |
| 2 | results in a reduction of the estimated |
| 3 | cost; and that reduction was |
| 4 | approximately a 20-percent reduction. |
| 5 | Q. I understand that. But what I'm saying |
| 6 | is, isn't -- |
| 7 | A. And -- |
| 8 | Q. Hold me. Let me finish my question and |
| 9 | you can finish your answer. But isn't |
| 10 | he saying that it doesn't matter |
| 11 | because PFMI is going to perform the |
| 12 | actual measurements during the first |
| 13 | ninety days? |
| 14 | A. It says that it didn't matter, but |
| 15 | their 20 percent came back to this 20 |
| 16 | percent (indicating). |
| 17 | Q. But you didn't bill based on 5.4 |
| 18 | million dollars for the first -- or in |
| 19 | September, you didn't bill on the 5.4 |
| 20 | million dollars, did you? |
| 21 | A. No. We billed them based on the 6.7 or |
| 22 | 6.9. |
| 23 | Q. And in October, you didn't bill based |

1933 Richard Arrington Jr. blvd, S*Birmingham, AL 35209*www.merrillcorp.com
1-800-888-DEPO

6c35e358-8cbe-4642-b782-f0632955f3c9

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 150

1    on 5.4 million square feet, did you?
2  A. That's correct.
3  Q. And you didn't in November, either?
4  A. That's correct. But we tried to bill
5     less and EMCOR denied that.
6  Q. I understand. But in December, you
7     didn't bill from anything other than
8     this either 6.9 or 6.7 million;
9     correct?
10 A. That's correct.
11 Q. In January, same thing, except you gave
12    a credit for twenty-six thousand.
13 A. That's correct.
14 Q. February, used the same billing, which
15    is either 6.9 or 6.7 million; right?
16 A. Correct.
17 Q. And March, it was billed based on these
18    same square footages; correct?
19 A. Correct.
20 Q. What is the date of Exhibit #17?
21 A. It's dated July 11th.
22 Q. Do you recall when you executed the
23    letter of intent with EMCOR?

Page 151

1  A. I believe that document says it was
2     sent to us on July 13th.
3  Q. Do you remember whether you signed it
4     on July 13th or could have been -- it
5     could have been earlier or later?
6     Probably wouldn't have been earlier,
7     would it?
8  A. Wouldn't have been earlier.
9  Q. So it could have been July. It
10    wouldn't have been earlier than
11    July 13th?
12 A. (Witness nodded.)
13 Q. And to clean up my sloppy questions,
14    PFMI wouldn't have executed the letter
15    of intent prior to July 13th; right?
16 A. That's correct.
17 Q. Could have been later?
18 A. Could have been.
19 Q. But at least by July 11th, 2005,
20    Mr. King, in Exhibit #17, this E-mail,
21    is telling you that it really doesn't
22    matter what the estimated annual cost
23    or estimated square footage is because

Page 152

1     you're going to go out and get the
2     actual numbers; right?
3  A. Prior to this letter, we informed EMCOR
4     that if it was anticipated that there
5     was going to be 20 percent less square
6     footage in the banks, that we could not
7     perform that.
8  Q. And you told who at EMCOR?
9  A. Sean Brookins.
10 Q. Is that in a phone call?
11 A. That was in a phone call.
12 Q. Is there any confirmations as far as a
13    letter or an E-mail or . . .
14 A. No, none other than the response back
15    from Steven King.
16 Q. The response back from Steven King is
17    this --
18 A. To me, this response assured us that it
19    was not perceived that there was going
20    to be a 20 percent less square footage.
21    Industry standards generally in the
22    banking industry is generally more in
23    the 3 to 4 percent, and there's --

Page 153

1  Q. Industry standards would have been 3 or
2     4 percent in the banking industry?
3  A. Right.
4  Q. Is that branch or high-rise?
5  A. Branch. We do not clean high-rises for
6     BB&T.
7  Q. Do you clean high-rises for anyone?
8  A. Yeah.
9  Q. Do you clean branch banking for anyone
10    else?
11 A. Yes.
12 Q. Colonial?
13 A. That's one customer.
14 Q. Did you bid Colonial during this job?
15 A. I can't recall if it was bid during the
16    job or after the job.
17 Q. Does March of 2006 ring any bells?
18 A. It doesn't ring any bells, Ben, no.
19 Q. Did you actually get the Colonial
20    Bank --
21 A. We are performing services for Colonial
22    Bank.
23 Q. Are you doing that right now?

6c35e358-8cbe-4642-b782-f0632955f3c9

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

| Page 154 |
| --- |

1   A. Yes.
2   Q. Do you recall as you sit here today
3      when you bid that job?
4   A. We started that job probably a year and
5      a half ago.
6   Q. I'm sorry -- higher math.  Where would
7      that put us?
8   A. That's why I can't be for sure.  I just
9      know how long ago it was.
10  Q. Whatever it is, it's probably about a
11     year and a half; right?
12  A. Yes.
13  Q. Was there ever a memorandum of
14     understanding or letter of intent or a
15     contract on the Colonial Bank job?
16  A. On all work we do, there's either a
17     letter of intent or a contract on the
18     jobs.
19  Q. Do you recall one way or the other
20     whether you were required by that on
21     the Colonial Bank job to go out and
22     measure cleanable square footage?
23  A. No, we were not.

| Page 155 |
| --- |

1   Q. You were not?
2   A. Were not.
3   Q. Was it just a lump-sum contract?
4   A. It's a firm fixed-cost contract.
5   Q. But you were not required to go out and
6      measure the cleanable square footage
7      for the --
8   A. No, we weren't.
9   Q. No field measurements were done at all;
10     right?
11  A. I can't say that no field measurements
12     were done at all, but we were not
13     required by the customer to go out and
14     measure.
15  Q. Is it customary to do that?
16  A. No.
17  Q. This was unique?
18  A. Is it customary to do what?
19  Q. To go out and verify the actual amount
20     of cleanable square footage, or is it
21     customary to do a lump sum?  Or have
22     you done both?
23  A. We've done both.

| Page 156 |
| --- |

1   Q. Have you done one more than the other?
2   A. I couldn't -- couldn't say so.
3   Q. How many square feet are you managing
4      on the Colonial Bank job?
5   A. I -- I don't know what the total square
6      footage on that job would be.
7   Q. Are you self-performing?  When I say
8      "you," I mean PFMI.
9   A. We are not self-performing most of
10     that.
11  Q. I'm sorry.  Did you say you are not
12     self-performing?
13  A. Correct.
14  Q. What vendors are you using?
15  A. We're using -- for what service?
16  Q. Janitorial.
17  A. Janitorial?  We use Varsity in a large
18     number of those locations.
19  Q. Any others?
20  A. Some smaller contractors scattered
21     but . . .
22  Q. Any other ones that were part of the
23     alliance group?

| Page 157 |
| --- |

1   A. No, because they didn't fit into their
2      geographical regions.
3   Q. Did Mr. Cristal help you with that bid?
4      And I'm referring to Colonial Bank.
5   A. He did not in the bid and -- and
6      he forms a pricing or he presented --
7      at the time, he was working for EMCOR.
8      And he presented EMCOR's man-in-the-van
9      portion, which we subbed out to EMCOR.
10  Q. Is EMCOR currently doing that job?
11  A. They're currently doing the Alabama and
12     Georgia regions; their subsidiary,
13     Aircon, is.
14  Q. Did there come a time when Mr. Cristal
15     came to work for you?
16  A. Yes.
17  Q. When did that happen?
18  A. I would have to, there again, get a
19     payroll record to be exact.
20  Q. Sure.
21  A. But I'm thinking it would have been
22     around April of '06 or maybe September
23     of '06.  I'm not -- not positive other

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

| Page 158 | | Page 160 | |
|---|---|---|---|
| 1 | than looking at the, you know, payroll | 1 | Q. Is that in Atlanta? |
| 2 | record to verify that, Ben. | 2 | A. Yeah, in Atlanta. |
| 3 | Q. Sure. Do you remember whether it was | 3 | Q. So he just quit? |
| 4 | while the BB&T job was going on? | 4 | A. Yes. |
| 5 | A. No. If my recollection is correct, it | 5 | Q. You happy or sad to see him go? |
| 6 | was probably six months after our BB&T | 6 | A. No response. |
| 7 | involvement. | 7 | Q. Indifferent? |
| 8 | Q. Was it after the termination letter? | 8 | A. Indifferent. |
| 9 | A. Yes. | 9 | Q. During the time he was there, did |
| 10 | Q. I believe the termination letter came | 10 | Mr. Cristal get any other jobs for PFMI |
| 11 | in April of 2006 for the original | 11 | or help get other jobs for PFMI? |
| 12 | contract. Does that comport with | 12 | A. Not to my recollection. |
| 13 | your . . . | 13 | MR. SAWYER: Off the record. |
| 14 | I'll represent to you that this | 14 | (Off-the-record discussion) |
| 15 | is Exhibit #6 from yesterday's | 15 | MR. SAWYER: Back on the |
| 16 | deposition of Mr. Brookins. | 16 | record. |
| 17 | A. Okay. | 17 | Q. All right, Mr. Littlefield. I'm going |
| 18 | Q. And looks like Exhibit #6, which is a | 18 | to ask this -- I'm going to try to |
| 19 | letter from Sean Brookins to you, | 19 | summarize and correct me where I'm |
| 20 | Mr. Littlefield, is an April 28th, | 20 | wrong. I just want to kind of hit some |
| 21 | 2006, letter terminating the original | 21 | points and move along so we don't hit |
| 22 | contract. Fair statement? | 22 | our seven-hour limit. |
| 23 | A. Yes. | 23 | But we've been talking, I guess, |

| Page 159 | | Page 161 | |
|---|---|---|---|
| 1 | Q. So I guess the best of your | 1 | about misrepresentations and the |
| 2 | recollection is that Mr. Cristal came | 2 | square-footage issue. But, number one, |
| 3 | on to work after -- | 3 | I guess we all agree that it was going |
| 4 | A. Yes. | 4 | to be based on what was actually out |
| 5 | Q. -- the termination letter? | 5 | there, right, what square footage was |
| 6 | A. Yes. I would assume three months or | 6 | actually out there? |
| 7 | more. But, of course, the payroll | 7 | A. It was going to be based upon the |
| 8 | documents would be exact so . . . | 8 | actual agreed-upon square footage. |
| 9 | Q. Sure. What did Mr. Cristal do for you? | 9 | Q. And that was what was actually the |
| 10 | A. What was he hired to do? | 10 | cleanable square footage? |
| 11 | Q. What was he hired to do? | 11 | A. Yes. |
| 12 | A. He was hired to sell facility services. | 12 | Q. But for September through, I guess, end |
| 13 | Q. Well, the way you couched it, were | 13 | of March, PFMI's billings were based on |
| 14 | there some problems you had with | 14 | either 6.9 or 6.7 -- |
| 15 | Mr. Cristal? | 15 | MS. TULEY: Object to form. |
| 16 | A. Well, he worked -- and there again, you | 16 | Q. -- million square feet? |
| 17 | know, our payroll records would reflect | 17 | MS. TULEY: Same objection. |
| 18 | exact amount of time -- but I think it | 18 | A. They're based upon the numbers provided |
| 19 | was less than a year for us. | 19 | to us by EMCOR. |
| 20 | Q. Did you fire him? | 20 | Q. And those numbers were 6.9 and 6.7 |
| 21 | A. No. He went to work for, I believe, | 21 | million square feet? |
| 22 | another EMCOR competitor, Linc | 22 | A. Now, for which months? It would not be |
| 23 | Services. | 23 | correct for all the months because all |

41 (Pages 158 to 161)

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

| Page 162 |
| --- |

```
1    the locations did not start up at the
2    same time.
3  Q. It was a staggered start?
4  A. In some locations, certain regions. So
5    we did not bill for those entire months
6    for 6.7 or 6.9.
7  Q. It would have been from wherever you
8    were actually cleaning; right?
9  A. Right. But we assumed that we were
10    deducted based on that for all those
11    months.
12  Q. That's interesting. You assumed but
13    don't know whether you were billing for
14    work that wasn't going forward?
15  A. No. That we were deducted for work
16    that wasn't billed.
17  Q. And you're talking about the deductions
18    that occurred in April?
19  A. In April and going forward from there.
20  Q. Starting in April and going forward.
21    But it was always understood there
22    would be an adjustment; correct?
23  A. It was always understood --
```

| Page 163 |
| --- |

```
1  Q. And I'm sorry to cut you off. In fact,
2    you tried to make an adjustment and
3    EMCOR wouldn't let you; right?
4  A. That's what I'd said many times.
5  Q. Right. And that to the best of your
6    knowledge, that was because -- that was
7    based on the actuals that you had and
8    that you were -- the actual square
9    footages that you had and were
10    confident in; correct?
11  A. It was in surveys that we had received
12    back, yes.
13  Q. And I recall that was roughly
14    twenty-six thousand dollars?
15  A. What was roughly twenty-six thousand?
16  Q. The credit that you gave in January.
17  A. Yes.
18  Q. And subsequently you tried to apply
19    different credits for square-footage
20    numbers that you had -- actual
21    cleanable square-footage numbers that
22    you had and were told not to by EMCOR?
23  A. Correct.
```

| Page 164 |
| --- |

```
1  Q. Actually, Jim was told and Jim told
2    you; correct?
3  A. That's correct.
4  Q. And Jim is going to know the most about
5    why that was done?
6  A. (Witness nodded.)
7  Q. And Debi Crosby's the one that told you
8    that you would be paid for trash
9    removal; correct?
10  A. She was the one that was in charge, and
11    she was the one on a conference call
12    that indicated that we would be paid
13    for trash removal.
14  Q. My understanding is that the real issue
15    was that BB&T was removing dumpsters;
16    right?
17  A. The real issue . . .
18  Q. Well, there were certain dumpsters that
19    were on site, and BB&T was -- made the
20    decision to start removing them.
21  A. To remove -- correct.
22  Q. And that was an issue, wasn't it?
23  A. An issue with who?
```

| Page 165 |
| --- |

```
1  Q. With PFMI.
2  A. It was an issue with EMCOR and an issue
3    with PFMI.
4  Q. It was an issue with both parties,
5    wasn't it?
6  A. (Witness nodded.)
7  Q. Let me try to summarize this. PFMI was
8    going to be responsible for trash
9    removal; correct?
10  A. We were to be responsible to place
11    trash in an onsite dumpster or carry it
12    to a designated location.
13  Q. And BB&T at some point in time made
14    some decision that they were going to
15    remove dumpsters that were on the
16    sites; right?
17  A. That's correct.
18  Q. And that increased your cost, didn't
19    it, or it increased your subs' cost?
20  A. Exactly.
21  Q. And you felt that was a change of
22    scope.
23  A. It was a change in what our cost was
```

42 (Pages 162 to 165)

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 166

```
1     going to be, yes.
2  Q. So the real issue is for -- and correct
3     me if I'm wrong here.  The real issue
4     is where BB&T elected to remove
5     dumpsters from sites which required, I
6     believe your words were, your
7     contractors or your vendors to haul
8     trash in the trunks of their cars,
9     et cetera, and take them other places;
10     is that right?
11           MS. TULEY: Object to form.
12  A. The real issue is that it was addressed
13     before the contract was started and
14     that PFMI was told by EMCOR that if we
15     incurred additional costs in the effort
16     of removing trash, that we would be
17     paid for it.
18  Q. But PFMI was going to always handle the
19     trash for where there were dumpsters on
20     site and ones where there was a
21     designated facility to put that trash
22     away or dispose of that trash; correct?
23  A. That was the scope.  But there was
```

Page 167

```
1     never a designated location presented
2     to us.
3  Q. For any sites.
4  A. For any sites that I know of.  We had
5     to figure it out.
6  Q. How did you figure it out?
7  A. Well, we paid our subs, found -- either
8     got dumpsters put at certain locations
9     they could take it to.  They paid other
10     companies to use their dumpsters.  And
11     in some cases, it was -- it was taken
12     to another BB&T dumpster across town,
13     which were complaints about.  In some
14     cases, it was thrown in somebody else's
15     dumpster.
16  Q. How much have you incurred or paid to
17     date -- how much has PFMI paid to date
18     for additional trash removal costs?
19  A. Ben, I'd have to -- I don't have that
20     information in my head.
21  Q. Is it more than a hundred thousand
22     dollars?
23  A. I would say probably so.
```

Page 168

```
1  Q. More than two hundred?
2  A. We have been invoiced for more than two
3     hundred.  Yes.
4  Q. Who were the vendors that invoiced you
5     for trash removal?
6  A. I don't know that I can name them all.
7     But --
8  Q. Well, of the alliance group, who were
9     your direct subtier contractors?
10  A. I know FMI and the other alliance
11     partners was under the understanding
12     that, all along, that that was an issue
13     that was being discussed with EMCOR and
14     EMCOR was having meetings with BB&T and
15     at some date they would get paid for
16     it.  But as I said earlier, there were
17     certain other vendors that BB&T and/or
18     EMCOR directed us to use, and they paid
19     their trash invoices that came through
20     us.
21  Q. What vendors did EMCOR direct you to
22     use?
23  A. They directed us to use a John Parrish.
```

Page 169

```
1  Q. Is that an individual or a company?
2  A. That's an individual.  I don't know his
3     company.  They directed us to use
4     Destiny Cleaning.
5  Q. EMCOR directed you to use Destiny's
6     Cleaning.  Is that your testimony?
7  A. EMCOR/BB&T.
8  Q. I'm just talking about EMCOR right now.
9  A. Okay.
10  Q. Did EMCOR direct you to use Destiny's
11     Cleaning?
12  A. Yes.
13  Q. Who at EMCOR directed you to --
14  A. Sean Brookins.
15  Q. When did you hire Destiny's Cleaning?
16  A. Oh, probably forty-five to sixty days,
17     maybe approaching into the ninety days
18     into the contract.
19  Q. Did you have a direct contract with
20     Destiny's Cleaning?
21  A. We sent a contract to Destiny's
22     Cleaning and was instructed that he had
23     not signed it because his local BB&T
```

43 (Pages 166 to 169)

1933 Richard Arrington Jr. blvd, S*Birmingham, AL 35209*www.merrillcorp.com
1-800-888-DEPO
6c35e358-8cbe-4642-b782-f0632955f3c9

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

| Page 170 | Page 172 |
|---|---|
| 1     representative was looking it over for<br>2     him.<br>3   Q. Did you pay Destiny's Cleaning?<br>4   A. Yes.<br>5   Q. Sean Brookins told you you had to use<br>6     this vendor?<br>7   A. With -- in the office of Ronny Eller<br>8     with Sean Brookins, it was directed to<br>9     us to not only use them but when they<br>10    would be starting.<br>11   Q. Who said that, Ronny Eller or Sean<br>12    Brookins?<br>13   A. Ronny Eller.<br>14   Q. So Mr. Eller directed you to use<br>15    Destiny's Cleaning, and Sean was in the<br>16    room?<br>17   A. That's correct.<br>18   Q. Is that because Destiny's Cleaning had<br>19    money in BB&T's accounts or did he say<br>20    why?<br>21   A. No. The RBOM was unhappy with the<br>22    changes and we had had representatives<br>23    in her region, all three of the | 1     to use.<br>2   A. Well, EMCOR was in charge of the<br>3     contract, so all these, they directed<br>4     us to use.<br>5   Q. Who did they -- other than John Parrish<br>6     and Destiny's Cleaning?<br>7   A. It would be two companies in -- I<br>8     believe it's the Myrtle Beach area, a<br>9     John Cashion, and another company in<br>10    that region. We were directed to not<br>11    use our -- our vendor, was just a week<br>12    or two weeks prior to that.<br>13   Q. Are you aware of something termed, I<br>14    guess, the -- well, strike that. Did<br>15    EMCOR terminate PFMI?<br>16   A. Based on the termination letter, yes.<br>17   Q. After that, was there a new agreement<br>18    reached?<br>19   A. There was an agreement reached -- an<br>20    agreement for us to perform services,<br>21    and we started performing those<br>22    services, yes.<br>23   Q. Was that agreement written or oral? |

| Page 171 | Page 173 |
|---|---|
| 1     previous managers I'd mentioned earlier<br>2     to you, there along with our vendors'<br>3     managers, and could not make her happy.<br>4     So it was directed by BB&T to EMCOR, I<br>5     suppose EMCOR to us, to use that<br>6     company.<br>7   Q. Best of your recollection, was that<br>8     because that was who that RBOM had used<br>9     before?<br>10   A. Yes.<br>11   Q. And I believe Mr. Wohlers is going to<br>12    know more about the stolen proof bag.<br>13   A. Yeah.<br>14   Q. And --<br>15   A. And there was other vendors that we<br>16    were directed to use.<br>17   Q. What were those or who were those? Who<br>18    did EMCOR direct you to use?<br>19   A. Well, EMCOR is who managed us. But the<br>20    word came from BB&T in many cases<br>21    through EMCOR to use certain other<br>22    vendors.<br>23   Q. I'm asking about who EMCOR directed you | 1   A. It was a written agreement. It was --<br>2     it was discussed orally and then put<br>3     into a written document.<br>4   Q. Was it signed by both parties?<br>5   A. No.<br>6   Q. Did you sign it?<br>7   A. No.<br>8   Q. Who signed it?<br>9   A. Well, I'm not sure if EMCOR signed it<br>10    or not. It was sent to us by EMCOR,<br>11    and I don't recall if they had already<br>12    signed it. I would assume they<br>13    probably didn't sign it before they<br>14    sent it to us.<br>15       MR. SAWYER: Can we mark<br>16       this as the next one in<br>17       order?<br>18      (Joint Exhibit #18 was<br>19      marked for identification.)<br>20   Q. Take a look at what's been marked as<br>21    Exhibit #18 and let me know if you can<br>22    identify it.<br>23      (Brief pause while witness |

44 (Pages 170 to 173)

1933 Richard Arrington Jr. blvd, S*Birmingham, AL 35209*www.merrillcorp.com
1-800-888-DEPO
6c35e358-8cbe-4642-b782-f0632955f3c9

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

| | Page 174 |
|---|---|
| 1 | reviews document) |
| 2 | A. Okay. |
| 3 | MS. TULEY: Was the question |
| 4 | for him to identify? |
| 5 | Q. Can you identify it? |
| 6 | A. It -- it is agreement with EMCOR and |
| 7 | PFMI for services to be provided in |
| 8 | certain regions for BB&T. |
| 9 | Q. And what I just heard you say is |
| 10 | there's a -- there's a written |
| 11 | agreement between EMCOR and PFMI, and I |
| 12 | heard Mr. Brookins say that yesterday. |
| 13 | Is there a written agreement between |
| 14 | PFMI and EMCOR for June of 2006 through |
| 15 | 2008? |
| 16 | A. I believe, if you'll read back on the |
| 17 | cancellation letter, there was |
| 18 | reference made to them wanting us to |
| 19 | service certain areas of BB&T, which we |
| 20 | agreed to, and they agreed to pay us. |
| 21 | Q. I've read the cancellation letter. My |
| 22 | question is different. My question is, |
| 23 | is there a written agreement or written |

| | Page 176 |
|---|---|
| 1 | termination? |
| 2 | A. That under the new agreement, that PFMI |
| 3 | would service a select number of |
| 4 | locations and we would begin billing |
| 5 | based on new square footages that they |
| 6 | produced to us for those areas, and |
| 7 | that that would begin a clean slate and |
| 8 | there would be no deductions going |
| 9 | forward in the new contract. |
| 10 | Q. How long did PFMI perform under the new |
| 11 | agreement? |
| 12 | A. Approximately six weeks, a month and a |
| 13 | half. |
| 14 | Q. And that would have been in June? |
| 15 | A. Yes. May I take a five-minute break? |
| 16 | Q. Absolutely. |
| 17 | (Brief recess) |
| 18 | MR. SAWYER: Back on the |
| 19 | record. |
| 20 | Q. (By Mr. Sawyer) Mr. Littlefield, did |
| 21 | you have any involvement with the |
| 22 | creation of the expert report that's |
| 23 | been produced in this action? |

| | Page 175 |
|---|---|
| 1 | contract for services going forward |
| 2 | after the termination? |
| 3 | A. There's a written contract, but there's |
| 4 | not a signed contract. |
| 5 | Q. And you're not a lawyer, sir; right? |
| 6 | A. No. I'm a janitor. |
| 7 | Q. Is there any document out there that |
| 8 | comprises the new agreement between |
| 9 | EMCOR which is signed by both parties? |
| 10 | A. Could you repeat your question? |
| 11 | Q. Sure. Is there any document in |
| 12 | existence signed by both parties |
| 13 | memorializing the agreement between |
| 14 | EMCOR and PFMI? |
| 15 | A. There was a verbal. |
| 16 | Q. Okay. But to your knowledge, the best |
| 17 | of your knowledge, there is no written |
| 18 | memorialization of what the agreement |
| 19 | going forward from June 2006 through |
| 20 | 2008 was going to be; is that accurate? |
| 21 | A. There's no document signed. |
| 22 | Q. What was the verbal agreement between |
| 23 | EMCOR and PFMI going forward from the |

| | Page 177 |
|---|---|
| 1 | A. I don't think I had any involvement |
| 2 | other than making sure Jim produced, |
| 3 | you know, information they requested. |
| 4 | Q. Did you ever speak with the expert? |
| 5 | A. The -- I think maybe once on a |
| 6 | conference call. |
| 7 | MR. SAWYER: I believe |
| 8 | that's Mr. Capilouto? |
| 9 | MS. TULEY: Yes. |
| 10 | Q. Did you ever E-mail your expert? |
| 11 | A. I did not. |
| 12 | Q. Did you ever provide any documents to |
| 13 | him, or just Jim? |
| 14 | A. Just Jim, that I am aware, that I |
| 15 | recall. |
| 16 | MR. SAWYER: Let me mark |
| 17 | this as the next in |
| 18 | order. |
| 19 | (Joint Exhibit #19 was |
| 20 | marked for identification.) |
| 21 | Q. Take a look at what's been marked as |
| 22 | Exhibit #19 and let me first ask you if |
| 23 | you can identify this document. |

45 (Pages 174 to 177)

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 178

1  A. I can read that it's a document from
2     David Willis to -- to Jim and then, I
3     guess, a response from Jim.
4  Q. You ever remember being copied on that
5     E-mail?
6  A. It's quite possible, but I -- it's
7     no -- I don't know.
8  Q. In the CC line, that's your E-mail
9     address?
10 A. Where is the CC line?
11        (Mr. Sawyer indicated.)
12 A. Okay. Yes.
13       MR. SAWYER: Off the record.
14       (Off-the-record discussion)
15 Q. Does it have your E-mail address down
16    there?
17 A. It does not.
18 Q. I will represent to you that this was
19    produced to us by your attorney.
20 A. Uh-huh.
21 Q. But as you sit here today, do you
22    remember the issues that are identified
23    in this E-mail?

Page 179

1  A. It pretty much supports what we've been
2     talking about all day, that there was
3     square footages or surveys not turned
4     in and we had -- it appeared that we
5     put pressure on them to get their work
6     done. And as indicated, our plan was
7     to, as the surveys came, as I said,
8     that we would -- we would bill based on
9     the surveys coming in and EMCOR told us
10    not to. And it supports that, I guess.
11    So saying this way we'll not be going
12    back ninety days and having to make
13    adjustments.
14 Q. Okay. And the vendor that's being
15    written to there, I guess, is that --
16    David Willis, is he with FMI?
17 A. That -- I'm quite sure that is, yes,
18    FMI.
19 Q. And FMI was the vendor that you didn't
20    have a whole lot of confidences in the
21    numbers that he finally produced?
22 A. Well, they -- they at the time had not
23    produced all the numbers either.

Page 180

1  Q. And the time frame we're talking about
2     here is December, mid December,
3     December 19th, 2005?
4  A. Yes.
5        MR. SAWYER: Okay. Let me
6     mark the next in order.
7     (Joint Exhibit #20 was
8     marked for identification.)
9        MR. SAWYER: Off the record.
10       (Off-the-record discussion)
11 Q. (By Mr. Sawyer) Take a look at what's
12    been marked as Exhibit #20 to your
13    deposition. Let me first ask you, who
14    is Melanie Bullard?
15 A. She was the administrative person that
16    was hired, one of the three or four
17    that was hired.
18 Q. Take your time and read the whole
19    thing.
20 A. You want me to read it out loud?
21 Q. No, you don't have to read it for the
22    record. I just want you to . . .
23       (Brief pause while witness

Page 181

1        reviews document)
2  A. Yes, I think this supports also that,
3     you know, my statement of saying we
4     tried to correct the billing and that
5     in here we're telling them that we're
6     not -- that we're going to have to
7     revert back to adjusted square footage
8     off the master list until all the
9     locations had been surveyed by EMCOR.
10 Q. Do you have an understanding of what
11    the master list is?
12 A. Well, there was many lists that came
13    out entitled master list. But the
14    master locations.
15 Q. And in those master lists, did they
16    have a column for gross square footage
17    and adjusted square footage?
18 A. Yes. Exhibit A shows gross and
19    adjusted.
20 Q. And I believe you testified that you
21    didn't recall whether PFMI had been
22    billing off the gross or adjusted; is
23    that correct?

46 (Pages 178 to 181)

6c35e358-8cbe-4642-b782-f0632955f3c9

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 182

1  A. That's correct.
2  Q. Does this document refresh your
3     recollection as to whether PFMI was
4     billing off of gross or adjusted?
5  A. It does not. It states that it's going
6     to revert back to adjusted square
7     footage, but I still don't know if it
8     was gross or adjusted. Based on this
9     document, it says adjusted, but that
10    could have been a clerical error of her
11    putting in. She may have not known --
12    she may have been assuming adjusted or
13    gross as being the same thing.
14 Q. And whatever the invoices show, they'll
15    show; right?
16 A. Exactly.
17 Q. Do you have a specific recollection of
18    this E-mail?
19 A. No, I don't, because I -- at this point
20    on the day to day, I was copied on it.
21 Q. But to the best of your knowledge, does
22    it appear to be true and --
23 A. Oh, yes. It's an E-mail from PFMI to

Page 183

1     our subcontractors and alliance
2     partners.
3           MR. SAWYER: Let me mark
4        this as the next in
5        order.
6        (Joint Exhibit #21 was
7        marked for identification.)
8  Q. I know we talked about this new
9     agreement, which is apparently verbal.
10    But anyway, prior to entering into that
11    verbal agreement, do you recall any
12    negotiations between yourself and/or
13    Jim regarding what it was going to take
14    to get that agreement?
15 A. As far as what it was going to take to
16    get it . . .
17 Q. Let me form the question this way. Did
18    PFMI offer any concessions to obtain
19    the new agreement after termination by
20    EMCOR?
21 A. We were asked by EMCOR to give them a
22    statement that we would not pursue the
23    trash issue after we had already agreed

Page 184

1     to move forward the new agreement.
2     There was a phone call stating that
3     Mark Smith said that to continue with
4     the new agreement, that we would have
5     to provide a statement to them that we
6     would not pursue the trash issue, which
7     I would not do and told them we would
8     not do. And there's E-mail -- I think
9     there's E-mail to support that.
10 Q. Take a look at what's been marked as
11    Exhibit #21. You can go ahead and
12    take --
13 A. To read all the different parts of it?
14 Q. Yes, sir.
15        (Brief pause while witness
16        reviews document)
17 A. Okay.
18 Q. Did you have a chance to finish it all?
19 A. I did.
20 Q. Is that E-mail consistent with your
21    recollection?
22 A. Yes.
23 Q. Do you agree with the statements in

Page 185

1     that E-mail, which is marked as
2     Defendants' Exhibit -- strike that --
3     as Exhibit #21 to your deposition?
4  A. The response of this E-mail was that
5     Mark Smith had called --
6  Q. Well, before you get to the response,
7     let me just ask you, did you agree with
8     the statements that, I guess,
9     Mr. Wohlers is making here?
10 A. Well, he's making these statements to a
11    request from Mark Smith, and that
12    request was for us to send a letter
13    that we would not pursue the trash
14    issue and that would be contingent on
15    the new contract. We told him on that
16    issue that if -- if it was contingent
17    on us dropping the trash issue, that we
18    wouldn't go into a new contract. That
19    was his call and we asked him to
20    respond by a certain date, and I don't
21    think we had a response by that date.
22 Q. And I'm just going to read from
23    Exhibit #21. Says: Concerning the

47 (Pages 182 to 185)

6c35e358-8cbe-4642-b782-f0632955f3c9

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 186

1    trash issue, PFMI will waive all trash
2    removal charges on its behalf, period.
3    Did I read that correct?
4  A. That's what it says, yes.
5  Q. Did you --
6  A. However --
7  Q. Hold on. Did you agree with what
8    Mr. Wohlers was saying there?
9  A. However, there's a lot more to it than
10   that one sentence. I agree with the
11   entire paragraph.
12 Q. Okay. I'll read the rest of it.
13   However, there are subs that were told
14   by EMCOR and BB&T that they would be
15   paid for trash removal and have
16   submitted invoices to PFMI. And until
17   we receive the letter requested earlier
18   this week stating that trash removal is
19   a nonbillable item and we are able to
20   resolve this with our subs, we cannot
21   waive this issue. We would suggest
22   that PFMI and EMCOR work together to
23   resolve this issue to the benefit of

Page 187

1    both companies. We would hope that our
2    position on the trash does not hinder
3    us from moving forward on the BB&T
4    project as we see this as an issue that
5    can be resolved. We just do not see
6    how we can dismiss the trash issue with
7    EMCOR and BB&T with the amount of
8    exposure outstanding.
9        And you agree with that?
10 A. Agree with that.
11 Q. Did you ever receive such a letter from
12   EMCOR?
13 A. I -- I do not recall that we did. But
14   it's not my statement that we did not
15   receive one. I do not think we did,
16   though.
17 Q. Could have happened but --
18 A. I don't think it did.
19 Q. Don't believe that it did.
20 A. Right.
21      MR. SAWYER: Off the record.
22      (Off-the-record discussion)
23      (Brief recess)

Page 188

1  Q. (By Mr. Sawyer) I haven't given this to
2    you yet, but please take a look at what
3    was marked as Exhibit #15.
4        (Brief pause while witness
5        reviews document)
6  A. Okay.
7  Q. Had you seen your deposition notice
8    before?
9  A. I'm assuming so.
10 Q. That's enough of an identification for
11   me.
12      MS. TULEY: He's here.
13      MR. SAWYER: He is here.
14 Q. Is it a fair statement,
15   Mr. Littlefield, you wouldn't want to
16   overcharge EMCOR or BB&T?
17 A. That's correct.
18 Q. Fair statement that you wouldn't want
19   to charge them for square feet that you
20   weren't actually cleaning?
21 A. It's a fair statement we would want to
22   get paid for the work we did.
23 Q. Well, would you want to get paid for

Page 189

1    square feet that you weren't actually
2    cleaning?
3  A. We would want to get paid for the work
4    we did.
5  Q. I understand that. But you wouldn't
6    want to charge them for square feet
7    that you weren't actually cleaning;
8    correct?
9        MS. TULEY: Object to form.
10       Asked and answered.
11 A. We would want to get paid for the work
12   that we performed that we have not been
13   paid for.
14 Q. And we've been through Topics of
15   Examination 6, 7, 9, 13, and 14?
16       MS. TULEY: You can look at
17       my copy to see what he's
18       talking about.
19 A. I believe so.
20       MR. SAWYER: And I believe,
21       Counsel, that
22       Mr. Wohlers is going to
23       be brought here tomorrow

48 (Pages 186 to 189)

6c35e358-8cbe-4642-b782-f0632955f3c9

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 190

1          to testify as to the
2          others?
3          MS. TULEY: Yes.
4          MR. SAWYER: That's all I
5          have.
6
7      *  *  *  *  *  *  *  *
8      FURTHER DEPONENT SAITH NOT
9      *  *  *  *  *  *  *  *
10
11
12
13
14
15
16
17
18
19
20
21
22
23

Page 191

1          REPORTER'S CERTIFICATE
2
3    STATE OF ALABAMA )
                       )
4    ELMORE COUNTY   )
5
6        I do hereby certify that the above
7    and foregoing transcript was taken down
8    by me in stenotype, and the questions
9    and answers thereto were transcribed by
10   means of computer-aided transcription,
11   and that the foregoing represents a true
12   and correct transcript of the testimony
13   given by said witness.
14       I further certify that I am neither
15   of counsel, nor of any relation to the
16   parties to the action, nor am I anywise
17   interested in the result of said cause.
18
19
         Barbara A. Howell, CSR No. 508
20       Court Reporter and Commissioner
         for the State of Alabama at Large
21       MY COMMISSION EXPIRES: 12/27/08
22
23

49 (Pages 190 to 191)

6c35e358-8cbe-4642-b782-f0632955f3c9

# Exhibit C

12/07/2006 10:11 FAX  2038497880          EMCOR GROUP INC.                    ☑003/013



## IN THE CIRCUIT COURT OF
## MONTGOMERY COUNTY, ALABAMA

| | |
|---|---|
| PROFESSIONAL FACILITIES MANAGEMENT, INC., <br><br> Plaintiffs, <br><br> v. <br><br> EMCOR FACILITIES SERVICES, INC.; and A, B, and C, as fictitious parties who are those persons, corporations, partnerships or entities who acted either as principal or agent, for or in concert with the other named Defendants and/or whose acts caused or contributed to the damages sustained by the Plaintiff, whose identities are unknown to Plaintiff, but which will be substituted by amendment when ascertained, <br><br> Defendants. | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§     CIVIL ACTION NO: CV-*2006-900134* <br><br>        JURY TRIAL DEMANDED |

### COMPLAINT

1.   Plaintiff Professional Facilities Management, Inc. has its principal place of business located at 4164 Troy Highway, Montgomery, Alabama 36116.

2.   EMCOR Facilities Services, Inc. has its principal place of business in Arlington, Virginia.

3.   The fictitious defendants A, B, and C are those persons, corporations, partnerships or entities who acted either as principal or agent, for or in concert with the other named Defendant and/or whose acts caused or contributed to the damages sustained by the Plaintiff, whose identities are unknown to Plaintiff, but which will be substituted by amendment when ascertained.

12/07/2006 10:11 FAX  2038497880        EMCOR GROUP INC.                    ☑004/013

4.    At all times material hereto EMCOR Facilities Services, Inc. (EFS) negotiated with Professional Facilities Management, Inc. (PFMI) over the telephone to PFMI in Montgomery, Alabama.   All payments from EFS were sent to PFMI in Montgomery, Alabama.   Representatives of EFS came to Montgomery, Alabama to conduct business with PFMI.

5.    Venue is proper in Montgomery, Alabama.

### STATEMENT OF FACTS

6.    Branch Banking & Trust (BB&T) contracted with EFS to provide facility management for its branch banks located in several states.

7.    As part of its facility management EFS was to obtain janitorial services for those branches.

8.    On or about March 17, 2005, EFS sent out a bid packet for janitorial work to be done at BB&T branch facilities in several states including Alabama.

9.    That bid packet contained a list of the square footage at each location to be cleaned.

10.    Relying on the square footage numbers contained in the bid packet, PFMI bid on the BB&T services contract.

11.    On or about July 12, 2005, EFS accepted PFMI's bid and they entered into a contract for services.  On or about July 13, 2005 EFS and PFMI executed a letter of intent stating in pertinent part that PFMI would begin to transition its services beginning July 12, 2005 with full implementation by September 6, 2005.

12.    The letter of intent also allowed for time for both parties to negotiate a mutually satisfactory definitive contractor agreement based on PFMI's proposed scope and pricing as outlined in their bid.

13.    PFMI discovered in its due diligence that BB&T wanted to remove the dumpsters from many branch locations. This left PFMI with the task of removing trash and garbage from the locations and hauling it to a suitable disposal site, thus increasing the labor costs associated with those branches.

14.    EFS acknowledged that trash disposal would have to be paid for separately and asked PFMI to present bills for the disposal. To date those bills have not been paid.

15.    During this negotiation period both parties understood that some adjustments to the cleanable square footage would by made.

16.    During the first ninety (90) days of the service PFMI, pursuant to the parties agreement, conducted measurements of many of the BB&T branch locations. Those measurements were provided to EFS.

17.    After the letter of intent was entered PFMI and EFS began in earnest to negotiate a final contactor agreement.

18.    During this time, PFMI began to provide janitorial services at the BB&T branch banks according to the square footage as provided them by EFS.

19.    During the months that the contract was being negotiated between PFMI and EFS, EFS began to give PFMI new square footage numbers for the facilities.

20.    Eventually BB&T provided EFS numbers that were approximately 15% less than the total original square footage provided to PFMI.

21.     In an email these dramatically lower numbers were called "estimated cleanable" square footage by EFS.

22.     Those estimated numbers were in EFS's words a "non issue" since PFMI would conduct their own measurements.

23.     EFS never agreed to the numbers provided by PFMI.

24.     EFS would not accept those numbers and continued to provide their own numbers that lowered the cleanable square footage.

25.     In or around April 2006, EFS deducted approximately 17% off of the bill submitted by PFMI claiming that was to recoup money for the disputed lower square footage numbers cleaned in previous months.

26.     In or around May 2006, EFS deducted approximately 20% from the first bill submitted by PFMI.

27.     There was no agreement between the parties allowing EFS to unilaterally take a set off.  Particularly, since no agreement had been reached as to the actual square footage to be cleaned.

28.     In or around June 2006, EFS terminated the contract with PFMI.

29.     The second bill for May cleaning was not paid by EFS.

30.     In or around June of 2006, EFS entered into a new contract with PFMI based on the new disputed contract numbers and PFMI began billing based on those numbers.

31.     There was an agreement that EFS would not take deductions from the new contract.

32.    Despite starting under a new agreement EFS refused to pay the June 2006 cleaning bill claiming a set off for previous months.

33.    By July 2006, PFMI could no longer continue to work under the EFS agreement due to the large amount of backpay owed.

### COUNT I

34.    On or about July 13, 2005 a contract was entered into between EFS and PFMI for the provision of janitorial services by PFMI to EFS's customer BB&T.

35.    Between July 2005 and June 2006 PFMI provided the contracted for services to EFS.

36.    EFS withheld payment for a portion of those services.

37.    EFS owes PFMI payment for work completed.

38.    Due to EFS's breach of contract PFMI has suffered damages, including, but not limited to, loss of revenue, interest on funds borrowed to pay subcontractors for work done at BB&T branches and loss of business opportunity.

WHEREFORE, PREMISES CONSIDERED, plaintiff demands compensatory damages in compensation for work performed and billed plus interest, attorney's fees and costs as allowed by law.

### COUNT II

39.    EFS represented to PFMI in its bid package that the total square footage to be cleaned was 6.7 million square feet.

40.    The amount of square footage was material to PFMI as PFMI based its pricing calculations including profit margin and eventually the amount in its bid on those square footage numbers.

41.    EFS knew that the square footage numbers were incorrect and were aware that PFMI would rely on those numbers when pricing the job.

42.    PFMI did in fact rely on the square footage numbers in pricing and bidding the job.

43.    This reliance was to PFMI's detriment.

44.    PFMI would not have hired subcontractors to perform this work or priced the work as they did had PFMI been correctly informed of the square footage numbers. In fact had PFMI known the true numbers they would not have bid the job.

WHEREFORE, PREMISES CONSIDERED, plaintiff demands compensatory damages and punitive damages in an amount to be determined by a jury.

### COUNT III

45.    EFS knew or should have known that the square footage numbers they placed in the bid package provided to PFMI were false.

46.    The amount of square footage was material to PFMI as PFMI based its pricing calculations including profit margin and eventually the amount in its bid on those square footage numbers.

47.    EFS was aware that PFMI would rely on those numbers when pricing the job.

48.    EFS misrepresented the square footage to induce PFMI to place a lower per square foot bid.

49.    PFMI did in fact rely on the square footage numbers in pricing and bidding the job and gave a lower price per square foot than had they known the truth.

50.    This reliance was to PFMI's detriment.

51.    PFMI would not have hired subcontractors to perform this work or priced the work as they did had PFMI been correctly informed of the square footage numbers.

WHEREFORE, PREMISES CONSIDERED, plaintiff demands compensatory damages and punitive damages in an amount to be determined by a jury.

## COUNT IV

52.    EFS mistakenly or innocently misrepresented the square footage numbers in the bid package provided to PFMI.

53.    The amount of square footage was material to PFMI, as PFMI based its pricing calculations, including profit margin and eventually the amount in its bid, on those square footage numbers.

54.    The square footage numbers were falsely inflated and EFS was aware that PFMI would rely on those numbers when pricing the job.

55.    EFS misrepresented the square footage to induce PFMI to place a lower per square foot bid.

56.    PFMI did in fact rely on the square footage numbers in pricing and bidding the job and gave a lower price per square foot than had they known the truth.

57.    This reliance was to PFMI's detriment.

58.    PFMI would not have hired subcontractors to perform this work or priced the work as they did had PFMI been correctly informed of the square footage numbers. In fact, had PFMI known the true numbers they would not have bid the job.

WHEREFORE, PREMISES CONSIDERED, plaintiff demands compensatory damages and punitive damages in an amount to be determined by a jury.

12/07/2006 10:13 FAX  2038497880                EMCOR GROUP INC.                                    ☒010/013

## COUNT V

59.    When EFS provided the bid package it had to duty to provide accurate information in that bid package.  In particular, EFS had a duty to disclose all the work expected of the bidder.

60.    BB&T was removing dumpsters from many of its branches and would therefore be requiring the janitorial crew to haul the trash and garbage away from the facility.

61.    EFS concealed and/or failed to disclose to PFMI that BB&T would not pay for the trash removal.

62.    The suppression of this fact induced PFMI to enter a lower bid than had PFMI known of the added expense associated with trash disposal.

63.    PFMI incurred greater expense for trash disposal and has not been paid by EFS for this service.

WHEREFORE, PREMISES CONSIDERED, plaintiff demands compensatory damages and punitive damages in an amount to be determined by a jury.

## COUNT VI

64.    During its due diligence PFMI learned that BB&T wanted to remove the dumpsters from most, if not all, of its branch locations.

65.    In a conference call EFS acknowledged this would increase PFMI's costs and stated that PFMI would be paid for this trash removal and disposal.

66.    EFS told PFMI to submit separate trash removal invoices and that those would be paid for separately from the other janitorial services.

67.    To date PFMI has not been paid for the trash removal and disposal.

12/07/2006 10:13 FAX 2038497880          EMCOR GROUP INC.                      ☒011/013

WHEREFORE, PREMISES CONSIDERED, plaintiff demands compensatory damages and punitive damages in an amount to be determined by a jury.

Rhon E. Jones (JON093)
Attorney for Plaintiff

Scarlette M. Tuley (TUL067)
Attorney for Plaintiff

OF COUNSEL:
BEASLEY, ALLEN, CROW,
METHVIN, PORTIS & MILES, P.C.
Post Office 4160
Montgomery, Alabama 36103-4160
Phone: (333) 269-2343
Fax: (334) 954-7555

PLAINTIFF REQUESTS A TRIAL BY STRUCK JURY ON ALL ISSUES OF THIS CASE.

OF COUNSEL

# Exhibit D

WohlersJim081007.txt

1

```
 1            IN THE UNITED STATES DISTRICT COURT FOR
 2               THE MIDDLE DISTRICT OF ALABAMA
 3                    NORTHERN DIVISION
 4
 5      PROFESSIONAL FACILITIES
 6      MANAGEMENT, INC.,
 7                Plaintiff,
 8      vs.                        CIVIL ACTION NO.
 9                                 2:06CV
10      EMCOR FACILITIES SERVICES,
11      INC.; AND A, B, AND C, AS
12      FICTITIOUS PARTIES,
13                Defendants.
14                *    *    *    *    *
15                DEPOSITION OF JIM WOHLERS,
16      taken pursuant to notice and stipulation
17      on behalf of the Defendant, in the offices
18      of Beasley, Allen, Crow, Methvin, Portis &
19      Miles, 250 Commerce Street, Montgomery,
20      Alabama, before Nicole Paulk, Certified
21      Shorthand Reporter and Notary Public in
22      and for the State of Alabama at Large, on
23      August 10, 2007, commencing at 8:17 a.m.
```

2

```
 1                     APPEARANCES
 2
 3      FOR THE PLAINTIFF:
```

Page 1

WohlersJim081007.txt

4          Scarlette M. Tuley, Esquire

5          Beasley, Allen, Crow, Methvin,

6           Portis & Miles

7          250 Commerce Street

8          Montgomery, Alabama 36104

9

10    FOR THE DEFENDANTS:

11              Benjamin H. Sawyer, Esquire

12              Sutherland, Asbill & Brennan

13              999 Peachtree Street, NE

14              Atlanta, Georgia 30309-3996

15    ALSO PRESENT:

16              Greg Littlefield

17

18

19

20

21

22

23

                                        3


1                    STIPULATIONS

2

3            It is stipulated and agreed by

4    and between counsel representing the

5    parties that the deposition of JIM WOHLERS

6    may be taken before Nicole Paulk, Court

7    Reporter and Notary Public in and for the

8    State of Alabama at Large, without the

9    formality of a commission; and all

                    Page 2

WohlersJim081007.txt

10    formality with respect to other procedural

11    requirements is waived; that objections to

12    questions, other than objections as to the

13    form of the questions need not be made at

14    this time, but may be reserved for a

15    ruling at such time as the deposition may

16    be offered in evidence or used for any

17    other purpose by either party as provided

18    by the Federal Rules of Civil

19    Procedure.

20              *    *    *    *    *

21                    I N D E X

22    Examination                        Page

23    By Mr. Sawyer                         5

                                           4

 1    Defendant's Exhibits               Page

 2    22 - March 24, 2005 E-Mail from Alan    59

 3         Cristal, copying Mr. Littlefield

 4         and Mr. Wohlers

 5    23 - E-mail from Mr. Wohlers to         65

 6         Mr. King, dated 07/11/2005

 7    24 - Memorandum of Understanding        79

 8    25 - E-mail from Mr. Blackburn re:     110

 9         Open work order report for

10         2-03-06, dated 2-07-06

11    26 - Various e-mails                   122

12    27 - Various e-mails                   123

13    28 - Plaintiff's First Supplemental    143

14         Responses to Defendant's First

15         Interrogatories

                    Page 3

wohlersJim081007.txt

16    29 - Vendor Activity Report
17    30 - E-mail from Mr. Wohlers, dated    154
18          7/14/06
19    31 - AP Field Check Register          167
20    32 - Various e-mails                  173

21                  *    *    *    *    *

22                  JIM WOHLERS, of lawful age,

23    having first been duly sworn, testified as

                                                  5


1     follows:

2                     EXAMINATION

3     BY MR. SAWYER:

4     Q.   Good morning, Mr. Wohlers.  My name is Ben

5          Sawyer, and I'm an attorney for EMCOR

6          Facilities Services, Incorporated.  How

7          are you doing today?

8     A.   Doing good.

9     Q.   Excellent.  Could you please state and

10         spell your name for the record?

11    A.   James, J. Wohlers, W-O-H-L-E-R-S, Jr.

12    Q.   And Mr. Wohlers, let me ask you, have you

13         ever been deposed before?

14    A.   No, sir.

15    Q.   Have you ever given any testimony in

16         arbitration before?

17    A.   Not that I recall.

18    Q.   How about a trial?

19    A.   Yes.

20    Q.   Okay.  What trial did you provide

21         testimony?

                      Page 4

wohlersJim081007.txt

```
22  A.   It was a divorce trial where some work had
23       been done on some wood floors, and
```

6

```
1        basically just the value of that work that
2        was done.
3   Q.   It was a divorce trial?
4   A.   I think that's what it was.  I don't know
5        what they call them.  It was a
6        mother-in-law deal.
7   Q.   Okay.
8   A.   So I was a hostile witness, I guess.
9   Q.   You were a hostile witness, all right.
10       You were not being sued at the time,
11       correct?
12  A.   No, no.  I was just -- I had seen the
13       floors before they were done, knew the
14       work that was done and then the after.
15       And just more or less they were arguing
16       about the -- you know, if they had an
17       outside contractor come in, how much it
18       would have cost to do that.
19  Q.   Okay.  What time frame was that?
20  A.   Oh, that was '01, '02, somewhere in there.
21  Q.   Any other prior testimony?
22  A.   No, sir.
23  Q.   All right.  I know you were here early
```

7

```
1        yesterday for Mr. Littlefield's
2        deposition, but I'll go ahead and run
```
Page 5

WohlersJim081007.txt

```
 3      through those rules again.  The court
 4      reporter will be taking everything we say
 5      down today, so we have to give verbal
 6      answers -- yes or no instead of shaking
 7      our head or saying uh-huh or huh-uh.  Is
 8      that fair to you?
 9   A. Yes, yes -- as I shake my head.
10   Q. If you don't understand something that
11      I've asked today or need me to rephrase
12      the question or for any reason don't
13      understand what I'm asking, don't hesitate
14      to stop and ask me to rephrase it or tell
15      me that you don't understand the question.
16      It's not your job to guess or speculate as
17      to what I'm asking; it's my job to ask a
18      good question.  Is that fair to you?
19   A. That's fair.
20   Q. Okay.  Is there anything that would
21      prevent you from offering truthful and
22      accurate testimony today?
23   A. No, sir.
```

                                                8


```
 1   Q. And you understand that it's important
 2      today that you tell the truth because at
 3      some point in time the jury and the judge
 4      in this case are going to be relying on
 5      what you say to resolve this issue?
 6   A. Yes, sir.
 7   Q. Tell me about your education.
 8   A. I graduated high school in 1986 from
```
                         Page 6

WohlersJim081007.txt

```
 9        Monroe County High School; worked full
10        time; went to college; graduated with my
11        undergrad from AUM with a human resources
12        major, minor in management.  Went back --
13        started back in '97-'98.  Completed my MBA
14        in 2001 with an emphasis in management,
15        minor in human resources.  And that's
16        formal education.  I've received my PHR
17        designation, which is professional in
18        human resources, from the Society of Human
19        Resource Managers.  That was in '92 -- or
20        excuse me, that was '94.  And that
21        certificate is still current.  Has to be
22        -- every three years that has to be
23        renewed.  Previously held certificate --
```
                                                    9


```
 1        or certified building services executive
 2        from BSCAI, a designation, but no longer
 3        hold that, and I can explain that when we
 4        get to work history.
 5   Q.   Well, let me stop you for a second.  Where
 6        did you go to college?
 7   A.   Auburn University, and then master's at
 8        Auburn University in Montgomery.
 9   Q.   Oh, my goodness.
10                  MR. SAWYER:  And this is off the
11                      record a minute.
12                  (Off-the-record discussion.)
13   Q.   Proceeding on.  So you received your MBA
14        from Auburn?
```
                        Page 7

WohlersJim081007.txt

| 15 | A. | Auburn University Montgomery. |
| 16 | Q. | Okay.  Did you have a bachelor's of |
| 17 |    | science undergrad? |
| 18 | A. | Yes. |
| 19 | Q. | And I believe you testified that was |
| 20 |    | management? |
| 21 | A. | That was human resources with a minor in |
| 22 |    | management, and then my MBA was just the |
| 23 |    | opposite; it was emphasis in management, |

10

| 1  |    | minor in human resources. |
| 2  | Q. | Okay.  Any other formal education? |
| 3  | A. | You know, besides seminars here and there, |
| 4  |    | that's pretty much it. |
| 5  | Q. | Have you ever given any seminars? |
| 6  | A. | Yes. |
| 7  | Q. | Okay.  What are some of the seminars that |
| 8  |    | you've given? |
| 9  | A. | Let's see.  I did my CPR, which is -- |
| 10 |    | deals with employee communications. |
| 11 | Q. | What does CPR stand for? |
| 12 | A. | I couldn't tell you.  It wasn't my |
| 13 |    | seminar.  Todd Hopkins with Office Pride |
| 14 |    | named it; I just gave it.  And in that one |
| 15 |    | I've done the employer communications |
| 16 |    | part, employee recognition part.  And |
| 17 |    | let's see.  Greg and I together have done |
| 18 |    | the plateaus of growth, which was |
| 19 |    | discussed yesterday.  Greg would take |
| 20 |    | certain plateaus; I'd take other plateaus. |

Page 8

wohlersJim081007.txt

21       And that was given in Atlanta.  I -- of

22       course, this relates to work history --

23       adjunct professor at Auburn University in

           11

 1       Montgomery, where I teach compensation and

 2       HR issues normally.

 3  Q.   When were you -- are you currently an

 4       adjunct professor?

 5  A.   I'm not teaching this semester, no.  I

 6       usually do spring semesters.

 7  Q.   Okay.  How long have you been teaching as

 8       a professor at the university?

 9  A.   Since I got my master's, three or four

10       years at least now.

11  Q.   And forgive me.  Is this at Auburn proper

12       or Auburn --

13  A.   Auburn Montgomery.

14  Q.   Okay.  And what are the courses that you

15       teach?

16  A.   They vary on semesters.  You know, I'll do

17       compensation, management.  We do one

18       class, which they give me pretty much free

19       reign, which is usually the recurring one,

20       which is termed senior projects.  And

21       basically, what we'll do in that class,

22       there's no text book; we'll just go out,

23       you know, looking at the marketplace.

           12

WohlersJim081007.txt

```
 1        I'll pick topics, put together lectures on
 2        each one.  You know, it'll be employment
 3        practice, liability insurance.  It'll be
 4        workers' compensation; it'll be, you know,
 5        arguing a non-employment claim.  I mean,
 6        all these little things that they don't
 7        teach in class, but in the real world when
 8        they get out of school, they need to know
 9        it.  So those are the type of things.  It
10        varies from semester to semester.
11   Q.   Would you create a -- I guess any --
12        strike that.
13               Have you ever written any books
14        or other texts to be used by your class?
15   A.   Not books or texts.  I mean, it's usually
16        just copy.  I'll create some Power Points.
17        You know, I'll bring in guest lecturers,
18        you know, people from the EEOC or
19        Department of Labor.  You know, I'll bring
20        in different attorneys that we might use
21        for different issues and have them give a
22        lecture.
23               MS. TULEY:  I haven't been asked.
```
                                                    13


```
 1               My feelings are hurt.
 2   A.   You know, I'll bring in accountants and
 3        they'll go over just how to fill out a --
 4        you know, the tax information for their
 5        employees, that type of thing.
 6   Q.   Do you ever bring Greg to speak at one of
```
                        Page 10

wohlersJim081007.txt

```
 7        these?
 8   A.   No, I've let him out of that torture
 9        thing.  It is amazing; it's a different
10        world.  And then just as far as other
11        seminars, there's just different employee
12        training seminars or safety seminars,
13        those type of things.  But I couldn't --
14        you know, confined space, those type of
15        things.
16   Q.   Okay.  Ballpark, how many would you say
17        you've given?
18   A.   50 plus.
19   Q.   Presented at 50 seminars?
20   A.   Well, either in-house seminars or those
21        type things.
22   Q.   Wow.  How many have you attended,
23        excluding the ones you just mentioned?
```

14

```
 1   A.   Two or three a year for 20 years, I guess.
 2        I don't know.
 3   Q.   So the 50 was a total of throughout?
 4   A.   Oh, yes.  Yeah.  That wasn't in the past
 5        year.
 6   Q.   All right.  Have you taken any special
 7        trainings concerning facilities
 8        management?
 9   A.   You know, through BSCAI, I mean, to obtain
10        the CBSC designation, you know, you have
11        to go through -- there's a series of
12        self-study books that you have to go
```

Page 11

wohlersJim081007.txt

```
13        through, from safety and security,
14        accounting, bidding and estimating, a
15        laundry list.  I couldn't name all the
16        books.  It's been quite a while since I've
17        done that.  I know I've taken bidding and
18        estimating from BSCAI, you know, gone
19        through the employer communications
20        myself, successful supervision seminars
21        with them.
22   Q.   Have you taken any accounting classes?
23   A.   Yes.
```

                                              15


```
 1   Q.   In college?
 2   A.   With my undergraduate, Accounting I, II,
 3        III; my master's, Accounting -- I think it
 4        start off with managerial accounting, and
 5        then I think there were two more after
 6        that, one with taxes, one with insurance
 7        and real estate.  And then, of course,
 8        tied in with that is the finance classes,
 9        you know, Finance I and II, and then
10        Finance I and II under the MBA level.
11   Q.   Are you a CPA?
12   A.   No.
13   Q.   And you mentioned that you had taken some
14        trainings in estimating, bidding, et
15        cetera?
16   A.   Yes.
17   Q.   Okay.  Did you participate at all on the
18        estimate or the bid on this job?
```

wohlersJim081007.txt

| 19 | A. | No. |
|---|---|---|
| 20 | Q. | That was just Greg? |
| 21 | A. | That was just Greg.  My involvement in |
| 22 | | that was no more than, you know, sending |
| 23 | | an e-mail.  Historically, for our company, |

16

| 1 | | that's not my world. |
|---|---|---|
| 2 | Q. | Okay.  Let's go to your work experience. |
| 3 | | After you got out of school -- or let me |
| 4 | | back you up, I guess. |
| 5 | A. | Yeah, let's go back.  In '85, I started |
| 6 | | working with a company, BD&S, which is a |
| 7 | | building service contractor.  Of course, I |
| 8 | | was still in high school at that point in |
| 9 | | time, worked stripping and waxing floors, |
| 10 | | doing janitorial, that type of stuff. |
| 11 | | When I went off to college, I would work |
| 12 | | with them in the summer.  You know, I laid |
| 13 | | out of college for a couple years, worked |
| 14 | | full time with that, and then in '90, |
| 15 | | '91 -- BD&S is located in Monroeville, |
| 16 | | Alabama.  I would drive back and forth |
| 17 | | from Monroeville to Montgomery to finish |
| 18 | | up my undergrad while working full time |
| 19 | | there.  Work with BD&S till approximately |
| 20 | | '96 or '97.  Left that one and -- I guess |
| 21 | | back up real quick.  BD&S, like I said, I |
| 22 | | started off at the bottom and worked my |
| 23 | | way up to operations manager. |

17

Page 13

wohlersJim081007.txt

```
1   Q.   When did you become operations manager?

2   A.   That was probably '87.

3   Q.   You moved up quick.

4   A.   Well, small company.

5   Q.   Okay.

6   A.   You know, and of course, responsibilities

7        there under operations were human

8        resources and the day-to-day operations of

9        the company on that.  Like I said, '96-'97

10       range, I went to work with a company, Stay

11       Fast Worldwide --

12  Q.   Well, let me ask you, why did you leave

13       BD&S?

14  A.   Well, small company, you know, limited

15       opportunity.  You know, I'd pretty much

16       grown as far as I could grow at that

17       company.

18  Q.   Did the new job pay more?

19  A.   No.

20  Q.   No?

21  A.   No, but better opportunity.

22  Q.   Were you fired from BD&S?

23  A.   No.
```

18

```
1   Q.   Okay.  What was the name of the company

2        where you moved?

3   A.   Stay Fast Worldwide, and it was textile.

4        Couple things, you know, better

5        opportunity, gave me more opportunity to
```
Page 14

wohlersjim081007.txt

6       use what I had gone to school for.

7       Started off there as human resource

8       manager; six months later, promoted to

9       production manager; and approximately

10      three months after that, production and

11      assistant plant manager.  Worked there

12      until approximately 2000.

13   Q. What were the -- strike that.

14              How many people did you manage

15      as the human resource manager for Stay

16      Fast?

17   A. Approximately 250 directly on that site.

18      Stay Fast had three other plants -- one in

19      Brooklyn, one in Mexico one in the

20      Philippines -- besides ours, so I also --

21   Q. Where was the plant located?

22   A. Uriah, Alabama.

23   Q. How do you spell that?

                                            19


1    A. U-R-I-A-H.  So if you're down there, it's

2       Uriah.

3              (Off-the-record discussion.)

4    Q. All right.  So you managed 250 people at

5       Stay Fast?

6    A. Yes.

7    Q. In Uriah?

8    A. Yes.

9    Q. Okay.  How did your job scope change when

10      you became production manager?

11   A. I was still responsible for human

                          Page 15

wohlersjim081007.txt

12      resources, but I was responsible for

13      day-to-day operations of the sewing

14      factory, which, of course, was production.

15   Q.  It was a sewing factory?

16   A.  It was a sewing factory.

17   Q.  What did they sew?

18   A.  This is interesting.

19          THE WITNESS:  You may not want to

20              take all of it down.

21   A.  We made nothing but bra fasteners.  Our

22      primary customer was Vanity Fair, of

23      course, Victoria's Secret.  400,000 dozen

                                              20


1       bra fasteners a month was what our goal

2       was.  That's a lot of bras.

3    Q.  Yes, it is.

4    A.  You never realized bras came in that many

5       colors.

6    Q.  Goodness.

7    A.  It was an interesting job.

8    Q.  I can imagine.

9    A.  Oh, yeah.

10   Q.  All right.  Well, after you left Stay --

11      I'm sorry.  Did you have a new job title

12      after production manager?

13   A.  Just assistant plant manager slash

14      production manager.

15   Q.  So you were promoted again?

16   A.  Yes.  I got to fire my boss, so it was --

17      yeah.  I took orders directly out of our

                    Page 16

wohlersJim081007.txt

```
18          New York office.  We were owned by a
19          holding company.
20    Q.    Who was your boss that you fired?
21    A.    It was a guy, Curt -- what was his last
22          name?  I can't even remember his last
23          name.  It was a vicious company.  They had
                                                    21


 1          me move him out of his office in the front
 2          and move him out on the production floor
 3          first before they fired him.  It was just
 4          -- it was run out of Manhattan; it was
 5          obvious.
 6    Q.    What year were you assistant plant
 7          manager?
 8    A.    It was probably about '99.
 9    Q.    And how did your job scope change?
10    A.    From production manager to the -- it
11          didn't change a whole lot, really.  I
12          mean, before Curt was released, I was
13          pretty much -- they were going to me for
14          all the things he was supposed to be doing
15          anyway -- you know, daily reports,
16          answering questions as to why things
17          weren't running like they were supposed
18          to, you know.  So it didn't change a whole
19          lot; it was just...
20    Q.    In terms of effect?
21    A.    Yeah.
22    Q.    How long did you work as assistant plant
23          manager?
```
                        Page 17

wohlersJim081007.txt

22

```
 1   A.    Probably just a year.
 2   Q.    Where did you work after that?
 3   A.    With PFMI, Professional Facilities
 4         Management.
 5   Q.    How did you come to work for PFMI?
 6   A.    All right.  In 1989, I had met Greg
 7         Littlefield at a BSCAI seminar, I think in
 8         Nashville.  Probably when I was working
 9         with BD&S and going to different seminars
10         and conventions with BSCAI, on occasion
11         would just speak with Greg -- Greg
12         McGehee, Littlefield, other employees
13         there.  So we got to know each other.  I
14         believe in -- oh, go ahead.  Was that a --
15   Q.    Well, in '89, you were working at BD&S,
16         right?
17   A.    Yes.
18   Q.    Okay.  So -- and they also provided
19         facility services, correct?
20   A.    Yes, yes.  In fact, they -- it was a funny
21         situation, because we were -- at that
22         time, BD&S was a more established company.
23         You know, Greg got into this business in
```

23

```
 1         '89, when he bought Mr. Janitor.  So at
 2         that point, we had been in business about
 3         five years, you know, and one thing -- you
```

Page 18

wohlersJim081007.txt

4      know, so at that point Greg would ask us

5      sometimes questions -- you know, how we

6      did things, how we approached things, you

7      know.

8   Q.  Do you recall how you met Greg?

9   A.  Yeah, at a BSCAI seminar, just -- you

10     know, you're wearing a name tag.  Greg is

11     quite a networker, you know, always

12     picking brains on ways to do things, so I

13     think just really bumped into each other

14     and, you know, my name tag says

15     Monroeville, Alabama, and his says

16     Montgomery, Alabama, and -- you know, a

17     little different scope of work that we

18     performed, so it was pretty easy -- you

19     know, there wasn't that -- janitorial is

20     an odd business with sharing information

21     sometimes, but --

22  Q.  What do you mean by that?

23  A.  well, you know, in some industries, it's

                                             24


1      very -- you know, people aren't going to

2      tell you what they bid on things or how

3      they bid things or what they do, because

4      oftentimes you're dealing with -- you

5      know, there's so many items involved

6      there, it's open discussions as to, well,

7      this is the way we approach it; this is

8      the way we do this.  So there's a lot of

9      open discussions on this.  This is how we

                    Page 19

wohlersJim081007.txt

```
10        strip a floor; we find these chemicals
11        work best.  It's an open industry.  So
12        like I said, we had met several times at
13        convention seminars, those type of things.
14        In '99, approximately, my sister called me
15        and she said, I don't know if I just
16        messed up, because some guy stopped by my
17        house trying to find you, so I don't know
18        if you're in trouble or what, but I gave
19        him your number.  And of course, it was a
20        salesperson that worked for PFMI.  Got to
21        talking with Greg, you know, more or less,
22        he said he'd been impressed with the way I
23        -- you know, with me and meeting me but
```

                                              25


```
 1        never wanted to step over that line and
 2        step on Al's toes -- which was my boss, Al
 3        Brewton; he owned BD&S.  So out of
 4        respect, he never approached me on
 5        anything.  And he had learned I was out of
 6        the industry now.  And we started talking
 7        in May of 2000 -- I believe May 17th, give
 8        or take a day.
 9   Q.   I hope, sir, that you can also remember
10        your anniversary.
11   A.   No, I can't.  I fail that test miserably
12        every time, and the same with birthdays.
13   Q.   All right.  So you met on or about May 17
14        -- or I'm sorry, you were approached in
15        May of 2000?
```

                      Page 20

wohlersJim081007.txt

16    A.    No, actually, Greg and I started talking

17          in January of 2000.  You know, I didn't

18          really have a reason to leave Stay Fast,

19          you know, so we went back and forth with

20          discussions on benefits, salary,

21          opportunity, that type of stuff.  And when

22          they started teaching me Spanish at the

23          sewing plant, Greg's offer looked a little

                                                    26


1           bit better.

2                    MR. SAWYER:  Off the record.

3                       (Off-the-record discussion.)

4     Q.    All right.  So where were we?

5     A.    May of 2000 I went to work with PFMI.

6     Q.    And you were approached in --

7     A.    Somewhere in January of 2000 -- well,

8           probably a little earlier.  And I might be

9           a little off on my dates, but it was

10          somewhere in that time frame.

11    Q.    When you first started with PFMI, what

12          were your --

13    A.    I was primarily responsible for human

14          resources and their IT.

15    Q.    What was your job title?

16    A.    I believe just human resources manager.

17    Q.    As human resources and IT manager --

18    A.    Yeah.  I mean, we just had a -- the

19          computer system we used -- in fact, I

20          started off on what was a DOS-based

21          system, so I had a pretty good knowledge

                          Page 21

wohlersJim081007.txt

22    of what --
23  Q.    A what based?

27

1   A.    DOS.
2   Q.    Could you spell that?
3   A.    What is it, D-O-S?
4   Q.    Oh, DOS?
5   A.    Back when I took programming, that's all
6         they taught, was DOS.
7   Q.    Have you taken any computer classes?
8   A.    I mean, just programming.  But a lot of
9         it's self-taught or being on hold with
10        support for hours on end.
11  Q.    Did you take programming in college?
12  A.    Yes, it was DOS.  And, you know, through
13        job training at Stay Fast I learned a lot.
14        You know, one of my direct bosses, he was
15        -- or in fact, one of the owners of our
16        company was one of the founder's
17        grandson's of IBM, so it was a very IT
18        environment.
19  Q.    What were your responsibilities as human
20        resource and IT manager when you first --
21  A.    Well, pretty much, you know, started off
22        evaluating the whole HR program.  At that
23        point in time, all of PFMI's employees

28

1         were leased employees through a PEO,
2         professional employment organization.  So
                         Page 22

wohlersJim081007.txt

3      it was -- some of it was limited because

4      I'd step on their toes wanting to do

5      things.  But, you know, reviewing, hiring,

6      firing, putting together employment -- you

7      know, at that point in time, PFMI had been

8      in business quite a while, but on the

9      human resources side, it was limited in

10     the systems for human resources.  You

11     know, we didn't have a good employment

12     application or a good interview technique.

13     So it was really putting together systems

14     and procedures for how to manage HR.  And

15     then I guess about a year later we brought

16     all of our employees in-house, meaning

17     they were all direct employees of PFMI.

18  Q.   Well, you said they were leased.  Was that

19     from some type of temp --

20  A.   That was from Skill Staff PEO,

21     professional employment organization.

22     Based on our payroll, they would mark up a

23     percentage to account for them processing

                               29

1      a payroll and workers' comp handling,

2      unemployment claims.

3  Q.   And I believe you testified that under I

4     guess your supervision and Greg's, that

5     those employees were later brought

6     in-house?

7  A.   Yes.

8  Q.   What time frame were those employees

wohlersjim081007.txt

9      brought in-house as direct employees?  Go

10     ahead.

11  A.  I would say 2001.  I mean, spring of 2001,

12     somewhere, maybe fall of 2001.  I'm not

13     really sure.

14  Q.  Why was the decision made to bring

15     employees that had been leased in-house at

16     PFMI?

17  A.  One of the downfalls I think were the PEO.

18     They were self-insured for workers' comp,

19     and, you know -- yeah, for workers' comp.

20     We didn't like the fact that they managed

21     our workers' comp claims.  Well, if they

22     didn't do a good job of managing that

23     claim and it cost more than it should have

                                              30

1      to close out that claim, all they did was

2      pass along that percentage on our charge.

3      So it didn't seem like -- well, that was

4      one reason.  Number 2, we wanted to be

5      able to offer a wider range of benefits to

6      our employees; they didn't like that.  And

7      then a third reason is just cost.  PFMI at

8      that point had 200 or some employees --

9      that's an estimate -- and it was getting

10     cost prohibitive, that percentage -- you

11     know, we had the software in place.  That

12     was one of the things with the IT.  We

13     already owned the software to run all our

14     payroll.  We had everything we needed,

                   Page 24

wohlersJim081007.txt

| | | |
|---|---|---|
| 15 | | just no one to manage it.  When I came in, |
| 16 | | I knew how to make that work, and we |
| 17 | | brought it in and were able to do it more |
| 18 | | cost-effective. |
| 19 | Q. | With respect to the workers' comp, sounds |
| 20 | | like they had an incentive to -- |
| 21 | A. | To not manage. |
| 22 | Q. | Because the worse they managed it, the |
| 23 | | more they got paid? |

31

| | | |
|---|---|---|
| 1 | A. | Exactly.  And that was my argument. |
| 2 | Q. | So how long were you the human resources |
| 3 | | manager? |
| 4 | A. | A couple of years.  I'm not -- I'm not |
| 5 | | sure -- |
| 6 | Q. | Well, let me ask you this way:  Did your |
| 7 | | job title and work scope ever change at |
| 8 | | PFMI? |
| 9 | A. | Yes, it has evolved.  We bought out -- I |
| 10 | | say bought out -- a partner we had in the |
| 11 | | Dothan region.  And at that point in time, |
| 12 | | Greg gave me the opportunity, because of |
| 13 | | my operations background, to manage that |
| 14 | | region as well as manage human resources. |
| 15 | | You know, so that was day-to-day |
| 16 | | operations of the janitorial services and, |
| 17 | | you know, Dothan along the gulf coast |
| 18 | | area.  As the company continued to grow, I |
| 19 | | wasn't able to be out of the office two |
| 20 | | and three days a week to manage -- to work |

Page 25

wohlersJim081007.txt

```
21        out of the Dothan office, so we hired a
22        manager for that.  My focus --
23   Q.   Who was that?
```

                                            32


```
1    A.   I believe it was Adam Littlefield.  He was
2         a manager in Montgomery.  I think he
3         assumed some of that responsibility down
4         there.
5    Q.   Any relation to Greg?
6    A.   I believe cousin, nephew, something.  I'm
7         not sure.
8    Q.   Okay.
9    A.   So yeah, Adam took over.  He took over
10        those operations.  I moved primarily back
11        into the office, continued with HR, and
12        got more involved in some more day-to-day
13        operations.  In '04-'05, we had a change
14        in some of the accounting office -- our
15        CFO retired.  We had an accounting
16        manager, you know, so I started taking
17        over more of the back office functions, is
18        what we call them, overseeing those
19        positions in accounting, purchasing, HR,
20        you know, anything -- like I said, we call
21        them back office functions there, the
22        marketing, that type of thing.
23   Q.   Who was the CFO?
```

                                            33

wohlersJim081007.txt

```
 1    A.   That was Hugh Foshee, F-O-S-H-E-E.
 2    Q.   Approximately what time did he retire?
 3         Let me ask it this way:  Was it before the
 4         BB&T job?
 5    A.   It was before BB&T.
 6    Q.   And who was the accounting manager?
 7    A.   I think -- are you asking more who was
 8         accounting manager when BB&T was on?
 9    Q.   Well --
10    A.   Well, Johnny Cobb was in accounting.  I
11         cannot recall if he was in accounting when
12         we started the BB&T/EMCOR job or if it was
13         Libby Johnson, who is our current
14         accounting manager/controller.
15    Q.   So just so I'm clear, Libby Johnson was
16         the accounting manager for PFMI during the
17         BB&T account?
18    A.   I believe so.  She's been on since then.
19         I'm not sure if she was on when we started
20         BB&T or not; I'd have to look at the
21         employment file.
22    Q.   Okay.  If -- well, who was the accounting
23         manager immediately prior to?
```

                                                34


```
 1    A.   John Cobb.
 2    Q.   John Cobb.  So it's possible that both of
 3         them worked on the BB&T account?
 4    A.   It's possible.  I don't think so, but it's
 5         possible.
 6    Q.   What was your job title when you began to
```

wohlersJim081007.txt

```
 7            handle I guess what you refer to as back
 8            office things?
 9      A.    I believe Greg just -- I had been promoted
10            up to vice president, and then what
11            followed that really depended on what type
12            of job I was doing.
13      Q.    What time frame were you promoted to vice
14            president?
15      A.    You know, I believe -- and I'm not 100
16            percent on this -- it was '03 or '04.  I'm
17            not sure, though.
18      Q.    You mentioned I think you met Greg at A
19            BOMA function?
20      A.    No, BSCAI.
21      Q.    Okay.  What does BOMA stand for?
22      A.    I think building office managers
23            association or something.  I'm not 100
```

                                                          35


```
 1            percent.  I'm not as involved.  I've seen
 2            it, I know about what it is, don't know
 3            what the acronym is exactly.
 4      Q.    Do either BOMA -- and that's B-O-M-A; it's
 5            an acronym -- or BSCAI produce any
 6            publications to your knowledge?
 7      A.    BSCAI does, and, you know, I believe BOMA
 8            does.
 9      Q.    When you started work at PFMI -- I believe
10            you testified it was 2000, 2001, sometime
11            around there?
12      A.    Yeah.  Well, it might have been a little
```

                        Page 28

wohlersJim081007.txt

13       earlier.  It was somewhere from '99 to

14       2000.

15  Q.   What was the scope of some of the projects

16       that you were working on?

17  A.   Trying to think at that point in time.  I

18       know not long after I started they were

19       awarded the West Point Stevens contract,

20       which is textiles, up in Valley, Georgia

21       -- Valley, Alabama --

22              MS. TULEY:  Valley is in Alabama.

23              THE WITNESS:  Even though they're

                                        36

 

1                on fast time.

2            MS. TULEY:  Yeah, they're on

3                Georgia time.

4  A.   -- which was, you know, a managerial

5       contract.  They were doing -- they had two

6       scopes of business, really, or two types

7       of janitorial contracts that they were

8       working on, one what's referred to as

9       site-based.

10  Q.   What's site-based?

11  A.   Site-based would be West Point Stevens and

12       International Paper, where a site manager

13       is hired.  All the employees, when they

14       report to work, go directly to that site.

15       We think of a site -- a good analogy, if

16       you think of a Family Dollar store.  It's

17       a self-contained unit almost.  And then we

18       have had, you know, down the street

wohlersjim081007.txt

```
19        business, which is small accounts where it
20        might just be a one or two hour account
21        where the employee goes directly there,
22        clocks in from there, does their hour,
23        two, three hours, whatever the case might
                                                    37


 1        be, and goes home.  Or they might hit, you
 2        know, a route of those down the streets
 3        where they're hitting three or four of
 4        those to make four or five hours a night.
 5        At that point in time, though, I was --
 6        you know, as human resources, I wasn't
 7        very involved in the actual operations.
 8    Q.  Okay.  So since -- I guess with human
 9        resources you wouldn't have much
10        involvement, I guess, with projects that
11        were going on --
12    A.  Yeah.  Like I said, West Point I was
13        familiar with because I went up there and
14        helped hire, interviewed on-site people
15        that wanted to stay on, you know, with our
16        company while they were leaving the other.
17        But that was really it.
18    Q.  Did your involvement change at all when
19        you became vice president in 2004 or 2005
20        with respect to involvement with projects?
21    A.  To some degree, yes.  You know, at that
22        point in time, we'd go out -- you know,
23        basically all management would go out when
                                                    38
```

wohlersJim081007.txt

```
 1        we started up a new account to work on
 2        site helping to train new cleaners, doing
 3        that type of thing.  I'm trying to think
 4        what else.  You know, just referring to
 5        '04, you know, that's probably it.  Then
 6        as it's developed, you know, have been
 7        more involved in the P&L side of it, those
 8        type of things.
 9   Q.   When you say P&L, do you mean profit and
10        loss?
11   A.   Profit and loss.
12   Q.   Okay.  When you came on as vice president,
13        what were -- let me ask it this way:  What
14        was the size of some of the projects you
15        were working on?
16   A.   As far as bid amount or employee size
17        or...
18   Q.   In terms of revenue and square footage
19        managed?
20   A.   Company revenue or -- and I mean, I'm not
21        trying to -- I'm just trying to make sure
22        I understand the question.  I mean,
23        because, you know, the bid sizes for
```

                                                    39


```
 1        specific bids would vary.  I mean, there
 2        would be some that were $2,000 a month,
 3        $500 a month bids.  There were some bids
 4        -- and like I said, I wasn't as involved
 5        in the bid numbers, you know, that were,
```
                              Page 31

wohlersjim081007.txt

```
6        you know, $30,000 a month, $70,000 a
7        month, you know, $80,000 a month, so there
8        was a wide variety of bids at that point
9        in time.  Square footage, same.  You know,
10       of course, a $500 a month account wasn't a
11       lot of square footage.
12   Q.  When you became vice president, what was
13       the largest project in terms of square
14       footage that PFMI had managed or
15       participated in?
16            MS. TULEY:  Object to the form.
17   A.  Best I could do is a guess.  I'm not --
18       again, because I didn't deal as much with
19       square footage, you know, I didn't see a
20       lot of the bids.  At that point I wasn't
21       involved in that.  Let me think.  I'm just
22       trying to think of the largest one we were
23       doing at that point.  Might have been West
                                                    40


1        Point or Propex.  And I'm not -- best I
2        could do is guess at square footage.  I'm
3        not sure.
4    Q.  And as vice president -- I guess, again,
5        it was 2004-2005?
6    A.  Somewhere in there, yeah.
7    Q.  And you were handling profit and loss,
8        right?
9    A.  Yeah.  Well, when Hugh retired, then I
10       started handling that aspect of it more.
11       Prior to that, I would do more setting up
```
                           Page 32

wohlersJim081007.txt

```
12      the charter accounts, formatting the
13      profit and loss statements, those type of
14      things.  So not necessarily responsible
15      for the bottom line, but responsible for,
16      you know, invoices coming in, reviewing
17      those invoices, making sure they were
18      legitimate charges, you know, slapping
19      hands when invoices -- things were charged
20      that shouldn't be charged or that type of
21      thing.  And then because of my knowledge
22      of the software, I formatted the P&L
23      statements and formatted billing and did
```

                                                       41


```
 1          that type of thing.
 2      Q.  So part of your job responsibility I guess
 3          at that point would be to -- for lack of a
 4          better word, vet the billing that you were
 5          receiving the payment of accounts payable?
 6      A.  Rephrase that.
 7      Q.  Well, I'm sorry.  You said that you would
 8          slap hands when invoices were paid that
 9          shouldn't have been paid?
10      A.  Yeah.  Well, not necessarily invoices, but
11          if they put a charge on a charge account
12          that shouldn't -- you know, there's limits
13          in the company.  You know, over $500 they
14          have to have approval for a charge.
15      Q.  You're talking about billing to overhead
16          for --
17      A.  Well, not billing to overhead,
```
                        Page 33

WohlersJim081007.txt

18    necessarily, but -- take an example of
19    West Point.  They go out and buy mops to
20    mop the floor.  Up to a limit, that's
21    fine.  When it hits a dollar threshold,
22    they need to make corporate aware that
23    they're going to charge this so we're

                                        42


1     aware, you know, that -- make sure they
2     have the proper PO, make sure PO matches
3     invoices, invoices match price, you know,
4     negotiating with vendors for pricing.
5     When I say vendors, supply vendors, you
6     know, that type of thing.
7  Q.  In 2004-2005, what was the largest account
8     that PFMI had in terms of square footage?
9  A.  You know, this would be a guess on my
10     part.  It would either be West Point or
11     Propex, I'm not sure.  And I'm not sure of
12     the square footage on either one of those.
13 Q.  Okay.  Were either one of those larger
14     than a million square feet?
15 A.  I couldn't tell you.  They're both big.  I
16     mean, I don't know -- you know, Propex is
17     eight plants scattered along Georgia and
18     Alabama.  I mean, total plant size, yes.
19     You know, same with West Point, yes.
20 Q.  To the best of your recollection, I guess,
21     then, Propex was management of about eight
22     plants?
23 A.  Yes.
                    Page 34

WohlersJim081007.txt

43

1   Q.   Okay.  And West Point, how many facilities
2        I guess or --
3   A.   Four or five.  You know, West Point is
4        textile.  And, you know, it would be four
5        one month, might be six the next month,
6        depending on where they shifted
7        production.
8   Q.   For West Point, what was the approximate
9        revenue annually?
10  A.   Oh, annually?  Somewhere over a million
11       dollars, I'm guessing.  The billing was
12       done on a monthly basis, based on hours
13       worked.
14  Q.   Could have been more, could have been
15       less?
16  A.   Could have been more, could have been
17       less.  It's evolved a bit.
18  Q.   What about for Propex?
19  A.   Same.  A little over a million, could be
20       more, could be less, depending on what we
21       did within that annual period.
22  Q.   Prior to September 2005, what was the
23       largest project that PFMI had been

44

1        involved with in terms of square footage
2        or revenue?
3   A.   You know, I could only speak to --

Page 35

wohlersJim081007.txt

```
 4                MR. SAWYER:   That was compound,
 5            sorry.
 6   Q.   Prior to the September 2005, what was the
 7        largest project to your knowledge that
 8        PFMI had worked on?
 9   A.   And I would just -- this is strictly a
10        guess.  I mean, you know, I would say
11        somewhere around a million square feet.
12        And I'm not really sure.
13   Q.   Well, I don't want you to guess.  Is there
14        any reason you would doubt that that would
15        be correct?
16   A.   Well, there might be larger ones.  You
17        know, really, what I see -- a lot of times
18        what I see is dollars.  I don't
19        necessarily see the square footage number,
20        so...
21   Q.   In terms of dollars, what's the largest
22        account that you can recall prior to
23        September 2005?
```

45

```
 1   A.   You know, I believe West Point, but I --
 2        again, I couldn't be 100 percent on that,
 3        because there's accounts that have
 4        started, you know -- or had ended prior to
 5        that, that, you know, I couldn't say for
 6        sure.
 7   Q.   I believe the record will reflect it was
 8        your best knowledge that it was roughly a
 9        million dollars annual plus or minus for
```

Page 36

wohlersJim081007.txt

| | | |
|---|---|---|
| 10 | | West Point? |
| 11 | A. | Yes, I believe. |
| 12 | Q. | Okay.  Prior to September 2005, how much |
| 13 | | work on a percentage basis did PFMI |
| 14 | | self-perform? |
| 15 | A. | You know, 80 percent, I guess.  I'm not... |
| 16 | Q. | When you came on as vice president in |
| 17 | | 2004, how many direct employees did PFMI |
| 18 | | have, roughly? |
| 19 | A. | At that point, it was four to five |
| 20 | | hundred.  And like I said, that's an |
| 21 | | estimate.  I'm not sure without looking at |
| 22 | | an actual employee count. |
| 23 | Q. | When you became vice president, did PFMI |

46

| | | |
|---|---|---|
| 1 | | ever have occasion to subcontract out 100 |
| 2 | | percent of the work? |
| 3 | A. | I don't know how I can answer that without |
| 4 | | just guessing.  There might be operations |
| 5 | | that yes, they did, but... |
| 6 | Q. | But to your knowledge as you sit here |
| 7 | | today, you don't recall? |
| 8 | A. | Not that I recall, no. |
| 9 | Q. | Okay. |
| 10 | | MR. SAWYER:  Off the record. |
| 11 | | (Brief recess.) |
| 12 | Q. | Let's go back on the record.  Mr. Wohlers, |
| 13 | | I've handed you what's been marked as |
| 14 | | Exhibit 16 from the deposition of Greg |
| 15 | | Littlefield.  Could you take a look at |

Page 37

WohlersJim081007.txt

```
16        that?
17                        (The referred-to document was
18                         marked Defendant's Exhibit No.
19                         16 in a prior deposition and
20                         is not attached hereto.)
21    A.    All right.
22    Q.    Let me first ask you, have you ever seen
23          that document before, that document being
```

                                                        47


```
1          Exhibit 16?
2    A.    I believe so, yes, sir.
3    Q.    If you'll turn to Exhibit A, which you
4          already have open, it's my understanding
5          that you're being produced as a corporate
6          representative today for Topic Number 2,
7          Professional Facilities Management, Inc.
8          agreements with EMCOR?
9    A.    Yes, sir.
10   Q.    To perform work and/or provide services on
11         banking and trust locations; is that
12         correct?
13   A.    Yes, sir.
14   Q.    And you're also being produced as a
15         corporate representative for PFMI for
16         Topics 3, 4, 5, 8, 10, 11, 12, 15, 16, 17,
17         and 18?
18   A.    Yes, sir.
19                        (Off-the-record discussion.)
20   Q.    Okay.  I've just conferred with counsel,
21         and the exact -- Topic Number 1, the exact
```

wohlersJim081007.txt

22    amount in calculation of each category of

23    damages, that will be handled by someone

48

1    else?

2          MS. TULEY:  Yes.  That will be

3             handled by our expert.

4  Q.  When did you first hear about the BB&T

5    account?

6  A.  The first time I heard about it was

7    February '05.

8  Q.  And how did you come to know about the

9    BB&T account?

10  A.  I believe, you know, just in conversation

11    with Greg.

12  Q.  What was discussed between you and Greg?

13  A.  I really don't recall the exact

14    conversation, just there was an

15    opportunity.

16  Q.  What involvement, if any, did you have

17    helping Greg after he informed you of the

18    BB&T opportunity?

19  A.  As far as preparing the bid or as far as

20    --

21  Q.  As far as anything?

22  A.  The entire project?

23  Q.  Yes.

49

1  A.  You know -- well, let's try and go --

2  Q.  Let me form a more precise question.  In

Page 39

wohlersJim081007.txt

```
 3        February of '05 or somewhere thereabouts,
 4        you heard about the BB&T account from
 5        Greg, correct?
 6   A.   Yes.
 7   Q.   Okay.  After Greg informed you there might
 8        be an opportunity to work on the BB&T
 9        account, how did you help Greg or how were
10        you involved in that prior to award of the
11        account?
12   A.   Really nothing more than printing out some
13        documents and passing those along to him.
14   Q.   what type of documents would you print
15        out?
16   A.   I think just the bid package itself.
17   Q.   And if you would, take a look at what was
18        marked as Exhibit 14 yesterday in
19        Mr. Littlefield's deposition.  I know you
20        were here yesterday, but you didn't get a
21        chance to look at it all --
22                    (The referred-to document was
23                     marked Defendant's Exhibit No.
                                                       50
```

```
 1                    14 in a prior deposition and
 2                     is not attached hereto.)
 3   A.   No.
 4   Q.   -- so please take your time.
 5   A.   All right.
 6   Q.   First of all, let me ask you this, have
 7        you seen what's marked as Exhibit 14
 8        before?
                    Page 40
```

WohlersJim081007.txt

```
 9   A.   Most of it I have.  I couldn't say that
10        I've seen all of it, no.
11   Q.   What parts haven't you seen?
12   A.   Well, let me put it this way:  If I've
13        seen it, I don't recall seeing it; I'll
14        put it that way.  Because very often when
15        I print out an e-mail, it might just be --
16        something like this, I'm not opening every
17        attachment.  The bulk of the RFP, if it
18        was sent to me, I printed it out, but I
19        couldn't say that I read through the
20        entire thing.  And I think that would be
21        about it.
22   Q.   What do you specifically recall seeing
23        before?
```

                                                    51


```
 1   A.   As far as with the bid prep or with the --
 2   Q.   Any of those documents?
 3   A.   I mean, I'd say I recall seeing most all
 4        these documents before.
 5   Q.   What is your understanding of what Exhibit
 6        14 comprises?
 7   A.   My understanding is it's a bid package.
 8   Q.   Now, you're being produced today as the
 9        corporate representative for PFMI for the
10        scope of work to be performed by PFMI for
11        EMCOR; is that correct?
12   A.   Yes, sir.
13   Q.   Okay.  Is -- well, let me just ask it this
14        way:  Do those documents comprise the
```
                         Page 41

WohlersJim081007.txt

15      scope of work to be performed by PFMI for

16      EMCOR?

17  A.  Yes, it does.

18  Q.  If you would, take a look at -- within

19      Exhibit 14, there's a spreadsheet which is

20      longer than the others, and it's kind of

21      thick.  I'm sorry, it's not that one; it's

22      the --

23  A.  The master location --

                                                52


1   Q.  That's it, master location list.

2   A.  All right.

3   Q.  First let me ask you, was this a unit

4       price contract with EMCOR, or was it a

5       lump sum contract?

6   A.  I believe it was -- when you say unit,

7       square footage?

8   Q.  Correct, square footage based on a unit

9       price number.

10  A.  It was unit-based.

11  Q.  Okay.  And I know you didn't have any

12      involvement with coming up with the unit

13      price number -- coming up with that, but

14      you did have involvement with, I guess,

15      the scope of the work, as far as the

16      locations that would be performed by PFMI?

17  A.  I don't understand the question in the

18      scope of work.

19  Q.  Well, did you have any involvement with

20      analyzing, I guess, the amount of

                        Page 42

wohlersJim081007.txt

```
21        locations that would be performed by PFMI
22        or the amount of square footage that would
23        be performed by or proclaimed by PFMI
                                                    53


1         prior to the awarding of the contract?
2    A.   No.
3    Q.   And that would have been Greg?
4    A.   I believe so.
5    Q.   Okay.  And I think you were sitting here
6         yesterday -- well, take a look through the
7         summary at the end, which shows the -- no,
8         you're on the right page.
9              MS. TULEY:  The last page.
10   A.   Oh, all right.
11   Q.   You're on the right page.
12   A.   All right.
13   Q.   And there's a couple of columns.  One
14        column is for gross square footage and the
15        other is for adjusted square footage.  Do
16        you have an understanding of what gross
17        square footage means in the industry?
18   A.   I believe so.
19   Q.   Okay.  What is that understanding?
20   A.   That it's total building size.
21   Q.   Okay.  Is it from the outside wall or the
22        inside wall?
23   A.   Outside wall.
                                                    54


                   Page 43
```

wohlersJim081007.txt

```
 1   Q.   Okay.  And how would you calculate gross
 2        square footage?
 3   A.   The way we do it, of course, is we'll
 4        measure length times width, subtract any
 5        odd angles, and multiply it out.
 6   Q.   And you would subtract the odd angles and
 7        get gross square footage?
 8   A.   Normally, yes.  If the building goes down
 9        a side and it's not a square, we would not
10        multiply it out as a square.  That would
11        be done differently.
12   Q.   Do you have any idea of what adjusted
13        square footage is?
14   A.   Yes, sir.
15   Q.   What is it?
16   A.   It would be gross minus, you know, any
17        vacant square footage.
18   Q.   Is there a difference between adjusted
19        square footage and net cleanable square
20        footage?
21   A.   In regards to?
22   Q.   Just would there be a difference?  Are
23        those two terms different or are they
```

                                                            55

```
 1        synonymous?
 2   A.   I guess it's depending on who's using
 3        those terms.
 4   Q.   Okay.  Do you have an understanding of
 5        what net cleanable square footage means, I
 6        guess, in the industry?
```

                            Page 44

wohlersJim081007.txt

```
 7   A.   Yes.
 8   Q.   Okay.  What is that understanding?
 9   A.   It would pretty much be the same -- to me,
10        very similar to adjusted square footage.
11        It would be your gross minus obviously
12        non-cleanable or vacant space.
13   Q.   Do you recall what time frame the
14        documents in Exhibit 14 were given to
15        PFMI?
16   A.   I don't recall.  I mean, I believe I saw a
17        cover sheet to an e-mail.  That's the only
18        way I could tell you when it was given.
19   Q.   But as you sit here today, you don't have
20        an independent recollection of the
21        approximate time when you would have
22        gotten it?
23   A.   No, sir.
```

                                        56


```
 1   Q.   Definitely would have been before July 13,
 2        2005, right?
 3   A.   I believe so.
 4   Q.   Because that's when we entered into the
 5        letter of intent, right?
 6   A.   Yes.
 7   Q.   Okay.  Do you ever recall a document
 8        referred to as an Exhibit C?
 9   A.   Yes.
10   Q.   I think Mr. Littlefield testified about
11        that a little bit yesterday.  And I'll
12        just go ahead and let you take a look at
```

                        Page 45

wohlersJim081007.txt
13    what was marked as Exhibit 17.
14                    (The referred-to document was
15                    marked Defendant's Exhibit No.
16                    17 in a prior deposition and
17                    is not attached hereto.)
18  A.  All right.
19  Q.  First let me ask if you can identify what
20      was marked as Exhibit 17 to
21      Mr. Littlefield's deposition.
22  A.  Yes, I can identify it.
23  Q.  Okay.  What is it?

                                                57


1   A.  It appears to be Exhibit C.
2   Q.  Now, the record will reflect whatever
3       Mr. Littlefield said, but do you recall
4       ever receiving an Exhibit C prior to the
5       contract?
6   A.  Yes.
7   Q.  Okay.  When do you recall?
8   A.  Again, without -- I looked at the e-mail,
9       but I couldn't tell you when I actually
10      received Exhibit C.  I mean, I know the
11      e-mail refers to it, but I don't know
12      exactly when I received it.
13  Q.  Okay.  And I think if you'll turn to the
14      last page of Exhibit 17, I think it shows
15      an estimated square or usable cleanable
16      square feet of 5.4 million; is that
17      correct?
18  A.  Yes, sir.

                    Page 46

WohlersJim081007.txt

19  Q.   Did you ever have any discussions with

20       Mr. Littlefield concerning Exhibit C,

21       which you have in front of you and is

22       marked as Exhibit 17?

23  A.   I can recall discussions about Exhibit C,

                                                    58


1        but not just with Greg.

2   Q.   Did you ever review it with him and

3        explain that part of the transition of

4        Phase 1 included measuring the cleanable

5        and adjusting it to reflect the actual

6        square footage?

7   A.   Yes, we discussed that fact.

8   Q.   And I think Mr. Littlefield's testimony

9        was -- and again, the record will say what

10       it says; your counsel can and will object

11       here -- but there was some talk about

12       Exhibit C out there that showed 5.4

13       million square feet estimated that wasn't

14       provided to PFMI.  Do you recall that?

15            MS. TULEY:  Object to the form.

16  A.   That it wasn't provided to PFMI?

17  Q.   Right.

18  A.   You know, I think -- you know, Exhibit C

19       was basically -- we were told that it was

20       an non-issue; it was created specifically

21       for budget purposes by EMCOR and just to

22       basically disregard it.

23  Q.   Who told you that?

                                                    59

WohlersJim081007.txt

```
1    A.    Sean Brookins and Steven King.
2    Q.    Did they tell you why you should disregard
3          it?
4    A.    That they created it strictly for budget
5          purposes for BB&T to look at numbers and
6          that was it.
7    Q.    Okay.  Let me mark this as the next
8          number.
9                    (Off-the-record discussion.)
10   Q.    I only have one copy.
11   A.    Oh, that's fine.  All right.
12   Q.    Can you identify what's been marked as
13         Exhibit 22?
14                    (The referred-to document was
15                     marked for identification as
16                     Defendant's Exhibit No. 22.)
17   A.    It appears to be an e-mail.
18   Q.    Do you recall it?
19   A.    No, sir, not specifically.
20   Q.    For the record, it's a March 24, 2005
21         e-mail from Alan Cristal that copies
22         Mr. Littlefield and Mr. Wohlers.  Well,
23         let me ask you this:  Is that your correct
```
                                                      60


```
1          e-mail address?
2    A.    Yes.
3    Q.    Okay.  And at the time, Mr. Cristal was an
4          EMCOR employee, right?
5    A.    Yes.
```
                        Page 48

WohlersJim081007.txt

6   Q.   And he was the EMCOR representative?

7   A.   Yes.

8   Q.   Okay.  If you would, could you -- and I'm

9        sorry, the e-mail is dated March 24, 2005.

10       If you would, could you read from Exhibit

11       22, starting here?

12  A.   (As read:) "Mr. Cristal, please read below

13       for changes to the attached exhibit.

14       Please contact me if you have any

15       questions in regards to these revisions.

16       Revised Exhibits C dot 5, janitorial

17       pricing by site, and Exhibit C dot 2,

18       sample site survey pricing.  The attached

19       Exhibit C consolidated C dot 1 through C

20       dot 6, cost proposal, contains revisions

21       to the exhibits noted above.  Please

22       replace the original Exhibit C,

23       consolidated C dot 1 through C dot 6, cost

                                              61


1        proposal with this workbook.  Exhibits C

2        dot 2 and C dot 5, which are tabs within

3        the master exhibit, have had square

4        footage revised.  The original adjusted

5        square footage has been modified to

6        reflect usable cleanable square feet.

7        Your pricing quotes should be based upon

8        this cleanable square footage which

9        reflects reduction in space to account for

10       equipment and mechanical rooms, electrical

11       and storage closets, and vertical

                   Page 49

wohlersjim081007.txt

```
12        penetration.  These space reductions
13        reduce the total square footage to an
14        estimated 5.4 million square feet.
15        Pricing may be adjusted ongoing if actual
16        usable cleanable square feet changes.
17        Note for Exhibits C dot 5, janitorial
18        pricing by site, and Exhibit A, location
19        identification information.  Locations
20        subject to minor changes upon final review
21        prior to contract signing and ongoing s a
22        result of mergers, consolidations,
23        closings, and/or openings.  Exhibit C,
```

                                                            62

```
 1        consolidated C dot 1 through C dot 6, cost
 2        proposal, revised 03/23/05 dot XLS,
 3        sincerely, Matt."  And it's signed -- or
 4        the electronic signature is Matt
 5        Llewellyn.
 6   Q.   Who is Matt Llewellyn?
 7   A.   A BB&T employee.
 8   Q.   Fair statement, EMCOR didn't hide Exhibit
 9        C from PFMI, did they?
10             MS. TULEY:  Object to the form.
11   A.   It doesn't appear so, no.
12   Q.   They actually provided it, didn't they?
13   A.   Yes.
14   Q.   Okay.  And at least as of March 24, 2005,
15        BB&T was telling EMCOR PFMI that the
16        square footage numbers might be 5.4
17        million, correct?
```
                         Page 50

WohlersJim081007.txt

```
18                    MS. TULEY:  Object to the form.
19   A.    Yes, it appears.
20   Q.    Okay.  And the contract in this case was
21         entered into July 11, 2005 -- or strike
22         that -- July 13, 2005?
23   A.    I'm not sure on the date, but that sounds
                                                      63


1          accurate.
2    Q.    After reviewing what's been marked as
3          Exhibit 22, is there any doubt in your
4          mind who prepared the square footage
5          numbers?
6                     MS. TULEY:  Exhibit 22?
7                     MR. SAWYER:  Exhibit 22.
8                     MS. TULEY:  Object to the form.
9    A.    Yes, there is.
10   Q.    Okay.  What doubts do you have?
11   A.    A comment by Steven King that he put
12         together Exhibit C and provided it to
13         BB&T.
14   Q.    When did Steven tell you that -- Steven
15         King tell you that he put together Exhibit
16         C?
17   A.    You know, I'm not sure of the exact date,
18         but when Exhibit C was brought up by BB&T,
19         called thinking FMI was low-balling some
20         of its current vendors and trying to get
21         vendors in place, they said, you know, FMI
22         is out there using numbers that are 20
23         percent below what we're currently doing.
```
                              Page 51

wohlersJim081007.txt

64

1    You know, their exact thing was pretty
2    much, what the hell is going on.  I got a
3    call from Sean Brookins asking me what was
4    going on.  Greg got a call, you know,
5    saying, why are we out there using numbers
6    that are 20 percent below what they're
7    currently doing.  So Greg, Steven, Sean,
8    and representatives from FMI all got
9    together on a phone call.  And like I
10   said, at that point in time, I was in his
11   office when they were discussing Exhibit
12   C, and that's when Steven King made the
13   comment that, you know -- well, Sean made
14   the comment that Exhibit C shouldn't be
15   used, that they should use the -- I forget
16   what square footage, but it wasn't the
17   square footage off Exhibit C.  And Steven
18   made the comment that that document had
19   been created for BB&T just for budget
20   purposes.
21 Q.   I'm going to mark this as the next in
22   order, which is -- let me hand you what is
23   marked as Exhibit 23.

65

1              (The referred-to document was
2               marked for identification as
3               Defendant's Exhibit No. 23.)
                    Page 52

WohlersJim081007.txt

4   A.   All right.

5   Q.   Can you identify what's been marked as

6        Exhibit 23?

7   A.   Yeah.  It appears it's an e-mail, you

8        know, regarding Exhibit C again.

9   Q.   Okay.  Could you read from where you're

10       actually responding?  And for the record

11       it's --

12  A.   Down here?

13  Q.   Yes.

14               MR. SAWYER:  It's an e-mail

15                    trail, but what I'm asking

16                    the witness to read from is

17                    from his e-mail dated

18                    07/11/2005.

19  A.   All right.  (As read:)  "Steven, I

20       received and discussed with Greg and

21       everything looks good.  Part of the

22       transition P-L -- I'm assuming it's plan;

23       it's cut off -- includes measuring the

                                              66


1        cleanable and adjusting to reflect actual

2        square footage."

3   Q.   Could the -- could that be P-L as in Phase

4        I?

5   A.   No, I don't believe so.

6   Q.   Okay.  You believe it's plan?

7   A.   I believe it's plan.

8   Q.   Okay.  Did you have those discussions with

9        Greg concerning measuring these locations

                        Page 53

wohlersJim081007.txt

10      and adjusting it to what's actually out

11      there as far as square footage?

12  A.    I'm sure I did, yes.

13  Q.    Did Greg say that that was okay?

14  A.    I assume he did.  I mean, I don't recall

15      the exact discussion though.

16  Q.    Sure.  Did he say everything looks good?

17  A.    I assume he did.  I mean, looking at the

18      e-mail, that's what he said.  But I

19      couldn't say.

20  Q.    All right.  If you would turn to the last

21      page of it.

22  A.    All right.

23  Q.    There's an attachment stating that Exhibit

                                        67

1      C, janitorial pricing by --

2  A.    By --

3  Q.    Sit?

4  A.    Yeah.  I'm assuming site, but...

5  Q.    The document actually didn't come with the

6      attachment broken out from the parent, but

7      does it appear that Exhibit C was also

8      provided in this e-mail or a copy at least

9      to this e-mail?

10  A.    It appears.  I -- you know...

11  Q.    Okay.  It doesn't appear that EMCOR was

12      hiding the ball with Exhibit C, does it?

13           MS. TULEY:  Object to the form.

14  A.    Not hiding Exhibit C, no.

15  Q.    Okay.  Did Mr. King ever tell you why

wohlersJim081007.txt

16      Exhibit C -- strike that -- why the
17      estimate -- did Steven King ever tell Jim
18      Wohlers why the 5.4 million square foot
19      number in the estimated square foot column
20      didn't matter or why it was just for
21      budget purposes?
22   A.  You know, I only recall Steven ever saying
23      that basically they just took the gross,

68

1       reduced everything by 20 percent, and
2       that's how they arrived at that number.
3    Q.  Okay.  My question is a little different.
4       Did Mr. King ever tell you why the
5       estimated square footage numbers on what
6       we've looked at -- I believe it was
7       Exhibit 17 -- why the estimated square
8       footage numbers didn't matter?
9    A.  Why Exhibit C didn't matter?
10   Q.  Or the 5.4 million square foot numbers in
11      Exhibit C, why that didn't matter?
12   A.  Well, I believe what he said was that
13      Exhibit C was a non-issue because
14      remeasurement would be performed.
15   Q.  And that was going to be performed by PFMI
16      during the first 90 days?
17   A.  Yes.
18   Q.  Okay.  Was it 90 days from the execution
19      of the contract, or was it 90 days from
20      the start of work in September?
21   A.  I believe it was from start of work in

Page 55

wohlersJim081007.txt

22      September.

23  Q.   And when, if you recall, did PFMI enter

                                69

1       into contracts with its sub-tier vendors?

2  A.   Without looking at the actual

3       subcontracts, I couldn't say.

4  Q.   Well, let me ask it this way:  Were those

5       contracts, the contracts with your

6       sub-tier vendors, were those executed or

7       entered into before or after EMCOR's

8       contract with PFMI?

9  A.   After.

10  Q.   All of them would have been after?

11  A.   I believe so.

12  Q.   Okay.  Because it doesn't make sense to

13       get a contract before you have a --

14  A.   Well, and that's -- yeah.  We want to make

15       sure it reflects what our contract is.

16              MR. SAWYER:  I'm mixing up my

17                   depositions here.  Do you

18                   have an Exhibit 17?

19  Q.   I'm handing you again what's marked as

20       Exhibit 17 to your deposition -- or to

21       Mr. Littlefield's deposition.  If you can

22       turn to the spreadsheet behind the first

23       page of Exhibit 17.  Do you have a

                                70

1       recollection one way or the other whether

2       the spreadsheet, which is identified at

wohlersJim081007.txt

3     the top of the page as Exhibit C dot 5,

4     janitorial pricing by site, whether that

5     Exhibit C is the same as the exhibit

6     that's referenced in the e-mail from BB&T

7     on March 24, 2005?

8               (The referred-to document was

9                marked Defendant's Exhibit No.

10              17 in a prior deposition and

11              is not attached hereto.)

12  A.   That -- I don't know.  I mean...

13  Q.   But it's true that the 5.4 million square

14     footage number is the same?

15  A.   Yes, it is.

16  Q.   And what's the run date on that

17     spreadsheet, which is Exhibit 17?

18  A.   Revised 3/23/05.

19  Q.   Okay.  If you could look at the date of

20     the e-mail on Exhibit 23 from the BB&T

21     personnel -- I apologize, it's Exhibit 22,

22     not Exhibit 23.

23  A.   The e-mail from Matt to Alan, the date?

                                         71

1  Q.   Yes.

2  A.   It appears to be 3/24/05.

3  Q.   So pretty close in time to the run date on

4     the spreadsheet that's attached or

5     included in Exhibit 17?

6  A.   Yes.  Do you want this one or just put it

7     over there?

8  Q.   You can put it over there.  Do you have

wohlersJim081007.txt

9    any reason to doubt that the spreadsheet

10    that's included in Exhibit 17 is not the

11    same spreadsheet as the one that's

12    referenced in Exhibit 23?

13         MS. TULEY:  I object to the form.

14              I think that was a double

15              negative.

16         MR. SAWYER:  That was a terrible

17              question.  I'll leave that

18              on the record.  You can put

19              it down.  Let me ask it

20              differently.

21    Q.    Do you believe that the spreadsheet that

22         shows 5.4 million square feet and is

23         identified as Exhibit 17 is the one that

                                           72


1    was forwarded to PFMI on March 24?

2    A.    It appears to be.

3    Q.    Thank you.  Did you have any involvement

4         with the negotiations of the contract

5         between EMCOR and PFMI?

6    A.    Not the letter of intent.

7    Q.    Anything?

8    A.    As far as the agreement?

9    Q.    As far as contract goes, yes.

10    A.    Not negotiations.  I mean, verbiage in the

11         contract or how it reads, yes, but not --

12         not what I'd call negotiations.

13    Q.    Well, in the letter of intent, verbiage in

14         that?

                    Page 58

wohlersJim081007.txt

```
15   A.   No, no.  I don't believe -- I don't recall
16        having anything to do with the letter of
17        intent.
18   Q.   There was never a definitive contract or a
19        different contract than the letter of
20        intent though, was there?
21   A.   There was -- there was an agreement, you
22        know, that we had reviewed and, you know,
23        went back and forth with Debi Crosby and I
```
                                                            73


```
1         want to say Joseph something at EMCOR.  I
2         believe he was their counsel.
3                    MR. SAWYER:  Off the record.
4                       (Off-the-record discussion.)
5    Q.   But a different contract other than the
6         letter of intent was never signed; is that
7         accurate?
8    A.   There was one signed by PFMI, but I don't
9         know if EMCOR ever signed it.
10   Q.   For the original contract?
11   A.   Yes.
12                   MR. SAWYER:  Off the record
13                      again.
14                   (Brief recess.)
15   Q.   Mr. Wohlers, you're also being produced
16        today as the corporate representative
17        regarding the measurements of BB&T's
18        locations conducted by PFMI?
19   A.   Yes.
20   Q.   And PFMI's sub-tier contractors and other
```
                          Page 59

WohlersJim081007.txt

21    entities on behalf of PFMI.  Did PFMI ever

22    perform any field measurements of BB&T's

23    bank locations?

                                                  74


1    A.    Yes.

2    Q.    Okay.  How many?

3    A.    All locations were measured.

4    Q.    Okay.  And let me ask the question more

5          precisely.  Did any direct personnel of

6          PFMI ever perform any field measurements

7          of BB&T locations?

8    A.    Yes.

9    Q.    Okay.  Who did that?

10   A.    Keith Blackburn, Ken Law, John Sauter,

11         S-A-U-T-E-R, Buz Campbell, B-U-Z.  He's

12         touchy about the second Z.  And those are

13         the ones I recall.

14   Q.    Did these individuals from PFMI perform

15         the initial measurements of the BB&T bank

16         locations?

17   A.    I can't recall if they did any initial

18         ones.

19   Q.    Did PFMI have a subcontractor go out and

20         measure BB&T bank locations in order to

21         get the actual square footage to be

22         cleaned out there?

23   A.    Yes.

                                                  75


                     Page 60

WohlersJim081007.txt

```
 1   Q.   Did the subcontractors do this in all
 2        instances?
 3   A.   Yes.
 4   Q.   And what I'm trying to get at is whether,
 5        first, the subcontractors went out and
 6        measured and then some individuals from
 7        PFMI went out and remeasured?
 8   A.   Yes, that occurred.
 9   Q.   Okay.  But is it a fair statement that the
10        subcontractors performed the initial
11        measurement?
12   A.   Yes, yes.  I -- like I said, I can't
13        recall if we performed any initial
14        measurements.  Keith might have, but I --
15        like I said, I can't recall.  But yeah,
16        subs -- we did rely on the subs to go out
17        and measure.
18   Q.   Okay.  But for the bulk of it, it would
19        have been the subcontractors initially?
20   A.   Yes.
21   Q.   Okay.  What direction did PFMI give to its
22        subcontractors concerning, I guess,
23        protocol for measuring these locations?
```

76

```
 1   A.   Yeah.  Without looking at the specific
 2        instructions, I mean, I -- to the best of
 3        my recollection is really all I could
 4        provide.
 5   Q.   Okay.  So there are specific instructions?
 6   A.   I believe there are, yes.  But we had a
```

Page 61

wohlersJim081007.txt

```
 7        meeting at the EMCOR Air Con (phonetic)
 8        facility -- not sure -- end of June,
 9        beginning of July; I'm not sure of the
10        date -- in which all our primary vendors,
11        you know, were there.  Sean Brookins and
12        Alan Cristal were there, also with EMCOR,
13        and we reviewed -- we had several agenda
14        items, and one of those items was the
15        performance of measurements, how those
16        surveys needed to be conducted and the
17        form that needed to be filled out for
18        those surveys.
19   Q.   Who generated -- well, first let me ask
20        you the specific instructions you were
21        referring to, who created the specific
22        instructions to -- for PFMI's vendors to
23        go out and perform these field
```

                                                    77


```
 1        measurements?
 2   A.   I believe it was a discussion between
 3        myself and Sean Brookins.
 4   Q.   Okay.  Is there some document I could look
 5        at that would show what instructions were
 6        given to the subcontractors concerning
 7        measurements of these BB&T locations?
 8   A.   I can't recall right off.  I believe there
 9        was an e-mail that gave those
10        instructions.
11   Q.   So as you sit here today, it could have
12        been -- strike that.
```

                        Page 62

WohlersJim081007.txt

```
13                    Could it have been a formal
14          document?
15    A.    I don't believe it was a Word document.  I
16          believe it was a -- you know, my
17          recollection, it was an e-mail.
18    Q.    Okay.  A mass e-mail sent out to all
19          vendors?
20    A.    Yeah, this is what needs to be done.
21    Q.    Do you recall what time that mass e-mail
22          would have gone out?
23    A.    No, not specifically.
                                            78



 1    Q.    Would it have been before or after
 2          September 6, 2005, when the work started?
 3    A.    I know one went out after September --
 4          after the work was started, but I couldn't
 5          state for sure if one went out prior.
 6    Q.    During the time of -- after execution of
 7          the letter of intent and before the start
 8          of the work in September, was PFMI doing
 9          any other large accounts or performing
10          work on any other large accounts?
11    A.    I don't recall right off.
12    Q.    Well, let me ask it this way:  What was
13          the other biggest thing you had going
14          except for the BB&T account?
15    A.    You know, without looking at a customer
16          file, I couldn't say for 100 percent what
17          that would be.
18    Q.    Do you remember bidding on work for
```

Page 63

wohlersJim081007.txt

19      Colonial Bank in August of 2005?

20  A.  Me specifically, no.

21  Q.  Okay.  You wouldn't have been involved in

22      that?

23  A.  Not the bid itself, no.

                                        79


1   Q.  Okay.  Were you aware of it?

2   A.  In August?  I couldn't say in August I

3       was.

4   Q.  Well, let me just mark this.  I apologize;

5       the highlighting is mine.

6                   (The referred-to document was

7                    marked for identification as

8                    Defendant's Exhibit No. 24.)

9   A.  All right.

10  Q.  Did PFMI ever get the work for Colonial

11      Bank?

12  A.  Yes, they did.

13  Q.  Okay.  What was the size of the contract?

14  A.  The initial?

15  Q.  Yes.

16  A.  I believe it was approximately $180,000 to

17      $200,000 dollars per month.

18  Q.  That's a pretty big contract.

19  A.  Yes.

20  Q.  Would you say it's -- strike that.  Sounds

21      like it's a little smaller than the BB&T

22      account?

23  A.  Yes.

                                        80

wohlersJim081007.txt

```
 1   Q.   But still very large, nonetheless?
 2   A.   Yes.
 3   Q.   Higher math, a little over 3 million or --
 4   A.   What, square footage?
 5   Q.   No, dollars, annual revenue?
 6   A.   That sounds accurate.
 7   Q.   I'm just doing 200,000 times 12 in my
 8        head.
 9   A.   Yeah.
10   Q.   When was PFMI awarded that work?
11   A.   April or May of '06.
12   Q.   Okay.  So the bid was going on in August
13        2005, but the award didn't actually go out
14        until April of 2006?
15   A.   Correct.
16   Q.   Okay.  Was any work performed for the
17        Colonial Bank job prior to the contract
18        award in April of 2006?
19   A.   Rephrase that.  I'm sorry.
20   Q.   Sure.  Did PFMI perform any work on the
21        Colonial Bank job before it received the
22        Colonial Bank contract?
23   A.   You mean -- are you asking --
```

                                               81


```
 1   Q.   Did you go out and perform services before
 2        you had the contract?
 3   A.   Before a signed contract?
 4   Q.   Correct.
 5   A.   Not prior to the letter of intent, as far
```
                        Page 65

wohlersJim081007.txt

| | | |
|---|---|---|
| 6 | | as I'm aware. |
| 7 | Q. | Are you referring to Exhibit 24, which is |
| 8 | | a memorandum of understanding? |
| 9 | A. | Yeah. |
| 10 | Q. | Do you know when that was executed? |
| 11 | A. | No. Not without looking at the actual |
| 12 | | signed document, I wouldn't know when that |
| 13 | | was executed. |
| 14 | Q. | Okay. For that job as well, did PFMI have |
| 15 | | to go out and measure square footage or |
| 16 | | verify square footage? |
| 17 | A. | No. I mean, I think there were some spot |
| 18 | | checks here and there, but it wasn't -- it |
| 19 | | wasn't that we had to go out and measure |
| 20 | | every branch. |
| 21 | Q. | Could you read the fifth bullet point? |
| 22 | A. | During the period of 8 August 2005 through |
| 23 | | 20 August 2005, PFMI field personnel will |

                                                            82

| | | |
|---|---|---|
| 1 | | conduct surveys of each Colonial branch |
| 2 | | site to verify square footages that were |
| 3 | | returned from Colonial's internal survey. |
| 4 | Q. | And is it your testimony that didn't |
| 5 | | happen? |
| 6 | A. | It's my testimony I don't know if that |
| 7 | | happened. I wasn't involved. |
| 8 | Q. | Fair enough. Now, I know you testified |
| 9 | | that there was e-mail concerning -- or |
| 10 | | definitely discussions concerning how the |
| 11 | | field measurements were to happen. Do you |

WohlersJim081007.txt

| | | |
|---|---|---|
| 12 | | recall the substance of either the |
| 13 | | discussions or e-mails as far as what the |
| 14 | | subcontractors were supposed to include -- |
| 15 | | or strike that -- how they were supposed |
| 16 | | to perform the field measurements? |
| 17 | A. | From the e-mail specifically? |
| 18 | Q. | I'm not asking you to regurgitate the |
| 19 | | e-mail, just your best recollection of |
| 20 | | what PFMI instructed its subcontractors to |
| 21 | | do with respect to field measurements. |
| 22 | A. | To visit each location, measure exterior |
| 23 | | length, time, width -- |

83

| | | |
|---|---|---|
| 1 | Q. | That would give them the gross, right? |
| 2 | A. | Yes. |
| 3 | Q. | Okay.  Go ahead. |
| 4 | A. | Then go inside, take -- you know, take |
| 5 | | measurements of any obviously vacant |
| 6 | | spaces or non-cleanable spaces.  You know, |
| 7 | | break down measurements, VCT carpet, |
| 8 | | window counts.  I don't believe it was a |
| 9 | | fixture count; I couldn't be sure on that, |
| 10 | | though.  Drive-through count, you know, |
| 11 | | number of drive-through lanes, exterior |
| 12 | | ATM, exterior trash cans, those type of |
| 13 | | things.  And the form we had put together, |
| 14 | | you know, basically broke down each one of |
| 15 | | those items and gave them total square |
| 16 | | footage and then a breakdown of each one |
| 17 | | and then the total cleanable. |

WohlersJim081007.txt

18    Q.    I know this may seem overly simplistic,
19          but can you describe for me what would be
20          vacant -- an example of vacant square
21          footage?
22    A.    Well, let's see.  Vacant square footage.
23          Let's say there was a two-story building.

                                                    84


1           You know, of course, they measured length
2           times width, which gave them the diameter
3           or gross square footage.  Then let's say
4           on the second floor absolutely no one was
5           up there, so that square footage would be
6           deducted -- or several offices that
7           weren't being used, you know, those
8           offices would be measured and deducted.
9     Q.    Okay.  You also mentioned non-cleanable?
10    A.    Yes.
11    Q.    What is that?
12    A.    Well, that would basically be the same as
13          the vacant.
14    Q.    Would it also include other items?
15    A.    Not unless the bank specifically -- you
16          know, branch personnel specifically said,
17          you don't go into this area; don't worry
18          about this area.  You know, gross leased
19          space, which is just something that BB&T
20          referred to on certain things.
21    Q.    What's gross leased space?
22    A.    Best of my understanding, it was space
23          they leased out to tenants that we weren't

wohlersjim081007.txt

1        responsible for cleaning.

2  Q.   So if they leased out a portion of the

3        facility, PFMI's subcontractors didn't

4        have to clean that?

5  A.   Correct.

6  Q.   So it would be backed out of whatever the

7        gross square footage would be?

8  A.   Correct.

9  Q.   And that would give you a cleanable square

10       footage number?

11  A.   Yes.

12  Q.   Okay.  And you said VCT?

13  A.   Tile.  Vinyl composition tile.

14  Q.   I'm a construction guy; I should know

15       that.  What would they do to measure -- or

16       why would they measure the tile?

17  A.   Well, if on occasion -- we tried to get

18       the carpet measurement, the VCT

19       measurement, the ceramic measurement so as

20       things progressed, if someone called up

21       and said, we want the tile stripped and

22       waxed at this branch, we wouldn't have to

23       take the time to say, well, we'll go out

1        and measure it and get you a price.  We'll

2        be able to give them the square footage

3        and basically move it along a little

wohlersJim081007.txt

```
 4        quickly.  And that, I don't think is a
 5        good example of BB&T, because I believe
 6        floor care was included but carpet wasn't,
 7        so it would apply more to carpet than
 8        tile.
 9   Q.   Have you ever heard the phrase "super
10        clean"?
11   A.   Yes.
12   Q.   What is that?
13   A.   If it's what I'm thinking of, we call it a
14        blitz clean.  Super clean I believe would
15        be the same thing, where extra people
16        would be thrown into a branch, into a
17        building, and, you know, according to the
18        scope of work, extra work is done or
19        whereas your periodics, daily, weekly,
20        monthly things, a lot of things are done
21        at the same time to bring a branch or
22        location up to its current level of
23        cleanliness.
                                              87
```

```
 1   Q.   And that's basically out-of-scope work?
 2   A.   It could be or couldn't be.
 3   Q.   If it's their fault that they need a super
 4        clean --
 5   A.   Then it would be out of scope.
 6   Q.   And by "their," I mean tenants.
 7   A.   Customer, yes.
 8   Q.   Why would you do a window count?
 9   A.   Very similar to carpet cleaning.  If they
```

Page 70

WohlersJim081007.txt

10    called up and had a special function going

11    on and wanted windows cleaned that

12    normally aren't due to be cleaned or

13    aren't supposed to be clean at that point

14    in time, you know, that type of thing.

15    And then I believe on the form was also a

16    couple of things that -- if the HVAC was

17    on the ground or on the roof, which was

18    nothing to do with PFMI.

19  Q.  Okay. Why would you do drive-through

20    accounts?

21  A.  Because we were required to place those

22    areas, empty the trash, wipe the ATMs. So

23    those would need to be taken into account

                                                88

1    when measuring the buildings.

2  Q.  Did you provide a form for subcontractors

3    to report this information on?

4  A.  Yes.

5  Q.  And those have been produced?

6  A.  Yes.

7          MS. TULEY: Boxes of those have

8             been produced.

9          MR. SAWYER: My expert's having

10             lots of fun with that.

11          THE WITNESS: I'm sure.

12  Q.  When did the actual measurements start on

13    the BB&T account?

14  A.  I'm not sure of a specific date. Sometime

15    after start-up. I think some did occur

                                Page 71

wohlersJim081007.txt

16        prior to start-up, because we got our hand

17        slapped for it.

18   Q.   And I believe it's true, is it not, that

19        PFMI didn't actually perform any cleaning,

20        as far as self-performing this work?

21   A.   That's correct.

22   Q.   Okay.  So it was PFMI's job to manage

23        these subcontractors?

                                         89

1   A.   Yes, sir.

2   Q.   Okay.  Was that primarily your

3        responsibility?

4   A.   It was primarily Keith Blackburn's

5        responsibility for the day-to-day

6        management of the subs.  But, you know, we

7        had a team of people that managed this

8        account.

9   Q.   Did Keith report to you?

10   A.   Split between myself and Greg.

11   Q.   But the buck stopped with you and Greg,

12        didn't it?

13   A.   Yes.

14   Q.   So I believe your testimony is the subs

15        started measuring whenever they got out

16        there in September, correct?

17   A.   Yes.  I couldn't say that they started --

18        the day they started cleaning.  I think

19        that would be a bad assumption.

20   Q.   And the measurement said were supposed to

21        be completed in 90 days?

wohlersJim081007.txt

```
22   A.   Yes.
23   Q.   Did that happen?
```

90

```
 1   A.   No.
 2   Q.   Was there one particular subcontractor who
 3        was late?
 4   A.   Not late.  We had concerns about some of
 5        the measurements and asked to extend that
 6        timeline to allow us to remeasure.
 7   Q.   Do you recall the subcontractor with whom
 8        you had concerns?
 9   A.   Yes, FMI.
10   Q.   why did you have concerns?
11   A.   Some of the measurements were coming back
12        same as the gross was listed.
13   Q.   when you say "some," how many?
14   A.   I -- without actually looking, I couldn't
15        -- couldn't give you a specific number.
16   Q.   I'll represent to you that -- well, I
17        think you were sitting here -- that I
18        think it was Greg's best recollection that
19        it was 30 to 40 percent -- I believe the
20        way he -- 60 to 70 percent that PFMI had
21        confidence in, but there was 30 to 40 that
22        they weren't real sure about?
23   A.   Yeah, I wasn't sitting here at that time.
```

91

```
 1        Yeah, sounds good.
 2                  MR. SAWYER:  Counsel, is that
```
Page 73

wohlersJim081007.txt

```
 3                  true?
 4          MS. TULEY:  Yeah.
 5   Q.   Well, let me ask the question, is that a
 6        fair statement that 30 to 40 percent you
 7        weren't comfortable with those numbers?
 8   A.   I believe so, yes.
 9   Q.   Did it look like the vendor had simply cut
10        the gross square footage and pasted it on
11        the cleanable square footage?
12   A.   I believe so, but they were handwritten.
13   Q.   So it's the manual cutting and pasting?
14   A.   Yeah.
15   Q.   And you knew that couldn't be right?
16   A.   We didn't feel it was accurate.
17   Q.   Highly, highly unlikely?
18   A.   We believe so.
19   Q.   And is it your testimony you went to EMCOR
20        and asked for a little more time so that
21        you could remeasure?
22   A.   Yes.
23   Q.   Because you wanted to do the right thing
                                              92


 1        because you had knowledge that this
 2        probably wasn't correct?
 3   A.   Correct.
 4   Q.   And did you actually perform those
 5        measurements?
 6   A.   They were -- yes, they were remeasured.
 7   Q.   And the individuals that would have
 8        remeasured would have been Keith Law, John
                        Page 74
```

wohlersJim081007.txt

```
 9        Sauter, Buz Campbell --
10   A.   On most occasions I believe they went out
11        with FMI representatives and remeasured.
12   Q.   What was the time frame of the
13        remeasurement?
14   A.   I believe -- without looking at it, I
15        believe it was December.
16   Q.   During this time frame, do you recall what
17        PFMI was billing from, whether it was
18        gross square footage or adjusted square
19        footage?
20   A.   We had been instructed to bill off of
21        gross.
22   Q.   And when you refer to gross -- and you can
23        take a look at Exhibit 14, I believe, to
                                                     93


 1        refresh your recollection -- are you
 2        referring to the gross number contained in
 3        Exhibit A, which is the spreadsheet?
 4   A.   No, sir.  Every month we were sent what's
 5        called a master list, which I believe BB&T
 6        gave to EMCOR, and it was broken down
 7        branches by region.  It listed -- because
 8        this doesn't list it.  There's a notes
 9        column on the master, and of course, gross
10        leased space was automatically taken out.
11        There were some notes on the master list
12        that would tell you to increase or
13        decrease that gross square footage because
14        the gross square might have had 2000
```

wohlersJim081007.txt

15      square feet and in the notes it had,

16      cleaned both floors; bill this.  So we

17      used the master list to bill from, not

18      Exhibit A.

19   Q.  Okay.  Did that change monthly?

20   A.  Yes.

21   Q.  Okay.  Because sometimes --

22   A.  Because --

23   Q.  Let me ask it.

                                              94


 1   A.  Sorry.

 2   Q.  Why did it change monthly?

 3   A.  Branches would open and close.

 4   Q.  Do you recall what the amount of gross

 5       square footage would have been starting in

 6       September?

 7   A.  I really don't.  A lot.

 8   Q.  Would it have been more than 6 million

 9       square feet?

10   A.  I -- without actually looking at an

11       invoice, I couldn't -- I couldn't answer

12       that.

13   Q.  But the invoice would show what --

14   A.  The invoice would show what we billed,

15       yes.

16   Q.  All right.  Who instructed you to -- or

17       who instructed PFMI to bill off of gross?

18   A.  A conference call with EMCOR and BB&T.

19       You know, we took our -- BB&T was present,

20       and I believe it was on the EMCOR side,

                        Page 76

wohlersJim081007.txt

```
21        Beth Goad.  I think that's -- I'm not sure
22        how you spell that last name --
23   Q.   G-O-A-D.
```
                                                    95


```
1    A.   -- Sean Brookins.  And on the first couple
2         of invoices, there were some issues
3         because we started adjusting according to
4         the surveys, and we were told to --
5         they're fun to look at, at first, because
6         there's a lot of ins and outs.
7    Q.   Would this conference call, I guess, have
8         taken place prior to the first invoice?
9    A.   No.  No.  Well, let me -- I'm sorry.  Let
10        me restate that.
11   Q.   Sure.
12   A.   Prior to the first invoice, it was
13        discussed how billing needed to be
14        formatted because there was an electronic
15        format that had to be used, and then -- so
16        yes, we were told what -- I believe we
17        were told what to -- but yes, we had
18        conversations prior to the first invoice
19        as to how that invoice should be formatted
20        and what it should contain.  But I believe
21        after the first invoice, that's when it
22        specifically said use gross.
23   Q.   So it would have been short in time after
```
                                                    96

wohlersJim081007.txt

```
 1        the first invoice?
 2   A.   I believe so.
 3   Q.   Makes sense, because you have to bill out
 4        something?
 5   A.   Yeah.
 6   Q.   You said it was a conference call where
 7        you were instructed to bill based on gross
 8        square footage.  Do you remember if that
 9        direction came from BB&T or an EMCOR
10        representative?
11   A.   BB&T was in on that call, but, you know,
12        I'm not sure who exactly said --
13   Q.   Probably would have been BB&T, wouldn't
14        it?
15   A.   I believe that's where the instruction
16        would have come from.
17   Q.   Right.  Do you know a gentleman by the
18        name of Ronnie Eller?
19   A.   Yes.  I don't think it would be Ronnie
20        though.
21   Q.   Okay.  And Beth Goad was on that
22        conference call from EMCOR, correct?
23   A.   Yes.
                                              97


 1   Q.   Sean Brookins?
 2   A.   Yes.
 3   Q.   Anybody else from EMCOR?
 4   A.   Lynn Wilson might have been, but I
 5        couldn't say for sure.  I forget when Lynn
 6        started up there.
```

Page 78

wohlersJim081007.txt

```
 7   Q.   Okay.  Do you recall anyone from BB&T on
 8        this conference call?
 9   A.   Debi Willis -- Deborah Willis.
10   Q.   Okay.  Anyone else?
11   A.   Not that I recall, no.
12   Q.   Does it make sense to you that EMCOR would
13        instruct you to bill off gross with BB&T
14        on the call?
15             MS. TULEY:  Object to the form.
16   Q.   You can answer.
17   A.   That --
18   Q.   My point is simply this -- and this is
19        going to be a terrible question.  But with
20        the client sitting there, they wouldn't
21        tell you to go bill off gross without the
22        client approving; is that right?
23   A.   Yeah, I agree with that.
                                            98


 1   Q.   Okay.  Were the master location lists from
 2        which you were billing off of gross square
 3        footage, were those updated weekly?
 4   A.   We only got it monthly.  So if they were
 5        updated weekly, I wouldn't know that.
 6   Q.   I believe you testified earlier that the
 7        subcontractors that you had, you would
 8        have executed those contracts after
 9        receiving an award from EMCOR; is that
10        correct?
11   A.   Correct.
12   Q.   Okay.  What type of -- what type of
```

Page 79

WohlersJim081007.txt

13      contracts were they?  And by that, I mean

14      you have unit price contracts for some

15      contractors based on square footage, and

16      did you have lump sum contracts?

17  A.  I do not recall lump sum contracts.  I

18      couldn't say for sure that there wasn't

19      one, but most of them were square footage

20      based contracts.

21  Q.  Do you recall Exhibit D to subcontractors,

22      which identified a scope of work?

23  A.  I don't recall that.

                                            99


1   Q.  Show you a document, right?

2   A.  Yeah.  I don't recall if it was Exhibit D.

3               MR. SAWYER:  Let me go off the

4                   record real quick.

5               (Off-the-record discussion.)

6               (Brief recess.)

7   Q.  I believe you testified there were

8       remeasurements done by PFMI of these BB&T

9       locations?

10  A.  Yes.

11  Q.  Was it only for FMI locations?

12  A.  No.  We spot-checked other areas also.

13  Q.  How many were done?

14  A.  I don't know off the top of my head.

15  Q.  More than 10?

16  A.  Yes, yes.

17  Q.  More than 100?

18  A.  Yes.

                    Page 80

wohlersJim081007.txt

19  Q.   What time frame was this remeasurement

20       performed, then?

21  A.   I'm not sure of the exact time frame.  I

22       want to say from when we first started

23       getting surveys in, some initial spot

                                              100


1        checks were done.  The bulk of them were

2        done in December/January.

3   Q.   And that was December of 2005 and January

4        of '06, right?

5   A.   Yes.

6   Q.   Did you -- strike that.

7                 Did PFMI measure all the FMI

8        locations?

9   A.   Not all of them.

10  Q.   Would it have been ones that you weren't

11       comfortable with?

12  A.   Yes.  And there very well could have been

13       some we were comfortable with still.

14  Q.   What did you do with the remeasurements?

15  A.   From that --

16  Q.   That your individuals --

17  A.   That PFMI performed?

18  Q.   Correct?

19  A.   If they were different, you know, we

20       basically discussed those differences, and

21       we had a survey book that we put all of

22       our surveys in, and then we also would

23       forward those surveys to Sean.

                                              101

Page 81

WohlersJim081007.txt

```
 1   Q.   I don't know if I asked this question:
 2        Why was it necessary to perform these
 3        remeasurements?
 4   A.   A couple of reasons.  There were some we
 5        were concerned about that the measurement
 6        that came in was -- was close if not
 7        identical to the master list.  And then
 8        some were just done as a, you know, check
 9        and balance to make sure they were
10        accurate.
11   Q.   Did any representative from EMCOR instruct
12        you to go out and remeasure?
13   A.   I believe there was a conversation in
14        regards to, you know, their concerns with
15        FMI's measurements and they wanted some
16        locations remeasured also.
17   Q.   Do you recall any directive from EMCOR to
18        PFMI to go out and remeasure locations for
19        which you had previously reported you
20        didn't have confidence in?
21   A.   When you say directive, do you mean e-mail
22        or conversation?
23   Q.   Either written or oral.
```

                                              102

```
 1   A.   Yes, I believe there was verbal
 2        conversation to remeasure these locations.
 3   Q.   Was that a conversation in which you
 4        participated?
 5   A.   I was present, yes.
```
                        Page 82

wohlersJim081007.txt

```
 6   Q.   Okay.  Who was involved with that
 7        conversation?
 8   A.   I believe Debi Crosby, Mark Smith, Sean
 9        Brookins from EMCOR, myself and Greg
10        Littlefield, Keith Blackburn.  I believe
11        Rich Reagan -- he's with FMI -- and Don
12        Pottieger; he's with FMI.
13   Q.   What did FMI say about these surveys?
14   A.   They agreed that they had -- when they saw
15        those surveys, they had some concerns
16        about them also and had no issue going out
17        to remeasure and check those facts.
18   Q.   And this is in the December/January time
19        frame?
20   A.   That discussion took place somewhere first
21        part of December -- first half.
22   Q.   And I guess -- how far out are we from 90
23        days now?  Is that --
                                              103


 1   A.   Just a week or two.
 2   Q.   A week or two over 90 days?
 3   A.   Yes.
 4   Q.   Okay.  And during this time frame, PFMI is
 5        still billing from the gross square
 6        footage, correct?
 7   A.   Yes, we were billing by what we had been
 8        instructed to.
 9   Q.   And I don't remember -- who did you say
10        instructed you to do that?  Oh --
11   A.   Do you know the answer?
```
                        Page 83

wohlersJim081007.txt

```
12   Q.   Strike that.  Were most, if not all, of

13        the remeasurements completed by January of

14        2006?

15   A.   Yes.

16   Q.   Do you have any recollection of

17        remeasurements still being performed I

18        guess through May of 2006?

19   A.   By PFMI?  Yes.

20   Q.   Why were measurements still going on in

21        May of 2006?

22   A.   We had gotten some partial measurements

23        back, didn't agree with the numbers we
```

104

```
 1        were seeing and were still sending people

 2        out to check the measurements we were

 3        receiving.

 4   Q.   Is this FMI again?

 5   A.   No.  I mean, this is also EMCOR.  EMCOR

 6        provided some numbers to us and, you know,

 7        we were going out and spot-checking some

 8        of those numbers we had received.

 9   Q.   All right.  When did you -- well, let me

10        take a step back.  Do you have an

11        understanding that EMCOR personnel

12        performed any measurements?

13   A.   Yes.

14   Q.   What is that understanding?

15   A.   Just that sometime in January we were

16        instructed that EMCOR personnel mobile

17        techs and regional managers would measure
```
                          Page 84

wohlersJim081007.txt

18        all the locations.
19   Q.   Do you know what a mobile tech is?  What
20        were those people?
21   A.   They were personnel that EMCOR had in vans
22        going to branches performing preventative
23        maintenance, you know, whatever needed to

                                                    105


1         be done at those locations.
2    Q.   Fair statement they're technicians?
3    A.   Yeah.  Most of them I believe were HVAC
4         certified, was their primary duty.
5    Q.   Do you know why EMCOR personnel performed
6         those measurements?
7    A.   Not specifically, no.
8    Q.   Were you told why?
9    A.   I believe -- I believe we were told why,
10        was that they just -- the numbers that we
11        had turned in weren't agreeable.
12   Q.   The remeasured numbers?
13   A.   Yes.  Well, the remeasured numbers we
14        turned in, but yes.
15   Q.   Let me make sure the record is clear.
16        Were you told by EMCOR that the -- strike
17        that.  Let me back up and form a more
18        precise question.
19             EMCOR told you that the first
20        measurement numbers, which came in in
21        December of 2005, were not acceptable,
22        correct?
23   A.   Well, I believe since they were

                    Page 85

wohlersJim081007.txt

106

|   |    |                                           |
|---|----|-------------------------------------------|
| 1 |    | remeasuring everything, they didn't --    |
| 2 |    | they didn't really accept any of the      |
| 3 |    | numbers.                                  |
| 4 | Q. | Right.  But my question is a little        |
| 5 |    | different.  We understand that when the   |
| 6 |    | first numbers came back, primarily from   |
| 7 |    | FMI, there was a problem?                 |
| 8 | A. | Yes.                                      |
| 9 | Q. | Okay.  And after that time, in the         |
| 10|    | December time frame, a remeasurement was  |
| 11|    | performed by representatives from PFMI?   |
| 12| A. | Yes, was in the process.                  |
| 13| Q. | Okay.  And that remeasurement included     |
| 14|    | many locations that were performed by FMI,|
| 15|    | correct?                                  |
| 16| A. | Correct.                                  |
| 17| Q. | As well as other locations?               |
| 18| A. | Correct.                                  |
| 19| Q. | Okay.  Did EMCOR, when they informed you   |
| 20|    | that they were going to be performing     |
| 21|    | measurements, tell you that they disagreed|
| 22|    | with the measurements that were done in   |
| 23|    | the December/January time frame by PFMI   |

107

|   |    |                                           |
|---|----|-------------------------------------------|
| 1 |    | representatives?                          |
| 2 | A. | I couldn't say they specifically said     |
| 3 |    | those surveys.                            |

Page 86

wohlersjim081007.txt

```
 4   Q.   So you couldn't say one way or the other
 5        whether they disagreed with the surveys
 6        that --
 7   A.   I don't know if they isolated just those
 8        surveys.  I mean, like I said, I don't
 9        think they agreed with any of the numbers,
10        you know, and wanted to remeasure the
11        whole lot.
12   Q.   Who is the principal for FMI?  Is it a Don
13        Pottieger?
14   A.   Don Pottieger.
15   Q.   Well, we've talked about some problems
16        that FMI has had with the measurements.
17        Were there also service problems or
18        quality at work problems that FMI had?
19   A.   Yes, there were some issues.
20   Q.   What kind of issues?
21   A.   Off the top of my head, I couldn't...
22   Q.   Okay.  Were there issues with misservice?
23   A.   I believe so.
                                        108


 1   Q.   Okay.  Issues of scope not being
 2        performed?
 3   A.   I don't recall a specific incident, I
 4        mean, but that is normally what a
 5        janitorial complaint comes down to.
 6   Q.   Did PFMI have a system of -- a work order
 7        system where it could track complaints and
 8        respond to complaints?
 9   A.   We primarily used EMCOR's knowledge center
```

Page 87

WohlersJim081007.txt

| | | |
|---|---|---|
| 10 | | for the tracking of complaints. |
| 11 | Q. | Have you ever heard of a system called |
| 12 | | VEKTR? |
| 13 | A. | Yes.  That's an internal system we use. |
| 14 | Q. | What kind of system is it? |
| 15 | A. | That's also a work order system and |
| 16 | | inspection system, quality control, that |
| 17 | | type of thing. |
| 18 | Q. | Did you use that on this job? |
| 19 | A. | Yes, it was used. |
| 20 | Q. | Did -- well, let me ask the question this |
| 21 | | way:  Was Keith involved with -- Keith |
| 22 | | Blackburn involved with monitoring open |
| 23 | | work order reports? |

109

| | | |
|---|---|---|
| 1 | A. | Yes, yes. |
| 2 | Q. | Was it within the scope of your |
| 3 | | responsibility to also monitor work order |
| 4 | | reports? |
| 5 | A. | I would monitor, not on a daily basis, you |
| 6 | | know, but -- |
| 7 | Q. | Fair statement that you would check in on |
| 8 | | Keith and see how he was doing? |
| 9 | A. | Yes. |
| 10 | Q. | Okay.  But as far as a first line of |
| 11 | | defense, that would have been Keith |
| 12 | | Blackburn? |
| 13 | A. | That would have been Keith, yes. |
| 14 | Q. | Is VEKTR spelled capital V-E-K-T-R? |
| 15 | A. | Yes. |

WohlersJim081007.txt

```
16   Q.   Is it proprietary?

17   A.   Not for us.

18   Q.   Do you have a license to use it?

19   A.   Yes.

20   Q.   Did you charge your vendors a --

21   A.   I believe there was a small usage fee,

22        yes, for using it.

23   Q.   $200 sound about right?
```

                                                    110


```
1    A.   Per month?

2    Q.   Total.

3    A.   Total?

4              MR. SAWYER:  Off the record.

5                  (Off-the-record discussion.)

6    Q.   I'm going to hand you what's been marked

7         Exhibit 25 to your deposition, and it's

8         identified by Bates label PFMI 000563

9         through 564.  Take a look at that document

10        and let me know if you recognize it.

11                 (The referred-to document was

12                  marked for identification as

13                  Defendant's Exhibit No. 25.)

14   A.   Not specifically.

15   Q.   Okay.  Does it refresh your recollection

16        one way or the other whether PFMI relied

17        upon the VEKTR system to track and process

18        work orders?

19   A.   No, it doesn't.  I mean, it -- you know,

20        my recollection is we primarily -- for

21        work orders, we primarily relied on the
```
                        Page 89

WohlersJim081007.txt

```
22        knowledge center.
23   Q.   FKC?
```

111

```
1    A.   Yes, Facility Knowledge Center, to process
2         work orders.
3    Q.   Well, tell me about that.  How -- let me
4         ask you first, how would you process a --
5         well, let me ask you this:  What is a work
6         order?
7    A.   A work order basically was normally put in
8         from the field over the internet, just
9         stating extra work, complaint, concern, at
10        a location.
11   Q.   Request from a client?
12   A.   Yes.
13   Q.   Concerning additional scope to be
14        performed or a problem with the service?
15   A.   Yes.
16   Q.   Okay.  I believe it's your testimony you
17        primarily relied upon the Facility
18        Knowledge Center, the FKC, that was I
19        guess provided by EMCOR?
20   A.   Yes.
21   Q.   Okay.  How would you rely upon that?
22   A.   We had personnel downstairs that were -- I
23        don't know what EMCOR referred --
```

112

```
1         registered users -- that their job was,
2         you know, as work orders came in each day,
```

Page 90

WohlersJim081007.txt

```
 3         they were dispatching those to partners
 4         and vendors to address issues, of course,
 5         depending on priority.  And at the end of
 6         the day, a work order report would be
 7         generated of all open work orders and sent
 8         to each vendor specifically.  So in other
 9         words, whoever was responsible for West
10         Virginia would only get West Virginia's
11         work orders.
12    Q.   How much staff was committed 100 percent
13         to this job?
14    A.   In-office?
15    Q.   Yes.
16    A.   I believe there were five personnel in
17         PFMI's office and one located in
18         Winston-Salem as administrative people for
19         this.
20    Q.   When you say in-office, was that here in
21         Montgomery?
22    A.   Yes.
23    Q.   Did you actually go out and represent a
```

113

```
 1         location to set people up for PFMI?
 2    A.   Within our building, yes.  We rent space,
 3         and we rented additional space for this
 4         project.
 5    Q.   Okay.  So did you rent another floor?
 6    A.   Yes.
 7    Q.   How big is the building that you guys are
 8         in, floors -- how many floors?
```
Page 91

WohlersJim081007.txt

```
 9    A.    Well, there's two floors, and it's broken
10          up into basically suites, loosely termed.
11    Q.    As vice president, do you have any
12          ownership interest in PFMI?
13    A.    No, sir.
14    Q.    You're a salaried employee?
15    A.    I'm just a flunkie.
16                MR. SAWYER:  Off the record.
17                   (Off-the-record discussion.)
18    Q.    Do you recall the volume of -- I know
19          we've talked about work orders, but do you
20          recall the volume of complaints that
21          happened early on in this job?
22    A.    I don't recall the specific volume of
23          complaints.
```

                                                     114

```
 1    Q.    Was it normal or was it less than normal
 2          or extraordinary?
 3    A.    It's about normal for a start-up.
 4    Q.    And when you say about normal for a
 5          start-up, is that because, you know, it
 6          takes a little while to get everything in
 7          place?
 8    A.    It takes -- yes, that would be fair.
 9    Q.    Because initially the prior vendors have
10          to be terminated, right?
11    A.    Yes.
12    Q.    You have to get your contracts with your
13          vendors, correct?
14    A.    Yes.
```
                          Page 92

wohlersJim081007.txt

| | | |
|---|---|---|
| 15 | Q. | And you have to get coverage? |
| 16 | A. | Yes, but also changes in the scope of work |
| 17 | | occurred or occur, frequency changes. |
| 18 | Q. | When you say "frequency changes," what are |
| 19 | | you -- I think I know what you mean, but I |
| 20 | | don't want to guess. |
| 21 | A. | Yeah.  And for example, let's say this |
| 22 | | room was vacuumed wall to wall every day. |
| 23 | | With a new frequency, it could be vacuumed |

115

| | | |
|---|---|---|
| 1 | | wall to wall once a week and only traffic |
| 2 | | patterns done on a daily basis. |
| 3 | Q. | And another example, instead of three-day |
| 4 | | service, it could be five-day service? |
| 5 | A. | Exactly.  It could go from five-day to |
| 6 | | three-day or six-day to five-day. |
| 7 | Q. | Any other problems that you can recall |
| 8 | | that you had to overcome when you're |
| 9 | | starting up this BB&T account? |
| 10 | A. | There were a couple of regions where BB&T |
| 11 | | didn't want us to use the vendor we were |
| 12 | | using and disallowed them, so it left some |
| 13 | | open areas last minute. |
| 14 | Q. | Well, let me stop you right there.  Do you |
| 15 | | recall specific ones, either by region or |
| 16 | | vendor, where BB&T said no way? |
| 17 | A. | There was one, and I want to say it was |
| 18 | | Four Aces, but I didn't really deal with |
| 19 | | them.  I think BB&T, they were a previous |
| 20 | | vendor.  The issue was something like BB&T |

Page 93

WohlersJim081007.txt

```
21        said they overpaid them by a thousand
22        dollars; the guy said, you didn't overpay
23        us by a thousand dollars, we're not paying
                                                    116



1         you back.
2    Q.   And the point is, you don't have a dog in
3         that fight?
4    A.   Right.  And that was pretty much an entire
5         region this guy was going to cover.  And I
6         think that it was September -- the Friday
7         before we started, that one got pulled.
8    Q.   Sounds like he was penny-wise and
9         pound-foolish?
10   A.   Yeah.
11   Q.   Any other problems you remember as far as
12        start-up?
13   A.   Outside of normal scope issues, you know,
14        I think, like we said, there were several
15        branches, and I couldn't be specific with
16        regions or branches.  We were supposed to
17        receive two keys for every branch; we only
18        received one key, which caused issues with
19        the alarm code.  There was only a certain
20        time we could enter the branch and leave
21        the branch; that caused some issues.
22   Q.   And how many locations did you have total
23        to start up?  1400 ring any bells?
                                                    117



                      Page 94
```

WohlersJim081007.txt

| 1  | A. | Yeah, I believe that was what we started |
| 2  |    | up. And I really couldn't tell you if we |
| 3  |    | staggered any starts or not. |
| 4  | Q. | At this time, what was your staff? |
| 5  | A. | For administrative staff or field staff? |
| 6  | Q. | All staff. |
| 7  | A. | Dedicated to BB&T? |
| 8  | Q. | Dedicated to BB&T. |
| 9  | A. | Five or -- five, maybe six. |
| 10 | Q. | Doesn't it seem like to you that's a heck |
| 11 |    | of a lot of -- five or six people? |
| 12 | A. | Well, we relied also on our alliance |
| 13 |    | partners and their management staff. And |
| 14 |    | their -- like I said, their management |
| 15 |    | staff to be in the field and assisting |
| 16 |    | with those start-ups. |
| 17 | Q. | But EMCOR was relying on you, right? |
| 18 | A. | Yes. |
| 19 | Q. | Over the course of performance of the |
| 20 |    | project, did PFMI ever increase staff? |
| 21 | A. | Yes. |
| 22 | Q. | Okay. Who did you hire on? |
| 23 | A. | We hired -- and the only reason I remember |

118

| 1 |    | his name now is because it's in one of |
| 2 |    | these work orders -- Vince Sabatine, I |
| 3 |    | believe was his last name, to manage work |
| 4 |    | orders at night. |
| 5 | Q. | And did you say Vince? |
| 6 | A. | Vince. |

Page 95

wohlersJim081007.txt

```
 7   Q.   Sabatine?
 8   A.   Sabatine, I believe.  I saw his name on an
 9        e-mail.
10   Q.   And how would he handle work orders at
11        night?
12   A.   After normal business hours.  I think his
13        hours were 4 to midnight, something like
14        that.  He and Mike Cleary and Keith would
15        sort of have a transition conference call
16        and open work orders that were a priority
17        for that night.  He would basically
18        hot-shot to try and ensure that they were
19        closed down and was sort of a second tier
20        in making sure, you know, if there was a
21        key issue, alarm issue, one of those
22        issues trying to create an e-mail for
23        Keith -- not Keith, I'm sorry, but yeah,
```

                                              119


```
 1        Keith would be copied, but Sean, so Sean
 2        wouldn't get hit first thing in the
 3        morning and not be aware of what occurred
 4        that night.
 5   Q.   And you said hot-shot.  What is that?
 6   A.   Well, just, you know, the work order
 7        needed to be closed that night.
 8        Coordinating with the vendors to make sure
 9        that, yes, it was being taken care of,
10        that someone was on-site, that type of
11        thing.
12   Q.   Were there different categories of work
```

                    Page 96

WohlersJim081007.txt

```
13        orders as far as importance?
14   A.   Yes.
15   Q.   Okay.  Was it numerical?
16   A.   Yes, yes.  And I can't recall if 1 was the
17        highest or 5 was the highest -- priority.
18   Q.   But it wasn't based on like our terrorist
19        system, where it's orange and red and I
20        don't know what the heck --
21   A.   No, sir.  It was a 1 through 5 system.
22   Q.   All right.
23   A.   Oh, I'm sorry.  And that wasn't the only
```

                                            120

```
 1        set.  We added Nicole Cruise -- and I
 2        think it's C-R -- like Tom Cruise -- in
 3        the BB&T office in Winston-Salem to sort
 4        of be a daily contact right there.
 5   Q.   When was Vince Sabatine hired?
 6   A.   Without looking at an employment file, I
 7        couldn't give you a specific date.
 8   Q.   But it was definitely after early on in
 9        the project?
10   A.   It was definitely after early on.
11   Q.   And Nicole Cruise, what about her?  When
12        was she hired?
13   A.   Without looking, I couldn't be specific.
14        I'm thinking December.
15   Q.   Okay.  Is there anyone else?
16   A.   Not that I recall.
17   Q.   Were these individuals hired to keep up
18        with scope, or -- why were they hired?
```

                    Page 97

wohlersjim081007.txt

19          Let me ask it that way.

20   A.     I'm sure partially to keep up with scope,

21          keep up with work orders, just keep

22          everyone in the loop of what's going on.

23   Q.     And at the time of and prior to these

                                                121


1           people being hired, had you received any

2           indication from BB&T that they weren't

3           happy with the way the janitorial

4           component was going on?

5    A.     Really, no.  No.  I mean, there were some

6           concerns here and there, but the feedback

7           we were getting was, you know, there were

8           some regions that there were some issues,

9           but the overall satisfaction was -- you

10          know, was about what was expected at that

11          point.

12   Q.     Have you ever heard of a performance

13          survey on this job?

14   A.     I don't know I've heard performance survey

15          specifically.

16   Q.     Okay.  Do you have an understanding one

17          way or the other of, after work orders

18          were completed and with respect to the

19          FKC, that surveys were kicked out

20          immediately to the people placing the work

21          order?

22   A.     No, I couldn't say I was aware of that.

23   Q.     Okay.  Let me mark this as the next in

                                                122

wohlersJim081007.txt

```
 1       order.  It's Exhibit 26, and for the
 2       record, it's Bates labeled PFMI 000668
 3       through 672.
 4                    (The referred-to document was
 5                     marked for identification as
 6                     Defendant's Exhibit No. 26.)
 7   A.  All right.
 8   Q.  Can you identify what's marked as Exhibit
 9       26?
10   A.  Yeah.  The final piece of it seems to be
11       an e-mail between myself and Sean
12       Brookins, describing a lack of service at
13       a location.
14   Q.  In fact, it describes, at least at that
15       location, they hadn't received service for
16       a month, right?
17   A.  That's how it appears, yes.
18   Q.  And I guess you would agree with me, would
19       you not, that you're not real happy about
20       your vendor?
21   A.  I would say from the looks of my e-mail,
22       no.
23   Q.  And the vendor was FMI?
```
                                                     123


```
 1   A.  Yes.
 2   Q.  Okay.  We'll mark as the next in order,
 3       and could you read the Bates labels?
 4   A.  PFMI 000528.
 5   Q.  Okay.  And I believe it's Exhibit 27; is
```
                          Page 99

WohlersJim081007.txt

```
 6          that correct?
 7                         (The referred-to document was
 8                          marked for identification as
 9                          Defendant's Exhibit No. 27.)
10   A.     Yes, sir.
11   Q.     Okay.  Could you identify that?
12   A.     It's apparently an e-mail I sent to Greg
13          and copied Don, Jr., on just in regards to
14          a call I had with Sean about
15          dissatisfaction with FMI.  And it's dated
16          August of 2005.
17   Q.     Okay.  All right.  My question is, does
18          that document refresh your recollection as
19          to whether EMCOR indicated concerns about
20          FMI prior to start of the work?
21   A.     I could not say whether it's -- before the
22          start of the work, because FMI started
23          some branches in August, so I'm not --
```

124

```
 1          without knowing what the -- you know, yes,
 2          there's -- there was some concern there,
 3          but I don't know what the concern was or
 4          what it was in regards to.
 5   Q.     But it's definitely at least early on in
 6          the project?
 7   A.     Yes, it is.
 8   Q.     Okay.  And did you just testify -- I'm
 9          sorry.  She can object if I'm asking it
10          again, but do you recall what concerns
11          Mr. Brookins might have had with FMI?
```

Page 100

wohlersJim081007.txt

12  A.    This is going out on a limb.  In racking
13        my brain on this one, there was a region
14        where the vendor had walked out on.  FMI
15        we called in last minute to cover those
16        branches, and I believe there was just
17        some concern about how they were being
18        covered or what was going on there.  But I
19        couldn't tell you what region, what
20        branches, without looking at something.
21  Q.    Sure.
22  A.    Hopefully you don't have it.
23  Q.    And FMI, again, is the vendor that --

                                              125


1   A.    Yes.
2   Q.    -- you had a lot of problems with the
3         measurements?
4   A.    That we had problems with measurements,
5         yes.
6   Q.    Did you feel like FMI, I guess, during the
7         course of this job, just kind of threw you
8         under the bus?
9             MS. TULEY:  Object to the form.
10  A.    I don't know if I'd phrase it that way.
11  Q.    Okay.  How would you phrase it?
12  A.    You know, I don't know if early on they
13        put everything into it they could have put
14        into it.
15  Q.    Fair statement, at least early on, you
16        weren't real happy with, I guess, what
17        they were doing?  And by them, I mean FMI.
                    Page 101

WohlersJim081007.txt

```
18   A.   I don't -- I mean, I don't recall
19        specifically.
20   Q.   How do you think they could have improved
21        or done better?
22   A.   I believe -- I think really just in
23        communication with their field personnel,
```

                                                     126


```
1         what was going on in the field.
2    Q.   Did FMI subcontract out their portion of
3         the work as well?  Do you have knowledge
4         of that?
5    A.   I believe they did.
6    Q.   How much did they subcontract out?
7    A.   I don't know on a percentage basis.  And I
8         don't even know on a location basis.  You
9         might have it.  I don't know.  But I just
10        don't know on any of the subs what they --
11        on a percentage basis what they
12        self-perform.
13   Q.   Okay.  Do you think it would be important
14        to know that?  Or at one time you did
15        know; you just don't know today?
16   A.   At one time there was a chart, I believe,
17        that was turned over.
18             MR. SAWYER:  If it's escaped --
19   A.   We provided EMCOR lists of who provided
20        service at every branch, but right now I
21        couldn't tell you what those numbers were
22        on that.
23   Q.   Fair enough, Mr. Wohlers.
```

wohlersJim081007.txt

127

| 1 | | MR. SAWYER:  Off the record. |
|---|---|---|
| 2 | | (Off-the-record discussion.) |
| 3 | | (Brief recess.) |
| 4 | Q. | Mr. Wohlers, do you remember a letter you |
| 5 | | wrote to EMCOR, which I believe is an |
| 6 | | exhibit, on or about February 3, 2006, |
| 7 | | concerning PFMI's understanding of what |
| 8 | | was going on with the remeasurements of |
| 9 | | BB&T facilities? |
| 10 | A. | Yes, yes. |
| 11 | Q. | Okay.  And I believe in that letter -- and |
| 12 | | it's an e-mail to Mr. Brookins, I believe? |
| 13 | | MS. TULEY:  Yes. |
| 14 | Q. | Do you recall -- off the record. |
| 15 | | (Off-the-record discussion.) |
| 16 | Q. | In that correspondence, I believe -- and |
| 17 | | correct me if I'm wrong -- you |
| 18 | | communicated to EMCOR that PFMI reserved |
| 19 | | the right to come back and challenge -- |
| 20 | A. | Challenge any and all measurements.  Might |
| 21 | | not be exact, but it's along the -- I |
| 22 | | think it's the last sentence. |
| 23 | Q. | Did that ever happen? |

128

| 1 | A. | we requested to remeasure, but that |
|---|---|---|
| 2 | | process got put off. |
| 3 | Q. | When did you first request to remeasure? |

Page 103

wohlersJim081007.txt

| 4 | A. | I couldn't give you an exact date. |
|---|---|---|
| 5 | Q. | Okay. Well, let me ask it this way: When |
| 6 | | did you receive the measurements that were |
| 7 | | performed by EMCOR? |
| 8 | A. | Well, we never received a complete list of |
| 9 | | measurements that EMCOR performed. |
| 10 | Q. | And by that, do you mean you didn't |
| 11 | | receive a complete list of measurements |
| 12 | | for all locations? |
| 13 | A. | Correct. |
| 14 | Q. | Okay. Did you receive measurements for |
| 15 | | some locations? |
| 16 | A. | Yes. |
| 17 | Q. | Did you want to challenge those? |
| 18 | A. | Yes. |
| 19 | Q. | Did you communicate that you wanted to |
| 20 | | challenge those? |
| 21 | A. | Yes, we did. |
| 22 | Q. | And that would be in an e-mail or some |
| 23 | | other correspondence? |

129

| 1 | A. | I believe so. I don't recall the e-mail |
|---|---|---|
| 2 | | specifically. I remember stating that, |
| 3 | | that yeah, there were locations that we |
| 4 | | didn't agree with. |
| 5 | Q. | Okay. Did you actually -- or did PFMI |
| 6 | | actually go to any sites and conduct such |
| 7 | | a challenge? |
| 8 | A. | We went on our own and measured, yes, |
| 9 | | after we received some of those |

Page 104

WohlersJim081007.txt

```
10          measurements.
11    Q.    Did an EMCOR representative attend with
12          you?
13    A.    I did not perform that measurement; I
14          couldn't say.  I believe when they did
15          some in Atlanta that possibly Rebecca
16          Walraven was with them, but I couldn't say
17          that for sure.
18    Q.    Okay.  And Mr. Brookins, I believe -- and
19          the record will reflect what it reflects,
20          but we recalled a challenge in Tennessee.
21          Do you remember anything along those
22          lines?
23    A.    I don't remember Tennessee specifically,
```

130

```
 1          but I remember there was a good number we
 2          did not agree with.
 3    Q.    Ballpark, how many did you not agree with?
 4    A.    I can't really -- you know, I don't
 5          remember exactly how many we got, so it's
 6          hard for me to say how many they disagreed
 7          with.  There were several that when we
 8          looked at, you know, definitely shot off
 9          some flares for us because we knew the
10          building itself and knew it was -- felt it
11          was off.
12    Q.    But you do recall, I guess, at least on
13          some occasions -- I believe you said
14          Atlanta --
15    A.    Yes.
```

Page 105

wohlersJim081007.txt

16  Q.   -- where EMCOR and PFMI met and they were

17       actually --

18  A.   Well, I believe EMCOR was -- I know we

19       measured some buildings in Atlanta.

20  Q.   And Rebecca Walraven may have been there?

21  A.   May have.  Ken Law performed those.  He

22       would know for sure.

23  Q.   Other than Atlanta and perhaps -- maybe,

                                          131


1        we're not sure -- Tennessee, were there

2        any other locations where PFMI sought to

3        challenge the measurements performed by

4        EMCOR's mobile techs?

5   A.   I know West Virginia was an area that we

6        were concerned about.

7   Q.   Who handled that for PFMI?  Was it Patton?

8   A.   Patton.

9   Q.   Anywhere else?

10  A.   Top of my head, not that I can recall, but

11       there were, like I said, a good number of

12       areas that we were -- you know, just

13       didn't have faith in those numbers.

14  Q.   And when you say "those numbers," you're

15       meaning the numbers that EMCOR provided,

16       correct?

17  A.   Yes, yes.

18  Q.   And you don't remember whether it was 50

19       percent, 20 percent, 100 percent?

20  A.   No, I don't, not right off.

21  Q.   Would there be any document I could look

                    Page 106

WohlersJim081007.txt

22 at to find locations that -- where EMCOR

23 and BB&T had performed measurements -- to

132

1 find out what PFMI's opinion was with

2 respect to the veracity of those

3 measurements?

4  MS. TULEY:  Object to the form.

5  MR. SAWYER:  I withdraw that

6   because that was a horrible

7   question.

8 Q. Is there a document that you have in your

9 files which would show PFMI's position

10 with respect to the remeasurements?  For

11 instance, such as a spreadsheet with

12 highlighted --

13 A. Highlighted locations that were --

14 possibly, on a limited basis.  When we

15 received the numbers, there's -- like I

16 said, when we received some of the

17 numbers, we instructed, you know, Ken,

18 John, Buz, Keith, to, you know, let's do

19 some spot checks here.  And those spot

20 checks I'm sure would be on a spreadsheet.

21 Q. Were the spot checks performed by PFMI's

22 representatives -- I know they were

23 performed after the original measurement

133

1 by PFMI's vendors.  Were spot checks done

2 also as to EMCOR's measurements?

Page 107

wohlersJim081007.txt

```
 3   A.   Yes.
 4   Q.   Okay.  Would the same people that
 5        performed the prior remeasurements -- such
 6        as Ken Law, Keith Blackburn, and other
 7        PFMI representatives -- have performed
 8        those measurements?
 9   A.   In some instances, yes.  In others we
10        added Jeff Chamberlain, Brian Booker, like
11        I said, Buz Campbell -- I think I
12        mentioned him before, but --
13   Q.   Two Zs, right?
14   A.   Yeah, one Z.  He gets mad about that.
15   Q.   I'm sorry.  I cut you off.  I think you
16        were going to say someone else.
17   A.   No, I think that's everyone.
18   Q.   Okay.  Were you ever told why EMCOR was
19        performing these instead of PFMI?  And I
20        mean the mobile tech remeasurements.
21   A.   Yeah.  I think I stated earlier that BB&T
22        just wasn't confident in the numbers they
23        were seeing or didn't like the numbers
```

                                                    134


```
 1        they were seeing.
 2   Q.   Okay.  And I apologize if I asked it
 3        earlier, but is it not confident in the
 4        original measurements or not confident in
 5        the remeasurements that were performed in
 6        January and December?
 7   A.   My understanding was they weren't happy
 8        with the numbers that came in, whether it
```
                            Page 108

WohlersJim081007.txt

9        was confidence or thought there should be

10       more of a difference from what they

11       originally put out.

12   Q.   Okay.  And that would have been the

13       original measurements?

14   A.   The original, yes.

15   Q.   Okay.  How, if at all, did EMCOR prevent

16       you from -- and when I say "you," PFMI --

17       prevent you from challenging measurements?

18   A.   You know, I believe the procedure for

19       challenge was an EMCOR rep, a BBD rep, and

20       a PFMI rep, and basically, that never

21       occurred.  When we asked to remeasure an

22       area, somebody was always unavailable.

23   Q.   Was it Jim Wohlers that would ask to

                                    135

1        remeasure -- or to challenge, rather?

2   A.   It wasn't spelled that I had to be the one

3       to challenge.

4   Q.   Were you the one that did it?

5   A.   I know at least on one occasion I had a

6       conversation with Sean about wanting to

7       remeasure.

8   Q.   Other than that one conversation, did you

9       ever ask anyone from EMCOR to challenge a

10       measurement that EMCOR had done?

11   A.   There were other conversations I had with

12       Sean that, you know, we weren't confident

13       in the numbers.  You know, the numbers

14       coming back just didn't seem right, and

WohlersJim081007.txt

15        Sean and I had some conversations

16        regarding that.

17   Q.   And the numbers are the ones performed by

18        EMCOR mobile techs?

19   A.   Yes.

20   Q.   So you're recalling conversations with

21        Sean Brookins?

22   A.   Vague, yes.

23   Q.   Do you have any recollection of asking

                                     136

1        Sean or anyone else from EMCOR to go

2        remeasure?

3   A.   Yes.

4   Q.   Okay.  How many occasions?

5   A.   At least one occasion.

6   Q.   But as you sit here right now, can you

7        remember more than one occasion?

8   A.   Not specifically.

9   Q.   Would anyone else from PFMI ask to

10       challenge a measurement of EMCOR?

11  A.   Yes.

12  Q.   Who?

13  A.   Buz Campbell, Ken Law, Keith Blackburn.

14  Q.   Anyone else?

15  A.   Possibly John Sauter.

16  Q.   Now, do you know for a fact that they did?

17       And when I say "did," asked to challenge a

18       measurement of an EMCOR mobile tech?

19  A.   When you say "a fact," I mean, did I --

20  Q.   Do you have a specific recollection of any

                      Page 110

WohlersJim081007.txt

21    of these individuals -- and that is Buz

22    Campbell, Ken Law, Keith Blackburn, John

23    Sauter -- asking, either written or oral,

                    137

1       to go and challenge a measurement made by

2       EMCOR?

3  A.   I don't know if I recall the challenge.  I

4       know of them being put off and going to

5       measure where they had planned to be in an

6       area and were there, and for one reason or

7       another, either EMCOR or BB&T was unable

8       to make that meeting.

9  Q.   So you do have a specific recollection of

10      them trying to organize a site and -- that

11      you do remember?

12  A.   Yes.

13  Q.   Okay.  Who was it?

14  A.   It would be those -- I mean, I remember

15      Buz going through that practice, Ken Law

16      going through that practice, and Keith

17      Blackburn going through that practice.

18  Q.   Okay.  So you remember each one of those

19      guys being put off -- Buz, Ken, Keith, and

20      John Sauter.

21  A.   I remember e-mails going around in regards

22      to attempting to remeasure and not being

23      able to.

                    138

wohlersJim081007.txt

```
 1   Q.   Okay.  What time frame is this?  It would
 2        have been after February 23, 2006, right?
 3   A.   Yes, I believe so.
 4   Q.   How many occasions do you recall Buz, Ken,
 5        Keith, and John being put off to go to
 6        measure?
 7   A.   I couldn't really say specifically.
 8   Q.   More than 10?
 9   A.   I would hate to even guess that number.
10   Q.   More than one?
11   A.   More than one.  I mean, it's...
12   Q.   And that would be in the documents
13        somewhere, right?
14   A.   It should be, yes, in the e-mails.
15   Q.   Okay.  Just so I'm clear, it's not the
16        request to actually make the challenge
17        that you recall; it's these individuals
18        being put off to go out and meet at the
19        site?
20   A.   Yes.  I mean, I recall conversations that
21        they were going to do this, that they had,
22        you know -- I don't recall them actually
23        requesting, but saying they had requested
```

139

```
 1        and then, you know, they couldn't make it
 2        this date or couldn't make it that date.
 3        I mean, that's the type of thing I recall.
 4   Q.   Do you ever recall anyone from EMCOR
 5        informing you or anyone else from PFMI
 6        that if the remeasurements were plus or
```

Page 112

WohlersJim081007.txt

```
 7        minus 5 percent, that the square footage
 8        numbers wouldn't be adjusted at all?
 9   A.   I recall a conversation where if it was
10        plus or minus 5 percent, the square
11        footage number would change; however,
12        there would not be a change -- there
13        wouldn't be a true-up in that case in
14        dollars, basically, because some would go
15        up, some would go down, that it would just
16        -- the square footage would change, the
17        billing would change, and that would be...
18   Q.   But you were billing off gross, weren't
19        you?
20   A.   Yes.
21   Q.   Okay.  How would you have more net
22        cleanable square footage than gross square
23        footage?
```

                                                140


```
 1   A.   Well, in some occasions we found there
 2        were bad measurements on the building.
 3        Their gross only included the first floor;
 4        we were cleaning the first and second
 5        floor.  So there were billings it went
 6        both ways.  There were occasions that we
 7        did measurements and the building did go
 8        up in square footage.
 9   Q.   They would have missed some of the gross?
10   A.   They would have missed some of the gross.
11        They took out more than they should have.
12        Whoever measured it didn't know what they
```
                    Page 113

WohlersJim081007.txt

```
13        were doing.
14   Q.   What was the total square footage compared
15        to PFMI and its bid?
16   A.   According to that exhibit?  Like 6.7, I
17        think is --
18   Q.   6.9?  You can take a look to refresh your
19        recollection.
20   A.   All right.  Yeah, gross square footage
21        according to Exhibit A was 6.9.
22   Q.   Do you know what 5 percent of -- I'm not
23        going to make you do math calculations.
```

141

```
 1        I'll strike that.  I will just represent
 2        to you that 5 percent of 6.9 million is
 3        345,000 square feet.
 4   A.   All right.
 5   Q.   Sound about right?  10 percent is 690, so
 6        --
 7   A.   Yeah.
 8   Q.   So essentially, it could have been a
 9        690,000 square foot swing one way or the
10        other, right, if it's 5 either way?
11   A.   On 5 percent?  Oh, total swing?  Yes,
12        below or above.
13   Q.   What was average unit price cost per
14        square foot on this?
15   A.   Top of my head, I don't know what the
16        average was.
17   Q.   Well, let's just say it was a dollar.
18   A.   All right.
```

Page 114

WohlersJim081007.txt

19  Q.   So that's about a $700,000 swing.  Do you

20       think that would have been pretty

21       important?

22            MS. TULEY:  Object to the form.

23  Q.   You can answer.

                                        142

1   A.   I mean, I would assume so.

2   Q.   If somebody told you that if it was plus

3        or minus 5 percent, that would have been

4        pretty important, wouldn't it have?

5   A.   Yes.

6   Q.   Okay.  Would you have put that in writing?

7            MS. TULEY:  Object to the form.

8   Q.   If you know?

9   A.   I mean, in retrospect, yes.

10  Q.   Do you recall who, if anyone, informed you

11       that if measurements were plus or minus 5

12       percent, there would be no change in

13       price?

14            MS. TULEY:  Object to the form.

15                 Mischaracterizes prior

16                 testimony.

17  Q.   Well, I'll just read from -- let me mark

18       this as the next in order.  Mr. Wohlers,

19       go ahead and take a look at what I've got

20       marked as Exhibit 28.  And I'd like to

21       specifically call your attention to Number

22       5, which is on Page 2 of Exhibit 28.

23            (The referred-to document was

                                        143

Page 115

WohlersJim081007.txt

```
 1              marked for identification as
 2              Defendant's Exhibit No. 28.)
 3   A.   All right.
 4   Q.   Now let me ask you to turn to the back
 5        page or the next to the last page of
 6        Exhibit 28.  Keep going.
 7   A.   That one?
 8   Q.   Yeah.  My question is, is that your
 9        signature?
10   A.   It appears to be.
11   Q.   Okay.  Do you recall signing that
12        verification?
13   A.   Not specifically.
14   Q.   But that's your signature?
15   A.   Yes.
16   Q.   Okay.  If you could turn back to -- well,
17        for the record, I'll represent that that's
18        plaintiff's supplemental interrogatory
19        responses.  If you'll turn back to the
20        response to Interrogatory Number 5.
21   A.   All right.
22   Q.   If you could read the second bullet point
23        for the record under response to
```

                                                              144


```
 1        Interrogatory Number 5.
 2   A.   (As read:)  "Conversations with EMCOR
 3        personnel early in the process indicated
 4        that EMCOR did not have a good feel for
 5        the square footage numbers.  Those
```
                          Page 116

WohlersJim081007.txt

```
 6        conversations were between Steven King,
 7        Alan Cristal, Sean Brookins and Debi
 8        Crosby for EMCOR and Greg Littlefield for
 9        PFMI."
10   Q.   Okay.
11   A.   Were you talking about down here?
12   Q.   Yeah, I screwed it up.  You let me dig my
13        own grave.  Just go down to 7 and read the
14        question and then the first bullet point
15        response.
16   A.   All right.  (As read:)  "State each and
17        every misrepresentation you contend was
18        made by EMCOR to PFMI.  In your answer,
19        please identify the date of the
20        misrepresentation, the time of the
21        misrepresentation, the place where the
22        misrepresentation was made, and all
23        documents that evidence, reference,
```

                                             145

```
 1        reflect, or relate to such alleged
 2        misrepresentation."
 3   Q.   Let me stop you right there.  Don't
 4        lawyers talk wonderfully?
 5   A.   They do.  So easy to read.
 6   Q.   Okay.  And if you could look down there --
 7        okay.  If you could read the first bullet
 8        point and not the objections.
 9   A.   All right.  (As read:)  "Prior to work
10        beginning on the contract, it was
11        specifically discussed in conference calls
```
                        Page 117

wohlersJim081007.txt

| | | |
|---|---|---|
| 12 | | that surveys would be required and that |
| 13 | | any measurements of a 5 percent increase |
| 14 | | or decrease in square footage would not be |
| 15 | | credited or debited but would be a wash. |
| 16 | | Jim Wohlers, Greg Littlefield, Debi |
| 17 | | Crosby, Sean Brookins, and a BB&T |
| 18 | | representative were involved in those |
| 19 | | conference calls.  This issue was |
| 20 | | discussed multiple times including in |
| 21 | | December of '05 and the January/February |
| 22 | | 2006 time frame between Sean Brookins, |
| 23 | | Mark Smith, Greg Swanberg, Jim Wohlers, |

146

| | | |
|---|---|---|
| 1 | | and Greg Littlefield." |
| 2 | Q. | Is that statement true? |
| 3 | A. | Yes, it is. |
| 4 | Q. | Okay.  who told you that it didn't matter |
| 5 | | if it was 5 percent off? |
| 6 | A. | Ronnie Eller and Debbie Willis.  And it |
| 7 | | wasn't necessarily that it didn't matter; |
| 8 | | it was that a true -- a credit or debit |
| 9 | | would not be made in that. |
| 10 | Q. | Did you or PFMI rely on Ronnie Eller's or |
| 11 | | Deborah Willis' statement? |
| 12 | A. | Yes, we did. |
| 13 | Q. | How did you rely? |
| 14 | A. | I don't understand the question. |
| 15 | Q. | well, you testified, I guess, that Ronnie |
| 16 | | Eller and Deborah Willis of BB&T informed |
| 17 | | you early on -- well, let me ask you this: |

Page 118

wohlersJim081007.txt

18          what time frame was this conference call?

19    A.    August or September was the very first

20          time it was...

21    Q.    And it's your best recollection that the

22          pricing wouldn't change if it was within

23          that 5 percent plus or minus?

                                                    147


1                  MS. TULEY:  Object to the form.

2     A.    The pricing would change.

3     Q.    Okay.

4     A.    But there would be no going back on those

5           items -- on those branch locations and

6           doing a debit or a credit.

7     Q.    Okay.  Was there a time frame, such as --

8     A.    At that point in time, no time frame was

9           discussed.

10    Q.    Okay.  But -- I think I understand your

11          testimony.  Let me see if I've got it or

12          if I've got it all wrong.  These

13          measurements were supposed to be conducted

14          during the first 90 days, right?

15    A.    Correct.

16    Q.    Okay.  Is it your testimony that if it was

17          plus or minus 5 percent, that there

18          wouldn't be a credit applied during that

19          90-day period?

20    A.    Well, the 90-day period was never -- to my

21          recollection, the 90-day period wasn't --

22          that statement wasn't made, in the 90-day

23          period; it was simply that the
                        Page 119

wohlersJim081007.txt

148

1       measurements will be taken and that if it

2       was plus or minus 5 percent, that there

3       wouldn't be a debit or a credit applied;

4       the price would be changed to reflect the

5       new net cleanable, going forward from that

6       point.

7   Q.   Understood.  Once the -- and let me see if

8       I've got it straight.  Once the

9       measurements come in, to get the actual

10      cleanable, if it's 5 percent difference

11      from the gross plus or minus, they don't

12      apply credit for prior to the actual

13      measurements, correct?

14  A.   Correct.

15  Q.   Okay.  But going forward, the price

16      changes, correct?

17  A.   Yes.

18  Q.   I may have already asked this; she can

19      object if I have.  But do you recall ever

20      confirming that understanding in any form

21      of writing?

22  A.   Not that I can -- not that I can recall.

23  Q.   Okay.  And as you sit here right now, do

149

1       you recall whether any credit was applied

2       by EMCOR or BB&T to that first 90-day

3       period?

Page 120

WohlersJim081007.txt

| | | |
|---|---|---|
| 4 | A. | If any credit? |
| 5 | Q. | Well, strike that. Was any credit for |
| 6 | | square footage discrepancies applied to |
| 7 | | PFMI during the first 90 days? |
| 8 | | MS. TULEY: Object to the form. |
| 9 | | MR. SAWYER: I'll withdraw the |
| 10 | | question. I'll ask a better |
| 11 | | question. |
| 12 | Q. | Did either EMCOR or BB&T apply a deduction |
| 13 | | of amounts for square footage |
| 14 | | discrepancies from September through |
| 15 | | December? |
| 16 | A. | We issued a credit -- |
| 17 | Q. | Let me stop you real quick. That's not my |
| 18 | | question. My question is whether BB&T |
| 19 | | and/or EMCOR applied a credit for square |
| 20 | | footage discrepancies from September |
| 21 | | through December of 2005. |
| 22 | A. | Maybe I just don't understand what you're |
| 23 | | asking, apparently. |

150

| | | |
|---|---|---|
| 1 | Q. | Well, what I understood your testimony to |
| 2 | | be is that PFMI was going to perform these |
| 3 | | measurements and they were going to be |
| 4 | | done in 90 days and there was a -- and |
| 5 | | stop me if I get anything wrong -- and |
| 6 | | there was going to be measurements that |
| 7 | | were performed on these branches. And you |
| 8 | | had a conference call in July, August, or |
| 9 | | September, early on, and representatives |

Page 121

WohlersJim081007.txt

10    represented that, hey, if there's a 5

11    percent difference on certain branches

12    plus or minus, we're not going to have a

13    credit that we're going to take going

14    backwards after the measurement's

15    complete, but going forward, we're going

16    to change the price.  Does that comport

17    with your recollection?  And that's pretty

18    long.

19  A.  Yeah.  To my recollection, the 90-day

20    period wasn't discussed; it was simply

21    stated that, you know, plus or minus 5

22    percent would not be trued up; it would

23    just -- the price would change --

                                         151


1   Q.  Going forward?

2   A.  -- going forward.

3   Q.  My question is, prior to measurements

4     coming in that were completed by PFMI or

5     its vendors, did either BB&T or EMCOR take

6     any deductions or credits for square

7     footage discrepancies -- for any

8     percentage?

9   A.  I could not say specifically without

10    looking at each invoice if they had or

11    not.  I know we changed some based on

12    surveys, and we were requested to change

13    them back.

14  Q.  But the invoices would show that, right?

15  A.  The invoices should, unless the entire

                 Page 122

wohlersJim081007.txt

16   invoice was trashed and a new one was

17   created in its place.  So in which case

18   the actual invoice wouldn't show it.

19   Q.   Sure.  But as we sit here today, do you

20        recall one way or the other whether BB&T

21        and/or EMCOR deducted monies from PFMI

22        invoices for square footage discrepancies

23        prior to December 2005?

152

1    A.   Not that I recall.

2    Q.   Okay.  Do you remember an issue of a

3         stolen proof bag?

4    A.   Yes.

5    Q.   Okay.  Who stole the proof bag?

6    A.   It's alleged --

7    Q.   You can't use those words.

8    A.   Well, they haven't been convicted.  That's

9         why I say "alleged."

10   Q.   I thought they confessed?

11   A.   No.  I mean, I --

12             THE WITNESS:  Do you want me to

13                  ramble or not?

14             MS. TULEY:  As long as -- you can

15                  tell him whatever you know

16                  as long as it's not

17                  something a lawyer told you.

18   A.   I called our insurance company previously

19        this week when I saw Exhibit A, and that

20        was one of the questions, to get a status

21        update on that.

Page 123

WohlersJim081007.txt

22   Q.   Okay.  I really want to know if BB&T's

23        been paid.

153


1    A.   Their comment to me was that as of May,

2         there has been just a continuance of the

3         charges, that they had not gone to court,

4         that the proof bag dollar amount had

5         dropped, but BB&T would not give an exact

6         accounting of what that dollar was, and

7         therefore, they were having trouble doing

8         anything with the claim because of lack of

9         information.

10   Q.   Okay.  Was Destiny Cleaning the FMI

11        subcontract?

12   A.   I do not recall if Destiny was FMI or

13        direct underneath us.

14   Q.   Do you recall whether you paid them

15        directly?

16   A.   I believe we did.

17   Q.   I'm going to mark this as the next in

18        order.  I'm putting it at the top.  Could

19        you identify what's been marked as 29?

20                  (The referred-to document was

21                   marked for identification as

22                   Defendant's Exhibit No. 29.)

23   A.   Yes.  It's a vendor report.

154


1    Q.   Go ahead and take a look at that.

2    A.   All right.

Page 124

wohlersJim081007.txt

| 3 | Q. | Does that refresh your recollection as to |
| 4 | | whether PFMI paid Destiny direct? |
| 5 | A. | Yes, we paid direct starting in October of |
| 6 | | '05. |
| 7 | Q. | Are all those vendors solely BB&T account |
| 8 | | vendors? |
| 9 | A. | Yes, they appear to be. |
| 10 | Q. | All of them? |
| 11 | A. | Yes, I believe so. |
| 12 | Q. | Okay. Has PFMI paid any amount to BB&T |
| 13 | | for the stolen proof bag? |
| 14 | A. | No, sir. |
| 15 | Q. | But the claim has been submitted to the |
| 16 | | insurance carrier for PFMI? |
| 17 | A. | The claim has been submitted. |
| 18 | Q. | And I believe you just testified as to the |
| 19 | | status of where the claim was? |
| 20 | A. | Yes, yes. |
| 21 | | MR. SAWYER: Off the record. |
| 22 | | (Off-the-record discussion.) |
| 23 | Q. | Mr. Wohlers, is what you just testified to |

155

| 1 | | the extent of your knowledge concerning |
| 2 | | the proof bag? |
| 3 | A. | Well, not my total knowledge. |
| 4 | | MS. TULEY: I object. |
| 5 | Q. | Let me back up. When did you hear about |
| 6 | | the loss of the proof bag? |
| 7 | A. | Sean Brookins called me after hours and |
| 8 | | said that a proof bag was missing and sort |

Page 125

wohlersJim081007.txt

```
 9           of brought me up to speed on what he
10           thought had occurred.
11    Q.     Do you remember what BB&T location this
12           was?
13    A.     One Destiny cleaned.  I think it was in --
14    Q.     North Carolina somewhere, right?
15    A.     -- Peggy -- Peggy's region.  That's all.
16                  MS. TULEY:  Are you trying to say
17                        Farnsworth?
18                  THE WITNESS:  Yes.  I forget that
19                        name.
20    Q.     Did PFMI ever withhold any money based on
21           this issue from Destiny Cleaning?
22    A.     I think there's one invoice left open on
23           their books, but I'm not sure.  But no,
```

                                                    156


```
 1           not -- according to this, all invoices
 2           have been paid.
 3                  MS. TULEY:  Will you, for the
 4                        record, just say what you're
 5                        looking at, the exhibit
 6                        number?
 7                  THE WITNESS:  Yeah.  Looking at
 8                        Exhibit 29, the vendor
 9                        activity report.  Shows all
10                        of Destiny's current
11                        invoices or invoices that
12                        were in the system as paid.
13    Q.     Well, after you discussed the issue with
14           Sean Brookins, what did you do next?
```
                              Page 126

wohlersJim081007.txt

```
15   A.   Sean asked me if everything was -- you

16        know, if everything had been performed

17        like they were supposed to on those subs.

18        You know, if the sub had done his

19        background checks and those type of

20        things.  I told him, I don't know.  I

21        called Keith Blackburn, asked him if

22        everything had been done; he told me yes.

23        So I called Sean back and said, you know,
```

157

```
1         I've been told yes.  He asked me if I

2         could just type up something real quick,

3         said, basically, this is what it needs to

4         say.  So I did that and sent that to Sean.

5    Q.   And it was essentially a letter stating

6         that the proper procedures had been

7         followed?

8    A.   Yes.

9    Q.   In terms of criminal background checks?

10   A.   Yes, drug check -- I believe it said that.

11        I'm not sure, but --

12   Q.   And I-9 forms or --

13   A.   Yeah, something like that.

14   Q.   And it was Keith?

15   A.   Keith Blackburn.

16   Q.   Mr. Blackburn told you that, yes, those

17        procedures had been followed?

18   A.   Yes.

19   Q.   I think I asked Mr. Littlefield this, and

20        he didn't recall one.  Do you ever recall
```

Page 127

WohlersJim081007.txt

21      a written agreement between PFMI and

22      Destiny?

23  A.  We gave them a written agreement.   The

                                            158

1       issue with Destiny was BB&T actually hired

2       that company, told us that's who we were

3       using in that region.  We had given them a

4       written agreement.  When we would call to

5       follow up on it, the basic reply we got

6       was call Peggy Farnsworth; she has the

7       agreement and she's looking over it.

8   Q.  Did you call her?

9   A.  I tried not to, but yes, I called her.

10      And she said, yes, indeed, she was looking

11      over it.

12  Q.  Is Ms. Farnsworth a pleasant person?

13  A.  No, she's not, off the record.

14          MS. TULEY:   That's on the record.

15  Q.  Who is Ms. Farnsworth?

16  A.  Ms. Farnsworth was a RBOM for BB&T.

17  Q.  When you say RBOM, it's Regional Branch

18      Office Manager, correct?

19  A.  I think so, yes, Regional Branch -- I've

20      heard that and operations manager also.

21  Q.  Sure.  Very well could be office or

22      operations?

23  A.  Yes.

                                            159

                    Page 128

WohlersJim081007.txt

1   Q.   And I believe you said BB&T hired Destiny?

2   A.   Yes.

3   Q.   Is it that BB&T hired them and had a

4        contract with them, or did PFMI have a

5        contract with them?

6   A.   BB&T hired them.  There were some issues

7        going on in that region.  And we were

8        called by Ronnie Eller and told, this is

9        who's been hired to clean this region; you

10       need to make contact with them and work

11       out an agreement with them.

12  Q.   Okay.  I understand your testimony.  You

13       were directed by BB&T to enter into a

14       contract with these people?

15  A.   Yes.

16  Q.   Did you have any say-so in that?

17  A.   No.

18  Q.   And that individual is Ronnie Eller?

19  A.   Yes.  That's who Peggy wanted in that

20       region.

21  Q.   Did Mr. Eller call you personally?

22  A.   I believe so, yes.  I believe Greg and

23       myself.

                                          160


1   Q.   So it was a conference call?

2   A.   Yes.  Well, Greg's office is next to mine,

3        so it's...

4             MR. SAWYER:  Let's take a quick

5                      break, because I have one

6                      more issue.

                  Page 129

wohlersJim081007.txt

```
 7                    (Brief recess.)
 8   Q.   DO you recall receiving a letter from
 9        EMCOR approximately the end of April
10        concerning termination of the original
11        agreement?
12   A.   Yes, I do.
13   Q.   Okay.  Were you ever informed why?
14   A.   I believe to break it down into smaller
15        pieces of the pie, basically.
16   Q.   Were you ever informed by EMCOR why that
17        was happening?
18   A.   There had been some changes, you know, on
19        who was managing it on the BB&T side and
20        felt like it was best if, you know, they
21        broke it down into more manageable pieces.
22   Q.   DO you recall which pieces of the original
23        agreement you got to keep?
```
                                                    161


```
 1   A.   West Virginia, Tennessee, Kentucky.  I
 2        want to say Georgia and Alabama.  Without
 3        looking at the actual letter -- I know in
 4        the letter it's spelled out which regions
 5        or states.
 6   Q.   Well, I recall your testimony being that
 7        Patton was primarily in West Virginia?
 8   A.   Yes.
 9   Q.   Okay.  And I think I remember from
10        yesterday Mr. Littlefield saying that FMI
11        was primarily the North Carolina/South
12        Carolina area?
```
                        Page 130

wohlersjim081007.txt

13    A.    Parts of it, yes.

14    Q.    Did it also extend into Tennessee,

15          Kentucky, or Georgia?

16    A.    Tennessee was Varsity.  Georgia was ABM, I

17          believe.  I don't know if they were -- I

18          think ABM and Varsity split Georgia.

19    Q.    Okay.  How about Alabama?

20    A.    Alabama, there were only two branches.  I

21          can't recall -- I think on this -- on the

22          vendor master, Exhibit 29, I think it

23          lists Carlos, Curtis, and Janet Buchanan.

                                              162


 1          They did just a couple of branches in that

 2          north Alabama/south Tennessee area.

 3    Q.    What about Kentucky?

 4    A.    Kentucky is CRM.

 5    Q.    Fair statement that FMI got carved out of

 6          this?

 7    A.    Yes.

 8    Q.    Did you agree or disagree with that?

 9    A.    Either way, it didn't really matter to me.

10    Q.    Okay.  And I want to -- I'll ask the

11          question.  It's my understanding there was

12          no signed written agreement for this new

13          agreement which was limited to West

14          Virginia, Tennessee, Kentucky, Georgia,

15          and Alabama.  Is that consistent with your

16          recollection, that there is no signed

17          agreement by both parties concerning the

18          scope of services for this -- it's a

                       Page 131

wohlersJim081007.txt

19    horrible question.  Strike it all.

20               Is there a signed written

21    agreement between PFMI and EMCOR

22    concerning this new scope of work?

23  A.  Not that -- not that I'm aware of.

163

1   Q.  Could there be?

2   A.  One was sent to us.  I'm not sure -- I

3       know it was sent to our attorneys, but I'm

4       not sure if Greg ever signed it and it was

5       sent back or not prior to the end.

6   Q.  And I don't want to know at all what your

7       attorneys told you, but do you have

8       another set of attorneys --

9   A.  We -- yes.

10  Q.  -- in addition to Beasley, Allen?

11  A.  Yes, yes.

12  Q.  Okay.  Are those corporate counsel?

13  A.  Yes.  Well, not PFMI, but yeah, they're

14      outside attorneys.

15  Q.  What firm do you use?

16  A.  What is it, Rushton, Stakely?

17          MS. TULEY:  Rushton, Stakely --

18              there's a bunch more names.

19  Q.  Are they in town?

20  A.  Yeah, right up the block.

21  Q.  But you hired these killers to go after

22      us?

23  A.  They're more in the contract side of

164

Page 132

wohlersJim081007.txt

| 1 | | thing. |
|---|---|---|
| 2 | Q. | As far as negotiating contracts? |
| 3 | A. | And reviewing them and that sort of thing. |

```
 1        thing.
 2   Q.   As far as negotiating contracts?
 3   A.   And reviewing them and that sort of thing.
 4   Q.   And again, I don't want to know what your
 5        attorneys told you, but did they review
 6        the letter of intent that came in July of
 7        2005?
 8   A.   I don't know if Chad -- and I'm sorry,
 9        Chad's our attorney with Rushton, Stakely.
10        I don't know if Chad reviewed that one or
11        not.
12   Q.   Okay.  How about -- never mind.  Doesn't
13        matter because there was no signed written
14        agreement between the parties, to your
15        knowledge, right?
16   A.   To my knowledge, correct.
17   Q.   Okay.  When was this new agreement
18        implemented?
19   A.   I believe it was to take place -- well,
20        the agreement, as far as the new areas we
21        were going to service, took place I
22        believe June 3rd.
23   Q.   So the new agreement kicked in June 3rd,
                                              165


 1        2006?
 2   A.   I believe so.
 3   Q.   Roughly thereabouts?
 4   A.   Roughly thereabout.
 5   Q.   Fair statement that it was kind of going
```

Page 133

wohlersJim081007.txt

```
 6        to -- the implementation of the new
 7        agreement was going to be staggered
 8        through June 15th?
 9   A.   Originally that was the conversation, but
10        that isn't what was done.
11   Q.   What was done?
12   A.   They were wanting to stagger one region,
13        and we basically said we just need to do
14        it all June 3rd.  And so that's the way it
15        was done.
16   Q.   Was that a directive from EMCOR?
17   A.   To stagger or --
18   Q.   Or start it all June 3rd?
19   A.   That was our reply back to their directive
20        to stagger it.
21   Q.   Oh, okay.  So PFMI said, hey, we're going
22        to start it June 3rd?
23   A.   Yes.  We'd rather -- if we're going to
```

                                              166


```
 1        make the transition, let's make it all on
 2        June 3rd.
 3   Q.   Did EMCOR agree with that?
 4   A.   Yes, they did.
 5   Q.   Who at EMCOR agreed with that?
 6   A.   Sean Brookins, Mark Smith.  On part of
 7        that, we released all of our subs.
 8   Q.   When you say you released all your subs,
 9        you mean for -- what do you mean by
10        released?
11   A.   They were under a no-compete, to where
```
                        Page 134

WohlersJim081007.txt

| 12 | | they couldn't go out from under PFMI, but |
| 13 | | we released them from that. |
| 14 | Q. | Do you ever recall FMI ever having any |
| 15 | | issues about the non-compete clauses in |
| 16 | | their contract? |
| 17 | A. | Not that I recall, no. |
| 18 | Q. | Do you remember them giving either EMCOR |
| 19 | | or ABM a hard time about not allowing |
| 20 | | their sub-tier vendors to be used by ABM? |
| 21 | A. | Okay, now that you mention that, yes, I |
| 22 | | recall some e-mails between Don and ABM |
| 23 | | that I think I saw. |

167

| 1 | Q. | Okay.  After PFMI start performing work on |
| 2 | | June 3rd, how long did they service West |
| 3 | | Virginia, Tennessee, Kentucky, Georgia, |
| 4 | | and the two locations in Alabama? |
| 5 | A. | Until approximately the middle of July. |
| 6 | Q. | July 14th ring any bells? |
| 7 | A. | It does, but without looking at the |
| 8 | | specific letter -- I know you have it. |
| 9 | Q. | This is the next exhibit in order.  Here |
| 10 | | you go, Mr. Wohlers.  Would you take a |
| 11 | | look at what's been marked as Exhibit 30 |
| 12 | | to your deposition? |
| 13 | | (The referred-to document was |
| 14 | | marked for identification as |
| 15 | | Defendant's Exhibit No. 30.) |
| 16 | A. | Yes. |
| 17 | Q. | Does that refresh your recollection as to |

Page 135

wohlersjim081007.txt

18      why PFMI stopped work?

19  A.  Yes, it does.

20  Q.  It was because you hadn't been paid for

21      the month of June, correct?

22  A.  Yes.

23  Q.  Or two weeks in July?

168

1   A.  Or two weeks in July.

2   Q.  Were you ever told why you weren't paid

3       for that?

4   A.  Yeah, according to the letter, pretty much

5       for square footage adjustments.

6   Q.  Who at EMCOR told you that payment was

7       being withheld?

8   A.  I believe it was Sean Brookins, but I'm

9       not sure.

10  Q.  Did anyone from EMCOR ever have occasion

11      to tell you -- strike that.

12          Did anyone from EMCOR tell you

13      that no more adjustments will be made

14      after the execution of the original

15      agreement?

16          MS. TULEY:  Object to the form.

17  A.  We were told there would be a clean slate

18      going forward from June 3rd, that past

19      performance, square footage, all that was

20      previous; going forward from June 3rd, it

21      would be based on the new square footages

22      they had given us.

23  Q.  Is that your interpretation of the words

Page 136

WohlersJim081007.txt

169

```
 1        "clean slate"?
 2    A.  Well, that's what they defined for us,
 3        because they said clean slate and then
 4        went on to say exactly what was intended
 5        by that.
 6    Q.  And representatives from EMCOR directly
 7        told you that no more adjustments would be
 8        made for square footage issues after June
 9        3rd?
10    A.  Yes.
11    Q.  Okay.  Who from EMCOR told you that?
12    A.  Sean Brookins and Mark Smith.
13    Q.  When did they tell you that?  It would
14        have been before June 3rd, right?
15    A.  It was before June 3rd.
16    Q.  And it would have been after the
17        termination of April 28, 2006, correct?
18    A.  Correct.  So I would have to assume it was
19        in May.
20    Q.  So it was between April 28th and June 3rd?
21    A.  Yes, sir.
22    Q.  Did you ever have occasion to confirm that
23        in writing in any form?
```

170

```
 1    A.  I don't know if there's an e-mail in
 2        regards to that.  I know Sean Brookins and
 3        I had additional conversations in regards
```

Page 137

WohlersJim081007.txt

```
 4        to that topic in which it was confirmed

 5        again that, you know, it's a new world,

 6        you know, we want -- everyone wants this

 7        to work.  And, you know, reiterated again

 8        that, you know, past performance,

 9        adjustments, all that, thing of the past.

10   Q.   Did EMCOR ever make any payments after

11        June 3rd, 2006, for your work?

12   A.   I would have to look at a register, but I

13        believe they paid for some out-of-scope

14        work, and I believe they did make another

15        payment, but I would need to look at that.

16   Q.   I'll mark this as an exhibit.  I don't

17        know if you'll be able to identify it or

18        not, but I'll let you take a look at it

19        and see what you can tell me.  All right.

20        I'm handing you what's been marked as the

21        next exhibit in order.  It's Exhibit 31.

22        Well, I'll represent to you that it's an

23        accounts payable check register from EMCOR
```

                                        171


```
 1        regarding the BB&T account.

 2                     (The referred-to document was

 3                      marked for identification as

 4                      Defendant's Exhibit No. 31.)

 5   A.   All right.

 6   Q.   Okay.  If you'll turn to the very, I

 7        guess, back two pages -- you were there.

 8        Did it refresh your recollection as far as

 9        do those numbers look familiar as far as
```

                          Page 138

WohlersJim081007.txt

```
10              receiving payments from EMCOR?
11    A.    I couldn't say.  I know we received some
12              payments, but I couldn't say these were
13              the amounts of those payments or, you
14              know, if they applied to those invoices,
15              you know.  If I had our AR register, I
16              could tell you specifically.
17    Q.    Okay.  But you do recall that payments
18              were made after June 3rd, correct?
19    A.    Yes.
20    Q.    Okay.  And does about 120 grand plus or
21              minus whatever -- does 120 grand sound
22              about right?
23                      MS. TULEY:  Object to the form.
```

172

```
1    Q.    You can answer if you know.
2    A.    Well, I mean, just looking at one of them,
3              143,000 of that is out-of-scope work.
4    Q.    Right.
5    A.    Which would be for carpet cleaning or any
6              other thing.  It would appear that 78,000
7              was paid for in-scope.
8    Q.    Okay.
9    A.    But I don't know what time frame that was
10              paid for.
11    Q.    Let me ask you another question.  Have you
12              ever seen that document before?
13    A.    No.  No, I haven't.
14    Q.    But if you had your accounts receivable --
15    A.    If I had my accounts receivable, I could
```

Page 139

WohlersJim081007.txt

| 16 |    | be a little bit more definitive on what |
| 17 |    | invoice time period payments were applied |
| 18 |    | or even when that out-of-scope invoice was |
| 19 |    | created, such as that. |
| 20 | Q. | Certainly.  That's all for that exhibit. |
| 21 | A. | All right. |
| 22 |    | MR. SAWYER:  Y'all give me just a |
| 23 |    | second. |

173

| 1 |    | (Brief recess.) |
| 2 | Q. | Hand you what's been marked as Exhibit 32. |
| 3 |    | Go ahead and read that, and if you can, |
| 4 |    | identify it for the record. |
| 5 |    | (The referred-to document was |
| 6 |    | marked for identification as |
| 7 |    | Defendant's Exhibit No. 32.) |
| 8 | A. | Do you want me to start at the very back |
| 9 |    | or just -- |
| 10 | Q. | Whatever works for you.  I'm most |
| 11 |    | interested in the first page. |
| 12 | A. | All right.  On the very first page? |
| 13 | Q. | Read the whole thing if you want. |
| 14 | A. | All right.  Let's see.  The very first |
| 15 |    | e-mail.  (As read:)  "Sean, we had called |
| 16 |    | today" -- |
| 17 |    | MS. TULEY:  Slow down.  She can't |
| 18 |    | write that when you're |
| 19 |    | reading that fast. |
| 20 |    | MR. SAWYER:  You can just read it |
| 21 |    | to yourself. |

Page 140

WohlersJim081007.txt

22          (Off-the-record discussion.)

23   Q.   Have you had a chance to look at what's

                                        174

1      been marked Exhibit 32 to your deposition?

2   A.   Yes.

3   Q.   Do you recall those e-mails?

4   A.   I don't recall the bottom two.  I recall

5      typing this one to Sean in regards to, you

6      know, that we never agreed to the 20

7      percent reduction.

8   Q.   And that's the 20 percent reduction going

9      forward on the new agreement, right, or --

10   A.   It reads as if the 20 percent reduction on

11      the bill that has occurred since March

12      16th of this year, and it doesn't state

13      the -- it doesn't really address the one

14      -- the new agreement.

15   Q.   Okay.

16   A.   At least the way I read it right now.

17   Q.   And are you responding to something that

18      Mr. Brookins said?

19   A.   Yes.  It appears as if I'm responding to

20      the fact that they had held the entire

21      second May payment and that -- you know,

22      that -- you know, Sean's basically saying

23      that the payment was withheld because

                                        175

1      we're working with BB&T on the evaluation

2      of those final credits and hope to have

wohlersJim081007.txt

```
 3          that information in a few days.
 4    Q.    Are you reading directly from the exhibit?
 5    A.    Yes.
 6    Q.    Okay.  And you're reading from the portion
 7          that Mr. Brookins wrote, correct?
 8    A.    Yes.
 9    Q.    Fair statement that I guess Mr. Brookins
10          and you saw things a little bit
11          differently as far as what was going to be
12          done?
13    A.    With the new agreement or with the last
14          May payment or the entire --
15    Q.    Well, with the last and with the new
16          agreement.
17    A.    It would sound -- it would sound like
18          that, yes.
19    Q.    Okay.  You can put it down.  Mr. Wohlers,
20          it's a fair statement that you wouldn't
21          want to overcharge EMCOR for work you did,
22          right?
23                MS. TULEY:  Object to the form.
                                                      176


 1    Q.    You can answer.
 2    A.    Correct.
 3    Q.    And that's because it would be wrong,
 4          wouldn't it?
 5                MS. TULEY:  Object to the form.
 6    Q.    You can answer.
 7    A.    It would appear that way, yes.
 8                MR. SAWYER:  Off the record.
                    Page 142
```

```
                    WohlersJim081007.txt
 9              (Off-the-record discussion.)
10              (The deposition of JIM WOHLERS
11       was concluded at approximately 1:36 p.m.,
12       on August 10, 2007.)
13              * * * * * * * * * * * *
14              REPORTER'S CERTIFICATE
15              * * * * * * * * * * * *
16
17       STATE OF ALABAMA
18       COUNTY OF MONTGOMERY
19
20              I, Nicole Paulk, Court Reporter
21       and Notary Public in and for the State of
22       Alabama at Large, do hereby certify that
23       the foregoing is a true and accurate
                                              177


 1       transcript of the proceedings as taken
 2       stenographically by me at the time and
 3       place aforementioned.
 4              This 16th day of August 2007.
 5
 6
 7                   Nicole Paulk
                     Reporter and Notary Public
 8                   State of Alabama at Large
 9
10
11
12
13
14                      Page 143
```

wohlersJim081007.txt

15
16
17
18
19
20
21
22
23

# Exhibit E

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION


PROFESSIONAL FACILITIES
MANAGEMENT, INC.,

    Plaintiff,

                   CASE NUMBER
    vs.              2:06CV1136-MHT

EMCOR FACILITIES SERVICES,
INC.; and A, B, and C, as
fictitious parties,

    Defendants.



   *    *    *    *    *    *    *    *


    DEPOSITION OF SEAN JOSEPH BROOKINS,

taken pursuant to stipulation and

agreement before Barbara A. Howell,

Court Reporter and Commissioner for the

State of Alabama at Large, in the Law

Offices of Beasley, Allen, Crow,

Methvin, Portis & Miles, P.C.,

250 Commerce Street, Montgomery,

Alabama, on Wednesday, August 8, 2007,

commencing at approximately 10:00 a.m.

d88e44a4-1e0c-4347-aed6-b1358f7a7c9

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

---

**Page 2**

```
1        APPEARANCES
2
     FOR THE PLAINTIFF:
3
     Ms. Scarlette M. Tuley
4    BEASLEY, ALLEN, CROW, METHVIN,
     PORTIS & MILES, P.C.
5    Attorneys at Law
     250 Commerce Street
6    Montgomery, Alabama 36104
7
     FOR THE DEFENDANTS:
8
     Mr. Benjamin H. Sawyer
9    SUTHERLAND, ASBILL & BRENNAN, LLP
     Attorneys at Law
10   999 Peachtree Street, NE
     Atlanta, Georgia  30309
11
12   ALSO PRESENT:
13   Mr. Greg Littlefield
     Mr. Jim Wohlers
14
15
16
17
18
19
20
21
22
23
```

---

**Page 3**

```
1                 INDEX
2    EXAMINATION BY:          PAGE
3    MS. TULEY...................  6
4
     EXHIBITS                 PAGE
5
     PLAINTIFF'S EXHIBIT #1............ 178
6
     PLAINTIFF'S EXHIBIT #2............ 180
7
     PLAINTIFF'S EXHIBIT #3............ 183
8
     PLAINTIFF'S EXHIBIT #4............ 189
9
     PLAINTIFF'S EXHIBIT #5............ 191
10
     PLAINTIFF'S EXHIBIT #6............ 194
11
     PLAINTIFF'S EXHIBIT #7............ 195
12
     PLAINTIFF'S EXHIBIT #8............ 197
13
     PLAINTIFF'S EXHIBIT #9............ 198
14
     PLAINTIFF'S EXHIBIT #10............ 203
15
     PLAINTIFF'S EXHIBIT #11............ 206
16
     PLAINTIFF'S EXHIBIT #12............ 207
17
     PLAINTIFF'S EXHIBIT #13............ 208
18
19
20
21
22
23
```

---

**Page 4**

```
1                STIPULATIONS
2        It is hereby stipulated and agreed
3    by and between counsel representing the
4    parties that the deposition of SEAN
5    JOSEPH BROOKINS is taken pursuant to the
6    Federal Rules of Civil Procedure and
7    that said deposition may be taken before
8    Barbara A. Howell, Court Reporter and
9    Commissioner for the State of Alabama at
10   Large, without the formality of a
11   commission; that objections to questions
12   other than objections as to the form of
13   the questions need not be made at this
14   time but may be reserved for a ruling at
15   such time as the deposition may be
16   offered in evidence or used for any
17   other purpose as provided for by the
18   Federal Rules of Civil Procedure.
19       It is further stipulated and agreed
20   by and between counsel representing the
21   parties in this case that said
22   deposition may be introduced at the
23   trial of this case or used in any manner
```

---

**Page 5**

```
1    by either party hereto provided for by
2    the Federal Rules of Civil Procedure.
3
4    *    *    *    *    *    *    *    *
5
6           SEAN JOSEPH BROOKINS
7     The witness, having first been duly
8    sworn or affirmed to speak the truth,
9    the whole truth, and nothing but the
10      truth, testified as follows:
11          THE REPORTER:  Usual
12        stipulations?
13        MS. TULEY:  Yes, unless you
14        want something
15        different.
16        MR. SAWYER:  What are the
17        usual stipulations?
18        Just reserve, thirty
19        days --
20        MS. TULEY:  Objections to
21        form.
22        MR. SAWYER:  Oh, okay.
23        MS. TULEY:  Do you want to
```

2  (Pages 2 to 5)

d88e44a4-1e0c-4347-aed6-b1358f7a7c9

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 6

1          read and sign?
2          MR. SAWYER: Yeah, read and
3          sign.
4              EXAMINATION
5    BY MS. TULEY:
6    Q. Mr. Brookins, we just met. I'm
7       Scarlette Tuley. Have you ever given a
8       deposition before?
9    A. I have.
10   Q. Well, I'm not going to go through all
11      that, then. If you can just, as we go
12      through, try to let me finish my
13      question before you answer and I'll try
14      to let you finish your answer before I
15      ask the next question, just so we can
16      help the court reporter. And if you
17      need to take a break, let me know. And
18      try to answer out loud so she can type
19      it all down. We all naturally do this,
20      shakes and nods and uh-huhs and uh-uhs.
21      That all reads the same. So I may
22      prompt you every once in a while,
23      because conversationally we just uh-huh

Page 7

1       and uh-uh. But I'm not getting on you.
2       I'm just trying to make sure the court
3       reporter can type up that you meant a
4       yes or a no.
5    A. I understand. Thank you.
6    Q. Would you just state your name for the
7       record, please.
8    A. Sean Joseph Brookins.
9    Q. And where do you live, Mr. Brookins?
10   A. I live in Burlington, North Carolina.
11   Q. And how long have you lived there?
12   A. Sixteen years.
13   Q. Where are you currently employed?
14   A. EMCOR Facilities Services.
15   Q. At what location are you working right
16      now?
17   A. I'm working on the Wachovia account in
18      Winston-Salem, which is where my office is.
19   Q. All right. My understanding is -- I
20      have noticed your deposition for you
21      personally, but I've also
22      done what's called a corporate
23      representative or a 30(b)(6) notice.

Page 8

1          MR. SAWYER: For the record,
2          he's not going to be
3          produced as a 30(b)(6)
4          witness today.
5          MS. TULEY: Okay.
6          MR. SAWYER: And we can get
7          together and --
8    Q. All right. So you're not going to be
9       here as a 30(b)(6) witness or corporate
10      representative; is that correct?
11   A. That's correct.
12   Q. Okay. Great. That just short-
13      circuited some stuff for you. Good
14      news for you.
15          I'm just going to go through
16      your background a little bit, and we'll
17      try to make this fast. Tell me where
18      you stopped with school.
19   A. I had some college, but I completed my
20      RPA, which is real property
21      administrator. That is a designation
22      offered through the Building Owners and
23      Managers Association. And it's a

Page 9

1       two-year program meant to give you all
2       of the background needed to
3       successfully manage property.
4    Q. And where did you do that?
5    A. It was a program depending on where the
6       teacher was. After work, I would go to
7       whatever the location was and we would
8       go through the coursework. Each course
9       was anywhere between thirteen and
10      sixteen weeks.
11   Q. And this was a two-year program, I
12      think you said?
13   A. Well, it took me two years to get
14      through it. There are seven courses.
15   Q. Got you. And where did you do this
16      study? Was it in --
17   A. Orlando, Florida.
18   Q. Orlando. Okay. And who was your
19      instructor in that?
20   A. Each course had a different instructor.
21   Q. Got you. Was it through a specific
22      institution?
23   A. Building Owners and Managers Institute

3 (Pages 6 to 9)

d88e44a4-1e0c-4347-aed6-b1358f7a7c9

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 10

1    International.
2    Q. And when did you complete it?
3    A. 1983 -- excuse me. It was in the mid
4      '80s, '83 or '85, and I don't . . .
5    Q. Fair enough. All right. How long have
6      you been working for EMCOR?
7    A. Since 1999.
8    Q. In the '80s when you were doing your
9      two-year program, the RPA --
10   A. Yes.
11   Q. -- where were you working then?
12   A. I worked for a subsidiary of The
13     Travelers called EBS.
14   Q. And what were you doing with them?
15   A. I was in facilities. I actually
16     started in their mailroom and was
17     promoted to work in the facility
18     department. It was a small company,
19     about two hundred employees.
20   Q. Was the facility work you did there
21     similar to what you do at EMCOR?
22   A. On a very basic level, yes.
23   Q. Just give me a sketch of what you were

Page 11

1      doing for EBS.
2    A. For EBS, I was actually their telephone
3      coordinator in making what we called
4      moves, adds, and changes to the phone
5      system; if someone changed their
6      extension; voice mail. I also did
7      space design, cubicle design work, and
8      coordinated those projects. And then
9      worked with the landlord on any
10     building issues -- air conditioning,
11     janitorial, landscaping, security -- to
12     make sure that we received the services
13     that we were supposed to receive.
14   Q. And was this for one office building?
15   A. It was one office building; a warehouse
16     location, also.
17   Q. And how long were you with EBS?
18   A. Till nineteen -- well, with The
19     Travelers EBS -- it was Travelers EBS.
20     And so under the umbrella of The
21     Travelers, I moved to North Carolina
22     and left their employ in May of 1996.
23   Q. What did you start doing in '96?

Page 12

1    A. I went to work for The Keith
2      Corporation. And they're based in
3      Charlotte. But I was managing the
4      Center for Molecular Biology and
5      Pathology in Research Triangle Park.
6    Q. And what were your duties there?
7    A. Same duties -- general care of the
8      facility but also supervision of the
9      maintenance technicians who repaired
10     some of the equipment. It didn't have
11     anything to do with the actual business
12     they were in but the upkeep of the
13     facility.
14   Q. Did that include janitorial?
15   A. It did.
16   Q. How many buildings were you over in the
17     Triangle Park location?
18   A. Two.
19   Q. And just round numbers, about how many
20     square feet are we talking about?
21   A. Two hundred thousand.
22   Q. And how long were you with The Keith
23     Group?

Page 13

1    A. I moved in 1999 to CES, which then
2      became EMCOR through --
3    Q. And that just explained something to
4      me. I've seen some E-mails where your
5      E-mail address is Sean Brookins CES
6      something, something; and then at some
7      point, it was Sean Brookins EMCOR
8      something, something?
9    A. That's correct.
10   Q. So it was just a transition, but it was
11     basically the same -- you kept your
12     same job.
13   A. There was an acquisition.
14   Q. Got you. When did it change from CES
15     to EMCOR?
16   A. I'm not exactly sure. Probably 2003.
17   Q. Sometime in the early to mid 2000s?
18   A. Yes, ma'am.
19   Q. Tell me what your current position with
20     EMCOR is.
21   A. I am the regional alliance manager on
22     the Wachovia account for EMCOR.
23   Q. Tell me, if you will, what does your

4 (Pages 10 to 13)

d88e44a4-1e0c-4347-aed6-b1358f7a7c9

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 14

1    job entail?
2    A. I am responsible for the seven managers
3        and their staff for South Carolina,
4        North Carolina, and Virginia high-rise
5        properties that we take care of for
6        Wachovia. In Virginia, it's everything
7        south of Fredericksburg, is kind of the
8        cut-off line for the next region. And
9        responsibility for approximately four
10       and a half million square feet.
11   Q. What are the areas of -- I guess the
12       area of building maintenance that you
13       oversee with these buildings?
14   A. I don't have any direct property
15       responsibility. My managers do.
16   Q. Okay.
17   A. However, it is all of the things again,
18       the support services for a facility --
19       air conditioning, plumbing, janitorial,
20       security, landscaping, general building
21       maintenance/repairs, painting, ceiling
22       tiles, some construction-type work,
23       project work if we are to be included

Page 15

1    in that. Sometimes we are; sometimes
2    we're not. Upkeep of their critical
3    facilities, their data centers in the
4    facilities that we have. Not every
5    building has one.
6    Q. Let me just ask you, would that be --
7        and I'm not a computer person. Would
8        that be like having, like, a tech
9        person that works with computers? Is
10       that what you're talking about?
11   A. No. The environment in which those
12       computers sit in.
13   Q. Okay. Got you.
14   A. Servers, the . . .
15   Q. Do y'all self-perform all these
16       functions?
17   A. No.
18   Q. Do you use subcontractors to do this
19       work, or vendors?
20   A. Some work, yes.
21   Q. Tell me what, if any, of this work
22       EMCOR self-performs.
23   A. Mainly the engineering services, the

Page 16

1    HVAC, electrical, general building
2    services that we have technicians that
3    work in these facilities or assigned to
4    areas that support those facilities.
5    Q. So would you be having a vendor do the
6        landscaping at those facilities?
7    A. Yes.
8    Q. Would you have a vendor do any
9        construction that was requested at
10       those facilities?
11   A. Yes.
12   Q. Would you have a vendor do any
13       janitorial that was required at those
14       facilities?
15   A. Yes.
16   Q. Do you use the same vendor for
17       janitorial at all of the facilities?
18   A. No.
19   Q. What about for landscaping, do you use
20       the same vendor for all the facilities?
21   A. No.
22   Q. How long have you been the regional
23       manager for this Wachovia account?

Page 17

1    A. Since October of last year.
2    Q. Which would be October '06?
3    A. Correct.
4    Q. Who are your seven managers that are
5        underneath you?
6    A. Specifically by name?
7    Q. Yes, please.
8    A. Atilla, A-T-I-L-L-A, Szekes,
9        S-Z-E-K-E-S.
10   Q. That's impressive.
11   A. Jim Sulier, S-U-L-I-E-R; Janet Hoover;
12       Janene Finger; David Coldren,
13       C-O-L-D-R-E-N; Lane Sisson,
14       S-I-S-S-O-N; and Jacqueline Able.
15   Q. That's good.
16   A. I was going across the state of
17       Virginia trying to count everybody.
18   Q. Now, are they at the same location you
19       are?
20   A. No.
21   Q. Are they set up where they're actually
22       in a Wachovia facility?
23   A. Yes.

5 (Pages 14 to 17)

d88e44a4-1e0c-4347-aed6-b1358f7a7c9

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 18

1  Q. All right. I'm going to take you back
2     now, and I want to just start with what
3     your first involvement was with the
4     BB&T project and just tell me when did
5     you first become aware of the BB&T
6     project.
7  A. Late spring 2005.
8  Q. How did you become aware of it?
9  A. The portfolio manager I was working for
10    at Wachovia had left to go to BB&T, had
11    left Wachovia to go to BB&T. In his
12    position there, he knew or had found
13    out that they were looking for an
14    outsourcing company and wanted to
15    recommend EMCOR to be on the bid list.
16 Q. And who was this portfolio manager?
17 A. Bob Evans.
18 Q. Did he contact you directly about that
19    opportunity?
20 A. No. My boss, Cathy Hice, with a C.
21 Q. And what did he tell -- strike that.
22       What did Cathy Hice tell you
23    about the opportunity with BB&T?

Page 19

1  A. I don't recall any specific
2     conversation about what it was going to
3     be about, what the contract was going
4     to be or potentially be. Just that I
5     had done a good job for her and she
6     wanted to at least make sure I had the
7     opportunity to move up the
8     opportunity presented itself.
9  Q. When were you first aware that EMCOR
10    had been requested to submit a bid or a
11    proposal?
12 A. I don't specifically recall when.
13 Q. Would it have been a few months after
14    that or shorter, longer?
15 A. Certainly not longer but . . .
16 Q. And that's fine. How did you first
17    become aware that EMCOR had been
18    requested to submit a proposal?
19 A. Again, I don't recall the specific date
20    or time. However, I became actively
21    involved shortly before we did a
22    presentation to BB&T.
23 Q. Tell me about that presentation.

Page 20

1  A. EMCOR had been selected as one of the
2     finalists, and we had to go to
3     Winston-Salem and before a group of
4     probably thirty BB&T people do a
5     presentation on why choose EMCOR.
6  Q. And who all from EMCOR was involved in
7     giving that presentation?
8  A. I don't know that I can remember
9     everybody. I'll tell you the ones I do
10    remember. Mike Terry; Debi Crosby,
11    D-E-B-I Crosby; Alan Cristal; Bill
12    Rogers; Ron Rogers; I was there.
13    That's all I remember.
14 Q. Tell me, of the ones that you can
15    remember, who was there for BB&T.
16 A. Steven Paige, Ronny Eller, Debra
17    Willis, John Thomas. And that's all
18    that I . . .
19 Q. That's fair enough.
20 A. It was a large room, a lot of people.
21 Q. And you said your involvement started
22    shortly before the presentation was
23    made.

Page 21

1  A. Yes, ma'am.
2  Q. All right. Tell me about your
3     involvement pre-presentation. What all
4     did you do?
5  A. Listened in on a number of phone calls,
6     conference calls. At that time, Mark
7     Smith had given us -- on the Wachovia
8     account, all of our managers, wanted us
9     to go look at some sample branches. So
10    we went and toured sample branches to
11    see what condition they were in.
12 Q. Are you talking sample BB&T branches?
13 A. Yes, ma'am.
14 Q. I'm sorry. Go ahead.
15 A. And again, just several conference
16    calls regarding the presentation.
17 Q. At this point, pre-presentation, were
18    you talking to any potential vendors?
19 A. I was not. I was still working on the
20    Wachovia account.
21 Q. Who was the main person responsible for
22    the BB&T presentation?
23 A. Alan Cristal.

6 (Pages 18 to 21)

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 22

1  Q. Do you know who the main, around the
2     time of the presentation, who the main
3     contact with BB&T was?
4  A. Ronny Eller.
5  Q. What format was this presentation in?
6     And by that, I mean was it, like, a
7     bound little presentation or was it a
8     Power Point presentation?
9  A. I believe it was both. I believe we
10    gave them copies of the Power Point
11    slides, but it was a Power Point
12    presentation.
13 Q. At the time of the presentation, had
14    you seen the request for proposal from
15    BB&T?
16 A. At the time of the presentation?
17 Q. Yes, sir.
18 A. I had not.
19 Q. Were you aware at the time of the
20    presentation of what work BB&T was
21    requesting from EMCOR?
22 A. By the time we did the presentation,
23    yes.

Page 23

1  Q. Tell me what your understanding was of
2     what BB&T was looking for.
3        MR. SAWYER: Objection.
4        Vague. You can answer
5        if you know.
6  A. Could you restate the question, please?
7  Q. Sure. What I'm asking is, at the time
8     of the presentation, what was your
9     understanding of what BB&T was looking
10    to hire to be done?
11       MR. SAWYER: Scopes of work,
12       Counsel? I don't want
13       to mess up your
14       question. Are you
15       referring to scopes of
16       work?
17       MS. TULEY: No. Let me make
18       it a little clearer.
19 Q. What was your understanding of what
20    BB&T was looking to put in place, just
21    from whatever understanding you have?
22       MR. SAWYER: Same objection.
23       You can answer if you

Page 24

1     know.
2  A. To consolidate services for their
3     branches and janitorial, landscaping,
4     and maintenance, mobile maintenance
5     services.
6  Q. Let me make sure I caught that.
7        MR. SAWYER: Off the record.
8        (Off-the-record discussion)
9  Q. The three areas that they wanted to
10    consolidate service for the branches, I
11    think you said, was janitorial,
12    landscaping, and mobile maintenance?
13 A. Yes, ma'am.
14 Q. At the time of the proposal, did you
15    know about how many branches y'all were
16    talking about?
17 A. By the time we did the presentation,
18    yes.
19 Q. About how many branches was that?
20 A. Fourteen hundred and eight.
21 Q. Had you ever worked on a project that
22    entailed that many locations?
23 A. No, ma'am.

Page 25

1  Q. Do you know if EMCOR as a company had
2     worked on an account that had that many
3     locations?
4  A. I don't have specific knowledge of
5     that, but I understand that they did.
6  Q. I want to back up to something you said
7     just a minute. How many of those
8     sample branch tours did you do?
9  A. Personally?
10 Q. Yes, sir.
11 A. Two or three.
12 Q. Do you know how many were done by EMCOR
13    as a whole?
14 A. I do not. I believe the number was
15    somewhere around fifty.
16 Q. How did y'all select which ones to go
17    tour?
18 A. BB&T selected them for us.
19 Q. And which ones did you go to?
20 A. I don't remember.
21 Q. That's fair enough. Did you take any
22    notes of your tours?
23 A. They had given us a form; EMCOR, Mark

7 (Pages 22 to 25)

d88e44a4-1e0c-4347-aed6-b1358f7a7c9

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 26

1    Smith at the time, had given us a form
2    to complete. Just a basic facility
3    assessment is what I would call it.
4  Q.  What was your impression of the shape
5    that the BB&T branches were in that you
6    toured?
7  A.  One was actually in pretty sad shape.
8    It -- and I will go back and say this
9    one was in -- I believe it was in
10   Danville, Virginia. Mechanically, it
11   appeared to be a mess.
12 Q.  I'm not a facility person. So when you
13   say "mechanically," what are you
14   talking about?
15 A.  The -- several lights were out, so
16   either bulbs or ballasts were out.
17   The -- in one place, they had tape over
18   breakers. The mechanical room, which
19   houses the heating, air conditioning,
20   there was a pump leaking, a seal; and
21   just from my prior knowledge, it
22   sounded like a bearing was going bad.
23   And the room had not been cleaned --

Page 27

1    spider webs, dust, just a mess.
2  Q.  Since there was -- all right. Let me
3    ask you this. What was your impression
4    of the landscaping at that location?
5  A.  At that location, there was very
6    little.
7  Q.  And what was your impression of the
8    janitorial work at that location?
9  A.  Fair.
10 Q.  And I guess it would make sense at this
11   point to ask you, how were these
12   branches -- how were they obtaining
13   these services at this point before
14   BB&T entered into this contract with
15   EMCOR?
16       MR. SAWYER: Object --
17 A.  I don't specifically know.
18       MR. SAWYER: Object to the
19          form. You can answer if
20          you know.
21       THE WITNESS: I apologize.
22 A.  I don't specifically know.
23 Q.  And let me just ask you. And you

Page 28

1    probably just told me the answer to it.
2    But let's just say at the Danville
3    location, was that branch contracting
4    for their own landscaping?
5  A.  I have no idea.
6  Q.  At any point during your work on this
7    BB&T project, did you become aware of
8    how these branches were taking care of
9    getting their janitorial, landscaping,
10   mechanical work done?
11 A.  Yes.
12 Q.  Tell me what your understanding of that
13   is.
14 A.  My understanding is that in -- and it
15   was different across their footprint.
16   In some locations, the financial center
17   manager went out and hired someone. In
18   other locations, an area operations
19   officer or a regional banking
20   operations manager made those
21   decisions.
22 Q.  And would a financial center manager,
23   would that be the person responsible

Page 29

1    for that particular branch?
2  A.  Yes, ma'am.
3  Q.  And then the area operations officer
4    would be responsible for maybe multiple
5    branches?
6  A.  That's my understanding, yes, ma'am.
7  Q.  But it would be fair to say that it was
8    not -- BB&T was not doing this at,
9    like, a high corporate level; like, one
10   of the vice presidents wasn't hiring it
11   for all the branches?
12 A.  Did not appear so, no, ma'am.
13 Q.  Do you remember any specifics from any
14   of the other branches you toured?
15 A.  There was only one or two others. And
16   no, I don't.
17 Q.  Did you talk to anybody else that did
18   these tours about their impression of
19   the branches?
20 A.  No, I did not.
21 Q.  Who did you turn in the facility form
22   that you filled out?
23 A.  To my boss at the time, Cathy Hice, who

8 (Pages 26 to 29)

d88e44a4-1e0c-4347-aed6-b1358f7a7c9

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

| Page 30 |
| --- |

1  presumably turned them back over to
2  Mark.
3  Q. That's Mark Smith?
4  A. Yes, ma'am.
5  Q. When you went and helped give the
6    presentation to BB&T, the proposal from
7    EMCOR had already been sent to BB&T; is
8    that correct?
9  A. I assume so since we had been selected
10   as a finalist.
11 Q. Do you know how many finalists they
12   selected?
13 A. I do not.
14 Q. Were you involved in any way in the
15   drafting of EMCOR's proposal to BB&T?
16 A. No, ma'am.
17 Q. Do you know who was?
18 A. No, ma'am. I can say that Alan Cristal
19   as the business development manager
20   would have led that effort.
21 Q. After you gave the proposal, what was
22   the next thing that happened that you
23   were involved in relative to the BB&T

| Page 31 |
| --- |

1  project?
2  A. I actually received a phone call on my
3    personal cell -- or on my cell phone
4    from Ronny Eller wanting the phone
5    number for Bill Rogers, who was the
6    president of EFS, to discuss some
7    issues or concerns he had regarding the
8    proposal or the presentation. And I
9    was -- I passed that up to Mark Smith.
10 Q. Did Mr. Eller tell you what the things
11   he wanted to discuss were?
12 A. He did not.
13 Q. Do you know what came of the
14   conversation that Ronny Eller had with
15   EFS's president?
16 A. I do not.
17 Q. What was Ronny Eller's position?
18 A. I don't know his title. He was running
19   the effort for BB&T to implement this
20   program.
21 Q. What was Mark Smith's position in
22   EMCOR?
23 A. Again, I don't know the title. But he

| Page 32 |
| --- |

1  was basically -- had several account
2    managers, Cathy Hice being one of
3    those, reporting to him. He had three
4    or four accounts, I believe.
5  Q. All right. Tell me what your next
6    involvement was with the BB&T project
7    after that phone call.
8  A. At some point thereafter, we were
9    awarded the project and I started
10   attending conference calls regarding
11   start-up.
12 Q. Let me ask you this. What is your
13   practice, just in general, regarding
14   conference calls? Do you keep notes?
15   Do you do memos to file? I mean, is
16   there any kind of record that you keep
17   regarding calls you have?
18 A. No, not in general, not me personally.
19 Q. On this BB&T project, were you taking
20   any notes or were you doing any memos
21   to anybody regarding the calls you were
22   on?
23 A. If something came up, if I had been

| Page 33 |
| --- |

1  assigned a task or something to look
2    into, yes, I would have sent an E-mail
3    or something. I generally don't take a
4    lot of notes on calls like that.
5  Q. If you were going to communicate with,
6    let's say, your supervisor, would you
7    type up a formal memo or would you
8    shoot an E-mail?
9  A. E-mail.
10 Q. Would you be more likely to E-mail than
11   to call somebody like your supervisor?
12        MR. SAWYER: Object to the
13        form of the question.
14        You can answer.
15 A. It would depend on a number of
16   things -- was it an urgent matter, what
17   time of day. I often get up in the
18   middle of the night or whatever and
19   working and presume that they would
20   rather receive an E-mail or phone call.
21   But it really depended on the
22   situation.
23 Q. And the reason I ask is -- I'll give

9  (Pages 30 to 33)

d88e44a4-1e0c-4347-aed6-b1358f7a7c9

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 34

1  you an example of here. Where I work,
2  you almost never talk to anybody.
3  Everybody E-mails. So I didn't know
4  if, you know, the culture of EMCOR was
5  more of an E-mail or more of where
6  y'all get together and actually talk on
7  the phone or face-to-face.
8          MR. SAWYER: Object to the
9          form of the question.
10         You can answer if you
11         know.
12  A. And I don't -- I can't speak to the
13  culture of EMCOR. It's really the
14  culture of the account and how the
15  account manager blends his or her team
16  together.
17  Q. Do you know if EMCOR had ever done any
18  work for BB&T prior to this project?
19  A. I don't know.
20  Q. When you started to participate in
21  these calls regarding the start-up,
22  what sort of issues were y'all going
23  over in these calls?

Page 35

1  A. We spent a great deal of time going
2  over the accounting setup -- how the
3  bills would have to be produced, how we
4  would track costs, how we would be able
5  to electronically send invoices. There
6  was a number of very exciting
7  accounting-related phone calls.
8  Q. Was this a particular way of sending
9  invoices that BB&T had requested?
10  A. I don't recall if BB&T requested it or
11  we proposed it, but certainly
12  electronic submission moves things
13  along faster than paper.
14  Q. Who would have been the main EMCOR
15  person responsible for getting this
16  accounting set up in place?
17  A. I don't know the answer to that.
18  Q. Do you know who the main contact with
19  BB&T on transmittal of invoices was?
20  A. I don't. We ran a lot of the calls
21  through the -- through their facility
22  management and maintenance group, which
23  Ronny Eller worked in, and he would

Page 36

1  provide the people necessary to address
2  whatever the issue was at the time.
3  Q. Were y'all outsourcing any of this
4  electronic accounting or invoicing
5  work?
6  A. No, ma'am.
7  Q. What other issues were you going over
8  in these conference calls during the
9  start-up time?
10  A. There was a great deal of talk
11  regarding -- and not just talk, E-mails
12  back and forth -- regarding the
13  janitorial start-up. And BB&T had the
14  opportunity to submit to us, EMCOR,
15  which we passed along to PFMI, any
16  vendors that they wanted to recommend.
17         MR. SAWYER: Off the record.
18         (Off-the-record discussion)
19         (Brief recess)
20         MS. TULEY: All right. Back
21         on the record.
22  Q. (By Ms. Tuley) We were talking about
23  calls and E-mails and start-up time

Page 37

1  regarding janitorial. And
2  specifically, I think we had just
3  talked about BB&T submitting vendors
4  they wanted to be considered.
5  A. Yes, ma'am.
6  Q. What was the agreement as to what would
7  be done with their proposed vendors?
8  A. I don't have any knowledge of a
9  specific agreement except that we would
10  consider or look at vendors where they
11  were in need. And in this case, I say
12  "we." Whatever PFMI's needs were.
13  Q. SO the process would be -- and just
14  correct me if I'm paraphrasing this
15  wrong -- BB&T would have some vendors
16  that they wanted considered. They
17  would transmit that list to you as
18  EMCOR, and then EMCOR would transmit
19  that to PFMI?
20  A. That's correct.
21  Q. What was the understanding between
22  EMCOR and PFMI of what EMCOR wanted
23  PFMI to do with that list?

10 (Pages 34 to 37)

d88e44a4-1e0c-4347-aed6-b1358f7a7c9

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 38

1    MR. SAWYER: Object to the
2       form of the question.
3       You can answer.
4  A. We were providing just as a basis of
5     information. If they needed a vendor
6     in a spot, here's one that they should
7     consider.
8  Q. Was PFMI required to interview all of
9     the suggested vendors from BB&T?
10      MR. SAWYER: By EMCOR?
11      MS. TULEY: Yes.
12 A. Required by EMCOR to interview --
13 Q. To interview all of those suggested
14    vendors.
15 A. I don't believe so, no, ma'am.
16 Q. And to back up just a little bit, were
17    you involved in the selection of PFMI
18    to be the janitorial vendor?
19 A. No, ma'am.
20 Q. Do you know who was involved with that?
21 A. Alan Cristal led the entire effort.
22 Q. And I probably already know the answer
23    to this. Did you look -- did you see

Page 39

1     any of the proposals or bids from
2     janitorial services for the BB&T
3     contract?
4  A. No, ma'am.
5  Q. Did anybody tell you why PFMI was
6     selected?
7  A. No, ma'am. The first -- in fact, the
8     only thing I recall is Alan Cristal
9     saying we have selected PFMI.
10 Q. Okay. Do you know who any of the other
11    janitorial companies were that
12    submitted proposals?
13 A. No, ma'am.
14 Q. I take it from these calls and E-mails
15    regarding potential vendors that you
16    were aware that PFMI would use vendors
17    or subcontractors to do a good bit of
18    this janitorial work; is that correct?
19      MR. SAWYER: Object to the
20        form of the question.
21        You can answer if you
22        know.
23 A. I believe I understood that they would

Page 40

1     be subcontracting out that work, yes,
2     ma'am.
3  Q. And let me ask it maybe a better way.
4     Was it your understanding in the
5     start-up process that PFMI would be
6     self-performing all the cleaning
7     duties?
8  A. In the presentation, it was presented
9     that they would self-perform a majority
10    of that work. Yes, ma'am.
11 Q. And by "self-perform," it was your
12    understanding or was it your
13    understanding that PFMI would actually
14    have PFMI people doing the cleaning?
15 A. That's my understanding of
16    self-perform.
17 Q. I'm not a janitorial person, so I like
18    to be clear. But you were aware that
19    they would use vendors or
20    subcontractors for some of the
21    cleaning?
22 A. At the point I was assigned to the
23    contract, yes.

Page 41

1  Q. During this time, once you were
2     assigned to the contract, were there
3     discussions regarding the amount of
4     square footage to be cleaned?
5  A. In what manner?
6  Q. As far as my understanding -- well, let
7     me strike that.
8       Do you know how EMCOR was to be
9     paid under the contract with BB&T?
10 A. I didn't have anything to do with how
11    that deal was struck, if you will.
12    However, regarding square footage, it
13    was on gross square footage at the
14    beginning through the first ninety days
15    of the contract.
16 Q. And was that how EMCOR was to be paid
17    by BB&T?
18 A. I believe that that is correct.
19 Q. And would that just be for the
20    janitorial work or would that be for
21    the entire contract?
22 A. Janitorial was all we were doing at the
23    beginning of the contract.

11 (Pages 38 to 41)

d88e44a4-1e0c-4347-aed6-b1358f7a7c9

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 42

1   Q. At some point, did landscaping and the
2       mechanical feed into the contract to
3       start being performed?
4   A. It was phased work and yes, that was
5       phase two of the contract.
6   Q. So phase one would have been
7       implementing janitorial?
8   A. That's correct.
9   Q. And what was the time line for that
10      implementation of the janitorial work?
11  A. That all 1400 locations would start up
12      during the -- and I apologize here.
13      Memorial Day weekend at the beginning
14      of the summer, in September? Excuse
15      me. Is it Labor Day?
16  Q. Labor Day at the end of --
17  A. Labor Day at the end of summer,
18      beginning of September.
19  Q. And then at what point was it
20      contemplated that there be full
21      implementation of the janitorial?
22  A. Full implementation was that weekend.
23  Q. That was a bad question. Was there a

Page 43

1       transition period for all of the
2       janitorial not to just be in place but
3       to be fully performing?
4           MR. SAWYER: Object to the
5           form of the question.
6           You can answer.
7   A. Yes. There was a -- in conjunction
8       with Keith Blackburn, who was my
9       representative with PFMI, the account
10      manager, if you will, we developed a
11      ninety-day implementation plan.
12  Q. All right. Tell me what was supposed
13      to happen during those ninety days.
14  A. The first thirty days were getting the
15      branches covered, you know, performing
16      in the branches, completing training.
17      I really don't recall the sixty-day.
18      And I believe inspections were at the
19      ninety-day mark.
20  Q. Who would be conducting the
21      inspections?
22  A. PFMI.
23  Q. Would that be some type of written

Page 44

1       inspection form?
2   A. Yes, ma'am.
3   Q. During those ninety days, how was EMCOR
4       paying PFMI? On what basis was EMCOR
5       paying PFMI?
6   A. PFMI would submit an invoice to EMCOR.
7       EMCOR would submit it to BB&T. BB&T
8       would pay us, and then we would turn
9       around and pay PFMI.
10  Q. Was the invoice submitted by PFMI to
11      EMCOR based on a particular rate per
12      square foot?
13  A. Yes. There were -- depending on the
14      location.
15  Q. So some locations had a different rate
16      than others?
17  A. That's correct.
18  Q. But all of it would have been whatever
19      that rate is times the square foot in
20      that facility?
21  A. Yes.
22  Q. Originally, when this project started,
23      Labor Day weekend, what was the total

Page 45

1       square footage of the contract?
2           MR. SAWYER: Object to the
3           form of the question.
4           You can answer.
5   A. I believe it was somewhere around six
6       and a half million.
7   Q. Was there some type of listing that
8       showed what the location was and what
9       the square footage for that location
10      was?
11  A. Yes.
12  Q. What was that document called?
13  A. I would call it a master locations
14      list.
15  Q. Do you know where that -- we'll call it
16      the master locations list. Where did
17      that document come from?
18  A. BB&T.
19  Q. Do you know how they created that
20      document? And I don't mean, like, what
21      computer formula. But where did they
22      get the information to create that
23      document?

12 (Pages 42 to 45)

d88e44a4-1e0c-4347-aed6-b1358f7a7c9

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

---

Page 46

1  A. I do not know.
2  Q. Do you know who created that document?
3  A. I do not.
4  Q. Who at EMCOR would know, would be the
5     most knowledgeable about that master
6     location list?
7  A. I would have to say Alan Cristal.
8  Q. What was your understanding there at
9     the beginning of the project of what --
10    of the accuracy of those square-footage
11    numbers?
12        MR. SAWYER: Object to the
13            foundation and form.
14            You can answer.
15 A. Would you re-ask the question, please?
16 Q. Sure. There at the beginning of the
17    project, what was your understanding of
18    accuracy of those square-footage
19    numbers?
20        MR. SAWYER: Same
21            objections.
22 A. I don't know that I had an
23    understanding about the accuracy of the

---

Page 47

1     numbers, the gross numbers that were
2     provided. They were not comfortable --
3     they being BB&T -- were not comfortable
4     with their net numbers but . . .
5  Q. And tell me how you -- well, strike
6     that part.
7         When you say "gross" versus
8     "net," explain that to me.
9  A. My understanding, gross is total space.
10    Net would be the amount of what I might
11    term net cleanable space in this
12    instance. Would be any rooms --
13    closets, mechanical rooms, storage
14    rooms -- that are not cleaned, would be
15    deducted.
16 Q. What is the standard way in which net
17    cleanable square footage is measured?
18 A. Well, again, you take the total space,
19    measure the room, and then deduct out
20    any -- any space that's not cleaned.
21    In other words, if you have a
22    twelve-by-twelve room, which is 144
23    square feet, and there's a ten-by-three

---

Page 48

1     closet in there that is not cleaned,
2     that's 30 square feet that would be
3     deducted from that space to be cleaned.
4  Q. All right. Let me ask you this. If
5     you have, like, an entire building,
6     like an entire branch bank, would you,
7     to figure out the gross, just take the
8     front by the side and measure the front
9     by the side and then multiply that to
10    come up with your gross space?
11 A. You actually have to measure the entire
12    building, because you have to take into
13    account odd angles and things like
14    that.
15 Q. Do that on the exterior?
16 A. Exterior and then go inside and measure
17    the space to be deducted.
18 Q. Was there any type of document that
19    stated what space was to be deducted
20    from the gross square footage?
21 A. From whom?
22 Q. Let me ask it a better way. I think
23    what you had told me a minute ago --

---

Page 49

1     and I'm paraphrasing, so correct me if
2     I'm wrong -- was that BB&T was not
3     completely comfortable with what you
4     called the net square footage; is that
5     fair?
6  A. Yes.
7  Q. What gave you that idea that BB&T
8     wasn't comfortable with that number?
9  A. The fact that they had asked EMCOR to
10    make sure that the janitorial service
11    provider would within the first ninety
12    days of the contract go and measure the
13    space to provide the net cleanable
14    numbers, which would then become the
15    billing numbers.
16 Q. Did BB&T provide any guidance, either
17    written or verbal, as to what they
18    wanted deducted from the gross
19    cleanable square footage?
20 A. Not to my recollection, no.
21 Q. Did EMCOR provide PFMI, either written
22    or verbal, any instructions as to what
23    EMCOR expected PFMI to deduct from the

---

13  (Pages 46 to 49)

d88e44a4-1e0c-4347-aed6-b1358f7a7c9

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 50

1  gross square footage to come up with a
2  net?
3  A. Not that I recall.
4  Q. Was EMCOR going to do any of its own
5     square-footage measurements to compare
6     those to measurements done by PFMI?
7  A. It was not planned, no.
8  Q. Did that in fact happen?
9  A. Yes.
10 Q. Tell me why.
11 A. When the numbers were submitted to
12    us -- and I believe that was in mid
13    December -- the bulk of the numbers
14    submitted were exactly the same as the
15    gross square-footage numbers and in a
16    few cases, higher.
17 Q. Who did the analysis to compare PFMI's
18    numbers to the original numbers
19    submitted by BB&T?
20 A. I did. It was presented on the
21    spreadsheet that -- on the master
22    location list, actually. They just
23    took and added a column for net

Page 51

1  cleanable or populated a column for net
2  cleanable.
3  Q. Were the numbers on the master location
4     list from BB&T, were they all gross
5     square footage or were some of them
6     gross, some of them net?
7     MR. SAWYER: You can answer
8     to the best of your
9     recollection.
10 A. I recall the gross square number being on
11    there. There was also a column for
12    vacant space and adjusted.
13 Q. And adjusted?
14 A. Yes, ma'am.
15 Q. And by vacant space, would that be,
16    like, empty offices?
17 A. Typically, it was half, like, a floor
18    or half a floor. But it could include
19    empty offices, offices that were not
20    being used.
21 Q. And when you said -- and you just told
22    me that sometime in mid December, PFMI
23    submitted their measurements. And you

Page 52

1  said they were the same as the gross
2  square footage or the adjustable square
3  footage?
4     MR. SAWYER: Object to the
5     extent it misstates
6     prior testimony. You
7     can answer.
8  A. The -- I believe what I said was the
9     numbers were coming in -- the net
10    cleanable numbers presented were coming
11    in the same as the gross numbers.
12 Q. Did that concern you?
13 A. Yes.
14 Q. Tell me why.
15 A. It concerned me because it is highly
16    unlikely that there would not be some
17    reduction in square footage. And to
18    me, it was fairly obvious that either
19    the exercise wasn't completed or wasn't
20    completed accurately. And since that
21    was the basis for billing going
22    forward, that was a major concern.
23 Q. Did you or EMCOR have a percentage in

Page 53

1  mind that the -- that would have been
2  the difference between what was the
3  gross and what would eventually be the
4  net?
5  A. I don't -- I can't speak for EMCOR. I
6     really wasn't sure, not having dealt
7     with branch locations before, what that
8     percentage would have been.
9  Q. Did you ever see anything, either an
10    E-mail or memo or some document, that
11    said something to the effect of we
12    think there will be a 5 percent, 10
13    percent, 15 percent difference or any
14    number?
15 A. That's certainly possible. Not that I
16    recall.
17 Q. You don't recall any specific number
18    that -- the difference that was
19    expected?
20 A. Not that I recall, no, ma'am.
21 Q. In your mind, did you have a number
22    that you thought would have been likely
23    a reasonable difference?

14 (Pages 50 to 53)

d88e44a4-1e0c-4347-aed6-b1358f7a7c9

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 54

1   A. Well, again, I wasn't sure regarding
2      the branch locations. However, if I
3      were to put forward a guess, it would
4      be, you know, 10 or 15 percent. And it
5      varies by location.
6   Q. Did you ever see anything from BB&T or
7      were you ever involved in any of the
8      discussions with anyone at BB&T where
9      BB&T had in mind what they thought the
10     difference between gross and net
11     have been or should have been?
12  A. There were many discussions, and I
13     don't recall what the content of those
14     discussions were.
15  Q. You don't recall anybody from BB&T
16     saying, We think it should be an X
17     percent difference?
18  A. Again, with all the conversations we
19     had, I just don't remember.
20  Q. Once you got those numbers from PFMI
21     and you had concerns because they were
22     substantially the same or similar to
23     the gross numbers, what did you do?

Page 55

1   A. I went to Ronny Eller and Edna Green,
2      who was new or fairly new to the team
3      at that point, and we discussed it and
4      had a conference call in Ronny's office
5      with Mr. Wohlers.
6   Q. All right. Tell me about that call.
7   A. It was really just to express the
8      concern over how the numbers were
9      coming in and why they came in the way
10     they did.
11  Q. And who was sort of the main person
12     having the discussion? Was it you or
13     was it Mr. Eller?
14  A. It was probably both of us.
15  Q. All right. What was the response you
16     got?
17  A. I believe in that call, we came up with
18     basically a couple of options: One,
19     BB&T could go out and measure the space
20     and pay for it; or, two, that we would
21     have our mobile technicians measure the
22     space once they came on board.
23  Q. And this would have been -- this would

Page 56

1      have been in the mid-December time
2      frame when this call happened?
3   A. Yes, ma'am.
4   Q. Did EMCOR continue to pay BB&T off the
5      gross numbers -- gross square-footage
6      numbers?
7   A. EMCOR didn't pay BB&T.
8   Q. I'm sorry. Did EMCOR continue to pay
9      PFMI off the gross square-footage
10     numbers?
11  A. Yes, ma'am, I believe that happened.
12  Q. In any of the discussions you had up
13     through mid December of -- that would
14     have been '05?
15  A. Yes, ma'am.
16  Q. -- was there any talk about what would
17     happen once the final net cleanable
18     square-footage numbers came in as far
19     as adjustments for over- or
20     underbilling?
21  A. Yes, ma'am. We were going to what I
22     would call "true up" the numbers in the
23     billing back to November 1st.

Page 57

1   Q. Was this outlined in any agreement
2      between EMCOR and PFMI?
3   A. There were E-mails talking about the
4      square -- the measurement process and
5      that there would be a true-up. We did
6      have a letter from PFMI stating their
7      understanding that the true-up would go
8      back to November 1.
9   Q. And do you know if PFMI on either the
10     December or January -- December '05 or
11     January '06 bill gave a credit back to
12     EMCOR?
13  A. Specifically for what?
14  Q. As an adjustment for what everybody
15     kind of anticipated would be -- let's
16     just strike that. Let's do a better
17     job of this.
18        Do you know if PFMI gave a
19     credit to EMCOR on either the December
20     '05 or January '06 bill for any
21     differences in square footage?
22  A. There were a lot of credits going back
23     and forth, missed services, things of

15 (Pages 54 to 57)

d88e44a4-1e0c-4347-aed6-b1358f7a7c9

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 58

1  that nature. I have a vague
2  recollection, but I couldn't speak to
3  it. A year and half ago, that's . . .
4  Q. In any of the discussions that you had
5     with BB&T or with anybody at EMCOR, did
6     you ever -- were you ever informed that
7     there was a certain either ceiling or
8     floor amount that BB&T wanted to pay
9     for janitorial services?
10 A. I don't know where I heard it or where
11    it was documented. But I believe the
12    average they wanted to keep in the
13    dollar thirty range, I believe.
14 Q. That would have been a dollar thirty
15    per square foot?
16 A. Per square foot, which is per year.
17 Q. Did you hear, in any of your
18    conversations or in E-mails or
19    anything, what their total budget would
20    have been for a year for janitorial?
21    And by "they," I mean BB&T.
22 A. I don't believe so, no, ma'am. Not
23    that I recall, anyway.

Page 59

1  Q. In any discussions with BB&T or anybody
2     at EMCOR, did you ever hear any
3     discussions where part of the -- where
4     it was discussed if part of the reason
5     that BB&T wanted this project was to
6     reduce facility costs?
7  A. I believe that was one of their stated
8     goals, yes, ma'am.
9  Q. And was that something that was in a
10    document that you saw or was that from
11    discussions?
12 A. I'm going to say it was more
13    discussions.
14 Q. Did anybody tell you or did you ever
15    see a document that showed what their
16    facilities costs were prior to the
17    beginning of this contract?
18 A. Not that I recall, no, ma'am.
19 Q. All right. Tell me, after that
20    conference call with you, Ronny, Edna,
21    and Jim, what was the next step that
22    EMCOR took regarding the square-footage
23    issue?

Page 60

1  A. We didn't do anything else until our
2     mobile techs were hired, which began in
3     mid February of '06.
4  Q. I'm sorry. You said mid January?
5  A. February.
6  Q. Mid February?
7  A. Yes, ma'am.
8  Q. Were these mobile techs EMCOR
9     employees?
10 A. Yes, ma'am.
11 Q. What were the -- we'll skip the square-
12    footage situation for now. What were
13    the mobile techs' duties and
14    responsibilities?
15 A. We would visit the branches at least
16    once a month and perform what we call
17    PM, or preventive maintenance, duties.
18    For instance, on an air conditioner,
19    check the belts, replace the filters if
20    we needed to. Any plumbing, if a
21    toilet was leaking or the flush valve
22    was leaking, we would repair those.
23    Basic light -- lighting ballasts

Page 61

1     repair; if the lights were out and it
2     wasn't the bulb, we would replace the
3     ballast. Any number of general duties
4     that would be created by a work order
5     that the client submitted -- hang a
6     board, hang a banner. Branches often
7     have these big advertising banners that
8     they want hung, that kind of thing.
9  Q. Okay. Based on our earlier
10    conversation, at some point these
11    mobile techs were enlisted to do
12    measurements of the BB&T branches; is
13    that correct?
14 A. Yes, ma'am.
15 Q. What instructions were given to these
16    mobile techs as to how to do the
17    measurements?
18 A. We gave them -- I recall one E-mail
19    where I said, This may seem simple, but
20    you take the measurements of the room
21    that is not to be cleaned and deduct it
22    from the gross square-footage number.
23 Q. Were they responsible for taking the

16  (Pages 58 to 61)

d88e44a4-1e0c-4347-aed6-b1358f7a7c9

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 62

1  gross square-footage measurements or
2  were they just going to -- were they
3  going to use what had been provided by
4  BB&T as the gross?
5  A. Initially we were using what was
6  provided by BB&T.
7  Q. How were the techs to determine what
8  was unused space?
9  A. If -- if there was a vacant floor, for
10  instance, that would have been noted.
11  A janitorial closet or storage closet
12  or electrical room or a small
13  mechanical room is typically what would
14  have been deducted out of those
15  numbers.
16  Q. Were those instructions included in the
17  E-mail as to how to -- what to deduct?
18  A. I don't recall.
19  Q. Who was the supervisor of the mobile
20  techs?
21  A. I had seven regional managers.
22  Q. Were the mobile techs ultimately under
23  your supervision as the BB&T project

Page 63

1  person?
2  A. Yes.
3  Q. And then you would have seven regional
4  managers, and the mobile techs in that
5  region would answer to that manager?
6  A. That's correct.
7  Q. Then that manager would pass things up
8  the chain to you next?
9  A. Yes, ma'am.
10  Q. And I think somewhere in all this I've
11  got an organizational chart we can go
12  over later.
13      Did the mobile techs measure all
14  of the branches?
15  A. No, ma'am.
16  Q. How was it determined which branches
17  the mobile techs would go measure?
18  A. First of all, we measured anything that
19  was over 10,000 square feet. And there
20  was a sampling of branches that fit
21  into a five-to-10,000-square-foot
22  category and then an under-5,000-
23  square-foot category.

Page 64

1  Q. Do you have an estimate of how many
2  branches the mobile techs measured?
3  A. Several hundred. But I don't.
4  Q. Do you know if the mobile techs
5  measured any of the locations more than
6  once?
7  A. I believe there were several
8  remeasurements. But in a
9  remeasurement, we assigned that to my
10  regional manager.
11  Q. What would be the purpose of a
12  remeasure?
13  A. For instance, to verify whether the
14  numbers were accurate, was something
15  left off, was something not accounted
16  for. I recall one instance where there
17  was a room not being used, and this was
18  in Crystal City. We didn't count that.
19  But it was under lease and so the
20  number provided BB&T, which may have
21  come from the lease, as a gross number
22  included that room; but it was not
23  measured because we didn't know about

Page 65

1  it.
2  Q. And I believe you said your regional
3  managers would have done the remeasure?
4  A. The remeasure, with a BB&T
5  representative.
6  Q. Would the BB&T representative have been
7  somebody from that branch or would it
8  have been somebody further up the
9  chain?
10  A. I believe the instructions were that it
11  had to be someone from their facility
12  department if they were available.
13  Q. Tell me who your seven regional
14  managers are.
15  A. Michael Crouse, C-R-O-U-S-E; Rebecca
16  Walraven; Timothy Carlisle,
17  C-A-R-L-I-S-L-E; Don Winterton. Don
18  was replaced by Steven Buckhalter later
19  in the program. But he was a regional
20  manager. Jim Maxey.
21      MR. SAWYER: M-A-X?
22      THE WITNESS: E-Y.
23  A. Robert Goodwin; Donald Boyd, B-O-Y-D.

17  (Pages 62 to 65)

d88e44a4-1e0c-4347-aed6-b1358f7a7c9

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

| Page 66 | Page 68 |
|---|---|
| 1    Is that everybody? | 1    Goodwin initially. I can't think of |
| 2 Q. Yeah, that's seven. | 2    his name. Paul Wilbur interviewed |
| 3 A. Okay. | 3    Donald Boyd for me. |
| 4 Q. Were any of these seven regional | 4 Q. Were you looking for any type of |
| 5    managers hired specifically for this | 5    specific experience in the folks you |
| 6    BB&T project? | 6    hired? |
| 7 A. They were all hired specifically for | 7 A. Prior supervision responsibilities of |
| 8    the BB&T project, specifically for | 8    maintenance people, understanding of |
| 9    mobile maintenance. | 9    basic maintenance-type operations. |
| 10 Q. And this question may be redundant. | 10 Q. On a day-to-day basis, would those |
| 11    But none of those seven you listed had | 11    seven regional managers be involved in |
| 12    been existing EMCOR employees; is that | 12    the janitorial aspect of the contract? |
| 13    correct? Let me ask it this way. | 13 A. That was not the intent, no. |
| 14    Before the BB&T contract, were any of | 14 Q. Do you know if any of those seven |
| 15    those seven people you just listed | 15    regional people had any experience in |
| 16    EMCOR employees? | 16    measuring or calculating cleanable |
| 17 A. Not at the time they came over. But | 17    square footage? |
| 18    Donald Boyd, who was working for BB&T | 18 A. I don't know. |
| 19    at the time, had been an EMCOR employee | 19 Q. What were the results of the mobile |
| 20    through one of EMCOR's companies, Viox. | 20    techs' square-footage measurements? |
| 21 Q. And so everyone else would have been -- | 21 A. There was a significant reduction in |
| 22    the other six would have been hired for | 22    square footage on the over-10,000- |
| 23    the BB&T project? | 23    square-foot buildings, close to 30 |

| Page 67 | Page 69 |
|---|---|
| 1 A. From the outside? | 1    percent. And I don't recall the exact |
| 2 Q. Yes. | 2    numbers on the other two categories. |
| 3 A. Yes. Michael Crouse is another one who | 3    Those large buildings represented |
| 4    I don't know if there was -- he had | 4    approximately a third of the total |
| 5    been an EMCOR employee on another | 5    square footage. |
| 6    account, but I don't know if there was | 6 Q. Did it surprise you that the difference |
| 7    a gap in his employment. I don't | 7    was so large between the gross and the |
| 8    recall if there had been a gap in his | 8    cleanable in those large buildings? |
| 9    employment or not. | 9 A. Probably less in the large buildings. |
| 10 Q. Do you know who hired these folks? | 10    I was surprised that there was a |
| 11 A. I did. | 11    difference, but I don't recall if those |
| 12 Q. And I think you said they were hired | 12    were because of vacant space or just |
| 13    for the mobile techs -- | 13    the way a particular building had been |
| 14 A. They were hired -- | 14    designed, maybe with a lot of closets |
| 15 Q. -- to be supervisors of the mobile | 15    or storage spaces, which would affect |
| 16    techs? | 16    your cleanable. |
| 17 A. That is correct. | 17 Q. What was the overall percentage of |
| 18 Q. What process did you go through to hire | 18    square-footage reduction based on the |
| 19    these people? | 19    mobile techs' measurements? |
| 20 A. Ads were placed, resumés were viewed. | 20 A. Again, I don't recall what the other |
| 21    I used other EMCOR people to help me | 21    two came in at, so I don't really |
| 22    get to -- if there was a finalist. For | 22    recall what that percentage was or the |
| 23    instance, Mark Smith interviewed Bob | 23    square footage reduction was. |

18 (Pages 66 to 69)

d88e44a4-1e0c-4347-aed6-b1358f7a7c9

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 70

1  Q. Did you feel more comfortable with the
2     mobile techs' measurements than you did
3     with PFMI's measurements?
4  A. Yes.
5  Q. Tell me why.
6  A. One, it was -- I was confident that the
7     buildings that they were sent to
8     measure had been measured, and they
9     didn't come back with an exact same
10    number as was presented when PFMI
11    submitted their numbers from -- as a
12    net cleanable to the gross.
13         MR. SAWYER: You finished?
14         THE WITNESS: Yes.
15 Q. Did you talk with any of the mobile
16    techs about the measurements they had
17    done?
18 A. I don't recall talking to the mobile
19    techs. I would have communicated
20    through the regional managers.
21 Q. How did the mobile techs report the
22    numbers that they were measuring back
23    up to you?

Page 71

1  A. I believe it was either on the list
2     that identified the property ID --
3     there was a number assigned to identify
4     this property from another -- and the
5     square footage, the net cleanable
6     square footage.
7  Q. Would it have been --
8  A. And that list --
9  Q. Go ahead. Finish up.
10 A. That list would have been compiled by
11    my administrative assistant.
12 Q. Did the mobile techs have some form
13    they filled out?
14 A. There was a form, yes. And I believe
15    it was so they could go from floor to
16    floor or make notes.
17 Q. And just so I can kind of get the
18    process straight, would they have taken
19    this form, each branch would have had a
20    form filled out, then those forms would
21    have been submitted to the regional
22    manager?
23 A. Yes.

Page 72

1  Q. Then would the regional manager compile
2     that or would she just send the form
3     straight to your assistant?
4  A. They did it both ways.
5  Q. But at some point, all of that data was
6     compiled by your assistant into a
7     spreadsheet format?
8  A. Back onto that master location list,
9     yes.
10 Q. So there would have been just another
11    column?
12 A. Another column. Remeasured, I believe,
13    was the title of that column but . . .
14 Q. As this remeasure project was going on,
15    were you or was anybody else in EMCOR
16    reporting the results back to BB&T?
17 A. Yes.
18 Q. Who would you have been reporting those
19    results back to?
20 A. At that time, Edna Green, I believe.
21 Q. What was Edna's position?
22 A. I don't know her title, but she became
23    the liaison.

Page 73

1  Q. The liaison between EMCOR and BB&T?
2  A. Between myself and BB&T. We worked in
3     the same office.
4  Q. Were you in a BB&T office building at
5     that time?
6  A. Yes.
7  Q. Who else -- what other EMCOR employees
8     were located in that BB&T building?
9  A. My assistant, Lynn Wilson, and two
10    accounting people. There was also a
11    space for my regional manager, Tim
12    Carlisle, because he had the -- that
13    was the central point for the region
14    that he was responsible for. He wasn't
15    always there, but there was a desk
16    there for him.
17 Q. I'm going to go back through this list
18    of your seven regional managers and
19    just ask you the same question for all
20    of them, if they are still an EMCOR
21    employee. And so I'll just list them
22    out for you. Robert Goodwin?
23 A. Yes.

19 (Pages 70 to 73)

d88e44a4-1e0c-4347-aed6-b1358f7a7c9

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 74

1  Q. Donald Boyd?
2  A. Yes.
3  Q. Michael Crouse?
4  A. I don't know. I lost touch with
5     Michael.
6  Q. Rebecca Walraven?
7  A. No.
8  Q. Timothy Carlisle?
9  A. No. No.
10 Q. Steven Buckhalter?
11 A. No.
12 Q. Jim Maxey?
13 A. No.
14 Q. Do you know if Edna Green is still at
15    BB&T?
16 A. Last I heard, she was.
17 Q. Is Lynn Wilson still with EMCOR?
18 A. No.
19 Q. When you reported back the final mobile
20    tech measurements to Edna Green, did
21    she take any action as far as billing
22    credits or asking for an adjustment
23    from PFMI?

Page 75

1  A. I believe that was -- yes, to answer
2     that.
3  Q. How far back was BB&T wanting to go
4     with that adjustment? And by "back," I
5     mean in time.
6  A. November 1st of 2005.
7  Q. Do you know who calculated that
8     adjustment?
9  A. I believe it was the person on Edna's
10    team, Hai, H-A-I, Falor, F-A-L-O-R.
11 Q. And that would have been a BB&T person?
12 A. Yes.
13 Q. Do you know what the calculation, what
14    that came out to be of the adjustment
15    that BB&T wanted?
16 A. In total dollars?
17 Q. Yes.
18 A. I don't recall, no.
19 Q. Were you involved in any of the
20    discussions with PFMI about that
21    adjustment?
22 A. I'm sure I was.
23 Q. Tell me what your recollection of those

Page 76

1     discussions was.
2  A. The adjustment would have been based on
3     the total billed for in-scope services
4     on the net cleanable square-foot space,
5     going back to November 1st. During
6     that period of time -- and I don't
7     recall if it was as the measurements
8     were being completed or right after
9     they had been completed but as the data
10    was coming in -- Edna Green, on behalf
11    of BB&T, instructed a 20-percent
12    reduction in service dollars of PFMI's
13    invoice.
14 Q. Would that have been, whatever month
15    this was, that when PFMI sent that
16    month's bill, it would have been -- 20
17    percent would have been subtracted and
18    so 80 percent of that would have been
19    remitted back to PFMI?
20         MR. SAWYER: Object to the
21         form. You can answer.
22 A. Of in-scope services, yes, ma'am.
23 Q. And for how long was that to continue?

Page 77

1  A. Until the back payment, if you will, or
2     the overcharge, was settled.
3  Q. Do you know how many months that the 20
4     percent was actually deducted?
5  A. I believe it started in March, with the
6     first March bill. It may have been the
7     second March bill. But it started in
8     March and continued through the
9     termination of the agreement.
10 Q. Do you know what the total deduction
11    from March through the end of the
12    agreement worked out to be?
13 A. I do not.
14 Q. Who would know that?
15 A. It would be available through our
16    finance department at EMCOR.
17 Q. Was there a person in the finance
18    department who had responsibility for
19    the BB&T project?
20 A. Beth Goad, G-O-A-D, processed the
21    invoice, but simply that -- just
22    processed the invoice.
23 Q. In discussions you had with PFMI, what

20  (Pages 74 to 77)

d88e44a4-1e0c-4347-aed6-b1358f7a7c9

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 78

1  was their reaction to this deduction by
2  Edna Green?
3  A. They were very unhappy.
4  Q. Was there any discussion about there
5  being a disagreement between EMCOR and
6  PFMI as to what the actual cleanable
7  square footage was?
8  A. I don't specifically recall a
9  disagreement. I recall either an
10  E-mail or a conversation that Jim
11  Wohlers and I had about being concerned
12  about what the numbers were coming in
13  at.
14  Q. Would it have been your concern of what
15  their numbers were coming in at or
16  their concern --
17  A. Their concern.
18  Q. -- of what the -- okay. Their concern
19  of what the mobile techs' numbers were
20  coming in at?
21  A. Yes.
22  Q. Do you know if part of the agreement
23  between EMCOR and PFMI was that the

Page 79

1  final net cleanable square-footage
2  numbers were to be agreed upon?
3      MR. SAWYER: Could you read
4      the question back for
5      me?
6      (The court reporter read the
7      requested material.)
8      MR. SAWYER: No objection.
9  A. The agreement was that they could
10  challenge those numbers.
11  Q. Were they challenging those numbers?
12  A. I received one challenge, I believe.
13  Q. Would that have been to one location or
14  one challenge as to a number of
15  locations?
16  A. I believe the challenge was in the east
17  Tennessee region, and I don't recall if
18  it was one location or a number of
19  locations there.
20  Q. What was the process for a challenged
21  location?
22  A. Once challenged, that a BB&T
23  representative, a PFMI or one of their

Page 80

1  representatives, and an EMCOR
2  representative would go and remeasure
3  the space and agree at that point in
4  time.
5  Q. Do you know if that happened where a
6  representative from those three
7  companies got together and remeasured a
8  space?
9  A. I don't recall if it did or not, no,
10  ma'am.
11  Q. What concerns about the 20-percent
12  reduction did PFMI relate to you?
13  A. I believe their concerns were around
14  the agreements that they had with their
15  subcontractors and what they were to be
16  paid and that they weren't receiving
17  the payment that they thought they
18  would be getting. I can't, you know,
19  speak specifically to any one vendor or
20  subcontractor that they had, but that
21  was my impression of the overall
22  concern.
23  Q. Do you know if prior to the termination

Page 81

1  of PFMI there came a time when PFMI
2  submitted invoices that were not paid
3  at all?
4  A. I believe their June payment was
5  withheld in full, one of their
6  June invoices.
7  Q. Why was that withheld in full?
8  A. I believe it was to make up for -- and
9  the monies still owed BB&T for the
10  overcharge going back to November.
11  Q. Why would that one have been withheld
12  in full instead of a 20-percent
13  reduction?
14  A. I believe the contract was being
15  terminated at that point in time.
16  Q. And we're going to talk about this a
17  little later; but at some point, there
18  was what's been referred to as a new
19  contract between PFMI and EMCOR; is
20  that correct?
21  A. Yes, ma'am.
22  Q. Was the June payment part of the
23  original contract or the new contract?

21 (Pages 78 to 81)

d88e44a4-1e0c-4347-aed6-b1358f7a7c9

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 82

1    A. I don't really recall, ma'am.
2            MR. SAWYER: Off the record.
3            (Off-the-record discussion)
4            (Lunch recess)
5            (Back on the record.)
6            (Mr. Wohlers not present.)
7    Q. (By Ms. Tuley) I want to back up just a
8        little bit, going back to the
9        measurement issue. You had said that
10       some of your managers, if there was a
11       remeasure that needed to be done, they
12       would go do it. Did you yourself go do
13       any measurements of the branches?
14   A. No.
15           MR. SAWYER: If I could
16               object to the extent it
17               misstates testimony.
18               You can answer. Go
19               ahead.
20   A. No.
21   Q. When you did those, like, in the early,
22       early stages when you did those, the
23       two words where you said, I think, you

Page 83

1        went to two or three or whatever the
2        number was you said, did you do any
3        measurements of square footage at that
4        time?
5    A. No, ma'am.
6    Q. And we had talked a little bit about
7        EMCOR's -- how they were paid by BB&T.
8        Did EMCOR receive a flat management fee
9        for this project?
10   A. The, quote/unquote, fee was based on
11       all of our costs to run the project.
12       For example, the staff -- myself, my
13       assistant, two accounting people -- the
14       FKC, which is facility knowledge
15       center -- that was the call center --
16       and other costs for the contract, that
17       total number divided by the square
18       footage gave us the ten-cent-a-square
19       foot fee, if you want to call it fee.
20   Q. It would be the ten-cent-a-square-foot
21       management payment?
22   A. Yes, ma'am.
23   Q. Did that change when the square-footage

Page 84

1        numbers were adjusted down?
2    A. It did not, because it, again, it was
3        based on our costs -- our costs to run
4        the project.
5    Q. Did it go -- did it go up from ten
6        cents?
7    A. I don't believe so, no, ma'am.
8    Q. Other than the amount that EMCOR would
9        be remitting to PFMI for janitorial,
10       what costs associated with the project
11       went down when the square-footage
12       number went down?
13   A. Well, again, I don't believe any of
14       those costs were adjusted either way,
15       up or down. It was based on the FKC
16       and the cost of us, our people.
17   Q. Let me ask you about the FKC. Tell me
18       what that is again.
19   A. Facilities knowledge center.
20   Q. What was that?
21   A. A call center where work orders would
22       be directed.
23   Q. Was that just for janitorial work

Page 85

1        orders?
2    A. No. It was for the entire project. It
3        started with janitorial.
4    Q. How was the cost of that call center
5        determined? And let me -- I'll
6        clarify. Was it on a per-call basis
7        that it was billed out, or was there
8        some kind of static charge for it being
9        in place?
10   A. A mixture, I guess. The -- there were
11       set-up charges. For instance, ten
12       dollars a location, I believe, was to
13       set up the location in their database.
14       And then it was an estimate of the
15       number of calls -- let me rephrase --
16       the number of work orders that were
17       generated. And each work order has a
18       cost. There was a cost to receive the
19       work order and then a cost to process
20       the work order. So that's how that
21       works.
22   Q. And the cost to receive the work order
23       would be the cost for the FKC to input

22  (Pages 82 to 85)

d88e44a4-1e0c-4347-aed6-b1358f7a7c9

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

|  | Page 86 |
|---|---|
| 1 | the data on the work order? |
| 2 | A. Work orders were created two ways |
| 3 | during this janitorial phase. The |
| 4 | client could call an 800 number that |
| 5 | was specifically for BB&T, or they |
| 6 | could go online using a what we termed |
| 7 | level-one interface where they could |
| 8 | key in a work order. |
| 9 | Q. Were there different costs associated |
| 10 | with those two different methods? |
| 11 | A. Yes. |
| 12 | Q. Explain that to me. |
| 13 | A. There is a cost to -- for the phone |
| 14 | call. It was a dollar fifty a minute. |
| 15 | And I believe the average was about |
| 16 | three minutes. There is no cost to |
| 17 | receive the work order on the |
| 18 | interface, the Web interface. |
| 19 | Q. Okay. And then you said there was the |
| 20 | cost of receiving the calls, and then I |
| 21 | believe you were saying that there was |
| 22 | a cost associated with actually |
| 23 | creating the work order or performing |

|  | Page 87 |
|---|---|
| 1 | the work order? |
| 2 | A. Dispersing the work order. In other |
| 3 | words, there was one cost to receive |
| 4 | it, one cost to process it. |
| 5 | Q. What was associated with processing the |
| 6 | work order? |
| 7 | A. The knowledge center customer rep would |
| 8 | input all of the data and then direct |
| 9 | it to whatever vendor which had been |
| 10 | preestablished in their dispatch |
| 11 | document. In other words, for each |
| 12 | location, if there was a janitorial |
| 13 | call, it would be directed to X vendor; |
| 14 | if it's a landscaping call, it goes to |
| 15 | another vendor. So we tell them this |
| 16 | is who it goes to. And all they're |
| 17 | doing is taking that data, that |
| 18 | information, from the caller, or off |
| 19 | the Web, assigning the vendor, and |
| 20 | sending it out. It's an electronic |
| 21 | process. |
| 22 | Q. What was the cost associated with the |
| 23 | processing and dispersing of the work |

|  | Page 88 |
|---|---|
| 1 | order? |
| 2 | A. It's a lower cost than it takes to |
| 3 | create the work order. I don't recall |
| 4 | directly but . . . |
| 5 | Q. Besides the cost for the call or to |
| 6 | process the work order, were there any |
| 7 | other costs associated with the FKC? |
| 8 | A. Yes. There were licensing fees for |
| 9 | software use. For me to have access to |
| 10 | the data, I had to create a level of |
| 11 | access to let me look at work orders. |
| 12 | Whatever we determined that level of |
| 13 | access to be, there's a cost |
| 14 | associated, a monthly cost, associated |
| 15 | with that license. |
| 16 | Q. Do you know who all had access to, like |
| 17 | you are describing, to look at the work |
| 18 | orders on the FKC? |
| 19 | A. For the janitorial piece or in general? |
| 20 | Q. Why don't we start with in general. |
| 21 | A. Okay. BB&T had a license. I had one. |
| 22 | Lynn Wilson, who is my -- who was my |
| 23 | staff assistant, had one. Our |

|  | Page 89 |
|---|---|
| 1 | accounting people had one. PFMI had |
| 2 | one. All of my regional managers, once |
| 3 | they were hired, had one. And I can't |
| 4 | remember if U.S. Lawns, who was our |
| 5 | landscaping vendor, had one or not. In |
| 6 | addition, all of our mobile techs |
| 7 | carried handheld devices. That's how |
| 8 | they received their work orders. There |
| 9 | were licenses associated with those. |
| 10 | Q. Do you know who at BB&T was the person |
| 11 | that actually had the license? |
| 12 | A. Edna Green. |
| 13 | Q. And I know I've asked this earlier, but |
| 14 | lunch has sort of wiped out my brain a |
| 15 | little bit. Was Edna your main contact |
| 16 | at BB&T? |
| 17 | A. Starting in late October-November, yes. |
| 18 | Q. Of 2005? |
| 19 | A. Of '05, yes, ma'am. |
| 20 | Q. Who would have been your primary |
| 21 | contact prior to that? |
| 22 | A. Ronny Eller and Debra Willis. |
| 23 | Q. And again, I may have asked this; and |

23 (Pages 86 to 89)

d88e44a4-1e0c-4347-aed6-b1358f7a7c9

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

---

Page 90

1    if I did, your lawyer can object to me.
2    Do you know if Edna Green is still with
3    BB&T?
4  A. The last I heard, she was.
5  Q. I think I did ask that before. Do you
6    know if Ronny Eller is still with BB&T?
7  A. He is not.
8  Q. Do you know where he is?
9  A. Last I heard, he was with Novant Health
10    in Winston-Salem.
11  Q. Do you know if Debra Willis is still
12    with BB&T?
13  A. Last I heard, she was, yes.
14  Q. And while we're talking about the FKC,
15    was this something new to the BB&T
16    project or had EMCOR been associated
17    with other projects that had an FKC?
18  A. EMCOR is, or was at that time, part
19    owner of the FKC as a separate business
20    unit. So it is -- it was already a
21    business and an integral part of what
22    we can provide.
23  Q. In that proposal that we talked about,

---

Page 91

1    would the FKC have been part of that
2    proposal discussed in that?
3        MR. SAWYER: Objection.
4        Foundation. You can
5        answer.
6  A. The presentation?
7  Q. Yes. Sorry. The presentation.
8  A. The presentation, the gentleman I
9    mentioned, Mike Terry, heads up the
10    FKC. And so yes, he covered those --
11    that aspect of the services.
12  Q. Do you remember at the presentation who
13    made the presentation about the
14    janitorial services?
15  A. Greg Littlefield.
16  Q. Were the mobile techs something new to
17    the BB&T project or was that something
18    that EMCOR already had in place on
19    other projects?
20  A. The technicians that were hired were
21    new to BB&T. Mobile services is
22    provided to other EMCOR accounts.
23  Q. And I'm not going to drag out all this

---

Page 92

1    stuff because there's mountains of
2    paperwork in this case. But I've
3    seen -- I represent to you that I've
4    seen in some documents something called
5    "a man in the van." Is that the same
6    as a mobile tech?
7  A. Same thing, yes, ma'am.
8  Q. I had that feeling.
9        MR. SAWYER: It conjures
10        various -- never mind.
11  Q. So if in documents somebody references
12    a man in the van, I can substitute
13    mobile tech and that would be the same
14    thing?
15  A. Same program, yes, ma'am.
16  Q. Thank you. Was anybody in particular
17    responsible for giving the part of the
18    presentation regarding the mobile
19    techs?
20  A. I'm sure it was assigned to someone. I
21    don't remember who did that part.
22  Q. Did you give any part of the
23    presentation?

---

Page 93

1  A. Yes. But I think it had to do with
2    general services, things that we had
3    done. It wasn't a large part of the
4    presentation so . . .
5  Q. Would it have been regarding services
6    y'all had done for other banks?
7  A. Really, I wish I could say I recall
8    that presentation, but I was very
9    nervous at the time; I was being
10    presented as a candidate for the
11    account manager's job. So I may have
12    talked about other financial
13    institutions that I had done business
14    with or worked for on the EMCOR account
15    or on the EMCOR team.
16  Q. And I probably have already asked you
17    this. Was becoming the account manager
18    for the BB&T account, was that a
19    promotion for you?
20  A. Yes.
21  Q. And I know we've discussed the ten-
22    cent-per-square-foot number. From
23    month to month, did EMCOR's management

24 (Pages 90 to 93)

d88e44a4-1e0c-4347-aed6-b1358f7a7c9

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 94

1  fee or management payment from BB&T
2  change? And by that, I mean, let's
3  just say in December, you would pay one
4  amount and then January was a different
5  amount, or was it more like equal
6  payments every month?
7  A. It was equal payments, and those
8  payments were actually every two weeks,
9  or twice a month, I should say.
10 Q. I want to go back to the transition
11 period, the initial transition period,
12 a little bit. And this is the danger
13 of not following your notes when you're
14 asking questions. Who was involved in
15 the transition from BB&T?
16      MR. SAWYER: I'm sorry,
17      Counsel. The initial
18      transition? Is it
19      the --
20 Q. That would have been the initial
21 transition where EMCOR started
22 performing under the BB&T contract and
23 the janitorial services as we discussed

Page 95

1  were going online. So it would have
2  been in that, I guess, that ninety-day
3  period that we talked about?
4  A. Yes, ma'am. Alan Cristal, Debi Crosby,
5  Mark Smith, Paul Wilbur, Steven King to
6  some extent, Kerri Collins, myself,
7  Lynn Wilson.
8  Q. And that -- okay. What BB&T personnel
9  were involved in the transition?
10 A. Ronny Eller, Debra Willis, Regina
11 Winning, Steven Paige. That's probably
12 it.
13 Q. Was there anybody in particular, like,
14 that was called a transition team?
15 A. Paul Wilbur was the transition manager.
16 Q. What information was disseminated to
17 the branches about this transition?
18      MR. SAWYER: Objection.
19      Foundation. You can
20      answer if you know.
21 A. I don't really know what was sent out
22 before we started. So what . . .
23 Q. Did EMCOR send anything to the branches

Page 96

1  regarding the transition?
2  A. Not the individual branches. We did
3  the transition letter that I mentioned
4  before the ninety-day transition plan
5  for janitorial. And that was
6  distributed through Ronny Eller's group
7  to the various AOOs, which is area
8  operations officer, and RBOMs. That's
9  R-B-O-M.
10 Q. What is that?
11 A. Regional banking operations manager is
12 what I believe it is. And then they
13 would disseminate down from there.
14 Q. Was the transition letter created by
15 EMCOR?
16 A. We had a part in it. Keith Blackburn
17 from PFMI sent me a draft, and we
18 tinkered with it a little bit,
19 corrected some spelling, expounded on
20 some things; and both our names were on
21 it.
22 Q. Besides the transition letter, were any
23 other documents of any sort regarding

Page 97

1  the transition sent either to the
2  branches or the AOOs or the RBOMs?
3  A. Not that I know of.
4  Q. Do you know if the scope of work was
5  sent to the branches or to the AOOs or
6  the RBOMs?
7  A. Prior to transition, I don't know.
8  Q. Do you know if during the transition
9  that was done?
10 A. I believe that it was in many of the
11 communications sent out by Ronny
12 Eller's group. Yes.
13 Q. Do you know if any other documents were
14 sent from Ronny Eller's group to the
15 branches regarding the transition
16 either pre or during that transition
17 time?
18 A. We prepared several E-mails, but I
19 don't know if they went to the branch
20 level or just to the AOOs.
21 Q. Who developed the scope of work for
22 this project?
23 A. For which service?

25 (Pages 94 to 97)

d88e44a4-1e0c-4347-aed6-b1358f7a7c9

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

| Page 98 | Page 100 |
|---|---|
| 1  Q. For the janitorial service.<br>2  A. BB&T developed the scope of work, is my<br>3     understanding.<br>4  Q. Prior to this project, do you know if<br>5     there was an overall scope of work for<br>6     all BB&T branches?<br>7  A. I have no idea.<br>8  Q. And just so I'm clear and the record is<br>9     clear, I'll ask it in just a little bit<br>10    of a different way. Prior to this<br>11    project, do you know if each branch was<br>12    responsible for setting the scope of<br>13    work they wanted in their branch as far<br>14    as janitorial services?<br>15 A. This morning I talked about depending<br>16    on who controlled those services, and I<br>17    think that's how it was set, if it was<br>18    set. Sometimes it was the FCM, the<br>19    financial center manager. Sometimes it<br>20    was the AOO for the RBOM. It just<br>21    depends on the area and the branch.<br>22    And I don't know a lot about banking.<br>23 Q. When you say a "financial center | 1     actually transcribed of any of those<br>2     transition meetings?<br>3  A. I believe so, yes. I don't know if<br>4     they were for all meetings, but<br>5     typically, yes.<br>6  Q. Were those meetings conducted on a<br>7     regular interval or . . .<br>8  A. I would say so, yes, ma'am.<br>9  Q. By that, I mean was it sort of a<br>10    standing every other Wednesday we're<br>11    going to have a conference call to see<br>12    how the transition's going, or was it<br>13    something less formal than that?<br>14 A. No. It was pretty set, if I remember<br>15    correctly.<br>16 Q. What do you recall about the frequency<br>17    of those?<br>18 A. I believe they were weekly.<br>19 Q. Were they conference calls or<br>20    face-to-face?<br>21 A. Conference calls.<br>22 Q. Besides yourself and Paul Wilbur, who<br>23    else would have been on those |

| Page 99 | Page 101 |
|---|---|
| 1     manager," would that be what people<br>2     typically would call, like, a branch<br>3     manager?<br>4  A. Yes, ma'am.<br>5  Q. Thank you. They've got a lot of<br>6     specific names.<br>7        During, I guess, pretransition<br>8     as you were getting ready to start the<br>9     transition into the janitorial and<br>10    during the transition, were there any<br>11    type of regular meetings conducted to<br>12    discuss the transition problems coming<br>13    up, that sort of thing?<br>14 A. Paul Wilbur as the transition manager<br>15    conducted a number of meetings, yes.<br>16 Q. Would you have been involved in most of<br>17    the transition meetings?<br>18 A. Yes, ma'am.<br>19 Q. Would you have taken any notes of those<br>20    meetings?<br>21 A. No. That was the job of the transition<br>22    manager.<br>23 Q. Do you know if any minutes were | 1     conference calls?<br>2  A. Most of the people I mentioned<br>3     before -- Debi Crosby, Alan Cristal,<br>4     Mark Smith, Lynn Wilson.<br>5  Q. Who for PFMI would have been involved<br>6     in those calls?<br>7  A. Keith Blackburn, Greg and Jim when they<br>8     were available and depending on the<br>9     topics that needed to be covered.<br>10 Q. Would an agenda be sent out prior to<br>11    these conference calls discussing what<br>12    was going to be covered in them?<br>13 A. I believe I recall that there was an<br>14    agenda; but in what order or what items<br>15    were discussed, I -- I don't recall.<br>16 Q. And I know that there would be a good<br>17    number of conference calls that took<br>18    place during this time period, so I'm<br>19    going to try to break it down a little<br>20    bit. I would like for you to just tell<br>21    me, to the best of your recollection,<br>22    what was going on in the transition<br>23    calls in those first thirty days. |

26 (Pages 98 to 101)

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 102

1   A. The first thirty days from contract
2      start-up or from janitorial start-up?
3   Q. I guess what I'm discussing is, we had
4      talked about there being a ninety-day
5      period with the janitorial and that it
6      was kind of broken down into thirty,
7      sixty, ninety. And so that's the
8      thirty I'm discussing.
9   A. We were still covering billing issues
10     as far as had all the accounts been set
11     up, is everything ready to go, did we
12     test the data stream between EMCOR and
13     BB&T, was PFMI ready to transmit, did
14     they need assistance.
15         In relation to other parts of
16     the service that were to be started
17     later, we had some initial
18     conversations about what planning would
19     need to be done for the phase two
20     piece. And then we had a fair amount
21     of discussion regarding the service
22     that was taking place on the janitorial
23     side.

Page 103

1   Q. Tell me about the discussions regarding
2      service for that first thirty days.
3   A. It was horrible.
4   Q. Now, let me just -- for the record, the
5      calls were horrible or the service was
6      horrible?
7   A. The service was horrible.
8      Specifically, many missed locations,
9      locations just not being cleaned,
10     people not showing up, people showing
11     up late, the scope of work not being
12     performed.
13  Q. All right. During those discussions
14     where these problems you just listed
15     out were being discussed, what
16     solutions did those problems were being
17     discussed in those calls?
18  A. Generally, how can we help or assist
19     PFMI in doing the job that needed to be
20     done.
21  Q. What was PFMI saying about these
22     problems?
23  A. They were relying on subcontractors to

Page 104

1      get the work done and felt they were
2      trying very hard to get through and get
3      everything covered as we had laid out
4      in that thirty-, sixty-, ninety-day
5      transition plan. And so if in the
6      first thirty days it was get everything
7      covered, people weren't showing up, so
8      that vendor they may have elected to
9      replace.
10  Q. During that first thirty days, did BB&T
11     relate to EMCOR that, at certain
12     branches, we just don't like this
13     cleaner, we want another cleaner, or we
14     want our old cleaner? Was there any
15     direction of we want you to fire
16     Cleaner X at this location, from BB&T?
17  A. Yes.
18         MR. SAWYER: Are we still in
19            the same time frame,
20            Counsel?
21         MS. TULEY: Yes, still in
22            the first thirty.
23  Q. How would that go through the chain of

Page 105

1      command?
2   A. It would have come to me, and I would
3      have called either Keith Blackburn or
4      Jim Wohlers.
5   Q. And said, Y'all need to get rid of
6      Company X?
7   A. Right.
8   Q. When BB&T would come in and say, We
9      want Company X at the Acme location
10     fired, how often would they say, And we
11     would like them replaced with
12     Company Y?
13  A. In a number of cases, they would say
14     that. I can't remember how many. But
15     not in all cases, they did not.
16  Q. Best of your recollection, do you think
17     it was more than half of the cases
18     where they had a substitute?
19  A. Not being real comfortable, but I guess
20     it could have been half.
21  Q. During that -- we're still in that
22     first thirty-day time period. Did it
23     come to your attention or were there

d88e44a4-1e0c-4347-aed6-b1358f7a7c9

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 106

1  any discussions about some branches
2  just loved their old cleaner and that's
3  who they want no matter what the new
4  cleaner is doing? Did you encounter
5  anything like that?
6  A. We encountered a lot of that.
7  Q. And how did you address that?
8  A. I would not specifically address it. I
9  would go to Ronny Eller, who is my --
10  really the main person, and make him
11  aware of it, number one, only because
12  if we were going to get support, we had
13  to get it there. We had to get -- you
14  know, give us time to get this program
15  in place and up and running.
16  Q. Do you know how Ronny Eller was
17  addressing that with his branches?
18  A. He wouldn't have addressed it at the
19  branch level. He would have gone to
20  the RBOMs probably at that point.
21  Q. Did you have any situations come up
22  where it was not a branch but either a
23  RBOM or an AOO that said, We liked how

Page 107

1  it was done before or we liked our old
2  cleaner, we want our old cleaner,
3  regardless of how the cleaning was
4  going in their region or area?
5        MR. SAWYER: Object to the
6        form of the question.
7        You can answer.
8  A. I'm -- I'm sure that we had a lot of
9  those requests. As to why they were
10  coming in or were they coming in at
11  branches that were getting the scope of
12  work performed, I don't know.
13  Q. To your recollection, was there any AOO
14  or RBOM in particular that just was not
15  going to be pleased under the new
16  system?
17  A. I hadn't met them all at that point, so
18  it's hard for me to say that of the
19  thirty-four of them, three would never
20  be happy.
21  Q. And if we expand it from the first
22  thirty days to just throughout that
23  first ninety days, was there anybody

Page 108

1  during that entire ninety-day
2  transition that you finally said, You
3  know, the only thing that's going to
4  make them happy is to get their old
5  cleaner back?
6  A. I don't specifically recall seeing that
7  put to us. I know in -- maybe it was
8  in upstate South Carolina; Diane Blewer
9  was very unhappy. Charlie Maddox in
10  the western Carolina region was very
11  unhappy; but his branches hadn't been
12  serviced for nine days straight at the
13  beginning, so I understand his
14  unhappiness. But he at least stated to
15  us he was willing to give it a try and
16  keep working on it.
17  Q. At the end of that first thirty-day
18  period -- well, let me rephrase that.
19  The goal, I think, as we've discussed
20  it, during that first thirty days was
21  to get service in all of the locations.
22  Is that fair?
23  A. That's the way I believe we had it

Page 109

1  stated, yes, ma'am.
2  Q. What was your assessment of that goal
3  at the end of the first thirty days?
4  A. I thought we had done a very poor job
5  at it.
6  Q. How did you relay that back to PFMI?
7        MR. SAWYER: Object to the
8        form of the question.
9        You can answer if you
10        understand.
11  A. We had many calls a day, E-mails going
12  back and forth, about working to the
13  scope of work, getting the scope of
14  work completed.
15  Q. And which part of the transition was
16  getting the scope of work down to a
17  science supposed to be completed?
18  A. I believe that was in the second part
19  of the --
20  Q. So that would have been at the
21  completion of sixty days?
22  A. Yes, ma'am.
23  Q. And I think I interrupted you when I

28  (Pages 106 to 109)

d88e44a4-1e0c-4347-aed6-b1358f7a7c9

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

**Page 110**

1  asked was that -- you were answering
2  how you were relaying the problems that
3  you thought that y'all were having with
4  the transition back to PFMI. And I
5  think you had said daily calls and
6  E-mails trying to work out the scope.
7  Anything else?
8       MR. SAWYER: And I apologize
9       in striking an
10      objection. I thought
11      you said relating those
12      problems to PFMI.
13 Q. And let me ask it this way. Besides
14   E-mails and phone calls with PFMI, you
15   know, relaying your concerns and
16   disapproval, did y'all have any
17   meetings, face-to-face meetings, during
18   the first thirty days?
19 A. I don't really recall, but I think
20   either Keith or Greg or Jim came up to
21   Winston-Salem. But was it at thirty
22   days or thirty-one days or sixty, you
23   know, that's . . .

**Page 111**

1  Q. And there may be a better way --
2  A. Several times during --
3  Q. -- to ask that.
4  A. -- that transition period.
5  Q. Yeah. And maybe a better way to ask
6    that is, what meetings do you recall
7    taking place during the transition
8    period?
9  A. I don't recall specific dates. I
10   recall many phone calls, many meetings,
11   conference calls, E-mails. If they
12   showed up, I couldn't tell you what
13   day, you know, what was discussed other
14   than we were trying -- we were being
15   inundated with complaints and trying to
16   get the -- the work done. So any
17   conversations that we had were likely
18   around that.
19 Q. Do you recall any action plans that
20   were created in any of those meetings
21   or calls or E-mails to address these
22   concerns, either by EMCOR or by PFMI?
23 A. I don't recall any specific documents,

**Page 112**

1  but it makes sense that there would
2  have been some.
3  Q. Nothing specifically that you could
4    point to?
5  A. Not -- not that I recall, no, ma'am.
6  Q. I didn't say this earlier, but this is
7    kind of my only chance to get to talk
8    to you before we go to trial about
9    these issues. So if as we go through
10   this you think of something that is
11   responsive to a question I asked
12   earlier or you want to correct
13   something that you said earlier or
14   change it, please let me know, because
15   I won't have to chance to talk to you
16   again. So, you know, let me know. Or
17   if we look at a document and something
18   sparks your memory and you say, Oh,
19   yeah, this reminds me of that meeting,
20   let me know, please.
21 A. Yes, ma'am.
22 Q. Thank you. What was your assessment of
23   the progress at the end of the sixty

**Page 113**

1  days?
2  A. I didn't feel like we were getting
3    anywhere.
4  Q. Did you see any improvement from thirty
5    days to sixty days?
6  A. On the project as a whole, I'd have to
7    say no.
8  Q. What was your assessment at the end of
9    ninety days?
10 A. I think by ninety days, we had made
11   some progress but not sufficient
12   progress.
13 Q. Let me ask you this. As the project
14   manager at that point at the end of
15   ninety days and you didn't see
16   sufficient progress, why didn't you
17   fire PFMI?
18 A. I guess, not having selected them, I
19   was trying to be a good partner and
20   continue to try to work out the issues.
21 Q. Who did select them?
22 A. The only thing I know, because it
23   was -- I was on a call -- and I don't

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

| Page 114 |
|---|
| 1    remember when the call was.  But Alan |
| 2    Cristal had said, We're bringing -- |
| 3    We've selected PFMI. |
| 4    Q.  But you don't know if Alan made that |
| 5    selection or he was just relaying that |
| 6    information? |
| 7    A.  I do not know, no, ma'am. |
| 8    Q.  I think we said earlier it was roughly |
| 9    1400 branches involved in this project? |
| 10   A.  Yes, ma'am. |
| 11   Q.  What was your expectation of |
| 12   transitioning janitorial services into |
| 13   1400 branches?  How fast did you think |
| 14   that that would get accomplished? |
| 15        MR. SAWYER:  Objection. |
| 16        Vague.  You can answer |
| 17        it. |
| 18   A.  I felt like the vendor would have come |
| 19   in with a plan, a start-up plan, like |
| 20   they had rolled out in their |
| 21   ninety-day.  But I didn't have the |
| 22   expectation that the work would just be |
| 23   missed in multiple locations for |

| Page 115 |
|---|
| 1    multiple days, that the scope of work |
| 2    was not being performed, so . . . |
| 3    Q.  And as far as the locations being |
| 4    missed -- and we'll just talk about |
| 5    throughout the entire ninety-day |
| 6    period -- did it finally look like it |
| 7    was -- strike all that. |
| 8        During that ninety-day period -- |
| 9    we're going to talk about misses -- was |
| 10   it misses all over the place or did it |
| 11   seem to be narrowed to certain regions |
| 12   or certain vendors that were having the |
| 13   missed problems? |
| 14   A.  It was fairly widespread.  However, I |
| 15   believe most of the issues were with |
| 16   the areas controlled by FMI services. |
| 17   They had roughly 50 percent of the |
| 18   portfolio. |
| 19   Q.  And I'm going to ask you the same |
| 20   question as to scope.  Did it seem to |
| 21   you that there was significant scope |
| 22   problems across the board, or was it |
| 23   narrowed to a certain region or a |

| Page 116 |
|---|
| 1    certain vendor? |
| 2        MR. SAWYER:  Counsel, when |
| 3        you say "scope" . . . |
| 4        MS. TULEY:  The scope of |
| 5        work that we've been |
| 6        discussing, the |
| 7        janitorial scope of |
| 8        work. |
| 9        MR. SAWYER:  Okay.  You can |
| 10       answer. |
| 11   A.  The scope of work was across the board. |
| 12   Q.  You couldn't narrow that down to a |
| 13   certain location or vendor? |
| 14   A.  No.  I can say that the vendor we had |
| 15   fewest problems with was in West |
| 16   Virginia, Patton Building Services. |
| 17   And not that they didn't have problems, |
| 18   but we didn't get as many complaints. |
| 19   Q.  On the FKC, was that system set up for |
| 20   complaints or for work orders? |
| 21   A.  For both. |
| 22   Q.  And maybe I need -- is there a |
| 23   difference between a complaint and a |

| Page 117 |
|---|
| 1    work order? |
| 2    A.  As it relates to janitorial? |
| 3    Q.  Yes. |
| 4    A.  Yes.  A complaint was no mopping done, |
| 5    maybe a specific part of the scope of |
| 6    work, no trash emptied, no dusting, |
| 7    something along those lines.  We had |
| 8    categories set up for janitorial, |
| 9    janitorial complaint, and janitorial |
| 10   extra, the extra being additional |
| 11   carpet cleaning.  Anything that was |
| 12   above the scope had to be requested and |
| 13   have a work order associated with it. |
| 14       I could use a break. |
| 15   Q.  Sure. |
| 16       (Brief recess) |
| 17   Q.  (By Ms. Tuley)  Back on the record.  All |
| 18   right.  We were talking about the |
| 19   transition and all the problems, and we |
| 20   had just discussed the difference |
| 21   between complaints and work orders. |
| 22   But I think you were telling me that |
| 23   they all -- either a complaint or a |

d88e44a4-1e0c-4347-aed6-b1358f7a7c9

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

---

Page 118

1    work order would still come through the
2    FKC?
3  A. That's the way it was set up.
4  Q. And you say that as if that maybe was
5    not the way it happened.  What actually
6    happened?
7        (Mr. Jones entered the
8        room.)
9  A. There was still a fair amount coming
10   through the FKC.  But there were so
11   many complaints that they stopped --
12   they being BB&T -- stopped using or
13   requiring the use of the FKC until
14   things smoothed out, and we were
15   providing E-mails of complaints.
16  Q. Was there a system in place that ranked
17   or categorized complaints -- and by
18   that I'll give you a hypothetical.
19   Would a complaint that we had a no-show
20   last night and our cleaners didn't come
21   and a complaint of they missed one of
22   the trash cans in our building and one
23   trash can didn't get emptied, was there

---

Page 119

1    a ranking where one of those would have
2    been this is a serious complaint, this
3    is something we need to address but
4    it's not so serious, or were all
5    complaints treated the same?
6  A. All the complaints were forwarded.  The
7   commentary that went along with them
8   may have indicated a different level of
9   concern.
10  Q. Was there any kind of formal ranking of
11   complaints, like this would be a one,
12   this would be a two, this would be a
13   three?
14  A. I don't remember a ranking of
15   complaints.  At the knowledge center,
16   there's a ranking of work orders, but
17   that only determines the response time.
18  Q. I believe I saw something on that.
19   That would be how many days for that
20   work order to be completed?
21  A. That's correct.  Some, hours.
22  Q. Did EMCOR do any kind of analysis of
23   the number of complaints received

---

Page 120

1    during the life of PFMI working on the
2    BB&T project?
3  A. We did several types of analysis.
4  Q. Were those done in writing?  Were they
5   reports of some sort?
6  A. Yes.
7  Q. What would those reports have been
8   entitled?
9  A. I don't recall any specific titles of
10   reports.  I'm sorry.
11  Q. Did you generate any of those reports
12   or analysis regarding complaints?
13  A. I'm sure I did.
14  Q. Tell me about the process you went
15   through to generate those.
16  A. It would have been through data
17   received from the FKC.
18  Q. And let me see if I can explain my
19   understanding, and then you can shoot
20   holes in it and tell me if it's right
21   or wrong.  Okay?  I think what I hear
22   you saying is you would just -- you
23   would take the information that was

---

Page 121

1    uploaded into the FKC and you could
2    generate a report from that program
3    that would list out locations and what
4    their complaint or work order was.  Is
5    that a fair statement?
6  A. That was available, yes.
7  Q. Was that one of the things that you
8   would do?
9  A. Probably, yes.
10  Q. Well, not to be picking on you, but
11   when you say "probably," do you know
12   you did it or do you know you didn't do
13   it?
14  A. That is probably one of the reports I
15   would have generated.
16  Q. But you don't remember as we sit here
17   today if you did or didn't generate
18   that kind of report?
19  A. I'd have to say no, I don't remember.
20  Q. Did you do any kind of a statistical
21   analysis of the number of complaints
22   you're getting versus the number of
23   branches that you had?

---

31 (Pages 118 to 121)

d88e44a4-1e0c-4347-aed6-b1358f7a7c9

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

| Page 122 |
|---|

1  A.  We did a couple of analysis regarding
2      that.  One of them was just a report
3      that came through the FKC on the number
4      of janitorial work orders, number of
5      complaints, number of misses, that kind
6      of thing.  And then BB&T and I want to
7      say it was Steven Paige asked for an
8      analysis of service opportunities
9      versus the complaints that we were
10     getting.
11  Q.  What is a service opportunity?
12  A.  The way Steve explained it -- and I
13     hadn't ever seen this before.  But the
14     way Steven had explained it was, if you
15     have a branch receiving five-day
16     service, then each one of those days
17     represents an opportunity, a service
18     opportunity.  So, for instance, on five
19     days, a branch would have 22 service
20     opportunities a month.  A six-day
21     branch would have more.  A three-day
22     branch would have less.  You take those
23     and you apply them mathematically

| Page 123 |
|---|

1      across all of the locations, and you
2      come up with X number of thousands of
3      service opportunities a month.
4   Q.  And then he requested those service
5      opportunities -- an analysis be done of
6      how many service opportunities there
7      were versus how many complaints were
8      received?
9   A.  It was complaints, misses, I think is
10     what it was, yes, ma'am.
11  Q.  And do you know if that analysis was
12     actually done?
13  A.  Yes.  Actually, PFMI provided the
14     information to us on a monthly basis.
15  Q.  And I'm assuming -- and that's always
16     dangerous -- that that would have been
17     passed along to Steven Paige at BB&T?
18  A.  Yes.  The entire team.  And at some
19     point in time -- and I don't recall
20     when -- they actually created a Web
21     site and started posting the
22     information on a BB&T Web site.  We
23     didn't have access to it, but where a

| Page 124 |
|---|

1      BB&T person could go out and look at
2      it.
3   Q.  At any time did you come to know what
4      particular branches were paying for
5      cleaning services prior to the BB&T
6      project?
7   A.  Not that I -- no, not that I recall
8      seeing, no, ma'am.
9   Q.  At any time did you come to know if the
10     overall cost for janitorial for all the
11     BB&T branches was less under the BB&T
12     project than it was previously?
13  A.  Yes, ma'am.  There was a -- I don't
14     recall when this was, the first
15     ninety-day period.  Steven Paige had
16     reported there was a multi-thousand
17     dollar -- many thousand-dollar savings,
18     and I don't remember what that number
19     was.
20  Q.  There would have been some sort of
21     E-mail or --
22  A.  There was probably an E-mail or
23     something.  In fact, I know I reported

| Page 125 |
|---|

1      it to Debi Crosby and I did that on
2      E-mail.  But I don't -- again, I don't
3      remember when.
4   Q.  To your knowledge, were the vendors
5      actually doing the work at the branch
6      level -- and by "the work," I mean the
7      janitorial work -- getting paid less
8      under the BB&T contract than they had
9      gotten paid previously?
10  A.  I don't have any knowledge of what they
11     would have been paid previously.  But
12     that would be an understanding.
13  Q.  Besides the Steven Paige E-mail or
14     whatever it was that we talked about,
15     did you see any other documents or
16     reports from BB&T discussing cost
17     savings under the BB&T contract?
18  A.  I guess it makes sense to me there
19     would have been some, but I don't
20     recall any specific documents.  I do
21     recall that one where he was quoting
22     the first recognized savings.
23  Q.  To your knowledge, there was not any

32  (Pages 122 to 125)

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 126

1  kind of a regular report that came out
2  every so many days outlining the
3  savings that had been generated for
4  BB&T?
5  A. I don't remember seeing any such
6  report, no, ma'am.
7  Q. Let's go back and just fill in the gaps
8  regarding the measurements that we've
9  already talked about, the square-
10  footage measurements. Did EMCOR ever
11  receive measurements from PFMI for all
12  of the branches?
13  A. Yes, ma'am. I believe that was that
14  mid-December report that they
15  submitted.
16  Q. And was that something that was
17  contemplated under the agreement
18  between EMCOR and PFMI?
19  A. Yes. That within the first ninety
20  days, they would go out and measure the
21  branches.
22  Q. Do you know how those reports generated
23  by the mobile techs, the measurement

Page 127

1  reports that they did, how they were
2  kept? And by that, let me ask a little
3  bit more specific question. When we
4  talked earlier -- and if I'm
5  paraphrasing you wrong, tell me. And
6  the record will reflect what you said.
7  But basically, I think, my
8  understanding was they generated some
9  type of little report, when the mobile
10  techs went out, of their measurements
11  and they would turn it in to their
12  regional manager, and that person would
13  either generate a spreadsheet or just
14  pass those up the chain to Lynn, your
15  assistant. Do you know where all of
16  those reports are stored?
17  A. I believe we turned them over to BB&T.
18  Q. Do you know when those would have been
19  turned over?
20  A. As they were completed. So no, ma'am,
21  not a specific . . .
22  Q. And so, I guess, just to sort of in my
23  mind clear up the process, I think we

Page 128

1  have where the mobile tech would have
2  done the report. He would have turned
3  it in to his regional person. That
4  person would have either put it up the
5  chain to Lynn or gone ahead and
6  summarized it in a spreadsheet format.
7  And at that point, that actual report
8  generated by the mobile tech would have
9  been forwarded to someone at BB&T?
10  A. Yes, ma'am.
11  Q. Do you know who at BB&T that would have
12  been forwarded to?
13  A. Probably Edna Green.
14  Q. Would that have been forwarded
15  electronically or would it have -- that
16  actual sheet of paper gone?
17  A. Electronically.
18  Q. If it was forwarded electronically,
19  what was done with the actual piece of
20  paper the mobile tech filled out?
21  A. As I stated, I believe all those were
22  turned over to BB&T.
23  Q. Were they done electronically initially

Page 129

1  or were they actually something they
2  wrote out on paper?
3  A. No, ma'am. If -- we talked about them
4  having a form that they took with them,
5  and I believe those forms were then
6  collected and turned over to BB&T.
7  Q. So Edna Green would have gotten an
8  electronic copy and a paper copy?
9  A. I don't know if Edna received those
10  individual branch measurements. Okay?
11  She received -- she would have likely
12  have received the final spreadsheet
13  with the answers, the compiled numbers.
14  Q. Got you. Who would know where the
15  actual -- who received at BB&T the
16  actual measurement reports, the ones
17  that the techs filled out?
18  A. Whether they were kept on a regional
19  level or turned all over to the
20  Winston-Salem office, which is where
21  the real estate services are
22  headquartered, I don't know.
23  Q. Would your regional managers know where

33 (Pages 126 to 129)

d88e44a4-1e0c-4347-aed6-b1358f7a7c9

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 130

1  those reports ended up?
2  A. They would be able to tell you who they
3  turned them over to. Whether they
4  ended up -- where they ended up after
5  that, I can't say.
6  Q. Would Lynn Wilson know better than you
7  do where those ended up?
8  A. If she handed any of them over -- if,
9  for instance, Jim Maxey collected all
10  of his technicians' and he turned them
11  over to the gentleman in his office in
12  Virginia, were they left there or
13  forwarded to Winston-Salem, I don't
14  know. But I do know that those reports
15  went to BB&T.
16  Q. And we had talked about that a number
17  of the measurements conducted by PFMI
18  were the same or substantially similar
19  to the gross square footage; is that
20  correct?
21  A. Yes, ma'am.
22  Q. In your review of the situation, did it
23  seem like those measurements that were

Page 131

1  the same or substantially similar came
2  from a particular region or a
3  particular vendor?
4  A. Jim Wohlers had sent me a list of the
5  ones he was confident in, that he was
6  confident had been done correctly, in
7  his term. The regions that he wasn't
8  confident in, I don't want to speak to
9  being one vendor but likely would have
10  been FMI since they had half of the
11  footprint. They -- they -- there was a
12  lot of issues with FMI, and that was
13  one of them.
14  Q. In December when you got the list of
15  all the square footages from PFMI, did
16  PFMI want to go ahead or suggest going
17  ahead and changing how they billed
18  based on those new square-footage
19  numbers?
20  A. I believe I recall that, yes, ma'am.
21  Q. And would that request to change how
22  they billed based on those
23  square-footage numbers have gone to

Page 132

1  you?
2  A. To me and then I would have taken it to
3  BB&T.
4  Q. Do you remember what the response was
5  to that request?
6  A. I have a vague recollection that BB&T
7  didn't want to make the changes twice.
8  They wanted to do it one time.
9  Q. Did you have any say in whether or not
10  that change got made then or made
11  later, or was it strictly a BB&T
12  decision?
13  A. I would have given input. I don't know
14  that I remember what that input was
15  but . . .
16  Q. Would that have been reflected in an
17  E-mail or any kind of written
18  documentation?
19  A. Probably E-mail, yes, ma'am.
20  Q. When did EMCOR, through its mobile
21  techs, finalize their square-footage
22  measurements?
23  A. End of March, first of April, is what I

Page 133

1  recall.
2  Q. How did you choose which locations to
3  have your mobile techs measure?
4  A. Again, all of the larger buildings,
5  those over 10,000 feet, were all
6  measured. And I believe Edna Green had
7  put together some statistical
8  program -- that's what she does; she's
9  a statistician type of person -- to
10  select the other. If you recall, I
11  stated that from one to five thousand
12  or zero to five thousand, we did a
13  sampling. From five to ten, there was
14  another sampling. And I believe she
15  had that program generated. And that's
16  how those were generated.
17  Q. Would it be fair to say that the
18  locations sampled were not selected
19  based on that list that Jim Wohlers
20  sent you of locations they were not
21  confident in? Or I guess he
22  actually -- sorry. Jim Wohlers sent
23  you a list of locations they were

34 (Pages 130 to 133)

d88e44a4-1e0c-4347-aed6-b1358f7a7c9

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

---

Page 134

1 confident that the measurements were
2 right. Were the locations that you
3 sampled chosen based on ones that were
4 excluded from that list, meaning he was
5 not confident in them?
6 A. First of all, the list he sent me was a
7 complete list. And the ones -- he
8 highlighted the ones he was confident
9 in, unhighlighted the others. And that
10 list, again, I believe Edna had some
11 program that she generated to pick. So
12 if it was based on that, I don't -- I
13 don't see how that would have happened.
14 I don't believe there was any other --
15 I'm not sure of the word I'm looking
16 for -- any other criteria.
17 Q. What was the average size of a BB&T
18 branch location?
19        MR. SAWYER: Objection.
20        Speculation. You can
21        answer if you know.
22 A. You know, I don't know, given the 1400
23 locations. I believe that there were

---

Page 135

1 more in that three- to five-thousand-
2 square-foot range.
3 Q. And we had talked about things that
4 were subtracted to create net cleanable
5 square footage. I know that at a lot
6 of locations, just from looking through
7 the documents, it was discussed that
8 ATMs -- that outside ATMs would be
9 cleaned. How was that accounted for in
10 the square-footage?
11        (Mr. Jones left the room.)
12        MR. SAWYER: Objection to
13        the extent that I don't
14        recall ATMs being
15        discussed. But you can
16        go ahead and answer the
17        question.
18 Q. Well, let me ask it this way. I mean,
19 did a lot of the branches want their
20 ATMs cleaned?
21 A. Yes. Wiping the face of the ATM.
22 Q. And would emptying the trash at the ATM
23 also be part of that work?

---

Page 136

1 A. Yes. And there were some that were
2 stand-alone ATMs where a special
3 service was set up to empty the trash
4 there.
5 Q. And just to kind of round out the ATM
6 discussion, would, like, cleaning out
7 cobwebs and bugs and stuff around the
8 ATM be part of it, part of the cleaning
9 that they wanted done?
10 A. Again, wiping the face of that ATM.
11 Q. And then to go back to my original
12 question, how was the cleaning of the
13 ATMs factored into the net cleanable
14 square-footage calculation?
15 A. I don't recall.
16 Q. It seems to me -- and I'm a lawyer, not
17 a person that knows anything about
18 janitorial work -- but there would be
19 some type of addition for going outside
20 and cleaning an ATM. I mean, is that
21 fair to say?
22        MR. SAWYER: Objection to
23        the form of the

---

Page 137

1 question. You can
2 answer.
3 A. The scope of work called for cleaning
4 up to a certain extent outside, and I
5 believe wiping the face of the ATM was
6 on that scope. But that I don't know.
7 Q. Was cleaning janitorial closets part of
8 the scope of work?
9 A. I think keeping the janitorial closets
10 neat was in the scope of work, yes.
11 Q. If that was in the scope of work, why
12 were janitorial closets subtracted from
13 net cleanable square footage?
14        MR. SAWYER: Objection to
15        the form of the
16        question. You can
17        answer.
18 A. The janitorial closet was not used
19 typically by the branch, and so they
20 had no control over how clean or how
21 dirty or whatever. And so it was used
22 for storing of those materials used by
23 the janitorial services only and,

---

35 (Pages 134 to 137)

d88e44a4-1e0c-4347-aed6-b1358f7a7c9

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 138

1  therefore, shouldn't be included in the
2  net cleanable square footage.
3  Q. Did you ever see any complaints or work
4     orders from any branches discussing
5     their unhappiness with the cleanliness
6     of the janitorial closets?
7  A. Honestly, there were so many
8     complaints, I don't want to say that
9     there weren't any that referred to
10    that.
11 Q. Nothing that you can recall as we sit
12    here right now?
13 A. No, ma'am.
14 Q. All right. In that March-April time
15    frame we just talked about where the
16    mobile techs finalized the square-
17    footage measurements and those were
18    transmitted to BB&T, was a change
19    discussed as far as how the billing
20    should be done for janitorial or was a
21    change discussed -- and this is a
22    multipart question, so let me just stop
23    there. Was a change -- at that time

Page 139

1  frame, March-April, mobile techs
2  finished their measurements,
3  transmitted to BB&T, were there any
4  discussions from BB&T and EMCOR
5  regarding changing the way that
6  janitorial would be billed?
7  A. Not the way it was billed. The net
8     cleanable numbers, which is and always
9     was the intent to bill off of those
10    going forward, were inserted as the new
11    billing rate number.
12 Q. How was that done when not all of the
13    branches were remeasured?
14 A. In the different segments of the
15    branches, the sampling, whatever the
16    average number was for the sampling of
17    the zero to 5,000, was applied across
18    the board for that set of branches.
19    The statistical sampling for the five
20    to ten was applied across the rest of
21    the branches for that segment. Then,
22    again, we measured all of the larger
23    branches.

Page 140

1  Q. Let me give you a hypothetical to make
2     sure I understand. Hypothetically
3     speaking, the ones up to 5,000 square
4     feet, let's say that you found that
5     there was a -- the net cleanable square
6     footage was 10 percent less than the
7     gross. In that scenario, then, would
8     you go through the entire master list
9     of locations and reduce the cleanable
10    square footage on all of those under
11    5,000 square feet by 10 percent?
12 A. Yes, ma'am.
13 Q. And that worked with each category?
14 A. Except for those larger ones.
15 Q. Except for the over ten, and those
16    were --
17 A. Yes, ma'am.
18 Q. -- actual measurements done by the
19    mobile techs?
20 A. Yes, ma'am.
21 Q. Do you recall what the adjustment was
22    for the under-5,000-square-feet
23    locations?

Page 141

1  A. No, ma'am.
2  Q. Would there have been a percentage
3     difference that was so small as to not
4     have been accounted for? For
5     instance -- and I'll give you a
6     hypothetical -- let's say the under
7     5,000 after they measured it, the
8     difference was 2 percent. Would those
9     have all been nonetheless reduced by
10    2 percent, or would you or BB&T have
11    said this is not -- it's not worth
12    changing it for 2 percent?
13 A. The instructions from BB&T were that
14    they were going to apply that sampling
15    percentage across the board.
16 Q. No matter what that number came back
17    as?
18 A. That's correct, yes, ma'am.
19 Q. In that sampling, did any of the
20    locations come back larger than what
21    the gross square footage initially was?
22 A. I don't recall if in the sampling it
23    did. I know in the measurements that

36 (Pages 138 to 141)

d88e44a4-1e0c-4347-aed6-b1358f7a7c9

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 142

1  they did, the original measurements
2  that were turned in.
3  Q. By PFMI?
4  A. Yes, ma'am.
5  Q. At some point in the spring/early
6  summer of 2006, a change was made and
7  PFMI stopped being responsible for all
8  the branches. Tell me what happened
9  there.
10 A. From -- how it happened, why it
11 happened? I'm not sure what you're
12 asking.
13 Q. Tell me first what happened.
14 A. Okay. That the client, BB&T, felt like
15 the only way to address the changes was
16 to make vendor changes so that the
17 scope of work could be performed,
18 because we were still having hundreds
19 of complaints a month of janitorial
20 complaints. And at that point, Greg
21 Swanberg with EMCOR made or led that
22 transition effort to bring on new
23 vendors. There was an interview

Page 143

1  process of potential vendors. Mark
2  Smith was involved in that as well.
3  And PFMI would be keeping several
4  regions, and the rest of the portfolio
5  was going to be divided up to other
6  vendors.
7  Q. And at that point, was the agreement
8  with PFMI terminated?
9       MR. SAWYER: Which
10       agreement, Counsel?
11       MS. TULEY: The original
12       agreement to work on the
13       1400 branches.
14 A. Yes, ma'am, I believe it was.
15 Q. And then for the regions that PFMI was
16 going to continue, was there a new
17 contract created?
18 A. Yes, ma'am. I believe Greg Swanberg
19 handled that piece.
20 Q. What discussions did you have with PFMI
21 over that contract termination?
22 A. I don't recall specific discussions how
23 to transition out, when, that kind of

Page 144

1  thing.
2  Q. Do you remember when the original --
3  and I'm just going to call it the
4  original contract since we've got two
5  contracts. I'll call the one we've
6  been discussing the original, and then
7  I'll call the second one the new
8  contract, if we can just have that
9  understanding.
10 A. Yes, ma'am.
11 Q. Do you remember when the original
12 contract was terminated?
13 A. No, ma'am, I really don't.
14 Q. Was that a decision made by EMCOR or by
15 BB&T to terminate PFMI?
16 A. I think it would be fair to say that
17 EMCOR was doing what the client had
18 requested.
19 Q. Who at BB&T made that request?
20 A. It would have been through Edna Green
21 and Randy Hondros, which is
22 H-O-N-D-R-O-S.
23 Q. Why was it that PFMI wasn't terminated

Page 145

1  as to all locations?
2  A. I wasn't a part of the discussion, but
3  I believe that Greg Swanberg and either
4  Greg Littlefield or Jim Wohlers or both
5  had a conversation about was there any
6  part of the business than they could
7  hold on to where they felt like they
8  could properly manage that business.
9  Q. Do you know when that discussion would
10 have taken place?
11 A. Ma'am, I don't really recall.
12 Q. Who took over the regions that PFMI
13 lost?
14 A. Two companies: ABM took over a bulk of
15 the business. A&L Services took over
16 some northern region -- D.C. market,
17 upper Virginia, D.C. capital region
18 market.
19 Q. How did the -- how well did the
20 transition go from PFMI to ABM and A&L?
21 A. Fairly rocky. When FMI, who was one of
22 PFMI's subs, walked out of the
23 branches, we got an E-mail confirming

37 (Pages 142 to 145)

d88e44a4-1e0c-4347-aed6-b1358f7a7c9

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 146

1  the walkout. But Jim Wohlers had
2  called me and felt it was going to
3  happen, and then he got a confirming
4  E-mail a couple of hours later. And so
5  there was a no -- what I would term a
6  no-notice walkout. And that was about
7  500 or so branches.
8  Q. And that was by the vendor FMI?
9  A. Yes, ma'am. Other than that, I think
10  it went pretty well. And I need to
11  correct or add that Patton Building
12  Services also took some business in
13  West Virginia.
14  Q. Was that the same branches they were
15  already the vendor for --
16  A. Yes, ma'am.
17  Q. -- under PFMI?
18  A. Yes, ma'am. And I don't recall if we
19  contracted CRM or if Kentucky stayed
20  with PFMI. I think it stayed with
21  PFMI. There were five or six regions
22  that stayed and I don't . . .
23  Q. Did you do a similar ninety-day

Page 147

1  transition period for ABM and A&L that
2  you did for PFMI?
3  A. No, ma'am. We weren't allowed to.
4  Q. How did the transition work for ABM and
5  A&L?
6  A. It was get in and start cleaning. Not
7  trying to oversimplify it, but that's
8  really what it was, especially in the
9  region where we had the walkout. It
10  was get people hired as quickly as
11  possible and get them in there. And in
12  the meantime, my mobile techs carried
13  cleaning supplies, were going in
14  branches trying to straighten up
15  restrooms, provide cleaning supplies,
16  do whatever little bit of work we could
17  do during the meantime. And we also
18  hired a company out of Atlanta to
19  backfill, put some folks on the road to
20  help in the branches as well.
21  Q. What was that company's name?
22  A. Alan Cristal set it up for me, and I
23  don't remember the name of that

Page 148

1  company. I apologize.
2  Q. That's fine. What was your
3  satisfaction with the performance of
4  ABM for the areas they took over?
5  A. It was better.
6  Q. How long did ABM perform services for
7  the BB&T branches?
8  A. With EMCOR?
9  Q. Yes.
10  A. Until we lost the account.
11  Q. You asked that as if they still might
12  be with BB&T branches. Is ABM still
13  servicing BB&T branches?
14  A. To the best of my knowledge, yes,
15  ma'am.
16  Q. What was your level of satisfaction
17  with A&L services?
18  A. Excellent.
19  Q. Were ABM and A&L being paid the same
20  amount for janitorial services that
21  PFMI was being paid?
22  A. I don't recall on a branch-by-branch
23  level, but I believe it was slightly

Page 149

1  more. I don't think in all cases
2  but . . .
3  Q. Were they paid in the same manner,
4  meaning on a square foot -- price per
5  square foot?
6  A. The net cleanable numbers that we had
7  come up and determined, yes, ma'am.
8  Q. So they would have been paid based on
9  the net cleanable square-footage
10  numbers as determined by the mobile
11  tech measurements?
12  A. Yes, ma'am.
13  Q. Tell me who negotiated the new contract
14  with PFMI.
15  A. I believe it was Greg Swanberg, ma'am.
16  Q. Were there any discussions regarding
17  the withholding of payments for
18  previous overcharges under the new
19  contract?
20  A. No, ma'am, not to my recollection.
21  Q. And what was your understanding of the
22  purpose of the new contract?
23  MR. SAWYER: Object to the

38  (Pages 146 to 149)

d88e44a4-1e0c-4347-aed6-b1358f7a7c9

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 150

1         form of the question.
2         You can answer.
3    A. The number of locations, that
4       substantially changed. And it was a
5       clean-cut ending and a start. I'm not
6       sure what you're asking so . . .
7    Q. Let me ask it this way. Under the new
8       contract, were the square-footage
9       numbers, the net cleanable
10      square-footage numbers being used,
11      those calculated by the mobile techs?
12   A. Yes, ma'am.
13   Q. Was the price per square foot the same
14      as under the original contract?
15   A. I didn't negotiate the contract, so I
16      don't know that for sure, ma'am.
17   Q. Under the new contract -- do you
18      remember when PFMI started performing
19      under the new contract?
20   A. Not specifically, ma'am, but I -- I'm
21      thinking it was June. I don't know for
22      sure.
23   Q. Let's just, for the purposes of

Page 151

1       discussion, just say it was started in
2       June of '06. And if it turns out to be
3       June 7th or whatever, we'll have an
4       understanding that whatever the
5       documents say can be controlling. But
6       just for purpose of discussion, let's
7       just say it started 1st of June '06.
8       Was PFMI to start their billing afresh
9       at June 1st, 2006, with these new
10      square-footage numbers and start
11      billing from there without any of the
12      setoffs?
13   A. Again, not negotiating the contract,
14      but that makes sense to me, yes, ma'am.
15   Q. Do you know if payment was withheld
16      from PFMI for perceived overcharges
17      in -- from the original contract?
18   A. I believe we talked earlier today that
19      the June payment was withheld to -- at
20      the direction of BB&T. They weren't
21      paying us. So if that was under the
22      new contract, yes, ma'am.
23   Q. Do you know if in the new contract it

Page 152

1       says that EMCOR has to be paid by BB&T
2       before EMCOR will pay PFMI?
3    A. Not without having the contract
4       document in front of me, no, ma'am.
5    Q. How long did PFMI perform under the new
6       contract?
7    A. Six weeks is my recollection. I
8       remember getting an E-mail when I was
9       in Phoenix. That was in mid July. I
10      couldn't open it on my Blackberry, but
11      it was from Jim saying that we were
12      ceasing service.
13   Q. Did he state why?
14   A. I couldn't open it till I got . . .
15   Q. Eventually when you were --
16   A. Yes.
17   Q. -- able to open it?
18   A. There were several statements in there,
19      and I know that letter is somewhere in
20      our documents. But I don't -- there
21      were several things.
22   Q. What is your recollection of what their
23      reason was?

Page 153

1    A. They -- my recollection of that letter
2       was that they purported that we had not
3       acted in good faith, that we didn't do
4       the things that we were supposed to do
5       or said that we were going to do, that
6       kind of tone of the letter.
7    Q. Were the things that they said -- were
8       the things that PFMI said EMCOR
9       wouldn't do paying PFMI?
10   A. Well, I'd like to have the document in
11      front of me to . . .
12   Q. All right. Well, let me just ask you
13      this. Do you know if during that
14      six-week period that PFMI performed
15      under that new contract they were ever
16      paid?
17   A. No, ma'am, I don't know. I believe
18      they were paid for the out-of-scope
19      work, but I don't know that BB&T ever
20      released the June payment to us for the
21      in-scope services.
22   Q. Were you surprised when BB -- sorry.
23      Were you surprised when PFMI quit?

39 (Pages 150 to 153)

d88e44a4-1e0c-4347-aed6-b1358f7a7c9

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

| | Page 154 |
|---|---|
| 1 | A. I don't know if "surprise" is the right |
| 2 | word. I wasn't happy about it. |
| 3 | Q. Let me ask you this. If you'd worked |
| 4 | for six weeks and nobody had paid you, |
| 5 | would you keep working? |
| 6 | MR. SAWYER: Object to the |
| 7 | form of the question. |
| 8 | You can answer. |
| 9 | A. If it was me personally, I'd probably |
| 10 | have a lot of issue with it, yes. |
| 11 | Q. Did you have any discussions with BB&T |
| 12 | about withholding payment from PFMI |
| 13 | under the new contract? |
| 14 | A. Me personally? |
| 15 | Q. Yes, ma'am. |
| 16 | A. Not that I recall. |
| 17 | Q. Do you know if anybody had those |
| 18 | discussions with BB&T? |
| 19 | A. No, ma'am, I don't know. |
| 20 | Q. Did you see any documents from anybody |
| 21 | at EMCOR to BB&T regarding the |
| 22 | nonpayment of PFMI under the new |
| 23 | contract? |

| | Page 155 |
|---|---|
| 1 | A. I don't know if I saw a document from |
| 2 | EMCOR to BB&T. But I know that we, |
| 3 | EMCOR, got a letter saying that we had |
| 4 | to make BB&T whole for the old square- |
| 5 | footage true-up before we could |
| 6 | continue, and we had to stroke them a |
| 7 | check for about a hundred and seventy |
| 8 | thousand dollars. |
| 9 | Q. Did y'all do any calculations of your |
| 10 | own to see if BB&T's true-up numbers |
| 11 | were correct? |
| 12 | A. I'm sure that was done. It would make |
| 13 | sense that they were done. |
| 14 | Q. Did you see anything to that effect? |
| 15 | A. If it was sent, I'm sure I would have |
| 16 | been copied on it. |
| 17 | Q. And I appreciate you being forthcoming |
| 18 | with me, but just -- we're on the |
| 19 | record, so I don't want you to have to |
| 20 | guess. I mean, do you recall seeing |
| 21 | anything like that? |
| 22 | A. I don't specifically recall a document |
| 23 | like that. There was so much happening |

| | Page 156 |
|---|---|
| 1 | at that time, including other |
| 2 | transition issues, just general |
| 3 | operating of the account. |
| 4 | Q. Do you know if EMCOR disputed that |
| 5 | true-up number? |
| 6 | A. The square-footage true-up number? |
| 7 | Q. Yes. |
| 8 | A. Greg Swanberg could probably better |
| 9 | answer that than I could. He was |
| 10 | having a lot of those higher-level |
| 11 | discussions. |
| 12 | Q. Is Mr. Swanberg still with EMCOR? |
| 13 | A. No, ma'am. |
| 14 | Q. Do you know where he's at? |
| 15 | A. I do not. |
| 16 | Q. During the new contract period, what |
| 17 | was your assessment of PFMI's |
| 18 | performance? |
| 19 | A. It was better. They had put managers |
| 20 | in the field to do inspections and |
| 21 | follow-up and react to the work orders. |
| 22 | So it was better. |
| 23 | Q. What kind of notice was given to PFMI |

| | Page 157 |
|---|---|
| 1 | of the termination of their original |
| 2 | contract? |
| 3 | A. Thirty-day notice, I believe, ma'am. |
| 4 | Excuse me. Can we take a break? |
| 5 | Q. Sure. Absolutely. |
| 6 | (Brief recess) |
| 7 | Q. (By Ms. Tuley) Who took over the part |
| 8 | of the janitorial regions that PFMI was |
| 9 | covering under the new contract? |
| 10 | A. ABM, A&L, Patton. |
| 11 | Q. So the same groups that took over what |
| 12 | they weren't covering under the |
| 13 | original contract took over what they |
| 14 | were covering under the new contract? |
| 15 | A. When we started transition, yes. We |
| 16 | didn't change -- the new contract |
| 17 | was -- like, after FMI walked out, we |
| 18 | had to get ABM in place and that kind |
| 19 | of stuff. So yes, it was those same |
| 20 | companies. |
| 21 | Q. Besides Patton -- and I think you named |
| 22 | one other -- were any of the subs that |
| 23 | PFMI had kept in place to do cleaning? |

40  (Pages 154 to 157)

d88e44a4-1e0c-4347-aed6-b1358f7a7c9

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 158

1   A. I didn't recall if CRM, we had kept
2       them or not.  I think that would have
3       been the only one.
4   Q. And you'd already mentioned Patton,
5       which was West Virginia?
6   A. Yes, ma'am.
7   Q. So to your knowledge, that was the only
8       subs of PFMI that were kept on the
9       project?
10  A. I can't speak to whom ABM subbed out
11      to.
12  Q. Were either ABM or A&L self-performing?
13  A. A&L was self-performing.  And I believe
14      Patton was and if we hired CRM, them as
15      well.
16  Q. Who ended up with the bulk of the
17      branches?  And when I say "who," I mean
18      CRM, ABM, A&L, or Patton.
19  A. ABM.
20  Q. And they were using vendors in a number
21      of the locations?
22  A. In all of the locations.
23  Q. And as you sit here today, you don't

Page 159

1       know if they were using any of the same
2       vendors that PFMI used?
3   A. I don't.
4   Q. During the life of the BB&T contract,
5       did EMCOR get any complaints about
6       maintenance services?
7   A. The mobile maintenance services?
8   Q. Yes.
9   A. Very few.  I recall them being in the
10      single digits.
11  Q. During the life of the contract, did
12      EMCOR get any complaints about the
13      landscaping services?
14  A. While I was still on the account, yes.
15  Q. What type of volume of complaints
16      regarding landscaping were you
17      receiving?
18  A. I don't specifically recall the volume.
19      It didn't start out with many, and I
20      know it -- there was some gradual
21      increase; but to what those numbers
22      were, I don't know.  But the FKC would
23      have reported that information out.

Page 160

1   Q. Once -- and I'll just include CRM since
2       you're not sure.  Once CRM, ABM, A&L,
3       and Patton took over the janitorial,
4       what kind of complaint volume were you
5       seeing?
6   A. There were still complaints but the,
7       from my recollection, the volume was
8       much less or significantly less than we
9       had before.
10  Q. Did you or anyone else at EMCOR do any
11      kind of analysis of the number of
12      complaints received under PFMI versus
13      the number of complaints received after
14      PFMI left the contract?
15  A. I don't recall doing one myself and if
16      someone else did one.  I left the
17      contract in September/early October of
18      2006.
19  Q. And I think you mentioned earlier at
20      some point EMCOR was terminated --
21  A. Yes.
22  Q. -- from BB&T?
23  A. That was after I had -- or right

Page 161

1       shortly after that, yes.
2   Q. Why was EMCOR terminated?
3   A. The reasons that I understand were
4       failure to handle the janitorial and,
5       to some extent, landscaping services.
6   Q. It seemed to me, like, by August-
7       September of 2006, the janitorial was
8       much improved; is that correct?
9   A. My recollection, yes, ma'am.
10  Q. Were you surprised, then, that BB&T
11      chose to terminate once, in your mind,
12      the janitorial had improved?
13  A. To me, yes.  But I had already been
14      removed from the contract.  In fact,
15      the problems with janitorial and
16      landscaping led BB&T to request me to
17      be removed.
18  Q. What did you get switched to when you
19      were removed?
20  A. I was given the opportunity to go back
21      to the Wachovia account.  They had
22      asked for me to come back and work for
23      them.

41 (Pages 158 to 161)

d88e44a4-1e0c-4347-aed6-b1358f7a7c9

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 162

1  Q.  And that's where you still are?
2  A.  Yes, ma'am.
3  Q.  Who took over the BB&T account when you
4     left it?
5  A.  A combination of Steve Yates and Andy
6     Ball, was my boss at the time.
7  Q.  Who at BB&T made the decision to
8     terminate EMCOR?
9  A.  I believe it was -- well, I don't know
10    specifically who.
11 Q.  Did you ever see any kind of written
12    documentation from BB&T stating why
13    they were terminating EMCOR?
14 A.  I recently saw a letter.  I wasn't
15    originally copied on it, but it was
16    E-mailed to me by Andy Ball.
17 Q.  What were reasons they stated in the
18    letter?
19 A.  Janitorial, issues with these no-
20    removal portion of landscaping, I
21    believe, was the main -- the main
22    issues listed on that letter.
23 Q.  Do you know if at any time from the

Page 163

1     beginning of the BB&T contract up
2     through the termination EMCOR and BB&T
3     ever entered into any kind of dispute
4     resolution process?
5  A.  Yes, we did.
6  Q.  Tell me what you know about that.
7  A.  I don't recall the specific date, but I
8     typed a letter and gave it to Randy
9     Hondros, hand-delivered it, to, per our
10    contract -- per EMCOR's contract with
11    BB&T, enter into a dispute resolution
12    process regarding trash-hauling.
13 Q.  What was the dispute regarding
14    trash-hauling?
15 A.  Whether it was in-scope or out-of-scope
16    work.
17 Q.  What was EMCOR's position?
18 A.  I can't speak for EMCOR.  I believe the
19    position was that it was -- I can't
20    speak for EMCOR.
21 Q.  Was EMCOR getting paid for hauling
22    trash by BB&T?
23 A.  No.

Page 164

1  Q.  Did EMCOR want to get paid for hauling
2     trash from BB&T?
3  A.  EMCOR did not -- EMCOR could only
4     process the invoices from our
5     subcontractors.  So it wasn't whether
6     EMCOR wanted it or not.  It was were
7     the vendors -- our subcontractors'
8     understanding of that agreement that
9     they could bill for it or not.
10 Q.  Was EMCOR getting billed for
11    trash-hauling?
12 A.  I remember seeing two invoices for
13    trash-hauling from PFMI for two
14    specific vendors.
15 Q.  Is that the only things you -- only
16    bills you remember seeing regarding
17    trash-hauling?
18 A.  In the old contract, yes.
19 Q.  At any point during the life of the
20    BB&T contract, was EMCOR billed for
21    trash-hauling besides the two you just
22    told me about?
23 A.  Yes, ma'am.

Page 165

1  Q.  Tell me how much in dollars or tons of
2     trash or however you want to tell me.
3     I mean, what kind of money are we
4     talking about here that's for
5     trash-hauling that y'all were getting
6     billed?
7  A.  There's -- I can't give you an exact
8     dollar amount, but I believe there was
9     two hundred thousand dollars, mainly
10    through ABM, but A&L had some as well.
11 Q.  Did a dispute resolution actually
12    occur?
13         MR. SAWYER:  Objection.
14         Vague.  You can answer
15         if you understand.
16 A.  The process would have been for Greg
17    Swanberg, who was the senior executive
18    at the level designated in the
19    contract, and Randy Hondros to sit down
20    and work out a resolution which we had
21    brought to their attention.  And while
22    I can't speak directly to it because I
23    don't have it and I wasn't a part of

42  (Pages 162 to 165)

d88e44a4-1e0c-4347-aed6-b1358f7a7c9

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 166

1    it, there is a letter that I think
2    resolved a number of issues but
3    trash-hauling. So the dispute
4    resolution was ineffective, I would
5    say, for the trash-hauling piece.
6  Q. Do you know if that dispute was ever
7    escalated to a lawsuit being filed
8    against BB&T by EMCOR?
9  A. I don't know if it's that or not.
10 Q. Do you know if an arbitration was
11   commenced by EMCOR against BB&T
12   regarding the trash-hauling?
13 A. I'm not aware of it, no, ma'am.
14 Q. Was EMCOR sued by ABM or A&L for
15   payment regarding trash-hauling?
16 A. Not to my knowledge, no, ma'am.
17 Q. Do you know if ABM or A&L started an
18   arbitration against EMCOR for payment
19   regarding trash-hauling?
20 A. Not to my knowledge, no.
21 Q. Would somebody else besides yourself
22   know more about whether or not
23   litigation or arbitrations were

Page 167

1    commenced against EMCOR regarding
2    trash-hauling?
3         MR. SAWYER: I would. Off
4         the record.
5         (Off-the-record discussion)
6  Q. Just to summarize, to your knowledge,
7    was the trash-hauling or trash-removal
8    issue ever resolved between BB&T and
9    EMCOR?
10 A. Not to my knowledge, no, ma'am.
11 Q. Was it uniformly the position of
12   EMCOR's vendors that they should be
13   paid to haul trash off-site?
14 A. My understanding was that trash-hauling
15   was a -- is a part of the scope of work
16   and, therefore, BB&T didn't want to pay
17   us to haul it off-site.
18 Q. Was it your understanding before the
19   project got started back in '05 that
20   BB&T would have a location on site to
21   dispose of trash?
22 A. My understanding in the scope of work
23   that it's either disposed of on site or

Page 168

1    at a regional-type location.
2  Q. Was there -- strike that. At some
3    point, either right before the project
4    started or during the life of the
5    project, did BB&T start a program to
6    remove dumpsters from any of its
7    locations?
8  A. I can't say it was a program. I can
9    speak to being notified -- and I'm not
10   quite sure how I found out about it.
11   But BB&T security had instructed, my
12   understanding -- I didn't see the
13   document -- but had instructed their
14   branches to, where possible, remove
15   dumpsters.
16 Q. Did you see any explanation of why they
17   thought that was a security problem?
18 A. Again, I don't remember seeing a
19   specific document. But I believe their
20   reasoning was the -- sometimes
21   financial records or transactions may
22   have been disposed of and ended up in
23   the trash can. Identity theft kind of

Page 169

1    issues was their concern.
2  Q. Do you have any idea what it costs to
3    have a dumpster on site at a branch
4    bank?
5  A. Not specifically at a branch bank. And
6    depending on location, variety, vendor
7    providing the service, an eight-yard
8    dumpster, which is a typical one, just
9    box-type dumpster that you would see, I
10   would think would be -- I don't know.
11   I think at our church we pay
12   seventy-five dollars a month and then
13   tipping fees, hauling fees. I just
14   don't know.
15 Q. That was going to be my next question.
16   In your experience with janitorial
17   work, I mean, would fifty to a hundred
18   dollars a month be about what a
19   dumpster costs?
20 A. Of that size, probably.
21 Q. Did you ever see any documentation or
22   hear any discussions about BB&T
23   removing dumpsters as a cost-savings

43 (Pages 166 to 169)

d88e44a4-1e0c-4347-aed6-b1358f7a7c9

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 170

1  device?
2  A. I don't recall a specific document.
3  However, I did report a -- and I think
4  it was in E-mail form; pretty confident
5  it was in E-mail form -- that we,
6  EMCOR, certainly didn't see that as a
7  viable option, that it would be a --
8  other costs, you know, may have been
9  incurred if you did that.
10  Q. And just so the record is clear, you
11  saw something, not sure exactly if it
12  was an E-mail or what, but that
13  basically said EMCOR doesn't see
14  dumpster removal as a viable option to
15  save money?
16  A. I think I wrote an E-mail that said
17  certainly that would be an issue of
18  concern.
19  Q. In the dispute letter that you typed up
20  and delivered to Randy Hondros --
21  A. Yes, ma'am.
22  Q. -- anywhere in that letter did it
23  discuss the fact that, whether

Page 171

1  intentionally or not intentionally,
2  BB&T had enjoyed a cost savings by
3  virtue of removing the dumpsters from
4  their branch bank locations?
5  A. I don't believe so. I think the letter
6  was pretty short and matter of fact in
7  that I quoted the section of the
8  contract that I was enacting and who
9  the contact should be and that within
10  five days, because I think that's what
11  it says in the contract, a meeting --
12  the first meeting is to be held and
13  that it could be done by conference
14  call. But I think it was pretty short,
15  matter of fact to the statement.
16  Q. In any conversations that you had had
17  with PFMI, did you ever discuss the
18  trash-hauling issue with them?
19  A. There was a trash -- what I term the
20  "trash summit" where PFMI and EMCOR and
21  PFMI -- no. I think Alan Cristal
22  brought to the table two companies,
23  like a BFI or other trash-hauling

Page 172

1  company, and BB&T did discuss the
2  ongoing trash issue.
3  Q. And that was -- was that a face-to-face
4  meeting?
5  A. It was a face-to-face meeting.
6  Q. Where did that occur?
7  A. At the real estate offices for BB&T in
8  Winston.
9  Q. Either at that summit or any other
10  time, was PFMI told that they would be
11  paid to take trash off-site?
12  A. I don't specifically recall that, no,
13  ma'am.
14  Q. Who was the point person for this trash
15  issue, the point person at EMCOR?
16  A. Alan Cristal wanted -- he took that on,
17  and I'm going to say that was early
18  February of '06. And he at that time
19  had requested, like, seventy-five days
20  to put some material together.
21  Q. Was a representative of BB&T at the
22  trash summit?
23  A. I was in and out of that meeting. I

Page 173

1  didn't -- I didn't stay throughout the
2  day. But I believe so, yes.
3  Q. Do you recall who that was?
4  A. No, ma'am, I don't.
5  Q. Besides Alan Cristal, do you recall who
6  else from EMCOR was involved in that
7  meeting?
8  A. I don't know if Debi Crosby -- I don't
9  remember.
10  Q. Do you know if any minutes or any kind
11  of written summary was created from
12  that meeting?
13  A. If they were, Alan would have done it.
14  Q. At what point in the life of either the
15  proposal phase or the contract phase
16  did EMCOR find out that BB&T intended
17  to remove dumpsters?
18  A. Again, I don't remember when that first
19  came to light, but I brought it to the
20  attention of Ronny Eller's group as
21  soon as I heard about it. And I think
22  they intervened to get security to stop
23  that program, but I really don't recall

44 (Pages 170 to 173)

d88e44a4-1e0c-4347-aed6-b1358f7a7c9

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

| Page 174 | Page 176 |
|---|---|
| 1 when that was. | 1 speak to that pretty well. |
| 2 Q. Where were the -- strike that. | 2 Q. Have you ever seen the Complaint, which |
| 3 At locations that didn't have a | 3 is the document that PFMI filed to |
| 4 dumpster, what was BB&T's designated | 4 start this lawsuit? |
| 5 location to dispose of trash? | 5 A. Yes, ma'am. |
| 6 A. I can't speak for all branches because | 6 Q. When did you first see the Complaint? |
| 7 I -- I just couldn't. There were | 7 A. December, I think, of -- of '06. I |
| 8 regional buildings or larger buildings. | 8 believe that's correct. |
| 9 If it was in an area where they had a | 9 Q. Have you seen what is often called the |
| 10 dumpster, they could take it from the | 10 Answer, which is EMCOR's response to |
| 11 branch to the larger building. | 11 PFMI's lawsuit? |
| 12 Q. Did you ever see any complaints where | 12 A. Yes, ma'am. I believe that was |
| 13 one BB&T branch was complaining about | 13 forwarded to me. |
| 14 people -- the cleaners dumping trash | 14 Q. At the termination of EMCOR by BB&T, |
| 15 from another BB&T branch in their | 15 what happened to all the mobile techs? |
| 16 dumpster? | 16 A. They were interviewed by the new |
| 17 A. Yes, ma'am, I do remember seeing at | 17 company. I don't remember how many got |
| 18 least one of those in Georgia, I | 18 hired on, but a lot of them did. Some |
| 19 believe. | 19 of them did not. |
| 20 Q. What would be the solution in a | 20 Q. What company took over the BB&T |
| 21 situation like that for that cleaner to | 21 project? |
| 22 do with the trash if they couldn't dump | 22 A. CB Richard Ellis. |
| 23 it at another BB&T branch? | 23 Q. Do they still have it? |

| Page 175 | Page 177 |
|---|---|
| 1 A. I believe in that case we took it to | 1 A. To the best of my recollection or |
| 2 the facility management group, Ronny | 2 knowledge, yes. |
| 3 Eller's group or Edna Green's group, to | 3 Q. During the proposal and the |
| 4 let them work it out, because it then | 4 presentation phase, did you hear or did |
| 5 to me seemed to me to be an internal | 5 you come to know how long BB&T had had |
| 6 BB&T issue. | 6 the majority of these branches? Strike |
| 7 Q. Do you remember what the resolution of | 7 that. Let me ask it another way. |
| 8 that issue was? | 8 The 1400 some-odd branches, had |
| 9 A. No, ma'am, I don't. | 9 all of those been long-standing BB&T |
| 10 Q. Do you know what EMCOR's projected | 10 branches or had BB&T recently gone |
| 11 profit margin was on the BB&T project? | 11 through an acquisition phase and picked |
| 12 MR. SAWYER: For the whole | 12 up a lot of those as new branches? |
| 13 contract? | 13 A. I couldn't speak to that, ma'am. I |
| 14 MS. TULEY: Yes. | 14 don't know that I recall that. |
| 15 A. Without having those financial | 15 Certainly BB&T had done many |
| 16 documents in front of me and I haven't | 16 acquisitions; but when they occurred, I |
| 17 looked at that stuff in quite some | 17 can't speak to. |
| 18 time, so I don't remember, ma'am. | 18 Q. You don't recall any discussions about |
| 19 Q. Who would be most familiar with what | 19 how new or old any of the branches |
| 20 the projected profit was on the BB&T | 20 were? And by "new or old," I mean to |
| 21 contract? | 21 BB&T. |
| 22 A. If you're looking for a current | 22 A. I don't specifically recall any of that |
| 23 employee, probably Andy Ball could | 23 during the presentation phase or |

45 (Pages 174 to 177)

d88e44a4-1e0c-4347-aed6-b1358f7a7c9

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

| | Page 178 |
|---|---|

1  proposal phase. There were some in
2  Virginia. But what acquisition that
3  was -- like the one I looked at didn't
4  seem to be that well upkept that I was
5  speaking to earlier. I don't know if
6  that had always been a BB&T or had that
7  been an acquisition. I don't know.
8          MS. TULEY: I'm going to
9              start going through some
10             documents. Y'all want
11             to take a quick break or
12             keep plowing on?
13         MR. SAWYER: Sure.
14         (Brief recess)
15         (Plaintiff's Exhibit #1 was
16             marked for identification.)
17 Q. (By Ms. Tuley) I'm going to show you
18    what I have just marked as Plaintiff's
19    Exhibit #1. And I'm going to ask you,
20    first of all, have you ever seen this
21    document before?
22 A. Yes.
23 Q. Could you tell me what this document

| | Page 179 |
|---|---|

1     is?
2  A. This is the letter of intent between
3     EMCOR and PFMI.
4  Q. Do you know who drafted this letter?
5  A. I don't know who drafted it, just who
6     signed it.
7  Q. Were you involved in the drafting of
8     this letter at all?
9  A. No, ma'am.
10 Q. In your office, did you keep any kind
11    of paper records regarding the BB&T
12    project?
13 A. Yes, ma'am.
14 Q. When you left the BB&T project and went
15    back to Wachovia project, what happened
16    with your paper files?
17 A. They stayed with the project.
18 Q. Do you know where those paper files are
19    stored today?
20 A. Not specifically where they are today,
21    no, ma'am.
22 Q. And do you know if what we've marked as
23    Plaintiff's Exhibit #1, this letter of

| | Page 180 |
|---|---|

1     intent, would have been something that
2     would have been kept in your paper
3     files, at least a copy of it?
4  A. I don't know that I had this in my
5     files.
6  Q. What type of documents would you have
7     kept in your files?
8  A. Contract files, scope of work -- I
9     tried to do a lot electronically
10    instead of having a lot of paper --
11    personnel files, copies of reports if
12    it was, like, from the FKC. But not a
13    lot of paper.
14 Q. Let me ask you this. How long is
15    information stored on that FKC?
16 A. I don't believe the information ever
17    goes away. We can access it back up to
18    sixty days; and if we want to go
19    further than that, we have to go
20    through the reporting group at the FKC.
21 Q. Where is the FKC headquartered?
22 A. Phoenix, Arizona.
23         (Plaintiff's Exhibit #2 was

| | Page 181 |
|---|---|

1          marked for identification.)
2  Q. I'm going to show you what I just
3     marked as Plaintiff's Exhibit #2. I'm
4     going to ask you first if you've ever
5     seen this document before.
6  A. I believe so, yes.
7  Q. Could you tell me what this is?
8  A. This appears to be the project plan for
9     implementing and rolling out the BB&T
10    account.
11 Q. Would this have just been with regards
12    to janitorial or would this have been
13    the entire project?
14 A. This appears just to be for the
15    janitorial implementation.
16 Q. Would there have been a similar
17    document with regards to the mobile
18    techs and the landscaping?
19 A. Yes, ma'am.
20 Q. Do you know if, just by looking at this
21    document, if this was the final time
22    line, implementation time line, or if
23    there were subsequent time lines?

46  (Pages 178 to 181)

d88e44a4-1e0c-4347-aed6-b1358f7a7c9

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 182

1   A.  This one appears to be the one that was
2       put into our contract, but I -- I don't
3       know if it's reflective of any changes
4       that occurred during or before
5       start-up.
6   Q.  I have read these kind of things
7       before, but they're always a little bit
8       confusing.  There are different -- I'm
9       sure this was originally in color.  But
10      there are dark bars, there are light
11      gray bars, and there's what I would
12      just call gray bars.  Did the color of
13      the bar indicate something specific or
14      does the color of the bar have any
15      meaning?
16  A.  It would.  For instance, if it was
17      in -- if there was a green bar, that
18      would represent a good condition or an
19      on-target condition.  But I don't know
20      the colors that were used here without
21      seeing the color copy.
22  Q.  And I think you just said this.  But it
23      was your recollection that this was

Page 183

1       included in the contract between BB&T
2       and EMCOR?
3   A.  Yes, ma'am.  The only reason I would
4       say that is because it's got an exhibit
5       number related at the top.
6   Q.  You're referring to the Exhibit K in
7       the upper right-hand corner?
8   A.  Yes, ma'am.
9   Q.  Or lower left-hand corner.  As the
10      project progressed, would there be
11      updated versions of this that were
12      generated?
13  A.  Yes, ma'am.
14  Q.  Who would be responsible for generating
15      these time lines?
16  A.  The transition manager.  That was Paul
17      Wilbur.
18          (Plaintiff's Exhibit #3 was
19           marked for identification.)
20      MS. TULEY:  Off the record.
21          (Off-the-record discussion)
22  Q.  I'm going to show you what I just
23      marked as Plaintiff's Exhibit #3.  This

Page 184

1       appears to be a letter to you from Jim
2       Wohlers.  Have you seen this letter
3       before?
4   A.  Yes, ma'am.
5   Q.  Do you recall receiving this letter?
6   A.  Yes, ma'am.
7   Q.  Tell me what -- was this a letter you
8       requested?
9   A.  Yes, ma'am.
10  Q.  Tell me why.
11  A.  This letter was generated after there
12      was an incident with a stolen what's
13      termed a bank proof bag from a branch.
14  Q.  Tell me what you know about that
15      proof-bag situation.
16  A.  That a subcontractor of PFMI, Destiny
17      Cleaning, had employed someone to clean
18      a branch -- and I don't recall the
19      branch location -- and that that person
20      had stolen the proof bag and there was
21      an amount of money assigned to
22      transactions that couldn't be recreated
23      for the bank and that EMCOR was

Page 185

1       responsible for making that whole.
2   Q.  Do you know, I mean, what types of
3       things are contained in a proof bag?
4   A.  When I asked that question, it was
5       checks, copies of transactions that
6       were done in a bank.  And I don't know
7       what else would be in there.
8   Q.  Did you see a police report regarding
9       the theft of the proof bag?
10  A.  I remember a report from security,
11      getting a report from BB&T security,
12      but I don't remember if that was the
13      police report or their report or both.
14  Q.  Do you know if a report was filed with
15      the police regarding the theft of the
16      proof bag?
17  A.  My understanding it was, yes, ma'am.
18  Q.  Do you know if there has been a
19      prosecution of the person accused of
20      stealing the proof bag?
21  A.  I don't have firsthand knowledge of
22      that.  I can tell you what I was told,
23      but I --

47  (Pages 182 to 185)

d88e44a4-1e0c-4347-aed6-b1358f7a7c9

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 186

1  Q.  What were you told about that?
2  A.  I was told that the person admitted it
3      and charges would have -- were filed.
4      But how -- the disposition of that, I
5      don't know.
6  Q.  Do you know who hired Destiny Cleaning
7      Services?
8  A.  They were a subcontractor of FMI.  But
9      who at FMI, I don't . . .
10 Q.  Were they recommended by BB&T?
11 A.  I don't recall, ma'am.
12 Q.  Did BB&T demand or seek any type of
13     payment from EMCOR regarding the proof
14     bag?
15 A.  Not only did they seek it, we had to
16     come up with it.
17 Q.  What type of investigation did EMCOR do
18     into the theft of the proof bag prior
19     to paying BB&T?
20 A.  I think Greg Swanberg could better
21     answer that than myself.
22 Q.  Did you do any type of investigation?
23 A.  We addressed it to our insurance risk

Page 187

1      people.  Now, whether they conducted
2      one or not, I can't speak to.
3  Q.  Do you know if EMCOR paid the money to
4      BB&T or if it came from EMCOR's
5      insurance?
6  A.  No.  EMCOR paid the money.  It did not
7      come from EMCOR insurance.
8  Q.  Was there any type of dispute process
9      instituted regarding that payment?
10 A.  Not that I'm -- that I recall, no,
11     ma'am.
12 Q.  And in your opinion, Greg Swanberg
13     would know the most about that issue?
14 A.  Yes, ma'am.
15 Q.  Are you aware that EMCOR has made a
16     claim against PFMI for reimbursement of
17     the amount that EMCOR paid to BB&T
18     regarding the proof bag?
19 A.  That's what I have been told, but I
20     don't have firsthand knowledge of that.
21         MR. SAWYER:  You mean in
22           this action?
23         MS. TULEY:  Yes, in this

Page 188

1          action.
2  Q.  Why did you request the information on
3      the background checks and drug screens?
4  A.  In an effort to determine whether the
5      procedure as we had laid out before for
6      background checks and drug screening of
7      people working in the branches had been
8      done.
9  Q.  And what was your determination?
10 A.  We had this letter that said yes, it
11     had been done, that Keith Blackburn had
12     gone to Destiny's office to review and
13     look at the documentation regarding the
14     services or the personnel involved.
15 Q.  Was BB&T able to recover or recoup any
16     of the losses resulting from the theft
17     of the proof bag prior to the
18     compensation being received from EMCOR?
19 A.  Yes.  EMCOR paid the balance of what
20     could not be reproduced or recreated,
21     and I don't know enough about banking
22     to tell you how that happens.
23 Q.  After EMCOR paid that balance, was BB&T

Page 189

1      able to make any other recoveries
2      regarding the proof bag?
3  A.  Not that I'm aware of, no, ma'am.
4  Q.  To your knowledge, was EMCOR reimbursed
5      any money that they had paid BB&T
6      regarding the proof bag?
7  A.  Not that I'm aware of, no, ma'am.
8          (Plaintiff's Exhibit #4 was
9           marked for identification.)
10 Q.  Let me show you what I've marked as
11     Plaintiff's Exhibit #4.  Can you tell
12     me what this is?
13 A.  This is a letter received from Jim
14     Wohlers at PFMI outlining the
15     understanding that EMCOR was currently
16     compiling accurate cleanable square-
17     footage numbers and that PFMI
18     understand that what has been billed by
19     PFMI since November, that billing
20     adjustments will be made, credits
21     and/or debits, based on those surveys
22     and that those would then become the
23     adjusted square-foot cleanable numbers

48  (Pages 186 to 189)

d88e44a4-1e0c-4347-aed6-b1358f7a7c9

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 190

1    going forward.
2    Q. The last, I guess it's sentence of
3       this, says, Once these surveys are
4       complete and prior to any adjustments
5       being made, PFMI reserves the right to
6       challenge and remeasure any surveys.
7          Did PFMI dispute any of the
8       measurements or surveys done by the
9       mobile techs?
10   A. I recall getting one challenge, to use
11      that term, and I spoke to it earlier
12      today. But I don't recall if that
13      was -- it was in the east Tennessee
14      region, I believe, but I couldn't
15      remember if it was multiple branches or
16      a single branch.
17   Q. Besides the one challenge, I mean, did
18      PFMI relate to you that they did not
19      agree with any of the other
20      remeasurement numbers?
21   A. The only other conversation I remember
22      having with Jim Wohlers was that there
23      was a big concern about the numbers.

Page 191

1    But pretty much to that extent.
2          (Plaintiff's Exhibit #5 was
3          marked for identification.)
4    Q. Let me show you what I've marked as
5       Plaintiff's Exhibit #5. I'm going to
6       ask you if you have seen a copy of this
7       letter.
8    A. Yes, ma'am, I believe so.
9    Q. Did you get this as -- let me ask it
10      this way. Did you see this letter in
11      the normal course of your work on the
12      BB&T project?
13   A. Yes, ma'am.
14   Q. I'm not going to go through this whole
15      letter. It looks like it's a letter
16      from Greg Swanberg to Timothy
17      Shelburne, who apparently is in the --
18      well, who is Timothy Shelburne? instead
19      of me guessing.
20   A. My understanding, he's the in-house
21      attorney for BB&T. And it's not from
22      Greg. It's to Greg.
23   Q. To Greg. You're right. Sorry. If

Page 192

1    you'll look at the second page, it's
2    a -- would you agree with me it's a
3    letter regarding the stolen proof bag?
4    A. Yes, ma'am.
5    Q. On the second page, third paragraph
6       from the end, it says inside that
7       paragraph: If EMCOR disputes such
8       liability in accordance with the
9       provisions of paragraph 14 of the
10      contract governing dispute resolution,
11      please consider this letter as demand
12      for dispute resolution meeting. And
13      we've already covered this, but just to
14      be clear, did any such dispute
15      resolution meeting regarding the proof
16      bag occur?
17   A. Not to my knowledge, no, ma'am.
18   Q. At the end of the first paragraph of
19      this letter, Mr. Shelburne writes: No
20      criminal background check on
21      Ms. McLaurin was conducted by Destiny
22      Cleaning Service prior to allowing her
23      to work on BB&T premises.

Page 193

1          I thought we had already
2    discussed where a background check had
3    been done on McLaurin. Was that your
4    understanding?
5          MR. SAWYER: Object to
6          counsel's
7          characterization of
8          prior testimony. You
9          can answer if that's
10         your understanding.
11   A. My understanding that one had been
12      done, but the owner of Destiny Cleaning
13      told BB&T that in fact he had not done
14      one.
15   Q. All right. He told BB&T that he -- the
16      owner of Destiny told BB&T he had not
17      done one?
18   A. Yes, ma'am.
19   Q. Did anybody at EMCOR contact the owner
20      of Destiny and ask them about the
21      background check?
22   A. Not from EMCOR. We went to our
23      contractor, PFMI.

49 (Pages 190 to 193)

d88e44a4-1e0c-4347-aed6-b1358f7a7c9

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 194

1  Q. And what did PFMI say about the
2     background check?
3  A. Well, we have the letter that talks
4     specifically to the background check
5     that Jim wrote to me after Keith
6     Blackburn had visited the site. Why
7     there's a -- why those two don't match
8     I can't speak to.
9  Q. Did you do any kind of investigation of
10    your own to see if a background check
11    had in fact been done on McLaurin?
12 A. Only by requesting from PFMI
13    confirmation that one had been done.
14        (Plaintiff's Exhibit #6 was
15        marked for identification.)
16 Q. I'm going to show you what I just
17    marked as Plaintiff's Exhibit #6. Can
18    you tell me what this letter is?
19 A. This is a letter composed and signed by
20    myself terminating the services between
21    EMCOR and PFMI, also stating that a new
22    agreement would be presented for
23    continued services in Georgia,

Page 195

1     Kentucky, West Virginia, and Tennessee.
2  Q. Who is -- is it Johnna Spera?
3  A. Johnna Spera. She was the in-house
4     corporate attorney for EMCOR at the
5     time, EMCOR Facilities Services.
6  Q. All right. And just, I think, for the
7     record, if you'll look, this seems to
8     confirm what we had discussed earlier,
9     that the new contract commenced
10    effective June 1, 2006; is that
11    correct?
12        MR. SAWYER: Object to
13        counsel's
14        characterization.
15 A. Yes.
16        (Plaintiff's Exhibit #7 was
17        marked for identification.)
18 Q. Let me show you what I've marked as
19    Plaintiff's Exhibit #7. This is a
20    rather big document, so if you could
21    look through it for a minute and then
22    tell me if you've seen this document
23    before.

Page 196

1  A. Yes, I have.
2  Q. Tell me what this is.
3  A. This is the -- a contract agreement for
4     services between EMCOR and PFMI.
5  Q. It's dated May 3rd, 2006; is that
6     correct?
7  A. Yes, ma'am.
8  Q. Is this what we have been referring to
9     as the new contract?
10 A. Yes, ma'am.
11 Q. The copy I'm looking at is not signed.
12    Do you know if this version was
13    executed?
14 A. To the best of my knowledge, yes,
15    ma'am.
16        MR. SAWYER: Off the record.
17        (Off-the-record discussion)
18 Q. If you will look at what's marked as
19    Exhibit B to what we have just marked
20    as Plaintiff's Exhibit #7.
21 A. Yes, ma'am.
22 Q. Tell me what Exhibit B is.
23 A. Exhibit B is a list of the locations

Page 197

1     that PFMI would be cleaning.
2  Q. Was this list the regions that PFMI
3     would be covering under the new
4     contract?
5  A. Yes, ma'am.
6  Q. Who generated this list?
7  A. I don't really know the answer to that,
8     because I didn't work on this contract.
9        (Brief pause)
10       (Plaintiff's Exhibit #8 was
11       marked for identification.)
12 Q. Let me show you what I've marked as
13    Plaintiff's Exhibit #8. I'm going to
14    ask you if you've seen this letter
15    before.
16 A. I don't specifically recall if I've
17    seen this one or not.
18 Q. If you'll look at the third page --
19 A. Yes, ma'am.
20 Q. -- which I'll represent to you I'm not
21    exactly sure if it goes with this
22    letter or not. I'm assuming it does.
23    Have you seen this document, the third

50 (Pages 194 to 197)

d88e44a4-1e0c-4347-aed6-b1358f7a7c9

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 198

1    page of Plaintiff's Exhibit #8?
2    A. I don't recall seeing this, no, ma'am.
3        MS. TULEY:  Y'all want to
4        take about a five-minute
5        break?
6        MR. SAWYER:  Yeah.
7        (Brief recess)
8        (Plaintiff's Exhibit #9 was
9        marked for identification.)
10   Q. (By Ms. Tuley) All right.  I'm going to
11       show you what I've marked as
12       Plaintiff's Exhibit #9.
13   A. Yes, ma'am.
14   Q. Tell me what this top page is.
15   A. This outlines the general scope of work
16       to be performed under the janitorial
17       services contract.
18   Q. And this is marked as Exhibit D, is
19       what it says at the top?
20   A. Yes, ma'am.
21   Q. Would this be, to your knowledge,
22       Exhibit D to the contract between EMCOR
23       and BB&T?

Page 199

1    A. To my knowledge, yes, ma'am.
2    Q. And if you will -- and is this a
3        document you're fairly familiar with,
4        this Exhibit D?
5    A. Yes, ma'am.
6    Q. Does this look like a correct copy of
7        it?
8    A. Appears to be so, yes.
9    Q. If you'll flip over to the second page.
10       We're looking at what looks like a
11       chart and has four columns:  Specific
12       service type, two columns that say
13       frequency, and one that says comment.
14       And without just going line by line
15       through this thing, this looks like it
16       just sets up how often the tasks in the
17       left-hand column are to be conducted.
18       Is that fair?
19   A. That's correct.
20   Q. And let's see.  The chart document
21       is -- let me make sure -- four pages.
22       MR. SAWYER:  You're looking
23       at Exhibit E, Counsel?

Page 200

1        MS. TULEY:  No.  I'm still
2        looking at Exhibit D.
3    Q. There is a first page that has bullets,
4        and then there's a four-page chart on
5        Exhibit D.  Was this Exhibit D the
6        entire scope of work?
7    A. For janitorial.
8    Q. For janitorial.
9    A. Yes, ma'am.
10   Q. Were there any additions to this scope
11       of work during the contract?
12   A. There were some changes made -- there
13       was a task force or a group of RBOMs,
14       myself; Edna Green led the effort -- to
15       modify the scope of work.  And I'm not
16       really sure when we did that.  February
17       or March, I believe, of '06.
18   Q. Was that modified scope ever put into
19       effect?
20   A. Yes, ma'am.
21   Q. It replaced the original scope?
22   A. Yes, ma'am.
23   Q. Do you recall what the changes were?

Page 201

1    A. I don't.  I believe they were -- there
2        weren't many changes at all to the
3        janitorial scope.  And without having
4        it in front of me, the -- there was
5        addition for paper towels in some break
6        rooms; some other, I think, fairly, you
7        know, moderate changes, not a lot, to
8        this -- to this scope.
9    Q. If you'll go back about eleven pages to
10       what is marked as Exhibit H.  It's
11       Exhibit H, Management Fee Summary.
12   A. Yes, ma'am.
13   Q. Are you familiar with this document?
14   A. Yes, ma'am.
15   Q. It says Portfolio Management &
16       Administration.  Does this document
17       outline the charges from EMCOR to BB&T
18       for the BB&T project?
19   A. For the janitorial portion of the BB&T
20       project, yes, ma'am.
21   Q. It has a line item for a facilities
22       knowledge center.  Was that for all use
23       of the facility knowledge center or

51 (Pages 198 to 201)

d88e44a4-1e0c-4347-aed6-b1358f7a7c9

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 202

1    just what was anticipated for the
2    janitorial?
3  A. Anticipated for janitorial and based on
4    an estimate.
5  Q. What are ODCs?
6  A. Other direct costs.
7  Q. And what is fringe?
8  A. Burden for the employee, the taxes, the
9    insurance.
10 Q. Fringe benefits?
11 A. Fringe benefits, yes, ma'am.
12 Q. Got you. At the bottom, it says, the
13    bottom of the little chart, it says,
14    Roughly 6.7 million square feet
15    managed. Is that gross or net?
16 A. I can't specifically speak to that. I
17    don't know.
18 Q. On the little bullets, it says, Level 3
19    licenses. Was that what we were
20    talking about to look at the FKCs?
21 A. Yes, ma'am.
22        (Brief pause)
23 Q. That's all the questions I have about

Page 203

1    that.
2        (Plaintiff's Exhibit #10 was
3        marked for identification.)
4  Q. I'm going to show you what I've marked
5    as Plaintiff's Exhibit #10. And the
6    first document we're looking at here is
7    entitled Exhibit B. Can you tell me
8    what Exhibit B is?
9  A. This was an original draft of how the
10    account would be laid out after the
11    implementation of mobile maintenance.
12 Q. And it's got your name as being the
13    account manager; is that correct?
14 A. Sean. Yes, ma'am.
15 Q. And then where it says Administrative
16    Assistant I, would that be Lynn Wilson
17    that we've talked about?
18 A. Yes, ma'am.
19 Q. Who would be the contracts manager?
20 A. We didn't end up with a contracts
21    manager. We had the accounting people.
22 Q. Where it says "Accounts Payable (2)"?
23 A. Yes, ma'am. It was an accounting

Page 204

1    manager and a payable clerk.
2  Q. We had talked about you having seven
3    regional managers.
4  A. Yes, ma'am.
5  Q. I'm seeing eight slots here.
6  A. This document is not how the account
7    was set up.
8  Q. This was just one of the original
9    drafts?
10 A. Yes, ma'am.
11 Q. Would there be a document similar to
12    this but with -- but correct?
13 A. Yes, ma'am.
14 Q. You've seen one?
15 A. Yes, ma'am.
16 Q. We may get to it; we may not. I don't
17    know if I have it in this pile. If
18    you'll flip to the next page where it
19    says Exhibit C.
20 A. Yes, ma'am.
21 Q. And I guess I should have asked, to
22    start with, it's got -- all of these
23    have up in the upper left-hand corner,

Page 205

1    where it says Contract Number
2    EMC-00793. Does this go with the
3    original contract between EMCOR and
4    BB&T?
5  A. I don't think this is in the original
6    contract, no.
7  Q. Do you know what these are exhibits to,
8    then?
9  A. I could only guess.
10 Q. That's fine. It's dated -- if you'll
11    look at what's marked as part of
12    Plaintiff's Exhibit #10 as Exhibit C,
13    it says Janitorial Price Response; and
14    it's got a revised date in the bottom
15    right-hand corner of March 23, '05. Do
16    you know who prepared this document?
17 A. No, ma'am.
18 Q. Have you seen this document before?
19 A. To the best of my recollection, no,
20    ma'am.
21 Q. Okay. We'll just move on.
22        MS. TULEY: I don't have an
23        extra copy of this one

52  (Pages 202 to 205)

d88e44a4-1e0c-4347-aed6-b1358f7a7c9

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

| | Page 206 |
|---|---|
| 1 | for some reason. |
| 2 | (Plaintiff's Exhibit #11 was |
| 3 | marked for identification.) |
| 4 | Q. Let me show you what I've marked as |
| 5 | Plaintiff's Exhibit #11. This is |
| 6 | another document entitled Exhibit B, |
| 7 | and it appears to be -- well, it is |
| 8 | entitled EFS Maintenance Organization |
| 9 | for BB&T. If you'll look at this and |
| 10 | tell me what this document is. |
| 11 | A. Again, this is an earlier version in |
| 12 | the organization chart. |
| 13 | Q. This is not a correct version, either? |
| 14 | A. It is not. |
| 15 | Q. We're closing in on it. I feel it. |
| 16 | Okay. |
| 17 | MR. SAWYER: I don't know. |
| 18 | I guess January 1 is |
| 19 | a -- January 1, 2007 is |
| 20 | the print date. I don't |
| 21 | know. |
| 22 | MS. TULEY: I assumed that |
| 23 | just was populated by |

| | Page 208 |
|---|---|
| 1 | gross square feet, one called current |
| 2 | vacant square feet, and one called |
| 3 | adjusted square feet. |
| 4 | A. Yes, ma'am. |
| 5 | Q. And I think we've discussed this |
| 6 | earlier. Is the way this works that -- |
| 7 | well, let me ask you this. Was this a |
| 8 | document provided by BB&T? |
| 9 | A. Yes, ma'am. |
| 10 | Q. Okay. Just to be clear, because we've |
| 11 | had a long day, you're not aware of how |
| 12 | BB&T derived their gross square-footage |
| 13 | numbers? |
| 14 | A. No, ma'am. |
| 15 | (Plaintiff's Exhibit #13 was |
| 16 | marked for identification.) |
| 17 | Q. Let me show you what I've marked as |
| 18 | Plaintiff's Exhibit #13. First I'm |
| 19 | just going to ask, is that your E-mail |
| 20 | address? |
| 21 | A. Yes, ma'am. |
| 22 | Q. What is a JSR? |
| 23 | A. I believe the acronym stands for job |

| | Page 207 |
|---|---|
| 1 | somebody looking at it. |
| 2 | (Plaintiff's Exhibit #12 was |
| 3 | marked for identification.) |
| 4 | Q. I'm going to show you what I've marked |
| 5 | as Plaintiff's Exhibit #12. Take a |
| 6 | look at that and, first off, tell me if |
| 7 | you've seen this document before. |
| 8 | (Brief pause while witness |
| 9 | reviews document) |
| 10 | A. If not this document, one very close to |
| 11 | it. |
| 12 | Q. Tell me what this is. |
| 13 | A. This is a listing of all the BB&T |
| 14 | branches that fell in our account. |
| 15 | Q. Would this Exhibit A have been part of |
| 16 | the original contract between BB&T and |
| 17 | EMCOR? |
| 18 | A. I don't know if it's this Exhibit A, |
| 19 | but there is an Exhibit A in the |
| 20 | contract that has all of the sites |
| 21 | listed. |
| 22 | Q. This has, if you'll kind of scroll |
| 23 | over, it has three columns, one called |

| | Page 209 |
|---|---|
| 1 | status report. |
| 2 | Q. What is a KPI? |
| 3 | A. Key performance indicator. |
| 4 | Q. That's all I had for that one. |
| 5 | MS. TULEY: I think I'm |
| 6 | about done. Y'all want |
| 7 | to give me -- |
| 8 | MR. SAWYER: Take a second |
| 9 | to -- |
| 10 | MS. TULEY: Yeah, a few |
| 11 | minutes to run through |
| 12 | my notes and talk to |
| 13 | Mr. Littlefield. |
| 14 | (Brief recess) |
| 15 | Q. (By Ms. Tuley) All right. I don't |
| 16 | really have much more to ask. Why did |
| 17 | EMCOR pay ABM and A&L Services more per |
| 18 | square foot than they were paying PFMI? |
| 19 | A. It was what the client had agreed to |
| 20 | pay for the service going forward and |
| 21 | what BB&T had approved. |
| 22 | Q. Do you know why BB&T approved a greater |
| 23 | amount per square foot? |

53 (Pages 206 to 209)

d88e44a4-1e0c-4347-aed6-b1358f7a7c9

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 210

```
 1   A. I don't.
 2          MR. SAWYER:  Objection.
 3          Mischaracter -- oh,
 4          strike that.  I withdraw
 5          the objection.  I just
 6          played it again in my
 7          head.  It's late.  I
 8          apologize.
 9   A. I don't.
10          MS. TULEY:  That's it.
11
12   *   *   *   *   *   *   *
13       FURTHER DEPONENT SAITH NOT
14   *   *   *   *   *   *   *
15
16
17
18
19
20
21
22
23
```

Page 211

```
 1          REPORTER'S CERTIFICATE
 2
 3   STATE OF ALABAMA )
                      )
 4   ELMORE COUNTY    )
 5
 6       I do hereby certify that the above
 7   and foregoing transcript was taken down
 8   by me in stenotype, and the questions
 9   and answers thereto were transcribed by
10   means of computer-aided transcription,
11   and that the foregoing represents a true
12   and correct transcript of the testimony
13   given by said witness.
14       I further certify that I am neither
15   of counsel, nor of any relation to the
16   parties to the action, nor am I anywise
17   interested in the result of said cause.
18
19
         Barbara A. Howell, CSR No. 508
20       Court Reporter and Commissioner
         for the State of Alabama at Large
21       MY COMMISSION EXPIRES: 12/27/08
22
23
```

54  (Pages 210 to 211)

d88e44a4-1e0c-4347-aed6-b1358f7a7c9

# Exhibit F

E. LARRY CAPILOUTO, CPA

| | |
|---|---|
| POSITION: | CPA with the accounting firm of Bern, Butler, Capilouto & Massey, CPA's, P.C., Montgomery, Alabama |
| EDUCATION: | Marion Military Institute, 1966, Distinguished Military Student University of Alabama, 1970, Bachelor of Science Degree in Accounting |

CERTIFICATIONS &
AFFILIATIONS:

Certified Public Accountant, Alabama
American Institute of Certified Public Accountants
Alabama Society of Certified Public Accountants
Georgia Society of Certified Public Accountants
American Institute of Certified Public Accountants PCPS
 MAP Committee
AICPA Tax Planning and Advising for Closely Held Businesses
 Certificate of Educational Achievement
AICPA Personal Financial Planning Process Certificate of
 Educational Achievement

CIVIC AND
COMMUNITY
ORGANIZATIONS:

Current Board Member of Montgomery Chamber of Commerce
Current Board Member of Janice Capilouto Center for the Deaf
 Easter Seal
Current Treasurer of the Board of Directors of Jackson Hospital
 Foundation
Current Member, Committee of 100, Montgomery Area Chamber
 of Commerce
Past Chairman, Easter Seal Rehab Center
Past Treasurer, Alabama Easter Seal Society, Inc.
Past President, Vice-President and Treasurer, Temple Beth-Or
 Board of Trustees
Past Treasurer, Temple Etz Ahayem
Past Board Member, Central YMCA
Past Branch Chairman, YMCA Capital Campaign
Past Board Member, YMCA Camp Chandler
Graduate, Leadership Montgomery Class of 1993
Past Board Member, American Cancer Society
Participant, American Cancer Society Biggest Rat and Relay for
 Life Campaigns
Past Board of Trustees Member, Jewish Federation of Montgomery

# E. LARRY CAPILOUTO, CPA

LITIGATION SUPPORT
SERVICES:

                          Domestic
                             Divorce
                          Business Valuations
                             Sale of Business
                             Purchase of Business
                             Estate Tax Returns
                             Disputed Valuations
                          Business Valuations/Loss of Income
                             Embezzlement
                             Minority Shareholders
                             Insurance Agencies
                             Insurance Agents
                             Beneficiary Estate/Trusts
                        Certificate of Need for Nursing Homes

Professional Facilities Management, Inc.

vs.

EMCOR Facilities Services, Inc.

Report of Financial Damages

Professional Facilities Management, Inc.
Report of Financial Damages

INDEX

|  | Page |
|---|---|
| Summary of damages | 3 |
| Loss on job September 2005 through July 2006 | 4 |
| Foregone profit on job September 2005 through July 2006 | 5 |
| Projected future profit | 6 |
| Notes and assumptions | 7 |
| Schedule I, Reconciliation of internal net loss to loss on job | 8 |

Professional Facilities Management, Inc.
Report of Financial Damages

Re: Summary of damages

| | | |
|---|---|---|
| Loss on Job from September 2005 through July 2006 | $ | 557,128 |
| Foregone profit on job from September 2005 through July 2006 | $ | 419,332 |
| Projected future profit under revised contract terms of of June 1, 2006 through June 30, 2008 | $ | 420,614 |
| Attorney fees related to subcontractor claims | $ | 6,265 |
| Total damages | | $ 1,403,339 |

-3-

Professional Facilities Management, Inc.
Report of Financial Damages

Re: Loss on Job from September 2005 through July 2006

|  | Amount |
|---|---|
| Revenue | $ 6,454,650 |
| Outside services | (5,571,779) |
| Direct labor & material cost | (61,075) |
| Gross profit | 821,796 |
| Direct personnel expenses | (135,583) |
| Other direct expenses | (236,306) |
| Income before adjustments | 449,907 |
| Revenue billed but not collected | (740,340) |
| Direct trash removal expenses not recorded | (236,120) * |
| Additional rent expense | (30,575) |
| Total loss on job from September 2005 through July 2006 | $  (557,128) |

\* Additional trash removal expenses of approximately $88,000 have not been included.
We will revise the loss to include these amounts when documentation is available.

-4-

Professional Facilities Management, Inc.
Report of Financial Damages

Re: Foregone profit on job from September 2005 through July 2006

| | Amount |
|---|---|
| Revenue | $ 6,454,650 |
| Outside services | (5,571,779) |
| Direct labor & material cost | (61,075) |
| Gross profit | 821,796 |
| Direct personnel expenses | (135,583) |
| Other direct expenses | (236,306) |
| Additional rent expense | (30,575) |
| Foregone profit on job | $    419,332 |

Professional Facilities Management, Inc.
Report of Financial Damages

Re: Projected future profit under revised contract terms of June 1, 2006 through June 30, 2008

| | |
|---|---:|
| Square footage per revised contract | 2,281,688 |
| Average janitorial revenue per square foot | 1.229 |
| Projected future annual revenue | $ 2,804,195 |
| Projected future monthly revenue | 233,683 |
| Remaining contract terms | 24 months |
| Projected remaining future revenue | $ 5,608,389 |
| Less: July 2006 revenue | (83,062) |
| Projected future revenue | 5,525,327 |
| Projected outside services | (4,769,569) |
| Projected direct labor & material cost | (52,282) |
| Projected gross profit | 703,476 |
| Projected direct personnel expenses | (116,062) |
| Projected other direct expenses | (166,800) |
| Projected net income | $ 420,614 |

Professional Facilities Management, Inc.
Report of Financial Damages

NOTES AND ASSUMPTIONS:

1. Loss on job from September 2005 through July 2006 - The loss was computed using internally prepared financial statements. Included are all directly related expenses, which consist of outside services, direct materials and labor, direct personnel expenses and other direct expenses. Testing was performed to satisfy with reasonable assurance that expenses were properly charged. No allocation of indirect overhead was deducted. Revenue per the internal financial statements included amounts billed but not collected. Revenue was reduced by this amount to calculate the loss on job. The additional trash removal expenses shown were not expensed in the internal financial statements. Additional rent expense represents the remaining rent due under a three-year lease for office space specifically for this job.

2. Foregone profit on job from September 2005 through July 2006 - This amount represents the profit that would have been made if the accounts receivable were collected and the unexpected trash removal expenses were not incurred.

3. Projected future profit - This amount was based on actual square footage per the revised contract terms of June 1, 2006 through June 30, 2008. The actual square footage per month for 24 months times the average janitorial revenue per square foot used in the original Bid package was calculated. Expenses were calculated based on historical percentages. Office furniture and fixtures, special programming fees, and additional office rent were non-recurring expenses and were not included in the historical percentages. The projected net income appears reasonable based on the calculations and historical trend analysis.

4. Schedule 1 - Reconciliation of internal net loss to loss on job - This reconciliation includes the net loss per the internally prepared financial statements and the indirect overhead not deducted in the loss on job calculation.

Professional Facilities Management, Inc.
Report of Financial Damages

Schedule I: Reconciliation of Internal Net Loss to Loss on Job

| | |
|---|---:|
| Internal net loss | $ (199,721) |
| General overhead | 649,628 |
| Income before adjustments | 449,907 |
| Revenue billed but not collected | (740,340) |
| Direct trash removal expenses not recorded | (236,120) |
| Additonal rent expense | (30,575) |
| Total loss on job from September 2005 through July 2006 | $ (557,128) |