IN THE UNITED STATES DISTRICT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| PROFESSIONAL FACILITIES MANAGEMENT, INC., | § § § | |
| Plaintiff, | § § | |
| v. | § § | |
| EMCOR FACILITIES SERVICES, INC.; and A, B, and C, as fictitious parties, | § § § § | CIVIL ACTION NO: 2:06CV1136-MHT |
| Defendants. | § § | |

**PROFESSIONAL FACTILITIES MANAGEMENT, INC.'S BRIEF IN
OPPOSITION TO EMCOR FACILITIES SERVICES, INC.'S
MOTION FOR PARTIAL SUMMARY JUDGMENT**

Professional Facilities Management, Inc. ("PFMI") hereby submits this brief in opposition to EMCOR Facilities Services, Inc.'s ("EMCOR") Motion for Partial Summary Judgment (Doc. 23).

### Introduction and Factual Background

In early 2005, BB&T bank decided to consolidate their facility services for their approximately 1,400 branch banks with one management company. Prior to that, each branch or regional group of branches obtained their own janitorial, maintenance and landscaping services. *Exhibit 1, Deposition of Debra Willis, page 9 lines 14-23.* This was a major cultural change within BB&T. *Willis, p. 42 lines 7-10.* One of BB&T's goals was to cut costs and save the company money by using their buying power. *Willis, p. 10, lines 2-14.*

As part of the process of selecting an outsourcing company, BB&T sent out requests for information (RFIs) to a select group of companies. *Exhibit 2, Deposition of Ronnie Eller, page*

*8, line 23 – page 9, line 13.*  Based on those results, a smaller group of companies were sent Requests for Proposals (RFPs).  EMCOR was one of the companies from which BB&T solicited information and a proposal.  Part of the RFP contained a document internally labeled, Exhibit A, the Master Location List, a listing of each branch location and the gross square footage for that location.  *Exhibit 3; see also Exhibit 4, Deposition of Sean Brookins, page 45, lines 7-18..*  From very early in the process, BB&T informed EMCOR that the gross square footage numbers were inaccurate and that the net cleanable square footage numbers would be quite different.  *Eller, p. 51, line 9 – p. 52, line 4.*  In fact, BB&T measured a sampling of thirty (30) to fifty (50) locations and found that net cleanable square footage was twenty percent (20%) less than their gross square footage numbers reflected in the Master Location List provided with the RFP.  *Willis, p. 16, lines 5-14.*  BB&T informed EMCOR that their sampling revealed this 20% difference.  *Willis, p. 17, lines 3-18.*  BB&T provided EMCOR Exhibits C and C.5, spreadsheets for pricing and bidding purposes, reflecting the 20% reduction.  *Exhibit 5, "Exhibit C" and Exhibit 5, "Exhibit C.5"*

   EMCOR gave PFMI the original RFP containing the Master Location List with the gross square footage numbers.  *Exhibit 7, Deposition of Greg Littlefield, page 64, line 18 – page 66, line 10.*  Emcor requested PFMI bid the project based on a unit price, which was a price per square foot.  *Exhibit 8, Deposition of Jim Wohlers, page 52, lines 3-10.*  Despite having Exhibit C and C.5, EMCOR did not inform PFMI that the numbers were off 20%, nor did they inform PFMI to use those exhibits for pricing and billing purposes.  Emcor requested PFMI measure the branches to determine net cleanable square footage.  Net cleanable square footage is the gross square footage minus obviously non-cleanable or vacant space.  *Wohlers, p. 55, lines 4-12.*  The measurements were to be done during the first ninety (90) days of the project.  *Wohlers, p. 68,*

lines 10-22; p. 89, lines 20-22.   In discussions with PFMI, EMCOR informed them that the difference would probably be a wash. *Littlefield, p. 118, line 23- p. 120, line 11.*   PFMI relied on these representations and bid the project based on the gross square footage numbers. *Littlefield, p. 76 line 21 – p. 77 line 13.*

EMCOR was eventually awarded the contract by BB&T based in part on the low price per square footage for janitorial provided by PFMI. *Exhibit 9, Service Master Agreement.*   On or about July 13, 2005, EMCOR and PFMI entered into an agreement for PFMI to supply the janitorial component of the BB&T project.   *Exhibit 10, Letter of Intent.*   The janitorial component was to start September 6, 2005, the Monday after Labor Day in all 1,400 plus locations. *Willis, p. 11, line 22 – p. 12, line 13.*   At or about the time the project started the gross square footage was approximately 6.5 million square feet. *Brookins, p. 44, line 22- p. 45, line 6.*

In anticipation of starting the cleaning, PFMI obtained five (5) alliance partners. *Littlefield, p. 70, line 21 – p. 71, line 15.*   The alliance partners were large regional cleaning companies that would cover much of the roughly eight (8) states that made up BB&T's large geographical territory with approximately 1406 branches. *Eller, p. 8, lines 9-22.*   During the start-up of the project, each branch was to be measured by PFMI or one of its alliance partners for the net cleanable square footage. *Wohlers, p. 73, line 20 – page 75, line 20.*   Until those measurements were completed, all the alliance partners and any subcontractors were instructed to bill PFMI based on gross square footage numbers.   *Wohlers, page 92, lines 16-21.*   The subcontractors had to bill based on gross square footage numbers because EMCOR insisted PFMI submit its' bills based on gross square footage numbers. *Littlefield, p. 78, lines 4-9.*

Before the project began, PFMI became aware of Exhibit C, the spreadsheet with 20% lower square footage numbers.  PFMI immediately contacted EMCOR. *Littlefield, p. 93 line 7 –*

*p. 95 line 20.* The Master Location List reflected 6.7 million adjusted square feet and 6.9 million gross square feet; whereas, the spreadsheet called Exhibit C reflected only 5.4 million net cleanable square feet. *Exhibit 3, Master Location List and Exhibit 5, "Exhibit C."* EMCOR assured PFMI that those numbers were for budgeting purposes only. *Wohlers, p. 58, line 17 – p. 59, line 16; p. 63, line 14 – p. 64, line 20.* Greg Littlefield, PFMI's President, told EMCOR that if the numbers were going to be that much less, that PFMI could not do the cleaning as priced. *Littlefield, p. 98 lines 15-21.* Littlefield was again told that it was just for budgeting and the difference would basically be a wash. *Littlefield, p. 119 line 21 – p. 120 line 11.* Based on these representations, PFMI began performance under the contract.

As the project progressed and net measurements were completed by PFMI, PFMI attempted to lower the amount they billed from gross to net. EMCOR repeatedly rejected these lower billings and insisted PFMI bill on gross. *Littlefield p. 101, lines 5-15; p. 125 line 13- p. 126 line 3; p. 139 lines 9-18.* In December 2005, PFMI transmitted the net cleanable square footage numbers to EMCOR. PFMI informed EMCOR that they were concerned a percentage of those measurements were inaccurate and wanted to re-measure. *Littlefield, p. 100 line 11- p. 101 line 4.* EMCOR denied PFMI's request to re-measure. *Littlefield, p. 104 line 14 – p. 105 line 7; p. 132 lines 12-23.* Instead, PFMI was forced to continue billing on gross for months until EMCOR's mobile maintenance techs entered the project. *Brookins, p. 59, line 19 – p. 60, line 10.* During this time frame, BB&T discussed frequently with Sean Brookins of Emcor, BB&T's belief that the net cleanable footage was 20% less than the gross square footage. *Exhibit 11, Deposition of Edna Green, page 24, lines 5-13 and page 24, lines 19-24.*

Emcor's mobile maintenance techs, mostly HVAC technicians, measured a small sampling of the branches and then applied the difference to all remaining branches. *Exhibit 12,*

*Deposition of Randy Hondros, page 25, line 21 – page 26, line 22.* Not surprisingly, the EMCOR techs measurements were 20% less than the gross square footage numbers. Prior to the completion of the sampling BB&T began withholding 20% of the janitorial payments based on the figures in Exhibit C reflecting a 20% reduction in square footage. *Hondros, p. 24, line 17 – p. 25, line 5.* Emcor had no objection to this amount being withheld, despite the fact that Emcor had repeatedly told PFMI not to use those lower figures, but to invoice off of the gross square footage. *Hondros, p. 27, lines 1-7.*

In or around April 28, 2006, EMCOR terminated PFMI's agreement for janitorial to the 1,400 plus branches. *Exhibit 13, Termination Letter.* EMCOR then entered into a new agreement for PFMI to provide janitorial services to a particular geographic area within BB&T's footprint. *Littlefield, p. 172 lines 17-22.* The agreement was that PFMI would start with a clean slate with EMCOR holding back no deductions from their payments. *Littlefield, p. 175 line 22 – p. 176 line 13.* PFMI began performance under the new agreement on June 3, 2006 and quit on July 14, 2006 for non-payment. *Wohlers, p. 164, line 17 – p. 165, line 2; Exhibit 14, July 13, 2006 Email; Exhibit 15, July 14, 2006 Email.* PFMI ceased performance because EMCOR never paid them for their services during those six weeks. Despite EMCOR's refusal to pay, PFMI was still obligated to pay their subcontractors during that time. PFMI performed work under the original contract from September 2005 through April 2006 and under the new contract from May 2006 through mid July 2006 causing direct losses to PFMI of over $900,000. *Exhibit 16, Larry Capilouto's Expert Report.*

### Undisputed Facts

1.    The agreement was both Emcor and PFMI had to agree on the net cleanable square footage numbers. It is undisputed that PFMI was not given that opportunity.

Deposition of Greg Littlefield:
Page 104

  9 Q.  Correct me if I'm wrong, but what I'm
10    hearing you tell me is that there was
11    never an issue that PFMI was going to
12    be paid based on its unit price times
13    the gross square footage.
14 A.  Never an issue that PFMI was not going
15    to be paid upon an agreed-upon
16    cleanable square footage.  When
17    measurements were done, it was agreed
18    between PFMI and EMCOR that both
19    parties would agree on that square
20    footage.  In other words, if -- if
21    EMCOR didn't agree with the square
22    footages that PFMI turned in, they
23    would spot-check them.  If EMCOR went

Page 105

 1    back and measured before any
 2    adjustments were made, we would have an
 3    opportunity to go with them and check
 4    the measurements and make sure that
 5    everybody was measuring buildings the
 6    same way.  PFMI never got that
 7    opportunity.

Page 119

14    ….  And the fact
15    that EMCOR did not allow us to confirm
16    that -- that they had agreed that
17    before any deductions were made that we
18    both would agree on it.  That --
19    deductions happened before they even
20    agreed with BB&T on square footages.

    2.    From September 2005 through April 2006 Emcor instructed PFMI to bill based on

the gross square footage provided in the Master Location list.

Deposition of Greg Littlefield:
Page 139

  9 Q.  So for all those months, you had got to
10    bill 100 percent based on those
11    numbers.
12 A.  We were told to bill.  We didn't get to
13    bill.  We tried to adjust it.  And we
14    were instructed not to adjust it.  If
15    we had adjusted it, it could have

16    prevented or would have prevented much
17    of the problems that we're encountering
18    now.

3.    If the net cleanable square footage was projected to be 20% less than the gross,

PFMI informed Emcor before the project started that they could not perform on the project.

Deposition of Greg Littlefield:
Page 151
19 Q.  But at least by July 11th, 2005,
20    Mr. King, in Exhibit #17, this E-mail,
21    is telling you that it really doesn't
22    matter what the estimated annual cost
23    or estimated square footage is because
Page 152
1    you're going to go out and get the
2    actual numbers; right?
3 A.  Prior to this letter, we informed EMCOR
4    that if it was anticipated that there
5    was going to be 20 percent less square
6    footage in the banks, that we could not
7    perform that.
8 Q.  And you told who at EMCOR?
9 A.  Sean Brookins.

4.    BB&T was undertaking a new project to consolidate all of its facility services

with one outsourcing company.

Deposition of Debra Willis:
Page 9
14 ……  What was
15    your understanding of what BB&T was wanting to do with this
16    project?
17    A.  BB&T was attempting to outsource janitorial
18    services, landscaping, snow removal services and put in
19    place a mobile maintenance service for the branch network.
20    Q.  What system was in place prior to this for the
21    branches to get these services?
22    A.  They were done locally at each branch location and
23    hired by the branch manager at each branch.

5.    Debra Willis was the BB&T senior corporate facilities administrator.  As such,

she managed the day-to-day process of the Emcor project for BB&T.

Deposition of Debra Willis:
Page 6
1   Q.  And what was your next position within BB&T after
2   that?
3       A.  Senior corporate facilities administrator.
4       Q.  Tell me what your job duties were with -- as
5   senior corporate facilities administrator?
6       A.  I managed the day-to-day process of the EMCOR
7   project for BB&T.

. . .
14      Q.  When you came over from real estate acquisition --
15      A.  (Nodding head in the affirmative.)
16      Q.  -- what were you told your job would be as far as
17   managing the EMCOR project?
18      A.  Facilitating with the EMCOR project manager,
19   basically managing the day-to-day functions of the EMCOR
20   project.  Making sure the billing process was done
21   correctly.  Making sure the EMCOR team was aware of
22   properties that we added, properties that we -- that needed
23   to be deleted from the process; facilitating questions and
24   issues within the regional branch operation staff within
25   BB&T.

    6.      Debra Willis testified that from the very beginning of the project janitorial was to

be billed on net cleanable square footage.

Deposition of Debra Willis:
Page 14
3   Q.  In the beginning of the project when the
4   janitorial first began, was the building [sic] to be done on gross
5   square footage, adjusted square footage or net cleanable
6   square footage?
7       A.  Net cleanable.
8       Q.  From the beginning?
9       A.  Yes.

    7.      Prior to sending the RFP, BB&T knew that the gross square footage numbers

were not correct and through a sampling it was determined that those numbers were about 20%

too high.  Emcor was made aware of this by BB&T.  *See Undisputed fact 2.*

Deposition of Debra Willis:
Page 16
5   Q.  What was the purpose of providing that 20 percent

6  differential to EMCOR?
7      A.  BB&T knew that the real estate database square
8  footage was not net cleanable square footage.  BB&T went out
9  and did a sampling of say 30 to 50 building branches and
10  some buildings and determined -- and actually did those net
11  cleanable measurements.  And determined that through that
12  sampling that the square footage from the database was
13  approximately 20 percent.  So that adjusted square footage
14  was the number that EMCOR was supposed to be billing BB&T.

Page 17
3      Q.  So from the very beginning, EMCOR was to have been
4  billing BB&T on a number that was 20 percent less than the
5  gross number, is that correct?
6      A.  Yes.
7      Q.  And that 20-percent-less number was provided by
8  BB&T to EMCOR?
9      A.  Yes.
10     Q.  Were you involved in any conversations or meetings
11  where this was explained to EMCOR that they were to bill on
12  this 20 percent number?
13     A.  Yes.
14     Q.  Who was involved in those meetings from EMCOR?
15     A.  Sean Brookins was involved.
16     Q.  Okay.  Anyone else that you can recall from
17  EMCOR?
18     A.  Alan Crystal was involved.

Page 19:
10  Q.  Would it be fair to say that until the actual net
11  cleanable square footage number measurements had been done
12  and those numbers were finalized, EMCOR should have been
13  billing BB&T off numbers that were 20 percent less than
14  gross?
15     A.  Yes.

Pages 26
25     Q.  Would that document have been generated to assist

Page 27
1  EMCOR in bidding this project?  And by that I mean in
2  determining what price per square foot they should bid this
3  project at?
4      A.  Well, EMCOR was told -- I don't know that the
5  numbers were provided, but they were told that the square
6  footage from the database based on the sampling that was
7  done by BB&T needed to be adjusted by 20 percent to have a
8  more accurate billing.
9      Q.  And that would have been done well in advance of
10  the first billing?

11     A.  Yes.

Deposition of Sean Brookins page 48 through 49:
Page 48
    22 Q.  Let me ask it a better way.  I think
    23     what you had told me a minute ago –
Page 49
    1     and I'm paraphrasing, so correct me if
    2     I'm wrong -- was that BB&T was not
    3     completely comfortable with what you
    4     called the net square footage; is that
    5     fair?
    6 A.  Yes.

       8.     Using the 20% lower square footage numbers would have meant that any

adjustments once the actual net cleanable was measured would be small in comparison to the

adjustments required using gross square footage.

Deposition of Debra Willis:
Page 18
 8    Q.  Was the purpose for having the billing starting
 9  off 20 percent less so that later on once the actual net
10  cleanable square footage numbers came in, that the
11  adjustments would be relatively small in comparison to if
12  the adjustments had to be done off the gross square
13  footage?
14    A.  Yes.
15    Q.  And using this 20-percent-off number was made
16  clear to EMCOR?
17    A.  Yes.
18    Q.  And you were involved in conversations with Sean
19  Brookins where that was made clear?
20    A.  Yes.
21    Q.  If Sean Brookins told PFMI to bill off of gross
22  square footage, would that have been incorrect?
23    A.  Yes.

       9.     EMCOR contracted with PFMI to provide the janitorial component of the BB&T

project.  *Exhibit 10, Letter of Intent.*

10.    After EMCOR terminated PFMI's original contract, they entered into a new agreement for PFMI to provide janitorial services to a smaller geographic portion of the BB&T branches. *Exhibit 13, Termination Letter.*

Deposition of Sean Brookins, page 81 and 143:
Page 81
    16 Q.  And we're going to talk about this a
    17    little later; but at some point, there
    18    was what's been referred to as a new
    19    contract between PFMI and EMCOR; is
    20    that correct?
    21 A.  Yes, ma'am.
Page 143
    15 Q.  And then for the regions that PFMI was
    16    going to continue, was there a new
    17    contract created?
    18 A.  Yes, ma'am.  I believe Greg Swanberg
    19    handled that piece.

11.    Emcor withheld 20% of the payments owed to PFMI from March 2006 through May 31, 2006.  Emcor did not pay PFMI's June or July invoices. *Exhibits 14, 15 and 17.*

Deposition of Sean Brookins, pages 80-81:
Page 80
    23 Q.  Do you know if prior to the termination
Page 81
    1    of PFMI there came a time when PFMI
    2    submitted invoices that were not paid
    3    at all?
    4 A.  I believe their June payment was
    5    withheld in full, one of their
    6    June invoices.

12.    The new agreement between PFMI and Emcor starting in June 2006 was supposed to be a fresh start without any withholdings for overpayments.

Deposition of Sean Brookins:
Page 149
    15 A.  I believe it was Greg Swanberg, ma'am.
    16 Q.  Were there any discussions regarding
    17    the withholding of payments for
    18    previous overcharges under the new

19    contract?
20 A.  No, ma'am, not to my recollection.
Page 151
8     Was PFMI to start their billing afresh
9     at June 1st, 2006, with these new
10    square-footage numbers and start
11    billing from there without any of the
12    setoffs?
13 A.  Again, not negotiating the contract,
14    but that makes sense to me, yes, ma'am.


13.    EMCOR did not pay PFMI for the six weeks they performed under the new

contract. *See Exhibit 14.*

Deposition of Sean Brookins:
Page 151
15 Q.  Do you know if payment was withheld
16    from PFMI for perceived overcharges
17    in -- from the original contract?
18 A.  I believe we talked earlier today that
19    the June payment was withheld to -- at
20    the direction of BB&T.  They weren't
21    paying us.  So if that was under the
22    new contract, yes, ma'am.
Page 152
5 Q.  How long did PFMI perform under the new
6    contract?
7 A.  Six weeks is my recollection. . . .
Page 153
12 Q.  All right.  Well, let me just ask you
13    this.  Do you know if during that
14    six-week period that PFMI performed
15    under that new contract they were ever
16    paid?
17 A.  No, ma'am, I don't know.  I believe
18    they were paid for the out-of-scope
19    work, but I don't know that BB&T ever
20    released the June payment to us for the
21    in-scope services.


14.    Emcor passed the janitorial bills from PFMI straight through to BB&T and the

payments were passed straight back from BB&T to PFMI.

Deposition of Edna Green:

Page 65
22   Q.   Okay.  My question is a little different.  My
23   question is whether EMCOR marked up or received a profit on
24   what was performed by its sub-tier vendor or was it a direct
25   pass-through?
Page 66
1   A.   I think it was a direct pass-through.

Deposition of Randy Hondros:
Page 72
20   Q.   Okay.  Do you have -- based on the contract with
21   EMCOR, do you have an understanding as to how much, if any,
22   EMCOR marked up the janitorial component of the work?
23   A.   It was my understanding it was supposed to be a 100
24   percent pass through.  There wasn't supposed to be any type of
25   markup.


15.   There was to be a "true up" of the janitorial payments once the net cleanable

square footage measurements were complete.

Deposition of Edna Green:
Page 25
25   Q.   All right.  Tell me how that true up process was
Page 26
1   supposed to work?
2   A.   Originally -- and this is before my time.  So I
3   understood that PFMI was to measure during the time period, 30
4   or 90 days, whatever that was.  That was plan A.
5   Q.   Okay.  But once that was done how would the true up
6   process work?
7   A.   Well, if the -- if -- had that been successful,
8   they would have been trued up and adjusted the billing
9   retroactively to the correct net cleanable square footage.


16.   The "true up" was to involve repayments to BB&T by PFMI for amounts billed

after November 1, 2005 above the net cleanable square footage amount determined by

measurement.

Deposition of Sean Brookins:
Page 56
8   Q.   I'm sorry.  Did EMCOR continue to pay
9   PFMI off the gross square-footage
10   numbers?

11 A. Yes, ma'am, I believe that happened.
12 Q. In any of the discussions you had up
13    through mid December of -- that would
14    have been '05?
15 A. Yes, ma'am.
16 Q. -- was there any talk about what would
17    happen once the final net cleanable
18    square-footage numbers came in as far
19    as adjustments for over- or
20    underbilling?
21 A. Yes, ma'am. We were going to what I
22    would call "true up" the numbers in the
23    billing back to November 1st.
Page 57
1 Q. Was this outlined in any agreement
2    between EMCOR and PFMI?
3 A. There were E-mails talking about the
4    square -- the measurement process and
5    that there would be a true-up. We did
6    have a letter from PFMI stating their
7    understanding that the true-up would go
8    back to November 1.


17.    Emcor had no incentive to tell PFMI the truth about the 20% reduction in square

footage because Emcor was not paid based on square footage.

Deposition of Sean Brookins pages 83 through 84:
Page 83
6 Q. And we had talked a little bit about
7    EMCOR's -- how they were paid by BB&T.
8    Did EMCOR receive a flat management fee
9    for this project?
10 A. The, quote/unquote, fee was based on
11    all of our costs to run the project.
12    For example, the staff -- myself, my
13    assistant, two accounting people -- the
14    FKC, which is facility knowledge
15    center -- that was the call center --
16    and other costs for the contract, that
17    total number divided by the square
18    footage gave us the ten-cent-a-square
19    foot fee, if you want to call it fee.
20 Q. It would be the ten-cent-a-square-foot
21    management payment?
22 A. Yes, ma'am.

14

23 Q.  Did that change when the square-footage
Page 84
   1   numbers were adjusted down?
   2 A.  It did not, because it, again, it was
   3   based on our costs -- our costs to run
   4   the project.
   5 Q.  Did it go -- did it go up from ten
   6   cents?
   7 A.  I don't believe so, no, ma'am.
   8 Q.  Other than the amount that EMCOR would
   9   be remitting to PFMI for janitorial,
  10   what costs associated with the project
  11   went down when the square-footage
  12   number went down?
  13 A.  Well, again, I don't believe any of
  14   those costs were adjusted either way,
  15   up or down.  It was based on the FKC
  16   and the cost of us, our people.

## Standard of Review

Summary judgment is appropriate only if the evidence presented shows that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." _Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986)_. The moving party "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." _Id. at 323, 106 S.Ct. 2548._ The movant must meet this burden by presenting evidence showing there is no dispute of material fact, or by showing the non-moving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof. _Id. at 322-23, 106 S.Ct. 2548._

If the moving party has meets its burden the burden then shifts to the nonmoving party to go beyond the pleadings and designate specific facts showing that there is a genuine issue for trial. _Id. at 324, 106 S.Ct. 2548._  The court must believe the evidence of the non-movant and

must draw all justifiable inferences from the evidence in the non-moving party's favor. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255 (1986).

## Summary of Argument

EMCOR has not met its burden of proving that viewed in the light most favorable to the non-movant PFMI has created no dispute as to material fact. In fact PFMI has established that 1) a contract existed between Emcor and PFMI for janitorial services, 2) PFMI performed under that contract, 3) Emcor failed to perform by withholding payments from PFMI thereby damaging PFMI, 4) Emcor knew that BB&T believed the square footage numbers to be 20% lower than what was provided in the RFP, 5) Emcor knew that this reduced the total square footage from 6.7 million square feet to 5.4 million square feet, 6) two weeks before the project start up PFMI told Emcor that if the actual numbers were 20% lower they could not start the work or perform the job, 7) Emcor was informed that the billing should be done on the 20% lower square footage numbers, 8) Emcor continued to instruct PFMI to bill on the gross square footage numbers. PFMI has been injured due to Emcor's breach of contract and fraud.

## Argument

**Summary Judgment should be denied on PFMI's fraud Counts II, III and IV.**

Four elements must be proven in a misrepresentation action: (1) a false representation; (2) as to a material existing fact; (3) reliance on that representation; and (4) damage resulting from the reliance. *Crowne Invs., Inc. v. Bryan,* 638 So.2d 873, 876-77 (Ala.1994).

PFMI has presented sufficient evidence from which a jury could reasonably determine that Emcor knew the square footage was 5.4 million square feet rather than 6.7 million and that Emcor knew the billing should be done on the 20% lower figure. In or around March 23, 2005 Exhibit C and Exhibit C.5 were created, both those documents have a "usable/cleanable square

16

feet" column that reflects numbers 20% lower than the Master Location List from the RFP. *Exhibit 5, "Exhibit C"; Exhibit 6, "Exhibit C.5."*  Emails show these documents being transmitted from BB&T to Emcor from March through August 2005. *Exhibit 18, March 24, 2005 Email; Exhibit 19, July 21, 2005 Email; Exhibit 20, August 29, 2005 Email.*  Testimony of Debra Willis, BB&T's project manager, is clear that she informed Emcor that billing was to be done off of Exhibit C, the 20% lower numbers. *See Undisputed Fact 7.*  Nonetheless Emcor repeatedly tells PFMI to bill off the gross numbers and that the 20% reduction is just for budgeting purposes and is not to be used.

The fact that BB&T intended to reduce the total square footage from 6.7 million to 5.4 million square feet was material to PFMI.  Two weeks before the project started Greg Littlefield, PFMI's President and CEO contacted Emcor about Exhibit C.  In that phone call Littlefield made it clear that if the square footage to be billed was 20% less PFMI would not do the work. *See Undisputed Fact 3.*  In that phone call Littlefield was assured that Exhibit C was for budgeting purposes only and that billing would be done from the Master Location List's gross square footage numbers.  Practically speaking, Emcor could not have found another contractor to begin cleaning 1406 branch banks throughout eight states in two weeks.

PFMI relied on Emcor's representation that billing should be done off the gross square footage from the Master Location List rather than Exhibit C.  As evidence of that reliance PFMI began work on the project on September 6, 2005.  As further evidence PFMI billed off the square footage numbers as reflected in the Master Location List.  Even as PFMI's net cleanable measurements came in lowering the square footage amount Emcor would not let those lower numbers be used and continued to insist on the gross square footage numbers.

In March 2006 Emcor began withholding 20% from payment on PFMI's invoices and then in June and July 2006 Emcor did not pay PFMI at all. *See Undisputed Fact 11.* PFMI was still performing under the contract during this time and was incurring substantial accounts payable from their vendors performing the work. PFMI lost in excess of $900,000 as a result of Emcor's fraud.

**Emcor's motion for partial summary judgment on PFMI's breach of contract claim is due to be denied.**

PFMI was required to bill Emcor based on gross square footage. Therefore, PFMI's vendors and subcontractors had to bill them based on gross square footage. PFMI has paid its contractors and is still obligated to many contractors for those payments. EMCOR could have easily remedied this problem by instructing PFMI to bill off the lower square footage numbers in Exhibit C. This would have meant little to no adjustment for over billing. It would have also eliminated PFMI's obligation to pay their subs as billed off of gross.

### Conclusion

Emcor has not met its burden of proof. PFMI has established two contracts between Emcor and PFMI and further established Emcor breached both contracts. PFMI has also established that it suffered damage from Emcor's fraudulent misrepresentations.

/s/ Scarlette M. Tuley
Scarlette M. Tuley (ASB-4517-T54S)
Attorney for Plaintiff

OF COUNSEL:
BEASLEY, ALLEN, CROW,
METHVIN, PORTIS & MILES, P.C.
Post Office 4160
Montgomery, Alabama 36103-4160
Phone: (333) 269-2343
Fax: (334) 954-7555

## CERTIFICATE OF SERVICE

I hereby certify that I have served a copy of the foregoing document upon all counsel of record <u>as listed below</u> either by virtue of electronic filing or by placing a copy of same in the United States Mail, first class, postage prepaid, a true and correct copy of the above and foregoing document on this the 10th day of June, 2007.

s/ Scarlette M. Tuley
OF COUNSEL

Mr. Jack Owen
Ball, Ball, Matthews & Novak, PA
Post Office Box 2148
Montgomery, Alabama 36102-2148
ccowen@ball-ball.com

Mr. Benjamin H. Sawyer
Mr. Lee C. Davis
Sutherland, Asbill & Brennan, LLP
999 Peachtree Street, NE
Atlanta, Georgia 30309
(404) 853-8188
ben.sawyer@sablaw.com
lee.davis@sablaw.com

```
            IN THE UNITED STATES DISTRICT
         FOR THE MIDDLE DISTRICT OF ALABAMA
                  NORTHERN DIVISION

PROFESSIONAL FACILITIES    )
MANAGEMENT, INC.,          )
                           )
              Plaintiffs,  )
                           )
        v.                 )  CIVIL ACTION NO: 2:06CV1136-MHT
                           )
EMCOR FACILITIES SERVICES, )
INC., and B and C as       )
fictitious parties,        )
                           )
              Defendants.  )
```

DEPOSITION OF

DEBRA WILLIS

September 5, 2007

9:00 a.m.

Law Office of LeClair Ryan, PC
1800 Wachovia Tower
Drawer 1200
Roanoke, Virginia

Sheryl Smith
Registered Merit Reporter
Virginia Certified Reporter

## Page 2

1  APPEARANCES:
2  For the Plaintiffs:    SCARLETTE M. TULEY, ESQUIRE
3                 Beasley, Allen, Crow, Methvin,
       Portis & Miles, P.C.
4      250 Commerce Street
       P.O. Box 4160
5      Montgomery, AL 36103
       scarlette.tuley@beasleyallen.com
6
7  For the Defendants:    BENJAMIN H. SAWYER, ESQUIRE
8                 Sutherland,Asbill & Brennan, LLP
       999 Peachtree Street, NE
9      Atlanta, GA 30309
       ben.sawyer@sablaw.com
10
11

12             I N D E X
13  WITNESS:                    PAGE:
14  DEBRA WILLIS
15  EXAMINATION BY
    MS. TULEY                    3
16
    EXAMINATION BY
17  MR. SAWYER                   44
18  EXAMINATION BY
    MS. TULEY                    69
19
      E X H I B I T S
20
    DEFENDANT'S:      DESCRIPTION       PAGE:
21
    Exhibit 75     List of BB&T locations    20
22
    Exhibit 76     PowerPoint presentation   52
23
24
25

## Page 3

1              Wednesday, September 5th, 2007
2        P R O C E E D I N G S
3        THE VIDEOGRAPHER: We're on the record September
4  5th, 2007, at 9:01. This is tape one in the deposition
5  of Debra Willis in the matter Professional Facilities
6  Management versus EMCOR. This deposition is taking
7  place at 10 South Jefferson Street in Roanoke,
8  Virginia. Would the attorneys present please introduce
9  themselves for the record.
10       MS. TULEY: Scarlette Tuley for PFMI.
11       MR. SAWYER: Benjamin Sawyer on behalf of EMCOR
12  Facilities Services, Inc.
13       MR. ODDO: Kevin Oddo for the witness.
14       THE VIDEOGRAPHER: Could the court reporter please
15  administer the oath.
16       DEBRA WILLIS,
17  called as a witness, having been first duly sworn, was
18  examined and testified as follows:
19       EXAMINATION
20  BY MS. TULEY:
21       Q. Good morning, Miss Willis. We just met but I'm
22  Scarlette Tuley. Have you ever given a deposition before?
23       A. No.
24       Q. Okay. I know this whole setup is a little
25  intimidating looking but all it is is I'm just going to ask

## Page 4

1  you some questions. And later Mr. Sawyer will probably have
2  a few questions for you. If at any time during when either
3  one of us are asking questions, if you need a break for
4  whatever reason, please let us know. We don't want you to
5  be uncomfortable. You don't have to tell us why. You want
6  to get a drink of water, whatever, just let us know and
7  we'll be glad to take a break.
8        If we could have an understanding of when I ask a
9  question -- because the court reporter has to type
10  everything down, that's the official record, I will try not
11  to talk over you -- and I'll be the one more guilty of this
12  -- but I'll try to let you finish your answer, and if you
13  could try to let me finish my question, that will make the
14  court reporter's job a little easier in typing everything
15  up.
16       A. Okay.
17       Q. And the only other thing is if you can just -- and
18  you're already doing it -- answer out loud. In
19  conversations we nod or shake our head, but that doesn't
20  show up on the transcript. So yes or no or whatever. That
21  way if you answer out loud, she can type it down.
22       A. Okay.
23       Q. All right. Well, you can just state your name for
24  the record.
25       A. Debra Willis.

## Page 5

1        Q. Where do you work, Miss Willis?
2        A. BB&T.
3        Q. How long have you been with BB&T?
4        A. Seven years.
5        Q. What's your current position?
6        A. I'm the area facilities resource manager for
7  corporate facilities in Virginia, Maryland and D.C.
8        Q. How long have you had that position?
9        A. Since August of '07.
10       Q. So you just got it. It's September '07 now.
11       A. Yeah. No, I'm sorry, April '07 -- April.
12       Q. And what is area facilities resource manager?
13  What does that entail?
14       A. It's the facilities management, maintenance of all
15  corporate buildings in Virginia, Maryland and D.C.
16       Q. Does corporate buildings include branch banks?
17       A. No, although there are some branches in the
18  corporate buildings.
19       Q. Would this be more like high rises?
20       A. Yes.
21       Q. When you -- about seven years ago when you first
22  started with BB&T, what was your position?
23       A. I was a real estate acquisition manager.
24       Q. How long did you do that?
25       A. Five years.

2 (Pages 2 to 5)

90c94586-72b1-48d9-923b-50eec20fc1cf

Page 6

1    Q.   And what was your next position within BB&T after
2  that?
3    A.   Senior corporate facilities administrator.
4    Q.   Tell me what your job duties were with -- as
5  senior corporate facilities administrator?
6    A.   I managed the day-to-day process of the EMCOR
7  project for BB&T.
8    Q.   Do you remember about when you started doing
9  that?
10   A.   May of '05.
11   Q.   What was your first involvement with the EMCOR
12 project?  Let me ask it a different way.
13   A.   Okay.
14   Q.   When you came over from real estate acquisition --
15   A.   (Nodding head in the affirmative.)
16   Q.   -- what were you told your job would be as far as
17 managing the EMCOR project?
18   A.   Facilitating with the EMCOR project manager,
19 basically managing the day-to-day functions of the EMCOR
20 project.  Making sure the billing process was done
21 correctly.  Making sure the EMCOR team was aware of
22 properties that we added, properties that we -- that needed
23 to be deleted from the process; facilitating questions and
24 issues within the regional branch operation staff within
25 BB&T.

Page 7

1    Q.   When you came into the project in May of 2005, had
2  the decision already been made to hire EMCOR?
3    A.   No.
4    Q.   Were you involved in that decision-making
5  process?
6    A.   Yes.
7    Q.   Who all was involved in that?
8    A.   From BB&T?
9    Q.   Yes, from BB&T.
10   A.   We had Steve Paige who was the senior BB&T person
11 on the EMCOR project.  We had Ronnie Eller, who was my boss
12 with the EMCOR project.  We had several construction
13 administrative staff from support services.  We had design
14 staff from support services.  We had purchasing agents from
15 support services.  We had other support services staff that
16 served on a team that actually interviewed EMCOR.
17   Q.   And were you involved in those interviews with
18 EMCOR?
19   A.   Yes.
20   Q.   Were you one of the people that designed the
21 Request for Proposal?
22   A.   No.
23   Q.   Do you know who designed the Request for
24 Proposal?
25   A.   Not specifically, no.

Page 8

1    Q.   Had the Request for Proposal already been done
2  once you came on in May of 2005?
3    A.   Yes.
4    Q.   Tell me about the interview process with EMCOR, if
5  you can.
6    A.   EMCOR sent a team to Winston-Salem, and BB&T had
7  the support services team present.  The project manager was
8  there.  Debbie Crosby was there with EMCOR.  Allen Crystal
9  was there with EMCOR.  Bill Rogers was there with EMCOR.
10 And Greg Littlefield with PFMI was also present.  And there
11 were others on the EMCOR team.  I just am not certain of all
12 their names.
13   Q.   And this was where a presentation was made to the
14 BB&T team?
15   A.   Yes.
16   Q.   Tell me what you recall about that presentation.
17   A.   Basically, EMCOR explained the services that they
18 could provide.  That they were going to partner with PFMI to
19 do the janitorial services.  They explained in detail
20 specifics of the project.  Some of it was generalizations.
21 They answered questions of the BB&T team.  I mean, it was an
22 all-day event.
23   Q.   Do you remember any specific concerns that the
24 BB&T team wanted addressed at that presentation?
25   A.   There were a lot of questions asked and answered.

Page 9

1  A lot of them were general but, you know, I don't recall a
2  lot of the questions that were asked.
3    Q.   How long after that presentation was it before
4  BB&T made the decision to hire EMCOR?
5    A.   Several weeks, maybe as much as a month.
6    Q.   Who was the final decision-maker in hiring
7  EMCOR?
8    A.   From BB&T?
9    Q.   Yeah.
10   A.   I don't know that there was a single individual
11 person that made that decision.  Collectively, the BB&T team
12 was polled.
13   Q.   When you came on board, I believe you already said
14 that the Request for Production had been done.  What was
15 your understanding of what BB&T was wanting to do with this
16 project?
17   A.   BB&T was attempting to outsource janitorial
18 services, landscaping, snow removal services and put in
19 place a mobile maintenance service for the branch network.
20   Q.   What system was in place prior to this for the
21 branches to get these services?
22   A.   They were done locally at each branch location and
23 hired by the branch manager at each branch.
24   Q.   Did this EMCOR project have any stated goals --
25 and I guess by BB&T?

3  (Pages 6 to 9)

90c94586-72b1-48d9-923b-50eec20fc1cf

Page 10

1    A.  You mean as far as performance?
2    Q.  Well, let me ask it this way.  When the decision
3  was made to outsource all these functions, did BB&T have any
4  benchmarks or goals as far as cost savings, production, any
5  sort of goals in mind when they started this project --
6  process?
7    A.  There was definitely cost savings associated with
8  the project.  The mobile maintenance service was something
9  that was a benefit because we did not have that in place.
10  We were subcontracting it to different vendors who had our
11  footprint.  And just centralizing the process was a goal.
12  And pulling it -- centralizing it into support services,
13  pulling it away from the regional staff.  And to try to get
14  more cost effective.
15    Q.  Were there any stated amount or percentage of cost
16  savings that BB&T was looking for?
17    A.  Not specifically.  I mean, we ran the numbers and
18  knew what we were paying currently and knew what EMCOR was
19  going to charge us, so you just did the math.
20    Q.  But prior to hiring EMCOR, had there been any
21  discussions of we needed X percent?
22    A.  No.
23    Q.  Okay.  Who pulled all that information together
24  and figured out what the current cost was?
25    A.  I don't recall.  That was done before I came in,

Page 11

1  in May of '05.
2    Q.  Fair enough.  At that presentation, do you recall
3  anything that Greg Littlefield or any other representatives
4  from PFMI presented to the group?
5    A.  Not specifically.
6    Q.  Was the presentation -- was it like a PowerPoint
7  presentation or was it more of where somebody would just get
8  up and talk for a little bit?
9    A.  It was both.
10    Q.  Okay.  Once the decision was made to hire EMCOR,
11  tell me what your involvement with the process was.
12    A.  We worked with Alan Crystal.  The project manager
13  that was assigned to the BB&T project was not available from
14  EMCOR until about a month or so after the decision was made
15  to go with EMCOR.  So we worked with Alan Crystal and the
16  EMCOR team to provide information on facilities and to make
17  sure that they were aware of which facilities -- all the
18  facilities that needed to be involved.  You know, just
19  general every day discussions on how to pull it together.
20  Janitorial services was the first piece of the project that
21  was being done.  So the focus was on the janitorial side.
22    Q.  Explain how that janitorial roll out was supposed
23  to work?
24    A.  The September 6 of '05 was the first date, which
25  was the day after Labor Day, which was the first date that

Page 12

1  PFMI actually started cleaning all the BB&T branches.  PFMI
2  was supposed to go in the branches the weekend prior to --
3  that Labor Day weekend prior to the 6th, set up supplies,
4  acquaint the cleaners with the branches, make sure everyone
5  had -- the managers for the janitorial staff had keys to the
6  branches.  Just to sort of familiarize themselves with the
7  locations.  Go in and kind of do a super clean, if you will,
8  on the branches so that it would be a smooth transition on
9  the 6th.
10    Q.  And on the 6th, how many branches were going to go
11  live with the new janitorial company?
12    A.  All of the branches were, roughly.  And I don't
13  know the exact number but it was approximately 1,400.
14    Q.  Was it BB&T or EMCOR's decision to start all of
15  the branches at once?
16    A.  I'm not sure of who made that decision, whether it
17  was a collective decision.  I don't think either BB&T or
18  EMCOR would have made that decision on their own.  It was a
19  collective decision.
20    Q.  Do you recall if there was discussions about
21  phasing all the branches in over a period of time instead of
22  starting them all at once?
23    A.  I think there were some discussion on that, and I
24  don't recall the reasoning behind doing them all at one
25  time.

Page 13

1    Q.  At some point did the EMCOR account manager enter
2  into the process?
3    A.  Yes.
4    Q.  And who was that?
5    A.  Sean Brookins.
6    Q.  I guess I should've asked this earlier.  At the
7  time all this was going on, where were you located?
8    A.  In Winston-Salem.
9    Q.  Was Mr. Brookins in that same office at
10  Winston-Salem?
11    A.  Yes.
12    Q.  How was the janitorial component of this project
13  to be billed?
14    A.  EMCOR was billing BB&T, and there we set up a
15  P-card process, which was like a credit card process.  And
16  EMCOR would send a file.  BB&T reviewed it.  We had so many
17  hours to review the file in a day.  I think it was 24 to 48
18  hours to review the file.  If it was correct, then it was
19  downloaded into our general ledger, and then charged all the
20  different center numbers for each branch.  And that was
21  pretty much the process.
22    Q.  Was this done on a unit price or a flat rate?
23    MR. SAWYER:  Object to the form of the question.
24  You can answer.
25    A.  It was based on cost per square foot per

4 (Pages 10 to 13)

90c94586-72b1-48d9-923b-50eec20fc1cf

1  location.
2  BY MS. TULEY:
3      Q.  In the beginning of the project when the
4  janitorial first began, was the building to be done on gross
5  square footage, adjusted square footage or net cleanable
6  square footage?
7      A.  Net cleanable.
8      Q.  From the beginning?
9      A.  Yes.
10     Q.  Just show you some documents.  There's lots of
11 lists of locations, and I'm going to ask you a few questions
12 about those.  We'll start with what we have marked in
13 another deposition as Exhibit 12.  It's called Exhibit A at
14 the top of the document.  And after you've had a chance to
15 look at that, tell me what that document is.
16     A.  Not knowing where this came from, it was a docu --
17 it was a similar document to what we used to -- as the
18 exhibit to the contract.
19     Q.  Let me show you something else and this may help.
20 It may muddy the water.
21         MR. SAWYER:  May help muddy the water.
22 BY MS. TULEY:
23     Q.  Always a bit of a gamble.  I'm going to show you
24 -- I'm going to take this apart a little bit.  This is
25 what's been previously marked in a deposition as Exhibit 14.

1  But it has a similar document inside of it.  And seeing all
2  this together may help.  It may not.
3      A.  Well, again it's a similar document that was used
4  by BB&T with EMCOR to identify each location that was
5  cleaned and identify their square footage from the real
6  estate database that BB&T had.
7      Q.  In this real estate database, could you tell me
8  where that information came from that was input into the
9  database?
10     A.  The square footage or --
11     Q.  Square footage, yes.
12     A.  On the lease locations, it came directly from the
13 lease.  On the owned locations, it came from a prior Access
14 database, and was supplied by someone within the BB&T
15 support services team.
16     Q.  And that information from that real estate
17 database was synthesized into this document that's Exhibit
18 12, is that fair?
19     A.  Yes.
20     Q.  In Exhibit 12 it has the column for gross square
21 feet and it has a column for adjusted square feet.  Could
22 you tell me what, if any, is the difference between the two
23 columns?
24     A.  Well, in looking at this document, it doesn't -- I
25 mean, I haven't been through every one but -- looks like

1  there are some differentials.  Basically, the gross square
2  footage was the number that came from the real estate
3  database.  The adjusted square footage was supposed to be a
4  20 percent differential that BB&T provided to EMCOR.
5      Q.  What was the purpose of providing that 20 percent
6  differential to EMCOR?
7      A.  BB&T knew that the real estate database square
8  footage was not net cleanable square footage.  BB&T went out
9  and did a sampling of say 30 to 50 building branches and
10 some buildings and determined -- and actually did those net
11 cleanable measurements.  And determined that through that
12 sampling that the square footage from the database was
13 approximately 20 percent.  So that adjusted square footage
14 was the number that EMCOR was supposed to be billing BB&T.
15     Q.  I'm going to show you what has previously been
16 marked as Exhibit 17.  And I'm going to represent to you
17 that it has a useable cleanable square feet column.
18     A.  Um-hum.
19     Q.  That is based on my observations -- which are
20 worth what you will -- 20 percent different than the gross
21 square footage numbers on Exhibit 12.  Could you tell me
22 what this Exhibit 17 is?
23     A.  I don't know where these spreadsheets came from --
24 whether someone developed them other than BB&T.  But the
25 billing process was supposed to be based on the 20 percent

1  differential knowing that EMCOR was tasked with actually
2  measuring the net cleanable number for each location.
3      Q.  So from the very beginning, EMCOR was to have been
4  billing BB&T on a number that was 20 percent less than the
5  gross number, is that correct?
6      A.  Yes.
7      Q.  And that 20-percent-less number was provided by
8  BB&T to EMCOR?
9      A.  Yes.
10     Q.  Were you involved in any conversations or meetings
11 where this was explained to EMCOR that they were to bill on
12 this 20 percent number?
13     A.  Yes.
14     Q.  Who was involved in those meetings from EMCOR?
15     A.  Sean Brookins was involved.
16     Q.  Okay.  Anyone else that you can recall from
17 EMCOR?
18     A.  Alan Crystal was involved.
19     Q.  When the janitorial project started, was EMCOR
20 billing BB&T based on those 20-percent-off numbers?
21     A.  The first bill we received was in October of '05.
22 EMCOR was billing some off of the gross number, some off of
23 the 20 percent less, and some off of a rentable number.
24     Q.  What's the -- what is the rentable number?
25     A.  Lease locations were based on rentable square

90c94586-72b1-48d9-923b-50eec20fc1cf

Page 18

```
1   footage.
2       Q.  Okay.  Okay.
3       A.  So it was a mix.  The first billing was a mix.
4   And BB&T worked with EMCOR and PFMI to make adjustments to
5   get it to the adjustable, which was the 20-percent-less
6   figure, knowing that further adjustments would have to be
7   made once the net cleanable numbers came back.
8       Q.  Was the purpose for having the billing starting
9   off 20 percent less so that later on once the actual net
10  cleanable square footage numbers came in, that the
11  adjustments would be relatively small in comparison to if
12  the adjustments had to be done off the gross square
13  footage?
14      A.  Yes.
15      Q.  And using this 20-percent-off number was made
16  clear to EMCOR?
17      A.  Yes.
18      Q.  And you were involved in conversations with Sean
19  Brookins where that was made clear?
20      A.  Yes.
21      Q.  If Sean Brookins told PFMI to bill off of gross
22  square footage, would that have been incorrect?
23      A.  Yes.
24      Q.  After that October '05 bill, about when would the
25  next billing cycle have occurred from EMCOR?
```

Page 19

```
1       A.  There was a billing every two weeks, so it was
2   mid-October, end of October.
3       Q.  Was the mid-October bill received from EMCOR on
4   the 20 percent-off-numbers?
5       A.  It was a mix.
6       Q.  Now, if I understand you, that would have been
7   incorrect; that that bill should have been on the
8   20-percent-off numbers not a mix?
9       A.  Yes.
10      Q.  Would it be fair to say that until the actual net
11  cleanable square footage number measurements had been done
12  and those numbers were finalized, EMCOR should have been
13  billing BB&T off numbers that were 20 percent less than
14  gross?
15      A.  Yes.
16      Q.  Do you remember how early in the process EMCOR was
17  provided square footage numbers that were 20 percent off the
18  adjust -- the gross square footage?
19      A.  I don't know the exact time frame.
20      Q.  Do you think it would have been prior to
21  contract?
22      A.  Well, the contract was still being worked on when
23  they actually started performing services.
24      Q.  Do you know if those 20-percent-off numbers had
25  been provided to EMCOR at the time of the presentation?
```

Page 20

```
1       A.  I don't recall that.
2           (Whereupon, Deposition Exhibit 75 was marked
3   for identification.)
4   BY MS. TULEY:
5       Q.  I'm going to show you what I've just marked as
6   Exhibit 75.  Take a moment and just look over that.  It's a
7   multi-page document, and see if you recognize that document.
8       A.  This is not familiar at all.
9       Q.  Okay.  That's fair.  I don't really -- I'm not
10  really sure what the source of that document is.
11      A.  I don't know where this came from but it is more
12  -- this is familiar.
13      Q.  The second page of Exhibit 75?
14      A.  Yes.
15      Q.  Tell me what is that?
16      A.  It is square footage by state with a monthly price
17  and an annual cost per square foot based on each state.
18      Q.  Are those numbers -- were those numbers collected
19  prior to the EMCOR project?  Is that -- I guess let me ask
20  it a better way.  Are those prices per state what the cost
21  to BB&T were before the EMCOR project?
22      A.  No.
23      Q.  Would those be prices to BB&T during the EMCOR
24  project?
25      A.  Possibly.
```

Page 21

```
1       Q.  Do you know who pulled that -- that document
2   together?
3       A.  I know that Hai Falor, who did the billing for
4   BB&T -- who handled the billing process for the BB&T team,
5   did a similar accounting once we got into the BB -- into the
6   EMCOR project to determine what we were paying -- actually
7   paying cost per square foot versus what we were paying
8   before the EMCOR project.
9       Q.  And do you recall what the savings were from that
10  analysis that Hai Falor did?
11      A.  Not specifically, no.
12      Q.  Would you have been the one to have the
13  discussions with Sean Brookins about any problems with the
14  bills that were coming in from EMCOR?
15      A.  Yes.
16      Q.  Was Hai Falor someone that worked for you?
17      A.  Yes.
18      Q.  So Hai would have reported to you as he did his
19  analysis of bills?
20      A.  Yes.
21      Q.  And I guess -- I just made an assumption.  Is Hai
22  Falor the one that would look over the bills when they came
23  in from EMCOR?
24      A.  Yes.
25      Q.  Tell me what he would do with those.
```

6 (Pages 18 to 21)

90c94586-72b1-48d9-923b-50eec20fc1cf

Page 22

1    A.  He received an initial file.  And that file was
2  reviewed.  If it required more than just his eyes on it --
3  in other words, if there were multiple mistakes and we had a
4  time frame that we had to review it in, if he could not
5  handle it by himself, then other team members would pitch
6  in.  And we would all review the data to determine what
7  adjustments needed to be made.
8        Hai would create a spreadsheet to submit back to
9  EMCOR with the adjustments.  And EMCOR and BB&T would agree
10  on those adjustments.  And then they were made before the
11  actual file was cut to GL.  So --
12    Q.  Once those adjustments were agreed upon, would
13  EMCOR submit a new invoice with the adjustments reflecting
14  those new adjustments?
15    A.  Well, they would submit a file first.  The
16  invoice -- there was not a paper invoice.  It was a P-card
17  -- that P-card process.  So it was an actual file that
18  uploaded into our GL, so it was more a file than it was --
19  but, yes, the invoice was adjusted based on their agreement
20  based on the adjustments.
21    Q.  Okay.  And just so I'm clear because I'm not an
22  accounting person.  But the process would be a file would be
23  transferred from EMCOR to BB&T, and Hai Falor would review
24  that?
25    A.  Yes.

Page 23

1    Q.  Then if any adjustments needed to be made, those
2  would be -- a spreadsheet would be generated by Hai and sent
3  back to EMCOR.  And then an agreement would be reached
4  between BB&T and EMCOR on those adjustments, is that
5  correct?
6    A.  Yes.
7    Q.  Then EMCOR would send a new file with those
8  adjustments to the GL?
9    A.  EMCOR would send the file to Hai.  And then Hai
10  would review the file again.  And then he would submit it
11  through the BB&T process for it to be uploaded to GL, yes.
12    Q.  And just for the record, GL is general ledger?
13    A.  Yes, sorry.
14    Q.  That's okay.  It could have been something else so
15  always good to check.  Was Hai Falor on this project from
16  the beginning?
17    A.  No.
18    Q.  When did Hai Falor come onto the project?
19    A.  I don't know the exact date.
20    Q.  Do you know if it was before or after the
21  janitorial started?
22    A.  It was before.
23    Q.  And in the beginning, were any other bills being
24  received from EMCOR other than those for janitorial?
25    A.  No.

Page 24

1    Q.  What was the -- how was the phase-in supposed to
2  work with the other components of the project after
3  janitorial?
4    A.  Landscaping was the second phase.  And that was
5  supposed to be phased in.
6    Q.  Was that going to be phased in like by region?
7  How was that going to work?
8    A.  Well, Florida was the first state and that was in
9  January of '06.  And then the mobile maintenance was
10  supposed to be phased in March of '06.
11    Q.  How long was the phase-in for landscaping
12  scheduled to take?
13    A.  I was transitioning into a new position in January
14  of '06, so I don't know the details on how long that took.
15    Q.  When did you start your transition out of the
16  EMCOR project?
17    A.  November of '05 Edna Green came in for training.
18  And I trained her November and December, and then worked
19  with her in January of '06.  And I moved to Roanoke on
20  February 10th, '06.
21    Q.  Was all of your involvement with the EMCOR project
22  done as of your move in February 2006?
23    A.  Edna pretty much took over my role as of January
24  '06, so I was really training her -- or working with her if
25  she had questions.  But the decision-making, the day-to-day

Page 25

1  was transitioned to Edna as of January '06.
2    Q.  While you were still on the project, did the
3  janitorial billing from EMCOR get straightened out?
4        MR. SAWYER:  Object to the form of the question.
5  You can answer.
6    A.  Adjustments were made every billing cycle.  There
7  were still adjustments to be made as of December of '05.
8  And the net cleanable numbers had yet to be determined by
9  that time.
10  BY MS. TULEY:
11    Q.  Between when the first bill came in in October
12  2005 and when you transitioned out, at any point in that
13  time, did EMCOR start billing on those 20 percent lower
14  numbers?
15    A.  Yes.
16    Q.  When during that time frame did that happen?
17    A.  Well, adjustments were made based on the 20
18  percent number from the first billing.  So from October
19  through December, adjustments were made each billing cycle.
20    Q.  So the bill would come in, and then though -- if
21  any of the numbers were gross, they'd be adjusted down to
22  lower by 20 percent?
23    A.  Yes.
24    Q.  During that time period and through December of
25  '05, did EMCOR ever send a file -- I'm going to call it an

90c94586-72b1-48d9-923b-50eec20f1cf

Page 26

1  invoice -- that reflected all the square footage numbers
2  being reduced by 20 percent so that no adjustment needed to
3  be made?
4      A.  No.
5      Q.  What discussions were you having with Sean
6  Brookins about the issue of EMCOR continuing to bill on
7  gross square footage?
8      A.  Basically, that they needed to bill on the 20
9  percent until the net cleanable numbers came back, and then
10  they'd be adjusted again once all the numbers came back.
11  Our team worked with PFMI's team and EMCOR's team, their
12  accounting folks, to deal with the adjustments from October
13  -- the first billing in October.  So we felt like we were
14  working through the process.
15      Q.  I know you don't recall the exact timing that the
16  spreadsheet was created that reflected numbers 20 percent
17  less than gross, is that correct?
18      A.  Correct.
19      Q.  Would it fit with your recollection that those --
20  that that spreadsheet would have had to have been created
21  prior to janitorial work being begun on the project?
22      A.  I recall that it was provided prior to the
23  billing.  I just -- I don't recollect the exact timing of --
24  of that.
25      Q.  Would that document have been generated to assist

Page 27

1  EMCOR in bidding this project?  And by that I mean in
2  determining what price per square foot they should bid this
3  project at?
4      A.  Well, EMCOR was told -- I don't know that the
5  numbers were provided, but they were told that the square
6  footage from the database based on the sampling that was
7  done by BB&T needed to be adjusted by 20 percent to have a
8  more accurate billing.
9      Q.  And that would have been done well in advance of
10  the first billing?
11      A.  Yes.
12      Q.  Do you recall any issues or any plans -- strike
13  all that.  Do you recall any plans by BB&T to remove
14  dumpsters from the branch locations?
15      A.  There was discussion with EMCOR that BB&T had a
16  need to do that as for a cost savings for this project.  And
17  there were ongoing discussions about the dumpster removal
18  process, but that had not been resolved before I left.
19      Q.  Do you know if BB&T had started removing any
20  dumpsters or had not put dumpsters at new locations before
21  you left?
22      A.  BB&T had made a decision to not put dumpsters at
23  any new -- new de novo branches, which were new branches
24  that we were building at unmarketed sites because of
25  permitting and space issues and so forth.

Page 28

1      Q.  Do you recall if prior to December '05 any
2  dumpsters had been removed from existing locations?
3      A.  Not that I recall.
4      Q.  Did EMCOR give BB&T any recommendations as far as
5  this dumpster removal program?
6      A.  It was still being negotiated or discussed when I
7  left, so I don't know what the outcome of that was.
8      Q.  Do you recall what EMCOR's position on dumpster
9  removal was?
10      A.  They were looking into it.  Alan Crystal was
11  looking into the process, so I don't know that they ever --
12  that I was aware of any position that they took.
13      Q.  Do you recall any discussions with EMCOR over
14  expense -- janitorial expense involved with removing trash
15  off-site at branch locations?
16      A.  No.
17      Q.  Let me ask it a better way maybe.  For branches
18  that did not have dumpsters, were there any extra billings
19  from EMCOR for those janitors having to haul trash
20  off-site?
21      A.  No.
22      Q.  Was there any discussion about if trash had to be
23  hauled off-site, how the janitorial crews would be
24  compensated for that?
25      A.  No.

Page 29

1      Q.  Did Sean Brookins or anyone else from EMCOR in any
2  of these dumpster discussions state that removing trash
3  off-site was outside of the scope of the janitorial work?
4      A.  Not with me.
5      Q.  Who was -- at BB&T -- the head of the dumpster
6  removal initiative?
7      A.  Ronnie Eller.
8      Q.  Who at EMCOR would have been his contact on that
9  dumpster removal issue?
10      A.  Alan Crystal and Sean Brookins.
11      Q.  Besides Hai Falor, did you have any other
12  employees that you supervised on the EMCOR project?
13      A.  Regina Winning.
14      Q.  What was her position?
15      A.  Regina handled a spreadsheet with identifying the
16  closed -- branches that were closing or the facilities that
17  were closing and the knew ones that were opening, and fed
18  that information to EMCOR monthly so they would be aware of
19  what locations to stop this project on and what locations to
20  add.  And she also provided the square footage from the real
21  estate database.  She also fielded phone calls, issues, that
22  kind of thing from the regional staff, BB&T staff.
23      Q.  In various depositions we've had people talk about
24  REBOM's and AOO's.  Could you tell me what the difference
25  between those two is?

8  (Pages 26 to 29)

90c94586-72b1-48d9-923b-50eec20f1cf

Page 30

1    A.  REBOM is a regional branch operations manager.
2  They're under the regional presidents in each region and
3  responsible for managing the branch network from a retail
4  perspective as well as a facilities perspective.  The AOO is
5  Area Operations Officer.  They are under the REBOM.  And
6  they're more directly involved with the day-to-day facility
7  management.  If someone has an issue at a facility, they
8  contact the AOO.
9    Q.  Would the AOO have responsibility for a smaller
10  geographic area than the REBOM?
11    A.  Yes.
12    Q.  So one regional branch operations manager could
13  have multiple area operation officers underneath them?
14    A.  Yes.
15    Q.  Is there a specific name for the person that I
16  would refer to as the branch manager that BB&T uses?
17    A.  Financial Center Leader or Financial Center
18  Manager.
19    Q.  Does the Financial Center Manager have facilities
20  responsibility?
21    A.  Other than reporting an issue in their facility to
22  the AOO, no.
23    Q.  After you left the project, did Hai Falor and
24  Regina Winning stay with the EMCOR project?
25    A.  Yes.

Page 31

1    Q.  Are you aware of whether or not PFMI was ever
2  terminated from the EMCOR project?
3    A.  No.
4    Q.  Are you aware of whether or not EMCOR was ever
5  terminated by BB&T?
6    A.  Yes.
7    Q.  Were you involved in any discussions regarding the
8  termination of EMCOR?
9    A.  No.
10    Q.  I have seen in some of the documents that there
11  was a plan in place that if a certain issue couldn't be
12  addressed, it was what's termed "elevated."  Are you
13  familiar with that?
14    A.  Yes.
15    Q.  Tell me how that elevation process worked.
16    A.  Well, if we had an issue or a problem, I would
17  address it with Sean who was the EMCOR project manager.
18    Q.  (Nodding head in the affirmative.)
19    A.  If we felt like the issue was something we could
20  not resolve or needed to be addressed or a decision made at
21  a higher level, it was elevated to Ronnie Eller.
22    Q.  If a branch or an area operations officer had a
23  complaint, how were they to have lodged that complaint with
24  EMCOR?
25    A.  EMCOR had a call center.  And if they had a

Page 32

1  janitorial complaint, they were supposed to lodge it through
2  the call center.
3    Q.  Would that be what I've heard call the Facility
4  Knowledge Center?
5    A.  Yes.
6    Q.  So it's your understanding that any complaints
7  from the branch or area level should have been lodged
8  through this Facility Knowledge Center?
9    A.  Yes.
10    Q.  Could reports be generated from that Facility
11  Knowledge Center?
12    A.  Through EMCOR, yes.
13    Q.  Was BB&T provided reports on any kind of periodic
14  basis from the Facility Knowledge Center?
15    A.  Yes.
16    Q.  Do you remember how often those reports were
17  provided?
18    A.  No.
19    Q.  How was EMCOR paid for the Facility Knowledge
20  Center?
21    A.  It was included in the pricing of the project.
22    Q.  Probably a better question would be how was EMCOR
23  paid for its management services?
24    A.  It was -- all of that was included in the pricing
25  of the project.

Page 33

1    Q.  Was EMCOR paid every two weeks or monthly a flat
2  management fee?  And by that I mean something that was not
3  tied to square footage numbers.
4    A.  I don't recall.
5    Q.  Do you know if EMCOR marked up the janitorial
6  component from PFMI to BB&T?
7    A.  I don't know.  I'm not aware of that.
8    Q.  How was the adjustment process supposed to work
9  once net cleanable square footage measurements were
10  complete?
11    A.  Once we had a net cleanable number for each
12  location, that number was subtracted from the 20 percent
13  adjusted number, and whatever the differential was, either a
14  debit or a credit, was to be given.  So either we owed --
15  and in some cases we were going to probably owe EMCOR, and
16  in some cases EMCOR was going to owe us.  And we were going
17  to settle up with a final number once those numbers were
18  derived.
19    Q.  Was there a period of time over which once --
20  let's just for hypothetical sake let's just say, after --
21  assuming after all the net cleanable square footage was
22  done, that it was discovered that -- and this is just
23  completely hypothetical bit -- BB&T had overpaid EMCOR by
24  $100,000.  Was that repayment to be spread out over a
25  certain period of time where EMCOR would repay BB&T or would

9  (Pages 30 to 33)

90c94586-72b1-48d9-923b-50eec20f1cf

Page 34

1  it have been an immediate repayment?
2      A.  Well, we never got that far with the numbers so
3  there was no discussion about how the payment was going to
4  be adjusted -- how we were going to deal with the payment
5  because we didn't know what it was.
6      Q.  What was your involvement with the measuring of
7  the branches to get the net cleanable square footage?
8      A.  I did not measure -- in my EMCOR role, I did not
9  measure any locations specifically.  But in my new role when
10  I moved to Roanoke, I actually assisted one of the EMCOR
11  area managers in measuring a Charlottesville location.
12      Q.  Tell me how that EMCOR person did those
13  measurements?
14      A.  We actually -- we took a wheel with footage on it
15  and measured any area that could be cleaned.
16      Q.  Was the wheel used to measure exterior walls?
17      A.  No, it was internal length to width.
18      Q.  So would each room --
19      A.  Yes.
20      Q.  -- be wheeled off and measured?
21      A.  Yes.
22      Q.  And then any area that was not to be cleaned,
23  would just not have been measured?
24      A.  Exactly.
25      Q.  And then all of the space that was measured would

Page 35

1  just be added up and that would be the total net cleanable
2  square footage?
3      A.  Yes.
4      Q.  Do you recall who that person was that did that
5  measurement with you?
6      A.  Jim Maxie.
7      Q.  Did BB&T provide any instructions to EMCOR as to
8  how the branches were to be measured?
9      A.  I don't know.
10      Q.  Do you know if BB&T provided a list of areas that
11  were to be subtracted or not to be counted as net cleanable
12  square footage?
13      A.  If any vacancy was discovered in the locations,
14  then that was supposed to be subtracted -- that square
15  footage was supposed to be subtracted out.
16      Q.  Anything else that you can recall where -- that
17  BB&T instructed EMCOR to subtract out besides vacancy?
18      A.  Well, core space, you know, any like elevator
19  shafts and any -- like supply areas that you could not --
20  any area that could not be cleaned.
21      Q.  Before you transitioned out, did you receive any
22  net cleanable square footage reports from EMCOR?
23      A.  No.
24      Q.  And that one time with Jim Maxie when y'all
25  measured that branch, did he have any type of form or report

Page 36

1  that he filled out regarding the measurements on that
2  branch?
3      A.  Yes.
4      Q.  What all was on that form?
5      A.  I don't recall specifically but it was basically
6  to go room by room and measure length times width of what
7  could be cleaned.
8      Q.  Did any type of drawing have to be generated of
9  the office based on the measurements?
10      A.  Like a floor plan?
11      Q.  Yeah.
12      A.  I don't recall.
13      Q.  I probably already asked this.  Do you know who
14  originally generated the list with each facility and how
15  many square feet it had on it?
16      A.  For the contract?
17      Q.  Yeah, from BB&T.
18      A.  Matt Llewellyn.
19      Q.  Is Matt Llewellyn still with BB&T?
20      A.  Yes.
21      Q.  What's his position?
22      A.  He's in support services.  I know he has a new
23  role.  I'm not sure of his specific job title right now.
24      Q.  That's fair enough.  Do you know what office he's
25  located in?

Page 37

1      A.  He's in Winston-Salem.
2      Q.  When you were communicating back and forth with
3  Sean Brookins or with anybody else from EMCOR, was most of
4  that done face to face or in phone conversations or would
5  most of that have been done by email?
6      A.  Most was face to face.  Some by email.
7      Q.  What about Ronnie Eller, do you know if he would
8  have done most face to face or most by email?
9      A.  Most face to face.
10      Q.  You smile like maybe Ronnie doesn't do email?
11      A.  He's limited.
12      Q.  I know some folks like that, too.
13          MR. SAWYER:  My father doesn't know how to use --
14  strike that.
15          MS. TULEY:  Do y'all mind if we take a quick
16  break.
17          THE VIDEOGRAPHER:  This concludes tape one.  We're
18  going off the record at 10:14.
19          (Brief pause in the deposition.)
20          THE VIDEOGRAPHER:  This is tape two in the
21  deposition of Miss Debra Willis.  We are back on the
22  record at 10:23.
23  BY MS. TULEY:
24      Q.  When we were talking about the adjustments that
25  would happen to the billings once the net cleanable square

10  (Pages 34 to 37)

90c94586-72b1-48d9-923b-50eec20fc1cf

Page 38

1  footage was done, would that go retroactive all the way back
2  to that September 6th when the project started -- the
3  cleaning started?
4      A.  Initially, that was the plan.  And then the
5  decision was made and agreed to by EMCOR and PFMI to make it
6  retroactive to November of '05.
7      Q.  While you were working on the project, were any
8  credits given by EMCOR back to BB&T regarding the janitorial
9  project?
10     A.  There were adjustments on each billing.
11     Q.  Besides the adjustments that Hai Falor would work
12  on, was there any point when EMCOR said something to the
13  effect of, look, we still think there's some discrepancies
14  with these numbers, and we know net cleanable is going to
15  have to be finished, but we're going to go ahead and do a
16  credit of X amount now?
17     A.  No.
18     Q.  Do you know if PFMI ever gave EMCOR a credit for
19  discrepancies besides the adjustments that were done by Hai
20  Falor?
21     A.  I don't know.
22     Q.  Would you ever receive billings straight from
23  PFMI?
24     A.  No.
25     Q.  All that would come through EMCOR?

Page 39

1      A.  Yes.
2      Q.  What was your assessment of the communication
3  between EMCOR and PFMI?
4          MR. SAWYER:  Object to the form of the question.
5  You can answer.
6      A.  There was communication but I was not involved in
7  all of those discussions, so I don't feel like I can really
8  add to that.
9  BY MS. TULEY:
10     Q.  Were there any personality conflicts between any
11  folks at BB&T and any EMCOR folks?
12         MR. SAWYER:  Object to the form of the question.
13  You can answer.
14     A.  No.
15  BY MS. TULEY:
16     Q.  Everybody got along pretty well?
17     A.  Yes.
18     Q.  Was the agreement to retroactively do adjustments
19  only up to November of '05, was that ever put down in
20  writing?
21     A.  I'm not sure.
22     Q.  Was it the practice for things like that to be
23  done more just a verbal agreement?
24     A.  Sometimes.
25     Q.  During the startup of the janitorial process up

Page 40

1  and through I guess December of '05 when you started
2  transitioning out, did EMCOR provide any type of periodic
3  summaries or reports of the progress that was being made
4  with the startup?
5      A.  They provided some reporting on the number of
6  complaints and that kind of thing on -- I think it was a
7  monthly basis based on what was coming into the Facility
8  Knowledge Center.
9      Q.  Were there weekly or biweekly or monthly meetings
10  between EMCOR and BB&T where the progress and any issues
11  were discussed?
12     A.  Yes.
13     Q.  Were those set same time every week, two weeks?
14     A.  As needed.
15     Q.  Were agendas created for those?
16     A.  Probably not in writing every time.
17     Q.  (Nodding head in the affirmative.)
18     A.  Unless it was a major meeting with the entire
19  EMCOR team.
20     Q.  Would any minutes be created from those
21  meetings?
22     A.  No.
23     Q.  Do you know who put together the bid request
24  package done by BB&T?
25     A.  Steve Paige was involved.  Ronnie Eller was

Page 41

1  involved and there were others.  I just am not sure exactly
2  who all was involved in that.
3      Q.  Were you involved in creating a scope of work?
4      A.  No.
5      Q.  Was EMCOR involved in the process of creating the
6  scope of work?
7      A.  I'm not sure.
8      Q.  Was that all created before you started with the
9  project?
10     A.  Yes.
11     Q.  Did BB&T have any involvement in choosing PFMI as
12  the janitorial contractor?
13     A.  No.
14     Q.  Was that decision left to EMCOR?
15     A.  Yes.
16     Q.  If an AOO or a branch wanted to try to keep a
17  specific janitor cleaning their facility, was there a
18  process that they could go through to try to keep that
19  person on once the EMCOR project started?
20     A.  Yes.  The region would provide -- the REBOM's were
21  supposed to provide a list of any janitorial staff that they
22  were interested in continuing services.  And that list was
23  provided to EMCOR.
24     Q.  Did any of the REBOM's say we just have to have
25  XYZ Cleaners.  We're not going to -- we don't want EMCOR

11  (Pages 38 to 41)

90c94586-72b1-48d9-923b-50eec20f c1cf

Page 42

1  doing this. We want XYZ. Did you ever have that scenario
2  where they just were not happy with anybody but the company
3  they were with right then?
4      A. There were some comments made, but because of the
5  process that we were involved in, there really wasn't any
6  discussion.
7      Q. Was this a pretty big change for the REBOM's and
8  the AOO's from the way facilities had been managed in the
9  past?
10     A. Yes, major cultural change.
11     Q. What kind of information was given to the REBOM's
12  and the AOO's prior to this project beginning?
13     A. The REBOM's have monthly meetings in different
14  parts of their footprint. And support services team went to
15  each REBOM meeting. EMCOR representative was there. Greg
16  Littlefield went to many of the meetings. And the plan was
17  described to them, the scope of work provided to them. And
18  they had the opportunity to ask questions.
19     Q. Do you recall how far in advance of the project
20  starting that would have taken place?
21     A. No, not specifically.
22     Q. As the project progressed, did -- do you recall
23  any other REBOM's or AOO's insisting that they get their old
24  cleaner back or that a specific cleaner be hired to replace
25  whoever they had?

Page 43

1      A. In the areas that PFMI was not performing well,
2  the REBOM's would ask if it was possible to get their old
3  cleaner back. But that's pretty much all that was stated.
4      Q. Was any type of analysis done to see how often
5  PFMI was able to take this suggest -- or the requested
6  company the REBOM's wanted and use them?
7      A. I don't know whether there was any reporting done
8  or -- but I do know that they did use several of them in
9  different areas.
10     Q. Were you involved in any conversations with Greg
11  Littlefield or anyone with PFMI about this issue of -- I'll
12  just call them preferred or suggested janitors?
13     A. What do you mean?
14     Q. Like were you involved in any discussion with Greg
15  Littlefield or anybody else from PFMI where, you know, you
16  said we have this list of folks that the REBOM's would like
17  to use. You know, what are your thoughts on how y'all
18  might be able to do that or how you could implement these
19  people or utilize these people?
20     A. I didn't have any direct discussions with Greg.
21  Any discussions would flow through Sean with EMCOR.
22     Q. Would it be fair that that process would have
23  worked for pretty much any issues, any discussions would
24  flowed through Sean onto PFMI with any issues that BB&T was
25  having?

Page 44

1      A. Normally, yes.
2      Q. Before you transitioned out, did Randy Handros
3  come on board on the EMCOR project?
4      A. No.
5      MS. TULEY: I think that might be about all I have
6  right now. I may need to regroup a little bit. Do you
7  want to switch spots with me? It's up to you.
8      MR. SAWYER: You're all spread out over there.
9      MS. TULEY: I can shove it all down.
10     MR. SAWYER: I think I can talk loud enough over
11  here. Are you passing the witness?
12     MS. TULEY: Yes.
13          EXAMINATION
14  BY MR. SAWYER:
15     Q. Good morning, Miss Willis. My name's Ben Sawyer.
16  I represent EMCOR Facility Services. First, let me thanks
17  you for being here. I know it was a heck of a lot of time
18  driving down to Roanoke, and sitting at a big table and
19  you've been asked a lot of questions about stuff that
20  happened a long time ago. And I just want you to know we
21  appreciate it. First, let me ask you -- let me regroup
22  myself here.
23     Did you have occasion in performing your job to deal
24  with an EMCOR personnel such as Donald Boyd and James Maxie
25  concerning mobile maintenance services?

Page 45

1      A. Yes.
2      Q. How did you find their performance? Was it good?
3  Was it bad?
4      A. It was good.
5      Q. How did you feel when -- or what was your opinion
6  when you learned that EMCOR was going to be terminated from
7  this job?
8      A. I felt like BB&T had been through a lot of
9  transition, and we were going to have to go through more to
10  -- to go through the process again. But basically it was a
11  business decision and out of my control.
12     Q. Do you know who made that decision?
13     A. No.
14     Q. And similarly did you have occasion to deal with
15  the janitorial component when you were -- at any time
16  throughout the start when you came on board in May 2005?
17  And what I'm referring to did you have occasion to deal with
18  complaints?
19     A. Yes.
20     Q. Were these complaints substantial, insubstantial,
21  what you expected or --
22     A. A little of everything of all of that, yes.
23     Q. Okay. What type of complaints were you receiving
24  concerning the janitorial work?
25     A. All kinds. Some emails. Some phone calls.

PIERCE REPORTING COMPANY
540-344-5393

90c94586-72b1-48d9-923b-50eec20f1cf

Page 46

1  Primarily, poor performance. Doors being left unlocked.
2  That kind of -- trash not being picked up, scope of work not
3  being completed daily.
4      Q. Was there a particular region where this was
5  happening more than others?
6      A. There were -- it varied. I mean, some regions
7  would have problems and then they would get better. Then
8  other regions would have problems so that varied.
9      Q. Were there any security issues I guess that were
10  brought to your attention concerning the janitorial work?
11      A. Yes, doors left unlocked. I know there was a
12  proof bag stolen in one region.
13      Q. Can you tell me about that?
14      A. Other than it was reported by the branch that a
15  proof bag was taken, and then it was turned over to the
16  security team. So -- and I don't have any information other
17  than that.
18      Q. Do you recall where it was stolen? Does
19  Elizabethtown ring any bells?
20      A. I don't recall the branch but I know it was in the
21  southeastern region.
22      Q. Now, I know you discussed with Miss Tuley
23  concerning measurements that were going to be performed for
24  each branch banking -- branch banking installation; do you
25  recall that?

Page 47

1      A. Yes.
2      Q. When were those measurements supposed to occur?
3      A. EMCOR was tasked with doing the measurements, and
4  then initially it was supposed to be a 30-day process.
5      Q. Was the process completed within 30 days?
6      A. No.
7      Q. Do you have an understanding of who was actually
8  going to perform this? Was it going to be EMCOR personnel
9  or was it going to be someone else?
10      A. EMCOR tasked PFMI managers -- janitorial managers
11  to do the measurements.
12      Q. Would that have been because PFMI was actually
13  doing or performing the janitorial scheduled work?
14      A. Yes.
15      Q. Okay. And I believe you just testified that the
16  process was not complete within 30 days. Was the process
17  completed by before you left?
18      A. No.
19      Q. What happened?
20      A. PFMI managers started the task of measuring for
21  net cleanable square footage. And when the numbers came in
22  to BB&T, they were off from the gross numbers that were from
23  the database. So after discussions, they were measured --
24  they were all measuring differently in doing the process.
25  So the time was extended to 90 days to obtain the cleanable

Page 48

1  square footage.
2      Q. Okay. You said that they were all measuring
3  differently. What do you -- what do you mean? Can you give
4  me some examples?
5      A. Well, I don't know exactly what was told or how to
6  measure -- whether how BB&T told EMCOR to measure. But the
7  PFMI managers were not measuring consistently. They were
8  not doing the same thing at each location.
9      Q. Were there any instances of the measured cleanable
10  square footage being exactly the same as the gross square
11  footage that you recall?
12      A. And I don't recall the numbers but there were some
13  that were higher and some that were close and that kind of
14  thing.
15      Q. And when you say higher, do you mean the number
16  measurements were coming back higher than the gross square
17  footage?
18      A. Yes.
19      Q. Did that seem odd to you?
20      A. Yes.
21      Q. Why did that seem odd to you?
22      A. Because net cleanable was supposed to be what you
23  could clean and not the actual gross square footage of the
24  building.
25      Q. Do you remember -- and I know it's been a little

Page 49

1  while, okay, do you remember, if at all, how many -- or an
2  approximation of how many times or instances this occurred
3  with measurements?
4      A. Oh, I don't have any idea.
5      Q. Okay. But it was more than once?
6      A. Yes.
7      Q. And we've had this number discussed in prior
8  depositions -- and counsel can and probably will object here
9  -- but I believe the number was 30 to 40 percent that nobody
10  really had -- 30 or 40 percent of the measurements that
11  nobody really had any confidence in?
12          MS. TULEY: Object to form. You can answer.
13      A. And I don't know the number.
14  BY MR. SAWYER:
15      Q. Sure. And I believe you discussed with Miss Tuley
16  -- and trust me I'm not going to ask you everything Miss
17  Tuley asked you. I'm not going to do that. But BB&T went
18  out and did a sampling of 30 sites just to test the net
19  cleanable. Do you remember that?
20      A. Yes.
21      Q. Okay, do you know who actually did that?
22      A. I know Ronnie Eller did some of it. And I'm not
23  sure -- I think the BB&T construction administration staff
24  was tasked with doing some of those measurements. There
25  were various members of the support services team that were

13 (Pages 46 to 49)

90c94586-72b1-48d9-923b-50eec20fc1cf

Page 50

1 tasked with that. But I don't recall exactly who all
2 measured.
3      Q.   But you recall it was about 30 thereabouts?
4      A.   Roughly.
5      Q.   How many -- during your time at -- on the BB&T
6 account in Winston-Salem before you left in January, how
7 many billings did you process?
8      A.   Two in October. Two in November. Two in
9 December. Two in January.
10     Q.   So you stayed through the end of January?
11     A.   Yes, I moved to Roanoke February 10th.
12     Q.   Do you recall -- strike that. I know there was
13 some discussion concerning this billing from 20 percent
14 less; do you recall that?
15     A.   Yes.
16     Q.   You would -- well, first let me ask you, did you
17 ever receive any, I guess, protest or requests from either
18 PFMI or EMCOR in this October-November-December and January
19 time frame concerning problems with this 20-percent
20 reduction or billing from a 20-percent reduction?
21     A.   No. Because that was a chosen number from the
22 beginning that everyone understood was going to be possibly
23 more accurate than the gross or rentable square footage, and
24 it was -- collectively seemed like a better number to work
25 from billing-wise to have less adjustments once the net

Page 51

1 cleanable numbers were derived.
2      Q.   And -- but I believe you testified also that you
3 were receiving a mixed bag of billings?
4      A.   Yes.
5      Q.   There would be some based upon gross, is that
6 right?
7      A.   Yes.
8      Q.   And there would also be some based on rentable?
9      A.   Yes.
10     Q.   Okay. And you would agree with me, wouldn't you,
11 that if we went and looked at the invoices, that would tell
12 us what exactly they were billing from if we compared them
13 with gross square footage or adjusted square footage or 20-
14 percent-reduced square footage? Do you understand the
15 question?
16     A.   I do. Yes, but -- (Nodding head in the
17 affirmative.) Yes.
18     Q.   Because it's been a while, right?
19     A.   Yeah. Yeah.
20     Q.   All we would really have to do is take a look at
21 what the original gross square footage was and what the
22 invoice was and what the square footage is saying in the
23 invoice, right?
24     A.   Correct.
25     Q.   And if Miss Green -- do you remember Miss -- well,

Page 52

1 you trained Miss Green, didn't you?
2      A.   Yes.
3      Q.   She testified -- and again counsel can and will
4 object here -- if Miss Green testified that she discovered
5 that we had -- we meaning EMCOR had been billing from gross
6 from the start of the job through a certain period of time,
7 would you agree or disagree with that statement?
8           MS. TULEY:  Object to form. You can answer it.
9      A.   I would disagree.
10 BY MR. SAWYER:
11     Q.   Let me back up for one minute. Going back to the
12 presentation that EMCOR, PFMI and other representatives made
13 at the onset of the project, do you remember that?
14     A.   Yes.
15          MR. SAWYER:  Miss Tuley, can I borrow your exhibit
16     over there. I will mark this as the next exhibit in
17     order. It's No. 76.
18          (Whereupon, Exhibit No. 76 was marked for
19     identification.)
20 BY MR. SAWYER:
21     Q.   And take your time and go through it, but my only
22 real question is going to be is -- but there will be others
23 after it -- but I just want to know whether you've seen that
24 document before?
25     A.   I don't recall.

Page 53

1      Q.   Could it have been part of a PowerPoint
2 presentation that was presented?
3      A.   Could have been.
4      Q.   You don't have an independent recollection of
5 it?
6      A.   No.
7      Q.   Okay, that's it for that one.
8      A.   Okay.
9      Q.   I believe you testified that everybody understood
10 that the actual payments for janitorial work were going to
11 be based on what was actually out there -- the net cleanable
12 square footage, is that correct?
13     A.   Yes.
14     Q.   Do you have an understanding whether PFMI
15 understood this?
16     A.   Yes.
17     Q.   How do you have that understanding?
18     A.   Because the BB&T team worked with the EMCOR
19 accounting team as well as the PFMI accounting team that
20 were actually doing the billing.
21     Q.   Okay. When you say the PFMI accounting team, who
22 are you referring to, if you recall?
23     A.   Well, Jim Wohlers was part of that and there were
24 several others but I don't recall their names.
25     Q.   And was Mr. Wohlers involved with these

14 (Pages 50 to 53)

90c94586-72b1-48d9-923b-50eec20fc1cf

Page 54

1  measurements of square footage, if you recall?
2      A.  I don't recall.
3      Q.  And the whole purpose of the measurements was to
4  get what was actually out there or what was actually being
5  claimed, correct?
6      A.  Yes.
7      Q.  And once that was established, then the invoices
8  would be adjusted to reflect what the square footage was of
9  each facility, right?
10     A.  Yes.
11     Q.  And I believe you testified that the decision was
12  made to only make that retroactive to November?
13     A.  Of '05, correct.
14     Q.  Who was part of making that decision?
15     A.  Ronnie Eller, Steve Paige, Sean Brookins and Greg
16  Littlefield.
17     Q.  How was Mr. Littlefield involved?
18     A.  We had discussions either at BB&T or on the
19  telephone and just agreed collectively that -- because we
20  all knew from the getgo that the square footage was not
21  correct.  And they were having a difficult time measuring
22  correctly.
23     Q.  Do you know who was actually performing the
24  measurements, whether it was PFMI or other individuals?
25     A.  Well, it was their managers and they subcontracted

Page 55

1  to different companies so --
2      Q.  So you say their managers, do you mean the PFMI's
3  managers?
4      A.  Well, I don't know whether these folks were
5  actually working for PFMI or other companies because they
6  did subcontract at different levels the management piece of
7  it as well as the janitorial work.
8      Q.  I think if I understand your testimony, it would
9  have been other vendors that would have been performing the
10  measurements, right?
11     A.  It may have been some of the PFMI managers that
12  were self-performing but they all -- PFMI was the main
13  contractor that was doing the janitorial.  So when I say
14  PFMI --
15     Q.  You're referring to all their other sub-tier
16  vendors?
17     A.  Yes.
18     Q.  Okay.  Do you have a recollection of how much
19  work, if any, that PFMI self-performed on this job -- if you
20  recall?
21     A.  I don't recall the number.
22     Q.  And I kind of wrote -- I didn't kind of -- I wrote
23  this down in quotes.  You said:  "Everybody knew from the
24  getgo that the square footage numbers were off."  When you
25  say "we all knew," would that include Mr. Littlefield?

Page 56

1      A.  Yes.
2      Q.  And when is the getgo?  Is that before the
3  performance of the work?
4      A.  And I don't recall exactly when everybody knew,
5  but they knew when the services started to be performed and
6  the billing -- and the billing process started.
7      Q.  So at least by the time that it was -- at least
8  when it was time to perform the services, everyone knew that
9  the square footage needed to be verified and measured, would
10  that have -- but as you said here, do you recall whether
11  that was before the time of the contract or the execution of
12  the contract?
13     A.  Well, EMCOR knew in the bidding process that the
14  square footage numbers were from a database and that they
15  were not net cleanable numbers.  And that the cost per
16  square foot in the contract was based on net cleanable
17  square footage.
18     Q.  And I guess it's your testimony that
19  Mr. Littlefield knew that as well?
20         MS. TULEY:  Object to form.  You can answer.
21     A.  Greg Littlefield knew that by the time the
22  services started and the billing process started.
23  BY MR. SAWYER:
24     Q.  Could he have known prior to that?
25         MS. TULEY:  Object to form.

Page 57

1  BY MR. SAWYER:
2      Q.  If you know?
3      A.  I don't know.
4      Q.  And you were referring to working with the PFMI
5  accounting team including Mr. Wohlers.  Was Mr. Wohlers in
6  Montgomery at the time or was he traveling back and forth to
7  Winston-Salem?
8      A.  He was traveling back and forth.
9      Q.  It's a long plane --
10     A.  Well, he flew most of the time.
11     Q.  It's no fun experience flying into Winston-Salem I
12  can tell you that.  How often did Mr. Wohlers travel or meet
13  with you in Winston-Salem?
14     A.  I can't tell you the exact number but initially
15  the first several months it was at least twice.
16     Q.  And what would Mr. Wohlers do when he came to --
17  how would he -- or what was the purpose of his visit when he
18  would come to meet with you?
19     A.  To -- well, he met with the entire team but he --
20  their primary concern was focusing around the billing
21  process and getting that straight and the performance issues
22  that we were experiencing.
23     Q.  Well, there are two separate things here.  What
24  did Mr. Wohlers help you do to get the billing process
25  straight?

15  (Pages 54 to 57)

90c94586-72b1-48d9-923b-50eec20fc1cf

Page 58

1    A.  He referred us to his actual accounting team in
2  Montgomery that was doing the spreadsheet.  They had some
3  sort of database in Montgomery at PFMI that was inputting
4  the data with the square footage numbers, and that report
5  was being fed to EMCOR.
6    Q.  Okay, would that spreadsheet include or was --
7  strike all that.  Was PFMI's accounting team inputting
8  measurements that they were receiving into this
9  spreadsheet?
10    A.  It was a database, an Access database.
11    Q.  Okay.  Were they putting the measurements -- the
12  field measurements that they took of the BB&T facilities
13  into this Access database and then providing that to
14  EMCOR?
15    A.  They were working off the gross square footage
16  less the 20 percent initially before all the net -- the net
17  cleanable numbers came back.  And once the net cleanable
18  numbers were agreed to, they were added in at some point.
19    Q.  And you have a recollection of net cleanable
20  numbers being agreed to?
21    A.  Not completely across the footprint, no.
22    Q.  Okay.  Was there some percentage that were agreed
23  to?
24    A.  Before I left we were still having issues with
25  that.  So the net clean -- the net cleanable numbers were

Page 59

1  not clearly defined before I left.
2    Q.  Do you know who was part of PFMI's accounting team
3  that was working with you to get the billing process
4  straight?
5    A.  I don't remember the names.
6    Q.  Melanie Bullard perhaps?
7    A.  I'm sorry, I don't know.
8    Q.  I know it's been a little while, hasn't it.  The
9  second thing you testified was that Mr. Wohlars would come
10  and visit you concerning performance issues?  Did I get that
11  right?
12    A.  Yes.
13    Q.  What were the performance issues that you were
14  having with PFMI?
15    A.  Primarily, complaints from the regional staff that
16  the scope of work was not being done, security issues, that
17  kind of thing.
18    Q.  Were you primarily in charge of handling these
19  complaints for BB&T?
20    A.  To a certain level, yes.
21    Q.  Well, you say "to a certain level."  What do you
22  mean?
23    A.  Well, they initially would come through me.
24  Sometimes they would -- Ronnie Eller would get the call
25  specifically.  Sometimes Steve Paige would get the call

Page 60

1  specifically.
2    Q.  So let me get this straight.  Ronnie Eller is your
3  boss, correct?
4    A.  Yeah.
5    Q.  Okay.  And Steve Paige is Ronnie Eller's boss,
6  correct?
7    A.  Yes.
8    Q.  So when the boss gets called, it's no fun for
9  anyone, is it?
10    A.  Correct.
11    Q.  And I bet they called you, did they not, after
12  they received a direct call --
13    A.  Yes.
14    Q.  -- regarding the janitorial complaints?
15    A.  Yes.  Yes.
16    Q.  What would be your response after getting calls
17  from the boss that were receiving contact from either
18  REBOM's or other people concerning complaints with
19  janitorial, what would you do?
20    A.  We would pull Sean Brookins in and have
21  discussions with Sean.  Occasionally, Greg Littlefield would
22  be pulled into those discussions.  Jim Wohlers would be
23  pulled into those discussions occasionally.
24    Q.  And when you say discussions, are you telling
25  --instructing them to get it right?

Page 61

1    A.  Depends on whatever the issue was.  If it was
2  something specific to security, to make them aware we had a
3  problem.  Sometimes it was just a communication issue of
4  this is the problem that we had, we want you to know about
5  it.  Sometimes it was just general scope of work performance
6  issues needs to get better, needs to improve.
7    Q.  During your period of time when you were on the
8  BB&T account in Winston-Salem, how would you rate the
9  performance of the janitorial scope of work?
10    A.  On a scale of what?
11    Q.  Well, just tell me whether you thought it was
12  acceptable, unacceptable.  Just how would you describe it,
13  and you can use your own terms.
14    A.  I don't think it was ever acceptable.
15    Q.  And why do you say that?
16    A.  Comparing it to what we had before we started the
17  EMCOR project, that's my basis for comparison.
18    Q.  Okay.  So what you had before was better than what
19  you got with the new deal in terms of janitorial?
20    A.  Absolutely.
21    Q.  And you transitioned up here to Virginia in
22  February, right?
23    A.  Correct.
24    Q.  Okay.  Were you promoted or why did you leave?
25    A.  There was an opportunity for a construction

16  (Pages 58 to 61)

90c94586-72b1-48d9-923b-50eec20fc1cf

Page 62

1  administrator basically in this area -- in this territory --
2  so, yes, it was a promotion for me. I had property in this
3  area, and the goals were to eventually get to this area. So
4  it was an early opportunity for me to come to Roanoke.
5      Q. Are you from this area?
6      A. No, I'm from Richmond.
7      Q. You said construction administrator?
8      A. Small projects.
9      Q. Okay. Do you handle construction projects?
10     A. Not today, no.
11     Q. Did you at one time?
12     A. Small projects, renovations, carpet changes,
13 interior build-outs. That kind of thing, yes.
14     Q. When you were handling the billings from -- you
15 received from EMCOR, what type of backup support were you
16 looking for or was it just a spreadsheet?
17     A. It was just a spreadsheet.
18     Q. And I believe it's your understanding that the
19 information would come from PFMI to EMCOR and then to BB&T
20 is that accurate?
21     A. Correct.
22     Q. And I don't think you had a recollection one way
23 or the other whether EMCOR marked up the cost of PFMI or
24 not?
25     A. I don't know that.

Page 63

1      Q. Okay. Were you ever involved with a document
2  called the Second Amendment to the Master Purchase and
3  Service Agreement? Have you ever heard of that before?
4      A. I know there was an amendment to the contract.
5      Q. Do you remember that specifically?
6      A. Not without seeing it, no.
7      Q. Sure.
8          MR. SAWYER: Can we go off the record for a
9  second.
10         THE VIDEOGRAPHER: We're going off the record at
11 11:19.
12         (Discussion held off the record.)
13         THE VIDEOGRAPHER: We're back on the record at
14 11:28.
15 BY MR. SAWYER:
16     Q. Miss Willis, I just have a few more questions. I
17 know I'd asked you earlier about the -- how you would rate
18 the janitorial performance. I'll ask you the same question
19 except this time I'm asking you about the mobile maintenance
20 that was provided by EMCOR. How would you rate that?
21     A. Good.
22     Q. Who were some of the people you worked with from
23 EMCOR concerning mobile maintenance?
24     A. Bob Boyd -- no, Donald Boyd, I'm sorry, Jim Maxie
25 and Sean Brookins.

Page 64

1      Q. Sean Brookins -- was Sean Brookins a hard
2  worker?
3      A. Yes.
4      Q. How would you rate his performance?
5      A. Average.
6      Q. Why average?
7      A. There were some areas that could have been
8  improved upon with Sean.
9      Q. What were those areas?
10     A. Conflict.
11     Q. And when you say "conflict," what do you mean?
12     A. Ah, probably, you know, just in his way of -- he
13 was more of a satisfying, wanting-to-please-type person, and
14 that had some problems going back to his EMCOR core team to
15 deal with issues.
16     Q. What kind of issues?
17     A. Performance issues with janitorial.
18     Q. Do you think he should have been, I guess, more
19 forceful on the janitorial problems that you were having?
20     A. In some cases, yes.
21     Q. Do you think he should have been more forceful
22 with PFMI?
23     A. I think he could have presented the issues to
24 EMCOR management team, you know. I think Sean was -- I
25 don't know whether Sean was the decision-maker with PFMI or

Page 65

1  whether -- you know whether he was -- what his -- you know,
2  whether he had total control with PFMI or it was he had to
3  report to somebody else to deal with PFMI -- I'm not sure of
4  that structure. But, yes, he could have been more forceful
5  with PFMI.
6      Q. Let me ask it this way, but for the janitorial
7  part of this contract, did you think EMCOR was a good
8  contractor?
9      A. Yes.
10     Q. And compared to what you had had before with
11 respect to maintenance, technical issues, was EMCOR better
12 or worse?
13     A. I would rather answer with EMCOR provided someone
14 there on a regular basis to deal with handyman-type issues
15 and maintenance-type issues versus problem or something, you
16 know, act. We were more preventive maintenance oriented
17 with the EMCOR mobile maintenance plan.
18     Q. And that was a significant step up from what you
19 had before where you put a Band-Aid on problems?
20     A. Yes.
21     Q. The same question with Donald Boyd, was he a hard
22 worker?
23     A. Yes.
24     Q. How would you rate Mr. Boyd's performance for
25 you?

17 (Pages 62 to 65)

90c94586-72b1-48d9-923b-50eec20f1cf

Page 66

1    A.  Average.
2    Q.  Why average?
3    A.  Donald worked for BB&T before he worked for EMCOR.
4  And in some cases the BB&T team had to provide guidance to
5  Donald to help him solve problems and so forth.
6    Q.  Do you remember any particular instances?
7    A.  Just some HVAC replacements.
8    Q.  Anything else?
9    A.  Just in general, you know.  Just the way he
10  handled the account -- the territory -- his inexperience in
11  dealing with maintenance-type issues.
12    Q.  How about James Maxie, how would you rate his
13  performance?
14    A.  I'd say a little better than average.
15    Q.  For what?
16    A.  Jim had more experience.  Jim came from HVAC
17  electrical field.
18    Q.  Did these gentlemen work directly with you -- and
19  I'm referring to Mr. Boyd, Mr. Maxie and Mr. Brookins?
20    A.  Donald covered -- Donald was out of Charleston,
21  West Virginia and covered the south West Virginia
22  territories for EMCOR's area manager.  And Jim Maxie worked
23  out of Richmond and covered the east of Roanoke area, and
24  southwest Virginia was my territory, which covered all of
25  southwest Virginia east of Martinsville -- I'm sorry, west

Page 67

1  of Martinsville to southwest Virginia up to Winchester was
2  my territory.  So I had to deal with both -- you know with
3  two different area managers.
4    Q.  I think I've got my geography right.  Can I ask
5  you where did you work before you came to BB&T?
6    A.  Wachovia.
7    Q.  And what did you do at Wachovia?
8    A.  I was a lease administration manager.
9    Q.  How long had you worked at Wachovia?
10    A.  Five years.
11    Q.  Five.
12    A.  Um-hum.
13    Q.  Did you have any involvement with the facilities
14  manager?
15    A.  Wachovia started the process of outsourcing the
16  facility management at that -- when I was there -- last year
17  or so I was there, and was involved in the interview process
18  with different companies to outsource support services.
19    Q.  Who were some of the companies you were involved
20  with down there?
21    A.  Trummel Crow.  CB Richard Ellis.
22    Q.  Was EMCOR one of them?
23    A.  Not that I recall.
24    Q.  Do you recall when Mr. Eller left the project?
25    A.  It was approximately March of '06.  He

Page 68

1  transitioned into a different position within BB&T.  Late
2  February, first part of March of '06.
3    Q.  And do you recall when Mr. Paige -- referring to
4  Stephen Paige -- left the project?
5    A.  It was after I left.
6    Q.  Do you know where Mr. Paige went?
7    A.  He's still with BB&T.
8    Q.  So it's just a different position?
9    A.  Yes.
10    Q.  Do you know what that position is?
11    A.  No, not specifically.
12    Q.  There are a lot of titles?
13    A.  Yes.
14    MR. SAWYER:  That's all I have.
15    MS. TULEY:  I have a few.  Don't listen to Ben.
16  He will say it's more than a few.
17    THE VIDEOGRAPHER:  Miss Tuley, I have
18  approximately ten minutes of tape left, would you like
19  me to change it now or do you want to --
20    MS. TULEY:  Why don't we change it.  I mean, I
21  don't really think I've got that much but --
22    THE VIDEOGRAPHER:  I don't want to have to
23  interrupt if you do.  This is the end of tape two.
24  We're going off the record at 11:43.
25    (Brief pause in deposition.)

Page 69

1    THE VIDEOGRAPHER:  This is tape three of the
2  deposition of Miss Debra Willis.  We are back on the
3  record at 11:47.
4    EXAMINATION
5  BY MS. TULEY:
6    Q.  Were you involved in interviewing any of other
7  bidders besides EMCOR?
8    A.  Yes.
9    Q.  Who were the other bidders?
10    A.  ABM.
11    Q.  Anybody else?
12    A.  No.
13    Q.  Was ABM offering similar services to what EMCOR
14  was offering?
15    A.  Yes.
16    Q.  Were they going to cover the same basic three
17  areas; janitorial, mobile maintenance and landscaping?
18    A.  Yes.
19    Q.  Did you have any involvement with a Stephen
20  King?
21    A.  Yes.
22    Q.  What was Stephen King's role in the project?
23    A.  Stephen provided some financial analysis for us.
24    Q.  What types of analysis?
25    A.  We provided him general ledger information on

18  (Pages 66 to 69)

90c94586-72b1-48d9-923b-50eec20fc1cf

Page 70

1  expenses. And he analyzed the data and went through it and
2  provided us information.
3      Q. Was he providing information as to where BB&T
4  could save money?
5      A. Yes.
6      Q. Do you remember what areas he found where BB&T
7  could save money?
8      A. In the janitorial area -- janitorial services.
9      Q. By consolidating janitorial?
10     A. Yes.
11     Q. Did BB&T pay less for janitorial under the EMCOR
12  contract than they had been paying previously?
13     A. Yes.
14     Q. Do you remember how much less it was?
15     A. It was different in every area.
16     Q. Was there ever an analysis done of what the total
17  percentage of savings was?
18     A. Yes.
19     Q. What was that?
20     A. You mean from what we were -- what BB&T was
21  paying --
22     Q. From what BB&T was paying for janitorial before it
23  was consolidated, to what they were paying for janitorial
24  under the EMCOR project?
25     A. I know rough numbers.

Page 71

1      Q. Just give me your best idea of what the savings
2  was?
3      A. More than a million.
4      Q. Per year?
5      A. Yes.
6      Q. Would that be yearly?
7      A. Yes.
8      Q. Okay. Going back to the stolen proof bag, do you
9  recall what cleaning company was involved in that?
10     A. Destiny, I believe.
11     Q. Do you know who hired Destiny for cleaning?
12     A. PFMI.
13     Q. Was Destiny a preferred or suggested company by
14  any of the REBOM's or AOO's?
15     A. Destiny provided janitorial services for BB&T
16  prior to EMCOR.
17     Q. Do you know if Destiny had a signed contract with
18  PFMI or with BB&T at the time of the proof bag was stolen?
19     A. I don't know that.
20     Q. Were ATMs and drive-thrus factored into the square
21  footage calculation?
22     A. No. Do you mean -- not ATMs but you mean like a
23  remote drive-thru or do you mean a drive-thru at a branch?
24     Q. Let me ask it this way. Was it your understanding
25  that part of the janitorial was to pick up and clean up

Page 72

1  around drive-thrus that were attached to a branch?
2      A. Trash -- general trash in the parking lot and wipe
3  down the equipment, yes.
4      Q. Was that area factored into the square -- the
5  cleanable square footage?
6      A. I don't know.
7      Q. Was cleaning on-site ATMs also part of the
8  janitorial responsibilities?
9      A. Wiping down the ATM was part of the original scope
10  of work.
11     Q. Are you aware that at some point a decision was
12  made by BB&T to just across the board reduce the -- or hold
13  back payments made for janitorial by 20 percent?
14     A. No.
15     Q. During those billing meetings that you talked
16  about where Jim Wohlers or somebody else from his team would
17  be involved, was there more discussed than just square
18  footage?
19     A. Well, his primary focus that was the area that we
20  were having issues with as far as being able to get the
21  billing accurate on that so that was his primary focus.
22     Q. Was the database that PFMI created was that
23  accessible to BB&T?
24     A. No.
25     Q. During the time that you worked on the project,

Page 73

1  did you see any improvements in the janitorial
2  performance?
3      A. Some.
4      Q. Aside from Sean Brookins, were there any other
5  EMCOR account managers or account personnel during the
6  janitorial startup phase?
7      A. Well, Alan Crystal initially served as the project
8  manager until Sean could come on board full-time.
9      Q. When did Maxie and Boyd come onto the project?
10     A. They were hired as area managers. And they were
11  more connected with the mobile maintenance. I'm not sure
12  exactly what time frame they came on board. Mobile
13  maintenance started in March of '06. Landscaping started in
14  January of '06. I don't know whether they were in place
15  during the landscaping phase or not.
16     Q. In the 2005 time frame from starting in September
17  when the janitorial started, besides Alan Crystal and Sean
18  Brookins, were there any other management folks with EMCOR
19  involved in the project?
20     A. Oh, yes. Debbie Crosby.
21     Q. What was her role?
22     A. She was the -- probably the lead project person on
23  the BB&T account.
24     Q. Would she have been higher up than Sean
25  Brookins?

19 (Pages 70 to 73)

90c94586-72b1-48d9-923b-50eec20fc1cf

Page 74

1    A.  Yes.
2    Q.  Anybody else besides Debbie Crosby?
3    A.  Bill Rogers was the president, I believe, of the
4  company.  He really wasn't connected to the day-to-day on
5  the project.
6    Q.  Beside Sean, Alan and Debbie Crosby, was anybody
7  else connected with the day-to-day in the 2005 time frame?
8    A.  Lynn Wilson was Sean's assistant in Winston-
9  Salem.
10    Q.  She was located in the same building as Sean?
11    A.  Yes, she was in the BB&T building.
12    Q.  Anybody else?
13    A.  Not that I recall.
14        MS. TULEY:  That's it.  That's all the questions I
15  have, thanks.
16        MR. SAWYER:  We're done.
17        MS. TULEY:  Okay, thank you.
18        THE WITNESS:  You're welcome.
19        THE VIDEOGRAPHER:  This concludes the deposition.
20  We're going off the record at 11:58.
21        (Deposition concluded at 11:58 a.m.)
22
23
24
25

Page 75

1            CERTIFICATE
2  COMMONWEALTH OF VIRGINIA  )
                            )
3  COUNTY OF ROANOKE        )
4
5    I, Sheryl Smith, Registered Merit Reporter and Notary
6  Public in and for the Commonwealth of Virginia, certify that
7  prior to being examined, the witness named in the foregoing
8  deposition, DEBRA WILLIS, was by me duly sworn to testify to
9  the truth, the whole truth and nothing but the truth.
10    That said deposition was taken before me at the time
11  and place set forth and was taken down by me in shorthand
12  and thereafter reduced to computerized transcription under
13  my supervision, and I hereby certify the foregoing
14  deposition is a full, true and correct transcript of my
15  shorthand notes so taken.
16    I further certify that I am neither counsel for nor
17  related to any party to said action, nor in any way
18  connected with the action, nor am I financially interested
19  in the action.
20
21        Dated this___day of_____, 2007
22
23        _____
        Sheryl Smith
24        Registered Merit Reporter
25

PIERCE REPORTING COMPANY
540-344-5393

90c94586-72b1-48d9-923b-50eec20fc1cf

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION
CASE NUMBER 2:06CV1136-MHT


PROFESSIONAL FACILITIES              )
MANAGEMENT, INC.,                    )
                                     )
          Plaintiff,                 )
                                     )
vs.                                  )
                                     )
EMCOR FACILITIES SERVICES, INC.;     )
and A, B, and C, as fictitious parties,)
                                     )
          Defendant.                 )
                                     )


VIDEO DEPOSITION OF RONALD THOMAS ELLER

(Taken by Plaintiff)

Winston-Salem, North Carolina

Tuesday, August 28, 2007


Reported in Stenotype by
V. Dario Stanziola, CSR, RPR, CRR
Transcript produced by computer-aided transcription

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

**Page 2**

```
1              APPEARANCES
2  ON BEHALF OF THE PLAINTIFF:
3       SCARLETTE M. TULEY, Esquire
        Beasley, Allen, Crow, Methvin,
4       Portis & Miles, P.C.
        250 Commerce Street
5       Montgomery, Alabama 36104
        (334) 269-2343
6
   ON BEHALF OF THE DEFENDANT
7  EMCOR FACILITIES SERVICES, INC.:
8       BENJAMIN H. SAWYER, Esquire
        Sutherland, Asbill & Brennan LLP
9       999 Peachtree Street, NE
        Atlanta, Georgia 30309
10      (404) 853-8188
11 ON BEHALF OF THE WITNESS RONALD THOMAS ELLER:
12      KEVIN P. ODDO, Esquire
        LeClair Ryan
13      1800 Wachovia Tower, Drawer 1200
        Roanoke, Virginia 24006
14      (540) 510-3020
15 Also Present:
16      BOB COLLIER, Videographer
17
18      VIDEOTAPED DEPOSITION OF RONALD THOMAS
19 ELLER, a witness called on behalf of the Plaintiff,
20 before V. Dario Stanziola, CSR, RPR, CRR, Notary
21 Public, in and for the State of North Carolina,
22 held at the offices of Ronald Thomas Eller, 3600
23 Country Club Road, Suite 102, Winston-Salem, North
24 Carolina, on Tuesday, August 28, 2007, commencing
25 at 8:19 a.m.
```

**Page 3**

```
1        INDEX OF EXAMINATIONS
2
3
   By Ms. Tuley          PAGE   5
4
   By Mr. Sawyer         PAGE   77
5
6        INDEX OF EXHIBITS
7  NUMBER    EXHIBIT          MARKED
   Exhibit 33: E-mail document from Debi   62
8  Crosby dated 7/18/05
                                           63
9  Exhibit 34: E-mail document from Alan
   Cristal dated 9/1/05
10                                         64
   Exhibit 35: An Emcor Facilities Services
11 letter from Steven T. King dated 7/29/05
                                           65
12 Exhibit 36: An e-mail document from
   Steven T. King dated 7/18/05
13                                         68
   Exhibit 37: A letter from Alan B.
14 Cristal dated 8/20/05
                                           69
15 Exhibit 38: An e-mail document from Alan
   Cristal dated 12/14/05
16                                         69
   Exhibit 39: An e-mail document from Debi
17 Crosby dated 7/5/05
                                           71
18 Exhibit 40: An e-mail document from
   Robert Goodwin dated 3/1/06
19                                         73
   Exhibit 41: An e-mail document from Alan
20 Cristal dated 7/14/05
                                           74
21 Exhibit 42: An e-mail document from Alan
   Cristal dated 7/24/05
22
23
24
25
```

**Page 4**

```
1       THE VIDEOGRAPHER:  This is the video
2  deposition of Ronald Thomas Eller taken by the
3  plaintiff in the matter of Professional
4  Facilities Management, Inc., plaintiff, versus
5  Emcor Facilities Services, Inc., and A, B and
6  C as fictitious parties, defendants, in the
7  United States District Court for the Middle
8  District of Alabama, Northern Division, Case
9  Number 2:06CV1136-MHT.
10      This deposition is being held at Novant
11 Health, 3600 Country Club Road, Suite 102,
12 Winston-Salem, North Carolina on August 28th,
13 2007 at 8:19 a.m., as indicated on the video
14 screen.
15      The court reporter is Dario Stanziola for
16 the firm of CaseWorks, Inc. of Winston-Salem,
17 North Carolina.  The videographer is Bob
18 Collier for the firm of CaseWorks, Inc. of
19 Winston-Salem, North Carolina.
20      Would counsel now please introduce
21 themselves and then the court reporter will
22 swear in the deponent.
23      MS. TULEY:  Scarlette Tuley for the
24 plaintiff, PFMI.
25      MR. SAWYER:  Benjamin Sawyer on behalf of
```

**Page 5**

```
1  Emcor Facilities Services, Incorporated.
2       MR. ODDO:  Kevin Oddo for the witness.
3       RONALD THOMAS ELLER,
4  having been duly sworn, was examined and testified
5  as follows:
6            EXAMINATION
7  BY MS. TULEY:
8       Q.  All right, Mr. Eller, we just met.  I'm
9  Scarlette Tuley.  I know you've got places to be
10 today so we're going to -- we're going to try to be
11 as fast as we can.
12      Have you given a deposition before?
13      A.  First time.
14      Q.  Okay.  I'll just tell you kind of the
15 simple rules of it, but, you know, if you need to
16 take a break or, you know, want a chance to, you
17 know, stop for whatever reason, just let me know.
18 The only thing I'd ask is if I've asked you a
19 question, go ahead and wrap up the answer so we don't
20 forget where we are.
21      A.  Okay.
22      Q.  If you don't understand a question, please
23 let me know.  Because if you answer it, on the record
24 it's going to look like we understood what we were
25 talking about.
```

2100 3rd Avenue North, Suite 960*Birmingham, AL 35203*www.merrillcorp.com
1-800-888-DEPO

f6bf4c9a-cefa-4882-be17-66579b656275

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 6

1    A.  I understand.
2    Q.  All right.  And I'll try not to, but I will
3  ask some questions that you probably will ask me to
4  rephrase it.  So don't -- don't be afraid to do that.
5    A.  Okay.
6    Q.  Mr. Eller, I'm going to try to just get
7  straight to the heart of the matter.  When did you
8  leave BB&T?
9    A.  I left in July of '06.  I started at
10  Novant July 1st, 2006.
11    Q.  And how long had you been at BB&T?
12    A.  Approximately three years.
13    Q.  And during that time, what was your
14  position?
15    A.  When I was first hired there I went in as
16  a consultant doing construction project management
17  up in the Virginia/Maryland market.  After -- after
18  about a year I was asked to go over and work on the
19  outsourcing of maintenance for our branch banks.  I
20  went over there and went and worked with a
21  gentleman by the name of Steve Paige and
22  implemented the -- the outsource maintenance for
23  approximately a year.  And then my duties changed
24  and I went to work for a gentleman by the name of
25  Gary Scott, and I was responsible for maintenance

Page 7

1  and construction from Virginia up to Maryland, in
2  that market.
3    Q.  All right.  How long did you do -- working
4  with Steve Paige on the outsourcing of maintenance
5  project?
6    A.  Approximately one year.
7    Q.  And give me kind of rough time frame of
8  what -- when that year was.
9    A.  I don't really remember.
10    Q.  Okay.  Was the -- was the project to start
11  outsourcing already underway when you came on board?
12    A.  Yes, ma'am.
13    Q.  Okay.  Who was the main person in charge of
14  the outsourcing project?
15    A.  Steve Paige.
16    Q.  What was his position?
17    A.  He was the manager.  He was the senior
18  manager responsible for the project.
19    Q.  Had you been involved in outsourcing work
20  like this before?
21    A.  Yes, I had.
22    Q.  Was it with banks?
23    A.  Yes, it was.
24    Q.  And when was that?
25    A.  It was my -- prior to going to work for

Page 8

1  BB&T, I was working for Wachovia Bank.
2    Q.  And what company handled -- or did you
3  outsource the maintenance too when you were with
4  Wachovia?
5    A.  Wachovia was a lot -- a lot bigger.  We
6  used several companies.  Emcor was one of them.
7  There -- there were other companies.  Wachovia's
8  footprint was much larger at that time.
9    Q.  And I guess that's a good question.  At the
10  time when you all started working on the outsourcing
11  project, how big was BB&T's footprint?
12    A.  There were 1,406 or 8 branch banks that
13  we outsourced.  I think it encompassed roughly
14  eight states.  I'm not sure.
15    Q.  Had there been a recent like large
16  acquisition or merger with BB&T to -- to come up to
17  that 1,408 number?
18    A.  Over the years BB&T had several mergers
19  to be the size they are.  They grew through mergers
20  more so than organic growth.  And they -- they --
21  they had -- they had a lot of mergers over the
22  years.
23    Q.  At what point was the outsourcing project
24  when you came on board?
25    A.  They had -- they had -- they'd already

Page 9

1  short listed the -- the companies that they wanted
2  to do an RFI for and they were trying to put the
3  RFP together at that time.
4    Q.  What is an RFI?
5    A.  It's a -- an RFI is a request for
6  information about the companies and the RFP was a
7  request for pricing.
8    Q.  Do you remember which companies were on
9  that short list?
10    A.  I could guess, but BB&T would have that
11  information.  There were three and four companies
12  along with Emcor on that -- on that list.  I
13  couldn't be for sure all of them at this time.
14    Q.  And on the request for information, what
15  information was requested from the companies on the
16  short list?
17    A.  I can give some of it, I can't -- I
18  don't -- I didn't send the RFI's out myself, but,
19  you know, it's basically their background, their
20  capabilities, their ability to cover the footprint,
21  things of that nature.
22    Q.  And with the -- with the RFI, would that
23  have come back as like a written report from those
24  companies?
25    A.  Yes, ma'am.

3 (Pages 6 to 9)

f6bf4c9a-cefa-4882-be17-66579b656275

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 10

1    Q.  And who would have those reports been given
2  to, Steven Paige?
3    A.  Steve Paige would have initially got
4  the -- got those RFI's, yes, ma'am.
5    Q.  Besides you and Steven Paige, who else was
6  working on the outsourcing project when you came on
7  board with it?
8    A.  Debbie Willis, Regina Wing.  Originally
9  there was a lady named Tracy Mustin that left the
10  company and we replaced her with a gentleman by the
11  name of Hai Failor.
12    Q.  Tell me what you started doing when you
13  first came on with the outsourcing project.
14    A.  I started looking at the scope, the
15  RFI's, just taking a look at the overall project
16  itself and the -- the initiative of what we were
17  asking the companies to do.
18    Q.  Who developed the scope?
19    A.  The scope was developed among BB&T.
20  There were several folks that sit on the committee
21  that developed the scope.  There was -- there's
22  probably nine to 12 people in -- in my best guess
23  that talked about the scope.  Looked at a whole lot
24  of what was currently being performed out there
25  from -- from a maintenance standpoint and -- and

Page 11

1  then took the best -- the best of what we had and
2  then the scope was developed from that point.
3    Q.  What aspects of the branch maintenance were
4  going to be included in this project?
5    A.  Janitorial, landscaping and maintenance,
6  preventative maintenance.
7    Q.  Was the -- strike that.  Let me ask it a
8  better way.
9      Was the thought to have all three of those
10  aspects of branch maintenance covered by one company?
11    A.  Yes, ma'am.
12    Q.  Had there been a thought of breaking that
13  up and having three different companies to cover each
14  one of those areas?
15    A.  We had given some thought to that.
16    Q.  And in the end the decision was made to
17  just have one company?
18    A.  Yes, ma'am.
19    Q.  Were there any meetings where that was
20  discussed of why -- picking one company over three?
21    A.  I -- we -- I'm sure we did talk about
22  that a lot, but we felt like that the track record
23  of the companies that we had interviewed had good
24  track records of being able to perform these
25  services and we felt comfortable with -- with

Page 12

1  putting it all in one house.
2    Q.  Do you know who made the decision of which
3  companies to ask for information from?
4    A.  It was part of that committee that put
5  the scope together.  It was several of us.
6    Q.  Was any of the information that was
7  provided by those companies used to develop the
8  scope?
9    A.  No, ma'am.
10    Q.  The scope was strictly developed by BB&T?
11    A.  That's correct.
12    Q.  Were all of the companies asked to provide
13  information given the scope of work?
14    A.  We -- it -- we asked for the information
15  on the companies that we were going to hire that
16  was going to provide these services.  And we made
17  that decision based off of the company that we
18  hired that was going to implement those other --
19  those services, the management company.
20    Q.  Okay.  And who was the management company?
21    A.  Emcor.
22    Q.  Okay.  At the time the decision was made to
23  hire Emcor, had they already seen the scope of work?
24    A.  Yes.
25    Q.  Okay.  Who would have provided Emcor the

Page 13

1  scope of work?
2    A.  Steve Paige -- our -- the team that was
3  going to manage the project, we gave them a scope
4  of work.  We -- we had to give them a scope of work
5  in order for them to price it.
6    Q.  Okay.  Did you -- I guess strike that.
7      A better way to ask it would be were more
8  than one company asked to price it or was the
9  decision made that we think we like Emcor and then
10  they were asked to price it?
11    A.  We bidded it.
12    Q.  About how many bids did you all receive?
13    A.  My guess was three.
14    Q.  As we sit here today, do you remember any
15  of the other bidders?
16    A.  No, ma'am.
17    Q.  Had you worked with -- strike that.
18      You'd already said you'd worked with Emcor
19  before with Wachovia; is that right?
20    A.  Indirectly, yes.
21    Q.  Did you -- did you know any of the Emcor
22  personnel that ended up working on the BB&T project?
23    A.  Did I know any of them?
24    Q.  Yes.
25    A.  One person.

4 (Pages 10 to 13)

f6bf4c9a-cefa-4882-be17-66579b656275

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 14

1    Q.  Who was that?
2    A.  A gentleman by the name of Tim Carlisle.
3    Q.  What was Tim Carlyle's position?
4    A.  He was a maintenance area manager.
5    Q.  And just so I'm clear, when we talk about
6  the maintenance, are we talking about what is --
7    A.  The prevent -- the preventative
8  maintenance.
9    Q.  Okay.  That's what's been called the man in
10  the van or the mobile tech?
11    A.  He was over the man in the van.
12    Q.  Okay.  Do you recall what instruction or
13  what guidance was given to the bidders as far as --
14  as what price range BB&T was looking at?
15    A.  No, ma'am.
16    Q.  Was any type of guidance given to your
17  recollection?
18    A.  You talking about -- ask the question
19  again, please.
20    Q.  Sure, sure.
21       When -- when bids were requested --
22    A.  Yes.
23    Q.  -- was any type of guidance given to the
24  bidders of, you know, we have a budget for this
25  project in this range?

Page 15

1    A.  No, ma'am.
2    Q.  Okay.  Do you know what the total budget
3  for the project was?
4    A.  I -- I don't remember.  It's been
5  two-and-a-half years.
6    Q.  Was there a budget set up before the bids
7  came in?
8    A.  I think we had a pretty good guess of
9  what we were currently paying for those services.
10  But I -- we didn't know what the budget would be, I
11  don't think, until after we got the bids in.
12    Q.  Who would have done an analysis of what the
13  current cost of those services was?
14    A.  Our spend dollars was collected by a
15  gentleman by the name of Matt Louellen (ph).
16    Q.  Is Matt Louellen still with BB&T?
17    A.  To my knowledge.
18    Q.  Did you have a specific contact person you
19  dealt with at Emcor?
20    A.  Sean Berkins (sic).
21    Q.  Was it the same person pretty much from the
22  beginning?
23    A.  Sean was the account manager.
24    Q.  Anybody else you dealt with on a pretty
25  regular basis?

Page 16

1    A.  No, ma'am, not regular.
2       Is this before or after the contract was
3  implemented?
4    Q.  I guess we're still talking about before
5  right now.
6    A.  Well, Emcor come in with quite a few
7  folks representing Emcor to tell us all about them
8  and the different people that was involved with
9  Emcor to make sure that our comfort level is good
10  with the project.  There were several folks, Alan
11  Cristal, Debi Crosby and Sean Berkins.  Those are
12  the three names I remember.  There's probably as
13  many as five or six, seven people.  That's all --
14  that's all I can remember.
15       MR. SAWYER:  Could that be Brookins?
16       THE WITNESS:  Berkins, yes.
17       MR. SAWYER:  Or Brookins,
18    B-R-O-O-K-I-N-S?
19       THE WITNESS:  Yeah.
20       MR. SAWYER:  Okay.
21    Q.  But it is safe to say your main contact
22  through the life of the project would have been Sean
23  Brookins?
24    A.  That was our first point of contact.  He
25  actually sat in our facility.

Page 17

1    Q.  Okay.  So he was located in the BB&T
2  facility?
3    A.  That's correct.
4    Q.  Was anybody else with Emcor located in the
5  BB&T facility?
6    A.  He -- his -- Sean's admin sat there.
7  That was a liaison for him, was there.  And then
8  the -- Tim Carlisle was -- was housed there also.
9  He had the -- the mobile techs in the Triad region
10  so he had a desk there as well.
11    Q.  Was that a requirement of BB&T that they
12  have personnel on site?
13    A.  I don't know that it was a requirement.
14  But we would -- we certainly would have told them
15  that we would have liked to have them close to us
16  so our communication lines would be better.
17    Q.  Tell me what you can recall about the --
18  the proposal that Emcor made to BB&T.
19    A.  I think that all the bids come in pretty
20  much really close.  They were all close in numbers.
21  Our -- we -- we made -- we hired Emcor based off of
22  their -- we -- their ability to do the work, our
23  comfort level with Emcor and their customer base
24  was good.  We just felt like for BB&T that at that
25  time they were the best company for us to choose.

2100 3rd Avenue North, Suite 960*Birmingham, AL 35203*www.merrillcorp.com
1-800-888-DEPO

f6bf4c9a-cefa-4882-be17-66579b656275

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 18

1  I had -- when I -- when I went into this project, I
2  was not part of the companies -- I did -- I was not
3  part of the selection of the companies that we
4  chose to bid the project.  They had already
5  identified companies of interest.  And -- and Emcor
6  was on that list when I entered this project.  And
7  I -- you know, all the companies were very
8  comparable in pricing the best I can remember.
9  But -- but I know that Emcor's -- their customer
10  base, their -- their -- their longevity in the --
11  in the maintenance business I think was -- was the
12  comfort level that I had with selecting them.  I
13  was part of a vote.
14      Q.   Was -- did Emcor have any type of unique
15  aspect of any of the services they provided that were
16  different than some of the other bidders?
17      A.   I liked their -- I liked their call
18  center they had -- their call center that's open
19  24/7 because with outsourcing the maintenance at
20  BB&T, we were also looking for a call center
21  where -- where problems -- there was a 1-800 number
22  24/7.  That was a -- that was very -- that was
23  very -- that was very impressive for us to know
24  that we had a call center that was open 24/7 being
25  a bank and all, that we never know when emergencies

Page 19

1  would happen.
2      Q.   Was there any expectation by BB&T that
3  Emcor would self-perform all of the work?
4      A.   No, ma'am.
5      Q.   Was it understood that BB&T -- I mean, I'm
6  sorry, was it understood that Emcor would use vendors
7  or subcontractors for a good bit of this work?
8      A.   Yes, ma'am.  It was to me.  I can't speak
9  for BB&T.  To me, it -- I understood it.
10      Q.   Okay.  Did you meet with any of the
11  subcontractors or vendors they were going to use
12  prior to contracting?
13      A.   I never met with any of them.  When BB&T
14  selected the contract -- when they were awarded the
15  contract, we had no idea who they were going to
16  use.  We hired Emcor, we -- we -- we didn't hire
17  their subs.  So they -- they knew what our
18  expectations were.
19      Q.   So would it be fair to say that at the
20  point of contracting, it was immaterial to you all
21  who they decided to use as subs, it was Emcor that
22  you were interested in?
23      A.   That was the management company we hired
24  to perform the services.
25      Q.   In the end did BB&T provide any approval of

Page 20

1  or refuse anybody that Emcor initially said, okay,
2  here's the subs we plan to use?
3      A.   No, ma'am, we did not.
4      Q.   The --
5      A.   I did not.
6      Q.   Okay.  As far as you can recall, the choice
7  of subs was left entirely up to Emcor?
8      A.   That is correct.
9      Q.   Had any portion of what was included in
10  this project previously ever been outsourced for
11  BB&T?
12      A.   You know, I'm going to answer the way I
13  understand it.  It's always been outsourced.  The
14  people that was cleaning, doing maintenance and
15  mowing our lawns was not BB&T employees, okay?  So
16  they were people that was hired by the regions that
17  was in the cleaning business or the maintenance
18  business or the janitorial business.
19          So outsourcing to some people means that
20  you're going to take the employee's job and
21  outsource it with a company it's going to outsource
22  the work to.  In my opinion, the work was always
23  outsourced because it was being performed by a
24  non-BB&T employee.
25      Q.   This was just going to be a consolidation

Page 21

1  of all the outsourcing into -- under one umbrella; is
2  that fair?
3      A.   That was correct.  It was more about
4  standardization -- it was more about BB&T getting
5  standardization with its janitorial, it's cleaning
6  and its maintenance and -- and try to capture some
7  of the savings through the pure volume of square
8  footage and properties that we had.
9      Q.   Did BB&T have any expectation of what they
10  wanted their cost savings to be in this project?
11      A.   We had no idea.
12      Q.   Did Emcor discuss with BB&T what they
13  thought that their cost -- excuse me, cost savings
14  could be for this project?
15      A.   I don't think that they could at that
16  time because they -- we didn't share with them what
17  we were currently paying so I don't think they
18  could tell us what we were going to be saving or
19  costing us.
20      Q.   Based on some other depositions we've had,
21  there's been discussion about when there was some
22  type of big proposal where there was a big meeting
23  and Emcor made a proposal or presentation I guess
24  would be a better way to describe it to BB&T and
25  introduced some of the subcontractors.

6 (Pages 18 to 21)

f6bf4c9a-cefa-4882-be17-66579b656275

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 22

1      Were you at that meeting?
2      A.  I was.
3      Q.  Okay.  Tell me what you can recall about
4  that meeting.
5      A.  It was held downtown once -- when we were
6  going through some of the interview process with
7  all the vendors that we'd chosen to participate.
8  Emcor come in.  The -- the gentleman Greg
9  Littlefield was there.  I remember Greg being there
10  talking.  This was held downtown in our
11  headquarters building.  It was more of, here's
12  who we are, this is how long we've been in the
13  business.  You know, it was giving us a comfort
14  level that we were hiring the right candidates.  It
15  was basically a job interview.  They were -- they
16  were interviewing for the jobs.
17      Q.  So at the point that the presentation was
18  made, a decision on the contract had not been made;
19  is that correct?
20      A.  I don't think it had at that time.  I'm
21  not a hundred percent sure.  No, I know it wasn't
22  because two other companies spoke that day and at
23  that time there was not a decision made, at that
24  time at the meeting I was at.
25      Q.  In that meeting do you recall any

Page 23

1  discussion about how janitorial would be billed?
2      A.  That was between -- no, ma am, that
3  was -- we had -- those conversations with Emcor
4  we -- we wasn't engaged with janitorial or
5  landscaping.  Our contract was with Emcor and how
6  that project was set up was through Emcor.  How
7  they -- what their agreement was with their
8  vendors, we -- we never seen that.
9      Q.  How did BB&T pay Emcor?
10      A.  I think it was -- Debbie Willis and Hai
11  Failor can better answer that question.  They were
12  over the billing once we received a bill.  I'm not
13  sure if it was once a month or twice a month.  I am
14  not a hundred percent sure.
15      Q.  Was it a flat rate or was it a unit price
16  based on square footage?
17      A.  It was X amount of -- it was X amount of
18  dollars and cents per square foot.
19      Q.  Where did the square foot numbers come
20  from?
21      A.  We had a system over there called AMT
22  that housed all of our -- our properties.  And on
23  that -- on AMT, it had information about each
24  property, square footage being there.  That's where
25  the information come from.  It give us a list of

Page 24

1  properties and some information about them.
2      Q.  Do you know where the information came from
3  for each particular facility as far as square
4  footage?
5      A.  Off of AMT.
6      Q.  Okay.  Who would have been the one to
7  determine, okay, this bank is 5,000 square feet and
8  input that into the AMT?
9      A.  Well, when they go through all the
10  mergers and build all the branches, all that
11  information goes to real estate first and then it's
12  loaded there and then it becomes an information
13  piece for the different departments that needs to
14  interface with that particular real estate.
15      Q.  And would the amount put in AMT be a gross
16  square footage number?
17      A.  I think so.
18      Q.  Was Emcor paid that amount per square foot
19  based on a gross square footage number or a net
20  square footage number?
21      A.  Net, net cleanable.
22      Q.  Okay.  What was your understanding of what
23  net cleanable meant?
24      A.  My understanding -- my personal
25  understanding, net cleanable is the space that is

Page 25

1  controlled by heat and air and is occupied and
2  used.
3      Q.  Was there ever any instructions or
4  definitions given to Emcor by BB&T as to exactly what
5  should be included or excluded from net cleanable?
6      A.  I think we gave really good instructions
7  myself.
8      Q.  Where -- where would those instructions
9  have been?  Was that an -- oral instructions or was
10  there some type of document?
11      A.  I'm sure there was both.
12      Q.  Do you know who would have created that
13  document?
14      A.  No, ma'am.
15      Q.  Tell me, did you have any conversations
16  with anyone with Emcor regarding net cleanable?
17      A.  Yes.
18      Q.  Okay.  Who would you have discussed that
19  with?
20      A.  I would say it would be Sean.
21      Q.  All right.  Tell me what you recall about
22  discussions about what should have been included or
23  excluded from net cleanable square footage with Sean.
24      A.  We wasn't very comfortable with the
25  square footage we had at AMT.  We -- we made

7 (Pages 22 to 25)

f6bf4c9a-cefa-4882-be17-66579b656275

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 26

1  that -- we made that aware upfront before the
2  contract ever got started with Emcor. We felt like
3  we had branches out there that was -- wasn't as big
4  as what was on AMT. We had -- we had looked at
5  50-some branches ourselves internally and there was
6  as much as a 20 percent error factor in some of the
7  square footage. And so when we -- we asked Emcor
8  and made that known and we asked them to measure.
9  They were supposed to field measure the banks in
10  the first 30 days or so that they were in this
11  contract. Debbie Willis was heavily involved with
12  these guys giving them specific instructions
13  because we wanted it accurate.
14      Q.  Would it be fair to say that Debbie Willis
15  was more involved in the square footage measurement
16  aspect than you were?
17      A.  Absolutely. I was aware of what was
18  going on, but all the small detail stuff I
19  wasn't -- you know, was not aware of every little
20  integral part that was going on. Eight states is a
21  big territory to look after.
22      Q.  With those 50 or so branches that you all
23  looked at, did you actually go to any of those
24  yourself?
25      A.  I measured one myself.

Page 27

1      Q.  Okay.
2      A.  I did in Mount Airy.
3      Q.  Tell me how you did that.
4      A.  We went inside with a -- I went in with
5  an Emcor employee and we pulled a tape from wall to
6  wall, inside wall/inside wall, on the entire
7  location and with -- with an Emcor employee and
8  wrote all the information down and reported the --
9  reported what we thought, we by myself and that
10  Emcor employee, what that square footage was.
11      Q.  At what point in the project did you do
12  that?
13      A.  It was toward the tail end of the
14  project. Actually, it was after I got out of the
15  project. We -- I was no longer involved in this
16  project, but I was responsible for part of -- part
17  of the footprint in my next job. And, you know,
18  the janitorial company was supposed to have
19  measured. I don't think that happened. I don't
20  think that it got -- any of that got cleared up.
21  Emcor was supposed to have measured it, but I don't
22  think that they had enough staff. And then we had
23  to get it cleaned up. We had to get it cleaned up
24  so it become an effort of a lot of folks, BB&T,
25  Emcor, where we asked a BB&T person and an Emcor

Page 28

1  person to measure these branches ourself. Edna
2  Green can share more information about that than I
3  can.
4      Q.  Do you have any estimate about how many
5  branches were done that way where a BB&T person and
6  an Emcor person went out and measured them?
7      A.  I know that it was an initiative that
8  BB&T wanted to do and that was under Randy Hondros
9  and Edna Green. So they can better answer that
10  than I can.
11      Q.  On the one branch that you measured, do you
12  recall what the difference was between the gross and
13  what you all came up with on net cleanable?
14      A.  What we had reported and what we actually
15  measured, these branches was off, you know, some of
16  them 50 square feet or a hundred square feet or
17  something like that. They was very close. They --
18  it -- you -- in my opinion, we -- everybody in this
19  room can take a tape and go measure a branch and I
20  bet you we come back with seven different
21  measurements. It's just according to who's pulling
22  the tape and what you understand it. That's --
23  that's my -- that's my opinion.
24      Q.  All right. Tell me what -- well, we just
25  discussed a little bit about it was your

Page 29

1  understanding that the janitorial company was
2  supposed to do the net cleanable square footage
3  measurements; is that correct?
4      A.  That's what I think.
5      Q.  All right. Where did you get that
6  understanding?
7      A.  From the -- from -- from what I think the
8  project -- from the overall project.
9      Q.  That would have been something that Emcor
10  would have told you or would have related to you
11  somehow?
12      A.  Well, we wouldn't have cleaned elevator
13  penetrations in a building. We would have only had
14  a need to clean only the square footage that was
15  basically being occupied or occupiable.
16      Q.  Okay. Did you ever see any measurements or
17  any summaries of measurements from -- that were
18  provided by PFMI, the janitorial company?
19      A.  Never seen any.
20      Q.  Okay. So do you know if any were done?
21      A.  Debbie Willis can answer that.
22      Q.  What did Emcor tell you about the
23  measurements or lack of measurements done by PFMI?
24      A.  Well, our responsibility was to get --
25  Emcor was our vendor and we were -- we were under

8 (Pages 26 to 29)

f6bf4c9a-cefa-4882-be17-66579b656275

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 30

1  the understanding that Emcor would get these
2  measurements done.  And how they got it -- how they
3  got this task accomplished, we didn't -- we didn't
4  ask all that.  It's just we hired them, told them
5  of what we needed to do.  They knew we needed to
6  get it -- to get it complete.  And that's -- that's
7  where -- that's where it stopped at.
8      Q.  When -- what was the time frame for
9  completing -- initially for completing these
10 measurements?
11     A.  We hoped to have the first 30 days
12 from the time the project started is what -- what
13 we -- what my understanding it was going to be.
14     Q.  Once those -- what was the plan of once the
15 measurements came in, what was going to be done?
16     A.  Adjust the square footage and -- and
17 either deduct or add square footage to those
18 particular properties that wasn't accurate from
19 what we had on AMT.
20     Q.  What was going to have been done for
21 payments that had been made to Emcor during the time
22 before the numbers got jailed?
23         For instance, I'll give you a hypothetical,
24 let's just say during the first 30 days, Emcor got
25 paid for six million square feet.

Page 31

1      A.  Okay.
2      Q.  And then the measurements came back and it
3  was five-and-a-half million square feet.  Would
4  anything be done to adjust what had previously been
5  paid to Emcor?
6          MR. SAWYER:  Object to the form of the
7      question.
8          You can answer.
9          THE WITNESS:  I can answer?
10         MR. SAWYER:  Absolutely.
11     A.  We -- we would have -- we would have paid
12 Emcor or they would have paid us back had those
13 measurements been less than six million square
14 feet.
15     Q.  So there would have been some type of
16 either credit or debit?
17     A.  That's correct.
18     Q.  Was there any time period where everybody
19 was just going to operate on the initial gross square
20 feet and there would have been a grace period and
21 then once the numbers were known, going forward there
22 would have been a change, but there would have been
23 no change going back?
24     A.  You've got to ask that one more time.
25     Q.  Okay.

Page 32

1      A.  We -- maybe I can answer it.
2      Q.  Okay.
3      A.  We -- we wasn't -- we wanted to pay
4  whatever the square footage was, the accurate
5  number.  We divulged upfront that we felt like it
6  was off.  We felt like it was off probably less or
7  more.  We had a branch in Florida, for example,
8  that was 26,000 square feet.  We knew that wasn't
9  but about a 2,200 square foot branch.  They
10 measured from property line to property line and
11 measured the yard, underneath the drive-thru and
12 everything.  So it was all over the board.  So
13 we -- we've -- we -- I don't know personally what
14 the square footage was because I wasn't there after
15 it got cleaned up.  It could have been less, it
16 could have been more.  There was -- there was signs
17 of it both ways, I think.  I'm not sure.
18     Q.  The -- the -- I'll just go ahead and
19 represent to you that the actual cleaning of this
20 project --
21     A.  Right.
22     Q.  -- was supposed to start I think right
23 around Labor Day of 2005.
24     A.  That is correct.
25     Q.  Okay.  In relation to that date, when did

Page 33

1  you stop working on the Emcor project?
2      A.  When did I start or stop?
3      Q.  Stop.
4      A.  A year after that.
5      Q.  So you would have been on the Emcor project
6  'til around Labor Day of '06?
7      A.  That would be close.  I think -- I think
8  so.
9      Q.  Okay.  When you left, who was your, I
10 guess, replacement person for your position?
11     A.  Let's see.  Steve Paige stayed on.  He
12 was my boss.  I don't know that my position ever
13 got replaced because it took more people to get it
14 implemented than it did to run it after it was
15 implemented and running.
16     Q.  Why was that?
17     A.  Why was that?
18     Q.  Um-hum.
19     A.  A lot of information flow and it just --
20 it takes a lot of us -- a lot of folks at BB&T to
21 tell the network, all the branch bank managers and
22 those folks -- it was a lot of information flow and
23 we -- we had a lot of communications out there that
24 we had to let folks know of changes that was going
25 on and this type of stuff.

9 (Pages 30 to 33)

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

---

Page 34

1    Q.   Was this project supposed to roll out in
2  phases?
3    A.   We -- we asked about rolling it out in
4  phases.  But Emcor assured us that they could
5  implement it over a long holiday weekend.
6    Q.   Okay.  So it was your understanding that
7  the janitorial would all roll into effect basically
8  in about one long weekend?
9    A.   That's correct.
10    Q.   After janitorial -- how long was the -- how
11  long of a time frame did janitorial have to be
12  completely in place?  Was it just that weekend or was
13  there a longer time frame for all the kinks to get
14  worked out?
15    A.   Well, when you're buying goods or buying
16  services, everybody tells you that they're going to
17  be perfect.  I think of us who's hired those
18  services knew that it would take 30 to 60 days for
19  the kinks to workout.  But if you asked Emcor or
20  PFMI, they're going to be day -- great on day one,
21  no problems going forward.  That's what people tell
22  you.  That wasn't the case.
23    Q.   What -- what was the case?  Like how did
24  the project in reality turn out?
25    A.   Started bedding down in my opinion after

---

Page 35

1  about 90 days.
2         MR. SAWYER:  I'm sorry?
3    A.   It started -- it started -- a lot of the
4  bumps and stuff started getting better after
5  approximately 90 days.
6    Q.   So at about the 90-day time frame is when
7  it all started working a lot more smoothly?
8    A.   It was smoother.
9    Q.   Smoother.
10        Okay. Tell me what was going on in that
11  first 90 days as far as janitorial.
12    A.   It was -- it was real hectic.  The -- the
13  thing that -- the thing that bothered me about the
14  whole project was is that we had assurances from
15  PFMI and Emcor that that long weekend, that they
16  would have several people flew in or brought in to
17  work in those branches over that weekend to get
18  their supplies and equipment, be sure that keys
19  were passed off and so forth and so on and kind of
20  walk through all the branches.  They gave -- I
21  mean, they assured us that they would just -- just
22  swarm this thing with 2 or 300 people and would be
23  working with their supervisors and that would help
24  implement the first day of work, that following
25  workday.  And in my opinion, they both failed

---

Page 36

1  miserably on the implementation of that project
2  with the janitorial.  Miserable.  Miserable.
3    Q.   As far as getting people out to cover those
4  areas --
5    A.   They did -- they did not do what they
6  said they would do, either party, in my opinion.
7    Q.   And would it be your testimony then that it
8  was not until 90 days that all of that got worked
9  out?
10    A.   That is correct.  In my opinion.
11    Q.   At any point did you talk to anyone with
12  Emcor or suggest to Emcor that they replace PFMI?
13    A.   I had no conversation about replacing
14  PFMI at any time.
15    Q.   Was there any discussions that you were
16  aware of with anybody at BB&T where they wanted PFMI
17  replaced?
18    A.   No, not me.
19    Q.   During that initial we'll call it 90-day
20  time period, was there any discussion that -- from
21  anybody at BB&T that they wanted Emcor replaced?
22    A.   No, ma'am.
23    Q.   After that 90 days, how did the project run
24  from there?
25    A.   I can only speak while I was involved in

---

Page 37

1  it.  The longer you do it, the better you get at
2  it, the better you learn your customer.  From where
3  it started and when I got out of it, it was a lot
4  better.
5    Q.   Were there any regions or branches within
6  BB&T that you got the sense were just not going to be
7  happy with the current janitorial situation no matter
8  what?
9         MR. SAWYER:  Object to the form of the
10    question.
11         You can answer.
12    A.   Yes.
13    Q.   Okay.  Tell me what you recall about those
14  regions or those areas.
15    A.   Well, basically, you know, it's just
16  where most of the complaints were coming in from,
17  you know, just wasn't happy with the cleaning that
18  they were getting, bringing their children to work
19  with them, which is something that we didn't want,
20  just -- it was just all over the board.  And it
21  seemed like that it was coming out of certain
22  regions and they were, you know -- that's -- that's
23  how you know that you've got a problem with your
24  employees because of that call center, go back to
25  that call center.  And that was how we were able to

---

2100 3rd Avenue North, Suite 960*Birmingham, AL 35203*www.merrillcorp.com
1-800-888-DEPO

f6bf4c9a-cefa-4882-be17-66579b656275

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 38

1   track where problem areas were.
2       Q.   And that way you would be getting
3   reports -- how often from that call center?
4       A.   I'd get it 24 -- every day.
5       Q.   So you weren't getting like one big report
6   of this is what happened over the last so long, you
7   were getting hit like every time a complaint was
8   made?
9       A.   Real time every day I'd pull a report out
10  of their call center and -- and monitor the
11  complaints and what type of complaints they were.
12      Q.   What -- what information was given to
13  either -- I know there's something called AOO's and
14  there's RBOM's --
15      A.   Um-hum.
16      Q.   -- about -- let's start over.
17          Before he -- that Labor Day weekend when
18  everything was supposed to start --
19      A.   Right.
20      Q.   -- what information was given to the RBOM's
21  and the AOO's about what was about to happen?
22      A.   They all had a copy of the scope of work.
23  They knew the company.  They knew -- they knew what
24  the -- you know, they had the call center numbers.
25  They -- they had all this information.  That -- it

Page 39

1   was not done in a vacuum.  It -- the information
2   flow went out.  There were several meetings held
3   with the AOO's and RBOM's and the RP's, the
4   regional presidents.  So they -- they knew -- they
5   knew who was -- who and what these folks were
6   supposed to do.
7       Q.   Did any of those groups, the AOO's, the
8   RBOM's or the RP's, have any input or make any
9   suggestions as to what cleaning companies they wanted
10  used in their areas?
11      A.   It disappointed some of them because they
12  lost their -- their cleaners who'd been cleaning
13  their branches for a long, long time.  It was a
14  disappointment.  But I think all of the BB&T folks
15  went into this thing with open eyes to -- to
16  support the project.  And sure, there was some
17  disappointment that vendors lost their job that's
18  been doing their work, but never -- but again, I
19  think that BB&T's position was let's give this a
20  chance.
21      Q.   Okay.  When in the project were landscaping
22  and the man in the van maintenance part supposed to
23  start phasing in?
24      A.   Steve Paige can better answer that
25  question and Debbie Willis.  If I'm not a hundred

Page 40

1   percent sure, I'm not going to answer a question.
2       Q.   That's fair.
3       A.   Okay.
4       Q.   Were you still working on the project when
5   the mobile maintenance phased in?
6       A.   Yes.
7       Q.   Okay.  How did that go?
8       A.   It went good.  That was the -- actually,
9   that went pleasantly well.
10      Q.   What about landscaping, were you still in
11  the project when that phased in?
12      A.   Yes.
13      Q.   How did that go?
14      A.   It had its 90 days of bumps in the road
15  and -- but it -- it -- it had room for improvement.
16  But again, I don't know how it ended up because I
17  was taken off the project.
18      Q.   Do you know how the -- the janitorial ended
19  up?
20      A.   What do you mean ended up?
21      Q.   Like -- let me ask it this way, do you
22  know -- were you still on the project when PFMI was
23  taken off as the janitorial supplier?
24          MR. SAWYER:  Object to the form of the
25      question.

Page 41

1          You can answer.
2       A.   I wasn't working on the project when PFMI
3   was taken off -- off of it.
4       Q.   Did you have --
5       A.   I think I was working here when PFMI was
6   taken off of it.  I wasn't aware that they got
7   taken off.
8       Q.   Okay.  Well, then that takes care of a few
9   more questions.
10          When you left the project --
11      A.   Right.
12      Q.   -- what was your overall opinion of how the
13  janitorial was doing at that time?
14      A.   I'll go back and say had the first long
15  weekend of implementation, had it been good, I
16  think the whole thing would have went smoother.  So
17  it was a constant fight from the janitorial's
18  perspective because they weren't prepared, in my
19  opinion, with the initiative that they took on.
20  Janitorial was -- is a tough business and -- and
21  it's -- when I left the project, I was happy with
22  the way it was going.  I wasn't happy about the
23  levels it was currently working at, but I was -- I
24  was seeing progress when I left the project.  What
25  happened after I left the project, ma'am, I can't

11 (Pages 38 to 41)

f6bf4c9a-cefa-4882-be17-66579b656275

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 42

1  tell you.
2      Q.  That's fair.
3      It sound like you were pretty realistic
4  that any type of project of this size is going to
5  take a certain amount of time to implement and work
6  out all the kinks; is that fair to say?
7      MR. SAWYER: Object to the form of the
8  question.
9      You can answer.
10     A.  Yes, I think that the size of this
11 project, the culture change that we were about to
12 embark on with our employees of something they've
13 done for 50 years one way and try to get people to
14 change is hard.  And so I knew that it would be a
15 lot of work to get this project implemented and get
16 it in.  I thought -- I think BB&T folks were
17 prepared for what we were doing, in my opinion.
18     Q.  Did you think once the project got started
19 that Emcor was prepared for the size of that project?
20     A.  No.
21     Q.  Tell me why you think that.
22     A.  I just think that -- I think that -- I
23 think that Emcor and the two companies that they
24 engaged with was not prepared.  I think that it
25 engulfed -- I think it engulfed them at the

Page 43

1  beginning.  I think they all had to play catch-up.
2  I think that BB&T would have been open to have
3  implemented this in phases had they -- he had it
4  been recommended.
5      To my opinion, I never seen a
6  recommendation from any outsource company that
7  they'd like to take this thing in.  We asked, we
8  talked about it.  We -- we, BB&T, had the comfort
9  level that these guys knew what they were doing and
10 had done it before.  So we -- we rolled the dice
11 and went with them and I think that was a mistake
12 on our part to have implemented this as one
13 project.  I think it was too big for them.
14     Q.  Would it -- in hindsight, would it have
15 been better to have split the project up based on the
16 types of service required, i.e., janitorial,
17 maintenance and landscaping, or is your thought more
18 it would have made more sense to have a longer time
19 frame to phase in the project?
20     MR. SAWYER: Object to the form of the
21 question.
22     You can answer.
23     A.  I think we hired the right company from a
24 maintenance standpoint to do the work, Emcor.  I
25 think that how they chose to do the landscaping and

Page 44

1  janitorial -- in my opinion, I think they should
2  have split it up among a lot of different companies
3  and -- but again, we had nothing to do with the
4  landscaping or the janitorial subs or their
5  contract or agreement that they had with Emcor.
6  We -- we hired Emcor.
7      Q.  Do you know if Emcor is still providing
8  services to BB&T?
9      A.  I do not know.
10     Q.  Did you -- I know you said you went out and
11 did a remeasure on one of the branches?
12     A.  I did.
13     Q.  Did you receive any -- well, let me -- let
14 me ask it another way.
15     I believe your previous testimony is you
16 never saw any kind of measurements from PFMI,
17 correct?
18     A.  I did not.  Debbie Willis could have, but
19 I did not.
20     Q.  At some point there was some decision for
21 BB&T and Emcor personnel to go out together and
22 measure, correct?
23     A.  At the very end.
24     Q.  Okay.  When in relation to that Labor Day
25 weekend was that decision made?

Page 45

1      MR. SAWYER: Counsel, which --
2      Q.  The decision to go out together and
3  measure.
4      A.  Well, it had to be within the first 12
5  months of when we did it, because we -- we tried to
6  get the measurements in the first 30 days.  We were
7  told that the janitorial folks, the crew leaders
8  were capable from PFMI of measuring it.  That's
9  what we were told.  That didn't happen.  Emcor
10 folks just -- they were very thin.  That didn't
11 really all get happened either.  So again, then it
12 become a joint venture of all of us to go out and
13 get this -- get this matter done.  I was not
14 working on the project then.  I was over the
15 southwest part of Virginia, up to Maryland, D.C.
16 And the folks that worked for me engaged with an
17 Emcor employee in all those regions and they done
18 measurements and I think that was under the
19 direction of Edna Green.
20     Q.  Do you know if all of the branches were
21 measured that way with a BB&T and Emcor person?
22     A.  I -- do I know if all of them?
23     Q.  Yes, sir.
24     A.  No, ma'am, I don't know that.
25     Q.  Were all of the ones in your area measured

12 (Pages 42 to 45)

f6bf4c9a-cefa-4882-be17-66579b656275

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 46

1  that way?
2     A.  All the ones that I received from Edna
3  Green to measure, we did measure them that way.
4     Q.  Did she provide you with a list of the ones
5  she wanted?
6     A.  I think she did, yes, ma'am.
7     Q.  Do you have any idea how she chose which
8  ones to measure?
9     A.  I'm not sure she didn't choose all of
10  them.  I -- no, I don't know.
11     Q.  Okay.  You just know she gave you a list,
12  you measured them?
13     A.  It's quite a few branches, um-hum.
14     Q.  Did you -- before that when you went that
15  one time and measured and you got the list from Edna
16  Green, had you seen any measurements from any source,
17  be it Emcor, whoever, of any of the branches?
18     A.  Other areas?
19     Q.  Yes.
20     A.  I had.
21     Q.  Okay.  Who had done those measurements?
22     A.  Other managers, supervisors and other
23  parts of the footprint.
24     Q.  BB&T personnel?
25     A.  Um-hum.

Page 47

1     Q.  Okay.  When were those measurements done?
2     A.  I can't be sure of that.
3     Q.  Was that all part of this effort to come up
4  with what the net cleanable square footage should be?
5     A.  Yes, ma'am.
6     Q.  I just wanted to make sure that wasn't for
7  some other type of project.
8     A.  No, ma'am.
9     Q.  Do you recall what -- on average what those
10  numbers were coming back as percentage
11  difference-wise?
12     A.  Edna never shared that with us.  Edna
13  replaced Debbie Willis.  And Edna never shared that
14  with us.  She was working with Randy Hondros at
15  that time or Steve Paige, I'm not sure who.  And
16  that was being handled from BB&T management and
17  Emcor management.  I don't know.
18     Q.  I'm going to show you something that was
19  marked in another exhibit (sic) as Exhibit 12.
20     A.  Okay.
21     Q.  And I just ask you if you have seen that
22  document before?
23     A.  I have seen this.  I have seen a document
24  looked just like this, yes.
25     Q.  Okay.  What is that?

Page 48

1     A.  Well, it's a list of our sites.  It's got
2  the property type, whether we lease it or own it.
3  It's -- it's information -- a gathering of our
4  different properties.
5     Q.  Okay.  At what point in the whole gathering
6  information, requesting pricing part of this project
7  would Exhibit 12 or a spreadsheet just like it have
8  been provided to Emcor?
9     A.  This would have went out, in my opinion,
10  when the RFP was being -- being -- was being put
11  together by the other companies as well, because
12  this right here is an exhibit to me to -- to the --
13  to the part of the RFP, request for pricing, that
14  tells all the vendors where they are and how big
15  they are.
16     Q.  Who put together that RFP?
17     A.  BB&T legal.
18     Q.  Okay.  Let me just ask you -- I apologize,
19  but my -- my own highlighting is on here because this
20  is my copy.  But there are look like three columns
21  towards the end of the spreadsheet.  One is called
22  gross square feet, one is called current vacant
23  square feet and one is called adjusted square feet.
24     A.  Right.
25     Q.  Tell me what your understanding is of what

Page 49

1  those three columns are.
2     A.  Well, the gross would be just what it
3  says, gross square footage.  The vacant square foot
4  is that we had a lot of vacant, unoccupied space
5  within buildings.  They also cleaned high-rise
6  buildings other than branches.  And we had two or
7  three floors blocked off that we didn't have people
8  on.  We did not maintain those floors from a
9  cleanable or maintenance standpoint or change light
10  bulbs or anything.  And the adjusted is -- is what
11  it would be -- what it -- what it should be -- I'm
12  not sure what adjusted means.  I mean, if we've got
13  the gross out here, I don't -- I'm not sure what
14  adjusted means.  I don't -- I don't know.  Somebody
15  within BB&T's group put this together.  And I -- I
16  think this come, I think -- I'm not sure who did
17  it.  Matt Louellen would probably be a person you
18  could ask.
19     Q.  Okay.  Was it your understanding that in
20  the request for pricing --
21     A.  Um-hum.
22     Q.  -- was the request for pricing sent out
23  based on the gross square foot number or the adjusted
24  square foot number?
25     MR. SAWYER:  Object to the form of the

13 (Pages 46 to 49)

f6bf4c9a-cefa-4882-be17-66579b656275

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 50

1      question.
2          THE WITNESS:  I can answer?
3          MR. SAWYER:  Absolutely.  I'm just
4      objecting for the record.  Whenever I object,
5      don't listen to it.  You can just answer
6      unless your counsel tells you not to answer.
7      A.  If you follow it across, the gross and
8  the adjusted is identically the same number --
9      Q.  Okay.
10     A.  -- throughout this whole thing here.  I
11  mean, it's -- to me it's all the same.  But I don't
12  know.  You'd have to find somebody in real estate.
13  You know, I'm -- you know, I look at square footage
14  as net cleanable square foot.  And that would be
15  inside the penetrated walls.  And sometimes I think
16  there's too much language on some of this stuff, in
17  my opinion.  So we -- we gave the square footage --
18  when we put the R -- when the RFP was put together
19  and the scope of work was put together, that went
20  out months, months and months before this contract
21  was ever implemented, okay?  The square footage is
22  what we had on our software system.  And we knew
23  that there were some errors in it.  Up or down, we
24  knew there were errors in it.  We asked to get them
25  corrected.  We made it -- we made it aware of

Page 51

1  the -- of everyone.  Everybody knew this, including
2  PFMI, Emcor.  Everyone knew it.  And we tried to
3  get those numbers adjusted to where they'd be
4  accurate.  Because quite frankly, I personally
5  thought that we were paying probably for more
6  square footage than we actually had to clean, in my
7  opinion, but I didn't really know.  We went with
8  what we had.  And that's all I can say.
9      Q.  All right.  Do you recall -- and I know
10  you've already testified that -- you made it clear
11  that you all didn't think these numbers were
12  accurate.
13     A.  Sure.  Yes.
14     Q.  Okay.  Did you give any guidance to Emcor
15  particularly in the early stages before the
16  contracting of, you know, here we think they could be
17  off at this percentage?
18     A.  We did.
19     Q.  Okay.  What percentage do you recall that
20  being at?
21     A.  I'm not sure.  Debbie Willis can tell you
22  that percentage --
23     Q.  Okay.
24     A.  -- or Matt Louellen, Steve Paige, one of
25  those folks that was putting this thing together.

Page 52

1      Q.  But there was a discussion, to the best of
2  your recollection that, you know, we think these
3  numbers are probably off by X percent?
4      A.  I think so.
5      Q.  Okay.
6      A.  They can -- they can better answer that
7  question than I can.
8      Q.  Were you involved in the receiving invoices
9  or paying invoices from Emcor?
10     A.  My group was.  I wasn't.  My group was.
11  Yeah -- yeah, I was.
12     Q.  Okay.  Were you involved in any of the
13  process of -- of what's called the true up or of --
14  of credits for having -- well, strike that.
15         Were you involved in any process of true up
16  between BB&T and Emcor?
17     A.  What does true up mean?
18     Q.  Okay.  That's a good question.  I've been
19  trying to figure that out myself.
20         Was it your understanding that once the net
21  cleanable square footage was determined, that there
22  would either be a situation where BB&T had overpaid
23  Emcor or BB&T had underpaid Emcor depending on what
24  those numbers came back?
25     A.  Those adjustments were made when it was

Page 53

1  made to our attention.
2      Q.  Okay.  How was that handled from a payment
3  aspect?
4      A.  I would -- I would -- Debbie Willis can
5  tell you verbatim word for word how that was
6  handled.  I -- I can sit here and tell you and
7  probably be accurate, but I'd rather it come from
8  her, because she was approving the bills and
9  working very closely with this -- with this
10  project, as well as I, but I want -- I don't want
11  to sit here and guess something that's
12  two-and-a-half years ago.  She can -- she's
13  probably got much better recollection of it than
14  me.
15     Q.  All right.  Well, without asking any
16  numbers, let me just ask you this in general.
17     A.  All right.
18     Q.  Did -- while you were still working on the
19  project, did BB&T determine that the net cleanable
20  square footage was lower than what the gross
21  cleanable square footage was?
22     A.  We never knew.  We never got them
23  measured while I was on the project.  They never
24  got measured.  All of them never got measured.  I
25  don't know what they end -- I don't know what it

14 (Pages 50 to 53)

f6bf4c9a-cefa-4882-be17-66579b656275

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 54

1  ended up.
2      Q.  Okay.  And so to your recollection, you
3  don't remember there ever being a determination that
4  BB&T had overpaid for square footage cleaned?
5      A.  To my knowledge, I -- I am not -- I'm not
6  sure if they overpaid or underpaid.  I never
7  seen -- I wasn't in the project long enough to see
8  if the numbers ever got corrected.
9      Q.  Well, you all don't mind maybe taking a
10  quick break and I think based on what you've told me,
11  I can short circuit some of this.
12      A.  Okay.
13          MS. TULEY:  All right.  Thank you.
14          THE VIDEOGRAPHER:  Going off the record.
15      The time is 9:22.
16          (A BRIEF RECESS WAS TAKEN.)
17          THE VIDEOGRAPHER:  Back on the record.
18      The time is 9:31.
19      Q.  At some point either in the precontract
20  phase or around the time of contracting, were there
21  any discussions on BB&T's end about removing
22  dumpsters from branch locations?
23      A.  With Emcor, yes.
24      Q.  Okay.  Tell me what was the thought behind
25  removing the dumpsters?

Page 55

1      A.  The thought behind moving the dumpsters
2  was it was going -- it was part of our cost savings
3  initiative program and Emcor said trash would be
4  removed from the sites and that we could get rid of
5  dumpsters.
6      Q.  Was this a proposal that was made to BB&T
7  by Emcor?
8      A.  They said this in meetings in front of
9  all the -- all the folks at BB&T.
10      Q.  Whose idea was it, BB&T's or Emcor's?
11      A.  I don't remember.
12      Q.  About how much was it represented that BB&T
13  could save by removing the dumpsters?
14      A.  I don't remember that number.
15      Q.  Do you have any recollection of what it
16  cost to have a dumpster on site?
17      A.  We wasn't sure what our cost was with the
18  dumpsters.  We didn't know what size dumpsters
19  were, how they were being emptied.  We just knew
20  that we had dumpsters on which sites because we
21  were getting billed for them.
22      Q.  And you called this the cost saving
23  initiative.  Were there any other aspects of the cost
24  saving initiative besides removing dumpsters?
25      A.  We felt like that, you know, we had one

Page 56

1  bill to pay.  It was better than paying 4 or 500
2  bills to 4 or 500 different janitorial people.  We
3  picked up savings there, I'm sure.  We -- we didn't
4  have to operate our call center as much because our
5  outsourcer had a call center.  And it -- just
6  things like that in general.
7      Q.  Tell me what you can recall about the
8  dumpster removal presentation by Emcor.
9          MR. SAWYER:  Object to the form of the
10      question.
11          You can answer.
12      A.  I can't -- I just know that it come up.
13  We were led to believe that dumpsters would be
14  removed from the site.  I can't remember all the
15  rest of it.
16      Q.  Was there any discussion about if the
17  janitors had to haul the trash away, there would be a
18  cost associated with removing the trash from the
19  site?
20      A.  I don't know what the arrangement between
21  Emcor and PFMI was.  Our -- our -- our information
22  was from Emcor.
23      Q.  Did Emcor ever relate to you or did you
24  ever hear any discussions where Emcor related that
25  there would be an additional cost for the trash

Page 57

1  removal if the dumpsters were taken away?
2      A.  I don't remember ever -- I don't -- never
3  had that conversation with anybody.
4      Q.  And I believe you've already said this, but
5  you were not aware of what the arrangement was as far
6  as trash removal or dumpster removal between Emcor
7  and PFMI?
8      A.  No, ma'am.
9      Q.  Did you ever have any discussions just
10  between you and anyone from PFMI?
11      A.  Did I ever speak to anyone at PFMI?
12      Q.  I guess a better way to ask this would be
13  did you ever have any specific meetings or calls with
14  just like Greg Littlefield, Jim Wohlers, Keith
15  Blackburn or any of the other PFMI folks?
16      A.  When they were in town, they stuck their
17  head in the office and said hello and spoke and
18  stuff like that.  But as far as having a
19  behind-the-door meeting or any of that stuff, I
20  never had those meetings.  They always spoke when
21  they were in town, always.
22      Q.  Okay.  Would you ever have occasion to like
23  if something came up just call PFMI directly?
24      A.  I may have one or two times, but I
25  don't -- I don't remember.

15  (Pages 54 to 57)

f6bf4c9a-cefa-4882-be17-66579b656275

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 58

1    Q.  Well, let me ask it a better way.
2        If something came up, would your -- in the
3    normal course would you have contacted the
4    subcontractor directly or would you have contacted
5    Emcor directly?
6    A.  I'd like to sit here and tell you I
7    always contacted the subcontractor -- I mean the
8    contractor that we hired, Emcor, but I could have
9    talked to Greg or -- or Jim.  I don't remember.
10   Q.  Do you remember if the dumpsters were all
11   removed?
12   A.  No, ma'am.
13   Q.  Do you remember any issues coming --
14   A.  From the time I started the project and
15   left the project, those dumpsters -- and I don't
16   know about today.  They could be gone today for all
17   I know.  But I can tell you in my time in the
18   project, no.
19   Q.  Okay.  Was that started during your time in
20   the project, the removal?
21   A.  It had -- it had started coming up about
22   the time that I got out.
23   Q.  I'm going to show you what has previously
24   been marked in depositions as Exhibit 10.  And
25   it's -- it's called Exhibit C --

Page 59

1    A.  Um-hum.
2    Q.  -- janitorial pricing by site.
3        Have you seen that document before?
4    A.  No, ma'am.
5    Q.  Okay.  It's got a revised date of March 23,
6    2005 at the bottom of it.
7    A.  Um-hum.
8    Q.  Would you have been working on the project
9    at that point?
10   A.  I don't remember.
11   Q.  Okay.  I'm going to just -- let me just ask
12   you this and you may -- since you said you haven't
13   seen it, you may not know.
14   A.  I don't -- I don't think I was working on
15   the project at that date.
16   Q.  Okay.  Would you have come on later?
17   A.  Yeah.
18   Q.  Okay.  In looking at Exhibit 10 and
19   Exhibit 12, I'm just going to take the -- the first
20   location which happens to be the -- the Quintard
21   Avenue location in Anniston, Alabama.  It's the first
22   one on both sheets.
23   A.  Okay.
24   Q.  On Exhibit 12 it has gross square footage
25   of 1,630, same number for adjusted.  On Exhibit 10,

Page 60

1    which is also called Exhibit C, it has usable
2    cleanable square feet as 1,304.
3        My question to you is no measurements had
4    been done to your knowledge in March of 2005, had
5    they?
6    A.  To my knowledge, no.
7    Q.  Okay.  Do you have any idea how this lower
8    number of usable cleanable square feet was derived in
9    Exhibit 10?
10   A.  No, ma'am.
11   Q.  Okay.  Who do you think would know about
12   this exhibit?
13   A.  Who put that together?
14   Q.  Do you -- would you have any idea of who
15   would have put something like this together?
16   A.  No, ma'am.
17   Q.  I'm going to show you another document.
18   It's got the same revised date down in the corner.
19   It's been previously marked as Exhibit 17.
20   A.  Okay.
21   Q.  A hole has been punched through it, but
22   best I can tell, at the top it says Exhibit C.5.
23   A.  Um-hum.
24   Q.  Have you seen that before?
25   A.  No, ma'am.

Page 61

1    Q.  Okay.  Would you have any idea of who put
2    that together?
3    A.  Based on the date on it, no, ma'am, I
4    wouldn't know.
5    Q.  Okay.  When we talked about this
6    Exhibit 12, you had thought that that might have been
7    something that Matt Louellen had put together?
8    A.  I did.
9    Q.  Would -- what -- what is his position?
10   A.  Matt was -- worked with us consolidating
11   all the information and things that we would put
12   together to give out to different companies to bid
13   off of and he would help with the gathering of
14   information for the RFP and those types of things.
15   Q.  Okay.  So he wasn't necessarily just the
16   person that put spreadsheets together, he would have
17   been the person that worked with anything that was
18   being bid out?
19   A.  That was part of the project.  It was a
20   lot of folks.
21   Q.  I've seen some e-mails -- I'm just going to
22   go ahead and mark this one, although I'll -- we're
23   probably not going to go over all the ones I've seen.
24   That would take a lifetime.
25       I'm going to mark this as Plaintiff's

16 (Pages 58 to 61)

f6bf4c9a-cefa-4882-be17-66579b656275

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 62

1  Exhibit -- or as Exhibit 33 --
2      (Exhibit 33: E-mail document from Debi
3  Crosby dated 7/18/05 marked for
4  identification, as of this date.)
5      Q.  -- and just show that to you.
6      You're referenced in the body, but I don't
7  believe that this was sent to you or copied to you.
8  And just take a moment, if you will, and read over
9  that.
10     A.  All right.
11     Q.  Okay.  It references some type of energy
12  services proposal.  Could you tell me what that is
13  about.
14     A.  Utility bills.  We -- utility cost is a
15  huge cost with as many properties as we got.  We
16  were looking into the -- where we could get some
17  cost savings in our utility bills, where someone
18  would come in and audit your bills.  You may be
19  under the wrong code.  There's thousands of codes
20  out there that people could put you under with
21  utilities.  When your lights come on, when they go
22  off, when the air conditioner comes on, when it
23  goes off.  We were just asking for information
24  about that and what the possibility was for saving
25  money for energy.  That was what that was.

Page 63

1      Q.  Okay.  So that would have been almost
2  consulting with BB&T regarding the utilities?
3      A.  Strictly.  That -- that e-mail -- I'm
4  familiar -- I'm -- I forgot about it, but after
5  reading it, I understand what it was.
6      Q.  Was that ever part of the -- the facility
7  management project?
8      A.  We never -- we never implemented one
9  there during my time.
10     Q.  Here at your current job are you doing any
11  work with Emcor or is your company doing any work
12  with Emcor?
13     A.  No, ma'am.  They're not doing any
14  services here for me or my group.  I don't -- this
15  is a big hospital.  I can't speak for anybody else
16  other than my group.
17     Q.  Fair enough.  Just -- just asking what you
18  know.
19     A.  Okay.
20     (Exhibit 34: E-mail document from Alan
21  Cristal dated 9/1/05 marked for
22  identification, as of this date.)
23     Q.  Let me show you what I've marked as
24  Exhibit 34.
25     Again, I don't think you were sent this

Page 64

1  e-mail necessarily, but you are referenced in the
2  bottom part of it.
3      A.  All right.
4      Okay.
5      Q.  It talks about basically Phase 2 planning.
6  What was the Phase 2 part of this project?
7      A.  I don't remember.  I'd refer that to
8  Debbie.  She'd probably have more information about
9  that than me.
10     Q.  It talks about there was going to be sounds
11  like a day-long meeting.  Do you recall anything
12  about a planning meeting for Phase 2 that looks like
13  it would have been in the September '05 time frame?
14     A.  I can't be sure.  I'm sorry.
15     (Exhibit 35: An Emcor Facilities Services
16  letter from Steven T. King dated 7/29/05
17  marked for identification, as of this date.)
18     Q.  I'm just going to show this to you.  I
19  don't -- I think this is one I won't have any
20  questions about.
21     I'm going to show you -- it's Exhibit 35.
22     A.  Um-hum.
23     Q.  Take a quick look at that and does that
24  just have to do with the -- the utilities consulting
25  we just discussed?

Page 65

1      A.  Yes, ma'am.
2      Q.  Okay.  That doesn't have anything to do
3  with an actual project, the facilities management
4  project?
5      A.  Just utilities.
6      Q.  Okay.  Let me show you another e-mail we'll
7  mark as Plaintiff's Exhibit 35.
8      MR. SAWYER:  36.
9      MS. TULEY:  36, sorry, 36.
10     (Exhibit 36: An e-mail document from
11  Steven T. King dated 7/18/05 marked for
12  identification, as of this date.)
13     Q.  It's discussing business case numbers.
14  Take a look at that.
15     MR. SAWYER:  What's the date?  I'm sorry.
16     THE WITNESS:  July the 18th, 2005.
17     Q.  All right.  That e-mail is talking about
18  some spreadsheets that were -- were business case
19  numbers.  Do you know what that's about?
20     A.  It's been two-and-a-half years.  You've
21  got to give me a second.
22     Q.  Sure.  I can't believe you just don't know
23  that right off the top of your head.
24     A.  I can't be positive.  I don't want to
25  stab at it.  I just -- I can't be positive, okay?

2100 3rd Avenue North, Suite 960*Birmingham, AL 35203*www.merrillcorp.com
1-800-888-DEPO

f6bf4c9a-cefa-4882-be17-66579b656275

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 66

1    Q.  Okay.  Would that have had anything to do
2  with like the cost savings initiative?
3    A.  I'm sure it did.
4    Q.  Okay.  But you don't recall as we sit here
5  right now any specifics about that?
6    A.  No.  Not the -- not the specifics I
7  don't.  I'm sorry.
8    Q.  This e-mail is from Steven King.  Did you
9  have any types of dealings with Steven King at Emcor?
10   A.  I did.
11   Q.  Okay.  What -- what was he your contact
12  for?
13   A.  Steven basically would go through our
14  bills of what we currently -- our spend and he
15  basically would look at it and -- and give us --
16  tell us how much we were spending and -- and then
17  he could -- we could monitor that and tell us if we
18  was making any savings or not of what -- those
19  types of things.  He was their financial guy, I
20  think.  I don't know what they call him -- I don't
21  know what they call him there, but.
22   Q.  And just so I kind of get an understanding,
23  was BB&T sending him like their costs associated with
24  maintenance of these -- of these various branches and
25  he was putting together spreadsheets?

Page 67

1    A.  We never sent anything off-site.  We --
2  he would come there and work sometimes.
3    Q.  Okay.  So he would come to your office --
4    A.  Yes.
5    Q.  -- and I guess hook into you all's system?
6    A.  We would give him paper documents, I
7  think.  I'm not sure.
8    Q.  Okay.  This is July of 2005.  So this would
9  have been before the actual project started, correct?
10   A.  That's correct.
11   Q.  Do you know if this was before the contract
12  was entered into?
13   A.  No.  I doubt he would be sitting there
14  doing that for us if he didn't have a signed
15  contract.
16   Q.  Okay.  What exactly was the purpose of him
17  running these cost numbers?
18   A.  Our maintenance was a big cost there and
19  we were -- our spend dollars and maintenance.
20   Q.  And he was just trying to help you all
21  locate places to save?
22   A.  Yeah, just save and help gather our costs
23  along with our folks.  That was what I remember his
24  primary purpose was.
25   Q.  Did you ever see any numbers on what was

Page 68

1  saved on maintenance?
2    A.  No, ma'am, I did not.  I was given other
3  assignments and left the project.
4    Q.  I don't know if I already asked you this.
5  Was the mobile tech -- were they already in the field
6  while you were still on the project?
7    A.  Yes.
8    Q.  Okay.
9       (Exhibit 37: A letter from Alan B.
10   Cristal dated 8/20/05 marked for
11   identification, as of this date.)
12   Q.  I'm going to show you what I've marked as
13  Exhibit 37.
14      It appears to be a letter to you from Alan
15  Cristal.
16   A.  Um-hum.
17   Q.  And it talks about in there small projects;
18  is that correct?
19   A.  Right, it does.
20   Q.  What are small projects?
21   A.  Just renovation projects, putting in
22  doors, putting in windows, stuff like that.
23   Q.  Okay.  This would have been separate then
24  from the -- the contract for facilities management?
25   A.  This would have been over and beyond what

Page 69

1  their contract was.
2    Q.  Do you know if any agreement was ever
3  struck between BB&T and Emcor for these small
4  projects?
5    A.  No, ma'am, I'm not sure.
6    Q.  Do you know if there is an executed copy of
7  this agreement?
8    A.  I do not know if there's an executed
9  copy, no.
10      (Exhibit 38: An e-mail document from Alan
11   Cristal dated 12/14/05 marked for
12   identification, as of this date.)
13   Q.  Let me show you what I've marked as
14  Exhibit 38.
15      You're not one of the people this was sent
16  to and I don't believe this was sent from you.
17   A.  Um-um.
18   Q.  It references something called BD and asks
19  whether you and Steve Paige should be informed.  And
20  you could take a second to read it, but do you recall
21  anything about BD?
22   A.  I don't know who BD or what BD means in
23  this, I really don't.
24   Q.  Okay.  That's fine.
25      (Exhibit 39: An e-mail document from Debi

2100 3rd Avenue North, Suite 960*Birmingham, AL 35203*www.merrillcorp.com
1-800-888-DEPO

f6bf4c9a-cefa-4882-be17-66579b656275

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 70

1    Crosby dated 7/5/05 marked for identification,
2    as of this date.)
3    Q.  I'm going to show you what I've marked as
4    Exhibit 39.
5        It's an e-mail about the dumpster issue.
6    It references you, but you are not a recipient of
7    that e-mail, I don't believe.
8    A.  All right.
9    Q.  It looks like that is an e-mail from Debi
10   Crosby; is that correct?
11       MR. SAWYER:  Objection, foundation.
12   Q.  Is that e-mail -- on the from line who's it
13   from?
14   A.  From Debi Crosby.
15   Q.  Okay.  Who is Debi Crosby?
16   A.  She was an account manager that worked
17   for Emcor.
18   Q.  Okay.  Did you -- do you recall having
19   discussions with Debi Crosby about the dumpster
20   removal issue?
21   A.  Vaguely.
22   Q.  Okay.  Do you mind if I borrow this for a
23   second?
24   A.  Sure.
25   Q.  In this e-mail she's -- and I'll just read

Page 71

1    it.  It says, I spoke to Ronnie at length today about
2    this issue and the subject line is BB&T, the dumpster
3    issue.  Further down it says, he would like us to
4    tell him what percentage of the dumpsters we could
5    get rid of in 60 to 90 days.
6        Do you recall having any kind of time frame
7    that you all -- that you all being BB&T -- wanted the
8    dumpsters removed in?
9    A.  There was no determined time frame in my
10   mind.
11   Q.  Okay.  Do you remember Emcor suggesting or
12   providing any kind of time frame that they thought it
13   would be feasible to remove those in?
14   A.  No, ma'am.
15   Q.  Okay.
16       MR. SAWYER:  Counsel, can I take a look?
17       MS. TULEY:  Sure.  I think you all
18   produced that one anyways.
19       (Exhibit 40: An e-mail document from
20   Robert Goodwin dated 3/1/06 marked for
21   identification, as of this date.)
22       MR. SAWYER:  Did you re-Bates label them?
23       MS. TULEY:  Did I?
24       MR. SAWYER:  Or did your firm?
25       MS. TULEY:  Not that I'm aware of.

Page 72

1        MR. SAWYER:  Okay.  We'll talk later, I
2    guess.
3    Q.  I'm going to show you what I've marked as
4    Exhibit 40.
5        And the front just looks like it's all
6    addresses so you may want to skip over to the next
7    page.
8        I guess, first of all, if you'll -- sorry.
9    If you'll look about halfway down that first page,
10   there's just a long list of people this e-mail was
11   sent to.
12       Do you see your -- and I've highlighted it.
13   But do you see your e-mail address in that?
14   A.  Yes.
15   Q.  Okay.  If you'll flip over to the next
16   page, right under the part that's marked -- that's
17   dated 7/13/05 and just take a look at this.
18   A.  I'm still trying to find 7/13/05.
19   Q.  Okay.  And I may be a page off.  My --
20   sorry, my version is a little bit different from
21   yours.  Start here at the top where it says RBOM's.
22   A.  Yeah.
23   Q.  Okay.  Just take a minute to look at that.
24   But my question is going to be is this all of the
25   information or at least of the some of the

Page 73

1    information that was sent in anticipate -- to like
2    the area manager folks in anticipation of this
3    contract starting?
4    A.  This and far more.
5    Q.  Okay.  There was more than just that?
6    A.  Oh, yeah.
7    Q.  Okay.  Let me try this one too then.
8        (Exhibit 41: An e-mail document from Alan
9    Cristal dated 7/14/05 marked for
10   identification, as of this date.)
11   Q.  Let me show you what I've marked as
12   Exhibit 41.
13       And feel free to keep looking at that if
14   you need to.
15       And about -- down towards the bottom it
16   looks like you were copied on that e-mail as well; is
17   that correct?
18   A.  Um-hum.
19   Q.  And take a minute to look at that.
20       Is that information there more -- more
21   information that would have been sent to the area
22   folks?
23   A.  Yes, ma'am.
24   Q.  Okay.  And that e-mail would have been in
25   anticipation of the janitorial project starting?

19 (Pages 70 to 73)

f6bf4c9a-cefa-4882-be17-66579b656275

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 74

1    A. That's the way it appears.
2    Q. Okay. Do you know who prepared that
3  information?
4    A. No, ma'am. Other than Alan Cristal, I
5  don't know.
6    Q. Okay. And at that time was Alan Cristal
7  working for Emcor?
8    A. Alan Cristal was working for Emcor when
9  we engaged the contract with them.
10    Q. Okay. What was -- what was your
11  understanding of what Alan Crystal's position with
12  Emcor was?
13    A. I wasn't sure of that. I think he was a
14  salesman -- sales guy. I think he represented
15  selling the account and getting Emcor in the door.
16  I'm not really sure what Alan's job was.
17        (Exhibit 42: An e-mail document from Alan
18    Cristal dated 7/24/05 marked for
19    identification, as of this date.)
20    Q. I'm going to show you what I've marked as
21  Exhibit 42.
22        It's a pretty long string of e-mails, but I
23  would like to address you to the original e-mail,
24  which would be the last one in the string.
25        And it looks like that e-mail is to -- is

Page 75

1  addressed to you; is that correct?
2    A. It appears to be addressed to me.
3    Q. Okay. Take a moment and look at that,
4  please.
5    A. Okay.
6    Q. Okay. In that e-mail it looks like --
7  well, just tell me -- I guess it's better for me to
8  ask it this way.
9        What -- could you just give me the gist of
10  what that e-mail is.
11    A. It's a -- BB&T employee's sending me an
12  e-mail requesting to keep the janitorial folks
13  that's currently cleaning their space. They --
14  that's what I read here.
15    Q. Was that something that you would have --
16  were -- were those types of requests something that
17  would have been routinely sent to you?
18    A. Me or Debbie or other folks on our team.
19    Q. Was that something that was pretty common
20  during that time frame?
21    A. When we first implemented the project we
22  got a lot of them, yes. Not a lot of them, but a
23  few.
24    Q. If -- if a regional person or a branch
25  person wanted to keep their janitorial staff, was

Page 76

1  that information as far as who had been doing their
2  cleaning passed on to anybody?
3    A. A list of all of our janitorial folks was
4  passed on to Emcor and I would assume Greg
5  Littlefield, so they had to hire a lot of folks,
6  you know. And we -- we also asked our folks to say
7  was our current janitors good or bad or fair or
8  poor or whatever. And we only gave -- we gave them
9  a list of a tremendous amount of janitors to
10  consider because he's going to have to hire a bunch
11  of folks picking up 1,400 branches. So that's all
12  we did.
13    Q. Do you remember if any kind of preferred
14  list was done?
15        Like you said where if they were good or
16  somebody like in this instance was really interested
17  in keeping them, was there ever any type of preferred
18  janitor list?
19    A. I don't know. The word preferred's a
20  little loose to me. But I will just say this, we
21  gave a list of janitorial companies that were -- we
22  had -- we were currently using and our position --
23  my position was that if you -- if they want to go
24  to work for you, that's fine. They -- these folks
25  do a good job and they have to work for you at

Page 77

1  whatever you pay them. That's between you all. We
2  wanted -- that's the way we did that on all of the
3  janitors that we had.
4    Q. So you -- you gave them the list, but you
5  left it entirely up to Emcor as to who they hired?
6    A. Yes, we never forced anyone to hire
7  anybody.
8        MS. TULEY: I think for now that's about
9    it for me.
10        MR. SAWYER: Let's go off the record.
11        THE VIDEOGRAPHER: Going off the record.
12    The time is 10:05.
13        (A BRIEF RECESS WAS TAKEN.)
14        THE VIDEOGRAPHER: Back on the record.
15    The time is 10:08.
16        EXAMINATION
17  BY MR. SAWYER:
18    Q. How do you do you, Mr. Eller? My name is
19  Ben Sawyer and I represent Emcor and I just have a
20  few questions for you today.
21        First, let me thank you for agreeing to
22  come down here and speak with us today.
23    A. Sure.
24    Q. First let me ask you, how long have you
25  been in facilities services?

Page 78

1    A.  30 years.
2    Q.  And I believe your testimony earlier was
3  that you handle things in real time in terms of
4  complaints on a day-to-day basis?
5    A.  I did at BB&T with the call center that
6  they had there in real time, yes.
7    Q.  And these were complaints with respect to
8  all aspects of work, correct?
9    A.  When it come to the project, yes.
10   Q.  Sure.
11       With respect to the volume of -- of
12  complaints with respect to only the janitorial
13  component and based on your 30 years of experience,
14  did you find it more, less than or approximately
15  equal to the amount of complaints that you typically
16  saw in your 30 years of experience in facilities
17  services?
18       MS. TULEY:  Object to form.
19   Q.  You can answer.
20   A.  I don't know.  I don't have anything to
21  really gauge it to.  I don't know how to weigh it.
22  Janitorial is a tough business.
23   Q.  Okay.  Do you recall a particular
24  subcontractor named Destiny's Cleaning?
25   A.  Yes.

Page 79

1    Q.  Did you direct anyone from PFMI to hire
2  this subcontractor?
3    A.  I never -- again, I go back on what I
4  said earlier.  We gave a list of folks that BB&T
5  folks thought did a good job.  If they needed
6  additional cleaners or if they needed cleaners, it
7  was a good list for them to work off of and that
8  was as far as our relationship in the thing was.
9    Q.  Sure.
10       So is it a true statement that Ronnie Eller
11  never told Jim Wohlers that they had to hire Destiny
12  Cleaners?
13   A.  I've never -- no, I don't think I ever
14  did that, no.
15   Q.  Okay.  If you'll take a look quickly at
16  Exhibit 41.  And I believe the record will reflect
17  what it -- what it -- what it will show.  But I think
18  your testimony was that Alan Cristal provided this
19  information?
20   A.  I just see his name on there, from Alan
21  Cristal, and I'm assuming that he did.  I don't
22  know that.
23   Q.  If -- if you'll take a look at the first --
24  go back to the first page.  At the very bottom does
25  it look like the bulk of the information is actually

Page 80

1  coming from Debra Willis of BB&T?
2    A.  She was -- she was the information flow
3  out of our office, a lot of it.
4    Q.  Okay.
5    A.  The majority.
6    Q.  But with respect to this particular
7  exhibit, does the information concerning the
8  janitorial scope -- take your time and -- and take a
9  look at it.  Does it appear that based on that
10  document that Debra Willis actually prepared that?
11   A.  Yes.
12   Q.  Thank you.
13       Excuse me.  And we're done with that.
14       And I believe your testimony was also that
15  the mobile maintenance went pleasantly well?
16   A.  It did.
17   Q.  Okay.  Was that also performed by Emcor?
18   A.  Not a hundred percent, no.
19   Q.  Okay.  What percentage was self-performed
20  by Emcor?
21   A.  Probably 80, 85 percent.
22   Q.  And when you say pleasantly well, are there
23  any particular instances that you can recall which
24  would give you that understanding or that opinion
25  that it went pleasantly well?

Page 81

1    A.  The complaints, didn't get as many.
2    Q.  Compared to other maintenance contractors
3  that you've had in the -- previously or just compared
4  to the janitorial component?
5    A.  No.  It's -- you know, I thought they was
6  well -- I thought they was well ready to go in and
7  change our light bulbs or filters in our air
8  conditioners and those types of things.  It --
9  maintenance changing a light bulb and maintenance
10  washing your bathrooms and your carpet's two
11  different maintenances.  It's totally different.
12   Q.  Sure.
13       Is it a fair statement that the quality of
14  the work of the mobile maintenance was good?
15   A.  Very good.
16   Q.  Thank you.
17       And you also referenced in your testimony
18  earlier conversations with Emcor, specifically a
19  conference concerning removal of dumpsters.  Do you
20  recall that?
21   A.  Vaguely.
22   Q.  Okay.  Do you recall specifically whom
23  from -- who from Emcor were involved in these
24  discussions?
25   A.  No.

21 (Pages 78 to 81)

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 82

1    Q.  Do you recall who from BB&T were involved
2  with discussions of removal of dumpsters from BB&T
3  locations?
4    A.  It come up in a presentation to a roomful
5  of folks.
6    Q.  Was that the original presentation?
7    A.  Yes.
8    Q.  Okay.  And was that the original
9  presentation where Mr. Littlefield you recall --
10 strike that.
11   With the original presentation concerning
12 the request for proposal, do you recall that?
13   A.  No, sir, I do not.
14   Q.  Well, I'm sorry, let me back up.
15   The -- the original presentation, I
16 understand there was a request for proposal for this
17 large piece of work?
18   A.  Right.  Right.
19   Q.  And you had different vendors that came
20 along and made presentations to BB&T?
21   A.  Right.
22   Q.  Okay.  One of those vendors was Emcor?
23   A.  Right.
24   Q.  And I believe your testimony is -- was
25 earlier that you recalled specifically that a

Page 83

1  representative from PFMI was there, correct?
2    A.  I do remember that.
3    Q.  And that individual was Greg Littlefield?
4    A.  I think, yes, it was Greg.  I know Greg
5  was one of the gentlemen there.
6    Q.  Okay.  So if I understand your testimony,
7  this issue with respect to removal of dumpsters was
8  raised at this initial presentation, correct?
9    A.  It come up in there.
10   Q.  Okay.  And Greg Littlefield was at this
11 presentation, correct?
12   A.  That was a long day.  We had several
13 folks in there.  I can't -- I can't say that Greg
14 was in the room or not in the room, but I know that
15 he was there that day.  But I can't -- I can't tell
16 you -- I can't swear that he was in that room when
17 that -- when the dumpster part was talked about.
18 He could have been.
19   Q.  Was -- was the presentation in
20 Winston-Salem?
21   A.  Yes, it was.
22   Q.  Okay.  Were there any other occasions that
23 you recall specifically disgusting -- discussing
24 removal of dumpsters from BB&T locations with Emcor
25 personnel?

Page 84

1    A.  With Sean Berkins quite a bit.
2    Q.  And could that be Sean Brookins?
3    A.  Berkins, however you want to pronounce
4  it, yes.  Sean Berkins.
5    Q.  Okay.  What was the -- what, to the best of
6  your recollection, was the substance of those
7  discussions
8    A.  When he's going to get it removed from
9  our properties and what the -- what the plan was.
10 That was about the extent of that.
11   Q.  Do you recall there being any other issues
12 with -- or any other reasons why other than cost
13 savings that BB&T was interested in removing
14 dumpsters?
15   A.  Safety, people hiding behind them.  For
16 our employees, as well as our customers.
17   Q.  Was there ever any issue with identity
18 theft or sensitive data in these dumpsters?
19   A.  There was a occasion that trash got put
20 in the wrong dumpster.
21   Q.  Do you recall what, if any, resolution to
22 the -- I'll just call it the dumpster issue came
23 about between BB&T and Emcor?
24   A.  You're talking about the removal of them?
25   Q.  Yes.

Page 85

1    A.  It was still being talked about when I
2  left the project.  I don't -- I can't tell you
3  what -- what happened.
4    Q.  Was it ever resolved prior to you leaving
5  the project?
6    A.  No, sir.
7    Q.  And just so I'm clear, when did you leave
8  the project?
9    A.  Somewhere '05, '06.  Late '05, early '06.
10 July the 1st of '07 I was off of it a year prior to
11 that.  So somewhere in that time frame.
12   Q.  Okay.  So it could have been, say,
13 November, December of '05 or January?
14   A.  Of '06.
15   Q.  Okay.
16   A.  That's close.
17   Q.  And I believe your testimony earlier,
18 pardon me, that -- was that PFMI knew the square
19 footage was off.  Do you recall that?
20       MR. SAWYER: Object to form.
21   A.  I don't know that PFI -- I don't -- I
22 can't swear that PFMI knew it.  I knew that Emcor
23 knew it.
24   Q.  Okay.
25   A.  Not all.  We questioned the accuracy of

22 (Pages 82 to 85)

f6bf4c9a-cefa-4882-be17-66579b656275

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 86

1  the square footage. We just really didn't know the
2  accuracy of it.
3      Q. And I believe what you're referring to, and
4  correct me if I'm wrong here, but the initial
5  measurements that came back to determine the net
6  cleanable square footage?
7      A. Yes.
8      Q. And how did you know those square feet
9  were -- were off?
10     A. Because we had field measured a bunch of
11 them ourselves and it wasn't accurate with what our
12 AMT had.
13     Q. And is it a correct statement that you were
14 not involved or you had no knowledge of the
15 termination of Emcor?
16     A. No, sir.
17     Q. Okay. Do you recall ever informing either
18 Jim Wohlers or Sean Brookins that during the course
19 of remeasurement, after it was determined that
20 several of the measurements provided to BB&T were
21 questionable or incorrect, that if there was a five
22 percent difference in the remeasurement plus or
23 minus, that would be a wash and it would not, going
24 backward, be charged back to Emcor and/or PFMI?
25     That was a rather long question. Do you

Page 87

1  understand it?
2      A. I did -- I did -- I did understand the
3  question. I can't -- Debbie Willis is probably
4  better for that question. I don't remember having
5  any conversation with them over that.
6      Q. So if I understand your testimony, you
7  don't remember discussions with that -- with respect
8  to that?
9      A. I don't.
10     Q. Given the size of this project, I believe
11 it was 1400 -- roughly 1400 locations --
12     A. Um-hum.
13     Q. -- what would you expect given your
14 30 years of experience would be the amount of
15 supervision necessary to effectively manage the scope
16 of work?
17     A. From which --
18     Q. From the janitorial component side.
19     A. Okay. Our regions were very tight,
20 close. I think in my opinion, they should have had
21 at least one or -- one person out there for every
22 30 to 45, 50 branches that was in a tight area.
23 You'd have to look at travel time and logistics.
24     Q. I'm not even going to try to do that math.
25     But you believe it's a -- it would be

Page 88

1  fair -- or a reasonable contractor would have had one
2  management supervision representative per 30 to 40
3  branches or 30 to 45?
4      A. In my opinion.
5      Q. Okay.
6      MR. SAWYER: Pass the witness. That's
7  all I have.
8      MS. TULEY: I don't have anymore
9  questions. Thanks.
10     THE VIDEOGRAPHER: This concludes the
11 August 28th, 2007 deposition of Ronald Thomas
12 Eller. The number of disks used was one.
13     The time is 10:23.
14         (TIME NOTED: 10:23 a.m.)
15         (SIGNATURE WAIVED)
16
17
18
19
20
21
22
23
24
25

Page 89

1  STATE OF NORTH CAROLINA
   COUNTY OF MECKLENBURG
2
3      REPORTER'S CERTIFICATE
4  I, V. Dario Stanziola, a Notary Public in
5  and for the State of North Carolina, do hereby
6  certify that there came before me on Tuesday,
7  August 28, 2007, the person hereinbefore named, who
8  was by me duly sworn to testify to the truth and
9  nothing but the truth of his knowledge concerning
10 the matters in controversy in this cause; that the
11 witness was thereupon examined under oath, the
12 examination reduced to typewriting under my
13 direction, and the deposition is a true record of
14 the testimony given by the witness.
15     I further certify that I am neither
16 attorney or counsel for, nor related to or employed
17 by, any attorney or counsel employed by the parties
18 hereto or financially interested in the action.
19     IN WITNESS WHEREOF, I have hereto set my
20 hand, this the 6th day of September 2007.
21
22
23
       V. DARIO STANZIOLA, CSR, RPR, CRR
24     Notary Public No. 20011200120
25

23 (Pages 86 to 89)

f6bf4c9a-cefa-4882-be17-66579b656275

Contract No. EMC-00793

Exhibit A

### Exhibit A
#### Location Identification Information

## BB&T Maintenance Report - Consolidated BB&T Regions as of 03/01/05

| Street Address | City | State | Zip | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1100 Quintard Avenue | Anniston | AL | 36201 | BR | O | N/A | N/A | 1,630 | 0 | 1,630 | | | | |
| 402 Main Street | Oxford | AL | 36203 | BR | O | N/A | Sat. (8:30am - 12:00pm) | 10,923 | 0 | 10,923 | | | | |
| 1316 U Street NW | Washington | DC | 20200 | BR | L | Net | N/A | 1,500 | 0 | 1,500 | T | LL | LL,T | T |
| 1730 Rhode Island Avenue NW | Washington | DC | 20036 | BR | L | Net | N/A | 1,950 | 0 | 1,950 | T | LL | LL | T |
| 317 Pennsylvania Avenue | Washington | DC | 20003-1148 | BR | L | Net | N/A | 4,253 | 0 | 4,253 | T | T | T | T |
| 601 Thirteenth Street NW | Washington | DC | 20005 | BR | L | Net | N/A | 3,714 | 0 | 3,714 | T | LL | LL | T |
| 614 H Street, Washington - Gallery Place | Washington | DC | | BR | L | Net | N/A | 2,610 | 0 | 2,610 | T | LL | LL | T |
| 815 Connecticut Avenue, N.W. | Washington | DC | 20006 | BR | L | Net | N/A | 3,659 | 0 | 3,659 | T | LL | LL | T |
| 1365 Wisconsin Avenue, N.W. | Washington | DC | 20007-3356 | BR | L | NNN | N/A | 3,539 | 0 | 3,539 | T | T | T | T |
| 5200 Wisconsin Avenue NW | Washington | DC | 20015 | BR | L | NNN | N/A | 5,831 | 0 | 5,831 | T | T | T | T |
| 401 North Indian Rocks Road | Belleair Bluffs | FL | 33770 | BR | L | NNN | N/A | 4,267 | 0 | 4,267 | T | T | T | T |
| 3527 North Lecanto Highway | Beverly Hills | FL | 34465 | BR | L | Net | N/A | 1,700 | 0 | 1,700 | T | LL | LL | T |
| 421- 12th Street West | Bradenton | FL | 34205 | BR | L | NNN | N/A | 2,015 | 0 | 2,015 | T | LL | LL | T |
| 5312 Cortez Rd. West | Bradenton | FL | 34210 | BR | L | NNN | N/A | 3,396 | 0 | 3,396 | T | T | T | T |
| 8704 State Road 70 East | Bradenton | FL | 34202 | BR | L | NNN | N/A | 3,500 | 0 | 3,500 | T | T | T | T |
| 5905 Manatee Avenue West | Bradenton | FL | 34209 | BR | O | N/A | N/A | 2,500 | 0 | 2,500 | | | | |
| 6208 14th Street West | Bradenton | FL | 34207 | BR | O | N/A | N/A | 3,500 | 0 | 3,500 | | | | |
| 6250 East State Road 70 | Bradenton | FL | 32308 | BR | O | N/A | | 6,000 | 0 | 6,000 | | | | |
| 404 Oakfield Drive | Brandon | FL | 33511 | BR | O | N/A | N/A | 4,092 | 0 | 4,092 | | | | |
| 1321 Southeast 47th Terrace | Cape Coral | FL | 33904 | BR | O | N/A | N/A | 6,600 | 0 | 6,600 | | | | |
| 1235 S. Missouri Avenue | Clearwater | FL | 33756 | BR | L | Net | N/A | 2,450 | 0 | 2,450 | T | LL | LL,T | T |
| 23684 US Highway 19 North | Clearwater | FL | 33765 | BR | L | Net | N/A | 4,000 | 0 | 4,000 | T | LL | LL | T |
| 28050 US Highway 19 North | Clearwater | FL | 33761 | BR | L | Gross | N/A | 9,239 | 0 | 9,239 | LL | LL | LL | LL |
| 3024 Enterprise Road | Clearwater | FL | 33759 | BR | L | Net | N/A | 2,858 | 0 | 2,858 | T | LL | LL | T |
| 301 Ulmerton Road | Clearwater | FL | 33759 | BR | L | Net | N/A | 3,038 | 0 | 3,038 | T | LL | LL | LL |

EXHIBIT
tables
3

Contract No. EMC-00793

Exhibit A

| Street Address | City | State | Zip | | | | Hours of Operation | Gross Square Feet | | Current Vacant Square Feet | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2415 North Orange Avenue | Orlando | FL | 32804 | BR | L | NNN | N/A | 5,000 | 0 | 5,000 | T | T | T | T |
| 193 East Granada Blvd. | Ormond Beach | FL | 32176 | BR | L | Net | N/A | 4,200 | 0 | 4,200 | T | LL | LL | T |
| 6000 Babcock Street SE | Palm Bay | FL | 32909 | BR | L | NNN | N/A | 3,037 | 0 | 3,037 | T | T | T | T |
| 7100 Fairway Drive, Suite 49 | Palm Beach Gardens | FL | 33418 | BR | L | Net | N/A | 2,100 | 0 | 2,100 | T | LL | T | T |
| 3412 East Lake Road | Palm Harbor | FL | 34685 | BR | L | Net | N/A | 2,000 | 0 | 2,000 | T | LL | LL | T |
| 5061 North 12th Avenue | Pensacola | FL | 32504-8916 | BR | O | N/A | N/A | 8,600 | 0 | 8,600 | | | | |
| 300 South Pine Island Road | Plantation | FL | 33324 | BR | L | Net | N/A | 10,608 | 0 | 10,608 | T | LL | LL | T |
| 226-8 Solana Road | Ponte Vedra Beach | FL | 32082 | BR | L | Net | N/A | 1,958 | 0 | 1,958 | T | LL | T | T |
| 9501 US 19 North | Port Richey | FL | 34668 | BR | L | Net | N/A | 5,000 | 0 | 5,000 | T | LL | LL | LL |
| 3880 Sun City Center Blvd. | Ruskin | FL | 33573 | BR | O | N/A | N/A | 3,000 | 0 | 3,000 | | | | |
| 4600 US 1 South | Saint Augustine | FL | 32066 | BR | O | N/A | N/A | 6,000 | 0 | 6,000 | | | | |
| 4291 13th Street | Saint Cloud | FL | 34769 | BR | O | N/A | Sat. (9:00am - 12:00pm) | 4,560 | 0 | 4,560 | | | | |
| 1718 Main Street | Sarasota | FL | 34236 | BR | L | Net | N/A | 6,400 | 0 | 6,400 | T | LL | LL | T |
| 5375 University Parkway | Sarasota | FL | 34243 | BR | L | Net | N/A | 3,500 | 0 | 3,500 | T | T | T | T |
| 5600 Bee Ridge Road | Sarasota | FL | 34233 | BR | L | Net | N/A | 9,131 | 0 | 9,131 | T | LL | LL | LL,T |
| 1100 South Tamiami Trail | Sarasota | FL | 34236 | BR | O | N/A | N/A | 5,000 | 0 | 5,000 | | | | |
| 3201 North Tamiami Trail | Sarasota | FL | 34234 | BR | O | N/A | N/A | 5,000 | 0 | 5,000 | | | | |
| 7995 113th Street North | Seminole | FL | 33772 | BR | L | NNN | N/A | 8,260 | 0 | 8,260 | T | T | T | T |
| 5431-E Silver Springs Blvd. Unit 1 | Silver Springs | FL | 34488 | BR | L | Net | N/A | 5,862 | 0 | 5,862 | T | T | LL | T |
| 15825 East Highway 40 | Silver Springs | FL | 34488 | BR | O | N/A | N/A | 3,480 | 0 | 3,480 | | | | |
| 405 8th Street South | South Naples | FL | 34102 | BR | L | Net | N/A | 3,639 | 0 | 3,639 | T | LL | LL | T |
| 11234 Spring Hill Drive | Spring Hill | FL | 34609 | BR | L | Net | N/A | 2,820 | 0 | 2,820 | T | LL | LL | LL |
| 5331 Spring Hill Drive | Spring Hill | FL | 34606 | BR | L | Net | N/A | 3,000 | 0 | 3,000 | T | LL | LL | LL |
| 6900 22nd Ave., N. | St. Petersburg | FL | 33710 | BR | L | Net | N/A | 4,463 | 0 | 4,463 | T | LL | LL | T |
| 100 34th Street North | St. Petersburg | FL | 33713 | BR | L | NNN | N/A | 4,300 | 0 | 4,300 | T | T | T | T |
| 182 37th Avenue North | St. Petersburg | FL | 33704 | BR | L | NNN | N/A | 5,500 | 2,200 | 3,300 | T | T | T | T |
| 3000 54th Avenue South | St. Petersburg | FL | 33712 | BR | L | NNN | N/A | 2,300 | 0 | 2,300 | T | T | T | T |
| 3233 Thomasville Road | Tallahassee | FL | 32308 | BR | O | N/A | N/A | 16,890 | 0 | 16,890 | | | | |
| 1322 South Dale Mabry Highway | Tampa | FL | 33629 | BR | L | Net | N/A | 2,950 | 0 | 2,950 | T | LL | LL | T |
| 15312 North Dale Mabry Highway | Tampa | FL | 33618 | BR | L | NNN | N/A | 3,500 | 0 | 3,500 | T | T | T | T |
| 218 North Dale Mabry Highway | Tampa | FL | 33609 | BR | O | N/A | N/A | 1,339 | 0 | 1,339 | | | | |
| 90184 Overseas Highway | Tavernier | FL | 33070 | BR | O | N/A | N/A | 5,235 | 2,600 | 2,635 | | | | |

Exhibit A - Location Identification Information.xls

Contract No. EMC-00793

Exhibit A

| Street Address | City | State | Zip | Property Type (BR/DU) | Lease/Own | Lease Type | Public Access Work Hrs | Gross Square Feet | Other Discount Square Feet | Rented Square Feet | Alteration | Life Safety | Snow Removal | Trash/Non-Compliant |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1580 Jacaranda Boulevard | Venice | FL | 34293 | BR | O | N/A | | 6,000 | 0 | 6,000 | | | | |
| 400 Venice Bypass North | Venice | FL | 34285 | BR | O | N/A | N/A | 3,600 | 0 | 3,600 | | | | |
| 1290 Weston Road | Weston | FL | 33326 | BR | L | Net | N/A | 4,630 | 0 | 4,630 | T | LL | LL | T |
| 1980 Howell Branch Road | Winter Park | FL | 32792 | BR | O | N/A | N/A | 3,000 | 0 | 3,000 | | | | |
| 4900 Ross Road | Acworth | GA | 30101 | BR | O | N/A | Sat. (9:00am-12:00pm) | 9,173 | 0 | 9,173 | | | | |
| 201 East Fourth Street | Adel | GA | 31620 | BR | O | N/A | N/A | 10,897 | 0 | 10,897 | | | | |
| 5960 North Point Parkway | Alpharetta | GA | 30022 | BR | O | N/A | Sat. (9:00am-12:00pm) | 7,100 | 0 | 7,100 | | | | |
| 950 East Paces Ferry Rd | Atlanta | GA | 30326 | BR | L | Net | N/A | 41,211 | 0 | 41,211 | LL,T | LL | LL | LL |
| 480 West First Street | Blue Ridge | GA | 30513 | BR | O | N/A | Sat. (8:30am-12:00pm) | 8,991 | 0 | 8,991 | | | | |
| Old Highway 76 Connector Road | Blue Ridge | GA | 30513 | BR | O | N/A | Sat. (8:30am-12:00pm) | 2,183 | 0 | 2,183 | | | | |
| 207 West College Street | Bowdon | GA | 30108 | BR | O | N/A | Sat. (8:00am-12:00pm) | 3,749 | 0 | 3,749 | | | | |
| 501 Alabama Avenue | Bremen | GA | 30110 | BR | L | NNN | Sat. (8:00am-12:00pm) | 10,291 | 0 | 10,291 | T | T | T | T |
| 4920 Friendship Road | Buford | GA | 30339 | BR | L | NNN | N/A | 5,300 | 0 | 5,300 | T | T | T | T |
| 4394 Buford Drive | Buford | GA | 30518 | BR | O | N/A | Sat. (9:00am-12:00pm) | 3,500 | 0 | 3,500 | | | | |
| 209 South Broad Street | Butler | GA | 31006 | BR | O | N/A | N/A | 5,800 | 0 | 5,800 | | | | |
| 102 Highway 49 | Byron | GA | 31008 | BR | O | N/A | N/A | 9,689 | 4,000 | 5,689 | | | | |
| 215 North Wall Street | Calhoun | GA | 30701-2221 | BR | O | N/A | Sat. (8:00am-12:00pm) | 18,634 | 9,317 | 9,317 | | | | |
| 409 East Highway 53 SE | Calhoun | GA | 30701 | BR | O | N/A | Sat. (8:00am-12:00pm) | 2,972 | 0 | 2,972 | | | | |
| 219 North Piedmont Avenue | Calhoun | GA | 30701 | DU | O | N/A | Sat. (8:00am-12:00pm) | 1,037 | 0 | 1,037 | | | | |
| 110 Dixie Street | Carrollton | GA | 30117 | BR | O | N/A | Sat. (8:00am-12:00pm) | 41,449 | 0 | 41,449 | | | | |
| 1119 South Park Street | Carrollton | GA | 30117 | BR | O | N/A | Sat. (8:00am-12:00pm) | 2,574 | 0 | 2,574 | | | | |
| 119 South White Street | Carrollton | GA | 30117 | DU | O | N/A | Sat. (8:00am-12:00pm) | 1,988 | 0 | 1,988 | | | | |
| 314 East Main Street | Cartersville | GA | 30120-3322 | BR | O | N/A | N/A | 18,634 | 0 | 18,634 | | | | |
| 314 East Main Street | Cartersville | GA | 30120 | DU | O | N/A | N/A | 509 | 0 | 509 | | | | |
| 5289 Cleveland Highway | Clermont | GA | 30527 | BR | O | N/A | Sat. (8:30am-12:00pm) | 2,449 | 0 | 2,449 | | | | |
| 1745 Highway 138, Suite C-15 | Conyers | GA | 30013 | BR | L | Net | N/A | 3,400 | 0 | 3,400 | LL | LL | LL,T | T |

Contract No. EMC-00793

Exhibit A

| Street Address | City | State | Zip | | | | Hours | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 214 Dahlonega Road | Cumming | GA | 30040 | BR | O | N/A | Sat. (9:00am - 12:00pm) | 20,000 | 0 | 20,000 | | | | |
| 3485 Braselton Highway | Dacula | GA | 30019 | BR | L | NNN | | 3,843 | 0 | 3,843 | T | T | T | T |
| 148 Memorial Drive | Dahlonega | GA | 30533 | BR | O | N/A | Sat. (8:00am - 12:00pm) | 1,982 | 0 | 1,982 | | | | |
| 60 Main Street West | Dahlonega | GA | 30533 | BR | O | N/A | N/A | 32,218 | 22,616 | 9,602 | | | | |
| 1244 Cleveland Road | Dalton | GA | 30721 | BR | O | N/A | N/A | 3,232 | 0 | 3,232 | | | | |
| 2500 East Walnut Avenue | Dalton | GA | 30720 | BR | O | N/A | N/A | 2,906 | 0 | 2,906 | | | | |
| 905 South Thornton Avenue | Dalton | GA | 307020 | BR | O | N/A | N/A | 3,518 | 0 | 3,518 | | | | |
| 220 Courthouse Square | Danielsville | GA | 30633 | BR | O | N/A | Sat. (9:00am - 12:00pm) | 7,283 | 0 | 7,283 | | | | |
| 136 Highway 400 South | Dawsonville | GA | 30534 | BR | O | N/A | N/A | 11,319 | 0 | 11,319 | | | | |
| 1221 Clairmont Road | Decatur | GA | 30030 | BR | O | N/A | N/A | 9,350 | 4,500 | 4,850 | | | | |
| 101 NW Bowens Mill Road | Douglas | GA | 31533 | BR | L | NNN | N/A | 504 | 0 | 504 | T | T | T | T |
| 102 North Peterson Avenue | Douglas | GA | 31534 | BR | O | N/A | N/A | 18,000 | 0 | 18,000 | | | | |
| 210 North Peterson Avenue | Douglas | GA | 31534 | BR | O | N/A | N/A | 1,900 | 0 | 1,900 | | | | |
| 8458 Campbellton Street | Douglasville | GA | 30134 | BR | O | N/A | Sat. (8:00am - 12:00pm) | 5,850 | 0 | 5,850 | | | | |
| 3200 Peachtree Industrial Boulevard Suites 100,102,201,202,205,209,210 | Duluth | GA | 30096 | BR | L | Net | N/A | 16,688 | 0 | 16,688 | T | LL | LL | LL |
| 1545 Mt. Vernon Rd | Dunwoody | GA | 30338-4103 | BR | L | NNN | N/A | 5,300 | 0 | 5,300 | T | T | T | T |
| 894 Maddox Drive | Ellijay | GA | 30540 | BR | O | N/A | Sat. (8:30am - 12:00pm) | 13,906 | 7,923 | 5,983 | | | | |
| 675 North Jefferson Davis Drive | Fayetteville | GA | 30214 | BR | O | N/A | Sat. (9:00am - 12:00pm) | 11,300 | 0 | 11,300 | | | | |
| 101 North Lee Street | Forsyth | GA | 31029 | BR | O | N/A | N/A | 2,477 | 0 | 2,477 | | | | |
| 110 North Camellia Boulevard | Fort Valley | GA | 31030 | BR | O | N/A | N/A | 9,437 | 0 | 9,437 | | | | |
| 1623 Thompson Bridge Road | Gainesville | GA | 30501 | BR | O | N/A | Sat. (8:30am - 12:00pm) | 2,449 | 0 | 2,449 | | | | |
| 2895 Browns Bridge Road | Gainesville | GA | 30504-5635 | BR | O | N/A | N/A | 2,059 | 0 | 2,059 | | | | |
| 455 Jesse Jewel Parkway | Gainesville | GA | 30501 | BR | O | N/A | Sat. (8:30am - 12:00pm) | 18,210 | 0 | 18,210 | | | | |
| 201 South Main Street | Greensboro | GA | 30501 | BR | O | N/A | N/A | 4,800 | 0 | 4,800 | | | | |
| 201 West Taylor Street | Griffin | GA | 30223 | BR | L | Net | Sat. (9:00am - 12:00pm) | 4,000 | 0 | 4,000 | T | T | T | T |
| 5071 Jimmy Lee Smith Parkway | Hiram | GA | 30141 | BR | O | N/A | Sat. (8:30am - 1:00pm) | 3,532 | 0 | 3,532 | | | | |
| 9008 Highway 29 South | Hull | GA | 30646 | BR | O | N/A | Sat. (9:00am - 12:00pm) | 6,031 | 0 | 6,031 | | | | |

Exhibit A - Location Identification Information.xls

Contract No. EMC-00793

Exhibit A

| Street Address | City | State | Zip | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 818 South First Street | Jessup | GA | 31545 | BR | O | N/A | N/A | 6,742 | 0 | 6,742 | | | | |
| 223 North Main Street | Jonesboro | GA | 30236 | BR | O | N/A | Sat. (9:00am - 12:00pm) | 4,300 | 0 | 4,300 | | | | |
| 2760 Cobb Parkway | Kennesaw | GA | 30152 | BR | O | N/A | Sat. (9:00am - 12:00pm) | 3,200 | 0 | 3,200 | | | | |
| 310 Broad Street | LaGrange | GA | 30240 | BR | O | N/A | Sat. (9:00am - 12:00pm) | 2,900 | 0 | 2,900 | | | | |
| 10 Silo Street | Lavonia | GA | 30553 | BR | O | N/A | N/A | 7,326 | 1,295 | 6,031 | | | | |
| 150 South Perry Street | Lawrenceville | GA | 30045 | BR | O | | Sat. (9:00am - 12:00pm) | 7,500 | 0 | 7,500 | | | | |
| 4700 US Highway 29 | Lilburn | GA | 30047 | BR | O | N/A | Sat. (9:00am - 12:00pm) | 3,206 | 0 | 3,206 | | | | |
| 1855 Thornton Road | Lithia Springs | GA | 30122 | BR | O | N/A | N/A | 3,310 | 0 | 3,310 | | | | |
| 1302 Gray Highway | Macon | GA | 31211 | BR | O | N/A | Sat. (9:00am - 1:00pm) | 2,261 | 0 | 2,261 | | | | |
| 2540 Riverside Drive | Macon | GA | 31210 | BR | O | N/A | N/A | 3,600 | 0 | 3,600 | | | | |
| 3525 Mercer University Drive | Macon | GA | 31204 | BR | O | N/A | Sat. (9:00am - 1:00pm) | 2,600 | 0 | 2,600 | | | | |
| 4357 Forsyth Road | Macon | GA | 31210 | BR | O | N/A | N/A | 2,544 | 0 | 2,544 | | | | |
| 4961 Forsyth Road | Macon | GA | 31203 | BR | O | N/A | N/A | 5,443 | 0 | 5,443 | | | | |
| 3390 Pio Nono Avenue | Macon | GA | 31206 | DU | O | N/A | N/A | 325 | 0 | 325 | | | | |
| 63 Barrett Parkway ,NE | Marietta | GA | 30066 | BR | L | Net | Sat. (9:00am - 12:00pm) | 5,400 | 0 | 5,400 | T | T | T | T |
| 4370 Roswell Road | Marietta | GA | 30339 | BR | L | NNN | Sat. (9:00am - 12:00pm) | 5,300 | 0 | 5,300 | T | T | T | T |
| 155 North Marietta Parkway | Marietta | GA | 30060 | BR | O | N/A | N/A | 2,800 | 0 | 2,800 | | | | |
| 2480 Dallas Highway | Marietta | GA | 30127 | BR | O | N/A | Sat. (9:00am - 12:00pm) | 4,500 | 0 | 4,500 | | | | |
| 12 North Cedar Street | McDonough | GA | 30263 | BR | O | N/A | Sat. (9:00am - 12:00pm) | 20,000 | 0 | 20,000 | | | | |
| 2 Southeast Broad Street | Metter | GA | 30439 | BR | O | N/A | Sat. (9:00am - 12:00pm) | 15,128 | 0 | 15,128 | | | | |
| 423 Vertia Street | Metter | GA | 30439 | DU | O | N/A | Sat. (9:00am - 12:00pm) | 0 | 0 | 0 | | | | |
| 150 West Green Street | Milledgeville | GA | 31061 | BR | O | N/A | N/A | 15,000 | 7,000 | 8,000 | | | | |
| 2345 North Columbia Street | Milledgeville | GA | 31061 | BR | O | N/A | N/A | 3,668 | 0 | 3,668 | | | | |
| 118 Walnut Street | Montezuma | GA | 31063 | BR | O | N/A | N/A | 2,535 | 0 | 2,535 | | | | |
| 2280 North Highway 29 | Newnan | GA | 30263 | BR | L | Net | N/A | 200 | 0 | 200 | LL | LL | LL | LL,T |
| 1421 Highway 34 East | Newnan | GA | 30265 | BR | L | NNN | N/A | 900 | 0 | 900 | T | T | T | T |

Exhibit A - Location Identification Information.xls

Contract No. EMC-00793

Exhibit A



| Street Address | City | State | Zip | | | Lease Type | Hours | SF | | SF | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 14 Hospital Road | Newnan | GA | 30263 | BR | O | N/A | Sat. (9:00am - 12:00pm) | 900 | 0 | 900 | | | | | |
| 19 Jefferson Street | Newnan | GA | 30263 | BR | O | N/A | N/A | 16,000 | 0 | 16,000 | | | | | |
| 232 Bullsboro Drive | Newnan | GA | 30263 | BR | O | N/A | Sat. (8:00am - 12:00pm) | 6,448 | 0 | 6,448 | | | | | |
| 26 Jefferson Street | Newnan | GA | 30263 | BR | O | N/A | N/A | 1,467 | 0 | 1,467 | | | | | |
| 3453 Mundy Mill Road | Oakwood | GA | 30566 | BR | O | N/A | Sat. (8:30am - 12:00pm) | 3,150 | 0 | 3,150 | | | | | |
| 705 Highway 54 East | Peachtree City | GA | 30269 | BR | O | N/A | Sat. (8:30am - 12:00pm) | 3,900 | 0 | 3,900 | | | | | |
| 27205 Highway 80 West | Portal | GA | 30450 | BR | O | N/A | N/A | 1,876 | 0 | 1,876 | | | | | |
| 470 South Columbia Avenue | Rincon | GA | 31326 | BR | O | N/A | N/A | 6,135 | 0 | 6,135 | | | | | |
| 6375 Highway 85 | Riverdale | GA | 30274-1641 | BR | O | N/A | Sat. (9:00am - 12:00pm) | 13,500 | 0 | 13,500 | | | | | |
| 50 North Dugger Avenue | Roberta | GA | 31078 | BR | O | N/A | N/A | 2,500 | 0 | 2,500 | | | | | |
| 11650 Alpharetta Highway | Roswell | GA | 30076 | BR | O | N/A | N/A | 3,576 | 0 | 3,576 | | | | | |
| 1709 Frederica Road | Saint Simons Island | GA | 31522 | BR | L | Net | N/A | 3,800 | 0 | 3,800 | T | LL | LL | T | |
| 7 East Congress Street #100 | Savannah | GA | 31401 | BR | L | Net | N/A | 14,125 | 0 | 14,125 | T | T | T | T | |
| 14095 Abercorn Expressway | Savannah | GA | 31419 | BR | O | N/A | N/A | 5,300 | 0 | 5,300 | | | | | |
| 477 Johnny Mercer Boulevard | Savannah | GA | 31410 | BR | O | N/A | N/A | 1,850 | 0 | 1,850 | | | | | |
| 5110 Waters Avenue | Savannah | GA | 31404 | BR | O | N/A | N/A | 1,850 | 0 | 1,850 | | | | | |
| 7393 Hodgson Memorial Drive | Savannah | GA | 31406 | BR | O | N/A | N/A | 27,756 | 0 | 27,756 | | | | | |
| 756 Concord Road, Smyrna, GA 30080 | Smyrna | GA | 30080 | BR | L | NNN | Sat. (9:00am - 12:00pm) | 2,289 | 0 | 2,289 | T | T | T | T | |
| 2230 Scenic Highway | Snellville | GA | 30078 | BR | O | N/A | Sat. (9:00am - 12:00pm) | 19,200 | 0 | 19,200 | | | | | |
| 501 South Laurel Street | Springfield | GA | 31329 | BR | O | N/A | N/A | 4,572 | 0 | 4,572 | | | | | |
| 38/40 North Main Street | Statesboro | GA | 30458-1300 | BR | O | N/A | N/A | 20,522 | 0 | 20,522 | | | | | |
| 506 Fair Road | Statesboro | GA | 30458-4929 | BR | O | N/A | N/A | 3,319 | 0 | 3,319 | | | | | |
| Northside Drive and Highway 80 East | Statesboro | GA | 30458 | BR | O | N/A | Sat. (9:00am - 2:00pm) | 3,820 | 0 | 3,820 | | | | | |
| 9861 Rome Boulevard | Summerville | GA | 30747-1585 | BR | O | N/A | Sat. (7:15am - 12:00pm) | 15,502 | 0 | 15,502 | | | | | |
| 3640 Peachtree Parkway, Suwanee, GA 30339 | Suwanee | GA | 30339 | BR | L | NNN | Sat. (9:00am - 12:00pm) | 7,100 | 0 | 7,100 | T | T | T | T | |
| 2885 Lawrenceville Suwannee Road | Suwanee | GA | 30024 | BR | O | N/A | Sat. (9:00am - 12:00pm) | 6,551 | 0 | 6,551 | | | | | |
| 205 South Main Street | Swainsboro | GA | 30401 | BR | O | N/A | N/A | 6,972 | 0 | 6,972 | | | | | |

Exhibit A - Location Identification Information.xls

Contract No. EMC-00793

Exhibit A

| Street Address | City | State | Zip | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 105 South Main Street | Sylvania | GA | 30467 | BR | L | Net | N/A | 10,400 | 0 | 10,400 | T | T | T | T | |
| 1623 Old Ocilla Road | Tifton | GA | 31794 | BR | O | N/A | N/A | 2,000 | 0 | 2,000 | | | | | |
| 300 Commerce Way | Tifton | GA | 31794-4818 | BR | O | N/A | N/A | 5,289 | 0 | 5,289 | | | | | |
| 14160 Highway 27 | Trion | GA | 30753 | BR | O | N/A | Sat. (8:00am - 12:00pm) | 2,800 | 0 | 2,800 | | | | | |
| 3617 Chattanooga Road | Tunnel Hill | GA | 30755 | BR | O | N/A | N/A | 2,876 | 0 | 2,876 | | | | | |
| 2901 A North Ashley Street | Valdosta | GA | 31602 | BR | O | N/A | N/A | 7,000 | 0 | 7,000 | | | | | |
| 900 East First Street | Vidalia | GA | 30474 | BR | L | NNN | N/A | 14,668 | 0 | 14,668 | T | T | T | T | |
| 640 West Bankhead Avenue | Villa Rica | GA | 30180-1601 | BR | O | N/A | Sat. (8:00am - 12:00pm) | 3,482 | 0 | 3,482 | | | | | |
| 127 Russell Parkway | Warner Robbins | GA | 31088-6164 | BR | O | N/A | Sat. (9:00am - 1:00pm) | 1,080 | 0 | 1,080 | | | | | |
| 3001 Watson Boulevard | Warner Robbins | GA | 31093-8534 | BR | O | N/A | Sat. (9:00am - 1:00pm) | 7,000 | 0 | 7,000 | | | | | |
| 500 Albany Avenue | Waycross | GA | 31501-4715 | BR | O | N/A | N/A | 4,191 | 0 | 4,191 | | | | | |
| 20 West May Street | Winder | GA | 30680-8105 | BR | O | N/A | Sat. (8:00am - 12:00pm) | 5,500 | 0 | 5,500 | | | | | |
| 4210 Charlestown Road | New Albany | IN | 47150-9567 | BR | O | N/A | Sat. (9:00am - 12:00pm) | 4,741 | 0 | 4,741 | | | | | |
| 40 West Highway 72 | Baxter | KY | 40806-8384 | BR | L | Net | N/A | 280 | 0 | 280 | T | LL | LL | T | |
| 14793 Regina Belcher Highway | Belcher | KY | 41513 | BR | O | N/A | N/A | 1,894 | 0 | 1,894 | | | | | |
| 1901 Russellville Road | Bowling Green | KY | 42101 | BR | L | Net | N/A | 9,000 | 0 | 9,000 | T | T | T | T | |
| 1820 Scottsville Road | Bowling Green | KY | 42101 | BR | O | N/A | Sat. (8:00am - 12:00pm) | 20,899 | 0 | 20,899 | | | | | |
| 2750 Nashville Road | Bowling Green | KY | 42101 | BR | O | N/A | N/A | 1,330 | 0 | 1,330 | | | | | |
| 600 US 31 – West Bypass | Bowling Green | KY | 42101 | BR | O | N/A | N/A | 825 | 0 | 825 | | | | | |
| 2945 Scottsville Road | Bowling Green | KY | 42101 | SF | L | Net | Sat. (9:00am - 3:00pm) | 398 | 0 | 398 | T | LL | LL | T | |
| 350 US 31 West Bypass | Bowling Green | KY | 42101 | SF | L | Net | Sat. (9:00am - 3:00pm) | 500 | 0 | 500 | T | LL | LL | T | |
| 711 Campbell Lane | Bowling Green | KY | 42101 | SF | L | Net | Sat. (9:00am - 3:00pm) | 500 | 0 | 500 | T | LL | LL | T | |
| 100 Main Street | Calhoun | KY | 42327 | BR | O | N/A | N/A | 3,330 | 0 | 3,330 | | | | | |
| 102 Broadway | Cave City | KY | 42127 | BR | O | N/A | N/A | 3,329 | 0 | 3,329 | | | | | |
| 1390 Master Street, Corbin, KY 40701-2560 | Corbin | KY | 40701-2560 | BR | L | NNN | N/A | 3,900 | 0 | 3,900 | T | T | T | T | |
| 1202 East Main Street | Cumberland | KY | 40823 | BR | O | N/A | N/A | 3,849 | 0 | 3,849 | | | | | |
| 31 Outlet Drive | Eddyville | KY | 42038 | BR | O | N/A | Sat. (8:30am - 12:00pm) | 3,895 | 0 | 3,895 | | | | | |

Exhibit A - Location Identification Information.xls

Contract No. EMC-00793

Exhibit A

| Street Address | City | State | Zip | Type | O/L | Lease Type | Rent Based on | Gross Square Feet | Current Vacant Square Feet | Adjusted Square Feet | Janitorial | Landscaping | Snow Removal | Trash Removal |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 107 Yocum Street | Evarts | KY | 40828 | BR | O | N/A | N/A | 1,220 | 0 | 1,220 | | | | |
| 103 Smith Road | Glasgow | KY | 42141 | BR | O | N/A | N/A | 2,357 | 0 | 2,357 | | | | |
| 301 West Main Street | Glasgow | KY | 42142 | BR | O | N/A | N/A | 26,800 | 0 | 26,800 | | | | |
| 900 US Highway 62 | Grand Rivers | KY | 42045 | BR | L | Net | Sat (8:30am - 12:00pm) | 7,866 | 0 | 7,866 | T | T | T | T |
| 101 North Main Street | Harlan | KY | 40831-2105 | BR | O | N/A | Sat. (9:00am - 1:00pm) | 6,044 | 0 | 6,044 | | | | |
| 200 Waldon Drive | Harlan | KY | 40831-2534 | SF | L | Net | Sat. (9:00am - 1:00pm) | 569 | 0 | 569 | T | LL | LL | T |
| 405 Main Street | Hazel | KY | 42049 | BR | O | N/A | N/A | 2,790 | 0 | 2,790 | | | | |
| 11 East Hiseville Main Street | Hiseville | KY | 42152 | BR | O | N/A | N/A | 2,408 | 0 | 2,408 | | | | |
| 495 North Drive | Hopkinsville | KY | 42240 | BR | L | NNN | N/A | 2,711 | 0 | 2,711 | T | T | T | T |
| 2933 Fort Campbell Boulevard | Hopkinsville | KY | 42240 | BR | O | N/A | Sat. (9:00am - 12:00pm) | 3,112 | 0 | 3,112 | | | | |
| 710 Country Club Lane | Hopkinsville | KY | 42240 | BR | O | N/A | Sat. (9:00am - 12:00pm) | 3,731 | 0 | 3,731 | | | | |
| 4000 Fort Campbell Boulevard, Space 325-K | Hopkinsville | KY | 42240 | DU | L | Net | Sat. (9:00am - 12:00pm) | 2,000 | 0 | 2,000 | T | LL | LL | T |
| 300 Clinic Drive | Hopkinsville | KY | 42240 | SF | L | Net | Sat. (10:00am - 3:00pm) | 517 | 0 | 517 | T | LL | LL | T |
| 119 Broadway | Irvine | KY | 40336 | BR | O | N/A | N/A | 11,887 | 0 | 11,887 | | | | |
| 910 Richmond Road | Irvine | KY | 40336 | DU | O | N/A | Sat. (9:00am - 12:00pm) | 885 | 0 | 885 | | | | |
| 2024 South Highway 53 | Lagrange | KY | 40031-9535 | BR | O | N/A | Sat. (9:00am - 12:00pm) | 2,812 | 0 | 2,812 | | | | |
| 1521 US Highway 60-W | Ledbetter | KY | 42058 | BR | O | N/A | Sat. (8:30am - 12:00pm) | 3,360 | 0 | 3,360 | | | | |
| 1780 Nicholasville Road, Suite 102 | Lexington | KY | 40503-1411 | BR | L | Net | N/A | 814 | 0 | 814 | LL | LL | LL | LL |
| 3061 Fieldstone Way, Suite 1400 | Lexington | KY | 40513-1773 | BR | L | Net | Sat. (9:00am - 1:00pm) | 2,914 | 0 | 2,914 | T | LL | LL | LL,T |
| 3285 Blazer Parkway, Suite 100 | Lexington | KY | 40509 | BR | L | Net | N/A | 2,706 | 0 | 2,706 | T | LL | LL | T |
| 3329 Tates Creek Road | Lexington | KY | 40502-3407 | BR | L | Net | Sat. (9:00am - 1:00pm) | 3,804 | 0 | 3,804 | T | LL | LL | T |
| 360 East Vine Street | Lexington | KY | 40507-1522 | BR | L | Net | N/A | 20,417 | 0 | 20,417 | LL | LL | LL | LL |
| 840 Whitley Street | London | KY | 40741 | BR | O | N/A | N/A | 4,102 | 0 | 4,102 | | | | |
| 2216 Dundee Road | Louisville | KY | 40205 | BR | L | Net | N/A | 1,188 | 0 | 1,188 | T | LL | LL | T |
| 3747 Lexington Road | Louisville | KY | 40207-3023 | BR | L | Net | N/A | 3,000 | 0 | 3,000 | T | T | T | T |
| 4082 Taylorsville Road at Hikes Point | Louisville | KY | 40220-01502 | BR | L | Net | Sat. (9:00am - 12:00pm) | 4,416 | 0 | 4,416 | T | T | T | T |

Contract No. EMC-00793

Exhibit A

| Street Address | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 4507 Shelbyville Road | Louisville | KY | 40207-3313 | BR | L | Net | Sat. (9:00am – 12:00pm) | 3,100 | 0 | 3,100 | T | LL | LL | T |
| 7802 Preston Highway | Louisville | KY | 40219 | BR | L | Net | N/A | 7,948 | 0 | 7,948 | T | T | T | T |
| 401 West Main Street | Louisville | KY | 40202 | BR | L | Gross | N/A | 58,730 | 0 | 58,730 | LL | LL | LL | LL |
| 4201 Shelbyville Road | Louisville | KY | 40207-3322 | BR | L | NNN | N/A | 7,172 | 0 | 7,172 | T | T | T | T |
| 10403 Dixie Highway | Louisville | KY | 40272-3953 | BR | O | N/A | Sat. (9:00am – 12:00pm) | 3,326 | 0 | 3,326 | | | | |
| 11401 South Preston Highway | Louisville | KY | 40229-2864 | BR | O | N/A | Sat. (9:00am – 12:00pm) | 2,828 | 0 | 2,828 | | | | |
| 11751 Bluegrass Parkway | Louisville | KY | 40299-2302 | BR | O | N/A | N/A | 3,008 | 0 | 3,008 | | | | |
| 12917 Shelbyville Road | Louisville | KY | 40243-1538 | BR | O | N/A | Sat. (9:00am – 12:00pm) | 2,943 | 0 | 2,943 | | | | |
| 1339 Bardstown Road | Louisville | KY | 40204-1319 | BR | O | N/A | Sat. (9:00am – 12:00pm) | 3,033 | 0 | 3,033 | | | | |
| 2501 West Broadway | Louisville | KY | 40211-1009 | BR | O | N/A | Sat. (9:00am – 12:00pm) | 4,017 | 0 | 4,017 | | | | |
| 2601 Hurstbourne Parkway | Louisville | KY | 40220-4008 | BR | O | N/A | N/A | 2,867 | 0 | 2,867 | | | | |
| 3140 Wilson Avenue | Louisville | KY | 40211-1932 | BR | O | N/A | N/A | 3,395 | 0 | 3,395 | | | | |
| 330 Whittington Parkway | Louisville | KY | 40222-4920 | BR | O | N/A | Sat. (9:00am – 12:00pm) | 6,200 | 0 | 6,200 | | | | |
| 3450 Taylor Boulevard | Louisville | KY | 40215-2681 | BR | O | N/A | Sat. (9:00am – 12:00pm) | 6,881 | 0 | 6,881 | | | | |
| 4415 Cane Run Road | Louisville | KY | 40216-4501 | BR | O | N/A | N/A | 2,785 | 0 | 2,785 | | | | |
| 4816 Outer Loop | Louisville | KY | 40219-3302 | BR | O | N/A | Sat. (9:00am – 12:00pm) | 2,945 | 0 | 2,945 | | | | |
| 4908 US Highway 42 | Louisville | KY | 40222-6369 | BR | O | N/A | Sat. (9:00am – 12:00pm) | 3,990 | 0 | 3,990 | | | | |
| 5004 Poplar Level Road | Louisville | KY | 40219-1125 | BR | O | N/A | Sat. (9:00am – 12:00pm) | 2,195 | 0 | 2,195 | | | | |
| 5100 Dixie Highway | Louisville | KY | 40216-1702 | BR | O | N/A | Sat. (9:00am – 12:00pm) | 3,192 | 0 | 3,192 | | | | |
| 5319 Preston Highway | Louisville | KY | 40213-2712 | BR | O | N/A | N/A | 3,641 | 0 | 3,641 | | | | |
| 6740 Bardstown Road | Louisville | KY | 40291-3048 | BR | O | N/A | Sat. (9:00am – 12:00pm) | 2,777 | 0 | 2,777 | | | | |
| 7111 Southside Drive | Louisville | KY | 40214-3611 | BR | O | N/A | Sat. (9:00am – 12:00pm) | 3,408 | 0 | 3,408 | | | | |
| 9050 Dixie Highway | Louisville | KY | 40258-1053 | BR | O | N/A | N/A | 2,178 | 0 | 2,178 | | | | |
| 9510 Brownsboro Road | Louisville | KY | 40241-1120 | BR | O | N/A | Sat. (9:00am – 12:00pm) | 2,879 | 0 | 2,879 | | | | |
| 300 Cumberland Cross | Monticello | KY | 42633 | BR | O | N/A | N/A | 3,006 | 0 | 3,006 | | | | |

Contract No. EMC-00793

Exhibit A

| Street Address | City | State | Zip | Type | | | Hours | Gross Sq Ft | Current Vacant Sq Ft | Sublet Sq Ft | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1104 Chestnut Street | Murray | KY | 42071 | BR | O | N/A | Sat. (8:00am - 12:00pm) | 11,453 | 0 | 11,453 | | | | |
| 602 South 12th Street | Murray | KY | 42071 | BR | O | N/A | N/A | 3,358 | 0 | 3,358 | | | | |
| 808 North 12th Street | Murray | KY | 42071 | SF | L | Net | Sat. (10:00am - 2:00pm) | 385 | 0 | 385 | T | LL | LL | T |
| 15744 Fort Campbell Boulevard | Oak Grove | KY | 42262 | BR | O | N/A | N/A | 1,924 | 0 | 1,924 | | | | |
| 3232 Villa Point | Owensboro | KY | | BR | L | Net | Sat. (9:00am - 3:00pm) | 480 | 0 | 480 | T | LL | LL | T |
| 5002 Frederica Street | Owensboro | KY | 42301 | BR | L | NNN | N/A | 3,262 | 0 | 3,262 | T | T | T | T |
| 2609 New Hartford Road | Owensboro | KY | 42303 | BR | O | N/A | N/A | 2,720 | 0 | 2,720 | | | | |
| 2800 Frederica Street | Owensboro | KY | 42301-5490 | BR | O | N/A | N/A | 3,961 | 0 | 3,961 | | | | |
| 2901 West Parrish Avenue | Owensboro | KY | 42301 | BR | O | N/A | N/A | 1,737 | 0 | 1,737 | | | | |
| 3000 East Fourth Street | Owensboro | KY | 42303 | BR | O | N/A | N/A | 3,033 | 0 | 3,033 | | | | |
| 1731 Scherm Rd | Owensboro | KY | 42301 | SF | L | Net | Sat. (9:00am - 3:00pm) | 580 | 0 | 580 | T | LL | LL | T |
| 2910 Highway 54 (Leitchfield Road) | Owensboro | KY | 42303 | SF | L | Net | Sat. (9:00am - 3:00pm) | 530 | 0 | 530 | T | LL | LL | T |
| 1601 Broadway | Paducah | KY | 42001 | BR | O | N/A | Sat. (8:00am - 12:00pm) | 16,822 | 0 | 16,822 | | | | |
| 300 North Mayo Trail | Paintsville | KY | 41240 | BR | L | Net | Sat. (8:00am - 1:00pm) | 7,039 | 0 | 7,039 | T | T | LL. | T |
| 226 South Main Street | Pembroke | KY | 42266 | BR | O | N/A | N/A | 2,290 | 0 | 2,290 | | | | |
| 4414 North Mayo Trail | Pikeville | KY | 41501 | BR | L | NNN | Sat. (8:00am - 1:00pm) | 12,600 | 0 | 12,600 | T | T | T | T |
| 216 Glynn View Plaza | Prestonburg | KY | 41653 | BR | L | Net | N/A | 1,415 | 0 | 1,415 | T | LL | LL | T |
| 5620 Robinson Creek Road | Robinson Creek | KY | 41560 | BR | O | N/A | N/A | 3,136 | 0 | 3,136 | | | | |
| 2198 Lakeway Drive | Russell Springs | KY | 42642 | BR | O | N/A | N/A | 1,636 | 0 | 1,636 | | | | |
| 102 NW Park Square | Russellville | KY | 42276 | BR | O | N/A | Sat. (8:30am - 1:00pm) | 10,899 | 0 | 10,899 | | | | |
| 124 North Main Street | Somerset | KY | 42501 | BR | O | N/A | N/A | 9,871 | 0 | 9,871 | | | | |
| 3977 South Highway 27 | Somerset | KY | 42501 | BR | O | N/A | N/A | 6,769 | 0 | 6,769 | | | | |
| 546 South Highway 27 | Somerset | KY | 42501 | BR | O | N/A | N/A | 3,863 | 0 | 3,863 | | | | |
| 805 Bardstown Road (New Lease) | Springfield | KY | 40069 | BR | L | Net | Sat. (8:30am - 12:00pm) | 5,267 | 0 | 5,267 | T | T | LL,T | T |
| 110 East Main Street | Springfield | KY | 40069-1225 | BR | O | N/A | N/A | 13,397 | 0 | 13,397 | | | | |
| 10026 Main Street | Whitesville | KY | 42378-9716 | BR | O | N/A | N/A | 2,272 | 0 | 2,272 | | | | |
| 30 West Broadway | Winchester | KY | 40391 | BR | O | N/A | N/A | 12,276 | 0 | 12,276 | | | | |

Exhibit A - Location Identification Information.xls

Contract No. EMC-00793

Exhibit A

| Street Address | City | State | Zip | Prop. Type/BR | Lease/Own | Lease Type | Hours | Gross Square Feet | | Office Square Feet | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 825 Bypass Road | Winchester | KY | 40391 | BR | O | N/A | Sat. (9:00am - 12:00pm) | 2,707 | 0 | 2,707 | | | | | |
| 801 Compass Way, Suite 7, Annapolis, MD, 21401 | Annapolis | MD | 21401 | BR | L | Net | N/A | 1,500 | 0 | 1,500 | T | LL | LL | T | |
| 91 Main Street, Annapolis, MD, 21401 | Annapolis | MD | 21401 | BR | L | Net | N/A | 1,060 | 0 | 1,060 | T | LL | LL | LL | |
| 2078 General's Highway | Annapolis | MD | 21401 | BR | L | NNN | Sat. (8:30am - 12:00pm) | 3,500 | 0 | 3,500 | T | T | T | T | |
| 2623 Riva Road | Annapolis | MD | 21401 | BR | L | NNN | Sat. (8:30am - 12:00pm) | 5,800 | 0 | 5,800 | T | T | T | T | |
| 416 Sixth Street | Annapolis | MD | 21403 | BR | L | NNN | Sat. (8:30am - 12:00pm) | 2,500 | 0 | 2,500 | T | T | T | T | |
| 101 Hillsmere Drive | Annapolis | MD | 21403 | BR | O | N/A | Sat. (8:30am - 12:00pm) | 2,675 | 0 | 2,675 | | | | | |
| 2015 West Street | Annapolis | MD | 21401 | BR | O | N/A | Sat. (8:30am - 12:00pm) | 3,967 | 0 | 3,967 | | | | | |
| 5 Church Circle | Annapolis | MD | 21401 | BR | O | N/A | N/A | 18,933 | 0 | 18,933 | | | | | |
| 2 Arnold Road | Arnold | MD | 21012 | BR | O | N/A | Sat. (8:30am - 12:00pm) | 2,610 | 0 | 2,610 | | | | | |
| 111 South Calvert Street | Baltimore | MD | 21202 | BR | L | Net | N/A | 2,167 | 0 | 2,167 | T | LL | LL | T | |
| 2 North Charles Street, Suite 100 | Baltimore | MD | 21201 | BR | L | Net | N/A | 3,311 | 0 | 3,311 | T | LL | LL | T | |
| 44 East Sudbrook Lane | Baltimore | MD | 21208 | BR | L | Net | N/A | 3,400 | 0 | 3,400 | T | LL | LL | T | |
| 5 Bel Air South Parkway | Bel Air | MD | 21015 | BR | L | Net | Sat. (8:00am - 12:00pm) | 3,500 | 0 | 3,500 | T | LL | LL | T | |
| 333 Baltimore Pike | Bel Air | MD | 21014 | BR | L | NNN | N/A | 2,556 | 0 | 2,556 | T | T | T | T | |
| 37 South Main Street | Bel Air | MD | 21014 | BR | O | N/A | N/A | 21,415 | 0 | 21,415 | | | | | |
| 315 South Main Street | Bel Air | MD | 21014 | DU | O | N/A | N/A | 1,014 | 0 | 1,014 | | | | | |
| 11605 Beltsville Drive | Beltsville | MD | 20705 | BR | L | Net | Sat. (9:00am - 12:00pm) | 2,500 | 0 | 2,500 | T | LL | LL | T | |
| 11121 Racetrack Road | Berlin | MD | 21811 | BR | O | N/A | Sat. (8:30am - 12:00pm) | 2,500 | 0 | 2,500 | | | | | |
| 4719 Hampden Lane | Bethesda | MD | 20814 | BR | L | Net | N/A | 11,993 | 0 | 11,993 | T | LL | LL | T | |
| 10657 Bishopville Road | Bishopville | MD | 21813 | BR | O | N/A | N/A | 1,710 | 0 | 1,710 | | | | | |
| 6901 Laurel Bowie Road | Bowie | MD | 20715 | BR | O | N/A | Sat. (8:30am - 12:00pm) | 3,100 | 0 | 3,100 | | | | | |
| 94 Souder Road | Brunswick | MD | 21716 | BR | L | Net | Sat. (9:00am - 12:00pm) | 2,040 | 0 | 2,040 | T | LL | LL | T | |
| 23415 Three Notch Road, #2060 | California | MD | 20619 | BR | L | Net | Sat. (8:30am - 12:00pm) | 2,480 | 0 | 2,480 | T | T | T | T | |
| 601 Crusader Road | Cambridge | MD | 21613 | BR | O | N/A | Sat. (8:30am - 12:00pm) | 1,911 | 0 | 1,911 | | | | | |
| 6309 Allentown Road | Camp Springs | MD | 20748 | BR | L | Net | N/A | 2,518 | 0 | 2,518 | T | LL | LL | T | |

Contract No. EMC-00793

Exhibit A

| Street Address | City | State | Zip | | | | Saturday Hours | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 919 Frederick Road | Catonsville | MD | 21228 | BR | O | N/A | -N/A | 3,744 | 0 | 3,744 | | | | |
| 102 Broadway | Centreville | MD | 21617 | BR | O | N/A | Sat. (8:30am-12:00pm) | 4,968 | 0 | 4,968 | | | | |
| 501 Washington Avenue | Chestertown | MD | 21620 | BR | L | Net | Sat. (8:30am-12:00pm) | 1,500 | 0 | 1,500 | T | T | T | LL |
| 2900 Churchville Road | Churchville | MD | 21028 | BR | L | NNN | Sat. (8:00am-12:00pm) | 1,692 | 0 | 1,692 | T | T | T | T |
| 9110 Piscataway Road, Clinton, MD, 20735 | Clinton | MD | 20735 | BR | L | Net | Sat. (8:30am-12:00pm) | 3,179 | 0 | 3,179 | T | T | T | T |
| 9658 Baltimore Avenue, Suite 101 | College Park | MD | 20740 | BR | L | Net | N/A | 1,916 | 0 | 1,916 | T | LL | LL | LL |
| 11000 Broken Land Parkway, Suite 118 | Columbia | MD | 21044 | BR | L | Net | N/A | 3,371 | 0 | 3,371 | LL | LL | LL | LL,T |
| 8850 Columbia 100 Parkway | Columbia | MD | 21045 | BR | L | Net | | 5,233 | | 5,233 | T? | LL,T | LL,T | T? |
| 5585 Twin Knolls Road | Columbia | MD | 21045 | BR | O | N/A | Sat. (9:00am-12:00pm) | 4,182 | 0 | 4,182 | | | | |
| 11000 Broken Land Parkway, Columbia, MD 21044 | Columbia | MD | 21044 | DU | L | N/A | N/A | 3,371 | 0 | 3,371 | LL | LL | LL | LL |
| 257 North Somerset Avenue | Crisfield | MD | 21817 | BR | O | N/A | Sat. (8:30am-12:00pm) | 2,400 | 0 | 2,400 | | | | |
| 2151 Defense Highway | Crofton | MD | 21114 | BR | L | Net | Sat. (8:00am-12:00pm) | 1,263 | 0 | 1,263 | T | LL | LL | T |
| 9815 Main Street | Damascus | MD | 20872 | BR | L | Net | N/A | 1,000 | 0 | 1,000 | T | LL | LL | T |
| 5801 Deale Churchton Road | Deale | MD | 20751 | BR | L | Net | Sat. (8:30am-12:00pm) | 1,188 | 0 | 1,188 | T | T | LL | LL |
| 10264 Southern Maryland Boulevard, Suite 100 | Dunkirk | MD | 20754 | BR | L | Net | Sat. (8:30am-12:00pm) | 2,561 | 0 | 2,561 | T | LL | LL,T | T |
| 100 Marlboro Avenue | Easton | MD | 21601 | BR | L | NNN | Sat. (8:30am-12:00pm) | 4,210 | 0 | 4,210 | T | T | T | T |
| 52 West Central Avenue | Edgewater | MD | 21037 | BR | L | Net | Sat. (8:00am-12:00pm) | 2,063 | 0 | 2,063 | T | T | T | T |
| Central Avenue and Pike Ridge Road | Edgewater | MD | 21037 | BR | L | Net | – | 3,000 | 0 | 3,000 | T | LL | LL | LL |
| 3062 Solomons Island Rd. | Edgewater | MD | 21037 | BR | L | NNN | Sat. (8:30am-12:00pm) | 1,800 | 0 | 1,800 | T | T | T | T |
| 1014 Gateway Road | Edgewood | MD | 21040 | BR | L | NNN | Sat. (8:00am-12:00pm) | 2,400 | 0 | 2,400 | T | T | T | T |
| 1300 Liberty Road | Eldersburg | MD | 21784 | BR | O | N/A | Sat. (7:30am-1:00pm) | 7,800 | 0 | 7,800 | | | | |
| 7290 Montgomery Road | Elkridge | MD | 21227 | BR | O | N/A | Sat. (9:00am-12:00pm) | 6,913 | 0 | 6,913 | | | | |
| 2401 Baldwin Mill Road | Fallston | MD | 21047 | BR | L | NNN | Sat. (8:00am-12:00pm) | 2,080 | 0 | 2,080 | T | T | T | T |
| 1911 Bel Air Road | Fallston | MD | 21047 | BR | O | N/A | Sat. (8:00am-12:00pm) | 3,596 | 0 | 3,596 | | | | |

Exhibit 4

Deposition of Sean Brookins

**MERRILL LEGAL SOULTIONS**
Court Reporting*Legal Videography*Trial Services

Page 3

1    IN THE UNITED STATES DISTRICT COURT
     FOR THE MIDDLE DISTRICT OF ALABAMA
2              NORTHERN DIVISION
3
     PROFESSIONAL FACILITIES
4    MANAGEMENT, INC.,
5        Plaintiff,
                   CASE NUMBER
6    vs.           2:06CV1136-MHT
7    EMCOR FACILITIES SERVICES,
     INC.; and A, B, and C, as
8    fictitious parties,
9        Defendants.
10
11   *    *    *    *    *    *    *    *
12
13       DEPOSITION OF SEAN JOSEPH BROOKINS,
14   taken pursuant to stipulation and
15   agreement before Barbara A. Howell,
16   Court Reporter and Commissioner for the
17   State of Alabama at Large, in the Law
18   Offices of Beasley, Allen, Crow,
19   Methvin, Portis & Miles, P.C.,
20   250 Commerce Street, Montgomery,
21   Alabama, on Wednesday, August 8, 2007,
22   commencing at approximately 10:00 a.m.
23

1              INDEX
2    EXAMINATION BY:              PAGE
3    MS. TULEY.......................   6
4
     EXHIBITS              PAGE
5
     PLAINTIFF'S EXHIBIT #1............  178
6
     PLAINTIFF'S EXHIBIT #2............  180
7
     PLAINTIFF'S EXHIBIT #3............  183
8
     PLAINTIFF'S EXHIBIT #4............  189
9
     PLAINTIFF'S EXHIBIT #5............  191
10
     PLAINTIFF'S EXHIBIT #6............  194
11
     PLAINTIFF'S EXHIBIT #7............  195
12
     PLAINTIFF'S EXHIBIT #8............  197
13
     PLAINTIFF'S EXHIBIT #9............  198
14
     PLAINTIFF'S EXHIBIT #10...........  203
15
     PLAINTIFF'S EXHIBIT #11...........  206
16
     PLAINTIFF'S EXHIBIT #12...........  207
17
     PLAINTIFF'S EXHIBIT #13...........  208
18
19
20
21
22
23

Page 2

1            APPEARANCES
2
     FOR THE PLAINTIFF:
3
     Ms. Scarlette M. Tuley
4    BEASLEY, ALLEN, CROW, METHVIN,
     PORTIS & MILES, P.C.
5    Attorneys at Law
     250 Commerce Street
6    Montgomery, Alabama  36104
7
     FOR THE DEFENDANTS:
8
     Mr. Benjamin H. Sawyer
9    SUTHERLAND, ASBILL & BRENNAN, LLP
     Attorneys at Law
10   999 Peachtree Street, NE
     Atlanta, Georgia  30309
11
12   ALSO PRESENT:
13   Mr. Greg Littlefield
     Mr. Jim Wohlers
14
15
16
17
18
19
20
21
22
23

Page 4

1            STIPULATIONS
2        It is hereby stipulated and agreed
3    by and between counsel representing the
4    parties that the deposition of SEAN
5    JOSEPH BROOKINS is taken pursuant to the
6    Federal Rules of Civil Procedure and
7    that said deposition may be taken before
8    Barbara A. Howell, Court Reporter and
9    Commissioner for the State of Alabama at
10   Large, without the formality of a
11   commission; that objections to questions
12   other than objections as to the form of
13   the questions need not be made at this
14   time but may be reserved for a ruling at
15   such time as the deposition may be
16   offered in evidence or used for any
17   other purpose as provided for by the
18   Federal Rules of Civil Procedure.
19       It is further stipulated and agreed
20   by and between counsel representing the
21   parties in this case that said
22   deposition may be introduced at the
23   trial of this case or used in any manner

1 (Pages 1 to 4)

**MERRILL LEGAL SOULTIONS**
**Court Reporting*Legal Videography*Trial Services**

| Page 5 | Page 7 |
|---|---|
| 1  by either party hereto provided for by | 1  and uh-uh. But I'm not getting on you. |
| 2  the Federal Rules of Civil Procedure. | 2  I'm just trying to make sure the court |
| 3 | 3  reporter can type up that you meant a |
| 4  *  *  *  *  *  *  *  * | 4  yes or a no. |
| 5 | 5  A. I understand. Thank you. |
| 6  SEAN JOSEPH BROOKINS | 6  Q. Would you just state your name for the |
| 7  The witness, having first been duly | 7  record, please. |
| 8  sworn or affirmed to speak the truth, | 8  A. Sean Joseph Brookins. |
| 9  the whole truth, and nothing but the | 9  Q. And where do you live, Mr. Brookins? |
| 10  truth, testified as follows: | 10  A. I live in Burlington, North Carolina. |
| 11  THE REPORTER: Usual | 11  Q. And how long have you lived there? |
| 12  stipulations? | 12  A. Sixteen years. |
| 13  MS. TULEY: Yes, unless you | 13  Q. Where are you currently employed? |
| 14  want something | 14  A. EMCOR Facilities Services. |
| 15  different. | 15  Q. At what location are you working right |
| 16  MR. SAWYER: What are the | 16  now? |
| 17  usual stipulations? | 17  A. I'm working on the Wachovia account in |
| 18  Just reserve, thirty | 18  Winston-Salem, is where my office is. |
| 19  days -- | 19  Q. All right. My understanding is -- I |
| 20  MS. TULEY: Objections to | 20  have noticed your deposition for you |
| 21  form. | 21  personally to be here, but I've also |
| 22  MR. SAWYER: Oh, okay. | 22  done what's called a corporate |
| 23  MS. TULEY: Do you want to | 23  representative or a 30(b)(6) notice. |

| Page 6 | Page 8 |
|---|---|
| 1  read and sign? | 1  MR. SAWYER: For the record, |
| 2  MR. SAWYER: Yeah, read and | 2  he's not going to be |
| 3  sign. | 3  produced as a 30(b)(6) |
| 4  EXAMINATION | 4  witness today. |
| 5  BY MS. TULEY: | 5  MS. TULEY: Okay. |
| 6  Q. Mr. Brookins, we just met. I'm | 6  MR. SAWYER: And we can get |
| 7  Scarlette Tuley. Have you ever given a | 7  together and -- |
| 8  deposition before? | 8  Q. All right. So you're not going to be |
| 9  A. I have. | 9  here as a 30(b)(6) witness or corporate |
| 10  Q. Well, I'm not going to go through all | 10  representative; is that correct? |
| 11  that, then. If you can just, as we go | 11  A. That's correct. |
| 12  through, try to let me finish my | 12  Q. Okay. Great. That just short- |
| 13  question before you answer and I'll try | 13  circuited some stuff for you. Good |
| 14  to let you finish your answer before I | 14  news for you. |
| 15  ask the next question, just so we can | 15  I'm just going to go through |
| 16  help the court reporter. And if you | 16  your background a little bit, and we'll |
| 17  need to take a break, let me know. And | 17  try to make this fast. Tell me where |
| 18  try to answer out loud so she can type | 18  you stopped with school. |
| 19  it all down. We all naturally do this, | 19  A. I had some college, but I completed my |
| 20  shakes and nods and uh-huhs and uh-uhs. | 20  RPA, which is real property |
| 21  That all reads the same. So I may | 21  administrator. That is a designation |
| 22  prompt you every once in a while, | 22  offered through the Building Owners and |
| 23  because conversationally we just uh-huh | 23  Managers Association. And it's a |

**1933 Richard Arrington Jr. blvd, S*Birmingham, AL 35209*www.merrillcorp.com**
**1-800-888-DEPO**

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

## Page 9

1 two-year program meant to give you all
2 of the background needed to
3 successfully manage property.
4 Q. And where did you do that?
5 A. It was a program depending on where the
6 teacher was. After work, I would go to
7 whatever the location was and we would
8 go through the coursework. Each course
9 was anywhere between thirteen and
10 sixteen weeks.
11 Q. And this was a two-year program, I
12 think you said?
13 A. Well, it took me two years to get
14 through it. There are seven courses.
15 Q. Got you. And where did you do this
16 study? Was it in --
17 A. Orlando, Florida.
18 Q. Orlando. Okay. And who was your
19 instructor in that?
20 A. Each course had a different instructor.
21 Q. Got you. Was it through a specific
22 institution?
23 A. Building Owners and Managers Institute

## Page 10

1 International.
2 Q. And when did you complete it?
3 A. 1983 -- excuse me. It was in the mid
4 '80s, '83 or '85, and I don't . . .
5 Q. Fair enough. All right. How long have
6 you been working for EMCOR?
7 A. Since 1999.
8 Q. In the '80s when you were doing your
9 two-year program, the RPA --
10 A. Yes.
11 Q. -- where were you working then?
12 A. I worked for a subsidiary of The
13 Travelers called EBS.
14 Q. And what were you doing with them?
15 A. I was in facilities. I actually
16 started in their mailroom and was
17 promoted to work in the facility
18 department. It was a small company,
19 about two hundred employees.
20 Q. Was the facility work you did there
21 similar to what you do at EMCOR?
22 A. On a very basic level, yes.
23 Q. Just give me a sketch of what you were

## Page 11

1 doing for EBS.
2 A. For EBS, I was actually their telephone
3 coordinator in making what we called
4 moves, adds, and changes to the phone
5 system; if someone changed their
6 extension; voice mail. I also did
7 space design, cubicle design work, and
8 coordinated those projects. And then
9 worked with the landlord on any
10 building issues -- air conditioning,
11 janitorial, landscaping, security -- to
12 make sure that we received the services
13 that we were supposed to receive.
14 Q. And was this for one office building?
15 A. It was one office building; a warehouse
16 location, also.
17 Q. And how long were you with EBS?
18 A. Till nineteen -- well, with The
19 Travelers EBS -- it was Travelers EBS.
20 And so under the umbrella of The
21 Travelers, I moved to North Carolina
22 and left their employ in May of 1996.
23 Q. What did you start doing in '96?

## Page 12

1 A. I went to work for The Keith
2 Corporation. And they're based in
3 Charlotte. But I was managing the
4 Center for Molecular Biology and
5 Pathology in Research Triangle Park.
6 Q. And what were your duties there?
7 A. Same duties -- general care of the
8 facility but also supervision of the
9 maintenance technicians who repaired
10 some of the equipment. It didn't have
11 anything to do with the actual business
12 they were in but the upkeep of the
13 facility.
14 Q. Did that include janitorial?
15 A. It did.
16 Q. How many buildings were you over in the
17 Triangle Park location?
18 A. Two.
19 Q. And just round numbers, about how many
20 square feet are we talking about?
21 A. Two hundred thousand.
22 Q. And how long were you with The Keith
23 Group?

3 (Pages 9 to 12)

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

| Page 13 | Page 15 |
|---|---|
| 1   A. I moved in 1999 to CES, which then | 1   in that. Sometimes we are; sometimes |
| 2     became EMCOR through -- | 2     we're not. Upkeep of their critical |
| 3   Q. And that just explained something to | 3     facilities, their data centers in the |
| 4     me. I've seen some E-mails where your | 4     facilities that we have. Not every |
| 5     E-mail address is Sean Brookins CES | 5     building has one. |
| 6     something, something; and then at some | 6   Q. Let me just ask you, would that be -- |
| 7     point, it was Sean Brookins EMCOR | 7     and I'm not a computer person. Would |
| 8     something, something? | 8     that be like having, like, a tech |
| 9   A. That's correct. | 9     person that works with computers? Is |
| 10   Q. So it was just a transition, but it was | 10     that what you're talking about? |
| 11     basically the same -- you kept your | 11   A. No. The environment in which those |
| 12     same job. | 12     computers sit in. |
| 13   A. There was an acquisition. | 13   Q. Okay. Got you. |
| 14   Q. Got you. When did it change from CES | 14   A. Servers, the . . . |
| 15     to EMCOR? | 15   Q. Do y'all self-perform all these |
| 16   A. I'm not exactly sure. Probably 2003. | 16     functions? |
| 17   Q. Sometime in the early to mid 2000s? | 17   A. No. |
| 18   A. Yes, ma'am. | 18   Q. Do you use subcontractors to do this |
| 19   Q. Tell me what your current position with | 19     work, or vendors? |
| 20     EMCOR is. | 20   A. Some work, yes. |
| 21   A. I am the regional alliance manager on | 21   Q. Tell me what, if any, of this work |
| 22     the Wachovia account for EMCOR. | 22     EMCOR self-performs. |
| 23   Q. Tell me, if you will, what does your | 23   A. Mainly the engineering services, the |

| Page 14 | Page 16 |
|---|---|
| 1   job entail? | 1   HVAC, electrical, general building |
| 2   A. I am responsible for the seven managers | 2     services that we have technicians that |
| 3     and their staff for South Carolina, | 3     work in these facilities or assigned to |
| 4     North Carolina, and Virginia high-rise | 4     areas that support those facilities. |
| 5     properties that we take care of for | 5   Q. So would you be having a vendor do the |
| 6     Wachovia. In Virginia, it's everything | 6     landscaping at those facilities? |
| 7     south of Fredericksburg, is kind of the | 7   A. Yes. |
| 8     cut-off line for the next region. And | 8   Q. Would you have a vendor do any |
| 9     responsibility for approximately four | 9     construction that was requested at |
| 10     and a half million square feet. | 10     those facilities? |
| 11   Q. What are the areas of -- I guess the | 11   A. Yes. |
| 12     area of building maintenance that you | 12   Q. Would you have a vendor do any |
| 13     oversee with these buildings? | 13     janitorial that was required at those |
| 14   A. I don't have any direct property | 14     facilities? |
| 15     responsibility. My managers do. | 15   A. Yes. |
| 16   Q. Okay. | 16   Q. Do you use the same vendor for |
| 17   A. However, it is all of the things again, | 17     janitorial at all of the facilities? |
| 18     the support services for a facility -- | 18   A. No. |
| 19     air conditioning, plumbing, janitorial, | 19   Q. What about for landscaping, do you use |
| 20     security, landscaping, general building | 20     the same vendor for all the facilities? |
| 21     maintenance/repairs, painting, ceiling | 21   A. No. |
| 22     tiles, some construction-type work, | 22   Q. How long have you been the regional |
| 23     project work if we are to be included | 23     manager for this Wachovia account? |

4 (Pages 13 to 16)

Page 17

1   A.  Since October of last year.
2   Q.  Which would be October '06?
3   A.  Correct.
4   Q.  Who are your seven managers that are
5       underneath you?
6   A.  Specifically by name?
7   Q.  Yes, please.
8   A.  Atilla, A-T-I-L-L-A, Szekes,
9       S-Z-E-K-E-S.
10  Q.  That's impressive.
11  A.  Jim Sulier, S-U-L-I-E-R; Janet Hoover;
12      Janene Finger; David Coldren,
13      C-O-L-D-R-E-N; Lane Sisson,
14      S-I-S-S-O-N; and Jacqueline Able.
15  Q.  That's good.
16  A.  I was going across the state of
17      Virginia trying to count everybody.
18  Q.  Now, are they at the same location you
19      are?
20  A.  No.
21  Q.  Are they set up where they're actually
22      in a Wachovia facility?
23  A.  Yes.

Page 18

1   Q.  All right.  I'm going to take you back
2       now, and I want to just start with what
3       your first involvement was with the
4       BB&T project and just tell me when did
5       you first become aware of the BB&T
6       project.
7   A.  Late spring 2005.
8   Q.  How did you become aware of it?
9   A.  The portfolio manager I was working for
10      at Wachovia had left to go to BB&T, had
11      left Wachovia to go to BB&T.  In his
12      position there, he knew or had found
13      out that they were looking for an
14      outsourcing company and wanted to
15      recommend EMCOR to be on the bid list.
16  Q.  And who was this portfolio manager?
17  A.  Bob Evans.
18  Q.  Did he contact you directly about that
19      opportunity?
20  A.  No.  My boss, Cathy Hice, with a C.
21  Q.  And what did he tell -- strike that.
22          What did Cathy Hice tell you
23      about the opportunity with BB&T?

Page 19

1   A.  I don't recall any specific
2       conversation about what it was going to
3       be about, what the contract was going
4       to be or potentially be.  Just that I
5       had done a good job for her and she
6       wanted to at least make sure I had the
7       opportunity to move up if the
8       opportunity presented itself.
9   Q.  When were you first aware that EMCOR
10      had been requested to submit a bid or a
11      proposal?
12  A.  I don't specifically recall when.
13  Q.  Would it have been a few months after
14      that or shorter, longer?
15  A.  Certainly not longer but . . .
16  Q.  And that's fine.  How did you first
17      become aware that EMCOR had been
18      requested to submit a proposal?
19  A.  Again, I don't recall the specific date
20      or time.  However, I became actively
21      involved shortly before we did a
22      presentation to BB&T.
23  Q.  Tell me about that presentation.

Page 20

1   A.  EMCOR had been selected as one of the
2       finalists, and we had to go to
3       Winston-Salem and before a group of
4       probably thirty BB&T people do a
5       presentation on why choose EMCOR.
6   Q.  And who all from EMCOR was involved in
7       giving that presentation?
8   A.  I don't know that I can remember
9       everybody.  I'll tell you the ones I do
10      remember.  Mike Terry; Debi Crosby,
11      D-E-B-I Crosby; Alan Cristal; Bill
12      Rogers; Ron Rogers; I was there.
13      That's all I remember.
14  Q.  Tell me, of the ones that you can
15      remember, who was there for BB&T.
16  A.  Steven Paige, Ronny Eller, Debra
17      Willis, John Thomas.  And that's all
18      that I . . .
19  Q.  That's fair enough.
20  A.  It was a large room, a lot of people.
21  Q.  And you said your involvement started
22      shortly before the presentation was
23      made.

5 (Pages 17 to 20)

Page 21

1    A. Yes, ma'am.
2    Q. All right. Tell me about your
3      involvement pre-presentation. What all
4      did you do?
5    A. Listened in on a number of phone calls,
6      conference calls. At that time, Mark
7      Smith had given us -- on the Wachovia
8      account, all of our managers, wanted us
9      to go look at some sample branches. So
10     we went and toured sample branches to
11     see what condition they were in.
12   Q. Are you talking sample BB&T branches?
13   A. Yes, ma'am.
14   Q. I'm sorry. Go ahead.
15   A. And again, just several conference
16     calls regarding the presentation.
17   Q. At this point, pre-presentation, were
18     you talking to any potential vendors?
19   A. I was not. I was still working on the
20     Wachovia account.
21   Q. Who was the main person responsible for
22     the BB&T presentation?
23   A. Alan Cristal.

Page 22

1    Q. Do you know who the main, around the
2      time of the presentation, who the main
3      contact with BB&T was?
4    A. Ronny Eller.
5    Q. What format was this presentation in?
6      And by that, I mean was it, like, a
7      bound little presentation or was it a
8      Power Point presentation?
9    A. I believe it was both. I believe we
10     gave them copies of the Power Point
11     slides, but it was a Power Point
12     presentation.
13   Q. At the time of the presentation, had
14     you seen the request for proposal from
15     BB&T?
16   A. At the time of the presentation?
17   Q. Yes, sir.
18   A. I had not.
19   Q. Were you aware at the time of the
20     presentation of what work BB&T was
21     requesting from EMCOR?
22   A. By the time we did the presentation,
23     yes.

Page 23

1    Q. Tell me what your understanding was of
2      what BB&T was looking for.
3        MR. SAWYER: Objection.
4          Vague. You can answer
5          if you know.
6    A. Could you restate the question, please?
7    Q. Sure. What I'm asking is, at the time
8      of the presentation, what was your
9      understanding of what BB&T was looking
10     to hire to be done?
11       MR. SAWYER: Scopes of work,
12         Counsel? I don't want
13         to mess up your
14         question. Are you
15         referring to scopes of
16         work?
17       MS. TULEY: No. Let me make
18         it a little clearer.
19   Q. What was your understanding of what
20     BB&T was looking to put in place, just
21     from whatever understanding you have?
22       MR. SAWYER: Same objection.
23         You can answer if you

Page 24

1      know.
2    A. To consolidate services for their
3      branches and janitorial, landscaping,
4      and maintenance, mobile maintenance
5      services.
6    Q. Let me make sure I caught that.
7        MR. SAWYER: Off the record.
8        (Off-the-record discussion)
9    Q. The three areas that they wanted to
10     consolidate service for the branches, I
11     think you said, was janitorial,
12     landscaping, and mobile maintenance?
13   A. Yes, ma'am.
14   Q. At the time of the proposal, did you
15     know about how many branches y'all were
16     talking about?
17   A. By the time we did the presentation,
18     yes.
19   Q. About how many branches was that?
20   A. Fourteen hundred and eight.
21   Q. Had you ever worked on a project that
22     entailed that many locations?
23   A. No, ma'am.

6 (Pages 21 to 24)

Page 25

1  Q. Do you know if EMCOR as a company had
2     worked on an account that had that many
3     locations?
4  A. I don't have specific knowledge of
5     that, but I understand that they did.
6  Q. I want to back up to something you said
7     just a minute. How many of those
8     sample branch tours did you do?
9  A. Personally?
10  Q. Yes, sir.
11  A. Two or three.
12  Q. Do you know how many were done by EMCOR
13     as a whole?
14  A. I do not. I believe the number was
15     somewhere around fifty.
16  Q. How did y'all select which ones to go
17     tour?
18  A. BB&T selected them for us.
19  Q. And which ones did you go to?
20  A. I don't remember.
21  Q. That's fair enough. Did you take any
22     notes of your tours?
23  A. They had given us a form; EMCOR, Mark

Page 26

1     Smith at the time, had given us a form
2     to complete. Just a basic facility
3     assessment is what I would call it.
4  Q. What was your impression of the shape
5     that the BB&T branches were in that you
6     toured?
7  A. One was actually in pretty sad shape.
8     It -- and I will go back and say this
9     one was in -- I believe it was in
10     Danville, Virginia. Mechanically, it
11     appeared to be a mess.
12  Q. I'm not a facility person. So when you
13     say "mechanically," what are you
14     talking about?
15  A. The -- several lights were out, so
16     either bulbs or ballasts were out.
17     The -- in one place, they had tape over
18     breakers. The mechanical room, which
19     houses the heating, air conditioning,
20     there was a pump leaking, a seal; and
21     just from my prior knowledge, it
22     sounded like a bearing was going bad.
23     And the room had not been cleaned --

Page 27

1     spider webs, dust, just a mess.
2  Q. Since there was -- all right. Let me
3     ask you this. What was your impression
4     of the landscaping at that location?
5  A. At that location, there was very
6     little.
7  Q. And what was your impression of the
8     janitorial work at that location?
9  A. Fair.
10  Q. And I guess it would make sense at this
11     point to ask you, how were these
12     branches -- how were they obtaining
13     these services at this point before
14     BB&T entered into this contract with
15     EMCOR?
16     MR. SAWYER: Object --
17  A. I don't specifically know.
18     MR. SAWYER: Object to the
19     form. You can answer if
20     you know.
21     THE WITNESS: I apologize.
22  A. I don't specifically know.
23  Q. And let me just ask you. And you

Page 28

1     probably just told me the answer to it.
2     But let's just say at the Danville
3     location, was that branch contracting
4     for their own landscaping?
5  A. I have no idea.
6  Q. At any point during your work on this
7     BB&T project, did you become aware of
8     how these branches were taking care of
9     getting their janitorial, landscaping,
10     mechanical work done?
11  A. Yes.
12  Q. Tell me what your understanding of that
13     is.
14  A. My understanding is that in -- and it
15     was different across their footprint.
16     In some locations, the financial center
17     manager went out and hired someone. In
18     other locations, an area operations
19     officer or a regional banking
20     operations manager made those
21     decisions.
22  Q. And would a financial center manager,
23     would that be the person responsible

Page 29

1    for that particular branch?
2    A. Yes, ma'am.
3    Q. And then the area operations officer
4       would be responsible for maybe multiple
5       branches?
6    A. That's my understanding, yes, ma'am.
7    Q. But it would be fair to say that it was
8       not -- BB&T was not doing this at,
9       like, a high corporate level; like, one
10      of the vice presidents wasn't hiring it
11      for all the branches?
12   A. Did not appear so, no, ma'am.
13   Q. Do you remember any specifics from any
14      of the other branches you toured?
15   A. There was only one or two others. And
16      no, I don't.
17   Q. Did you talk to anybody else that did
18      these tours about their impression of
19      the branches?
20   A. No, I did not.
21   Q. Who did you turn in the facility form
22      that you filled out?
23   A. To my boss at the time, Cathy Hice, who

Page 30

1    presumably turned them back over to
2    Mark.
3    Q. That's Mark Smith?
4    A. Yes, ma'am.
5    Q. When you went and helped give the
6       presentation to BB&T, the proposal from
7       EMCOR had already been sent to BB&T; is
8       that correct?
9    A. I assume so since we had been selected
10      as a finalist.
11   Q. Do you know how many finalists they
12      selected?
13   A. I do not.
14   Q. Were you involved in any way in the
15      drafting of EMCOR's proposal to BB&T?
16   A. No, ma'am.
17   Q. Do you know who was?
18   A. No, ma'am. I can say that Alan Cristal
19      as the business development manager
20      would have led that effort.
21   Q. After you gave the proposal, what was
22      the next thing that happened that you
23      were involved in relative to the BB&T

Page 31

1    project?
2    A. I actually received a phone call on my
3       personal cell -- or on my cell phone
4       from Ronny Eller wanting the phone
5       number for Bill Rogers, who was the
6       president of EFS, to discuss some
7       issues or concerns he had regarding the
8       proposal or the presentation. And I
9       was -- I passed that up to Mark Smith.
10   Q. Did Mr. Eller tell you what the things
11      he wanted to discuss were?
12   A. He did not.
13   Q. Do you know what came of the
14      conversation that Ronny Eller had with
15      EFS's president?
16   A. I do not.
17   Q. What was Ronny Eller's position?
18   A. I don't know his title. He was running
19      the effort for BB&T to implement this
20      program.
21   Q. What was Mark Smith's position in
22      EMCOR?
23   A. Again, I don't know the title. But he

Page 32

1    was basically -- had several account
2    managers, Cathy Hice being one of
3    those, reporting to him. He had three
4    or four accounts, I believe.
5    Q. All right. Tell me what your next
6       involvement was with the BB&T project
7       after that phone call.
8    A. At some point thereafter, we were
9       awarded the project and I started
10      attending conference calls regarding
11      start-up.
12   Q. Let me ask you this. What is your
13      practice, just in general, regarding
14      conference calls? Do you keep notes?
15      Do you do memos to file? I mean, is
16      there any kind of record that you keep
17      regarding calls you have?
18   A. No, not in general, not me personally.
19   Q. On this BB&T project, were you taking
20      any notes or were you doing any memos
21      to anybody regarding the calls you were
22      on?
23   A. If something came up, if I had been

8 (Pages 29 to 32)

Page 33

1   assigned a task or something to look
2   into, yes, I would have sent an E-mail
3   or something.  I generally don't take a
4   lot of notes on calls like that.
5   Q.  If you were going to communicate with,
6   let's say, your supervisor, would you
7   type up a formal memo or would you
8   shoot an E-mail?
9   A.  E-mail.
10  Q.  Would you be more likely to E-mail than
11  to call somebody like your supervisor?
12          MR. SAWYER:  Object to the
13          form of the question.
14          You can answer.
15  A.  It would depend on a number of
16  things -- was it an urgent matter, what
17  time of day.  I often get up in the
18  middle of the night or whatever and
19  working and presume that they would
20  rather receive an E-mail or phone call.
21  But it really depended on the
22  situation.
23  Q.  And the reason I ask is -- I'll give

Page 34

1   you an example of here.  Where I work,
2   you almost never talk to anybody.
3   Everybody E-mails.  So I didn't know
4   if, you know, the culture of EMCOR was
5   more of an E-mail or more of where
6   y'all get together and actually talk on
7   the phone or face-to-face.
8           MR. SAWYER:  Object to the
9           form of the question.
10          You can answer if you
11          know.
12  A.  And I don't -- I can't speak to the
13  culture of EMCOR.  It's really the
14  culture of the account and how the
15  account manager blends his or her team
16  together.
17  Q.  Do you know if EMCOR had ever done any
18  work for BB&T prior to this project?
19  A.  I don't know.
20  Q.  When you started to participate in
21  these calls regarding the start-up,
22  what sort of issues were y'all going
23  over in these calls?

Page 35

1   A.  We spent a great deal of time going
2   over the accounting setup -- how the
3   bills would have to be produced, how we
4   would track costs, how we would be able
5   to electronically send invoices.  There
6   was a number of very exciting
7   accounting-related phone calls.
8   Q.  Was this a particular way of sending
9   invoices that BB&T had requested?
10  A.  I don't recall if BB&T requested it or
11  we proposed it, but certainly
12  electronic submission moves things
13  along faster than paper.
14  Q.  Who would have been the main EMCOR
15  person responsible for getting this
16  accounting set up in place?
17  A.  I don't know the answer to that.
18  Q.  Do you know who the main contact with
19  BB&T on transmittal of invoices was?
20  A.  I don't.  We ran a lot of the calls
21  through the -- through their facility
22  management and maintenance group, which
23  Ronny Eller worked in, and he would

Page 36

1   provide the people necessary to address
2   whatever the issue was at the time.
3   Q.  Were y'all outsourcing any of this
4   electronic accounting or invoicing
5   work?
6   A.  No, ma'am.
7   Q.  What other issues were you going over
8   in these conference calls during the
9   start-up time?
10  A.  There was a great deal of talk
11  regarding -- and not just talk, E-mails
12  back and forth -- regarding the
13  janitorial start-up.  And BB&T had the
14  opportunity to submit to us, EMCOR,
15  which we passed along to PFMI, any
16  vendors that they wanted to recommend.
17          MR. SAWYER:  Off the record.
18          (Off-the-record discussion)
19          (Brief recess)
20          MS. TULEY:  All right.  Back
21          on the record.
22  Q.  (By Ms. Tuley) We were talking about
23  calls and E-mails and start-up time

**MERRILL LEGAL SOULTIONS**
**Court Reporting*Legal Videography*Trial Services**

Page 37

1   regarding janitorial. And
2   specifically, I think we had just
3   talked about BB&T submitting vendors
4   they wanted to be considered.
5   A. Yes, ma'am.
6   Q. What was the agreement as to what would
7   be done with their proposed vendors?
8   A. I don't have any knowledge of a
9   specific agreement except that we would
10  consider or look at vendors where they
11  were in need. And in this case, I say
12  "we." Whatever PFMI's needs are.
13  Q. SO the process would be -- and just
14  correct me if I'm paraphrasing this
15  wrong -- BB&T would have some vendors
16  that they wanted considered. They
17  would transmit that list to you as
18  EMCOR, and then EMCOR would transmit
19  that to PFMI?
20  A. That's correct.
21  Q. What was the understanding between
22  EMCOR and PFMI of what EMCOR wanted
23  PFMI to do with that list?

Page 38

1           MR. SAWYER: Object to the
2               form of the question.
3               You can answer.
4   A. We were providing just as a basis of
5   information. If they needed a vendor
6   in a spot, here's one that they should
7   consider.
8   Q. Was PFMI required to interview all of
9   the suggested vendors from BB&T?
10          MR. SAWYER: By EMCOR?
11          MS. TULEY: Yes.
12  A. Required by EMCOR to interview --
13  Q. To interview all of those suggested
14  vendors.
15  A. I don't believe so, no, ma'am.
16  Q. And to back up just a little bit, were
17  you involved in the selection of PFMI
18  to be the janitorial vendor?
19  A. No, ma'am.
20  Q. Do you know who was involved with that?
21  A. Alan Cristal led the entire effort.
22  Q. And I probably already know the answer
23  to this. Did you look -- did you see

Page 39

1   any of the proposals or bids from
2   janitorial services for the BB&T
3   contract?
4   A. No, ma'am.
5   Q. Did anybody tell you why PFMI was
6   selected?
7   A. No, ma'am. The first -- in fact, the
8   only thing I recall is Alan Cristal
9   saying we have selected PFMI.
10  Q. Okay. Do you know who any of the other
11  janitorial companies were that
12  submitted proposals?
13  A. No, ma'am.
14  Q. I take it from these calls and E-mails
15  regarding potential vendors that you
16  were aware that PFMI would use vendors
17  or subcontractors to do a good bit of
18  this janitorial work; is that correct?
19          MR. SAWYER: Object to the
20              form of the question.
21              You can answer if you
22              know.
23  A. I believe I understood that they would

Page 40

1   be subcontracting out that work, yes,
2   ma'am.
3   Q. And let me ask it maybe a better way.
4   Was it your understanding in the
5   start-up process that PFMI would be
6   self-performing all the cleaning
7   duties?
8   A. In the presentation, it was presented
9   that they would self-perform a majority
10  of that work. Yes, ma'am.
11  Q. And by "self-perform," it was your
12  understanding or was it your
13  understanding that PFMI would actually
14  have PFMI people doing the cleaning?
15  A. That's my understanding of
16  self-perform.
17  Q. I'm not a janitorial person, so I like
18  to be clear. But you were aware that
19  they would use vendors or
20  subcontractors for some of the
21  cleaning?
22  A. At the point I was assigned to the
23  contract, yes.

**1933 Richard Arrington Jr. blvd, S*Birmingham, AL 35209*www.merrillcorp.com**
**1-800-888-DEPO**

Page 41

1  Q. During this time, once you were
2     assigned to the contract, were there
3     discussions regarding the amount of
4     square footage to be cleaned?
5  A. In what manner?
6  Q. As far as my understanding -- well, let
7     me strike that.
8        Do you know how EMCOR was to be
9     paid under the contract with BB&T?
10 A. I didn't have anything to do with how
11    that deal was struck, if you will.
12    However, regarding square footage, it
13    was on gross square footage at the
14    beginning through the first ninety days
15    of the contract.
16 Q. And was that how EMCOR was to be paid
17    by BB&T?
18 A. I believe that that is correct.
19 Q. And would that just be for the
20    janitorial work or would that be for
21    the entire contract?
22 A. Janitorial was all we were doing at the
23    beginning of the contract.

Page 42

1  Q. At some point, did landscaping and the
2     mechanical feed into the contract to
3     start being performed?
4  A. It was phased work and yes, that was
5     phase two of the contract.
6  Q. So phase one would have been
7     implementing janitorial?
8  A. That's correct.
9  Q. And what was the time line for that
10    implementation of the janitorial work?
11 A. That all 1400 locations would start up
12    during the -- and I apologize here.
13    Memorial Day weekend at the beginning
14    of the summer, in September? Excuse
15    me. Is it Labor Day?
16 Q. Labor Day at the end of --
17 A. Labor Day at the end of summer,
18    beginning of September.
19 Q. And then at what point was it
20    contemplated that there be full
21    implementation of the janitorial?
22 A. Full implementation was that weekend.
23 Q. That was a bad question. Was there a

Page 43

1     transition period for all of the
2     janitorial not to just be in place but
3     to be fully performing?
4        MR. SAWYER:  Object to the
5        form of the question.
6        You can answer.
7  A. Yes.  There was a -- in conjunction
8     with Keith Blackburn, who was my
9     representative with PFMI, the account
10    manager, if you will, we developed a
11    ninety-day implementation plan.
12 Q. All right.  Tell me what was supposed
13    to happen during those ninety days.
14 A. The first thirty days were getting the
15    branches covered, you know, performing
16    in the branches, completing training.
17    I really don't recall the sixty-day.
18    And I believe inspections were at the
19    ninety-day mark.
20 Q. Who would be conducting the
21    inspections?
22 A. PFMI.
23 Q. Would that be some type of written

Page 44

1     inspection form?
2  A. Yes, ma'am.
3  Q. During those ninety days, how was EMCOR
4     paying PFMI?  On what basis was EMCOR
5     paying PFMI?
6  A. PFMI would submit an invoice to EMCOR.
7     EMCOR would submit it to BB&T.  BB&T
8     would pay us, and then we would turn
9     around and pay PFMI.
10 Q. Was the invoice submitted by PFMI to
11    EMCOR based on a particular rate per
12    square foot?
13 A. Yes.  There were -- depending on the
14    location.
15 Q. So some locations had a different rate
16    than others?
17 A. That's correct.
18 Q. But all of it would have been whatever
19    that rate is times the square foot in
20    that facility?
21 A. Yes.
22 Q. Originally, when this project started,
23    Labor Day weekend, what was the total

**MERRILL LEGAL SOULTIONS**
**Court Reporting*Legal Videography*Trial Services**

Page 45

1  square footage of the contract?
2      MR. SAWYER:  Object to the
3      form of the question.
4      You can answer.
5  A. I believe it was somewhere around six
6  and a half million.
7  Q. Was there some type of listing that
8  showed what the location was and what
9  the square footage for that location
10  was?
11  A. Yes.
12  Q. What was that document called?
13  A. I would call it a master locations
14  list.
15  Q. Do you know where that -- we'll call it
16  the master locations list.  Where did
17  that document come from?
18  A. BB&T.
19  Q. Do you know how they created that
20  document?  And I don't mean, like, what
21  computer formula.  But where did they
22  get the information to create that
23  document?

Page 46

1  A. I do not know.
2  Q. Do you know who created that document?
3  A. I do not.
4  Q. Who at EMCOR would know, would be the
5  most knowledgeable about that master
6  location list?
7  A. I would have to say Alan Cristal.
8  Q. What was your understanding there at
9  the beginning of the project of what --
10  of the accuracy of those square-footage
11  numbers?
12      MR. SAWYER:  Object to the
13      foundation and form.
14      You can answer.
15  A. Would you re-ask the question, please?
16  Q. Sure.  There at the beginning of the
17  project, what was your understanding of
18  accuracy of those square-footage
19  numbers?
20      MR. SAWYER:  Same
21      objections.
22  A. I don't know that I had an
23  understanding about the accuracy of the

Page 47

1  numbers, the gross numbers that were
2  provided.  They were not comfortable --
3  they being BB&T -- were not comfortable
4  with their net numbers but . . .
5  Q. And tell me how you -- well, strike
6  that part.
7      When you say "gross" versus
8  "net," explain that to me.
9  A. My understanding, gross is total space.
10  Net would be the amount of what I might
11  term net cleanable space in this
12  instance.  Would be any rooms --
13  closets, mechanical rooms, storage
14  rooms -- that are not cleaned, would be
15  deducted.
16  Q. What is the standard way in which net
17  cleanable square footage is measured?
18  A. Well, again, you take the total space,
19  measure the room, and then deduct out
20  any -- any space that's not cleaned.
21  In other words, if you have a
22  twelve-by-twelve room, which is 144
23  square feet, and there's a ten-by-three

Page 48

1  closet in there that is not cleaned,
2  that's 30 square feet that would be
3  deducted from that space to be cleaned.
4  Q. All right.  Let me ask you this.  If
5  you have, like, an entire building,
6  like an entire branch bank, would you,
7  to figure out the gross, just take the
8  front by the side and measure the front
9  by the side and then multiply that to
10  come up with your gross space?
11  A. You actually have to measure the entire
12  building, because you have to take into
13  account odd angles and things like
14  that.
15  Q. Do that on the exterior?
16  A. Exterior and then go inside and measure
17  the space to be deducted.
18  Q. Was there any type of document that
19  stated what space was to be deducted
20  from the gross square footage?
21  A. From whom?
22  Q. Let me ask it a better way.  I think
23  what you had told me a minute ago --

12 (Pages 45 to 48)

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 49

1   and I'm paraphrasing, so correct me if
2   I'm wrong -- was that BB&T was not
3   completely comfortable with what you
4   called the net square footage; is that
5   fair?
6   A. Yes.
7   Q. What gave you that idea that BB&T
8       wasn't comfortable with that number?
9   A. The fact that they had asked EMCOR to
10      make sure that the janitorial service
11      provider would within the first ninety
12      days of the contract go and measure the
13      space to provide the net cleanable
14      numbers, which would then become the
15      billing numbers.
16  Q. Did BB&T provide any guidance, either
17      written or verbal, as to what they
18      wanted deducted from the gross
19      cleanable square footage?
20  A. Not to my recollection, no.
21  Q. Did EMCOR provide PFMI, either written
22      or verbal, any instructions as to what
23      EMCOR expected PFMI to deduct from the

Page 50

1   gross square footage to come up with a
2   net?
3   A. Not that I recall.
4   Q. Was EMCOR going to do any of its own
5       square-footage measurements to compare
6       those to measurements done by PFMI?
7   A. It was not planned, no.
8   Q. Did that in fact happen?
9   A. Yes.
10  Q. Tell me why.
11  A. When the numbers were submitted to
12      us -- and I believe that was in mid
13      December -- the bulk of the numbers
14      submitted were exactly the same as the
15      gross square-footage numbers and in a
16      few cases, higher.
17  Q. Who did the analysis to compare PFMI's
18      numbers to the original numbers
19      submitted by BB&T?
20  A. I did. It was presented on the
21      spreadsheet that -- on the master
22      location list, actually. They just
23      took and added a column for net

Page 51

1   cleanable or populated a column for net
2   cleanable.
3   Q. Were the numbers on the master location
4       list from BB&T, were they all gross
5       square footage or were some of them
6       gross, some of them net?
7           MR. SAWYER: You can answer
8               to the best of your
9               recollection.
10  A. I recall the gross number being on
11      there. There was also a column for
12      vacant space and adjusted.
13  Q. And adjusted?
14  A. Yes, ma'am.
15  Q. And by vacant space, would that be,
16      like, empty offices?
17  A. Typically, it was half, like, a floor
18      or half a floor. But it could include
19      empty offices, offices that were not
20      being used.
21  Q. And when you said -- and you just told
22      me that sometime in mid December, PFMI
23      submitted their measurements. And you

Page 52

1   said they were the same as the gross
2   square footage or the adjustable square
3   footage?
4           MR. SAWYER: Object to the
5               extent it misstates
6               prior testimony. You
7               can answer.
8   A. The -- I believe what I said was the
9       numbers were coming in -- the net
10      cleanable numbers presented were coming
11      in the same as the gross numbers.
12  Q. Did that concern you?
13  A. Yes.
14  Q. Tell me why.
15  A. It concerned me because it is highly
16      unlikely that there would not be some
17      reduction in square footage. And to
18      me, it was fairly obvious that either
19      the exercise wasn't completed or wasn't
20      completed accurately. And since that
21      was the basis for billing going
22      forward, that was a major concern.
23  Q. Did you or EMCOR have a percentage in

13 (Pages 49 to 52)

| Page 53 |
|---|
| 1  mind that the -- that would have been |
| 2  the difference between what was the |
| 3  gross and what would eventually be the |
| 4  net? |
| 5  A. I don't -- I can't speak for EMCOR. I |
| 6  really wasn't sure, not having dealt |
| 7  with branch locations before, what that |
| 8  percentage would have been. |
| 9  Q. Did you ever see anything, either an |
| 10  E-mail or memo or some document, that |
| 11  said something to the effect of we |
| 12  think there will be a 5 percent, 10 |
| 13  percent, 15 percent difference or any |
| 14  number? |
| 15  A. That's certainly possible. Not that I |
| 16  recall. |
| 17  Q. You don't recall any specific number |
| 18  that -- the difference that was |
| 19  expected? |
| 20  A. Not that I recall, no, ma'am. |
| 21  Q. In your mind, did you have a number |
| 22  that you thought would have been likely |
| 23  a reasonable difference? |

| Page 54 |
|---|
| 1  A. Well, again, I wasn't sure regarding |
| 2  the branch locations. However, if I |
| 3  were to put forward a guess, it would |
| 4  be, you know, 10 or 15 percent. And it |
| 5  varies by location. |
| 6  Q. Did you ever see anything from BB&T or |
| 7  were you ever involved in any of the |
| 8  discussions with anyone at BB&T where |
| 9  BB&T had in mind what they thought the |
| 10  difference between gross and net would |
| 11  have been or should have been? |
| 12  A. There were many discussions, and I |
| 13  don't recall what the content of those |
| 14  discussions were. |
| 15  Q. You don't recall anybody from BB&T |
| 16  saying, We think it should be an X |
| 17  percent difference? |
| 18  A. Again, with all the conversations we |
| 19  had, I just don't remember. |
| 20  Q. Once you got those numbers from PFMI |
| 21  and you had concerns because they were |
| 22  substantially the same or similar to |
| 23  the gross numbers, what did you do? |

| Page 55 |
|---|
| 1  A. I went to Ronny Eller and Edna Green, |
| 2  who was new or fairly new to the team |
| 3  at that point, and we discussed it and |
| 4  had a conference call in Ronny's office |
| 5  with Mr. Wohlers. |
| 6  Q. All right. Tell me about that call. |
| 7  A. It was really just to express the |
| 8  concern over how the numbers were |
| 9  coming in and why they came in the way |
| 10  they did. |
| 11  Q. And who was sort of the main person |
| 12  having the discussion? Was it you or |
| 13  was it Mr. Eller? |
| 14  A. It was probably both of us. |
| 15  Q. All right. What was the response you |
| 16  got? |
| 17  A. I believe in that call, we came up with |
| 18  basically a couple of options: One, |
| 19  BB&T could go out and measure the space |
| 20  and pay for it; or, two, that we would |
| 21  have our mobile technicians measure the |
| 22  space once they came on board. |
| 23  Q. And this would have been -- this would |

| Page 56 |
|---|
| 1  have been in the mid-December time |
| 2  frame when this call happened? |
| 3  A. Yes, ma'am. |
| 4  Q. Did EMCOR continue to pay BB&T off the |
| 5  gross numbers -- gross square-footage |
| 6  numbers? |
| 7  A. EMCOR didn't pay BB&T. |
| 8  Q. I'm sorry. Did EMCOR continue to pay |
| 9  PFMI off the gross square-footage |
| 10  numbers? |
| 11  A. Yes, ma'am, I believe that happened. |
| 12  Q. In any of the discussions you had up |
| 13  through mid December of -- that would |
| 14  have been '05? |
| 15  A. Yes, ma'am. |
| 16  Q. -- was there any talk about what would |
| 17  happen once the final net cleanable |
| 18  square-footage numbers came in as far |
| 19  as adjustments for over- or |
| 20  underbilling? |
| 21  A. Yes, ma'am. We were going to what I |
| 22  would call "true up" the numbers in the |
| 23  billing back to November 1st. |

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

## Page 57

1  Q. Was this outlined in any agreement
2     between EMCOR and PFMI?
3  A. There were E-mails talking about the
4     square -- the measurement process and
5     that there would be a true-up. We did
6     have a letter from PFMI stating their
7     understanding that the true-up would go
8     back to November 1.
9  Q. And do you know if PFMI on either the
10    December or January -- December '05 or
11    January '06 bill gave a credit back to
12    EMCOR?
13 A. Specifically for what?
14 Q. As an adjustment for what everybody
15    kind of anticipated would be -- let's
16    just strike that. Let's do a better
17    job of this.
18       Do you know if PFMI gave a
19    credit to EMCOR on either the December
20    '05 or January '06 bill for any
21    differences in square footage?
22 A. There were a lot of credits going back
23    and forth, missed services, things of

## Page 58

1     that nature. I have a vague
2     recollection, but I couldn't speak to
3     it. A year and half ago, that's . . .
4  Q. In any of the discussions that you had
5     with BB&T or with anybody at EMCOR, did
6     you ever -- were you ever informed that
7     there was a certain either ceiling or
8     floor amount that BB&T wanted to pay
9     for janitorial services?
10 A. I don't know where I heard it or where
11    it was documented. But I believe the
12    average they wanted to keep in the
13    dollar thirty range, I believe.
14 Q. That would have been a dollar thirty
15    per square foot?
16 A. Per square foot, which is per year.
17 Q. Did you hear, in any of your
18    conversations or in E-mails or
19    anything, what their total budget would
20    have been for a year for janitorial?
21    And by "they," I mean BB&T.
22 A. I don't believe so, no, ma'am. Not
23    that I recall, anyway.

## Page 59

1  Q. In any discussions with BB&T or anybody
2     at EMCOR, did you ever hear any
3     discussions where part of the -- where
4     it was discussed if part of the reason
5     that BB&T wanted this project was to
6     reduce facility costs?
7  A. I believe that was one of their stated
8     goals, yes, ma'am.
9  Q. And was that something that was in a
10    document that you saw or was that from
11    discussions?
12 A. I'm going to say it was more
13    discussions.
14 Q. Did anybody tell you or did you ever
15    see a document that showed what their
16    facilities costs were prior to the
17    beginning of this contract?
18 A. Not that I recall, no, ma'am.
19 Q. All right. Tell me, after that
20    conference call with you, Ronny, Edna,
21    and Jim, what was the next step that
22    EMCOR took regarding the square-footage
23    issue?

## Page 60

1  A. We didn't do anything else until our
2     mobile techs were hired, which began in
3     mid February of '06.
4  Q. I'm sorry. You said mid January?
5  A. February.
6  Q. Mid February?
7  A. Yes, ma'am.
8  Q. Were these mobile techs EMCOR
9     employees?
10 A. Yes, ma'am.
11 Q. What were the -- we'll skip the square-
12    footage situation for now. What were
13    the mobile techs' duties and
14    responsibilities?
15 A. We would visit the branches at least
16    once a month and perform what we call
17    PM, or preventive maintenance, duties.
18    For instance, on an air conditioner,
19    check the belts, replace the filters if
20    we needed to. Any plumbing, if a
21    toilet was leaking or the flush valve
22    was leaking, we would repair those.
23    Basic light -- lighting ballasts

1933 Richard Arrington Jr. blvd, S*Birmingham, AL 35209*www.merrillcorp.com
1-800-888-DEPO

Page 61

1    repair; if the lights were out and it
2    wasn't the bulb, we would replace the
3    ballast. Any number of general duties
4    that would be created by a work order
5    that the client submitted -- hang a
6    board, hang a banner. Branches often
7    have these big advertising banners that
8    they want hung, that kind of thing.
9  Q. Okay. Based on our earlier
10    conversation, at some point these
11    mobile techs were enlisted to do
12    measurements of the BB&T branches; is
13    that correct?
14  A. Yes, ma'am.
15  Q. What instructions were given to these
16    mobile techs as to how to do the
17    measurements?
18  A. We gave them -- I recall one E-mail
19    where I said, This may seem simple, but
20    you take the measurements of the room
21    that is not to be cleaned and deduct it
22    from the gross square-footage number.
23  Q. Were they responsible for taking the

Page 62

1    gross square-footage measurements or
2    were they just going to -- were they
3    going to use what had been provided by
4    BB&T as the gross?
5  A. Initially we were using what was
6    provided by BB&T.
7  Q. How were the techs to determine what
8    was unused space?
9  A. If -- if there was a vacant floor, for
10    instance, that would have been noted.
11    A janitorial closet or storage closet
12    or electrical room or a small
13    mechanical room is typically what would
14    have been deducted out of those
15    numbers.
16  Q. Were those instructions included in the
17    E-mail as to how to -- what to deduct?
18  A. I don't recall.
19  Q. Who was the supervisor of the mobile
20    techs?
21  A. I had seven regional managers.
22  Q. Were the mobile techs ultimately under
23    your supervision as the BB&T project

Page 63

1    person?
2  A. Yes.
3  Q. And then you would have seven regional
4    managers, and the mobile techs in that
5    region would answer to that manager?
6  A. That's correct.
7  Q. Then that manager would pass things up
8    the chain to you next?
9  A. Yes, ma'am.
10  Q. And I think somewhere in all this I've
11    got an organizational chart we can go
12    over later.
13        Did the mobile techs measure all
14    of the branches?
15  A. No, ma'am.
16  Q. How was it determined which branches
17    the mobile techs would go measure?
18  A. First of all, we measured anything that
19    was over 10,000 square feet. And there
20    was a sampling of branches that fit
21    into a five-to-10,000-square-foot
22    category and then an under-5,000-
23    square-foot category.

Page 64

1  Q. Do you have an estimate of how many
2    branches the mobile techs measured?
3  A. Several hundred. But I don't.
4  Q. Do you know if the mobile techs
5    measured any of the locations more than
6    once?
7  A. I believe there were several
8    remeasurements. But in a
9    remeasurement, we assigned that to my
10    regional manager.
11  Q. What would be the purpose of a
12    remeasure?
13  A. For instance, to verify whether the
14    numbers were accurate, was something
15    left off, was something not accounted
16    for. I recall one instance where there
17    was a room not being used, and this was
18    in Crystal City. We didn't count that.
19    But it was under lease and so the
20    number provided BB&T, which may have
21    come from the lease, as a gross number
22    included that room; but it was not
23    measured because we didn't know about

16 (Pages 61 to 64)

**MERRILL LEGAL SOULTIONS**
**Court Reporting*Legal Videography*Trial Services**

Page 65

```
1       it.
2    Q. And I believe you said your regional
3       managers would have done the remeasure?
4    A. The remeasure, with a BB&T
5       representative.
6    Q. Would the BB&T representative have been
7       somebody from that branch or would it
8       have been somebody further up the
9       chain?
10   A. I believe the instructions were that it
11      had to be someone from their facility
12      department if they were available.
13   Q. Tell me who your seven regional
14      managers are.
15   A. Michael Crouse, C-R-O-U-S-E; Rebecca
16      Walraven; Timothy Carlisle,
17      C-A-R-L-I-S-L-E; Don Winterton. Don
18      was replaced by Steven Buckhalter later
19      in the program. But he was a regional
20      manager. Jim Maxey.
21         MR. SAWYER: M-A-X?
22         THE WITNESS: E-Y.
23   A. Robert Goodwin; Donald Boyd, B-O-Y-D.
```

Page 66

```
1       Is that everybody?
2    Q. Yeah, that's seven.
3    A. Okay.
4    Q. Were any of these seven regional
5       managers hired specifically for this
6       BB&T project?
7    A. They were all hired specifically for
8       the BB&T project, specifically for
9       mobile maintenance.
10   Q. And this question may be redundant.
11      But none of those seven you listed had
12      been existing EMCOR employees; is that
13      correct? Let me ask it this way.
14      Before the BB&T contract, were any of
15      those seven people you just listed
16      EMCOR employees?
17   A. Not at the time they came over. But
18      Donald Boyd, who was working for BB&T
19      at the time, had been an EMCOR employee
20      through one of EMCOR's companies, Viox.
21   Q. And so everyone else would have been --
22      the other six would have been hired for
23      the BB&T project?
```

Page 67

```
1    A. From the outside?
2    Q. Yes.
3    A. Yes. Michael Crouse is another one who
4       I don't know if there was -- he had
5       been an EMCOR employee on another
6       account, but I don't know if there was
7       a gap in his employment. I don't
8       recall if there had been a gap in his
9       employment or not.
10   Q. Do you know who hired these folks?
11   A. I did.
12   Q. And I think you said they were hired
13      for the mobile techs --
14   A. They were hired --
15   Q. -- to be supervisors of the mobile
16      techs?
17   A. That is correct.
18   Q. What process did you go through to hire
19      these people?
20   A. Ads were placed, resumés were viewed.
21      I used other EMCOR people to help me
22      get to -- if there was a finalist. For
23      instance, Mark Smith interviewed Bob
```

Page 68

```
1       Goodwin initially. I can't think of
2       his name. Paul Wilbur interviewed
3       Donald Boyd for me.
4    Q. Were you looking for any type of
5       specific experience in the folks you
6       hired?
7    A. Prior supervision responsibilities of
8       maintenance people, understanding of
9       basic maintenance-type operations.
10   Q. On a day-to-day basis, would those
11      seven regional managers be involved in
12      the janitorial aspect of the contract?
13   A. That was not the intent, no.
14   Q. Do you know if any of those seven
15      regional people had any experience in
16      measuring or calculating cleanable
17      square footage?
18   A. I don't know.
19   Q. What were the results of the mobile
20      techs' square-footage measurements?
21   A. There was a significant reduction in
22      square footage on the over-10,000-
23      square-foot buildings, close to 30
```

17 (Pages 65 to 68)

**MERRILL LEGAL SOULTIONS**
**Court Reporting*Legal Videography*Trial Services**

Page 69

1    percent. And I don't recall the exact
2    numbers on the other two categories.
3    Those large buildings represented
4    approximately a third of the total
5    square footage.
6    Q. Did it surprise you that the difference
7    was so large between the gross and the
8    cleanable in those large buildings?
9    A. Probably less in the large buildings.
10   I was surprised that there was a
11   difference, but I don't recall if those
12   were because of vacant space or just
13   the way a particular building had been
14   designed, maybe with a lot of closets
15   or storage spaces, which would affect
16   your cleanable.
17   Q. What was the overall percentage of
18   square-footage reduction based on the
19   mobile techs' measurements?
20   A. Again, I don't recall what the other
21   two came in at, so I don't really
22   recall what that percentage was or the
23   square footage reduction was.

Page 70

1    Q. Did you feel more comfortable with the
2    mobile techs' measurements than you did
3    with PFMI's measurements?
4    A. Yes.
5    Q. Tell me why.
6    A. One, it was -- I was confident that the
7    buildings that they were sent to
8    measure had been measured, and they
9    didn't come back with an exact same
10   number as was presented when PFMI
11   submitted their numbers from -- as a
12   net cleanable to the gross.
13        MR. SAWYER: You finished?
14        THE WITNESS: Yes.
15   Q. Did you talk with any of the mobile
16   techs about the measurements they had
17   done?
18   A. I don't recall talking to the mobile
19   techs. I would have communicated
20   through the regional managers.
21   Q. How did the mobile techs report the
22   numbers that they were measuring back
23   up to you?

Page 71

1    A. I believe it was either on the list
2    that identified the property ID --
3    there was a number assigned to identify
4    this property from another -- and the
5    square footage, the net cleanable
6    square footage.
7    Q. Would it have been --
8    A. And that list --
9    Q. Go ahead. Finish up.
10   A. That list would have been compiled by
11   my administrative assistant.
12   Q. Did the mobile techs have some form
13   they filled out?
14   A. There was a form, yes. And I believe
15   it was so they could go from floor to
16   floor or make notes.
17   Q. And just so I can kind of get the
18   process straight, would they have taken
19   this form, each branch would have had a
20   form filled out, then those forms would
21   have been submitted to the regional
22   manager?
23   A. Yes.

Page 72

1    Q. Then would the regional manager compile
2    that or would she just send the form
3    straight to your assistant?
4    A. They did it both ways.
5    Q. But at some point, all of that data was
6    compiled by your assistant into a
7    spreadsheet format?
8    A. Back onto that master location list,
9    yes.
10   Q. So there would have been just another
11   column?
12   A. Another column. Remeasured, I believe,
13   was the title of that column but . . .
14   Q. As this remeasure project was going on,
15   were you or was anybody else in EMCOR
16   reporting the results back to BB&T?
17   A. Yes.
18   Q. Who would you have been reporting those
19   results back to?
20   A. At that time, Edna Green, I believe.
21   Q. What was Edna's position?
22   A. I don't know her title, but she became
23   the liaison.

18 (Pages 69 to 72)

**MERRILL LEGAL SOULTIONS**
**Court Reporting*Legal Videography*Trial Services**

---

Page 73

1    Q.  The liaison between EMCOR and BB&T?
2    A.  Between myself and BB&T.  We worked in
3         the same office.
4    Q.  Were you in a BB&T office building at
5         that time?
6    A.  Yes.
7    Q.  Who else -- what other EMCOR employees
8         were located in that BB&T building?
9    A.  My assistant, Lynn Wilson, and two
10        accounting people.  There was also a
11        space for my regional manager, Tim
12        Carlisle, because he had the -- that
13        was the central point for the region
14        that he was responsible for.  He wasn't
15        always there, but there was a desk
16        there for him.
17   Q.  I'm going to go back through this list
18        of your seven regional managers and
19        just ask you the same question for all
20        of them, if they are still an EMCOR
21        employee.  And so I'll just list them
22        out for you.  Robert Goodwin?
23   A.  Yes.

Page 74

1    Q.  Donald Boyd?
2    A.  Yes.
3    Q.  Michael Crouse?
4    A.  I don't know.  I lost touch with
5         Michael.
6    Q.  Rebecca Walraven?
7    A.  No.
8    Q.  Timothy Carlisle?
9    A.  No.  No.
10   Q.  Steven Buckhalter?
11   A.  No.
12   Q.  Jim Maxey?
13   A.  No.
14   Q.  Do you know if Edna Green is still at
15        BB&T?
16   A.  Last I heard, she was.
17   Q.  Is Lynn Wilson still with EMCOR?
18   A.  No.
19   Q.  When you reported back the final mobile
20        tech measurements to Edna Green, did
21        she take any action as far as billing
22        credits or asking for an adjustment
23        from PFMI?

Page 75

1    A.  I believe that was -- yes, to answer
2         that.
3    Q.  How far back was BB&T wanting to go
4         with that adjustment?  And by "back," I
5         mean in time.
6    A.  November 1st of 2005.
7    Q.  Do you know who calculated that
8         adjustment?
9    A.  I believe it was the person on Edna's
10        team, Hai, H-A-I, Falor, F-A-L-O-R.
11   Q.  And that would have been a BB&T person?
12   A.  Yes.
13   Q.  Do you know what the calculation, what
14        that came out to be of the adjustment
15        that BB&T wanted?
16   A.  In total dollars?
17   Q.  Yes.
18   A.  I don't recall, no.
19   Q.  Were you involved in any of the
20        discussions with PFMI about that
21        adjustment?
22   A.  I'm sure I was.
23   Q.  Tell me what your recollection of those

Page 76

1         discussions was.
2    A.  The adjustment would have been based on
3         the total billed for in-scope services
4         on the net cleanable square-foot space,
5         going back to November 1st.  During
6         that period of time -- and I don't
7         recall if it was as the measurements
8         were being completed or right after
9         they had been completed but as the data
10        was coming in -- Edna Green, on behalf
11        of BB&T, instructed a 20-percent
12        reduction in service dollars of PFMI's
13        invoice.
14   Q.  Would that have been, whatever month
15        this was, that when PFMI sent that
16        month's bill, it would have been -- 20
17        percent would have been subtracted and
18        so 80 percent of that would have been
19        remitted back to PFMI?
20              MR. SAWYER:  Object to the
21              form.  You can answer.
22   A.  Of in-scope services, yes, ma'am.
23   Q.  And for how long was that to continue?

19 (Pages 73 to 76)

**MERRILL LEGAL SOULTIONS**
**Court Reporting*Legal Videography*Trial Services**

| Page 77 | Page 79 |
|---|---|
| 1   A.  Until the back payment, if you will, or | 1   final net cleanable square-footage |
| 2        the overcharge, was settled. | 2   numbers were to be agreed upon? |
| 3   Q.  Do you know how many months that the 20 | 3              MR. SAWYER:  Could you read |
| 4        percent was actually deducted? | 4         the question back for |
| 5   A.  I believe it started in March, with the | 5         me? |
| 6        first March bill.  It may have been the | 6         (The court reporter read the |
| 7        second March bill.  But it started in | 7         requested material.) |
| 8        March and continued through the | 8              MR. SAWYER:  No objection. |
| 9        termination of the agreement. | 9   A.  The agreement was that they could |
| 10  Q.  Do you know what the total deduction | 10       challenge those numbers. |
| 11       from March through the end of the | 11  Q.  Were they challenging those numbers? |
| 12       agreement worked out to be? | 12  A.  I received one challenge, I believe. |
| 13  A.  I do not. | 13  Q.  Would that have been to one location or |
| 14  Q.  Who would know that? | 14       one challenge as to a number of |
| 15  A.  It would be available through our | 15       locations? |
| 16       finance department at EMCOR. | 16  A.  I believe the challenge was in the east |
| 17  Q.  Was there a person in the finance | 17       Tennessee region, and I don't recall if |
| 18       department who had responsibility for | 18       it was one location or a number of |
| 19       the BB&T project? | 19       locations there. |
| 20  A.  Beth Goad, G-O-A-D, processed the | 20  Q.  What was the process for a challenged |
| 21       invoice, but simply that -- just | 21       location? |
| 22       processed the invoice. | 22  A.  Once challenged, that a BB&T |
| 23  Q.  In discussions you had with PFMI, what | 23       representative, a PFMI or one of their |

| Page 78 | Page 80 |
|---|---|
| 1        was their reaction to this deduction by | 1   representatives, and an EMCOR |
| 2        Edna Green? | 2   representative would go and remeasure |
| 3   A.  They were very unhappy. | 3   the space and agree at that point in |
| 4   Q.  Was there any discussion about there | 4   time. |
| 5        being a disagreement between EMCOR and | 5   Q.  Do you know if that happened where a |
| 6        PFMI as to what the actual cleanable | 6        representative from those three |
| 7        square footage was? | 7        companies got together and remeasured a |
| 8   A.  I don't specifically recall a | 8        space? |
| 9        disagreement.  I recall either an | 9   A.  I don't recall if it did or not, no, |
| 10       E-mail or a conversation that Jim | 10       ma'am. |
| 11       Wohlers and I had about being concerned | 11  Q.  What concerns about the 20-percent |
| 12       about what the numbers were coming in | 12       reduction did PFMI relate to you? |
| 13       at. | 13  A.  I believe their concerns were around |
| 14  Q.  Would it have been your concern of what | 14       the agreements that they had with their |
| 15       their numbers were coming in at or | 15       subcontractors and what they were to be |
| 16       their concern -- | 16       paid and that they weren't receiving |
| 17  A.  Their concern. | 17       the payment that they thought they |
| 18  Q.  -- of what the -- okay.  Their concern | 18       would be getting.  I can't, you know, |
| 19       of what the mobile techs' numbers were | 19       speak specifically to any one vendor or |
| 20       coming in at? | 20       subcontractor that they had, but that |
| 21  A.  Yes. | 21       was my impression of the overall |
| 22  Q.  Do you know if part of the agreement | 22       concern. |
| 23       between EMCOR and PFMI was that the | 23  Q.  Do you know if prior to the termination |

**1933 Richard Arrington Jr. blvd, S*Birmingham, AL 35209*www.merrillcorp.com**
**1-800-888-DEPO**

Page 81

1    of PFMI there came a time when PFMI
2    submitted invoices that were not paid
3    at all?
4    A. I believe their June payment was
5      withheld in full, one of their
6      June invoices.
7    Q. Why was that withheld in full?
8    A. I believe it was to make up for -- and
9      the monies still owed BB&T for the
10     overcharge going back to November.
11   Q. Why would that one have been withheld
12     in full instead of a 20-percent
13     reduction?
14   A. I believe the contract was being
15     terminated at that point in time.
16   Q. And we're going to talk about this a
17     little later; but at some point, there
18     was what's been referred to as a new
19     contract between PFMI and EMCOR; is
20     that correct?
21   A. Yes, ma'am.
22   Q. Was the June payment part of the
23     original contract or the new contract?

Page 82

1    A. I don't really recall, ma'am.
2          MR. SAWYER:  Off the record.
3          (Off-the-record discussion)
4          (Lunch recess)
5          (Back on the record.)
6          (Mr. Wohlers not present.)
7    Q. (By Ms. Tuley) I want to back up just a
8      little bit, going back to the
9      measurement issue.  You had said that
10     some of your managers, if there was a
11     remeasure that needed to be done, they
12     would go do it.  Did you yourself go do
13     any measurements of the branches?
14   A. No.
15         MR. SAWYER:  If I could
16            object to the extent it
17            misstates testimony.
18            You can answer.  Go
19            ahead.
20   A. No.
21   Q. When you did those, like, in the early,
22     early stages when you did those, the
23     two words where you said, I think, you

Page 83

1    went to two or three or whatever the
2      number was you said, did you do any
3      measurements of square footage at that
4      time?
5    A. No, ma'am.
6    Q. And we had talked a little bit about
7      EMCOR's -- how they were paid by BB&T.
8      Did EMCOR receive a flat management fee
9      for this project?
10   A. The, quote/unquote, fee was based on
11     all of our costs to run the project.
12     For example, the staff -- myself, my
13     assistant, two accounting people -- the
14     FKC, which is facility knowledge
15     center -- that was the call center --
16     and other costs for the contract, that
17     total number divided by the square
18     footage gave us the ten-cent-a-square
19     foot fee, if you want to call it fee.
20   Q. It would be the ten-cent-a-square-foot
21     management payment?
22   A. Yes, ma'am.
23   Q. Did that change when the square-footage

Page 84

1    numbers were adjusted down?
2    A. It did not, because it, again, it was
3      based on our costs -- our costs to run
4      the project.
5    Q. Did it go -- did it go up from ten
6      cents?
7    A. I don't believe so, no, ma'am.
8    Q. Other than the amount that EMCOR would
9      be remitting to PFMI for janitorial,
10     what costs associated with the project
11     went down when the square-footage
12     number went down?
13   A. Well, again, I don't believe any of
14     those costs were adjusted either way,
15     up or down.  It was based on the FKC
16     and the cost of us, our people.
17   Q. Let me ask you about the FKC.  Tell me
18     what that is again.
19   A. Facilities knowledge center.
20   Q. What was that?
21   A. A call center where work orders would
22     be directed.
23   Q. Was that just for janitorial work

21 (Pages 81 to 84)

**MERRILL LEGAL SOULTIONS**
**Court Reporting*Legal Videography*Trial Services**

| | |
|---|---|
| Page 85 | Page 87 |

Page 85

1    orders?
2    A.  No.  It was for the entire project.  It
3    started with janitorial.
4    Q.  How was the cost of that call center
5    determined?  And let me -- I'll
6    clarify.  Was it on a per-call basis
7    that it was billed out, or was there
8    some kind of static charge for it being
9    in place?
10   A.  A mixture, I guess.  The -- there were
11   set-up charges.  For instance, ten
12   dollars a location, I believe, was to
13   set up the location in their database.
14   And then it was an estimate of the
15   number of calls -- let me rephrase --
16   the number of work orders that were
17   generated.  And each work order has a
18   cost.  There was a cost to receive the
19   work order and then a cost to process
20   the work order.  So that's how that
21   works.
22   Q.  And the cost to receive the work order
23   would be the cost for the FKC to input

Page 87

1    the work order?
2    A.  Dispersing the work order.  In other
3    words, there was one cost to receive
4    it, one cost to process it.
5    Q.  What was associated with processing the
6    work order?
7    A.  The knowledge center customer rep would
8    input all of the data and then direct
9    it to whatever vendor which had been
10   preestablished in their dispatch
11   document.  In other words, for each
12   location, if there was a janitorial
13   call, it would be directed to X vendor;
14   if it's a landscaping call, it goes to
15   another vendor.  So we tell them this
16   is who it goes to.  And all they're
17   doing is taking that data, that
18   information, from the caller, or off
19   the Web, assigning the vendor, and
20   sending it out.  It's an electronic
21   process.
22   Q.  What was the cost associated with the
23   processing and dispersing of the work

Page 86

1    the data on the work order?
2    A.  Work orders were created two ways
3    during this janitorial phase.  The
4    client could call an 800 number that
5    was specifically for BB&T, or they
6    could go online using a what we termed
7    level-one interface where they could
8    key in a work order.
9    Q.  Were there different costs associated
10   with those two different methods?
11   A.  Yes.
12   Q.  Explain that to me.
13   A.  There is a cost to -- for the phone
14   call.  It was a dollar fifty a minute.
15   And I believe the average was about
16   three minutes.  There is no cost to
17   receive the work order on the
18   interface, the Web interface.
19   Q.  Okay.  And then you said there was the
20   cost of receiving the calls, and then I
21   believe you were saying that there was
22   a cost associated with actually
23   creating the work order or performing

Page 88

1    order?
2    A.  It's a lower cost than it takes to
3    create the work order.  I don't recall
4    directly but . . .
5    Q.  Besides the cost for the call or to
6    process the work order, were there any
7    other costs associated with the FKC?
8    A.  Yes.  There were licensing fees for
9    software use.  For me to have access to
10   the data, I had to create a level of
11   access to let me look at work orders.
12   Whatever we determined that level of
13   access to be, there's a cost
14   associated, a monthly cost, associated
15   with that license.
16   Q.  Do you know who all had access to, like
17   you are describing, to look at the work
18   orders on the FKC?
19   A.  For the janitorial piece or in general?
20   Q.  Why don't we start with in general.
21   A.  Okay.  BB&T had a license.  I had one.
22   Lynn Wilson, who is my -- who was my
23   staff assistant, had one.  Our

22 (Pages 85 to 88)

Page 89

1 accounting people had one. PFMI had
2 one. All of my regional managers, once
3 they were hired, had one. And I can't
4 remember if U.S. Lawns, who was our
5 landscaping vendor, had one or not. In
6 addition, all of our mobile techs
7 carried handheld devices. That's how
8 they received their work orders. There
9 were licenses associated with those.
10 Q. Do you know who at BB&T was the person
11 that actually had the license?
12 A. Edna Green.
13 Q. And I know I've asked this earlier, but
14 lunch has sort of wiped out my brain a
15 little bit. Was Edna your main contact
16 at BB&T?
17 A. Starting in late October-November, yes.
18 Q. Of 2005?
19 A. Of '05, yes, ma'am.
20 Q. Who would have been your primary
21 contact prior to that?
22 A. Ronny Eller and Debra Willis.
23 Q. And again, I may have asked this; and

Page 90

1 if I did, your lawyer can object to me.
2 Do you know if Edna Green is still with
3 BB&T?
4 A. The last I heard, she was.
5 Q. I think I did ask that before. Do you
6 know if Ronny Eller is still with BB&T?
7 A. He is not.
8 Q. Do you know where he is?
9 A. Last I heard, he was with Novant Health
10 in Winston-Salem.
11 Q. Do you know if Debra Willis is still
12 with BB&T?
13 A. Last I heard, she was, yes.
14 Q. And while we're talking about the FKC,
15 was this something new to the BB&T
16 project or had EMCOR been associated
17 with other projects that had an FKC?
18 A. EMCOR is, or was at that time, part
19 owner of the FKC as a separate business
20 unit. So it is -- it was already a
21 business and an integral part of what
22 we can provide.
23 Q. In that proposal that we talked about,

Page 91

1 would the FKC have been part of that
2 proposal discussed in that?
3     MR. SAWYER: Objection.
4     Foundation. You can
5     answer.
6 A. The presentation?
7 Q. Yes. Sorry. The presentation.
8 A. The presentation, the gentleman I
9 mentioned, Mike Terry, heads up the
10 FKC. And so yes, he covered those --
11 that aspect of the services.
12 Q. Do you remember at the presentation who
13 made the presentation about the
14 janitorial services?
15 A. Greg Littlefield.
16 Q. Were the mobile techs something new to
17 the BB&T project or was that something
18 that EMCOR already had in place on
19 other projects?
20 A. The technicians that were hired were
21 new to BB&T. Mobile services is
22 provided to other EMCOR accounts.
23 Q. And I'm not going to drag out all this

Page 92

1 stuff because there's mountains of
2 paperwork in this case. But I've
3 seen -- I represent to you that I've
4 seen in some documents something called
5 "a man in the van." Is that the same
6 as a mobile tech?
7 A. Same thing, yes, ma'am.
8 Q. I had that feeling.
9     MR. SAWYER: It conjures
10     various -- never mind.
11 Q. So if in documents somebody references
12 a man in the van, I can substitute
13 mobile tech and that would be the same
14 thing?
15 A. Same program, yes, ma'am.
16 Q. Thank you. Was anybody in particular
17 responsible for giving the part of the
18 presentation regarding the mobile
19 techs?
20 A. I'm sure it was assigned to someone. I
21 don't remember who did that part.
22 Q. Did you give any part of the
23 presentation?

23 (Pages 89 to 92)

Page 93

1  A. Yes. But I think it had to do with
2     general services, things that we had
3     done. It wasn't a large part of the
4     presentation so . . .
5  Q. Would it have been regarding services
6     y'all had done for other banks?
7  A. Really, I wish I could say I recall
8     that presentation, but I was very
9     nervous at the time; I was being
10    presented as a candidate for the
11    account manager's job. So I may have
12    talked about other financial
13    institutions that I had done business
14    with or worked for on the EMCOR account
15    or on the EMCOR team.
16 Q. And I probably have already asked you
17    this. Was becoming the account manager
18    for the BB&T account, was that a
19    promotion for you?
20 A. Yes.
21 Q. And I know we've discussed the ten-
22    cent-per-square-foot number. From
23    month to month, did EMCOR's management

Page 94

1     fee or management payment from BB&T
2     change? And by that, I mean, let's
3     just say in December, you would pay one
4     amount and then January was a different
5     amount, or was it more like equal
6     payments every month?
7  A. It was equal payments, and those
8     payments were actually every two weeks,
9     or twice a month, I should say.
10 Q. I want to go back to the transition
11    period, the initial transition period,
12    a little bit. And this is the danger
13    of not following your notes when you're
14    asking questions. Who was involved in
15    the transition from BB&T?
16       MR. SAWYER: I'm sorry,
17          Counsel. The initial
18          transition? Is it
19          the --
20 Q. That would have been the initial
21    transition where EMCOR started
22    performing under the BB&T contract and
23    the janitorial services as we discussed

Page 95

1     were going online. So it would have
2     been in that, I guess, that ninety-day
3     period that we talked about?
4  A. Yes, ma'am. Alan Cristal, Debi Crosby,
5     Mark Smith, Paul Wilbur, Steven King to
6     some extent, Kerri Collins, myself,
7     Lynn Wilson.
8  Q. And that -- okay. What BB&T personnel
9     were involved in the transition?
10 A. Ronny Eller, Debra Willis, Regina
11    Winning, Steven Paige. That's probably
12    it.
13 Q. Was there anybody in particular, like,
14    that was called a transition team?
15 A. Paul Wilbur was the transition manager.
16 Q. What information was disseminated to
17    the branches about this transition?
18       MR. SAWYER: Objection.
19          Foundation. You can
20          answer if you know.
21 A. I don't really know what was sent out
22    before we started. So what . . .
23 Q. Did EMCOR send anything to the branches

Page 96

1     regarding the transition?
2  A. Not the individual branches. We did
3     the transition letter that I mentioned
4     before the ninety-day transition plan
5     for janitorial. And that was
6     distributed through Ronny Eller's group
7     to the various AOOs, which is area
8     operations officer, and RBOMs. That's
9     R-B-O-M.
10 Q. What is that?
11 A. Regional banking operations manager is
12    what I believe it is. And then they
13    would disseminate down from there.
14 Q. Was the transition letter created by
15    EMCOR?
16 A. We had a part in it. Keith Blackburn
17    from PFMI sent me a draft, and we
18    tinkered with it a little bit,
19    corrected some spelling, expounded on
20    some things; and both our names were on
21    it.
22 Q. Besides the transition letter, were any
23    other documents of any sort regarding

24 (Pages 93 to 96)

**MERRILL LEGAL SOULTIONS**
**Court Reporting*Legal Videography*Trial Services**

Page 97

1    the transition sent either to the
2    branches or the AOOs or the RBOMs?
3    A. Not that I know of.
4    Q. Do you know if the scope of work was
5       sent to the branches or to the AOOs or
6       the RBOMs?
7    A. Prior to transition, I don't know.
8    Q. Do you know if during the transition
9       that was done?
10   A. I believe that it was in many of the
11      communications sent out by Ronny
12      Eller's group. Yes.
13   Q. Do you know if any other documents were
14      sent from Ronny Eller's group to the
15      branches regarding the transition
16      either pre or during that transition
17      time?
18   A. We prepared several E-mails, but I
19      don't know if they went to the branch
20      level or just to the AOOs.
21   Q. Who developed the scope of work for
22      this project?
23   A. For which service?

Page 98

1    Q. For the janitorial service.
2    A. BB&T developed the scope of work, is my
3       understanding.
4    Q. Prior to this project, do you know if
5       there was an overall scope of work for
6       all BB&T branches?
7    A. I have no idea.
8    Q. And just so I'm clear and the record is
9       clear, I'll ask it in just a little bit
10      of a different way. Prior to this
11      project, do you know if each branch was
12      responsible for setting the scope of
13      work they wanted in their branch as far
14      as janitorial services?
15   A. This morning I talked about depending
16      on who controlled those services, and I
17      think that's how it was set, if it was
18      set. Sometimes it was the FCM, the
19      financial center manager. Sometimes it
20      was the AOO for the RBOM. It just
21      depends on the area and the branch.
22      And I don't know a lot about banking.
23   Q. When you say a "financial center

Page 99

1    manager," would that be what people
2    typically would call, like, a branch
3    manager?
4    A. Yes, ma'am.
5    Q. Thank you. They've got a lot of
6       specific names.
7         During, I guess, pretransition
8    as you were getting ready to start the
9    transition into the janitorial and
10   during the transition, were there any
11   type of regular meetings conducted to
12   discuss the transition problems coming
13   up, that sort of thing?
14   A. Paul Wilbur as the transition manager
15      conducted a number of meetings, yes.
16   Q. Would you have been involved in most of
17      the transition meetings?
18   A. Yes, ma'am.
19   Q. Would you have taken any notes of those
20      meetings?
21   A. No. That was the job of the transition
22      manager.
23   Q. Do you know if any minutes were

Page 100

1    actually transcribed of any of those
2    transition meetings?
3    A. I believe so, yes. I don't know if
4       they were for all meetings, but
5       typically, yes.
6    Q. Were those meetings conducted on a
7       regular interval or . . .
8    A. I would say so, yes, ma'am.
9    Q. By that, I mean was it sort of a
10      standing every other Wednesday we're
11      going to have a conference call to see
12      how the transition's going, or was it
13      something less formal than that?
14   A. No. It was pretty set, if I remember
15      correctly.
16   Q. What do you recall about the frequency
17      of those?
18   A. I believe they were weekly.
19   Q. Were they conference calls or
20      face-to-face?
21   A. Conference calls.
22   Q. Besides yourself and Paul Wilbur, who
23      else would have been on those

**1933 Richard Arrington Jr. blvd, S*Birmingham, AL 35209*www.merrillcorp.com**
**1-800-888-DEPO**

**MERRILL LEGAL SOULTIONS**
**Court Reporting*Legal Videography*Trial Services**

| Page 101 | Page 103 |
|---|---|
| 1     conference calls?<br>2  A. Most of the people I mentioned<br>3     before -- Debi Crosby, Alan Cristal,<br>4     Mark Smith, Lynn Wilson.<br>5  Q. Who for PFMI would have been involved<br>6     in those calls?<br>7  A. Keith Blackburn, Greg and Jim when they<br>8     were available and depending on the<br>9     topics that needed to be covered.<br>10  Q. Would an agenda be sent out prior to<br>11     these conference calls discussing what<br>12     was going to be covered in them?<br>13  A. I believe I recall that there was an<br>14     agenda; but in what order or what items<br>15     were discussed, I -- I don't recall.<br>16  Q. And I know that there would be a good<br>17     number of conference calls that took<br>18     place during this time period, so I'm<br>19     going to try to break it down a little<br>20     bit. I would like for you to just tell<br>21     me, to the best of your recollection,<br>22     what was going on in the transition<br>23     calls in those first thirty days. | 1  Q. Tell me about the discussions regarding<br>2     service for that first thirty days.<br>3  A. It was horrible.<br>4  Q. Now, let me just -- for the record, the<br>5     calls were horrible or the service was<br>6     horrible?<br>7  A. The service was horrible.<br>8     Specifically, many missed locations,<br>9     locations just not being cleaned,<br>10     people not showing up, people showing<br>11     up late, the scope of work not being<br>12     performed.<br>13  Q. All right. During those discussions<br>14     where these problems you just listed<br>15     out were being discussed, what<br>16     solutions did those problems were being<br>17     discussed in those calls?<br>18  A. Generally, how can we help or assist<br>19     PFMI in doing the job that needed to be<br>20     done.<br>21  Q. What was PFMI saying about these<br>22     problems?<br>23  A. They were relying on subcontractors to |

| Page 102 | Page 104 |
|---|---|
| 1  A. The first thirty days from contract<br>2     start-up or from janitorial start-up?<br>3  Q. I guess what I'm discussing is, we had<br>4     talked about there being a ninety-day<br>5     period with the janitorial and that it<br>6     was kind of broken down into thirty,<br>7     sixty, ninety. And so that's the<br>8     thirty I'm discussing.<br>9  A. We were still covering billing issues<br>10     as far as had all the accounts been set<br>11     up, is everything ready to go, did we<br>12     test the data stream between EMCOR and<br>13     BB&T, was PFMI ready to transmit, did<br>14     they need assistance.<br>15     In relation to other parts of<br>16     the service that were to be started<br>17     later, we had some initial<br>18     conversations about what planning would<br>19     need to be done for the phase two<br>20     piece. And then we had a fair amount<br>21     of discussion regarding the service<br>22     that was taking place on the janitorial<br>23     side. | 1     get the work done and felt they were<br>2     trying very hard to get through and get<br>3     everything covered as we had laid out<br>4     in that thirty-, sixty-, ninety-day<br>5     transition plan. And so if in the<br>6     first thirty days it was get everything<br>7     covered, people weren't showing up, so<br>8     that vendor they may have elected to<br>9     replace.<br>10  Q. During that first thirty days, did BB&T<br>11     relate to EMCOR that, at certain<br>12     branches, we just don't like this<br>13     cleaner, we want another cleaner, or we<br>14     want our old cleaner? Was there any<br>15     direction of we want you to fire<br>16     Cleaner X at this location, from BB&T?<br>17  A. Yes.<br>18     MR. SAWYER: Are we still in<br>19     the same time frame,<br>20     Counsel?<br>21     MS. TULEY: Yes, still in<br>22     the first thirty.<br>23  Q. How would that go through the chain of |

26 (Pages 101 to 104)

**MERRILL LEGAL SOULTIONS**
**Court Reporting*Legal Videography*Trial Services**

Page 105

1    command?
2    A.  It would have come to me, and I would
3        have called either Keith Blackburn or
4        Jim Wohlers.
5    Q.  And said, Y'all need to get rid of
6        Company X?
7    A.  Right.
8    Q.  When BB&T would come in and say, We
9        want Company X at the Acme location
10       fired, how often would they say, And we
11       would like them replaced with
12       Company Y?
13   A.  In a number of cases, they would say
14       that.  I can't remember how many.  But
15       not in all cases, they did not.
16   Q.  Best of your recollection, do you think
17       it was more than half of the cases
18       where they had a substitute?
19   A.  Not being real comfortable, but I guess
20       it could have been half.
21   Q.  During that -- we're still in that
22       first thirty-day time period.  Did it
23       come to your attention or were there

Page 106

1        any discussions about some branches
2        just loved their old cleaner and that's
3        who they want no matter what the new
4        cleaner is doing?  Did you encounter
5        anything like that?
6    A.  We encountered a lot of that.
7    Q.  And how did you address that?
8    A.  I would not specifically address it.  I
9        would go to Ronny Eller, who is my --
10       really the main person, and make him
11       aware of it, number one, only because
12       if we were going to get support, we had
13       to get it there.  We had to get -- you
14       know, give us time to get this program
15       in place and up and running.
16   Q.  Do you know how Ronny Eller was
17       addressing that with his branches?
18   A.  He wouldn't have addressed it at the
19       branch level.  He would have gone to
20       the RBOMs probably at that point.
21   Q.  Did you have any situations where it come up
22       where it was not a branch but either a
23       RBOM or an AOO that said, We liked how

Page 107

1        it was done before or we liked our old
2        cleaner, we want our old cleaner,
3        regardless of how the cleaning was
4        going in their region or area?
5            MR. SAWYER:  Object to the
6            form of the question.
7            You can answer.
8    A.  I'm -- I'm sure that we had a lot of
9        those requests.  As to why they were
10       coming in or were they coming in at
11       branches that were getting the scope of
12       work performed, I don't know.
13   Q.  To your recollection, was there any AOO
14       or RBOM in particular that just was not
15       going to be pleased under the new
16       system?
17   A.  I hadn't met them all at that point, so
18       it's hard for me to say that of the
19       thirty-four of them, three would never
20       be happy.
21   Q.  And if we expand it from the first
22       thirty days to just throughout that
23       first ninety days, was there anybody

Page 108

1        during that entire ninety-day
2        transition that you finally said, You
3        know, the only thing that's going to
4        make them happy is to get their old
5        cleaner back?
6    A.  I don't specifically recall seeing that
7        put to us.  I know in -- maybe it was
8        in upstate South Carolina; Diane Blewer
9        was very unhappy.  Charlie Maddox in
10       the western Carolina region was very
11       unhappy; but his branches hadn't been
12       serviced for nine days straight at the
13       beginning, so I understand his
14       unhappiness.  But he at least stated to
15       us he was willing to give it a try and
16       keep working on it.
17   Q.  At the end of that first thirty-day
18       period -- well, let me rephrase that.
19       The goal, I think, as we've discussed
20       it, during that first thirty days was
21       to get service in all of the locations.
22       Is that fair?
23   A.  That's the way I believe we had it

27 (Pages 105 to 108)

Page 109

1    stated, yes, ma'am.
2    Q. What was your assessment of that goal
3    at the end of the first thirty days?
4    A. I thought we had done a very poor job
5    at it.
6    Q. How did you relay that back to PFMI?
7            MR. SAWYER: Object to the
8            form of the question.
9            You can answer if you
10            understand.
11    A. We had many calls a day, E-mails going
12    back and forth, about working to the
13    scope of work, getting the scope of
14    work completed.
15    Q. And which part of the transition was
16    getting the scope of work down to a
17    science supposed to be completed?
18    A. I believe that was in the second part
19    of the --
20    Q. So that would have been at the
21    completion of sixty days?
22    A. Yes, ma'am.
23    Q. And I think I interrupted you when I

Page 110

1    asked was that -- you were answering
2    how you were relaying the problems that
3    you thought that y'all were having with
4    the transition back to PFMI. And I
5    think you had said daily calls and
6    E-mails trying to work out the scope.
7    Anything else?
8            MR. SAWYER: And I apologize
9            in striking an
10            objection. I thought
11            you said relating those
12            problems to PFMI.
13    Q. And let me ask it this way. Besides
14    E-mails and phone calls with PFMI, you
15    know, relaying your concerns and
16    disapproval, did y'all have any
17    meetings, face-to-face meetings, during
18    the first thirty days?
19    A. I don't really recall, but I think
20    either Keith or Greg or Jim came up to
21    Winston-Salem. But was it at thirty
22    days or thirty-one days or sixty, you
23    know, that's . . .

Page 111

1    Q. And there may be a better way --
2    A. Several times during --
3    Q. -- to ask that.
4    A. -- that transition period.
5    Q. Yeah. And maybe a better way to ask
6    that is, what meetings do you recall
7    taking place during the transition
8    period?
9    A. I don't recall specific dates. I
10    recall many phone calls, many meetings,
11    conference calls, E-mails. If they
12    showed up, I couldn't tell you what
13    day, you know, what was discussed other
14    than we were trying -- we were being
15    inundated with complaints and trying to
16    get the -- the work done. So any
17    conversations that we had were likely
18    around that.
19    Q. Do you recall any action plans that
20    were created in any of those meetings
21    or calls or E-mails to address these
22    concerns, either by EMCOR or by PFMI?
23    A. I don't recall any specific documents,

Page 112

1    but it makes sense that there would
2    have been some.
3    Q. Nothing specifically that you could
4    point to?
5    A. Not -- not that I recall, no, ma'am.
6    Q. I didn't say this earlier, but this is
7    kind of my only chance to get to talk
8    to you before we go to trial about
9    these issues. So if as we go through
10    this you think of something that is
11    responsive to a question I asked
12    earlier or you want to correct
13    something that you said earlier or
14    change it, please let me know, because
15    I won't have to chance to talk to you
16    again. So, you know, let me know. Or
17    if we look at a document and something
18    sparks your memory and you say, Oh,
19    yeah, this reminds me of that meeting,
20    let me know, please.
21    A. Yes, ma'am.
22    Q. Thank you. What was your assessment of
23    the progress at the end of the sixty

28 (Pages 109 to 112)

Page 113

1    days?
2    A. I didn't feel like we were getting
3       anywhere.
4    Q. Did you see any improvement from thirty
5       days to sixty days?
6    A. On the project as a whole, I'd have to
7       say no.
8    Q. What was your assessment at the end of
9       ninety days?
10   A. I think by ninety days, we had made
11      some progress but not sufficient
12      progress.
13   Q. Let me ask you this. As the project
14      manager at that point at the end of
15      ninety days and you didn't see
16      sufficient progress, why didn't you
17      fire PFMI?
18   A. I guess, not having selected them, I
19      was trying to be a good partner and
20      continue to try to work out the issues.
21   Q. Who did select them?
22   A. The only thing I know, because it
23      was -- I was on a call -- and I don't

Page 114

1    remember when the call was. But Alan
2    Cristal had said, We're bringing --
3    We've selected PFMI.
4    Q. But you don't know if Alan made that
5       selection or he was just relaying that
6       information?
7    A. I do not know, no, ma'am.
8    Q. I think we said earlier it was roughly
9       1400 branches involved in this project?
10   A. Yes, ma'am.
11   Q. What was your expectation of
12      transitioning janitorial services into
13      1400 branches? How fast did you think
14      that that would get accomplished?
15      MR. SAWYER: Objection.
16      Vague. You can answer
17      it.
18   A. I felt like the vendor would have come
19      in with a plan, a start-up plan, like
20      they had rolled out in their
21      ninety-day. But I didn't have the
22      expectation that the work would just be
23      missed in multiple locations for

Page 115

1    multiple days, that the scope of work
2    was not being performed, so . . .
3    Q. And as far as the locations being
4       missed -- and we'll just talk about
5       throughout the entire ninety-day
6       period -- did it finally look like it
7       was -- strike all that.
8       During that ninety-day period --
9       we're going to talk about misses -- was
10      it misses all over the place or did it
11      seem to be narrowed to certain regions
12      or certain vendors that were having the
13      missed problems?
14   A. It was fairly widespread. However, I
15      believe most of the issues were with
16      the areas controlled by FMI services.
17      They had roughly 50 percent of the
18      portfolio.
19   Q. And I'm going to ask you the same
20      question as to scope. Did it seem to
21      you that there was significant scope
22      problems across the board, or was it
23      narrowed to a certain region or a

Page 116

1    certain vendor?
2       MR. SAWYER: Counsel, when
3       you say "scope" . . .
4       MS. TULEY: The scope of
5       work that we've been
6       discussing, the
7       janitorial scope of
8       work.
9       MR. SAWYER: Okay. You can
10      answer.
11   A. The scope of work was across the board.
12   Q. You couldn't narrow that down to a
13      certain location or vendor?
14   A. No. I can say that the vendor we had
15      fewest problems with was in West
16      Virginia, Patton Building Services.
17      And not that they didn't have problems,
18      but we didn't get as many complaints.
19   Q. On the FKC, was that system set up for
20      complaints or for work orders?
21   A. For both.
22   Q. And maybe I need -- is there a
23      difference between a complaint and a

29 (Pages 113 to 116)

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 117

1    work order?
2    A.  As it relates to janitorial?
3    Q.  Yes.
4    A.  Yes.  A complaint was no mopping done,
5        maybe a specific part of the scope of
6        work, no trash emptied, no dusting,
7        something along those lines.  We had
8        categories set up for janitorial,
9        janitorial complaint, and janitorial
10       extra, the extra being additional
11       carpet cleaning.  Anything that was
12       above the scope had to be requested and
13       have a work order associated with it.
14           I could use a break.
15   Q.  Sure.
16           (Brief recess)
17   Q.  (By Ms. Tuley) Back on the record.  All
18       right.  We were talking about the
19       transition and all the problems, and we
20       had just discussed the difference
21       between complaints and work orders.
22       But I think you were telling me that
23       they all -- either a complaint or a

Page 118

1        work order would still come through the
2        FKC?
3    A.  That's the way it was set up.
4    Q.  And you say that as if that maybe was
5        not the way it happened.  What actually
6        happened?
7            (Mr. Jones entered the
8             room.)
9    A.  There was still a fair amount coming
10       through the FKC.  But there were so
11       many complaints that they stopped --
12       they being BB&T -- stopped using or
13       requiring the use of the FKC until
14       things smoothed out, and we were
15       providing E-mails of complaints.
16   Q.  Was there a system in place that ranked
17       or categorized complaints -- and by
18       that I'll give you a hypothetical.
19       Would a complaint that we had a no-show
20       last night and our cleaners didn't come
21       and a complaint of they missed one of
22       the trash cans in our building and one
23       trash can didn't get emptied, was there

Page 119

1        a ranking where one of those would have
2        been this is a serious complaint, this
3        is something we need to address but
4        it's not so serious, or were all
5        complaints treated the same?
6    A.  All the complaints were forwarded.  The
7        commentary that went along with them
8        may have indicated a different level of
9        concern.
10   Q.  Was there any kind of formal ranking of
11       complaints, like this would be a one,
12       this would be a two, this would be a
13       three?
14   A.  I don't remember a ranking of
15       complaints.  At the knowledge center,
16       there's a ranking of work orders, but
17       that only determines the response time.
18   Q.  I believe I saw something on that.
19       That would be how many days for that
20       work order to be completed?
21   A.  That's correct.  Some, hours.
22   Q.  Did EMCOR do any kind of analysis of
23       the number of complaints received

Page 120

1        during the life of PFMI working on the
2        BB&T project?
3    A.  We did several types of analysis.
4    Q.  Were those done in writing?  Were they
5        reports of some sort?
6    A.  Yes.
7    Q.  What would those reports have been
8        entitled?
9    A.  I don't recall any specific titles of
10       reports.  I'm sorry.
11   Q.  Did you generate any of those reports
12       or analysis regarding complaints?
13   A.  I'm sure I did.
14   Q.  Tell me about the process you went
15       through to generate those.
16   A.  It would have been through data
17       received from the FKC.
18   Q.  And let me see if I can explain my
19       understanding, and then you can shoot
20       holes in it and tell me if it's right
21       or wrong.  Okay?  I think what I hear
22       you saying is you would just -- you
23       would take the information that was

1933 Richard Arrington Jr. blvd, S*Birmingham, AL 35209*www.merrillcorp.com
1-800-888-DEPO

**MERRILL LEGAL SOULTIONS**
**Court Reporting*Legal Videography*Trial Services**

| Page 121 | Page 123 |
|---|---|
| 1    uploaded into the FKC and you could<br>2    generate a report from that program<br>3    that would list out locations and what<br>4    their complaint or work order was.  Is<br>5    that a fair statement?<br>6   A.  That was available, yes.<br>7   Q.  Was that one of the things that you<br>8    would do?<br>9   A.  Probably, yes.<br>10   Q.  Well, not to be picking on you, but<br>11    when you say "probably," do you know<br>12    you did it or do you know you didn't do<br>13    it?<br>14   A.  That is probably one of the reports I<br>15    would have generated.<br>16   Q.  But you don't remember as we sit here<br>17    today if you did or didn't generate<br>18    that kind of report?<br>19   A.  I'd have to say no, I don't remember.<br>20   Q.  Did you do any kind of a statistical<br>21    analysis of the number of complaints<br>22    you're getting versus the number of<br>23    branches that you had? | 1    across all of the locations, and you<br>2    come up with X number of thousands of<br>3    service opportunities a month.<br>4   Q.  And then he requested those service<br>5    opportunities -- an analysis be done of<br>6    how many service opportunities there<br>7    were versus how many complaints were<br>8    received?<br>9   A.  It was complaints, misses, I think is<br>10    what it was, yes, ma'am.<br>11   Q.  And do you know if that analysis was<br>12    actually done?<br>13   A.  Yes.  Actually, PFMI provided the<br>14    information to us on a monthly basis.<br>15   Q.  And I'm assuming -- and that's always<br>16    dangerous -- that that would have been<br>17    passed along to Steven Paige at BB&T?<br>18   A.  Yes.  The entire team.  And at some<br>19    point in time -- and I don't recall<br>20    when -- they actually created a Web<br>21    site and started posting the<br>22    information on a BB&T Web site.  We<br>23    didn't have access to it, but where a |

| Page 122 | Page 124 |
|---|---|
| 1   A.  We did a couple of analysis regarding<br>2    that.  One of them was just a report<br>3    that came through the FKC on the number<br>4    of janitorial work orders, number of<br>5    complaints, number of misses, that kind<br>6    of thing.  And then BB&T and I want to<br>7    say it was Steven Paige asked for an<br>8    analysis of service opportunities<br>9    versus the complaints that we were<br>10    getting.<br>11   Q.  What is a service opportunity?<br>12   A.  The way Steve explained it -- and I<br>13    hadn't ever seen this before.  But the<br>14    way Steven had explained it was, if you<br>15    have a branch receiving five-day<br>16    service, then each one of those days<br>17    represents an opportunity, a service<br>18    opportunity.  So, for instance, on five<br>19    days, a branch would have 22 service<br>20    opportunities a month.  A six-day<br>21    branch would have more.  A three-day<br>22    branch would have less.  You take those<br>23    and you apply them mathematically | 1    BB&T person could go out and look at<br>2    it.<br>3   Q.  At any time did you come to know what<br>4    particular branches were paying for<br>5    cleaning services prior to the BB&T<br>6    project?<br>7   A.  Not that I -- no, not that I recall<br>8    seeing, no, ma'am.<br>9   Q.  At any time did you come to know if the<br>10    overall cost for janitorial for all the<br>11    BB&T branches was less under the BB&T<br>12    project than it was previously?<br>13   A.  Yes, ma'am.  There was a -- I don't<br>14    recall when this was, the first<br>15    ninety-day period.  Steven Paige had<br>16    reported there was a multi-thousand<br>17    dollar -- many thousand-dollar savings,<br>18    and I don't remember what that number<br>19    was.<br>20   Q.  There would have been some sort of<br>21    E-mail or --<br>22   A.  There was probably an E-mail or<br>23    something.  In fact, I know I reported |

31 (Pages 121 to 124)

**MERRILL LEGAL SOULTIONS**
**Court Reporting*Legal Videography*Trial Services**

Page 125

1    it to Debi Crosby and I did that on
2    E-mail. But I don't -- again, I don't
3    remember when.
4    Q. To your knowledge, were the vendors
5    actually doing the work at the branch
6    level -- and by "the work," I mean the
7    janitorial work -- getting paid less
8    under the BB&T contract than they had
9    gotten paid previously?
10   A. I don't have any knowledge of what they
11   would have been paid previously. But
12   that would be an understanding.
13   Q. Besides the Steven Paige E-mail or
14   whatever it was that we talked about,
15   did you see any other documents or
16   reports from BB&T discussing cost
17   savings under the BB&T contract?
18   A. I guess it makes sense to me there
19   would have been some, but I don't
20   recall any specific documents. I do
21   recall that one where he was quoting
22   the first recognized savings.
23   Q. To your knowledge, there was not any

Page 126

1    kind of a regular report that came out
2    every so many days outlining the
3    savings that had been generated for
4    BB&T?
5    A. I don't remember seeing any such
6    report, no, ma'am.
7    Q. Let's go back and just fill in the gaps
8    regarding the measurements that we've
9    already talked about, the square-
10   footage measurements. Did EMCOR ever
11   receive measurements from PFMI for all
12   of the branches?
13   A. Yes, ma'am. I believe that was that
14   mid-December report that they
15   submitted.
16   Q. And was that something that was
17   contemplated under the agreement
18   between EMCOR and PFMI?
19   A. Yes. That within the first ninety
20   days, they would go out and measure the
21   branches.
22   Q. Do you know how those reports generated
23   by the mobile techs, the measurement

Page 127

1    reports that they did, how they were
2    kept? And by that, let me ask a little
3    bit more specific question. When we
4    talked earlier -- and if I'm
5    paraphrasing you wrong, tell me. And
6    the record will reflect what you said.
7    But basically, I think, my
8    understanding was they generated some
9    type of little report, when the mobile
10   techs went out, of their measurements
11   and they would turn it in to their
12   regional manager, and that person would
13   either generate a spreadsheet or just
14   pass those up the chain to Lynn, your
15   assistant. Do you know where all of
16   those reports are stored?
17   A. I believe we turned them over to BB&T.
18   Q. Do you know when those would have been
19   turned over?
20   A. As they were completed. So no, ma'am,
21   not a specific . . .
22   Q. And so, I guess, just to sort of in my
23   mind clear up the process, I think we

Page 128

1    have where the mobile tech would have
2    done the report. He would have turned
3    it in to his regional person. That
4    person would have either put it up the
5    chain to Lynn or gone ahead and
6    summarized it in a spreadsheet format.
7    And at that point, that actual report
8    generated by the mobile tech would have
9    been forwarded to someone at BB&T?
10   A. Yes, ma'am.
11   Q. Do you know who at BB&T that would have
12   been forwarded to?
13   A. Probably Edna Green.
14   Q. Would that have been forwarded
15   electronically or would it have -- that
16   actual sheet of paper gone?
17   A. Electronically.
18   Q. If it was forwarded electronically,
19   what was done with the actual piece of
20   paper the mobile tech filled out?
21   A. As I stated, I believe all those were
22   turned over to BB&T.
23   Q. Were they done electronically initially

32 (Pages 125 to 128)

**MERRILL LEGAL SOULTIONS**
**Court Reporting*Legal Videography*Trial Services**

Page 129

1    or were they actually something they
2    wrote out on paper?
3    A. No, ma'am.  If -- we talked about them
4    having a form that they took with them,
5    and I believe those forms were then
6    collected and turned over to BB&T.
7    Q. So Edna Green would have gotten an
8    electronic copy and a paper copy?
9    A. I don't know if Edna received those
10    individual branch measurements.  Okay?
11    She received -- she would have likely
12    have received the final spreadsheet
13    with the answers, the compiled numbers.
14    Q. Got you.  Who would know where the
15    actual -- who received at BB&T the
16    actual measurement reports, the ones
17    that the techs filled out?
18    A. Whether they were kept on a regional
19    level or turned all over to the
20    Winston-Salem office, which is where
21    the real estate services are
22    headquartered, I don't know.
23    Q. Would your regional managers know where

Page 130

1    those reports ended up?
2    A. They would be able to tell you who they
3    turned them over to.  Whether they
4    ended up -- where they ended up after
5    that, I can't say.
6    Q. Would Lynn Wilson know better than you
7    do where those ended up?
8    A. If she handed any of them over -- if,
9    for instance, Jim Maxey collected all
10    of his technicians' and he turned them
11    over to the gentleman in his office in
12    Virginia, were they left there or
13    forwarded to Winston-Salem, I don't
14    know.  But I do know that those reports
15    went to BB&T.
16    Q. And we had talked about that a number
17    of the measurements conducted by PFMI
18    were the same or substantially similar
19    to the gross square footage; is that
20    correct?
21    A. Yes, ma'am.
22    Q. In your review of the situation, did it
23    seem like those measurements that were

Page 131

1    the same or substantially similar came
2    from a particular region or a
3    particular vendor?
4    A. Jim Wohlers had sent me a list of the
5    ones he was confident in, that he was
6    confident had been done correctly, in
7    his term.  The regions that he wasn't
8    confident in, I don't seem to speak to
9    being one vendor but likely would have
10    been FMI since they had half of the
11    footprint.  They -- they -- there was a
12    lot of issues with FMI, and that was
13    one of them.
14    Q. In December when you got the list of
15    all the square footages from PFMI, did
16    PFMI want to go ahead or suggest going
17    ahead and changing how they billed
18    based on those new square-footage
19    numbers?
20    A. I believe I recall that, yes, ma'am.
21    Q. And would that request to change how
22    they billed based on those
23    square-footage numbers have gone to

Page 132

1    you?
2    A. To me and then I would have taken it to
3    BB&T.
4    Q. Do you remember what the response was
5    to that request?
6    A. I have a vague recollection that BB&T
7    didn't want to make the changes twice.
8    They wanted to do it one time.
9    Q. Did you have any say in whether or not
10    that change got made then or made
11    later, or was it strictly a BB&T
12    decision?
13    A. I would have given input.  I don't know
14    that I remember what that input was
15    but . . .
16    Q. Would that have been reflected in an
17    E-mail or any kind of written
18    documentation?
19    A. Probably E-mail, yes, ma'am.
20    Q. When did EMCOR, through its mobile
21    techs, finalize their square-footage
22    measurements?
23    A. End of March, first of April, is what I

**1933 Richard Arrington Jr. blvd, S*Birmingham, AL 35209*www.merrillcorp.com**
**1-800-888-DEPO**

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 133

1    recall.
2    Q. How did you choose which locations to
3       have your mobile techs measure?
4    A. Again, all of the larger buildings,
5       those over 10,000 feet, were all
6       measured. And I believe Edna Green had
7       put together some statistical
8       program -- that's what she does; she's
9       a statistician type of person -- to
10      select the other. If you recall, I
11      stated that from one to five thousand
12      or zero to five thousand, we did a
13      sampling. From five to ten, there was
14      another sampling. And I believe she
15      had that program generated. And that's
16      how those were generated.
17   Q. Would it be fair to say that the
18      locations sampled were not selected
19      based on that list that Jim Wohlers
20      sent you of locations they were not
21      confident in? Or I guess he
22      actually -- sorry. Jim Wohlers sent
23      you a list of locations they were

Page 134

1    confident that the measurements were
2    right. Were the locations that you
3    sampled chosen based on ones that were
4    excluded from that list, meaning he was
5    not confident in them?
6    A. First of all, the list he sent me was a
7    complete list. And the ones -- he
8    highlighted the ones he was confident
9    in, unhighlighted the others. And that
10   list, again, I believe Edna had some
11   program that she generated to pick. So
12   if it was based on that, I don't -- I
13   don't see how that would have happened.
14   I don't believe there was any other --
15   I'm not sure of the word I'm looking
16   for -- any other criteria.
17   Q. What was the average size of a BB&T
18      branch location?
19          MR. SAWYER: Objection.
20             Speculation. You can
21             answer if you know.
22   A. You know, I don't know, given the 1400
23      locations. I believe that there were

Page 135

1    more in that three- to five-thousand-
2    square-foot range.
3    Q. And we had talked about things that
4       were subtracted to create net cleanable
5       square footage. I know that at a lot
6       of locations, just from looking through
7       the documents, it was discussed that
8       ATMs -- that outside ATMs would be
9       cleaned. How was that accounted for in
10      the square-footage?
11         (Mr. Jones left the room.)
12          MR. SAWYER: Objection to
13             the extent that I don't
14             recall ATMs being
15             discussed. But you can
16             go ahead and answer the
17             question.
18   Q. Well, let me ask it this way. I mean,
19      did a lot of the branches want their
20      ATMs cleaned?
21   A. Yes. Wiping the face of the ATM.
22   Q. And would emptying the trash at the ATM
23      also be part of that work?

Page 136

1    A. Yes. And there were some that were
2    stand-alone ATMs where a special
3    service was set up to empty the trash
4    there.
5    Q. And just to kind of round out the ATM
6    discussion, would, like, cleaning out
7    cobwebs and bugs and stuff around the
8    ATM be part of it, part of the cleaning
9    that they wanted done?
10   A. Again, wiping the face of that ATM.
11   Q. And then to go back to my original
12      question, how was the cleaning of the
13      ATMs factored into the net cleanable
14      square-footage calculation?
15   A. I don't recall.
16   Q. It seems to me -- and I'm a lawyer, not
17      a person that knows anything about
18      janitorial work -- but there would be
19      some type of addition for going outside
20      and cleaning an ATM. I mean, is that
21      fair to say?
22          MR. SAWYER: Objection to
23             the form of the

34 (Pages 133 to 136)

**MERRILL LEGAL SOULTIONS**
**Court Reporting*Legal Videography*Trial Services**

Page 137

1      question.  You can
2      answer.
3  A.  The scope of work called for cleaning
4      up to a certain extent outside, and I
5      believe wiping the face of the ATM was
6      on that scope.  But that I don't know.
7  Q.  Was cleaning janitorial closets part of
8      the scope of work?
9  A.  I think keeping the janitorial closets
10     neat was in the scope of work, yes.
11 Q.  If that was in the scope of work, why
12     were janitorial closets subtracted from
13     net cleanable square footage?
14          MR. SAWYER:  Objection to
15          the form of the
16          question.  You can
17          answer.
18 A.  The janitorial closet was not used
19     typically by the branch, and so they
20     had no control over how clean or how
21     dirty or whatever.  And so it was used
22     for storing of those materials used by
23     the janitorial services only and,

Page 138

1      therefore, shouldn't be included in the
2      net cleanable square footage.
3  Q.  Did you ever see any complaints or work
4      orders from any branches discussing
5      their unhappiness with the cleanliness
6      of the janitorial closets?
7  A.  Honestly, there were so many
8      complaints, I don't want to say that
9      there weren't any that referred to
10     that.
11 Q.  Nothing that you can recall as we sit
12     here right now?
13 A.  No, ma'am.
14 Q.  All right.  In that March-April time
15     frame we just talked about where the
16     mobile techs finalized the square-
17     footage measurements and those were
18     transmitted to BB&T, was a change
19     discussed as far as how the billing
20     should be done for janitorial or was a
21     change discussed -- and this is a
22     multipart question, so let me just stop
23     there.  Was a change -- at that time

Page 139

1      frame, March-April, mobile techs
2      finished their measurements,
3      transmitted to BB&T, were there any
4      discussions from BB&T and EMCOR
5      regarding changing the way that
6      janitorial would be billed?
7  A.  Not the way it was billed.  The net
8      cleanable numbers, which is and always
9      was the intent to bill off of those
10     going forward, were inserted as the new
11     billing rate number.
12 Q.  How was that done when not all of the
13     branches were remeasured?
14 A.  In the different segments of the
15     branches, the sampling, whatever the
16     average number was for the sampling of
17     the zero to 5,000, was applied across
18     the board for that set of branches.
19     The statistical sampling for the five
20     to ten was applied across the rest of
21     the branches for that segment.  Then,
22     again, we measured all of the larger
23     branches.

Page 140

1  Q.  Let me give you a hypothetical to make
2      sure I understand.  Hypothetically
3      speaking, the ones up to 5,000 square
4      feet, let's say that you found that
5      there was a -- the net cleanable square
6      footage was 10 percent less than the
7      gross.  In that scenario, then, would
8      you go through the entire master list
9      of locations and reduce the cleanable
10     square footage on all of those under
11     5,000 square feet by 10 percent?
12 A.  Yes, ma'am.
13 Q.  And that worked with each category?
14 A.  Except for those larger ones.
15 Q.  Except for the over ten, and those
16     were --
17 A.  Yes, ma'am.
18 Q.  -- actual measurements done by the
19     mobile techs?
20 A.  Yes, ma'am.
21 Q.  Do you recall what the adjustment was
22     for the under-5,000-square-feet
23     locations?

35 (Pages 137 to 140)

**MERRILL LEGAL SOULTIONS**
**Court Reporting*Legal Videography*Trial Services**

Page 141

1  A. No, ma'am.
2  Q. Would there have been a percentage
3     difference that was so small as to not
4     have been accounted for?  For
5     instance -- and I'll give you a
6     hypothetical -- let's say the under
7     5,000 after they measured it, the
8     difference was 2 percent.  Would those
9     have all been nonetheless reduced by
10    2 percent, or would you or BB&T have
11    said this is not -- it's not worth
12    changing it for 2 percent?
13 A. The instructions from BB&T were that
14    they were going to apply that sampling
15    percentage across the board.
16 Q. No matter what that number came back
17    as?
18 A. That's correct, yes, ma'am.
19 Q. In that sampling, did any of the
20    locations come back larger than what
21    the gross square footage initially was?
22 A. I don't recall if in the sampling it
23    did.  I know in the measurements that

Page 142

1     they did, the original measurements
2     that were turned in.
3  Q. By PFMI?
4  A. Yes, ma'am.
5  Q. At some point in the spring/early
6     summer of 2006, a change was made and
7     PFMI stopped being responsible for all
8     the branches.  Tell me what happened
9     there.
10 A. From -- how it happened, why it
11    happened?  I'm not sure what you're
12    asking.
13 Q. Tell me first what happened.
14 A. Okay.  That the client, BB&T, felt like
15    the only way to address the changes was
16    to make vendor changes so that the
17    scope of work could be performed,
18    because we were still having hundreds
19    of complaints a month of janitorial
20    complaints.  And at that point, Greg
21    Swanberg with EMCOR made or led that
22    transition effort to bring on new
23    vendors.  There was an interview

Page 143

1     process of potential vendors.  Mark
2     Smith was involved in that as well.
3     And PFMI would be keeping several
4     regions, and the rest of the portfolio
5     was going to be divided up to other
6     vendors.
7  Q. And at that point, was the agreement
8     with PFMI terminated?
9        MR. SAWYER:  Which
10          agreement, Counsel?
11       MS. TULEY:  The original
12          agreement to work on the
13          1400 branches.
14 A. Yes, ma'am, I believe it was.
15 Q. And then for the regions that PFMI was
16    going to continue, was there a new
17    contract created?
18 A. Yes, ma'am.  I believe Greg Swanberg
19    handled that piece.
20 Q. What discussions did you have with PFMI
21    over that contract termination?
22 A. I don't recall specific discussions how
23    to transition out, when, that kind of

Page 144

1     thing.
2  Q. Do you remember when the original --
3     and I'm just going to call it the
4     original contract since we've got two
5     contracts.  I'll call the one we've
6     been discussing the original, and then
7     I'll call the second one the new
8     contract, if we can just have that
9     understanding.
10 A. Yes, ma'am.
11 Q. Do you remember when the original
12    contract was terminated?
13 A. No, ma'am, I really don't.
14 Q. Was that a decision made by EMCOR or by
15    BB&T to terminate PFMI?
16 A. I think it would be fair to say that
17    EMCOR was doing what the client had
18    requested.
19 Q. Who at BB&T made that request?
20 A. It would have been through Edna Green
21    and Randy Hondros, which is
22    H-O-N-D-R-O-S.
23 Q. Why was it that PFMI wasn't terminated

36 (Pages 141 to 144)

**MERRILL LEGAL SOULTIONS**
**Court Reporting*Legal Videography*Trial Services**

Page 145

1   as to all locations?
2   A. I wasn't a part of the discussion, but
3   I believe that Greg Swanberg and either
4   Greg Littlefield or Jim Wohlers or both
5   had a conversation about was there any
6   part of the business that they could
7   hold on to where they felt like they
8   could properly manage that business.
9   Q. Do you know when that discussion would
10  have taken place?
11  A. Ma'am, I don't really recall.
12  Q. Who took over the regions that PFMI
13  lost?
14  A. Two companies: ABM took over a bulk of
15  the business. A&L Services took over
16  some northern region -- D.C. market,
17  upper Virginia, D.C. capital region
18  market.
19  Q. How did the -- how well did the
20  transition go from PFMI to ABM and A&L?
21  A. Fairly rocky. When FMI, who was one of
22  PFMI's subs, walked out of the
23  branches, we got an E-mail confirming

Page 146

1   the walkout. But Jim Wohlers had
2   called me and felt it was going to
3   happen, and then he got a confirming
4   E-mail a couple of hours later. And so
5   there was a no -- what I would term a
6   no-notice walkout. And that was about
7   500 or so branches.
8   Q. And that was by the vendor FMI?
9   A. Yes, ma'am. Other than that, I think
10  it went pretty well. And I need to
11  correct or add that Patton Building
12  Services also took some business in
13  West Virginia.
14  Q. Was that the same branches they were
15  already the vendor for --
16  A. Yes, ma'am.
17  Q. -- under PFMI?
18  A. Yes, ma'am. And I don't recall if we
19  contracted CRM or if Kentucky stayed
20  with PFMI. I think it stayed with
21  PFMI. There were five or six regions
22  that stayed and I don't . . .
23  Q. Did you do a similar ninety-day

Page 147

1   transition period for ABM and A&L that
2   you did for PFMI?
3   A. No, ma'am. We weren't allowed to.
4   Q. How did the transition work for ABM and
5   A&L?
6   A. It was get in and start cleaning. Not
7   trying to oversimplify it, but that's
8   really what it was, especially in the
9   region where we had the walkout. It
10  was get people hired as quickly as
11  possible and get them in there. And in
12  the meantime, my mobile techs carried
13  cleaning supplies, were going in
14  branches trying to straighten up
15  restrooms, provide cleaning supplies,
16  do whatever little bit of work we could
17  do during the meantime. And we also
18  hired a company out of Atlanta to
19  backfill, put some folks on the road to
20  help in the branches as well.
21  Q. What was that company's name?
22  A. Alan Cristal set it up for me, and I
23  don't remember the name of that

Page 148

1   company. I apologize.
2   Q. That's fine. What was your
3   satisfaction with the performance of
4   ABM for the areas they took over?
5   A. It was better.
6   Q. How long did ABM perform services for
7   the BB&T branches?
8   A. With EMCOR?
9   Q. Yes.
10  A. Until we lost the account.
11  Q. You asked that as if they still might
12  be with BB&T branches. Is ABM still
13  servicing BB&T branches?
14  A. To the best of my knowledge, yes,
15  ma'am.
16  Q. What was your level of satisfaction
17  with A&L services?
18  A. Excellent.
19  Q. Were ABM and A&L being paid the same
20  amount for janitorial services that
21  PFMI was being paid?
22  A. I don't recall on a branch-by-branch
23  level, but I believe it was slightly

37 (Pages 145 to 148)

**MERRILL LEGAL SOULTIONS**
**Court Reporting*Legal Videography*Trial Services**

Page 149

1   more.  I don't think in all cases
2   but . . .
3   Q.  Were they paid in the same manner,
4       meaning on a square foot -- price per
5       square foot?
6   A.  The net cleanable numbers that we had
7       come up and determined, yes, ma'am.
8   Q.  So they would have been paid based on
9       the net cleanable square-footage
10      numbers as determined by the mobile
11      tech measurements?
12  A.  Yes, ma'am.
13  Q.  Tell me who negotiated the new contract
14      with PFMI.
15  A.  I believe it was Greg Swanberg, ma'am.
16  Q.  Were there any discussions regarding
17      the withholding of payments for
18      previous overcharges under the new
19      contract?
20  A.  No, ma'am, not to my recollection.
21  Q.  And what was your understanding of the
22      purpose of the new contract?
23          MR. SAWYER:  Object to the

Page 150

1           form of the question.
2           You can answer.
3   A.  The number of locations, that
4       substantially changed.  And it was a
5       clean-cut ending and a start.  I'm not
6       sure what you're asking so . . .
7   Q.  Let me ask it this way.  Under the new
8       contract, were the square-footage
9       numbers, the net cleanable
10      square-footage numbers being used,
11      those calculated by the mobile techs?
12  A.  Yes, ma'am.
13  Q.  Was the price per square foot the same
14      as under the original contract?
15  A.  I didn't negotiate the contract, so I
16      don't know that for sure, ma'am.
17  Q.  Under the new contract -- do you
18      remember when PFMI started performing
19      under the new contract?
20  A.  Not specifically, ma'am, but I -- I'm
21      thinking it was June.  I don't know for
22      sure.
23  Q.  Let's just, for the purposes of

Page 151

1   discussion, just say it was started in
2   June of '06.  And if it turns out to be
3   June 7th or whatever, we'll have an
4   understanding that whatever the
5   documents say can be controlling.  But
6   just for purpose of discussion, let's
7   just say it started 1st of June '06.
8   Was PFMI to start their billing afresh
9   at June 1st, 2006, with these new
10  square-footage numbers and start
11  billing from there without any of the
12  setoffs?
13  A.  Again, not negotiating the contract,
14      but that makes sense to me, yes, ma'am.
15  Q.  Do you know if payment was withheld
16      from PFMI for perceived overcharges
17      in -- from the original contract?
18  A.  I believe we talked earlier today that
19      the June payment was withheld to -- at
20      the direction of BB&T.  They weren't
21      paying us.  So if that was under the
22      new contract, yes, ma'am.
23  Q.  Do you know if in the new contract it

Page 152

1   says that EMCOR has to be paid by BB&T
2   before EMCOR will pay PFMI?
3   A.  Not without having the contract
4       document in front of me, no, ma'am.
5   Q.  How long did PFMI perform under the new
6       contract?
7   A.  Six weeks is my recollection.  I
8       remember getting an E-mail when I was
9       in Phoenix.  That was in mid July.  I
10      couldn't open it on my Blackberry, but
11      it was from Jim saying that we were
12      ceasing service.
13  Q.  Did he state why?
14  A.  I couldn't open it till I got . . .
15  Q.  Eventually when you were --
16  A.  Yes.
17  Q.  -- able to open it?
18  A.  There were several statements in there,
19      and I know that letter is somewhere in
20      our documents.  But I don't -- there
21      were several things.
22  Q.  What is your recollection of what their
23      reason was?

**1933 Richard Arrington Jr. blvd, S*Birmingham, AL 35209*www.merrillcorp.com**
**1-800-888-DEPO**

**MERRILL LEGAL SOULTIONS**
**Court Reporting*Legal Videography*Trial Services**

| Page 153 |
|---|
| 1    A.  They -- my recollection of that letter |
| 2         was that they purported that we had not |
| 3         acted in good faith, that we didn't do |
| 4         the things that we were supposed to do |
| 5         or said that we were going to do, that |
| 6         kind of tone of the letter. |
| 7    Q.  Were the things that they said -- were |
| 8         the things that PFMI said EMCOR |
| 9         wouldn't do paying PFMI? |
| 10   A.  Well, I'd like to have the document in |
| 11        front of me to . . . |
| 12   Q.  All right.  Well, let me just ask you |
| 13        this.  Do you know if during that |
| 14        six-week period that PFMI performed |
| 15        under that new contract they were ever |
| 16        paid? |
| 17   A.  No, ma'am, I don't know.  I believe |
| 18        they were paid for the out-of-scope |
| 19        work, but I don't know that BB&T ever |
| 20        released the June payment to us for the |
| 21        in-scope services. |
| 22   Q.  Were you surprised when BB -- sorry. |
| 23        Were you surprised when PFMI quit? |

| Page 154 |
|---|
| 1    A.  I don't know if "surprise" is the right |
| 2         word.  I wasn't happy about it. |
| 3    Q.  Let me ask you this.  If you'd worked |
| 4         for six weeks and nobody had paid you, |
| 5         would you keep working? |
| 6              MR. SAWYER:  Object to the |
| 7         form of the question. |
| 8              You can answer. |
| 9    A.  If it was me personally, I'd probably |
| 10        have a lot of issue with it, yes. |
| 11   Q.  Did you have any discussions with BB&T |
| 12        about withholding payment from PFMI |
| 13        under the new contract? |
| 14   A.  Me personally? |
| 15   Q.  Yes, ma'am. |
| 16   A.  Not that I recall. |
| 17   Q.  Do you know if anybody had those |
| 18        discussions with BB&T? |
| 19   A.  No, ma'am, I don't know. |
| 20   Q.  Did you see any documents from anybody |
| 21        at EMCOR to BB&T regarding the |
| 22        nonpayment of PFMI under the new |
| 23        contract? |

| Page 155 |
|---|
| 1    A.  I don't know if I saw a document from |
| 2         EMCOR to BB&T.  But I know that we, |
| 3         EMCOR, got a letter saying that we had |
| 4         to make BB&T whole for the old square- |
| 5         footage true-up before we could |
| 6         continue, and we had to stroke them a |
| 7         check for about a hundred and seventy |
| 8         thousand dollars. |
| 9    Q.  Did y'all do any calculations of your |
| 10        own to see if BB&T's true-up numbers |
| 11        were correct? |
| 12   A.  I'm sure that was done.  It would make |
| 13        sense that they were done. |
| 14   Q.  Did you see anything to that effect? |
| 15   A.  If it was sent, I'm sure I would have |
| 16        been copied on it. |
| 17   Q.  And I appreciate you being forthcoming |
| 18        with me, but just -- we're on the |
| 19        record, so I don't want you to have to |
| 20        guess.  I mean, do you recall seeing |
| 21        anything like that? |
| 22   A.  I don't specifically recall a document |
| 23        like that.  There was so much happening |

| Page 156 |
|---|
| 1         at that time, including other |
| 2         transition issues, just general |
| 3         operating of the account. |
| 4    Q.  Do you know if EMCOR disputed that |
| 5         true-up number? |
| 6    A.  The square-footage true-up number? |
| 7    Q.  Yes. |
| 8    A.  Greg Swanberg could probably better |
| 9         answer that than I could.  He was |
| 10        having a lot of those higher-level |
| 11        discussions. |
| 12   Q.  Is Mr. Swanberg still with EMCOR? |
| 13   A.  No, ma'am. |
| 14   Q.  Do you know where he's at? |
| 15   A.  I do not. |
| 16   Q.  During the new contract period, what |
| 17        was your assessment of PFMI's |
| 18        performance? |
| 19   A.  It was better.  They had put managers |
| 20        in the field to do inspections and |
| 21        follow-up and react to the work orders. |
| 22        So it was better. |
| 23   Q.  What kind of notice was given to PFMI |

**1933 Richard Arrington Jr. blvd, S*Birmingham, AL 35209*www.merrillcorp.com**
**1-800-888-DEPO**

**MERRILL LEGAL SOULTIONS**
**Court Reporting*Legal Videography*Trial Services**

| Page 157 | | Page 159 | |
|---|---|---|---|
| 1 | of the termination of their original | 1 | know if they were using any of the same |
| 2 | contract? | 2 | vendors that PFMI used? |
| 3 | A. Thirty-day notice, I believe, ma'am. | 3 | A. I don't. |
| 4 | Excuse me. Can we take a break? | 4 | Q. During the life of the BB&T contract, |
| 5 | Q. Sure. Absolutely. | 5 | did EMCOR get any complaints about |
| 6 | (Brief recess) | 6 | maintenance services? |
| 7 | Q. (By Ms. Tuley) Who took over the part | 7 | A. The mobile maintenance services? |
| 8 | of the janitorial regions that PFMI was | 8 | Q. Yes. |
| 9 | covering under the new contract? | 9 | A. Very few. I recall them being in the |
| 10 | A. ABM, A&L, Patton. | 10 | single digits. |
| 11 | Q. So the same groups that took over what | 11 | Q. During the life of the contract, did |
| 12 | they weren't covering under the | 12 | EMCOR get any complaints about the |
| 13 | original contract took over what they | 13 | landscaping services? |
| 14 | were covering under the new contract? | 14 | A. While I was still on the account, yes. |
| 15 | A. When we started transition, yes. We | 15 | Q. What type of volume of complaints |
| 16 | didn't change -- the new contract | 16 | regarding landscaping were you |
| 17 | was -- like, after FMI walked out, we | 17 | receiving? |
| 18 | had to get ABM in place and that kind | 18 | A. I don't specifically recall the volume. |
| 19 | of stuff. So yes, it was those same | 19 | It didn't start out with many, and I |
| 20 | companies. | 20 | know it -- there was some gradual |
| 21 | Q. Besides Patton -- and I think you named | 21 | increase; but to what those numbers |
| 22 | one other -- were any of the subs that | 22 | were, I don't know. But the FKC would |
| 23 | PFMI had kept in place to do cleaning? | 23 | have reported that information out. |

| Page 158 | | Page 160 | |
|---|---|---|---|
| 1 | A. I didn't recall if CRM, we had kept | 1 | Q. Once -- and I'll just include CRM since |
| 2 | them or not. I think that would have | 2 | you're not sure. Once CRM, ABM, A&L, |
| 3 | been the only one. | 3 | and Patton took over the janitorial, |
| 4 | Q. And you'd already mentioned Patton, | 4 | what kind of complaint volume were you |
| 5 | which was West Virginia? | 5 | seeing? |
| 6 | A. Yes, ma'am. | 6 | A. There were still complaints but the, |
| 7 | Q. So to your knowledge, that was the only | 7 | from my recollection, the volume was |
| 8 | subs of PFMI that were kept on the | 8 | much less or significantly less than we |
| 9 | project? | 9 | had before. |
| 10 | A. I can't speak to whom ABM subbed out | 10 | Q. Did you or anyone else at EMCOR do any |
| 11 | to. | 11 | kind of analysis of the number of |
| 12 | Q. Were either ABM or A&L self-performing? | 12 | complaints received under PFMI versus |
| 13 | A. A&L was self-performing. And I believe | 13 | the number of complaints received after |
| 14 | Patton was and if we hired CRM, them as | 14 | PFMI left the contract? |
| 15 | well. | 15 | A. I don't recall doing one myself and if |
| 16 | Q. Who ended up with the bulk of the | 16 | someone else did one. I left the |
| 17 | branches? And when I say "who," I mean | 17 | contract in September/early October of |
| 18 | CRM, ABM, A&L, or Patton. | 18 | 2006. |
| 19 | A. ABM. | 19 | Q. And I think you mentioned earlier at |
| 20 | Q. And they were using vendors in a number | 20 | some point EMCOR was terminated -- |
| 21 | of the locations? | 21 | A. Yes. |
| 22 | A. In all of the locations. | 22 | Q. -- from BB&T. |
| 23 | Q. And as you sit here today, you don't | 23 | A. That was after I had -- or right |

**1933 Richard Arrington Jr. blvd, S*Birmingham, AL 35209*www.merrillcorp.com**
**1-800-888-DEPO**

Page 161

1    shortly after that, yes.
2    Q. Why was EMCOR terminated?
3    A. The reasons that I understand were
4       failure to handle the janitorial and,
5       to some extent, landscaping services.
6    Q. It seemed to me, like, by August-
7       September of 2006, the janitorial was
8       much improved; is that correct?
9    A. My recollection, yes, ma'am.
10   Q. Were you surprised, then, that BB&T
11      chose to terminate once, in your mind,
12      the janitorial had improved?
13   A. To me, yes. But I had already been
14      removed from the contract. In fact,
15      the problems with janitorial and
16      landscaping led BB&T to request me to
17      be removed.
18   Q. What did you get switched to when you
19      were removed?
20   A. I was given the opportunity to go back
21      to the Wachovia account. They had
22      asked for me to come back and work for
23      them.

Page 162

1    Q. And that's where you still are?
2    A. Yes, ma'am.
3    Q. Who took over the BB&T account when you
4       left it?
5    A. A combination of Steve Yates and Andy
6       Ball, was my boss at the time.
7    Q. Who at BB&T made the decision to
8       terminate EMCOR?
9    A. I believe it was -- well, I don't know
10      specifically who.
11   Q. Did you ever see any kind of written
12      documentation from BB&T stating why
13      they were terminating EMCOR?
14   A. I recently saw a letter. I wasn't
15      originally copied on it, but it was
16      E-mailed to me by Andy Ball.
17   Q. What were reasons they stated in the
18      letter?
19   A. Janitorial, issues with these no-
20      removal portion of landscaping, I
21      believe, was the main -- the main
22      issues listed on that letter.
23   Q. Do you know if at any time from the

Page 163

1    beginning of the BB&T contract up
2    through the termination EMCOR and BB&T
3    ever entered into any kind of dispute
4    resolution process?
5    A. Yes, we did.
6    Q. Tell me what you know about that.
7    A. I don't recall the specific date, but I
8       typed a letter and gave it to Randy
9       Hondros, hand-delivered it, to, per our
10      contract -- per EMCOR's contract with
11      BB&T, enter into a dispute resolution
12      process regarding trash-hauling.
13   Q. What was the dispute regarding
14      trash-hauling?
15   A. Whether it was in-scope or out-of-scope
16      work.
17   Q. What was EMCOR's position?
18   A. I can't speak for EMCOR. I believe the
19      position was that it was -- I can't
20      speak for EMCOR.
21   Q. Was EMCOR getting paid for hauling
22      trash by BB&T?
23   A. No.

Page 164

1    Q. Did EMCOR want to get paid for hauling
2       trash from BB&T?
3    A. EMCOR did not -- EMCOR could only
4       process the invoices from our
5       subcontractors. So it wasn't whether
6       EMCOR wanted it or not. It was were
7       the vendors -- our subcontractors'
8       understanding of that agreement that
9       they could bill for it or not.
10   Q. Was EMCOR getting billed for
11      trash-hauling?
12   A. I remember seeing two invoices for
13      trash-hauling from PFMI for two
14      specific vendors.
15   Q. Is that the only things you -- only
16      bills you remember seeing regarding
17      trash-hauling?
18   A. In the old contract, yes.
19   Q. At any point during the life of the
20      BB&T contract, was EMCOR billed for
21      trash-hauling besides the two you just
22      told me about?
23   A. Yes, ma'am.

41 (Pages 161 to 164)

Page 165

1  Q. Tell me how much in dollars or tons of
2     trash or however you want to tell me.
3     I mean, what kind of money are we
4     talking about here that's for
5     trash-hauling that y'all were getting
6     billed?
7  A. There's -- I can't give you an exact
8     dollar amount, but I believe there was
9     two hundred thousand dollars, mainly
10    through ABM, but A&L had some as well.
11 Q. Did a dispute resolution actually
12    occur?
13        MR. SAWYER: Objection.
14        Vague. You can answer
15        if you understand.
16 A. The process would have been for Greg
17    Swanberg, who was the senior executive
18    at the level designated in the
19    contract, and Randy Hondros to sit down
20    and work out a resolution which we had
21    brought to their attention. And while
22    I can't speak directly to it because I
23    don't have it and I wasn't a part of

Page 166

1     it, there is a letter that I think
2     resolved a number of issues but
3     trash-hauling. So the dispute
4     resolution was ineffective, I would
5     say, for the trash-hauling piece.
6  Q. Do you know if that dispute was ever
7     escalated to a lawsuit being filed
8     against BB&T by EMCOR?
9  A. I don't know if it's that or not.
10 Q. Do you know if an arbitration was
11    commenced by EMCOR against BB&T
12    regarding the trash-hauling?
13 A. I'm not aware of it, no, ma'am.
14 Q. Was EMCOR sued by ABM or A&L for
15    payment regarding trash-hauling?
16 A. Not to my knowledge, no, ma'am.
17 Q. Do you know if ABM or A&L started an
18    arbitration against EMCOR for payment
19    regarding trash-hauling?
20 A. Not to my knowledge, no.
21 Q. Would somebody else besides yourself
22    know more about whether or not
23    litigation or arbitrations were

Page 167

1     commenced against EMCOR regarding
2     trash-hauling?
3        MR. SAWYER: I would. Off
4        the record.
5        (Off-the-record discussion)
6  Q. Just to summarize, to your knowledge,
7     was the trash-hauling or trash-removal
8     issue ever resolved between BB&T and
9     EMCOR?
10 A. Not to my knowledge, no, ma'am.
11 Q. Was it uniformly the position of
12    EMCOR's vendors that they should be
13    paid to haul trash off-site?
14 A. My understanding was that trash-hauling
15    was a -- is a part of the scope of work
16    and, therefore, BB&T didn't want to pay
17    us to haul it off-site.
18 Q. Was it your understanding before the
19    project got started back in '05 that
20    BB&T would have a location on site to
21    dispose of trash?
22 A. My understanding in the scope of work
23    that it's either disposed of on site or

Page 168

1     at a regional-type location.
2  Q. Was there -- strike that. At some
3     point, either right before the project
4     started or during the life of the
5     project, did BB&T start a program to
6     remove dumpsters from any of its
7     locations?
8  A. I can't say it was a program. I can
9     speak to being notified -- and I'm not
10    quite sure how I found out about it.
11    But BB&T security had instructed, my
12    understanding -- I didn't see the
13    document -- but had instructed their
14    branches to, where possible, remove
15    dumpsters.
16 Q. Did you see any explanation of why they
17    thought that was a security problem?
18 A. Again, I don't remember seeing a
19    specific document. But I believe their
20    reasoning was the -- sometimes
21    financial records or transactions may
22    have been disposed of and ended up in
23    the trash can. Identity theft kind of

42 (Pages 165 to 168)

**MERRILL LEGAL SOULTIONS**
Court Reporting*Legal Videography*Trial Services

Page 169

1    issues was their concern.
2  Q.  Do you have any idea what it costs to
3     have a dumpster on site at a branch
4     bank?
5  A.  Not specifically at a branch bank.  And
6     depending on location, variety, vendor
7     providing the service, an eight-yard
8     dumpster, which is a typical one, just
9     box-type dumpster that you would see, I
10    would think would be -- I don't know.
11    I think at our church we pay
12    seventy-five dollars a month and then
13    tipping fees, hauling fees.  I just
14    don't know.
15  Q.  That was going to be my next question.
16    In your experience with janitorial
17    work, I mean, would fifty to a hundred
18    dollars a month be about what a
19    dumpster costs?
20  A.  Of that size, probably.
21  Q.  Did you ever see any documentation or
22    hear any discussions about BB&T
23    removing dumpsters as a cost-savings

Page 170

1     device?
2  A.  I don't recall a specific document.
3     However, I did report a -- and I think
4     it was in E-mail form; pretty confident
5     it was in E-mail form -- that we,
6     EMCOR, certainly didn't see that as a
7     viable option, that it would be a --
8     other costs, you know, may have been
9     incurred if you did that.
10  Q.  And just so the record is clear, you
11    saw something, not sure exactly if it
12    was an E-mail or what, but that
13    basically said EMCOR doesn't see
14    dumpster removal as a viable option to
15    save money?
16  A.  I think I wrote an E-mail that said
17    certainly that would be an issue of
18    concern.
19  Q.  In the dispute letter that you typed up
20    and delivered to Randy Hondros --
21  A.  Yes, ma'am.
22  Q.  -- anywhere in that letter did it
23    discuss the fact that, whether

Page 171

1     intentionally or not intentionally,
2     BB&T had enjoyed a cost savings by
3     virtue of removing the dumpsters from
4     their branch bank locations?
5  A.  I don't believe so.  I think the letter
6     was pretty short and matter of fact in
7     that I quoted the section of the
8     contract that I was enacting and who
9     the contact should be and that within
10    five days, because I think that's what
11    it says in the contract, a meeting --
12    the first meeting is to be held and
13    that it could be done by conference
14    call.  But I think it was pretty short,
15    matter of fact to the statement.
16  Q.  In any conversations that you had had
17    with PFMI, did you ever discuss the
18    trash-hauling issue with them?
19  A.  There was a trash -- what I term the
20    "trash summit" where PFMI and EMCOR and
21    PFMI -- no.  I think Alan Cristal
22    brought to the table two companies,
23    like a BFI or other trash-hauling

Page 172

1     company, and BB&T did discuss the
2     ongoing trash issue.
3  Q.  And that was -- was that a face-to-face
4     meeting?
5  A.  It was a face-to-face meeting.
6  Q.  Where did that occur?
7  A.  At the real estate offices for BB&T in
8     Winston.
9  Q.  Either at that summit or any other
10    time, was PFMI told that they would be
11    paid to take trash off-site?
12  A.  I don't specifically recall that, no,
13    ma'am.
14  Q.  Who was the point person for this trash
15    issue, the point person at EMCOR?
16  A.  Alan Cristal wanted -- he took that on,
17    and I'm going to say that was early
18    February of '06.  And he at that time
19    had requested, like, seventy-five days
20    to put some material together.
21  Q.  Was a representative of BB&T at the
22    trash summit?
23  A.  I was in and out of that meeting.  I

43 (Pages 169 to 172)

**MERRILL LEGAL SOULTIONS**
**Court Reporting*Legal Videography*Trial Services**

| Page 173 | Page 175 |
|---|---|
| 1   didn't -- I didn't stay throughout the | 1   A. I believe in that case we took it to |
| 2   day.  But I believe so, yes. | 2   the facility management group, Ronny |
| 3   Q. Do you recall who that was? | 3   Eller's group or Edna Green's group, to |
| 4   A. No, ma'am, I don't. | 4   let them work it out, because it then |
| 5   Q. Besides Alan Cristal, do you recall who | 5   to me seemed to me to be an internal |
| 6   else from EMCOR was involved in that | 6   BB&T issue. |
| 7   meeting? | 7   Q. Do you remember what the resolution of |
| 8   A. I don't know if Debi Crosby -- I don't | 8   that issue was? |
| 9   remember. | 9   A. No, ma'am, I don't. |
| 10  Q. Do you know if any minutes or any kind | 10  Q. Do you know what EMCOR's projected |
| 11  of written summary was created from | 11  profit margin was on the BB&T project? |
| 12  that meeting? | 12      MR. SAWYER:  For the whole |
| 13  A. If they were, Alan would have done it. | 13      contract? |
| 14  Q. At what point in the life of either the | 14      MS. TULEY:  Yes. |
| 15  proposal phase or the contract phase | 15  A. Without having those financial |
| 16  did EMCOR find out that BB&T intended | 16  documents in front of me and I haven't |
| 17  to remove dumpsters? | 17  looked at that stuff in quite some |
| 18  A. Again, I don't remember when that first | 18  time, so I don't remember, ma'am. |
| 19  came to light, but I brought it to the | 19  Q. Who would be most familiar with what |
| 20  attention of Ronny Eller's group as | 20  the projected profit was on the BB&T |
| 21  soon as I heard about it.  And I think | 21  contract? |
| 22  they intervened to get security to stop | 22  A. If you're looking for a current |
| 23  that program, but I really don't recall | 23  employee, probably Andy Ball could |

| Page 174 | Page 176 |
|---|---|
| 1   when that was. | 1   speak to that pretty well. |
| 2   Q. Where were the -- strike that. | 2   Q. Have you ever seen the Complaint, which |
| 3       At locations that didn't have a | 3   is the document that PFMI filed to |
| 4   dumpster, what was BB&T's designated | 4   start this lawsuit? |
| 5   location to dispose of trash? | 5   A. Yes, ma'am. |
| 6   A. I can't speak for all branches because | 6   Q. When did you first see the Complaint? |
| 7   I -- I just couldn't.  There were | 7   A. December, I think, of -- '06.  I |
| 8   regional buildings or larger buildings. | 8   believe that's correct. |
| 9   If it was in an area where they had a | 9   Q. Have you seen what is often called the |
| 10  dumpster, they could take it from the | 10  Answer, which is EMCOR's response to |
| 11  branch to the larger building. | 11  PFMI's lawsuit? |
| 12  Q. Did you ever see any complaints where | 12  A. Yes, ma'am.  I believe that was |
| 13  one BB&T branch was complaining about | 13  forwarded to me. |
| 14  people -- the cleaners dumping trash | 14  Q. At the termination of EMCOR by BB&T, |
| 15  from another BB&T branch in their | 15  what happened to all the mobile techs? |
| 16  dumpster? | 16  A. They were interviewed by the new |
| 17  A. Yes, ma'am, I do remember seeing at | 17  company.  I don't remember how many got |
| 18  least one of those in Georgia, I | 18  hired on, but a lot of them did.  Some |
| 19  believe. | 19  of them did not. |
| 20  Q. What would be the solution in a | 20  Q. What company took over the BB&T |
| 21  situation like that for that cleaner to | 21  project? |
| 22  do with the trash if they couldn't dump | 22  A. CB Richard Ellis. |
| 23  it at another BB&T branch? | 23  Q. Do they still have it? |

44 (Pages 173 to 176)

**MERRILL LEGAL SOULTIONS**
**Court Reporting*Legal Videography*Trial Services**

Page 177

1 A. To the best of my recollection or
2   knowledge, yes.
3 Q. During the proposal and the
4   presentation phase, did you hear or did
5   you come to know how long BB&T had had
6   the majority of these branches?  Strike
7   that.  Let me ask it another way.
8     The 1400 some-odd branches, had
9   all of those been long-standing BB&T
10   branches or had BB&T recently gone
11   through an acquisition phase and picked
12   up a lot of those as new branches?
13 A. I couldn't speak to that, ma'am.  I
14   don't know that I recall that.
15   Certainly BB&T had done many
16   acquisitions; but when they occurred, I
17   can't speak to.
18 Q. You don't recall any discussions about
19   how new or old any of the branches
20   were?  And by "new or old," I mean to
21   BB&T.
22 A. I don't specifically recall any of that
23   during the presentation phase or

Page 178

1   proposal phase.  There were some in
2   Virginia.  But what acquisition that
3   was -- like the one I looked at didn't
4   seem to be that well upkept that I was
5   speaking to earlier.  I don't know if
6   that had always been a BB&T or had that
7   been an acquisition.  I don't know.
8     MS. TULEY:  I'm going to
9       start going through some
10       documents.  Y'all want
11       to take a quick break or
12       keep plowing on?
13     MR. SAWYER:  Sure.
14     (Brief recess)
15     (Plaintiff's Exhibit #1 was
16       marked for identification.)
17 Q. (By Ms. Tuley) I'm going to show you
18   what I have just marked as Plaintiff's
19   Exhibit #1.  And I'm going to ask you,
20   first of all, have you ever seen this
21   document before?
22 A. Yes.
23 Q. Could you tell me what this document

Page 179

1   is?
2 A. This is the letter of intent between
3   EMCOR and PFMI.
4 Q. Do you know who drafted this letter?
5 A. I don't know who drafted it, just who
6   signed it.
7 Q. Were you involved in the drafting of
8   this letter at all?
9 A. No, ma'am.
10 Q. In your office, did you keep any kind
11   of paper records regarding the BB&T
12   project?
13 A. Yes, ma'am.
14 Q. When you left the BB&T project and went
15   back to Wachovia project, what happened
16   with your paper files?
17 A. They stayed with the project.
18 Q. Do you know where those paper files are
19   stored today?
20 A. Not specifically where they are today,
21   no, ma'am.
22 Q. And do you know if what we've marked as
23   Plaintiff's Exhibit #1, this letter of

Page 180

1   intent, would have been something that
2   would have been kept in your paper
3   files, at least a copy of it?
4 A. I don't know that I had this in my
5   files.
6 Q. What type of documents would you have
7   kept in your files?
8 A. Contract files, scope of work -- I
9   tried to do a lot electronically
10   instead of having a lot of paper --
11   personnel files, copies of reports if
12   it was, like, from the FKC.  But not a
13   lot of paper.
14 Q. Let me ask you this.  How long is
15   information stored on that FKC?
16 A. I don't believe the information ever
17   goes away.  We can access it back up to
18   sixty days; and if we want to go
19   further than that, we have to go
20   through the reporting group at the FKC.
21 Q. Where is the FKC headquartered?
22 A. Phoenix, Arizona.
23     (Plaintiff's Exhibit #2 was

45 (Pages 177 to 180)

**MERRILL LEGAL SOULTIONS**
**Court Reporting*Legal Videography*Trial Services**

Page 181

1          marked for identification.)
2  Q.  I'm going to show you what I just
3       marked as Plaintiff's Exhibit #2.  I'm
4       going to ask you first if you've ever
5       seen this document before.
6  A.  I believe so, yes.
7  Q.  Could you tell me what this is?
8  A.  This appears to be the project plan for
9       implementing and rolling out the BB&T
10      account.
11  Q.  Would this have just been with regards
12      to janitorial or would this have been
13      the entire project?
14  A.  This appears just to be for the
15      janitorial implementation.
16  Q.  Would there have been a similar
17      document with regards to the mobile
18      techs and the landscaping?
19  A.  Yes, ma'am.
20  Q.  Do you know if, just by looking at this
21      document, if this was the final time
22      line, implementation time line, or if
23      there were subsequent time lines?

Page 182

1  A.  This one appears to be the one that was
2       put into our contract, but I -- I don't
3       know if it's reflective of any changes
4       that occurred during or before
5       start-up.
6  Q.  I have read these kind of things
7       before, but they're always a little bit
8       confusing.  There are different -- I'm
9       sure this was originally in color.  But
10      there are dark bars, there are light
11      gray bars, and there's what I would
12      just call gray bars.  Did the color of
13      the bar indicate something specific or
14      does the color of the bar have any
15      meaning?
16  A.  It would.  For instance, if it was
17      in -- if there was a green bar, that
18      would represent a good condition or an
19      on-target condition.  But I don't know
20      the colors that were used here without
21      seeing the color copy.
22  Q.  And I think you just said this.  But it
23      was your recollection that this was

Page 183

1  included in the contract between BB&T
2  and EMCOR?
3  A.  Yes, ma'am.  The only reason I would
4     say that is because it's got an exhibit
5     number related at the top.
6  Q.  You're referring to the Exhibit K in
7     the upper right-hand corner?
8  A.  Yes, ma'am.
9  Q.  Or lower left-hand corner.  As the
10    project progressed, would there be
11    updated versions of this that were
12    generated?
13  A.  Yes, ma'am.
14  Q.  Who would be responsible for generating
15    these time lines?
16  A.  The transition manager.  That was Paul
17    Wilbur.
18         (Plaintiff's Exhibit #3 was
19         marked for identification.)
20         MS. TULEY:  Off the record.
21         (Off-the-record discussion)
22  Q.  I'm going to show you what I just
23    marked as Plaintiff's Exhibit #3.  This

Page 184

1  appears to be a letter to you from Jim
2  Wohlers.  Have you seen this letter
3  before?
4  A.  Yes, ma'am.
5  Q.  Do you recall receiving this letter?
6  A.  Yes, ma'am.
7  Q.  Tell me what -- was this a letter you
8     requested?
9  A.  Yes, ma'am.
10  Q.  Tell me why.
11  A.  This letter was generated after there
12    was an incident with a stolen what's
13    termed a bank proof bag from a branch.
14  Q.  Tell me what you know about that
15    proof-bag situation.
16  A.  That a subcontractor of PFMI, Destiny
17    Cleaning, had employed someone to clean
18    a branch -- and I don't recall the
19    branch location -- and that that person
20    had stolen the proof bag and there was
21    an amount of money assigned to
22    transactions that couldn't be recreated
23    for the bank and that EMCOR was

46 (Pages 181 to 184)

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 185

1    responsible for making that whole.
2  Q.  Do you know, I mean, what types of
3    things are contained in a proof bag?
4  A.  When I asked that question, it was
5    checks, copies of transactions that
6    were done in a bank.  And I don't know
7    what else would be in there.
8  Q.  Did you see a police report regarding
9    the theft of the proof bag?
10  A.  I remember a report from security,
11    getting a report from BB&T security,
12    but I don't remember if that was the
13    police report or their report or both.
14  Q.  Do you know if a report was filed with
15    the police regarding the theft of the
16    proof bag?
17  A.  My understanding it was, yes, ma'am.
18  Q.  Do you know if there has been a
19    prosecution of the person accused of
20    stealing the proof bag?
21  A.  I don't have firsthand knowledge of
22    that.  I can tell you what I was told,
23    but I --

Page 186

1  Q.  What were you told about that?
2  A.  I was told that the person admitted it
3    and charges would have -- were filed.
4    But how -- the disposition of that, I
5    don't know.
6  Q.  Do you know who hired Destiny Cleaning
7    Services?
8  A.  They were a subcontractor of FMI.  But
9    who at FMI, I don't . . .
10  Q.  Were they recommended by BB&T?
11  A.  I don't recall, ma'am.
12  Q.  Did BB&T demand or seek any type of
13    payment from EMCOR regarding the proof
14    bag?
15  A.  Not only did they seek it, we had to
16    come up with it.
17  Q.  What type of investigation did EMCOR do
18    into the theft of the proof bag prior
19    to paying BB&T?
20  A.  I think Greg Swanberg could better
21    answer that than myself.
22  Q.  Did you do any type of investigation?
23  A.  We addressed it to our insurance risk

Page 187

1    people.  Now, whether they conducted
2    one or not, I can't speak to.
3  Q.  Do you know if EMCOR paid the money to
4    BB&T or if it came from EMCOR's
5    insurance?
6  A.  No.  EMCOR paid the money.  It did not
7    come from EMCOR insurance.
8  Q.  Was there any type of dispute process
9    instituted regarding that payment?
10  A.  Not that I'm -- that I recall, no,
11    ma'am.
12  Q.  And in your opinion, Greg Swanberg
13    would know the most about that issue?
14  A.  Yes, ma'am.
15  Q.  Are you aware that EMCOR has made a
16    claim against PFMI for reimbursement of
17    the amount that EMCOR paid to BB&T
18    regarding the proof bag?
19  A.  That's what I have been told, but I
20    don't have firsthand knowledge of that.
21      MR. SAWYER:  You mean in
22      this action?
23      MS. TULEY:  Yes, in this

Page 188

1    action.
2  Q.  Why did you request the information on
3    the background checks and drug screens?
4  A.  In an effort to determine whether the
5    procedure as we had laid out before for
6    background checks and drug screening of
7    people working in the branches had been
8    done.
9  Q.  And what was your determination?
10  A.  We had this letter that said yes, it
11    had been done, that Keith Blackburn had
12    gone to Destiny's office to review and
13    look at the documentation regarding the
14    services or the personnel involved.
15  Q.  Was BB&T able to recover or recoup any
16    of the losses resulting from the theft
17    of the proof bag prior to the
18    compensation being received from EMCOR?
19  A.  Yes.  EMCOR paid the balance of what
20    could not be reproduced or recreated,
21    and I don't know enough about banking
22    to tell you how that happens.
23  Q.  After EMCOR paid that balance, was BB&T

1933 Richard Arrington Jr. blvd, S*Birmingham, AL 35209*www.merrillcorp.com
1-800-888-DEPO

**MERRILL LEGAL SOULTIONS**
**Court Reporting*Legal Videography*Trial Services**

Page 189

1  able to make any other recoveries
2  regarding the proof bag?
3  A. Not that I'm aware of, no, ma'am.
4  Q. To your knowledge, was EMCOR reimbursed
5  any money that they had paid BB&T
6  regarding the proof bag?
7  A. Not that I'm aware of, no, ma'am.
8  (Plaintiff's Exhibit #4 was
9  marked for identification.)
10  Q. Let me show you what I've marked as
11  Plaintiff's Exhibit #4. Can you tell
12  me what this is?
13  A. This is a letter received from Jim
14  Wohlers at PFMI outlining the
15  understanding that EMCOR was currently
16  compiling accurate cleanable square-
17  footage numbers and that PFMI
18  understand that what has been billed by
19  PFMI since November, that billing
20  adjustments will be made, credits
21  and/or debits, based on those surveys
22  and that those would then become the
23  adjusted square-foot cleanable numbers

Page 190

1  going forward.
2  Q. The last, I guess it's sentence of
3  this, says, Once these surveys are
4  complete and prior to any adjustments
5  being made, PFMI reserves the right to
6  challenge and remeasure any surveys.
7  Did PFMI dispute any of the
8  measurements or surveys done by the
9  mobile techs?
10  A. I recall getting one challenge, to use
11  that term, and I spoke to it earlier
12  today. But I don't recall if that
13  was -- it was in the east Tennessee
14  region, I believe, but I couldn't
15  remember if it was multiple branches or
16  a single branch.
17  Q. Besides the one challenge, I mean, did
18  PFMI relate to you that they did not
19  agree with any of the other
20  remeasurement numbers?
21  A. The only other conversation I remember
22  having with Jim Wohlers was that there
23  was a big concern about the numbers.

Page 191

1  But pretty much to that extent.
2  (Plaintiff's Exhibit #5 was
3  marked for identification.)
4  Q. Let me show you what I've marked as
5  Plaintiff's Exhibit #5. I'm going to
6  ask you if you have seen a copy of this
7  letter.
8  A. Yes, ma'am, I believe so.
9  Q. Did you get this as -- let me ask it
10  this way. Did you see this letter in
11  the normal course of your work on the
12  BB&T project?
13  A. Yes, ma'am.
14  Q. I'm not going to go through this whole
15  letter. It looks like it's a letter
16  from Greg Swanberg to Timothy
17  Shelburne, who apparently is in the --
18  well, who is Timothy Shelburne? instead
19  of me guessing.
20  A. My understanding, he's the in-house
21  attorney for BB&T. And it's not from
22  Greg. It's to Greg.
23  Q. To Greg. You're right. Sorry. If

Page 192

1  you'll look at the second page, it's
2  a -- would you agree with me it's a
3  letter regarding the stolen proof bag?
4  A. Yes, ma'am.
5  Q. On the second page, third paragraph
6  from the end, it says inside that
7  paragraph: If EMCOR disputes such
8  liability in accordance with the
9  provisions of paragraph 14 of the
10  contract governing dispute resolution,
11  please consider this letter as demand
12  for dispute resolution meeting. And
13  we've already covered this, but just to
14  be clear, did any such dispute
15  resolution meeting regarding the proof
16  bag occur?
17  A. Not to my knowledge, no, ma'am.
18  Q. At the end of the first paragraph of
19  this letter, Mr. Shelburne writes: No
20  criminal background check on
21  Ms. McLaurin was conducted by Destiny
22  Cleaning Service prior to allowing her
23  to work on BB&T premises.

48 (Pages 189 to 192)

**MERRILL LEGAL SOULTIONS**
**Court Reporting*Legal Videography*Trial Services**

Page 193

1    I thought we had already
2  discussed where a background check had
3  been done on McLaurin.  Was that your
4  understanding?
5          MR. SAWYER:  Object to
6              counsel's
7              characterization of
8              prior testimony.  You
9              can answer if that's
10             your understanding.
11  A.  My understanding that one had been
12  done, but the owner of Destiny Cleaning
13  told BB&T that in fact he had not done
14  one.
15  Q.  All right.  He told BB&T that he -- the
16  owner of Destiny told BB&T he had not
17  done one?
18  A.  Yes, ma'am.
19  Q.  Did anybody at EMCOR contact the owner
20  of Destiny and ask them about the
21  background check?
22  A.  Not from EMCOR.  We went to our
23  contractor, PFMI.

Page 194

1  Q.  And what did PFMI say about the
2  background check?
3  A.  Well, we have the letter that talks
4  specifically to the background check
5  that Jim wrote to me after Keith
6  Blackburn had visited the site.  Why
7  there's a -- why those two don't match
8  I can't speak to.
9  Q.  Did you do any kind of investigation of
10  your own to see if a background check
11  had in fact been done on McLaurin?
12  A.  Only by requesting from PFMI
13  confirmation that one had been done.
14          (Plaintiff's Exhibit #6 was
15              marked for identification.)
16  Q.  I'm going to show you what I just
17  marked as Plaintiff's Exhibit #6.  Can
18  you tell me what this letter is?
19  A.  This is a letter composed and signed by
20  myself terminating the services between
21  EMCOR and PFMI, also stating that a new
22  agreement would be presented for
23  continued services in Georgia,

Page 195

1  Kentucky, West Virginia, and Tennessee.
2  Q.  Who is -- is it Johnna Spera?
3  A.  Johnna Spera.  She was the in-house
4  corporate attorney for EMCOR at the
5  time, EMCOR Facilities Services.
6  Q.  All right.  And just, I think, for the
7  record, if you'll look, this seems to
8  confirm what we had discussed earlier,
9  that the new contract commenced
10  effective June 1, 2006; is that
11  correct?
12          MR. SAWYER:  Object to
13              counsel's
14              characterization.
15  A.  Yes.
16          (Plaintiff's Exhibit #7 was
17              marked for identification.)
18  Q.  Let me show you what I've marked as
19  Plaintiff's Exhibit #7.  This is a
20  rather big document, so if you could
21  look through it for a minute and then
22  tell me if you've seen this document
23  before.

Page 196

1  A.  Yes, I have.
2  Q.  Tell me what this is.
3  A.  This is the -- a contract agreement for
4  services between EMCOR and PFMI.
5  Q.  It's dated May 3rd, 2006; is that
6  correct?
7  A.  Yes, ma'am.
8  Q.  Is this what we have been referring to
9  as the new contract?
10  A.  Yes, ma'am.
11  Q.  The copy I'm looking at is not signed.
12  Do you know if this version was
13  executed?
14  A.  To the best of my knowledge, yes,
15  ma'am.
16          MR. SAWYER:  Off the record.
17          (Off-the-record discussion)
18  Q.  If you will look at what's marked as
19  Exhibit B to what we have just marked
20  as Plaintiff's Exhibit #7.
21  A.  Yes, ma'am.
22  Q.  Tell me what Exhibit B is.
23  A.  Exhibit B is a list of the locations

49 (Pages 193 to 196)

Page 197

1     that PFMI would be cleaning.
2  Q. Was this list the regions that PFMI
3     would be covering under the new
4     contract?
5  A. Yes, ma'am.
6  Q. Who generated this list?
7  A. I don't really know the answer to that,
8     because I didn't work on this contract.
9        (Brief pause)
10       (Plaintiff's Exhibit #8 was
11         marked for identification.)
12 Q. Let me show you what I've marked as
13    Plaintiff's Exhibit #8. I'm going to
14    ask you if you've seen this letter
15    before.
16 A. I don't specifically recall if I've
17    seen this one or not.
18 Q. If you'll look at the third page --
19 A. Yes, ma'am.
20 Q. -- which I'll represent to you I'm not
21    exactly sure if it goes with this
22    letter or not. I'm assuming it does.
23    Have you seen this document, the third

Page 198

1     page of Plaintiff's Exhibit #8?
2  A. I don't recall seeing this, no, ma'am.
3        MS. TULEY: Y'all want to
4            take about a five-minute
5            break?
6        MR. SAWYER: Yeah.
7        (Brief recess)
8        (Plaintiff's Exhibit #9 was
9            marked for identification.)
10 Q. (By Ms. Tuley) All right. I'm going to
11    show you what I've marked as
12    Plaintiff's Exhibit #9.
13 A. Yes, ma'am.
14 Q. Tell me what this top page is.
15 A. This outlines the general scope of work
16    to be performed under the janitorial
17    services contract.
18 Q. And this is marked as Exhibit D, is
19    what it says at the top?
20 A. Yes, ma'am.
21 Q. Would this be, to your knowledge,
22    Exhibit D to the contract between EMCOR
23    and BB&T?

Page 199

1  A. To my knowledge, yes, ma'am.
2  Q. And if you will -- and is this a
3     document you're fairly familiar with,
4     this Exhibit D?
5  A. Yes, ma'am.
6  Q. Does this look like a correct copy of
7     it?
8  A. Appears to be so, yes.
9  Q. If you'll flip over to the second page.
10    We're looking at what looks like a
11    chart and has four columns: Specific
12    service type, two columns that say
13    frequency, and one that says comment.
14    And without just going line by line
15    through this thing, this looks like it
16    just sets up how often the tasks in the
17    left-hand column are to be conducted.
18    Is that fair?
19 A. That's correct.
20 Q. And let's see. The chart document
21    is -- let me make sure -- four pages.
22        MR. SAWYER: You're looking
23            at Exhibit E, Counsel?

Page 200

1        MS. TULEY: No. I'm still
2            looking at Exhibit D.
3  Q. There is a first page that has bullets,
4     and then there's a four-page chart on
5     Exhibit D. Was this Exhibit D the
6     entire scope of work?
7  A. For janitorial.
8  Q. For janitorial.
9  A. Yes, ma'am.
10 Q. Were there any additions to this scope
11    of work during the contract?
12 A. There were some changes made -- there
13    was a task force or a group of RBOMs,
14    myself; Edna Green led the effort -- to
15    modify the scope of work. And I'm not
16    really sure when we did that. February
17    or March, I believe, of '06.
18 Q. Was that modified scope ever put into
19    effect?
20 A. Yes, ma'am.
21 Q. It replaced the original scope?
22 A. Yes, ma'am.
23 Q. Do you recall what the changes were?

**MERRILL LEGAL SOULTIONS**
**Court Reporting*Legal Videography*Trial Services**

Page 201

1  A. I don't. I believe they were -- there
2     weren't many changes at all to the
3     janitorial scope. And without having
4     it in front of me, the -- there was
5     addition for paper towels in some break
6     rooms; some other, I think, fairly, you
7     know, moderate changes, not a lot, to
8     this -- this scope.
9  Q. If you'll go back about eleven pages to
10    what is marked as Exhibit H. It's
11    Exhibit H, Management Fee Summary.
12 A. Yes, ma'am.
13 Q. Are you familiar with this document?
14 A. Yes, ma'am.
15 Q. It says Portfolio Management &
16    Administration. Does this document
17    outline the charges from EMCOR to BB&T
18    for the BB&T project?
19 A. For the janitorial portion of the BB&T
20    project, yes, ma'am.
21 Q. It has a line item for a facilities
22    knowledge center. Was that for all use
23    of the facility knowledge center or

Page 202

1     just what was anticipated for the
2     janitorial?
3  A. Anticipated for janitorial and based on
4     an estimate.
5  Q. What are ODCs?
6  A. Other direct costs.
7  Q. And what is fringe?
8  A. Burden for the employee, the taxes, the
9     insurance.
10 Q. Fringe benefits?
11 A. Fringe benefits, yes, ma'am.
12 Q. Got you. At the bottom, it says, the
13    bottom of the little chart, it says,
14    Roughly 6.7 million square feet
15    managed. Is that gross or net?
16 A. I can't specifically speak to that. I
17    don't know.
18 Q. On the little bullets, it says, Level 3
19    licenses. Was that what we were
20    talking about to look at the FKCs?
21 A. Yes, ma'am.
22       (Brief pause)
23 Q. That's all the questions I have about

Page 203

1     that.
2       (Plaintiff's Exhibit #10 was
3       marked for identification.)
4  Q. I'm going to show you what I've marked
5     as Plaintiff's Exhibit #10. And the
6     first document we're looking at here is
7     entitled Exhibit B. Can you tell me
8     what Exhibit B is?
9  A. This was an original draft of how the
10    account would be laid out after the
11    implementation of mobile maintenance.
12 Q. And it's got your name as being the
13    account manager; is that correct?
14 A. Sean. Yes, ma'am.
15 Q. And then where it says Administrative
16    Assistant I, would that be Lynn Wilson
17    that we've talked about?
18 A. Yes, ma'am.
19 Q. Who would be the contracts manager?
20 A. We didn't end up with a contracts
21    manager. We had the accounting people.
22 Q. Where it says "Accounts Payable (2)"?
23 A. Yes, ma'am. It was an accounting

Page 204

1     manager and a payable clerk.
2  Q. We had talked about you having seven
3     regional managers.
4  A. Yes, ma'am.
5  Q. I'm seeing eight slots here.
6  A. This document is not how the account
7     was set up.
8  Q. This was just one of the original
9     drafts?
10 A. Yes, ma'am.
11 Q. Would there be a document similar to
12    this but with -- but correct?
13 A. Yes, ma'am.
14 Q. You've seen one?
15 A. Yes, ma'am.
16 Q. We may get to it; we may not. I don't
17    know if I have it in this pile. If
18    you'll flip to the next page where it
19    says Exhibit C.
20 A. Yes, ma'am.
21 Q. And I guess I should have asked, to
22    start with, it's got -- all of these
23    have up in the upper left-hand corner,

**1933 Richard Arrington Jr. blvd, S*Birmingham, AL 35209*www.merrillcorp.com**
**1-800-888-DEPO**

**MERRILL LEGAL SOULTIONS**
**Court Reporting*Legal Videography*Trial Services**

| Page 205 | | Page 207 | |
|---|---|---|---|
| 1 | where it says Contract Number | 1 | somebody looking at it. |
| 2 | EMC-00793. Does this go with the | 2 | (Plaintiff's Exhibit #12 was |
| 3 | original contract between EMCOR and | 3 | marked for identification.) |
| 4 | BB&T? | 4 | Q. I'm going to show you what I've marked |
| 5 | A. I don't think this is in the original | 5 | as Plaintiff's Exhibit #12. Take a |
| 6 | contract, no. | 6 | look at that and, first off, tell me if |
| 7 | Q. Do you know what these are exhibits to, | 7 | you've seen this document before. |
| 8 | then? | 8 | (Brief pause while witness |
| 9 | A. I could only guess. | 9 | reviews document) |
| 10 | Q. That's fine. It's dated -- if you'll | 10 | A. If not this document, one very close to |
| 11 | look at what's marked as part of | 11 | it. |
| 12 | Plaintiff's Exhibit #10 as Exhibit C, | 12 | Q. Tell me what this is. |
| 13 | it says Janitorial Price Response; and | 13 | A. This is a listing of all the BB&T |
| 14 | it's got a revised date in the bottom | 14 | branches that fell in our account. |
| 15 | right-hand corner of March 23, '05. Do | 15 | Q. Would this Exhibit A have been part of |
| 16 | you know who prepared this document? | 16 | the original contract between BB&T and |
| 17 | A. No, ma'am. | 17 | EMCOR? |
| 18 | Q. Have you seen this document before? | 18 | A. I don't know if it's this Exhibit A, |
| 19 | A. To the best of my recollection, no, | 19 | but there is an Exhibit A in the |
| 20 | ma'am. | 20 | contract that has all of the sites |
| 21 | Q. Okay. We'll just move on. | 21 | listed. |
| 22 | MS. TULEY: I don't have an | 22 | Q. This has, if you'll kind of scroll |
| 23 | extra copy of this one | 23 | over, it has three columns, one called |

| Page 206 | | Page 208 | |
|---|---|---|---|
| 1 | for some reason. | 1 | gross square feet, one called current |
| 2 | (Plaintiff's Exhibit #11 was | 2 | vacant square feet, and one called |
| 3 | marked for identification.) | 3 | adjusted square feet. |
| 4 | Q. Let me show you what I've marked as | 4 | A. Yes, ma'am. |
| 5 | Plaintiff's Exhibit #11. This is | 5 | Q. And I think we've discussed this |
| 6 | another document entitled Exhibit B, | 6 | earlier. Is the way this works that -- |
| 7 | and it appears to be -- well, it is | 7 | well, let me ask you this. Was this a |
| 8 | entitled EFS Maintenance Organization | 8 | document provided by BB&T? |
| 9 | for BB&T. If you'll look at this and | 9 | A. Yes, ma'am. |
| 10 | tell me what this document is. | 10 | Q. Okay. Just to be clear, because we've |
| 11 | A. Again, this is an earlier version in | 11 | had a long day, you're not aware of how |
| 12 | the organization chart. | 12 | BB&T derived their gross square-footage |
| 13 | Q. This is not a correct version, either? | 13 | numbers? |
| 14 | A. It is not. | 14 | A. No, ma'am. |
| 15 | Q. We're closing in on it. I feel it. | 15 | (Plaintiff's Exhibit #13 was |
| 16 | Okay. | 16 | marked for identification.) |
| 17 | MR. SAWYER: I don't know. | 17 | Q. Let me show you what I've marked as |
| 18 | I guess January 1 is | 18 | Plaintiff's Exhibit #13. First I'm |
| 19 | a -- January 1, 2007 is | 19 | just going to ask, is that your E-mail |
| 20 | the print date. I don't | 20 | address? |
| 21 | know. | 21 | A. Yes, ma'am. |
| 22 | MS. TULEY: I assumed that | 22 | Q. What is a JSR? |
| 23 | just was populated by | 23 | A. I believe the acronym stands for job |

52 (Pages 205 to 208)

**MERRILL LEGAL SOULTIONS**
**Court Reporting*Legal Videography*Trial Services**

Page 209

| | |
|---|---|
| 1 | status report. |
| 2 | Q. What is a KPI? |
| 3 | A. Key performance indicator. |
| 4 | Q. That's all I had for that one. |
| 5 | MS. TULEY: I think I'm |
| 6 | about done. Y'all want |
| 7 | to give me -- |
| 8 | MR. SAWYER: Take a second |
| 9 | to -- |
| 10 | MS. TULEY: Yeah, a few |
| 11 | minutes to run through |
| 12 | my notes and talk to |
| 13 | Mr. Littlefield. |
| 14 | (Brief recess) |
| 15 | Q. (By Ms. Tuley) All right. I don't |
| 16 | really have much more to ask. Why did |
| 17 | EMCOR pay ABM and A&L Services more per |
| 18 | square foot than they were paying PFMI? |
| 19 | A. It was what the client had agreed to |
| 20 | pay for the service going forward and |
| 21 | what BB&T had approved. |
| 22 | Q. Do you know why BB&T approved a greater |
| 23 | amount per square foot? |

Page 210

| | |
|---|---|
| 1 | A. I don't. |
| 2 | MR. SAWYER: Objection. |
| 3 | Mischaracter -- oh, |
| 4 | strike that. I withdraw |
| 5 | the objection. I just |
| 6 | played it again in my |
| 7 | head. It's late. I |
| 8 | apologize. |
| 9 | A. I don't. |
| 10 | MS. TULEY: That's it. |
| 11 | |
| 12 | * * * * * * * * |
| 13 | FURTHER DEPONENT SAITH NOT |
| 14 | * * * * * * * * |
| 15 | |
| 16 | |
| 17 | |
| 18 | |
| 19 | |
| 20 | |
| 21 | |
| 22 | |
| 23 | |

Page 211

| | |
|---|---|
| 1 | REPORTER'S CERTIFICATE |
| 2 | |
| 3 | STATE OF ALABAMA ) |
| | ) |
| 4 | ELMORE COUNTY   ) |
| 5 | |
| 6 | I do hereby certify that the above |
| 7 | and foregoing transcript was taken down |
| 8 | by me in stenotype, and the questions |
| 9 | and answers thereto were transcribed by |
| 10 | means of computer-aided transcription, |
| 11 | and that the foregoing represents a true |
| 12 | and correct transcript of the testimony |
| 13 | given by said witness. |
| 14 | I further certify that I am neither |
| 15 | of counsel, nor of any relation to the |
| 16 | parties to the action, nor am I anywise |
| 17 | interested in the result of said cause. |
| 18 | |
| 19 | |
| | Barbara A. Howell, CSR No. 508 |
| 20 | Court Reporter and Commissioner |
| | for the State of Alabama at Large |
| 21 | MY COMMISSION EXPIRES: 12/27/08 |
| 22 | |
| 23 | |

**1933 Richard Arrington Jr. blvd, S*Birmingham, AL 35209*www.merrillcorp.com**
**1-800-888-DEPO**

Contract No. EMC-00793

Exhibit C

## Exhibit C
### Janitorial Pricing by Site

## Janitorial Price Response - Consolidated BB&T Regions

| Street Address | City | State | ZIP | Property Type (BR/O/L) | Lease Type | Lease Type | Hours Beyond Mon-Fri | Usable / Cleanable Square Feet | Exhibit C Cost Per Square Foot ($) | Estimated Janitorial Cost Per Year |
|---|---|---|---|---|---|---|---|---|---|---|
| 1100 Quintard Avenue | Anniston | AL | 36201 | BR | O | N/A | N/A | 1,304 | $ 1.233 | $1,607.83 |
| 402 Main Street | Oxford | AL | 36203 | BR | O | N/A | Sat.(6:30am - 12:00pm) | 8,738 | $ 1.392 | $12,163.85 |
| 1730 Rhode Island Avenue NW | Washington | DC | 20200 | BR | L | Net | N/A | 1,200 | $ 1.233 | $1,479.60 |
| 317 Pennsylvania Avenue | Washington | DC | 20036 | BR | L | Net | N/A | 1,560 | $ 1.233 | $1,923.48 |
| 601 Thirteenth Street NW | Washington | DC | 20003-1148 | BR | L | Net | N/A | 3,402 | $ 1.233 | $4,195.16 |
| 614 H Street, Washington - Gallery Place | Washington | DC | 20005 | BR | L | Net | N/A | 2,971 | $ 1.233 | $3,663.49 |
| 815 Connecticut Avenue, N.W. | Washington | DC | | BR | L | Net | N/A | 2,088 | $ 1.233 | $2,574.50 |
| 1385 Wisconsin Avenue, N.W. | Washington | DC | 20006 | BR | L | NNN | N/A | 2,927 | $ 1.233 | $3,609.24 |
| 5200 Wisconsin Avenue NW | Washington | DC | 20007-3356 | BR | L | NNN | N/A | 2,831 | $ 1.233 | $3,490.87 |
| 401 North Indian Rocks Road | Washington | DC | 20015 | BR | L | NNN | N/A | 4,665 | $ 1.233 | $5,751.70 |
| 3527 North Lecanto Highway | Belleair Bluffs | FL | 33770 | BR | L | NNN | N/A | 3,414 | $ 1.233 | $4,208.97 |
| 421- 12th Street West | Beverly Hills | FL | 34465 | BR | L | Net | N/A | 1,360 | $ 1.233 | $1,676.88 |
| 5312 Cortez Rd. West | Bradenton | FL | 34205 | BR | L | NNN | N/A | 1,612 | $ 0.897 | $1,445.96 |
| 8704 State Road 70 East | Bradenton | FL | 34210 | BR | L | NNN | N/A | 2,717 | $ 1.233 | $3,349.81 |
| 5905 Manatee Avenue West | Bradenton | FL | 34202 | BR | L | NNN | N/A | 2,800 | $ 1.233 | $3,452.40 |
| 6208 14th Street West | Bradenton | FL | 34209 | BR | O | N/A | N/A | 2,000 | $ 1.233 | $2,466.00 |
| 6250 East State Road 70 | Bradenton | FL | 34207 | BR | O | N/A | N/A | 2,800 | $ 1.233 | $3,452.40 |
| 404 Oakfield Drive | Bradenton | FL | 32308 | BR | O | N/A | N/A | 4,800 | $ 1.233 | $5,918.40 |
| 1321 Southeast 47th Terrace | Brandon | FL | 33511 | BR | O | N/A | N/A | 3,274 | $ 1.233 | $4,036.35 |
| 1235 S. Missouri Avenue | Cape Coral | FL | 33904 | BR | O | N/A | N/A | 5,280 | $ 1.233 | $6,510.24 |
| 23684 US Highway 19 North | Clearwater | FL | 33756 | BR | L | Net | N/A | 1,960 | $ 1.233 | $2,416.68 |
| 28050 US Highway 19 North | Clearwater | FL | 33765 | BR | L | Net | N/A | 3,200 | $ 1.233 | $3,945.60 |
| 3024 Enterprise Road | Clearwater | FL | 33761 | BR | L | Net | N/A | 7,391 | N/A | N/A |
| 5801 Ulmerton Road | Clearwater | FL | 33759 | BR | L | Net | N/A | 2,286 | $ 1.233 | $2,819.13 |
| 13636 W. State Road 84 | Davie | FL | 33753 | BR | L | Net | N/A | 2,430 | $ 1.233 | $2,996.68 |
| 1834 West Hillsboro Blvd. | Deerfield Beach | FL | 33325 | BR | L | NNN | N/A | 2,247 | $ 0.897 | $2,015.74 |
| | | FL | 33442 | BR | L | Net | N/A | 4,166 | $ 0.897 | $3,737.26 |

EXHIBIT
5
tabbies*

Exhibit C - Janitorial Pricing by Site.xls

Page 1 of 47
Revised 03/23/05

Contract No. EMC-00793

Exhibit C

| Street Address | City | State | Zip | Property Type BR/DU | Lease / Own | Lease Type | Total Hours Beyond Mon - Fri | Usable / Cleanable Square Feet | Estimated Janitorial Cost Per Square Foot | Estimated Janitorial Cost Per Year |
|---|---|---|---|---|---|---|---|---|---|---|
| 5500 W. Atlantic Avenue | Delray Beach | FL | 33446 | BR | L | NNN | N/A | 3,747 | $ 0.897 | $3,361.24 |
| 1478 Main Street | Dunedin | FL | 34698 | BR | O | N/A | N/A | 2,550 | $ 1.233 | $3,144.64 |
| 3510 US Highway 301 | Ellenton | FL | 34222 | BR | L | Net | N/A | 3,200 | $ 1.233 | $3,945.60 |
| 1699 S. 14th Street | Fernandina Beach | FL | 32034 | BR | O | N/A | N/A | 4,160 | $ 1.233 | $5,129.28 |
| 2211 US Highway 19 | Holiday | FL | 34691 | DU | O | N/A | N/A | 5,630 | $ 1.233 | $6,942.28 |
| 4651 Sunray Drive | Holiday | FL | 34690 | BR | L | Net | N/A | 0 | $ 0.897 | $0.00 |
| 3251 Hollywood Blvd, Suite 470 | Hollywood | FL | 33021 | BR | L | Net | N/A | 2,800 | $ 0.897 | $2,511.60 |
| 4651 Sheridan Street, Suite 125 | Hollywood | FL | 33021 | BR | O | N/A | N/A | 3,250 | | N/A |
| 450 East Eau Gallie Blvd. | Indian Harbor Beach | FL | 32937 | BR | O | N/A | N/A | 3,304 | $ 0.897 | $2,963.69 |
| 10611 Deerwood Park Boulevard | Jacksonville | FL | 32256 | BR | O | N/A | N/A | 20,000 | $ 1.233 | $24,660.00 |
| 11331 San Jose Boulevard | Jacksonville | FL | 32223 | BR | L | Net | N/A | 13,600 | $ 1.233 | $16,768.80 |
| 1010 Kennedy Drive | Key West | FL | 33040 | BR | L | Net | N/A | 9,217 | $ 1.233 | $11,364.31 |
| 614 Front Street | Key West | FL | 33040 | BR | L | Net | N/A | 984 | $ 1.233 | $1,213.27 |
| 200 East Broadway | Kissimmee | FL | 34741 | BR | O | N/A | N/A | 5,600 | $ 0.897 | $5,023.20 |
| 1115 North John Young Pkwy. | Kissimmee | FL | 34741 | BR | O | N/A | N/A | 3,304 | $ 0.897 | $2,963.69 |
| 1302 East Vine Street | Kissimmee | FL | 34744 | BR | O | N/A | N/A | 2,000 | $ 0.897 | $1,794.00 |
| 10500 Ulmerton Road East, Unit #816 | Largo | FL | 33771 | BR | L. | Net | N/A | 3,006 | $ 1.233 | $3,705.90 |
| 14141 Walsingham Road | Largo | FL | 33774 | BR | O | N/A | N/A | 3,006 | $ 1.233 | $3,705.90 |
| 10 Avenue of the Flowers | Longboat Key | FL | 34228 | BR | L | Net | N/A | 2,162 | $ 1.233 | $2,666.24 |
| 6090 Overseas Highway | Marathon | FL | 33050 | BR | O | N/A | N/A | 1,954 | $ 1.233 | $2,408.79 |
| 1300 Babcock Street | Melbourne | FL | 32901 | BR | O | N/A | N/A | 5,101 | $ 0.897 | $4,575.42 |
| 6430 North Wickham Road | Melbourne | FL | 32940 | BR | O | N/A | N/A | 3,859 | $ 0.897 | $3,461.70 |
| 401 Ocean Avenue | Melbourne Beach | FL | 32951 | BR | L | Net | N/A | 2,200 | $ 0.897 | $1,973.40 |
| 8840 Tamiami Trail North, Unit 105 | Naples | FL | 34108 | BR | L | NNN | N/A | 4,800 | $ 1.233 | $5,918.40 |
| 9213 Little Road | New Port Richey | FL | 34654 | BR | L | Net | N/A | 2,200 | $ 1.233 | $2,712.60 |
| 2019 Little Road | New Port Richey | FL | 34655 | BR | L | NNN | N/A | 2,800 | $ 1.233 | $3,452.40 |
| 6500 Massachusetts Avenue | New Port Richey | FL | 34653 | BR | O | N/A | N/A | 2,280 | $ 1.233 | $2,811.24 |
| 1626 SE 36th Avenue | Ocala | FL | 34471 | BR | O | N/A | N/A | 3,520 | $ 1.233 | $4,340.16 |
| 3711 Tampa Road, Oldsmar, FL 34677 | Oldsmar | FL | 34677 | BR | L | NNN | N/A | 2,093 | $ 1.233 | $2,580.42 |
| 2051 Town Center Boulevard | Orlando | FL | 32837 | BR | L | NNN | Sat. (9:00am - 12:00pm) | 2,800 | $ 0.897 | $2,511.60 |
| 2415 North Orange Avenue | Orlando | FL | 32804 | BR | L | NNN | N/A | 4,000 | $ 0.897 | $3,588.00 |
| 193 East Granada Blvd. | Ormond Beach | FL | 32176 | BR | L | Net | N/A | 3,360 | $ 1.233 | $4,142.88 |
| 6000 Babcock Street SE | Palm Bay | FL | 32909 | BR | L | NNN | N/A | 2,430 | $ 0.897 | $2,179.35 |
| 7100 Fairway Drive, Suite 49 | Palm Beach Gardens | FL | 33418 | BR | L | Net | N/A | 1,680 | $ 0.897 | $1,506.96 |

Exhibit C - Janitorial Pricing by Site.xls

Page 2 of 47
Revised 03/23/05

Contract No. EMC-00793

Exhibit C

| Street Address | City | State | Zip | | Property Type Building | Lease Type | Initial Bound (May FY) | Usable / Cleanable Square Feet | Estimated Cost Per Square Foot | Estimated Janitorial Cost Per Year |
|---|---|---|---|---|---|---|---|---|---|---|
| 3412 East Lake Road | Palm Harbor | FL | 34685 | BR | L | Net | N/A | 1,600 | $ 1.233 | $1,972.80 |
| 5061 North 12th Avenue | Pensacola | FL | 32504-8916 | BR | O | N/A | N/A | 6,880 | $ 1.233 | $8,483.04 |
| 300 South Pine Island Road | Plantation | FL | 33324 | BR | L | Net | N/A | 8,486 | $ 0.897 | $7,612.30 |
| 226-8 Solana Road | Ponte Vedra Beach | FL | 32082 | BR | L | Net | N/A | 1,566 | $ 1.233 | $1,931.37 |
| 9501 US 19 North | Port Richey | FL | 34668 | BR | L | Net | N/A | 4,000 | $ 1.233 | $4,932.00 |
| 3880 Sun City Center Blvd. | Ruskin | FL | 33573 | BR | O | N/A | N/A | 2,400 | $ 1.233 | $2,959.20 |
| 4600 US 1 South | Saint Augustine | FL | 32086 | BR | O | N/A | N/A | 4,800 | $ 1.233 | $5,918.40 |
| 4291 13th Street | Saint Cloud | FL | 34769 | BR | O | N/A | Sat. (9:00am - 12:00pm) | 3,648 | $ 0.897 | $3,272.26 |
| 1718 Main Street | Sarasota | FL | 34236 | BR | L | Net | N/A | 5,120 | $ 1.233 | $6,312.96 |
| 5375 University Parkway | Sarasota | FL | 34243 | BR | L | Net | N/A | 2,800 | $ 1.233 | $3,452.40 |
| 5600 Bee Ridge Road | Sarasota | FL | 34233 | BR | L | Net | N/A | 7,305 | $ 1.233 | $9,006.82 |
| 1100 South Tamiami Trail | Sarasota | FL | 34236 | BR | O | N/A | N/A | 4,000 | $ 1.233 | $4,932.00 |
| 3201 North Tamiami Trail | Sarasota | FL | 34234 | BR | O | N/A | N/A | 4,000 | $ 1.233 | $4,932.00 |
| 7995 113th Street North | Seminole | FL | 33772 | BR | L | NNN | N/A | 6,608 | $ 1.233 | $8,147.66 |
| 5431-E Silver Springs Blvd. Unit 1 | Silver Springs | FL | 34488 | BR | L | Net | N/A | 4,690 | $ 1.233 | $5,782.28 |
| 16825 East Highway 40 | Silver Springs | FL | 34488 | BR | L | Net | N/A | 2,784 | $ 1.233 | $3,432.67 |
| 405 8th Street South | South Naples | FL | 34102 | BR | L | Net | N/A | 2,911 | $ 0.897 | $2,611.35 |
| 1234 Spring Hill Drive | Spring Hill | FL | 34609 | BR | L | Net | N/A | 2,256 | $ 1.233 | $2,781.65 |
| 5331 Spring Hill Drive | Spring Hill | FL | 34606 | BR | L | Net | N/A | 2,400 | $ 1.233 | $2,959.20 |
| 6900 22nd Ave., N. | St. Petersburg | FL | 33710 | BR | L | Net | N/A | 3,570 | $ 1.233 | $4,402.30 |
| 100 34th Street North | St. Petersburg | FL | 33713 | BR | L | NNN | N/A | 3,440 | $ 1.233 | $4,241.52 |
| 182 37th Avenue North | St. Petersburg | FL | 33704 | BR | L | NNN | N/A | 2,640 | $ 1.233 | $3,255.12 |
| 3000 54th Avenue South | St. Petersburg | FL | 33712 | BR | L | NNN | N/A | 1,840 | $ 1.233 | $2,268.72 |
| 3233 Thomasville Road | Tallahassee | FL | 32308 | BR | O | N/A | N/A | 13,512 | $ 1.233 | $16,660.30 |
| 1322 South Dale Mabry Highway | Tampa | FL | 33629 | BR | L | Net | N/A | 2,360 | $ 1.233 | $2,909.88 |
| 15312 North Dale Mabry Highway | Tampa | FL | 33618 | BR | L | NNN | N/A | 2,800 | $ 1.233 | $3,452.40 |
| 218 North Dale Mabry Highway | Tampa | FL | 33609 | BR | O | N/A | N/A | 1,071 | $ 1.233 | $1,320.79 |
| 90184 Overseas Highway | Tavernier | FL | 33070 | BR | O | N/A | N/A | 2,108 | $ 1.233 | $2,599.16 |
| 1580 Jacaranda Boulevard | Venice | FL | 34293 | BR | O | N/A | N/A | 4,800 | $ 1.233 | $5,918.40 |
| 400 Venice Bypass North | Venice | FL | 34285 | BR | O | N/A | N/A | 2,880 | $ 1.233 | $3,551.04 |
| 1290 Weston Road | Weston | FL | 33326 | BR | L | Net | N/A | 3,704 | $ 0.897 | $3,322.49 |
| 1980 Howell Branch Road | Winter Park | FL | 32792 | BR | O | N/A | N/A | 2,400 | $ 0.897 | $2,152.80 |
| 4900 Ross Road | Acworth | GA | 30101 | BR | O | N/A | Sat. (9:00am - 12:00pm) | 7,338 | $ 1.392 | $10,215.05 |
| 201 East Fourth Street | Adel | GA | 31620 | BR | O | N/A | N/A | 8,718 | $ 0.897 | $7,819.69 |

Exhibit C - Janitorial Pricing by Site.xls

Page 3 of 47
Revised 03/23/05

Contract No. EMC-00793

Exhibit C

| Street Address | City | State | Zip | Property Type/Building Use | Lease Type | Rate Type | Cleanup By: per Man-Hrs | Usable / Cleanable Square Feet | Janitorial per Usable Square Feet | Annual Janitorial Cost |
|---|---|---|---|---|---|---|---|---|---|---|
| 5960 North Point Parkway | Alpharetta | GA | 30022 | BR | O | N/A | Sat. (9:00am - 12:00pm) | 5,680 | $ 1.392 | $7,906.56 |
| 950 East Paces Ferry Rd | Atlanta | GA | 30326 | BR | L | Net | N/A | 32,969 | $ 1.233 | $40,650.53 |
| 480 West First Street | Blue Ridge | GA | 30513 | BR | O | N/A | Sat. (8:30am - 12:00pm) | 7,193 | $ 1.233 | $10,012.38 |
| Old Highway 76 Connector Road | Blue Ridge | GA | 30513 | BR | O | N/A | Sat. (8:30am - 12:00pm) | 1,746 | $ 0.897 | $1,566.52 |
| 207 West College Street | Bowdon | GA | 30108 | BR | O | N/A | Sat. (8:00am - 12:00pm) | 2,999 | $ 1.392 | $4,174.89 |
| 501 Alabama Avenue | Bremen | GA | 30110 | BR | L | NNN | Sat. (8:00am - 12:00pm) | 8,233 | $ 1.392 | $11,460.06 |
| 4920 Friendship Road | Buford | GA | 30339 | BR | L | NNN | N/A | 4,240 | $ 0.897 | $3,803.28 |
| 4394 Buford Drive | Buford | GA | 30518 | BR | O | N/A | Sat. (9:00am - 12:00pm) | 2,800 | $ 1.392 | $3,897.60 |
| 209 South Broad Street | Butler | GA | 31006 | BR | O | N/A | N/A | 4,640 | $ 0.897 | $4,162.08 |
| 102 Highway 49 | Byron | GA | 31008 | BR | O | N/A | N/A | 4,551 | $ 0.897 | $4,082.43 |
| 215 North Wall Street | Calhoun | GA | 30701-2221 | BR | O | N/A | Sat. (8:00am - 12:00pm) | 7,454 | $ 1.392 | $10,375.41 |
| 409 East Highway 53 SE | Calhoun | GA | 30701 | BR | O | N/A | Sat. (8:00am - 12:00pm) | 2,376 | $ 1.392 | $3,309.62 |
| 219 North Piedmont Avenue | Calhoun | GA | 30701 | DU | O | N/A | Sat. (8:00am - 12:00pm) | 830 | $ 0.897 | $744.15 |
| 110 Dixie Street | Carrollton | GA | 30117 | BR | O | N/A | Sat. (8:00am - 12:00pm) | 33,159 | $ 1.392 | $46,157.61 |
| 1119 South Park Street | Carrollton | GA | 30117 | BR | O | N/A | Sat. (8:00am - 12:00pm) | 2,059 | $ 1.392 | $2,866.41 |
| 119 South White Street | Carrollton | GA | 30117 | DU | O | N/A | Sat. (8:00am - 12:00pm) | 1,590 | $ 0.897 | $1,426.59 |
| 314 East Main Street | Cartersville | GA | 30120-3322 | BR | O | N/A | N/A | 14,907 | $ 1.233 | $18,380.58 |
| 314 East Main Street | Cartersville | GA | 30120 | DU | O | N/A | N/A | 407 | $ 0.897 | $365.26 |
| 5289 Cleveland Highway | Clermont | GA | 30527 | BR | O | N/A | Sat. (8:30am - 12:00pm) | 1,959 | $ 0.897 | $1,757.40 |
| 1745 Highway 138, Suite C-15 | Conyers | GA | 30013 | BR | L | Net | N/A | 2,720 | N/A | N/A |
| 214 Dahlonega Road | Cumming | GA | 30040 | BR | O | N/A | Sat. (8:00am - 12:00pm) | 16,000 | $ 1.392 | $22,272.00 |
| 3485 Braselton Highway | Dacula | GA | 30019 | BR | L | NNN | N/A | 3,074 | $ 1.233 | $3,790.74 |
| 148 Memorial Drive | Dahlonega | GA | 30533 | BR | O | N/A | Sat. (8:00am - 12:00pm) | 1,586 | $ 1.392 | $2,207.16 |
| 60 Main Street West | Dahlonega | GA | 30533 | BR | O | N/A | N/A | 7,682 | $ 1.233 | $9,471.41 |
| 1244 Cleveland Road | Dalton | GA | 30721 | BR | O | N/A | N/A | 2,586 | $ 1.233 | $3,188.04 |
| 2500 East Walnut Avenue | Dalton | GA | 30720 | BR | O | N/A | N/A | 2,325 | $ 1.233 | $2,866.48 |
| 905 South Thornton Avenue | Dalton | GA | 307020 | BR | O | N/A | N/A | 2,814 | $ 1.233 | $3,470.16 |

Exhibit C - Janitorial Pricing by Site.xls

Page 4 of 47
Revised 03/23/05

Contract No. EMC-00793

Exhibit C

| Street Address | City | State | Zip | Property Type | Lease/Own | Lease Type | Days/Hours of Operation M-F | Usable/Cleanable Square Feet | Janitorial Cost per Square Foot ($) | Estimated Janitorial Cost per Year |
|---|---|---|---|---|---|---|---|---|---|---|
| 220 Courthouse Square | Danielsville | GA | 30633 | BR | O | N/A | Sat. (9:00am-12:00pm) | 5,826 | $ 1.392 | $8,110.35 |
| 136 Highway 400 South | Dawsonville | GA | 30534 | BR | O | N/A | N/A | 9,055 | $ 1.233 | $11,165.06 |
| 1221 Clairmont Road | Decatur | GA | 30030 | BR | O | N/A | N/A | 3,880 | $ 1.233 | $4,784.04 |
| 101 NW Bowens Mill Road | Douglas | GA | 31533 | BR | L | NNN | N/A | 403 | $ 0.897 | $361.67 |
| 102 North Peterson Avenue | Douglas | GA | 31534 | BR | O | N/A | N/A | 14,400 | $ 0.897 | $12,916.80 |
| 210 North Peterson Avenue | Douglas | GA | 31534 | BR | O | N/A | N/A | 1,520 | $ 0.897 | $1,363.44 |
| 8458 Campbellton Street | Douglasville | GA | 30134 | BR | O | N/A | Sat. (8:00am-12:00pm) | 4,680 | $ 1.392 | $6,514.56 |
| 3200 Peachtree Industrial Boulevard Suites 100,102,201,202,205,209,210 | Duluth | GA | 30096 | BR | L | Net | N/A | 13,350 | $ 1.233 | $16,461.04 |
| 1545 Mt. Vernon Rd | Dunwoody | GA | 30338-4103 | BR | L | NNN | N/A | 4,240 | $ 1.233 | $5,227.92 |
| 894 Maddox Drive | Ellijay | GA | 30540 | BR | O | N/A | Sat. (8:30am-12:00pm) | 4,786 | $ 1.392 | $6,662.67 |
| 675 North Jefferson Davis Drive | Fayetteville | GA | 30214 | BR | O | N/A | Sat. (9:00am-12:00pm) | 9,040 | $ 1.392 | $12,583.68 |
| 101 North Lee Street | Forsyth | GA | 31029 | BR | O | N/A | N/A | 1,982 | $ 1.233 | $2,443.31 |
| 110 North Camellia Boulevard | Fort Valley | GA | 31030 | BR | O | N/A | N/A | 7,550 | $ 0.897 | $6,771.99 |
| 1623 Thompson Bridge Road | Gainesville | GA | 30501 | BR | O | N/A | Sat. (8:30am-12:00pm) | 1,959 | $ 1.392 | $2,727.21 |
| 2895 Browns Bridge Road | Gainesville | GA | 30504-5635 | BR | O | N/A | N/A | 1,647 | $ 1.233 | $2,031.00 |
| 455 Jesse Jewel Parkway | Gainesville | GA | 30501 | BR | O | N/A | Sat. (8:30am-12:00pm) | 14,568 | $ 1.392 | $20,278.66 |
| 201 South Main Street | Greensboro | GA | 30501 | BR | O | N/A | N/A | 3,840 | $ 0.897 | $3,444.48 |
| 201 West Taylor Street | Griffin | GA | 30223 | BR | L | Net | Sat. (9:00am-12:00pm) | 3,200 | $ 1.392 | $4,454.40 |
| 5071 Jimmy Lee Smith Parkway | Hiram | GA | 30141 | BR | O | N/A | Sat. (8:30am-1:00pm) | 2,826 | $ 1.392 | $3,933.24 |
| 9008 Highway 29 South | Hull | GA | 30646 | BR | O | N/A | Sat. (9:00am-12:00pm) | 4,825 | $ 1.392 | $6,716.12 |
| 818 South First Street | Jesup | GA | 31545 | BR | O | N/A | N/A | 5,394 | $ 1.233 | $6,650.31 |
| 223 North Main Street | Jonesboro | GA | 30236 | BR | O | N/A | Sat. (9:00am-12:00pm) | 3,440 | $ 1.392 | $4,788.48 |
| 2760 Cobb Parkway | Kennesaw | GA | 30152 | BR | O | N/A | Sat. (9:00am-12:00pm) | 2,660 | $ 1.392 | $3,563.52 |
| 310 Broad Street | LaGrange | GA | 30240 | BR | O | N/A | Sat. (9:00am-12:00pm) | 2,320 | $ 1.392 | $3,229.44 |
| 10 Silo Street | Lavonia | GA | 30553 | BR | O | N/A | N/A | 4,825 | $ 1.233 | $5,948.98 |
| 150 South Perry Street | Lawrenceville | GA | 30045 | BR | O | N/A | Sat. (9:00am-12:00pm) | 6,000 | $ 1.392 | $8,352.00 |
| 4700 US Highway 29 | Lilburn | GA | 30047 | BR | O | N/A | Sat. (9:00am-12:00pm) | 2,565 | $ 1.392 | $3,570.20 |
| 1855 Thornton Road | Lithia Springs | GA | 30122 | BR | O | N/A | N/A | 2,648 | $ 1.233 | $3,264.98 |

Exhibit C - Janitorial Pricing by Site.xls

Page 5 of 47
Revised 03/23/05

Contract No. EMC-00793

Exhibit C

| Street Address | City | State | Zip | | | | Times Served | Usable / Cleanable Square Feet | Janitorial Square Foot Price | Estimated Monthly Cost |
|---|---|---|---|---|---|---|---|---|---|---|
| 1302 Gray Highway | Macon | GA | 31211 | BR | O | N/A | Sat. (9:00am–1:00pm) | 1,809 | $ 1.392 | $2,517.85 |
| 2540 Riverside Drive | Macon | GA | 31210 | BR | O | N/A | N/A | 2,880 | $ 0.897 | $2,583.36 |
| 3525 Mercer University Drive | Macon | GA | 31204 | BR | O | N/A | Sat. (9:00am–1:00pm) | 2,080 | $ 1.392 | $2,896.36 |
| 4357 Forsyth Road | Macon | GA | 31210 | BR | O | N/A | N/A | 2,035 | $ 0.897 | $1,825.57 |
| 4961 Forsyth Road | Macon | GA | 31203 | BR | O | N/A | N/A | 4,354 | $ 0.897 | $3,905.90 |
| 3390 Pio Nono Avenue | Macon | GA | 31206 | DU | O | N/A | N/A | 260 | $ 0.897 | $233.22 |
| 63 Barrett Parkway ,NE | Marietta | GA | 30066 | BR | L | Net | Sat. (9:00am–12:00pm) | 4,320 | $ 1.392 | $6,013.44 |
| 4370 Roswell Road | Marietta | GA | 30339 | BR | L | NNN | Sat. (9:00am–12:00pm) | 4,240 | $ 1.392 | $5,902.08 |
| 155 North Marietta Parkway | Marietta | GA | 30060 | BR | O | N/A | N/A | 2,240 | $ 1.233 | $2,761.92 |
| 2480 Dallas Highway | Marietta | GA | 30127 | BR | O | N/A | Sat. (9:00am–12:00pm) | 3,600 | $ 1.392 | $5,011.20 |
| 12 North Cedar Street | McDonough | GA | 30263 | BR | O | N/A | Sat. (9:00am–12:00pm) | 16,000 | $ 1.392 | $22,272.00 |
| 2 Southeast Broad Street | Metter | GA | 30439 | BR | O | N/A | Sat. (9:00am–12:00pm) | 12,102 | $ 0.897 | $10,855.85 |
| 423 Vertia Street | Metter | GA | 30439 | DU | O | N/A | Sat. (9:00am–12:00pm) | 0 | $ 0.897 | $0.00 |
| 160 West Green Street | Milledgeville | GA | 31061 | BR | O | N/A | N/A | 6,400 | $ 1.233 | $7,891.20 |
| 2345 North Columbia Street | Milledgeville | GA | 31061 | BR | O | N/A | N/A | 2,934 | $ 1.233 | $3,618.12 |
| 118 Walnut Street | Montezuma | GA | 31063 | BR | O | N/A | N/A | 2,028 | $ 0.897 | $1,819.12 |
| 2280 North Highway 29 | Newnan | GA | 30263 | BR | L | Net | N/A | 160 | N/A | N/A |
| 1421 Highway 34 East | Newnan | GA | 30265 | BR | L | NNN | N/A | 720 | $ 1.233 | $887.76 |
| 14 Hospital Road | Newnan | GA | 30263 | BR | O | N/A | Sat. (9:00am–12:00pm) | 720 | $ 1.392 | $1,002.24 |
| 19 Jefferson Street | Newnan | GA | 30263 | BR | O | N/A | N/A | 12,800 | $ 1.233 | $15,782.40 |
| 232 Bullsboro Drive | Newnan | GA | 30263 | BR | O | N/A | Sat. (9:00am–12:00pm) | 5,158 | $ 1.392 | $7,180.49 |
| 26 Jefferson Street | Oakwood | GA | 30566 | BR | O | N/A | N/A | 1,174 | $ 1.233 | $1,447.05 |
| 3453 Mundy Mill Road | Peachtree City | GA | 30269 | BR | O | N/A | Sat. (8:30am–12:00pm) | 2,520 | $ 1.392 | $3,507.84 |
| 705 Highway 54 East | Portal | GA | 30450 | BR | O | N/A | Sat. (8:30am–12:00pm) | 3,120 | $ 1.392 | $4,343.04 |
| 27205 Highway 80 West | Rincon | GA | 31326 | BR | O | N/A | N/A | 1,501 | $ 0.897 | $1,346.22 |
| 470 South Columbia Avenue | Riverdale | GA | 30274-1641 | BR | O | N/A | N/A | 4,908 | $ 1.233 | $6,051.56 |
| 6375 Highway 85 | Roberta | GA | 31078 | BR | O | N/A | Sat. (9:00am–12:00pm) | 10,800 | $ 1.392 | $15,033.60 |
| 50 North Dugger Avenue | Roswell | GA | 30076 | BR | O | N/A | N/A | 2,000 | $ 0.897 | $1,794.00 |
| 11650 Alpharetta Highway | | | | BR | O | N/A | N/A | 2,861 | $ 1.233 | $3,527.37 |

Exhibit C - Janitorial Pricing by Site.xls

Contract No. EMC-00793

Exhibit C

| Street Address | City | State | Zip | | | | Fire Beyond Mon-Fri | Usable / Cleanable Square Feet | Janitorial Cost Per Square Feet | Estimated Janitorial Cost Per Year |
|---|---|---|---|---|---|---|---|---|---|---|
| 1709 Frederica Road | Saint Simons Island | GA | 31522 | BR | L | Net | N/A | 3,040 | $ 1.233 | $3,748.32 |
| 7 East Congress Street #100 | Savannah | GA | 31401 | BR | L | Net | N/A | 11,300 | $ 1.233 | $13,932.90 |
| 14095 Abercorn Expressway | Savannah | GA | 31419 | BR | O | N/A | N/A | 4,240 | $ 1.233 | $5,227.92 |
| 477 Johnny Mercer Boulevard | Savannah | GA | 31410 | BR | O | N/A | N/A | 1,480 | $ 1.233 | $1,824.84 |
| 5110 Waters Avenue | Savannah | GA | 31404 | BR | O | N/A | N/A | 1,480 | $ 1.233 | $1,824.84 |
| 7393 Hodgson Memorial Drive | Savannah | GA | 31406 | BR | O | N/A | N/A | 22,205 | $ 1.233 | $27,378.52 |
| 756 Concord Road, Smyrna, GA 30080 | Smyrna | GA | 30080 | BR | L | NNN | Sat. (9:00am - 12:00pm) | 1,831 | $ 1.392 | $2,549.03 |
| 2230 Scenic Highway | Snellville | GA | 30078 | BR | O | N/A | Sat. (9:00am - 12:00pm) | 15,360 | $ 1.392 | $21,381.12 |
| 501 South Laurel Street | Springfield | GA | 31329 | BR | O | N/A | N/A | 3,658 | $ 0.897 | $3,280.87 |
| 38/40 North Main Street | Statesboro | GA | 30458-1300 | BR | O | N/A | N/A | 16,418 | $ 1.233 | $20,242.90 |
| 506 Fair Road | Statesboro | GA | 30458-4929 | BR | O | N/A | N/A | 2,655 | $ 0.897 | $2,381.71 |
| Northside Drive and Highway 80 East | Statesboro | GA | 30458 | BR | O | N/A | Sat. (9:00am - 2:00pm) | 3,056 | $ 1.392 | $4,253.95 |
| 9861 Rome Boulevard | Summerville | GA | 30747-1585 | BR | O | N/A | Sat. (7:15am - 12:00pm) | 12,402 | $ 1.392 | $17,263.03 |
| 3640 Peachtree Parkway, Suwanee, GA 30339 | Suwanee | GA | 30339 | BR | L | NNN | Sat. (9:00am - 12:00pm) | 5,680 | $ 1.392 | $7,906.56 |
| 2885 Lawrenceville Suwannee Road | Suwanee | GA | 30024 | BR | O | N/A | Sat. (9:00am - 12:00pm) | 5,241 | $ 1.392 | $7,295.19 |
| 205 South Main Street | Swainsboro | GA | 30401 | BR | O | N/A | N/A | 5,578 | $ 0.897 | $5,003.11 |
| 105 South Main Street | Sylvania | GA | 30467 | BR | L | Net | N/A | 8,320 | $ 0.897 | $7,463.04 |
| 1623 Old Ocilla Road | Tifton | GA | 31794 | BR | O | N/A | N/A | 1,600 | $ 0.897 | $1,435.20 |
| 300 Commerce Way | Tifton | GA | 31794-4818 | BR | O | N/A | N/A | 4,231 | $ 1.233 | $5,217.07 |
| 14160 Highway 27 | Trion | GA | 30753 | BR | O | N/A | Sat. (8:00am - 12:00pm) | 2,240 | $ 1.392 | $3,118.08 |
| 3617 Chattanooga Road | Tunnel Hill | GA | 30755 | BR | O | N/A | N/A | 2,301 | $ 1.233 | $2,836.89 |
| 2901 A North Ashley Street | Valdosta | GA | 31602 | BR | O | N/A | N/A | 5,600 | $ 1.233 | $6,904.80 |
| 900 East First Street | Vidalia | GA | 30474 | BR | L | NNN | N/A | 11,734 | $ 0.897 | $10,525.76 |
| 640 West Bankhead Avenue | Villa Rica | GA | 30180-1601 | BR | O | N/A | Sat. (8:00am - 12:00pm) | 2,786 | $ 1.392 | $3,877.56 |
| 127 Russell Parkway | Warner Robbins | GA | 31088-6164 | BR | O | N/A | Sat. (9:00am - 1:00pm) | 864 | $ 0.897 | $775.01 |
| 3001 Watson Boulevard | Warner Robbins | GA | 31093-8534 | BR | O | N/A | Sat. (9:00am - 1:00pm) | 5,600 | $ 1.392 | $7,795.20 |
| 500 Albany Avenue | Waycross | GA | 31501-4715 | BR | O | N/A | N/A | 3,353 | $ 0.897 | $3,007.46 |
| 20 West May Street | Winder | GA | 30680-8105 | BR | O | N/A | Sat. (9:00am - 12:00pm) | 4,400 | $ 1.392 | $6,124.80 |
| 4210 Charlestown Road | New Albany | IN | 47150-9567 | BR | O | N/A | Sat. (9:00am - 12:00pm) | 3,793 | $ 0.897 | $3,402.14 |

Exhibit C - Janitorial Pricing by Site.xls

Page 7 of 47
Revised 03/23/05

Contract No. EMC-00793

Exhibit C

| Street Address | City | State | Zip | Bldg Type | Lease Own | Lease Type | Hours Beyond Mon-Fri | Usable / Cleanable Square Feet | Annual Janitorial Price per SF | Estimated Annual Janitorial Cost Per Year |
|---|---|---|---|---|---|---|---|---|---|---|
| 40 West Highway 72 | Baxter | KY | 40806-8384 | BR | L | Net | N/A | 224 | $ 0.897 | $200.93 |
| 14793 Regina Belcher Highway | Belcher | KY | 41513 | BR | O | N/A | N/A | 1,515 | $ 0.897 | $1,359.13 |
| 1901 Russellville Road | Bowling Green | KY | 42101 | BR | L | Net | N/A | 7,200 | $ 0.897 | $6,458.40 |
| 1820 Scottsville Road | Bowling Green | KY | 42101 | BR | O | N/A | Sat. (8:00am - 12:00pm) | 16,719 | $ 0.897 | $14,997.12 |
| 2750 Nashville Road | Bowling Green | KY | 42101 | BR | O | N/A | N/A | 1,064 | $ 0.897 | $954.41 |
| 600 US 31 - West Bypass | Bowling Green | KY | 42101 | BR | O | N/A | N/A | 660 | $ 0.897 | $592.02 |
| 2945 Scottsville Road | Bowling Green | KY | 42101 | SF | L | Net | Sat. (9:00am - 3:00pm) | 318 | $ 0.897 | $285.60 |
| 350 US 31 West Bypass | Bowling Green | KY | 42101 | SF | L | Net | Sat. (9:00am - 3:00pm) | 400 | $ 0.897 | $358.80 |
| 711 Campbell Lane | Bowling Green | KY | 42101 | SF | L | Net | Sat. (9:00am - 3:00pm) | 400 | $ 0.897 | $358.80 |
| 100 Main Street | Calhoun | KY | 42327 | BR | O | N/A | N/A | 2,664 | $ 1.233 | $3,284.71 |
| 102 Broadway | Cave City | KY | 42127 | BR | O | N/A | N/A | 2,663 | $ 0.897 | $2,388.89 |
| 1390 Master Street, Corbin, KY 40701-2560 | Corbin | KY | 40701-2560 | BR | L | NNN | N/A | 3,120 | $ 0.897 | $2,798.64 |
| 1202 East Main Street | Cumberland | KY | 40823 | BR | O | N/A | N/A | 3,079 | $ 1.233 | $3,796.65 |
| 31 Outlet Drive | Eddyville | KY | 42038 | BR | O | N/A | Sat. (8:30am - 12:00pm) | 3,116 | $ 0.897 | $2,795.05 |
| 107 Yocum Street | Evarts | KY | 40828 | BR | O | N/A | N/A | 976 | $ 0.897 | $875.47 |
| 103 Smith Road | Glasgow | KY | 42141 | BR | O | N/A | N/A | 1,886 | $ 0.897 | $1,691.38 |
| 301 West Main Street | Glasgow | KY | 42142 | BR | O | N/A | N/A | 21,440 | $ 1.233 | $26,435.52 |
| 900 US Highway 62 | Grand Rivers | KY | 42045 | BR | L | Net | Sat. (8:30am - 12:00pm) | 6,293 | $ 0.897 | $5,644.64 |
| 101 North Main Street | Harlan | KY | 40831-2105 | BR | O | N/A | Sat. (9:00am - 1:00pm) | 4,835 | $ 1.392 | $6,730.60 |
| 200 Waldon Drive | Harlan | KY | 40831-2534 | SF | L | Net | Sat. (9:00am - 1:00pm) | 455 | $ 0.897 | $408.31 |
| 405 Main Street | Hazel | KY | 42049 | BR | O | N/A | N/A | 2,232 | $ 0.897 | $2,002.10 |
| 11 East Hiseville Main Street | Hiseville | KY | 42152 | BR | O | N/A | N/A | 1,926 | $ 0.897 | $1,727.98 |
| 495 North Drive | Hopkinsville | KY | 42240 | BR | L | NNN | N/A | 2,169 | $ 1.233 | $2,674.13 |
| 2933 Fort Campbell Boulevard | Hopkinsville | KY | 42240 | BR | O | N/A | Sat. (9:00am - 12:00pm) | 2,490 | $ 1.392 | $3,465.52 |
| 710 Country Club Lane | Hopkinsville | KY | 42240 | BR | O | N/A | Sat. (9:00am - 12:00pm) | 2,985 | $ 1.392 | $4,154.84 |
| 4000 Fort Campbell Boulevard, Space 325-K | Hopkinsville | KY | 42240 | DU | L | Net | Sat. (9:00am - 12:00pm) | 1,600 | $ 0.897 | $1,435.20 |
| 300 Clinic Drive | Hopkinsville | KY | 42240 | SF | L | Net | Sat. (10:00am - 3:00pm) | 414 | $ 0.897 | $371.00 |
| 119 Broadway | Irvine | KY | 40336 | BR | O | N/A | N/A | 9,510 | $ 1.233 | $11,725.34 |
| 910 Richmond Road | Irvine | KY | 40336 | DU | O | N/A | Sat. (9:00am - 12:00pm) | 708 | $ 0.897 | $635.08 |

Exhibit C - Janitorial Pricing by Site.xls

Page 8 of 47
Revised 03/23/05

Contract No. EMC-00793

Exhibit C

| Street Address | City | State | Zip | Bldg Type BR/O | Lease Type | Gross/Net | Hours of Operation Mon-Fri | Usable / Cleanable Square Feet | Janitorial Price per sq ft since Feb 2010 | Monthly Janitorial Cost Per Site |
|---|---|---|---|---|---|---|---|---|---|---|
| 2024 South Highway 53 | Lagrange | KY | 40031-9635 | BR | O | N/A | Sat. (9:00am-12:00pm) | 2,250 | $ 0.897 | $2,017.89 |
| 1521 US Highway 60-W | Ledbetter | KY | 42056 | BR | O | N/A | Sat. (8:30am-12:00pm) | 2,688 | $ 0.897 | $2,411.14 |
| 1780 Nicholasville Road, Suite 102 | Lexington | KY | 40503-1411 | BR | L | Net | Sat. (9:00am-1:00pm) | 651 | N/A | N/A |
| 3061 Fieldstone Way, Suite 1400 | Lexington | KY | 40513-1773 | BR | L | Net | N/A | 2,331 | $ 1.392 | $3,245.03 |
| 3285 Blazer Parkway, Suite 100 | Lexington | KY | 40509 | BR | L | Net | Sat. (9:00am-1:00pm) | 2,165 | $ 1.233 | $2,669.20 |
| 3329 Tates Creek Road | Lexington | KY | 40502-3407 | BR | L | Net | N/A | 3,043 | $ 1.392 | $4,236.13 |
| 360 East Vine Street | Lexington | KY | 40507-1622 | BR | L | Net | N/A | 16,334 | N/A | |
| 840 Whitley Street | London | KY | 40741 | BR | O | N/A | N/A | 3,282 | $ 1.233 | $4,046.21 |
| 2216 Dundee Road | Louisville | KY | 40205 | BR | L | Net | N/A | 950 | $ 0.897 | $852.51 |
| 3747 Lexington Road | Louisville | KY | 40207-3023 | BR | L | Net | N/A | 2,400 | $ 0.897 | $2,152.80 |
| 4082 Taylorsville Road at Hikes Point | Louisville | KY | 40220-01502 | BR | L | Net | Sat. (9:00am-12:00pm) | 3,533 | $ 0.897 | $3,168.92 |
| 4507 Shelbyville Road | Louisville | KY | 40207-3313 | BR | L | Net | Sat. (9:00am-12:00pm) | 2,480 | $ 0.897 | $2,224.56 |
| 7802 Preston Highway | Louisville | KY | 40219 | BR | L | Net | N/A | 6,358 | $ 0.897 | $5,703.48 |
| 401 West Main Street | Louisville | KY | 40202 | BR | L | NNN | N/A | 46,984 | N/A | N/A |
| 4201 Shelbyville Road | Louisville | KY | 40207-3322 | BR | O | N/A | Sat. (9:00am-12:00pm) | 5,738 | $ 0.897 | $5,146.63 |
| 10403 Dixie Highway | Louisville | KY | 40272-3953 | BR | O | N/A | Sat. (9:00am-12:00pm) | 2,661 | $ 0.897 | $2,386.74 |
| 11401 South Preston Highway | Louisville | KY | 40229-2864 | BR | O | N/A | Sat. (9:00am-12:00pm) | 2,262 | $ 0.897 | $2,029.37 |
| 11751 Bluegrass Parkway | Louisville | KY | 40299-2302 | BR | O | N/A | Sat. (9:00am-12:00pm) | 2,406 | $ 0.897 | $2,158.54 |
| 12917 Shelbyville Road | Louisville | KY | 40243-1638 | BR | O | N/A | Sat. (9:00am-12:00pm) | 2,354 | $ 0.897 | $2,111.90 |
| 1339 Bardstown Road | Louisville | KY | 40204-1319 | BR | O | N/A | Sat. (9:00am-12:00pm) | 2,426 | $ 0.897 | $2,176.48 |
| 2501 West Broadway | Louisville | KY | 40211-1009 | BR | O | N/A | Sat. (9:00am-12:00pm) | 3,214 | $ 0.897 | $2,882.60 |
| 2601 Hurstbourne Parkway | Louisville | KY | 40220-4008 | BR | O | N/A | N/A | 2,294 | $ 0.897 | $2,057.36 |
| 3140 Wilson Avenue | Louisville | KY | 40211-1932 | BR | O | N/A | N/A | 2,716 | $ 0.897 | $2,436.25 |
| 330 Whittington Parkway | Louisville | KY | 40222-4920 | BR | O | N/A | Sat. (9:00am-12:00pm) | 4,960 | $ 0.897 | $4,449.12 |
| 3450 Taylor Boulevard | Louisville | KY | 40215-2681 | BR | O | N/A | Sat. (9:00am-12:00pm) | 5,505 | $ 0.897 | $4,937.81 |
| 4415 Cane Run Road | Louisville | KY | 40216-4501 | BR | O | N/A | N/A | 2,228 | $ 0.897 | $1,998.52 |
| 4816 Outer Loop | Louisville | KY | 40219-3302 | BR | O | N/A | Sat. (9:00am-12:00pm) | 2,356 | $ 0.897 | $2,113.33 |
| 4908 US Highway 42 | Louisville | KY | 40222-6369 | BR | O | N/A | Sat. (9:00am-12:00pm) | 3,192 | $ 0.897 | $2,863.22 |

Exhibit C - Janitorial Pricing by Site.xls

Page 9 of 47
Revised 03/23/05

Contract No. EMC-00793

Exhibit C

| Street Address | City | State | ZIP | | | | Hours Swept Mon-Fri | Usable / Cleanable Square Feet | Janitorial Cost Per Square Foot ($) | Estimated Janitorial Cost Per Year |
|---|---|---|---|---|---|---|---|---|---|---|
| 5004 Poplar Level Road | Louisville | KY | 40219-1125 | BR | O | N/A | Sat. (9:00am - 12:00pm) | 1,756 | $ 0.897 | $1,575.13 |
| 5100 Dixie Highway | Louisville | KY | 40216-1702 | BR | O | N/A | Sat. (9:00am - 12:00pm) | 2,554 | $ 0.897 | $2,290.58 |
| 5319 Preston Highway | Louisville | KY | 40213-2712 | BR | O | N/A | N/A | 2,913 | $ 0.897 | $2,612.78 |
| 6740 Bardstown Road | Louisville | KY | 40291-3048 | BR | O | N/A | Sat. (9:00am - 12:00pm) | 2,222 | $ 0.897 | $1,992.78 |
| 7111 Southside Drive | Louisville | KY | 40214-3611 | BR | O | N/A | Sat. (9:00am - 12:00pm) | 2,726 | $ 0.897 | $2,445.58 |
| 9050 Dixie Highway | Louisville | KY | 40258-1053 | BR | O | N/A | N/A | 1,742 | $ 0.897 | $1,562.93 |
| 9510 Brownsboro Road | Louisville | KY | 40241-1120 | BR | O | N/A | Sat. (9:00am - 12:00pm) | 2,303 | $ 0.897 | $2,065.97 |
| 300 Cumberland Cross | Monticello | KY | 42633 | BR | O | N/A | N/A | 2,405 | $ 0.897 | $2,157.11 |
| 1104 Chestnut Street | Murray | KY | 42071 | BR | O | N/A | Sat. (9:00am - 12:00pm) | 9,162 | $ 0.897 | $8,218.67 |
| 602 South 12th Street | Murray | KY | 42071 | BR | O | N/A | N/A | 2,686 | $ 0.897 | $2,409.70 |
| 808 North 12th Street | Murray | KY | 42071 | SF | L | Net | Sat. (10:00am - 2:00pm) | 308 | $ 1.392 | $428.74 |
| 15744 Fort Campbell Boulevard | Oak Grove | KY | 42262 | BR | O' | N/A | Sat. (9:00am - 3:00pm) | 1,539 | $ 1.233 | $1,897.83 |
| 3232 Villa Point | Owensboro | KY | | BR | L | Net | N/A | 384 | $ 0.897 | $344.45 |
| 5002 Frederica Street | Owensboro | KY | 42301 | BR | L | NNN | N/A | 2,610 | $ 1.233 | $3,217.64 |
| 2609 New Hartford Road | Owensboro | KY | 42303 | BR | O | N/A | N/A | 2,176 | $ 1.233 | $2,683.01 |
| 2800 Frederica Street | Owensboro | KY | 42301-5490 | BR | O | N/A | N/A | 3,169 | $ 1.233 | $3,907.13 |
| 2901 West Parrish Avenue | Owensboro | KY | 42301 | BR | O | N/A | N/A | 1,390 | $ 1.233 | $1,713.38 |
| 3000 East Fourth Street | Owensboro | KY | 42303 | BR | O | N/A | N/A | 2,426 | $ 0.897 | $2,176.48 |
| 1731 Scherm Rd | Owensboro | KY | 42301 | SF | L | Net | Sat. (9:00am - 3:00pm) | 464 | $ 1.392 | $645.89 |
| 2910 Highway 54 (Leitchfield Road) | Owensboro | KY | 42303 | SF | L | Net | Sat. (9:00am - 3:00pm) | 424 | $ 0.897 | $380.33 |
| 1601 Broadway | Paducah | KY | 42001 | BR | O | N/A | Sat. (8:00am - 12:00pm) | 13,458 | $ 0.897 | $12,071.47 |
| 300 North Mayo Trail | Paintsville | KY | 41240 | BR | L | Net | Sat. (8:00am - 1:00pm) | 5,631 | $ 1.392 | $7,838.63 |
| 226 South Main Street | Pembroke | KY | 42266 | BR | O | N/A | N/A | 1,832 | $ 0.897 | $1,643.30 |
| 4414 North Mayo Trail | Pikeville | KY | 41501 | BR | L | NNN | Sat. (8:00am - 1:00pm) | 10,080 | $ 1.392 | $14,031.36 |
| 216 Glynn View Plaza | Prestonburg | KY | 41653 | BR | L | Net | N/A | 1,132 | $ 0.897 | $1,015.40 |
| 5620 Robinson Creek Road | Robinson Creek | KY | 41560 | BR | O | N/A | N/A | 2,509 | $ 0.897 | $2,250.39 |
| 2198 Lakeway Drive | Russell Springs | KY | 42642 | BR | O | N/A | N/A | 1,309 | $ 0.897 | $1,173.99 |
| 102 NW Park Square | Russellville | KY | 42276 | BR | O | N/A | Sat. (8:30am - 1:00pm) | 8,719 | $ 0.897 | $7,821.12 |

Contract No. EMC-00793

Exhibit C

| Street Address | City | State | Zip | Property Type | Owned/Leased | Lease Type | Hours Beyond Mon-Fri | Usable / Cleanable Square Feet | Janitorial $ Per Square Feet | Estimated Janitorial Cost Per Month |
|---|---|---|---|---|---|---|---|---|---|---|
| 124 North Main Street | Somerset | KY | 42501 | BR | O | N/A | N/A | 7,897 | $ 1.233 | $9,736.75 |
| 3977 South Highway 27 | Somerset | KY | 42501 | BR | O | N/A | N/A | 5,415 | $ 0.897 | $4,857.43 |
| 546 South Highway 27 | Somerset | KY | 42501 | BR | O | N/A | N/A | 3,090 | $ 0.897 | $2,772.09 |
| 805 Bardstown Road (New Lease) | Springfield | KY | 40069 | BR | L | Net | Sat. (8:30am - 12:00pm) | 4,214 | $ 1.392 | $5,865.33 |
| 110 East Main Street | Springfield | KY | 40069-1225 | BR | O | N/A | N/A | 10,718 | $ 1.233 | $13,214.80 |
| 10026 Main Street | Whitesville | KY | 42378-9716 | BR | O | N/A | N/A | 1,818 | $ 0.897 | $1,630.39 |
| 30 West Broadway | Winchester | KY | 40391 | BR | O | N/A | N/A | 9,821 | $ 1.233 | $12,109.05 |
| 825 Bypass Road | Winchester | KY | 40391 | BR | O | N/A | Sat. (9:00am - 12:00pm) | 2,166 | $ 1.392 | $3,014.52 |
| 801 Compass Way, Suite 7, Annapolis, MD, 21401 | Annapolis | MD | 21401 | BR | L | Net | N/A | 1,200 | $ 1.233 | $1,479.60 |
| 91 Main Street, Annapolis, MD, 21401 | Annapolis | MD | 21401 | BR | L | Net | N/A | 848 | $ 1.233 | $1,045.58 |
| 2078 General's Highway | Annapolis | MD | 21401 | BR | L | NNN | Sat. (8:30am - 12:00pm) | 2,800 | $ 1.392 | $3,897.60 |
| 2623 Riva Road | Annapolis | MD | 21401 | BR | L | NNN | Sat. (8:30am - 12:00pm) | 4,640 | $ 1.392 | $6,458.88 |
| 416 Sixth Street | Annapolis | MD | 21403 | BR | L | NNN | Sat. (8:30am - 12:00pm) | 2,000 | $ 1.392 | $2,784.00 |
| 101 Hillsmere Drive | Annapolis | MD | 21403 | BR | O | N/A | Sat. (8:30am - 12:00pm) | 2,140 | $ 1.392 | $2,978.88 |
| 2015 West Street | Annapolis | MD | 21401 | BR | O | N/A | Sat. (8:30am - 12:00pm) | 3,174 | $ 1.392 | $4,417.65 |
| 5 Church Circle | Annapolis | MD | 21401 | BR | O | N/A | N/A | 15,146 | $ 1.233 | $18,675.51 |
| 2 Arnold Road | Arnold | MD | 21012 | BR | O | N/A | Sat. (8:30am - 12:00pm) | 2,088 | $ 1.392 | $2,906.50 |
| 111 South Calvert Street | Baltimore | MD | 21202 | BR | L | Net | N/A | 1,734 | $ 1.233 | $2,137.53 |
| 2 North Charles Street, Suite 100 | Baltimore | MD | 21201 | BR | L | Net | N/A | 2,649 | $ 0.897 | $2,375.97 |
| 44 East Sudbrook Lane | Baltimore | MD | 21208 | BR | L | Net | N/A | 2,720 | $ 0.897 | $2,439.84 |
| 5 Bel Air South Parkway | Bel Air | MD | 21015 | BR | L | Net | Sat. (8:00am - 12:00pm) | 2,800 | $ 0.897 | $2,511.60 |
| 333 Baltimore Pike | Bel Air | MD | 21014 | BR | L | NNN | N/A | 2,045 | $ 0.897 | $1,834.19 |
| 37 South Main Street | Bel Air | MD | 21014 | BR | O | N/A | N/A | 17,132 | $ 1.233 | $21,123.76 |
| 315 South Main Street | Bel Air | MD | 21014 | DU | O | N/A | N/A | 811 | $ 0.897 | $727.65 |
| 11605 Beltsville Drive | Beltsville | MD | 20705 | BR | L | Net | Sat. (9:00am - 12:00pm) | 2,000 | $ 1.392 | $2,784.00 |
| 11121 Racetrack Road | Berlin | MD | 21811 | BR | O | N/A | Sat. (8:30am - 12:00pm) | 2,000 | $ 1.392 | $2,784.00 |
| 4719 Hampden Lane | Bethesda | MD | 20814 | BR | L | Net | N/A | 9,594 | $ 1.233 | $11,829.90 |
| 10657 Bishopville Road | Bishopville | MD | 21813 | BR | O | N/A | N/A | 1,368 | $ 1.233 | $1,686.74 |
| 6901 Laurel Bowie Road | Bowie | MD | 20715 | BR | O | N/A | Sat. (8:30am - 12:00pm) | 2,480 | $ 1.392 | $3,452.16 |

Contract No. EMC-00793

Exhibit C

| Street Address | City | State | Zip | Property Type (BR/DU) | Lease Type (Own) | Lease Term (Net/NNN) | Hours of Operation | Usable/Cleanable Square Feet | Janitorial Cost Per Square Foot ($) | Estimated Janitorial Cost (Per Mo) ($) |
|---|---|---|---|---|---|---|---|---|---|---|
| 94 Souder Road | Brunswick | MD | 21716 | BR | L | Net | Sat. (9:00am - 12:00pm) | 1,632 | $ 1.392 | $2,271.74 |
| 23415 Three Notch Road, #2060 | California | MD | 20619 | BR | L | Net | Sat. (8:30am - 12:00pm) | 1,984 | $ 1.392 | $2,761.73 |
| 601 Crusader Road | Cambridge | MD | 21613 | BR | O | N/A | Sat. (8:30am - 12:00pm) | 1,529 | $ 1.392 | $2,128.09 |
| 6309 Allentown Road | Camp Springs | MD | 20748 | BR | L | Net | N/A | 2,014 | $ 1.233 | $2,483.76 |
| 919 Frederick Road | Catonsville | MD | 21228 | BR | O | N/A | N/A | 2,995 | $ 0.897 | $2,686.69 |
| 102 Broadway | Centreville | MD | 21617 | BR | L | Net | Sat. (8:30am - 12:00pm) | 3,974 | $ 1.392 | $5,532.36 |
| 601 Washington Avenue | Chestertown | MD | 21620 | BR | L | Net | Sat. (8:00am - 12:00pm) | 1,200 | $ 1.392 | $1,670.40 |
| 2900 Churchville Road | Churchville | MD | 21028 | BR | L | NNN | Sat. (8:30am - 12:00pm) | 1,354 | $ 0.897 | $1,214.10 |
| 9110 Piscataway Road, Clinton, MD, 20735 | Clinton | MD | 20735 | BR | L | Net | Sat. (8:30am - 12:00pm) | 2,543 | $ 1.392 | $3,540.13 |
| 9658 Baltimore Avenue, Suite 101 | College Park | MD | 20740 | BR | L | Net | N/A | 1,533 | $ 1.233 | $1,889.94 |
| 11000 Broken Land Parkway, Suite 118 | Columbia | MD | 21044 | BR | L | Net | | 2,697 | N/A | N/A |
| 8850 Columbia 100 Parkway | Columbia | MD | 21045 | BR | L | Net | Sat. (9:00am - 12:00pm) | 4,186 | $ 1.233 | $5,161.83 |
| 5585 Twin Knolls Road | Columbia | MD | 21045 | BR | O | N/A | Sat. (9:00am - 12:00pm) | 3,346 | $ 1.392 | $4,657.08 |
| 11000 Broken Land Parkway, Columbia, MD 21044 | Columbia | MD | 21044 | DU | L | Net | | 2,697 | N/A | N/A |
| 257 North Somerset Avenue | Crisfield | MD | 21817 | BR | O | N/A | Sat. (8:30am - 12:00pm) | 1,920 | $ 1.392 | $2,672.64 |
| 2151 Defense Highway | Crofton | MD | 21114 | BR | L | Net | Sat. (8:00am - 12:00pm) | 1,010 | $ 0.897 | $906.33 |
| 9815 Main Street | Damascus | MD | 20872 | BR | L | Net | N/A | 800 | $ 1.233 | $986.40 |
| 5801 Deale Churchton Road | Deale | MD | 20751 | BR | L | Net | Sat. (8:30am - 12:00pm) | 950 | $ 1.392 | $1,322.96 |
| 10264 Southern Maryland Boulevard, Suite 100 | Dunkirk | MD | 20754 | BR | L | Net | Sat. (8:30am - 12:00pm) | 2,049 | $ 1.392 | $2,851.93 |
| 100 Marlboro Avenue | Easton | MD | 21601 | BR | L | NNN | Sat. (8:30am - 12:00pm) | 3,368 | $ 1.392 | $4,688.26 |
| 52 West Central Avenue | Edgewater | MD | 21037 | BR | L | Net | Sat. (8:30am - 12:00pm) | 1,650 | $ 1.392 | $2,297.36 |
| Central Avenue and Pike Ridge Road | Edgewater | MD | 21037 | BR | L | Net | | 2,400 | $ 1.233 | $2,959.20 |
| 3062 Solomans Island Rd. | Edgewater | MD | 21037 | BR | L | NNN | Sat. (8:30am - 12:00pm) | 1,440 | $ 1.392 | $2,004.48 |
| 1014 Gateway Road | Edgewood | MD | 21040 | BR | L | NNN | Sat. (8:00am - 12:00pm) | 1,920 | $ 0.897 | $1,722.24 |
| 1300 Liberty Road | Eldersburg | MD | 21784 | BR | O | N/A | Sat. (7:30am - 1:00pm) | 6,240 | $ 1.392 | $8,686.08 |
| 7290 Montgomery Road | Elkridge | MD | 21227 | BR | O | N/A | Sat. (8:00am - 12:00pm) | 5,530 | $ 1.392 | $7,698.32 |

Exhibit C - Janitorial Pricing by Site.xls

Contract No. EMC-00793

Exhibit C

| Street Address | City | State | ZIP | Facility Type | Lease Type | Service Day of Month FY | Usable / Cleanable Square Feet | Janitorial Cost Per Square Foot ($) | Estimated Janitorial Cost Per Month |
|---|---|---|---|---|---|---|---|---|---|
| 2401 Baldwin Mill Road | Fallston | MD | 21047 | BR | L | NNN | Sat. (8:00am - 12:00pm) 1,664 | $ 0.897 | $1,492.61 |
| 1911 Bel Air Road | Fallston | MD | 21047 | BR | O | N/A | Sat. (8:00am - 12:00pm) 2,877 | $ 0.897 | $2,580.49 |
| 102 South Main Street | Federalsburg | MD | 21632 | BR | O | N/A | Sat. (8:30am - 12:00pm) 3,106 | $ 1.392 | $4,324.11 |
| 3000 Gamber Road | Finksburg | MD | 21048 | BR | L | Net | Sat. (8:00am - 12:00pm) 3,192 | $ 0.897 | $2,863.22 |
| 3348 Donnell Drive (Penn Mar Shopping Center) | Forestville | MD | 20747 | BR | L | Net | 3,000 | $ 1.233 | $3,699.00 |
| 9412 Livingston Road | Fort Washington | MD | 20744 | BR | L | NNN | Sat. (8:30am - 12:00pm) 40,126 | $ 1.392 | $55,855.95 |
| 571 North Solomons Island Road | Frederick | MD | 20678 | BR | L | Net | N/A 1,120 | $ 1.233 | $1,380.96 |
| 1 North Market Street | Frederick | MD | 21701 | BR | L | Net | N/A 4,154 | $ 1.233 | $5,122.38 |
| 100 Buchimer Road | Frederick | MD | 21701 | BR | L | Net | Sat. (9:00am - 12:00pm) 1,704 | $ 1.392 | $2,371.97 |
| 1370 West Patrick Street | Frederick | MD | 21701 | BR | L | NNN | Sat. (8:00am - 12:00pm) 1,850 | $ 1.392 | $2,574.64 |
| 192 Thomas Johnson Drive | Frederick | MD | 21701 | BR | O | N/A | N/A 56,106 | $ 1.233 | $69,178.20 |
| 1303 East Patrick Street | Frederick | MD | 21702-4137 | BR | O | N/A | 1,980 | $ 1.233 | $2,441.34 |
| 1602 Rosemont Avenue | Frederick | MD | 21704 | BR | O | N/A | Sat. (9:00am - 12:00pm) 3,778 | $ 1.392 | $5,258.42 |
| 5602 Buckeystown Pike | Gaithersburg | MD | 20878 | BR | L | Net | Sat. (9:00am - 12:00pm) 1,480 | $ 1.392 | $2,060.16 |
| 266 Kentlands Boulevard | Gaithersburg | MD | 20852 | BR | L | Net | N/A 2,357 | $ 1.233 | $2,905.93 |
| 8019 Snouffer School Road | Gaithersburg | MD | 20877-2420 | BR | L | NNN | 1,920 | $ 1.233 | $2,367.36 |
| 467 North Frederick Avenue | Gambrills | MD | 21054 | BR | L | Net | N/A 8,000 | $ 1.233 | $9,864.00 |
| 2405 Brandermill Blvd., Gambrills-Waugh Chapel | Germanton | MD | 20786 | BR | L | Net | Sat. (9:00am - 12:00pm) 4,240 | $ 0.897 | $3,803.28 |
| 19941 Century Boulevard | Glen Burnie | MD | 21061 | BR | L | Net | Sat. (9:00am - 12:00pm) 2,800 | $ 1.392 | $3,897.60 |
| 7381 Baltimore-Annapolis Boulevard | Greenbelt | MD | 20770 | BR | L | Net | Sat. (9:00am - 1:00pm) 1,920 | $ 0.897 | $1,722.24 |
| 8951 Edmonston Road | Greensboro | MD | 21639 | BR | O | N/A | N/A 1,642 | $ 1.233 | $2,024.09 |
| 103 North Main Street | Hampstead | MD | 21074 | BR | O | N/A | Sat. (8:30am - 12:00pm) 2,472 | $ 1.392 | $3,441.02 |
| 999 South Main Street | Havre De Grace | MD | 21078 | BR | O | N/A | Sat. (8:00am - 12:00pm) 3,832 | $ 0.897 | $3,437.30 |
| 233 St. John Street | Hyattsville | MD | 20781 | BR | L | Net | Sat. (8:00am - 12:00pm) 7,779 | $ 0.897 | $6,977.94 |
| 3004 62nd Avenue | Jarettsville | MD | 21084 | BR | O | N/A | N/A 1,384 | $ 1.233 | $1,706.47 |
| 3891 Jarrettsville Road | Lanham | MD | 20706 | BR | O | N/A | Sat. (8:00am - 12:00pm) 3,194 | $ 0.897 | $2,864.66 |
| 9395 Lanham-Severn Road | | MD | 20706 | BR | O | N/A | Sat. (9:00am - 12:00pm) 1,932 | $ 1.392 | $2,689.34 |

Contract No. EMC-00793

Exhibit C

| Street Address | City | State | Zip | Property Type | Lease | Lease Type | Hours Beyond Mon-Fri | Usable / Cleanable Square Feet | Janitorial Cost Per Square Foot | Estimated Janitorial Cost Per Year |
|---|---|---|---|---|---|---|---|---|---|---|
| 6640 Crain Highway | LaPlata | MD | | BR | L | Net | N/A | 2,480 | $1.233 | $3,057.84 |
| 380 Main Street | Laurel | MD | 20707 | BR | O | N/A | Sat.(9:00am-12:00pm) | 5,074 | $1.392 | $7,062.45 |
| 5401 Southern Maryland Boulevard | Lothian | MD | 20711 | BR | L | NNN | Sat.(8:30am-12:00pm) | 2,032 | $1.392 | $2,828.54 |
| 3200 Main Street | Manchester | MD | 21102 | BR | O | N/A | N/A | 2,925 | $0.897 | $2,623.55 |
| 3068 Westminster Street | Manchester | MD | 21102 | DU | O | N/A | Sat.(9:00am-12:00pm) | 250 | $0.897 | $223.69 |
| 819 East Main Street | Middletown | MD | 21769 | BR | L | NNN | Sat.(9:00am-12:00pm) | 1,613 | $1.392 | $2,245.02 |
| 400 Cypress Street | Millington | MD | 21651 | BR | O | N/A | Sat.(8:30am-12:00pm) | 2,039 | $1.392 | $2,838.57 |
| 10450 Lottsford Road | Mitchellville | MD | 20721 | BR | L | Net | N/A | 352 | $0.897 | $315.74 |
| 11796 Fingerboard Road | Monrovia | MD | 21770 | BR | L | Net | Sat.(9:00am-12:00pm) | 640 | $1.392 | $890.88 |
| 443 East Ridgeville Boulevard | Mount Airy | MD | 21771 | BR | L | Net | Sat.(9:00am-12:00pm) | 2,048 | $1.392 | $2,850.82 |
| 14501 Coastal Highway | Ocean City | MD | 21842 | BR | O | N/A | Sat.(8:30am-12:00pm) | 915 | $1.392 | $1,273.96 |
| 4604 Coastal Highway | Ocean City | MD | 21842 | BR | O | N/A | Sat.(8:30am-12:00pm) | 3,342 | $1.392 | $4,651.51 |
| 7900 Coastal Highway | Ocean City | MD | 21842 | BR | O | N/A | Sat.(8:30am-12:00pm) Summer Only | 1,721 | $1.392 | $2,395.35 |
| 1219 Annapolis Road | Odenton | MD | 21113 | BR | O | N/A | Sat.(9:00am-1:00pm) | 2,917 | $0.897 | $2,616.37 |
| 6168 Oxon Hill Road | Oxon Hill | MD | 20745 | BR | O | N/A | Sat.(8:30am-12:00pm) | 1,522 | $1.392 | $2,118.07 |
| 3030 Mountain Road | Pasadena | MD | 21122 | BR | O | N/A | Sat.(8:30am-12:00pm) | 2,605 | $0.897 | $2,336.51 |
| 19645 Fisher Avenue | Poolesville | MD | 20837 | BR | L | Net | N/A | 1,904 | $1.233 | $2,347.63 |
| 12136 Elm Street | Princess Anne | MD | 21853 | BR | O | N/A | Sat.(8:30am-12:00pm) | 2,432 | $1.392 | $3,385.34 |
| 11702 Reisterstown Road | Reisterstown | MD | 21136 | BR | L | Net | Sat.(9:00am-1:00pm) | 2,016 | $0.897 | $1,808.35 |
| 1097 Seven Locks Rd., Rockville, MD | Rockville | MD | 20850 | BR | L | Net | Sat.(9:00am-12:00pm) | 2,552 | $1.233 | $3,146.62 |
| 404 King Farm Boulevard, Building 7 | Rockville | MD | 20850 | BR | L | Net | N/A | 1,755 | $1.392 | $2,443.24 |
| 9401 Key West Avenue | Rockville | MD | 20850 | BR | L | Net | N/A | 1,346 | $1.233 | $1,660.11 |
| 99 South Washington Street | Rockville | MD | 20852 | BR | O | N/A | N/A | 3,744 | $1.233 | $4,616.35 |
| 1470 Rockville Pike | Rockville | MD | 20852 | BR | L | Net | Sat.(8:30am-12:00pm) | 1,369 | $1.233 | $1,687.73 |
| 2400 Salisbury Blvd. | Salisbury | MD | 21801 | BR | L | Net | Sat.(8:30am-12:00pm) | 2,160 | $1.392 | $3,006.72 |
| 1105 Mt. Hermon Road | Salisbury | MD | 21804 | BR | L | NNN | Sat.(8:30am-12:00pm) | 1,855 | $1.392 | $2,582.44 |

Contract No. EMC-00793

Exhibit C

| Street Address | City | State | Zip | Primary Use of Building | Lease / Own | Lease Type | Hours Between M-F | Usable / Cleanable Square Feet | Janitorial Cost per Square Foot (1) | Estimated Janitorial Cost Per Year |
|---|---|---|---|---|---|---|---|---|---|---|
| 1300 South Salisbury Boulevard | Salisbury | MD | 21801 | BR | O | N/A | Sat. (8:00am-12:00pm) | 4,860 | $ 1.392 | $6,765.12 |
| 542 Riverside Drive | Salisbury | MD | 21801 | BR | O | N/A | Sat. (8:30am-12:00pm) | 1,608 | $ 1.392 | $2,238.34 |
| 559 Baltimore Annapolis Boulevard | Severna Park | MD | 21446 | BR | L | Net | Sat. (8:00am-12:00pm) | 1,984 | $ 0.897 | $1,779.65 |
| 569 Benfield Road | Severna Park | MD | 21446 | BR | L | Net | Sat. (8:00am-12:00pm) | 806 | $ 0.897 | $723.34 |
| 1100 Wayne Avenue, Suite 200 | Silver Spring | MD | 20910 | BR | L | Net | N/A | 2,754 | $ 1.233 | $3,396.18 |
| 14328 Layhill Road | Silver Spring | MD | 20906 | BR | L | Net | N/A | 1,280 | $ 1.233 | $1,578.24 |
| 15509 & 15511 New Hampshire Avenue | Silver Spring | MD | 20905 | BR | L | Net | N/A | 3,649 | $ 1.233 | $4,498.97 |
| 13350 New Hampshire Avenue | Silver Spring | MD | 20904 | BR | O | N/A | Sat. (9:00am-12:00pm) | 1,113 | $ 1.392 | $1,549.02 |
| 10590 Campus Way | South Largo | MD | 20774 | BR | L | Net | N/A | 2,800 | $ 1.233 | $3,452.40 |
| 3500 Conowingo Road | Street | MD | 21154 | BR | O | N/A | Sat. (8:00am-12:00pm) | 1,978 | $ 0.897 | $1,773.91 |
| 7200 Third Avenue | Sykesville | MD | 21784 | BR | L | Net | N/A | 854 | $ 1.233 | $1,052.49 |
| 4345 Old Taneytown Road | Taneytown | MD | 21787 | BR | O | N/A | Sat. (8:00am-12:00pm) | 1,584 | $ 0.897 | $1,420.85 |
| 31 West Timonium Road | Timonium | MD | 21048 | BR | L | NNN | N/A | 4,240 | $ 0.897 | $3,803.28 |
| 600 Washington Avenue | Towson | MD | 21204 | BR | L | Net | N/A | 2,899 | $ 0.897 | $2,600.58 |
| 9420 Pennsylvania Avenue, Melwood | Upper Marlboro | MD | 20772 | BR | O | N/A | Sat. (8:30am-12:00pm) | 11,696 | $ 1.392 | $16,280.83 |
| Sugarloaf Parkway and Worthington Blvd. | Urbana | MD | 21704 | BR | L | NNN | N/A | 2,800 | $ 1.233 | $3,452.40 |
| 2140 Old Washington Road | Waldorf | MD | 20601 | BR | L | NNN | Sat. (8:30am-12:00pm) | 1,578 | $ 1.392 | $2,197.13 |
| 3425 Leonardtown Road | Waldorf | MD | 20601-3644 | BR | O | N/A | Sat. (8:30am-12:00pm) | 4,594 | $ 1.392 | $6,394.29 |
| 100 Commerce Drive | Walkersville | MD | 21793 | BR | O | N/A | Sat. (9:00am-12:00pm) | 1,120 | $ 1.392 | $1,558.04 |
| 204 Saint Mark Way | Westminster | MD | 21157 | BR | L | Net | N/A | 1,200 | $ 0.897 | $1,076.40 |
| 193 East Main Street | Westminster | MD | 21157-5014 | BR | O | N/A | N/A | 3,712 | $ 0.897 | $3,329.66 |
| 401 Englar Road | Westminster | MD | 21157-4851 | BR | O | N/A | Sat. (7:30am-1:00pm) | 4,920 | $ 0.897 | $4,413.24 |
| 45 West Main Street | Westminster | MD | 21157-4815 | BR | O | N/A | N/A | 30,580 | $ 1.233 | $37,705.14 |
| 11200 Viers Mill Road | Wheaton | MD | 20902 | BR | L | Net | N/A | 4,530 | $ 1.233 | $5,585.00 |
| 10579 Theodore Green Blvd. | White Plains | MD | 20695 | BR | L | Net | Sat. (8:30am-12:00pm) | 1,600 | $ 1.392 | $2,227.20 |
| 7101 Security Blvd | Woodlawn | MD | 21207 | BR | L | Net | N/A | 3,074 | $ 0.897 | $2,757.74 |
| 1803 Sandhills Boulevard North | Aberdeen | NC | 28315 | BR | O | N/A | N/A | 2,240 | $ 1.233 | $2,761.92 |
| 203 East Depot Street | Angier | NC | 27501 | BR | O | N/A | N/A | 2,755 | $ 1.233 | $3,397.16 |
| Main Street Highway 52 | Ansonville | NC | 28007 | BR | O | N/A | N/A | 2,186 | $ 1.233 | $2,694.84 |

Contract No. EMC-00793

Exhibit C

| Street Address | City | State | Zip | | | | Hours Beyond Mon-Fri | Usable / Cleanable Square Feet | Janitorial Cost Per Square Foot | Estimated Janitorial Cost Per Year |
|---|---|---|---|---|---|---|---|---|---|---|
| 801 East Williams Street | Apex | NC | 27502 | BR | L | NNN | N/A | 3,426 | $ 1.233 | $4,224.75 |
| 261 North Fayetteville Street | Asheboro | NC | 27203 | BR | L | NNN | N/A | 8,340 | $ 1.233 | $10,283.22 |
| 1343 Parkwood Road | Asheville | NC | 28806 | BR | L | NNN | Sat. (9:00am - 12:00pm) | 4,240 | $ 1.392 | $5,902.08 |
| 1653 Hendersonville Road | Asheville | NC | 28803 | BR | L | NNN | Sat. (9:00am - 12:00pm) | 3,360 | $ 1.392 | $4,677.12 |
| 850 Merrimon Avenue | Asheville | NC | 28808 | BR | L | NNN | N/A | 1,337 | $ 1.233 | $1,648.27 |
| 121 Third Street | Ayden | NC | 28513 | BR | O | N/A | N/A | 2,422 | $ 1.233 | $2,986.82 |
| 617 Front Street | Beaufort | NC | 28516 | BR | O | N/A | N/A | 3,546 | $ 1.233 | $4,371.72 |
| 307 East Main Street | Benson | NC | 27504 | BR | O | N/A | N/A | 2,176 | $ 1.233 | $2,683.01 |
| 104 West Main Street | Beulaville | NC | 28518 | BR | O | N/A | N/A | 3,860 | $ 1.233 | $4,759.38 |
| 210 West Center Street | Black Creek | NC | 27813 | BR | O | N/A | N/A | 640 | $ 0.897 | $574.08 |
| 124 North Main Street | Boiling Springs | NC | 28017 | BR | O | N/A | N/A | 2,036 | $ 1.233 | $2,510.39 |
| 3769 Old Ocean Highway | Bolivia | NC | 28422 | BR | L | NNN | N/A | 1,600 | $ 1.233 | $1,972.80 |
| 2458 Highway 105 | Boone | NC | 28607 | BR | L | NNN | N/A | 3,360 | $ 1.233 | $4,142.88 |
| 971 Blowing Rock Road | Boone | NC | 28607 | BR | O | N/A | Sat. (9:00am - 12:00pm) | 6,871 | $ 1.392 | $9,564.71 |
| 106 South Main Street | Broadway | NC | 27505 | BR | O | N/A | N/A | 1,928 | $ 1.233 | $2,377.22 |
| 2040 South Church Street | Burlington | NC | 27216 | BR | L | Net | N/A | 6,984 | $ 1.233 | $8,611.27 |
| 10027 Beach Drive | Calabash | NC | 28459 | BR | O | N/A | N/A | 1,857 | $ 1.233 | $2,289.43 |
| 7 North Lake Park Boulevard | Carolina Beach | NC | 28428 | BR | O | N/A | N/A | 2,766 | $ 1.233 | $3,410.97 |
| 502 Monroe Street | Carthage | NC | 28327 | DU | O | N/A | N/A | 2,060 | $ 0.897 | $1,847.82 |
| 200 East Chatham St. | Cary | NC | 27511 | BR | L | Net | N/A | 4,832 | $ 1.233 | $5,957.86 |
| 7317 Tryon Road | Cary | NC | 27511 | BR | L | Net | Sat. (9:00am - 12:00pm) | 4,240 | $ 1.392 | $5,902.08 |
| 848 East Maynard Road | Cary | NC | 27511 | BR | L | Net | N/A | 1,840 | $ 1.233 | $2,268.72 |
| 977 North Harrison Ave. | Cary | NC | 27511 | BR | L | Net | N/A | 2,554 | $ 1.233 | $3,148.59 |
| 924 Kildare Farm Road | Cary | NC | 27511 | BR | L | NNN | N/A | 2,080 | $ 1.233 | $2,564.64 |
| 5610 Castle Hayne Road | Castle Hayne | NC | 28429-5111 | BR | O | N/A | N/A | 960 | $ 1.233 | $1,183.68 |
| 625 Brown Street | Chadbourn | NC | 28431 | BR | L | NNN | N/A | 1,920 | $ 1.233 | $2,367.36 |
| 100 North Elliot Road | Chapel Hill | NC | 27515 | BR | O | N/A | Sat. (9:00am - 12:00pm) | 2,640 | $ 1.392 | $3,674.88 |
| 143 East Rosemary Street | Chapel Hill | NC | 27514-3528 | BR | O | N/A | N/A | 2,960 | $ 1.233 | $3,649.68 |
| 1814 Oakdale Road | Charlotte | NC | 28214 | BR | L | Net | N/A | 2,600 | $ 1.233 | $3,205.80 |
| 2520 Sardis Road North, First Floor | Charlotte | NC | 28217 | BR | L | Net | N/A | 4,000 | $ 1.233 | $4,932.00 |
| 3800 Shamrock Dr. | Charlotte | NC | 28215 | BR | L | Net | N/A | 493 | $ 1.233 | $607.62 |
| 250 East Woodlawn Rd. | Charlotte | NC | 28212 | BR | L | NNN | N/A | 1,970 | $ 1.233 | $2,428.52 |

Contract No. EMC-00793

Exhibit C

| Street Address | City | State | Zip | | | | Future Renovation End | Usable Cleanable Square Feet | Janitorial Cost per Square Foot | Estimated Janitorial Cost Per Year |
|---|---|---|---|---|---|---|---|---|---|---|
| 419 Little Rock Road | Charlotte | NC | 28214 | BR | L | NNN | N/A | 1,774 | $ 1.233 | $2,186.85 |
| 4309 Providence Road | Charlotte | NC | 28211 | BR | L | NNN | N/A | 2,110 | $ 1.233 | $2,602.12 |
| 7521 Matthews Pineville Rd Charlotte-Carmel Commons | Charlotte | NC | 28209 | BR | L | NNN | Sat. (9:00am - 12:00pm) | 2,160 | $ 1.392 | $3,006.72 |
| 8558 University City Boulevard | Charlotte | NC | 28213 | BR | L | NNN | N/A | 880 | $ 1.233 | $1,085.04 |
| 6869 Fairview Road | Charlotte | NC | 28217 | BR | L | NNN | Sat. (9:00am - 12:00pm) | 9,600 | $ 1.392 | $13,363.20 |
| 101 Queens Road | Charlotte | NC | 28204-3215 | BR | O | N/A | N/A | 3,080 | $ 1.233 | $3,797.64 |
| 13901 Conlan Circle | Charlotte | NC | 28210 | BR | O | N/A | Sat. (9:00am - 12:00pm) | 4,240 | $ 1.392 | $5,902.08 |
| 3059 Eastway Drive | Charlotte | NC | 28205 | BR | O | N/A | N/A | 1,386 | $ 1.233 | $1,708.44 |
| 3726 Monroe Road | Charlotte | NC | 28205-7736 | BR | O | N/A | N/A | 2,400 | $ 1.233 | $2,959.20 |
| 4901 Albemarle Road | Charlotte | NC | 28205 | BR | O | N/A | Sat. (9:00am - 12:00pm) | 3,400 | $ 1.392 | $4,732.80 |
| 5369 Ballantyne Commons Parkway | Charlotte | NC | 28277 | BR | O | N/A | Sat. (9:00am - 12:00pm) | 4,720 | $ 1.392 | $6,570.24 |
| 6021 Hickory Grove Road | Charlotte | NC | 28212 | BR | O | N/A | N/A | 3,680 | $ 1.233 | $4,537.44 |
| 8011 Mallard Creek Road | Charlotte | NC | 28262-2236 | BR | O | N/A | Sat. (9:00am - 12:00pm) | 3,360 | $ 1.392 | $4,677.12 |
| 9200 South Tryon Street | Charlotte | NC | 28273-3107 | BR | O | N/A | N/A | 3,360 | $ 1.233 | $4,142.88 |
| 4500 South Tryon Street | Charlotte | NC | 28213 | DU | O | N/A | N/A | 1,840 | $ 0.897 | $1,650.48 |
| 100 South Mountain Street | Cherryville | NC | 28021 | BR | O | N/A | N/A | 7,872 | $ 1.233 | $9,706.18 |
| 1001 East Church Street | Cherryville | NC | 28021 | BR | O | N/A | N/A | 1,649 | $ 1.233 | $2,032.97 |
| 3296 East Main Street | Claremont | NC | 28610 | BR | O | N/A | N/A | 2,890 | $ 1.233 | $3,562.88 |
| 7 East Green Street | Clarkton | NC | 28433 | BR | L | NNN | N/A | 3,058 | $ 1.233 | $3,771.01 |
| 11508 Highway 70 | Clayton | NC | 27520-2265 | BR | O | N/A | N/A | 4,000 | $ 1.233 | $4,932.00 |
| 2629 Lewisville-Clemmons Road | Clemmons | NC | 27012 | BR | O | N/A | Sat. (9:00am - 12:00pm) | 4,000 | $ 1.392 | $5,568.00 |
| 1106 Sunset Avenue | Clinton | NC | 28328 | BR | L | NNN | N/A | 2,110 | $ 1.233 | $2,602.12 |
| 501 Warsaw Road | Clinton | NC | 28328 | BR | L | NNN | N/A | 6,436 | $ 1.233 | $7,935.59 |
| 140 North McKinley Street | Coats | NC | 27521 | BR | O | N/A | N/A | 1,928 | $ 1.233 | $2,377.22 |
| 107 Main Street | Columbia | NC | 27925 | BR | O | N/A | N/A | 1,299 | $ 0.897 | $1,165.38 |
| 5145 Poplar Tent Road | Concord | NC | 28027 | BR | O | N/A | N/A | 4,897 | $ 1.233 | $6,037.75 |
| 202 First Avenue South | Conover | NC | 28613 | BR | O | N/A | N/A | 4,280 | $ 1.233 | $5,277.24 |
| 20400 Catawba Avenue | Cornelius | NC | 28031-6391 | BR | O | N/A | N/A | 2,160 | $ 1.233 | $2,663.28 |
| 109 Center Street | Cramerton | NC | 28032 | BR | O | N/A | N/A | 2,614 | $ 1.233 | $3,222.57 |
| 501 West Trade Street | Dallas | NC | 28034 | BR | O | N/A | N/A | 1,922 | $ 1.233 | $2,369.33 |
| 94 North Main Street | Denton | NC | 27239 | BR | O | N/A | N/A | 1,600 | $ 1.233 | $1,972.80 |

E━━C.5
Janitorial Pricing by Site

## Janitorial Price Response - Consolidated BB&T Regions

| Street Address | | | Property Type BR/O/USF | Lease / Own | Lease Type | Hours Beyond Mon. - Fri. | Usable / Cleanable Square Feet | Janitorial Cost Per Square Foot (g) | Estimated Janitorial Cost Per Year |
|---|---|---|---|---|---|---|---|---|---|
| 1100 Quintard Avenue | Anniston | AL 36201 | BR | O | N/A | N/A | 1,304 | $ 1.233 | $2,009.79 |
| 402 Main Street | Oxford | AL 36203 | BR | O | N/A | Sat. (6:30am - 12:00pm) | 8,738 | $ 1.392 | $15,204.82 |
| 1316 U Street NW | Washington | DC 20200 | BR | L | Net | N/A | 1,200 | $ 1.233 | $1,849.50 |
| 1730 Rhode Island Avenue NW | Washington | DC 20036 | BR | L | Net | N/A | 1,560 | $ 1.233 | $2,404.35 |
| 317 Pennsylvania Avenue | Washington | DC 20003-1146 | BR | L | Net | N/A | 3,402 | $ 1.233 | $5,243.95 |
| 601 Thirteenth Street NW | Washington | DC 20005 | BR | L | Net | N/A | 2,971 | $ 1.233 | $4,579.36 |
| 614 H Street, Washington - Gallery Place | Washington | DC | BR | L | Net | N/A | 2,088 | $ 1.233 | $3,218.13 |
| 815 Connecticut Avenue, N.W. | Washington | DC 20006 | BR | L | Net | N/A | 2,927 | $ 1.233 | $4,511.55 |
| 1365 Wisconsin Avenue, N.W. | Washington | DC 20007-3356 | BR | L | NNN | N/A | 2,831 | $ 1.233 | $4,363.59 |
| 5200 Wisconsin Avenue NW | Washington | DC 20015 | BR | L | NNN | N/A | 4,665 | $ 1.233 | $7,189.62 |
| 401 North Indian Rocks Road | Belleair Bluffs | FL 33770 | BR | L | NNN | N/A | 3,414 | $ 1.233 | $5,261.21 |
| 3527 North Lecanto Highway | Beverly Hills | FL 34465 | BR | L | Net | N/A | 1,360 | $ 1.233 | $2,096.10 |
| 421- 12th Street West | Bradenton | FL 34205 | BR | L | NNN | N/A | 1,612 | $ 0.897 | $1,807.46 |
| 5312 Cortez Rd. West | Bradenton | FL 34210 | BR | L | NNN | N/A | 2,717 | $ 1.233 | $4,187.27 |
| 8704 State Road 70 East | Bradenton | FL 34202 | BR | L | NNN | N/A | 2,800 | $ 1.233 | $4,315.50 |
| 5905 Manatee Avenue West | Bradenton | FL 34209 | BR | O | N/A | N/A | 2,000 | $ 1.233 | $3,082.50 |
| 6208 14th Street West | Bradenton | FL 34207 | BR | O | N/A | N/A | 2,800 | $ 1.233 | $4,315.50 |
| 6250 East State Road 70 | Bradenton | FL 32308 | BR | O | N/A | | 4,800 | $ 1.233 | $7,398.00 |
| 404 Oakfield Drive | Brandon | FL 33511 | BR | O | N/A | | 3,274 | $ 1.233 | $5,045.44 |
| 1321 Southeast 47th Terrace | Cape Coral | FL 33904 | BR | O | N/A | | 5,280 | $ 1.233 | $8,137.80 |
| 1235 S. Missouri Avenue | Clearwater | FL 33756 | BR | L | Net | N/A | 1,960 | $ 1.233 | $3,020.85 |
| 23684 US Highway 19 North | Clearwater | FL 33765 | BR | L | Net | N/A | 3,200 | $ 1.233 | $4,932.00 |
| 28050 US Highway 19 North | Clearwater | FL 33761 | BR | L | Net | N/A | 7,391 | N/A | N/A |
| 3024 Enterprise Road | Clearwater | FL 33759 | BR | L | Net | N/A | 2,286 | $ 1.233 | $3,523.91 |
| 5801 Ulmerton Road | Clearwater | FL 33759 | BR | L | Net | N/A | 2,430 | $ 1.233 | $3,745.85 |
| 13636 W. State Road 84 | Davie | FL 33325 | BR | L | NNN | N/A | 2,247 | $ 0.897 | $2,519.67 |
| 1834 West Hillsboro Blvd. | Deerfield Beach | FL 33442 | BR | L | Net | N/A | 4,166 | $ 0.897 | $4,671.58 |
| 6500 W. Atlantic Avenue | Delray Beach | FL 33446 | BR | L | NNN | N/A | 3,747 | $ 0.897 | $4,201.55 |
| 1478 Main Street | Dunedin | FL 34698 | BR | L | NNN | N/A | 2,550 | $ 1.233 | $3,930.80 |
| 3510 US Highway 301 | Ellenton | FL 34222 | BR | O | N/A | N/A | 3,200 | $ 1.233 | $4,932.00 |
| 1699 S. 14th Street | Fernandina Beach | FL 32034 | BR | L | Net | N/A | 4,160 | $ 1.233 | $6,411.60 |
| 2211 US Highway 19 | Holiday | FL 34691 | BR | O | N/A | | 5,530 | $ 1.233 | $8,677.85 |

EXHIBIT

6

tabbies®

1

Revised 03/23/05

E     C.5
Janitorial Pricing by Site

| Street Address | | | | Property Type BR/OU/SF | Lease / Own | Lease Type | Hours Beyond Mon - Fri. | Usable / Cleanable Square Feet | Janitorial Cost Per Square Foot ($) | Estimated Janitorial Cost Per Year |
|---|---|---|---|---|---|---|---|---|---|---|
| 4651 Sunray Drive | Holiday | FL | 34690 | DU | O | N/A | N/A | 0 | $ 0.897 | $0.00 |
| 3251 Hollywood Blvd, Suite 470 | Hollywood | FL | 33021 | BR | L | Net | N/A | 2,800 | $ 0.897 | $3,139.50 |
| 4651 Sheridan Street, Suite 125 | Hollywood | FL | 33021 | BR | L | Net | N/A | 3,250 | N/A | N/A |
| 450 East Eau Gallie Blvd. | Indian Harbor Beach | FL | 32937 | BR | O | N/A | N/A | 3,304 | $ 0.897 | $3,704.61 |
| 10611 Deerwood Park Boulevard | Jacksonville | FL | 32256 | BR | O | N/A | N/A | 20,000 | $ 1.233 | $30,825.00 |
| 11331 San Jose Boulevard | Jacksonville | FL | 32223 | BR | O | N/A | N/A | 13,600 | $ 1.233 | $20,961.00 |
| 1010 Kennedy Drive | Key West | FL | 33040 | BR | L | Net | N/A | 9,217 | $ 1.233 | $14,205.39 |
| 614 Front Street | Key West | FL | 33040 | BR | L | Net | N/A | 984 | $ 1.233 | $1,516.59 |
| 200 East Broadway | Kissimmee | FL | 34741 | BR | L | Net | N/A | 5,600 | $ 0.897 | $6,279.00 |
| 1115 North John Young Pkwy. | Kissimmee | FL | 34741 | BR | O | N/A | N/A | 3,304 | $ 0.897 | $3,704.61 |
| 1302 East Vine Street | Kissimmee | FL | 34744 | BR | O | N/A | N/A | 2,000 | $ 0.897 | $2,242.50 |
| 10500 Ulmerton Road East, Unit #816 | Largo | FL | 33771 | BR | L | Net | N/A | 3,006 | $ 1.233 | $4,632.38 |
| 14141 Walsingham Road | Largo | FL | 33774 | BR | O | N/A | N/A | 3,006 | $ 1.233 | $4,632.38 |
| 10 Avenue of the Flowers | Longboat Key | FL | 34228 | BR | L | Net | N/A | 2,162 | $ 1.233 | $3,332.80 |
| 6090 Overseas Highway | Marathon | FL | 33050 | BR | O | N/A | N/A | 1,954 | $ 1.233 | $3,010.99 |
| 1300 Babcock Street | Melbourne | FL | 32901 | BR | O | N/A | N/A | 5,101 | $ 0.897 | $5,719.27 |
| 6430 North Wickham Road | Melbourne | FL | 32940 | BR | O | N/A | N/A | 3,859 | $ 0.897 | $4,327.13 |
| 401 Ocean Avenue | Melbourne Beach | FL | 32951 | BR | L | Net | N/A | 2,200 | $ 0.897 | $2,466.75 |
| 8640 Tamiami Trail North, Unit 105 | Naples | FL | 34108 | BR | L | NNN | N/A | 4,800 | $ 1.233 | $7,398.00 |
| 9213 Little Road | New Port Richey | FL | 34654 | BR | L | Net | N/A | 2,200 | $ 1.233 | $3,390.75 |
| 2019 Little Road | New Port Richey | FL | 34655 | BR | L | NNN | N/A | 2,800 | $ 1.233 | $4,315.50 |
| 6500 Massachusetts Avenue | New Port Richey | FL | 34653 | BR | O | N/A | N/A | 2,280 | $ 1.233 | $3,514.05 |
| 1626 SE 36th Avenue | Ocala | FL | 34471 | BR | O | N/A | N/A | 3,520 | $ 1.233 | $5,425.20 |
| 3711 Tampa Road, Oldsmar, FL 34677 | Oldsmar | FL | 34677 | BR | L | Net | N/A | 2,093 | $ 1.233 | $3,225.53 |
| 2051 Town Center Boulevard | Orlando | FL | 32837 | BR | L | NNN | Sat. (9:00am - 12:00pm) | 2,800 | $ 0.897 | $3,139.50 |
| 2415 North Orange Avenue | Orlando | FL | 32804 | BR | L | NNN | N/A | 4,000 | $ 0.897 | $4,485.00 |
| 193 East Granada Blvd. | Ormond Beach | FL | 32176 | BR | L | Net | N/A | 3,360 | $ 1.233 | $5,178.60 |
| 6000 Babcock Street SE | Palm Bay | FL | 32909 | BR | L | NNN | N/A | 2,430 | $ 0.897 | $2,724.19 |
| 7100 Fairway Drive, Suite 49 | Palm Beach Gardens | FL | 33418 | BR | L | Net | N/A | 1,680 | $ 0.897 | $1,883.70 |
| 3412 East Lake Road | Palm Harbor | FL | 34685 | BR | L | Net | N/A | 1,600 | $ 1.233 | $2,466.00 |
| 5061 North 12th Avenue | Pensacola | FL | 32504-8916 | BR | O | N/A | N/A | 6,880 | $ 1.233 | $10,603.80 |
| 300 South Pine Island Road | Plantation | FL | 33324 | BR | O | N/A | N/A | 8,486 | $ 0.897 | $9,515.38 |
| 226-A Solana Road | Ponte Vedra Beach | FL | 32082 | BR | L | Net | N/A | 1,566 | $ 1.233 | $2,414.21 |
| 9501 US 19 North | Port Richey | FL | 34668 | BR | L | Net | N/A | 4,000 | $ 1.233 | $6,165.00 |
| 3880 Sun City Center Blvd. | Ruskin | FL | 33573 | BR | O | N/A | N/A | 2,400 | $ 1.233 | $3,699.00 |
| 4600 US 1 South | Saint Augustine | FL | 32066 | BR | O | N/A | N/A | 4,800 | $ 1.233 | $7,398.00 |

Revised 03/23/05

E    t C.5
Janitorial Pricing by Site

| Street Address | | | | Property Type BR/OO/SF | Lease / Own | Lease Type | Hours Beyond Mon.- Fri. | Usable / Cleanable Square Feet | Janitorial Cost Per Square Foot ($) | Estimated Janitorial Cost Per Year |
|---|---|---|---|---|---|---|---|---|---|---|
| 4291 13th Street | Saint Cloud | FL | 34769 | BR | O | N/A | Sat. (9:00am – 12:00pm) | 3,648 | $ 0.897 | $4,090.32 |
| 1718 Main Street | Sarasota | FL | 34236 | BR | L | Net | N/A | 5,120 | $ 1.233 | $7,891.20 |
| 5375 University Parkway | Sarasota | FL | 34243 | BR | L | Net | N/A | 2,800 | $ 1.233 | $4,315.50 |
| 5600 Bee Ridge Road | Sarasota | FL | 34233 | BR | L | Net | N/A | 7,305 | $ 1.233 | $11,258.52 |
| 1100 South Tamiami Trail | Sarasota | FL | 34236 | BR | O | N/A | N/A | 4,000 | $ 1.233 | $6,165.00 |
| 3201 North Tamiami Trail | Sarasota | FL | 34234 | BR | O | N/A | N/A | 4,000 | $ 1.233 | $6,165.00 |
| 7995 113th Street North | Seminole | FL | 33772 | BR | L | NNN | N/A | 6,608 | $ 1.233 | $10,184.58 |
| 5431-E Silver Springs Blvd. Unit 1 | Silver Springs | FL | 34488 | BR | L | Net | N/A | 4,690 | $ 1.233 | $7,227.85 |
| 15825 East Highway 40 | Silver Springs | FL | 34488 | BR | O | N/A | N/A | 2,784 | $ 1.233 | $4,290.84 |
| 405 8th Street South | South Naples | FL | 34102 | BR | L | Net | N/A | 2,911 | $ 0.897 | $3,264.18 |
| 11234 Spring Hill Drive | Spring Hill | FL | 34609 | BR | L | Net | N/A | 2,256 | $ 1.233 | $3,477.06 |
| 5331 Spring Hill Drive | Spring Hill | FL | 34606 | BR | L | Net | N/A | 2,400 | $ 1.233 | $3,699.00 |
| 6900 22nd Ave., N. | St. Petersburg | FL | 33710 | BR | L | Net | N/A | 3,570 | $ 1.233 | $5,502.88 |
| 100 34th Street North | St. Petersburg | FL | 33713 | BR | L | NNN | N/A | 3,440 | $ 1.233 | $5,301.90 |
| 182 37th Avenue North | St. Petersburg | FL | 33704 | BR | L | NNN | N/A | 2,640 | $ 1.233 | $4,068.90 |
| 3000 54th Avenue South | St. Petersburg | FL | 33712 | BR | L | NNN | N/A | 1,840 | $ 1.233 | $2,835.90 |
| 3233 Thomasville Road | Tallahassee | FL | 32308 | BR | O | N/A | N/A | 13,512 | $ 1.233 | $20,825.37 |
| 1322 South Dale Mabry Highway | Tampa | FL | 33629 | BR | L | Net | N/A | 2,360 | $ 1.233 | $3,637.35 |
| 15312 North Dale Mabry Highway | Tampa | FL | 33618 | BR | L | NNN | N/A | 2,800 | $ 1.233 | $4,315.50 |
| 218 North Dale Mabry Highway | Tampa | FL | 33609 | BR | O | N/A | N/A | 1,071 | $ 1.233 | $1,650.99 |
| 90184 Overseas Highway | Tavernier | FL | 33070 | BR | O | N/A | N/A | 2,108 | $ 1.233 | $3,248.96 |
| 1580 Jacaranda Boulevard | Venice | FL | 34293 | BR | O | N/A | N/A | 4,800 | $ 1.233 | $7,398.00 |
| 400 Venice Bypass North | Venice | FL | 34285 | BR | O | N/A | N/A | 2,880 | $ 1.233 | $4,438.80 |
| 1290 Weston Road | Weston | FL | 33326 | BR | L | Net | N/A | 3,704 | $ 0.897 | $4,153.11 |
| 1980 Howell Branch Road | Winter Park | FL | 32792 | BR | O | N/A | N/A | 2,400 | $ 0.897 | $2,691.00 |
| 4900 Ross Road | Acworth | GA | 30101 | BR | O | N/A | Sat. (9:00am – 12:00pm) | 7,338 | $ 1.392 | $12,768.82 |
| 201 East Fourth Street | Adel | GA | 31620 | BR | O | N/A | N/A | 8,718 | $ 0.897 | $9,774.61 |
| 5960 North Point Parkway | Alpharetta | GA | 30022 | BR | O | N/A | Sat. (9:00am – 12:00pm) | 5,680 | $ 1.392 | $9,883.20 |
| 950 East Paces Ferry Rd | Atlanta | GA | 30326 | BR | L | Net | N/A | 32,969 | $ 1.233 | $50,613.16 |
| 480 West First Street | Blue Ridge | GA | 30513 | BR | O | N/A | Sat. (8:30am – 12:00pm) | 7,193 | $ 1.392 | $12,515.47 |
| Old Highway 76 Connector Road | Blue Ridge | GA | 30513 | BR | O | N/A | Sat. (8:30am – 12:00pm) | 1,746 | $ 0.897 | $1,958.15 |
| 207 West College Street | Bowdon | GA | 30108 | BR | O | N/A | Sat. (8:00am – 12:00pm) | 2,999 | $ 1.392 | $5,218.61 |
| 501 Alabama Avenue | Bremen | GA | 30110 | BR | L | NNN | Sat. (8:00am – 12:00pm) | 8,233 | $ 1.392 | $14,325.07 |
| 4920 Friendship Road | Buford | GA | 30339 | BR | L | NNN | N/A | 4,240 | $ 0.897 | $4,754.10 |

3

Revised 03/23/05

E    C.5

## Janitorial Pricing by Site

| Street Address | | | | Property Type BR/DU/SF | Lease / Own | Lease Type | Hours Beyond Mon. - Fri. | Usable / Cleanable Square Feet | Janitorial Cost Per Square Foot ($) | Estimated Janitorial Cost Per Year |
|---|---|---|---|---|---|---|---|---|---|---|
| 4394 Buford Drive | Buford | GA | 30518 | BR | O | N/A | Sat. (9:00am - 12:00pm) | 2,800 | $ 1.392 | $4,672.00 |
| 209 South Broad Street | Butler | GA | 31006 | BR | O | N/A | | 4,640 | $ 0.897 | $5,202.60 |
| 102 Highway 49 | Byron | GA | 31008 | BR | O | N/A | | 4,551 | $ 0.897 | $5,103.03 |
| 215 North Wall Street | Calhoun | GA | 30701-2221 | BR | O | N/A | Sat. (8:00am - 12:00pm) | 7,454 | $ 1.392 | $12,969.26 |
| 409 East Highway 53 SE | Calhoun | GA | 30701 | BR | O | N/A | Sat. (8:00am - 12:00pm) | 2,378 | $ 1.392 | $4,137.02 |
| 219 North Piedmont Avenue | Calhoun | GA | 30701 | DU | O | N/A | Sat. (8:00am - 12:00pm) | 830 | $ 0.897 | $930.19 |
| 110 Dixie Street | Carrollton | GA | 30117 | BR | O | N/A | Sat. (8:00am - 12:00pm) | 33,159 | $ 1.392 | $57,697.01 |
| 1119 South Park Street | Carrollton | GA | 30117 | BR | O | N/A | Sat. (8:00am - 12:00pm) | 2,058 | $ 1.392 | $3,583.01 |
| 119 South White Street | Carrollton | GA | 30117 | DU | O | N/A | Sat. (8:00am - 12:00pm) | 1,590 | $ 0.897 | $1,783.24 |
| 314 East Main Street | Cartersville | GA | 30120-3322 | BR | O | N/A | N/A | 14,907 | $ 1.233 | $22,975.72 |
| 314 East Main Street | Cartersville | GA | 30120 | DU | O | N/A | N/A | 407 | $ 0.897 | $456.57 |
| 5289 Cleveland Highway | Clermont | GA | 30527 | BR | O | N/A | Sat. (8:00am - 12:00pm) | 1,959 | $ 0.897 | $2,196.75 |
| 1745 Highway 138, Suite C-15 | Conyers | GA | 30013 | BR | L | Net | N/A | 2,720 | N/A | N/A |
| 214 Dahlonega Road | Cumming | GA | 30040 | BR | O | N/A | Sat. (9:00am - 12:00pm) | 16,000 | $ 1.392 | $27,840.00 |
| 3485 Braselton Highway | Dacula | GA | 30019 | BR | L | NNN | | 3,074 | $ 1.233 | $4,736.42 |
| 148 Memorial Drive | Dahlonega | GA | 30533 | BR | O | N/A | Sat. (8:00am - 12:00pm) | 1,586 | $ 1.392 | $2,758.94 |
| 60 Main Street West | Dahlonega | GA | 30533 | BR | O | N/A | N/A | 7,682 | $ 1.233 | $11,838.27 |
| 1244 Cleveland Road | Dalton | GA | 30721 | BR | O | N/A | N/A | 2,586 | $ 1.233 | $3,985.06 |
| 2500 East Walnut Avenue | Dalton | GA | 30720 | BR | O | N/A | N/A | 2,325 | $ 1.233 | $3,583.10 |
| 905 South Thornton Avenue | Dalton | GA | 307020 | BR | O | N/A | N/A | 2,814 | $ 1.233 | $4,337.69 |
| 220 Courthouse Square | Danielsville | GA | 30633 | BR | O | N/A | Sat. (9:00am - 12:00pm) | 5,826 | $ 1.392 | $10,137.94 |
| 136 Highway 400 South | Dawsonville | GA | 30534 | BR | O | N/A | N/A | 9,055 | $ 1.233 | $13,956.33 |
| 1221 Clairmont Road | Decatur | GA | 30030 | BR | O | N/A | N/A | 3,880 | $ 1.233 | $5,980.05 |
| 101 NW Bowens Mill Road | Douglas | GA | 31533 | BR | L | NNN | N/A | 403 | $ 0.897 | $452.09 |
| 102 North Peterson Avenue | Douglas | GA | 31534 | BR | O | N/A | N/A | 14,400 | $ 0.897 | $16,146.00 |
| 210 North Peterson Avenue | Douglas | GA | 31534 | BR | O | N/A | N/A | 1,520 | $ 0.897 | $1,704.30 |
| 8458 Campbellton Street | Douglasville | GA | 30134 | BR | O | N/A | Sat. (8:00am - 12:00pm) | 4,680 | $ 1.392 | $8,143.20 |
| 3200 Peachtree Industrial Boulevard Suites 100,102,201,202,205,209,210 | Duluth | GA | 30096 | BR | L | Net | N/A | 13,350 | $ 1.233 | $20,576.30 |
| 1545 Mt. Vernon Rd | Dunwoody | GA | 30338-4103 | BR | L | NNN | N/A | 4,240 | $ 1.233 | $5,834.90 |
| 894 Maddox Drive | Ellijay | GA | 30540 | BR | O | N/A | Sat. (8:30am - 12:00pm) | 4,786 | $ 1.392 | $8,328.34 |
| 675 North Jefferson Davis Drive | Fayetteville | GA | 30214 | BR | O | N/A | Sat. (9:00am - 12:00pm) | 9,040 | $ 1.392 | $15,729.60 |

Revised 03/23/05

E    . C.5
## Janitorial Pricing by Site

| Street Address | | | | Property Type BR/DU/SF | Lease v/ Own | Lease Type | Hours Beyond Mon. - Fri. | Usable / Cleanable Square Feet | Janitorial Cost Per Square Foot ($) | Estimated Janitorial Cost Per Year |
|---|---|---|---|---|---|---|---|---|---|---|
| 101 North Lee Street | Forsyth | GA | 31029 | BR | O | N/A | N/A | 1,962 | $ 1.233 | $3,054.14 |
| 110 North Camelia Boulevard | Fort Valley | GA | 31030 | BR | O | N/A | N/A | 7,550 | $ 0.897 | $8,464.99 |
| 1623 Thompson Bridge Road | Gainesville | GA | 30501 | BR | O | N/A | Sat. (8:30am - 12:00pm) | 1,959 | $ 1.392 | $3,409.01 |
| 2895 Browns Bridge Road | Gainesville | GA | 30504-5635 | BR | O | N/A | N/A | 1,647 | $ 1.233 | $2,538.75 |
| 455 Jesse Jewel Parkway | Gainesville | GA | 30501 | BR | O | N/A | Sat. (8:30am - 12:00pm) | 14,568 | $ 1.392 | $25,348.32 |
| 201 South Main Street | Greensboro | GA | 30501 | BR | O | N/A | N/A | 3,840 | $ 0.897 | $4,305.60 |
| 201 West Taylor Street | Griffin | GA | 30223 | BR | L | Net | Sat. (9:00am - 12:00pm) | 3,200 | $ 1.392 | $5,568.00 |
| 5071 Jimmy Lee Smith Parkway | Hiram | GA | 30141 | BR | O | N/A | Sat. (8:30am - 1:00pm) | 2,826 | $ 1.392 | $4,916.54 |
| 9008 Highway 29 South | Hull | GA | 30646 | BR | O | N/A | Sat. (9:00am - 12:00pm) | 4,825 | $ 1.392 | $8,395.15 |
| 618 South First Street | Jessup | GA | 31545 | BR | O | N/A | N/A | 5,394 | $ 1.233 | $8,312.89 |
| 223 North Main Street | Jonesboro | GA | 30236 | BR | O | N/A | Sat. (9:00am - 12:00pm) | 3,440 | $ 1.392 | $5,985.60 |
| 2760 Cobb Parkway | Kennesaw | GA | 30152 | BR | O | N/A | Sat. (9:00am - 12:00pm) | 2,560 | $ 1.392 | $4,454.40 |
| 310 Broad Street | LaGrange | GA | 30240 | BR | O | N/A | Sat. (9:00am - 12:00pm) | 2,320 | $ 1.392 | $4,036.80 |
| 10 Silo Street | Lavonia | GA | 30553 | BR | O | N/A | N/A | 4,825 | $ 1.233 | $7,436.22 |
| 150 South Perry Street | Lawrenceville | GA | 30045 | BR | O | N/A | Sat. (9:00am - 12:00pm) | 6,000 | $ 1.392 | $10,440.00 |
| 4700 US Highway 29 | Lilburn | GA | 30047 | BR | O | N/A | Sat. (9:00am - 12:00pm) | 2,565 | $ 1.392 | $4,462.75 |
| 1855 Thornton Road | Lithia Springs | GA | 30122 | BR | O | N/A | N/A | 2,648 | $ 1.392 | $4,081.23 |
| 1302 Gray Highway | Macon | GA | 31211 | BR | O | N/A | Sat. (9:00am - 1:00pm) | 1,809 | $ 1.392 | $3,147.31 |
| 2540 Riverside Drive | Macon | GA | 31210 | BR | O | N/A | N/A | 2,880 | $ 0.897 | $3,229.20 |
| 3525 Mercer University Drive | Macon | GA | 31204 | BR | O | N/A | Sat. (9:00am - 1:00pm) | 2,080 | $ 1.392 | $3,519.20 |
| 4357 Forsyth Road | Macon | GA | 31210 | BR | O | N/A | N/A | 2,035 | $ 0.897 | $2,281.97 |
| 4961 Forsyth Road | Macon | GA | 31203 | BR | O | N/A | N/A | 4,354 | $ 0.897 | $4,882.37 |
| 3390 Pio Nono Avenue | Macon | GA | 31206 | DU | O | N/A | N/A | 260 | $ 0.897 | $291.53 |
| 63 Barrett Parkway ,NE | Marietta | GA | 30066 | BR | L | Net | Sat. (9:00am - 12:00pm) | 4,320 | $ 1.392 | $7,516.80 |
| 4370 Roswell Road | Marietta | GA | 30339 | BR | L | NNN | Sat. (9:00am - 12:00pm) | 4,240 | $ 1.392 | $7,377.60 |
| 155 North Marietta Parkway | Marietta | GA | 30060 | BR | O | N/A | N/A | 2,240 | $ 1.233 | $3,452.40 |
| 2480 Dallas Highway | Marietta | GA | 30127 | BR | O | N/A | Sat. (9:00am - 12:00pm) | 3,600 | $ 1.392 | $6,264.00 |
| 12 North Cedar Street | McDonough | GA | 30263 | BR | O | N/A | Sat. (9:00am - 12:00pm) | 16,000 | $ 1.392 | $27,840.00 |
| 2 Southeast Broad Street | Metter | GA | 30439 | BR | O | N/A | Sat. (9:00am - 12:00pm) | 12,102 | $ 0.897 | $13,569.82 |

Revised 03/23/05

E    C.5

## Janitorial Pricing by Site

| Street Address | | | | Property Type BR/DU/SF | Lease / Own | Lease Type | Hours Beyond Mon. - Fri. | Usable / Cleanable Square Feet | Janitorial Cost Per Square Foot ($) | Estimated Janitorial Cost Per Year |
|---|---|---|---|---|---|---|---|---|---|---|
| 423 Vertla Street | Metter | GA | 30439 | DU | O | N/A | Sat. (9:00am - 12:00pm) | 0 | $ 0.897 | $0.00 |
| 150 West Green Street | Milledgeville | GA | 31061 | BR | O | N/A | N/A | 8,400 | $ 1.233 | $9,864.00 |
| 2345 North Columbia Street | Milledgeville | GA | 31061 | BR | O | N/A | N/A | 2,934 | $ 1.233 | $4,522.84 |
| 118 Walnut Street | Montezuma | GA | 31063 | BR | O | N/A | N/A | 2,028 | $ 0.897 | $2,273.90 |
| 2280 North Highway 29 | Newnan | GA | 30263 | BR | L | Net | N/A | 160 | N/A | N/A |
| 1421 Highway 34 East | Newnan | GA | 30263 | BR | L | NNN | N/A | 720 | $ 1.233 | $1,109.70 |
| 14 Hospital Road | Newnan | GA | 30263 | BR | O | N/A | Sat. (9:00am - 12:00pm) | 720 | $ 1.392 | $1,252.80 |
| 19 Jefferson Street | Newnan | GA | 30263 | BR | O | N/A | N/A | 12,800 | $ 1.233 | $19,728.00 |
| 232 Bullsboro Drive | Newnan | GA | 30263 | BR | O | N/A | Sat. (9:00am - 12:00pm) | 5,158 | $ 1.392 | $8,975.62 |
| 26 Jefferson Street | Newnan | GA | 30263 | BR | O | N/A | N/A | 1,174 | $ 1.233 | $1,808.81 |
| 3453 Mundy Mill Road | Oakwood | GA | 30566 | BR | O | N/A | Sat. (8:30am - 12:00pm) | 2,520 | $ 1.392 | $4,384.60 |
| 705 Highway 54 East | Peachtree City | GA | 30269 | BR | O | N/A | Sat. (8:30am - 12:00pm) | 3,120 | $ 1.392 | $5,428.80 |
| 27205 Highway 80 West | Portal | GA | 30450 | BR | O | N/A | N/A | 1,501 | $ 0.897 | $1,682.77 |
| 470 South Columbia Avenue | Rincon | GA | 31326 | BR | O | N/A | N/A | 4,908 | $ 1.233 | $7,564.46 |
| 6375 Highway 85 | Riverdale | GA | 30274-1641 | BR | O | N/A | Sat. (9:00am - 12:00pm) | 10,600 | $ 1.392 | $18,792.00 |
| 50 North Dugger Avenue | Roberta | GA | 31078 | BR | O | N/A | N/A | 2,000 | $ 0.897 | $2,242.50 |
| 11650 Alpharetta Highway | Roswell | GA | 30076 | BR | O | N/A | N/A | 2,861 | $ 1.233 | $4,409.21 |
| 1709 Frederica Road | Saint Simons Island | GA | 31522 | BR | L | Net | N/A | 3,040 | $ 1.233 | $4,685.40 |
| 7 East Congress Street #100 | Savannah | GA | 31401 | BR | L | Net | N/A | 11,300 | $ 1.233 | $17,416.13 |
| 14095 Abercorn Expressway | Savannah | GA | 31419 | BR | O | N/A | N/A | 4,240 | $ 1.233 | $6,534.90 |
| 477 Johnny Mercer Boulevard | Savannah | GA | 31410 | BR | O | N/A | N/A | 1,480 | $ 1.233 | $2,281.05 |
| 5110 Waters Avenue | Savannah | GA | 31404 | BR | O | N/A | N/A | 1,480 | $ 1.233 | $2,281.05 |
| 7393 Hodgson Memorial Drive | Savannah | GA | 31406 | BR | O | N/A | N/A | 22,205 | $ 1.233 | $34,223.15 |
| 756 Concord Road, Smyrna, GA 30080 | Smyrna | GA | 30080 | BR | L | NNN | Sat. (9:00am - 12:00pm) | 1,831 | $ 1.392 | $3,186.29 |
| 2230 Scenic Highway | Snellville | GA | 30078 | BR | O | N/A | Sat. (9:00am - 12:00pm) | 15,360 | $ 1.392 | $26,726.40 |
| 501 South Laurel Street | Springfield | GA | 31329 | BR | O | N/A | N/A | 3,658 | $ 0.897 | $4,101.08 |
| 38/40 North Main Street | Statesboro | GA | 30458-1300 | BR | O | N/A | N/A | 16,416 | $ 1.233 | $25,303.63 |
| 505 Fair Road | Statesboro | GA | 30458-4929 | BR | O | N/A | N/A | 2,655 | $ 0.897 | $2,977.14 |
| Northside Drive and Highway 80 East | Statesboro | GA | 30458 | BR | O | N/A | Sat. (9:00am - 2:00pm) | 3,056 | $ 1.392 | $5,317.44 |
| 9861 Rome Boulevard | Summerville | GA | 30747-1585 | BR | O | N/A | Sat. (7:15am - 12:00pm) | 12,402 | $ 1.392 | $21,578.78 |
| 3640 Peachtree Parkway, Suwanee, GA 30339 | Suwanee | GA | 30339 | BR | L | NNN | Sat. (9:00am - 12:00pm) | 5,680 | $ 1.392 | $9,883.20 |

6

Revised 03/23/05

E. ... C.5
Janitorial Pricing by Site

| Street Address | | | | Property Type BR/O/SF | Lease/Own | Lease Type | Hours Beyond Mon - Fri. | Usable / Cleanable Square Feet | Janitorial Cost Per Square Foot ($) | Estimated Janitorial Cost Per Year |
|---|---|---|---|---|---|---|---|---|---|---|
| 2885 Lawrenceville Suwannee Road | Suwanee | GA | 30024 | BR | O | N/A | Sat. (9:00am - 12:00pm) | 5,241 | $ 1.392 | $9,118.99 |
| 205 South Main Street | Swainsboro | GA | 30401 | BR | O | N/A | N/A | 5,578 | $ 0.897 | $6,253.88 |
| 105 South Main Street | Sylvania | GA | 30467 | BR | L | Net | N/A | 8,320 | $ 0.897 | $9,328.80 |
| 1523 Old Ocilla Road | Tifton | GA | 31794 | BR | O | N/A | N/A | 1,600 | $ 0.897 | $1,794.00 |
| 300 Commerce Way | Tifton | GA | 31794-4816 | BR | O | N/A | N/A | 4,231 | $ 1.233 | $6,521.34 |
| 14160 Highway 27 | Trion | GA | 30753 | BR | O | N/A | Sat. (9:00am - 12:00pm) | 2,240 | $ 1.392 | $3,897.60 |
| 3617 Chattanooga Road | Tunnel Hill | GA | 30755 | BR | O | N/A | N/A | 2,301 | $ 1.233 | $3,546.11 |
| 2901 A North Ashley Street | Valdosta | GA | 31602 | BR | O | N/A | N/A | 5,600 | $ 1.233 | $8,631.00 |
| 900 East First Street | Vidalia | GA | 30474 | BR | L | NNN | N/A | 11,734 | $ 0.897 | $13,157.20 |
| 640 West Bankhead Avenue | Villa Rica | GA | 30180-1601 | BR | O | N/A | Sat. (9:00am - 12:00pm) | 2,786 | $ 1.392 | $4,846.94 |
| 127 Russell Parkway | Warner Robbins | GA | 31088-6164 | BR | O | N/A | Sat. (9:00am - 1:00pm) | 864 | $ 0.897 | $968.78 |
| 3001 Watson Boulevard | Warner Robbins | GA | 31093-8534 | BR | O | N/A | Sat. (9:00am - 1:00pm) | 5,600 | $ 1.392 | $9,744.00 |
| 500 Albany Avenue | Waycross | GA | 31501-4715 | BR | O | N/A | N/A | 3,353 | $ 0.897 | $3,759.33 |
| 20 West May Street | Winder | GA | 30680-6105 | BR | O | N/A | Sat. (9:00am - 12:00pm) | 4,400 | $ 1.392 | $7,656.00 |
| 4210 Charlestown Road | New Albany | IN | 47150-9567 | BR | O | N/A | Sat. (9:00am - 12:00pm) | 3,793 | $ 0.897 | $4,252.68 |
| 40 West Highway 72 | Baxter | KY | 40806-8384 | BR | L | Net | N/A | 224 | $ 0.897 | $251.16 |
| 14793 Regina Belcher Highway | Belcher | KY | 41513 | BR | O | N/A | N/A | 1,515 | $ 0.897 | $1,698.92 |
| 1901 Russellville Road | Bowling Green | KY | 42101 | BR | L | Net | Sat. (8:00am - 12:00pm) | 7,200 | $ 0.897 | $8,073.00 |
| 1820 Scottsville Road | Bowling Green | KY | 42101 | BR | O | N/A | Sat. (8:00am - 12:00pm) | 16,719 | $ 0.897 | $18,746.40 |
| 2750 Nashville Road | Bowling Green | KY | 42101 | BR | O | N/A | N/A | 1,054 | $ 0.897 | $1,193.01 |
| 600 US 31 - West Bypass | Bowling Green | KY | 42101 | BR | O | N/A | N/A | 660 | $ 0.897 | $740.03 |
| 2945 Scottsville Road | Bowling Green | KY | 42101 | SF | L | Net | Sat. (9:00am - 3:00pm) | 318 | $ 0.897 | $357.01 |
| 350 US 31 West Bypass | Bowling Green | KY | 42101 | SF | L | Net | Sat. (9:00am - 3:00pm) | 400 | $ 0.897 | $448.50 |
| 711 Campbell Lane | Bowling Green | KY | 42101 | SF | L | Net | Sat. (9:00am - 3:00pm) | 400 | $ 0.897 | $448.50 |
| 100 Main Street | Calhoun | KY | 42327 | BR | O | N/A | N/A | 2,664 | $ 1.233 | $4,105.89 |
| 102 Broadway | Cave City | KY | 42127 | BR | O | N/A | N/A | 2,663 | $ 0.897 | $2,986.11 |
| 1390 Master Street, Corbin, KY 40701-2560 | Corbin | KY | 40701-2560 | BR | L | NNN | N/A | 3,120 | $ 0.897 | $3,498.30 |
| 1202 East Main Street | Cumberland | KY | 40823 | BR | O | N/A | N/A | 3,079 | $ 1.233 | $4,745.82 |
| 31 Outlet Drive | Eddyville | KY | 42038 | BR | O | N/A | Sat. (8:30am - 12:00pm) | 3,116 | $ 0.897 | $3,493.82 |
| 107 Yocum Street | Evarts | KY | 40828 | BR | O | N/A | N/A | 976 | $ 0.897 | $1,094.34 |
| 103 Smith Road | Glasgow | KY | 42141 | BR | O | N/A | N/A | 1,886 | $ 0.897 | $2,114.23 |

Revised 03/23/05

E ... r C.5
Janitorial Pricing by Site

| Street Address | | | | Property Type BR/DU/SF | Lease / Own | Lease Type | Hours Beyond Mon. - Fri. | Usable / Cleanable Square Feet | Janitorial Cost Per Square Foot ($) | Estimated Janitorial Cost Per Year |
|---|---|---|---|---|---|---|---|---|---|---|
| 301 West Main Street | Glasgow | KY | 42142 | BR | O | N/A | N/A | 21,440 | $ 1.233 | $33,044.40 |
| 900 US Highway 62 | Grand Rivers | KY | 42045 | BR | L | Net | Sat. (8:30am - 12:00pm) | 6,293 | $ 0.897 | $7,055.80 |
| 101 North Main Street | Harlan | KY | 40831-2105 | BR | O | N/A | Sat. (9:00am - 1:00pm) | 4,635 | $ 1.392 | $8,413.25 |
| 200 Waldon Drive | Harlan | KY | 40831-2534 | SF | L | Net | Sat. (9:00am - 1:00pm) | 455 | $ 0.897 | $510.39 |
| 405 Main Street | Hazel | KY | 42049 | BR | O | N/A | N/A | 2,232 | $ 0.897 | $2,502.63 |
| 11 East Hiseville Main Street | Hiseville | KY | 42152 | BR | O | N/A | N/A | 1,926 | $ 0.897 | $2,159.98 |
| 495 North Drive | Hopkinsville | KY | 42240 | BR | L | NNN | N/A | 2,169 | $ 1.233 | $3,342.66 |
| 2933 Fort Campbell Boulevard | Hopkinsville | KY | 42240 | BR | O | N/A | Sat. (9:00am - 12:00pm) | 2,490 | $ 1.392 | $4,331.90 |
| 710 Country Club Lane | Hopkinsville | KY | 42240 | BR | O | N/A | Sat. (9:00am - 12:00pm) | 2,985 | $ 1.392 | $5,193.55 |
| 4000 Fort Campbell Boulevard, Space 325-K | Hopkinsville | KY | 42240 | DU | L | Net | Sat. (9:00am - 12:00pm) | 1,600 | $ 0.897 | $1,794.00 |
| 300 Clinic Drive | Hopkinsville | KY | 42240 | SF | L | Net | Sat. (10:00am - 3:00pm) | 414 | $ 0.897 | $463.75 |
| 119 Broadway | Irvine | KY | 40336 | BR | O | N/A | N/A | 9,510 | $ 1.233 | $14,656.67 |
| 910 Richmond Road | Irvine | KY | 40336 | DU | O | N/A | Sat. (9:00am - 12:00pm) | 708 | $ 0.897 | $793.85 |
| 2024 South Highway 53 | Lagrange | KY | 40031-9535 | BR | O | N/A | Sat. (9:00am - 12:00pm) | 2,250 | $ 0.897 | $2,522.36 |
| 1521 US Highway 60-W | Ledbetter | KY | 42058 | BR | O | N/A | Sat. (8:30am - 12:00pm) | 2,688 | $ 0.897 | $3,013.92 |
| 1780 Nicholasville Road, Suite 102 | Lexington | KY | 40503-1411 | BR | L | Net | N/A | 651 | N/A | N/A |
| 3061 Fieldstone Way, Suite 1400 | Lexington | KY | 40513-1773 | BR | L | Net | Sat. (9:00am - 1:00pm) | 2,331 | $ 1.392 | $4,056.29 |
| 3285 Blazer Parkway, Suite 100 | Lexington | KY | 40509 | BR | L | Net | N/A | 2,165 | $ 1.233 | $3,336.50 |
| 3329 Tates Creek Road | Lexington | KY | 40502-3407 | BR | L | Net | Sat. (9:00am - 1:00pm) | 3,043 | $ 1.392 | $5,295.17 |
| 360 East Vine Street | Lexington | KY | 40507-1522 | BR | L | Net | N/A | 16,334 | N/A | N/A |
| 840 Whitley Street | London | KY | 40741 | BR | O | N/A | N/A | 3,282 | $ 1.233 | $5,057.77 |
| 2216 Dundee Road | Louisville | KY | 40205 | BR | L | Net | N/A | 950 | $ 0.897 | $1,065.64 |
| 3747 Lexington Road | Louisville | KY | 40207-3023 | BR | L | Net | N/A | 2,400 | $ 0.897 | $2,691.00 |
| 4082 Taylorsville Road at Hikes Point | Louisville | KY | 40220-01502 | BR | L | Net | Sat. (9:00am - 12:00pm) | 3,533 | $ 0.897 | $3,961.15 |
| 4507 Shelbyville Road | Louisville | KY | 40207-3313 | BR | L | Net | Sat. (9:00am - 12:00pm) | 2,480 | $ 0.897 | $2,780.70 |
| 7802 Preston Highway | Louisville | KY | 40219 | BR | L | Net | N/A | 6,358 | $ 0.897 | $7,129.36 |
| 401 West Main Street | Louisville | KY | 40202 | BR | L | Net | N/A | 46,984 | N/A | N/A |
| 4201 Shelbyville Road | Louisville | KY | 40207-3322 | BR | L | NNN | N/A | 5,738 | $ 0.897 | $6,433.28 |
| 10403 Dixie Highway | Louisville | KY | 40272-3953 | BR | O | N/A | Sat. (9:00am - 12:00pm) | 2,661 | $ 0.897 | $2,983.42 |
| 11401 South Preston Highway | Louisville | KY | 40229-2864 | BR | O | N/A | Sat. (9:00am - 12:00pm) | 2,262 | $ 0.897 | $2,536.72 |

Revised 03/23/05

Exhibit C.5
Janitorial Pricing by Site

| Street Address | City | State | Zip | Property Type BR/OO/USF | Lease / Own | Lease Type | Hours Beyond Mon. - Fri. | Usable / Cleanable Square Feet | Janitorial Cost Per Square Foot ($) | Estimated Janitorial Cost Per Year |
|---|---|---|---|---|---|---|---|---|---|---|
| 11751 Bluegrass Parkway | Louisville | KY | 40299-2302 | BR | O | N/A | N/A | 2,406 | $ 0.897 | $2,696.18 |
| 12917 Shelbyville Road | Louisville | KY | 40243-1538 | BR | O | N/A | Sat. (9:00am - 12:00pm) | 2,354 | $ 0.897 | $2,639.87 |
| 1339 Bardstown Road | Louisville | KY | 40204-1319 | BR | O | N/A | Sat. (9:00am - 12:00pm) | 2,426 | $ 0.897 | $2,720.60 |
| 2501 West Broadway | Louisville | KY | 40211-1009 | BR | O | N/A | Sat. (9:00am - 12:00pm) | 3,214 | $ 0.897 | $3,603.25 |
| 2601 Hurstbourne Parkway | Louisville | KY | 40220-4008 | BR | O | N/A | N/A | 2,294 | $ 0.897 | $2,571.70 |
| 3140 Wilson Avenue | Louisville | KY | 40211-1932 | BR | O | N/A | N/A | 2,716 | $ 0.897 | $3,045.32 |
| 330 Whittington Parkway | Louisville | KY | 40222-4920 | BR | O | N/A | Sat. (9:00am - 12:00pm) | 4,980 | $ 0.897 | $5,561.40 |
| 3450 Taylor Boulevard | Louisville | KY | 40215-2681 | BR | O | N/A | Sat. (9:00am - 12:00pm) | 5,505 | $ 0.897 | $6,172.26 |
| 4415 Cane Run Road | Louisville | KY | 40216-4501 | BR | O | N/A | N/A | 2,228 | $ 0.897 | $2,498.15 |
| 4816 Outer Loop | Louisville | KY | 40219-3302 | BR | O | N/A | Sat. (9:00am - 12:00pm) | 2,356 | $ 0.897 | $2,641.67 |
| 4908 US Highway 42 | Louisville | KY | 40222-6369 | BR | O | N/A | Sat. (9:00am - 12:00pm) | 3,192 | $ 0.897 | $3,579.03 |
| 5004 Poplar Level Road | Louisville | KY | 40219-1125 | BR | O | N/A | Sat. (9:00am - 12:00pm) | 1,756 | $ 0.897 | $1,968.92 |
| 5100 Dixie Highway | Louisville | KY | 40216-1702 | BR | O | N/A | Sat. (9:00am - 12:00pm) | 2,554 | $ 0.897 | $2,863.22 |
| 5319 Preston Highway | Louisville | KY | 40213-2712 | BR | O | N/A | N/A | 2,913 | $ 0.897 | $3,265.98 |
| 6740 Bardstown Road | Louisville | KY | 40291-3048 | BR | O | N/A | Sat. (9:00am - 12:00pm) | 2,222 | $ 0.897 | $2,490.97 |
| 7111 Southside Drive | Louisville | KY | 40214-3611 | BR | O | N/A | Sat. (9:00am - 12:00pm) | 2,726 | $ 0.897 | $3,056.98 |
| 9050 Dixie Highway | Louisville | KY | 40258-1053 | BR | O | N/A | N/A | 1,742 | $ 0.897 | $1,953.67 |
| 9510 Brownsboro Road | Louisville | KY | 40241-1120 | BR | O | N/A | Sat. (9:00am - 12:00pm) | 2,303 | $ 0.897 | $2,582.46 |
| 300 Cumberland Cross | Monticello | KY | 42633 | BR | O | N/A | N/A | 2,405 | $ 0.897 | $2,696.38 |
| 1104 Chestnut Street | Murray | KY | 42071 | BR | O | N/A | Sat. (8:00am - 12:00pm) | 9,162 | $ 0.897 | $10,273.34 |
| 602 South 12th Street | Murray | KY | 42071 | BR | O | N/A | N/A | 2,686 | $ 0.897 | $3,012.13 |
| 808 North 12th Street | Murray | KY | 42071 | SF | L | Net | Sat. (10:00am - 2:00pm) | 308 | $ 1.392 | $535.92 |
| 15744 Fort Campbell Boulevard | Oak Grove | KY | 42262 | BR | O | N/A | N/A | 1,539 | $ 1.233 | $2,372.29 |
| 3232 Villa Point | Owensboro | KY | | BR | L | Net | Sat. (9:00am - 3:00pm) | 384 | $ 0.897 | $430.56 |
| 5002 Frederica Street | Owensboro | KY | 42301 | BR | L | NNN | N/A | 2,610 | $ 1.233 | $4,022.05 |
| 2609 New Hartford Road | Owensboro | KY | 42303 | BR | O | N/A | N/A | 2,176 | $ 1.233 | $3,353.76 |
| 2800 Frederica Street | Owensboro | KY | 42301-5490 | BR | O | N/A | N/A | 3,169 | $ 1.233 | $4,883.91 |
| 2901 West Parrish Avenue | Owensboro | KY | 42301 | BR | O | N/A | N/A | 1,390 | $ 1.233 | $2,141.72 |
| 3000 East Fourth Street | Owensboro | KY | 42303 | BR | O | N/A | N/A | 2,426 | $ 0.897 | $2,720.60 |
| 1731 Scherm Rd | Owensboro | KY | 42301 | SF | L | Net | Sat. (9:00am - 3:00pm) | 464 | $ 1.392 | $807.36 |

Revised 03/23/05

Janitorial Pricing by Site

| Street Address | City | State | Zip | Property Type BR/OO/SF | Lease / Own | Lease Type | Hours Beyond Mon - Fri. | Usable / Cleanable Square Feet | Janitorial Cost Per Square Foot ($) | Estimated Janitorial Cost Per Year |
|---|---|---|---|---|---|---|---|---|---|---|
| 2910 Highway 54 (Leitchfield Road) | Owensboro | KY | 42303 | SF | L | Net | Sat. (9:00am - 3:00pm) | 424 | $ 0.897 | $475.41 |
| 1601 Broadway | Paducah | KY | 42001 | BR | O | N/A | Sat. (8:00am - 12:00pm) | 13,458 | $ 1.392 | $15,089.33 |
| 300 North Mayo Trail | Paintsville | KY | 41240 | BR | L | Net | Sat. (8:00am - 1:00pm) | 5,631 | $ 1.392 | $9,798.29 |
| 226 South Main Street | Pembroke | KY | 42266 | BR | O | N/A | N/A | 1,832 | $ 0.897 | $2,054.13 |
| 4414 North Mayo Trail | Pikeville | KY | 41501 | BR | L | NNN | Sat. (8:00am - 1:00pm) | 10,080 | $ 1.392 | $17,539.20 |
| 216 Glynn View Plaza | Prestonburg | KY | 41653 | BR | L | Net | N/A | 1,132 | $ 0.897 | $1,269.26 |
| 5620 Robinson Creek Road | Robinson Creek | KY | 41560 | BR | O | N/A | N/A | 2,509 | $ 0.897 | $2,812.99 |
| 2198 Lakeway Drive | Russell Springs | KY | 42642 | BR | O | N/A | N/A | 1,309 | $ 0.897 | $1,467.49 |
| 102 NW Park Square | Russellville | KY | 42276 | BR | O | N/A | Sat. (8:30am - 1:00pm) | 8,719 | $ 0.897 | $9,776.40 |
| 124 North Main Street | Somerset | KY | 42501 | BR | O | N/A | N/A | 7,897 | $ 1.233 | $12,170.94 |
| 3977 South Highway 27 | Somerset | KY | 42501 | BR | O | N/A | N/A | 5,415 | $ 0.897 | $6,071.79 |
| 546 South Highway 27 | Somerset | KY | 42501 | BR | O | N/A | N/A | 3,090 | $ 0.897 | $3,465.11 |
| 805 Bardstown Road (New Lease) | Springfield | KY | 40069 | BR | L | Net | Sat. (8:30am - 12:00pm) | 4,214 | $ 1.392 | $7,331.66 |
| 110 East Main Street | Springfield | KY | 40069-1225 | BR | O | N/A | N/A | 10,718 | $ 1.233 | $15,518.50 |
| 10026 Main Street | Whitesville | KY | 42378-9716 | BR | O | N/A | N/A | 1,818 | $ 0.897 | $2,037.98 |
| 30 West Broadway | Winchester | KY | 40391 | BR | O | N/A | N/A | 9,821 | $ 1.233 | $15,136.31 |
| 825 Bypass Road | Winchester | KY | 40391 | BR | O | N/A | Sat. (9:00am - 12:00pm) | 2,166 | $ 1.392 | $3,768.14 |
| 801 Compass Way, Suite 7, Annapolis, MD, 21401 | Annapolis | MD | 21401 | BR | L | Net | N/A | 1,200 | $ 1.233 | $1,849.50 |
| 91 Main Street, Annapolis, MD, 21401 | Annapolis | MD | 21401 | BR | L | Net | N/A | 848 | $ 1.233 | $1,306.98 |
| 2078 General's Highway | Annapolis | MD | 21401 | BR | L | NNN | Sat. (8:30am - 12:00pm) | 2,800 | $ 1.392 | $4,872.00 |
| 2623 Riva Road | Annapolis | MD | 21401 | BR | L | NNN | Sat. (8:30am - 12:00pm) | 4,640 | $ 1.392 | $8,073.60 |
| 416 Sixth Street | Annapolis | MD | 21403 | BR | L | NNN | Sat. (8:30am - 12:00pm) | 2,000 | $ 1.392 | $3,480.00 |
| 101 Hillsmere Drive | Annapolis | MD | 21403 | BR | O | N/A | Sat. (8:30am - 12:00pm) | 2,140 | $ 1.392 | $3,723.60 |
| 2015 West Street | Annapolis | MD | 21401 | BR | O | N/A | Sat. (8:30am - 12:00pm) | 3,174 | $ 1.392 | $5,522.06 |
| 5 Church Circle | Annapolis | MD | 21401 | BR | O | N/A | N/A | 15,146 | $ 1.233 | $23,344.39 |
| 2 Arnold Road | Arnold | MD | 21012 | BR | O | N/A | Sat. (8:30am - 12:00pm) | 2,088 | $ 1.392 | $3,633.12 |
| 111 South Calvert Street | Baltimore | MD | 21202 | BR | L | Net | N/A | 1,734 | $ 1.233 | $2,671.91 |
| 2 North Charles Street, Suite 100 | Baltimore | MD | 21201 | BR | L | Net | N/A | 2,649 | $ 0.897 | $2,969.97 |
| 44 East Sudbrook Lane | Baltimore | MD | 21208 | BR | L | Net | N/A | 2,720 | $ 0.897 | $3,049.80 |
| 5 Bel Air South Parkway | Bel Air | MD | 21015 | BR | L | Net | Sat. (8:00am - 12:00pm) | 2,800 | $ 0.897 | $3,139.50 |
| 333 Baltimore Pike | Bel Air | MD | 21014 | BR | L | NNN | N/A | 2,045 | $ 0.897 | $2,292.73 |

Revised 03/23/05

E ... t C.5
Janitorial Pricing by Site

| Street Address | | | | Property Type BR/DU/SF | Lease / Own | Lease Type | Hours Beyond Mon. - Fri. | Usable / Cleanable Square Feet | Janitorial Cost Per Square Foot (f) | Estimated Janitorial Cost Per Year |
|---|---|---|---|---|---|---|---|---|---|---|
| 37 South Main Street | Bel Air | MD | 21014 | BR | O | N/A | N/A | 17,132 | $ 1.233 | $26,404.70 |
| 315 South Main Street | Bel Air | MD | 21014 | DU | O | N/A | N/A | 811 | $ 0.897 | $909.56 |
| 11605 Beltsville Drive | Beltsville | MD | 20705 | BR | L | Net | Sat. (9:00am - 12:00pm) | 2,000 | $ 1.392 | $3,480.00 |
| 11121 Racetrack Road | Berlin | MD | 21811 | BR | O | N/A | Sat. (8:30am - 12:00pm) | 2,000 | $ 1.392 | $3,480.00 |
| 4719 Hampden Lane | Bethesda | MD | 20814 | BR | L | Net | N/A | 8,594 | $ 1.233 | $14,787.37 |
| 10657 Bishopville Road | Bishopville | MD | 21813 | BR | O | N/A | N/A | 1,368 | $ 1.233 | $2,108.43 |
| 6901 Laurel Bowie Road | Bowie | MD | 20715 | BR | O | N/A | Sat. (8:30am - 12:00pm) | 2,480 | $ 1.392 | $4,315.20 |
| 94 Souder Road | Brunswick | MD | 21716 | BR | L | Net | Sat. (9:00am - 12:00pm) | 1,632 | $ 1.392 | $2,839.68 |
| 23415 Three Notch Road, #2060 | California | MD | 20619 | BR | L | Net | Sat. (8:30am - 12:00pm) | 1,984 | $ 1.392 | $3,452.16 |
| 601 Crusader Road | Cambridge | MD | 21613 | BR | O | N/A | Sat. (8:30am - 12:00pm) | 1,529 | $ 1.392 | $2,660.11 |
| 6309 Allentown Road | Camp Springs | MD | 20748 | BR | L | Net | N/A | 2,014 | $ 1.233 | $3,104.69 |
| 919 Frederick Road | Catonsville | MD | 21228 | BR | O | N/A | Sat. (8:30am - 12:00pm) | 2,995 | $ 0.897 | $3,358.37 |
| 102 Broadway | Centreville | MD | 21617 | BR | O | N/A | Sat. (8:30am - 12:00pm) | 3,974 | $ 1.392 | $6,915.46 |
| 501 Washington Avenue | Chestertown | MD | 21620 | BR | L | Net | Sat. (9:00am - 12:00pm) | 1,200 | $ 1.392 | $2,088.00 |
| 2900 Churchville Road | Churchville | MD | 21028 | BR | L | NNN | Sat. (8:30am - 12:00pm) | 1,354 | $ 0.897 | $1,517.72 |
| 9110 Piscataway Road, Clinton, MD, 20735 | Clinton | MD | 20735 | BR | L | Net | Sat. (9:00am - 12:00pm) | 2,543 | $ 1.392 | $4,425.17 |
| 9658 Baltimore Avenue, Suite 101 | College Park | MD | 20740 | BR | L | Net | N/A | 1,533 | $ 1.233 | $2,362.43 |
| 11000 Broken Land Parkway, Suite 118 | Columbia | MD | 21044 | BR | L | Net | N/A | 2,697 | N/A | N/A |
| 8850 Columbia 100 Parkway | Columbia | MD | 21045 | BR | L | Net | N/A | 4,186 | $ 1.233 | $6,452.29 |
| 5585 Twin Knolls Road | Columbia | MD | 21045 | BR | O | N/A | Sat. (9:00am - 12:00pm) | 3,346 | $ 1.392 | $5,821.34 |
| 11000 Broken Land Parkway, Columbia, MD 21044 | Columbia | MD | 21044 | DU | L | Net | N/A | 2,697 | N/A | N/A |
| 257 North Somerset Avenue | Crisfield | MD | 21817 | BR | O | N/A | Sat. (8:30am - 12:00pm) | 1,920 | $ 1.392 | $3,340.80 |
| 2151 Defense Highway | Crofton | MD | 21114 | BR | L | Net | Sat. (9:00am - 12:00pm) | 1,010 | $ 0.897 | $1,132.91 |
| 9815 Main Street | Damascus | MD | 20872 | BR | L | Net | N/A | 800 | $ 1.233 | $1,233.00 |
| 5801 Deale Churchton Road | Deale | MD | 20751 | BR | L | Net | Sat. (8:30am - 12:00pm) | 950 | $ 1.392 | $1,653.70 |
| 10264 Southern Maryland Boulevard, Suite 100 | Dunkirk | MD | 20754 | BR | L | Net | Sat. (8:30am - 12:00pm) | 2,049 | $ 1.392 | $3,564.91 |
| 100 Marlboro Avenue | Easton | MD | 21601 | BR | L | NNN | Sat. (8:30am - 12:00pm) | 3,368 | $ 1.392 | $5,860.32 |
| 52 West Central Avenue | Edgewater | MD | 21037 | BR | L | Net | Sat. (8:30am - 12:00pm) | 1,650 | $ 1.392 | $2,871.70 |
| Central Avenue and Pike Ridge Road | Edgewater | MD | 21037 | BR | L | Net | - | 2,400 | $ 1.233 | $3,698.00 |

11

E   C.5
Janitorial Pricing by Site

| Street Address | | | | Property Type BR0/DU/SF | Lease / Own | Lease Type | Hours Beyond Mon - Fri | Usable / Cleanable Square Feet | Janitorial Cost Per Square Foot ($) | Estimated Janitorial Cost Per Year |
|---|---|---|---|---|---|---|---|---|---|---|
| 3062 Solomans Island Rd. | Edgewater | MD | 21037 | BR | L | NNN | Sat. (8:30am - 12:00pm) | 1,440 | $ 1.392 | $2,505.60 |
| 1014 Gateway Road | Edgewood | MD | 21040 | BR | L | NNN | Sat. (8:00am - 12:00pm) | 1,920 | $ 0.897 | $2,152.80 |
| 1300 Liberty Road | Eldersburg | MD | 21784 | BR | O | N/A | Sat. (7:30am - 1:00pm) | 6,240 | $ 1.392 | $10,857.60 |
| 7290 Montgomery Road | Elkridge | MD | 21227 | BR | O | N/A | Sat. (8:00am - 12:00pm) | 5,530 | $ 1.392 | $9,622.90 |
| 2401 Baldwin Mill Road | Fallston | MD | 21047 | BR | L | NNN | Sat. (8:00am - 12:00pm) | 1,664 | $ 0.897 | $1,865.76 |
| 1911 Bel Air Road | Fallston | MD | 21047 | BR | O | N/A | Sat. (8:00am - 12:00pm) | 2,877 | $ 0.897 | $3,225.61 |
| 102 South Main Street | Federalsburg | MD | 21632 | BR | O | N/A | Sat. (8:30am - 12:00pm) | 3,106 | $ 1.392 | $5,405.14 |
| 3000 Gamber Road | Finksburg | MD | 21048 | BR | L | Net | Sat. (8:00am - 12:00pm) | 3,192 | $ 0.897 | $3,579.03 |
| 3348 Donnell Drive (Penn Mar Shopping Center) | Forestville | MD | 20747 | BR | L | Net | | 3,000 | $ 1.233 | $4,623.75 |
| 9412 Livingston Road | Fort Washington | MD | 20744 | BR | L | Net | Sat. (8:30am - 12:00pm) | 40,126 | $ 1.392 | $69,819.94 |
| 571 North Solomons Island Road | Frederick | MD | 20678 | BR | L | Net | N/A | 1,120 | $ 1.233 | $1,726.20 |
| 1 North Market Street | Frederick | MD | 21701 | BR | L | Net | N/A | 4,154 | $ 1.233 | $6,402.97 |
| 100 Buchimer Road | Frederick | MD | 21701 | BR | L | Net | Sat. (9:00am - 12:00pm) | 1,704 | $ 1.392 | $2,964.96 |
| 1370 West Patrick Street | Frederick | MD | 21701 | BR | L | NNN | Sat. (8:00am - 12:00pm) | 1,850 | $ 1.392 | $3,218.30 |
| 192 Thomas Johnson Drive | Frederick | MD | 21701 | BR | L | NNN | N/A | 56,106 | $ 1.233 | $86,472.76 |
| 1303 East Patrick Street | Frederick | MD | 21701 | BR | O | N/A | | 1,980 | $ 1.233 | $3,051.68 |
| 1602 Rosemont Avenue | Frederick | MD | 21702-4137 | BR | O | N/A | Sat. (9:00am - 12:00pm) | 3,778 | $ 1.392 | $5,573.02 |
| 5602 Buckeystown Pike | Frederick | MD | 21704 | BR | O | N/A | Sat. (9:00am - 12:00pm) | 1,480 | $ 1.392 | $2,575.20 |
| 265 Kentlands Boulevard | Gaithersburg | MD | 20878 | BR | L | Net | N/A | 2,357 | $ 1.233 | $3,632.42 |
| 8019 Snouffer School Road | Gaithersburg | MD | 20852 | BR | L | Net | N/A | 1,920 | $ 1.233 | $2,959.20 |
| 457 North Frederick Avenue | Gaithersburg | MD | 20877-2420 | BR | L | NNN | N/A | 8,000 | $ 1.233 | $12,330.00 |
| 2405 Brandermill Blvd., Gambrills-Waugh Chapel | Gambrills | MD | 21054 | BR | L | Net | N/A | 4,240 | $ 0.897 | $4,754.10 |
| 19941 Century Boulevard | Germanton | MD | 20786 | BR | L | Net | Sat. (9:00am - 12:00pm) | 2,800 | $ 1.392 | $4,872.00 |
| 7381 Baltimore-Annapolis Boulevard | Glen Burnie | MD | 21061 | BR | L | Net | Sat. (9:00am - 1:00pm) | 1,920 | $ 0.897 | $2,152.80 |
| 8951 Edmonston Road | Greenbelt | MD | 20770 | BR | L | Net | N/A | 1,642 | $ 1.233 | $2,530.12 |
| 103 North Main Street | Greensboro | MD | 21639 | BR | O | N/A | Sat. (8:30am - 12:00pm) | 2,472 | $ 1.392 | $4,301.28 |
| 999 South Main Street | Hampstead | MD | 21074 | BR | O | N/A | Sat. (8:00am - 12:00pm) | 3,632 | $ 0.897 | $4,296.63 |
| 233 St. John Street | Havre De Grace | MD | 21078 | BR | O | N/A | Sat. (8:00am - 12:00pm) | 7,779 | $ 0.897 | $8,722.43 |
| 3004 52nd Avenue | Hyattsville | MD | 20781 | BR | L | Net | N/A | 1,384 | $ 1.233 | $2,133.09 |

Revised 03/23/05

E. ~t C.5
**Janitorial Pricing by Site**

| Street Address | | | | Property Type BR/DU/SF | Lease / Own | Lease Type | Hours Beyond Mon - Fri. | Usable / Cleanable Square Feet | Janitorial Cost Per Square Foot ($) | Estimated Janitorial Cost Per Year |
|---|---|---|---|---|---|---|---|---|---|---|
| 3891 Jarrettsville Road | Jarettsville | MD | 21084 | BR | O | N/A | Sat. (8:00am - 12:00pm) | 3,194 | $ 0.897 | $3,580.82 |
| 9395 Lanham-Severn Road | Lanham | MD | 20706 | BR | O | N/A | Sat. (9:00am - 12:00pm) | 1,932 | $ 1.392 | $3,361.68 |
| 6640 Crain Highway | LaPlata | MD | | BR | L | Net | N/A | 2,480 | $ 1.233 | $3,822.30 |
| 380 Main Street | Laurel | MD | 20707 | BR | O | N/A | Sat. (9:00am - 12:00pm) | 5,074 | $ 1.392 | $8,828.06 |
| 5401 Southern Maryland Boulevard | Lothian | MD | 20711 | BR | L | NNN | Sat. (8:30am - 12:00pm) | 2,032 | $ 1.392 | $3,535.68 |
| 3200 Main Street | Manchester | MD | 21102 | BR | O | N/A | N/A | 2,925 | $ 0.897 | $3,278.43 |
| 3068 Westminster Street | Manchester | MD | 21102 | DU | O | N/A | Sat. (8:00am - 12:00pm) | 250 | $ 0.897 | $279.86 |
| 819 East Main Street | Middletown | MD | 21769 | BR | L | NNN | Sat. (9:00am - 12:00pm) | 1,613 | $ 1.392 | $2,806.27 |
| 400 Cypress Street | Millington | MD | 21651 | BR | O | N/A | Sat. (8:30am - 12:00pm) | 2,039 | $ 1.392 | $3,548.21 |
| 10450 Lottsford Road | Mitchellville | MD | 20721 | BR | L | Net | N/A | 352 | $ 0.897 | $394.68 |
| 11796 Fingerboard Road | Monrovia | MD | 21770 | BR | L | Net | Sat. (9:00am - 12:00pm) | 640 | $ 1.392 | $1,113.60 |
| 443 East Ridgeville Boulevard | Mount Airy | MD | 21771 | BR | L | Net | Sat. (9:00am - 12:00pm) | 2,048 | $ 1.392 | $3,563.52 |
| 14501 Coastal Highway | Ocean City | MD | 21842 | BR | O | N/A | Sat. (8:30am - 12:00pm) | 915 | $ 1.392 | $1,592.45 |
| 4604 Coastal Highway | Ocean City | MD | 21842 | BR | O | N/A | Sat. (8:00am - 12:00pm) | 3,342 | $ 1.392 | $5,814.38 |
| 7900 Coastal Highway | Ocean City | MD | 21842 | BR | O | N/A | Sat. (8:30am - 12:00pm ) - Summer Only | 1,721 | $ 1.392 | $2,994.19 |
| 1219 Annapolis Road | Odenton | MD | 21113 | BR | O | N/A | Sat. (9:00am - 1:00pm) | 2,917 | $ 0.897 | $3,270.46 |
| 6168 Oxon Hill Road | Oxon Hill | MD | 20745 | BR | O | N/A | Sat. (8:30am - 12:00pm) | 1,522 | $ 1.392 | $2,647.58 |
| 3030 Mountain Road | Pasadena | MD | 21122 | BR | O | N/A | Sat. (8:00am - 12:00pm) | 2,605 | $ 0.897 | $2,920.63 |
| 19645 Fisher Avenue | Poolesville | MD | 20837 | BR | L | Net | N/A | 1,904 | $ 1.233 | $2,934.54 |
| 12136 Elm Street | Princess Anne | MD | 21853 | BR | O | N/A | Sat. (8:30am - 12:00pm) | 2,432 | $ 1.392 | $4,231.68 |
| 11702 Reisterstown Road | Reisterstown | MD | 21136 | BR | L | Net | Sat. (9:00am - 1:00pm) | 2,016 | $ 0.897 | $2,260.44 |
| 1097 Seven Locks Rd., Rockville, MD | Rockville | MD | 20850 | BR | L | Net | N/A | 2,552 | $ 1.233 | $3,933.27 |
| 404 King Farm Boulevard, Building 7 | Rockville | MD | 20850 | BR | L | Net | Sat. (9:00am - 12:00pm) | 1,755 | $ 1.392 | $3,054.05 |
| 9401 Key West Avenue | Rockville | MD | 20850 | BR | L | Net | N/A | 1,346 | $ 1.233 | $2,075.14 |
| 99 South Washington Street | Rockville | MD | 20850 | BR | L | Net | N/A | 3,744 | $ 1.233 | $5,770.44 |
| 1470 Rockville Pike | Rockville | MD | 20852 | BR | O | N/A | N/A | 1,369 | $ 1.233 | $2,109.66 |
| 2400 Salisbury Blvd. | Salisbury | MD | 21801 | BR | L | Net | Sat. (8:30am - 12:00pm) | 2,160 | $ 1.392 | $3,758.40 |

Revised 03/23/05

E   C.5
Janitorial Pricing by Site

| Street Address | | | | Property Type BR/O/USF | Lease / Own | Lease Type | Hours Beyond Mon. - Fri. | Usable / Cleanable Square Feet | Janitorial Cost Per Square Foot ($) | Estimated Janitorial Cost Per Year |
|---|---|---|---|---|---|---|---|---|---|---|
| 1105 Mt. Hermon Road | Salisbury | MD | 21804 | BR | L | NNN | Sat. (8:30am - 12:00pm) | 1,855 | $ 1.392 | $3,228.05 |
| 1300 South Salisbury Boulevard | Salisbury | MD | 21801 | BR | O | N/A | Sat. (8:30am - 12:00pm) | 4,860 | $ 1.392 | $8,456.40 |
| 542 Riverside Drive | Salisbury | MD | 21801 | BR | O | N/A | Sat. (8:30am - 12:00pm) | 1,508 | $ 1.392 | $2,797.92 |
| 559 Baltimore Annapolis Boulevard | Severna Park | MD | 21446 | BR | L | Net | Sat. (8:00am - 12:00pm) | 1,984 | $ 0.897 | $2,224.56 |
| 569 Benfield Road | Severna Park | MD | 21446 | BR | L | Net | Sat. (8:00am - 12:00pm) | 806 | $ 0.897 | $904.19 |
| 1100 Wayne Avenue, Suite 200 | Silver Spring | MD | 20910 | BR | L | Net | N/A | 2,754 | $ 1.233 | $4,245.22 |
| 14328 Layhill Road | Silver Spring | MD | 20906 | BR | L | Net | N/A | 1,280 | $ 1.233 | $1,972.80 |
| 15505 & 15511 New Hampshire Avenue | Silver Spring | MD | 20905 | BR | L | Net | N/A | 3,649 | $ 1.233 | $5,623.71 |
| 13350 New Hampshire Avenue | Silver Spring | MD | 20904 | BR | O | N/A | Sat. (9:00am - 12:00pm) | 1,113 | $ 1.392 | $1,936.27 |
| 10590 Campus Way | South Largo | MD | 20774 | BR | L | Net | N/A | 2,800 | $ 1.233 | $4,315.50 |
| 3500 Conowingo Road | Street | MD | 21154 | BR | O | N/A | Sat. (8:00am - 12:00pm) | 1,978 | $ 0.897 | $2,217.38 |
| 7200 Third Avenue | Sykesville | MD | 21784 | BR | L | Net | N/A | 854 | $ 1.233 | $1,315.61 |
| 4345 Old Taneytown Road | Taneytown | MD | 21787 | BR | O | N/A | Sat. (8:00am - 12:00pm) | 1,584 | $ 0.897 | $1,776.06 |
| 31 West Timonium Road | Timonium | MD | 21048 | BR | L | NNN | N/A | 4,240 | $ 0.897 | $4,754.10 |
| 600 Washington Avenue | Towson | MD | 21204 | BR | L | Net | N/A | 2,899 | $ 0.897 | $3,250.73 |
| 9420 Pennsylvania Avenue, Melwood | Upper Marlboro | MD | 20772 | BR | O | N/A | Sat. (8:30am - 12:00pm) | 11,696 | $ 1.392 | $20,351.04 |
| Sugarloaf Parkway and Worthington Blvd. | Urbana | MD | 21704 | BR | O | NNN | N/A | 2,800 | $ 1.233 | $4,315.50 |
| 2140 Old Washington Road | Waldorf | MD | 20601 | BR | L | NNN | Sat. (8:30am - 12:00pm) | 1,578 | $ 1.392 | $2,746.42 |
| 3425 Leonardtown Road | Waldorf | MD | 20601-3644 | BR | O | N/A | Sat. (8:30am - 12:00pm) | 4,594 | $ 1.392 | $7,992.86 |
| 100 Commerce Drive | Walkersville | MD | 21793 | BR | O | N/A | Sat. (9:00am - 12:00pm) | 1,120 | $ 1.392 | $1,948.80 |
| 204 Saint Mark Way | Westminster | MD | 21157 | BR | L | Net | N/A | 1,200 | $ 1.392 | $1,345.50 |
| 193 East Main Street | Westminster | MD | 21157-5014 | BR | O | N/A | N/A | 3,712 | $ 0.897 | $4,162.08 |
| 401 Englar Road | Westminster | MD | 21157-4851 | BR | O | N/A | Sat. (7:30am - 1:00pm) | 4,920 | $ 0.897 | $5,516.55 |
| 45 West Main Street | Westminster | MD | 21157-4815 | BR | O | N/A | N/A | 30,580 | $ 1.233 | $47,131.43 |
| 11200 Viers Mill Road | Wheaton | MD | 20902 | BR | L | Net | N/A | 4,530 | $ 1.233 | $6,981.25 |
| 10579 Theodore Green Blvd. | White Plains | MD | 20695 | BR | L | Net | Sat. (8:30am - 12:00pm) | 1,600 | $ 1.392 | $2,784.00 |
| 7101 Security Blvd | Woodlawn | MD | 21207 | BR | L | Net | N/A | 3,074 | $ 0.897 | $3,447.17 |
| 1803 Sandhills Boulevard North | Aberdeen | NC | 28315 | BR | O | N/A | N/A | 2,240 | $ 1.233 | $3,452.40 |
| 203 East Depot Street | Angier | NC | 27501 | BR | O | N/A | N/A | 2,755 | $ 1.233 | $4,246.45 |
| Main Street Highway 52 | Ansonville | NC | 28007 | BR | O | N/A | N/A | 2,185 | $ 1.233 | $3,368.56 |
| 801 East Williams Street | Apex | NC | 27502 | BR | L | NNN | N/A | 3,426 | $ 1.233 | $5,280.94 |

14

Revised 03/23/05

E     C.5
Janitorial Pricing by Site

| Street Address | | | | Property Type BR/DU/SF | Lease / Own | Lease Type | Hours Beyond Mon - Fri. | Usable / Cleanable Square Feet | Janitorial Cost Per Square Foot ($) | Estimated Janitorial Cost Per Year |
|---|---|---|---|---|---|---|---|---|---|---|
| 261 North Fayetteville Street | Asheboro | NC | 27203 | BR | L | NNN | N/A | 8,340 | $ 1.233 | $12,654.03 |
| 1343 Parkwood Road | Asheville | NC | 28806 | BR | L | NNN | Sat. (9:00am - 12:00pm) | 4,240 | $ 1.392 | $7,377.60 |
| 1653 Hendersonville Road | Asheville | NC | 28803 | BR | L | NNN | Sat. (9:00am - 12:00pm) | 3,360 | $ 1.392 | $5,846.40 |
| 850 Merrimon Avenue | Asheville | NC | 28808 | BR | L | NNN | N/A | 1,337 | $ 1.233 | $2,060.34 |
| 121 Third Street | Ayden | NC | 28513 | BR | O | N/A | N/A | 2,422 | $ 1.233 | $3,733.52 |
| 617 Front Street | Beaufort | NC | 28516 | BR | O | N/A | N/A | 3,546 | $ 1.233 | $5,464.66 |
| 307 East Main Street | Benson | NC | 27504 | BR | O | N/A | N/A | 2,176 | $ 1.233 | $3,353.76 |
| 104 West Main Street | Beulaville | NC | 28518 | BR | O | N/A | N/A | 3,860 | $ 1.233 | $5,949.23 |
| 210 West Center Street | Black Creek | NC | 27813 | BR | O | N/A | N/A | 640 | $ 0.897 | $717.60 |
| 124 North Main Street | Boiling Springs | NC | 28017 | BR | O | N/A | N/A | 2,036 | $ 1.233 | $3,137.99 |
| 3769 Old Ocean Highway | Bolivia | NC | 28422 | BR | L | NNN | N/A | 1,600 | $ 1.233 | $2,466.00 |
| 2458 Highway 105 | Boone | NC | 28607 | BR | L | NNN | N/A | 3,360 | $ 1.233 | $5,178.60 |
| 971 Blowing Rock Road | Boone | NC | 28607 | BR | O | N/A | Sat. (9:00am - 12:00pm) | 6,871 | $ 1.392 | $11,955.89 |
| 106 South Main Street | Broadway | NC | 27505 | BR | O | N/A | N/A | 1,928 | $ 1.233 | $2,971.53 |
| 2040 South Church Street | Burlington | NC | 27216 | BR | L | Net | N/A | 6,984 | $ 1.233 | $10,764.09 |
| 10027 Beach Drive | Calabash | NC | 28459 | BR | O | N/A | N/A | 1,857 | $ 1.233 | $2,861.79 |
| 7 North Lake Park Boulevard | Carolina Beach | NC | 28428 | BR | O | N/A | N/A | 2,766 | $ 1.233 | $4,263.71 |
| 502 Monroe Street | Carthage | NC | 28327 | DU | O | N/A | N/A | 2,060 | $ 0.897 | $2,309.78 |
| 200 East Chatham St. | Cary | NC | 27511 | BR | L | Net | N/A | 4,832 | $ 1.233 | $7,447.32 |
| 7317 Tryon Road | Cary | NC | 27511 | BR | L | Net | Sat. (9:00am - 12:00pm) | 4,240 | $ 1.392 | $7,377.60 |
| 848 East Maynard Road | Cary | NC | 27511 | BR | L | Net | N/A | 1,840 | $ 1.233 | $2,835.90 |
| 977 North Harrison Ave. | Cary | NC | 27511 | BR | L | Net | N/A | 2,554 | $ 1.233 | $3,935.74 |
| 924 Kildare Farm Road | Cary | NC | 27511 | BR | L | NNN | N/A | 2,080 | $ 1.233 | $3,205.80 |
| 5610 Castle Hayne Road | Castle Hayne | NC | 28429-5111 | BR | O | N/A | N/A | 960 | $ 1.233 | $1,479.60 |
| 625 Brown Street | Chadbourn | NC | 28431 | BR | L | NNN | N/A | 1,920 | $ 1.233 | $2,959.20 |
| 100 North Elliot Road | Chapel Hill | NC | 27515 | BR | O | N/A | Sat. (9:00am - 12:00pm) | 2,640 | $ 1.392 | $4,593.60 |
| 143 East Rosemary Street | Chapel Hill | NC | 27514-3528 | BR | O | N/A | N/A | 2,960 | $ 1.233 | $4,562.10 |
| 1814 Oakdale Road | Charlotte | NC | 28214 | BR | L | Net | N/A | 2,600 | $ 1.233 | $4,007.25 |
| 2520 Sardis Road North, First Floor | Charlotte | NC | 28217 | BR | L | Net | N/A | 4,000 | $ 1.233 | $6,165.00 |
| 3800 Shamrock Dr. | Charlotte | NC | 28215 | BR | L | Net | N/A | 493 | $ 1.233 | $759.53 |
| 250 East Woodlawn Rd. | Charlotte | NC | 28212 | BR | L | NNN | N/A | 1,970 | $ 1.233 | $3,035.65 |
| 419 Little Rock Road | Charlotte | NC | 28214 | BR | L | NNN | N/A | 1,774 | $ 1.233 | $2,733.56 |
| 4309 Providence Road | Charlotte | NC | 28211 | BR | L | NNN | N/A | 2,110 | $ 1.233 | $3,252.65 |
| 7521 Matthews Pineville Rd Charlotte-Carmel Commons | Charlotte | NC | 28209 | BR | L | NNN | Sat. (9:00am - 12:00pm) | 2,160 | $ 1.392 | $3,758.40 |

Revised 03/23/05

E...t C.5
Janitorial Pricing by Site

| Street Address | City | State | Zip | Property Type BR/DU/SF | Lease/Own | Lease Type | Hours Beyond Mon.-Fri. | Usable/Cleanable Square Feet | Janitorial Cost Per Square Foot ($) | Estimated Janitorial Cost Per Year |
|---|---|---|---|---|---|---|---|---|---|---|
| 8558 University City Boulevard | Charlotte | NC | 28213 | BR | L | NNN | N/A | 880 | $ 1.233 | $1,356.30 |
| 6869 Fairview Road | Charlotte | NC | 28217 | BR | L | NNN | Sat. (9:00am - 12:00pm) | 9,600 | $ 1.392 | $16,704.00 |
| 101 Queens Road | Charlotte | NC | 28204-3215 | BR | O | N/A | N/A | 3,080 | $ 1.233 | $4,747.05 |
| 13901 Conlan Circle | Charlotte | NC | 28217 | BR | O | N/A | Sat. (9:00am - 12:00pm) | 4,240 | $ 1.392 | $7,377.60 |
| 3059 Eastway Drive | Charlotte | NC | 28205 | BR | O | N/A | N/A | 1,386 | $ 1.233 | $2,135.56 |
| 3726 Monroe Road | Charlotte | NC | 28205-7736 | BR | O | N/A | N/A | 2,400 | $ 1.233 | $3,699.00 |
| 4901 Albemarle Road | Charlotte | NC | 28205 | BR | O | N/A | Sat. (9:00am - 12:00pm) | 3,400 | $ 1.392 | $5,916.00 |
| 5369 Ballantyne Commons Parkway | Charlotte | NC | 28277 | BR | O | N/A | Sat. (9:00am - 12:00pm) | 4,720 | $ 1.392 | $8,212.80 |
| 6021 Hickory Grove Road | Charlotte | NC | 28212 | BR | O | N/A | N/A | 3,680 | $ 1.233 | $5,671.80 |
| 8011 Mallard Creek Road | Charlotte | NC | 28262-2236 | BR | O | N/A | Sat. (9:00am - 12:00pm) | 3,360 | $ 1.392 | $5,846.40 |
| 9200 South Tryon Street | Charlotte | NC | 28273-3107 | BR | O | N/A | N/A | 3,360 | $ 1.233 | $5,178.60 |
| 4500 South Tryon Street | Charlotte | NC | 28213 | DU | O | N/A | N/A | 1,840 | $ 0.897 | $2,063.10 |
| 100 South Mountain Street | Cherryville | NC | 28021 | BR | O | N/A | N/A | 7,672 | $ 1.233 | $12,132.72 |
| 1001 East Church Street | Cherryville | NC | 28021 | BR | O | N/A | N/A | 1,649 | $ 1.233 | $2,541.21 |
| 3296 East Main Street | Claremont | NC | 28610 | BR | O | N/A | N/A | 2,890 | $ 1.233 | $4,453.60 |
| 7 East Green Street | Clarkton | NC | 28433 | BR | L | NNN | N/A | 3,056 | $ 1.233 | $4,713.76 |
| 11508 Highway 70 | Clayton | NC | 27520-2265 | BR | O | N/A | N/A | 4,000 | $ 1.233 | $6,165.00 |
| 2629 Lewisville-Clemmons Road | Clemmons | NC | 27012 | BR | O | N/A | Sat. (9:00am - 12:00pm) | 4,000 | $ 1.392 | $6,960.00 |
| 1106 Sunset Avenue | Clinton | NC | 28328 | BR | L | N/A | N/A | 2,110 | $ 1.233 | $3,252.65 |
| 501 Warsaw Road | Clinton | NC | 28328 | BR | L | NNN | N/A | 6,436 | $ 1.233 | $9,919.49 |
| 140 North McKinley Street | Coats | NC | 27521 | BR | O | N/A | N/A | 1,928 | $ 1.233 | $2,971.53 |
| 107 Main Street | Columbia | NC | 27925 | BR | O | N/A | N/A | 1,299 | $ 0.897 | $1,456.73 |
| 5145 Poplar Tent Road | Concord | NC | 28027 | BR | O | N/A | N/A | 4,897 | $ 1.233 | $7,547.19 |
| 202 First Avenue South | Conover | NC | 28613 | BR | O | N/A | N/A | 4,280 | $ 1.233 | $6,596.55 |
| 20400 Catawba Avenue | Cornelius | NC | 28031-6391 | BR | O | N/A | N/A | 2,160 | $ 1.233 | $3,329.10 |
| 105 Center Street | Cramerton | NC | 28032 | BR | O | N/A | N/A | 2,614 | $ 1.233 | $4,028.21 |
| 501 West Trade Street | Dallas | NC | 28034 | BR | O | N/A | N/A | 1,922 | $ 1.233 | $2,961.67 |
| 94 North Main Street | Denton | NC | 27239 | BR | O | N/A | N/A | 1,600 | $ 1.233 | $2,466.00 |
| 3674 North Highway 16 North | Denver | NC | 28037-8268 | BR | O | N/A | N/A | 1,966 | $ 1.233 | $3,030.71 |
| 107 West Broad Street | Dunn | NC | 28334 | BR | O | N/A | N/A | 4,960 | $ 1.233 | $7,644.60 |
| 1724 West Cumberland Street | Dunn | NC | 28335 | BR | O | N/A | N/A | 1,482 | $ 1.233 | $2,284.75 |
| 1530 North Gregson Street | Durham | NC | 27701 | BR | L | Net | Sat. (9:00am - 12:00pm) | 4,274 | $ 1.392 | $7,436.06 |
| 2726 Crossdale Drive, Ste. 104 | Durham | NC | 27705 | BR | L | Net | N/A | 1,572 | N/A | N/A |
| 4717 Hope Valley Road | Durham | NC | 27702 | BR | O | N/A | N/A | 1,824 | $ 1.233 | $2,811.24 |

16

Revised 03/23/05

Exhibit C.5
Janitorial Pricing by Site

| Street Address | | | | Property Type BR/DU/SF | Lease / Own | Lease Type | Hours Beyond Mon.- Fri. | Usable / Cleanable Square Feet | Janitorial Cost Per Square Feet | Estimated Janitorial Cost Per Year |
|---|---|---|---|---|---|---|---|---|---|---|
| 5028 Roxboro Road | Durham | NC | 27704 | BR | O | N/A | N/A | 4,240 | $ 1.233 | $6,534.90 |
| 5407 South Miami Boulevard | Durham | NC | 27703 | BR | O | N/A | N/A | 4,240 | $ 1.233 | $6,534.90 |
| 680 South Van Buren Road | Eden | NC | 27288 | BR | O | N/A | N/A | 4,800 | $ 1.233 | $7,398.00 |
| 322 South Broad Street | Edenton | NC | 27932 | BR | O | N/A | N/A | 2,400 | $ 1.233 | $3,699.00 |
| 1000 West Ehringhaus St. | Elizabeth City | NC | 27909 | BR | L | NNN | N/A | 6,000 | $ 1.233 | $9,247.50 |
| 215 West Broad Street | Elizabethtown | NC | 28337 | BR | O | N/A | N/A | 3,820 | $ 1.233 | $5,887.58 |
| 1661 North Bridge Street | Elkin | NC | 28621 | BR | O | N/A | N/A | 3,880 | $ 1.233 | $5,980.05 |
| 202 West Main Street | Elkin | NC | 28621-3447 | DU | O | N/A | N/A | 0 | $ 0.897 | $0.00 |
| 267 Second Street | Ellerbe | NC | 28338 | BR | O | N/A | N/A | 2,040 | $ 1.233 | $3,144.15 |
| 111 East Main Street | Elm City | NC | 27822 | BR | O | N/A | N/A | 969 | $ 0.897 | $1,086.27 |
| 205 Whitfield Street | Enfield | NC | 27823 | BR | L | NNN | N/A | 2,080 | $ 0.897 | $2,332.20 |
| 111 Denim Drive | Erwin | NC | 28339 | BR | O | N/A | N/A | 1,550 | $ 1.233 | $2,388.32 |
| 101 East Main St. | Eureka | NC | 28630 | BR | L | Net | N/A | 688 | $ 1.233 | $1,060.38 |
| 1054 Main Street | Fair Bluff | NC | 28439 | BR | L | NNN | N/A | 1,892 | $ 1.233 | $2,916.05 |
| 104 West Thompson Street | Fairmont | NC | 28340 | BR | O | N/A | N/A | 2,560 | $ 1.233 | $3,945.60 |
| 4541 Fallston Road | Fallston | NC | 28042 | BR | O | N/A | N/A | 1,327 | $ 1.233 | $2,045.55 |
| 4275 West Church Street | Farmville | NC | 27828 | BR | O | N/A | N/A | 2,240 | $ 1.233 | $3,452.40 |
| 3012 Raeford Road | Fayetteville | NC | 28302 | BR | L | NNN | N/A | 2,400 | $ 1.233 | $3,699.00 |
| 3817 Morganton Road | Fayetteville | NC | 28302 | BR | L | NNN | N/A | 8,460 | $ 1.233 | $13,036.98 |
| 5137 College Center Drive | Fayetteville | NC | 28311 | BR | L | NNN | N/A | 4,000 | $ 1.233 | $6,165.00 |
| 6313 Raeford Rd (Falcon Ridge) | Fayetteville | NC | 28303 | BR | L | NNN | N/A | 1,440 | $ 1.233 | $2,219.40 |
| 1401 Morganton Road | Fayetteville | NC | 28305 | BR | O | N/A | N/A | 800 | $ 1.233 | $1,233.00 |
| 218 Bragg Boulevard | Fayetteville | NC | 28303 | BR | O | N/A | N/A | 2,000 | $ 1.233 | $3,082.50 |
| 2507 Bragg Boulevard | Fayetteville | NC | 28303 | BR | O | N/A | N/A | 10,080 | $ 1.233 | $15,535.80 |
| 300 Rowan Street | Fayetteville | NC | 28302 | BR | O | N/A | N/A | 10,720 | $ 1.233 | $16,522.20 |
| 3034 Boone Trail Extension | Fayetteville | NC | 28304 | BR | O | N/A | N/A | 4,080 | $ 1.233 | $6,288.30 |
| 5801 Yadkin Road | Fayetteville | NC | 28304 | BR | O | N/A | N/A | 1,920 | $ 1.233 | $2,959.20 |
| 316 Green Street | Fayetteville | NC | 28301 | DU | L | NNN | N/A | 384 | $ 0.897 | $430.56 |
| 3811 Hendersonville Road | Fletcher | NC | 28732 | BR | O | N/A | N/A | 2,435 | $ 1.233 | $3,753.25 |
| 179 East Main Street | Forest City | NC | 28043 | BR | L | NNN | N/A | 3,053 | $ 1.233 | $4,705.13 |
| 364 Butler Road | Forest City | NC | 28043 | BR | O | N/A | N/A | 5,200 | $ 1.233 | $8,014.50 |
| 126 East Main Street | Fremont | NC | 27830 | BR | O | N/A | N/A | 4,200 | $ 1.233 | $6,473.25 |
| 1405 North Main Street | Fuquay-Varina | NC | 27526 | BR | L | NNN | N/A | 4,435 | $ 1.233 | $6,835.75 |
| 301 Vandora Springs Road | Garner | NC | 27529 | BR | O | N/A | N/A | 2,240 | $ 1.233 | $3,452.40 |
| 120 South New Hope Road | Gastonia | NC | 28054 | BR | O | N/A | N/A | 3,837 | $ 1.233 | $5,913.47 |
| 2414 West Franklin Boulevard | Gastonia | NC | 28052 | BR | O | N/A | Sat. (9:00am - 12:00pm) | 3,510 | $ 1.392 | $6,108.10 |
| 265 West Franklin Boulevard | Gastonia | NC | 28054 | BR | O | N/A | N/A | 19,200 | $ 1.233 | $29,592.00 |

Revised 03/23/05

E    C.5

Janitorial Pricing by Site

| Street Address | City | State | Zip | Property Type BR/DU/SF | Lease / Own | Lease Type | Hours Beyond Mon. - Fri. | Usable / Cleanable Square Feet | Janitorial Cost Per Square Foot ($) | Estimated Janitorial Cost Per Year |
|---|---|---|---|---|---|---|---|---|---|---|
| 3070 Union Road | Gastonia | NC | 28056 | BR | O | N/A | N/A | 1,920 | $ 1.233 | $2,959.20 |
| 1326 West Grantham St. | Goldsboro | NC | 27530 | BR | L | Net | N/A | 1,920 | $ 1.233 | $2,959.20 |
| 435 North Berkley Boulevard | Goldsboro | NC | 27532 | BR | L | NNN | N/A | 2,240 | $ 1.233 | $3,452.40 |
| 201 North Spence Avenue - Building | Goldsboro | NC | 27534-4317 | BR | O | N/A | N/A | 16,000 | $ 1.233 | $24,660.00 |
| 207 East Ash Street | Goldsboro | NC | 27530 | BR | O | N/A | N/A | 17,030 | $ 1.233 | $26,246.87 |
| 2111 South Main Street | Goldston | NC | 27252 | BR | O | N/A | N/A | 1,666 | $ 1.233 | $2,567.11 |
| 220 South Main Street | Graham | NC | 27253 | BR | L | NNN | N/A | 8,926 | $ 1.233 | $13,756.58 |
| 3307 Battleground Avenue | Greensboro | NC | 27410 | BR | L | Net | N/A | 2,374 | $ 1.233 | $3,658.31 |
| 625 Green Valley Road | Greensboro | NC | 27408 | BR | L | Net | Sat. (9:00am - 12:00pm) | 9,600 | $ 1.392 | $16,704.00 |
| 2274 Vanstory Street | Greensboro | NC | 27407 | BR | L | NNN | N/A | 4,887 | $ 1.233 | $7,532.40 |
| 4541 West Market Street | Greensboro | NC | 27407 | BR | L | NNN | N/A | 2,418 | $ 1.233 | $3,727.36 |
| 1300 Battleground Avenue | Greensboro | NC | 27408 | BR | O | N/A | N/A | 6,591 | $ 1.233 | $10,158.69 |
| 201 West Market Street | Greensboro | NC | 27401 | BR | O | N/A | N/A | 34,626 | $ 1.233 | $53,366.71 |
| 2835 Randleman Road | Greensboro | NC | 27406-5111 | BR | O | N/A | N/A | 3,600 | $ 1.233 | $5,548.50 |
| 606 College Road | Greensboro | NC | 27410-4102 | BR | O | N/A | N/A | 3,360 | $ 1.233 | $5,178.60 |
| 915 East Bessemer Avenue | Greensboro | NC | 27405 | BR | O | N/A | N/A | 3,360 | $ 1.233 | $5,178.60 |
| 2475 Stantonsburg Road | Greenville | NC | 27834-7211 | BR | O | N/A | N/A | 1,840 | $ 1.233 | $2,835.90 |
| 514 East Greenville Boulevard SE | Greenville | NC | 27858 | BR | O | N/A | N/A | 11,200 | $ 1.233 | $17,262.00 |
| 543 South Evans Street | Greenville | NC | 27834 | BR | O | N/A | N/A | 9,600 | $ 1.233 | $14,796.00 |
| 700 East Arlington Boulevard | Greenville | NC | 27858 | BR | O | N/A | N/A | 1,600 | $ 1.233 | $2,466.00 |
| 3 South King Street | Halifax | NC | 27839 | BR | O | N/A | N/A | 2,370 | $ 0.897 | $2,656.91 |
| 8 Raleigh Street | Hamlet | NC | 28345-2756 | BR | O | N/A | N/A | 3,360 | $ 1.233 | $5,178.60 |
| 1303 East Main Street | Havelock | NC | 28532 | BR | L | NNN | N/A | 2,712 | $ 1.233 | $4,179.87 |
| 632 Dabney Drive | Henderson | NC | 27536 | BR | L | Net | N/A | 2,040 | $ 1.233 | $3,144.15 |
| 213 North Chestnut Street - Main Office | Henderson | NC | 27536 | BR | O | N/A | N/A | 6,400 | $ 1.233 | $9,864.00 |
| 1342 Second Street NE | Hickory | NC | 28601-2555 | BR | O | N/A | N/A | 1,200 | $ 1.233 | $1,849.50 |
| 1856 12th Avenue NE | Hickory | NC | 28601 | BR | O | N/A | N/A | 3,740 | $ 1.233 | $5,764.28 |
| 2141 Highway 70 SE | Hickory | NC | 28602 | BR | O | N/A | N/A | 2,506 | $ 1.233 | $3,862.99 |
| 2527 NC Highway 127 South | Hickory | NC | 28602-9128 | BR | O | N/A | N/A | 2,788 | $ 1.233 | $4,297.01 |
| 3201 First Avenue SW | Hickory | NC | 28602 | BR | O | N/A | N/A | 2,760 | $ 1.233 | $4,253.85 |
| 9541 NC Highway 127 | Hickory | NC | 28601-8395 | BR | O | N/A | N/A | 1,885 | $ 1.233 | $2,904.95 |
| 2105 Westchester Drive | High Point | NC | 27262 | BR | O | N/A | N/A | 1,920 | $ 1.233 | $2,959.20 |
| 2940 South Main Street | High Point | NC | 27263 | BR | O | N/A | N/A | 3,200 | $ 1.233 | $4,932.00 |
| 4025 Premier Drive | High Point | NC | 27265 | BR | O | N/A | Sat. (9:00am - 12:00pm) | 4,240 | $ 1.392 | $7,377.60 |
| 620 North Main Street | High Point | NC | 27262 | BR | O | N/A | N/A | 11,200 | $ 1.233 | $17,262.00 |
| 301 South Center Street | Hildebran | NC | 28637 | BR | O | N/A | N/A | 2,828 | $ 1.233 | $4,356.66 |

18

Revised 03/23/05

E. ..C.5
Janitorial Pricing by Site

| Street Address | City | State | Zip | Property Type BR/OU/SF | Lessee / Own | Lease Type | Hours Beyond Mon. - Fri. | Usable / Cleanable Square Feet | Janitorial Cost Per Square Foot ($) | Estimated Janitorial Cost Per Year |
|---|---|---|---|---|---|---|---|---|---|---|
| 351 South Churton Street | Hillsborough | NC | 27278 | BR | L | NNN | N/A | 1,921 | $ 1.233 | $2,960.43 |
| 3226 Holden Beach Road | Holden Beach | NC | 28462 | BR | O | N/A | N/A | 2,720 | $ 1.233 | $4,192.20 |
| 3618 North Main Street | Hope Mills | NC | 28348 | BR | O | N/A | N/A | 2,402 | $ 1.233 | $3,702.70 |
| 16710 Northcross Drive | Huntersville | NC | 28078-5090 | BR | O | N/A | Sat. (9:00am - 12:00pm) | 3,200 | $ 1.392 | $5,568.00 |
| 200 Indian Trail | Indian Trail | NC | 28079 | BR | O | N/A | Sat. (9:00am - 12:00pm) | 3,018 | $ 1.392 | $5,252.02 |
| 120 West Main Street | Jamestown | NC | 27282-9529 | BR | L | NNN | N/A | 2,429 | $ 1.233 | $3,743.39 |
| 1810 W. Main Street | Jamesville | NC | 27846 | BR | O | N/A | N/A | 1,095 | $ 1.233 | $1,687.98 |
| 237 East Mountain Street | Kernersville | NC | 27284 | BR | L | N/A | N/A | 4,930 | $ 1.233 | $7,598.98 |
| 124 Harmon Creek Road | Kernersville | NC | 27284 | BR | O | N/A | Sat. (9:00am - 12:00pm) | 4,240 | $ 1.392 | $7,377.60 |
| 1920 North Croatan Highway | Kill Devil Hills | NC | 27948 | BR | O | N/A | N/A | 4,160 | $ 1.233 | $5,411.60 |
| 601 South Main Street | King | NC | 27021 | BR | O | N/A | N/A | 3,350 | $ 1.233 | $5,163.80 |
| 410 East King Street | Kings Mountain | NC | 28086 | BR | O | N/A | N/A | 1,586 | $ 1.233 | $2,445.04 |
| 2009 West Vernon Avenue | Kinston | NC | 28504 | BR | O | N/A | N/A | 6,000 | $ 1.233 | $9,247.50 |
| 611 Plaza Boulevard | Kinston | NC | 28501 | BR | O | N/A | N/A | 2,609 | $ 1.233 | $4,020.81 |
| 7120 Highway 64 East | Knightdale | NC | 27545 | BR | L | NNN | N/A | 1,928 | $ 1.233 | $2,971.53 |
| 104 East Washington Street | La Grange | NC | 28551 | BR | L | Net | N/A | 1,192 | $ 1.233 | $1,837.17 |
| 103 Sam Potts Highway East | Lake Waccamaw | NC | 28450 | BR | L | NNN | N/A | 2,098 | $ 1.233 | $3,232.93 |
| 1700 South Main Street | Laurinburg | NC | 28352 | BR | L | NNN | N/A | 1,456 | $ 1.233 | $2,244.06 |
| 400 South Main Street | Laurinburg | NC | 28352 | BR | O | N/A | N/A | 3,360 | $ 1.233 | $5,176.60 |
| 300 East Main Street | Lawndale | NC | 28090 | BR | O | N/A | N/A | 1,600 | $ 1.233 | $2,466.00 |
| 201 Village Road | Leland | NC | 28451 | BR | L | NNN | N/A | 2,720 | $ 1.233 | $4,192.20 |
| 6454 Shallowford Road | Lewisville | NC | 27023 | BR | O | N/A | N/A | 1,813 | $ 0.897 | $2,032.60 |
| 209 North Main Street | Lexington | NC | 27292-3417 | BR | O | N/A | N/A | 11,200 | $ 1.233 | $17,262.00 |
| 1907 Cotton Grove Road | Lexington | NC | 27292-5721 | BR | O | N/A | N/A | 2,400 | $ 1.233 | $3,699.00 |
| 151 Fayetteville Street | Liberty | NC | 27298 | BR | O | N/A | N/A | 1,928 | $ 1.233 | $2,971.53 |
| 111 West Front Street | Lillington | NC | 27546 | BR | L | Net | N/A | 4,000 | $ 1.233 | $6,165.00 |
| 813 East Main Street | Lincolnton | NC | 28093 | BR | L | NNN | N/A | 4,240 | $ 1.233 | $6,534.90 |
| 131 East South Main Street | Littleton | NC | 27850 | BR | O | N/A | N/A | 3,443 | $ 0.897 | $3,860.69 |
| 403 East Nash Street | Louisburg | NC | 27549 | BR | O | N/A | N/A | 3,085 | $ 1.233 | $3,458.83 |
| 830 Groves Street | Lowell | NC | 28098 | BR | O | N/A | N/A | 1,794 | $ 1.233 | $2,764.39 |
| 2700 North Elm Street | Lumberton | NC | 28358 | BR | L | NNN | N/A | 2,640 | $ 1.233 | $4,068.90 |
| 5000 Fayetteville Road | Lumberton | NC | 28359 | BR | O | N/A | N/A | 1,765 | $ 1.233 | $2,720.00 |
| 1105 North Highway 220 | Madison | NC | 27025 | BR | L | Net | N/A | 2,360 | $ 1.233 | $3,637.35 |
| 2451 Soco Road | Maggie Valley | NC | 28751 | BR | O | N/A | N/A | 1,121 | $ 1.233 | $1,727.43 |
| 6605 East Marshville Blvd | Marshville | NC | 28103 | BR | O | N/A | N/A | 2,712 | $ 1.233 | $4,179.87 |
| 310 East John Street | Matthews | NC | 28106 | BR | L | NNN | N/A | 3,639 | $ 1.233 | $5,608.92 |

19

Revised 03/23/05

Exhibit C.5
## Janitorial Pricing by Site

| Street Address | | | | Property Type BR/OU/SF | Lease / Own | Lease Type | Hours Beyond Mon.- Fri. | Usable / Cleanable Square Feet | Janitorial Cost Per Square Foot ($) | Estimated Janitorial Cost Per Year |
|---|---|---|---|---|---|---|---|---|---|---|
| 1321 Matthew Township Parkway | Matthews | NC | 28106 | BR | O | N/A | Sat. (9:00am - 12:00pm) | 2,489 | $ 1.392 | $4,330.51 |
| 32 Railroad Street | Micro | NC | 27555 | BR | O | N/A | N/A | 2,870 | $ 1.233 | $4,424.00 |
| 11425 Lawyers Road | Mint Hill | NC | 28227 | BR | O | N/A | N/A | 6,800 | $ 1.233 | $10,480.50 |
| 1109 Yadkinville Road | Mocksville | NC | 27028 | BR | O | N/A | N/A | 2,592 | $ 1.233 | $3,994.92 |
| 119 Gaither Street | Mocksville | NC | 27028 | BR | O | N/A | N/A | 4,234 | $ 1.233 | $6,525.04 |
| 2123 Roosevelt Boulevard | Monroe | NC | 28110 | BR | L | Net | Sat. (9:00am - 12:00pm) | 4,165 | $ 1.392 | $7,281.55 |
| 301 Roosevelt Boulevard | Monroe | NC | 28110 | BR | O | N/A | N/A | 15,778 | $ 1.233 | $24,318.46 |
| 512 North Hayne Street | Monroe | NC | 28110 | BR | O | N/A | N/A | 9,754 | $ 1.233 | $15,032.74 |
| 163 Plantation Ridge Drive | Mooresville | NC | 28117 | BR | O | N/A | N/A | 4,240 | $ 1.233 | $6,534.90 |
| 255 North Main Street | Mooresville | NC | 28115 | BR | O | N/A | N/A | 2,522 | $ 1.233 | $3,887.65 |
| 2905 Bridges Street | Morehead City | NC | 28557 | BR | L | Net | N/A | 1,872 | $ 1.233 | $2,885.22 |
| 4408 Arandell Street | Morehead City | NC | 28557 | BR | L | NNN | N/A | 6,346 | $ 1.233 | $9,781.39 |
| 105 Avery Avenue | Morganton | NC | 28655 | BR | L | NNN | N/A | 11,200 | $ 1.233 | $17,262.00 |
| 2151 Rockford Street | Mount Airy | NC | 27030-5205 | BR | O | N/A | N/A | 3,397 | $ 1.233 | $5,235.32 |
| 541 North Main Street | Mount Airy | NC | 27030 | BR | O | N/A | N/A | 18,372 | $ 1.233 | $28,315.85 |
| 200 North Main Street | Mount Gilead | NC | 27306 | BR | L | Net | N/A | 2,640 | $ 1.233 | $4,066.90 |
| 150 South Main Street | Mount Holly | NC | 28120 | BR | O | N/A | N/A | 3,779 | $ 1.233 | $5,824.69 |
| 251 King Street | Murphy | NC | 28906 | BR | O | N/A | N/A | 2,183 | $ 1.233 | $3,364.86 |
| 3509 Dr. Martin Luther King, Jr. Blvd. | New Bern | NC | 28560 | BR | L | NNN | N/A | 3,360 | $ 1.233 | $5,178.60 |
| 375 South Front Street | New Bern | NC | 28561 | BR | L | NNN | N/A | 10,811 | $ 1.233 | $16,662.76 |
| 2011 Neuse Boulevard | New Bern | NC | 28560 | BR | O | N/A | N/A | 3,003 | $ 1.233 | $4,628.68 |
| 12 North Main Avenue | Newton | NC | 28658 | BR | O | N/A | N/A | 9,451 | $ 1.233 | $14,566.66 |
| 2004 North Main Avenue | Newton | NC | 28658 | BR | O | N/A | N/A | 2,589 | $ 1.233 | $3,989.99 |
| 307 Main Street | Newton Grove | NC | 28366 | BR | L | NNN | N/A | 1,954 | $ 1.233 | $3,012.22 |
| 8905 East Oak Island Drive | Oak Island | NC | 28465-8104 | BR | O | N/A | N/A | 1,664 | $ 1.233 | $2,564.64 |
| 127 Causeway Drive | Ocean Isle Beach | NC | 28459 | BR | L | NNN | N/A | 1,802 | $ 1.233 | $2,776.72 |
| 106 East Main Street | Old Fort | NC | 28762 | BR | O | N/A | N/A | 2,080 | $ 1.233 | $3,205.80 |
| 154 Hillsboro Street | Oxford | NC | 27565 | BR | L | Net | N/A | 5,760 | $ 0.897 | $6,458.40 |
| 105 West Main Street | Pikeville | NC | 27863 | BR | L | Net | N/A | 2,027 | $ 1.233 | $3,124.42 |
| 108 East Main Street | Pilot Mountain | NC | 27041 | BR | O | N/A | N/A | 2,080 | $ 1.233 | $3,205.80 |
| 100 Blake Boulevard | Pinehurst | NC | 28374 | BR | L | NNN | N/A | 1,996 | $ 1.233 | $3,076.34 |
| 50 Aviemore Drive | Pinehurst | NC | 28374 | BR | O | N/A | N/A | 16,000 | $ 1.233 | $24,660.00 |
| 11100 Carolina Place Parkway | Pineville | NC | 28134 | BR | O | N/A | N/A | 6,841 | $ 1.233 | $10,543.36 |
| 102 West Main Street | Plymouth | NC | 27962 | BR | L | NNN | N/A | 6,501 | $ 1.233 | $10,019.36 |
| 102 North Pine Street | Princeton | NC | 27569 | BR | O | N/A | N/A | 1,680 | $ 1.233 | $2,589.30 |
| 207 South Main Street | Raeford | NC | 28376 | BR | L | NNN | N/A | 6,208 | $ 1.233 | $9,568.08 |

Revised 03/23/05

Exhibit C.5
Janitorial Pricing by Site

| Street Address | | | | Property Type BR/O/USF | Lease / Own | Lease Type | Hours Beyond Mon.- Fri. | Usable / Cleanable Square Feet | Janitorial Cost Per Square Foot ($) | Estimated Janitorial Cost Per Year |
|---|---|---|---|---|---|---|---|---|---|---|
| 3701 Barrett Drive | Raleigh | NC | 27609 | BR | L | NNN | N/A | 6,680 | $ 1.233 | $10,295.55 |
| 3800 Lake Boone Trail | Raleigh | NC | 27619 | BR | L | NNN | N/A | 2,240 | $ 1.233 | $3,452.40 |
| 4409 Creedmoor Road | Raleigh | NC | 27612 | BR | L | NNN | N/A | 1,920 | $ 1.233 | $2,959.20 |
| 611 Oberlin Road | Raleigh | NC | 27605 | BR | L | NNN | Sat. (9:00am - 12:00pm) | 1,936 | $ 1.392 | $3,368.64 |
| 6655 Falls of the Neuse Road | Raleigh | NC | 27615 | BR | L | NNN | Sat. (9:00am - 12:00pm) | 4,526 | $ 1.392 | $7,874.54 |
| 7447 Six Forks Road | Raleigh | NC | 27619 | BR | L | NNN | N/A | 2,640 | $ 1.233 | $4,068.90 |
| 8320 Creedmoor Road | Raleigh | NC | 27612 | BR | L | NNN | N/A | 2,792 | $ 1.233 | $4,303.17 |
| 1806 Hillsborough Street | Raleigh | NC | 27605 | BR | O | N/A | N/A | 2,304 | $ 1.233 | $3,551.04 |
| 4424 Capital Boulevard | Raleigh | NC | 27604 | BR | O | N/A | N/A | 4,352 | $ 1.233 | $6,707.52 |
| 4450-4460 Six Forks Road | Raleigh | NC | 27609 | BR | O | N/A | N/A | 5,395 | $ 1.233 | $8,315.35 |
| 6638 Jordan Road (formerly 171 Jordan Road) | Ramseur | NC | 27316-9530 | BR | O | N/A | N/A | 1,928 | $ 1.233 | $2,971.53 |
| 2301 Lowell Road | Ranlo | NC | 28054 | BR | L | NNN | N/A | 1,792 | $ 1.233 | $2,761.92 |
| 608 East 4th Street | Red Springs | NC | 28377 | BR | O | N/A | N/A | 3,040 | $ 1.233 | $4,685.40 |
| 609 South Main Street | Reidsville | NC | 27320 | BR | O | N/A | N/A | 4,080 | $ 1.233 | $6,288.30 |
| 216 Riegelwood Shopping Center | Riegelwood | NC | 28456 | BR | L | Net | N/A | 1,970 | $ 1.233 | $3,035.65 |
| 1583 East 10th Street | Roanoke Rapids | NC | 27870 | BR | O | N/A | N/A | 5,557 | $ 1.233 | $8,564.42 |
| 245 South Herlong Avenue | Rock Hill | NC | 29731 | BR | O | N/A | N/A | 4,840 | $ 1.233 | $7,459.65 |
| 1300 Broad Avenue | Rockingham | NC | 28379 | BR | L | Net | N/A | 1,188 | $ 1.233 | $1,831.01 |
| 116 South Lee Street | Rockingham | NC | 28456 | BR | L | NNN | N/A | 5,434 | $ 1.233 | $8,375.77 |
| 200 North Church Street | Rocky Mount | NC | 27801 | BR | L | Net | N/A | 9,634 | $ 1.233 | $14,849.02 |
| 1114 Benvenue Road | Rocky Mount | NC | 27802 | BR | O | N/A | N/A | 10,080 | $ 1.233 | $15,535.80 |
| 147 Winstead Avenue | Rocky Mount | NC | 27802 | BR | O | N/A | N/A | 1,920 | $ 1.233 | $2,959.20 |
| 332 South Sycamore Street | Rose Hill | NC | 28458 | BR | O | N/A | N/A | 2,957 | $ 1.233 | $4,557.17 |
| 201 East Roseboro Street | Roseboro | NC | 28382 | BR | O | N/A | N/A | 1,200 | $ 1.233 | $1,849.50 |
| 201 East Main Street | Rowland | NC | 28383 | BR | O | N/A | N/A | 2,560 | $ 1.233 | $3,945.60 |
| 500 North Madison Boulevard | Roxboro | NC | 27573 | BR | O | N/A | N/A | 3,280 | $ 1.233 | $5,055.30 |
| 134 Charlotte Avenue | Rutherfordton | NC | 28139-2912 | BR | O | N/A | Sat. (9:00am - 12:00pm) | 3,760 | $ 1.392 | $6,542.40 |
| 108 Broad Street | Saint Pauls | NC | 28384 | BR | L | Net | N/A | 2,891 | $ 1.233 | $4,456.06 |
| 1135 Spring Lane | Sanford | NC | 27330 | BR | L | Net | N/A | 880 | $ 1.233 | $1,356.30 |
| 145 West Main Street | Sanford | NC | 27330 | BR | O | N/A | N/A | 8,522 | $ 1.233 | $13,135.15 |
| 200 North Horner Boulevard | Sanford | NC | 27330 | BR | O | N/A | N/A | 8,800 | $ 1.233 | $13,563.00 |
| 1001 South Main Street | Scotland Neck | NC | 27874 | BR | O | N/A | N/A | 3,318 | $ 0.897 | $3,720.75 |
| 212 North Raeford Street | Selma | NC | 27576 | BR | O | N/A | N/A | 3,682 | $ 1.233 | $5,674.27 |
| 101 Lakeway Drive | Seven Lakes | NC | 27376 | BR | O | N/A | N/A | 1,600 | $ 1.233 | $2,466.00 |
| 4567 North Main Street | Shallotte | NC | 28459 | BR | L | NNN | N/A | 6,768 | $ 1.233 | $10,431.18 |
| 5002 Main Street | Shallotte | NC | 28459 | BR | L | NNN | N/A | 4,480 | $ 1.233 | $6,904.80 |

Revised 03/23/05

E _ _ _ C.5
Janitorial Pricing by Site

| Street Address | | | | Property Type BR/DU/SF | Lease / Own | Lease Type | Hours Beyond Mon - Fri. | Usable / Cleanable Square Feet | Janitorial Cost Per Square Foot ($) | Estimated Janitorial Cost Per Year |
|---|---|---|---|---|---|---|---|---|---|---|
| 1774 East Dixon Boulevard | Shelby | NC | 28152-6948 | BR | O | N/A | N/A | 1,920 | $ 1.233 | $2,959.20 |
| 400 South Lafayette Street | Shelby | NC | 28151 | BR | O | N/A | N/A | 6,000 | $ 1.233 | $9,247.50 |
| 501 North Second Street | Siler City | NC | 27344 | BR | O | N/A | N/A | 1,928 | $ 1.233 | $2,971.53 |
| 1112 Brightleaf Boulevard | Smithfield | NC | 27577 | BR | O | N/A | N/A | 6,880 | $ 1.233 | $10,603.60 |
| 200 Southwest Broad Street | Southern Pines | NC | 28388 | BR | O | N/A | N/A | 6,720 | $ 1.233 | $10,357.20 |
| 1606 Howe Street | Southport | NC | 28461 | BR | L | NNN | N/A | 1,820 | $ 1.233 | $2,805.08 |
| 104 South Howe Street | Southport | NC | 28461 | BR | O | N/A | N/A | 8,416 | $ 1.233 | $12,973.63 |
| 173 South Main Street | Sparta | NC | 28675 | BR | O | N/A | N/A | 4,584 | $ 1.233 | $7,065.09 |
| 201 Main Street | Spindale | NC | 28160 | BR | O | N/A | N/A | 3,336 | $ 1.233 | $5,141.61 |
| 101 North Main Street | Stanley | NC | 28164 | BR | O | N/A | N/A | 4,000 | $ 1.233 | $6,165.00 |
| 111 South Main Street | Stantonsburg | NC | 27883 | BR | O | N/A | N/A | 2,422 | $ 0.897 | $2,716.12 |
| 1913 West Front Street | Statesville | NC | 28687 | BR | O | N/A | N/A | 1,408 | $ 1.233 | $2,170.08 |
| 186 Grindstaff Cove Road | Sylva | NC | 28779 | BR | O | N/A | | 1,672 | $ 1.233 | $2,576.97 |
| 301 Hickmann Street | Tabor City | NC | 28463 | BR | O | N/A | N/A | 7,120 | $ 1.233 | $10,973.70 |
| 930 Western Boulevard | Tarboro | NC | 27886 | BR | O | N/A | N/A | 4,960 | $ 1.233 | $7,644.60 |
| 1120 Randolph Street 57 | Thomasville | NC | 27361 | BR | O | N/A | N/A | 4,946 | $ 1.233 | $7,622.41 |
| 521 National Highway | Thomasville | NC | 27361 | BR | O | N/A | N/A | 2,688 | $ 1.233 | $4,142.88 |
| 150 West Jones Street | Trenton | NC | 28585 | BR | O | N/A | N/A | 3,664 | $ 1.233 | $5,647.14 |
| Cherry Street - Drive Up | Trenton | NC | 28585 | DU | O | N/A | | 4,028 | $ 0.897 | $4,516.40 |
| 183 Wagner Street | Troutman | NC | 28166 | BR | O | N/A | N/A | 2,182 | $ 1.233 | $3,363.62 |
| 225 Main Street East | Valdese | NC | 28690 | BR | O | N/A | N/A | 3,963 | $ 1.233 | $6,108.28 |
| 100 Bank Street | Vass | NC | 28394 | BR | O | N/A | N/A | 2,752 | $ 1.233 | $4,241.52 |
| 119 West Wade Street | Wadesboro | NC | 28170-2136 | BR | O | N/A | N/A | 4,480 | $ 1.233 | $6,904.80 |
| 725 East Caswell Street | Wadesboro | NC | 28170-2301 | BR | O | N/A | N/A | 2,220 | $ 1.233 | $3,421.58 |
| 12213 Capital Boulevard | Wake Forest | NC | 27587 | BR | O | N/A | N/A | 1,840 | $ 1.233 | $2,835.90 |
| 415 North Norwood Street | Wallace | NC | 28466 | BR | O | N/A | N/A | 6,000 | $ 1.233 | $9,247.50 |
| 114 East Market Street | Warrenton | NC | 27589-2026 | BR | O | N/A | N/A | 1,200 | $ 1.233 | $1,849.50 |
| 122 South Main Street | Warrenton | NC | 27589-1952 | BR | O | N/A | N/A | 6,453 | $ 1.233 | $9,945.38 |
| 103 West Hill Street | Warsaw | NC | 28398 | BR | O | N/A | N/A | 3,080 | $ 1.233 | $4,747.05 |
| 520-528 North Broome Street | Waxhaw | NC | 28173 | BR | O | N/A | N/A | 7,321 | $ 1.233 | $11,283.18 |
| 370 North Main Street | Waynesville | NC | 28786 | BR | O | N/A | Sat. (8:00am - 12:00pm) | 26,198 | $ 1.392 | $45,583.82 |
| 6287 Old Hwy 52 | Welcome | NC | 27374 | BR | O | N/A | N/A | 1,813 | $ 1.233 | $2,793.96 |
| 301 Washington Avenue | Weldon | NC | 27890 | BR | O | N/A | N/A | 3,142 | $ 0.897 | $3,522.52 |
| 2 Whiteville Plaza | Whiteville | NC | 28472 | BR | L | NNN | N/A | 3,078 | $ 1.233 | $4,744.58 |
| 810 Pinckney Street | Whiteville | NC | 28472 | BR | O | N/A | N/A | 3,470 | $ 1.233 | $5,348.75 |
| 810 Pinckney Street | Whiteville | NC | 28472 | BR | O | N/A | N/A | 3,470 | $ 1.233 | $5,348.75 |
| 900 River Street | Wilkesboro | NC | 28697 | BR | L | NNN | N/A | 4,493 | $ 1.233 | $6,924.53 |

Revised 03/23/05

E    C.5

Janitorial Pricing by Site

| Street Address | City | State | ZIP | Property Type BR/DU/SF | Lease / Own | Lease Type | Hours Beyond Mon - Fri | Usable / Cleanable Square Feet | Janitorial Cost Per Square Foot ($) | Estimated Janitorial Cost Per Year |
|---|---|---|---|---|---|---|---|---|---|---|
| 901 Main Street | Wilkesboro | NC | 28659 | BR | L | NNN | N/A | 2,520 | $ 0.897 | $2,825.55 |
| 918 Washington Street | Williamston | NC | 27892 | BR | O | N/A | N/A | 5,200 | $ 1.233 | $8,014.50 |
| 115 N. Third Street | Wilmington | NC | 28406 | BR | L | Net | N/A | 29,759 | $ 1.233 | |
| 3417 Oleander Drive | Wilmington | NC | 28406 | BR | L | NNN | N/A | 4,000 | $ 1.233 | $6,165.00 |
| 6830 Market Street | Wilmington | NC | 28405 | BR | L | NNN | N/A | 1,658 | $ 1.233 | $2,554.78 |
| 2401 South 17th Street | Wilmington | NC | 28401 | BR | O | N/A | N/A | 2,568 | $ 1.233 | $3,957.93 |
| 301 South College Road | Wilmington | NC | 28403 | BR | O | N/A | N/A | 2,205 | $ 1.233 | $3,398.15 |
| 680 South College Road | Wilmington | NC | 28403 | BR | O | N/A | N/A | 5,760 | $ 1.233 | $8,877.60 |
| 2214 West Nash Street | Wilson | NC | 27896 | BR | L | Net | N/A | 2,240 | $ 1.233 | $3,452.40 |
| 1604 (1610) South Tarboro Street (Branch) | Wilson | NC | 27894 | BR | O | N/A | N/A | 4,820 | $ 1.233 | $7,428.83 |
| 1100 South Stratford Road - Suite 400 | Winston-Salem | NC | 27104 | BR | L | Net | N/A | 6,000 | $ 1.233 | $12,330.00 |
| 121 Jonestown Road | Winston-Salem | NC | 27104 | BR | L | NNN | N/A | 2,240 | $ 1.233 | $3,452.40 |
| 2710 Peters Creek Parkway | Winston-Salem | NC | 27127 | BR | L | NNN | N/A | 4,080 | $ 1.233 | $6,288.30 |
| 3410 Robinhood Road | Winston-Salem | NC | 27106 | BR | L | NNN | Sat. (9:00am - 12:00pm) | 2,472 | $ 1.392 | $4,301.28 |
| 2601 New Walkertown Road | Winston-Salem | NC | 27101-1948 | BR | O | N/A | N/A | 2,480 | $ 1.233 | $3,822.30 |
| 2815 Reynolda Road | Winston-Salem | NC | 27106 | BR | O | N/A | N/A | 3,600 | $ 1.233 | $5,548.50 |
| 6000 University Parkway | Winston-Salem | NC | 27105 | BR | O | N/A | Sat. (9:00am - 12:00pm) | 1,760 | $ 1.392 | $3,062.40 |
| 150 North Marshall Street | Winston-Salem | NC | 27101-2733 | DU | O | N/A | N/A | 0 | $ 0.897 | $0.00 |
| 101 West Firetower Road | Winterville | NC | 28590 | BR | O | N/A | N/A | 3,929 | $ 1.233 | $6,055.26 |
| 7031 Wrightsville Beach | Wrightsville Beach | NC | 28480 | BR | O | N/A | N/A | 1,923 | $ 1.233 | $2,964.13 |
| 101 East Main Street | Yadkinville | NC | 27055-8141 | BR | O | N/A | N/A | 3,204 | $ 1.233 | $4,936.17 |
| 1510 North Main Street | Anderson | SC | 29621-4735 | BR | O | N/A | N/A | 2,640 | $ 1.233 | $4,068.90 |
| 4007 Clemson Boulevard | Anderson | SC | 29621 | BR | O | N/A | N/A | 5,760 | $ 1.233 | $8,877.60 |
| 303 West Columbia Avenue | Batesburg | SC | 29006 | BR | O | N/A | N/A | 2,521 | $ 1.233 | $3,885.18 |
| 1 Kemmerlin Lane | Beaufort | SC | 29902 | BR | O | N/A | N/A | 10,080 | $ 1.233 | $15,535.80 |
| 706 Bay Street | Beaufort | SC | 29902 | BR | O | N/A | N/A | 19,200 | $ 1.233 | $29,592.00 |
| 123 O'Neal Street | Belton | SC | 29627 | BR | O | N/A | N/A | 5,120 | $ 1.233 | $7,891.20 |
| 108 McGee Way | Belton | SC | 29627 | DU | L | Net | N/A | 0 | $ 0.897 | $0.00 |
| US 278 and Burnt Church Road | Bluffton | SC | 29910-6406 | BR | L | NNN | N/A | 4,000 | $ 1.233 | $6,165.00 |
| 2701 Boiling Springs Road | Boiling Springs | SC | 29316 | BR | O | N/A | N/A | 2,352 | $ 1.233 | $3,625.02 |
| 1301 Chaplin Road | Chapin | SC | 29036 | BR | O | N/A | N/A | 2,521 | $ 1.233 | $3,885.18 |
| 151 Meeting Street | Charleston | SC | 29401 | BR | L | Net | N/A | 7,156 | $ 1.233 | $11,029.19 |
| 2152 Northwoods Boulevard | Charleston | SC | 27406 | BR | L | Net | N/A | 3,360 | $ 1.233 | $5,178.60 |
| 1962 Sam Rittenberg Blvd | Charleston | SC | 29407-4858 | BR | O | N/A | N/A | 14,424 | $ 1.233 | $22,230.99 |
| 5010 Dorchester Road | Charleston | SC | 29418 | BR | O | N/A | N/A | 2,317 | $ 1.233 | $3,570.77 |
| 389 College Avenue | Clemson | SC | 29631 | BR | O | N/A | N/A | 3,536 | $ 1.233 | $5,449.86 |

Revised 03/23/05

E    C.5
Janitorial Pricing by Site

| Street Address | | | | Property Type BR/O/USF | Lease / Own | Lease Type | Hours Beyond Mon. - Fri. | Usable / Cleanable Square Feet | Janitorial Cost per Square Foot ($) | Estimated Janitorial Cost per Year |
|---|---|---|---|---|---|---|---|---|---|---|
| 6910 Two Notch Road, First Floor | Columbia | SC | 29223 | BR | L | Net | N/A | 4,000 | $ 1.233 | $6,165.00 |
| 291 Harbison Boulevard | Columbia | SC | 29212-2218 | BR | O | N/A | N/A | 2,584 | $ 1.233 | $3,982.59 |
| 3401 Forest Drive | Columbia | SC | 29211 | BR | O | N/A | N/A | 3,360 | $ 1.233 | $5,178.60 |
| 6098 Garners Ferry Road | Columbia | SC | 29202 | BR | O | N/A | N/A | 1,792 | $ 1.233 | $2,761.92 |
| 8920 Farrow Road | Columbia | SC | 29202 | BR | O | N/A | N/A | 4,720 | $ 1.233 | $7,274.70 |
| 2300 Highway 501 West | Conway | SC | 29526 | BR | O | N/A | N/A | 1,994 | $ 1.233 | $3,072.64 |
| 128 West Main Street | Duncan | SC | 29334 | BR | L | Net | N/A | 2,303 | $ 1.233 | $3,549.81 |
| 2075 East Main Street | Duncan | SC | 29334 | BR | O | N/A | N/A | 2,352 | $ 1.233 | $3,625.02 |
| 6016 Calhoun Memorial Highway | Easley | SC | 29640-3812 | BR | O | N/A | N/A | 5,220 | $ 1.233 | $8,045.33 |
| 605 South Irby Street | Florence | SC | 29501 | BR | L | NNN | N/A | 1,920 | $ 1.233 | $2,959.20 |
| 407 Second Loop Road | Florence | SC | 29505 | BR | O | N/A | N/A | 2,400 | $ 1.233 | $3,699.00 |
| 144 St James Avenue | Goose Creek | SC | 29445-2624 | BR | O | N/A | N/A | 1,600 | $ 1.233 | $2,466.00 |
| 1954 Cedar Lane Road | Greenville | SC | 29617 | BR | L | Net | N/A | 3,360 | $ 1.233 | $5,178.60 |
| 3841 Pelham Road | Greenville | SC | 29601 | BR | L | NNN | N/A | 2,400 | $ 1.233 | $3,699.00 |
| 416 East North Street | Greenville | SC | 29607 | BR | L | NNN | N/A | 4,400 | $ 1.233 | $6,781.50 |
| 701 Haywood Road | Greenville | SC | 29604 | BR | L | NNN | N/A | 2,560 | $ 1.233 | $3,945.60 |
| 1533 Wade Hampton Boulevard | Greenville | SC | 29609-5047 | BR | O | N/A | N/A | 2,580 | $ 1.233 | $3,976.43 |
| 2000 Woodruff Road | Greenville | SC | 29607-5954 | BR | O | N/A | N/A | 2,108 | $ 1.233 | $3,248.96 |
| 2204 Augusta Road | Greenville | SC | 29605-1743 | BR | O | N/A | N/A | 3,362 | $ 1.233 | $5,182.30 |
| 265 South Pleasantburg Drive | Greenville | SC | 29607-2521 | BR | O | N/A | N/A | 3,200 | $ 1.233 | $4,932.00 |
| 3515 East North Street | Greenville | SC | 29615-1909 | BR | O | N/A | N/A | 1,280 | $ 1.233 | $1,972.80 |
| 505 Mills Avenue | Greenville | SC | 29605 | BR | O | N/A | N/A | 2,240 | $ 1.233 | $3,452.40 |
| 101 North Main Street | Greer | SC | 29651 | BR | O | N/A | N/A | 2,240 | $ 1.233 | $3,452.40 |
| 1319 West Poinsett Street | Greer | SC | 29650 | BR | O | N/A | N/A | 2,352 | $ 1.233 | $3,625.02 |
| 2101 Old Spartanburg Road | Greer | SC | 29650-2704 | BR | O | N/A | N/A | 1,920 | $ 1.233 | $2,959.20 |
| 400 Elm Street East | Hampton | SC | 29924 | BR | L | NNN | N/A | 3,600 | $ 1.233 | $5,548.50 |
| 200 Main Street | Hilton Head Island | SC | 29926 | BR | L | Net | N/A | 2,531 | $ 1.233 | $3,901.21 |
| 21 West Greer Street | Honea Path | SC | 29654 | BR | O | N/A | N/A | 1,600 | $ 1.233 | $2,466.00 |
| 11157 Asheville Highway | Inman | SC | 29349 | BR | O | N/A | N/A | 2,352 | $ 1.233 | $3,625.02 |
| 7425 St Andrew Road | Irmo | SC | 29063 | BR | O | N/A | N/A | 3,330 | $ 1.233 | $5,131.75 |
| 1900 Seabrook Island Road ssa 1860 Andell Bluff | Johns Island | SC | 29455 | BR | L | NNN | N/A | 1,512 | $ 1.233 | $2,330.37 |
| 126 East Main Street | Lexington | SC | 29072 | BR | L | NNN | N/A | 971 | $ 1.233 | $1,496.86 |
| 1120 South Lake Drive | Lexington | SC | 29073 | BR | O | N/A | N/A | 3,200 | $ 1.233 | $4,932.00 |
| 309 Columbia Avenue | Lexington | SC | 29072 | BR | O | N/A | N/A | 17,228 | $ 1.233 | $26,562.66 |
| 1702 Highway 17 North | Little River | SC | 29566 | BR | O | N/A | N/A | 4,000 | $ 1.233 | $6,165.00 |
| 4207 Main Street | Loris | SC | 29569 | BR | O | N/A | N/A | 8,000 | $ 1.233 | $12,330.00 |
| 110 Main Street | Mauldin | SC | 29605 | BR | O | N/A | N/A | 3,731 | $ 1.233 | $5,750.71 |

24

**MERRILL LEGAL SOULTIONS**
**Court Reporting*Legal Videography*Trial Services**

Page 3

1    INDEX
2    EXAMINATION BY:                    PAGE
3    MR. SAWYER.......................  5
4
   EXHIBITS                    PAGE
5
   JOINT EXHIBIT #14.................  64
6
   JOINT EXHIBIT #15.................  65
7
   JOINT EXHIBIT #16.................  85
8
   JOINT EXHIBIT #17.................  145
9
   JOINT EXHIBIT #18.................  173
10
   JOINT EXHIBIT #19.................  177
11
   JOINT EXHIBIT #20.................  180
12
   JOINT EXHIBIT #21.................  183
13
14
15
16
17
18
19
20
21
22
23

---

Page 1

1       IN THE UNITED STATES DISTRICT COURT
        FOR THE MIDDLE DISTRICT OF ALABAMA
2              NORTHERN DIVISION
3
   PROFESSIONAL FACILITIES
4  MANAGEMENT, INC.,
5         Plaintiff,
                CASE NUMBER
6     vs.        2:06CV1136-MHT
7  EMCOR FACILITIES SERVICES,
   INC.; and A, B, and C, as
8  fictitious parties,
9         Defendants.
10
11  *   *   *   *   *   *   *   *
12
13       DEPOSITION OF GREG LITTLEFIELD,
14  taken pursuant to stipulation and
15  agreement before Barbara A. Howell,
16  Court Reporter and Commissioner for the
17  State of Alabama at Large, in the Law
18  Offices of Beasley, Allen, Crow,
19  Methvin, Portis & Miles, P.C., 250
20  Commerce Street, Montgomery, Alabama, on
21  Thursday, August 9, 2007, commencing at
22  approximately 9:25 a.m.
23

---

Page 2

1            APPEARANCES
2
   FOR THE PLAINTIFF:
3
   Ms. Scarlette M. Tuley
4  BEASLEY, ALLEN, CROW, METHVIN,
   PORTIS & MILES, P.C.
5  Attorneys at Law
   250 Commerce Street
6  Montgomery, Alabama 36104
7
   FOR THE DEFENDANTS:
8
   Mr. Benjamin H. Sawyer
9  SUTHERLAND, ASBILL & BRENNAN, LLP
   Attorneys at Law
10 999 Peachtree Street, NE
   Atlanta, Georgia 30309
11
12 ALSO PRESENT:
13 Mr. Jim Wohlers
14
15
16
17
18
19
20
21
22
23

---

Page 4

1           STIPULATIONS
2        It is hereby stipulated and agreed
3  by and between counsel representing the
4  parties that the deposition of GREG
5  LITTLEFIELD is taken pursuant to the
6  Federal Rules of Civil Procedure and
7  that said deposition may be taken before
8  Barbara A. Howell, Court Reporter and
9  Commissioner for the State of Alabama at
10 Large, without the formality of a
11 commission; that objections to questions
12 other than objections as to the form of
13 the questions need not be made at this
14 time but may be reserved for a ruling at
15 such time as the deposition may be
16 offered in evidence or used for any
17 other purpose as provided for by the
18 Federal Rules of Civil Procedure.
19       It is further stipulated and agreed
20 by and between counsel representing the
21 parties in this case that said
22 deposition may be introduced at the
23 trial of this case or used in any manner

1 (Pages 1 to 4)

|  | Page 5 |
|---|---|

1  by either party hereto provided for by
2  the Federal Rules of Civil Procedure.
3
4       *   *   *   *   *   *   *   *
5
6              GREG LITTLEFIELD
7     The witness, having first been duly
8   sworn or affirmed to speak the truth,
9   the whole truth, and nothing but the
10   truth, testified as follows:
11         THE REPORTER:  Usual
12            stipulations?
13         MS. TULEY:  I'd like to read
14            and sign.
15         MR. SAWYER:  Is it thirty
16            days?
17         MS. TULEY:  I think.
18         EXAMINATION
19   BY MR. SAWYER:
20   Q.  Good morning, Mr. Littlefield.  My name
21     is Ben Sawyer.  And I represent EMCOR
22     Facility Services.  How do you do
23     today?

|  | Page 6 |
|---|---|

1   A.  Good.
2   Q.  Let me ask you, have you ever been
3     deposed before?
4   A.  Once.
5   Q.  What case was that?
6   A.  It was a case where a competitor
7     claimed we took confidential
8     information to secure an account.
9   Q.  Who was the competitor?
10   A.  I could -- it was so long ago, I
11     couldn't tell you who it was.  It was a
12     small company in LaGrange, Georgia.
13   Q.  How long ago was the case?
14   A.  I would assume probably seven, eight
15     years ago.
16   Q.  You said you assume.  Do you know
17     whether it was after 2000?
18   A.  I don't know, without going back and
19     checking.
20   Q.  But it was a company in LaGrange,
21     Georgia; correct?
22   A.  Uh-huh.
23   Q.  As I understand your testimony, it was

|  | Page 7 |
|---|---|

1     a dispute concerning whether you had
2     taken -- or I'm sorry.  Let me let you
3     explain it.  What was the dispute
4     regarding?
5   A.  I think I said dispute was regarding
6     the -- a company in LaGrange claimed we
7     took confidential information and used
8     it in order to gain a new account in
9     LaGrange.  But the case never went to
10     court.  His attorney dropped it after
11     the deposition.
12   Q.  What confidential information did they
13     allege that you took?
14   A.  Alleged that we knew his pricing and we
15     based our pricing on his pricing.
16   Q.  So that you took his trade secrets or
17     he alleged that you took his trade
18     secrets?
19   A.  Alleged we knew his price and undercut
20     his price.  And as I stated, once the
21     deposition was completed, his attorney
22     dropped all charges.
23   Q.  Was it a civil suit?

|  | Page 8 |
|---|---|

1   A.  I couldn't tell you.
2   Q.  Do you know whether it was a criminal
3     suit?
4   A.  I don't know.
5   Q.  Was it you personally or was it your
6     present company, PFMI?
7   A.  I would assume it was PFMI.
8   Q.  Do you know one way or the other?
9   A.  I don't.
10   Q.  Were you personally ever indicted?
11   A.  No.  Explain "indicted."
12   Q.  Charged with a crime.
13   A.  No.
14   Q.  With respect to this particular issue.
15   A.  No.
16   Q.  Was PFMI ever indicted?
17   A.  No.  As I said, it never went to court
18     and his attorney dropped all his
19     charges after the day of the
20     deposition.
21   Q.  But it was an attorney for this
22     LaGrange company?
23   A.  That's correct.

2 (Pages 5 to 8)

Page 9

1  Q. Was it a district attorney or was it an
2    officer of the state?
3  A. It was -- it was -- it was just his
4    company's attorney.
5  Q. Was there ever a settlement agreement
6    between this LaGrange, Georgia,
7    company?
8  A. No. It was never a proposed settlement
9    agreement.
10 Q. As you sit here today, to the best of
11   your recollection, that was
12   approximately six, seven years ago?
13 A. I believe that's what I said.
14 Q. But you don't recall whether you
15   personally were being sued or PFMI was
16   being sued?
17 A. Correct.
18 Q. Well, that's been a couple years ago,
19   so I'm going to refresh your
20   recollection as far as the rules of a
21   deposition. I know you sat here
22   yesterday and listened to Mr. Brookins
23   testify, and Ms. Tuley did a wonderful

Page 10

1  job explaining those rules. But
2  everything today is being taken down by
3  the court reporter here; and as such,
4  we have to give verbal answers so that
5  it shows up on the record. Do you
6  understand that?
7  A. Yes.
8  Q. So I know in common -- when we're
9    having a conversation, we'll nod or
10   shake our head. On the record, we have
11   to say either yes, no, or provide a
12   verbal answer. Is that fair to you?
13 A. Yes.
14 Q. Is there anything today that would
15   prevent you from offering truthful and
16   accurate testimony?
17 A. Nothing.
18 Q. And you know it's important to tell the
19   truth today because the judge or, in
20   this case, the jury is ultimately going
21   to be relying on what you say.
22 A. Yes.
23 Q. I don't think I had you state your

Page 11

1    address. Could you please do that for
2    the record.
3  A. 860 Meriwether Road, Pike Road, Alabama
4    36064.
5  Q. Okay, Mr. Littlefield. What is your
6    education?
7  A. High school.
8  Q. Where did you go to high school?
9  A. Dixie Academy.
10 Q. Is that here in Alabama?
11 A. Uh-huh. Yes.
12 Q. Any education after high school?
13 A. No formal college.
14 Q. Have you taken any courses which teach
15   a particular skill?
16 A. No, other than just general business
17   through the companies I had worked for
18   in the past.
19 Q. Are those actual courses or just --
20   what are you saying?
21 A. Seminars, certificate programs.
22 Q. Did you give seminars or attend
23   seminars?

Page 12

1  A. I've done both.
2  Q. What are some of those seminars in
3    which you've participated?
4  A. In giving or receiving?
5  Q. In giving.
6  A. In giving? I've been a speaker at BOMA
7    International --
8  Q. Could you spell that?
9  A. B-O-M-A. That stands for Building
10   Owner Manager Association. -- at their
11   annual convention in Toronto, Canada.
12   I've spoken numerous times to upwards
13   of two thousand service companies on
14   behalf of BSCAI; that's Building
15   Service Contractors Association
16   International. I was on the board --
17   elected to the board of BSCAI and
18   served on that board for five years,
19   and was president of the national
20   association -- international
21   association -- in 2005.
22 Q. International Association of BSCAI?
23 A. BSCAI.

3 (Pages 9 to 12)

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 13

1    Q. How long were you president?
2    A. One year. It's a one-year term.
3    Q. Where is that association actually
4        located?
5    A. It was located in Washington, D.C.,
6        Frederick, Maryland. And it's now
7        headquartered in Chicago.
8    Q. Other than what you've already
9        testified to, is there any other
10       training or experience, I guess, that
11       you've done in the last twenty years
12       related to facility services?
13             MS. TULEY: Object to form.
14   Q. You can answer.
15   A. Seminars through BSCAI and the building
16       service contracting industry would be,
17       you know, there again, numerous, almost
18       annually, CEO conferences to teach
19       proper skills of running this type of
20       business for -- attended annually for
21       seven years, eight years, every
22       January. In September for the last
23       eight or nine years, I've attended

Page 14

1        executive management seminar through
2        BSCAI. For approximately eight or nine
3        years, I've attended an annual
4        convention where many seminars were
5        presented and sat in on those.
6    Q. And I believe you just said -- and the
7        record will say whatever it says -- but
8        that you actually presented to other
9        people, telling them how to run this
10       business. I assume you're referring to
11       the facility service business?
12   A. Facility service business.
13   Q. I'm not going to ask you to
14       recapitulate the seminar that you
15       presented. But to the best of your
16       recollection, what were some of the
17       topics you discussed when you gave this
18       seminar?
19   A. Plateaus of growth.
20   Q. What is that?
21   A. Growing a business from a small
22       business to a larger janitorial
23       business and different plateaus and

Page 15

1        stages of that growth; supervision
2        seminars where you teach -- instruct
3        supervisors on how to manage people.
4    Q. Could you explain for me what plateaus
5        of growth are?
6    A. As a company starts, it's at one
7        plateau. As it grows from, say, a
8        company that's doing two hundred
9        thousand dollars a year revenue and
10       grows to a million, would be a plateau
11       and the company structure would change.
12       Then growing --
13   Q. Let me stop you right there. How would
14       it change?
15   A. By the number of people you would be
16       hiring, how you would start adding
17       management structure in your company,
18       becoming more of a one-man show, to
19       hiring managers to help manage.
20   Q. At the two thousand -- I guess the
21       one-million-dollar phase, the kind of
22       level you just gave, how many managers
23       did you have?

Page 16

1    A. Did I have?
2    Q. No. We're in the seminar. We'll get
3        to that later.
4    A. We would -- I would have to get the
5        book and see what the book said.
6    Q. Would it have been less than five?
7    A. Without -- without seeing what they
8        instructed, I could not tell you.
9    Q. I believe I stopped you at the one-
10       million-dollar level. What goes on
11       after that?
12   A. Well, it -- it went on through
13       different plateaus up to ten-million-
14       plus company.
15   Q. How many people attended the seminar?
16   A. Which one?
17   Q. The one we were just referring to where
18       you presented on how to run this
19       business. And I believe it was --
20       correct me, now, if I'm incorrect --
21       but I think it was the BSCAI.
22   A. Uh-huh.
23   Q. Okay.

1933 Richard Arrington Jr. blvd, S*Birmingham, AL 35209*www.merrillcorp.com
1-800-888-DEPO

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 17

1  A. This particular plateaus of growth
2     would have been in Atlanta for area
3     contractors in the Atlanta market and
4     would be approximately twenty-five to
5     thirty companies represented there.
6  Q. How many people were in the room, to
7     the best of your knowledge?
8  A. Best of my knowledge, twenty-five to
9     thirty.
10 Q. What were some of the contractors
11    around the Atlanta area that were
12    there?
13 A. I couldn't recall, couldn't tell you
14    that.
15 Q. Do you participate -- and I believe
16    you've mentioned some:  BOMA, BSCAI.
17    Are there any other organizations that
18    you've recently been a part of or are
19    now?
20 A. No.
21 Q. Any civic organizations that you're a
22    part of?
23 A. No.

Page 18

1  Q. All right.  After you finished high
2     school -- well, let me back up.  Please
3     tell me your first work experience.
4  A. My first work experience?
5  Q. Mine was in a cotton mill.  So go
6     ahead.
7  A. Was pulling weeds out of a peanut
8     field.
9  Q. Were you in Georgia, sir?
10 A. No.  I was in Alabama.
11        (Brief phone interruption)
12 Q. After pulling weeds, what did you do,
13    sir?
14 A. Well, I went back to school.  That was
15    about the fourth or fifth grade, I
16    guess.
17 Q. After high school, what was your first
18    work experience?
19 A. My first job after high school was with
20    Coca-Cola Bottling Company, for
21    approximately five years.
22 Q. What did you do for Coke?
23 A. I was a route salesman.

Page 19

1  Q. Did you work out of Atlanta?
2  A. Worked out of Dothan, Alabama, which I
3     think reported to Atlanta.
4  Q. Why did you leave Coke?
5  A. To further advance my opportunities in
6     sales with a 3M distributor.
7  Q. What did you do for 3M?
8  A. I was a salesman for the first couple
9     of years.
10 Q. Were you still in Dothan, Alabama?
11 A. Yes.
12 Q. And I believe you just testified that
13    for the first couple of years, you were
14    a salesman.  What products were you
15    selling?
16 A. Office equipment.
17 Q. Did your role at 3M ever change?
18 A. It did.
19 Q. How did it change?
20 A. It changed from a salesman to a sales
21    manager.
22 Q. So you got a promotion?
23 A. Yes.

Page 20

1  Q. How many people did you manage?
2  A. To begin with, approximately five to
3     six.
4  Q. Did it increase?
5  A. Once I got another promotion, it did.
6  Q. So after you were -- after your
7     position as sales manager, you were
8     promoted; correct?
9  A. Correct.
10 Q. What was your position after that?
11 A. I was promoted to a district branch
12    manager here in Montgomery, Alabama.
13 Q. What was the scope of your job
14    responsibilities as district branch
15    manager in Montgomery, Alabama?
16 A. Can I back up?
17 Q. Sure.
18 A. There's a stop in between.
19 Q. Sure.
20 A. My next stop was district sales
21    manager, and that was in Nashville,
22    Tennessee.  Then promoted to
23    Montgomery, Alabama, as district branch

1933 Richard Arrington Jr. blvd, S*Birmingham, AL 35209*www.merrillcorp.com
1-800-888-DEPO

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 21

1 manager.
2 Q. As district sales manager in Nashville,
3 what was your job?
4 A. To manage a larger sales organization.
5 Q. And as district branch manager, when
6 you came back to or -- I'm sorry -- you
7 went to Montgomery, what was your job?
8 A. District branch manager.
9 Q. What did that involve?
10 A. It involved managing sales, service,
11 and administration.
12 Q. How many people did you manage?
13 A. Approximately forty to fifty.
14 Q. And that's essentially just selling 3M
15 products?
16 A. Right. Correct.
17 Q. How long were you district branch
18 manager in Montgomery?
19 A. Approximately one year.
20 Q. Did you leave 3M?
21 A. No. I had an opportunity to move with
22 the 3M distributor to Columbus, Ohio,
23 to manage a larger market.

Page 22

1 Q. Who was the distributor?
2 A. 3M. Oh, Modern Office Methods is the
3 name of the distributor, which was the
4 same as in all the other locations.
5 Q. What was your job in Columbus?
6 A. I was a branch manager there, also, but
7 a much larger market.
8 Q. Were you a district branch manager in
9 Columbus?
10 A. Branch manager. District branch
11 manager was the title, was the same.
12 Q. Was it a lateral move or was it a
13 demotion?
14 A. It was a lateral move but a much larger
15 market and a start-up market for this
16 company.
17 Q. How big was the market?
18 A. Compared to?
19 Q. Well, you testified that it was a much
20 larger market.
21 A. Well, Columbus, Ohio, and the
22 surrounding areas are much larger than
23 Montgomery, Alabama.

Page 23

1 Q. Population-wise?
2 A. Yes. Business-wise.
3 Q. How long did you work in Columbus?
4 A. About a year and a half.
5 Q. What was your next employment?
6 A. It was -- moved back to Montgomery,
7 Alabama. I was employed with another
8 office products distributor in
9 Montgomery.
10 Q. Who was that?
11 A. Berney Office Automation.
12 Q. What was your job title at Berney
13 Office Automation?
14 A. My job title was sales manager.
15 Q. Back up for a second. Why did you
16 leave Columbus, Ohio?
17 A. Because I was making too much money and
18 the company was going to change my pay
19 plan.
20 Q. And when you say you were making too
21 much money, they were going to decrease
22 the amount of money that you received?
23 A. They were going to decrease the

Page 24

1 structure in which I was paid, to
2 change the structure, which would
3 decrease my income.
4 Q. How did they change the structure? Let
5 me give you, I guess, a little
6 foundation. Was it based on bonuses
7 and were they taking those away?
8 A. It was based on -- the pay program was
9 based on the increase in sales that I
10 generated for them over the previous
11 year, and it was also based on net
12 profit that I produced. And they were
13 going to change that to a lower
14 percentage.
15 Q. At Berney's Office Automation -- am I
16 saying that correctly?
17 A. Uh-huh.
18 Q. I believe you testified you were a
19 sales manager?
20 A. Correct.
21 Q. How many people did you manage?
22 A. Approximately eight.
23 Q. What was the scope of your

1933 Richard Arrington Jr. blvd, S*Birmingham, AL 35209*www.merrillcorp.com
1-800-888-DEPO

**MERRILL LEGAL SOULTIONS**
**Court Reporting*Legal Videography*Trial Services**

Page 25

1    responsibilities at this new job?
2    A. Managing salespeople and ultimately
3    production of -- of sales.
4    Q. And I assume by the name, it's office
5    supplies?
6    A. Equipment.
7    Q. What kind of equipment?
8    A. Copiers, fax, computers, laser
9    printers, shipping systems.
10   Q. How long did you work for Berney's?
11   A. Approximately four years.
12   Q. Why did you leave?
13   A. To start my own business.
14   Q. What business did you start?
15   A. I started a moving -- local moving and
16   storage business and also a janitorial
17   business.
18   Q. Did you do this with anybody else?
19   A. No.
20   Q. Did it all by yourself?
21   A. Well, I -- the company was -- was -- I
22   mean, I had no partner.
23   Q. And there were two companies; correct?

Page 26

1    A. Correct.
2    Q. Why a moving and storage business?
3    A. Because the opportunity presented
4    itself at the right time.
5    Q. What was that opportunity and how did
6    it present itself to you?
7    A. There was a local -- small local
8    company for sale, and I knew it would
9    give instant cash flow.
10   Q. How did you know that?
11   A. Well, you -- you move someone from one
12   house to another house in the same day
13   and when you get done, they pay you.
14   Q. How much did you pay for the business?
15   A. I don't -- I don't recollect.
16   Q. Was it ten million dollars?
17   A. It was not two million dollars.
18   Q. Ballpark, was it a hundred thousand
19   dollars?
20   A. Ballpark, sixty thousand.
21   Q. And you also testified that you started
22   a janitorial business.
23   A. Right. Correct.

Page 27

1    Q. How did that opportunity present itself
2    to you?
3    A. Small local company for sale.
4    Q. And I tracked the years a little bit,
5    but in time, what year are we when you
6    left --
7    A. We are in approximately June-July of
8    '89.
9    Q. Let me back you up for a second. I
10   know we talked about your education and
11   you've given seminars and you've
12   completed high school. Have you ever
13   taken any accounting classes?
14   A. No formal accounting classes.
15   Q. Any informal accounting classes?
16   A. None other than through -- through
17   business being taught, how to put
18   together budgets, how to read P&Ls and
19   manage a profit and loss statement. As
20   I told you, that's how I was paid
21   through most of these jobs.
22   Q. Jobs as sales manager?
23   A. As sales -- primarily as the branch

Page 28

1    managers, because I was paid based on a
2    profit and loss.
3    Q. Going back up to, I guess, your job
4    when you were sales manager, what kind
5    of documents, I guess, would you have
6    to review in order to complete your
7    job? Strike that. That's a pretty --
8    let me form a better question for you.
9        When you were a branch sales
10   manager, at the end of the day, was it
11   your job to analyze how the business
12   was doing?
13   A. No.
14   Q. Whose job would that have been?
15   A. At the end of the day?
16   Q. Yes.
17   A. I'm not sure that at the end of each
18   day you can analyze how the business
19   was doing.
20   Q. But you said that you reviewed profit
21   and loss statements; correct?
22   A. Yes. As a district or branch manager.
23   Q. Did you review any other statements as

7 (Pages 25 to 28)

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 29

1    a business or -- I'm sorry -- a branch
2    manager?
3    A. As a branch manager?
4    Q. Yes.
5    A. Any other statements, any other -- I
6    don't understand what you're asking.
7    Q. Sure. Did you review accounts payable?
8    A. Yes.
9    Q. Did you review accounts receivable?
10    A. Yes.
11    Q. Did you review general ledgers?
12    A. Yes.
13    Q. Was it within the scope of your
14    responsibility to deal with those
15    documents?
16    A. As district branch manager, there was
17    administrative people that reported
18    that information to me.
19    Q. They reported it to you. Did you
20    report to anyone else concerning
21    accounts payable, accounts receivable,
22    general ledger?
23    A. All -- yes. All that was set up

Page 30

1    electronically in the corporate office;
2    was reported there on a daily, weekly,
3    monthly basis.
4    Q. Prior to buying the -- by the way, what
5    was the name of the moving company?
6    A. First Class Movers.
7    Q. What was the name of the janitorial
8    company you bought?
9    A. Mr. Janitor.
10    Q. Do you recall who you bought it from?
11    A. I believe the gentleman's name was
12    Darrell Acord, Acord.
13    Q. Prior to buying this, had you ever had
14    any involvement with janitorial
15    services?
16    A. I had not.
17    Q. Prior to your purchasing of
18    Mr. Janitor, had you ever prepared bids
19    or estimates concerning janitorial
20    services?
21    A. I had not.
22    Q. And I believe you bought this in 1989;
23    correct?

Page 31

1    A. That's correct, thereabout.
2    Q. How much did you pay for it?
3    A. Approximately fifty to sixty thousand.
4    Q. How many employees did it have at that
5    time?
6    A. Best of my recollection, four or five
7    part-time cleaners.
8    Q. In the purchase, did you buy their
9    accounts receivable?
10    A. No.
11    Q. Did you purchase their client list?
12    A. The contracts that the company had in
13    place and the revenue stream went --
14    went to me, yes.
15    Q. Did you hire any management at that
16    time?
17    A. No.
18    Q. Did you handle it yourself?
19    A. That's correct.
20    Q. Were these direct -- these four, I
21    guess, five part-times, were these
22    direct employees to Mr. Janitor, your
23    new company?

Page 32

1    A. That's correct.
2    Q. What was your annual revenue, I guess,
3    in 1989?
4    A. Approximately thirty thousand annually.
5    Q. Were they primarily around the
6    Montgomery area?
7    A. Yes.
8    Q. What became of the moving and storage
9    business, first?
10    A. I sold it after approximately three to
11    four years.
12    Q. What became of the janitorial -- what
13    became of the janitorial business that
14    you bought?
15    A. It's now known as Professional
16    Facilities Management, Inc.
17    Q. When did you change the name?
18    A. Approximately within the first six
19    months.
20        MR. SAWYER: Off the record.
21        (Off-the-record discussion)
22        MR. SAWYER: Back on.
23    A. I need a restroom break.

8 (Pages 29 to 32)

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 33

1    Q. While we're still on the record, any
2       time you need a break, just let me
3       know.
4          (Brief recess)
5          MR. SAWYER: Back on the
6          record.
7    Q. I believe where we were headed,
8       Mr. Littlefield, is you had just
9       purchased a janitorial company and
10      renamed it PFMI; is that correct?
11   A. That's correct.
12   Q. And that's the same PFMI that's the
13      plaintiff in this action; correct?
14   A. Correct.
15   Q. What types of projects does PFMI
16      perform?
17   A. What type of projects does PFMI
18      perform? We perform janitorial,
19      landscape, general maintenance
20      projects.
21   Q. Do you do HVAC work?
22   A. We subcontract HVAC work.
23   Q. How many current employees does PFMI

Page 34

1       have?
2    A. Current employees?
3    Q. Yes.
4    A. Approximately -- and I don't keep up
5       with this on a day-to-day basis. It
6       depends on how contracts -- you know,
7       the number of contracts you have at the
8       time. But I would assume the six
9       hundred range, direct employees.
10   Q. And those are paid by PFMI?
11   A. That's correct.
12   Q. How many states?
13   A. Those direct employees would be in
14      approximately five or six states.
15   Q. And I don't think I did this yet, but
16      for the record, what's your position
17      with PFMI?
18   A. My position is president/CEO.
19   Q. Have you always been president and CEO?
20   A. That's correct.
21   Q. Since 1989?
22   A. That's correct.
23   Q. What are your job responsibilities for

Page 35

1       PFMI?
2    A. My job responsibility would be to
3       oversee the -- the company as a whole
4       at a top level.
5    Q. What's involved with that?
6    A. It's having regular meetings with VPs,
7       reviewing budgets and P&Ls, and
8       occasionally cleaning a toilet if it
9       needs to be done.
10   Q. Anything else?
11   A. No. Well, let me back up. It could be
12      other things as -- as they come up, but
13      to name everything, I couldn't name
14      everything.
15   Q. Would you also try to get business?
16   A. Would I try to get business? Our
17      company would, yes.
18   Q. Are you involved with sales?
19   A. I'm involved to some part all aspects
20      of the business. But yes, I'm -- I
21      also would be involved in the sales
22      side.
23   Q. Were you involved with obtaining the

Page 36

1       contract with EMCOR?
2    A. Yes, I was.
3    Q. How were you involved?
4    A. I was the direct contact.
5    Q. By "direct contact," what do you mean?
6    A. I was -- I was the direct person that
7       dealt with EMCOR on the initial process
8       of being selected and putting together
9       an agreement with EMCOR.
10   Q. Who at EMCOR did you deal with?
11   A. I dealt with -- who did I deal with,
12      who did I have contact with?
13   Q. Sure. Who did you have contact with at
14      EMCOR related to the BB&T account?
15   A. Okay. I had contact with Alan Cristal.
16      I had contact with Debi Crosby, which
17      was Alan Cristal's boss or which was
18      the -- who was the head of this BB&T
19      project. I dealt with Mark Smith and
20      also had contact with Bill Rogers.
21   Q. Anyone else from EMCOR?
22   A. There could have been other -- there
23      was other people on their team, but I

9 (Pages 33 to 36)

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 37

1    couldn't, you know, recall the names.
2    Q.  So there could have been other people,
3        but you just don't remember right now?
4    A.  There was other people.
5    Q.  There were other people that --
6    A.  There were other people that I would
7        have had contact.  But specific names,
8        I -- at this time -- these were the
9        major -- major players.
10   Q.  How did you first hear about the BB&T
11       account?
12   A.  We were contacted by Alan Cristal.
13   Q.  When was that?
14   A.  If my -- it would have been
15       approximately January-February of '05.
16       Have I got that year correct?  '05.
17   Q.  How did he contact you?
18   A.  By phone, I believe, the first time.
19   Q.  What did he say?
20   A.  I can't recall the actual conversation,
21       but obviously it was to ask us to -- if
22       we'd be interested in a possible
23       project that EMCOR would possibly have

Page 38

1    coming up.  The first conversation, I
2    don't think they knew for sure if they
3    were going to be selected to bid or
4    not.
5    Q.  How do you know Alan Cristal or --
6        strike that.  Did you know Alan Cristal
7        before he called you in January-
8        February '05?
9    A.  I had met Alan and had conversation
10       with him before then.
11   Q.  When did you first meet Alan Cristal?
12   A.  There again, approximately maybe a year
13       before.
14   Q.  Prior to Alan Cristal calling you in
15       January-February of 2005, did you ever
16       employ him?
17   A.  No.
18   Q.  Did you ever later employ him?
19   A.  Yes.
20   Q.  How did you meet him to begin with?
21   A.  I believe it was through one of our
22       managers, Buz Campbell, that they
23       somehow met in the field and actually

Page 39

1    worked a bid -- a couple of accounts
2    together.
3    Q.  At that time, was Mr. Cristal, to your
4        knowledge, employed by EMCOR?
5    A.  To my knowledge, he was.
6    Q.  And I believe you just testified that
7        you met Mr. Cristal with Buz
8        Campbell --
9    A.  Through Buz Campbell, one of our
10       managers.
11   Q.  Is Buz Campbell currently a manager for
12       PFMI?
13   A.  He is.
14   Q.  Did you ever have any dealings with
15       Alan Cristal after you met him
16       approximately a year ago and before
17       he -- I'm sorry.  Strike that.  Did you
18       ever have any dealings with Alan
19       Cristal after you met him and before he
20       contacted you regarding the BB&T
21       account?
22   A.  Yes.  I believe I stated that -- that
23       Buz and Alan worked on a couple or

Page 40

1    several bids together.
2    Q.  But my question was a little different.
3        It was whether you did, whether you had
4        dealings with Alan after meeting him
5        and before him contacting you about the
6        BB&T account.
7    A.  I would have had dealings, yes,
8        through -- through Buz or at
9        presentations that was given to these
10       possible bids.
11   Q.  What were the bids that you and Alan
12       Cristal and Buz Campbell worked on with
13       Alan Cristal?
14   A.  Could we say bids or presentations?
15   Q.  Fare enough.
16   A.  One particular was Russell Corporation.
17       And others by name, I -- I couldn't
18       recall.
19   Q.  What was the contract or -- I'm
20       sorry -- proposal amount for the
21       Russell Corporation bid or proposal?
22   A.  I don't think we ever got to a bid.  We
23       gave a presentation and they elected

10 (Pages 37 to 40)

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

| | |
|---|---|
| Page 41 | Page 43 |

| | |
|---|---|
| 1    not to pursue. | 1  Q. What projects? |
| 2  Q. Were you ever awarded any other | 2  A. 8(a) stand-alone. |
| 3    contracts in conjunction with | 3  Q. Sorry. What's 8(a)? |
| 4    Mr. Cristal prior to him contacting you | 4  A. It's set-aside contracts. |
| 5    in January-February of 2005? | 5  Q. What are set-aside contracts? |
| 6  A. No. | 6  A. That would be contracts that would be |
| 7  Q. So after Mr. Cristal contacted you in | 7    set aside for special groups. |
| 8    January-February of 2005 regarding the | 8  Q. I'm sorry. You've forgotten more than |
| 9    BB&T account, what happened next? | 9    I'll ever know about set-aside |
| 10  A. At some point, we were -- we were | 10    contracts. Could you explain what |
| 11    contacted again and was asked if we | 11    exactly that is? |
| 12    would be interested in putting -- | 12  A. Well, we don't -- we don't have any. |
| 13    putting together a quote for them. And | 13    But I'll explain to the best of my |
| 14    it was explained to us it was -- the | 14    knowledge. It's contracts that |
| 15    approximate number of locations, | 15    possibly the government would set aside |
| 16    approximate number of square footage, | 16    for minority groups; and in some cases, |
| 17    that the janitorial part of it was a | 17    even large corporations set aside |
| 18    very important piece, and that they had | 18    certain portions of their business to |
| 19    lost -- had not gained several | 19    go to minorities and handicapped/ |
| 20    contracts because they were not | 20    disability companies. In those cases, |
| 21    competitive enough on the janitorial | 21    oftentimes they pay -- pay more than |
| 22    side, and asked us to research the | 22    the competitive price. |
| 23    market, see what banks on average were | 23  Q. So for government, minority, or |

| | |
|---|---|
| Page 42 | Page 44 |

| | |
|---|---|
| 1    paying, what other contractors were | 1    handicap contracts, you really don't |
| 2    doing, and to put together a proposed | 2    have to provide a competitive price? |
| 3    program. | 3  A. I don't think I said that. |
| 4  Q. I believe -- and the record will show | 4  Q. I want to make sure I'm clear. |
| 5    what it shows. But I believe you just | 5  A. I said for set-aside contracts for |
| 6    said that you came to an understanding | 6    those particular groups. |
| 7    that EMCOR informed you that the | 7  Q. So for set-aside contracts for the |
| 8    janitorial component was important. Is | 8    government; right? |
| 9    that a fair statement? | 9  A. Certain government contracts set aside, |
| 10  A. They informed me that they had not | 10    yes. |
| 11    gained business because they were not | 11  Q. And for set-aside contracts for |
| 12    competitive enough and needed to put | 12    minorities, your price doesn't have to |
| 13    together a very competitive janitorial | 13    be competitive; right? |
| 14    program -- | 14  A. It doesn't matter what your price is if |
| 15  Q. Who informed you that? | 15    you don't fall into those categories to |
| 16  A. -- in terms of pricing. Alan Cristal. | 16    get -- to get the business. |
| 17  Q. Alan Cristal informed you that the | 17  Q. Okay. |
| 18    pricing had to be competitive; correct? | 18  A. And that could probably be better |
| 19  A. Correct. | 19    explained by calling a government |
| 20  Q. Are you aware of other projects where | 20    agency and procurement and gathering |
| 21    the pricing does not have to be | 21    that information. |
| 22    competitive? | 22  Q. I'm sorry. I'm just trying to |
| 23  A. Yes. | 23    understand. If you do a -- if you do a |

11 (Pages 41 to 44)

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 45

1    proposal for a set-aside contract for
2    the government, right, are you saying
3    it doesn't have to be competitively
4    bid?
5    A. I'm saying I can bid it cheaper or more
6    competitive and not be able to secure
7    that business because it was a set-
8    aside contract, yes.
9    Q. So you could bid it cheaper? What do
10   you mean by that?
11   A. Less price.
12   Q. Wouldn't that be more competitive?
13   A. Yeah. I would be more competitive and
14   not get it.
15         MS. TULEY: Off the record.
16         (Off-the-record discussion)
17         MR. SAWYER: Go back on the
18         record.
19   Q. (By Mr. Sawyer) So we're clear, with
20   respect to set-aside contracts, I
21   believe your point is that no matter
22   how competitive you bid it for
23   government contracts, minority

Page 46

1    contracts, or handicapped or disabled
2    or people-with-disabilities contracts,
3    no matter how competitive you bid it,
4    you're likely or may not get the
5    contract. Is that a fair statement?
6    A. That's a fair statement with a set-
7    aside contract.
8    Q. For other contracts, to the best of
9    your knowledge, you almost always have
10   to competitively bid them; correct?
11   A. Competitively, yes.
12   Q. Because in order to get the work, your
13   price has to be lower than the other
14   guy; correct?
15         MS. TULEY: Object to form.
16   A. No, that's incorrect.
17   Q. Explain.
18   A. Your price does not always have to be
19   lower.
20   Q. In most cases, it would have to be
21   lower; correct?
22   A. Not if -- not if you showed value and
23   they chose to choose you over the value

Page 47

1    that you're presenting.
2    Q. Do you have a general practice of not
3    competitively bidding your prices?
4    A. We generally bid based on our cost and
5    an average markup.
6    Q. And when you bid based on your cost and
7    your actual markup, do you find that
8    those are competitive or not
9    competitive prices?
10   A. Generally competitive.
11   Q. After Mr. Cristal contacted you
12   regarding the opportunity to
13   potentially work on the BB&T account,
14   did you start -- what did you do?
15   A. We started contacting other regional
16   janitorial companies that were very
17   reputable in the industry and
18   surveying, based on the business they
19   were doing, what the average bank --
20   bank cost was for janitorial cleaning.
21   Q. Who were those other regional
22   janitorial companies?
23   A. I believe some -- some of those would

Page 48

1    have been a company called Kimco out of
2    Chicago.
3    Q. The BB&T account, to the best of your
4    recollection, how many locations were
5    in Illinois?
6    A. I don't believe any were in Illinois.
7    Q. Who else did you contact regarding --
8    or what were the other regional
9    janitorial companies that you
10   contacted?
11   A. We contacted a company by the name of
12   4M --
13   Q. Where are they out of?
14   A. Based out of St. Louis. -- and
15   gathered what their average price for
16   bank cleaning was.
17   Q. Did you contact anyone else?
18   A. We contacted a company out of Michigan.
19   Q. What was that company's name?
20   A. New Image.
21   Q. Anyone else?
22   A. Contacted a company by the name of
23   Varsity.

12 (Pages 45 to 48)

Page 49

1  Q. Where are they located?
2  A. Their corporate based out of Pocatello,
3     Idaho.
4  Q. Did you contact anyone else?
5  A. We contacted a company out of
6     Maryland/D.C. market by the name of
7     Mr. Clean.
8  Q. No relation to Mr. Janitor?
9  A. No relation.
10 Q. Anyone else?
11 A. We contacted a company by the name of
12    FMI.
13 Q. Where are they located?
14 A. Their home base now is in Charlotte --
15    no -- Charleston, South Carolina.
16 Q. Have you been sued by FMI?
17 A. No.
18 Q. Have you reached any settlement
19    agreements with FMI?
20 A. Yes.
21 Q. When did you reach a settlement
22    agreement with FMI?
23 A. I would say approximately three --

Page 50

1     three months ago.
2  Q. Did you receive assignment of any
3     claims of FMI?
4  A. I'm -- I don't know.
5  Q. How much did you pay FMI under the
6     terms of the settlement?
7  A. I would have to refer to whatever
8     documentation we have on that.
9  Q. Was it more than ten thousand dollars?
10 A. Yes, it would be.
11 Q. Was it more than a hundred thousand
12    dollars?
13 A. I would assume it would be.
14 Q. Do you know one way or -- you believe
15    it's more than one hundred thousand
16    dollars?
17 A. Yes.
18       MR. SAWYER: Off the record.
19       (Off-the-record discussion)
20       MR. SAWYER: Back on the
21       record.
22 Q. Do you recall one way or the other
23    whether the settlement agreement was

Page 51

1     confidential?
2  A. I do not.
3        (Brief pause)
4  Q. Have you entered into any other
5     settlement agreements with vendors?
6  A. At this point, we do have verbal or
7     written agreement with all our vendors,
8     to the best of my knowledge.
9  Q. How much has PFMI paid these vendors as
10    a result of settlement negotiations?
11 A. I -- I couldn't tell you without
12    reflecting back, going back to our
13    documentation.
14       MR. SAWYER: And I guess I
15       should cut this short.
16       I conferred with
17       counsel, and she's going
18       to check regarding the
19       status of these. And to
20       the extent they're --
21       whatever portion is
22       nonconfidential, it is
23       my understanding you'll

Page 52

1        check and we'll have a
2        discussion as to whether
3        we'll produce them or
4        they'll be produced or
5        we can, I guess, go to
6        the judge.
7     MS. TULEY: I can check with
8        their corporate
9        attorney -- that is not
10       something I have
11       handled -- and see what
12       the status is on those
13       and confer with him on
14       whether or not those can
15       be disclosed or not.
16       And then I'll report
17       back to you on whether
18       or not that information
19       can be disclosed.
20       MR. SAWYER: Appreciate
21       that.
22 Q. (By Mr. Sawyer) After you contacted FMI
23    concerning prices in the region, did

13 (Pages 49 to 52)

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 53

1    you contact --
2  A.  Now, I didn't say it was pricing in the
3    region.  I said contacted regional
4    companies to -- because some of these
5    are more than just regional companies;
6    some of these are national companies --
7    to get a good feel of national pricing.
8  Q.  And this national pricing for what?
9  A.  For banking.
10  Q.  Did you contact anyone else?
11  A.  There could have been others that, you
12    know, offline that I had talked to, but
13    none that I specifically know that I
14    called and asked specifically about
15    that.
16  Q.  So far you've contacted Kimco.  And
17    I've got K-I-M-C-O?
18  A.  (Witness nodded.)
19  Q.  4M?
20  A.  (Witness nodded.)
21  Q.  New Image?
22  A.  (Witness nodded.)
23  Q.  Varsity?

Page 54

1  A.  (Witness nodded.)
2  Q.  Mr. Clean?
3  A.  (Witness nodded.)
4  Q.  FMI?
5  A.  (Witness nodded.)
6  Q.  And there could be others; but as you
7    sit here today, you don't recall
8    others?
9  A.  Right.
10  Q.  Did anyone assist you in this endeavor?
11  A.  No.
12  Q.  So Greg Littlefield made all the calls
13    to these people?
14  A.  Yeah.
15  Q.  What time frame were these calls made?
16  A.  I'm assuming it would have been in
17    February-March-April time frame, plus
18    or minus a week or so.
19  Q.  What information did you obtain from
20    them?  And when I say "them," I'm
21    referring to other regional janitorial
22    companies that you contacted.
23  A.  I asked them what type of book of

Page 55

1    business -- most of these I contacted
2    because I knew they had -- had or
3    previously had a large amount of branch
4    bank locations.
5  Q.  And by "book of business," what do you
6    mean?
7  A.  That they were cleaning or managing the
8    cleaning of branch -- branch banks.
9  Q.  How did they price the work?  And when
10    I say "they," I'm referring to -- can
11    we have an agreement that I'm referring
12    to these companies that you contacted
13    after receiving notice that you might
14    be involved with the -- or might have
15    the opportunity to be involved with the
16    BB&T account?
17  A.  Most of it was broken down to come out
18    to a monthly -- monthly amount per --
19    per branch, which could come back to a
20    square-footage price.
21  Q.  When you say "could come back to a
22    square-footage price," could you
23    explain that for me?

Page 56

1  A.  Well, any time you -- if you take X
2    amount per month and divide it by the
3    square footage of the building, it
4    gives you the square-foot price.
5  Q.  What is your understanding of gross
6    square footage?
7        MS. TULEY:  Object to form.
8  A.  Total square footage.
9  Q.  How long have you worked in this
10    industry?
11  A.  I think the record reflects since '89.
12  Q.  I'm sorry.  Higher math.  I guess
13    eighteen years now?
14  A.  (Witness nodded.)
15  Q.  How do you calculate gross square
16    footage?  Do you just take the
17    footprint of the building?
18  A.  Yes.
19  Q.  Is that from exterior wall or interior
20    wall?
21  A.  Exterior.
22  Q.  Do you have an understanding of what
23    net cleanable square footage is?  Well,

14 (Pages 53 to 56)

**MERRILL LEGAL SOULTIONS**
**Court Reporting*Legal Videography*Trial Services**

Page 57

1    let me first ask you, have you ever
2    heard that term before?
3  A. Yes.
4  Q. What does that term mean as you
5    understand it?
6  A. Net cleanable can -- can mean different
7    things to different people. But the
8    net amount of space that is cleanable.
9  Q. What's the difference between gross
10   square footage and net cleanable square
11   footage?
12 A. Could be an empty floor in a building,
13   that you never went into.
14 Q. Any other differences?
15 A. Could be partial empty floor.
16 Q. Anything else?
17 A. No.
18 Q. So when you contacted these other
19   regional janitorial companies, they
20   were essentially giving you -- and
21   correct me if I misstate anything --
22   average cost per unit per month?
23 A. Well, they gave me their average

Page 58

1    charge. And it could have come to me
2    in different ways. But I assimilated
3    it to come up with an average parameter
4    of -- to see what the market was
5    paying.
6  Q. And by "the market," what are you
7    referring to?
8  A. Just what -- what these groups -- what
9    would be competitive for cleaning
10   branch banks.
11 Q. Nationally?
12 A. Yes. And there's also publications
13   from BOMA that would indicate square --
14   average square-foot prices for -- for
15   certain types of buildings.
16 Q. Did you consult any publications from
17   BOMA when you were doing this exercise?
18 A. I did but I don't think I found branch
19   banks specifically in their
20   publications.
21 Q. On other projects, do you ever have
22   occasion to rely on publications from
23   BOMA?

Page 59

1  A. Not rely on publications from BOMA, no.
2  Q. Is it a good source of information?
3  A. It's information that -- it's a source
4    of information that we don't readily
5    use.
6  Q. But in this case, you did consult it?
7  A. I didn't say I consulted it. We
8    checked it.
9  Q. But you didn't find anything concerning
10   branch banks; right?
11 A. Correct.
12 Q. Well, after you conducted this exercise
13   regarding contacting other regional
14   janitorial companies, what did you do
15   next?
16 A. I think we probably didn't do anything
17   till we received information from EMCOR
18   in regards to the bid.
19 Q. Let me back up one second. What was
20   the -- what were some of the numbers
21   you were getting back from these
22   individuals or these firms, to the best
23   of your recollection?

Page 60

1  A. To the best of my recollection, as far
2    as the square-foot number, I -- I
3    obviously with our -- the price that we
4    arrived at, it was competitive in what
5    I received back from them.
6  Q. Was it unusual that they would just
7    provide the -- strike that.
8        Did you find it unusual that
9    they would just provide their pricing
10   for branch banking installations?
11 A. Well, they didn't give me the names of
12   installations.
13 Q. What did you give you?
14 A. Just how they would price banking
15   locations.
16 Q. How would they price it?
17 A. Some was a flat monthly charge. Some
18   was based on square footage, which I
19   think I stated earlier which -- either
20   a monthly charge, you can turn that
21   back into a square-footage charge to
22   check the average square foot per, you
23   know, locations out there.

15 (Pages 57 to 60)

Page 61

1  Q. How did you use that information?
2  A. To see how competitive we would have to
3     be to put together a competitive
4     pricing program for EMCOR.
5  Q. And do you recall --
6  A. Based on their request.
7  Q. I'm sorry. I didn't know that you
8     weren't finished.
9  A. Yeah.
10 Q. Do you recall the numbers you were
11    getting back as far as cost per square
12    foot from these individuals?
13 A. I think you just asked me that
14    question, and I think my response was I
15    didn't recall the exact numbers but the
16    price that we put together must have
17    been -- must have been similar because
18    that was the intent, to find out what
19    the market was paying.
20 Q. Do you recall whether it was more than
21    a dollar?
22 A. I don't recall any of the specific
23    pricing.

Page 62

1  Q. After you finished this exercise, what
2     did you do next? And when I say "this
3     exercise," I'm referring to contacting
4     other regional companies to get their
5     prices. What did you do after that?
6  A. I -- there again, I think you asked me
7     that question, and I think I stated
8     that we didn't do anything until we got
9     a package request from EMCOR officially
10    to bid, to give them a quote on the
11    project.
12 Q. Who provided -- strike that.
13    What was provided to you from
14    EMCOR?
15 A. It was a package that I'm pretty sure
16    would have already been, you know,
17    provided. You should have -- have that
18    information. But I couldn't tell you
19    what all was in it, but it was requests
20    to bid on, give them a price on all
21    those locations.
22 Q. And we'll get to it later, but if
23    there's a -- well, strike that.

Page 63

1         Who provided that to you from
2  EMCOR?
3  A. It would have been Alan Cristal or Debi
4     Crosby or possibly a gentleman by the
5     name of Steven King, which was their
6     pricing -- I think he did EMCOR's
7     pricing, if I'm correct. I need
8     another break.
9  Q. Sure.
10       (Brief recess)
11 Q. (By Mr. Sawyer) Mr. Littlefield, I'll
12    represent to you that I'm handing you
13    what will be marked as the next exhibit
14    in order. I believe it's #14.
15       MS. TULEY: Do you want to
16          keep going on mine or do
17          you want to start your
18          own numbers? because
19          I've been calling them
20          plaintiff's exhibits in
21          the last deposition.
22       MR. SAWYER: I think it
23          makes sense to call just

Page 64

1          call them joint exhibits
2          so we can go one through
3          whatever. Is that fair?
4       MS. TULEY: That's fine with
5          me.
6       MR. SAWYER: All right.
7          This will be the next
8          exhibit in order.
9       (Joint Exhibit #14 was
10         marked for identification.)
11 Q. (By Mr. Sawyer) Mr. Littlefield, I'm
12    handing you what's been marked as -- I
13    guess what we're going to call Joint
14    Exhibit #14, which is the first exhibit
15    to your deposition. Could you take a
16    look at that for me?
17 A. The entire package?
18 Q. Yes. I'll represent to you that this
19    was produced to us in a folder entitled
20    Bid Package. But it's my understanding
21    that, from counsel, that your attorneys
22    put it in that folder, not you.
23 A. This is entitled Bid Package?

16 (Pages 61 to 64)

Page 65

1   Q. It was in a folder entitled Bid
2       Package.
3           (Brief pause while witness
4           reviews document)
5           (Joint Exhibit #15 was
6           marked for identification.)
7   A. Okay.
8   Q. After having reviewed what's been
9       marked as Exhibit #14, can you identify
10      it?
11  A. Can I identify it?
12  Q. What's been marked as Exhibit #14 to
13      your deposition.
14  A. I can identify it, yes.
15  Q. Okay. What is it?
16  A. It appears to be the bid request from
17      BB&T to EMCOR.
18  Q. If you'll turn to the first page. And
19      I'm just trying to understand
20      whether -- to try to shorten this up,
21      I'm trying to understand whether this
22      was the package that was provided by --
23          (Cell phone interruption)

Page 66

1   Q. I'm trying to understand whether this
2       is the package that was provided by
3       EMCOR to you.
4   A. It appears to be the package, yes, that
5       EMCOR provided to us. But I would say
6       that there could be an exhibit in here,
7       some type of exhibit, that may not
8       have -- I can't say that every exhibit
9       that's in this right now was the
10      original that came from EMCOR.
11  Q. Do you have the original?
12  A. Well, this -- this would have been the
13      original. But what I'm saying is there
14      could have been a later exhibit that
15      came after the fact that could have
16      been added.
17  Q. So I understand your testimony, an
18      exhibit could have been provided later;
19      but as far as the original package
20      coming from EMCOR to PFMI, to the best
21      of your recollection, this would be it?
22  A. Yes.
23  Q. After you received this package from

Page 67

1       EMCOR -- and I believe your testimony,
2       it was either Alan, Debi, or Steven
3       King?
4   A. Right.
5   Q. -- what did you do?
6   A. We reviewed it and probably, you know,
7       we looked at scope, looked at locations
8       and started determining what vendors
9       might be a good fit to perform the
10      services, and to gather pricing from
11      those vendors.
12  Q. And when you refer to reviewing scope,
13      what in particular about Exhibit #14
14      are you referring to?
15  A. The janitorial, what would be -- the
16      whole package includes more than
17      janitorial, so we focused on the
18      janitorial section.
19  Q. Did you understand that if you were
20      awarded the contract that that would be
21      what your scope of work would be
22      comprised of?
23  A. Well, there was discussions at meetings

Page 68

1       that the scope -- yes, it was our
2       understanding.
3   Q. So if you got the job, this was the
4       scope of work that you would have to
5       perform?
6   A. Yes.
7   Q. I believe you also said that you
8       started to contemplate what vendors
9       would be a good fit.
10  A. Uh-huh.
11  Q. Did PFMI contemplate self-performing
12      this work?
13  A. No.
14  Q. At no time?
15  A. At no time.
16  Q. Does PFMI in this time frame
17      self-perform -- and when I say "in this
18      time frame," when you received the bid
19      which is marked as Exhibit #14 -- did
20      it self-perform work?
21  A. Yes.
22  Q. How much did it self-perform?
23  A. I would say 70 percent.

17 (Pages 65 to 68)

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

| Page 69 |
|---|

1    Q. Was that just for janitorial?
2    A. Yes.
3    Q. Landscaping, do you normally
4        subcontract that out?
5    A. Not necessarily.
6    Q. So PFMI does self-perform some
7        landscaping?
8    A. Yes.
9    Q. How much?
10   A. Landscaping?
11   Q. Yes.
12   A. How much in terms of --
13   Q. Percentage.
14   A. -- percentage? Everything that's
15       within a certain geographical area, we
16       self-perform all of it. Anything
17       outside of a geographical area, we
18       subcontract.
19   Q. In what geographical area do you
20       self-perform?
21   A. Landscape?
22   Q. Yes.
23   A. Montgomery, Alabama.

| Page 70 |
|---|

1    Q. Anywhere else?
2    A. Huntsville, Alabama; Destin, Florida.
3    Q. Did you prepare any calculations or
4        estimates based upon -- can we call
5        Exhibit #14 the BB&T bid?
6    A. Yes.
7    Q. What types of estimates did you
8        perform?
9    A. Estimates in terms of what? I'm not
10       sure what you're asking.
11   Q. Pricing.
12   A. Pricing? We provided at the
13       appropriate time a square-foot price to
14       EMCOR for five-day-per-week service,
15       six-day-per-week service, and
16       three-day-per-week service.
17   Q. Prior to providing that to EMCOR, did
18       you internally prepare estimates of the
19       cost of the work?
20   A. Yes.
21   Q. Where did you keep those estimates?
22   A. It was a simple process after we
23       selected the vendors that would be the

| Page 71 |
|---|

1        alliance group. They priced a
2        square-foot price, and we added our
3        markup, which would have been on the
4        average of 18 to 21 cents per square
5        foot annually. And that was the
6        calculation.
7    Q. Who is the alliance group?
8    A. It's the group that we proposed to
9        EMCOR that would be providing the
10       services.
11   Q. What other companies in the alliance
12       group?
13   A. The group for this project was PFMI,
14       was Varsity cleaners, was FMI,
15       Galley Services, and Patton.
16   Q. Was Goka ever involved?
17   A. Goka was a subcontractor, not an
18       alliance partner.
19   Q. Any other alliance partners?
20   A. No.
21   Q. What time frame did you prepare these
22       estimates?
23   A. I think, as I said earlier, it was

| Page 72 |
|---|

1        between the time frame of February-
2        March-April. Probably the actual
3        pricing back to them was probably more
4        toward the mid-April range.
5    Q. So to the best of your recollection, it
6        would have been mid April when you were
7        getting these prices from members of
8        the alliance group?
9    A. Yes.
10   Q. During this time frame, did you have
11       any communications with BB&T personnel
12       directly?
13   A. I don't believe so, no.
14   Q. So that I understand your testimony,
15       you received prices from members of the
16       alliance group per square foot;
17       correct?
18   A. Correct.
19   Q. And that would have been Varsity, FMI,
20       Galley Services, and Patton. Is that
21       accurate?
22   A. Uh-huh. Yes.
23   Q. And you marked those up by 18 to 21

18 (Pages 69 to 72)

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 73

1    percent -- strike that -- 18 to 21
2    cents?
3    A.  Correct.
4    Q.  Do you know offhand what percentage
5    that would have been on the square-foot
6    cost you were getting?
7    A.  I guess it would have been from 12 to
8    18 percent.
9    Q.  Do you have any understanding who
10   created what's been marked as
11   Exhibit #14?
12   A.  I have no understanding.  I would
13   assume it would be BB&T.
14   Q.  Why would you assume that?
15   A.  Well, it's got BB&T's name on it.
16   Q.  Did you provide this document to your
17   subcontractors?
18   A.  We provided -- I would assume we
19   provided the scope -- the scope of
20   work.  Not the entire document, no.
21   Q.  And when you say "scope of work," which
22   portions of Exhibit #14 are you
23   referring to?

Page 75

1    price and add its profit on top of it,
2    which I believe you testified is 18
3    percent -- 18 cents or 21 cents per
4    square foot?
5    A.  In that average range, yes.  I will not
6    testify that each -- each vendor
7    submitted a price to us.  In some
8    cases, we may have collected a certain
9    amount of prices and when we chose,
10   say, a Patton Services, we told them
11   this is the average pricing and would
12   you do it at this price.  But I cannot
13   tell you which ones we got the price
14   from and which ones we told this will
15   be the pricing.
16   Q.  Do you know what the members of the
17   alliance group based their price per
18   square foot on?
19   A.  I don't understand your question.
20   Q.  Well, they came up with a unit price
21   for square footage; correct?
22   A.  (Witness nodded.)
23   Q.  Is that correct?

Page 74

1            (Brief pause while witness
2            reviews document)
3    A.  Exhibit S1 and Exhibit A, that was
4    provided to us, which shows the gross
5    square feet and then shows their
6    adjusted square feet.
7    Q.  Was anyone else involved with this
8    process of coming up with the price for
9    what I'm calling -- what we've been
10   calling the BB&T bid?  Anyone --
11   A.  The --
12   Q.  -- else --
13   A.  -- pricing, no.
14   Q.  I'm sorry.  I'm talking over you.
15       Anyone else in PFMI?
16   A.  No.
17   Q.  It was --
18   A.  Not in determining the pricing.
19   Q.  And if I understand your testimony
20   correctly, the actual vendors came up
21   with the unit price; correct?
22   A.  With their price.
23   Q.  And all PFMI did was simply take that

Page 76

1    A.  I'm saying -- I'm saying all -- all
2    those that you listed there may not
3    have came up with a square-foot price.
4    Some -- some came up with a square-foot
5    price and submitted it back to us, and
6    some we may have said these three
7    vendors are doing it in this price
8    range, can you do this region, would
9    you want to do this region in this
10   price range.  So that's how.
11   Q.  I think I understand your testimony.
12       Well, let me ask it this way.  Each one
13   of the vendors that you contacted, how
14   did they price their work?  Was it --
15       let me ask it differently.  Did you
16   receive lump-sum proposals?
17   A.  Any that we received a price from would
18   have been based on square footage,
19   because that's how we would have asked
20   for it.
21   Q.  And why did you ask for it based on
22   square footage?
23   A.  Because that's how we were asked to

1933 Richard Arrington Jr. blvd, S*Birmingham, AL 35209*www.merrillcorp.com
1-800-888-DEPO

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 77

1    provide it from EMCOR.
2  Q.  Who at EMCOR asked you to provide it
3      that way?
4  A.  I'm not sure if the documentations in
5      here asked for it that way.  But it
6      would have been Alan Cristal, Debi
7      Crosby, or Steven King.
8  Q.  Was the pricing to be based on gross
9      square footage?
10  A.  Pricing was to be based on square
11      footage.  And they gave us an estimated
12      square footage of, I think, between
13      seven and seven million square feet.
14  Q.  When you say "they," who gave you --
15      estimated between six and seven million
16      square feet?
17  A.  That was the conversations between --
18      it was understood between PFMI and
19      EMCOR.  Plus, on their document that
20      they furnished us here, they gave us
21      the adjusted gross square footage.
22      They gave us a gross and then an
23      adjusted.  And that's the terms that

Page 78

1      were used here.  And so we based it on
2      the adjusted square feet, which I think
3      shows here 6.7 million square feet.
4  Q.  Did you instruct your vendors to base
5      their pricing on adjusted square feet?
6  A.  Yes.
7  Q.  Why did you do that?
8  A.  Because that's the way EMCOR said to do
9      it.
10  Q.  Who from EMCOR said that?
11  A.  Well, I don't know if the documents --
12      we can read back through all the
13      documents and see if it tells us, you
14      know, tells us to do that in here.  But
15      in conversations, it would have been
16      from Alan Cristal or Debi Crosby or
17      Steven King.
18  Q.  Do you recall whether within -- and you
19      can look back through this.  Do you
20      recall was it ever part of your work --
21      and when I say "your," I mean PFMI's
22      work -- to conduct field measurements
23      of units?

Page 79

1  A.  There was nothing in the documents.
2      But we were asked to, within the first
3      ninety days, to conduct field
4      measurements.  Before the contract
5      started, EMCOR met with PFMI and all
6      its alliance partners in Atlanta to go
7      over all the details of the contract.
8      And at this point in time, part of the
9      discussion was the measurements that we
10      would, within the first ninety days,
11      provide a measurement of the
12      facilities.  And they were instructed
13      to -- how to measure it.
14  Q.  Who was at this -- strike that.  Who
15      individually from the alliance group
16      members attended this conference?
17  A.  Varsity representative was Scott
18      Steven -- Scott Evans, was Steve
19      Schwartz.  FMI was Mark Campbell.
20      Galley Services was Leroy Dock.  If you
21      contact him, don't call him Leroy; call
22      him Leroy.  Patton Services was Mark
23      Patton.  And I believe that rounds out

Page 80

1      the alliance.  And from EMCOR was Sean
2      Brookins and Alan Cristal.
3  Q.  Did Mr. -- strike that.  Did anyone
4      from PFMI attend with you?
5  A.  Jim Wohlers.  I think our regional
6      managers that we hired from
7      Winston-Salem, John Sauter and probably
8      Keith Blackburn, and there could have
9      been someone else, but that -- that's
10      who I recall.
11  Q.  Now, you testified that this was before
12      the signing of the contract; correct?
13  A.  It was before -- well, actually, I
14      don't know if it was before the signing
15      of the contract with EMCOR and BB&T,
16      because I don't know when their
17      contract was physically signed.
18  Q.  Was it before the signing of the
19      contract between PFMI and EMCOR?
20  A.  It would not have been before the
21      letter of intent.
22  Q.  It would not have been before the
23      letter of intent?

1933 Richard Arrington Jr. blvd, S*Birmingham, AL 35209*www.merrillcorp.com
1-800-888-DEPO

**MERRILL LEGAL SOULTIONS**
**Court Reporting*Legal Videography*Trial Services**

Page 81

1  A. I don't think it would have been before
2      the letter of intent. It could have
3      been. It was approaching a time that
4      it was agreed upon that PFMI and its
5      alliance partners was the one that had
6      been chosen. And it was to meet and
7      cover in person from EMCOR the details
8      of the contract to the alliance
9      partners.
10 Q. But as you sit here today, you don't
11     recall whether the meeting, what I --
12     to discuss the contract, the meeting
13     that occurred in Atlanta, whether it
14     occurred before the signing of the
15     letter of intent or after?
16 A. Ben, I don't. The purpose of the
17     meeting was not to still propose. It
18     was a meeting that we were chosen and
19     to make plans to implement.
20         (Brief pause)
21 Q. Mr. Littlefield, I'm just going to show
22     you what was marked yesterday as
23     Exhibit #1 to the deposition of Sean

Page 82

1      Brookins. I'll just first ask you, is
2      that your signature?
3  A. It is.
4  Q. Does it appear that the letter of
5      intent, what I'm calling the contract,
6      was signed, I guess, July 13th?
7  A. Yes.
8  Q. And I believe you testified that at
9      this meeting in Atlanta, the topic of
10     actually field-measuring the BB&T
11     locations was discussed; is that
12     correct?
13 A. Yes.
14 Q. Who participated in those discussions?
15 A. Everyone at that meeting. And that was
16     not the only discussion, but it would
17     have been a discussion.
18 Q. And --
19 A. But EMCOR participated, PFMI, and the
20     alliance partners participated.
21 Q. Were you informed why field
22     measurements would be taken?
23 A. Yes. To verify square footages.

Page 83

1  Q. Were you informed why you were to
2      verify square footages?
3  A. Yes. For new billing purposes.
4  Q. You said "new billing purposes." How
5      was it different?
6  A. Can you explain your question? How
7      was --
8  Q. Sure.
9  A. How was what different?
10 Q. Sure. You just, I guess, testified
11     that you were going or -- strike
12     that -- that EMCOR informed you that
13     there would be a verification of square
14     footages and that this was for new
15     billing purposes. What was the old
16     billing?
17 A. I can't testify if we were billing off
18     of the adjusted or the gross, but we
19     were billing off of what EMCOR had
20     instructed us to bill from.
21 Q. At the time of the meeting, had any
22     billing occurred?
23 A. No.

Page 84

1  Q. After the meeting, did PFMI bill from
2      the adjusted or the gross?
3  A. I don't know. We'd have to look on the
4      document to see, on a billing master
5      list. But we billed based upon EMCOR's
6      instructions.
7  Q. And whether it's gross or adjusted, the
8      documents will reflect that; correct?
9  A. That's correct.
10 Q. Who from EMCOR instructed you to bill
11     from gross or adjusted?
12 A. I couldn't testify as to who
13     specifically instructed us to do that.
14     My assumption would be whoever was in
15     charge of that contract. That would
16     have been Sean Brookins.
17 Q. And the reason you would assume that is
18     because he's in charge of the contract?
19 A. Correct.
20 Q. Would there be some document reflecting
21     that?
22 A. Reflecting . . .
23 Q. How PFMI should conduct this billing

21 (Pages 81 to 84)

**MERRILL LEGAL SOULTIONS**
Court Reporting*Legal Videography*Trial Services

Page 85

1    practice.
2    A. I was not involved in the day-to-day
3      details of the actual billing. So Jim
4      Wohlers would probably be more capable
5      of answering that question.
6         MR. SAWYER: Y'all want to
7           go eat?
8         MS. TULEY: I never say no
9           to that. Do you want to
10          go off the record?
11        MR. SAWYER: Sure.
12       (Lunch recess)
13       (Mr. Wohlers not present.)
14        MR. SAWYER: Let's go back
15          on the record. I'd like
16          to mark this as the next
17          in order.
18       (Joint Exhibit #16 was
19          marked for identification.)
20   Q. (By Mr. Sawyer) Mr. Littlefield, can
21      you identify what the court reporter
22      has just handed you?
23   A. Could you explain to me what it is?

Page 86

1    Q. Yeah, let me do that. What the court
2      reporter has just handed you as
3      Exhibit #16 is a 30(b)(6) deposition
4      notice. Have you ever seen that
5      before?
6    A. I believe I have.
7    Q. If you could, turn back a couple of
8      pages.
9    A. Okay.
10   Q. Now, I'm having you turn to Exhibit A
11      of the 30(b)(6) deposition notice.
12      With conversations with counsel, it's
13      my understanding that you are being
14      presented today as the corporate
15      representative of PFMI for Topics of
16      Examination 6, 7, 9, 13, and 14?
17   A. Correct. Correct.
18   Q. So if you would, take a look at Topic
19      No. 6, which is the preparation of
20      PFMI's bid for the BB&T services
21      contract. Today you are testifying as
22      PFMI's corporate representative and
23      person most knowledgeable for that

Page 87

1    topic of examination; correct?
2    A. That's correct.
3    Q. And we discussed that at, I guess, some
4      length this morning, and I'd just like
5      to recap it so my understanding is
6      clear. As far as the preparation of
7      PFMI's bid, what I understand is that
8      initially, you contacted regional
9      facilities -- regional and national
10      facilities companies to obtain
11      information and pricing.
12        MS. TULEY: Object to form.
13   Q. Is that correct?
14        MS. TULEY: Go ahead.
15   A. That's correct.
16        MS. TULEY: That's just a
17          lawyer thing. You can
18          answer his question.
19   Q. Is that correct?
20   A. That's correct.
21   Q. After you did that -- after that point
22      in time, you received what we've
23      referred to as the BB&T bid, which is

Page 88

1    marked as Exhibit #14, I believe.
2    A. That's correct.
3    Q. After receipt of the BB&T bid, you
4      contacted other subcontractors or other
5      vendors that might perform the work
6      identified in Exhibit #14, the BB&T
7      bid?
8    A. That's correct.
9    Q. And those contractors were in what
10      we've referred to as the alliance
11      group?
12   A. Yes.
13   Q. And the contractors that comprised the
14      alliance group were Varsity -- help me
15      out here.
16   A. Was Varsity Services, was FMI Services.
17   Q. Patton?
18   A. Was Patton; and a company from the D.C.
19      market, Leroy Dock's company, Galley
20      Services.
21   Q. And you did provide the BB&T bid
22      documents to each of these individual
23      vendors; correct?

22 (Pages 85 to 88)

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 89

1        MS. TULEY:  Object to form.
2   A.  We provided scope of work.  We provided
3       a location list, which would be
4       identified here as Exhibit A.
5   Q.  But as far as providing or -- did you
6       have any involvement with the vendors'
7       pricing of that work?
8   A.  We did not have any involvement in
9       their pricing of that work.
10  Q.  So after you received, I guess, quotes
11      from these vendors to perform certain
12      areas, I believe the testimony was you
13      marked it up 18 to 21 cents -- and I
14      apologize if I say percent; what I mean
15      is 18 to 21 cents -- for PFMI?
16  A.  That's correct.
17  Q.  How did you come up with that markup?
18  A.  Based on an average 5 to 8 percent
19      overhead and a profit of 12 or so
20      percent after overhead costs.
21  Q.  What's included in the 5-percent
22      overhead cost?
23  A.  It's insurance, liability, workers'

Page 90

1       comp, corporate cost, my time,
2       corporate staff cost, accounting,
3       administration.
4   Q.  Any other general or administrative
5       costs that would go into that
6       5 percent --
7   A.  No.
8   Q.  -- markup?
9   A.  That would be the bulk of it.
10  Q.  And I guess you've expressed that in
11      terms of percent, but it would be, I
12      guess, five cents per square foot for
13      overhead and 12 cents per square foot
14      for profit?
15        MS. TULEY:  Object to form.
16  A.  No.  That's based more on percentages
17      of revenue.
18  Q.  I think I understand your testimony.
19      If it's -- was it an 18-percent markup
20      just on the revenue you anticipated
21      achieving?
22  A.  I'd like to refer back to the record.
23      I answered that earlier this morning

Page 91

1       and gave you a range of what it should
2       have been in.
3   Q.  Do you recall what that was?  I mean,
4       the record will say what it says.
5   A.  Yeah, the record will say what it says.
6       I don't want to -- you know, that 18-
7       to 20-percent range, I'm assuming.
8         MS. TULEY:  I object to the
9             form to the extent that
10            it mischaracterizes
11            previous testimony.
12  Q.  Take a look at that Exhibit A, which is
13      in what we've been calling the BB&T
14      bid.  And I believe you said there were
15      a couple of columns referring to gross
16      square footage?
17  A.  There's one column referring to gross
18      square footage.
19  Q.  I'm sorry.  There's one column
20      referring to gross square footage and,
21      I believe, another for adjusted square
22      footage.
23  A.  Correct.

Page 92

1   Q.  Did you ever ask anyone from EMCOR what
2       adjusted square footage meant?
3   A.  Well, it shows, when they knew they had
4       vacant space, they deducted it out of
5       the column that says current vacant
6       square footage.
7   Q.  My question is a little different.  My
8       question is, did you ever ask anyone
9       from EMCOR what adjusted square footage
10      meant?
11  A.  Now, there was -- I can't recall a
12      specific meeting to meet and discuss
13      what adjusted square footage meant.
14      You know, I didn't ask them, either,
15      what lease type meant on here, either.
16      Some things are -- could be assumed.
17      It says adjusted.  Adjusted means
18      adjusted.  And that's how we would be
19      paid, based on what we would bill.
20      Whether -- and I told you this morning
21      I didn't know if we billed based on
22      adjusted or gross, but we billed based
23      upon EMCOR's direction.

23 (Pages 89 to 92)

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 93

1  Q. Did you ever or do you have a
2     recollection of ever asking anyone from
3     EMCOR questions about this bid?
4  A. Questions about this bid?
5  Q. Yes.
6  A. Definitely.
7  Q. What were some of the questions that
8     you asked EMCOR?
9  A. Two weeks before -- Exhibit A was
10    produced to us; we produced this
11    information to our alliance group.  Two
12    weeks prior to start of the contract,
13    actual servicing the locations, I got a
14    call from Sean Brookins.  And he was
15    very upset with a practice he alleged
16    that one of our subcontractors was
17    doing.  He said that he'd gotten word
18    that they'd reduced their square
19    footage by 20 percent and was trying to
20    get local, smaller subcontractors to do
21    the work for 20 percent less a square
22    footage.
23        So I immediately called that

Page 94

1     subcontractor to find out what was
2     going on.  And what I found was there
3     was another exhibit that had been
4     produced that now had another column
5     that said -- well, it's Exhibit C.  I'm
6     not sure what the column said, but it
7     was clearly that 20 percent -- it was
8     showing from EMCOR and BB&T that
9     20-percent square footage had been
10    deducted from the gross.  So that
11    contractor had assumed that that's how
12    he was going to get paid, based on the
13    20-percent reduction.  So he was trying
14    to hire cleaners and/or subcontractors
15    to do the work for that.
16        We had never seen that document.
17    Immediately I knew that if EMCOR or
18    BB&T expected PFMI or their subs,
19    alliance partners, to perform the work
20    at 20 cent -- at 20 percent less a
21    square footage, that it couldn't be
22    done and wouldn't be done.
23        So I immediately called Sean

Page 95

1     Brookins, because it was two weeks
2     before start of the contract, and asked
3     him where this came from and told him
4     if -- you know, we've got to be very
5     clear on this matter -- if BB&T or
6     EMCOR is expecting us to perform this
7     contract at 20 percent less based on
8     those numbers that was in that column,
9     that we couldn't do it, that now was
10    the time, that we couldn't move
11    forward.
12        He got Steven King involved and
13    told us that there was no intent to
14    reduce the square footages down by 20
15    percent.  And the E-mail we received
16    back from Steven King was not to worry
17    about it, that it was for budget
18    purposes only.  That was a -- I
19    believe -- would you repeat the
20    question that you asked me?
21  Q. To be honest with you, I don't remember
22    what the question was.
23        MR. SAWYER:  Could the court

Page 96

1         reporter read it back
2         for me?
3  A. I believe it was what conversations did
4     we have with EMCOR about the contract.
5  Q. My recollection is that it was did you
6     ever ask any questions about --
7  A. Did I ever ask any questions.  So we
8     asked the question of what this
9     20-percent reduction meant, that we --
10    and told him we couldn't do the work if
11    it was going to be a 20-percent
12    reduction, and to get us some firm
13    answers on what it was all about.  And
14    the E-mail we got from Steven King was
15    not to worry about it, it was for
16    budgeted purposes only.  So we informed
17    our contractor to go back to the gross
18    or adjusted square footage.
19        Another question that was asked
20    during the term of preparing the
21    contract was in reference to trash.
22    And on a conference call with Sean
23    Brookins, Debi Crosby, and possibly

24 (Pages 93 to 96)

---

Page 97

1  other EMCOR representatives and myself
2  and Jim Wohlers, the question of trash
3  removal was brought up. And at this
4  time, EMCOR had found out that BB&T was
5  removing dumpsters from locations prior
6  to start of the physical work.
7      And at that point in time, we
8  addressed the issue that if dumpsters
9  were removed, that was going to be an
10  extra expense -- after we've already
11  negotiated the price -- an extra
12  expense to remove trash in 900-plus
13  locations. And on that conference
14  call, Debi Crosby asked me -- well, she
15  asked me, first of all, that -- Greg,
16  that would be an additional cost for
17  you to do that, wouldn't it. Yes, Debi
18  it would. Then BB&T will have to pay
19  for it. So we moved forward with
20  taking care of that with anticipation
21  of being reimbursed for those incurred
22  costs.
23  Q. Did you ask him --

---

Page 98

1  A. Those are two -- two questions that I
2  know was asked before the start of the
3  physical contract that we got
4  clarification from EMCOR on.
5  Q. So you asked about the trash removal
6  and would the square footage be reduced
7  20 percent; correct?
8  A. Correct.
9  Q. And I believe it's your testimony that
10  Steven King informed you that it
11  wouldn't be reduced 20 percent?
12  A. He produced an E-mail to us that -- and
13  the E-mail will reflect, obviously,
14  what he said.
15  Q. And Greg Littlefield told him that you
16  couldn't do it for 20 percent less
17  square footage; correct?
18  A. That's correct.
19  Q. Because the actual square -- the actual
20  work doesn't change, does it?
21  A. The actual work does not change.
22  Q. But as a product of math, the amount of
23  money would change; correct?

---

Page 99

1  A. That is definitely correct.
2  Q. At that point in time, could you have
3  increased your unit price?
4  A. EMCOR did not give us an opportunity to
5  increase the unit price.
6  Q. Prior to execution of the letter of
7  intent, is it your recollection that
8  Mr. King informed you that the square
9  footage or net square footage would be
10  a nonissue since PFMI would be
11  performing actual measurements of
12  cleanable space during the first ninety
13  days?
14  A. I believe that's -- I can't see what
15  you're reading there, but I think
16  that's the E-mail I was referring to.
17      MR. SAWYER: Off the record.
18      (Off-the-record discussion)
19      MR. SAWYER: Back on the
20      record.
21  Q. Was it your agreement that the cost
22  going forth would be based on the
23  actual measurements performed during

---

Page 100

1  the first ninety days?
2  A. Repeat your question.
3  Q. Sure. Was it PFMI's agreement that
4  contract price would be based upon
5  whatever your unit prices were times
6  the actual amount of cleanable square
7  footage out there that was going to be
8  taken care of by PFMI during the first
9  ninety days?
10  A. That is correct.
11  Q. Did PFMI conduct those measurements
12  during the first ninety days?
13  A. PFMI conducted measurements within the
14  first ninety days and supplied that
15  information to EMCOR. There was one
16  vendor who had not completed theirs, so
17  we met with EMCOR and extended it a
18  matter of a week or two. PFMI reviewed
19  those measurements and, upon sending
20  them up to EMCOR or delivering them to
21  EMCOR, upon review of them, indicated
22  there was a number that we were not
23  comfortable with that was correct so we

---

25 (Pages 97 to 100)

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 101

1    wanted to go back and remeasure.  It
2    was a certain percentage, say, we felt,
3    60-70 percent of them we had a good
4    feel for; the rest not.
5        At that point in time, as PFMI
6    was receiving surveys back, we adjusted
7    our billing to reflect the new numbers
8    coming in and was instructed by EMCOR
9    not to do that.  On several occasions,
10   we tried to adjust the numbers moving
11   forward so it could be more accurate;
12   and EMCOR continued to instruct us not
13   to reduce or increase if we got a
14   survey that showed an increase in
15   square footage.
16   Q.  Now, was PFMI actually doing these
17       surveys or was it a vendor of PFMI?
18   A.  It was the vendors.
19   Q.  Was it 100 percent performed by the
20       vendors or did Jim or some other
21       representative from PFMI go out there
22       to conduct measurements?
23   A.  It would have been whoever company was

Page 102

1    responsible for -- for that branch.
2    Q.  So the vendors that we've been talking
3        about, I guess -- FMI, Varsity, Patton,
4        and the other vendors in the alliance
5        group; correct?
6    A.  That's correct.
7    Q.  And whoever their subtier contractors
8        might be?
9    A.  I can't answer to that.  Can't answer
10       that.
11   Q.  Did any representative from PFMI ever
12       perform any field measurements?
13   A.  I can't answer that, Ben.  Jim would be
14       better to answer that.
15   Q.  Jim would know?
16   A.  (Witness nodded.)
17   Q.  And I believe you testified you tried
18       to reduce your billings based on the
19       numbers that were coming back in?
20   A.  We tried if measurements came back in
21       that was less, yes; if there was a
22       building that would reflect more square
23       footage, then -- there was much fewer

Page 103

1    of those than reduction.  And we tried
2    to -- we tried to do that even within
3    the first sixty days.
4    Q.  Do you recall a time frame when you got
5        all the surveys in from your vendors?
6    A.  I don't think I can speak on exactly.
7        But during the -- during the time that
8        was allotted, we had them all in except
9        a portion of them and was allotted an
10       additional amount of time to complete
11       that.  But before that was completed,
12       EMCOR told us they were not going to
13       use any of our surveys.
14   Q.  And I think you said you were
15       comfortable with about 60 or 70 percent
16       of those surveys?
17   A.  I would say that's a, you know, good
18       number to use.
19   Q.  For the ones you weren't comfortable
20       with, which is either 40 or 30 percent
21       rough numbers, why weren't you
22       comfortable with those numbers?
23   A.  Because a particular vendor -- most of

Page 104

1    it was FMI -- had not completed or a
2    good number of them was coming back as
3    the same -- exact same number.
4    Q.  Exact same number as what?
5    A.  As the adjusted or gross.
6    Q.  I guess you knew that probably couldn't
7        be right.
8    A.  For the most part, yes.
9    Q.  Correct me if I'm wrong, but what I'm
10       hearing you tell me is that there was
11       never an issue that PFMI was going to
12       be paid based on its unit price times
13       the gross square footage.
14   A.  Never an issue that PFMI was not going
15       to be paid upon an agreed-upon
16       cleanable square footage.  When
17       measurements were done, it was agreed
18       between PFMI and EMCOR that both
19       parties would agree on that square
20       footage.  In other words, if -- if
21       EMCOR didn't agree with the square
22       footages that PFMI turned in, they
23       would spot-check them.  If EMCOR went

1933 Richard Arrington Jr. blvd, S*Birmingham, AL 35209*www.merrillcorp.com
1-800-888-DEPO

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 105

1  back and measured before any
2  adjustments were made, we would have an
3  opportunity to go with them and check
4  the measurements and make sure that
5  everybody was measuring buildings the
6  same way. PFMI never got that
7  opportunity.
8  Q. Why not?
9  A. You'll have to ask EMCOR why not.
10 Q. Did PFMI ever ask to go, I guess,
11    remeasure any sites with EMCOR?
12 A. We were told before any adjustments
13    would be made that we'd have an
14    opportunity to go with them and
15    remeasure and agree upon a percentage
16    before any deductions were made. That
17    did not happen. Deductions were
18    made -- started being made prior to BB
19    and EMCOR completing their
20    measurements.
21 Q. What time frame was that?
22 A. Was what?
23 Q. Deductions.

Page 106

1  A. We actually gave a credit in January
2     for December's. And then in April, I
3     think, EMCOR started deducting 20
4     percent of our March -- from our
5     March -- now, this could be -- I could
6     be off a month or a billing cycle, but
7     in that time frame.
8  Q. Why did you give a credit to EMCOR in
9     January?
10 A. Because they -- we knew that there
11    would be some adjustments that would
12    need to be made, and we gave an agreed-
13    upon amount to satisfy BB&T for
14    December.
15 Q. For December work, credit, I believe,
16    was given in January. What amount of
17    credit did you give? What was the
18    number?
19 A. I believe it was twenty-six,
20    twenty-nine thousand dollars.
21 Q. And I believe it's your testimony that,
22    I guess, all the measurements were
23    supposed to be taken care of in the

Page 107

1  first ninety days; correct?
2  A. That was -- correct.
3  Q. But the deductions that began -- and I
4     believe they were 20-percent
5     deductions?
6  A. (Witness nodded.)
7  Q. That didn't happen until April, to the
8     best of your knowledge; correct?
9  A. To the best of my knowledge.
10 Q. Does the ninety days begin from July
11    when the contract is executed or from
12    September when you started work?
13 A. When we started work.
14 Q. So the ninety days would have run from
15    September forward; correct?
16 A. That's correct.
17 Q. So hypothetically in a perfect world,
18    all these measurements were supposed to
19    be done -- and I'm referring to field
20    measurements of these BB&T branch
21    banks -- sometime in November; correct?
22 A. Correct.
23 Q. But FMI had not completed all of them

Page 108

1  by that time; correct?
2  A. That's correct.
3  Q. Had other vendors not completed as well
4     by November?
5  A. I do not believe so. But Jim would be
6     able to speak more on their behalf.
7  Q. Certainly. But simply put, the deal
8     was not gross; it's whatever is
9     cleanable out there, and there were
10    going to be measurements taken within
11    the ninety days to find that out; is
12    that right?
13 A. That's correct.
14 Q. So as for Topic No. 7 on that
15    exhibit --
16 A. Can we take a quick break?
17 Q. Absolutely.
18          (Brief recess)
19          MR. SAWYER:  Back on the
20    record.
21 Q. (By Mr. Sawyer) Mr. Littlefield, I
22    believe today we've discussed in detail
23    PFMI's preparation of this bid. Fair

1933 Richard Arrington Jr. blvd, S*Birmingham, AL 35209*www.merrillcorp.com
1-800-888-DEPO

Page 109

1    statement?
2    A. We have discussed that.
3    Q. And that's Topic No. 6. Topic No. 7 is
4       PFMI's estimated cost to perform the
5       work pursuant to its agreement with
6       EMCOR. Did I read that accurately?
7    A. PFMI's estimated cost to perform its
8       work pursuant to its agreement with
9       EMCOR.
10   Q. Are there any documents that I could
11      look at which would show how PFMI came
12      to prepare its estimated cost to
13      perform the work?
14   A. There's no documents.
15   Q. It's just an 18- to 20-percent markup?
16           MS. TULEY: Object to form.
17           You said percent.
18   A. That -- that was . . .
19   Q. I'm sorry. Go ahead.
20   A. That was the markup. But that was not
21      the cost incurred to do the work. When
22      you say "cost incurred," define cost
23      incurred.

Page 110

1    Q. Well, since PFMI wasn't self-performing
2       anything, right, and didn't anticipate
3       self-performing this contract; correct?
4    A. (Witness nodded.)
5    Q. Okay. The costs would be, I guess, the
6       overhead.
7    A. (Witness nodded.)
8    Q. Fair statement?
9    A. The cost would be the people we hired
10      for the contract and -- plus overhead.
11   Q. And, yeah, not including the vendor
12      cost. Well, vendor cost, I guess,
13      could also be considered.
14   A. Right. Yeah, vendor cost, but then you
15      had people that we hired directly for
16      the EMCOR/BB&T contract.
17   Q. Who did you hire directly for the
18      EMCOR/BB&T contract?
19   A. In addition to our present staff, there
20      was approximately three field managers.
21   Q. When did you hire them?
22   A. They were hired approximately, you
23      know, before -- thirty days to two

Page 111

1    weeks before start of the contract.
2    And approximately three to four
3    administrative, plus an administrative
4    person to work out of BB&T's corporate
5    headquarters or their facilities
6    headquarters.
7    Q. And that's in addition to the three or
8    four administrative people?
9    A. Correct.
10   Q. Who were the field managers that you
11      hired?
12   A. Keith Blackburn was the project
13      manager.
14   Q. Who were the others?
15   A. John Sauter.
16   Q. Okay.
17   A. And Ken Law.
18   Q. Were those people all hired before
19      execution of the EMCOR/PFMI contract?
20   A. I know at least two was hired prior to
21      the start of the physical work and Ken
22      soon after, if not about the same time.
23   Q. Did those people work solely on this

Page 112

1    account?
2    A. Yes.
3    Q. Did there come a point in time where
4       you had to hire additional supervision?
5    A. There -- there did not.
6    Q. And when you were analyzing, I guess --
7       well, strike that. Let me ask it this
8       way. Did you do an analysis of the
9       estimated costs that you would incur in
10      taking on this BB&T contract?
11   A. I did. Obviously I did.
12   Q. Are there any documents showing -- I
13      know I asked a different question
14      earlier. But are there any documents
15      showing the analysis you performed in
16      coming up with your estimated costs?
17   A. There -- there would be no documents.
18      But, you know, each individuals that we
19      knew we would be hiring, there was a
20      cost factor and calculated. So, you
21      know, I know a cost that I associated
22      to -- to that.
23   Q. How much did PFMI pay these people?

28 (Pages 109 to 112)

| Page 113 | Page 115 |
|---|---|
| 1     And I'm referring to Keith Blackburn,<br>2     John Sauter, Ken Law.<br>3  A.  I would -- I would have to look -- go<br>4     into a payroll record to find out.<br>5     But, you know, the total anticipated<br>6     cost for, you know, field personnel and<br>7     expenses was -- to run the account was<br>8     approximately in the four-hundred-<br>9     thousand-dollar-a-year range. I would<br>10    say three -- three to four range.<br>11    Anticipated billing based on the square<br>12    footage and numbers, anticipated gross<br>13    profit, would have been a million two<br>14    to a million three for in-scope work.<br>15    I mean, it's simple math of square<br>16    footage times 18 to 20 percent.<br>17  Q.  In the estimated costs, do you include<br>18    yourself and Jim?<br>19  A.  No.  That would be considered an<br>20    overhead cost.<br>21  Q.  So that would have been excluded from<br>22    the estimated costs that you<br>23    considered, because it definitely | 1     project managers. Keith Blackburn was<br>2     a project manager; right?<br>3  A.  Right.  And the other two reported to<br>4     Keith.<br>5  Q.  And whatever the burden labor of that<br>6     would be, would be shown on the payroll<br>7     record?<br>8  A.  Right.<br>9  Q.  Did you have a commercial general<br>10    liability policy on this job?<br>11  A.  We have a standard general liability<br>12    policy.<br>13  Q.  Does it float all over your projects?<br>14  A.  Right.<br>15  Q.  How much does that cost?<br>16  A.  It's based on annual calculation that<br>17    the insurance company does based on<br>18    annual revenues and/or payroll.<br>19  Q.  During the time of the project, how<br>20    much did you have to pay, I guess, for<br>21    your CGL policy?<br>22  A.  I couldn't speak to exact amount of<br>23    that. |

| Page 114 | Page 116 |
|---|---|
| 1     wasn't the only project that you worked<br>2     on; right?<br>3  A.  That's correct.<br>4  Q.  Was any allocation of your costs<br>5    included in what you anticipated<br>6    incurring?<br>7  A.  No.<br>8  Q.  I guess the way you calculated your<br>9    anticipated gross profit was simply --<br>10   I believe the -- I think the markups<br>11   were 5 percent and 12 percent times the<br>12   gross square-footage number; is that<br>13   right?<br>14  A.  It was 18-20 cents.<br>15  Q.  Cents.<br>16  A.  So, quick math, 20 cents times six and<br>17   a half million square feet, a million<br>18   three, less anticipated three to<br>19   hundred thousand of cost, is a net of<br>20   nine hundred thousand.<br>21  Q.  And whatever the burden of labor for<br>22   those three project managers? I don't<br>23   think you testified they were all | 1  Q.  Was some allocation, I guess, of that<br>2    cost a portion for what your estimated<br>3    costs were in here?<br>4  A.  It's included in that generally what we<br>5    consider 5 percent overhead cost.<br>6       I would assume some of this<br>7    information would be confidential --<br>8  Q.  You mean like --<br>9  A.  -- information on how we bid contracts<br>10   and our company's overhead costs<br>11   associated that obviously we wouldn't<br>12   want published to competitors or any<br>13   way we would want a competitor to find<br>14   out how we structure our price.<br>15      MS. TULEY:  If I feel like<br>16        something needs to be<br>17        made confidential, we'll<br>18        discuss that.<br>19  Q.  There are ways to protect for that.<br>20      MS. TULEY:  We can protect<br>21        it.<br>22  Q.  Whatever you're concerned about, we'll<br>23    work out. |

Page 117

```
1        As far as Topic No. 9, PFMI's
2    anticipated profit, I believe it's your
3    testimony -- correct me if I'm wrong --
4    it's just an amount that per square
5    foot that you thought you could
6    achieve; is that correct?
7  A. Well, which comes to approximately nine
8    hundred thousand dollars annually for
9    in-scope work.  That excludes
10   out-of-scope work that we would do and
11   make a profit on.
12 Q. How much did you mark up out-of-scope
13   work?
14 A. I can't speak to that.  That was -- Jim
15   would be better, because that was
16   after -- after the execution of the
17   contract and -- and after work had
18   started.
19 Q. So with respect to out-of-scope work,
20   Jim would probably be better to answer
21   what profit was actually charged?
22 A. I think so, yes.
23 Q. And what PFMI anticipated charging?
```

Page 118

```
1  A. (Witness nodded.)
2  Q. Let me ask, did you anticipate doing
3    out-of-scope work when you entered into
4    this contract?
5  A. Generally, based on industry average,
6    there's generally about 25 percent more
7    work or revenue anticipated to receive.
8  Q. Take a look at Topic No. 14.  And it
9    reads -- the topic of examination
10   reads: All alleged, quote,
11   misrepresentations PFMI contends were
12   made by EMCOR to PFMI.  PFMI's
13   designated representative should be
14   prepared to identify the individual
15   making the misrepresentation, the time
16   of the misrepresentation, any documents
17   that contain an alleged
18   misrepresentation, and the amount of
19   damages PFMI is seeking for any alleged
20   misrepresentations.  Did I read that
21   correctly?
22 A. Yes.
23 Q. In Exhibit #14, which we've been
```

Page 119

```
1    referring to, I guess, as the BB&T bid,
2    what did EMCOR misrepresent?
3  A. One issue is square footage.  In our
4    findings that later there was a
5    document produced, Exhibit C, that
6    showed 20 percent less square footage
7    and we asked them about it two weeks
8    prior to start-up and told them then if
9    there was going to be that type of
10   reduced square footage, then we
11   couldn't do the project.  The E-mail
12   that came back to really disregard or
13   not pay any attention to that, it's for
14   budgeted purposes anyway.  And the fact
15   that EMCOR did not allow us to confirm
16   that -- that they had agreed that
17   before any deductions were made that we
18   both would agree on it.  That --
19   deductions happened before they even
20   agreed with BB&T on square footages.
21       It was represented to us in the
22   process of measuring, Sean Brookins
23   went from -- from his office to a bank
```

Page 120

```
1    in the parking lot and did a
2    measurement and told us that in his
3    calculations, it was about 4 percent
4    less square footage and that he felt
5    overall it wouldn't be any more than
6    4 or 5 percent, if not a wash.  We were
7    also told in meetings with EMCOR and
8    BB&T that -- not to worry about square
9    footages that was going to be under 500
10   square feet, plus or minus.  All those
11   were misrepresentations.
12       The trash, we were told, in
13   this -- in a document here, it tells us
14   that, as we're preparing our bid,
15   that -- from EMCOR -- that the trash,
16   nonconfidential trash, would be
17   disposed of, how it was to be disposed
18   of, consolidated by site, or how it is
19   to -- or how it is consolidated between
20   sites, the size of the dumpsters,
21   frequency of collection, and said that
22   they were going to provide us either
23   with a dumpster on site or a designated
```

30 (Pages 117 to 120)

Page 121

1    location to take trash.  And that was
2    never provided.
3    Q.  Is that what that document says?
4    A.  I'll read the document.  It says, Trash
5    removal.  BB&T will establish with
6    selected supplier the most efficient
7    method for collection and disposal of
8    nonconfidential trash.  This will
9    include defining what is to disposed of
10   and how it is consolidated by site, how
11   it is consolidated between sites, the
12   size of containers, dumpsters, and
13   frequency of collection and/or removal
14   to a licensed disposal facility.
15        And the scope of work, it also
16   states:  Collect all nonconfidential
17   trash from site, deposit it in onsite
18   container or remove to designated
19   off-site location.  EMCOR never
20   provided a designated off-site
21   location.
22        When EMCOR found out that BB&T
23   were removing more dumpsters, as

Page 122

1    already on record, we told EMCOR that
2    that would be an additional charge,
3    additional cost of labor to do that.
4    Debi Crosby said, Then you'll be paid
5    for it.  Sean Brookins later -- we were
6    never paid for it.  Sean Brookins later
7    told us to bill trash disposal as out
8    of scope.  We -- we did bill some as
9    out of scope.  Some -- some were paid.
10   Then he came back and said no, we
11   won't -- won't do that anymore.  We're
12   negotiating with BB&T on how we're
13   going to handle that.
14   Q.  How much were paid?
15   A.  We'd have to go back to an invoice,
16   invoices, to see.  But it -- it -- it
17   would not be any that we would be
18   claiming had not been paid.
19   Q.  Sure.  I'm just saying, ballpark, how
20   many -- or dollar amount, how much was
21   paid for trash removal?
22   A.  I don't know.  I would -- we would have
23   to calculate that for you.

Page 123

1    Q.  And that would be in PFMI's invoices --
2    A.  Right.
3    Q.  -- I would imagine.
4    A.  Invoices to EMCOR.  So EMCOR
5    misrepresented the issue of trash and
6    the payments of trash.  Certain vendors
7    that we were told by EMCOR/BB&T to
8    hire, some of those vendors they paid
9    for trash removal; so they selected who
10   they would pay and wouldn't pay.  But
11   in some cases, they paid certain
12   vendors and they -- and they didn't pay
13   in other ways.
14   Q.  For trash removal?
15   A.  For trash removal.
16        (Brief pause)
17   A.  Also, in reference to trash removal,
18   there was -- there was meetings with
19   BB&T that EMCOR held in reference to a
20   solution of trash removal knowing that
21   it was an additional burden and cost to
22   us to do it, knowing that -- that it
23   also caused higher turnover in

Page 124

1    employees by having to put trash in the
2    trunk of their car and carry all around
3    town.  Mark Smith also indicated for us
4    to produce him a total bill for trash
5    removal and he would present it to
6    BB&T.
7    Q.  As EMCOR's designated -- I'm sorry.
8    Strike that.  As PFMI's designated
9    corporate representative, are there any
10   other misrepresentations that you are
11   aware of?
12   A.  Is there any in the claim that I didn't
13   mention?
14        MS. TULEY:  I don't think
15        you can ask that.
16        THE WITNESS:  I can't ask
17        that question?
18        MS. TULEY:  No.  You just
19        have to tell him if
20        that's all you remember
21        or not.
22   A.  At this point, I wouldn't say that is
23   all.  That's all that -- that -- to

Page 125

1    memory at this point.
2  Q.  So to recap, one is EMCOR didn't allow
3       you to confirm square-footage numbers
4       or remeasure; correct?  That's one
5       misrepresentation?
6  A.  That is one.
7  Q.  And they told you they would; right?
8  A.  That was confirmed.
9  Q.  Who told you that?
10 A.  It was -- it was told by Sean Brookins
11      and we confirmed that phone
12      conversation back to him with a letter.
13 Q.  But the square-footage numbers that
14      PFMI's vendors were supposed to provide
15      came in roughly in December; correct?
16          MS. TULEY:  Object to form.
17              Asked and answered.  You
18              can go ahead and answer.
19 A.  They came in probably from mid October
20      through December.  And as they came in,
21      we tried to adjust the billing
22      accordingly so that the billing would
23      be more accurate, which would allow us

Page 126

1       to adjust payments back to our vendors
2       at that time and was told not to adjust
3       it, to leave the billing like it was.
4  Q.  And I believe it's your testimony you
5       don't know whether PFMI was billing off
6       of gross square footage or adjusted
7       square footage?
8  A.  It was the adjusted -- Exhibit A was
9       either adjusted or gross.
10 Q.  But you don't know which one?
11 A.  Right.  But the difference on that is
12      about 300,000 square feet.
13 Q.  And the 20 percent reductions, I guess,
14      came in April?
15          MS. TULEY:  Object to form.
16 Q.  And what I'm referring to is when
17      PFMI's billings were reduced by 20
18      percent.  That happened in April;
19      correct?
20 A.  We gave a credit in January for
21      December.  And if my timing is right,
22      the deductions started in late March or
23      in April.  But the deductions started

Page 127

1       after a conversation -- a conference
2       with Greg Swanberg, Mark Smith, after
3       we had talked to our partners and told
4       them that the reports we were getting
5       back -- nothing official, no one had
6       gotten us any documentation, no one
7       has -- still has not given us any final
8       numbers of square footage.  But it was
9       relayed back to us at this time that
10      the numbers -- that the square footage
11      that, after remeasuring several times,
12      could be as much as 20 percent.
13          We informed our vendors, our
14      alliance partners; and it was decided
15      to tell EMCOR that once again -- we
16      already told them if it was going to be
17      a 20 percent from the beginning, that
18      we couldn't do the project.  Now we're
19      getting -- months later, we're getting
20      reports, Well, it looks like it may be
21      17-20 percent.  Collectively, we went
22      back and told them, If that's going to
23      be the reductions, we're not going to

Page 128

1       be able to stay in the game with you.
2           It was after this -- it was
3       after we told them, is when they
4       started deducting.  And I believe that
5       conversation was at the end of March or
6       the first part of April.  And after
7       that conversation is when the
8       deductions started without us agreeing
9       to deductions.
10 Q.  Between December and April when the
11      deductions happened, how many
12      facilities did PFMI remeasure?
13 A.  How many did we remeasure after -- ask
14      me that question again.  I'm not
15      following you on it, Ben.
16 Q.  The surveys, the measurements, were
17      supposed to come back in ninety days.
18      Ultimately they came back -- or many of
19      them came back -- in December.  Between
20      December when the original numbers came
21      out and April when the deductions
22      happened, how many locations did PFMI
23      go and remeasure?

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 129

1  A. We were instructed by EMCOR not to
2     measure any more.
3  Q. Who instructed PFMI not to measure any
4     more?
5  A. It would have been Sean Brookins as
6     the -- they said that they would be
7     sending their techs out to measure and
8     that they would have it completed and
9     we'd be able to agree upon numbers by
10    the end of March. It was communicated
11    back to us that the first round of ever
12    how many branches they measured came
13    back in and BB&T didn't like the
14    numbers, so they sent them back again
15    to measure again, then a third
16    measurement by them with a BB&T -- in
17    some cases, we were told that an EMCOR
18    representative went to the same
19    location up to three times to
20    remeasure.
21 Q. Who told you that?
22 A. I believe Sean Brookins had indicated
23    that they had to send their people back

Page 130

1     out, some cases twice by themselves and
2     then the third would be with a BB&T
3     representative. And we were under the
4     impression that they were remeasuring
5     all locations, versus a sampling of
6     locations.
7  Q. How did you get that understanding?
8  A. Based on that they were going to go out
9     and remeasure. And as I stated, we
10    never, to date, to my knowledge, never
11    got a complete list of facilities with
12    the remeasuring. It seemed that they
13    just started deducting and continued to
14    deduct unless there was nothing else to
15    deduct.
16 Q. Did PFMI ever receive any results or
17    measurements performed by EMCOR?
18 A. The only measurements I recall we
19    received -- there was no actual
20    document showing how the facility
21    measured or a measurement form per
22    facility. But when we discussed
23    negotiating a new contract for certain

Page 131

1     regions that we would assume
2     responsibility for, they provided us --
3     I'm saying it would probably have been
4     toward the end of May -- square
5     footages for those locations. But to
6     my knowledge, we've never been supplied
7     with a complete list of facilities and
8     the findings that they made of square
9     footages.
10    (Brief pause)
11 Q. Did PFMI ever incur the cost or make
12    any effort to go and measure or
13    remeasure to confirm the accuracy of
14    the square footages for locations in
15    the BB&T contract?
16 A. PFMI did send representatives to
17    remeasure certain locations, to
18    spot-check.
19 Q. Do you recall what locations?
20 A. I do not.
21 Q. Do you recall how many?
22 A. I do not. At this point, we were told
23    they would remeasure; when the

Page 132

1     remeasurements came in, they would be
2     presented to us to spot-check and agree
3     or disagree. But we never received
4     square footages for those locations, as
5     indicated prior. In fact, it was at --
6     at some point, even though we had
7     agreed that we would receive square
8     footages, be able to go out, check on,
9     then agree or disagree, and go back
10    together to measure -- to measure. As
11    I indicated, we never received that
12    information. But in questioning Greg
13    Swanberg after many deductions had been
14    made about the square footage, it was
15    told to me that that issue's over, that
16    EMCOR had already resolved it with
17    BB&T, and that there would be no more
18    discussions of it.
19 Q. As far as remeasuring?
20 A. As far as remeasuring, that they had
21    closed that issue out, that EMCOR had
22    closed that issue out with BB&T and it
23    wouldn't be open again.

1933 Richard Arrington Jr. blvd, S*Birmingham, AL 35209*www.merrillcorp.com
1-800-888-DEPO

**MERRILL LEGAL SOULTIONS**
**Court Reporting*Legal Videography*Trial Services**

| Page 133 | Page 135 |
|---|---|
| 1   Q. It was going to be based on the new | 1   Q. Did you ask for one? |
| 2      numbers that were done by EMCOR's field | 2   A. Yes. |
| 3      techs? | 3   Q. And what were you told? |
| 4   A. It was based on -- I don't know what | 4   A. There were meetings with BB&T to |
| 5      numbers it was based on. | 5      discuss trash issues. |
| 6      (Brief pause) | 6   Q. How about these square-footage numbers, |
| 7   Q. Between September and April, September | 7      are they false? |
| 8      of 2005 and April of 2006, PFMI was | 8   A. The square-footage numbers, it's false |
| 9      billing off of what's Exhibit A, what | 9      compared to what we were paid, yes. |
| 10      we've been referring to as the BB&T | 10   Q. But you don't know as you sit here |
| 11      contract; is that correct? | 11      whether you were billing off the gross |
| 12   A. It's correct that PFMI had been billing | 12      or the adjusted; is that right? |
| 13      off of Exhibit A but had tried to bill | 13   A. It was -- it's an issue that can be |
| 14      off of new surveyed numbers as they had | 14      cleared up very quickly by asking our |
| 15      come in and was informed by EMCOR not | 15      billing person. |
| 16      to do that. | 16   Q. Sure. |
| 17   Q. Did they tell you why? | 17   A. But it was one or the other. But PFMI |
| 18   A. They said not to do that. | 18      was not paid based -- based on these |
| 19   Q. Did you ask why? | 19      two numbers, because there was |
| 20   A. I'll have to defer that to Jim Wohlers, | 20      deductions. |
| 21      because he was doing the billing. | 21   Q. You were not paid based on either the |
| 22   Q. So did a guy -- did a representative | 22      adjusted or the gross? |
| 23      from EMCOR inform you not to bill from | 23   A. Not after the deductions. |

| Page 134 | Page 136 |
|---|---|
| 1      surveyed numbers? | 1   Q. Okay. You're referring to April; |
| 2   A. He informed Jim Wohlers. | 2      correct? |
| 3   Q. And Jim told you? | 3   A. December -- January and April, because |
| 4   A. Correct. | 4      we gave a credit. |
| 5   Q. What about Exhibit #14, which is the | 5   Q. Correct. You gave that twenty-six- |
| 6      BB&T bid, what about it is false, if | 6      thousand-dollar credit in January; |
| 7      anything? | 7      right? |
| 8          MS. TULEY: Object to form. | 8   A. That's right. |
| 9   A. The trash issue is false. They did not | 9   Q. But the 20-percent deductions which |
| 10      provide designated locations. | 10      were instituted by BB&T didn't start |
| 11   Q. What would be involved in providing a | 11      until April; correct? |
| 12      designated location? | 12   A. Correct. |
| 13   A. I'm assuming you'd have to ask EMCOR | 13   Q. So from the start of the contract in |
| 14      that since this was their document. | 14      September, in September, October, |
| 15   Q. Well, did you ask EMCOR that? | 15      November, December, January there's a |
| 16   A. Yeah. | 16      credit. But for February up until |
| 17   Q. What did they tell you? | 17      maybe March, to the best of your |
| 18   A. That -- that there would be dumpsters | 18      recollection, are you billing off of |
| 19      or there would be a designated location | 19      one of those two numbers? |
| 20      supplied to take trash to. | 20   A. That's correct. But we tried to bill |
| 21   Q. Did you ever find a list of designated | 21      on the number -- survey numbers and |
| 22      locations or . . . | 22      EMCOR refused that. |
| 23   A. There was never a list given to us. | 23   Q. And that's the whole issue that Jim |

34 (Pages 133 to 136)

Page 137

1    will have or Jim Wohlers will have more
2    knowledge about that because we had
3    those dealings with EMCOR personnel;
4    correct?
5    A. That's correct.
6    Q. But it was always understood, I guess,
7        that there would be measurements done.
8        And PFMI, its vendors, ultimately
9        EMCOR, spent a heck of a lot of time
10       going out and measuring these
11       locations; correct?
12   A. I'm not sure how much time they spent.
13       I'm not sure how many they physically
14       measured. We have no reports to know.
15   Q. Sure. Are you sure that, you know,
16       your vendors actually went out and
17       measured?
18   A. On a portion of them that we told -- we
19       were up front and said that, no, we
20       were not comfortable. And we were very
21       upfront and proactive in that.
22   Q. And I believe the number you gave us
23       was 60-70 percent you were confident in

Page 138

1    or comfortable with?
2    A. I think that's -- the record will
3        reflect that statement.
4    Q. Is it a fair statement that -- I'm
5        sorry. Let me just cut through all
6        this. But there was always going to be
7        an adjustment made; it was just not
8        clear what adjustment was going to be
9        made; correct?
10   A. There was -- there was -- we never
11       claim that there was not an agreement
12       that there would be a, as EMCOR calls
13       it, a true-up, is their terminology I
14       think they use, but an adjustment based
15       on square footage. But it -- but based
16       on our findings before we started the
17       contract, that there was a document
18       between EMCOR and BB&T that showed a
19       20-percent deduction in square footage
20       and that in April, 20 percent started
21       being deducted from PFMI. So --
22   Q. Let me stop you. But until April, I
23       guess, except for the twenty-six-

Page 139

1    thousand-dollar credit, you had been
2    billing for 100 percent of the square
3    foot, hadn't you?
4    A. That is correct.
5    Q. And it's either the adjusted or the
6        gross. And if it's the gross, it's 6.9
7        million; correct?
8    A. Uh-huh.
9    Q. So for all those months, you had got to
10       bill 100 percent based on those
11       numbers.
12   A. We were told to bill. We didn't get to
13       bill. We tried to adjust it. And we
14       were instructed not to adjust it. If
15       we had adjusted it, it could have
16       prevented or would have prevented much
17       of the problems that we're encountering
18       now.
19   Q. Do you recall the percentage adjustment
20       that you were trying to make?
21   A. It wasn't a set percentage. It was
22       based on the surveys as they came in.
23   Q. Was it based on the ones you were

Page 140

1    confident on?
2    A. Yes.
3    Q. What did you do with the ones that you
4        weren't confident with? How did you
5        handle that?
6    A. You have to ask Mr. Wohlers.
7    Q. Mr. Wohlers is going to know that?
8    A. (Witness nodded.)
9    Q. What actions did EMCOR take to -- did
10       EMCOR ever tell PFMI that it couldn't
11       participate or that it was -- it
12       couldn't challenge any surveys that
13       were performed by EMCOR
14       representatives?
15   A. EMCOR never produced any surveys
16       produced by EMCOR representatives to us
17       to challenge.
18   Q. I understand that's your testimony.
19   A. They only -- they only deducted 20
20       percent.
21   Q. Okay. My question is different. My
22       question is, did EMCOR ever tell you
23       that you could not challenge whatever

35 (Pages 137 to 140)

## Page 141

1    remeasurements were done?
2  A.  EMCOR agreed that we would be able to
3      agree upon the square footage.  And we
4      were never given the opportunity to do
5      that simply because they started
6      deducting 20 percent and they never
7      gave us a complete list of measurements
8      for us to spot-check.  So in that case,
9      they did deny it.
10  Q.  But you agree that 30-40 percent of
11      these just probably weren't right?
12  A.  Thirty or 40 percent of what they
13      measured?
14  Q.  When I say "these," I'm talking about
15      the original measurements that you got
16      for the square footages for the BB&T
17      locations from your vendors.
18  A.  I would say 30 or 40 percent could have
19      been questionable.  I don't know that
20      they were not right.
21  Q.  And you don't know because PFMI didn't
22      perform any of the measurements;
23      correct?

## Page 142

1  A.  We didn't know because we didn't go
2      back and measure any of them.
3  Q.  Did you measure any of the ones that
4      were 60 or 70 percent that you felt
5      confident in?
6  A.  First measurement?
7  Q.  Correct.
8  A.  Very few, if any, Ben.  But I don't --
9      I couldn't testify to exact.
10  Q.  Sure.  But, you know, PFMI's accusing
11      my client of misrepresentation and
12      essentially making false statements.
13      Is that document right there that
14      you're looking at, which is
15      Exhibit #14, is that a
16      misrepresentation when it has gross and
17      adjusted square footage numbers?  Is
18      that a misrepresentation?
19      MS. TULEY:  Object to form.
20          Asked and answered.  Go
21          ahead.
22  A.  When they don't give us Exhibit C with
23      it that shows 20-percent reduction of a

## Page 143

1      form that's between EMCOR and BB&T and
2      somehow gets sent out for us to see and
3      then we question them on it, yes.  And
4      the trash, when it states that -- that
5      we would be provided the means of
6      disposing the trash and if we had to
7      remove it, we would get paid, that's
8      definitely misrepresentation.
9          MR. SAWYER:  Off the record.
10      (Off-the-record discussion)
11      (Brief recess)
12          MR. SAWYER:  Let's go back
13          on the record.
14  Q.  (By Mr. Sawyer) Currently, do you have
15      any ownership interest in any of the
16      subcontractors that performed work on
17      this project?
18  A.  Any ownership interest of any of the
19      subcontractors.  No.
20  Q.  During the project, did you have any
21      ownership -- you or PFMI have any
22      ownership interest in any of the
23      subcontractors?

## Page 144

1  A.  No.
2  Q.  FMI is just a coincidence; right?
3  A.  Correct.
4      (Brief pause)
5  Q.  I'm looking, I guess, at paragraph 45
6      of the Complaint that your company has
7      filed against my client, EMCOR.  It
8      says -- I'll just read it verbatim --
9      EFS knew or should have known that the
10      square footage numbers they'd placed in
11      the bid package provided to PFMI were
12      false.  I'll let you just --
13          MR. SAWYER:  I'm letting the
14          witness take a look at
15          it.
16  A.  In 45?  Knew or should have known the
17      square footage numbers they placed in
18      the bid package provided.  Okay.
19  Q.  I'm just trying -- it's kind of hard to
20      get my arms around.  The deal was
21      always that PFMI would go out and
22      measure the locations; right?
23  A.  That was what we agreed to do.

36 (Pages 141 to 144)

Page 145

1   Q. If it was PFMI's job to go out and
2     measure what the square footages
3     actually were, isn't it -- you know,
4     it's obvious that BB&T, EMCOR, whoever
5     it was, didn't have a firm
6     square-footage number.
7   A. But they had an estimated square
8     footage number based on Exhibit C that
9     they did not provide to us.
10   Q. And this has got my highlighting and I
11     apologize. But I'll mark this as the
12     next in order.
13        (Joint Exhibit #17 was
14         marked for identification.)
15   Q. We've been talking about an Exhibit C
16     that wasn't provided, I guess, to you.
17     Well, why don't you take a look at
18     Exhibit #17 and tell me what it is.
19        MS. TULEY: Off the record
20        for just a second while
21        he looks.
22     (Off-the-record discussion)
23        MR. SAWYER: Back on the

Page 146

1     record.
2   Q. Have you had the opportunity to take a
3     look at what's been marked as
4     Exhibit #17?
5   A. I have.
6   Q. Do you recall the document?
7   A. I recall the E-mail, yes.
8   Q. Is that the E-mail you've been
9     referring to in this deposition, the
10     E-mail from Steven King?
11   A. Correct.
12   Q. The spreadsheet that's attached to the
13     E-mail, did it come with that E-mail?
14   A. I could not -- I don't know.
15   Q. Well, I can represent to you that it
16     was produced in PFMI's documents. The
17     question is, well, do you know one way
18     or the other whether -- at some point
19     in time, PFMI had it because I got it
20     from PFMI. Do you know when PFMI got
21     that?
22   A. I would assume we got it after we
23     questioned the 20 percent, because it

Page 147

1     was not in the original documents or
2     bid request.
3   Q. And the E-mail that you're looking at
4     right there which is marked as
5     Exhibit #17 --
6        MR. SAWYER: And for the
7        record, it's a
8        July 11th, 2005, E-mail
9        from Steven King to Jim
10        Wohlers at 12:02 p.m.
11   A. Uh-huh.
12   Q. Does that refresh your recollection,
13     now that you've looked at that, one way
14     or the other as to whether EMCOR
15     provided an Exhibit C which showed 5.4
16     million estimated square feet?
17   A. I do know it was provided after we
18     requested the -- we questioned it.
19     Whether it was provided before, I can't
20     testify to that or exactly when it was
21     provided.
22   Q. And didn't Mr. King in that E-mail
23     which you're looking at, which is

Page 148

1     Exhibit #17, say it doesn't matter --
2        MS. TULEY: Flip it around
3        so he can read it.
4   Q. And I apologize, Mr. Littlefield.
5   A. That's all right.
6   Q. Well, I'll read from the document.
7     Bullet Point No. 2 says: The listed
8     square footage on this exhibit has
9     changed from total to estimated
10     cleanable, which results in a reduction
11     of the estimated annual cost. No. 3
12     says: No. 2 above is a nonissue since
13     PFMI will be performing actual
14     measurements of cleanable space during
15     the first ninety days.
16   A. Okay.
17   Q. So the point is, that it didn't matter
18     what the estimated cost would be
19     because PFMI and its representatives
20     were going to be performing the
21     measurements; right?
22   A. Well, it matters that it's saying that
23     square footages on this exhibit had

37 (Pages 145 to 148)

Page 149

1  changed from total to estimated, which
2  results in a reduction of the estimated
3  cost; and that reduction was
4  approximately a 20-percent reduction.
5  Q. I understand that. But what I'm saying
6  is, isn't --
7  A. And --
8  Q. Hold me. Let me finish my question and
9  you can finish your answer. But isn't
10  he saying that it doesn't matter
11  because PFMI is going to perform the
12  actual measurements during the first
13  ninety days?
14  A. It says that it didn't matter, but
15  their 20 percent came back to this 20
16  percent (indicating).
17  Q. But you didn't bill based on 5.4
18  million dollars for the first -- or in
19  September, you didn't bill on the 5.4
20  million dollars, did you?
21  A. No. We billed them based on the 6.7 or
22  6.9.
23  Q. And in October, you didn't bill based

Page 150

1  on 5.4 million square feet, did you?
2  A. That's correct.
3  Q. And you didn't in November, either?
4  A. That's correct. But we tried to bill
5  less and EMCOR denied that.
6  Q. I understand. But in December, you
7  didn't bill from anything other than
8  this either 6.9 or 6.7 million;
9  correct?
10  A. That's correct.
11  Q. In January, same thing, except you gave
12  a credit for twenty-six thousand.
13  A. That's correct.
14  Q. February, used the same billing, which
15  is either 6.9 or 6.7 million; right?
16  A. Correct.
17  Q. And March, it was billed based on these
18  same square footages; correct?
19  A. Correct.
20  Q. What is the date of Exhibit #17?
21  A. It's dated July 11th.
22  Q. Do you recall when you executed the
23  letter of intent with EMCOR?

Page 151

1  A. I believe that document says it was
2  sent to us on July 13th.
3  Q. Do you remember whether you signed it
4  on July 13th or could have been -- it
5  could have been earlier or later?
6  Probably wouldn't have been earlier,
7  would it?
8  A. Wouldn't have been earlier.
9  Q. So it could have been July. It
10  wouldn't have been earlier than
11  July 13th?
12  A. (Witness nodded.)
13  Q. And to clean up my sloppy questions,
14  PFMI wouldn't have executed the letter
15  of intent prior to July 13th; right?
16  A. That's correct.
17  Q. Could have been later?
18  A. Could have been.
19  Q. But at least by July 11th, 2005,
20  Mr. King, in Exhibit #17, this E-mail,
21  is telling you that it really doesn't
22  matter what the estimated annual cost
23  or estimated square footage is because

Page 152

1  you're going to go out and get the
2  actual numbers; right?
3  A. Prior to this letter, we informed EMCOR
4  that if it was anticipated that there
5  was going to be 20 percent less square
6  footage in the banks, that we could not
7  perform that.
8  Q. And you told who at EMCOR?
9  A. Sean Brookins.
10  Q. Is that in a phone call?
11  A. That was in a phone call.
12  Q. Is there any confirmations as far as a
13  letter or an E-mail or . . .
14  A. No, none other than the response back
15  from Steven King.
16  Q. The response back from Steven King is
17  this --
18  A. To me, this response assured us that it
19  was not perceived that there was going
20  to be a 20 percent less square footage.
21  Industry standards generally in the
22  banking industry is generally more in
23  the 3 to 4 percent, and there's --

38 (Pages 149 to 152)

Page 153

1    Q. Industry standards would have been 3 or
2        4 percent in the banking industry?
3    A. Right.
4    Q. Is that branch or high-rise?
5    A. Branch. We do not clean high-rises for
6        BB&T.
7    Q. Do you clean high-rises for anyone?
8    A. Yeah.
9    Q. Do you clean branch banking for anyone
10       else?
11   A. Yes.
12   Q. Colonial?
13   A. That's one customer.
14   Q. Did you bid Colonial during this job?
15   A. I can't recall if it was bid during the
16       job or after the job.
17   Q. Does March of 2006 ring any bells?
18   A. It doesn't ring any bells, Ben, no.
19   Q. Did you actually get the Colonial
20       Bank --
21   A. We are performing services for Colonial
22       Bank.
23   Q. Are you doing that right now?

Page 154

1    A. Yes.
2    Q. Do you recall as you sit here today
3        when you bid that job?
4    A. We started that job probably a year and
5        a half ago.
6    Q. I'm sorry -- higher math. Where would
7        that put us?
8    A. That's why I can't be for sure. I just
9        know how long ago it was.
10   Q. Whatever it is, it's probably about a
11       year and a half; right?
12   A. Yes.
13   Q. Was there ever a memorandum of
14       understanding or letter of intent or a
15       contract on the Colonial Bank job?
16   A. On all work we do, there's either a
17       letter of intent or a contract on the
18       jobs.
19   Q. Do you recall one way or the other
20       whether you were required by that on
21       the Colonial Bank job to go out and
22       measure cleanable square footage?
23   A. No, we were not.

Page 155

1    Q. You were not?
2    A. Were not.
3    Q. Was it just a lump-sum contract?
4    A. It's a firm fixed-cost contract.
5    Q. But you were not required to go out and
6        measure the cleanable square footage
7        for the --
8    A. No, we weren't.
9    Q. No field measurements were done at all;
10       right?
11   A. I can't say that no field measurements
12       were done at all, but we were not
13       required by the customer to go out and
14       measure.
15   Q. Is it customary to do that?
16   A. No.
17   Q. This was unique?
18   A. Is it customary to do what?
19   Q. To go out and verify the actual amount
20       of cleanable square footage, or is it
21       customary to do a lump sum? Or have
22       you done both?
23   A. We've done both.

Page 156

1    Q. Have you done one more than the other?
2    A. I couldn't -- couldn't say so.
3    Q. How many square feet are you managing
4        on the Colonial Bank job?
5    A. I -- I don't know what the total square
6        footage on that job would be.
7    Q. Are you self-performing? When I say
8        "you," I mean PFMI.
9    A. We are not self-performing most of
10       that.
11   Q. I'm sorry. Did you say you are not
12       self-performing?
13   A. Correct.
14   Q. What vendors are you using?
15   A. We're using -- for what service?
16   Q. Janitorial.
17   A. Janitorial? We use Varsity in a large
18       number of those locations.
19   Q. Any others?
20   A. Some smaller contractors scattered
21       but . . .
22   Q. Any other ones that were part of the
23       alliance group?

39 (Pages 153 to 156)

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 157

1  A. No, because they didn't fit into their
2     geographical regions.
3  Q. Did Mr. Cristal help you with that bid?
4     And I'm referring to Colonial Bank.
5  A. He did not help in the bid and -- and
6     he forms a pricing or he presented --
7     at the time, he was working for EMCOR.
8     And he presented EMCOR's man-in-the-van
9     portion, which we subbed out to EMCOR.
10 Q. Is EMCOR currently doing that job?
11 A. They're currently doing the Alabama and
12    Georgia regions; their subsidiary,
13    Aircon, is.
14 Q. Did there come a time when Mr. Cristal
15    came to work for you?
16 A. Yes.
17 Q. When did that happen?
18 A. I would have to, there again, get a
19    payroll record to be exact.
20 Q. Sure.
21 A. But I'm thinking it would have been
22    around April of '06 or maybe September
23    of '06. I'm not -- not positive other

Page 158

1     than looking at the, you know, payroll
2     record to verify that, Ben.
3  Q. Sure. Do you remember whether it was
4     while the BB&T job was going on?
5  A. No. If my recollection is correct, it
6     was probably six months after our BB&T
7     involvement.
8  Q. Was it after the termination letter?
9  A. Yes.
10 Q. I believe the termination letter came
11    in April of 2006 for the original
12    contract. Does that comport with
13    your . . .
14       I'll represent to you that this
15    is Exhibit #6 from yesterday's
16    deposition of Mr. Brookins.
17 A. Okay.
18 Q. And looks like Exhibit #6, which is a
19    letter from Sean Brookins to you,
20    Mr. Littlefield, is an April 28th,
21    2006, letter terminating the original
22    contract. Fair statement?
23 A. Yes.

Page 159

1  Q. So I guess the best of your
2     recollection is that Mr. Cristal came
3     on to work after --
4  A. Yes.
5  Q. -- the termination letter?
6  A. Yes. I would assume three months or
7     more. But, of course, the payroll
8     documents would be exact so . . .
9  Q. Sure. What did Mr. Cristal do for you?
10 A. What was he hired to do?
11 Q. What was he hired to do?
12 A. He was hired to sell facility services.
13 Q. Well, the way you couched it, were
14    there some problems you had with
15    Mr. Cristal?
16 A. Well, he worked -- and there again, you
17    know, our payroll records would reflect
18    exact amount of time -- but I think it
19    was less than a year for us.
20 Q. Did you fire him?
21 A. No. He went to work for, I believe,
22    another EMCOR competitor, Linc
23    Services.

Page 160

1  Q. Is that in Atlanta?
2  A. Yeah, in Atlanta.
3  Q. So he just quit?
4  A. Yes.
5  Q. You happy or sad to see him go?
6  A. No response.
7  Q. Indifferent?
8  A. Indifferent.
9  Q. During the time he was there, did
10    Mr. Cristal get any other jobs for PFMI
11    or help get other jobs for PFMI?
12 A. Not to my recollection.
13       MR. SAWYER: Off the record.
14       (Off-the-record discussion)
15       MR. SAWYER: Back on the
16       record.
17 Q. All right, Mr. Littlefield. I'm going
18    to ask this -- I'm going to try to
19    summarize and correct me where I'm
20    wrong. I just want to kind of hit some
21    points and move along so we don't hit
22    our seven-hour limit.
23       But we've been talking, I guess,

40 (Pages 157 to 160)

Page 161

1    about misrepresentations and the
2    square-footage issue. But, number one,
3    I guess we all agree that it was going
4    to be based on what was actually out
5    there, right, what square footage was
6    actually out there?
7    A. It was going to be based upon the
8    actual agreed-upon square footage.
9    Q. And that was what was actually the
10   cleanable square footage?
11   A. Yes.
12   Q. But for September through, I guess, end
13   of March, PFMI's billings were based on
14   either 6.9 or 6.7 --
15        MS. TULEY: Object to form.
16   Q. -- million square feet?
17        MS. TULEY: Same objection.
18   A. They're based upon the numbers provided
19   to us by EMCOR.
20   Q. And those numbers were 6.9 and 6.7
21   million square feet?
22   A. Now, for which months? It would not be
23   correct for all the months because all

Page 162

1    the locations did not start up at the
2    same time.
3    Q. It was a staggered start?
4    A. In some locations, certain regions. So
5    we did not bill for those entire months
6    for 6.7 or 6.9.
7    Q. It would have been from wherever you
8    were actually cleaning; right?
9    A. Right. But we assumed that we were
10   deducted based on that for all those
11   months.
12   Q. That's interesting. You assumed but
13   don't know whether you were billing for
14   work that wasn't going forward?
15   A. No. That we were deducted for work
16   that wasn't billed.
17   Q. And you're talking about the deductions
18   that occurred in April?
19   A. In April and going forward from there.
20   Q. Starting in April and going forward.
21   But it was always understood there
22   would be an adjustment; correct?
23   A. It was always understood --

Page 163

1    Q. And I'm sorry to cut you off. In fact,
2    you tried to make an adjustment and
3    EMCOR wouldn't let you; right?
4    A. That's what I'd said many times.
5    Q. Right. And that to the best of your
6    knowledge, that was because -- that was
7    based on the actuals that you had and
8    that you were -- the actual square
9    footages that you had and were
10   confident in; correct?
11   A. It was in surveys that we had received
12   back, yes.
13   Q. And I recall that was roughly
14   twenty-six thousand dollars?
15   A. What was roughly twenty-six thousand?
16   Q. The credit that you gave in January.
17   A. Yes.
18   Q. And subsequently you tried to apply
19   different credits for square-footage
20   numbers that you had -- actual
21   cleanable square-footage numbers that
22   you had and were told not to by EMCOR?
23   A. Correct.

Page 164

1    Q. Actually, Jim was told and Jim told
2    you; correct?
3    A. That's correct.
4    Q. And Jim is going to know the most about
5    why that was done?
6    A. (Witness nodded.)
7    Q. And Debi Crosby's the one that told you
8    that you would be paid for trash
9    removal; correct?
10   A. She was the one that was in charge, and
11   she was the one on a conference call
12   that indicated that we would be paid
13   for trash removal.
14   Q. My understanding is that the real issue
15   was that BB&T was removing dumpsters;
16   right?
17   A. The real issue . . .
18   Q. Well, there were certain dumpsters that
19   were on site, and BB&T was -- made the
20   decision to start removing them.
21   A. To remove -- correct.
22   Q. And that was an issue, wasn't it?
23   A. An issue with who?

41 (Pages 161 to 164)

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 165

1  Q.  With PFMI.
2  A.  It was an issue with EMCOR and an issue
3     with PFMI.
4  Q.  It was an issue with both parties,
5     wasn't it?
6  A.  (Witness nodded.)
7  Q.  Let me try to summarize this.  PFMI was
8     going to be responsible for trash
9     removal; correct?
10 A.  We were to be responsible to place
11    trash in an onsite dumpster or carry it
12    to a designated location.
13 Q.  And BB&T at some point in time made
14    some decision that they were going to
15    remove dumpsters that were on the
16    sites; right?
17 A.  That's correct.
18 Q.  And that increased your cost, didn't
19    it, or it increased your subs' cost?
20 A.  Exactly.
21 Q.  And you felt that was a change of
22    scope.
23 A.  It was a change in what our cost was

Page 166

1     going to be, yes.
2  Q.  So the real issue is for -- and correct
3     me if I'm wrong here.  The real issue
4     is where BB&T elected to remove
5     dumpsters from sites which required, I
6     believe your words were, your
7     contractors or your vendors to haul
8     trash in the trunks of their cars,
9     et cetera, and take them other places;
10    is that right?
11       MS. TULEY:  Object to form.
12 A.  The real issue is that it was addressed
13    before the contract was started and
14    that PFMI was told by EMCOR that if we
15    incurred additional costs in the effort
16    of removing trash, that we would be
17    paid for it.
18 Q.  But PFMI was going to always handle the
19    trash for where there were dumpsters on
20    site and ones where there was a
21    designated facility to put that trash
22    away or dispose of that trash; correct?
23 A.  That was the scope.  But there was

Page 167

1     never a designated location presented
2     to us.
3  Q.  For any sites.
4  A.  For any sites that I know of.  We had
5     to figure it out.
6  Q.  How did you figure it out?
7  A.  Well, we paid our subs, found -- either
8     got dumpsters put at certain locations
9     they could take it to.  They paid other
10    companies to use their dumpsters.  And
11    in some cases, it was -- it was taken
12    to another BB&T dumpster across town,
13    which were complaints about.  In some
14    cases, it was thrown in somebody else's
15    dumpster.
16 Q.  How much have you incurred or paid to
17    date -- how much has PFMI paid to date
18    for additional trash removal costs?
19 A.  Ben, I'd have to -- I don't have that
20    information in my head.
21 Q.  Is it more than a hundred thousand
22    dollars?
23 A.  I would say probably so.

Page 168

1  Q.  More than two hundred?
2  A.  We have been invoiced for more than two
3     hundred.  Yes.
4  Q.  Who were the vendors that invoiced you
5     for trash removal?
6  A.  I don't know that I can name them all.
7     But --
8  Q.  Well, of the alliance group, who were
9     your direct subtier contractors?
10 A.  I know FMI and the other alliance
11    partners was under the understanding
12    that, all along, that that was an issue
13    that was being discussed with EMCOR and
14    EMCOR was having meetings with BB&T and
15    at some date they would get paid for
16    it.  But as I said earlier, there were
17    certain other vendors that BB&T and/or
18    EMCOR directed us to use, and they paid
19    their trash invoices that came through
20    us.
21 Q.  What vendors did EMCOR direct you to
22    use?
23 A.  They directed us to use a John Parrish.

1933 Richard Arrington Jr. blvd, S*Birmingham, AL 35209*www.merrillcorp.com
1-800-888-DEPO

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 169

1  Q.  Is that an individual or a company?
2  A.  That's an individual.  I don't know his
3     company.  They directed us to use
4     Destiny Cleaning.
5  Q.  EMCOR directed you to use Destiny's
6     Cleaning.  Is that your testimony?
7  A.  EMCOR/BB&T.
8  Q.  I'm just talking about EMCOR right now.
9  A.  Okay.
10  Q.  Did EMCOR direct you to use Destiny's
11     Cleaning?
12  A.  Yes.
13  Q.  Who at EMCOR directed you to --
14  A.  Sean Brookins.
15  Q.  When did you hire Destiny's Cleaning?
16  A.  Oh, probably forty-five to sixty days,
17     maybe approaching into the ninety days
18     into the contract.
19  Q.  Did you have a direct contract with
20     Destiny's Cleaning?
21  A.  We sent a contract to Destiny's
22     Cleaning and was instructed that he had
23     not signed it because his local BB&T

Page 170

1     representative was looking it over for
2     him.
3  Q.  Did you pay Destiny's Cleaning?
4  A.  Yes.
5  Q.  Sean Brookins told you you had to use
6     this vendor?
7  A.  With -- in the office of Ronny Eller
8     with Sean Brookins, it was directed to
9     us to not only use them but when they
10     would be starting.
11  Q.  Who said that, Ronny Eller or Sean
12     Brookins?
13  A.  Ronny Eller.
14  Q.  So Mr. Eller directed you to use
15     Destiny's Cleaning, and Sean was in the
16     room?
17  A.  That's correct.
18  Q.  Is that because Destiny's Cleaning had
19     money in BB&T's accounts or did he say
20     why?
21  A.  No.  The RBOM was unhappy with the
22     changes and we had had representatives
23     in her region, all three of the

Page 171

1     previous managers I'd mentioned earlier
2     to you, there along with our vendors'
3     managers, and could not make her happy.
4     So it was directed by BB&T to EMCOR, I
5     suppose EMCOR to us, to use that
6     company.
7  Q.  Best of your recollection, was that
8     because that was who that RBOM had used
9     before?
10  A.  Yes.
11  Q.  And I believe Mr. Wohlers is going to
12     know more about the stolen proof bag.
13  A.  Yeah.
14  Q.  And --
15  A.  And there was other vendors that we
16     were directed to use.
17  Q.  What were those or who were those?  Who
18     did EMCOR direct you to use?
19  A.  Well, EMCOR is who managed us.  But the
20     word came from BB&T in many cases
21     through EMCOR to use certain other
22     vendors.
23  Q.  I'm asking about who EMCOR directed you

Page 172

1     to use.
2  A.  Well, EMCOR was in charge of the
3     contract, so all these, they directed
4     us to use.
5  Q.  Who did they -- other than John Parrish
6     and Destiny's Cleaning?
7  A.  It would be two companies in -- I
8     believe it's the Myrtle Beach area, a
9     John Cashion, and another company in
10     that region.  We were directed to not
11     use our -- our vendor, was just a week
12     or two weeks prior to that.
13  Q.  Are you aware of something termed, I
14     guess, the -- well, strike that.  Did
15     EMCOR terminate PFMI?
16  A.  Based on the termination letter, yes.
17  Q.  After that, was there a new agreement
18     reached?
19  A.  There was an agreement reached -- an
20     agreement for us to perform services,
21     and we started performing those
22     services, yes.
23  Q.  Was that agreement written or oral?

1933 Richard Arrington Jr. blvd, S*Birmingham, AL 35209*www.merrillcorp.com
1-800-888-DEPO

Page 173

1  A. It was a written agreement.  It was --
2     it was discussed orally and then put
3     into a written document.
4  Q. Was it signed by both parties?
5  A. No.
6  Q. Did you sign it?
7  A. No.
8  Q. Who signed it?
9  A. Well, I'm not sure if EMCOR signed it
10    or not.  It was sent to us by EMCOR,
11    and I don't recall if they had already
12    signed it.  I would assume they
13    probably didn't sign it before they
14    sent it to us.
15        MR. SAWYER:  Can we mark
16            this as the next one in
17            order?
18        (Joint Exhibit #18 was
19            marked for identification.)
20  Q. Take a look at what's been marked as
21    Exhibit #18 and let me know if you can
22    identify it.
23        (Brief pause while witness

Page 174

1        reviews document)
2  A. Okay.
3        MS. TULEY:  Was the question
4            for him to identify?
5  Q. Can you identify it?
6  A. It -- it is agreement with EMCOR and
7     PFMI for services to be provided in
8     certain regions for BB&T.
9  Q. And what I just heard you say is
10    there's a -- there's a written
11    agreement between EMCOR and PFMI, and I
12    heard Mr. Brookins say that yesterday.
13    Is there a written agreement between
14    PFMI and EMCOR for June of 2006 through
15    2008?
16  A. I believe, if you'll read back on the
17    cancellation letter, there was
18    reference made to them wanting us to
19    service certain areas of BB&T, which we
20    agreed to, and they agreed to pay us.
21  Q. I've read the cancellation letter.  My
22    question is different.  My question is,
23    is there a written agreement or written

Page 175

1     contract for services going forward
2     after the termination?
3  A. There's a written contract, but there's
4     not a signed contract.
5  Q. And you're not a lawyer, sir; right?
6  A. No.  I'm a janitor.
7  Q. Is there any document out there that
8     comprises the new agreement between
9     EMCOR which is signed by both parties?
10  A. Could you repeat your question?
11  Q. Sure.  Is there any document in
12    existence signed by both parties
13    memorializing the agreement between
14    EMCOR and PFMI?
15  A. There was a verbal.
16  Q. Okay.  But to your knowledge, the best
17    of your knowledge, there is no written
18    memorialization of what the agreement
19    going forward from June 2006 through
20    2008 was going to be; is that accurate?
21  A. There's no document signed.
22  Q. What was the verbal agreement between
23    EMCOR and PFMI going forward from the

Page 176

1     termination?
2  A. That under the new agreement, that PFMI
3     would service a select number of
4     locations and we would begin billing
5     based on new square footages that they
6     produced to us for those areas, and
7     that that would begin a clean slate and
8     there would be no deductions going
9     forward in the new contract.
10  Q. How long did PFMI perform under the new
11    agreement?
12  A. Approximately six weeks, a month and a
13    half.
14  Q. And that would have been in June?
15  A. Yes.  May I take a five-minute break?
16  Q. Absolutely.
17        (Brief recess)
18        MR. SAWYER:  Back on the
19            record.
20  Q. (By Mr. Sawyer) Mr. Littlefield, did
21    you have any involvement with the
22    creation of the expert report that's
23    been produced in this action?

Page 177

1 A. I don't think I had any involvement
2   other than making sure Jim produced,
3   you know, information they requested.
4 Q. Did you ever speak with the expert?
5 A. The -- I think maybe once on a
6   conference call.
7        MR. SAWYER: I believe
8          that's Mr. Capilouto?
9        MS. TULEY: Yes.
10 Q. Did you ever E-mail your expert?
11 A. I did not.
12 Q. Did you ever provide any documents to
13   him, or just Jim?
14 A. Just Jim, that I am aware, that I
15   recall.
16        MR. SAWYER: Let me mark
17          this as the next in
18          order.
19        (Joint Exhibit #19 was
20          marked for identification.)
21 Q. Take a look at what's been marked as
22   Exhibit #19 and let me first ask you if
23   you can identify this document.

Page 178

1 A. I can read that it's a document from
2   David Willis to -- to Jim and then, I
3   guess, a response from Jim.
4 Q. You ever remember being copied on that
5   E-mail?
6 A. It's quite possible, but I -- it's
7   no -- I don't know.
8 Q. In the CC line, that's your E-mail
9   address?
10 A. Where is the CC line?
11        (Mr. Sawyer indicated.)
12 A. Okay. Yes.
13        MR. SAWYER: Off the record.
14        (Off-the-record discussion)
15 Q. Does it have your E-mail address down
16   there?
17 A. It does not.
18 Q. I will represent to you that this was
19   produced to us by your attorney.
20 A. Uh-huh.
21 Q. But as you sit here today, do you
22   remember the issues that are identified
23   in this E-mail?

Page 179

1 A. It pretty much supports what we've been
2   talking about all day, that there was
3   square footages or surveys not turned
4   in and we had -- it appeared that we
5   put pressure on them to get their work
6   done. And as indicated, our plan was
7   to, as the surveys came, as I said,
8   that we would -- we would bill based on
9   the surveys coming in and EMCOR told us
10   not to. And it supports that, I guess.
11   So saying this way we'll not be going
12   back ninety days and having to make
13   adjustments.
14 Q. Okay. And the vendor that's being
15   written to there, I guess, is that --
16   David Willis, is he with FMI?
17 A. That -- I'm quite sure that is, yes,
18   FMI.
19 Q. And FMI was the vendor that you didn't
20   have a whole lot of confidences in the
21   numbers that he finally produced?
22 A. Well, they -- they at the time had not
23   produced all the numbers either.

Page 180

1 Q. And the time frame we're talking about
2   here is December, mid December,
3   December 19th, 2005?
4 A. Yes.
5        MR. SAWYER: Okay. Let me
6          mark the next in order.
7        (Joint Exhibit #20 was
8          marked for identification.)
9        MR. SAWYER: Off the record.
10        (Off-the-record discussion)
11 Q. (By Mr. Sawyer) Take a look at what's
12   been marked as Exhibit #20 in your
13   deposition. Let me first ask you, who
14   is Melanie Bullard?
15 A. She was the administrative person that
16   was hired, one of the three or four
17   that was hired.
18 Q. Take your time and read the whole
19   thing.
20 A. You want me to read it out loud?
21 Q. No, you don't have to read it for the
22   record. I just want you to . . .
23        (Brief pause while witness

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

## Page 181

1   reviews document)
2   A. Yes, I think this supports also that,
3       you know, my statement of saying we
4       tried to correct the billing and that
5       in here we're telling them that we're
6       not -- that we're going to have to
7       revert back to adjusted square footage
8       off the master list until all the
9       locations had been surveyed by EMCOR.
10  Q. Do you have an understanding of what
11      the master list is?
12  A. Well, there was many lists that came
13      out entitled master list. But the
14      master locations.
15  Q. And in those master lists, did they
16      have a column for gross square footage
17      and adjusted square footage?
18  A. Yes. Exhibit A shows gross and
19      adjusted.
20  Q. And I believe you testified that you
21      didn't recall whether PFMI had been
22      billing off the gross or adjusted; is
23      that correct?

## Page 182

1   A. That's correct.
2   Q. Does this document refresh your
3       recollection as to whether PFMI was
4       billing off of gross or adjusted?
5   A. It does not. It states that it's going
6       to revert back to adjusted square
7       footage, but I still don't know if it
8       was gross or adjusted. Based on this
9       document, it says adjusted, but that
10      could have been a clerical error of her
11      putting in. She may have not known --
12      she may have been assuming adjusted or
13      gross as being the same thing.
14  Q. And whatever the invoices show, they'll
15      show; right?
16  A. Exactly.
17  Q. Do you have a specific recollection of
18      this E-mail?
19  A. No, I don't, because I -- at this point
20      on the day to day, I was copied on it.
21  Q. But to the best of your knowledge, does
22      it appear to be true and --
23  A. Oh, yes. It's an E-mail from PFMI to

## Page 183

1   our subcontractors and alliance
2   partners.
3           MR. SAWYER: Let me mark
4       this as the next in
5       order.
6       (Joint Exhibit #21 was
7       marked for identification.)
8   Q. I know we talked about this new
9       agreement, which is apparently verbal.
10      But anyway, prior to entering into that
11      verbal agreement, do you recall any
12      negotiations between yourself and/or
13      Jim regarding what it was going to take
14      to get that agreement?
15  A. As far as what it was going to take to
16      get it . . .
17  Q. Let me form the question this way. Did
18      PFMI offer any concessions to obtain
19      the new agreement after termination by
20      EMCOR?
21  A. We were asked by EMCOR to give them a
22      statement that we would not pursue the
23      trash issue after we had already agreed

## Page 184

1   to move forward the new agreement.
2   There was a phone call stating that
3   Mark Smith said that to continue with
4   the new agreement, that we would have
5   to provide a statement from them that we
6   would not pursue the trash issue, which
7   I would not do and told them we would
8   not do. And there's E-mail -- I think
9   there's E-mail to support that.
10  Q. Take a look at what's been marked as
11      Exhibit #21. You can go ahead and
12      take --
13  A. To read all the different parts of it?
14  Q. Yes, sir.
15          (Brief pause while witness
16          reviews document)
17  A. Okay.
18  Q. Did you have a chance to finish it all?
19  A. I did.
20  Q. Is that E-mail consistent with your
21      recollection?
22  A. Yes.
23  Q. Do you agree with the statements in

1933 Richard Arrington Jr. blvd, S*Birmingham, AL 35209*www.merrillcorp.com
1-800-888-DEPO

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 185

1    that E-mail, which is marked as
2    Defendants' Exhibit -- strike that --
3    as Exhibit #21 to your deposition?
4    A.  The response of this E-mail was that
5    Mark Smith had called --
6    Q.  Well, before you get to the response,
7    let me just ask you, did you agree with
8    the statements that, I guess,
9    Mr. Wohlers is making here?
10   A.  Well, he's making these statements to a
11   request from Mark Smith, and that
12   request was for us to send a letter
13   that we would not pursue the trash
14   issue and that would be contingent on
15   the new contract.  We told him on that
16   issue that if -- if it was contingent
17   on us dropping the trash issue, that we
18   wouldn't go into a new contract.  That
19   was his call and we asked him to
20   respond by a certain date, and I don't
21   think we had a response by that date.
22   Q.  And I'm just going to read from
23   Exhibit #21.  Says:  Concerning the

Page 186

1    trash issue, PFMI will waive all trash
2    removal charges on its behalf, period.
3    Did I read that correct?
4    A.  That's what it says, yes.
5    Q.  Did you --
6    A.  However --
7    Q.  Hold on.  Did you agree with what
8    Mr. Wohlers was saying there?
9    A.  However, there's a lot more to it than
10   that one sentence.  I agree with the
11   entire paragraph.
12   Q.  Okay.  I'll read the rest of it.
13   However, there are subs that were told
14   by EMCOR and BB&T that they would be
15   paid for trash removal and have
16   submitted invoices to PFMI.  And until
17   we receive the letter requested earlier
18   this week stating that trash removal is
19   a nonbillable item and we are able to
20   resolve this with our subs, we cannot
21   waive this issue.  We would suggest
22   that PFMI and EMCOR work together to
23   resolve this issue to the benefit of

Page 187

1    both companies.  We would hope that our
2    position on the trash does not hinder
3    us from moving forward on the BB&T
4    project as we see this as an issue that
5    can be resolved.  We just do not see
6    how we can dismiss the trash issue with
7    EMCOR and BB&T with the amount of
8    exposure outstanding.
9        And you agree with that?
10   A.  Agree with that.
11   Q.  Did you ever receive such a letter from
12   EMCOR?
13   A.  I -- I do not recall that we did.  But
14   it's not my statement that we did not
15   receive one.  I do not think we did,
16   though.
17   Q.  Could have happened but --
18   A.  I don't think it did.
19   Q.  Don't believe that it did.
20   A.  Right.
21            MR. SAWYER:  Off the record.
22            (Off-the-record discussion)
23            (Brief recess)

Page 188

1    Q.  (By Mr. Sawyer) I haven't given this to
2    you yet, but please take a look at what
3    was marked as Exhibit #15.
4            (Brief pause while witness
5            reviews document)
6    A.  Okay.
7    Q.  Had you seen your deposition notice
8    before?
9    A.  I'm assuming so.
10   Q.  That's enough of an identification for
11   me.
12            MS. TULEY:  He's here.
13            MR. SAWYER:  He is here.
14   Q.  Is it a fair statement,
15   Mr. Littlefield, you wouldn't want to
16   overcharge EMCOR or BB&T?
17   A.  That's correct.
18   Q.  Fair statement that you wouldn't want
19   to charge them for square feet that you
20   weren't actually cleaning?
21   A.  It's a fair statement we would want to
22   get paid for the work we did.
23   Q.  Well, would you want to get paid for

1933 Richard Arrington Jr. blvd, S*Birmingham, AL 35209*www.merrillcorp.com
1-800-888-DEPO

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

| Page 189 | Page 191 |
|---|---|
| 1　　square feet that you weren't actually | 1　　　　REPORTER'S CERTIFICATE |
| 2　　cleaning? | 2 |
| 3　A.  We would want to get paid for the work | 3　STATE OF ALABAMA ) |
| 4　　we did. | 　　　　　　　　　　　　) |
| 5　Q.  I understand that.  But you wouldn't | 4　ELMORE COUNTY   ) |
| 6　　want to charge them for square feet | 5 |
| 7　　that you weren't actually cleaning; | 6　　　I do hereby certify that the above |
| 8　　correct? | 7　and foregoing transcript was taken down |
| 9　　　　MS. TULEY:  Object to form. | 8　by me in stenotype, and the questions |
| 10　　　　Asked and answered. | 9　and answers thereto were transcribed by |
| 11　A.  We would want to get paid for the work | 10　means of computer-aided transcription, |
| 12　　that we performed that we have not been | 11　and that the foregoing represents a true |
| 13　　paid for. | 12　and correct transcript of the testimony |
| 14　Q.  And we've been through Topics of | 13　given by said witness. |
| 15　　Examination 6, 7, 9, 13, and 14? | 14　　　I further certify that I am neither |
| 16　　　　MS. TULEY:  You can look at | 15　of counsel, nor of any relation to the |
| 17　　　　my copy to see what he's | 16　parties to the action, nor am I anywise |
| 18　　　　talking about. | 17　interested in the result of said cause. |
| 19　A.  I believe so. | 18 |
| 20　　　　MR. SAWYER:  And I believe, | 19 |
| 21　　　　Counsel, that | 　　　Barbara A. Howell, CSR No. 508 |
| 22　　　　Mr. Wohlers is going to | 20　Court Reporter and Commissioner |
| 23　　　　be brought here tomorrow | 　　　for the State of Alabama at Large |
|  | 21　MY COMMISSION EXPIRES:  12/27/08 |
|  | 22 |
|  | 23 |

| Page 190 | |
|---|---|
| 1　　　　to testify as to the | |
| 2　　　　others? | |
| 3　　　MS. TULEY:  Yes. | |
| 4　　　MR. SAWYER:  That's all I | |
| 5　　　have. | |
| 6 | |
| 7　*　*　*　*　*　*　*　* | |
| 8　　FURTHER DEPONENT SAITH NOT | |
| 9　*　*　*　*　*　*　*　* | |
| 10 | |
| 11 | |
| 12 | |
| 13 | |
| 14 | |
| 15 | |
| 16 | |
| 17 | |
| 18 | |
| 19 | |
| 20 | |
| 21 | |
| 22 | |
| 23 | |

1933 Richard Arrington Jr. blvd, S*Birmingham, AL 35209*www.merrillcorp.com
1-800-888-DEPO

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 1

IN THE UNITED STATES DISTRICT COURT FOR

THE MIDDLE DISTRICT OF ALABAMA

NORTHERN DIVISION


PROFESSIONAL FACILITIES

MANAGEMENT, INC.,

        Plaintiff,

vs.                     CIVIL ACTION NO.

                        2:06CV

EMCOR FACILITIES SERVICES,

INC.; AND A, B, AND C, AS

FICTITIOUS PARTIES,

        Defendants.

            *    *    *    *    *

        DEPOSITION OF JIM WOHLERS,

taken pursuant to notice and stipulation

on behalf of the Defendant, in the offices

of Beasley, Allen, Crow, Methvin, Portis &

Miles, 250 Commerce Street, Montgomery,

Alabama, before Nicole Paulk, Certified

Shorthand Reporter and Notary Public in

and for the State of Alabama at Large, on

August 10, 2007, commencing at 8:17 a.m.

b0948471-2d80-4e32-8b15-f0691512c0d4

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 2

1           APPEARANCES
2
3    FOR THE PLAINTIFF:
4         Scarlette M. Tuley, Esquire
5         Beasley, Allen, Crow, Methvin,
6          Portis & Miles
7         250 Commerce Street
8         Montgomery, Alabama 36104
9
10   FOR THE DEFENDANTS:
11        Benjamin H. Sawyer, Esquire
12        Sutherland, Asbill & Brennan
13        999 Peachtree Street, NE
14        Atlanta, Georgia 30309-3996
15   ALSO PRESENT:
16        Greg Littlefield
17
18
19
20
21
22
23

Page 3

1           STIPULATIONS
2
3        It is stipulated and agreed by
4    and between counsel representing the
5    parties that the deposition of JIM WOHLERS
6    may be taken before Nicole Paulk, Court
7    Reporter and Notary Public in and for the
8    State of Alabama at Large, without the
9    formality of a commission; and all
10   formality with respect to other procedural
11   requirements is waived; that objections to
12   questions, other than objections as to the
13   form of the questions need not be made at
14   this time, but may be reserved for a
15   ruling at such time as the deposition may
16   be offered in evidence or used for any
17   other purpose by either party as provided
18   by the Federal Rules of Civil
19   Procedure.
20        *   *   *   *   *
21           I N D E X
22   Examination              Page
23   By Mr. Sawyer              5

Page 4

1    Defendant's Exhibits            Page
2    22 - March 24, 2005 E-Mail from Alan   59
3         Cristal, copying Mr. Littlefield
4         and Mr. Wohlers
5    23 - E-mail from Mr. Wohlers to       65
6         Mr. King, dated 07/11/2005
7    24 - Memorandum of Understanding      79
8    25 - E-mail from Mr. Blackburn re:   110
9         Open work order report for
10        2-03-06, dated 2-07-06
11   26 - Various e-mails           122
12   27 - Various e-mails           123
13   28 - Plaintiff's First Supplemental   143
14        Responses to Defendant's First
15        Interrogatories
16   29 - Vendor Activity Report
17   30 - E-mail from Mr. Wohlers, dated   154
18        7/14/06
19   31 - AP Field Check Register       167
20   32 - Various e-mails           173
21        *   *   *   *   *
22           JIM WOHLERS, of lawful age,
23   having first been duly sworn, testified as

Page 5

1    follows:
2           EXAMINATION
3    BY MR. SAWYER:
4    Q.   Good morning, Mr. Wohlers.  My name is Ben
5         Sawyer, and I'm an attorney for EMCOR
6         Facilities Services, Incorporated.  How
7         are you doing today?
8    A.   Doing good.
9    Q.   Excellent.  Could you please state and
10        spell your name for the record?
11   A.   James, J. Wohlers, W-O-H-L-E-R-S, Jr.
12   Q.   And Mr. Wohlers, let me ask you, have you
13        ever been deposed before?
14   A.   No, sir.
15   Q.   Have you ever given any testimony in
16        arbitration before?
17   A.   Not that I recall.
18   Q.   How about a trial?
19   A.   Yes.
20   Q.   Okay.  What trial did you provide
21        testimony?
22   A.   It was a divorce trial where some work had
23        been done on some wood floors, and

2 (Pages 2 to 5)

b0948471-2d80-4e32-8b15-f0691512c0d4

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 6

1  basically just the value of that work that
2  was done.
3  Q.   It was a divorce trial?
4  A.   I think that's what it was.  I don't know
5  what they call them.  It was a
6  mother-in-law deal.
7  Q.   Okay.
8  A.   So I was a hostile witness, I guess.
9  Q.   You were a hostile witness, all right.
10  You were not being sued at the time,
11  correct?
12  A.   No, no.  I was just -- I had seen the
13  floors before they were done, knew the
14  work that was done and then the after.
15  And just more or less they were arguing
16  about the -- you know, if they had an
17  outside contractor come in, how much it
18  would have cost to do that.
19  Q.   Okay.  What time frame was that?
20  A.   Oh, that was '01, '02, somewhere in there.
21  Q.   Any other prior testimony?
22  A.   No, sir.
23  Q.   All right.  I know you were here early

Page 7

1  yesterday for Mr. Littlefield's
2  deposition, but I'll go ahead and run
3  through those rules again.  The court
4  reporter will be taking everything we say
5  down today, so we have to give verbal
6  answers -- yes or no instead of shaking
7  our head or saying uh-huh or huh-uh.  Is
8  that fair to you?
9  A.   Yes, yes -- as I shake my head.
10  Q.   If you don't understand something that
11  I've asked today or need me to rephrase
12  the question or for any reason don't
13  understand what I'm asking, don't hesitate
14  to stop and ask me to rephrase it or tell
15  me that you don't understand the question.
16  It's not your job to guess or speculate as
17  to what I'm asking; it's my job to ask a
18  good question.  Is that fair to you?
19  A.   That's fair.
20  Q.   Okay.  Is there anything that would
21  prevent you from offering truthful and
22  accurate testimony today?
23  A.   No, sir.

Page 8

1  Q.   And you understand that it's important
2  today that you tell the truth because at
3  some point in time the jury and the judge
4  in this case are going to be relying on
5  what you say to resolve this issue?
6  A.   Yes, sir.
7  Q.   Tell me about your education.
8  A.   I graduated high school in 1986 from
9  Monroe County High School; worked full
10  time; went to college; graduated with my
11  undergrad from AUM with a human resources
12  major, minor in management.  Went back --
13  started back in '97-'98.  Completed my MBA
14  in 2001 with an emphasis in management,
15  minor in human resources.  And that's
16  formal education.  I've received my PHR
17  designation, which is professional in
18  human resources, from the Society of Human
19  Resource Managers.  That was in '92 -- or
20  excuse me, that was '94.  And that
21  certificate is still current.  Has to be
22  -- every three years that has to be
23  renewed.  Previously held certificate --

Page 9

1  or certified building services executive
2  from BSCAI, a designation, but no longer
3  hold that, and I can explain that when we
4  get to work history.
5  Q.   Well, let me stop you for a second.  Where
6  did you go to college?
7  A.   Auburn University, and then master's at
8  Auburn University in Montgomery.
9  Q.   Oh, my goodness.
10     MR. SAWYER:  And this is off the
11     record a minute.
12     (Off-the-record discussion.)
13  Q.   Proceeding on.  So you received your MBA
14  from Auburn?
15  A.   Auburn University Montgomery.
16  Q.   Okay.  Did you have a bachelor's of
17  science undergrad?
18  A.   Yes.
19  Q.   And I believe you testified that was
20  management?
21  A.   That was human resources with a minor in
22  management, and then my MBA was just the
23  opposite; it was emphasis in management,

3 (Pages 6 to 9)

b0948471-2d80-4e32-8b15-f0691512c0d4

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 10

1    minor in human resources.
2  Q.   Okay.  Any other formal education?
3  A.   You know, besides seminars here and there,
4    that's pretty much it.
5  Q.   Have you ever given any seminars?
6  A.   Yes.
7  Q.   Okay.  What are some of the seminars that
8    you've given?
9  A.   Let's see.  I did my CPR, which is --
10    deals with employee communications.
11  Q.   What does CPR stand for?
12  A.   I couldn't tell you.  It wasn't my
13    seminar.  Todd Hopkins with Office Pride
14    named it; I just gave it.  And in that one
15    I've done the employer communications
16    part, employee recognition part.  And
17    let's see.  Greg and I together have done
18    the plateaus of growth, which was
19    discussed yesterday.  Greg would take
20    certain plateaus; I'd take other plateaus.
21    And that was given in Atlanta.  I -- of
22    course, this relates to work history --
23    adjunct professor at Auburn University in

Page 11

1    Montgomery, where I teach compensation and
2    HR issues normally.
3  Q.   When were you -- are you currently an
4    adjunct professor?
5  A.   I'm not teaching this semester, no.  I
6    usually do spring semesters.
7  Q.   Okay.  How long have you been teaching as
8    a professor at the university?
9  A.   Since I got my master's, three or four
10    years at least now.
11  Q.   And forgive me.  Is this at Auburn proper
12    or Auburn --
13  A.   Auburn Montgomery.
14  Q.   Okay.  And what are the courses that you
15    teach?
16  A.   They vary on semesters.  You know, I'll do
17    compensation, management.  We do one
18    class, which they give me pretty much free
19    reign, which is usually the recurring one,
20    which is termed senior projects.  And
21    basically, what we'll do in that class,
22    there's no text book; we'll just go out,
23    you know, looking at the marketplace.

Page 12

1    I'll pick topics, put together lectures on
2    each one.  You know, it'll be employment
3    practice, liability insurance.  It'll be
4    workers' compensation; it'll be, you know,
5    arguing a non-employment claim.  I mean,
6    all these little things that they don't
7    teach in class, but in the real world when
8    they get out of school, they need to know
9    it.  So those are the type of things.  It
10    varies from semester to semester.
11  Q.   Would you create a -- I guess any --
12    strike that.
13        Have you ever written any books
14    or other texts to be used by your class?
15  A.   Not books or texts.  I mean, it's usually
16    just copy.  I'll create some Power Points.
17    You know, I'll bring in guest lecturers,
18    you know, people from the EEOC or
19    Department of Labor.  You know, I'll bring
20    in different attorneys that we might use
21    for different issues and have them give a
22    lecture.
23        MS. TULEY:  I haven't been asked.

Page 13

1        My feelings are hurt.
2  A.   You know, I'll bring in accountants and
3    they'll go over just how to fill out a --
4    you know, the tax information for their
5    employees, that type of thing.
6  Q.   Do you ever bring Greg to speak at one of
7    these?
8  A.   No, I've let him out of that torture
9    thing.  It is amazing; it's a different
10    world.  And then just as far as other
11    seminars, there's just different employee
12    training seminars or safety seminars,
13    those type of things.  But I couldn't --
14    you know, confined space, those type of
15    things.
16  Q.   Okay.  Ballpark, how many would you say
17    you've given?
18  A.   50 plus.
19  Q.   Presented at 50 seminars?
20  A.   Well, either in-house seminars or those
21    type things.
22  Q.   Wow.  How many have you attended,
23    excluding the ones you just mentioned?

4 (Pages 10 to 13)

b0948471-2d80-4e32-8b15-f0691512c04d

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 14

1  A.  Two or three a year for 20 years, I guess.
2     I don't know.
3  Q.  So the 50 was a total of throughout?
4  A.  Oh, yes.  Yeah.  That wasn't in the past
5     year.
6  Q.  All right.  Have you taken any special
7     trainings concerning facilities
8     management?
9  A.  You know, through BSCAI, I mean, to obtain
10    the CBSC designation, you know, you have
11    to go through -- there's a series of
12    self-study books that you have to go
13    through, from safety and security,
14    accounting, bidding and estimating, a
15    laundry list.  I couldn't name all the
16    books.  It's been quite a while since I've
17    done that.  I know I've taken bidding and
18    estimating from BSCAI, you know, gone
19    through the employer communications
20    myself, successful supervision seminars
21    with them.
22 Q.  Have you taken any accounting classes?
23 A.  Yes.

Page 15

1  Q.  In college?
2  A.  With my undergraduate, Accounting I, II,
3     III; my master's, Accounting -- I think it
4     start off with managerial accounting, and
5     then I think there were two more after
6     that, one with taxes, one with insurance
7     and real estate.  And then, of course,
8     tied in with that is the finance classes,
9     you know, Finance I and II, and then
10    Finance I and II under the MBA level.
11 Q.  Are you a CPA?
12 A.  No.
13 Q.  And you mentioned that you had taken some
14    trainings in estimating, bidding, et
15    cetera?
16 A.  Yes.
17 Q.  Okay.  Did you participate at all on the
18    estimate or the bid on this job?
19 A.  No.
20 Q.  That was just Greg?
21 A.  That was just Greg.  My involvement in
22    that was no more than, you know, sending
23    an e-mail.  Historically, for our company,

Page 16

1     that's not my world.
2  Q.  Okay.  Let's go to your work experience.
3     After you got out of school -- or let me
4     back you up, I guess.
5  A.  Yeah, let's go back.  In '85, I started
6     working with a company, BD&S, which is a
7     building service contractor.  Of course, I
8     was still in high school at that point in
9     time, worked stripping and waxing floors,
10    doing janitorial, that type of stuff.
11    When I went off to college, I would work
12    with them in the summer.  You know, I laid
13    out of college for a couple years, worked
14    full time with that, and then in '90,
15    '91 -- BD&S is located in Monroeville,
16    Alabama.  I would drive back and forth
17    from Monroeville to Montgomery to finish
18    up my undergrad while working full time
19    there.  Work with BD&S till approximately
20    '96 or '97.  Left that one and -- I guess
21    back up real quick.  BD&S, like I said, I
22    started off at the bottom and worked my
23    way up to operations manager.

Page 17

1  Q.  When did you become operations manager?
2  A.  That was probably '87.
3  Q.  You moved up quick.
4  A.  Well, small company.
5  Q.  Okay.
6  A.  You know, and of course, responsibilities
7     there under operations were human
8     resources and the day-to-day operations of
9     the company on that.  Like I said, '96-'97
10    range, I went to work with a company, Stay
11    Fast Worldwide --
12 Q.  Well, let me ask you, why did you leave
13    BD&S?
14 A.  Well, small company, you know, limited
15    opportunity.  You know, I'd pretty much
16    grown as far as I could grow at that
17    company.
18 Q.  Did the new job pay more?
19 A.  No.
20 Q.  No?
21 A.  No, but better opportunity.
22 Q.  Were you fired from BD&S?
23 A.  No.

5 (Pages 14 to 17)

b0948471-2d80-4e32-8b15-f0691512c0d4

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 18

1   Q.   Okay.  What was the name of the company
2        where you moved?
3   A.   Stay Fast Worldwide, and it was textile.
4        Couple things, you know, better
5        opportunity, gave me more opportunity to
6        use what I had gone to school for.
7        Started off there as human resource
8        manager; six months later, promoted to
9        production manager; and approximately
10       three months after that, production and
11       assistant plant manager.  Worked there
12       until approximately 2000.
13  Q.   What were the -- strike that.
14            How many people did you manage
15       as the human resource manager for Stay
16       Fast?
17  A.   Approximately 250 directly on that site.
18       Stay Fast had three other plants -- one in
19       Brooklyn, one in Mexico one in the
20       Philippines -- besides ours, so I also --
21  Q.   Where was the plant located?
22  A.   Uriah, Alabama.
23  Q.   How do you spell that?

Page 19

1   A.   U-R-I-A-H.  So if you're down there, it's
2        Uriah.
3            (Off-the-record discussion.)
4   Q.   All right.  So you managed 250 people at
5        Stay Fast?
6   A.   Yes.
7   Q.   In Uriah?
8   A.   Yes.
9   Q.   Okay.  How did your job scope change when
10       you became production manager?
11  A.   I was still responsible for human
12       resources, but I was responsible for
13       day-to-day operations of the sewing
14       factory, which, of course, was production.
15  Q.   It was a sewing factory?
16  A.   It was a sewing factory.
17  Q.   What did they sew?
18  A.   This is interesting.
19            THE WITNESS:  You may not want to
20       take all of it down.
21  A.   We made nothing but bra fasteners.  Our
22       primary customer was Vanity Fair, of
23       course, Victoria's Secret.  400,000 dozen

Page 20

1        bra fasteners a month was what our goal
2        was.  That's a lot of bras.
3   Q.   Yes, it is.
4   A.   You never realized bras came in that many
5        colors.
6   Q.   Goodness.
7   A.   It was an interesting job.
8   Q.   I can imagine.
9   A.   Oh, yeah.
10  Q.   All right.  Well, after you left Stay --
11       I'm sorry.  Did you have a new job title
12       after production manager?
13  A.   Just assistant plant manager slash
14       production manager.
15  Q.   So you were promoted again?
16  A.   Yes.  I got to fire my boss, so it was --
17       yeah.  I took orders directly out of our
18       New York office.  We were owned by a
19       holding company.
20  Q.   Who was your boss that you fired?
21  A.   It was a guy, Curt -- what was his last
22       name?  I can't even remember his last
23       name.  It was a vicious company.  They had

Page 21

1        me move him out of his office in the front
2        and move him out on the production floor
3        first before they fired him.  It was just
4        -- it was run out of Manhattan; it was
5        obvious.
6   Q.   What year were you assistant plant
7        manager?
8   A.   It was probably about '99.
9   Q.   And how did your job scope change?
10  A.   From production manager to the -- it
11       didn't change a whole lot, really.  I
12       mean, before Curt was released, I was
13       pretty much -- they were going to me for
14       all the things he was supposed to be doing
15       anyway -- you know, daily reports,
16       answering questions as to why things
17       weren't running like they were supposed
18       to, you know.  So it didn't change a whole
19       lot; it was just...
20  Q.   In terms of effect?
21  A.   Yeah.
22  Q.   How long did you work as assistant plant
23       manager?

6 (Pages 18 to 21)

b0948471-2d80-4e32-8b15-f0691512c0d4

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 22

1   A.   Probably just a year.
2   Q.   Where did you work after that?
3   A.   With PFMI, Professional Facilities
4        Management.
5   Q.   How did you come to work for PFMI?
6   A.   All right.  In 1989, I had met Greg
7        Littlefield at a BSCAI seminar, I think in
8        Nashville.  Probably when I was working
9        with BD&S and going to different seminars
10       and conventions with BSCAI, on occasion
11       would just speak with Greg -- Greg
12       McGehee, Littlefield, other employees
13       there.  So we got to know each other.  I
14       believe in -- oh, go ahead.  Was that a --
15  Q.   Well, in '89, you were working at BD&S,
16       right?
17  A.   Yes.
18  Q.   Okay.  So -- and they also provided
19       facility services, correct?
20  A.   Yes, yes.  In fact, they -- it was a funny
21       situation, because we were -- at that
22       time, BD&S was a more established company.
23       You know, Greg got into this business in

Page 23

1        '89, when he bought Mr. Janitor.  So at
2        that point, we had been in business about
3        five years, you know, and one thing -- you
4        know, so at that point Greg would ask us
5        sometimes questions -- you know, how we
6        did things, how we approached things, you
7        know.
8   Q.   Do you recall how you met Greg?
9   A.   Yeah, at a BSCAI seminar, just -- you
10       know, you're wearing a name tag.  Greg is
11       quite a networker, you know, always
12       picking brains on ways to do things, so I
13       think just really bumped into each other
14       and, you know, my name tag says
15       Monroeville, Alabama, and his says
16       Montgomery, Alabama, and -- you know, a
17       little different type of work that we
18       performed, so it was pretty easy -- you
19       know, there wasn't that -- janitorial is
20       an odd business with sharing information
21       sometimes, but --
22  Q.   What do you mean by that?
23  A.   Well, you know, in some industries, it's

Page 24

1        very -- you know, people aren't going to
2        tell you what they bid on things or how
3        they bid things or what they do, because
4        oftentimes you're dealing with -- you
5        know, there's so many items involved
6        there, it's open discussions as to, well,
7        this is the way we approach it; this is
8        the way we do this.  So there's a lot of
9        open discussions on this.  This is how we
10       strip a floor; we find these chemicals
11       work best.  It's an open industry.  So
12       like I said, we had met several times at
13       convention seminars, those type of things.
14       In '99, approximately, my sister called me
15       and she said, I don't know if I just
16       messed up, because some guy stopped by my
17       house trying to find you, so I don't know
18       if you're in trouble or what, but I gave
19       him your number.  And of course, it was a
20       salesperson that worked for PFMI.  Got to
21       talking with Greg, you know, more or less,
22       he said he'd been impressed with the way I
23       -- you know, with me and meeting me but

Page 25

1        never wanted to step over that line and
2        step on Al's toes -- which was my boss, Al
3        Brewton; he owned BD&S.  So out of
4        respect, he never approached me on
5        anything.  And he had learned I was out of
6        the industry now.  And we started talking
7        in May of 2000 -- I believe May 17th, give
8        or take a day.
9   Q.   I hope, sir, that you can also remember
10       your anniversary.
11  A.   No, I can't.  I fail that test miserably
12       every time, and the same with birthdays.
13  Q.   All right.  So you met on or about May 17
14       -- or I'm sorry, you were approached in
15       May of 2000?
16  A.   No, actually, Greg and I started talking
17       in January of 2000.  You know, I didn't
18       really have a reason to leave Stay Fast,
19       you know, so we went back and forth with
20       discussions on benefits, salary,
21       opportunity, that type of stuff.  And when
22       they started teaching me Spanish at the
23       sewing plant, Greg's offer looked a little

7 (Pages 22 to 25)

b0948471-2d80-4e32-8b15-f0691512c0d4

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 26

1  bit better.
2         MR. SAWYER:  Off the record.
3         (Off-the-record discussion.)
4  Q.  All right.  So where were we?
5  A.  May of 2000 I went to work with PFMI.
6  Q.  And you were approached in --
7  A.  Somewhere in January of 2000 -- well,
8      probably a little earlier.  And I might be
9      a little off on my dates, but it was
10     somewhere in that time frame.
11 Q.  When you first started with PFMI, what
12     were your --
13 A.  I was primarily responsible for human
14     resources and their IT.
15 Q.  What was your job title?
16 A.  I believe just human resources manager.
17 Q.  As human resources and IT manager --
18 A.  Yeah.  I mean, we just had a -- the
19     computer system we used -- in fact, I
20     started off on what was a DOS-based
21     system, so I had a pretty good knowledge
22     of what --
23 Q.  A what based?

Page 27

1  A.  DOS.
2  Q.  Could you spell that?
3  A.  What is it, D-O-S?
4  Q.  Oh, DOS?
5  A.  Back when I took programming, that's all
6      they taught, was DOS.
7  Q.  Have you taken any computer classes?
8  A.  I mean, just programming.  But a lot of
9      it's self-taught or being on hold with
10     support for hours on end.
11 Q.  Did you take programming in college?
12 A.  Yes, it was DOS.  And, you know, through
13     job training at Stay Fast I learned a lot.
14     You know, one of my direct bosses, he was
15     -- or in fact, one of the owners of our
16     company was one of the founder's
17     grandson's of IBM, so it was a very IT
18     environment.
19 Q.  What were your responsibilities as human
20     resource and IT manager when you first --
21 A.  Well, pretty much, you know, started off
22     evaluating the whole HR program.  At that
23     point in time, all of PFMI's employees

Page 28

1  were leased employees through a PEO,
2  professional employment organization.  So
3  it was -- some of it was limited because
4  I'd step on their toes wanting to do
5  things.  But, you know, reviewing, hiring,
6  firing, putting together employment -- you
7  know, at that point in time, PFMI had been
8  in business quite a while, but on the
9  human resources side, it was limited in
10 the systems for human resources.  You
11 know, we didn't have a good employment
12 application or a good interview technique.
13 So it was really putting together systems
14 and procedures for how to manage HR.  And
15 then I guess about a year later we brought
16 all of our employees in-house, meaning
17 they were all direct employees of PFMI.
18 Q.  Well, you said they were leased.  Was that
19     from some type of temp --
20 A.  That was from Skill Staff PEO,
21     professional employment organization.
22     Based on our payroll, they would mark up a
23     percentage to account for them processing

Page 29

1  a payroll and workers' comp handling,
2  unemployment claims.
3  Q.  And I believe you testified that under I
4      guess your supervision and Greg's, that
5      those employees were later brought
6      in-house?
7  A.  Yes.
8  Q.  What time frame were those employees
9      brought in-house as direct employees?  Go
10     ahead.
11 A.  I would say 2001.  I mean, spring of 2001,
12     somewhere, maybe fall of 2001.  I'm not
13     really sure.
14 Q.  Why was the decision made to bring
15     employees that had been leased in-house at
16     PFMI?
17 A.  One of the downfalls I think were the PEO.
18     They were self-insured for workers' comp,
19     and, you know -- yeah, for workers' comp.
20     We didn't like the fact that they managed
21     our workers' comp claims.  Well, if they
22     didn't do a good job of managing that
23     claim and it cost more than it should have

8 (Pages 26 to 29)

b0948471-2d80-4e32-8b15-f0691512c0d4

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 30

1    to close out that claim, all they did was
2    pass along that percentage on our charge.
3    So it didn't seem like -- well, that was
4    one reason.  Number 2, we wanted to be
5    able to offer a wider range of benefits to
6    our employees; they didn't like that.  And
7    then a third reason is just cost.  PFMI at
8    that point had 200 or some employees --
9    that's an estimate -- and it was getting
10   cost prohibitive, that percentage -- you
11   know, we had the software in place.  That
12   was one of the things with the IT.  We
13   already owned the software to run all our
14   payroll.  We had everything we needed,
15   just no one to manage it.  When I came in,
16   I knew how to make that work, and we
17   brought it in and were able to do it more
18   cost-effective.
19 Q.   With respect to the workers' comp, sounds
20      like they had an incentive to --
21 A.   To not manage.
22 Q.   Because the worse they managed it, the
23      more they got paid?

Page 31

1  A.   Exactly.  And that was my argument.
2  Q.   So how long were you the human resources
3       manager?
4  A.   A couple of years.  I'm not -- I'm not
5       sure --
6  Q.   Well, let me ask you this way:  Did your
7       job title and work scope ever change at
8       PFMI?
9  A.   Yes, it has evolved.  We bought out -- I
10      say bought out -- a partner we had in the
11      Dothan region.  And at that point in time,
12      Greg gave me the opportunity, because of
13      my operations background, to manage that
14      region as well as manage human resources.
15      You know, so that was day-to-day
16      operations of the janitorial services and,
17      you know, Dothan along the gulf coast
18      area.  As the company continued to grow, I
19      wasn't able to be out of the office two
20      and three days a week to manage -- to work
21      out of the Dothan office, so we hired a
22      manager for that.  My focus --
23 Q.   Who was that?

Page 32

1  A.   I believe it was Adam Littlefield.  He was
2       a manager in Montgomery.  I think he
3       assumed some of that responsibility down
4       there.
5  Q.   Any relation to Greg?
6  A.   I believe cousin, nephew, something.  I'm
7       not sure.
8  Q.   Okay.
9  A.   So yeah, Adam took over.  He took over
10      those operations.  I moved primarily back
11      into the office, continued with HR, and
12      got more involved in some more day-to-day
13      operations.  In '04-'05, we had a change
14      in some of the accounting office -- our
15      CFO retired.  We had an accounting
16      manager, you know, so I started taking
17      over more of the back office functions, is
18      what we call them, overseeing those
19      positions in accounting, purchasing, HR,
20      you know, anything -- like I said, we call
21      them back office functions there, the
22      marketing, that type of thing.
23 Q.   Who was the CFO?

Page 33

1  A.   That was Hugh Foshee, F-O-S-H-E-E.
2  Q.   Approximately what time did he retire?
3       Let me ask it this way:  Was it before the
4       BB&T job?
5  A.   It was before BB&T.
6  Q.   And who was the accounting manager?
7  A.   I think -- are you asking more who was
8       accounting manager when BB&T was on?
9  Q.   Well --
10 A.   Well, Johnny Cobb was in accounting.  I
11      cannot recall if he was in accounting when
12      we started the BB&T/EMCOR job or if it was
13      Libby Johnson, who is our current
14      accounting manager/controller.
15 Q.   So just so I'm clear, Libby Johnson was
16      the accounting manager for PFMI during the
17      BB&T account?
18 A.   I believe so.  She's been on since then.
19      I'm not sure if she was on when we started
20      BB&T or not; I'd have to look at the
21      employment file.
22 Q.   Okay.  If -- well, who was the accounting
23      manager immediately prior to?

9 (Pages 30 to 33)

b0948471-2d80-4e32-8b15-f0691512c0d4

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 34

1   A.   John Cobb.
2   Q.   John Cobb.  So it's possible that both of
3        them worked on the BB&T account?
4   A.   It's possible.  I don't think so, but it's
5        possible.
6   Q.   What was your job title when you began to
7        handle I guess what you refer to as back
8        office things?
9   A.   I believe Greg just -- I had been promoted
10       up to vice president, and then what
11       followed that really depended on what type
12       of job I was doing.
13  Q.   What time frame were you promoted to vice
14       president?
15  A.   You know, I believe -- and I'm not 100
16       percent on this -- it was '03 or '04.  I'm
17       not sure, though.
18  Q.   You mentioned I think you met Greg at A
19       BOMA function?
20  A.   No, BSCAI.
21  Q.   Okay.  What does BOMA stand for?
22  A.   I think building office managers
23       association or something.  I'm not 100

Page 35

1        percent.  I'm not as involved.  I've seen
2        it, I know about what it is, don't know
3        what the acronym is exactly.
4   Q.   Do either BOMA -- and that's B-O-M-A; it's
5        an acronym -- or BSCAI produce any
6        publications to your knowledge?
7   A.   BSCAI does, and, you know, I believe BOMA
8        does.
9   Q.   When you started work at PFMI -- I believe
10       you testified it was 2000, 2001, sometime
11       around there?
12  A.   Yeah.  Well, it might have been a little
13       earlier.  It was somewhere from '99 to
14       2000.
15  Q.   What was the scope of some of the projects
16       that you were working on?
17  A.   Trying to think at that point in time.  I
18       know not long after I started they were
19       awarded the West Point Stevens contract,
20       which is textiles, up in Valley, Georgia
21       -- Valley, Alabama --
22            MS. TULEY:  Valley is in Alabama.
23            THE WITNESS:  Even though they're

Page 36

1             on fast time.
2             MS. TULEY:  Yeah, they're on
3             Georgia time.
4   A.   -- which was, you know, a managerial
5        contract.  They were doing -- they had two
6        scopes of business, really, or two types
7        of janitorial contracts that they were
8        working on, one what's referred to as
9        site-based.
10  Q.   What's site-based?
11  A.   Site-based would be West Point Stevens and
12       International Paper, where a site manager
13       is hired.  All the employees, when they
14       report to work, go directly to that site.
15       We think of a site -- a good analogy, if
16       you think of a Family Dollar store.  It's
17       a self-contained unit almost.  And then we
18       have had, you know, down the street
19       business, which is small accounts where it
20       might just be a one or two hour account
21       where the employee goes directly there,
22       clocks in from there, does their hour,
23       two, three hours, whatever the case might

Page 37

1        be, and goes home.  Or they might hit, you
2        know, a route of those down the streets
3        where they're hitting three or four of
4        those to make four or five hours a night.
5        At that point in time, though, I was --
6        you know, as human resources, I wasn't
7        very involved in the actual operations.
8   Q.   Okay.  So since -- I guess with human
9        resources you wouldn't have much
10       involvement, I guess, with projects that
11       were going on --
12  A.   Yeah.  Like I said, West Point I was
13       familiar with because I went up there and
14       helped hire, interviewed on-site people
15       that wanted to stay on, you know, with our
16       company while they were leaving the other.
17       But that was really it.
18  Q.   Did your involvement change at all when
19       you became vice president in 2004 or 2005
20       with respect to involvement with projects?
21  A.   To some degree, yes.  You know, at that
22       point in time, we'd go out -- you know,
23       basically all management would go out when

10 (Pages 34 to 37)

b0948471-2d80-4e32-8b15-f0691512c0d4

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 38

1    we started up a new account to work on
2    site helping to train new cleaners, doing
3    that type of thing. I'm trying to think
4    what else. You know, just referring to
5    '04, you know, that's probably it. Then
6    as it's developed, you know, have been
7    more involved in the P&L side of it, those
8    type of things.
9  Q.   When you say P&L, do you mean profit and
10      loss?
11 A.   Profit and loss.
12 Q.   Okay. When you came on as vice president,
13      what were -- let me ask it this way: What
14      was the size of some of the projects you
15      were working on?
16 A.   As far as bid amount or employee size
17      or...
18 Q.   In terms of revenue and square footage
19      managed?
20 A.   Company revenue or -- and I mean, I'm not
21      trying to -- I'm just trying to make sure
22      I understand the question. I mean,
23      because, you know, the bid sizes for

Page 39

1    specific bids would vary. I mean, there
2    would be some that were $2,000 a month,
3    $500 a month bids. There were some bids
4    -- and like I said, I wasn't as involved
5    in the bid numbers, you know, that were,
6    you know, $30,000 a month, $70,000 a
7    month, you know, $80,000 a month, so there
8    was a wide variety of bids at that point
9    in time. Square footage, same. You know,
10     of course, a $500 a month account wasn't a
11     lot of square footage.
12 Q.   When you became vice president, what was
13      the largest project in terms of square
14      footage that PFMI had managed or
15      participated in?
16         MS. TULEY: Object to the form.
17 A.   Best I could do is a guess. I'm not --
18      again, because I didn't deal as much with
19      square footage, you know, I didn't see a
20      lot of the bids. At that point I wasn't
21      involved in that. Let me think. I'm just
22      trying to think of the largest one we were
23      doing at that point. Might have been West

Page 40

1    Point or Propex. And I'm not -- best I
2    could do is guess at square footage. I'm
3    not sure.
4  Q.   And as vice president -- I guess, again,
5       it was 2004-2005?
6  A.   Somewhere in there, yeah.
7  Q.   And you were handling profit and loss,
8       right?
9  A.   Yeah. Well, when Hugh retired, then I
10      started handling that aspect of it more.
11      Prior to that, I would do more setting up
12      the charter accounts, formatting the
13      profit and loss statements, those type of
14      things. So not necessarily responsible
15      for the bottom line, but responsible for,
16      you know, invoices coming in, reviewing
17      those invoices, making sure they were
18      legitimate charges, you know, slapping
19      hands when invoices -- things were charged
20      that shouldn't be charged or that type of
21      thing. And then because of my knowledge
22      of the software, I formatted the P&L
23      statements and formatted billing and did

Page 41

1    that type of thing.
2  Q.   So part of your job responsibility I guess
3       at that point would be to -- for lack of a
4       better word, vet the billing that you were
5       receiving the payment of accounts payable?
6  A.   Rephrase that.
7  Q.   Well, I'm sorry. You said that you would
8       slap hands when invoices were paid that
9       shouldn't have been paid?
10 A.   Yeah. Well, not necessarily invoices, but
11      if they put a charge on a charge account
12      that shouldn't -- you know, there's limits
13      in the company. You know, over $500 they
14      have to have approval for a charge.
15 Q.   You're talking about billing to overhead
16      for --
17 A.   Well, not billing to overhead,
18      necessarily, but -- take an example of
19      West Point. They go out and buy mops to
20      mop the floor. Up to a limit, that's
21      fine. When it hits a dollar threshold,
22      they need to make corporate aware that
23      they're going to charge this so we're

11 (Pages 38 to 41)

b0948471-2d80-4e32-8b15-f0691512c04d

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 42

1  aware, you know, that -- make sure they
2  have the proper PO, make sure PO matches
3  invoices, invoices match price, you know,
4  negotiating with vendors for pricing.
5  When I say vendors, supply vendors, you
6  know, that type of thing.
7  Q.  In 2004-2005, what was the largest account
8  that PFMI had in terms of square footage?
9  A.  You know, this would be a guess on my
10  part.  It would either be West Point or
11  Propex, I'm not sure.  And I'm not sure of
12  the square footage on either one of those.
13  Q.  Okay.  Were either one of those larger
14  than a million square feet?
15  A.  I couldn't tell you.  They're both big.  I
16  mean, I don't know -- you know, Propex is
17  eight plants scattered along Georgia and
18  Alabama.  I mean, total plant size, yes.
19  You know, same with West Point, yes.
20  Q.  To the best of your recollection, I guess,
21  then, Propex was management of about eight
22  plants?
23  A.  Yes.

Page 43

1  Q.  Okay.  And West Point, how many facilities
2  I guess or --
3  A.  Four or five.  You know, West Point is
4  textile.  And, you know, it would be four
5  one month, might be six the next month,
6  depending on where they shifted
7  production.
8  Q.  For West Point, what was the approximate
9  revenue annually?
10  A.  Oh, annually?  Somewhere over a million
11  dollars, I'm guessing.  The billing was
12  done on a monthly basis, based on hours
13  worked.
14  Q.  Could have been more, could have been
15  less?
16  A.  Could have been more, could have been
17  less.  It's evolved a bit.
18  Q.  What about for Propex?
19  A.  Same.  A little over a million, could be
20  more, could be less, depending on what we
21  did within that annual period.
22  Q.  Prior to September 2005, what was the
23  largest project that PFMI had been

Page 44

1  involved with in terms of square footage
2  or revenue?
3  A.  You know, I could only speak to --
4      MR. SAWYER:  That was compound,
5      sorry.
6  Q.  Prior to the September 2005, what was the
7  largest project to your knowledge that
8  PFMI had worked on?
9  A.  And I would just -- this is strictly a
10  guess.  I mean, you know, I would say
11  somewhere around a million square feet.
12  And I'm not really sure.
13  Q.  Well, I don't want you to guess.  Is there
14  any reason you would doubt that that would
15  be correct?
16  A.  Well, there might be larger ones.  You
17  know, really, what I see -- a lot of times
18  what I see is dollars.  I don't
19  necessarily see the square footage number,
20  so...
21  Q.  In terms of dollars, what's the largest
22  account that you can recall prior to
23  September 2005?

Page 45

1  A.  You know, I believe West Point, but I --
2  again, I couldn't be 100 percent on that,
3  because there's accounts that have
4  started, you know -- or had ended prior to
5  that, that, you know, I couldn't say for
6  sure.
7  Q.  I believe the record will reflect it was
8  your best knowledge that it was roughly a
9  million dollars annual plus or minus for
10  West Point?
11  A.  Yes, I believe.
12  Q.  Okay.  Prior to September 2005, how much
13  work on a percentage basis did PFMI
14  self-perform?
15  A.  You know, 80 percent, I guess.  I'm not...
16  Q.  When you came on as vice president in
17  2004, how many direct employees did PFMI
18  have, roughly?
19  A.  At that point, it was four to five
20  hundred.  And like I said, that's an
21  estimate.  I'm not sure without looking at
22  an actual employee count.
23  Q.  When you became vice president, did PFMI

12 (Pages 42 to 45)

b0948471-2d80-4e32-8b15-f0691512c0d4

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 46

1    ever have occasion to subcontract out 100
2    percent of the work?
3  A.   I don't know how I can answer that without
4    just guessing. There might be operations
5    that yes, they did, but...
6  Q.   But to your knowledge as you sit here
7    today, you don't recall?
8  A.   Not that I recall, no.
9  Q.   Okay.
10       MR. SAWYER: Off the record.
11       (Brief recess.)
12  Q.   Let's go back on the record. Mr. Wohlers,
13    I've handed you what's been marked as
14    Exhibit 16 from the deposition of Greg
15    Littlefield. Could you take a look at
16    that?
17       (The referred-to document was
18        marked Defendant's Exhibit No.
19        16 in a prior deposition and
20        is not attached hereto.)
21  A.   All right.
22  Q.   Let me first ask you, have you ever seen
23    that document before, that document being

Page 47

1    Exhibit 16?
2  A.   I believe so, yes, sir.
3  Q.   If you'll turn to Exhibit A, which you
4    already have open, it's my understanding
5    that you're being produced as a corporate
6    representative today for Topic Number 2,
7    Professional Facilities Management, Inc.
8    agreements with EMCOR.
9  A.   Yes, sir.
10  Q.   To perform work and/or provide services on
11    banking and trust locations; is that
12    correct?
13  A.   Yes, sir.
14  Q.   And you're also being produced as a
15    corporate representative for PFMI for
16    Topics 3, 4, 5, 8, 10, 11, 12, 15, 16, 17,
17    and 18?
18  A.   Yes, sir.
19       (Off-the-record discussion.)
20  Q.   Okay. I've just conferred with counsel,
21    and the exact -- Topic Number 1, the exact
22    amount in calculation of each category of
23    damages, that will be handled by someone

Page 48

1    else?
2       MS. TULEY: Yes. That will be
3        handled by our expert.
4  Q.   When did you first hear about the BB&T
5    account?
6  A.   The first time I heard about it was
7    February '05.
8  Q.   And how did you come to know about the
9    BB&T account?
10  A.   I believe, you know, just in conversation
11    with Greg.
12  Q.   What was discussed between you and Greg?
13  A.   I really don't recall the exact
14    conversation, just there was an
15    opportunity.
16  Q.   What involvement, if any, did you have
17    helping Greg after he informed you of the
18    BB&T opportunity?
19  A.   As far as preparing the bid or as far as
20    --
21  Q.   As far as anything?
22  A.   The entire project?
23  Q.   Yes.

Page 49

1  A.   You know -- well, let's try and go --
2  Q.   Let me form a more precise question. In
3    February of '05 or somewhere thereabouts,
4    you heard about the BB&T account from
5    Greg, correct?
6  A.   Yes.
7  Q.   Okay. After Greg informed you there might
8    be an opportunity to work on the BB&T
9    account, how did you help Greg or how were
10    you involved in that prior to award of the
11    account?
12  A.   Really nothing more than printing out some
13    documents and passing those along to him.
14  Q.   What type of documents would you print
15    out?
16  A.   I think just the bid package itself.
17  Q.   And if you would, take a look at what was
18    marked as Exhibit 14 yesterday in
19    Mr. Littlefield's deposition. I know you
20    were here yesterday, but you didn't get a
21    chance to look at it all --
22       (The referred-to document was
23        marked Defendant's Exhibit No.

13 (Pages 46 to 49)

b0948471-2d80-4e32-8b15-f0691512c0d4

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 50

1           14 in a prior deposition and
2              is not attached hereto.)
3    A.   No.
4    Q.   -- so please take your time.
5    A.   All right.
6    Q.   First of all, let me ask you this, have
7         you seen what's marked as Exhibit 14
8         before?
9    A.   Most of it I have.  I couldn't say that
10        I've seen all of it, no.
11   Q.   What parts haven't you seen?
12   A.   Well, let me put it this way:  If I've
13        seen it, I don't recall seeing it; I'll
14        put it that way.  Because very often when
15        I print out an e-mail, it might just be --
16        something like this, I'm not opening every
17        attachment.  The bulk of the RFP, if it
18        was sent to me, I printed it out, but I
19        couldn't say that I read through the
20        entire thing.  And I think that would be
21        about it.
22   Q.   What do you specifically recall seeing
23        before?

Page 51

1    A.   As far as with the bid prep or with the --
2    Q.   Any of those documents?
3    A.   I mean, I'd say I recall seeing most all
4         these documents before.
5    Q.   What is your understanding of what Exhibit
6         14 comprises?
7    A.   My understanding is it's a bid package.
8    Q.   Now, you're being produced today as the
9         corporate representative for PFMI for the
10        scope of work to be performed by PFMI for
11        EMCOR; is that correct?
12   A.   Yes, sir.
13   Q.   Okay.  Is -- well, let me just ask it this
14        way:  Do those documents comprise the
15        scope of work to be performed by PFMI for
16        EMCOR?
17   A.   Yes, it does.
18   Q.   If you would, take a look at -- within
19        Exhibit 14, there's a spreadsheet which is
20        longer than the others, and it's kind of
21        thick.  I'm sorry, it's not that one; it's
22        the --
23   A.   The master location --

Page 52

1    Q.   That's it, master location list.
2    A.   All right.
3    Q.   First let me ask you, was this a unit
4         price contract with EMCOR, or was it a
5         lump sum contract?
6    A.   I believe it was -- when you say unit,
7         square footage?
8    Q.   Correct, square footage based on a unit
9         price number.
10   A.   It was unit-based.
11   Q.   Okay.  And I know you didn't have any
12        involvement with coming up with the unit
13        price number -- coming up with that, but
14        you did have involvement with, I guess,
15        the scope of the work, as far as the
16        locations that would be performed by PFMI?
17   A.   I don't understand the question in the
18        scope of work.
19   Q.   Well, did you have any involvement with
20        analyzing, I guess, the amount of
21        locations that would be performed by PFMI
22        or the amount of square footage that would
23        be performed by or proclaimed by PFMI

Page 53

1         prior to the awarding of the contract?
2    A.   No.
3    Q.   And that would have been Greg?
4    A.   I believe so.
5    Q.   Okay.  And I think you were sitting here
6         yesterday -- well, take a look through the
7         summary at the end, which shows the -- no,
8         you're on the right page.
9              MS. TULEY:  The last page.
10   A.   Oh, all right.
11   Q.   You're on the right page.
12   A.   All right.
13   Q.   And there's a couple of columns.  One
14        column is for gross square footage and the
15        other is for adjusted square footage.  Do
16        you have an understanding of what gross
17        square footage means in the industry?
18   A.   I believe so.
19   Q.   Okay.  What is that understanding?
20   A.   That it's total building size.
21   Q.   Okay.  Is it from the outside wall or the
22        inside wall?
23   A.   Outside wall.

14 (Pages 50 to 53)

b0948471-2d80-4e32-8b15-f0691512c0d4

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 54

1    Q.   Okay.  And how would you calculate gross
2         square footage?
3    A.   The way we do it, of course, is we'll
4         measure length times width, subtract any
5         odd angles, and multiply it out.
6    Q.   And you would subtract the odd angles and
7         get gross square footage?
8    A.   Normally, yes.  If the building goes down
9         a side and it's not a square, we would not
10        multiply it out as a square.  That would
11        be done differently.
12   Q.   Do you have any idea of what adjusted
13        square footage is?
14   A.   Yes, sir.
15   Q.   What is it?
16   A.   It would be gross minus, you know, any
17        vacant square footage.
18   Q.   Is there a difference between adjusted
19        square footage and net cleanable square
20        footage?
21   A.   In regards to?
22   Q.   Just would there be a difference?  Are
23        those two terms different or are they

Page 55

1         synonymous?
2    A.   I guess it's depending on who's using
3         those terms.
4    Q.   Okay.  Do you have an understanding of
5         what net cleanable square footage means, I
6         guess, in the industry?
7    A.   Yes.
8    Q.   Okay.  What is that understanding?
9    A.   It would pretty much be the same -- to me,
10        very similar to adjusted square footage.
11        It would be your gross minus obviously
12        non-cleanable or vacant space.
13   Q.   Do you recall what time frame the
14        documents in Exhibit 14 were given to
15        PFMI?
16   A.   I don't recall.  I mean, I believe I saw a
17        cover sheet to an e-mail.  That's the only
18        way I could tell you when it was given.
19   Q.   But as you sit here today, you don't have
20        an independent recollection of the
21        approximate time when you would have
22        gotten it?
23   A.   No, sir.

Page 56

1    Q.   Definitely would have been before July 13,
2         2005, right?
3    A.   I believe so.
4    Q.   Because that's when we entered into the
5         letter of intent, right?
6    A.   Yes.
7    Q.   Okay.  Do you ever recall a document
8         referred to as an Exhibit C?
9    A.   Yes.
10   Q.   I think Mr. Littlefield testified about
11        that a little bit yesterday.  And I'll
12        just go ahead and let you take a look at
13        what was marked as Exhibit 17.
14             (The referred-to document was
15              marked Defendant's Exhibit No.
16              17 in a prior deposition and
17              is not attached hereto.)
18   A.   All right.
19   Q.   First let me ask if you can identify what
20        was marked as Exhibit 17 to
21        Mr. Littlefield's deposition.
22   A.   Yes, I can identify it.
23   Q.   Okay.  What is it?

Page 57

1    A.   It appears to be Exhibit C.
2    Q.   Now, the record will reflect whatever
3         Mr. Littlefield said, but do you recall
4         ever receiving an Exhibit C prior to the
5         contract?
6    A.   Yes.
7    Q.   Okay.  When do you recall?
8    A.   Again, without -- I looked at the e-mail,
9         but I couldn't tell you when I actually
10        received Exhibit C.  I mean, I know the
11        e-mail refers to it, but I don't know
12        exactly when I received it.
13   Q.   Okay.  And I think if you'll turn to the
14        last page of Exhibit 17, I think it shows
15        an estimated square or usable cleanable
16        square feet of 5.4 million; is that
17        correct?
18   A.   Yes, sir.
19   Q.   Did you ever have any discussions with
20        Mr. Littlefield concerning Exhibit C,
21        which you have in front of you and is
22        marked as Exhibit 17?
23   A.   I can recall discussions about Exhibit C,

15 (Pages 54 to 57)

b0948471-2d80-4e32-8b15-f0691512c0d4

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 58

1  but not just with Greg.
2  Q.  Did you ever review it with him and
3  explain that part of the transition of
4  Phase 1 included measuring the cleanable
5  and adjusting it to reflect the actual
6  square footage?
7  A.  Yes, we discussed that fact.
8  Q.  And I think Mr. Littlefield's testimony
9  was -- and again, the record will say what
10  it says; your counsel can and will object
11  here -- but there was some talk about
12  Exhibit C out there that showed 5.4
13  million square feet estimated that wasn't
14  provided to PFMI.  Do you recall that?
15       MS. TULEY:  Object to the form.
16  A.  That it wasn't provided to PFMI?
17  Q.  Right.
18  A.  You know, I think -- you know, Exhibit C
19  was basically -- we were told that it was
20  an non-issue; it was created specifically
21  for budget purposes by EMCOR and just to
22  basically disregard it.
23  Q.  Who told you that?

Page 59

1  A.  Sean Brookins and Steven King.
2  Q.  Did they tell you why you should disregard
3  it?
4  A.  That they created it strictly for budget
5  purposes for BB&T to look at numbers and
6  that was it.
7  Q.  Okay.  Let me mark this as the next
8  number.
9       (Off-the-record discussion.)
10  Q.  I only have one copy.
11  A.  Oh, that's fine.  All right.
12  Q.  Can you identify what's been marked as
13  Exhibit 22?
14       (The referred-to document was
15        marked for identification as
16        Defendant's Exhibit No. 22.)
17  A.  It appears to be an e-mail.
18  Q.  Do you recall it?
19  A.  No, sir, not specifically.
20  Q.  For the record, it's a March 24, 2005
21  e-mail from Alan Cristal that copies
22  Mr. Littlefield and Mr. Wohlers.  Well,
23  let me ask you this:  Is that your correct

Page 60

1  e-mail address?
2  A.  Yes.
3  Q.  Okay.  And at the time, Mr. Cristal was an
4  EMCOR employee, right?
5  A.  Yes.
6  Q.  And he was the EMCOR representative?
7  A.  Yes.
8  Q.  Okay.  If you would, could you -- and I'm
9  sorry, the e-mail is dated March 24, 2005.
10  If you would, could you read from Exhibit
11  22, starting here?
12  A.  (As read:) "Mr. Cristal, please read below
13  for changes to the attached exhibit.
14  Please contact me if you have any
15  questions in regards to these revisions.
16  Revised Exhibits C dot 5, janitorial
17  pricing by site, and Exhibit C dot 2,
18  sample site survey pricing.  The attached
19  Exhibit C consolidated C dot 1 through C
20  dot 6, cost proposal, contains revisions
21  to the exhibits noted above.  Please
22  replace the original Exhibit C,
23  consolidated C dot 1 through C dot 6, cost

Page 61

1  proposal with this workbook.  Exhibits C
2  dot 2 and C dot 5, which are tabs within
3  the master exhibit, have had square
4  footage revised.  The original adjusted
5  square footage has been modified to
6  reflect usable cleanable square feet.
7  Your pricing quotes should be based upon
8  this cleanable square footage which
9  reflects reduction in space to account for
10  equipment and mechanical rooms, electrical
11  and storage closets, and vertical
12  penetration.  These space reductions
13  reduce the total square footage to an
14  estimated 5.4 million square feet.
15  Pricing may be adjusted ongoing if actual
16  usable cleanable square feet changes.
17  Note for Exhibits C dot 5, janitorial
18  pricing by site, and Exhibit A, location
19  identification information.  Locations
20  subject to minor changes upon final review
21  prior to contract signing and ongoing s a
22  result of mergers, consolidations,
23  closings, and/or openings.  Exhibit C,

16 (Pages 58 to 61)

b0948471-2d80-4e32-8b15-f0691512c0d4

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 62

1    consolidated C dot 1 through C dot 6, cost
2    proposal, revised 03/23/05 dot XLS,
3    sincerely, Matt."  And it's signed -- or
4    the electronic signature is Matt
5    Llewellyn.
6    Q.   Who is Matt Llewellyn?
7    A.   A BB&T employee.
8    Q.   Fair statement, EMCOR didn't hide Exhibit
9         C from PFMI, did they?
10             MS. TULEY:  Object to the form.
11   A.   It doesn't appear so, no.
12   Q.   They actually provided it, didn't they?
13   A.   Yes.
14   Q.   Okay.  And at least as of March 24, 2005,
15        BB&T was telling EMCOR PFMI that the
16        square footage numbers might be 5.4
17        million, correct?
18             MS. TULEY:  Object to the form.
19   A.   Yes, it appears.
20   Q.   Okay.  And the contract in this case was
21        entered into July 11, 2005 -- or strike
22        that -- July 13, 2005?
23   A.   I'm not sure on the date, but that sounds

Page 63

1    accurate.
2    Q.   After reviewing what's been marked as
3         Exhibit 22, is there any doubt in your
4         mind who prepared the square footage
5         numbers?
6              MS. TULEY:  Exhibit 22?
7              MR. SAWYER:  Exhibit 22.
8              MS. TULEY:  Object to the form.
9    A.   Yes, there is.
10   Q.   Okay.  What doubts do you have?
11   A.   A comment by Steven King that he put
12        together Exhibit C and provided it to
13        BB&T.
14   Q.   When did Steven tell you that -- Steven
15        King tell you that he put together Exhibit
16        C?
17   A.   You know, I'm not sure of the exact date,
18        but when Exhibit C was brought up by BB&T,
19        called thinking FMI was low-balling some
20        of its current vendors and trying to get
21        vendors in place, they said, you know, FMI
22        is out there using numbers that are 20
23        percent below what we're currently doing.

Page 64

1    You know, their exact thing was pretty
2    much, what the hell is going on.  I got a
3    call from Sean Brookins asking me what was
4    going on.  Greg got a call, you know,
5    saying, why are we out there using numbers
6    that are 20 percent below what they're
7    currently doing.  So Greg, Steven, Sean,
8    and representatives from FMI all got
9    together on a phone call.  And like I
10   said, at that point in time, I was in his
11   office when they were discussing Exhibit
12   C, and that's when Steven King made the
13   comment that, you know -- well, Sean made
14   the comment that Exhibit C shouldn't be
15   used, that they should use the -- I forget
16   what square footage, but it wasn't the
17   square footage off Exhibit C.  And Steven
18   made the comment that that document had
19   been created for BB&T just for budget
20   purposes.
21   Q.   I'm going to mark this as the next in
22        order, which is -- let me hand you what is
23        marked as Exhibit 23.

Page 65

1              (The referred-to document was
2               marked for identification as
3               Defendant's Exhibit No. 23.)
4    A.   All right.
5    Q.   Can you identify what's been marked as
6         Exhibit 23?
7    A.   Yeah.  It appears it's an e-mail, you
8         know, regarding Exhibit C again.
9    Q.   Okay.  Could you read from where you're
10        actually responding?  And for the record
11        it's --
12   A.   Down here?
13   Q.   Yes.
14             MR. SAWYER:  It's an e-mail
15             trail, but what I'm asking
16             the witness to read from is
17             from his e-mail dated
18             07/11/2005.
19   A.   All right.  (As read:)  "Steven, I
20        received and discussed with Greg and
21        everything looks good.  Part of the
22        transition P-L -- I'm assuming it's plan;
23        it's cut off -- includes measuring the

17 (Pages 62 to 65)

b0948471-2d80-4e32-8b15-f0691512c0d4

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 66

1  cleanable and adjusting to reflect actual
2  square footage."
3  Q.  Could the -- could that be P-L as in Phase
4  I?
5  A.  No, I don't believe so.
6  Q.  Okay.  You believe it's plan?
7  A.  I believe it's plan.
8  Q.  Okay.  Did you have those discussions with
9     Greg concerning measuring these locations
10    and adjusting it to what's actually out
11    there as far as square footage?
12 A.  I'm sure I did, yes.
13 Q.  Did Greg say that that was okay?
14 A.  I assume he did.  I mean, I don't recall
15    the exact discussion though.
16 Q.  Sure.  Did he say everything looks good?
17 A.  I assume he did.  I mean, looking at the
18    e-mail, that's what he said.  But I
19    couldn't say.
20 Q.  All right.  If you would turn to the last
21    page of it.
22 A.  All right.
23 Q.  There's an attachment stating that Exhibit

Page 67

1  C, janitorial pricing by --
2  A.  By --
3  Q.  Sit?
4  A.  Yeah.  I'm assuming site, but...
5  Q.  The document actually didn't come with the
6     attachment broken out from the parent, but
7     does it appear that Exhibit C was also
8     provided in this e-mail or a copy at least
9     to this e-mail?
10 A.  It appears.  I -- you know...
11 Q.  Okay.  It doesn't appear that EMCOR was
12    hiding the ball with Exhibit C, does it?
13       MS. TULEY:  Object to the form.
14 A.  Not hiding Exhibit C, no.
15 Q.  Okay.  Did Mr. King ever tell you why
16    Exhibit C -- strike that -- why the
17    estimate -- did Steven King ever tell Jim
18    Wohlers why the 5.4 million square foot
19    number in the estimated square foot column
20    didn't matter or why it was just for
21    budget purposes?
22 A.  You know, I only recall Steven ever saying
23    that basically they just took the gross,

Page 68

1  reduced everything by 20 percent, and
2  that's how they arrived at that number.
3  Q.  Okay.  My question is a little different.
4     Did Mr. King ever tell you why the
5     estimated square footage numbers on what
6     we've looked at -- I believe it was
7     Exhibit 17 -- why the estimated square
8     footage numbers didn't matter?
9  A.  Why Exhibit C didn't matter?
10 Q.  Or the 5.4 million square foot numbers in
11    Exhibit C, why that didn't matter?
12 A.  Well, I believe what he said was that
13    Exhibit C was a non-issue because
14    remeasurement would be performed.
15 Q.  And that was going to be performed by PFMI
16    during the first 90 days?
17 A.  Yes.
18 Q.  Okay.  Was it 90 days from the execution
19    of the contract, or was it 90 days from
20    the start of work in September?
21 A.  I believe it was from start of work in
22    September.
23 Q.  And when, if you recall, did PFMI enter

Page 69

1  into contracts with its sub-tier vendors?
2  A.  Without looking at the actual
3     subcontracts, I couldn't say.
4  Q.  Well, let me ask it this way:  Were those
5     contracts, the contracts with your
6     sub-tier vendors, were those executed or
7     entered into before or after EMCOR's
8     contract with PFMI?
9  A.  After.
10 Q.  All of them would have been after?
11 A.  I believe so.
12 Q.  Okay.  Because it doesn't make sense to
13    get a contract before you have a --
14 A.  Well, and that's -- yeah.  We want to make
15    sure it reflects what our contract is.
16       MR. SAWYER:  I'm mixing up my
17          depositions here.  Do you
18          have an Exhibit 17?
19 Q.  I'm handing you again what's marked as
20    Exhibit 17 to your deposition -- or to
21    Mr. Littlefield's deposition.  If you can
22    turn to the spreadsheet behind the first
23    page of Exhibit 17.  Do you have a

18 (Pages 66 to 69)

b0948471-2d80-4e32-8b15-f0691512c0d4

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 70

1  recollection one way or the other whether
2  the spreadsheet, which is identified at
3  the top of the page as Exhibit C dot 5,
4  janitorial pricing by site, whether that
5  Exhibit C is the same as the exhibit
6  that's referenced in the e-mail from BB&T
7  on March 24, 2005?
8      (The referred-to document was
9      marked Defendant's Exhibit No.
10     17 in a prior deposition and
11     is not attached hereto.)
12 A.  That -- I don't know.  I mean...
13 Q.  But it's true that the 5.4 million square
14 footage number is the same?
15 A.  Yes, it is.
16 Q.  And what's the run date on that
17 spreadsheet, which is Exhibit 17?
18 A.  Revised 3/23/05.
19 Q.  Okay.  If you could look at the date of
20 the e-mail on Exhibit 23 from the BB&T
21 personnel -- I apologize, it's Exhibit 22,
22 not Exhibit 23.
23 A.  The e-mail from Matt to Alan, the date?

Page 71

1  Q.  Yes.
2  A.  It appears to be 3/24/05.
3  Q.  So pretty close in time to the run date on
4  the spreadsheet that's attached or
5  included in Exhibit 17?
6  A.  Yes.  Do you want this one or just put it
7  over there?
8  Q.  You can put it over there.  Do you have
9  any reason to doubt that the spreadsheet
10 that's included in Exhibit 17 is not the
11 same spreadsheet as the one that's
12 referenced in Exhibit 23?
13     MS. TULEY:  I object to the form.
14     I think that was a double
15     negative.
16     MR. SAWYER:  That was a terrible
17     question.  I'll leave that
18     on the record.  You can put
19     it down.  Let me ask it
20     differently.
21 Q.  Do you believe that the spreadsheet that
22 shows 5.4 million square feet and is
23 identified as Exhibit 17 is the one that

Page 72

1  was forwarded to PFMI on March 24?
2  A.  It appears to be.
3  Q.  Thank you.  Did you have any involvement
4  with the negotiations of the contract
5  between EMCOR and PFMI?
6  A.  Not the letter of intent.
7  Q.  Anything?
8  A.  As far as the agreement?
9  Q.  As far as contract goes, yes.
10 A.  Not negotiations.  I mean, verbiage in the
11 contract or how it reads, yes, but not --
12 not what I'd call negotiations.
13 Q.  Well, in the letter of intent, verbiage in
14 that?
15 A.  No, no.  I don't believe -- I don't recall
16 having anything to do with the letter of
17 intent.
18 Q.  There was never a definitive contract or a
19 different contract than the letter of
20 intent though, was there?
21 A.  There was -- there was an agreement, you
22 know, that we had reviewed and, you know,
23 went back and forth with Debi Crosby and I

Page 73

1  want to say Joseph something at EMCOR.  I
2  believe he was their counsel.
3      MR. SAWYER:  Off the record.
4      (Off-the-record discussion.)
5  Q.  But a different contract other than the
6  letter of intent was never signed; is that
7  accurate?
8  A.  There was one signed by PFMI, but I don't
9  know if EMCOR ever signed it.
10 Q.  For the original contract?
11 A.  Yes.
12     MR. SAWYER:  Off the record
13     again.
14     (Brief recess.)
15 Q.  Mr. Wohlers, you're also being produced
16 today as the corporate representative
17 regarding the measurements of BB&T's
18 locations conducted by PFMI?
19 A.  Yes.
20 Q.  And PFMI's sub-tier contractors and other
21 entities on behalf of PFMI.  Did PFMI ever
22 perform any field measurements of BB&T's
23 bank locations?

19 (Pages 70 to 73)

b0948471-2d80-4e32-8b15-f0691512c0d4

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 74

1  A.  Yes.
2  Q.  Okay.  How many?
3  A.  All locations were measured.
4  Q.  Okay.  And let me ask the question more
5      precisely.  Did any direct personnel of
6      PFMI ever perform any field measurements
7      of BB&T locations?
8  A.  Yes.
9  Q.  Okay.  Who did that?
10 A.  Keith Blackburn, Ken Law, John Sauter,
11     S-A-U-T-E-R, Buz Campbell, B-U-Z.  He's
12     touchy about the second Z.  And those are
13     the ones I recall.
14 Q.  Did these individuals from PFMI perform
15     the initial measurements of the BB&T bank
16     locations?
17 A.  I can't recall if they did any initial
18     ones.
19 Q.  Did PFMI have a subcontractor go out and
20     measure BB&T bank locations in order to
21     get the actual square footage to be
22     cleaned out there?
23 A.  Yes.

Page 75

1  Q.  Did the subcontractors do this in all
2      instances?
3  A.  Yes.
4  Q.  And what I'm trying to get at is whether,
5      first, the subcontractors went out and
6      measured and then some individuals from
7      PFMI went out and remeasured?
8  A.  Yes, that occurred.
9  Q.  Okay.  But is it a fair statement that the
10     subcontractors performed the initial
11     measurement?
12 A.  Yes, yes.  I -- like I said, I can't
13     recall if we performed any initial
14     measurements.  Keith might have, but I --
15     like I said, I can't recall.  But yeah,
16     subs -- we did rely on the subs to go out
17     and measure.
18 Q.  Okay.  But for the bulk of it, it would
19     have been the subcontractors initially?
20 A.  Yes.
21 Q.  Okay.  What direction did PFMI give to its
22     subcontractors concerning, I guess,
23     protocol for measuring these locations?

Page 76

1  A.  Yeah.  Without looking at the specific
2      instructions, I mean, I -- to the best of
3      my recollection is really all I could
4      provide.
5  Q.  Okay.  So there are specific instructions?
6  A.  I believe there are, yes.  But we had a
7      meeting at the EMCOR Air Con (phonetic)
8      facility -- not sure -- end of June,
9      beginning of July; I'm not sure of the
10     date -- in which all our primary vendors,
11     you know, were there.  Sean Brookins and
12     Alan Cristal were there, also with EMCOR,
13     and we reviewed -- we had several agenda
14     items, and one of those items was the
15     performance of measurements, how those
16     surveys needed to be conducted and the
17     form that needed to be filled out for
18     those surveys.
19 Q.  Who generated -- well, first let me ask
20     you the specific instructions you were
21     referring to, who created the specific
22     instructions to -- for PFMI's vendors to
23     go out and perform these field

Page 77

1      measurements?
2  A.  I believe it was a discussion between
3      myself and Sean Brookins.
4  Q.  Okay.  Is there some document I could look
5      at that would show what instructions were
6      given to the subcontractors concerning
7      measurements of these BB&T locations?
8  A.  I can't recall right off.  I believe there
9      was an e-mail that gave those
10     instructions.
11 Q.  So as you sit here today, it could have
12     been -- strike that.
13         Could it have been a formal
14     document?
15 A.  I don't believe it was a Word document.  I
16     believe it was a -- you know, my
17     recollection, it was an e-mail.
18 Q.  Okay.  A mass e-mail sent out to all
19     vendors?
20 A.  Yeah, this is what needs to be done.
21 Q.  Do you recall what time that mass e-mail
22     would have gone out?
23 A.  No, not specifically.

20 (Pages 74 to 77)

2100 3rd Avenue North, Suite 960*Birmingham, AL 35203*www.merrillcorp.com
1-800-888-DEPO

b0948471-2d80-4e32-8b15-f0691512c0d4

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 78

1  Q.  Would it have been before or after
2      September 6, 2005, when the work started?
3  A.  I know one went out after September --
4      after the work was started, but I couldn't
5      state for sure if one went out prior.
6  Q.  During the time of -- after execution of
7      the letter of intent and before the start
8      of the work in September, was PFMI doing
9      any other large accounts or performing
10     work on any other large accounts?
11 A.  I don't recall right off.
12 Q.  Well, let me ask it this way:  What was
13     the other biggest thing you had going
14     except for the BB&T account?
15 A.  You know, without looking at a customer
16     file, I couldn't say for 100 percent what
17     that would be.
18 Q.  Do you remember bidding on work for
19     Colonial Bank in August of 2005?
20 A.  Me specifically, no.
21 Q.  Okay.  You wouldn't have been involved in
22     that?
23 A.  Not the bid itself, no.

Page 79

1  Q.  Okay.  Were you aware of it?
2  A.  In August?  I couldn't say in August I
3      was.
4  Q.  Well, let me just mark this.  I apologize;
5      the highlighting is mine.
6          (The referred-to document was
7           marked for identification as
8           Defendant's Exhibit No. 24.)
9  A.  All right.
10 Q.  Did PFMI ever get the work for Colonial
11     Bank?
12 A.  Yes, they did.
13 Q.  Okay.  What was the size of the contract?
14 A.  The initial?
15 Q.  Yes.
16 A.  I believe it was approximately $180,000 to
17     $200,000 dollars per month.
18 Q.  That's a pretty big contract.
19 A.  Yes.
20 Q.  Would you say it's -- strike that.  Sounds
21     like it's a little smaller than the BB&T
22     account?
23 A.  Yes.

Page 80

1  Q.  But still very large, nonetheless?
2  A.  Yes.
3  Q.  Higher math, a little over 3 million or --
4  A.  What, square footage?
5  Q.  No, dollars, annual revenue?
6  A.  That sounds accurate.
7  Q.  I'm just doing 200,000 times 12 in my
8      head.
9  A.  Yeah.
10 Q.  When was PFMI awarded that work?
11 A.  April or May of '06.
12 Q.  Okay.  So the bid was going on in August
13     2005, but the award didn't actually go out
14     until April of 2006?
15 A.  Correct.
16 Q.  Okay.  Was any work performed for the
17     Colonial Bank job prior to the contract
18     award in April of 2006?
19 A.  Rephrase that.  I'm sorry.
20 Q.  Sure.  Did PFMI perform any work on the
21     Colonial Bank job before it received the
22     Colonial Bank contract?
23 A.  You mean -- are you asking --

Page 81

1  Q.  Did you go out and perform services before
2      you had the contract?
3  A.  Before a signed contract?
4  Q.  Correct.
5  A.  Not prior to the letter of intent, as far
6      as I'm aware.
7  Q.  Are you referring to Exhibit 24, which is
8      a memorandum of understanding?
9  A.  Yeah.
10 Q.  Do you know when that was executed?
11 A.  No.  Not without looking at the actual
12     signed document, I wouldn't know when that
13     was executed.
14 Q.  Okay.  For that job as well, did PFMI have
15     to go out and measure square footage or
16     verify square footage?
17 A.  No.  I mean, I think there were some spot
18     checks here and there, but it wasn't -- it
19     wasn't that we had to go out and measure
20     every branch.
21 Q.  Could you read the fifth bullet point?
22 A.  During the period of 8 August 2005 through
23     20 August 2005, PFMI field personnel will

21 (Pages 78 to 81)

b0948471-2d80-4e32-8b15-f0691512c0d4

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 82

1    conduct surveys of each Colonial branch
2    site to verify square footages that were
3    returned from Colonial's internal survey.
4  Q.   And is it your testimony that didn't
5    happen?
6  A.   It's my testimony I don't know if that
7    happened. I wasn't involved.
8  Q.   Fair enough. Now, I know you testified
9    that there was e-mail concerning -- or
10   definitely discussions concerning how the
11   field measurements were to happen. Do you
12   recall the substance of either the
13   discussions or e-mails as far as what the
14   subcontractors were supposed to include --
15   or strike that -- how they were supposed
16   to perform the field measurements?
17 A.   From the e-mail specifically?
18 Q.   I'm not asking you to regurgitate the
19   e-mail, just your best recollection of
20   what PFMI instructed its subcontractors to
21   do with respect to field measurements.
22 A.   To visit each location, measure exterior
23   length, time, width --

Page 83

1  Q.   That would give them the gross, right?
2  A.   Yes.
3  Q.   Okay. Go ahead.
4  A.   Then go inside, take -- you know, take
5    measurements of any obviously vacant
6    spaces or non-cleanable spaces. You know,
7    break down measurements, VCT carpet,
8    window counts. I don't believe it was a
9    fixture count; I couldn't be sure on that,
10   though. Drive-through count, you know,
11   number of drive-through lanes, exterior
12   ATM, exterior trash cans, those type of
13   things. And the form we had put together,
14   you know, basically broke down each one of
15   those items and gave them total square
16   footage and then a breakdown of each one
17   and then the total cleanable.
18 Q.   I know this may seem overly simplistic,
19   but can you describe for me what would be
20   vacant -- an example of vacant square
21   footage?
22 A.   Well, let's see. Vacant square footage.
23   Let's say there was a two-story building.

Page 84

1    You know, of course, they measured length
2    times width, which gave them the diameter
3    or gross square footage. Then let's say
4    on the second floor absolutely no one was
5    up there, so that square footage would be
6    deducted -- or several offices that
7    weren't being used, you know, those
8    offices would be measured and deducted.
9  Q.   Okay. You also mentioned non-cleanable?
10 A.   Yes.
11 Q.   What is that?
12 A.   Well, that would basically be the same as
13   the vacant.
14 Q.   Would it also include other items?
15 A.   Not unless the bank specifically -- you
16   know, branch personnel specifically said,
17   you don't go into this area; don't worry
18   about this area. You know, gross leased
19   space, which is just something that BB&T
20   referred to on certain things.
21 Q.   What's gross leased space?
22 A.   Best of my understanding, it was space
23   they leased out to tenants that we weren't

Page 85

1    responsible for cleaning.
2  Q.   So if they leased out a portion of the
3    facility, PFMI's subcontractors didn't
4    have to clean that?
5  A.   Correct.
6  Q.   So it would be backed out of whatever the
7    gross square footage would be?
8  A.   Correct.
9  Q.   And that would give you a cleanable square
10   footage number?
11 A.   Yes.
12 Q.   Okay. And you said VCT?
13 A.   Tile. Vinyl composition tile.
14 Q.   I'm a construction guy; I should know
15   that. What would they do to measure -- or
16   why would they measure the tile?
17 A.   Well, if on occasion -- we tried to get
18   the carpet measurement, the VCT
19   measurement, the ceramic measurement so as
20   things progressed, if someone called up
21   and said, we want the tile stripped and
22   waxed at this branch, we wouldn't have to
23   take the time to say, well, we'll go out

22 (Pages 82 to 85)

b0948471-2d80-4e32-8b15-f0691512c0d4

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 86

1    and measure it and get you a price. We'll
2    be able to give them the square footage
3    and basically move it along a little
4    quickly. And that, I don't think is a
5    good example of BB&T, because I believe
6    floor care was included but carpet wasn't,
7    so it would apply more to carpet than
8    tile.
9    Q.   Have you ever heard the phrase "super
10   clean"?
11   A.   Yes.
12   Q.   What is that?
13   A.   If it's what I'm thinking of, we call it a
14   blitz clean. Super clean I believe would
15   be the same thing, where extra people
16   would be thrown into a branch, into a
17   building, and, you know, according to the
18   scope of work, extra work is done or
19   whereas your periodics, daily, weekly,
20   monthly things, a lot of things are done
21   at the same time to bring a branch or
22   location up to its current level of
23   cleanliness.

Page 87

1    Q.   And that's basically out-of-scope work?
2    A.   It could be or couldn't be.
3    Q.   If it's their fault that they need a super
4    clean --
5    A.   Then it would be out of scope.
6    Q.   And by "their," I mean tenants.
7    A.   Customer, yes.
8    Q.   Why would you do a window count?
9    A.   Very similar to carpet cleaning. If they
10   called up and had a special function going
11   on and wanted windows cleaned that
12   normally aren't due to be cleaned or
13   aren't supposed to be clean at that point
14   in time, you know, that type of thing.
15   And then I believe on the form was also a
16   couple of things that -- if the HVAC was
17   on the ground or on the roof, which was
18   nothing to do with PFMI.
19   Q.   Okay. Why would you do drive-through
20   accounts?
21   A.   Because we were required to place those
22   areas, empty the trash, wipe the ATMs. So
23   those would need to be taken into account

Page 88

1    when measuring the buildings.
2    Q.   Did you provide a form for subcontractors
3    to report this information on?
4    A.   Yes.
5    Q.   And those have been produced?
6    A.   Yes.
7         MS. TULEY:  Boxes of those have
8         been produced.
9         MR. SAWYER:  My expert's having
10        lots of fun with that.
11        THE WITNESS:  I'm sure.
12   Q.   When did the actual measurements start on
13   the BB&T account?
14   A.   I'm not sure of a specific date. Sometime
15   after start-up. I think some did occur
16   prior to start-up, because we got our hand
17   slapped for it.
18   Q.   And I believe it's true, is it not, that
19   PFMI didn't actually perform any cleaning,
20   as far as self-performing this work?
21   A.   That's correct.
22   Q.   Okay. So it was PFMI's job to manage
23   these subcontractors?

Page 89

1    A.   Yes, sir.
2    Q.   Okay. Was that primarily your
3    responsibility?
4    A.   It was primarily Keith Blackburn's
5    responsibility for the day-to-day
6    management of the subs. But, you know, we
7    had a team of people that managed this
8    account.
9    Q.   Did Keith report to you?
10   A.   Split between myself and Greg.
11   Q.   But the buck stopped with you and Greg,
12   didn't it?
13   A.   Yes.
14   Q.   So I believe your testimony is the subs
15   started measuring whenever they got out
16   there in September, correct?
17   A.   Yes. I couldn't say that they started --
18   the day they started cleaning. I think
19   that would be a bad assumption.
20   Q.   And the measurement said were supposed to
21   be completed in 90 days?
22   A.   Yes.
23   Q.   Did that happen?

23 (Pages 86 to 89)

b0948471-2d80-4e32-8b15-f0691512c0d4

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 90

1   A.   No.
2   Q.   Was there one particular subcontractor who
3        was late?
4   A.   Not late.  We had concerns about some of
5        the measurements and asked to extend that
6        timeline to allow us to remeasure.
7   Q.   Do you recall the subcontractor with whom
8        you had concerns?
9   A.   Yes, FMI.
10  Q.   Why did you have concerns?
11  A.   Some of the measurements were coming back
12       same as the gross was listed.
13  Q.   When you say "some," how many?
14  A.   I -- without actually looking, I couldn't
15       -- couldn't give you a specific number.
16  Q.   I'll represent to you that -- well, I
17       think you were sitting here -- that I
18       think it was Greg's best recollection that
19       it was 30 to 40 percent -- I believe the
20       way he -- 60 to 70 percent that PFMI had
21       confidence in, but there was 30 to 40 that
22       they weren't real sure about?
23  A.   Yeah, I wasn't sitting here at that time.

Page 91

1        Yeah, sounds good.
2             MR. SAWYER:  Counsel, is that
3             true?
4             MS. TULEY:  Yeah.
5   Q.   Well, let me ask the question, is that a
6        fair statement that 30 to 40 percent you
7        weren't comfortable with those numbers?
8   A.   I believe so, yes.
9   Q.   Did it look like the vendor had simply cut
10       the gross square footage and pasted it on
11       the cleanable square footage?
12  A.   I believe so, but they were handwritten.
13  Q.   So it's the manual cutting and pasting?
14  A.   Yeah.
15  Q.   And you knew that couldn't be right?
16  A.   We didn't feel it was accurate.
17  Q.   Highly, highly unlikely?
18  A.   We believe so.
19  Q.   And is it your testimony you went to EMCOR
20       and asked for a little more time so that
21       you could remeasure?
22  A.   Yes.
23  Q.   Because you wanted to do the right thing

Page 92

1        because you had knowledge that this
2        probably wasn't correct?
3   A.   Correct.
4   Q.   And did you actually perform those
5        measurements?
6   A.   They were -- yes, they were remeasured.
7   Q.   And the individuals that would have
8        remeasured would have been Keith Law, John
9        Sauter, Buz Campbell --
10  A.   On most occasions I believe they went out
11       with FMI representatives and remeasured.
12  Q.   What was the time frame of the
13       remeasurement?
14  A.   I believe -- without looking at it, I
15       believe it was December.
16  Q.   During this time frame, do you recall what
17       PFMI was billing from, whether it was
18       gross square footage or adjusted square
19       footage?
20  A.   We had been instructed to bill off of
21       gross.
22  Q.   And when you refer to gross -- and you can
23       take a look at Exhibit 14, I believe, to

Page 93

1        refresh your recollection -- are you
2        referring to the gross number contained in
3        Exhibit A, which is the spreadsheet?
4   A.   No, sir.  Every month we were sent what's
5        called a master list, which I believe BB&T
6        gave to EMCOR, and it was broken down
7        branches by region.  It listed -- because
8        this doesn't list it.  There's a notes
9        column on the master, and of course, gross
10       leased space was automatically taken out.
11       There were some notes on the master list
12       that would tell you to increase or
13       decrease that gross square footage because
14       the gross square might have had 2000
15       square feet and in the notes it had,
16       cleaned both floors; bill this.  So we
17       used the master list to bill from, not
18       Exhibit A.
19  Q.   Okay.  Did that change monthly?
20  A.   Yes.
21  Q.   Okay.  Because sometimes --
22  A.   Because --
23  Q.   Let me ask it.

24 (Pages 90 to 93)

b0948471-2d80-4e32-8b15-f0691512c0d4

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 94

1   A.   Sorry.
2   Q.   Why did it change monthly?
3   A.   Branches would open and close.
4   Q.   Do you recall what the amount of gross
5        square footage would have been starting in
6        September?
7   A.   I really don't.  A lot.
8   Q.   Would it have been more than 6 million
9        square feet?
10  A.   I -- without actually looking at an
11       invoice, I couldn't -- I couldn't answer
12       that.
13  Q.   But the invoice would show what --
14  A.   The invoice would show what we billed,
15       yes.
16  Q.   All right.  Who instructed you to -- or
17       who instructed PFMI to bill off of gross?
18  A.   A conference call with EMCOR and BB&T.
19       You know, we took our -- BB&T was present,
20       and I believe it was on the EMCOR side,
21       Beth Goad.  I think that's -- I'm not sure
22       how you spell that last name --
23  Q.   G-O-A-D.

Page 95

1   A.   -- Sean Brookins.  And on the first couple
2        of invoices, there were some issues
3        because we started adjusting according to
4        the surveys, and we were told to --
5        they're fun to look at, at first, because
6        there's a lot of ins and outs.
7   Q.   Would this conference call, I guess, have
8        taken place prior to the first invoice?
9   A.   No.  No.  Well, let me -- I'm sorry.  Let
10       me restate that.
11  Q.   Sure.
12  A.   Prior to the first invoice, it was
13       discussed how billing needed to be
14       formatted because there was an electronic
15       format that had to be used, and then -- so
16       yes, we were told what -- I believe we
17       were told what to -- but yes, we had
18       conversations prior to the first invoice
19       as to how that invoice should be formatted
20       and what it should contain.  But I believe
21       after the first invoice, that's when it
22       specifically said use gross.
23  Q.   So it would have been short in time after

Page 96

1        the first invoice?
2   A.   I believe so.
3   Q.   Makes sense, because you have to bill out
4        something?
5   A.   Yeah.
6   Q.   You said it was a conference call where
7        you were instructed to bill based on gross
8        square footage.  Do you remember if that
9        direction came from BB&T or an EMCOR
10       representative?
11  A.   BB&T was in on that call, but, you know,
12       I'm not sure who exactly said --
13  Q.   Probably would have been BB&T, wouldn't
14       it?
15  A.   I believe that's where the instruction
16       would have come from.
17  Q.   Right.  Do you know a gentleman by the
18       name of Ronnie Eller?
19  A.   Yes.  I don't think it would be Ronnie
20       though.
21  Q.   Okay.  And Beth Goad was on that
22       conference call from EMCOR, correct?
23  A.   Yes.

Page 97

1   Q.   Sean Brookins?
2   A.   Yes.
3   Q.   Anybody else from EMCOR?
4   A.   Lynn Wilson might have been, but I
5        couldn't say for sure.  I forget when Lynn
6        started up there.
7   Q.   Okay.  Do you recall anyone from BB&T on
8        this conference call?
9   A.   Debi Willis -- Deborah Willis.
10  Q.   Okay.  Anyone else?
11  A.   Not that I recall, no.
12  Q.   Does it make sense to you that EMCOR would
13       instruct you to bill off gross with BB&T
14       on the call?
15           MS. TULEY:  Object to the form.
16  Q.   You can answer.
17  A.   That --
18  Q.   My point is simply this -- and this is
19       going to be a terrible question.  But with
20       the client sitting there, they wouldn't
21       tell you to go bill off gross without the
22       client approving; is that right?
23  A.   Yeah, I agree with that.

25 (Pages 94 to 97)

b0948471-2d80-4e32-8b15-f0691512c0d4

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 98

1  Q.  Okay.  Were the master location lists from
2      which you were billing off of gross square
3      footage, were those updated weekly?
4  A.  We only got it monthly.  So if they were
5      updated weekly, I wouldn't know that.
6  Q.  I believe you testified earlier that the
7      subcontractors that you had, you would
8      have executed those contracts after
9      receiving an award from EMCOR; is that
10     correct?
11 A.  Correct.
12 Q.  Okay.  What type of -- what type of
13     contracts were they?  And by that, I mean
14     you have unit price contracts for some
15     contractors based on square footage, and
16     did you have lump sum contracts?
17 A.  I do not recall lump sum contracts.  I
18     couldn't say for sure that there wasn't
19     one, but most of them were square footage
20     based contracts.
21 Q.  Do you recall Exhibit D to subcontractors,
22     which identified a scope of work?
23 A.  I don't recall that.

Page 99

1  Q.  Show you a document, right?
2  A.  Yeah.  I don't recall if it was Exhibit D.
3          MR. SAWYER:  Let me go off the
4      record real quick.
5          (Off-the-record discussion.)
6          (Brief recess.)
7  Q.  I believe you testified there were
8      remeasurements done by PFMI of these BB&T
9      locations?
10 A.  Yes.
11 Q.  Was it only for FMI locations?
12 A.  No.  We spot-checked other areas also.
13 Q.  How many were done?
14 A.  I don't know off the top of my head.
15 Q.  More than 10?
16 A.  Yes, yes.
17 Q.  More than 100?
18 A.  Yes.
19 Q.  What time frame was this remeasurement
20     performed, then?
21 A.  I'm not sure of the exact time frame.  I
22     want to say from when we first started
23     getting surveys in, some initial spot

Page 100

1      checks were done.  The bulk of them were
2      done in December/January.
3  Q.  And that was December of 2005 and January
4      of '06, right?
5  A.  Yes.
6  Q.  Did you -- strike that.
7          Did PFMI measure all the FMI
8      locations?
9  A.  Not all of them.
10 Q.  Would it have been ones that you weren't
11     comfortable with?
12 A.  Yes.  And there very well could have been
13     some we were comfortable with still.
14 Q.  What did you do with the remeasurements?
15 A.  From that --
16 Q.  That your individuals --
17 A.  That PFMI performed?
18 Q.  Correct?
19 A.  If they were different, you know, we
20     basically discussed those differences, and
21     we had a survey book that we put all of
22     our surveys in, and then we also would
23     forward those surveys to Sean.

Page 101

1  Q.  I don't know if I asked this question:
2      Why was it necessary to perform these
3      remeasurements?
4  A.  A couple of reasons.  There were some we
5      were concerned about that the measurement
6      that came in was -- was close if not
7      identical to the master list.  And then
8      some were just done as a, you know, check
9      and balance to make sure they were
10     accurate.
11 Q.  Did any representative from EMCOR instruct
12     you to go out and remeasure?
13 A.  I believe there was a conversation in
14     regards to, you know, their concerns with
15     FMI's measurements and they wanted some
16     locations remeasured also.
17 Q.  Do you recall any directive from EMCOR to
18     PFMI to go out and remeasure locations for
19     which you had previously reported you
20     didn't have confidence in?
21 A.  When you say directive, do you mean e-mail
22     or conversation?
23 Q.  Either written or oral.

26 (Pages 98 to 101)

2100 3rd Avenue North, Suite 960*Birmingham, AL 35203*www.merrillcorp.com
1-800-888-DEPO

b0948471-2d80-4e32-8b15-f0691512c0d4

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 102

1  A.  Yes, I believe there was verbal
2      conversation to remeasure these locations.
3  Q.  Was that a conversation in which you
4      participated?
5  A.  I was present, yes.
6  Q.  Okay.  Who was involved with that
7      conversation?
8  A.  I believe Debi Crosby, Mark Smith, Sean
9      Brookins from EMCOR, myself and Greg
10     Littlefield, Keith Blackburn.  I believe
11     Rich Reagan -- he's with FMI -- and Don
12     Pottieger; he's with FMI.
13 Q.  What did FMI say about these surveys?
14 A.  They agreed that they had -- when they saw
15     those surveys, they had some concerns
16     about them also and had no issue going out
17     to remeasure and check those facts.
18 Q.  And this is in the December/January time
19     frame?
20 A.  That discussion took place somewhere first
21     part of December -- first half.
22 Q.  And I guess -- how far out are we from 90
23     days now?  Is that --

Page 103

1  A.  Just a week or two.
2  Q.  A week or two over 90 days?
3  A.  Yes.
4  Q.  Okay.  And during this time frame, PFMI is
5      still billing from the gross square
6      footage, correct?
7  A.  Yes, we were billing by what we had been
8      instructed to.
9  Q.  And I don't remember -- who did you say
10     instructed you to do that?  Oh --
11 A.  Do you know the answer?
12 Q.  Strike that.  Were most, if not all, of
13     the remeasurements completed by January of
14     2006?
15 A.  Yes.
16 Q.  Do you have any recollection of
17     remeasurements still being performed I
18     guess through May of 2006?
19 A.  By PFMI?  Yes.
20 Q.  Why were measurements still going on in
21     May of 2006?
22 A.  We had gotten some partial measurements
23     back, didn't agree with the numbers we

Page 104

1      were seeing and were still sending people
2      out to check the measurements we were
3      receiving.
4  Q.  Is this FMI again?
5  A.  No.  I mean, this is also EMCOR.  EMCOR
6      provided some numbers to us and, you know,
7      we were going out and spot-checking some
8      of those numbers we had received.
9  Q.  All right.  When did you -- well, let me
10     take a step back.  Do you have an
11     understanding that EMCOR personnel
12     performed any measurements?
13 A.  Yes.
14 Q.  What is that understanding?
15 A.  Just that sometime in January we were
16     instructed that EMCOR personnel mobile
17     techs and regional managers would measure
18     all the locations.
19 Q.  Do you know what a mobile tech is?  What
20     were those people?
21 A.  They were personnel that EMCOR had in vans
22     going to branches performing preventative
23     maintenance, you know, whatever needed to

Page 105

1      be done at those locations.
2  Q.  Fair statement they're technicians?
3  A.  Yeah.  Most of them I believe were HVAC
4      certified, was their primary duty.
5  Q.  Do you know why EMCOR personnel performed
6      those measurements?
7  A.  Not specifically, no.
8  Q.  Were you told why?
9  A.  I believe -- I believe we were told why,
10     was that they just -- the numbers that we
11     had turned in weren't agreeable.
12 Q.  The remeasured numbers?
13 A.  Yes.  Well, the remeasured numbers we
14     turned in, but yes.
15 Q.  Let me make sure the record is clear.
16     Were you told by EMCOR that the -- strike
17     that.  Let me back up and form a more
18     precise question.
19         EMCOR told you that the first
20     measurement numbers, which came in in
21     December of 2005, were not acceptable,
22     correct?
23 A.  Well, I believe since they were

27 (Pages 102 to 105)

b0948471-2d80-4e32-8b15-f0691512c0d4

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

| Page 106 |
| --- |

1    remeasuring everything, they didn't --
2    they didn't really accept any of the
3    numbers.
4  Q.   Right.  But my question is a little
5    different.  We understand that when the
6    first numbers came back, primarily from
7    FMI, there was a problem?
8  A.   Yes.
9  Q.   Okay.  And after that time, in the
10    December time frame, a remeasurement was
11    performed by representatives from PFMI?
12  A.   Yes, was in the process.
13  Q.   Okay.  And that remeasurement included
14    many locations that were performed by FMI,
15    correct?
16  A.   Correct.
17  Q.   As well as other locations?
18  A.   Correct.
19  Q.   Okay.  Did EMCOR, when they informed you
20    that they were going to be performing
21    measurements, tell you that they disagreed
22    with the measurements that were done in
23    the December/January time frame by PFMI

| Page 107 |
| --- |

1    representatives?
2  A.   I couldn't say they specifically said
3    those surveys.
4  Q.   So you couldn't say one way or the other
5    whether they disagreed with the surveys
6    that --
7  A.   I don't know if they isolated just those
8    surveys.  I mean, like I said, I don't
9    think they agreed with any of the numbers,
10    you know, and wanted to remeasure the
11    whole lot.
12  Q.   Who is the principal for FMI?  Is it a Don
13    Pottieger?
14  A.   Don Pottieger.
15  Q.   Well, we've talked about some problems
16    that FMI has had with the measurements.
17    Were there also service problems or
18    quality at work problems that FMI had?
19  A.   Yes, there were some issues.
20  Q.   What kind of issues?
21  A.   Off the top of my head, I couldn't...
22  Q.   Okay.  Were there issues with misservice?
23  A.   I believe so.

| Page 108 |
| --- |

1  Q.   Okay.  Issues of scope not being
2    performed?
3  A.   I don't recall a specific incident, I
4    mean, but that is normally what a
5    janitorial complaint comes down to.
6  Q.   Did PFMI have a system of -- a work order
7    system where it could track complaints and
8    respond to complaints?
9  A.   We primarily used EMCOR's knowledge center
10    for the tracking of complaints.
11  Q.   Have you ever heard of a system called
12    VEKTR?
13  A.   Yes.  That's an internal system we use.
14  Q.   What kind of system is it?
15  A.   That's also a work order system and
16    inspection system, quality control, that
17    type of thing.
18  Q.   Did you use that on this job?
19  A.   Yes, it was used.
20  Q.   Did -- well, let me ask the question this
21    way:  Was Keith involved with -- Keith
22    Blackburn involved with monitoring open
23    work order reports?

| Page 109 |
| --- |

1  A.   Yes, yes.
2  Q.   Was it within the scope of your
3    responsibility to also monitor work order
4    reports?
5  A.   I would monitor, not on a daily basis, you
6    know, but --
7  Q.   Fair statement that you would check in on
8    Keith and see how he was doing?
9  A.   Yes.
10  Q.   Okay.  But as far as a first line of
11    defense, that would have been Keith
12    Blackburn?
13  A.   That would have been Keith, yes.
14  Q.   Is VEKTR spelled capital V-E-K-T-R?
15  A.   Yes.
16  Q.   Is it proprietary?
17  A.   Not for us.
18  Q.   Do you have a license to use it?
19  A.   Yes.
20  Q.   Did you charge your vendors a --
21  A.   I believe there was a small usage fee,
22    yes, for using it.
23  Q.   $200 sound about right?

28 (Pages 106 to 109)

b0948471-2d80-4e32-8b15-f0691512c0d4

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 110

1   A.   Per month?
2   Q.   Total.
3   A.   Total?
4          MR. SAWYER:  Off the record.
5          (Off-the-record discussion.)
6   Q.   I'm going to hand you what's been marked
7        Exhibit 25 to your deposition, and it's
8        identified by Bates label PFMI 000563
9        through 564.  Take a look at that document
10       and let me know if you recognize it.
11             (The referred-to document was
12               marked for identification as
13               Defendant's Exhibit No. 25.)
14  A.   Not specifically.
15  Q.   Okay.  Does it refresh your recollection
16       one way or the other whether PFMI relied
17       upon the VEKTR system to track and process
18       work orders?
19  A.   No, it doesn't.  I mean, it -- you know,
20       my recollection is primarily -- for
21       work orders, we primarily relied on the
22       knowledge center.
23  Q.   FKC?

Page 111

1   A.   Yes, Facility Knowledge Center, to process
2        work orders.
3   Q.   Well, tell me about that.  How -- let me
4        ask you first, how would you process a --
5        well, let me ask you this:  What is a work
6        order?
7   A.   A work order basically was normally put in
8        from the field over the internet, just
9        stating extra work, complaint, concern, at
10       a location.
11  Q.   Request from a client?
12  A.   Yes.
13  Q.   Concerning additional scope to be
14       performed or a problem with the service?
15  A.   Yes.
16  Q.   Okay.  I believe it's your testimony you
17       primarily relied upon the Facility
18       Knowledge Center, the FKC, that was I
19       guess provided by EMCOR?
20  A.   Yes.
21  Q.   Okay.  How would you rely upon that?
22  A.   We had personnel downstairs that were -- I
23       don't know what EMCOR referred --

Page 112

1        registered users -- that their job was,
2        you know, as work orders came in each day,
3        they were dispatching those to partners
4        and vendors to address issues, of course,
5        depending on priority.  And at the end of
6        the day, a work order report would be
7        generated of all open work orders and sent
8        to each vendor specifically.  So in other
9        words, whoever was responsible for West
10       Virginia would only get West Virginia's
11       work orders.
12  Q.   How much staff was committed 100 percent
13       to this job?
14  A.   In-office?
15  Q.   Yes.
16  A.   I believe there were five personnel in
17       PFMI's office and one located in
18       Winston-Salem as administrative people for
19       this.
20  Q.   When you say in-office, was that here in
21       Montgomery?
22  A.   Yes.
23  Q.   Did you actually go out and represent a

Page 113

1        location to set people up for PFMI?
2   A.   Within our building, yes.  We rent space,
3        and we rented additional space for this
4        project.
5   Q.   Okay.  So did you rent another floor?
6   A.   Yes.
7   Q.   How big is the building that you guys are
8        in, floors -- how many floors?
9   A.   Well, there's two floors, and it's broken
10       up into basically suites, loosely termed.
11  Q.   As vice president, do you have any
12       ownership interest in PFMI?
13  A.   No, sir.
14  Q.   You're a salaried employee?
15  A.   I'm just a flunkie.
16          MR. SAWYER:  Off the record.
17          (Off-the-record discussion.)
18  Q.   Do you recall the volume of -- I know
19       we've talked about work orders, but do you
20       recall the volume of complaints that
21       happened early on in this job?
22  A.   I don't recall the specific volume of
23       complaints.

29 (Pages 110 to 113)

b0948471-2d80-4e32-8b15-f0691512c04d

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 114

1  Q.  Was it normal or was it less than normal
2      or extraordinary?
3  A.  It's about normal for a start-up.
4  Q.  And when you say about normal for a
5      start-up, is that because, you know, it
6      takes a little while to get everything in
7      place?
8  A.  It takes -- yes, that would be fair.
9  Q.  Because initially the prior vendors have
10     to be terminated, right?
11 A.  Yes.
12 Q.  You have to get your contracts with your
13     vendors, correct?
14 A.  Yes.
15 Q.  And you have to get coverage?
16 A.  Yes, but also changes in the scope of work
17     occurred or occur, frequency changes.
18 Q.  When you say "frequency changes," what are
19     you -- I think I know what you mean, but I
20     don't want to guess.
21 A.  Yeah.  And for example, let's say this
22     room was vacuumed wall to wall every day.
23     With a new frequency, it could be vacuumed

Page 115

1      wall to wall once a week and only traffic
2      patterns done on a daily basis.
3  Q.  And another example, instead of three-day
4      service, it could be five-day service?
5  A.  Exactly.  It could go from five-day to
6      three-day or six-day to five-day.
7  Q.  Any other problems that you can recall
8      that you had to overcome when you're
9      starting up this BB&T account?
10 A.  There were a couple of regions where BB&T
11     didn't want us to use the vendor we were
12     using and disallowed them, so it left some
13     open areas last minute.
14 Q.  Well, let me stop you right there.  Do you
15     recall specific ones, either by region or
16     vendor, where BB&T said no way?
17 A.  There was one, and I want to say it was
18     Four Aces, but I didn't really deal with
19     them.  I think BB&T, they were a previous
20     vendor.  The issue was something like BB&T
21     said they overpaid them by a thousand
22     dollars; the guy said, you didn't overpay
23     us by a thousand dollars, we're not paying

Page 116

1      you back.
2  Q.  And the point is, you don't have a dog in
3      that fight?
4  A.  Right.  And that was pretty much an entire
5      region this guy was going to cover.  And I
6      think that it was September -- the Friday
7      before we started, that one got pulled.
8  Q.  Sounds like he was penny-wise and
9      pound-foolish?
10 A.  Yeah.
11 Q.  Any other problems you remember as far as
12     start-up?
13 A.  Outside of normal scope issues, you know,
14     I think, like we said, there were several
15     branches, and I couldn't be specific with
16     regions or branches.  We were supposed to
17     receive two keys for every branch; we only
18     received one key, which caused issues with
19     the alarm code.  There was only a certain
20     time we could enter the branch and leave
21     the branch; that caused some issues.
22 Q.  And how many locations did you have total
23     to start up?  1400 ring any bells?

Page 117

1  A.  Yeah, I believe that was what we started
2      up.  And I really couldn't tell you if we
3      staggered any starts or not.
4  Q.  At this time, what was your staff?
5  A.  For administrative staff or field staff?
6  Q.  All staff.
7  Q.  Dedicated to BB&T?
8  Q.  Dedicated to BB&T.
9  A.  Five or -- five, maybe six.
10 Q.  Doesn't it seem like to you that's a heck
11     of a lot of -- five or six people?
12 A.  Well, we relied also on our alliance
13     partners and their management staff.  And
14     their -- like I said, their management
15     staff to be in the field and assisting
16     with those start-ups.
17 Q.  But EMCOR was relying on you, right?
18 A.  Yes.
19 Q.  Over the course of performance of the
20     project, did PFMI ever increase staff?
21 A.  Yes.
22 Q.  Okay.  Who did you hire on?
23 A.  We hired -- and the only reason I remember

30 (Pages 114 to 117)

b0948471-2d80-4e32-8b15-f0691512c0d4

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 118

1    his name now is because it's in one of
2    these work orders -- Vince Sabatine, I
3    believe was his last name, to manage work
4    orders at night.
5  Q.   And did you say Vince?
6  A.   Vince.
7  Q.   Sabatine?
8  A.   Sabatine, I believe.  I saw his name on an
9    e-mail.
10  Q.   And how would he handle work orders at
11    night?
12  A.   After normal business hours.  I think his
13    hours were 4 to midnight, something like
14    that.  He and Mike Cleary and Keith would
15    sort of have a transition conference call
16    and open work orders that were a priority
17    for that night.  He would basically
18    hot-shot to try and ensure that they were
19    closed down and was sort of a second tier
20    in making sure, you know, if there was a
21    key issue, alarm issue, one of those
22    issues trying to create an e-mail for
23    Keith -- not Keith, I'm sorry, but yeah,

Page 119

1    Keith would be copied, but Sean, so Sean
2    wouldn't get hit first thing in the
3    morning and not be aware of what occurred
4    that night.
5  Q.   And you said hot-shot.  What is that?
6  A.   Well, just, you know, the work order
7    needed to be closed that night.
8    Coordinating with the vendors to make sure
9    that, yes, it was being taken care of,
10    that someone was on-site, that type of
11    thing.
12  Q.   Were there different categories of work
13    orders as far as importance?
14  A.   Yes.
15  Q.   Okay.  Was it numerical?
16  A.   Yes, yes.  And I can't recall if 1 was the
17    highest or 5 was the highest -- priority.
18  Q.   But it wasn't based on like our terrorist
19    system, where it's orange and red and I
20    don't know what the heck --
21  A.   No, sir.  It was a 1 through 5 system.
22  Q.   All right.
23  A.   Oh, I'm sorry.  And that wasn't the only

Page 120

1    set.  We added Nicole Cruise -- and I
2    think it's C-R -- like Tom Cruise -- in
3    the BB&T office in Winston-Salem to sort
4    of be a daily contact right there.
5  Q.   When was Vince Sabatine hired?
6  A.   Without looking at an employment file, I
7    couldn't give you a specific date.
8  Q.   But it was definitely after early on in
9    the project?
10  A.   It was definitely after early on.
11  Q.   And Nicole Cruise, what about her?  When
12    was she hired?
13  A.   Without looking, I couldn't be specific.
14    I'm thinking December.
15  Q.   Okay.  Is there anyone else?
16  A.   Not that I recall.
17  Q.   Were these individuals hired to keep up
18    with scope, or -- why were they hired?
19    Let me ask it that way.
20  A.   I'm sure partially to keep up with scope,
21    keep up with work orders, just keep
22    everyone in the loop of what's going on.
23  Q.   And at the time of and prior to these

Page 121

1    people being hired, had you received any
2    indication from BB&T that they weren't
3    happy with the way the janitorial
4    component was going on?
5  A.   Really, no.  No.  I mean, there were some
6    concerns here and there, but the feedback
7    we were getting was, you know, there were
8    some regions that there were some issues,
9    but the overall satisfaction was -- you
10    know, was about what was expected at that
11    point.
12  Q.   Have you ever heard of a performance
13    survey on this job?
14  A.   I don't know I've heard performance survey
15    specifically.
16  Q.   Okay.  Do you have an understanding one
17    way or the other of, after work orders
18    were completed and with respect to the
19    FKC, that surveys were kicked out
20    immediately to the people placing the work
21    order?
22  A.   No, I couldn't say I was aware of that.
23  Q.   Okay.  Let me mark this as the next in

31 (Pages 118 to 121)

b0948471-2d80-4e32-8b15-f0691512c0d4

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 122

1    order.  It's Exhibit 26, and for the
2    record, it's Bates labeled PFMI 000668
3    through 672.
4         (The referred-to document was
5         marked for identification as
6         Defendant's Exhibit No. 26.)
7    A.   All right.
8    Q.   Can you identify what's marked as Exhibit
9    26?
10   A.   Yeah.  The final piece of it seems to be
11   an e-mail between myself and Sean
12   Brookins, describing a lack of service at
13   a location.
14   Q.   In fact, it describes, at least at that
15   location, they hadn't received service for
16   a month, right?
17   A.   That's how it appears, yes.
18   Q.   And I guess you would agree with me, would
19   you not, that you're not real happy about
20   your vendor?
21   A.   I would say from the looks of my e-mail,
22   no.
23   Q.   And the vendor was FMI?

Page 123

1    A.   Yes.
2    Q.   Okay.  We'll mark as the next in order,
3    and could you read the Bates labels?
4    A.   PFMI 000528.
5    Q.   Okay.  And I believe it's Exhibit 27; is
6    that correct?
7         (The referred-to document was
8         marked for identification as
9         Defendant's Exhibit No. 27.)
10   A.   Yes, sir.
11   Q.   Okay.  Could you identify that?
12   A.   It's apparently an e-mail I sent to Greg
13   and copied Don, Jr., on just in regards to
14   a call I had with Sean about
15   dissatisfaction with FMI.  And it's dated
16   August of 2005.
17   Q.   Okay.  All right.  My question is, does
18   that document refresh your recollection as
19   to whether EMCOR indicated concerns about
20   FMI prior to start of the work?
21   A.   I could not say whether it's -- before the
22   start of the work, because FMI started
23   some branches in August, so I'm not --

Page 124

1    without knowing what the -- you know, yes,
2    there's -- there was some concern there,
3    but I don't know what the concern was or
4    what it was in regards to.
5    Q.   But it's definitely at least early on in
6    the project?
7    A.   Yes, it is.
8    Q.   Okay.  And did you just testify -- I'm
9    sorry.  She can object if I'm asking it
10   again, but do you recall what concerns
11   Mr. Brookins might have had with FMI?
12   A.   This is going out on a limb.  In racking
13   my brain on this one, there was a region
14   where the vendor had walked out on.  FMI
15   we called in last minute to cover those
16   branches, and I believe there was just
17   some concern about how they were being
18   covered or what was going on there.  But I
19   couldn't tell you what region, what
20   branches, without looking at something.
21   Q.   Sure.
22   A.   Hopefully you don't have it.
23   Q.   And FMI, again, is the vendor that --

Page 125

1    A.   Yes.
2    Q.   -- you had a lot of problems with the
3    measurements?
4    A.   That we had problems with measurements,
5    yes.
6    Q.   Did you feel like FMI, I guess, during the
7    course of this job, just kind of threw you
8    under the bus?
9         MS. TULEY:  Object to the form.
10   A.   I don't know if I'd phrase it that way.
11   Q.   Okay.  How would you phrase it?
12   A.   You know, I don't know if early on they
13   put everything into it they could have put
14   into it.
15   Q.   Fair statement, at least early on, you
16   weren't real happy with, I guess, what
17   they were doing?  And by them, I mean FMI.
18   A.   I don't -- I mean, I don't recall
19   specifically.
20   Q.   How do you think they could have improved
21   or done better?
22   A.   I believe -- I think really just in
23   communication with their field personnel,

32 (Pages 122 to 125)

b0948471-2d80-4e32-8b15-f0691512c0d4

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 126

1  what was going on in the field.
2  Q.  Did FMI subcontract out their portion of
3     the work as well?  Do you have knowledge
4     of that?
5  A.  I believe they did.
6  Q.  How much did they subcontract out?
7  A.  I don't know on a percentage basis.  And I
8     don't even know on a location basis.  You
9     might have it.  I don't know.  But I just
10    don't know on any of the subs what they --
11    on a percentage basis what they
12    self-perform.
13 Q.  Okay.  Do you think it would be important
14    to know that?  Or at one time you did
15    know; you just don't know today?
16 A.  At one time there was a chart, I believe,
17    that was turned over.
18        MR. SAWYER:  If it's escaped --
19 A.  We provided EMCOR lists of who provided
20    service at every branch, but right now I
21    couldn't tell you what those numbers were
22    on that.
23 Q.  Fair enough, Mr. Wohlers.

Page 127

1        MR. SAWYER:  Off the record.
2        (Off-the-record discussion.)
3        (Brief recess.)
4  Q.  Mr. Wohlers, do you remember a letter you
5     wrote to EMCOR, which I believe is an
6     exhibit, on or about February 3, 2006,
7     concerning PFMI's remeasurements of what
8     was going on with the remeasurements of
9     BB&T facilities?
10 A.  Yes, yes.
11 Q.  Okay.  And I believe in that letter -- and
12    it's an e-mail to Mr. Brookins, I believe?
13        MS. TULEY:  Yes.
14 Q.  Do you recall -- off the record.
15        (Off-the-record discussion.)
16 Q.  In that correspondence, I believe -- and
17    correct me if I'm wrong -- you
18    communicated to EMCOR that PFMI reserved
19    the right to come back and challenge --
20 A.  Challenge any and all measurements.  Might
21    not be exact, but it's along the -- I
22    think it's the last sentence.
23 Q.  Did that ever happen?

Page 128

1  A.  We requested to remeasure, but that
2     process got put off.
3  Q.  When did you first request to remeasure?
4  A.  I couldn't give you an exact date.
5  Q.  Okay.  Well, let me ask it this way:  When
6     did you receive the measurements that were
7     performed by EMCOR?
8  A.  Well, we never received a complete list of
9     measurements that EMCOR performed.
10 Q.  And by that, do you mean you didn't
11    receive a complete list of measurements
12    for all locations?
13 A.  Correct.
14 Q.  Okay.  Did you receive measurements for
15    some locations?
16 A.  Yes.
17 Q.  Did you want to challenge those?
18 A.  Yes.
19 Q.  Did you communicate that you wanted to
20    challenge those?
21 A.  Yes, we did.
22 Q.  And that would be in an e-mail or some
23    other correspondence?

Page 129

1  A.  I believe so.  I don't recall the e-mail
2     specifically.  I remember stating that,
3     that yeah, there were locations that we
4     didn't agree with.
5  Q.  Okay.  Did you actually -- or did PFMI
6     actually go to any sites and conduct such
7     a challenge?
8  A.  We went on our own and measured, yes,
9     after we received some of those
10    measurements.
11 Q.  Did an EMCOR representative attend with
12    you?
13 A.  I did not perform that measurement; I
14    couldn't say.  I believe when they did
15    some in Atlanta that possibly Rebecca
16    Walraven was with them, but I couldn't say
17    that for sure.
18 Q.  Okay.  And Mr. Brookins, I believe -- and
19    the record will reflect what it reflects,
20    but we recalled a challenge in Tennessee.
21    Do you remember anything along those
22    lines?
23 A.  I don't remember Tennessee specifically,

33 (Pages 126 to 129)

b0948471-2d80-4e32-8b15-f0691512c0d4

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 130

1    but I remember there was a good number we
2    did not agree with.
3  Q.  Ballpark, how many did you not agree with?
4  A.  I can't really -- you know, I don't
5    remember exactly how many we got, so it's
6    hard for me to say how many they disagreed
7    with.  There were several that when we
8    looked at, you know, definitely shot off
9    some flares for us because we knew the
10    building itself and knew it was -- felt it
11    was off.
12  Q.  But you do recall, I guess, at least on
13    some occasions -- I believe you said
14    Atlanta --
15  A.  Yes.
16  Q.  -- where EMCOR and PFMI met and they were
17    actually --
18  A.  Well, I believe EMCOR was -- I know we
19    measured some buildings in Atlanta.
20  Q.  And Rebecca Walraven may have been there?
21  A.  May have.  Ken Law performed those.  He
22    would know for sure.
23  Q.  Other than Atlanta and perhaps -- maybe,

Page 131

1    we're not sure -- Tennessee, were there
2    any other locations where PFMI sought to
3    challenge the measurements performed by
4    EMCOR's mobile techs?
5  A.  I know West Virginia was an area that we
6    were concerned about.
7  Q.  Who handled that for PFMI?  Was it Patton?
8  A.  Patton.
9  Q.  Anywhere else?
10  A.  Top of my head, not that I can recall, but
11    there were, like I said, a good number of
12    areas that we were -- you know, just
13    didn't have faith in those numbers.
14  Q.  And when you say "those numbers," you're
15    meaning the numbers that EMCOR provided,
16    correct?
17  A.  Yes, yes.
18  Q.  And you don't remember whether it was 50
19    percent, 20 percent, 100 percent?
20  A.  No, I don't, not right off.
21  Q.  Would there be any document I could look
22    at to find locations that -- where EMCOR
23    and BB&T had performed measurements -- to

Page 132

1    find out what PFMI's opinion was with
2    respect to the veracity of those
3    measurements?
4        MS. TULEY:  Object to the form.
5        MR. SAWYER:  I withdraw that
6          because that was a horrible
7          question.
8  Q.  Is there a document that you have in your
9    files which would show PFMI's position
10    with respect to the remeasurements?  For
11    instance, such as a spreadsheet with
12    highlighted --
13  A.  Highlighted locations that were --
14    possibly, on a limited basis.  When we
15    received the numbers, there's -- like I
16    said, when we received some of the
17    numbers, we instructed, you know, Ken,
18    John, Buz, Keith, to, you know, let's do
19    some spot checks here.  And those spot
20    checks I'm sure would be on a spreadsheet.
21  Q.  Were the spot checks performed by PFMI's
22    representatives -- I know they were
23    performed after the original measurement

Page 133

1    by PFMI's vendors.  Were spot checks done
2    also as to EMCOR's measurements?
3  A.  Yes.
4  Q.  Okay.  Would the same people that
5    performed the prior remeasurements -- such
6    as Ken Law, Keith Blackburn, and other
7    PFMI representatives -- have performed
8    those measurements?
9  A.  In some instances, yes.  In others we
10    added Jeff Chamberlain, Brian Booker, like
11    I said, Buz Campbell -- I think I
12    mentioned him before, but --
13  Q.  Two Zs, right?
14  A.  Yeah, one Z.  He gets mad about that.
15  Q.  I'm sorry.  I cut you off.  I think you
16    were going to say someone else.
17  A.  No, I think that's everyone.
18  Q.  Okay.  Were you ever told why EMCOR was
19    performing these instead of PFMI?  And I
20    mean the mobile tech remeasurements.
21  A.  Yeah.  I think I stated earlier that BB&T
22    just wasn't confident in the numbers they
23    were seeing or didn't like the numbers

34 (Pages 130 to 133)

b0948471-2d80-4e32-8b15-f0691512c0d4

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 134

1    they were seeing.
2  Q.   Okay.  And I apologize if I asked it
3       earlier, but is it not confident in the
4       original measurements or not confident in
5       the remeasurements that were performed in
6       January and December?
7  A.   My understanding was they weren't happy
8       with the numbers that came in, whether it
9       was confidence or thought there should be
10      more of a difference from what they
11      originally put out.
12 Q.   Okay.  And that would have been the
13      original measurements?
14 A.   The original, yes.
15 Q.   Okay.  How, if at all, did EMCOR prevent
16      you from -- and when I say "you," PFMI --
17      prevent you from challenging measurements?
18 A.   You know, I believe the procedure for
19      challenge was an EMCOR rep, a BBD rep, and
20      a PFMI rep, and basically, that never
21      occurred.  When we asked to remeasure an
22      area, somebody was always unavailable.
23 Q.   Was it Jim Wohlers that would ask to

Page 135

1    remeasure -- or to challenge, rather?
2  A.   It wasn't spelled that I had to be the one
3       to challenge.
4  Q.   Were you the one that did it?
5  A.   I know at least on one occasion I had a
6       conversation with Sean about wanting to
7       remeasure.
8  Q.   Other than that one conversation, did you
9       ever ask anyone from EMCOR to challenge a
10      measurement that EMCOR had done?
11 A.   There were other conversations I had with
12      Sean that, you know, we weren't confident
13      in the numbers.  You know, the numbers
14      coming back just didn't seem right, and
15      Sean and I had some conversations
16      regarding that.
17 Q.   And the numbers are the ones performed by
18      EMCOR mobile techs?
19 A.   Yes.
20 Q.   So you're recalling conversations with
21      Sean Brookins?
22 A.   Vague, yes.
23 Q.   Do you have any recollection of asking

Page 136

1    Sean or anyone else from EMCOR to go
2    remeasure?
3  A.   Yes.
4  Q.   Okay.  How many occasions?
5  A.   At least one occasion.
6  Q.   But as you sit here right now, can you
7       remember more than one occasion?
8  A.   Not specifically.
9  Q.   Would anyone else from PFMI ask to
10      challenge a measurement of EMCOR?
11 A.   Yes.
12 Q.   Who?
13 A.   Buz Campbell, Ken Law, Keith Blackburn.
14 Q.   Anyone else?
15 A.   Possibly John Sauter.
16 Q.   Now, do you know for a fact that they did?
17      And when I say "did," asked to challenge a
18      measurement of an EMCOR mobile tech?
19 A.   When you say "a fact," I mean, did I --
20 Q.   Do you have a specific recollection of any
21      of these individuals -- and that is Buz
22      Campbell, Ken Law, Keith Blackburn, John
23      Sauter -- asking, either written or oral,

Page 137

1    to go and challenge a measurement made by
2    EMCOR?
3  A.   I don't know if I recall the challenge.  I
4       know of them being put off and going to
5       measure where they had planned to be in an
6       area and were there, and for one reason or
7       another, either EMCOR or BB&T was unable
8       to make that meeting.
9  Q.   So you do have a specific recollection of
10      them trying to organize a site and -- that
11      you do remember?
12 A.   Yes.
13 Q.   Okay.  Who was it?
14 A.   It would be those -- I mean, I remember
15      Buz going through that practice, Ken Law
16      going through that practice, and Keith
17      Blackburn going through that practice.
18 Q.   Okay.  So you remember each one of those
19      guys being put off -- Buz, Ken, Keith, and
20      John Sauter.
21 A.   I remember e-mails going around in regards
22      to attempting to remeasure and not being
23      able to.

35 (Pages 134 to 137)

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 138

1  Q.  Okay.  What time frame is this?  It would
2      have been after February 23, 2006, right?
3  A.  Yes, I believe so.
4  Q.  How many occasions do you recall Buz, Ken,
5      Keith, and John being put off to go to
6      measure?
7  A.  I couldn't really say specifically.
8  Q.  More than 10?
9  A.  I would hate to even guess that number.
10 Q.  More than one?
11 A.  More than one.  I mean, it's...
12 Q.  And that would be in the documents
13     somewhere, right?
14 A.  It should be, yes, in the e-mails.
15 Q.  Okay.  Just so I'm clear, it's not the
16     request to actually make the challenge
17     that you recall; it's these individuals
18     being put off to go out and meet at the
19     site?
20 A.  Yes.  I mean, I recall conversations that
21     they were going to do this, that they had,
22     you know -- I don't recall them actually
23     requesting, but saying they had requested

Page 139

1      and then, you know, they couldn't make it
2      this date or couldn't make it that date.
3      I mean, that's the type of thing I recall.
4  Q.  Do you ever recall anyone from EMCOR
5      informing you or anyone else from PFMI
6      that if the remeasurements were plus or
7      minus 5 percent, that the square footage
8      numbers wouldn't be adjusted at all?
9  A.  I recall a conversation where if it was
10     plus or minus 5 percent, the square
11     footage number would change; however,
12     there would not be a change -- there
13     wouldn't be a true-up in that case in
14     dollars, basically, because some would go
15     up, some would go down, that it would just
16     -- the square footage would change, the
17     billing would change, and that would be...
18 Q.  But you were billing off gross, weren't
19     you?
20 A.  Yes.
21 Q.  Okay.  How would you have more net
22     cleanable square footage than gross square
23     footage?

Page 140

1  A.  Well, in some occasions we found there
2      were bad measurements on the building.
3      Their gross only included the first floor;
4      we were cleaning the first and second
5      floor.  So there were billings it went
6      both ways.  There were occasions that we
7      did measurements and the building did go
8      up in square footage.
9  Q.  They would have missed some of the gross?
10 A.  They would have missed some of the gross.
11     They took out more than they should have.
12     Whoever measured it didn't know what they
13     were doing.
14 Q.  What was the total square footage compared
15     to PFMI and its bid?
16 A.  According to that exhibit?  Like 6.7, I
17     think is --
18 Q.  6.9?  You can take a look to refresh your
19     recollection.
20 A.  All right.  Yeah, gross square footage
21     according to Exhibit A was 6.9.
22 Q.  Do you know what 5 percent of -- I'm not
23     going to make you do math calculations.

Page 141

1      I'll strike that.  I will just represent
2      to you that 5 percent of 6.9 million is
3      345,000 square feet.
4  A.  All right.
5  Q.  Sound about right?  10 percent is 690, so
6      --
7  A.  Yeah.
8  Q.  So essentially, it could have been a
9      690,000 square foot swing one way or the
10     other, right, if it's 5 either way?
11 A.  On 5 percent?  Oh, total swing?  Yes,
12     below or above.
13 Q.  What was average unit price cost per
14     square foot on this?
15 A.  Top of my head, I don't know what the
16     average was.
17 Q.  Well, let's just say it was a dollar.
18 A.  All right.
19 Q.  So that's about a $700,000 swing.  Do you
20     think that would have been pretty
21     important?
22         MS. TULEY:  Object to the form.
23 Q.  You can answer.

36 (Pages 138 to 141)

b0948471-2d80-4e32-8b15-f0691512c0d4

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 142

1   A.   I mean, I would assume so.
2   Q.   If somebody told you that if it was plus
3        or minus 5 percent, that would have been
4        pretty important, wouldn't it have?
5   A.   Yes.
6   Q.   Okay.  Would you have put that in writing?
7            MS. TULEY:  Object to the form.
8   Q.   If you know?
9   A.   I mean, in retrospect, yes.
10  Q.   Do you recall who, if anyone, informed you
11       that if measurements were plus or minus 5
12       percent, there would be no change in
13       price?
14           MS. TULEY:  Object to the form.
15               Mischaracterizes prior
16               testimony.
17  Q.   Well, I'll just read from -- let me mark
18       this as the next in order.  Mr. Wohlers,
19       go ahead and take a look at what I've got
20       marked as Exhibit 28.  And I'd like to
21       specifically call your attention to Number
22       5, which is on Page 2 of Exhibit 28.
23           (The referred-to document was

Page 143

1            marked for identification as
2            Defendant's Exhibit No. 28.)
3   A.   All right.
4   Q.   Now let me ask you to turn to the back
5        page or the next to the last page of
6        Exhibit 28.  Keep going.
7   A.   That one?
8   Q.   Yeah.  My question is, is that your
9        signature?
10  A.   It appears to be.
11  Q.   Okay.  Do you recall signing that
12       verification?
13  A.   Not specifically.
14  Q.   But that's your signature?
15  A.   Yes.
16  Q.   Okay.  If you could turn back to -- well,
17       for the record, I'll represent that that's
18       plaintiff's supplemental interrogatory
19       responses.  If you'll turn back to the
20       response to Interrogatory Number 5.
21  A.   All right.
22  Q.   If you could read the second bullet point
23       for the record under response to

Page 144

1        Interrogatory Number 5.
2   A.   (As read:)  "Conversations with EMCOR
3        personnel early in the process indicated
4        that EMCOR did not have a good feel for
5        the square footage numbers.  Those
6        conversations were between Steven King,
7        Alan Cristal, Sean Brookins and Debi
8        Crosby for EMCOR and Greg Littlefield for
9        PFMI."
10  Q.   Okay.
11  A.   Were you talking about down here?
12  Q.   Yeah, I screwed it up.  You let me dig my
13       own grave.  Just go down to 7 and read the
14       question and then the first bullet point
15       response.
16  A.   All right.  (As read:)  "State each and
17       every misrepresentation you contend was
18       made by EMCOR to PFMI.  In your answer,
19       please identify the date of the
20       misrepresentation, the time of the
21       misrepresentation, the place where the
22       misrepresentation was made, and all
23       documents that evidence, reference,

Page 145

1        reflect, or relate to such alleged
2        misrepresentation."
3   Q.   Let me stop you right there.  Don't
4        lawyers talk wonderfully?
5   A.   They do.  So easy to read.
6   Q.   Okay.  And if you could look down there --
7        okay.  If you could read the first bullet
8        point and not the objections.
9   A.   All right.  (As read:)  "Prior to work
10       beginning on the contract, it was
11       specifically discussed in conference calls
12       that surveys would be required and that
13       any measurements of a 5 percent increase
14       or decrease in square footage would not be
15       credited or debited but would be a wash.
16       Jim Wohlers, Greg Littlefield, Debi
17       Crosby, Sean Brookins, and a BB&T
18       representative were involved in those
19       conference calls.  This issue was
20       discussed multiple times including in
21       December of '05 and the January/February
22       2006 time frame between Sean Brookins,
23       Mark Smith, Greg Swanberg, Jim Wohlers,

37 (Pages 142 to 145)

b0948471-2d80-4e32-8b15-f0691512c0d4

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 146

1    and Greg Littlefield."
2  Q.   Is that statement true?
3  A.   Yes, it is.
4  Q.   Okay.  Who told you that it didn't matter
5       if it was 5 percent off?
6  A.   Ronnie Eller and Debbie Willis.  And it
7       wasn't necessarily that it didn't matter;
8       it was that a true -- a credit or debit
9       would not be made in that.
10 Q.   Did you or PFMI rely on Ronnie Eller's or
11      Deborah Willis' statement?
12 A.   Yes, we did.
13 Q.   How did you rely?
14 A.   I don't understand the question.
15 Q.   Well, you testified, I guess, that Ronnie
16      Eller and Deborah Willis of BB&T informed
17      you early on -- well, let me ask you this:
18      What time frame was this conference call?
19 A.   August or September was the very first
20      time it was...
21 Q.   And it's your best recollection that the
22      pricing wouldn't change if it was within
23      that 5 percent plus or minus?

Page 147

1        MS. TULEY:  Object to the form.
2  A.   The pricing would change.
3  Q.   Okay.
4  A.   But there would be no going back on those
5       items -- on those branch locations and
6       doing a debit or a credit.
7  Q.   Okay.  Was there a time frame, such as --
8  A.   At that point in time, no time frame was
9       discussed.
10 Q.   Okay.  But -- I think I understand your
11      testimony.  Let me see if I've got it or
12      if I've got it all wrong.  These
13      measurements were supposed to be conducted
14      during the first 90 days, right?
15 A.   Correct.
16 Q.   Okay.  Is it your testimony that if it was
17      plus or minus 5 percent, that there
18      wouldn't be a credit applied during that
19      90-day period?
20 A.   Well, the 90-day period was never -- to my
21      recollection, the 90-day period wasn't --
22      that statement wasn't made, in the 90-day
23      period; it was simply that the

Page 148

1       measurements will be taken and that if it
2       was plus or minus 5 percent, that there
3       wouldn't be a debit or a credit applied;
4       the price would be changed to reflect the
5       new net cleanable, going forward from that
6       point.
7  Q.   Understood.  Once the -- and let me see if
8       I've got it straight.  Once the
9       measurements come in, to get the actual
10      cleanable, if it's 5 percent difference
11      from the gross plus or minus, they don't
12      apply credit for prior to the actual
13      measurements, correct?
14 A.   Correct.
15 Q.   Okay.  But going forward, the price
16      changes, correct?
17 A.   Yes.
18 Q.   I may have already asked this; she can
19      object if I have.  But do you recall ever
20      confirming that understanding in any form
21      of writing?
22 A.   Not that I can -- not that I can recall.
23 Q.   Okay.  And as you sit here right now, do

Page 149

1       you recall whether any credit was applied
2       by EMCOR or BB&T to that first 90-day
3       period?
4  A.   If any credit?
5  Q.   Well, strike that.  Was any credit for
6       square footage discrepancies applied to
7       PFMI during the first 90 days?
8          MS. TULEY:  Object to the form.
9          MR. SAWYER:  I'll withdraw the
10         question.  I'll ask a better
11         question.
12 Q.   Did either EMCOR or BB&T apply a deduction
13      of amounts for square footage
14      discrepancies from September through
15      December?
16 A.   We issued a credit --
17 Q.   Let me stop you real quick.  That's not my
18      question.  My question is whether BB&T
19      and/or EMCOR applied a credit for square
20      footage discrepancies from September
21      through December of 2005.
22 A.   Maybe I just don't understand what you're
23      asking, apparently.

38 (Pages 146 to 149)

b0948471-2d80-4e32-8b15-f0691512c0d4

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 150

1  Q.  Well, what I understood your testimony to
2      be is that PFMI was going to perform these
3      measurements and they were going to be
4      done in 90 days and there was a -- and
5      stop me if I get anything wrong -- and
6      there was going to be measurements that
7      were performed on these branches. And you
8      had a conference call in July, August, or
9      September, early on, and representatives
10     represented that, hey, if there's a 5
11     percent difference on certain branches
12     plus or minus, we're not going to have a
13     credit that we're going to take going
14     backwards after the measurement's
15     complete, but going forward, we're going
16     to change the price.  Does that comport
17     with your recollection?  And that's pretty
18     long.
19 A.  Yeah.  To my recollection, the 90-day
20     period wasn't discussed; it was simply
21     stated that, you know, plus or minus 5
22     percent would not be trued up; it would
23     just -- the price would change --

Page 151

1  Q.  Going forward?
2  A.  -- going forward.
3  Q.  My question is, prior to measurements
4      coming in that were completed by PFMI or
5      its vendors, did either BB&T or EMCOR take
6      any deductions or credits for square
7      footage discrepancies -- for any
8      percentage?
9  A.  I could not say specifically without
10     looking at each invoice if they had or
11     not.  I know we changed some based on
12     surveys, and we were requested to change
13     them back.
14 Q.  But the invoices would show that, right?
15 A.  The invoices should, unless the entire
16     invoice was trashed and a new one was
17     created in its place.  So in which case
18     the actual invoice wouldn't show it.
19 Q.  Sure.  But as we sit here today, do you
20     recall one way or the other whether BB&T
21     and/or EMCOR deducted monies from PFMI
22     invoices for square footage discrepancies
23     prior to December 2005?

Page 152

1  A.  Not that I recall.
2  Q.  Okay.  Do you remember an issue of a
3      stolen proof bag?
4  A.  Yes.
5  Q.  Okay.  Who stole the proof bag?
6  A.  It's alleged --
7  Q.  You can't use those words.
8  A.  Well, they haven't been convicted.  That's
9      why I say "alleged."
10 Q.  I thought they confessed?
11 A.  No.  I mean, I --
12     THE WITNESS:  Do you want me to
13        ramble or not?
14     MS. TULEY:  As long as -- you can
15        tell him whatever you know
16        as long as it's not
17        something a lawyer told you.
18 A.  I called our insurance company previously
19     this week when I saw Exhibit A, and that
20     was one of the questions, to get a status
21     update on that.
22 Q.  Okay.  I really want to know if BB&T's
23     been paid.

Page 153

1  A.  Their comment to me was that as of May,
2      there has been just a continuance of the
3      charges, that they had not gone to court,
4      that the proof bag dollar amount had
5      dropped, but BB&T would not give an exact
6      accounting of what that dollar was, and
7      therefore, they were having trouble doing
8      anything with the claim because of lack of
9      information.
10 Q.  Okay.  Was Destiny Cleaning the FMI
11     subcontract?
12 A.  I do not recall if Destiny was FMI or
13     direct underneath us.
14 Q.  Do you recall whether you paid them
15     directly?
16 A.  I believe we did.
17 Q.  I'm going to mark this as the next in
18     order.  I'm putting it at the top.  Could
19     you identify what's been marked as 29?
20     (The referred-to document was
21        marked for identification as
22        Defendant's Exhibit No. 29.)
23 A.  Yes.  It's a vendor report.

39 (Pages 150 to 153)

b0948471-2d80-4e32-8b15-f0691512c0d4

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 154

1   Q.   Go ahead and take a look at that.
2   A.   All right.
3   Q.   Does that refresh your recollection as to
4        whether PFMI paid Destiny direct?
5   A.   Yes, we paid direct starting in October of
6        '05.
7   Q.   Are all those vendors solely BB&T account
8        vendors?
9   A.   Yes, they appear to be.
10  Q.   All of them?
11  A.   Yes, I believe so.
12  Q.   Okay.  Has PFMI paid any amount to BB&T
13       for the stolen proof bag?
14  A.   No, sir.
15  Q.   But the claim has been submitted to the
16       insurance carrier for PFMI?
17  A.   The claim has been submitted.
18  Q.   And I believe you just testified as to the
19       status of where the claim was?
20  A.   Yes, yes.
21            MR. SAWYER:  Off the record.
22            (Off-the-record discussion.)
23  Q.   Mr. Wohlers, is what you just testified to

Page 155

1        the extent of your knowledge concerning
2        the proof bag?
3   A.   Well, not my total knowledge.
4            MS. TULEY:  I object.
5   Q.   Let me back up.  When did you hear about
6        the loss of the proof bag?
7   A.   Sean Brookins called me after hours and
8        said that a proof bag was missing and sort
9        of brought me up to speed on what he
10       thought had occurred.
11  Q.   Do you remember what BB&T location this
12       was?
13  A.   One Destiny cleaned.  I think it was in --
14  Q.   North Carolina somewhere, right?
15  A.   -- Peggy -- Peggy's region.  That's all.
16            MS. TULEY:  Are you trying to say
17            Farnsworth?
18            THE WITNESS:  Yes.  I forget that
19            name.
20  Q.   Did PFMI ever withhold any money based on
21       this issue from Destiny Cleaning?
22  A.   I think there's one invoice left open on
23       their books, but I'm not sure.  But no,

Page 156

1        not -- according to this, all invoices
2        have been paid.
3            MS. TULEY:  Will you, for the
4            record, just say what you're
5            looking at, the exhibit
6            number?
7            THE WITNESS:  Yeah.  Looking at
8            Exhibit 29, the vendor
9            activity report.  Shows all
10           of Destiny's current
11           invoices or invoices that
12           were in the system as paid.
13  Q.   Well, after you discussed the issue with
14       Sean Brookins, what did you do next?
15  A.   Sean asked me if everything was -- you
16       know, if everything had been performed
17       like they were supposed to on those subs.
18       You know, if the sub had done his
19       background checks and those type of
20       things.  I told him, I don't know.  I
21       called Keith Blackburn, asked him if
22       everything had been done; he told me yes.
23       So I called Sean back and said, you know,

Page 157

1        I've been told yes.  He asked me if I
2        could just type up something real quick,
3        said, basically, this is what it needs to
4        say.  So I did that and sent that to Sean.
5   Q.   And it was essentially a letter stating
6        that the proper procedures had been
7        followed?
8   A.   Yes.
9   Q.   In terms of criminal background checks?
10  A.   Yes, drug check -- I believe it said that.
11       I'm not sure, but --
12  Q.   And I-9 forms or --
13  A.   Yeah, something like that.
14  Q.   And it was Keith?
15  A.   Keith Blackburn.
16  Q.   Mr. Blackburn told you that, yes, those
17       procedures had been followed?
18  A.   Yes.
19  Q.   I think I asked Mr. Littlefield this, and
20       he didn't recall one.  Do you ever recall
21       a written agreement between PFMI and
22       Destiny?
23  A.   We gave them a written agreement.  The

40 (Pages 154 to 157)

b0948471-2d80-4e32-8b15-f0691512c0d4

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 158

1    issue with Destiny was BB&T actually hired
2    that company, told us that's who we were
3    using in that region. We had given them a
4    written agreement. When we would call to
5    follow up on it, the basic reply we got
6    was call Peggy Farnsworth; she has the
7    agreement and she's looking over it.
8  Q.  Did you call her?
9  A.  I tried not to, but yes, I called her.
10   And she said, yes, indeed, she was looking
11   over it.
12 Q.  Is Ms. Farnsworth a pleasant person?
13 A.  No, she's not, off the record.
14       MS. TULEY:  That's on the record.
15 Q.  Who is Ms. Farnsworth?
16 A.  Ms. Farnsworth was a RBOM for BB&T.
17 Q.  When you say RBOM, it's Regional Branch
18   Office Manager, correct?
19 A.  I think so, yes, Regional Branch -- I've
20   heard that and operations manager also.
21 Q.  Sure. Very well could be office or
22   operations?
23 A.  Yes.

Page 159

1  Q.  And I believe you said BB&T hired Destiny?
2  A.  Yes.
3  Q.  Is it that BB&T hired them and had a
4    contract with them, or did PFMI have a
5    contract with them?
6  A.  BB&T hired them. There were some issues
7    going on in that region. And we were
8    called by Ronnie Eller and told, this is
9    who's been hired to clean this region; you
10   need to make contact with them and work
11   out an agreement with them.
12 Q.  Okay. I understand your testimony. You
13   were directed by BB&T to enter into a
14   contract with these people?
15 A.  Yes.
16 Q.  Did you have any say-so in that?
17 A.  No.
18 Q.  And that individual is Ronnie Eller?
19 A.  Yes. That's who Peggy wanted in that
20   region.
21 Q.  Did Mr. Eller call you personally?
22 A.  I believe so, yes. I believe Greg and
23   myself.

Page 160

1  Q.  So it was a conference call?
2  A.  Yes. Well, Greg's office is next to mine,
3    so it's...
4        MR. SAWYER:  Let's take a quick
5        break, because I have one
6        more issue.
7        (Brief recess.)
8  Q.  Do you recall receiving a letter from
9    EMCOR approximately the end of April
10   concerning termination of the original
11   agreement?
12 A.  Yes, I do.
13 Q.  Okay. Were you ever informed why?
14 A.  I believe to break it down into smaller
15   pieces of the pie, basically.
16 Q.  Were you ever informed by EMCOR why that
17   was happening?
18 A.  There had been some changes, you know, on
19   who was managing it on the BB&T side and
20   felt like it was best if, you know, they
21   broke it down into more manageable pieces.
22 Q.  Do you recall which pieces of the original
23   agreement you got to keep?

Page 161

1  A.  West Virginia, Tennessee, Kentucky. I
2    want to say Georgia and Alabama. Without
3    looking at the actual letter -- I know in
4    the letter it's spelled out which regions
5    or states.
6  Q.  Well, I recall your testimony being that
7    Patton was primarily in West Virginia?
8  A.  Yes.
9  Q.  Okay. And I think I remember from
10   yesterday Mr. Littlefield saying that FMI
11   was primarily the North Carolina/South
12   Carolina area?
13 A.  Parts of it, yes.
14 Q.  Did it also extend into Tennessee,
15   Kentucky, or Georgia?
16 A.  Tennessee was Varsity. Georgia was ABM, I
17   believe. I don't know if they were -- I
18   think ABM and Varsity split Georgia.
19 Q.  Okay. How about Alabama?
20 A.  Alabama, there were only two branches. I
21   can't recall -- I think on this -- on the
22   vendor master, Exhibit 29, I think it
23   lists Carlos, Curtis, and Janet Buchanan.

41 (Pages 158 to 161)

b0948471-2d80-4e32-8b15-f0691512c0d4

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 162

1     They did just a couple of branches in that
2     north Alabama/south Tennessee area.
3  Q.   What about Kentucky?
4  A.   Kentucky is CRM.
5  Q.   Fair statement that FMI got carved out of
6     this?
7  A.   Yes.
8  Q.   Did you agree or disagree with that?
9  A.   Either way, it didn't really matter to me.
10 Q.   Okay.  And I want to -- I'll ask the
11    question.  It's my understanding there was
12    no signed written agreement for this new
13    agreement which was limited to West
14    Virginia, Tennessee, Kentucky, Georgia,
15    and Alabama.  Is that consistent with your
16    recollection, that there is no signed
17    agreement by both parties concerning the
18    scope of services for this -- it's a
19    horrible question.  Strike it all.
20         Is there a signed written
21    agreement between PFMI and EMCOR
22    concerning this new scope of work?
23 A.   Not that -- not that I'm aware of.

Page 163

1  Q.   Could there be?
2  A.   One was sent to us.  I'm not sure -- I
3     know it was sent to our attorneys, but I'm
4     not sure if Greg ever signed it and it was
5     sent back or not prior to the end.
6  Q.   And I don't want to know at all what your
7     attorneys told you, but do you have
8     another set of attorneys --
9  A.   We -- yes.
10 Q.   -- in addition to Beasley, Allen?
11 A.   Yes, yes.
12 Q.   Okay.  Are those corporate counsel?
13 A.   Yes.  Well, not PFMI, but yeah, they're
14    outside attorneys.
15 Q.   What firm do you use?
16 A.   What is it, Rushton, Stakely?
17    MS. TULEY:  Rushton, Stakely --
18         there's a bunch more names.
19 Q.   Are they in town?
20 A.   Yeah, right up the block.
21 Q.   But you hired these killers to go after
22    us?
23 A.   They're more in the contract side of

Page 164

1     thing.
2  Q.   As far as negotiating contracts?
3  A.   And reviewing them and that sort of thing.
4  Q.   And again, I don't want to know what your
5     attorneys told you, but did they review
6     the letter of intent that came in July of
7     2005?
8  A.   I don't know if Chad -- and I'm sorry,
9     Chad's our attorney with Rushton, Stakely.
10    I don't know if Chad reviewed that one or
11    not.
12 Q.   Okay.  How about -- never mind.  Doesn't
13    matter because there was no signed written
14    agreement between the parties, to your
15    knowledge, right?
16 A.   To my knowledge, correct.
17 Q.   Okay.  When was this new agreement
18    implemented?
19 A.   I believe it was to take place -- well,
20    the agreement, as far as the new areas we
21    were going to service, took place I
22    believe June 3rd.
23 Q.   So the new agreement kicked in June 3rd,

Page 165

1     2006?
2  A.   I believe so.
3  Q.   Roughly thereabouts?
4  A.   Roughly thereabout.
5  Q.   Fair statement that it was kind of going
6     to -- the implementation of the new
7     agreement was going to be staggered
8     through June 15th?
9  A.   Originally that was the conversation, but
10    that isn't what was done.
11 Q.   What was done?
12 A.   They were wanting to stagger one region,
13    and we basically said we just need to do
14    it all June 3rd.  And so that's the way it
15    was done.
16 Q.   Was that a directive from EMCOR?
17 A.   To stagger or --
18 Q.   Or start it all June 3rd?
19 A.   That was our reply back to their directive
20    to stagger it.
21 Q.   Oh, okay.  So PFMI said, hey, we're going
22    to start it June 3rd?
23 A.   Yes.  We'd rather -- if we're going to

42 (Pages 162 to 165)

b0948471-2d80-4e32-8b15-f0691512c04d

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 166

1   make the transition, let's make it all on
2   June 3rd.
3   Q.   Did EMCOR agree with that?
4   A.   Yes, they did.
5   Q.   Who at EMCOR agreed with that?
6   A.   Sean Brookins, Mark Smith.  On part of
7   that, we released all of our subs.
8   Q.   When you say you released all your subs,
9   you mean for -- what do you mean by
10  released?
11  A.   They were under a no-compete, to where
12  they couldn't go out from under PFMI, but
13  we released them from that.
14  Q.   Do you ever recall FMI ever having any
15  issues about the non-compete clauses in
16  their contract?
17  A.   Not that I recall, no.
18  Q.   Do you remember them giving either EMCOR
19  or ABM a hard time about not allowing
20  their sub-tier vendors to be used by ABM?
21  A.   Okay, now that you mention that, yes, I
22  recall some e-mails between Don and ABM
23  that I think I saw.

Page 167

1   Q.   Okay.  After PFMI start performing work on
2   June 3rd, how long did they service West
3   Virginia, Tennessee, Kentucky, Georgia,
4   and the two locations in Alabama?
5   A.   Until approximately the middle of July.
6   Q.   July 14th ring any bells?
7   A.   It does, but without looking at the
8   specific letter -- I know you have it.
9   Q.   This is the next exhibit in order.  Here
10  you go, Mr. Wohlers.  Would you take a
11  look at what's been marked as Exhibit 30
12  to your deposition?
13       (The referred-to document was
14        marked for identification as
15        Defendant's Exhibit No. 30.)
16  A.   Yes.
17  Q.   Does that refresh your recollection as to
18  why PFMI stopped work?
19  A.   Yes, it does.
20  Q.   It was because you hadn't been paid for
21  the month of June, correct?
22  A.   Yes.
23  Q.   Or two weeks in July?

Page 168

1   A.   Or two weeks in July.
2   Q.   Were you ever told why you weren't paid
3   for that?
4   A.   Yeah, according to the letter, pretty much
5   for square footage adjustments.
6   Q.   Who at EMCOR told you that payment was
7   being withheld?
8   A.   I believe it was Sean Brookins, but I'm
9   not sure.
10  Q.   Did anyone from EMCOR ever have occasion
11  to tell you -- strike that.
12       Did anyone from EMCOR tell you
13  that no more adjustments will be made
14  after the execution of the original
15  agreement?
16       MS. TULEY:  Object to the form.
17  A.   We were told there would be a clean slate
18  going forward from June 3rd, that past
19  performance, square footage, all that was
20  previous; going forward from June 3rd, it
21  would be based on the new square footages
22  they had given us.
23  Q.   Is that your interpretation of the words

Page 169

1   "clean slate"?
2   A.   Well, that's what they defined for us,
3   because they said clean slate and then
4   went on to say exactly what was intended
5   by that.
6   Q.   And representatives from EMCOR directly
7   told you that no more adjustments would be
8   made for square footage issues after June
9   3rd?
10  A.   Yes.
11  Q.   Okay.  Who from EMCOR told you that?
12  A.   Sean Brookins and Mark Smith.
13  Q.   When did they tell you that?  It would
14  have been before June 3rd, right?
15  A.   It was before June 3rd.
16  Q.   And it would have been after the
17  termination of April 28, 2006, correct?
18  A.   Correct.  So I would have to assume it was
19  in May.
20  Q.   So it was between April 28th and June 3rd?
21  A.   Yes, sir.
22  Q.   Did you ever have occasion to confirm that
23  in writing in any form?

43 (Pages 166 to 169)

b0948471-2d80-4e32-8b15-f0691512c0d4

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 170

1   A.   I don't know if there's an e-mail in
2        regards to that.  I know Sean Brookins and
3        I had additional conversations in regards
4        to that topic in which it was confirmed
5        again that, you know, it's a new world,
6        you know, we want -- everyone wants this
7        to work.  And, you know, reiterated again
8        that, you know, past performance,
9        adjustments, all that, thing of the past.
10  Q.   Did EMCOR ever make any payments after
11       June 3rd, 2006, for your work?
12  A.   I would have to look at a register, but I
13       believe they paid for some out-of-scope
14       work, and I believe they did make another
15       payment, but I would need to look at that.
16  Q.   I'll mark this as an exhibit.  I don't
17       know if you'll be able to identify it or
18       not, but I'll let you take a look at it
19       and see what you can tell me.  All right.
20       I'm handing you what's been marked as the
21       next exhibit in order.  It's Exhibit 31.
22       Well, I'll represent to you that it's an
23       accounts payable check register from EMCOR

Page 171

1        regarding the BB&T account.
2             (The referred-to document was
3               marked for identification as
4               Defendant's Exhibit No. 31.)
5   A.   All right.
6   Q.   Okay.  If you'll turn to the very, I
7        guess, back two pages -- you were there.
8        Did it refresh your recollection as far as
9        do those numbers look familiar as far as
10       receiving payments from EMCOR?
11  A.   I couldn't say.  I know we received some
12       payments, but I couldn't say these were
13       the amounts of those payments or, you
14       know, if they applied to those invoices,
15       you know.  If I had our AR register, I
16       could tell you specifically.
17  Q.   Okay.  But you do recall that payments
18       were made after June 3rd, correct?
19  A.   Yes.
20  Q.   Okay.  And does about 120 grand plus or
21       minus whatever -- does 120 grand sound
22       about right?
23            MS. TULEY:  Object to the form.

Page 172

1   Q.   You can answer if you know.
2   A.   Well, I mean, just looking at one of them,
3        143,000 of that is out-of-scope work.
4   Q.   Right.
5   A.   Which would be for carpet cleaning or any
6        other thing.  It would appear that 78,000
7        was paid for in-scope.
8   Q.   Okay.
9   A.   But I don't know what time frame that was
10       paid for.
11  Q.   Let me ask you another question.  Have you
12       ever seen that document before?
13  A.   No.  No, I haven't.
14  Q.   But if you had your accounts receivable --
15  A.   If I had my accounts receivable, I could
16       be a little bit more definitive on what
17       invoice time period payments were applied
18       or even when that out-of-scope invoice was
19       created, such as that.
20  Q.   Certainly.  That's all for that exhibit.
21  A.   All right.
22            MR. SAWYER:  Y'all give me just a
23              second.

Page 173

1             (Brief recess.)
2   Q.   Hand you what's been marked as Exhibit 32.
3        Go ahead and read that, and if you can,
4        identify it for the record.
5             (The referred-to document was
6               marked for identification as
7               Defendant's Exhibit No. 32.)
8   A.   Do you want me to start at the very back
9        or just --
10  Q.   Whatever works for you.  I'm most
11       interested in the first page.
12  A.   All right.  On the very first page?
13  Q.   Read the whole thing if you want.
14  A.   All right.  Let's see.  The very first
15       e-mail.  (As read:)  "Sean, we had called
16       today" --
17            MS. TULEY:  Slow down.  She can't
18              write that when you're
19              reading that fast.
20            MR. SAWYER:  You can just read it
21              to yourself.
22            (Off-the-record discussion.)
23  Q.   Have you had a chance to look at what's

44 (Pages 170 to 173)

b0948471-2d80-4e32-8b15-f0691512c0d4

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 174

1    been marked Exhibit 32 to your deposition?
2  A.   Yes.
3  Q.   Do you recall those e-mails?
4  A.   I don't recall the bottom two. I recall
5    typing this one to Sean in regards to, you
6    know, that we never agreed to the 20
7    percent reduction.
8  Q.   And that's the 20 percent reduction going
9    forward on the new agreement, right, or --
10  A.   It reads as if the 20 percent reduction on
11    the bill that has occurred since March
12    16th of this year, and it doesn't state
13    the -- it doesn't really address the one
14    -- the new agreement.
15  Q.   Okay.
16  A.   At least the way I read it right now.
17  Q.   And are you responding to something that
18    Mr. Brookins said?
19  A.   Yes. It appears as if I'm responding to
20    the fact that they had held the entire
21    second May payment and that -- you know,
22    that -- you know, Sean's basically saying
23    that the payment was withheld because

Page 175

1    we're working with BB&T on the evaluation
2    of those final credits and hope to have
3    that information in a few days.
4  Q.   Are you reading directly from the exhibit?
5  A.   Yes.
6  Q.   Okay. And you're reading from the portion
7    that Mr. Brookins wrote, correct?
8  A.   Yes.
9  Q.   Fair statement that I guess Mr. Brookins
10    and you saw things a little bit
11    differently as far as what was going to be
12    done?
13  A.   With the new agreement or with the last
14    May payment or the entire --
15  Q.   Well, with the last and with the new
16    agreement.
17  A.   It would sound -- it would sound like
18    that, yes.
19  Q.   Okay. You can put it down. Mr. Wohlers,
20    it's a fair statement that you wouldn't
21    want to overcharge EMCOR for work you did,
22    right?
23    MS. TULEY: Object to the form.

Page 176

1  Q.   You can answer.
2  A.   Correct.
3  Q.   And that's because it would be wrong,
4    wouldn't it?
5    MS. TULEY: Object to the form.
6  Q.   You can answer.
7  A.   It would appear that way, yes.
8    MR. SAWYER: Off the record.
9    (Off-the-record discussion.)
10    (The deposition of JIM WOHLERS
11    was concluded at approximately 1:36 p.m.,
12    on August 10, 2007.)
13    * * * * * * * * * * * *
14    REPORTER'S CERTIFICATE
15    * * * * * * * * * * * *
16
17    STATE OF ALABAMA
18    COUNTY OF MONTGOMERY
19
20    I, Nicole Paulk, Court Reporter
21    and Notary Public in and for the State of
22    Alabama at Large, do hereby certify that
23    the foregoing is a true and accurate

Page 177

1    transcript of the proceedings as taken
2    stenographically by me at the time and
3    place aforementioned.
4    This 16th day of August 2007.
5
6
7    Nicole Paulk
    Reporter and Notary Public
    State of Alabama at Large
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23

45 (Pages 174 to 177)

b0948471-2d80-4e32-8b15-f0691512c0d4



Contract No. EMC-00793

## Purchase and Service Master Agreement
Facilities Maintenance and Management

This Agreement is between BRANCH BANKING AND TRUST COMPANY with its principal office located at 200 West Second Street, Winston-Salem NC 27101-4011 ("BB&T") and EMCOR Facilities Services with its principal office located 320 23rd Street South, Arlington, VA 22202 (Supplier).

WHEREAS, Supplier has the experience to perform the services required to be performed by it under this Agreement, and has the organization, means, financial and technical ability to fulfill all of its obligations under this Agreement,

WHEREAS, BB&T agrees to purchase and Supplier agrees to provide the services, and sell, install, and maintain the equipment required to perform in accordance with the terms and conditions stated in this Agreement,

NOW, THEREFORE, in consideration of the mutual promises herein contained, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

MASTER AGREEMENT. This Agreement shall operate as a master agreement and shall govern all present and future transactions entered into by BB&T and Supplier for the equipment and services described in this Agreement. All equipment and services at the locations described on the attached Exhibits and Attachments are covered under this Agreement. Individual future installations will be initiated by the issuance of either a Supplier Work Order or a BB&T Purchase/Work Order. The terms and conditions of this Agreement shall supersede any and all conflicting or inconsistent terms and conditions on any Supplier Installation Order or BB&T Purchase Order (individually and collectively, an "Order"). If this Agreement is terminated, then no future transactions will be entered into under this Agreement and completion of work in progress shall be as directed by BB&T.

The following Exhibits shall be attached to this Agreement.

Exhibit "A"   Location Identification Information
Exhibit "B"   Organization Chart
Exhibit "C"   Janitorial Pricing by Site
Exhibit "D"   Janitorial Scope of Work
Exhibit "E"   Janitorial Supplies
Exhibit "F"   Interior Lighting
Exhibit "G"   Management and Administration SOW
Exhibit "H"   Management Fees
Exhibit "I"    Accounts Payable Electronic Invoice Format
Exhibit "J"   Detail Invoice History and Reporting
Exhibit "K"   Implementation Timeline
Exhibit "L"   Escalation and Senior Executives
Exhibit "M"   Confidentiality Agreement
Exhibit "N"   Service Level Agreement
Exhibit "O"   Building Security Requirements

The Exhibits are incorporated herein by reference. To the extent that there is any inconsistency between any of the Exhibits and the Agreement, the Agreement shall control.



EXHIBIT
9

1. **Term of the Agreement.** This Agreement is effective June 1, 2005, and unless sooner terminated or canceled as provided herein shall remain in full force and effect for a term of three (3) years following the date hereof. BB&T shall have the option, subject to mutual agreement of BB&T and Supplier as to terms and amounts of compensation, to renew and extend the term of this Agreement for two successive one (1) year periods BB&T shall furnish written notice to Supplier of its intention to renew and extend the term of this Agreement at least 180 days prior to the expiration of the initial term or any renewal term of this Agreement

2. **Acceptance.** All goods purchased and/or services performed hereunder are subject to inspection and approval at BB&T's facility or destination. BB&T reserves the right to reject and refuse acceptance of product which does not conform to BB&T's specification, as provided to Supplier, and BB&T shall have no obligation to pay for such goods. BB&T. Supplier will provide services to BB&T in accordance with the Scopes of Services detailed in Exhibits D and G. Additionally, Supplier's services will performed in accordance with requirements detailed in Exhibits N and O.

3. **Acquisition/Merger.** In the event BB&T or its parent corporation acquires, merges with, or is acquired by other institution(s) which utilize Supplier's products or services and such institution(s) have an agreement(s) with Supplier, upon ninety (90) days written notice to Supplier BB&T may terminate such Agreement without any penalty or obligation. Such products or services covered under said Agreements(s) might then be provided under BB&T's existing Agreement(s) with Supplier at the prices provided for therein and/or adjusted for increased volume or scope., as mutually agreed between BB&T and Supplier.

4. **Affiliates/Subsidiaries.** BB&T may purchase goods and services for its own use as well as for use by its subsidiaries and affiliates. Accordingly, all warranties and other agreements of Supplier hereunder shall extend to each of the subsidiaries and affiliates with respect to goods and services transferred to or ordered on their behalf by BB&T. At BB&T's direction Supplier may be required to directly invoice some affiliates/subsidiaries for products supplied or services performed. Such direction to directly invoice affiliates/subsidiaries shall not relieve BB&T of any of its obligations and liabilities hereunder, including, but not limited to, payment to Supplier.

5. **Assignment.** Neither party may assign any of its rights or obligations hereunder without the prior written consent of the other party except that BB&T may assign its rights and obligations under this agreement without the approval of Supplier to any of its affiliates, subsidiaries or parent company or to an entity other than an affiliate, subsidiary or parent company that (a) acquires substantially all of the assets or stock of, merges or consolidates with or into, or acquires a controlling interest in BB&T and (b) expressly assumes in writing BB&T's obligations and responsibilities hereunder. Any attempted assignment that does not comply with the terms of this section will be void.

6. **Audit Rights.** Supplier shall provide BB&T's auditors and inspectors with reasonable access to any data regarding Supplier's obligation under this Agreement (a) allowing BB&T to determine whether Supplier is complying with the terms and conditions of this Agreement, and (2) allowing such auditors and inspectors to perform audits or inspections of BB&T. Supplier will provide such assistance to the auditors and inspectors as they reasonably request, including allowing on-site inspection of Supplier's books, records and operations directly related to Supplier's obligations under this Agreement, and BB&T shall pay Supplier at Supplier's standard rates for any services, other than of a routine nature, rendered in connection with any such audit or inspection.

7. **Binding Effect.** The rights and obligations of Supplier and the BB&T under this Agreement shall inure to the benefit of and shall be binding upon the successors and assigns of Supplier and the BB&T.

8. **Compliance with Laws.** Supplier shall comply with all applicable federal, state, and local laws, regulations, and codes, including, but not limited to, the procurement of permits, certificates, and licenses when needed in the performance of this Agreement, and shall comply with the Immigration Reform and Control Act of 1986 (IRCA) and, notwithstanding any other term or condition of this Agreement, shall indemnify, defend and hold harmless BB&T and all of its affiliates, subsidiaries and

parent companies from and against any and all losses, liability, claims, damages, fines, penalties, or expenses (including reasonable attorney's fees) that may be sustained by reason of Supplier or Supplier's employees or sub-contractors, or Supplier's failure to comply with such federal, state, and local laws, regulations, and codes. Supplier will be responsible with obtaining all permits required for the installation of equipment or construction or renovation of any building or landscaping.

9. **Confidentiality Agreement.** Supplier must sign a copy of BB&T's Confidentiality Agreement attached hereto as Exhibit "M" which is incorporated by reference and shall survive the expiration of this Agreement. The purpose of the Confidentiality Agreement is to (a) protect the confidential information disclosed by BB&T and (b) to comply with the requirements of Title V of the Gramm-Leach-Bliley Act ("GLB") and applicable federal and state privacy laws

10. **Contingency.** If Supplier fails to perform the work, service or installation, after having been notified by BB&T and given a 24-hour opportunity to commence to cure, BB&T may arrange for the same by another party. Supplier will be responsible to BB&T for all expenses incurred as a result of such work by another party. BB&T shall not be liable for any work, service or installation not performed by Supplier, nor any products or services not installed by Supplier.

11. **Corporate Identification.** Neither party shall identify the other party or any of its affiliates, subsidiaries or parent companies, or use any of their trademarks, trade names, service marks, or other proprietary marks, without the owning party's prior written approval.

12. **Delays.** Time is of the essence in the Agreement. Supplier shall immediately notify BB&T of any possible delays in the timely performance under this Agreement.

13. **Disaster Recovery Plan.** Supplier shall maintain current disaster recovery plan sufficient to allow Supplier to continue furnishing the services and products contemplated by this Agreement in the event of a disaster. The recovery plan must document procedures to prepare for a disaster and detailed procedures to follow after a disaster has occurred. Recovery plan development must be flexible enough to adapt the plan to a constantly evolving environment. The Supplier must be available to provide comprehensive support – 24 hours a day, seven days a week, including holidays. The Supplier must provide, at a minimum, annual testing of the recovery plan.

14. **Dispute Resolution.** Any dispute relating to this Agreement or with respect to the performance by a party hereunder shall be resolved as provided in this section.

Informal Dispute Resolution. Except as otherwise set forth in this section, prior to the initiation of any proceeding, the representatives for each party shall meet for the purpose of endeavoring to resolve a dispute.

*Senior Executives.* In the event that the Informal Dispute Resolution process is unable to resolve the Dispute within fifteen (15) business days following its first meeting, it shall promptly notify the senior executives of each Party (collectively, the "Senior Executives") Exhibit L". The Senior Executives shall meet (in person or otherwise) in an attempt to resolve the Dispute as promptly as possible, but in any event no later than five (5) days following notification thereof. If the Senior Executives cannot resolve the Dispute within ten (10) days following notification thereof (or such longer period as the Parties may agree), either Party may submit such Dispute for resolution under the mediation and arbitration procedures provided below.

*Procedures.* The representatives and Senior Executives, as applicable, shall meet as often as reasonably necessary in order to gather and furnish to the other all information with respect to the matter in issue which they believe to be appropriate and germane in connection with its resolution. The representatives and Senior Executives, as applicable, shall discuss the Dispute and negotiate in good faith in an effort to resolve the Dispute without the necessity of any formal proceeding. During the course of negotiations, all reasonable requests made by one Party to another for non-

privileged information, reasonably related to this Agreement, shall be honored in order that each of the Parties may be fully advised of the other's position.

Formal Proceedings.

Mediation. If, after thirty (30) days following the earliest date upon which one of the parties gave written notification of its desire to meet to resolve the dispute (or such longer period as the parties may agree), either party concludes in good faith that amicable resolution through continued negotiation does not appear likely, then the dispute may be promptly submitted by such party to non-binding mediation by a single mediator chosen by the mutual consent of the parties.

Arbitration. Following completion of the mediation, if mediation is not satisfactory to either Party, either party may submit the dispute to J.A.M.S./Endispute for final settlement by arbitration in accordance with the Arbitration Rules of the American Arbitration Association. The arbitration shall be held before a panel of three arbitrators, with each party selecting one arbitrator and the third arbitrator selected by the two arbitrators selected by the parties.  The mediation and arbitration proceedings shall be held in Forsyth County, Winston Salem, North Carolina and all submissions, rulings and awards with respect thereto shall be in English. The mediators and arbitrators shall apply North Carolina law and U.S. federal law, without regard to conflicts of laws principles, to all aspects of this Agreement and the dispute, including the interpretation and validity of this Agreement, the rights and obligations of the parties, the mode of performance and the remedies and the consequences of the breach of this Agreement. The parties consent to the jurisdiction of the Federal District Court or State Court in Forsyth County, Winston Salem, North Carolina, for all purposes in connection with mediation and arbitration, including (1) enforcement of the arbitration award, and (2) issuance of provisional remedies to protect rights, interests, assets or property, including temporary or preliminary injunctive relief, to ensure ultimate satisfaction of the mediation ruling or arbitration award. The parties agree that the award made by the arbitrator shall be final and binding on the parties, and they waive any right to appeal the arbitrator award, to the extent an appeal may be lawfully waived.

Protective Order. Notwithstanding the foregoing provisions, either party may seek or obtain an injunction or other appropriate relief from a court within the exclusive jurisdiction set forth above to enforce the provisions of this section or maintain the status quo, but no such injunction or relief shall in any way stay or otherwise impede the progress of mediation or arbitration.

15. **Equal Employment Opportunity.**  Supplier agrees that it shall comply with all applicable Federal and State programs requiring equal employment opportunity.

16. **Force Majeure.**  Neither party shall be in default of the Agreement and liable to the other for any delay or failure in the performance of its obligations hereunder due to causes which are beyond its reasonable control and without its fault or negligence.  If a force majeure occurs the party unable to perform shall immediately notify the other party and BB&T may elect to terminate orders for goods not already shipped for the duration of the force majeure during which period BB&T may obtain substitute goods elsewhere.   BB&T shall not be obliged to pay for goods for the duration that performance is delayed or prevented.

17. **Goods/Services and Prices.**  Goods and services, which may be purchased under this Agreement, are set forth in attached Exhibits C,D,E,F,G and H. whichare incorporated herein by reference. Supplier will provide dedicated staffing to BB&T in accordance with Exhibit B. The transition of services will be in accordance with the timeline included in Exhibit K.

18. **Governing Law.**  Unless otherwise specified, the laws of the State of North Carolina shall govern this Agreement and the parties expressly consent to the exclusive jurisdiction of the federal and state courts located in Forsyth County, North Carolina.

Contract No. EMC-00793

19. **Indemnity.** Supplier agrees to indemnify, defend, and hold harmless BB&T and its affiliates, officers, directors and employees (the "BB&T Indemnities) from and against any and all losses, damages, expenses (including reasonable attorney's fees), claims, demands, suits, and liabilities of any kind whatsoever including, but not limited to, any injuries or death to person(s) (whether employee(s), subcontractor(s), or Suppliers, while performing the work), or other persons or damages to property including theft caused by: (1) Supplier's acts of omission or negligence or those of persons furnished by Supplier or Supplier's subcontractor; or (2) claims under Worker's Compensation or similar laws made by person(s) furnished by Supplier; or (3) the failure of Supplier or any goods or services provided by Supplier to fully comply with terms and conditions of this Agreement; or (4) destruction or damage to any property, contamination of, or adverse effects on the environment or any violation of the law caused by Supplier. Supplier agrees to defend BB&T at BB&T's request against any such claim, demand, or suit using counsel selected in consultation with BB&T and paid for by Supplier. Notwithstanding the foregoing, Supplier shall not be required to indemnify, defend and hold harmless BB&T to the extent any losses, damages, expenses, claims, demands, suits or liabilities are attributable to the negligence or willful misconduct of BB&T.

20. **Independent Contractor.** Supplier represents and warrants that it is fully experienced and properly qualified to perform the class of work provided herein and that it is properly licensed, equipped, organized, and financed to perform such work. Supplier shall act as an independent contractor and not as the agent or employee of BB&T. Supplier shall be solely responsible for compliance with all applicable laws governing the employment of its employees and for Supplier's own acts and those of its employees, agents, and contractors during the performance of its obligations hereunder. **Any contract Supplier enters into hereunder with a contractor or vendor as agent of Owner shall be approved by Owner prior to execution or on a form of contract mutually agreeable to the parties.**

21. **Information.** No information obtained by Supplier from BB&T hereunder or in contemplation hereof shall become Supplier's property. Neither party shall disclose to others any information concerning the other party's operation or those doing business with the other party as a result of this Agreement without the prior written permission of the non-disclosing party.

22. **Infringement.** Supplier warrants that the product or service in the form delivered or provided BB&T is free from any valid claim for patent or copyright infringement and that any labels or trademarks affixed thereto by or on behalf of Supplier are free from any valid claim for trademark infringement and Supplier agrees to defend, indemnify, and hold harmless BB&T from and against any suits, claims, actions, losses, damages, expenses (including reasonable attorney's fees), or liabilities that may result by reason of any alleged violation, infringement or misappropriation of a United States patent, trade secret, copyright, or other proprietary right based on BB&T's use of any product or service provided hereunder. If the use of product or service shall be prevented as a result of such claim then Supplier shall (1) procure for BB&T the right to continue to use the product or service, or (2) modify such product or service such that they are functionally equivalent to the original and are no longer subject to such claim, or (3) provide other remedy acceptable to BB&T.

23. **Insurance.** Any and all insurance that may be required under the laws, ordinances, and regulations of any governmental authority is and shall be the sole responsibility of Supplier. Supplier shall also maintain and cause Supplier's subcontractors to maintain during the term of this Agreement the following in manner which extends to BB&T and its affiliates, subsidiaries and parent companies (1) Fidelity Coverage with limits of at least $1,500,000 each occurrence; (2) Comprehensive General Liability Insurance which includes product and completed operations, premises and operations liability, broad form property damage, broad form contractual liability, personal injury, and independent Supplier's liability coverage with limits of at least $2,000,000; (3) Comprehensive Automobile Liability Insurance if use of motor vehicle is required, with limits of at least $1,000,000 for bodily injury including death to any one person and $2,000,000 for any one occurrence and $1,000,000 for each occurrence of property damage; all issued by a company with a BEST rating of A or better, and other insurance as Supplier may deem necessary to protect its interest. . Supplier shall also maintain and cause Supplier's subcontractors to maintain during the term of this Agreement the

following : (1) Worker's Compensation Insurance as prescribed by the law of the state in which Supplier's obligations under the Agreement are performed; Supplier agrees that Supplier's insurer(s) and anyone claiming by, through, under, or in Supplier's behalf shall have no claim or right of action against BB&T based on any loss or liability insured against under the foregoing insurance. Supplier shall furnish certificates evidencing its insurance coverage prior to commencement of the Agreement. Supplier shall notify BB&T in writing at least thirty (30) days prior to cancellation of or any material change to the policy and such certificates shall name BB&T as an additional insured (see Exhibit "TBD"). Supplier shall insure that all subcontractors maintain adequate insurance and Supplier will maintain current certificate of insurance for these subcontractors

24. **Licenses.** No licenses expressed or implied under any patents, trademarks, copyrights, or other propriety rights are granted by BB&T to Supplier under this Agreement. Supplier hereby assigns BB&T and its affiliates, subsidiaries and parent companies all of Supplier's rights to use without restriction the products and services provided, installed and maintained by or for Supplier pursuant to this Agreement.

25. **Locations of Services.** Exhibit "A" shall contain a current list of locations where the services are to be provided.BB&T at its options may add or delete locations of services upon 30 day written notice to Supplier. BB&T will furnish Supplier monthly a list of additions and deletions. Supplier shall maintain a current database of these locations and furnish BB&T monthly an electronic copy . In accordance with Section 49, BB&T and Supplier agree to adjust Exhibits B, C, and H, as mutually agreed, based on changes to Exhibit A.

26. **Minority Business Subcontract.** It is the policy of BB&T to promote and increase the participation of minority and women's business enterprises in our purchasing and contractual business. Any subcontracting activity associated with this Contract will be reported to BB&T quarterly, specifying dollars spent, MBE/WBE firm and description of product/service.

27. **Nonsolicitation Of Employees.** For a period of two years after the termination or expiration of this Agreement, neither party shall , on its own behalf or on behalf of any other person, partnership, association, corporation, or other entity, directly solicit or in any manner attempt to influence or induce any employee of the other party or its subsidiaries or affiliates (known by the party to be such) to leave the employment of the affected party or its subsidiaries or affiliates, nor shall it use or disclose to any person, partnership, association, corporation or other entity any information obtained during performance of this Agreement concerning the names and addresses of those - employees.

28. **Notices.** Except as otherwise specified in this Agreement all notices which may be required by the Agreement or any rule of law shall be deemed to have been duly given when made in writing and delivered in person or sent by certified or registered mail and addressed as follows:

| | | |
|---|---|---|
| **Supplier**<br>Emcor Facilities Services | **BB&T**<br>Support Services | **Additional Copy**<br>BB&T Support Services |
| Vice President<br>Debi Crosby | Facilities Maintenance and Management<br>Steve Paige | Contract Administration<br>Johnny Gurkin C.P.M. |
| 320 23rd Street South, Ste 100<br>Arlington, VA 22202 | PO Box 1220<br>Winston Salem NC 27102 | PO Box 1220<br>Winston Salem NC 27102 |
| **Supplier** – Additional Copy<br>Emcor Facilities Services | | |
| Sr Vice President and General Counsel<br>Johnna Spera<br>320 23rd Street South, Ste 100<br>Arlington, VA 22202 | | |

29. **Occupational Safety and Health (Hazardous/Toxic Material).** Supplier warrants and represents that any and all equipment, product and material sold and delivered and/or all work performed hereunder will comply with all requirements of the Occupational Safety and Health Act of 1970, as the same may be amended from time to time and including all regulations adopted pursuant to such Act and will comply with all applicable federal, state, and municipal laws and regulations relating to the goods purchased or work performed in accordance with this Agreement. Supplier agrees to provide BB&T upon written request all information which will reasonably assist BB&T in the safe handling and use of any product sold hereunder and will furnish a completed Material Safety Data Sheet as required by law.

30. **Ownership of Data and Deliverables.** Supplier agrees that, as between Supplier and BB&T, BB&T and its Affiliates and/or their respective licensors own exclusively, and throughout the world, all right, title and interest in and to (i) the data developed or prepared specifically for BB&T by Supplier under this Agreement, and (ii) all other new deliverables, technology, tools, interfaces, content and applications developed by Supplier specifically and exclusively for BB&T pursuant to a Work Order pursuant to BB&T's request, in all cases including, without limitation, source codes, object codes, HTML or XML code, operating instructions, interfaces, and documentation, program images and text viewable on the Internet developed for or relating thereto, together with all modifications, revisions, changes, copies, partial copies, translations, compilations, partial copies with modifications and derivative works thereto (collectively, the "Developed Property"). All Developed Property is deemed to be "works made for hire" and made in the course of services rendered and will belong exclusively to BB&T, with BB&T having the right to obtain, and to hold in its name, patents, copyright registrations or trademark or service mark registrations or such other protection as may be appropriate to the subject matter, and any extensions and renewals thereof. To the extent that exclusive title and/or ownership rights may not originally vest in BB&T as contemplated hereunder (e.g., may not be deemed works made for hire) in any Developed Property, Supplier hereby agrees to irrevocably assign, transfer and convey to BB&T all right, title and interest therein. Supplier and its personnel shall give BB&T, and/or any BB&T designee, all reasonable assistance and execute all documents necessary to assist and/or enable BB&T to perfect, preserve, register and/or record its rights in such Developed Property. BB&T agrees to promptly reimburse Supplier for all reasonable, out of pocket costs and expenses incurred in connection with such assistance. Supplier shall, immediately upon request of BB&T, or upon the termination, cancellation or expiration of each Work Order or this Agreement, turn over to BB&T all Developed Property obtained by Supplier or prepared or developed as a result of this Agreement and/or any Work Order, and any BB&T documents or other materials held by or on behalf of Supplier, together with all copies thereof.

Supplier shall perform daily back ups and provide BB&T with periodic backups of all data held by Supplier in connection with the administration of this contract. Within 30 days of termination of this contract, Supplier shall update all such backups and upon termination of this contract, Supplier shall promptly return all of BB&T's data on a CD ROM. Thereafter Supplier shall destroy or surrender to BB&T all data held by Supplier in connection with the administration of this contract.

31. **Ownership of Equipment.** All products installed by Supplier or Subcontractor pursuant to this Agreement shall become the property of BB&T upon payment of the Purchase Price, in full, to Supplier. Other than Manufacturer's identification (added at factory and part of equipment) Supplier shall not apply any identification (tags or stickers etc.) unless approved by BB&T or required by law or otherwise required under this Agreement. Supplier shall apply special identification stickers if requested by BB&T as part of this agreement.

32. **Payment Terms.** BB&T shall pay Supplier for goods and services pursuant to this Agreement through a bank account fully funded by BB&T or an alternative funding structure which ensures that Supplier will not be obligated to make any advances or payments on behalf of Owner, except for those advances and payments for which BB&T has provided funds in such bank account. Any undisputed sum due to Contractor pursuant to this Agreement shall be paid within 30 days from the date of the invoice. Supplier agrees to provide BB&T with invoice formats and detail in accordance with the samples included as Exhibits I and J.

33. **Performance.** Supplier represents and warrants that it shall perform the services set forth herein in a prompt, diligent, and workmanlike manner and in accordance with the specifications and all laws, rules, regulations and codes of any government. Unless otherwise indicated, Supplier shall supply all labor, tools, equipment, supplies, and parts that may be necessary for the proper performance of the work. Work not meeting specifications or laws, rules, regulations or codes of any government will, at BB&T's option, be re-performed by Supplier at no cost to BB&T.

34. **Permits, Licenses, and Fees.** Unless in its notification of work BB&T agrees to the contrary, Supplier shall secure all permits and licenses necessary for the accomplishment of the work to be done hereunder and shall comply with all local laws and regulations and, if anything herein contained is at variance with any law or regulation, then the Supplier shall notify the BB&T and receive written instructions before proceeding with the Work. BB&T shall reimburse Supplier for actual, reasonable and customary authorized fees.

35. **Personnel.** Supplier shall ensure that all personnel performing work for BB&T subject to Supplier control and supervision are properly trained and eligible for employment in the United States. Supplier shall perform, or ensure performance of, a criminal background check on all such personnel, suppliers, contract labor, or subcontractors that will be performing work at BB&T's location(s). BB&T strongly recommends that Supplier also perform a drug test and reference check on such personnel. Supplier shall not allow any individual who has been arrested and convicted of a felony (excluding motor vehicle-related offenses) within the past fifteen (15) years to perform work at BB&T's location(s). Whenever employees of Supplier or Supplier's subcontractor's are performing services at BB&T's locations, Supplier shall ensure that at least one such employee shall be fluent in the English language.

36. **Price Warranty.** In the event Supplier reduces its prices for such goods or services during the term of this Agreement and/or receives rebates, incentives, price reduction from subcontractors, manufactures or distributors. Supplier agrees to reduce the prices herein accordingly.

37. **Product Complaint.** BB&T shall issue to Supplier a written product complaint to report unsatisfactory conditions or improper performance that may be caused by design or manufacturing deficiencies. Supplier shall promptly respond to such complaint. Supplier shall implement corrective action to meet BB&T's reasonable satisfaction within seven (7) days of receipt of product complaint.

38. **Publicity.** A party to this Agreement shall submit a written request to the other party for approval of all advertising, sales promotion, press releases, and other publicity matters relating to the goods or services of the other party where the name or mark of the other party is mentioned or inferred or implied. Such approval may be withheld by either party in its sole discretion. Neither party shall use in any manner any advertising, sales promotion, press releases or other publicity relating to the goods or services where the name or mark of the other party or any of its affiliates, subsidiaries or parent companies is mentioned or inferred or implied without the prior written approval of the other party.

39. **Quality and Assurance.** Supplier will ensure that all work is performed in a prompt, diligent, and workmanlike manner and in accordance with the specifications furnished. Any work not meeting specifications or unsatisfactory to BB&T must be addressed and corrected within five (5) days of inspection unless correction is of critical nature or is life safety related. Supplier shall be responsible for all costs associated with correction of defected or unsatisfactory work.

40. **Remedies.** The rights and remedies herein provided shall be cumulative and in addition to any other remedies available at law or in equity.

41. **Severability.** If any provision or any part of a provision of this Agreement shall be invalid or unenforceable, such invalidity or lack of enforceability shall not invalidate or render unenforceable the entire Agreement or provision, but rather the entire Agreement or provision shall be construed as if not containing the particular invalid or unenforceable provision or portion thereof, and the rights and obligations of Supplier and BB&T shall be construed and enforced accordingly.

Contract No. EMC-00793

42. **Specifications.** Product furnished hereunder shall comply with BB&T's and Supplier's written requirements and the applicable manufacturer's published commercial specifications in effect on the date of this Agreement. Supplier shall notify BB&T in writing ninety (90) days prior to any change in product, which would impact its operation, life, or interchangeability with product previously furnished by Supplier. Should BB&T and Supplier fail to reach agreement on the change then BB&T shall have the right to terminate any purchase orders for product affected by the change and cease placing orders against this Agreement.

43. **Specification Changes.** BB&T reserves the right to change any specifications stated in this Agreement upon written notice to Supplier. BB&T shall compensate Supplier for any actual increased costs or Supplier shall make adjustments for any actual decreased costs caused by such changes provided however, that the party claiming the cost change shall notify the other party in writing of the effect of the change in cost within 30 days prior to when changes are proposed otherwise the prices stated in the Agreement shall remain unchanged. Any changes in prices shall be agreed to by both parties.

44. **Subcontractors.** Notwithstanding the foregoing, Supplier reserves the right to subcontract any of its obligations under this Agreement upon prior written notice to BB&T provided that (x) the entity to which Supplier subcontracts the work agrees to be bound in writing to the previously signed Confidentiality Agreement hereinafter discussed, (y) Supplier assumes all liability for any actions or failure to act by such entity, and (z) notwithstanding any term or condition to the contrary in this Agreement, Supplier indemnifies, defends and holds harmless BB&T and all of its affiliates, subsidiaries and parent company from any losses, damages or injuries, including attorney's fees and expenses, resulting from any action or inaction of such subcontractor. Supplier agrees that Supplier shall not use subcontractors for any service, maintenance or warranty work performed on the equipment or systems without prior written approval of BB&T's Facility Maintenance Manager. In such case the approval shall only be for only a specific location or locations as specified in the written approvals.

No act of subcontracting by Supplier shall relieve Supplier of any of its obligations and liabilities hereunder. Supplier will be directly responsible and liable to and for the performance of all of its subcontractors, and will monitor and manage such subcontractors, including the payment to all subcontractors. Supplier will remain directly responsible in accordance with this Agreement for the performance of Services subcontracted by Supplier to the same extent as if the subcontracted Services were performed by Supplier itself, and any completion schedules, specifications and Service Levels applicable to subcontracted Services will continue to apply notwithstanding any such subcontracting.

Supplier shall be solely responsible for all payments to its subcontractors in a timely manner. Under no circumstances including, without limitation, Supplier's failure to make timely and full payments to any subcontractor) shall BB&T be liable to any of Supplier's subcontractor for payment of any amounts. So long as BB&T is current in its payment obligations hereunder, Supplier shall not permit any subcontractor to file a materialman's, mechanic's or similar lien against any property of BB&T, and in the event such a lien is filed, BB&T may make payment to such lien claimant of any and all amounts claimed to be owed and deduct such amount from fees due to Supplier. Supplier shall indemnify, defend and hold harmless the BB&T Indemnitees from and against any loss, expense, obligation or liability incurred by any BB&T Indemnitee arising out of claims made by a Supplier subcontractor related to its performance of the subcontracted Services or any matters related thereto.

(a) If BB&T notifies Supplier that it is dissatisfied with the performance of any subcontractor, Supplier will use its best efforts to address BB&T's concern regarding such subcontractor. If BB&T's dissatisfaction is not addressed to BB&T's reasonable satisfaction within a reasonable amount of time, Supplier will, as soon as reasonably practicable, replace such subcontractor with either Supplier personnel or another subcontractor.

(b) Supplier shall be responsible for and shall indemnify, defend and hold harmless the BB&T Indemnitees from and against any loss, expense, obligation or liability incurred by

BB&T arising out of Supplier's subcontractor's failure to comply with the terms of this Agreement.

(c) Supplier shall promptly report in writing to BB&T any actions or omissions by a subcontractor that, if they were the acts or omissions of Supplier, would constitute a breach of this Agreement.

(d) Supplier shall use commercially reasonable efforts to obtain from subcontractor and provide to BB&T any information concerning the subcontractor reasonably requested by BB&T, including information regarding the subcontractor's financial condition, ability to perform the subcontracted services and subcontractor's compliance with the terms of this Agreement.

(e) No subcontractor of Supplier shall be permitted to subcontract or assign to any third party the performance of any services without the prior written consent of BB&T.

(f) Notwithstanding anything in this Section 44 to the contrary, it shall not be deemed an act of subcontracting and shall not be subject to this Section 44 for Supplier to hire or retain temporary and part-time employees or other individuals or personnel subject to Supplier's control and supervision to perform the Services hereunder for and on behalf of Supplier.

45. **Survival.** The provisions contained in this Agreement that by their sense and context are intended to survive the provisions hereof by any party to this Agreement (which shall include, by way of example and not limitation, all warranties, obligations to indemnify, defend and hold harmless, the license from Supplier to BB&T to use the products and services, etc.) shall so survive the completion of performance, termination, or cancellation of this Agreement.

46. **Termination.** After the initial term of this Agreement, BB&T may at any time terminate this Agreement upon one hundred eighty (180) days written notice without having to assign any cause. BB&T may at any time terminate this Agreement with cause subject to the following: (a) BB&T will have the right to terminate this Agreement if there is a breach of any warranty and Supplier has not cured such breach within seven (7) days after Supplier's receipt of BB&T's written notice of such breach; (b) BB&T will have the right to terminate this Agreement if there is a breach of any term or condition of this Agreement (other than a warranty) by Supplier and Supplier has not cured such breach within fourteen (14) days after Supplier's receipt of BB&T's written notice of such breach; (c) BB&T shall have the right to terminate this Agreement for any failure by Supplier or any products delivered hereunder to meet the performance criteria set forth in all Exhibits and Attachments as part of this agreement, as determined by BB&T in its sole discretion, and Supplier has not cured such breach within thirty (30) days after Supplier's receipt of BB&T's notice of such failure; and (d) BB&T will have the right to terminate this Agreement upon bankruptcy of Supplier. Unless otherwise specified herein, BB&T's liability to Supplier with respect to such termination shall be limited to payment for work and services performed to the effective date of any such termination and the actual out-of-pocket fees charged by the manufacturer of the product for returning the product which has not been installed, tested and accepted, provided that such product cannot be returned to its supplier or manufacturer and cannot otherwise be sold to or used by another BB&T of Supplier. If requested, Supplier agrees to substantiate such costs with proof reasonably satisfactory to BB&T. Supplier may at any time terminate this Agreement with cause subject to the following: (a) Supplier will have the right to terminate this Agreement if there is a breach of any term or condition of this Agreement by BB&T and BB&T has not cured such breach within fourteen (14) days after BB&T's receipt of Supplier's written notice of such breach; and (b) Supplier will have the right to terminate this Agreement upon bankruptcy of BB&T. Upon termination as provided for in this Section 46, the parties shall be entitled to such additional remedies as may be allowed by law.

47. **Time.** All references to time shall mean the time zone of BB&T's location. Supplier shall provide Help Desk Services to receive calls from BB&T and/or its tenants on a 24/7/365 basis in the Eastern, Central, Mountain, and Pacific time zones that BB&T owns/operates facilities.

48. **USA Patriot Act Clause.** Notwithstanding any provision herein to the contrary, Customer may terminate this Agreement immediately without Notice if 1) Supplier or any subcontractor or Supplier of Supplier is listed on the US Department of Treasury's Office of Foreign Assets Control (OFAC) list of Specially Designated Nationals and Blocked Persons, or 2) any state or federal regulator or law enforcement agency requires Customer to terminate the Agreement for US foreign policy or national security purposes. Termination under this section shall relieve Customer from any further payment or performance obligation of any kind under the Agreement whether current or past due, to the extent that 1) such payment or performance obligation is attributable to an OFAC listed entity, or 2) nonpayment or nonperformance is required by any state or federal regulator or law enforcement agency. If Customer has other agreements or contracts with Supplier Customer may also terminate those agreements pursuant to and subject to the provisions of this section.

49. **Volume Changes.** Increased demand due to extraordinary volume changes caused by organizational, specification, or other factors will be considered for repricing at an agreed to negotiated rate based on but not limited to the impact to production, delivery, or BB&T service levels.

50. **Waivers.** Any failure by BB&T or Supplier to strictly enforce any term or condition shall not be deemed a general waiver.

51. **Warranty.** Supplier warrants that the goods or services covered by this Agreement are new unless authorized by BB&T to use refurbished or rebuilt, of merchantable quality, free from defects of material, workmanship, or design and shall conform to and perform strictly to the specifications, drawings, or samples specified or furnished for a period of one (1) year and are fit and safe for the purpose for which they were purchased. Such warranties shall be in addition to all express warranties and shall run to the benefit of BB&T, the BB&T's employees, agents, affiliates, and purchasers from BB&T. Supplier further warrants that they shall convey free and clear title to the goods delivered hereunder. Supplier agrees to indemnify BB&T against all liability, loss and damage, including reasonable attorney's fees, sustained by BB&T by reason of failure of goods or services to conform to such warranties or to any requirement of law. Such warranties and indemnity shall survive delivery, inspection, acceptance, or payment by BB&T for the goods or services.

BB&T hereby acknowledges that Supplier is not an environmental consultant or specialist in dealing with hazardous materials; therefore, BB&T acknowledges and agrees that notwithstanding anything to the contrary contained herein or in any appendix, the work to be performed by Supplier under this Agreement shall not include the identification, detection, abatement, encapsulation, removal or disposal of any hazardous materials, including, without limitation, asbestos. In addition, Supplier shall not be deemed an "operator" of any facility for purposes of current or pending federal, state or local laws, rules or regulations pertaining to hazardous materials, and BB&T shall indemnify and hold Supplier harmless from any claims made with respect thereto. Supplier shall not be required to perform any services in any location of a facility where hazardous materials are present. Supplier's nonperformance of any services due to unsafe working conditions shall not give rise to a breach hereunder nor shall it be cause for termination of this Agreement by BB&T.

52. **Entire Agreement.** Both parties agree that the terms of this Agreement represent the entire Agreement between the parties, and supersede any prior oral and written agreements relating to the services defined. No amendment or modification of the terms shall be valid unless in writing, signed by both parties.

Contract No. EMC-00793

**IN WITNESS WHEREOF,** the parties have signed and sealed this Agreement on the day and year shown below.

Branch Banking and Trust Company

_____
Signature

~~David Park~~     Stephen N. Gaige
_____
Print Name

Support Services Manager
Senior ~~Executive~~ Vice President
_____
Title

    7/12/05
_____
Date

_____
Signature

Debi Crosby
_____
Print Name

Vice President
_____
Title

    July 11, 2005
_____
Date

Agr-Emcor Final 06-22-05.doc



EMCOR Facilities Services, Inc.
320 23rd Street, South, Suite 100
Arlington, VA 22202



EXHIBIT
10

July 13, 2005

Mr. Greg Littlefield
President/CEO
PFMI
4164 Troy Highway
Montgomery, AL  36116

Dear Greg:

     This letter of intent will confirm our discussions as follows with respect to the proposed provision by Professional Facilities Management, Inc. (PFMI) to EMCOR Facilities Services (EFS) of certain facilities services (the "Services") at the Branch Banking and Trust (BB&T) branch facilities (the "Facilities").

1.     EFS and PFMI shall promptly proceed to negotiate a mutually satisfactory definitive Contractor Agreement (the "Definitive Agreement"), based on PFMI's proposed scope and pricing, as incorporated in EFS' proposal to BB&T.  The form of agreement (the "Form") attached hereto as Exhibit A shall be the basis for the negotiation of the Definitive Agreement. EFS and PFMI shall each be entitled to propose changes in the terms, conditions and pricing from those contained in the form. If EFS and PFMI fail to agree neither EFS nor PFMI shall be obligated to enter into any agreement with respect to the provision of Services.

2.     The Contract for services between EMCOR Facilities Services, Inc and BB&T has been executed as of July 12, 2005. EFS and PFMI intend to execute a Definitive Agreement, which incorporates the applicable terms, conditions and pricing contained in such contract.  It is anticipated that PFMI will begin to transition its services beginning July 12, 2005, with full implementation by September 6, 2005. PFMI hereby agrees on July 12, 2005 to commence providing facilities services to be mutually agreed upon by EFS and PFMI (the "Interim Services") at the Facilities.  PFMI shall be paid for services provided during the this period, in accordance with the approved pricing provided by PFMI to EFS, payable monthly within 30 days of EFS' receipt of an invoice for such Interim Services.  Notwithstanding the foregoing, until a Definitive Agreement is executed, either party may terminate such Interim Services at any time upon 30 days notice.

G:\DOC3\CARRIE 2005\026 TVPFMI LOI 07_13_05 Rev1.doc

www.emcorfacilities.com



3.  This letter of intent constitutes the entire understanding of the parties hereto with respect to the subject matter hereof and supercedes all prior agreements or understandings between the parties with respect to such subject matter. This letter of intent shall be governed by the domestic substantive laws of the State of Virginia, without regard to conflicts of laws rules. This letter of intent may be signed in multiple counterparts, all of which shall constitute the same agreement.

4.  This letter of intent represents a non-binding statement of our intentions with respect to the provision of Services (other than Interim Services) and does not constitute a firm or final agreement or Definitive Agreement for the provision of the Services (other than Interim Services) by PFMI. No party shall be bound to the other with respect to the provision of Services (other than Interim Services) until a Definitive Agreement shall have been prepared, executed and delivered.

If the foregoing is in accordance with your understanding, please sign this letter of intent in the space provided below and return it to my attention by facsimile no later than July 18, 2005. Please also send an original executed counterpart of this letter to me by overnight courier. The proposal contained herein will expire unless we have received this letter of intent signed by you within the time period provided above or if sooner rejected.

Very truly yours,

EMCOR FACILITIES SERVICES, INC.

By: _Deborah J. Crosby_

Name: _Deborah F. Crosby_

Title: _Vice President_

The foregoing is hereby confirmed
and agreed to by:

PROFESSIONAL FACILITIES MANAGEMENT, INC.

By: _Greg L. Littlefield_

Name: _Greg L. Littlefield_

Title: _CEO_

G:\DOCS\CARRIE 2005\B&T\PFMI LOI 07_13_05 Rev1.doc

Exhibit 11

Deposition of Edna Green

**MERRILL LEGAL SOULTIONS**
**Court Reporting*Legal Videography*Trial Services**

## Page 1

```
 1    IN THE UNITED STATES DISTRICT COURT
      FOR THE MIDDLE DISTRICT OF ALABAMA
 2           NORTHERN DIVISION
 3
 4    PROFESSIONAL FACILITIES        )
      MANAGEMENT, INC.,              )
 5                                   )
             Plaintiff,     )
 6                          )   Case No.:
      -vs-                  )  2:06 CV 1136-MHT
 7                          )
      EMCOR FACILITIES SERVICES, INC.; AND )
 8    A, B, AND C, AS FICTITIOUS PARTIES,  )
                                           )
 9                                 )
             Defendants.     )
10    _____)
11
12
13
14       VIDEO DEPOSITION OF EDNA C. GREEN
15             (Taken by Plaintiff)
16         Winston-Salem, North Carolina
17         Wednesday, August 29, 2007
18
19
20
21
22
23
            Reported in Stenotype by
24    Lisa A. DeGroat, Registered Professional Reporter
      Transcript produced by computer-aided transcription
25
```

## Page 2

```
 1              APPEARANCES
 2    ON BEHALF OF PLAINTIFF:
 3       SCARLETTE M. TULEY, Esquire
         Beasley, Allen, Crow, Methvin, Portis & Miles, P.C.
 4       250 Commerce Street
         Montgomery, Alabama  36104
 5       (334) 269-2343
 6
      ON BEHALF OF DEFENDANTS:
 7
         BENJAMIN H. SAWYER, Esquire
 8       Sutherland, Asbill & Brennan L.L.P.
         999 Peachtree Street, N.E.
 9       Atlanta, Georgia  30309-3996
         (404) 853-8188
10
11    ON BEHALF OF THE WITNESS:
12       KEVIN P. ODDO, Esquire
         LeClair Ryan, P.C.
13       1800 Wachovia Tower
         Drawer 1200
14       Roanoke, Virginia  24006
         (540) 510-3020
15
16
17
18
19
20       VIDEO DEPOSITION OF EDNA C. GREEN, a witness
21    called on behalf of Plaintiff, before Lisa A. DeGroat, RPR,
22    Notary Public, in and for the State of North Carolina, at the
23    law office of Bell, Davis & Pitt, P.A., 100 North Cherry
24    Street, Suite 600, Winston-Salem, North Carolina, on
25    Wednesday, August 29th, 2007, commencing at 1:09 p.m.
```

## Page 3

```
 1           INDEX OF EXAMINATIONS
 2                                      PAGE
 3    BY MS. TULEY . . . . . . . . . . . . . . . .   6
 4    BY MR. SAWYER  . . . . . . . . . . . . . . .  58
 5    BY MS. TULEY . . . . . . . . . . . . . . . .  80
 6    BY MR. SAWYER  . . . . . . . . . . . . . . .  83
 7
 8            INDEX OF EXHIBITS
 9    NUMBER        DESCRIPTION        MARKED
10    54  6/19/06 document . . . . . . . . . . . .   46
11    55  11/16/06 e-mails . . . . . . . . . . . .   47
12    56  String of e-mails . . . . . . . . . . .   50
13    57  String of e-mails . . . . . . . . . . .   53
14    58  Spread sheet . . . . . . . . . . . . . .   56
15
16
17
18
19
20
21
22
23
24
25
```

## Page 4

```
 1           S T I P U L A T I O N S
 2       Before testimony was taken, it was stipulated by and
      between counsel representing the respective parties as
 3    follows:
 4       1. That any defect in the notice of the taking of this
      deposition, either as to time or place or otherwise as
 5    required by statute, is expressly waived, and this deposition
      shall have the same effect as if formal notice in all respects
 6    as required by statute had been given and served upon the
      counsel in the manner prescribed by law.
 7
 8       2. That this deposition shall be taken for the purpose of
      discovery or for use as evidence in the above-entitled action
 9    or for both purposes.
10       3. That this deposition is deemed opened and all
      formalities and requirements with respect to the opening of
10    this deposition are hereby waived, and this deposition shall
11    have the same effect as if all formalities in respect to the
      opening of the same had been complied with in detail.
12
13       4. That the undersigned, Lisa A. DeGroat, RPR and Notary
      Public, is duly qualified and constituted to take this
13    deposition.
14
15       5. Objections to questions, except as to the form thereof,
      and motions to strike answers need not be made during the
15    taking of this deposition, but may be reserved until any
      pretrial hearing held before any judge of any court of
16    competent jurisdiction for the purpose of ruling thereon, or
17    at any other hearing or trial of said case at which said
      deposition might be used, except that an objection as to the
18    form of a question must be made at the time such a question is
      asked or objection is waived as to the form of the question.
19
20       6. That the Federal Rules of Civil Procedure shall control
      concerning the use of the deposition at court.
21       7. That the reading and signing of the deposition
22    transcript by the deponent are waived.
23
24
25
```

2100 3rd Avenue North, Suite 960*Birmingham, AL 35203*www.merrillcorp.com
1-800-888-DEPO

Page 5

1       THE VIDEOGRAPHER:  This is the video
2   deposition of Edna Green, taken by the plaintiff, in the
3   matter of Professional Facilities Management, Inc.,
4   plaintiff, versus EMCOR Facilities Services, Inc.,
5   defendant, in the United States District Court, for the
6   Middle District of Alabama, Northern Division.  Case
7   number 2:06 CV 1136-MHT.
8       This deposition is being held at the offices
9   of Bell, Davis & Pitt, 100 North Cherry Street, Suite 600,
10  Winston-Salem, North Carolina, on August 29th, 2007, at
11  1310, as indicated on the video screen.
12      The court reporter is Lisa DeGroat, for the
13  firm of CaseWorks, of Winston-Salem, North Carolina.  The
14  videographer is Randy Bernard, for the firm of CaseWorks,
15  of Winston-Salem, North Carolina.
16      Would counsels now, please, introduce
17  themselves, and then the court reporter will swear in the
18  deponent.
19      MS. TULEY:  Scarlette Tuley, for PFMI.
20      MR. SAWYER:  Benjamin Sawyer, on behalf of
21  EMCOR Facilities Services, Incorporated.
22      MR. ODDO:  Kevin Oddo, for the witness.
23
24
25              *   *   *

Page 6

1           EDNA C. GREEN,
2   having been first duly sworn, was examined and
3           testified as follows:
4           DIRECT EXAMINATION
5   BY MS. TULEY:
6   Q.   Hi, Ms. Green, we just met briefly, but I'm
7   Scarlette Tuley.
8       Have you ever given a deposition before?
9   A.   I have not.
10  Q.   Okay.  Nothing to be nervous about, and I'll just
11  kind of tell you quickly, while we're going through this if --
12  if at any point you'd like to take a break, for whatever
13  reason, please, let us know, and we'll be glad to accommodate
14  you.
15  A.   Thank you.
16  Q.   Also, if I've asked a question, and you don't
17  understand it, please, let me know, because it's my job to ask
18  good questions, and I don't want you guessing at what the
19  meaning of the question is.
20  A.   Okay.
21  Q.   And, also, one last thing, even though we've got a
22  camera going, the record is actually what the court reporter
23  writes down.  So the -- it's in -- and I'm really more of an
24  offender of this than you will be, but normal tendency in
25  conversation is to nod your head, and if you know what

Page 7

1   somebody is about to say, to sort of join in, but she can only
2   type one person at a time.
3       So we need -- I'll let -- try to let you finish
4   talking, and then I'll -- and if you can just try to let me
5   finish asking a question.  And, also, try to remember to just
6   answer out loud, so she can type it down.
7   A.   Okay.
8   Q.   All right.  Ms. Green, would you -- are you still
9   working at BB&T?
10  A.   Yes.
11  Q.   Okay.  How long have you been with BB&T?
12  A.   Five years and five months.
13  Q.   What's your current position with BB&T?
14  A.   I work in the strategic vendor management group as
15  a process improvement consultant.
16  Q.   As a process improvement consultant?
17  A.   Yes, ma'am.
18  Q.   What -- what is a process improvement consultant?
19  A.   I've received Six Sigma training, which is a
20  quality methodology, and I'm assigned projects to find ways to
21  do the work more efficiently or to save the company money.
22  Q.   Is that what, I guess, used to be called like an
23  efficiency consultant?
24  A.   I don't know.
25  Q.   Okay.  What is the strategic vendor management

Page 8

1   group do?
2   A.   In addition to my function, we manage an outsourced
3   vendors facility services and outsourcer.
4   Q.   Do you right now work with Randy Hondros?
5   A.   He is my supervisor.
6   Q.   Okay.  How long have you been the process
7   improvement consultant?
8   A.   Eight months.
9   Q.   Is there more than one process improvement
10  consultant, or are you it?
11  A.   There is also a -- let me rephrase that.  No.
12  There's only one in my group.
13  Q.   So you would have started as process improvement
14  consultant around December '06, January '07?
15  A.   Yes.
16  Q.   Okay.  What were you doing prior to that?
17  A.   I worked as the day-to-day operations liaison for
18  our facility service outsourcer.
19  Q.   Tell me what you did in that capacity?
20  A.   I was the point of contact at BB&T for -- it's kind
21  of hard to say succinctly.  I was the BB&T person who worked
22  with the account representative for our outsourcer, and I was
23  also the person who would escalate items when needed from
24  BB&T.  So I'm sort of the BB&T operations day-to-day manager.
25  Q.   And how long have -- well, did you work in that

## Page 9

1  capacity?

2    A.    I worked in that capacity 13 and a half months.

3    Q.    When did you start as the operations liaison?

4    A.    November 15th of 2005.

5    Q.    Did anybody hold that position before you took it

6  over?

7    A.    Yes.

8    Q.    Who was that?

9    A.    Debbie Willis.

10   Q.    Did Ms. Willis stay with the project, or did she

11  move on to something else?

12   A.    We worked together for approximately two months,

13  and then she moved to another position.

14   Q.    Who was your contact with the outsourcing company?

15   A.    Sean Brookins.

16   Q.    And, just for the record, when we say, "outsourcing

17  company," are you referring to EMCOR?

18   A.    Yes, I am.

19   Q.    Were you and Sean Brookins in the same office?  And

20  I don't mean like sharing a space, but in the same office

21  building?

22   A.    Yes.

23   Q.    What was going on with the outsourcing project when

24  you came on in the November 15, 2005 timeframe?

25   A.    I'm not sure I understand the question.

## Page 10

1    Q.    Sure.

2          When you came on November 15, 2005, at what point

3  was the outsourcing project?

4    A.    Implementation had begun roughly two months prior

5  for one of their services.  They had not yet implemented

6  additional services.

7    Q.    And what was your understanding about what the

8  timeframe for phasing in all of the services was?

9    A.    We were to do a phased implementation of

10  landscaping services, starting in the south and working north

11  in three phases.  And the mobile maintenance service was going

12  to be the last implemented, and it was to begin February or

13  March.

14   Q.    Prior to November 15, 2005 had you had any dealings

15  with the outsourcing project?

16   A.    No.

17   Q.    Did you have any dealings with the contract

18  formation or negotiation between EMCOR and BB&T?

19   A.    I did not.

20   Q.    Did you have anything to do with the selection of

21  EMCOR to be the facilities manager for BB&T?

22   A.    I did not.

23   Q.    Had you worked with any other facilities management

24  project prior to that -- to November 15th?

25   A.    No.

## Page 11

1    Q.    Who is your -- let me ask it a better way.

2          Who would your supervisor have been when you

3  started with the project?

4    A.    It's not an easy question to answer.  I need to

5  understand something.  Are you talking about the person who

6  reported to in the hierarchical --

7    Q.    Yeah.  Who would you have considered to be your

8  boss?

9    A.    Steve Page.

10   Q.    Was there anybody else -- obviously, Deborah

11  Willis -- that you had daily contact with, who was a BB&T

12  personnel once you started on the project?

13   A.    Now, by, "daily contact," what do you mean?

14   Q.    Well, would there be anybody that you would

15  routinely be working with regarding the project?

16   A.    To some degree, Ronny Eller.

17   Q.    Earlier you said that part of your job was to work

18  with the -- the account rep for EMCOR?

19   A.    (WITNESS NODS HEAD UP AND DOWN)

20   Q.    What -- what kind of work would you do with Sean

21  Brookins?

22   A.    I would escalate items to him.

23   Q.    And I've seen that term -- define to me what is

24  meant by escalate?

25   A.    When there is a problem that arises that is not

## Page 12

1  being solved in the normal channels and you need to get a

2  little more help to get it solved, you escalate it to the next

3  level.

4    Q.    Okay.  So one of the things you would deal with

5  Sean Brookins on was escalating items?

6    A.    (WITNESS NODS HEAD UP AND DOWN)

7    Q.    What else would you -- what other kind of work

8  would you do with him?

9    A.    We would have status meetings.  We would review

10  implementation plans.  We would work on communications.

11   Q.    How often did you-all have the status meetings?

12   A.    They were intermittent.  We -- we tried to have

13  them weekly.  Actually, we did have them weekly for a

14  significant amount of time.

15   Q.    Were those meetings held at your office?

16   A.    They were generally in a conference room in our

17  building.  Yes.

18   Q.    Who all would attend those weekly status meetings?

19   A.    I'm not sure I can remember everyone who attended.

20   Q.    Just give me your best shot.

21   A.    Okay.  There would be representatives from the

22  stake holders in the process.  For example, there might be

23  someone there from the regional structures, from the branches,

24  a representative from the regions.  There would be -- Steve

25  Page was there.  The -- our people who worked on billing were

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

## Page 13

1 there.
2         And then there would be all those who participated
3 in personnel. Also people from facilities at BB&T, from
4 support services. And on the phone we would have others that
5 were involved in the process. For example, people who were
6 involved in payments and -- and that process. And I believe
7 there were others. I just can't remember who all was there.
8     Q.    Would Sean Brookins normally attend these weekly
9 status meetings?
10    A.    Oh, yes.
11    Q.    Anybody else from EMCOR?
12    A.    I think at times the transition manager from EMCOR
13 would attend early on. There may -- there may have been
14 someone on the phone, but I -- from accounting. I -- it's
15 hard to remember.
16    Q.    Were -- were any minutes or reports generated from
17 these meetings?
18    A.    I think there were agendas. I don't remember.
19    Q.    Who would generate those agendas?
20    A.    I don't remember.
21    Q.    One of the things you listed was review
22 implementation plans?
23    A.    (WITNESS NODS HEAD UP AND DOWN)
24    Q.    Were -- well, tell me what an implementation plan
25 in your mind is?

## Page 14

1    A.    It had to do with time lines. It had to do with
2 tasks that needed to be completed, and we also would discuss
3 issues that were coming up with implementation or that might
4 be something to look out for.
5    Q.    We talked to Randy Hondros earlier today, and he
6 told us about a survey that was done of, for lack of a better
7 word, the branches, as to their satisfaction with janitorial
8 service. Are you familiar with that?
9    A.    I'm very familiar with that.
10    Q.    Okay. Tell me -- let me ask it this way: Who
11 developed that survey form?
12    A.    I led the development of it. I had people on my
13 team who also helped, and I -- I can't remember if I actually
14 had other input or not.
15    Q.    Tell me about the process of sending out these
16 surveys. Were they paper surveys, or were they sent -- sent
17 electronically?
18    A.    The survey that we sent the first time was a -- I
19 think it was a Microsoft Word form that we e-mailed.
20    Q.    Was that e-mailed to regional management, or was
21 that e-mailed down to the branch level?
22    A.    It was e-mailed to roughly 700 people, which
23 included the regional branch operations managers and also the
24 area operations managers.
25    Q.    And when was the first survey done?

## Page 15

1    A.    I'm not sure I have the date exactly, but I believe
2 it was December.
3    Q.    It would be December of 2005?
4    A.    I may be getting my dates confused. I believe I
5 sent a survey in December, but I don't know if that was the
6 first survey or a subsequent one. So I can't answer that
7 question. I'm sorry.
8    Q.    How many surveys were done?
9    A.    I did two janitorial surveys six months apart.
10    Q.    Were surveys done on any other parts of the
11 project?
12    A.    I believe we did a landscaping survey, but I'm not
13 100 percent positive. I know we planned to, and I think we
14 did, but I'm not positive of that.
15    Q.    What -- tell me what you recall about what the
16 questions on the survey were?
17    A.    There were some open-ended questions, and there
18 were some short-answer questions. Open-ended questions were,
19 what is the best thing about janitorial service, for example.
20 And one is -- would have been, what would you most like to see
21 improved? Those would be examples of open-ended questions.
22 Short-answer questions would be, rate janitorial service, for
23 example. These aren't exact.
24    Q.    Right.
25    A.    Just a general idea.

## Page 16

1    Q.    Would it have something like a one to five scale
2 type thing?
3    A.    There -- there was -- there was a -- there were
4 ratings. We may have translated them to one to five. I don't
5 remember how we did that, but there were -- there were
6 definitely -- there were two categories that were
7 unsatisfactory.
8         I believe one was, needs improvement, and one was
9 something like, really awful. It wasn't that, but it was
10 worse than needs improvement. There was a middle answer and
11 then an above average and an excellent.
12    Q.    What percentage of responses did you get to the
13 first survey?
14    A.    It was very high. It was -- I don't know the exact
15 number, but it was more than half, maybe even a lot more than
16 half.
17    Q.    What about responses to the second survey?
18    A.    It was almost as good. It was at least half, I
19 believe.
20    Q.    Were the surveys identical, or were they -- did you
21 change them up?
22    A.    We kept the questions the same, so that we could do
23 apples to apples.
24    Q.    And what was -- well, when -- when the survey
25 responses came back in, what did you do with that information?

2100 3rd Avenue North, Suite 960*Birmingham, AL 35203*www.merrillcorp.com
1-800-888-DEPO

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

## Page 17

1    A.   We put all of the response -- all -- all of the
2    data into a spread sheet, so that we could summarize, and then
3    we put it into a presentation, where we showed the responses
4    to each question.
5    Q.   And did you do any kind of percentage analysis of
6    satisfaction versus dissatisfaction?
7    A.   (WITNESS NODS HEAD UP AND DOWN)
8    Q.   And what was --
9    A.   Yes.
10   Q.   What were the results of that?
11   A.   There was at least 70 percent dissatisfaction. At
12   least 70 percent of the responses were either needs
13   improvement or the worse category.
14   Q.   What about for the second survey?
15   A.   It hardly changed. It was still that bad.
16   Q.   Did you share those survey results with EMCOR?
17   A.   Yes.
18   Q.   Did you have any discussions with anybody from
19   EMCOR about the survey results and what BB&T expected EMCOR to
20   do to make those results better?
21   A.   We told -- we had discussions and told them it was
22   their responsibility to make it better.
23   Q.   Did you give them any guidance as to what to do to
24   improve the situation?
25   A.   No.

## Page 18

1                MR. SAWYER: Was that a, no?
2                THE WITNESS: No.
3                MR. SAWYER: Okay.
4                THE WITNESS: Sorry.
5    BY MS. TULEY:
6    Q.   And would that be true for both sets of surveys?
7    A.   I believe so.
8    Q.   All right. During the time -- your time on the --
9    the facilities management project with EMCOR, did you ever
10   have any direct conversations with any PFMI employees?
11   A.   Yes.
12   Q.   Okay. Who did you talk to?
13   A.   I'm not sure of the name, but I think it was Ken
14   Law. Also there were meetings where Greg Littlefield came in
15   for a meeting. There also were times when some of their --
16   I can't remember the names. I think there was somebody named
17   Campbell, but I'm not sure of his name, attended an AOO
18   meeting, and also I met Jim Wohlers.
19   Q.   What was your understanding of what PFMI's role
20   was?
21   A.   They were a contractor to EMCOR, responsible for
22   fulfilling the scope of work -- janitorial scope of work.
23   Q.   When it came to janitorial issues, would you
24   generally direct any issues you had to Sean Brookins or to a
25   PFMI person?

## Page 19

1    A.   I would almost always, if not always, give them to
2    Sean Brookins.
3    Q.   Is your understanding that at some point during
4    the EMCOR project that PFMI was terminated as one of their
5    contractors?
6    A.   I'm sorry. I didn't understand the question.
7    Q.   Sure.
8         Is it your understanding that at some point during
9    this project EMCOR terminated PFMI?
10   A.   I know that PFMI quit before we thought they were
11   going to. So, yeah, I think that EMCOR had terminated it, but
12   I -- I think PFMI left before they had or something.
13   Something -- they left us in a lurch for several weeks there.
14   Q.   Do you -- was it your understanding that at one
15   point PFMI had all of the BB&T footprint?
16   A.   I know they had at least the majority of it. I'm
17   not sure whether it was 100 percent.
18   Q.   Do you have any recollection of if at some point
19   the amount of the footprint they had was narrowed?
20   A.   I don't know.
21        Does it mean the same thing to say I don't know and
22   I don't remember?
23   Q.   Yeah.
24   A.   Because it's -- I don't remember really.
25   Q.   No. That's fine.

## Page 20

1    A.   Okay.
2    Q.   Did you have any dealings with how the janitorial
3    contractors were paid for their work?
4    A.   No. Our -- our contract was with EMCOR.
5    Q.   What was your understanding about how the
6    janitorial was supposed to be billed?
7    A.   Can you elaborate on your question?
8    Q.   Sure.
9    A.   That could mean lots of different things.
10   Q.   Sure.
11        Was it your understanding that janitorial was
12   billed on a flat rate or on a square -- price by square
13   footage?
14   A.   My understanding, it was to be billed based on net
15   cleanable square footage.
16   Q.   Okay. Was it supposed to be billed on net
17   cleanable square footage from the very beginning?
18   A.   You see, I wasn't there at the very beginning.
19   Q.   Were you -- well, at the time when you came in
20   November --
21   A.   (WITNESS NODS HEAD UP AND DOWN)
22   Q.   -- at that point was billing supposed to be done
23   for janitorial on net or gross?
24   A.   When I first came, since I had no experience with
25   any of it, it took me some time to read through documents. So

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 21

1    I did not know at the beginning.
2    Q.    At some point did you come to an understanding?
3    A.    I -- I -- when I studied the contract, it was my
4    understanding that we were supposed to be paying based on net
5    cleanable square footage.
6    Q.    Okay.  But you don't know if that was true for the
7    entire contract or not from day one?
8    MR. SAWYER:  Object to the form of the
9    question.
10    You can answer it.
11    THE WITNESS:  I'm sorry?
12    MR. SAWYER:  You can answer.
13    THE WITNESS:  Okay.  I believe in the contract
14    that it probably always said based on cleanable square
15    footage.
16    BY MS. TULEY:
17    Q.    Did you have any discussions with Sean Brookins or
18    anyone else at EMCOR about how the janitorial was being
19    billed, as far as whether it was on gross or net?
20    A.    We did have discussion about how it was being
21    billed.  Yes.
22    Q.    All right.  And what did they tell you?
23    A.    They agreed it was supposed to be billed on net
24    cleanable.
25    Q.    And at the time you had that conversation, what

Page 22

1    were they billing it on in reality?
2    A.    I believe they were billing on gross.
3    Q.    Was there a timeframe in which net cleanable was
4    supposed to be determined?
5    A.    I -- I believe it was supposed to be determined
6    either within 30 or 90 days.  I'm not sure which.
7    Q.    During that whatever time period that that was
8    supposed to be determined would it have been your
9    understanding that during that time period it would be billed
10    on whatever square footage numbers were provided by BB&T?
11    A.    I was not a party to that.  So I don't know.
12    Q.    Okay.  Do you know where the original gross square
13    footage numbers came from?
14    A.    Yes.
15    Q.    Okay.  Where did they come from?
16    A.    There's a real estate database called AMT.
17    Q.    And that is a BB&T real estate database?
18    A.    I believe it's a database that we subscribe to, but
19    we have BB&T data loaded into it.  We subscribe to the
20    software.
21    Q.    Okay.  Did anyone talk to you -- let me ask it a
22    better way.
23    Did anyone with BB&T discuss with you what they
24    thought would be the difference between the gross numbers and
25    the net cleanable?

Page 23

1    A.    Yeah.
2    Q.    Okay.  Tell me about those discussions?
3    A.    The -- general rule of thumb was that net
4    cleanable was roughly 20 percent less than gross.
5    Q.    And where did that general rule of thumb come from?
6    A.    I believe a study had been done prior to my taking
7    that position, where a number of branches were measured, both
8    gross square footage and cleanable areas, and a ratio came out
9    of that study.
10    Q.    Do you know if that study was shared with EMCOR?
11    A.    I don't know.
12    Q.    Do you know who did that study?
13    A.    I think I do, but I'm not positive.
14    Q.    Who do you think did it?
15    A.    Matt Llewellyn.
16    Q.    Did you ever see that spread sheet?
17    A.    I did see a document.
18    Q.    Was it in a report format or spread sheet format?
19    What did it look like?
20    A.    I think it was a spread sheet.
21    Q.    Would it have -- and I -- there's tons of
22    spreadsheets in this case, but a lot of them have like the
23    name -- the address of the branch, and then it'll have various
24    columns, and one of those columns being gross or adjusted or
25    whatever square footage?

Page 24

1    A.    (WITNESS NODS HEAD UP AND DOWN)
2    Q.    Was it in that type of format?
3    A.    It -- if I remember it correctly, it was a spread
4    sheet, and I don't remember what all columns it had.
5    Q.    When you started the project, did you discuss with
6    Sean Brookins or anybody with EMCOR that you thought that
7    these net cleanable would end up being about 20 percent less
8    than gross?
9    A.    Always when we talked about net cleanable we based
10    it on thinking they'd be roughly 20 percent different.
11    Q.    And that would have been including any
12    conversations you would have had with Sean Brookins?
13    A.    Absolutely.
14    THE VIDEOGRAPHER:  I'm sorry to interrupt.
15    Please, don't touch the microphone cables.
16    THE WITNESS:  I'm sorry.
17    THE VIDEOGRAPHER:  That's okay.
18    BY MS. TULEY:
19    Q.    And would -- what would Sean Brookins' response be
20    or reaction be to these discussions where you were relating
21    that you thought it would be 20 percent less?
22    A.    It was never -- it was never a surprise.  I mean
23    I -- my belief was that from the very beginning that was the
24    expectation.
25    Q.    Did you get the impression from Sean Brookins that

2100 3rd Avenue North, Suite 960*Birmingham, AL 35203*www.merrillcorp.com
1-800-888-DEPO

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

## Page 25

1  EMCOR understood that the net cleanable would probably be
2  about 20 percent less once the measurements were done?
3       MR. SAWYER: Object to the form of the
4  question.
5       MS. TULEY: You can go ahead and answer it.
6       THE WITNESS: Okay. I'm sorry. I've
7  forgotten the question now. Could you state it one more
8  time?
9       MR. SAWYER: I'm sorry. Whenever I object,
10 I'm just protecting the record.
11      THE WITNESS: Okay.
12      MR. SAWYER: And unless your counsel tells you
13 not to answer, you can always just answer the question.
14      THE WITNESS: Okay. Okay. But the question
15 again was?
16      MS. TULEY: I totally lost that question.
17 Would you mind reading it back.
18      MR. SAWYER: Sorry guys.
19      (THE PREVIOUS QUESTION WAS THEN READ.)
20      THE WITNESS: I think it was important to Sean
21 to agree that whatever they turned out to be, we would
22 true up. I don't think he agreed to them being a firm 20
23 percent.
24 BY MS. TULEY:
25      Q.    All right. Tell me how that true up process was

## Page 26

1  supposed to work?
2       A.    Originally -- and this is before my time. So I
3  understood that PFMI was to measure during the time period, 30
4  or 90 days, whatever that was. That was plan A.
5       Q.    Okay. But once that was done how would the true up
6  process work?
7       A.    Well, if the -- if -- had that been successful,
8  they would have been trued up and adjusted the billing
9  retroactively to the correct net cleanable square footage.
10      Q.    Okay. Let me ask it this way: If at the end of
11 that 90 days, hypothetically speaking, the numbers came back,
12 and they were ten percent lower than the gross --
13      A.    (WITNESS NODS HEAD UP AND DOWN)
14      Q.    -- would then PFMI owe ten percent back for
15 everything they had billed up to that point?
16      A.    I believe that's true.
17      Q.    From the point of the new numbers forward would
18 billing be done by the new net numbers?
19      A.    Had they been correct, yes.
20      Q.    At some point you were provided some numbers --
21 some net cleanable square footage numbers by PFMI; is that
22 correct?
23      A.    (WITNESS NODS HEAD UP AND DOWN)
24      Q.    Just for the record, yes?
25      A.    Yes.

## Page 27

1       Q.    Sorry. Sorry.
2             And based on your previous answer, I take it that
3  you did not think those numbers were correct?
4       A.    They were not.
5       Q.    Were those numbers provided to you directly from
6  PFMI or were they provided to you through EMCOR?
7       A.    They had to have come through EMCOR.
8       Q.    Did EMCOR give you any guidance as to, we think
9  this group of numbers is correct, and we think this group of
10 numbers is probably incorrect?
11      A.    I don't remember them doing that.
12      Q.    Was it given to you in a spread sheet format?
13      A.    I think so.
14      Q.    Were -- was it a black and white spread sheet, or
15 did it have like highlights or colors?
16      A.    It would have been electronic. I don't know that I
17 looked at the line details. I don't know.
18      Q.    For instance -- and I'll just give you an example.
19 I know on spreadsheets you can do, where you can highlight
20 various lines and various colors?
21      A.    (WITNESS NODS HEAD UP AND DOWN)
22      Q.    And do you recall if there was any kind of
23 discussion or any remittance of a document where, we think the
24 green highlighted ones are correct, we think the yellow
25 highlighted ones are incorrect?

## Page 28

1       A.    From EMCOR?
2       Q.    Yes.
3       A.    I don't remember looking at the spread sheet.
4  The -- you know, the line details.
5       Q.    Okay. If you didn't look at the spread sheet, what
6  gave you the impression that it was incorrect?
7       A.    We have an analyst in our group, who checks
8  absolutely everything. And, also, I think that first take
9  through may have happened when Debbie was here, and I was new,
10 and I may have been busy studying the contract while she was
11 looking at the spread sheet. I'm not sure why.
12      Q.    Who is the analyst?
13      A.    Hal Falor.
14      Q.    Does Hai review all of the invoices?
15      A.    Oh, yes.
16      Q.    Does Hai review the payments out in response to
17 those invoices?
18      A.    Okay. What do you mean by that question?
19      Q.    Like when you get an invoice, and he reviews it,
20 does he review the payment to make sure it correlates with the
21 invoice?
22      A.    I'm not sure that I understand the relevancy of
23 that, given our process. It may sound like a simple question
24 to answer, but it's not.
25      Q.    Who pays the bills?

2100 3rd Avenue North, Suite 960*Birmingham, AL 35203*www.merrillcorp.com
1-800-888-DEPO

**MERRILL LEGAL SOULTIONS**
**Court Reporting*Legal Videography*Trial Services**

| | Page 29 |
|---|---|
| 1 | A.    They are paid -- it works on a P card, purchasing |
| 2 | card.  So, I guess, technically, accounts payable. |
| 3 | Q.    Well, once Hai does his work with the invoice, does |
| 4 | he send it to accounts payable? |
| 5 | A.    I guess, yes. |
| 6 | Q.    Do you know? |
| 7 | A.    Yes, I know.  It's just the questions don't match |
| 8 | the process. |
| 9 | Q.    Well, how does the process work? |
| 10 | A.    Okay.  We receive a very extensive spread sheet. |
| 11 | It has over 1,000 lines, with several pieces of information, |
| 12 | which include the branch to be charged and the service that's |
| 13 | charged and the amounts.  We -- we receive that first. |
| 14 | EMCOR's job is to review that and to pass it to us. |
| 15 | Then we review it, and that's Hai, when I say, "we."  Hai |
| 16 | reviews that very carefully.  When he finds errors, he gets |
| 17 | that back to EMCOR. |
| 18 | EMCOR then has to do their thing to get it |
| 19 | adjusted.  Then EMCOR resends, and then we recheck.  And if |
| 20 | it's correct, then we send an electronic message that says, |
| 21 | it's okay for you to bill your P card.  And then they bill the |
| 22 | amount to their P card. |
| 23 | Q.    And by, "they," you mean EMCOR? |
| 24 | A.    Yes. |
| 25 | Q.    How long does that process generally take? |

| | Page 30 |
|---|---|
| 1 | A.    If there were no errors, it would probably take |
| 2 | roughly 48 hours. |
| 3 | Q.    If there are errors, about how long would it take? |
| 4 | A.    It depends on how long it takes to resolve the |
| 5 | errors. |
| 6 | Q.    What type of errors would Hai look for? |
| 7 | A.    Every type.  Did they do the service?  Did they |
| 8 | bill it to the correct account?  Everything. |
| 9 | Q.    Who was Hai's supervisor? |
| 10 | A.    First Debbie Willis, and then me. |
| 11 | Q.    Other than reviewing all of the invoices, what else |
| 12 | did Hai Falor do? |
| 13 | A.    He responded to customer complaints or requests. |
| 14 | Q.    Did he have a specific person at EMCOR that he |
| 15 | would have dealt with regarding complaints or requests? |
| 16 | A.    He would send them probably to Sean. |
| 17 | Q.    Besides Hai, who else in your group would have |
| 18 | received customer complaints or requests? |
| 19 | A.    Anybody in our team. |
| 20 | Q.    Okay.  Who all was on your team? |
| 21 | A.    When?  What time period? |
| 22 | Q.    When you started? |
| 23 | A.    When I started, it would have been Hai Falor, |
| 24 | Regina Winning, Debbie Willis, myself. |
| 25 | Q.    And at some point during the process that changed, |

| | Page 31 |
|---|---|
| 1 | the team; is that correct? |
| 2 | A.    Yes. |
| 3 | Q.    Okay.  Who -- let's see.  Debbie Willis left the |
| 4 | team? |
| 5 | A.    (WITNESS NODS HEAD UP AND DOWN) |
| 6 | Q.    Who came in as her replacement? |
| 7 | A.    Me. |
| 8 | Q.    Okay.  Anybody else added to the team? |
| 9 | A.    No. |
| 10 | Q.    So at some point the team just goes down to Hai, |
| 11 | Regina and yourself? |
| 12 | A.    Yes. |
| 13 | By, "the team," you mean my team? |
| 14 | Q.    Yes.  The team that would be receiving the |
| 15 | complaints? |
| 16 | A.    Well, I mean our managers could have received |
| 17 | complaints too. |
| 18 | Q.    Okay.  And that would have been Randy Hondros? |
| 19 | A.    Yes. |
| 20 | Q.    Okay.  Tell me -- and we'll go back now to, I |
| 21 | think, what started that whole rabbit trail I just went down, |
| 22 | was, we were talking about the square footage numbers that |
| 23 | came from PFMI and that Hai Falor would have looked at those? |
| 24 | A.    (WITNESS NODS HEAD UP AND DOWN) |
| 25 | Q.    Okay.  How did he determine that those numbers were |

| | Page 32 |
|---|---|
| 1 | not accurate? |
| 2 | A.    That -- I believe there were several that were |
| 3 | larger than gross square footage. |
| 4 | Q.    And he would have reported that to you? |
| 5 | A.    Yes.  And, also, I think many of the rest, if not |
| 6 | all of the rest, were the same as gross square footage. |
| 7 | Q.    Did he do any type of analysis as to what |
| 8 | percentage were the same versus what percentage were |
| 9 | different? |
| 10 | A.    I don't remember that. |
| 11 | Q.    Once Hai reported back to you that he didn't think |
| 12 | those numbers were correct, what did you do? |
| 13 | A.    We talked to Sean about needing good net cleanable |
| 14 | square footage numbers. |
| 15 | Q.    And was a plan developed to get those numbers? |
| 16 | A.    Yes. |
| 17 | Q.    What was the plan? |
| 18 | A.    The plan was to have once the mobile maintenance |
| 19 | technicians were in the field and their managers, to have |
| 20 | someone from EMCOR and someone from BB&T go to a |
| 21 | statistical -- statistically valid sample of branches and do |
| 22 | measurements.  We tiered it into three sizes of buildings and |
| 23 | did a random statistical sample of each of the three and each |
| 24 | of the three size ranges. |
| 25 | Q.    Who did that statistical work? |

8 (Pages 29 to 32)

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

## Page 33

1  A.  Dan Ohara came up with the -- number of
2  branches that we needed to measure based on a 95 percent
3  confidence level.
4  Q.  How many did you measure?
5  A.  I can't remember the exact numbers.  I believe it
6  was roughly -- I believe we started out with either 15 or 25
7  of the larger buildings.  I can't remember from the branches.
8  It was somewhere between -- I think it was roughly 125, but I
9  may be off on that number.  I believe it was at least that.
10  Q.  125 total branches?
11  A.  Of the -- of the under 5,000 square feet --
12  Q.  Okay.
13  A.  -- size.  And I don't remember what the number was
14  in the middle tier.
15  Q.  Do you know if you-all -- if more or less than 500
16  branches were measured?
17  A.  I do not believe it was more than 500 branches.
18  Q.  Were any other options discussed as to how to go
19  about getting corrected measurements besides doing the
20  statistical sampling?
21  A.  When we came back with our results, they asked us
22  to measure more of the larger buildings, because they had the
23  larger square footage, and they had the larger impact.
24  Q.  Who asked you to measure more of the larger ones?
25  A.  Sean Brookins.

## Page 34

1  Q.  So after the statistical measurements came back --
2  A.  (WITNESS NODS HEAD UP AND DOWN)
3  Q.  -- Sean Brookins asked for more of the over 10,000
4  square foot buildings to be measured?
5  A.  Yes.
6  Q.  Were more of those buildings measured?
7  A.  Yes.
8  Q.  Do you know if all of the over 10,000 square foot
9  buildings were measured?
10  A.  I'm not positive, but I -- I think they probably
11  were.
12  Q.  What were done once those -- all of those
13  measurements were done, what was done with that information?
14  A.  We came up with a proportion that compared net
15  cleanable square footage to gross square footage, which we
16  then applied to all of the branches.
17  Q.  And what was the difference in -- between net and
18  gross that you-all came up with?
19  A.  We came up with one number for each tier.
20  Q.  Okay.  So let's just start with the over 10,000
21  square foot?
22  A.  I can't remember exactly.  I can only give you a
23  ballpark.
24  Q.  Okay.  Would there -- well, first, let me ask this:
25  Is there some kind of document out there that would show

## Page 35

1  exactly what the results of all of this were?
2  A.  I'm sure it's on a spread sheet somewhere.
3  Q.  You wouldn't recall what that spread sheet would be
4  called?
5  A.  I -- no.  I'm sorry.
6  Q.  Who would have made that?
7  A.  I would have.
8  Q.  Okay.  All right.  Let -- and let's back up then.
9  Ballpark, what do you remember the difference in -- between
10  gross and net being for the over 10,000 square foot?
11  A.  I believe it was roughly 25 or 26 percent.
12  Q.  What about -- what was the difference in gross and
13  net for the five to 10,000 square foot?
14  A.  I'm a little bit less confident of this number, but
15  I believe it was somewhere around 18 percent.
16  Q.  All right.  And what about for the under 5,000?
17  A.  I don't remember that one with any degree of
18  confidence at all.
19  Q.  Was -- for each group was its own factor applied,
20  like whatever the percentage difference was for the over
21  10,000, that was applied only to the over 10,000?
22  A.  Correct.
23  Q.  Okay.  But was that actually applied if all of the
24  over ten thousands were measured, or were there actual nets,
25  just exactly what the measurements were?

## Page 36

1  A.  We would have done exactly what the measurements
2  were, if we knew it.
3  Q.  Okay.
4  A.  In every case if we knew the actual measurement, we
5  would use that.
6  Q.  Okay.  So the -- the percentage would only be
7  applied to the ones that had not been measured?
8  A.  That's correct.
9  Q.  For --
10  A.  I think that's correct.
11  Q.  For the second to the middle tier, would its -- its
12  own factor would have been applied to the five to ten, and
13  then a separate factor for the under five?
14  A.  That's correct.
15  Q.  Okay.  What percentage of the net cleanable square
16  footage do the buildings over 10,000 square feet represent?
17  A.  I'm sorry.  What was the question again?
18  Q.  Sure.
19  Out of the total of the net cleanable square
20  footage of the BB&T footprint, what do the over 10,000 square
21  foot buildings represent?
22  A.  In number of buildings?
23  Q.  In percentage?
24  A.  In -- in square footage?
25  Q.  Yeah.  Like, for instance, out of 6,000,000 square

2100 3rd Avenue North, Suite 960*Birmingham, AL 35203*www.merrillcorp.com
1-800-888-DEPO

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

## Page 37

1  feet, the over 10,000 square feet building represent five
2  percent?
3      A.   Yeah.  I don't know the answer to that.
4      Q.   Okay.  Prior to this statistical sampling and all
5  of that starting, when you first met with Sean Brookins and
6  said, we don't have a very good comfort level with these
7  initial net cleanable numbers, were any other options as to
8  how to get accurate numbers discussed?
9      A.   I don't remember.
10     Q.   Was it ever discussed that PFMI needed to go back
11  out and remeasure?
12     A.   I don't remember.  And that could have happened
13  before I came.  I -- you know, I don't know.  I don't
14  remember.  I just don't know.
15     Q.   Do you recall if PFMI was still doing any
16  janitorial work at the time of the second survey?
17     A.   I'm not sure I know the date of the second survey.
18  So I don't know the answer to that.
19     Q.   Were you involved any at all in any discussions
20  about separate payments for trash hauling?
21     A.   Okay.  Now, ask the question again?
22     Q.   Sure.
23          Do you remember any discussions about separate
24  payments for hauling trash away from branches?
25     A.   Yes.

## Page 38

1      Q.   Okay.  Tell me what you recall about this trash
2  hauling issue?
3      A.   I recall Ronny Eller telling me that he had an
4  e-mail, saying that it was included in the scope of work.  I
5  remember looking at the scope of work and seeing something
6  that made me think it was included, and I remember that there
7  was a lot of buzz around it.
8      Q.   Did you ever have any conversations with anyone
9  from PFMI regarding the trash hauling issue?
10     A.   I don't believe so.
11     Q.   Were you ever involved in any meetings with EMCOR
12  and PFMI regarding the trash hauling issue?
13     A.   I don't remember being in that.
14     Q.   What, if any, involvement did you actually have in
15  determining what payments should or shouldn't be made for
16  trash hauling?
17     A.   I don't think I was involved in that.
18     Q.   The trash -- the trash hauling issue would have
19  been someone else's issue; is that fair?
20     A.   I guess.
21     Q.   I know you don't remember the exact dates, but do
22  you -- you recall at some point PFMI was no longer involved in
23  the janitorial?
24     A.   Yes.
25     Q.   Okay.  Was the janitorial overall satisfaction

## Page 39

1  better from the branches after PFMI left?
2      A.   I think it was less bad.
3      Q.   Was it good after they left?
4      A.   I don't think it was ever great.
5      Q.   Were you involved at all with the decision to
6  terminate EMCOR?
7      A.   What does involved mean?  Did I -- what does
8  involved mean?
9      Q.   Did you have any kind of input?
10     A.   Formal input, probably not.
11     Q.   What discussions were you involved in regarding the
12  termination of EMCOR?
13     A.   I don't know how to answer that.  I don't know how
14  to answer that with any specifics.
15     Q.   Did you ever have any discussions with Randy
16  Hondros, where it was brought up that, you know, maybe we need
17  to make a change with the project?
18     A.   Yeah.
19     Q.   Okay.  Was it brought up in the fact -- in the idea
20  that a change needed to be made, or was it brought up as the
21  idea of, we need a replacement as the project manager --
22  management company?
23     A.   I don't think I understand the question.
24     Q.   Okay.  You had some discussions with Randy Hondros
25  about you weren't -- that there was dissatisfaction with

## Page 40

1  EMCOR; correct?
2      A.   Yes.
3      Q.   Okay.  When were those discussions?
4      A.   Daily probably.
5      Q.   At what point in the project did discussions start
6  occurring about, we probably need to start looking for another
7  management company?
8      A.   I don't remember my dates.  We did -- we terminated
9  one or two regions to try an alternative.  So, I guess, that
10  would be the beginning, but in our mind it was like they were
11  going to compete, and that was the chance to, you know, see
12  how well you could do for both parties.
13     Q.   Did you do any analysis of cost savings that the
14  consolidating of services brought to BB&T?
15     A.   The analysis that was done to decide on the project
16  was all done prior to my coming.  I don't remember doing an
17  analysis after the fact.  We were too busy fighting the
18  alligators.
19     Q.   What instructions were given to the folks that went
20  out and measured the buildings?
21     A.   We created a document for them and asked them to
22  follow the same instructions.  So everyone would follow the
23  same instructions.  I don't remember specifically what was on
24  there.  I can give you some examples.  Like, don't include the
25  com rooms.  They don't clean the com rooms.

2100 3rd Avenue North, Suite 960*Birmingham, AL 35203*www.merrillcorp.com
1-800-888-DEPO

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

## Page 41

1    Probably don't -- don't count the area of elevators
2    shafts, other than on one floor.  Stuff like that.  I don't
3    remember specifically what it was.
4    Q.    And, just so we're clear on the record, I know in
5    your mind what a com room is --
6    A.    Communication room.
7    Q.    Okay.  Thank you.
8    A.    Where the equipment is.
9    Q.    And which -- which group of locations were actually
10   physically measured?
11   A.    What we did is we numbered each branch, gave it a
12   number, one to 14, 50 or whatever it was, and then we did a
13   random number function to come up with a random group of
14   branches.  And so if numbers three, five and 28 came out, we
15   took the branch that was on line three, the branch that was on
16   line five and the branch that was on line 28.
17   Q.    Did somebody actually physically go and measure all
18   of those --
19   A.    Yes.
20   Q.    -- or were the schematics used for any of those?
21   A.    We did use the CAD drawings for some.
22   Q.    Okay.  Which groups were the CADs used for?
23   A.    Probably the newer branches, because we would have
24   had those drawings.
25   Q.    Do you have an estimate as to what percentage

## Page 42

1    was -- the measurements were done using CAD?
2    A.    It would only be a guess.  I don't know.
3    Q.    Would there be any way to tell by looking at the
4    spreadsheets as to which ones were actually physically
5    measured and which ones were done using CAD?
6    A.    I don't know of a way.
7    Q.    So once the numbers were all crunched, it all
8    looked the same?
9    A.    I think so.
10   Q.    During the period that this sampling measure --
11   measuring was going on, did BB&T request or ask -- import a
12   change the way they were billing for janitorial?
13   A.    I don't know what you mean.
14   Q.    Yeah.  Okay.  While those measurements were being
15   done, prior to that they had been billed on gross square
16   footage; correct?
17   A.    (WITNESS NODS HEAD UP AND DOWN)
18   Q.    I'm sorry?
19   A.    Yes.
20   Q.    Okay.
21   A.    It's hard to remember.
22   Q.    It's human nature.
23       All right.  And you-all knew that those gross
24   square footage numbers were probably too high?
25   A.    Yes.

## Page 43

1    Q.    Okay.  So once this remeasure was undertaken, but
2    before the results came in, did BB&T ask EMCOR to change how
3    those -- change how they were billing and not bill based on
4    the square footage numbers?
5    A.    Yes.  When we determined that we were overpaying,
6    and we feared that we were overpaying by at least 20 percent,
7    we asked them to bill based on 80 percent until we could find
8    out the exact numbers.  We had already paid many months at 100
9    percent, and we wanted to make sure we didn't lose all of that
10   money that was due to us.
11   Q.    Do you ever remember any issues where as PFMI was
12   doing measurements they were -- they stopped billing on the
13   gross and started billing on the net cleanable measurements
14   they were doing?
15   A.    Okay.  I for some -- that sounded simple, but for
16   some reason I didn't understand it.  I'm sorry.
17   Q.    Do you -- do you remember any issues where during
18   the period when PFMI was -- was doing their net cleanable
19   measurements --
20   A.    So that would be like the first 30 or 90 days?
21   Q.    Yes.
22   A.    Before I was there.
23   Q.    Okay.  Was that -- but would all of that have been
24   before you were there?
25   A.    I believe so.

## Page 44

1    Q.    Okay.  Let me ask it this way then:  Do you
2    remember any issues -- and it could be from before you got
3    there, after you got there, where PFMI had stopped billing on
4    the gross and was billing on a net cleanable based on their
5    measurements?
6    A.    I don't remember.
7    Q.    Do you know -- let me strike that.
8        You had said that you thought early in the process
9    there had been some type of analysis done that looked like the
10   gross square footage was about 20 percent too high; is that
11   correct?
12   A.    I believe the analysis said it was more like 26
13   percent too high.
14   Q.    Okay.  Was -- would that have been something that
15   would have been known before the contracting with EMCOR?
16       MR. SAWYER:  Objection.  Foundation.
17       You can answer.
18       THE WITNESS:  I don't know the date.  I don't
19   remember the date that they did that, and it was before I
20   was there.  So I don't know.
21   BY MS. TULEY:
22   Q.    And I don't -- I probably already asked this.  Do
23   you know who did that calculation?
24   A.    I think it was Matt Llewellyn, but I'm not sure.
25   Q.    Do you know why that calculation was done?

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

## Page 45

1    MR. SAWYER:  Same objection.
2    THE WITNESS:  I mean I would guess why it's
3    done, but it's only a guess.
4    BY MS. TULEY:
5    Q.    Nobody ever told you what the purpose of doing that
6    calculation was?
7    A.    I didn't ask.  It seemed obvious.
8    Q.    Okay.  What was your take on it?
9    A.    They knew they were contracting to pay based on net
10   cleanable square footage, and they wanted to have an idea of
11   what that might be.
12   Q.    Was there -- why wouldn't that number have been the
13   number that was then provided as -- instead of using gross,
14   why wouldn't that adjusted 26 percent less number have been
15   used from day one?
16   A.    That would have to be a guess again.
17   Q.    What do you -- I mean what is your thought on it?
18   MR. SAWYER:  Objection.  Speculation.
19   THE WITNESS:  Yeah.  My guess is they didn't
20   do a large enough number of branches, and so they were
21   conservative, because they didn't have a statistically
22   valid number of branches.
23   BY MS. TULEY:
24   Q.    And you don't have any idea how that number was
25   determined?

## Page 46

1    A.    I believe they physically measured whatever number
2    of branches it was.
3    Q.    Do you have any idea who did those measurements?
4    A.    I don't know who did those measurements.
5    Q.    When were the -- all of the measurements done and
6    the final net cleanable -- at what point in the project was
7    that determined?
8    A.    I'm terrible on dates.  I really don't know.  I'm
9    sorry.
10   Q.    All right.  Let's ask it this way:  Would it have
11   been in the summer?
12   A.    Possibly.  I mean my building has no windows, you
13   know.  I don't even know what month it is half of the time.
14   (PLAINTIFF'S EXHIBIT NUMBER 54 WAS MARKED FOR
15   IDENTIFICATION)
16   BY MS. TULEY:
17   Q.    I'm going to show you reluctantly, because it's so
18   long, what I have marked as Exhibit 54.  It's dated at the top
19   June 19th, 2006; is that correct?
20   A.    That's correct.
21   (DISCUSSION HELD OFF THE RECORD)
22   BY MS. TULEY:
23   Q.    Just from looking at that, it's discussing
24   measurements for a B ridge location; is that correct?
25   A.    That's what it says.

## Page 47

1    Q.    All right.  Does that refresh your memory in any
2    way as to whether measurements were still going on in June of
3    2006?
4    A.    I have no way to know whether this is tied to our
5    process.  I'm not even on this.
6    MS. TULEY:  Okay.  Hand that back to me real
7    quick.
8    (PLAINTIFF'S EXHIBIT NUMBER 55 WAS MARKED FOR
9    IDENTIFICATION)
10   BY MS. TULEY:
11   Q.    I'm going to show you what I've just marked as
12   Exhibit 55.  It's an e-mail, dated November 16, 2006.  And you
13   may want to take a minute -- it's long -- and just -- just
14   look through it.
15   A.    (THE WITNESS COMPLIED)
16   Q.    All right.  Will you identify what Exhibit 55 is
17   for the record, please?
18   A.    Okay.  It's a letter of complaint, written from an
19   area operations officer in West Virginia, to me, and it shows
20   me forwarding it to Sean Brookins, and it shows Sean Brookins
21   responding to me and copying several people.
22   Q.    And that would have been in the November 2006
23   timeframe?
24   A.    It's dated -- Sean's response is dated
25   November 16th of 2006.

## Page 48

1    Q.    What is your recollection about janitorial problems
2    that were going on in the November 2006 timeframe?
3    A.    I can't -- my memory could not possibly hold and
4    identify individual pieces of janitorial complaints.  There
5    were just too many, from too many places, too many times.
6    Q.    Well, let me ask it this way:  During that roughly
7    end of the year 2006, November-ish timeframe, what types of
8    complaints were you seeing on a routine basis?
9    A.    I couldn't tell you.  I mean the branches had been
10   so battered for so long that -- I mean I can't describe the
11   hell we went through.
12   Q.    Let me ask this.  You started in about November of
13   2005; correct?
14   A.    (WITNESS NODS HEAD UP AND DOWN)
15   Q.    In that -- in the year between November 2005 and
16   this e-mail in November 2006, were the volume of complaints
17   pretty much the same?
18   A.    I have no valid way to know.  Probably the number
19   of complaints on the knowledge center may have gone down by
20   November, but I don't know.
21   Q.    Were most of the branches or the AOOs using the
22   knowledge center as their chief way of making complaints?
23   A.    That was what we instructed them over and over and
24   over to do.
25   Q.    Did you have situations where it got to a certain

2100 3rd Avenue North, Suite 960*Birmingham, AL 35203*www.merrillcorp.com
1-800-888-DEPO

## Page 49

1 point where people were bypassing the knowledge center and
2 just going straight to you or somebody else up the chain?
3    A.    I think in some cases that happened.  Yes.  I think
4 in some cases they did both.
5    Q.    If somebody wanted to do an analysis of the number
6 of complaints at any period in time, would the facilities
7 knowledge center be the best way to undertake that?
8    A.    It's the only accessible data that we would have, I
9 guess.
10    Q.    Did you-all -- did BB&T ever do any type of monthly
11 or quarterly analysis of the number of complaints received off
12 the facilities knowledge center?
13    A.    There was not a lot of time for analysis.  In fact,
14 I was working until 8:30 every night, trying to answer
15 complaints and phone calls.  So we did not do a lot of
16 analysis.  No.
17            (DISCUSSION HELD OFF THE RECORD.)
18            MS. TULEY:  Do you need a break?  Why don't we
19 go off the record for a minute.
20            THE VIDEOGRAPHER:  Going off the record.  The
21 time is 1437.
22            (RECESS TAKEN AT 2:37 P.M. TO 2:47 P.M.)
23            THE VIDEOGRAPHER:  Back on the record.  The
24 time is 1447.
25 BY MS. TULEY:

## Page 50

1    Q.    Do you remember any issues involving like
2 snowplowing or snow removal from the landscaping company?
3    A.    The snow happened after I was in the next job.
4 Yeah.
5            (PLAINTIFF'S EXHIBIT NUMBER 56 WAS MARKED FOR
6 IDENTIFICATION)
7 BY MS. TULEY:
8    Q.    Okay.  I'm going to show you what I have marked
9 as -- as Exhibit 56.  It is a -- yet again, a string of
10 e-mails, but the -- the first one is dated November 22nd,
11 2006.  If you'll kind of look through those?  Your name is
12 throughout it.
13    A.    Okay.  Well, I was still there in November.
14    Q.    If you want to take that clip off, that's fine.  So
15 you can read it better.
16    A.    Okay.
17    Q.    I don't think you were copied on what would be the
18 very last part of that e-mail; is that correct?
19    A.    That's correct.
20    Q.    Okay.  For -- could you identify what the bulk of
21 the e-mail is regarding?
22    A.    Okay.  A regional branch operations officer in
23 West Virginia did not like the fact that the landscaping
24 vendor was putting neon orange stakes around her property to
25 help him when he cleared the snow.

## Page 51

1    Q.    Was that an issue that was happening at other
2 locations?
3    A.    I don't know.  This is the only one that was
4 brought to my attention, as far as I can remember.
5    Q.    Was that something that was in the landscaping
6 scope of work?
7    A.    I don't remember seeing anything about stakes in
8 the landscaping scope of work, but that -- I don't remember
9 that.
10    Q.    I believe the person who sent that e-mail -- the
11 final e-mail is a -- is that Buck -- Beaudry -- Bo Wilson.  Do
12 you know who that is?
13    A.    There's a name Lynn at the bottom.
14    Q.    Uh-huh.
15    A.    Lynn Wilson worked for Sean Brookins.  It may be
16 her, but I don't -- I can't say that for sure.
17    Q.    Okay.  And I think you had stated that by the time
18 the snow started you had moved on from this project?
19    A.    Well, I -- I -- the -- the snow -- I don't think we
20 had a lot of snow in November or December.  So the bulk of the
21 snow events would have happened in January when I was not
22 working on this as much.
23    Q.    Yet that January you had moved on to a different
24 position?
25    A.    Well, understand, I was still in the same office.

## Page 52

1    Q.    Uh-huh.
2    A.    And so -- and I don't know the exact date when my
3 successor took over for me.  I don't remember exactly when it
4 was.  So --
5    Q.    That's fair.
6    A.    Have I answered the question?  I don't --
7    Q.    That's fair enough.
8            Would you mind if I look at that one more time?
9    A.    Okay.
10    Q.    I'm sorry.  I didn't bring extra copies.
11    A.    I can't get it through my head to not touch the
12 mike.
13    Q.    Did you ever have any dealings or conversations
14 with Lynn Wilson?
15    A.    Yeah.
16    Q.    Did she ever discuss this snow stake issue with
17 you?
18    A.    I don't know specifically.  She -- she was Sean's
19 assistant.  So if Sean wasn't there, we would have gone
20 through her.  I don't remember specifically which items I
21 spoke with her and which with Sean.
22    Q.    Did you ever have any problems with Lynn Wilson?
23            MR. SAWYER:  Object to the form of the
24 question.
25            You can answer.

13 (Pages 49 to 52)

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

| Page 53 | Page 55 |
|---|---|
| 1  THE WITNESS: I don't remember specific | 1  Q.  And then on that same day you send a request for |
| 2  problems with Lynn. | 2  some action to Sean Brookins? |
| 3  BY MS. TULEY: | 3  A.  That's correct. |
| 4  Q.  Did you read this final part of the e-mail? | 4  Q.  And then as of November 27th there is an e-mail |
| 5  A.  Yeah.  She did not use that language with me. | 5  where -- showing that nothing has been done and no one has |
| 6  Q.  Did she ever take a sassy tone like this with you? | 6  contacted Ms. Williams; is that correct? |
| 7  A.  Not that I can recall. | 7  A.  That is what she said.  Yes. |
| 8  Q.  Do you recall getting a lot of blow-back on this | 8  Q.  And that from start to finish then, from |
| 9  snow stake issue, like this e-mail would indicate? | 9  September 27th to November 27th is a month; is that correct? |
| 10  A.  That's the only one. | 10  A.  From September to November?  Two months. |
| 11  Q.  Were you surprised to read that Lynn Wilson says, | 11  Q.  No.  Two months.  Two months; is that correct? |
| 12  quote, "I'm telling you, they are nuts"? | 12  A.  I believe so. |
| 13  MR. SAWYER: Object to the form of the | 13  Q.  Thank you for helping me with that. |
| 14  question. | 14  MR. SAWYER: Sorry. |
| 15  THE WITNESS: Yeah.  I am sorry.  I -- the | 15  Q.  Is that pretty typical of the reaction time that |
| 16  language at the beginning sort of distracted me.  I | 16  BB&T was seeing from EMCOR on complaints? |
| 17  didn't -- I don't remember what else is in there. | 17  MR. SAWYER: Object to the form of the |
| 18  BY MS. TULEY: | 18  question. |
| 19  Q.  I mean did that language from her surprise you? | 19  THE WITNESS: Yeah.  If you mean typical, did |
| 20  A.  Yes. | 20  everything I send take two months to resolve?  No. |
| 21  Q.  Had you ever gotten any indication from Lynn or | 21  BY MS. TULEY: |
| 22  Sean that they had any ill will towards BB&T? | 22  Q.  Did you have more than just that issue that took a |
| 23  A.  No. | 23  month or two months to resolve? |
| 24  (PLAINTIFF'S EXHIBIT NUMBER 57 WAS MARKED FOR | 24  MR. SAWYER: Object to the form of the |
| 25  IDENTIFICATION) | 25  question. |

| Page 54 | Page 56 |
|---|---|
| 1  BY MS. TULEY: | 1  THE WITNESS: Okay.  There were over 1,000 |
| 2  Q.  Let me show you what I've marked as Exhibit 57. | 2  branches.  There are 52 weeks in a year, five days a week. |
| 3  It's another long string of e-mails.  Just take a moment and | 3  There were many, many, many complaints.  So if the |
| 4  look through that, please? | 4  question is -- I'm not sure what the question is, but most |
| 5  A.  (THE WITNESS COMPLIED) | 5  of them did not take this long.  No. |
| 6  Q.  Okay.  And -- I'm sorry.  I know that was a long | 6  BY MS. TULEY: |
| 7  string of e-mails. | 7  Q.  I'm going to show you what has previously been |
| 8  A.  Yeah.  I can't remember all of the details. | 8  marked as Exhibit 51, and what I'm really looking for just is |
| 9  Q.  For the record, will you -- would you identify | 9  if you recognize what that is? |
| 10  Exhibit 57, please? | 10  A.  I don't recognize the headers.  So if I had to |
| 11  A.  Okay.  It's a string of e-mails that originated | 11  guess, I would not think it was one of BB&T's reports. |
| 12  from an area operations officer in the southwest region | 12  Q.  That's fair enough. |
| 13  regarding bushes that had died and the work orders they had | 13  (PLAINTIFF'S EXHIBIT NUMBER 58 WAS MARKED FOR |
| 14  placed in attempting to resolve it and complaints that it | 14  IDENTIFICATION) |
| 15  wasn't resolved. | 15  THE WITNESS: Or I guess I should say while I |
| 16  Q.  And just because that's so long to summarize, and, | 16  was in the job, but -- |
| 17  please, feel free to look at that to make sure I'm summarizing | 17  BY MS. TULEY: |
| 18  this correctly, but it looks like on September 27th | 18  Q.  It's not something you recognize? |
| 19  Ms. Williams reports a complaint regarding the bushes? | 19  A.  I don't recognize it in its format.  No. |
| 20  A.  Yes, yes. | 20  Q.  I'm going to show you what I've marked as |
| 21  Q.  Okay.  And that is eventually forwarded to Randy | 21  Exhibit 58.  Do you recognize this -- I'm just going to call |
| 22  Hondros on October 5th? | 22  it a spread sheet? |
| 23  A.  Correct. | 23  A.  The field names are familiar.  I don't necessarily |
| 24  Q.  Who then forwards it to you on October 5th? | 24  recognize this exact configuration. |
| 25  A.  That's correct. | 25  Q.  It's entitled, just at the top, "Remeasured Net |

2100 3rd Avenue North, Suite 960*Birmingham, AL 35203*www.merrillcorp.com
1-800-888-DEPO

## Page 57

1 Cleanable, EMCOR"?
2  A.  Yeah. I don't recognize the title either.
3  Q.  Okay. When you say, "the field names," which
4 column are you referring to?
5  A.  Well, status.
6  Q.  Okay.
7  A.  We have that in our database. Regions, center
8 number, portfolio, city, state, zip, gross square feet,
9 adjusted square feet. Now, we don't call it EMCOR net
10 cleanable square feet, I don't think.
11  Q.  Okay.
12  A.  AOO. All of that information. JDE, I think, is an
13 EMCOR -- something or other.
14  Q.  You don't recall having seen this spread sheet
15 before?
16  A.  Not specifically this one. I may have. I don't.
17 I -- it doesn't do anything for me.
18  Q.  As far as you can tell, this is not something that
19 you prepared or that BB&T prepared?
20  A.  Most of these fields, and possibly all, are in our
21 database. There could be a query that would create this, but
22 I don't -- I don't know that I've actually created this.
23 I -- it could be ours. It may not be ours. I don't know.
24  Q.  If you'll just look at that second page for a
25 minute, the first two columns. The first one is, "EMCOR Net

## Page 58

1 Cleanable Square Feet," and then the next was, "Net Cleanable
2 Square Feet Remeasured"?
3  A.  Uh-huh.
4  Q.  Do you have any idea of what the difference would
5 be between those two?
6  A.  I -- you know, the -- the heading sounds like I may
7 have seen it, but I don't remember the context. I don't -- I
8 don't remember.
9      MS. TULEY: That's fine.
10     I think that's it for the moment for me.
11         CROSS-EXAMINATION
12 BY MR. SAWYER:
13  Q.  How do you do, Ms. Green? My name is Ben Sawyer,
14 and I represent EMCOR Facilities Services. Thank you for
15 coming here today, and --
16  A.  It's not like I had a choice.
17  Q.  Well, we -- we still appreciate it.
18     And every lawyer in the world will tell you this,
19 but I'll be -- I'll be brief.
20     You mentioned that -- in your testimony with Ms. --
21 Ms. Tuley that you were fighting alligators. Do you remember
22 that?
23  A.  Yes.
24  Q.  Okay. The alligators you were referring to, were
25 those pretty much complaints?

## Page 59

1  A.  Yes.
2  Q.  Okay. Did that begin as soon as you got on to --
3 on to the job in November?
4  A.  Yes.
5  Q.  What types of complaints would you get?
6  A.  Janitorial services was what we had rolled out
7 completely. So initially it was all janitorial complaints.
8  Q.  As far as the janitorial complaints, do you recall
9 any specifically that were with regard to -- or problems with
10 what would be considered a security issue?
11  A.  Yes.
12  Q.  Okay. What were those?
13  A.  Boggled my mind. Doors left unlocked, doors left
14 propped open at night when they were in there cleaning,
15 bringing children to the branch, children climbing around on
16 desks, riffling through people's things. I'm sure there were
17 others. It was an eye-opening experience.
18  Q.  Do you have a ballpark of the volume of
19 specifically security issues with the janitorial services?
20  A.  I do not.
21     MS. TULEY: Timeframe?
22 BY MR. SAWYER:
23  Q.  Let's -- during the first couple of months that you
24 were on the job?
25  A.  I really could not come up with a good estimate.

## Page 60

1  Q.  Sure.
2  A.  It was just a lot more than I would have imagined.
3  Q.  Do you remember -- remember -- or recall an issue
4 with a theft of what's been called a proof bag?
5  A.  Yes.
6  Q.  Okay. What do you recall about that?
7  A.  A woman brought -- I think it was her daughter, who
8 was not an employee of the bank. She, I believe, had a record
9 as having a felony. I'm not positive about that. So the
10 mother had brought her with her when she cleaned, and the
11 proof bag was stolen.
12  Q.  Do you recall whether that was in Elizabethtown --
13 Elizabethtown?
14  A.  I believe it was Elizabethtown.
15  Q.  What was BB&T's reaction when that happened?
16  A.  What was our reaction?
17  Q.  Yes.
18  A.  It was, you're responsible. You have to get the
19 money back.
20  Q.  Were -- were people at BB&T upset?
21  A.  Oh, yes.
22  Q.  It didn't do much for EMCOR's customer relations,
23 did it?
24  A.  No.
25  Q.  I'd like you to take a look at what's been

15 (Pages 57 to 60)

## Page 61

1  previously marked in other depositions as Exhibit 8. It's
2  the -- and I believe we have a copy over here. Otherwise, I
3  can just give you my copy.
4  　　　MS. TULEY: There's a copy in there.
5  　　　MR. SAWYER: I thought so.
6  　　　I can just give you mine.
7  　　　THE WITNESS: I promise to give it back.
8  　　　MS. TULEY: It's kind of ratty. I don't think
9  you want to keep it anyways.
10 　　　MR. SAWYER: It is a bit ratty, and I
11 apologize for that, but --
12 BY MR. SAWYER:
13 　Q.　I'm going to give you the -- the good copy. Take
14 your time.
15 　A.　Was I only supposed to be looking at highlighted
16 something? I'm sorry.
17 　Q.　No, not at all. Take your time to review it and
18 refresh your recollection. I know you've looked at a lot of
19 documents today.
20 　A.　Okay.
21 　Q.　And if you'll turn, please, to the back page of
22 what has previously been marked as Exhibit 8. It contains
23 various calculations?
24 　A.　It's the net overpayments page. Yes.
25 　Q.　Are you with me?

## Page 62

1  　A.　I'm on net overpayments. Is that the right one?
2  　Q.　That's it.
3  　A.　Okay.
4  　Q.　Okay. Did you have any involvement with the
5  creation of this -- this specific document?
6  　A.　I was certainly aware of it. I think Hai probably
7  did the calculations, but I'm not positive.
8  　Q.　And that would be Hai Falor?
9  　A.　Yes, or Randy might have done -- actually, I'm not
10 sure who did them.
11 　　　MR. SAWYER: Let's -- let's go ahead and stop.
12 We'll go ahead and stop and let you reload.
13 　　　MS. TULEY: Tape switch.
14 　　　MR. SAWYER: The bad thing about video
15 depositions is a lot of times you want to go off the
16 record or something like that, and --
17 　　　MS. TULEY: I think we're still on, by the
18 way.
19 　　　THE VIDEOGRAPHER: This marks the end of tape
20 number one in the deposition of Edna Green. Going off the
21 record. The time is 1516.
22 　　　(RECESS TAKEN AT 3:16 P.M. TO 3:21 P.M.)
23 　　　THE VIDEOGRAPHER: Back on the record. This
24 begins tape number two in the deposition of Edna Green.
25 The videographer is Randy Bernard, for the firm of

## Page 63

1  CaseWorks, of Winston-Salem, North Carolina.
2  　　　The deposition is being held at the offices of
3  Bell, Davis & Pitt, 100 North Cherry Street, Suite 600,
4  Winston-Salem, North Carolina, on August 29th, 2007. The
5  time is 1521.
6  BY MR. SAWYER:
7  　Q.　All right. Ms. Green, where we left off, we were
8  looking at what has been marked as Exhibit Number 8, which is
9  a July 6, 2006 letter from Mr. Hondros. If you could, please,
10 turn to the -- the last page of it, the net overpayments.
11 　　　And I'll turn your attention to the footnote one,
12 which says, "Invoice recalculated using final net cleanable
13 square footage results." Do you see that?
14 　A.　I do.
15 　Q.　And did you have involvement in determining what
16 the final net cleanable square footage results were?
17 　A.　I believe those are the ones that I described
18 earlier.
19 　Q.　And I'm not going to ask you all of the questions
20 that Ms. Tuley did, but my recollection is that the BB&T
21 locations were -- that were over 10,000 feet were measured,
22 and, to the best of your recollection, I think it was all of
23 them were?
24 　A.　I think they were probably all measured at EMCOR's
25 request.

## Page 64

1  　Q.　And the secondary tier was between five to ten and
2  a sampling was taken --
3  　A.　Yes.
4  　Q.　-- and randomized?
5  　A.　Yes.
6  　Q.　And the same for -- for below 5,000?
7  　A.　Under 5,000 square feet. Correct.
8  　Q.　And that would give us the column -- or the revised
9  invoice amount based on those square footages in this spread
10 sheet here?
11 　A.　Yes.
12 　Q.　And, if you would, take a look at the line item,
13 which starts with March 16, 2006. Are you with me?
14 　A.　The service date of March 16th?
15 　Q.　Correct.
16 　A.　Okay.
17 　Q.　Service date of March 16th. And does it appear
18 that the revised invoice amount indicated that BB&T had
19 underpaid?
20 　A.　Yes.
21 　Q.　That the 20 percent reduction was too much?
22 　A.　Yes.
23 　Q.　Is that because the final net cleanable amount was
24 less than 20 percent?
25 　A.　I would guess all of them in aggregate, but since

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

## Page 65

1  we calculate them individually, I can't -- I don't remember
2  what the aggregate number was.
3      Q.    But the bottom line number, at least here on the
4  underpayment, would have been -- the deduction of 20 percent
5  was too large, and it should have been 18, or whatever the
6  number --
7      A.    Maybe.
8      Q.    -- was?
9      A.    Right.
10     Q.    Okay. And just going back to when you originally
11 decided to perform the remeasurement, because I believe your
12 testimony was it was obvious that the -- the square footage
13 calculations provided by PFMI were just wrong?
14     A.    Right.
15     Q.    Okay. Let me ask you: Do you have an
16 understanding of what EMCOR's markup on the janitorial
17 component of this work was?
18     A.    I have no knowledge of their contract. Therefore,
19 no knowledge of their markup.
20     Q.    EMCOR's?
21     A.    I mean EMCOR's with their contractors.
22     Q.    Okay. My question is a little different. My
23 question is whether EMCOR marked up or received a profit on
24 what was performed by its sub-tier vendor or was it a direct
25 pass-through?

## Page 66

1      A.    I think it was a direct pass-through.
2      Q.    Okay. And your testimony is that -- well, it's --
3  is it your understanding that PFMI performed the original
4  measurements?
5      A.    Before my time it's my understanding that they were
6  instructed to perform it, the measurements.
7      Q.    Did you also have an understanding that their
8  compensation was directly tied to these measurements?
9      A.    Yes.
10     Q.    Is -- could that have been one of the reasons that
11 PFMI was not instructed to go back out and remeasure after
12 the -- after the measurements came back wrong?
13     A.    Possibly.
14     Q.    Were there any other reasons why you wanted EMCOR
15 to actually perform the measurements that were out there that
16 you recall?
17     A.    We wanted to pay fairly, according to our contract.
18 We wanted good measurements. We didn't have good
19 measurements. So we wanted good measurements.
20     Q.    Okay. Could one of the options have been to
21 instruct the subcontractor to just go out and remeasure?
22     A.    I guess that could have been an option. It
23 wouldn't have been my choice.
24     Q.    Why wouldn't it have been your choice?
25     A.    Fox in the hen house.

## Page 67

1      Q.    And moving on, just forward, after PFMI left this
2  job, and even after EMCOR left this job, does BB&T continue to
3  use the same square footage measurements?
4      A.    I'm not involved right now, but I have no knowledge
5  that they do not. I would guess that they do.
6      Q.    Okay. Up until the time you left, which I believe
7  was in -- did you say it was January '07?
8      A.    In -- about then. Yes.
9      Q.    Were they -- was BB&T still using the square
10 footage analysis that you helped create?
11     A.    Yes, I believe so.
12     Q.    Have you received any indication that a change was
13 made by BB&T with respect to square footage measurements?
14     A.    The only changes would be if they added locations,
15 to my knowledge.
16     Q.    Or deleted locations?
17     A.    Or deleted locations.
18     Q.    And you mentioned that you had Six Sigma training?
19     A.    Yes.
20     Q.    Could you tell me about that?
21     A.    It's a statistically based quality methodology --
22     Q.    Okay.
23     A.    -- for -- that includes several phases; define,
24 measure, analyze and prove and control.
25     Q.    Okay. I -- you know, I've heard of it before, but

## Page 68

1  how -- how long does that training take?
2      A.    It was five -- five weeks in the classroom, with a
3  month between, and then you work on a project for six to 12
4  months. I'm working on my project now.
5      Q.    So have you actually completed the training yet?
6      A.    I've completed the training. I have not received
7  my certification yet.
8      Q.    And when do you anticipate that?
9      A.    As soon as we turn in our final results and get
10 them approved. Hopefully in the next two or three months.
11     Q.    Can you tell me about your project that you're
12 working on?
13     A.    Saving energy. Saving six percent on electricity
14 costs for the corporation.
15     Q.    And is that corporation BB&T?
16     A.    Yes.
17     Q.    Was this facilities project any part of your Six
18 Sigma training?
19     A.    No.
20     Q.    Did you use things that you learned there with
21 respect to this job?
22     A.    On the electricity project?
23     Q.    No, no.
24     A.    No.
25     Q.    With respect to the facilities job. I'm sorry.

2100 3rd Avenue North, Suite 960*Birmingham, AL 35203*www.merrillcorp.com
1-800-888-DEPO

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

## Page 69

1    A.    Oh, are you saying, have I used what I've learned
2    in Six Sigma on the project?
3    Q.    That's correct.
4    A.    Okay.
5    Q.    On the facilities project?
6    A.    Right. Not a whole lot.
7    Q.    I believe you testified earlier that you were
8    staying up to 8:30 in the evening dealing with complaints?
9    A.    Many times. Yes.
10    Q.    That must have been hard.
11    A.    It was.
12    Q.    Did you have an understanding of what amount of
13    work that PFMI self-performed?
14    A.    I had been told that they had said they were going
15    to self-perform 85 percent of the work.
16    Q.    How did you have that understanding?
17    A.    I was told that that was promised in their
18    presentation. I was not there at the time, though.
19    Q.    Who informed you of that?
20    A.    I don't remember.
21    Q.    Do you know whether PFMI performed 85 percent of
22    the work -- self-performed 85 percent of the work?
23    A.    I am reasonably sure they did not.
24    Q.    Do you know whether they performed any -- or
25    self-performed any of the work?

## Page 70

1    A.    I don't know if they self-performed any. I --
2    I'm -- I'm positive that they did not self-perform at least 85
3    percent of it.
4    Q.    Well, I'll represent to you -- and counsel can
5    object or correct me if I'm wrong, but their -- their
6    representatives have informed us that they performed none.
7    A.    I am not surprised.
8    Q.    Or self-performed none.
9        Did it -- did you anticipate when you got this job
10    the amount involvement -- the amount of involvement would be
11    so great with respect to the janitorial component of this
12    work? And what I mean by that -- I'll strike the question.
13    It was a terrible question.
14        When you originally received this job, did you
15    anticipate that your personal amount of involvement in the
16    janitorial component of the work would be as great as it was?
17    A.    I had no idea what I was getting into in that job.
18    No.
19    Q.    And when you say you had no idea what you were
20    getting into, what do you mean?
21    A.    (NO AUDIBLE RESPONSE WAS GIVEN)
22    Q.    I think I know what you mean, but --
23    A.    The job was hell. I have never had such a
24    difficult challenge at work in my career.
25    Q.    What about it was difficult?

## Page 71

1    A.    It was all negative. I -- the whole time I was
2    either receiving complaints or passing on to EMCOR complaints,
3    beating up on them to make it better. I say, "the whole
4    time." It probably wasn't 100 percent. It may have been 98.
5    I don't know what percent, but it was -- it seemed like the
6    whole time.
7    Q.    Do you have an understanding one way or the other
8    whether EMCOR was paying PFMI to manage this janitorial scope?
9    A.    I do not. I know nothing about the terms between
10    EMCOR and PFMI.
11    Q.    And you referenced in your testimony with
12    Ms. Tuley, I believe it was termed an estimate of square
13    footage, which showed that it would be potentially 20 percent
14    less than the gross square footage. The -- I'm sorry. The
15    net cleanable square footage would be potentially 20 percent
16    less than the gross square footage. Do you recall that?
17    A.    Yes. I believe it's a little more than 20 percent,
18    but I don't remember the exact number.
19    Q.    Okay. But it was the intent of BB&T to get the
20    actual number, that's why all of these measurements were
21    performed; correct?
22    A.    Yes. It was our intent to pay for what we used,
23    which was -- we had agreed would be the net cleanable square
24    footage. Yes.
25    Q.    And I believe it was also your testimony that you

## Page 72

1    didn't remember whether it was 30 or 90 days, but it was
2    supposed to be -- the measurements were supposed to be
3    conducted during that timeframe?
4    A.    Yes. Now, that was all before my time. So --
5    Q.    Sure.
6    A.    I'm not your best witness for that.
7    Q.    Do you -- have you ever heard of -- or do you --
8    were you involved at all with the second amendment to the
9    purchase and service master agreement?
10    A.    Which one is that?
11    Q.    Well, I think it's been marked already.
12        MS. TULEY:  It's been marked.
13    Q.    Please, take a look at what's been previously --
14    previously marked as Exhibit 44?
15    A.    Okay.
16    Q.    Did you have any involvement with the second
17    amendment through the purchase and service master agreement?
18    A.    That was during my time. So my involvement would
19    be as supervisor to Hai, I guess, who would have maintained
20    the database with the cleanable square footage number.
21    Q.    And if you'll take a look at paragraph two of the
22    amendment to the -- or -- I'm sorry. The second amendment to
23    the purchase and service master agreement?
24    A.    (WITNESS NODS HEAD UP AND DOWN)
25    Q.    Are you with me?

**MERRILL LEGAL SOULTIONS**
**Court Reporting*Legal Videography*Trial Services**

## Page 73

1    A.    I'm with you.
2    Q.    Okay.  And, if you would, flip back on Exhibit
3    Number 8?
4    A.    (WITNESS NODS HEAD UP AND DOWN)
5    Q.    Do those numbers tie out?
6    A.    They do.
7    Q.    And do -- were you involved with EMCOR's payment to
8    BB&T of -- for the $112,000 for the proof bag and then
9    $178,000 for overpayments on square footage?
10   A.    I was aware of it.  Randy Hondros is the one who
11   made it -- put it together, I guess, wrote the letter, and Hai
12   would have been the one that deposited it.
13   Q.    And you made reference to -- on a different -- I'm
14   done with that.
15         All right.  You also made reference to PFMI, quote,
16   leaving BB&T in the lurch for a couple of weeks.  Do you
17   remember that?
18   A.    Yes.
19   Q.    Was that --
20   A.    I -- they left -- I think it was sometime in May.
21   I'm not exactly sure of the date.  I perceive that it was six
22   weeks earlier than we expected, but I'm not sure of that
23   number.  Just completely quit.
24   Q.    How did that affect performance of the work when
25   they completely quit?

## Page 74

1    A.    Unfortunately, in some branches it probably didn't
2    affect it too much, because they were doing such a bad job,
3    but it was definitely not a good thing.
4    Q.    How many locations, ballpark, had to be picked up
5    and covered?
6    A.    I don't know the number, but it was a lot.  And
7    there were several weeks that I recall that bankers were
8    having to do the cleaning.  It was horrible.
9    Q.    And who was the person -- or strike that.
10        Were you the person that -- for BB&T that was on
11   the front line that had to deal with this?
12   A.    Everybody on our team had to deal with it.  I maybe
13   received more calls than anybody else because of my position,
14   but we all suffered.
15   Q.    Okay.  And the members of your team would have been
16   Randy Hondros?
17   A.    Yes, and Regina Winning and Hai Falor and myself.
18   Q.    Anyone else?
19   A.    Well, the -- the regional branch operations
20   managers have to have suffered, as did the area operations
21   managers.
22   Q.    The REBOMs and --
23   A.    Yeah, the REBOMs and the AOOs, area operations
24   officers.
25   Q.    What did EMCOR do to try to mitigate PFMI's walking

## Page 75

1    off the job?
2    A.    They tried to find other suppliers.  I'm not sure
3    about my chronology.  This may have been the time when they
4    brought in -- I guess ABM came at that time.  And I can't
5    remember if Patton was already there or if this was when they
6    came in West Virginia and Kentucky.  And then A&L, I think
7    they didn't come until June in the Maryland, D.C. area.
8    Q.    Did ABM continue to perform through EMCOR's
9    termination?
10   A.    When I left, ABM was still performing.  I don't
11   know -- I think they probably still are in some places now.  I
12   don't know.
13   Q.    And ABM was performing the janitorial scope of
14   work?
15   A.    That's -- that was the instruction.  Yes.
16   Q.    Do you know whether Trammell Crow -- or I believe
17   it's -- we've also heard that it's now CB Richard Ellison?
18   A.    CB Richard Ellis and Trammell Crow have merged.
19   Q.    Okay.
20   A.    So they are the same.
21   Q.    Does ABM continue, to your knowledge, to perform
22   the janitorial scope of work with what is Trammell Crow or --
23   A.    CBRE.
24   Q.    -- or CBRE?
25   A.    I'm not the best person to ask about now, but I

## Page 76

1    think they may.
2    Q.    Who would be the best person to ask?
3    A.    Mary Barrette or Randy Hondros.  Randy knows.
4         MR. SAWYER:  Can we go off the record for a
5    second.
6         THE VIDEOGRAPHER:  Going off the record.  The
7    time is 1544.
8         (RECESS TAKEN AT 3:44 P.M. TO 3:51 P.M.)
9         THE VIDEOGRAPHER:  Back on the record.  The
10   time is 1551.
11   BY MR. SAWYER:
12   Q.    All right.  Ms. Green, just a few more questions.
13        I was wondering what, if any, role you had in the
14   termination of EMCOR?
15   A.    Randy is the one with the decision-making ability
16   at that level.  So the only -- my only conceivable role would
17   be keeping him in the loop on what was happening with
18   complaints, et cetera.
19   Q.    Did Mr. Hondros consult you concerning potentially
20   terminating EMCOR?
21   A.    I'm not sure what the definition of consult is, but
22   we talked about it.  I mean he certainly didn't need my
23   opinion, I guess.  It was his job.
24   Q.    But he would want your opinion; correct?
25   A.    I think he thought I knew what was going on and

2100 3rd Avenue North, Suite 960*Birmingham, AL 35203*www.merrillcorp.com
1-800-888-DEPO

**MERRILL LEGAL SOULTIONS**
**Court Reporting*Legal Videography*Trial Services**

## Page 77

1    trusted me pretty much.
2        Q.    And what was your opinion?
3        A.    There was some good people we worked with, but I
4    wanted the pain to stop.
5        Q.    Who were some of the good people you worked with?
6        A.    Well, Sean Brookins and Lynn Wilson, they were good
7    people.  They just weren't in the right -- or at least he
8    wasn't in the right role.
9        Q.    Were they hard workers?
10       A.    Sean is definitely a hard worker, yes, and I
11   believe Lynn is too.
12       Q.    Were there a lot of fires to be put out?
13       A.    Yes, there were.
14       Q.    And did you think that they worked hard at doing
15   that?
16       A.    Yes.
17       Q.    With respect to the janitorial scope performance,
18   what the performance of the janitorial vendors, specifically
19   under PFMI, how much -- or the percentage of time did EMCOR
20   personnel spend dealing with those complaints?
21       A.    I don't know what percentage of time they spent.  I
22   know that -- that I received an e-mail on Christmas day which
23   I thought was pretty shocking.  I know that Sean wanted all
24   complaints to come to him, which I thought was -- he was
25   asking for a lot.  So I -- I know he spent a lot of time.  I

## Page 78

1    don't know what percentage.
2        Q.    And you do recall a point in time where PFMI was
3    taken off the job or walked off the job?
4        A.    (WITNESS NODS HEAD UP AND DOWN)
5        Q.    Do you remember that?
6        A.    I think that was in May.
7        Q.    Could it have been June or July?
8        A.    It could have been.
9        Q.    Okay.
10       A.    I'm not really good with the dates.
11       Q.    Sure.
12             How did it affect EMCOR, having to get a whole new
13   janitorial service provider in the middle of this job?
14             MS. TULEY:  Object to the form.
15             You can go ahead and answer.
16             THE WITNESS:  Yeah.  It can't have been easy,
17   but it wasn't easy on us.  I don't think it was easy on
18   EMCOR.
19   BY MR. SAWYER:
20       Q.    What were some of the obstacles that BB&T and EMCOR
21   had to overcome?
22             MS. TULEY:  Object to the form.
23             THE WITNESS:  I mean we needed the branches
24   clean.  They didn't have somebody to clean them.  Is that
25   an obstacle -- is that what you mean by an obstacle?  I

## Page 79

1    don't know.  That's the bottom line.
2    BY MR. SAWYER:
3        Q.    Well, the bottom line is you had to go get -- go
4    and get new providers or arrange for providers?
5        A.    EMCOR had to do that.  Yes.
6        Q.    In your opinion, is that a small or a large task?
7        A.    Well, there was 1,500 branches.  It seems like a
8    large task to me.  Roughly.  That's not an exact number of
9    branches.  Sorry.
10       Q.    And during that time did the level of complaints
11   increase, to the best of your knowledge, when they're trying
12   to get new providers out there?
13       A.    We received many complaints and many stories of
14   hardship during that time.  I -- the number of complaints is
15   very hard to quantify at anytime.  There were other factors
16   that would have affected the number of complaints, but we
17   received some of the most serious hardship stories during that
18   time.
19             It's hard to -- to hear.  For us, our clients are
20   the people in the branches, and when people in the branches
21   tell us that clients are wondering why bankers are cleaning
22   the toilets, that's kind of hard to take, if you care.
23       Q.    What did that do to your perception of EMCOR?
24       A.    EMCOR is not a -- may not be a four-letter word,
25   but it's -- it's certainly not a -- word that brings a smile

## Page 80

1    at BB&T.
2        Q.    And I know you testified that you gave some input
3    to Mr. -- Mr. Hondros.  Based on your knowledge and all of the
4    dealings that you've had since you got on the job, do you
5    believe if the janitorial component of this work was
6    successfully performed -- and I'll just tell you, I think -- I
7    think Mr. Hondros said -- the record will reflect what it
8    does, but I think he said 70 percent acceptable was what we
9    were looking -- what BB&T was looking for.
10       A.    I think the contract may actually have had a higher
11   number.  It may actually have had something like 85 percent,
12   somewhere in the service level agreement, but I'm not sure
13   about that.  I'm guessing.
14       Q.    All right.  If the janitorial component had met,
15   say, 85 percent, do you believe that EMCOR would have been
16   terminated by BB&T?
17       A.    That would have to be -- if EMCOR was hired to do
18   four services, so I can't speculate based on how the other
19   services would have gone, but janitorial service definitely
20   gave a bad name to EMCOR, I believe.
21             MR. SAWYER:  Okay.  That's all I have.
22             MS. TULEY:  I have a few follow-up questions.
23             REDIRECT EXAMINATION
24   BY MS. TULEY:
25       Q.    Just a minute ago, in response to one of

20 (Pages 77 to 80)

## Page 81

1   Mr. Sawyer's questions, you said, I believe, that you thought
2   that Sean Brookins was not in the right role; is that correct?
3       A.   That's correct.
4       Q.   Tell me what you mean by that?
5       A.   I believe that he was a -- very good at fighting
6   fires. He worked very hard to fight fires, but at his level
7   we needed someone who could prevent the fires.  And he then
8   needed to have the adequate staff to fight them, or wherever
9   he got it.  Some -- somebody needed to be there to do that.
10      Q.   Would I be wrong in saying that personally you like
11  Sean Brookins fine; correct?
12      A.   I think Sean is a good person.  Is that what you're
13  asking me?
14      Q.   Yes.
15      A.   (WITNESS NODS HEAD UP AND DOWN)
16      Q.   But that you found his job as the account manager
17  to be lacking?
18          MR. SAWYER:  Object to the form of the
19  question.
20          THE WITNESS:  Okay.  Can you ask the question
21  again, please?
22  BY MS. TULEY:
23      Q.   Sure.
24          Personally -- you don't have anything personal
25  against Sean Brookins, do you?

## Page 82

1       A.   No, I do not.
2       Q.   But you do believe he could have done a better job
3   as the account manager?
4       A.   I believe that -- I don't know if he could have
5   done a -- I don't know if he could have done a better job as
6   the account manager.  No.  I think --
7       Q.   Could you have had a better account manager than
8   Sean Brookins?
9       A.   Yes.
10      Q.   Was BB&T responsible for paying EMCOR's subs?
11      A.   No.  Our contract's with EMCOR.
12      Q.   If -- do you have any idea of how long it had been
13  since PFMI had been paid by EMCOR when they walked off the
14  job?
15      A.   I have no knowledge of -- of that.
16      Q.   How long would you expect a vendor to stay on the
17  job without payment?
18          MR. SAWYER:  Object to the form of the
19  question.
20          THE WITNESS:  You know, I can't -- I can't
21  speak to that.  There's lots of vendors, lots of terms,
22  lots of contracts.  So I can't -- I have nothing to -- of
23  value to add.
24          MS. TULEY:  That's it.
25          MR. SAWYER:  One last question.

## Page 83

1                  RECROSS-EXAMINATION
2   BY MR. SAWYER:
3       Q.   You do have knowledge that EMCOR paid BB&T roughly
4   $300,000 for the proof bag and for overpayments on square
5   footage?
6       A.   I think it was like 112 for the proof bag and
7   whatever the other amount was for the overpayment.
8          MR. SAWYER:  All right.  That's all I have.
9          THE VIDEOGRAPHER:  This concludes the
10  August 29th, 2007 deposition of Edna Green.  The number of
11  tapes used was two.  The time is 1603.
12          (SIGNATURE WAIVED)
13          (DEPOSITION CONCLUDED AT 4:03 P.M.)

## Page 84

1   STATE OF NORTH CAROLINA
2   COUNTY OF PERSON
3              REPORTER'S CERTIFICATE
4       I, Lisa A. DeGroat, RPR, a Notary Public in and for
5   the State of North Carolina, do hereby certify that there came
6   before me on Wednesday, the 29th day of August, 2007, the
7   person hereinbefore named, who had been previously sworn to
8   testify to the truth and nothing but the truth of her
9   knowledge concerning the matters in controversy in this cause;
10  that the witness was thereupon examined under oath, the
11  examination reduced to typewriting under my direction; and the
12  transcript is a true record of the testimony given by the
13  witness.
14      I further certify that I am neither attorney or
15  counsel for, nor related to or employed by, any attorney or
16  counsel employed by the parties hereto or financially
17  interested in the action.
18      IN WITNESS WHEREOF, this the 5th day of September,
19  2007.
20
21
22
23  _____
24  LISA A. DeGROAT
    Registered Professional Reporter
25  Notary Public 19952760001

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION


PROFESSIONAL FACILITIES              )
MANAGEMENT, INC.,                    )
                                     )
                  Plaintiff,         )
                                     )    Case No.:
        -vs-                         )  2:06 CV 1136-MHT
                                     )
EMCOR FACILITIES SERVICES, INC.; AND )
A, B, AND C, AS FICTITIOUS PARTIES,  )
                                     )
                  Defendants.        )
_____)


VIDEOTAPE DEPOSITION OF RANDY HONDROS

(Taken by Plaintiff)

Winston-Salem, North Carolina

Wednesday, August 29, 2007


Reported in Stenotype by
Lisa A. DeGroat, Registered Professional Reporter
Transcript produced by computer-aided transcription

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 2

```
 1              APPEARANCES
 2  ON BEHALF OF PLAINTIFF:
 3      SCARLETTE M. TULEY, Esquire
        Beasley, Allen, Crow, Methvin, Portis & Miles, P.C.
 4      250 Commerce Street
        Montgomery, Alabama 36104
 5      (334) 269-2343
 6
    ON BEHALF OF DEFENDANTS:
 7
        BENJAMIN H. SAWYER, Esquire
 8      Sutherland, Asbill & Brennan LLP
        999 Peachtree Street, N.E.
 9      Atlanta, Georgia  30309-3996
        (404) 853-8188
10
    ON BEHALF OF THE WITNESS:
11
        KEVIN P. ODDO, Esquire
12      LeClair Ryan, P.C.
        1800 Wachovia Tower
13      Drawer 1200
        Roanoke, Virginia  24006
14      (540) 510-3020
15
16
17
18
19
20      VIDEOTAPE DEPOSITION OF RANDY HONDROS, a witness
21  called on behalf of Plaintiff, before Lisa A. DeGroat, RPR,
22  Notary Public, in and for the State of North Carolina, at
23  the law office of Bell, Davis & Pitt, P.A., 100 North
24  Cherry Street, Suite 600, Winston-Salem, North Carolina,
25  on Wednesday, August 29th, 2007, commencing at 9:20 a.m.
```

Page 4

```
 1              S T I P U L A T I O N S
 2      Before testimony was taken, it was stipulated by and
    between counsel representing the respective parties as
 3  follows:
 4      1. That any defect in the notice of the taking of this
        deposition, either as to time or place or otherwise as
 5      required by statute, is expressly waived, and this deposition
        shall have the same effect as if formal notice in all respects
 6      as required by statute had been given and served upon the
        counsel in the manner prescribed by law.
 7
        2. That this deposition shall be taken for the purpose of
 8  discovery or for use as evidence in the above-entitled action
    or for both purposes.
 9
        3. That this deposition is deemed opened and all
10  formalities and requirements with respect to the opening of
    this deposition are hereby waived, and this deposition shall
11  have the same effect as if all formalities in respect to the
    opening of the same had been complied with in detail.
12
        4. That the undersigned, Lisa A. DeGroat, RPR and Notary
13  Public, is duly qualified and constituted to take this
    deposition.
14
        5. Objections to questions, except as to the form thereof,
15  and motions to strike answers need not be made during the
    taking of this deposition, but may be reserved until any
16  pretrial hearing before any judge of any court of
    competent jurisdiction for the purpose of ruling thereon, or
17  at any other hearing or trial of said case at which said
    deposition might be used, except that an objection as to the
18  form of a question must be made at the time such a question is
    asked or objection is waived as to the form of the question.
19
        6. That the Federal Rules of Civil Procedure shall control
20  concerning the use of the deposition at court.
21      7. That the reading and signing of the deposition
    transcript by the deponent are waived.
22
23
24
25
```

Page 3

```
 1          INDEX OF EXAMINATIONS
 2                              PAGE
 3  BY MS. TULEY . . . . . . . . . . . . . . . . .    6
 4  BY MR. SAWYER . . . . . . . . . . . . . . . .      65
 5  BY MS. TULEY . . . . . . . . . . . . . . . .      79
 6
 7          INDEX OF EXHIBITS
 8  NUMBER    DESCRIPTION              MARKED
 9  43  5/16 e-mails . . . . . . . . . . . . . . .    37
10  44  8/1 agreement . . . . . . . . . . . . . .    40
11  45  5/22/06 e-mail . . . . . . . . . . . . . .    47
12  46  Wohlers' e-mail . . . . . . . . . . . . .    51
13  47  String of e-mails . . . . . . . . . . . . .    52
14  48  10/19/06 letter . . . . . . . . . . . . . .    53
15  49  12/21 letter . . . . . . . . . . . . . .    57
16  50  1/5/07 e-mail . . . . . . . . . . . . . .    59
17  51  Spread sheet . . . . . . . . . . . . . .    62
18  52  Shelburne's letter . . . . . . . . . . .    63
19  53  5/8/06 document . . . . . . . . . . . . .    74
20
21
22
23
24
25
```

Page 5

```
 1          THE VIDEOGRAPHER:  This is the video
 2  deposition of Randy Hondros, taken by the defense, in the
 3  matter of Professional Facilities Management,
 4  Incorporated, Plaintiff, versus EMCOR Facilities Services,
 5  Incorporated, Defendant, in the United States District
 6  Court, for the Middle District of Alabama, Northern
 7  Division.  Case Number 2:06 CV 1136-MHT.
 8          This deposition is being held at the offices
 9  of Bell, Davis & Pitt, 100 North Cherry Street, Suite 600,
10  Winston-Salem, North Carolina, on August 29th, 2007, at
11  9:21 a.m., as indicated on the video screen.
12          The court reporter is Lisa DeGroat, for the
13  firm of CaseWorks, of Winston-Salem, North Carolina.  The
14  videographer is Randy Bernard, for the firm of CaseWorks,
15  of Winston-Salem, North Carolina.
16          Would counsels now, please, introduce
17  themselves, and then the court reporter will swear in the
18  deponent.
19          MS. TULEY:  Scarlette Tuley, for PFMI.
20          MR. SAWYER:  Benjamin Sawyer, on behalf of
21  EMCOR Facilities Services.
22          MR. ODDO:  Kevin Oddo, for the witness.
23
24
25                  *       *       *
```

2 (Pages 2 to 5)

01419bd0-db10-477a-acb7-532ee8c9f16e

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 6

1           RANDY HONDROS,
2      having been first duly sworn, was examined and
3           testified as follows:
4               DIRECT EXAMINATION
5    BY MS. TULEY:
6      Q.   All right.  Mr. Hondros, we've already met, but,
7    for the record, I'm Scarlette Tuley, and I represent PFMI here
8    today.
9           Have you ever given a deposition before?
10     A.   I have.
11     Q.   Okay.  I'm not going to go through all of the
12   mundane rules with you.  I'd just let you know, if you need to
13   take a break at anytime, for whatever reason, just let me
14   know.  We'll be glad -- let me know.  We'll be glad to go off
15   the record, and you can take care of whatever you need to.
16          If at anytime I ask you a question, and you don't
17   understand it or it doesn't make sense, and that's probably
18   going to happen, let me know, and I'll be glad to rephrase it.
19     A.   Okay.
20     Q.   All right.  We've talked about this just a little
21   bit off the record, but can you tell me how long you've been
22   with BB&T?
23     A.   I joined BB&T in 1978.  So I've been there
24   approximately 30 years.
25     Q.   And what, I guess, department are you with right

Page 7

1    now?
2      A.   It's the support services division.
3      Q.   And that's located here in Winston-Salem?
4      A.   It is.
5      Q.   How long have you been in that department?
6      A.   I joined this division in 2004.
7      Q.   What -- what does the support services division do?
8      A.   It provides primarily facility support to the -- to
9    the corporation.  We buy land.  We build buildings.  We
10   maintain those buildings.  We provide purchasing services for
11   supplies, printed material.  Our aviation group is part of
12   support services.  We are a general support function for the
13   bank.
14     Q.   And what is your position with support services?
15     A.   My title is senior vice president, and I manage a
16   department called the strategic vendor management group.
17     Q.   What does the strategic vendor management group do?
18     A.   We are responsible for managing large vendor
19   relationships.
20     Q.   Would that cover all of the areas that you just
21   discussed, like the buying of land, building maintenance,
22   purchasing of supplies, aviation?
23     A.   It primarily covers the relationship for facility
24   management services.  It does not cover the other areas.
25     Q.   Prior to coming over with support services in 2004,

Page 8

1    what had you been doing with BB&T?
2      A.   In my 30 years I've had a number of varied
3    positions.  Just prior to the position with the support
4    services division I was in the financial division.
5      Q.   About how long were you with them?
6      A.   Probably four to five years.
7      Q.   What -- what facilitated the switch for you from
8    financial to support services?
9      A.   Well, in 2004 I had been asked to participate in
10   a -- on a committee that we affectionately called the Warren
11   commission, and it was headed by one of our executive
12   officers, Berney Warren.  We were responsible for looking for
13   cost savings opportunities, revenue enhancement opportunities
14   for the organization.
15          It was a small group.  It was chosen by our
16   chairman and CEO, and I participated on that for about a year.
17   And then coming off of that assignment, I was assigned to the
18   support services division.
19     Q.   Did any of your work on the Warren committee have
20   anything to do with any facilities management?
21     A.   One of the recommendations was that we look at
22   consolidation of our facility management services.
23     Q.   While you were on that committee did you-all
24   interview or talk to any facility management companies?
25     A.   While I was on that committee, no, we did not talk

Page 9

1    to any facility management companies.
2      Q.   When you -- when you switched over to support
3    services in '04, what type of facility management services did
4    BB&T have at that point?
5      A.   The services that we had were decentralized.  In
6    other words, we had the typical janitorial, lawn maintenance,
7    facility maintenance, i.e. plumbing, electrician, HVAC repair
8    and maintenance.  That was all decentralized.  Meaning that
9    each branch hired its own janitors, its own landscape
10   contractors and its own repair and maintenance organizations,
11   service providers.
12     Q.   Was part of your new job at support services to
13   facilitate consolidating all of those services under one
14   umbrella?
15     A.   No.  It wasn't my role or responsibility.  I --
16   when I joined the division, after the -- the assignment on the
17   Warren commission, I came in as the purchasing manager.
18     Q.   That would be purchasing supplies?
19     A.   Purchasing supplies, printed material.
20     Q.   Who at the time you came over was working on the
21   consolidation of services?
22     A.   David Park was our division manager.  He and a
23   group -- I don't remember the total number, but it was a task
24   force, a group, that at the time was headed up by Steve Page,
25   and, again, a cross-functional team of people that was

3  (Pages 6 to 9)

01419bd0-db10-477a-acb7-532ee8c9f16e

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 10

1  responsible for that.
2      Q.    When did you first become involved with the
3  facility management part of it?
4      A.    March the 6th, 2006.
5      Q.    Okay.  You remember that really specifically.  Why
6  does that stand out?
7      A.    It just -- just -- I was asked by our new division
8  manager to take responsibility for the project at that time.
9      Q.    Had you been doing any work at all with the
10 project -- the consolidation of facilities management prior to
11 the March 6, 2006?
12     A.    No.
13     Q.    Who was the -- I think you said there was a new
14 project manager --
15     A.    Division manager.
16     Q.    -- division manager?
17     A.    Carla Fox.
18     Q.    And was it Ms. Fox that asked you to come over and
19 work on the facilities management?
20     A.    She did.
21     Q.    Tell me -- did you replace anyone in particular?
22     A.    I replaced Ronny Eller and Steve Page.
23     Q.    When you started on March 6th, what all were your
24 job duties?
25     A.    My duties were to improve the level of service,

Page 11

1  work with our incumbent vendor, at that time EMCOR Facilities
2  Services, to improve the underlying facility management
3  services that they were providing on our behalf.
4      Q.    What kind of -- what kind of information were you
5  given when you -- when you started March 6th regarding the
6  status of the project?
7      A.    Can you repeat that?
8      Q.    Yeah.
9             I guess what I'm asking is:  When you start -- when
10 you started on March 6th, what all were you told about where
11 the project was at that point?
12     A.    I was told that the banking network, who were the
13 recipient of these services --
14     Q.    Would that be the branches?
15     A.    The branches were very upset, dissatisfied with the
16 level of services they were receiving.
17     Q.    Do you recall who would have given you that
18 information?
19     A.    Generally in the conversation with Carla Fox she
20 made me aware of that.
21     Q.    Was it any particular part of the services that the
22 branches were dissatisfied with?
23     A.    Janitorial at that time had -- was -- was
24 experiencing the largest level of dissatisfaction.
25     Q.    Besides janitorial, what other -- and I'm, I guess,

Page 12

1  referring to the March 2006 timeframe.
2      A.    Right.
3      Q.    What other services were being offered by EMCOR to
4  the branches at that point in time?
5      A.    The mobile maintenance service was just being
6  rolled out.  Landscaping was being phased in during the first
7  quarter of '06.  Therefore, in March it was probably 50 to 75
8  percent complete, the rollout of landscaping services.
9      Q.    What were as the -- in your new position what were
10 some of the first things you did in facilities management?
11     A.    Well, I asked -- I met with my team, Edna Green and
12 Hai Falor, to try to get an understanding from them of what
13 their take was on -- on the situation and also decided to
14 perform a survey of the banking network, the branches, to
15 determine their level of dissatisfaction, at least from a --
16 at a point in time, so that we would have a measurement to
17 determine whether or not we had improved or not over time.
18     Q.    How did you go about doing that survey?
19     A.    Edna Green worked on the survey.  She prepared a
20 list of questions related to the services being provided and
21 sent that out to our regional branch operations people for
22 completion.
23     Q.    What were the results of that survey?
24     A.    My recollection are -- or is that the survey
25 indicated a 70 percent dissatisfaction level with the

Page 13

1  janitorial services being provided.
2      Q.    Did the survey address anything other than
3  janitorial at that time?
4      A.    I don't recall.
5      Q.    And I believe you said that you more or less had a
6  team meeting with Edna and Hai to kind of assess what was
7  going on.  What did they tell you?
8      A.    They indicated there were numerous complaints that
9  were being registered through the facility knowledge center
10 for EMCOR, which was their -- their call center.  They
11 indicated they were receiving numerous e-mails regarding
12 dissatisfaction and phone calls.
13     Q.    What did you do after you-all had gone through this
14 survey process in an effort to improve things?
15     A.    Met with our in-house account manager, Sean
16 Brookins.
17     Q.    Tell me about what all you and Mr. Brookins
18 discussed?
19     A.    Well, we would discuss the number of complaints
20 that we were receiving, the type of complaints, what -- I
21 indicated to Sean that this type of service was not what we
22 had contracted for, nor what it was -- what we were paying
23 for, and that changes needed to be made, and they needed to be
24 made immediately.
25             And he, as the account manager, had responsibility

4 (Pages 10 to 13)

01419bd0-db10-477a-acb7-532ee8c9f16e

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 14

1  to see that our needs were being met and that the contract was
2  being upheld and the scope of work was being provided.
3      Q.   Did you and he discuss any ways to -- to make those
4  improvements?
5      A.   Not generally.  We looked at EMCOR as our facility
6  management service company.  They were professionals.  That's
7  what we hired them for.  Sean was an experienced person based
8  on his past experience.  So he should have the -- the
9  knowledge and the ability to -- to make whatever changes were
10 necessary to improve the service.
11     Q.   Would it be fair to say that you left what types of
12 changes need to be made up to Sean?
13     A.   Yes.
14     Q.   Did he indicate to you what his plan was to improve
15 service?
16     A.   Not that I recall.
17     Q.   Did -- during the time -- well, strike that.
18          In that early timeframe, let's say, maybe March,
19 April, when you came on with facilities management, did you
20 ever meet with anyone from PFMI?
21     A.   No.
22     Q.   At any point in time have you ever had any meetings
23 with anyone from PFMI?
24     A.   There was a meeting in Winston-Salem, where I
25 remember Jim Wohlers was present and the president of PFMI.  I

Page 15

1  don't recall his name.
2      Q.   Would it have been Greg Littlefield?
3      A.   Greg Littlefield was present.  It was a meeting
4  that Sean had called.  I attended.  Edna attended.  But I
5  don't recall the -- the meaning -- I mean the -- the reason
6  for the meeting.  That was the only time I can recall ever
7  having met those two gentlemen.
8      Q.   What was your understanding about what PFMI was
9  doing on the project?
10     A.   It was my understanding when I took over
11 responsibility that PFMI was EMCOR's janitorial provider,
12 janitorial service provider, for the services that BB&T had
13 contracted for from -- from EMCOR.
14     Q.   From your observation what did Sean Brookins do
15 after your meeting to -- in an effort to improve the
16 janitorial services?
17     A.   I don't recall any individual efforts.
18     Q.   Let me ask you this:  After you had that meeting
19 with Sean, which I'm assuming was sometime in March of 2006 --
20     A.   (WITNESS NODS HEAD UP AND DOWN)
21     Q.   -- did the level of -- of janitorial service
22 improve?
23     A.   I can't say that it did.
24     Q.   Would that be -- well, strike that.
25          At some point was it your understanding that EMCOR

Page 16

1  terminated PFMI as the janitorial contractor?
2      A.   I understand -- I know that they terminated them
3  in -- in the late April, May timeframe, I believe.
4      Q.   Did BB&T give EMCOR any guidance as to who should
5  replace PFMI as the janitorial contractor?
6      A.   No.
7      Q.   Were those decisions left up to EMCOR?
8      A.   Absolutely.
9      Q.   After PFMI was terminated, what in your opinion was
10 the level of janitorial service?
11     A.   After PFMI was terminated?
12     Q.   Yes, sir.
13     A.   It was poor.
14     Q.   And would it be -- I take it from your previous
15 testimony that you weren't happy with it before -- while PFMI
16 was there; is that correct?
17     A.   That is correct.
18     Q.   And you were not happy with it after EMCOR
19 terminated PFMI; is that correct?
20     A.   At the -- at the time of termination, no, we were
21 not happy with the level of service that we were being
22 provided.
23     Q.   Did you have any further meetings with Sean
24 Brookins to discuss, you know, needed improvement with the
25 janitorial?

Page 17

1      A.   Well, given that we shared the same building, I was
2  in constant contact with Sean on a day-to-day basis about the
3  level of service that we were being provided.
4      Q.   Was Sean keeping you up to date about the things
5  that EMCOR was doing to improve service?
6      A.   I don't recall specific issues or specific methods
7  that they were using.
8      Q.   Do you recall who replaced PFMI as the janitorial
9  contractor?
10     A.   ABM.
11     Q.   Was it your understanding that in that -- I
12 think -- I think you had said April timeframe, when PFMI was
13 terminated, that they were doing no further work for EMCOR?
14     A.   I don't know that.
15     Q.   And let me -- I'll ask it a better way.
16          At the time that PFMI was terminated did -- do you
17 know if they kept any regions or branches and continued to
18 give janitorial service?
19     A.   Not that I can recall.
20     Q.   At some point in this project would it be correct
21 to say that BB&T terminated EMCOR?
22     A.   Yes.
23     Q.   When was that?
24     A.   December 2006.
25     Q.   Tell me, if you will, sort of what led up to that

5 (Pages 14 to 17)

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 18

1   decision being made?
2       A.   There was a history of poor performance on behalf
3   of the service that we received from EMCOR through its service
4   suppliers.
5       Q.   Would that have been for all types of facilities
6   management, and by that I mean janitorial, landscaping and
7   maintenance?
8       A.   They all had their problems.  There were lesser
9   degrees of problems with some services than others, and there
10  were greater degrees of problems with some services than
11  others.
12      Q.   In the -- well, let's just say June through
13  December timeframe what was going on with the janitorial
14  services?
15      A.   June through --
16      Q.   December --
17      A.   -- December.
18      Q.   -- of 2006.
19      A.   EMCOR had hired ABM Services to provide janitorial
20  for the majority of our branching network to replace PFMI.
21  The -- over that time the level of service seemed to improve.
22      Q.   Were you completely satisfied with the janitorial
23  service provided in that June to December timeframe?
24      A.   It was not up to our level of expectation.
25      Q.   What was the -- I guess, just to cut to the chase,

Page 19

1   what was the main problem that caused EMCOR to be terminated?
2       A.   I would have to say that their inability to provide
3   the janitorial services was the single largest issue that we
4   faced, and we got the most negative feedback from the banking
5   network, the branches, on those services than any other.
6       Q.   Were you continuing to get negative feedback long
7   after PFMI had been terminated?
8           MR. SAWYER:  Object to the form of the
9   question.
10          MS. TULEY:  You can answer it.
11          MR. SAWYER:  You can answer.
12          THE WITNESS:  The -- we did get negative
13      feedback.  The feedback was not as numerous as it had been
14      in the past.  We didn't have as many phone calls and
15      e-mails as we had had prior to ABM.
16  BY MS. TULEY:
17      Q.   If -- if the janitorial was doing better the whole
18  second half of 2006 -- well, strike that.  Let me ask it a
19  different way.
20          I believe your testimony is that there were less
21  complaints after PFMI was terminated; is that correct?
22      A.   There were less.
23      Q.   In your opinion were there still too many
24  complaints after PFMI left?
25      A.   Yes.

Page 20

1       Q.   Is the service provided by PFMI to EMCOR the reason
2   EMCOR was terminated?
3       A.   It was a significant part of the decision process.
4       Q.   Was the service provided after PFMI was terminated
5   a significant part of the determination?
6       A.   That was part of it.
7       Q.   Well, the reason I ask is it would seem to me --
8   and you correct me if I'm wrong -- that if things were
9   obviously going much better and the project was working as it
10  should have in the second half of 2006, that BB&T would not
11  have gone to the trouble of terminating EMCOR and finding a
12  replacement for them; is that fair?
13          MR. SAWYER:  Object to the form of the
14      question.
15      Q.   You can answer that.
16      A.   Oh, the -- it wouldn't be fair to say that it was
17  going in the direction it needed to go.  It was not where we
18  had expected it to be even in the second half of 2006.
19      Q.   Would it be fair to say that at any point during
20  this project EMCOR was free to have terminated PFMI and
21  replaced them with whoever they wanted to?
22      A.   Yes.
23      Q.   As part of this project -- and I think we had
24  talked about looking for cost savings?
25      A.   (WITNESS NODS HEAD UP AND DOWN)

Page 21

1       Q.   Did you ever have any discussions or come to know
2   anything about cost savings regarding the removal of
3   dumpsters?
4       A.   No.
5       Q.   Were you involved in any decisions to remove
6   dumpsters from branch locations?
7       A.   No, I was not.
8       Q.   Were you involved in any discussions between BB&T
9   and EMCOR for payment of hauling trash away from branch
10  locations?
11      A.   Repeat that?
12      Q.   Sure.
13          Were you involved in any discussions with EMCOR
14  regarding payment for hauling trash from branches?
15      A.   There were discussions about trash hauling charges.
16      Q.   All right.  Tell me what you recall about that?
17      A.   I recall that there were -- after I came in March
18  of '06, there were some charges that PFMI was charging BB&T
19  for hauling trash away from branches.
20      Q.   And those were charges from PFMI, I believe you
21  said?
22      A.   Well, PFMI would bill EMCOR --
23      Q.   Uh-huh.
24      A.   -- and EMCOR would pass through those charges to
25  BB&T.

6 (Pages 18 to 21)

01419bd0-db10-477a-acb7-532ee8c9f16e

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 22

1    Q.    And why was -- what was the issue, as far as -- as
2  far as PFMI charging for trash hauling?
3    A.    There's no issue to us whether or not PFMI charged
4  for trash hauling to EMCOR.  The issue to us was that it was
5  our understanding that trash hauling was part of the price we
6  were paying for janitorial services at that time.
7    Q.    And where did you get your understanding that trash
8  hauling was encompassed in just the total normal janitorial
9  payment?
10   A.    In talking with Edna Green and at that time Ronny
11  Eller.
12   Q.    And, to your knowledge, any -- let me strike that.
13        Did you have any direct conversations with PFMI
14  regarding payments for trash hauling?
15   A.    No.
16   Q.    Would it be your understanding that any
17  conversations regarding trash hauling and payments for trash
18  hauling would have occurred between EMCOR and PFMI?
19   A.    Yes.
20   Q.    And I believe you've already stated this, but just
21  so the record is clear, you're not aware as we sit here today
22  if there was an initiative to remove dumpsters or there
23  wasn't?
24   A.    No, I -- I don't know.
25   Q.    If there was such an initiative, who would -- who

Page 23

1  would probably be the person to know about that?
2    A.    I don't know.
3    Q.    Going back to when you first came on in the March
4  timeframe, what was your understanding about how payments were
5  to be made for janitorial services?
6    A.    Payments made, I believe, twice a month.
7    Q.    And was that a flat rate or was that on a square
8  footage basis?
9    A.    It was on a price per square foot.
10   Q.    And in that timeframe, the March timeframe, was
11  there any dispute about the amount that was being charged for
12  janitorial?
13   A.    Yes.
14   Q.    Okay.  Tell me what you recall about that?
15   A.    Edna Green made me aware that we were paying our
16  square foot charge times gross square footage, instead of net
17  cleanable square footage.
18   Q.    Did she tell you how long that had been -- it had
19  been being paid by square -- gross square footage?
20   A.    She'd said since the inception of the contract.
21   Q.    What was your understanding about when payments
22  were to have gone from gross to net?
23   A.    My understanding was -- and this is through
24  others -- is that there was a period of time when EMCOR was to
25  have measured our branches or had our branches measured to

Page 24

1  determine the net cleanable square footage.  I don't recall
2  the exact time period, whether it was 30 days, 60 days, 90
3  days.
4    Q.    And then at some point it was your understanding
5  that payments would go from gross square footage to the net
6  cleanable?
7    A.    Yes.
8    Q.    Okay.  At the time you came on and Edna told you
9  that they were -- it was a price per square foot based on
10  gross, was BB&T doing anything accounting wise to recapture
11  what they thought were overpayments for paying on gross?
12        MR. SAWYER:  Object to the form of the
13   question.
14        You can answer.
15        THE WITNESS:  No.
16  BY MS. TULEY:
17   Q.    All right.  Was anything eventually done to
18  recapture any amounts that BB&T felt were overpaid?
19   A.    Yes.
20   Q.    Okay.  What was done?
21   A.    I indicated to Edna and to Hai that with the next
22  billing from EMCOR we would deduct, hold back 20 percent.
23   Q.    How was the 20 percent determined?
24   A.    Information that Edna provided to me indicated
25  there was an estimate done early on that indicated there was

Page 25

1  approximately a 20 percent noncleanable area in the average
2  branch or in -- in an average site to be cleaned, and,
3  therefore, I used that percentage as a proxy to hold back
4  payment until we could determine what the actual amount of --
5  of net cleanable space was.
6    Q.    Prior to holding or deducting that 20 percent from
7  the next bill did you inform EMCOR of what your intentions
8  were?
9    A.    Yes.
10   Q.    And what was their reaction?
11   A.    I don't recall.
12   Q.    Had you seen any net cleanable square footage
13  numbers at that point?
14   A.    Edna shared with me a number of spreadsheets that
15  had multiple columns, and it had columns -- it had gross,
16  adjusted, you know, several columns with several headings.  I
17  couldn't understand what any of those were and whether or not
18  they were accurate.  So I just said, we're going to start with
19  a blank sheet of paper, and we're going to undertake a new
20  method for determining square footage.
21   Q.    What -- how were you going to go about once you
22  started the 20 percent deduction determining what the correct
23  amount of square footage was?
24   A.    We were going to measure each facility -- or --
25  excuse me.  We were going to measure the facilities.

7 (Pages 22 to 25)

01419bd0-db10-477a-acb7-532ee8c9f16e

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 26

1    Q.    Okay.  Who was going to do those measurements?
2    A.    We were going to do the measurements through a
3    statistical sampling process.
4    Q.    And who was going to determine -- or how was it
5    going to be determined which branches were going to be
6    measured?
7    A.    We -- we -- Edna and I took our branch network and
8    broke it down into three components.  Less than 5,000 square
9    feet, five to ten and greater than ten.  And from those
10    subsets we statistically chose a random sample to -- to
11    measure.
12          Our -- our thought process here was that you
13    couldn't measure -- field measure all 1,400 locations.  1,400
14    plus locations.  So we determined that the -- the next best
15    way to determine what the accurate cleanable square footage
16    was was to use a statistical sampling method and to measure
17    those.
18    Q.    Did you inform EMCOR that that was the process you
19    were going to use?
20    A.    Yes, we did.
21    Q.    Did they object to that process?
22    A.    No, they did not.
23    Q.    Did they say that they had already measured all of
24    those branch locations?
25    A.    I don't recall that that -- that they said that.

Page 27

1    Q.    But it's your recollection that EMCOR did not
2    object to or dispute the validity of using this statistical
3    sampling?
4    A.    No, they did not object.
5    Q.    Did EMCOR object to the withholding of the 20
6    percent or the deducting of the 20 percent?
7    A.    Not that I'm aware of.
8    Q.    What was your understanding about what the initial
9    agreement was to have been regarding determining net cleanable
10    square footage?
11          MR. SAWYER:  Object to the form of the
12    question.
13          THE WITNESS:  My understanding was that EMCOR
14    was either going to provide net cleanable square footage
15    or have it measured.  I -- I was not part of the -- of the
16    negotiations at the contract time.  I was purchasing
17    services manager.
18          So the only thing I know is what I recall from
19    people who -- like Ronny and like Edna, who shared with me
20    their understanding.  So their understanding was that
21    EMCOR or their service provider was going to provide
22    accurate net cleanable square footage numbers at some
23    point in time after the inception of the contract.
24    BY MS. TULEY:
25    Q.    Did you -- and I've asked this a couple different

Page 28

1    ways, but in those -- some of those spreadsheets that you
2    looked at, was it ever explained to you who took any
3    particular set of net cleanable square footage measurements?
4    A.    I can't say with certainty.
5    Q.    Let me ask it a different way --
6    A.    Okay.
7    Q.    -- just to make sure we're clear.
8          Were you ever presented with a set of net cleanable
9    square footage numbers and told, these are numbers that were
10    done by EMCOR mobile techs?
11    A.    I don't recall that.
12    Q.    When you made your decision to just start over, who
13    did you discuss that with for EMCOR?
14    A.    Sean Brookins.
15    Q.    Okay.  Did that escalate up the chain to anyone
16    else with EMCOR?
17    A.    Yes.
18    Q.    Okay.  Who did it go to?
19    A.    Greg Swanberg.
20    Q.    Okay.  Why did that escalate up to Greg Swanberg?
21    A.    I think Sean might not have been fully -- fully
22    understand what we were trying to do using the statistical
23    methods.  I felt like Greg had a better grasp of the situation
24    that we were facing, and I made him aware of the methods that
25    we were going to use to try to get at a more accurate net

Page 29

1    cleanable square footage number, so that we could all move
2    forward.
3    Q.    And did he agree to that?
4    A.    Yes, he did.
5    Q.    What was the -- and during that -- when you were
6    discussing with Greg Swanberg this issue, did you all also
7    discuss how long the hold back of 20 percent would continue?
8    A.    It would continue until we had a net cleanable
9    number that we could use in a true up in order to determine
10    what we had paid, how much we had overpaid and how much we
11    were due as a refund, taking into account the -- the 20
12    percent that we were -- we were withholding at the time.
13    Q.    I think you had said earlier that there had been
14    some kind of -- and I don't want to put words in your mouth,
15    but there had been some kind of estimate early on in the
16    project of -- and that's where you got the 20 percent number?
17    A.    (WITNESS NODS HEAD UP AND DOWN)
18    Q.    What -- was that a document?
19    A.    I remember that Edna had shown me something like a
20    spread sheet that had gross and adjusted, and the adjusted was
21    adjusted by 20 percent.
22    Q.    Do you know what that -- what that spread sheet --
23    what was the purpose of creating that spread sheet in the
24    first place?
25    A.    I don't recall.

8  (Pages 26 to 29)

01419bd0-db10-477a-acb7-532ee8c9f16e

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 30

1    Q.   Did -- at the point where the 20 percent deduction
2  started, did you have any discussions with anybody from PFMI
3  regarding that issue?
4    A.   No.
5    Q.   Did you have -- at the -- around the time when PFMI
6  was terminated do you have any awareness of any new agreement
7  that was made between EMCOR and PFMI to continue cleaning
8  certain areas?
9    A.   No.
10   Q.   In documents I've seen a company called Trammell
11 Crow mentioned?
12   A.   (WITNESS NODS HEAD UP AND DOWN)
13   Q.   Who is that?
14   A.   Trammell Crow is a facility management company that
15 provides similar services that EMCOR Facility Services
16 provided.
17   Q.   And did Trammell Crow replace EMCOR?
18   A.   Eventually they did.
19   Q.   Is -- is Trammell Crow still doing the facilities
20 management work for BB&T?
21   A.   They are through -- they were acquired by
22 CB Richard Ellis in December of 2006.  So CB Richard Ellis is
23 legally the firm -- the name of the firm that's providing the
24 services.
25   Q.   Are they providing substantially the same services

Page 31

1  that were being provided by EMCOR?
2    A.   Yes, they are.
3    Q.   What is your opinion of the services currently
4  being provided?
5    A.   Much better.
6    Q.   When we were talking about the -- statistical
7  sampling --
8    A.   (WITNESS NODS HEAD UP AND DOWN)
9    Q.   -- how many banks total were measured for that
10 statistical sampling?
11   A.   I would have to look back at our -- our
12 information, but it was a sampling taken that was of
13 sufficient number that would give us a high confidence ratio
14 that the -- the sample size was of sufficient size to give us
15 a high confidence ratio that we would have an accurate net
16 cleanable square footage number.
17   Q.   Let me ask this:  After that -- those sample
18 numbers of banks were measured, what was done with that
19 information?
20   A.   It was used to develop a database of net cleanable
21 square footage for each branch based on the -- the results of
22 the sampling, and those numbers were then applied to the price
23 per square foot.
24   Q.   Was -- let me ask it this way:  I'm going to give
25 you a hypothetical, and you tell me if this is how it worked

Page 32

1  or not.
2    A.   Okay.
3    Q.   So I can just get an understanding.  For all of
4  those banks that were measured, let's say they came back and
5  for every one of them once you averaged it out, the average
6  difference between gross and net was ten percent.
7    A.   Okay.
8    Q.   Would that then have been across the board all of
9  the square footage numbers for each location would have been
10 reduced by ten percent?
11   A.   I don't believe that it was that simple.
12   Q.   Okay.  Could you maybe explain it to me a little
13 better about how that process worked?
14   A.   Take the sample that we did of the group, the
15 subset, less than 5,000.  I don't recall the number of
16 branches in that subset, but a -- a sample size was taken of
17 that subset, and the -- and a random picking of the branches
18 out of that subset were done.
19       Again, this was all done using statistical
20 measurements, and we had -- had one of the staff members on
21 our -- in our division who had as a -- has a statistics
22 background helped with us this selection process.
23       Each one of those locations were then measured
24 using our CAD system.  Our designers measured it on the --
25 using the -- the CAD drawings.  As they were measuring they

Page 33

1  were also measuring noncleanable areas, such as the vault,
2  communication room and any areas where there was not
3  cleanable.  Areas that the janitorial staff would not clean.
4        Those measurements -- we took the gross
5  measurements, subtracted the noncleanable for each one of this
6  sampling and determined what the average noncleanable area
7  was.  And in the smaller branches it was a percentage of
8  somewhere less than ten percent, I believe.  Then we moved on
9  to the next sample size.
10   Q.   Okay.  So would -- whatever that percentage for the
11 under 5,000 branches eventually worked out to be --
12   A.   Yes.
13   Q.   -- would that have been applied then to all of the
14 branches with under 5,000 square feet?
15   A.   It's my recollection that's what we did.
16   Q.   And then that process would have been repeated for
17 the five to 10,000?
18   A.   And the over ten.
19   Q.   And the over ten.
20       Okay.  And, just so I'm clear, that was done not by
21 actually going to the branch.  That was done by using the CAD
22 drawings?
23   A.   For the locations less than five and less than ten.
24   Q.   Okay.  But the ten --
25   A.   Only.

9 (Pages 30 to 33)

01419bd0-db10-477a-acb7-532ee8c9f16e

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

---

Page 34

1    Q.    -- plus were actually gone out and physically
2    measured?
3    A.    Field measured.
4    Q.    Were all of the locations that were over 10,000
5    feet measured?
6    A.    To my recollection, they were.
7    Q.    What -- and you listed a couple of them, the vault
8    and the communications room. What was it that was your
9    understanding of what areas should be subtracted to get net
10   cleanable square footage?
11   A.    Elevator shafts, janitorial closets. I don't
12   recall the others. There may have been some more, but I
13   just -- I just don't recall them.
14   Q.    Earlier you had said vaults. Were vaults part of
15   what should have been subtracted?
16   A.    Yes.
17   Q.    Was -- were there any discussions that you were
18   involved in with EMCOR regarding, let's -- coming to an
19   agreement on what should be subtracted from gross?
20   A.    I believe we had that conversation.
21   Q.    And so that conversation would have been sitting
22   down and, you know, discussing, okay. We think janitorial
23   closets should be subtracted, or, we think elevator shafts
24   should be subtracted, that type of a conversation?
25   A.    I don't know if it was that formal.

---

Page 35

1    Q.    Okay. Would it maybe have been just phone calls?
2    A.    It may have been.
3    Q.    But, to your recollection, there were discussions
4    between BB&T and EMCOR about what space should be subtracted?
5    A.    I recall in my discussions with Sean and Greg
6    Littlefield -- not Greg. Excuse me. Greg Swanberg that in
7    describing our process, our methodology, we were going to
8    measure using the CAD system, and we were going to exclude
9    certain areas, such as, and I -- I went through the list,
10   similar to what I just explained to you.
11   Q.    Did they request any of the things that you listed
12   be -- not be excluded?
13   A.    Not that I recall.
14   Q.    And specifically, for instance, let's just say the
15   scope of work would include having -- cleaning the janitorial
16   closets. Would -- if the scope of work included cleaning
17   janitorial closets, would janitorial -- would it still be your
18   position that janitorial closets should be subtracted?
19   A.    Janitorial closets were not part of the scope of
20   work.
21   Q.    And, speaking of that, if -- if ATMs -- outdoor
22   ATMs were to be cleaned, how would that be factored into the
23   square footage?
24   A.    It wouldn't. It would just simply be a service
25   that was provided as part of the overall cleaning service.

---

Page 36

1    Q.    What about if for a location outdoor drivethrough
2    lanes were to be maintained, like trash picked up and cobwebs
3    swept up, that kind of thing, would that be included in the
4    square footage?
5    A.    No. It would have been simply an extension of the
6    services being provided to these ancillary areas.
7    Q.    Did you have any -- any problems or concerns
8    regarding Sean Brookins and the job he did as the account
9    manager?
10        MR. SAWYER: Objection to the form of the
11   question.
12        THE WITNESS: Sean was a very good person at
13   putting out fires. In my opinion Sean was not as
14   proactive in determining the source of those fires, so
15   that they wouldn't occur again.
16   BY MS. TULEY:
17   Q.    Was that lack of being proactive one of the things
18   that eventually led to EMCOR losing the contract?
19        MR. SAWYER: Object to the form.
20        THE WITNESS: It factored into our decision,
21   but it wasn't the overarching reasons -- one of the
22   overarching reasons.
23   BY MS. TULEY:
24   Q.    Who was involved in the decision to terminate
25   EMCOR?

---

Page 37

1    A.    I was.
2    Q.    Was anybody else?
3    A.    I made the recommendation.
4    Q.    If after PFMI had been terminated, which was in, I
5    think we said, April, May timeframe, if the janitorial service
6    had gotten back on track and was doing good by, let's say,
7    August, would EMCOR have been terminated?
8    A.    I really can't say, because that didn't happen.
9    Q.    Well, was it your expectation that by the end of
10   the year EMCOR would have janitorial working well? And, "by
11   the end of the year," I mean 2006?
12   A.    We certainly expected to have significant
13   improvement by the end of 2006.
14        MS. TULEY: Why don't we take a quick break.
15   I think I've got a few documents to show you.
16        THE WITNESS: Okay.
17        THE VIDEOGRAPHER: Going off the record. The
18   time is 10:22.
19        (RECESS TAKEN AT 10:22 A.M. TO 10:30 A.M.)
20        (PLAINTIFF'S EXHIBIT NUMBER 43 WAS MARKED FOR
21   IDENTIFICATION)
22        THE VIDEOGRAPHER: Back on the record. The
23   time is 10:30.
24   BY MS. TULEY:
25   Q.    I'm going to show you what I've just marked as

---

10 (Pages 34 to 37)

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 38

1 Exhibit 43. This is my only copy. So you can kind of ignore
2 all of the highlighting and whatnot on there. Just take a
3 look at that. The main part of it, I think, is at the bottom.
4 And after you've had a chance to look over it, would you
5 identify what that document is for the record?
6     A.    This is an e-mail that -- actually, it's two
7 e-mails. One was sent by myself to Greg Swanberg and copied
8 to others, on May 16th, and then there's a reply from Greg
9 Swanberg back to myself, with copies to -- to others, dated
10 May 16th.
11    Q.    Okay. And in that e-mail what are you requesting?
12    A.    I am requesting a meeting with members of EMCOR's
13 senior managers, along with our senior managers, to discuss a
14 trash hauling dispute.
15    Q.    And it looks like you're invoking a specific
16 dispute resolution clause; is that correct?
17    A.    That is correct.
18    Q.    Okay. Tell me -- and we may have already talked
19 about it some -- what was the trash hauling issue that you
20 wanted to have this dispute resolution meeting about?
21    A.    You asked me earlier if I -- if there was, I
22 believe, any -- any disputes or -- over trash hauling, and I
23 said, yes.
24    Q.    Okay. Was it -- so why would you have been the one
25 to request that?

Page 39

1     A.    Because we had been either billed by EMCOR or
2 indicated they were going to bill us. EMCOR was going to bill
3 us for trash hauling charges.
4     Q.    And I think you had said earlier that you did not
5 think that BB&T should have to pay a separate charge for trash
6 hauling?
7     A.    It was my understanding that trash hauling was
8 something -- was a service that was to be provided by EMCOR as
9 part of the scope of work that was provided to them in the --
10 well, was made part of the contract.
11    Q.    How did this dispute resolution meeting take place?
12 Was it a face-to-face meeting or on the phone?
13    A.    I don't recall.
14    Q.    What was -- who all was involved in that meeting?
15    A.    To my recollection, it was myself, Carla Fox, Greg
16 Swanberg, Edna Green, and I don't recall others that might
17 have been there. Sean might have been there, but I don't -- I
18 don't recall.
19    Q.    What -- what was EMCOR's position during that
20 meeting, as far as trash hauling?
21    A.    I don't recall their -- repeat the question again?
22    Q.    Sure.
23          During this meeting regarding trash hauling what
24 was EMCOR's position, as far as payment -- extra payments for
25 trash hauling?

Page 40

1     A.    I believe they took the position that the services
2 had been provided -- trash hauling services had been provided.
3 They had been billed for us -- for them, and, therefore, they
4 were looking to pass these charges along to us.
5     Q.    And what was your response to that?
6     A.    My response was that the contract did not call for
7 trash hauling charges to be paid by BB&T. It was part of the
8 price per square foot we were paying for janitorial services.
9 So we pushed back.
10    Q.    And what was the outcome of that meeting, as far as
11 trash hauling?
12    A.    Eventually on August the 1st we signed a -- an
13 amendment to the -- to the agreement that -- I'm trying to
14 think of the words. We signed an amendment to the agreement
15 that -- that all past trash hauling charges would not -- that
16 we -- they wouldn't have a claim against us for all -- for
17 past trash hauling charges.
18    Q.    Why was it necessary to put that in a new
19 agreement?
20    A.    For our protection, so that we didn't have EMCOR
21 coming back to us at a later date in time for these payments
22 of these services.
23          (PLAINTIFF'S EXHIBIT NUMBER 44 WAS MARKED FOR
24 IDENTIFICATION)
25 BY MS. TULEY:

Page 41

1     Q.    I'm going to show you what I've marked as
2 Exhibit 44. Is that the August 1st agreement you just
3 referenced?
4     A.    It is.
5     Q.    Who drafted that agreement?
6     A.    Tim Shelburne.
7     Q.    Is he legal counsel?
8     A.    Yes. He is internal legal counsel.
9     Q.    It looks like -- and feel free to flip through and
10 see, but it looks like -- that Greg Swanberg was no longer
11 with EMCOR at that point, and I'm going to murder this, but a
12 Mr. Dabrowski --
13    A.    Dr. Dabrowski.
14    Q.    Dabrowski?
15    A.    Dabrowski.
16    Q.    -- signed that?
17    A.    He did.
18    Q.    All right. What -- when was your first interaction
19 with Mr. Dabrowski?
20    A.    I believe it was at -- with this -- this -- signing
21 of this contract.
22    Q.    Was this -- so was that about the time, as far as
23 you can recall, when Mr. Swanberg left and Mr. Dabrowski took
24 over?
25    A.    It must have been.

11 (Pages 38 to 41)

01419bd0-db10-477a-acb7-532ee8c9f16e

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

---

Page 42

1    Q.   Did the change over of leadership at EMCOR from
2    Swanberg to Dabrowski have anything to do with your decision
3    to terminate EMCOR?
4             MR. SAWYER:  Object to the form of the
5    question.  Facts not in evidence.
6             THE WITNESS:  The --
7             MR. SAWYER:  You can answer.
8             THE WITNESS:  Dabrowski really wasn't
9    leadership.  He was simply their CFO, who I had been
10   instructed to send this to, or he -- he was in receipt of
11   this, but he didn't have leadership on the account.
12   BY MS. TULEY:
13   Q.   Okay.  Did you have very many conversations with
14   Mr. Dabrowski?
15   A.   Very few.
16   Q.   Besides the trash hauling issue, was there anything
17   else that was included in the August 1st agreement that was
18   different from the original agreement?
19   A.   Well, in this agreement what we were attempting to
20   do was to settle all payment issues and clear up any
21   misunderstanding or any -- about trash hauling.
22   Q.   So the -- the thrust of the August 1st agreement
23   was to take care of the trash hauling issue?
24            MR. SAWYER:  Object to the form of the
25   question.

---

Page 43

1             THE WITNESS:  It was to -- this agreement was
2    to have -- settle between us and EMCOR the overpayment
3    that we had determined we had incurred for janitorial
4    services.  It was to recover losses that we had incurred
5    on the proof bag that had been stolen, and it was to clear
6    up any misunderstanding or -- or -- it was to clarify each
7    company's position as it related to trash hauling.  That
8    was the gist of this -- of this agreement.
9    BY MS. TULEY:
10   Q.   You bring up another issue, the -- the proof bag.
11   I guess, tell me what you recall about the proof bag issue?
12   A.   I came on on March the 6th, as I said.  I don't
13   recall when the actual proof bag was stolen, whether it was
14   before March the 6th or after March the 6th, but I became
15   aware that a proof bag had been stolen in our Elizabethtown
16   office and that the bank had recorded a loss on the -- on the
17   theft of this bag.
18   Q.   Will you explain for the record what a proof bag
19   is?
20   A.   A proof bag is a bag of -- it's a bag that we
21   transport daily from the branches back to our item processing
22   center, and it normally -- it does not include cash.  It only
23   includes checks, where depositors have either made a deposit,
24   and attached to that deposit are all of the checks that maybe
25   they had used as part of their deposit.

---

Page 44

1             The bank then processes those checks, gives the
2    customer credit for them and then sends those checks off for
3    collection, so that we can get our money back.  So it's --
4    it's internal bank work that is kept in a locked, secure bag
5    and transported nightly from the branch to the item processing
6    centers.
7    Q.   Is -- is there someone in particular who goes from
8    branch to branch and picks up those bags?
9    A.   We have a contract with a courier.
10   Q.   What was your understanding about the investigation
11   done into the theft of the proof bag?
12   A.   I understood there was an internal investigation
13   and a police report and a police investigation.
14   Q.   Who at BB&T would have been the one in charge of
15   investigating the -- the theft of the proof bag?
16   A.   Well, our security officer at that time was Jerry
17   Barkley, and he had investigators throughout the -- the
18   footprint.
19   Q.   What were -- what was your understanding of how
20   this proof bag had been stolen?
21   A.   My understanding that it was taken by a party
22   related to the cleaning crew that was performing janitorial
23   services there.
24   Q.   How did you come to have that understanding?
25   A.   I believe I read the police report and the internal

---

Page 45

1    investigation.
2    Q.   Do you know if the individual that was -- that had
3    been indicated on the police report as the thief has been
4    prosecuted?
5    A.   I don't know.
6    Q.   Who would know that?
7    A.   Perhaps someone in our investigations department or
8    the local police down in Elizabethtown.
9    Q.   Who within your department was charged with the
10   recovery of any funds lost regarding the proof bag?
11   A.   We were not charged with recovering the loss, or
12   the -- the banking network, the branches and our operations
13   people out in the branches are responsible for recovering
14   losses of this type.
15   Q.   How -- how does that process work -- since we're
16   not talking about cash, how does the recovery process on items
17   in a proof bag work?
18   A.   The people in the -- in the branches, the
19   operations people in the branches, would attempt to make
20   contact with the depositors, whose items had been included in
21   that to identify what items had been deposited and what banks
22   they had been drawn on in an effort to recreate those -- those
23   deposit instruments in -- in order to -- for us to have a way
24   to get our funds back.
25            If we've given you credit for that deposit, but we

---

2100 3rd Avenue North, Suite 960*Birmingham, AL 35203*www.merrillcorp.com
1-800-888-DEPO

01419bd0-db10-477a-acb7-532ee8c9f16e

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

---

Page 46

1  have no instruments on which to -- to get our money back
2  through the banking payment system, then we are at a loss.
3  And they attempt to try to recreate those deposits from the
4  prior day by -- by calling customers and attempting to get new
5  checks issued and void the old ones.
6      Q.   Do you know if the actual proof bag, the physical
7  thing, was ever recovered?
8      A.   I don't know.
9      Q.   How is it determined what loss, if any, after
10 these recovery efforts that BB&T incurred?
11     A.   Well, the total amount of work that was in the
12 proof bag -- I don't know the exact amount, but it was in the
13 $275,000 range, let's say close to 300,000, but they were able
14 to recreate a substantial amount of that work, and, thus, we
15 did not incur a loss.
16         At the end of the investigation or the recovery
17 efforts we were left with a loss of 112,639.44 that we had not
18 been able to recover, and, therefore, that was what our claim
19 was for.
20     Q.   And did -- did you do any personal investigation or
21 calculations in coming up with that number?
22     A.   No.
23     Q.   Was that a number that was provided to you?
24     A.   That number was provided to us by our operations
25 division.

---

Page 47

1      Q.   I would assume -- and we all know that's
2  dangerous -- prior to this August 1st agreement some
3  discussions had been had between BB&T and EMCOR regarding the
4  amount of the loss and what BB&T was going to expect EMCOR to
5  reimburse them for; is that fair?
6      A.   We kept EMCOR aware of the collection efforts that
7  were being made and what the amount was.  On a periodic basis
8  it was coming down.  And then when the -- the loss -- there
9  weren't any other further recoveries, we notified them that
10 the -- that the total loss was 112,639.44.
11     Q.   And did EMCOR pay that amount?
12     A.   Yes.
13     Q.   After August 1st, do you know if any further
14 recoveries were made by the branch?
15     A.   I haven't been made aware of any further
16 recoveries.
17     Q.   Do you have any awareness of who hired the cleaning
18 company in the Elizabethtown branch?
19     A.   No.  It was -- it was already in -- they were
20 already servicing that branch when I came on.
21         (PLAINTIFF'S EXHIBIT NUMBER 45 WAS MARKED FOR
22 IDENTIFICATION)
23         MR. SAWYER:  Scarlette, what's the date on
24 that?
25         MS. TULEY:  It's May 22nd, '06.  I've got a

---

Page 48

1      Bates number, but I'm not sure those are matching up.
2  BY MS. TULEY:
3      Q.   All right.  I'm going to show you an e-mail I've
4  just marked as Exhibit 45, and, again, just ignore the
5  highlighting on it.  And after you've had an opportunity to
6  take a look at that, if you will identify that for the record,
7  please?
8          MR. SAWYER:  E-mail.
9          MS. TULEY:  That's another copy.  It just
10 doesn't look the same.
11         MR. SAWYER:  What about these numbers?
12         MS. TULEY:  (INDICATING)
13         THE WITNESS:  Okay.
14 BY MS. TULEY:
15     Q.   All right.  If you could, for the record, just
16 identify it?
17     A.   It is an e-mail that was sent by me to -- on
18 May 22nd, 2006, to all of our operations people.  What we
19 refer to as REBOMS, regional branch operation managers.
20 They're staff, area operations officers and other operations
21 staff that report to these REBOMS, with copies to BB&T
22 management within the support services division and copies to
23 the EMCOR regional operations managers.  And it was -- the
24 subject was work order -- EMCOR work order and escalation
25 process.

---

Page 49

1      Q.   And it looks like basically what you've done is
2  just -- just set out the steps to follow in either making a
3  complaint or logging a work order and how to work that up the
4  chain of command; is that fair?
5      A.   That is exactly what it is.
6      Q.   Was there -- were there any problems with -- with
7  going through the right channels or everybody knowing what to
8  do that prompted this e-mail?
9      A.   Well, the -- the services that had been -- when
10 people were dissatisfied with services, they took many
11 different avenues to make us aware of that, many different
12 channels.  Some would -- would process a work order complaint
13 through the FKC, facility knowledge center.
14         Some would call us direct.  Some would e-mail us.
15 And what we were trying to do here was to set up a logical
16 process, so that, one, we could track all complaints.  And in
17 one -- through one channel, preferred the facility knowledge
18 center, because it gives us a -- a hard copy record of it.
19         However, we wanted to give them the option of
20 escalating their concern to a live person.  And if -- again,
21 if that wasn't resolved, to another person, to another person.
22     Q.   It looked like you were the ultimate -- at the very
23 end -- the court of last resort, so to speak?
24     A.   I was.  I was.  You know, the buck stops with the
25 manager.  So --

---

2100 3rd Avenue North, Suite 960*Birmingham, AL 35203*www.merrillcorp.com
1-800-888-DEPO

01419bd0-db10-477a-acb7-532ee8c9f16e

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 50

1    Q.    I'm going to show you what has previously been
2  marked as Exhibit 8, and just take a minute and look over
3  that, and then I'm going to ask you just to identify it for
4  the record.
5    A.    Okay. All right.
6    Q.    If you will identify what that is, for the record,
7  please?
8    A.    This is a letter that I wrote to Greg Swanberg, on
9  July the 6th, 2006, outlining the points that we had been in
10  recent discussion about. One, the resolution of the net
11  cleanable square footage numbers and the computation of any
12  overpayments that were due, discussions that we had had
13  regarding the proof bag loss and what the -- the loss
14  currently -- we don't say what the loss currently was.
15        We just said that we expect it to be repaid by
16  EMCOR and not delayed by any insurance underwriter, and,
17  three, we clarify our understanding of how trash hauling will
18  be provided going forward from this point forward.
19    Q.    And were all of those issues eventually
20  memorialized in the August 1st agreement?
21    A.    Yes, they were.
22    Q.    Did -- in any discussions about the overcharges did
23  Greg Swanberg or anybody else with EMCOR offer up a different
24  computation as to how to determine that overage amount?
25    A.    No.

Page 51

1    Q.    Did they accept BB&T's computation?
2    A.    Yes.
3        (PLAINTIFF'S EXHIBIT NUMBER 46 WAS MARKED FOR
4    IDENTIFICATION)
5  BY MS. TULEY:
6    Q.    I'm going to show you what I've marked as
7  Exhibit 46.
8        (DISCUSSION HELD OFF THE RECORD)
9        THE WITNESS: Okay. I read it.
10  BY MS. TULEY:
11    Q.    All right. It looks like that e-mail was sent by
12  Jim Wohlers and directed to a number of people. One of whom,
13  looks like, it was you. Does that seem correct?
14    A.    That's my e-mail address.
15    Q.    Okay. Do you recall this e-mail?
16    A.    Vaguely.
17    Q.    Okay. And, just to paraphrase -- and if I
18  paraphrase this wrong, correct me. It's an e-mail from Jim
19  Wohlers to you -- yourself, and several other people,
20  discussing what he refers to as a new agreement that he had or
21  a clean slate agreement he had with EMCOR and his displeasure
22  with not being paid under that new agreement; is that fair?
23    A.    That's what it appears to be.
24    Q.    Okay. And I think I asked you this earlier, but do
25  you -- other than what's referenced in that e-mail, did you

Page 52

1  have any previous awareness about any kind of new agreement
2  between EMCOR and PFMI?
3    A.    No.
4    Q.    Okay. Did you respond to that e-mail in any way?
5    A.    No.
6    Q.    Okay. Did you respond to anyone at EMCOR
7  regarding -- regarding that e-mail?
8    A.    Not that I recall.
9    Q.    Okay. Do you recall having any discussions with
10  Jim Wohlers about PFMI not being paid under what they called a
11  new agreement?
12    A.    No.
13        (PLAINTIFF'S EXHIBIT NUMBER 47 WAS MARKED FOR
14    IDENTIFICATION)
15  BY MS. TULEY:
16    Q.    I'm going to show you what I have just marked as
17  Exhibit 47, and really I'm going to direct you to -- it's a
18  string of e-mails, but to the -- it would be probably the
19  first e-mail sent -- the last e-mail on the page.
20    A.    The last one?
21    Q.    Uh-huh.
22    A.    Okay.
23    Q.    And that is an August 11 e-mail.
24    A.    Okay.
25    Q.    All right. I'm going to direct you down to the

Page 53

1  first e-mail in the string. I believe it's dated August 11th,
2  2006, and it's from Hai Falor to Sean Brookins, and I think
3  copied to you; is that correct?
4    A.    That is correct.
5    Q.    Okay. It looks like -- it's regarding square
6  footage issues on some invoice -- janitorial invoices in the
7  July 2006 timeframe; is that correct?
8    A.    It appears to be. Yes.
9    Q.    Okay. What -- what numbers -- or what -- what
10  would Hai Falor be looking at to compare the -- the invoices
11  to determine -- to determine if square footage numbers were
12  correct?
13    A.    He would be comparing them back to the master list,
14  the database, that we calculated back in the spring, when we
15  were going through our calculations.
16    Q.    The one from the statistical calculation?
17    A.    That's correct.
18    Q.    Okay. Would that master list have been provided to
19  EMCOR?
20    A.    It was provided to EMCOR.
21    Q.    Do you recall what the problem was in July with
22  contractors using incorrect square footage numbers?
23    A.    I -- I do not know.
24        (PLAINTIFF'S EXHIBIT NUMBER 48 WAS MARKED FOR
25    IDENTIFICATION)

14 (Pages 50 to 53)

01419bd0-db10-477a-acb7-532ee8c9f16e

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 54

1   BY MS. TULEY:
2      Q.   I'm going to show you what I've marked as
3   Exhibit 48. I think it's that October letter.
4      A.   October 19th, 2006.
5      Q.   After you've had a chance to look at that, if
6   you -- will you just identify that for the record?
7      A.   Yes. I recognize it.
8      Q.   Okay. And is that a letter from you to
9   Mr. Dabrowski?
10     A.   Yes, it is.
11     Q.   Okay. What is the purpose of that letter?
12     A.   To notify EMCOR of termination of services for our
13  Florida network.
14     Q.   Did BB&T cease to do business in Florida?
15     A.   No.
16     Q.   Were those -- were the Florida branches transferred
17  to someone else for management?
18     A.   Yes.
19     Q.   Okay. Who was the management of the Florida
20  branches transferred to?
21     A.   Trammell Crow Company.
22     Q.   And in there there's some calculations of
23  transition cost and amortization and -- I'm no accountant, but
24  what is the purpose of all of those numbers?
25     A.   The transition costs are costs that EMCOR incurred

Page 55

1   in setting up this account. One time type costs. And they
2   were to be amortized or written off over the life of the
3   contract or over a period of 30 months.
4          Since we were terminating the contract early, we --
5   the contract required us to repay these amounts, these
6   transition costs. So as it related to these sites, we were
7   terminating 103 sites. We calculated the unamortized cost per
8   site, and multiplied that by the number of sites being
9   terminated, and determined that we owed EMCOR $18,611.27 in --
10  in transition costs associated with this group of properties.
11     Q.   And I believe that letter is dated in October of
12  2006?
13     A.   That is correct.
14     Q.   Was -- at that point in time were these the -- was
15  this a part of a complete termination of EMCOR services, or
16  was it expected that at that point in time it would just be
17  the Florida branches?
18     A.   At this time it was the Florida branches.
19     Q.   At that time were you in -- or anyone with BB&T in
20  discussions with Trammell Crow about taking over all of the
21  branches?
22     A.   In October?
23     Q.   Yes.
24     A.   When this was written?
25     Q.   Yes, sir.

Page 56

1      A.   I don't recall the -- exact discussions we were
2   having with regard to whether or not the -- the total
3   portfolio would eventually be available or if it would be
4   available, but the -- we -- this was regarding the Florida
5   properties only, as we had done in Maryland and
6   South Carolina.
7      Q.   Were there any specific problems in Florida that
8   caused you to move the management from EMCOR to Trammell Crow?
9      A.   Well, we had the -- we had the existing problems
10  with just general dissatisfaction of cleaning and some
11  janitor -- and some landscaping problems, but at the same time
12  we were looking at Florida as a pilot for the Trammell Crow
13  solution.
14          Trammell Crow was providing us at this time, down
15  in Florida, they were providing us project management
16  services, helping us build our branching network down there,
17  construction project management, and they were providing us
18  brokerage services, site selection and brokerage services for
19  acquiring land to build those sites on.
20          Carla Fox and I jointly decided that we would try
21  a -- kind of a holistic view of facility management, where
22  Trammell Crow would provide a suite of services, almost soup
23  to nuts, from brokerage services, site selection, land
24  acquisition, project management and facility management, and
25  facility management was also going to be expanded to include

Page 57

1   building -- overseeing small projects, not construction
2   projects, but small renovation projects.
3      Q.   That would be in existing branches?
4      A.   That would be a carpet change-out, repaper --
5   re-wallpapering, fixing a leaky roof, those sorts of things.
6          (PLAINTIFF'S EXHIBIT NUMBER 49 WAS MARKED FOR
7          IDENTIFICATION)
8   BY MS. TULEY:
9      Q.   I'm going to show you what I have marked as
10  Exhibit 49. It's a December 21 letter.
11     A.   Okay. I recognize this.
12     Q.   All right. And, just for the record, will you go
13  ahead and identify what that is?
14     A.   It's a letter that I wrote to Mr. Dabrowski on
15  December 21st, 2006, informing him that we wish to terminate
16  EMCOR's services at all remaining locations that they were
17  providing service for.
18     Q.   And in that letter you reference -- I think the
19  quote is, frank and open discussions, that you had with some
20  people at EMCOR?
21     A.   That's correct.
22     Q.   Tell me what you recall about those discussions.
23     A.   Well, as it says here, we met on December the 7th
24  with a gentleman that I had not previously been -- had not
25  previously met, Jack O'Connor and Paul Asmar, along with Andy

15 (Pages 54 to 57)

01419bd0-db10-477a-acb7-532ee8c9f16e

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 58

1 Ball, who was functioning as the account manager on this
2 account at that time. And we set this meeting up to discuss
3 the current relationship between BB&T and -- and EMCOR at the
4 time.
5          We had continued to get unsatisfactory e-mails,
6 work order complaints, et cetera, regarding the performance of
7 the services being provided by EMCOR. The history that we
8 were collecting on the services being provided by Trammell
9 Crow seemed to indicate that there was a better solution out
10 there.
11          And we were getting favorable responses from our
12 Florida network, our Maryland network and our South Carolina
13 network, where they had -- well, our Florida network hadn't --
14 had not begun operation. Our Maryland and South Carolina had
15 had some early successes. So we met with these gentlemen to
16 discuss how we could terminate services at these -- at all
17 remaining locations.
18      Q.   Prior to that meeting had you had any meeting
19 where, more or less, you had said, this is your last chance.
20 We're very dissatisfied, and here's the things that have to be
21 improved, or we're going to terminate?
22      A.   There wasn't anything formal like that. There --
23 we had ongoing, just informal discussions. There were
24 probably e-mails sent back and forth between me and the EMCOR
25 management team, just on a -- on a very informal basis,

Page 59

1 advising them of our dissatisfaction.
2      Q.   And what was the period that they were going to
3 phase out doing management work?
4      A.   By March the 19th, 2007 was going to be -- excuse
5 me. March 18th was going to be their last day. Trammell Crow
6 was going to take over on March 19th, 2007.
7      Q.   Did that -- did that phaseout go according to plan?
8      A.   Yes.
9          (PLAINTIFF'S EXHIBIT NUMBER 50 WAS MARKED FOR
10 IDENTIFICATION)
11 BY MS. TULEY:
12      Q.   During the -- the life of the EMCOR project, did
13 you do any or see any cost savings reports?
14      A.   I did not.
15          MS. TULEY: Let's take a quick break. He
16 needs to change a tape, and I'm almost done.
17          THE WITNESS: Okay.
18          THE VIDEOGRAPHER: This marks the end of tape
19 number one, the deposition of Randy Hondros. Going off
20 the record. The time is 11:24.
21          (RECESS TAKEN AT 11:24 A.M. TO 11:30 A.M.)
22          THE VIDEOGRAPHER: Back on the record. This
23 begins tape number two in the deposition of Randy Hondros.
24 The videographer is Randy Bernard, for the firm of
25 CaseWorks, of Winston-Salem, North Carolina.

Page 60

1          The deposition is being held at the offices of
2 Bell, Davis & Pitt, 100 North Cherry Street, Suite 600,
3 Winston-Salem, North Carolina, on August 29th, 2007. The
4 time is 11:31.
5 BY MS. TULEY:
6      Q.   I'm going to show you what I have just marked as
7 Exhibit 50. It's January 5, 2007. To be honest with you, I
8 don't know that you've ever seen this e-mail.
9          MR. SAWYER: Objection. Foundation.
10          MS. TULEY: His name is in there.
11          THE WITNESS: I -- I have not seen this.
12 BY MS. TULEY:
13      Q.   Okay. Well, my -- my question really has to do
14 with -- I guess it's that second full paragraph that starts
15 with, "Randy Hondros"?
16      A.   (WITNESS NODS HEAD UP AND DOWN)
17      Q.   It discusses some more conversations about trash
18 hauling that look like they might have taken place after
19 EMCOR's termination sometime in early 2007. Do you recall any
20 further conversations about the trash hauling issue after the
21 termination?
22      A.   Well, the termination was given on December the
23 21st. There was a transition period --
24      Q.   Uh-huh.
25      A.   -- until March the 19th. So between those -- those

Page 61

1 two periods they were continuing to provide us services, and
2 there was, to my recollection, discussions about trash hauling
3 charges that had been invoiced to us by A -- not ABM, but by
4 EMCOR through ABM.
5      Q.   And that would be more or less the same issue of
6 there was not a dumpster on-site, so whoever the janitorial
7 company was was having to take trash off-site?
8      A.   That is correct.
9      Q.   Okay. And it looks like from that e-mail that some
10 kind of agreement was made where some off-site trash hauling
11 would be paid in addition to the normal janitorial fee?
12          MR. SAWYER: Object to the form of the
13 question.
14          THE WITNESS: If you refer back to the
15 agreement that we had on the addendum or the amendment on
16 March -- excuse me -- on August the 1st, it states that we
17 will work together to identify those locations where trash
18 hauling needs -- where trash hauling is necessary and is
19 needed.
20 BY MS. TULEY:
21      Q.   And do you know if any kind of spread sheet or list
22 was made of those locations?
23      A.   Yes.
24          MS. TULEY: All right. I'm going to show you
25 this, and I make no representations.

16 (Pages 58 to 61)

01419bd0-db10-477a-acb7-532ee8c9f16e

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 62

1    (PLAINTIFF'S EXHIBIT NUMBER 51 WAS MARKED FOR
2    IDENTIFICATION)
3  BY MS. TULEY:
4    Q.  I'm going to show you what I'm marking as
5  Exhibit 51.  I'm going to ask you if that is a listing or a
6  spread sheet of locations where trash hauling off-site would
7  be paid?
8    A.  This is a listing.  I don't know the context of
9  this listing.  It appears to have cost center numbers that
10 are -- appear to be our cost center numbers, square footage
11 numbers, that just simply say, "square footage."
12     It indicates the type of ATM that would -- would
13 appear at this office.  And then it has a column, "Dumpster,"
14 with the indications of, yes, or, no, underneath it.  But I
15 don't know if this was our information or whether this --
16 based on the fact that there are no titles or anything, I
17 can't tell whether this was information that we supplied or
18 whether it was supplied by EMCOR.
19   Q.  And these are a little bit out of order.  I should
20 have showed you this while we were discussing it.  I'm going
21 to show you what's previously been marked as Exhibit 5.
22   A.  Okay.  Okay.  I'm familiar with this.
23   Q.  Okay.  Well -- and really we've already discussed
24 the proof bag issue.
25   A.  Uh-huh.

Page 63

1    Q.  But will you, for the record, identify what that
2  is, what Exhibit 5 is?
3    A.  This is a letter that our internal counsel, Tim
4  Shelburne, wrote to EMCOR Facilities Services, specifically to
5  Greg Swanberg, outlining our position on this loss and giving
6  him the -- at that time, as of March 28, what the known
7  outstanding loss from uncollected items were.  And BB&T
8  requesting that EMCOR acknowledge its liability under the
9  contract for these damages and the result of this loss.
10   Q.  And it looks like you were copied on that letter?
11   A.  I was.
12   Q.  Does that look like an accurate -- true and
13 accurate copy of the letter you saw?
14   A.  It -- yes, it is.
15     (PLAINTIFF'S EXHIBIT NUMBER 52 WAS MARKED FOR
16 IDENTIFICATION)
17 BY MS. TULEY:
18   Q.  I'm going to show you what I've marked as
19 Exhibit 52.
20   A.  I'm familiar with this.
21   Q.  Okay.  Well, for the record, will you identify what
22 that is?
23   A.  This is a letter from -- again, from our internal
24 counsel, Tim Shelburne, to Mr. Matthew Hartz.  He worked for
25 specialty risk services.  Outlining, again, the losses that we

Page 64

1  had incurred.  It enclosed spreadsheets, showing the items
2  lost by -- as a result of this theft of the proof bag and the
3  recoveries and the charge-offs that we were incurring.
4    Q.  We had talked earlier about work done to recover --
5  by the branch to recover the losses from the proof bag?
6    A.  Correct.
7    Q.  And there was a spread sheet attached there to
8  Exhibit 52.
9    A.  Excuse me.
10   Q.  Does that look like what you saw in relation to
11 that recovery effort?
12   A.  Yes.  This would be the work sheets that they would
13 use -- the operations people would use to recreate and
14 determine what was recovered and what was ultimately charged
15 off.
16   Q.  And what's the date -- is there a date on the
17 spread sheet, or is there just a date on the letter?
18   A.  There's a date on -- this spread sheet is dated
19 2/28.  This one is dated 3/1, and this one is dated 3/1.  It
20 looks like there's a 2/27 spread sheet, and that's -- there
21 appear to be different dates on -- on different spread sheets.
22   Q.  Do you know, as we sit here today, if that spread
23 sheet encompasses all of the recoveries that were made?
24   A.  I can't say.  I don't know.
25     MS. TULEY:  All right.  That's all of the

Page 65

1  questions I have right now.  I told you I was about done.
2     CROSS-EXAMINATION
3  BY MR. SAWYER:
4    Q.  All right.  Good morning, Mr. -- or good afternoon
5  now, Mr. Hondros.  My name is Ben Sawyer.  I represent EMCOR
6  Facilities Services, and I just have a few questions.
7    A.  Okay.
8    Q.  Since we were back on the topic of the proof bag,
9  let me make sure I've got this straight in my head, because I
10 only got a B plus in negotiable instruments.
11   A.  Okay.
12   Q.  Basically you had given credit to the -- your
13 customers that had deposited the amounts in the bank, but you
14 had no way to get the monies back from the payor bank?
15   A.  That's right.
16   Q.  Okay.  And ultimately with the execution of the
17 second amendment to the purchase and service master agreement,
18 EMCOR agreed to pay BB&T $112,639.44; correct?
19   A.  That is correct.
20   Q.  Ultimately did EMCOR deliver a check, paying BB&T
21 for that amount?
22   A.  I don't recall whether they -- it was a separate
23 check or if it was in with all of the other monies that we
24 were due at that time.
25   Q.  Okay.

17 (Pages 62 to 65)

01419bd0-db10-477a-acb7-532ee8c9f16e

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 66

1    A.    But it's my recollection that the monies were
2    received from EMCOR and applied to our loss to erase that loss
3    from our balance sheet.
4    Q.    Stated differently, with respect to paragraphs two
5    and three --
6    A.    Okay.
7    Q.    I'm sorry.  Go ahead and pull out the second
8    amendment to the purchase and service master agreement.
9    A.    Let's see.  Okay.  I've got it.  Number two and
10   number three?
11   Q.    Correct.
12   A.    Okay.
13   Q.    With -- with respect to these two paragraphs of
14   this agreement, did EMCOR personnel deliver a check, paying
15   BB&T for $178,000 and $112,000?
16   A.    We -- we received the funds.  I don't remember
17   what -- if they were a wire or a check or --
18   Q.    Do you recall Mr. Andy Ball flying here to deliver
19   the check?
20   A.    He may have.  I really don't recall how we were
21   paid.
22   Q.    But you do recall that BB&T was paid?
23   A.    BB&T was paid.
24   Q.    Okay.  If I could have you flip back to -- it was
25   probably marked as Exhibit 8.

Page 67

1    A.    8?
2    Q.    8.
3         MR. SAWYER:  Does he still have that?
4         THE WITNESS:  I don't have 8.
5         MS. TULEY:  I think it's one where I wrote,
6    "8," on the bottom of it.
7         THE WITNESS:  Oh, really?
8         MS. TULEY:  So it may be -- it's probably in
9    the stack you've got over there to your left.
10        THE WITNESS:  All right.  Oh, yeah.
11        MS. TULEY:  Yeah.
12        THE WITNESS:  Yeah, yeah.  8.  Okay.  Uh-huh.
13   BY MR. SAWYER:
14   Q.    If you'll turn to the -- the back page, which
15   basically has --
16   A.    Yeah.
17        MS. TULEY:  Oh, you can ignore that sticky
18   note, by the way.
19        THE WITNESS:  Okay.
20        (HANDED DOCUMENTS)
21        MS. TULEY:  Thanks.
22        THE WITNESS:  All right.
23   BY MS. TULEY:
24   Q.    Which has the tabulations of BB&T -- BB&T's
25   calculation of overpayments made and underpayments made.

Page 68

1    A.    Yeah.
2    Q.    Do you see -- are you with me so far?
3    A.    I'm with you.
4    Q.    Okay.  Based on this analysis, it appears that the
5    20 percent reduction was too much; correct?
6    A.    It was.
7    Q.    Okay.  Do you remember what the correct percentage
8    of net --
9    A.    It seems to me I recall it being around 17, 18
10   percent, somewhere in that neighborhood.
11   Q.    And, just so I'm clear, everything over 10,000 feet
12   was actually field measured; correct?
13   A.    That's my recollection.  Yes.
14   Q.    Okay.  Do you recall whether EMCOR personnel
15   performed those measurements or whether it was BB&T personnel?
16   A.    The instructions were that BB&T personnel,
17   accompanied by EMCOR personnel, were to make those
18   measurements together.
19   Q.    How much of BB&T's footprint did that comprise,
20   these 10,000 or greater?
21   A.    A smaller portion than the -- than the -- less than
22   5,000 and -- 5,000 to 10,000, but I don't recall what the
23   percentage was.
24   Q.    Thirty-three percent sound about right, or was it a
25   third?

Page 69

1    A.    It -- well, it was -- I believe that it was less
2    than a third.
3    Q.    And if you'll look at the -- I believe it's the
4    total overpayment/underpayment issue?
5    A.    Yes.
6    Q.    And the bottom number is $178,696?
7    A.    That's correct.
8    Q.    And does that tie to the payment that was made by
9    EMCOR pursuant to the second amendment to the master service
10   agreement?
11   A.    Yes, it does.
12   Q.    With respect to the $214,000 -- and I'm back at --
13   you're in the right spot.
14   A.    Okay.
15   Q.    With respect to the --
16   A.    Yeah.
17   Q.    -- $214,000, which were representative of the
18   May 31 -- I'm sorry -- May 16 through May 31, were those
19   amounts funded by BB&T to EMCOR?
20   A.    No.  I believe that was -- again, looking at this,
21   and my recollection was we withheld that and applied it to the
22   subtotal of overpayments, which prior to that was 392,771.11.
23   Q.    Okay.
24   A.    For a net difference of 178,696.35, which your
25   company owed BB&T.

18 (Pages 66 to 69)

01419bd0-db10-477a-acb7-532ee8c9f16e

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 70

1    Q.    Okay.  And, so I'm clear, the reason for this is
2  the contractor had received payment based on gross square
3  footage from the inception of the contract through, it looks
4  to be, March; is that consistent with your recollection?
5    A.    Through some -- through some period of time.  It
6  looks like it was through -- actually through the May time --
7  time period that -- that we were continuing to be billed based
8  on erroneous square footage numbers.
9    Q.    So that -- that's -- that's a little different
10  issue.  They were continuing to bill based on gross square
11  footage, correct, through May; is what you just testified to?
12    A.    My notes here -- and I prepared this spread sheet.
13  So my -- my footnotes here that I'm referring to show that the
14  service dates for March 16th through March 31st, April 1st
15  through April 15th, April 16th through April 30th and May 1st
16  through May 15th, the -- the amounts that we were paying
17  included a 20 percent reduction, while net cleanable square
18  footage was being determined.
19    Q.    So throughout -- I'm sorry.  So from the start of
20  the job through May they had been billed -- or they were
21  billing based on gross square footage; is that consistent with
22  your understanding?
23    A.    Let me -- let me look at this a little closer --
24    Q.    Sure.
25    A.    -- just to recall specifically what was happening

Page 71

1  here.
2         Okay.  Through -- it appears that through March the
3  15th we were being invoiced by EMCOR based on gross square
4  footage through March 15th.
5    Q.    All right.
6    A.    On March 5th -- excuse me.  The invoice dated
7  April 5th for the period 3/16 through three -- 3/31, we began
8  deducting 20 percent.  That's where we started the 20 percent
9  reduction.
10    Q.    And --
11    A.    For those -- for the time periods March 16th
12  through -- through March 31st, April 1st through April 15th,
13  April 16th through April 30th and May 1st through May 15th.
14  And -- and those were the amounts that we remitted or paid by
15  BB&T after our deduction of 20 percent.
16    Q.    So let me make sure I have it right.
17    A.    Okay.
18    Q.    From the start of the job through May BB&T was
19  receiving invoices from EMCOR and its sub-tier contractor,
20  PFMI, for janitorial services based on gross square footage,
21  and in March of 2006, specifically March 16th --
22    A.    Yes.
23    Q.    -- 2006, the decision was made to reduce it by 20
24  percent -- or reduce the invoices by 20 percent, because
25  square -- actual square footages were being determined?

Page 72

1    A.    That is correct.
2    Q.    Okay.  And the next question I have is, but from
3  September 2005, all of the way through March 15th, 2006, PFMI
4  was being paid based on -- was receiving payment based on the
5  gross square footage; correct?
6         MS. TULEY:  Objection to the form, foundation.
7         THE WITNESS:  I don't know how they were being
8  paid.  I -- we were -- we were -- these are the amounts we
9  were being billed from EMCOR.  We were paying EMCOR the
10  amounts that I show here.  I -- I do not know what they
11  paid PFMI.
12  BY MR. SAWYER:
13    Q.    Fair enough, but BB&T was paying these amounts to
14  EMCOR?
15    A.    Yes, they were.
16    Q.    And you have an understanding that EMCOR would have
17  had to pay or pass on back to whoever was performing the work;
18  correct?
19    A.    Certainly.
20    Q.    Okay.  Do you have -- based on the contract with
21  EMCOR, do you have an understanding as to how much, if any,
22  EMCOR marked up the janitorial component of the work?
23    A.    It was my understanding it was supposed to be a 100
24  percent pass through.  There wasn't supposed to be any type of
25  markup.

Page 73

1    Q.    I believe you testified that it wasn't -- I don't
2  know that you used this exact word, but there was a reason why
3  every smaller BB&T facility was not measured?
4    A.    (WITNESS NODS HEAD UP AND DOWN)
5    Q.    Could you explain that?  Is it because it was not
6  practicable?
7    A.    There wasn't -- it wasn't practical.  It -- or
8  practicable.  It was because we didn't have enough manpower
9  and time and resources to -- to effectively measure every
10  single location.
11    Q.    Did you have any understanding whatsoever whether
12  PFMI or its subs had already been tasked with that job, of
13  measuring these facilities?
14    A.    I believe Edna had indicated to me that -- that
15  efforts had been made by PFMI and EMCOR, and that was the
16  basis for those spreadsheets that she originally showed to me,
17  but it seemed like there was so much confusion with the
18  numbers on those spreadsheets that I didn't have a confidence
19  level in them to accept that information.  So, therefore, I
20  made the decision to start fresh, start new and to start with
21  a very methodical process to determine that number that we
22  could all agree on.
23    Q.    And when you say you didn't have a confidence
24  level, did it appear that the analyses that were performed by
25  PFMI and/or EMCOR that it was incorrect?

19 (Pages 70 to 73)

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 74

1    A.    Yes.  It appeared to be incorrect to me.
2    Q.    Why do you have that understanding, that it was
3  incorrect?
4    A.    Well, some of the -- some of the -- one column was
5  labeled, "Gross."  So it -- I took that to mean that these
6  were the original numbers, the gross numbers, total square
7  footage of the -- of the footprint of the building.
8          Then there was a column called -- I believe it was
9  called, "First adjusted," or, "Adjusted."  And in some cases
10  they were the same.  And so it would not seem reasonable that
11  if it was adjusted, it should be less than gross, because
12  every single location is not -- the net cleanable is always
13  going to be less than the gross.  It can never be equal to or
14  greater than.  And in some cases we even saw numbers greater
15  than the gross.  So it didn't -- it didn't -- there was no
16  credibility in my opinion.
17          (PLAINTIFF'S EXHIBIT NUMBER 53 WAS MARKED FOR
18    IDENTIFICATION.)
19          MR. SAWYER:  Counsel, this is May 8, 2006.
20  BY MR. SAWYER:
21    Q.    Mr. Hondros, I'd like you to, please, take a look
22  at what I've marked as Exhibit 53 to this deposition and take
23  a minute.  The part I'm most interested about is on the second
24  page.
25    A.    Okay.  I have read this.

Page 75

1    Q.    I appreciate it.
2          Now, you'll remember counsel for PFMI asking you a
3  few questions about the -- the termination of PFMI?
4    A.    Right.
5    Q.    Do you remember that?
6    A.    Right.
7    Q.    Does this document refresh your recollection as to
8  what happened after EMCOR terminated PFMI on this job?
9    A.    Well, what I remember after reading this is that --
10  that ABM was going to come in and service North Carolina,
11  South Carolina, Virginia and Florida at this time.
12          A&L, I remember, was going to do the
13  Washington, D.C. -- Metropolitan Washington, D.C. and also was
14  going to pick up Baltimore Metro, our Battlefield region,
15  Fairfax and D.C. Metro regions.
16          And that PFMI was going to continue to provide
17  service in the Kentucky, West Virginia, Tennessee and Georgia
18  markets.  So it -- it appears that PFMI was going to continue
19  to provide some service as of the date that this was written.
20  And it appears that June 1st through June 15th, that was --
21  after June 15th, they were going to be served by these three
22  main contractors.
23    Q.    All right.  Does the document indicate how PFMI is
24  to be supervised, or is there some reference to that?
25    A.    There is a reference that they will be -- that PFMI

Page 76

1  will, with very close scrutiny, service Kentucky, West
2  Virginia, Tennessee and Georgia.
3    Q.    Do you know why the scrutiny was going to be
4  involved?
5    A.    The scrutiny on EMCOR's part was based on our
6  previous dissatisfaction with the level of service that PFMI
7  had provided to the entire network prior to -- to this --
8  these changes.
9    Q.    Do you remember a point in time after that -- after
10  these performance of services by PFMI -- after their
11  termination from some states, which we're just talking about
12  right here?
13    A.    Right.
14    Q.    Where PFMI walked off the job?
15    A.    I do remember PFMI walking off the job -- some of
16  their subcontractors walking off the job in the May time
17  period.
18    Q.    Do you remember a gentleman by the name of Don
19  Pottieger?
20    A.    I never -- I've never met Mr. Pottieger.  He has --
21  I've never -- I -- do -- what was your question again?
22    Q.    Do you know a gentleman by the name of Don
23  Pottieger?
24    A.    I don't know him.
25    Q.    Have you --

Page 77

1    A.    I know --
2    Q.    -- heard his name before?
3    A.    I've heard his name before.
4    Q.    Does a facility FMI ring any bells?
5    A.    They were a subcontractor of PFMI.
6    Q.    Do you remember any issues or problems that were
7  created by having to switch horses midstream specifically with
8  respect to FMI?
9          MS. TULEY:  Object to the form.
10          THE WITNESS:  FMI was one of the companies, if
11  I remember correctly, and I'm pretty certain about this,
12  that walked off the job, and we had to backfill -- well, I
13  say, "we."
14          EMCOR had to backfill these locations that
15  were not being served by FMI after they walked off the
16  job.  My recollection, there was about 500 of these
17  locations.  So it put us in somewhat of a bind.
18  BY MR. SAWYER:
19    Q.    So -- well, not essentially.  You literally had 500
20  locations that didn't have any service?
21    A.    That is correct.
22    Q.    What kind of efforts do you recall EMCOR making to
23  remedy that problem?
24    A.    EMCOR called on -- at that time they called on --
25  well, they called on ABM, to my recollection, to begin finding

20 (Pages 74 to 77)

01419bd0-db10-477a-acb7-532ee8c9f16e

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

---

Page 78

1  subcontractors in these areas where we had the vacancy. They
2  utilized their own regional operations managers, and they
3  utilized their -- their technicians to provide cleaning
4  services in these areas where we had -- where we didn't have a
5  cleaner.
6    Q.   So you had technicians riding around in trucks with
7  mops and things like that?
8    A.   It was my understanding that that's what they were
9  doing.
10   Q.   Are you aware of any premium portion that was paid
11 by EMCOR to ABM, but not billed to BB&T during this timeframe?
12   A.   No. I'm not aware of that.
13       MR. SAWYER: Can we go off the record real
14 quick.
15       THE VIDEOGRAPHER: Going off the record. The
16 time is 12:08.
17       (RECESS TAKEN AT 12:08 P.M. TO 12:13 P.M.)
18       THE VIDEOGRAPHER: Back on the record. The
19 time is 12:13.
20 BY MR. SAWYER:
21   Q.   Mr. Hondros, you had indicated previously that
22 when -- the period of time when PFMI was performing the work
23 there was a 70 percent level of dissatisfaction; do you recall
24 that?
25   A.   Yes.

---

Page 79

1    Q.   All right. My question to you is real simple. If
2  the janitorial component had been successfully performed --
3  well, strike that.
4        Let me ask you: What percent of satisfaction did
5  you consider to be acceptable with respect to the janitorial
6  services? What were you looking for?
7    A.   I think Edna and I talked about this from time to
8  time, and we thought somewhere in the 75 to 80 percent
9  acceptable level would have been reasonable to -- for these
10 types of services.
11   Q.   Had the janitorial scope been properly performed,
12 would you have recommended that EMCOR be terminated?
13   A.   If -- if what you're asking me is the -- if the
14 services being provided by their subcontractors had been in
15 the 80 percent approval level --
16   Q.   (NODS HEAD UP AND DOWN)
17   A.   -- would we have terminated them? It's not likely.
18       MR. SAWYER: Fair enough. That's all I have.
19       MS. TULEY: Let me follow up with one thing --
20 or a couple things.
21       REDIRECT EXAMINATION
22 BY MS. TULEY:
23   Q.   How many of these surveys were done? Like how many
24 different times were surveys done?
25   A.   There was a survey done in April, and I believe

---

Page 80

1  there was another survey conducted in the November timeframe.
2    Q.   What was the satisfaction rating on the November
3  survey?
4    A.   The responses were generally the same, about a 70
5  percent dissatisfaction level.
6    Q.   And, just for the record, was it your understanding
7  that by November 2006 PFMI was no longer working on the BB&T
8  project?
9    A.   2000 -- November 2006 they were not working on
10 the -- on the account.
11       MS. TULEY: I have no further questions.
12       MR. SAWYER: Let's go eat.
13       THE VIDEOGRAPHER: This concludes the
14 August 29th, 2007 deposition of Randy Hondros. The number
15 of tapes used was two. The time is 12:15.
16       (SIGNATURE WAIVED)
17       (DEPOSITION CONCLUDED AT 12:15 P.M.)
18
19
20
21
22
23
24
25

---

Page 81

1  STATE OF NORTH CAROLINA
2  COUNTY OF PERSON
3       REPORTER'S CERTIFICATE
4    I, Lisa A. DeGroat, RPR, a Notary Public in and for
5  the State of North Carolina, do hereby certify that there came
6  before me on Wednesday, the 29th day of August, 2007, the
7  person hereinbefore named, who had been previously sworn to
8  testify to the truth and nothing but the truth of his
9  knowledge concerning the matters in controversy in this cause;
10 that the witness was thereupon examined under oath, the
11 examination reduced to typewriting under my direction; and the
12 transcript is a true record of the testimony given by the
13 witness.
14    I further certify that I am neither attorney or
15 counsel for, nor related to or employed by, any attorney or
16 counsel employed by the parties hereto or financially
17 interested in the action.
18    IN WITNESS WHEREOF, this the 4th day of September,
19 2007.
20
21
22
23 _____
24 LISA A. DeGROAT
   Registered Professional Reporter
25 Notary Public 19952760001

---

21 (Pages 78 to 81)

01419bd0-db10-477a-acb7-532ee8c9f16e



EMCOR Facilities Services, Inc.
320 23rd Street, South, Suite 100
Arlington, VA 22202

April 28,2006

Mr. Greg Littlefield
President
Professional Facilities Management, Inc
4164 Troy Highway
Montgomery, Alabama 36116

Dear Mr. Littlefield:

This letter is to inform you that EMCOR Facilities Services, Inc. has elected to terminate
your services on the BB&T Account beginning on June 1 with staggered end dates
through June 15 2006.  A final schedule will be sent under separate cover.  This
termination is intended to cancel all services at all locations:

A new contract agreement will be presented to PFMI for services to be provided in
Georgia, Kentucky, West Virginia and Tennessee effective June 1, 2006.

EMCOR Facilities Services will work with you to coordinate key return and equipment
pickup on a pre-determined schedule for all locations not being retained by your
company.  In the meantime if you have any questions, please contact me

Sincerely,

Sean J. Brookins

Sean J. Brookins, RPA
Key Account Manager
EMCOR Facilities Services, Inc.

Cc:     Mark Smith
        Greg Swanberg
        Johnna Spera

EXHIBIT
**13**

www.emcorfacilities.com

| **From:** | Jim Wohlers <WohlersJ@pfmi.net> |
|---|---|
| **Sent:** | Thursday, July 13, 2006 11:35 AM |
| **To:** | <Sean_Brookins@EMCOR.net>; <Greg_Swanberg@emcorgroup.com>; <MSmith@cesengineers.com>; <ABall@EMCOR.net>; Hondros, Randy <Randy.Hondros@BBandT.com> |
| **Cc:** | Greg Littlefield <littlefieldg@pfmi.net> |
| **Subject:** | Payment |

In a conference call between myself, Mark Smith and Sean Brookins we were told that June 3 started a new project with BB&T and that PFMI would have a "Clean Slate" that all previous issues, concerns, complaints and most importantly square footage issues would no longer apply – we were starting at the same place the other companies on the project were starting and that PFMI payments would no longer be deducted for square footage issues.  Last Monday July 3, I spoke with Sean Brookins, he stated that the June invoices had been approved and PFMI should be funded by the end of the week, July 7. When this funding did not arrive PFMI inquired numerous times as to the status and was informed on July 12 by Emcor representative Andy Ball that since they received PFMI's letter of termination that payment was being held pending reconcilement of previous issues.  This goes completely against what we, PFMI, had been told and agreed to – that is when EMCOR cancelled the previous contract that all previous issues would not roll over into the new project and invoices would no longer be adjusted due to square footage issues.  All June invoices were billed to EMCOR using the new square footage numbers EMCOR provided PFMI, even though we feel they are not accurate and are in the process of requesting a re-measure of certain locations.

If PFMI does not receive confirmation of full payment of June and July invoices by close of business today we will cease all service to the BB&T locations on Friday, July 14.

Jim Wohlers
Vice President
PFMI
4164 Troy Highway
Montgomery, AL 36116
334-551-1175 - direct line
334-799-5429 - cell
334-281-7134 - fax

EXHIBIT
14



"Jim Wohlers"
<WohlersJ@pfmi.net>

07/14/2006 11:31 AM

To  <Sean_Brookins@EMCOR.net>,
    <Greg_Swanberg@emcorgroup.com>,
    <MSmith@cesengineers.com>, <ABall@EMCOR.net>,
cc  "Greg Littlefield" <littlefieldg@pfmi.net>, "Ken Law"
    <lawk@pfmi.net>

bcc

Subject  Cease Service

History:       This message has been forwarded.

Due to non-payment of services and failure to respond to request for confirmation of payment by EMCOR
/ BB&T, PFMI and all its subs will cease all services on the BB&T account as of 11:59pm tonight, Friday
July 14.  We regret the decision by EMCOR and BB&T to go back on its word to pay PFMI for services
rendered from June forward without adjusting for square footage.

PFMI will instruct all subs to remove equipment and supplies tonight and begin returning keys on
Monday, July 17.  Again, we regret that the business decisions by EMCOR and BB&T have forced PFMI
to take this action, but we cannot afford to continue servicing this account without payment.


Jim Wohlers
Vice President
PFMI
4164 Troy Highway
Montgomery, AL 36116
334-551-1175 - direct line
334-799-5429 - cell
334-281-7134 - fax



EXHIBIT
15

DB100050209

## E. LARRY CAPILOUTO, CPA

| | |
|---|---|
| **POSITION:** | CPA with the accounting firm of Bern, Butler, Capilouto & Massey, CPA's, P.C., Montgomery, Alabama |
| **EDUCATION:** | Marion Military Institute, 1966, Distinguished Military Student University of Alabama, 1970, Bachelor of Science Degree in Accounting |

**CERTIFICATIONS &
AFFILIATIONS:**

Certified Public Accountant, Alabama
American Institute of Certified Public Accountants
Alabama Society of Certified Public Accountants
Georgia Society of Certified Public Accountants
American Institute of Certified Public Accountants PCPS
MAP Committee
AICPA Tax Planning and Advising for Closely Held Businesses
Certificate of Educational Achievement
AICPA Personal Financial Planning Process Certificate of
Educational Achievement

**CIVIC AND
COMMUNITY
ORGANIZATIONS:**

Current Board Member of Montgomery Chamber of Commerce
Current Board Member of Janice Capilouto Center for the Deaf
Easter Seal
Current Treasurer of the Board of Directors of Jackson Hospital
Foundation
Current Member, Committee of 100, Montgomery Area Chamber
of Commerce
Past Chairman, Easter Seal Rehab Center
Past Treasurer, Alabama Easter Seal Society, Inc.
Past President, Vice-President and Treasurer, Temple Beth-Or
Board of Trustees
Past Treasurer, Temple Etz Ahayem
Past Board Member, Central YMCA
Past Branch Chairman, YMCA Capital Campaign
Past Board Member, YMCA Camp Chandler
Graduate, Leadership Montgomery Class of 1993
Past Board Member, American Cancer Society
Participant, American Cancer Society Biggest Rat and Relay for
Life Campaigns
Past Board of Trustees Member, Jewish Federation of Montgomery



EXHIBIT
16

# E. LARRY CAPILOUTO, CPA

LITIGATION SUPPORT
  SERVICES:                       Domestic
                                          Divorce
                                  Business Valuations
                                          Sale of Business
                                          Purchase of Business
                                          Estate Tax Returns
                                          Disputed Valuations
                                  Business Valuations/Loss of Income
                                          Embezzlement
                                          Minority Shareholders
                                          Insurance Agencies
                                          Insurance Agents
                                          Beneficiary Estate/Trusts
                                  Certificate of Need for Nursing Homes

Professional Facilities Management, Inc.

vs.

EMCOR Facilities Services, Inc.

Report of Financial Damages

Professional Facilities Management, Inc.
Report of Financial Damages

INDEX

| | Page |
|---|---|
| Summary of damages | 3 |
| Loss on job September 2005 through July 2006 | 4 |
| Foregone profit on job September 2005 through July 2006 | 5 |
| Projected future profit | 6 |
| Notes and assumptions | 7 |
| Schedule I, Reconciliation of internal net loss to loss on job | 8 |

Professional Facilities Management, Inc.
Report of Financial Damages

Re:  Summary of damages

| | | |
|---|---|---|
| Loss on Job from September 2005 through July 2006 | $ | 557,128 |
| Foregone profit on job from September 2005 through July 2006 | $ | 419,332 |
| Projected future profit under revised contract terms of of June 1, 2006 through June 30, 2008 | $ | 420,614 |
| Attorney fees related to subcontractor claims | $ | 6,265 |
| Total damages | $ | 1,403,339 |

Professional Facilities Management, Inc.
Report of Financial Damages

Re: Loss on Job from September 2005 through July 2006

| | Amount |
|---|---|
| Revenue | $ 6,454,650 |
| Outside services | (5,571,779) |
| Direct labor & material cost | (61,075) |
| Gross profit | 821,796 |
| Direct personnel expenses | (135,583) |
| Other direct expenses | (236,306) |
| Income before adjustments | 449,907 |
| Revenue billed but not collected | (740,340) |
| Direct trash removal expenses not recorded | (236,120) * |
| Additional rent expense | (30,575) |
| Total loss on job from September 2005 through July 2006 | $ (557,128) |

\* Additional trash removal expenses of approximately $88,000 have not been included.
We will revise the loss to include these amounts when documentation is available.

Professional Facilities Management, Inc.
Report of Financial Damages

Re: Foregone profit on job from September 2005 through July 2006

|  | Amount |
|---|---|
| Revenue | $ 6,454,650 |
| Outside services | (5,571,779) |
| Direct labor & material cost | (61,075) |
| Gross profit | 821,796 |
| Direct personnel expenses | (135,583) |
| Other direct expenses | (236,306) |
| Additional rent expense | (30,575) |
| Foregone profit on job | $    419,332 |

Professional Facilities Management, Inc.
Report of Financial Damages

Re:  Projected future profit under revised contract terms of June 1, 2006 through June 30, 2008

| | |
|---|---:|
| Square footage per revised contract | 2,281,688 |
| Average janitorial revenue per square foot | 1.229 |
| Projected future annual revenue | $ 2,804,195 |
| Projected future monthly revenue | 233,683 |
| Remaining contract terms | 24 months |
| Projected remaining future revenue | $ 5,608,389 |
| Less: July 2006 revenue | (83,062) |
| Projected future revenue | 5,525,327 |
| Projected outside services | (4,769,569) |
| Projected direct labor & material cost | (52,282) |
| Projected gross profit | 703,476 |
| Projected direct personnel expenses | (116,062) |
| Projected other direct expenses | (166,800) |
| Projected net income | $    420,614 |

Professional Facilities Management, Inc.
Report of Financial Damages

NOTES AND ASSUMPTIONS:

1. Loss on job from September 2005 through July 2006 - The loss was computed using internally prepared financial statements. Included are all directly related expenses, which consist of outside services, direct materials and labor, direct personnel expenses and other direct expenses. Testing was performed to satisfy with reasonable assurance that expenses were properly charged. No allocation of indirect overhead was deducted. Revenue per the internal financial statements included amounts billed but not collected. Revenue was reduced by this amount to calculate the loss on job. The additional trash removal expenses shown were not expensed in the internal financial statements. Additional rent expense represents the remaining rent due under a three-year lease for office space specifically for this job.

2. Foregone profit on job from September 2005 through July 2006 - This amount represents the profit that would have been made if the accounts receivable were collected and the unexpected trash removal expenses were not incurred.

3. Projected future profit - This amount was based on actual square footage per the revised contract terms of June 1, 2006 through June 30, 2008. The actual square footage per month for 24 months times the average janitorial revenue per square foot used in the original Bid package was calculated. Expenses were calculated based on historical percentages. Office furniture and fixtures, special programming fees, and additional office rent were non-recurring expenses and were not included in the historical percentages. The projected net income appears reasonable based on the calculations and historical trend analysis.

4. Schedule I - Reconciliation of internal net loss to loss on job - This reconciliation includes the net loss per the internally prepared financial statements and the indirect overhead not deducted in the loss on job calculation.

Professional Facilities Management, Inc.
Report of Financial Damages

Schedule I:  Reconciliation of Internal Net Loss to Loss on Job

| | |
|---|---:|
| Internal net loss | $(199,721) |
| General overhead | 649,628 |
| Income before adjustments | 449,907 |
| Revenue billed but not collected | (740,340) |
| Direct trash removal expenses not recorded | (236,120) |
| Additonal rent expense | (30,575) |
| Total loss on job from September 2005 through July 2006 | $(557,128) |

| | |
|---|---|
| **From:** | Jim Wohlers <WohlersJ@pfmi.net> |
| **Sent:** | Thursday, June 15, 2006 6:08 PM |
| **To:** | <sean_brookins@emcor.net> |
| **Cc:** | <Greg_Swanberg@emcorgroup.com>; <MSmith@emcor.net>; <ABall@emcor.net>; Greg Littlefield <littlefieldg@pfmi.net> |
| **Subject:** | RE: 2nd May Payment |
| **Attach:** | Adjustments.pdf |

Sean:

Our understanding was that once the surveys were complete and prior to any adjustments being made PFMI would have the right to challenge and re-measure any surveys as stated in the attached letter dated February 23, 2006. Furthermore, PFMI never agreed to the 20% reduction per bill that has occurred since March 16 of this year. The decision by EMCOR and BB&T to reduce and withhold payment has put PFMI in a dire financial position.

Jim Wohlers
Vice President
PFMI

-----Original Message-----
From: sean_brookins@emcor.net [mailto:sean_brookins@emcor.net]
Sent: Thursday, June 15, 2006 4:49 PM
To: Jim Wohlers
Cc: Greg_Swanberg@emcorgroup.com; MSmith@emcor.net; ABall@emcor.net
Subject: Re: 2nd May Payment


Jim:  Good afternoon.  All previous conversations have indicated that the
last payment would be held as a result of credits owed BB&T for the square
footage adjustments.  This was confirmed with Mark Smith and Greg Swanberg.
We are working with BB&T on the valuation of those final credits and hope
to have that information in a few days.

Please advise on new contract and first billing on those sites you have retained

Thank you

Sean

Sean J. Brookins, RPA
Key Account Manager
For BB&T Bank
EMCOR Facilities Services, Inc.



EXHIBIT
17

(336) 703-5746 Phone
(336) 703-5602 Fax

|  |  |  |
|---|---|---|
| To | "Jim Wohlers"<br><WohlersJ@pfmi.net> | <sean_brookins@emcor.net> |
| cc | 06/14/2006 05:14 PM | <MSmith@cesengineers.com>, "Greg Swanberg" <greg_swanberg@emcorgroup.com>, "Greg Littlefield" <littlefieldg@pfmi.net> |
| Subject | 2nd May Payment | |

Sean:

We had called today to get an update on the status of the 2nd May invoice
and Lynn informed us that "He cannot give you an answer until he gets
direction from the bank." Monday we had a conference call and nothing
was

**Jim Wohlers**

| | |
|---|---|
| **From:** | Alan Cristal [alan_cristal@emcorgroup.com] |
| **Sent:** | Thursday, March 24, 2005 10:31 AM |
| **To:** | Debi Crosby; Doug Rowles; Cathy Hice; Mark Smith; Steven T King; Eddie Dunlap; Nicole Stoner; John Wagner |
| **Cc:** | littlefieldg@pfmi.net; wohlersj@pfmi.net; KHutcheson@uslawns.com |
| **Subject:** | Update to BB&T's Maintenance Manager RFP 3/23/05 |

| | |
|---|---|
| **Importance:** | High |

| | |
|---|---|
| **Follow Up Flag:** | Follow up |
| **Flag Status:** | Completed |

| | |
|---|---|
| **Attachments:** | Exhibit C – consolidated C.1 thru C.6 - Cost Proposal - REVISED 032305.xls |



Exhibit C -
consolidated C.1 t...
                    FYI

```
Alan B. Cristal
Director, Business Development
EMCOR Facilities Services, Inc.
770.444.3355 (Office)
800.768.2472 (Office)
770.805.2501 (Fax)
404.395.8678 (Cell)
Alan_Cristal@emcorgroup.com
www.emcorgroup.com
----- Forwarded by Alan Cristal/EFS/EMCORGROUP on 03/24/2005 11:19 AM -----
```

```
                    "Llewellyn,
                    Matthew"              To:      'Alan Cristal'
<alan_cristal@emcorgroup.com>
                    <MLlewellyn@BBand     cc:
                    T.com>                Subject:  Update to BB&T's Maintenance
Manager RFP 3/23/05

                    03/24/2005 11:19
                    AM
```

```
Mr. Cristal:


Please read below for changes to the attached Exhibit.  Please contact me if you have any
questions in regards to these revisions.

REVISED EXHIBITS: C.5 (Janitorial Pricing by Site) and EXHIBIT C.2 (Sample Site Survey
Pricing)

The attached, "Exhibit C - consolidated C.1 thru C.6 - Cost Proposal", contains revisions
to the exhibits noted above.  Please replace the original "Exhibit C - consolidated C.1
thru C.6 - Cost Proposal" with this workbook.  Exhibits C.2 and C.5, which are tabs within
the master exhibit, have had square footage revised.  The original adjusted square footage
```

1



EXHIBIT
**18**

PFMI 000713

has been modified to reflect usable/cleanable square feet. Your pricing quotes should be based upon this cleanable square footage which reflects reduction in space to account for equipment and mechanical rooms, electrical and storage closets, and vertical penetration. These space reductions reduce the total square footage to an estimated 5.4 million square feet. Pricing may be adjusted ongoing if actual usable/cleanable square feet changes.

NOTE for EXHIBITS: C.5 (Janitorial Pricing by Site) and EXHIBIT A (Location Identification Information)

Locations subject to minor changes upon final review prior to contract signing and ongoing as a result of mergers, consolidations, closings, and/or openings.

<<Exhibit C - consolidated C.1 thru C.6 - Cost Proposal - REVISED 032305.xls>> Sincerely, Matt

Matt Llewellyn
BB&T - Support Services
2825 Reynolda Road
Ph: 336.703.5683
Fx: 336.703.5649
mllewellyn@bbandt.com (See attached file: Exhibit C - consolidated C.1 thru C.6 - Cost Proposal - REVISED 032305.xls)

This message is for the named person's use only. It may contain confidential, proprietary or legally privileged information. No confidentiality or privilege is waived or lost by any mistransmission. If you receive this message in error, please immediately delete it and all copies of it from your system, destroy any hard copies of it and notify the sender. You must not, directly or indirectly, use, disclose, distribute, print, or copy any part of this message if you are not the intended recipient.

PFMI 000714

## Jim Wohlers

| | |
|---|---|
| ~om: | steven_t_king@emcorgroup.com |
| nt: | Monday, July 11, 2005 12:02 PM |
| : | wohlersj@pfmi.net |
| subject: | BB&T Pricing |

Jim,

Just to follow up on our conversation, please confirm our mutual understanding of the following:

1) Per the final exhibit pricing attached to the BB&T contract with EFS, our quoted cost per square foot has not changed.

2) The listed square footage on this exhibit has changed from total to estimated cleanable, which results in a reduction of the estimated annual cost.

3) Number 2, above is a non issue since PFMI will be performing actual measurements of cleanable space during the first 90 days.

Ill forward the final pricing exhibit to you under another email.

Thank you for your quick response.


Steven T King, PE
EMCOR Facilities Services
Office: 317.885.7742
Fax: 509.351.9395
bile: 317.407.5767


This message is for the named person's use only.  It may contain confidential, proprietary or legally privileged information.  No confidentiality or privilege is waived or lost by any mistransmission.  If you receive this message in error, please immediately delete it and all copies of it from your system, destroy any hard copies of it and notify the sender.  You must not, directly or indirectly, use, disclose, distribute, print, or copy any part of this message if you are not the intended recipient.



EXHIBIT

19

Sean,

Here is my "email trail" regarding the PFMI pricing. The spreadsheet itself is at the bottom of the email.

Steven T King, PE
EMCOR Facilities Services
Office: 317.885.7742
Fax: 509.351.9395
Mobile: 317.407.5767

----- Forwarded by Steven T King/EFS/EMCORGROUP on 08/29/2005 01:30 PM -----

| | | |
|---|---|---|
| **Steven T King** | To: | Debi Crosby/EFS/EMCOF |
| 08/29/2005 11:30 AM | cc: | |
| | Subject: Re: Exhibit C - Janitorial Pricing by Site.xls | |

Debi,

The email below was the last conversation that I had with the PFMI folks regarding pricing - also from the 11th of July, referring to the file that I forwarded to you in the previous email. I havent been involved in any pricing discussions since then.

Steven T King, PE
EMCOR Facilities Services
Office: 317.885.7742
Fax: 509.351.9395
Mobile: 317.407.5767

----- Forwarded by Steven T King/EFS/EMCORGROUP on 08/29/2005 11:29 AM -----

| | | |
|---|---|---|
| **"Jim Wohlers"** <wohlersj@nextel.bla ckberry.net> | To: | steven_t_king@emcorgrc |
| 07/11/2005 12:12 PM | cc: | |
| | Subject: Re: Exhibit C - Janitorial Pricing by Site.xls | |

```
Steven:

I reviewed and discussed with Greg and everything looks good. Part of the transition pl
includes measuring the cleanable and adjusting to reflect actual square footage.

Jim
-----Original Message-----
From: steven_t_king@emcorgroup.com
Date: Mon, 11 Jul 2005 12:02:45
To:wohlersj@pfmi.net
Subject: Exhibit C - Janitorial Pricing by Site.xls
```



EXHIBIT
20

fyi

Steven T King, PE
EMCOR Facilities Services
Office: 317.885.7742
Fax: 509.351.9395
Mobile: 317.407.5767

----- Forwarded by Steven T King/EFS/EMCORGROUP on 07/11/2005 12:02 PM
-----

```
|--------+--------------------------->
|        |                            |
|        |         "Llewellyn,        |
|        |         Matthew"           |
|        |         <MLlewellyn@BBand| 
|        |         T.com>             |
|        |                            |
|        |                            |
|        |         07/11/2005 11:05   |
|        |         AM                 |
|        |                            |
|--------+--------------------------->
  >-------------------------------------------------------------------------------
------------------------------------------|
   |
 |
   |      To:      "'steven_t_king@emcorgroup.com'" <steven_t_king@emcorgroup.com>,
'Debi Crosby' <Debi_Crosby@emcor.net>      |
   |      cc:      "Eller, Ronny" <REller@BBandT.com>, "Willis, Debra"
<Debra.Willis@BBandT.com>                  |
   |      Subject:  Exhibit C - Janitorial Pricing by Site.xls
 |
   >-------------------------------------------------------------------------------
------------------------------------------|
```

Steven/Debbie,

Here is the soft copy of Exhibit C.  Please let me know if you need
anything else.

<<Exhibit C - Janitorial Pricing by Site.xls>>

Sincerely,
Matt

Matt Llewellyn
BB&T - Support Services
2825 Reynolda Road
Ph: 336.703.5683

```
Fx: 336.703.5678
mllewellyn@bbandt.com (See attached file: Exhibit C - Janitorial Pricing by
Site.xls)
```

```
This message is for the named person's use only.  It may contain
confidential, proprietary or legally privileged information.  No
confidentiality or privilege is waived or lost by any mistransmission.  If
you receive this message in error, please immediately delete it and all
copies of it from your system, destroy any hard copies of it and notify the
sender.  You must not, directly or indirectly, use, disclose, distribute,
print, or copy any part of this message if you are not the intended
recipient.
```

```
Jim Wohlers
Vice President
Professional Facilities Management, Inc
4164 Troy Highway
Montgomery, AL 36116
Cell: 334-799-5429
Office: 334-551-1175
```

---- Forwarded by Steven T King/EFS/EMCORGROUP on 08/29/2005 01:30 PM -----

**Steven T King**

08/29/2005 01:09 PM

To:
cc:
Subject: PFMI pricing

Debi Crosby/EFS/EMCOF

Debi,

The attached file is the last pricing document that I have with respect to PFMI - its dated from the 11th of July.



Exhibit C - Janitorial Pricing by Sit

Steven T King, PE
EMCOR Facilities Services
Office: 317.885.7742
Fax: 509.351.9395
Mobile: 317.407.5767