IN THE UNITED STATES DISTRICT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| PROFESSIONAL FACILITIES MANAGEMENT, INC., | § § § | |
| Plaintiff, | § § | |
| v. | § § | |
| EMCOR FACILITIES SERVICES, INC.; and A, B, and C, as fictitious parties, | § § § § | CIVIL ACTION NO: <u>2:06CV1136-MHT</u> |
| Defendants. | § § § | |

<u>**PLAINTIFF'S BRIEF IN OPPOSITION TO DEFENDANT'S MOTION FOR LEAVE TO AMEND COUNTERCLAIM AND ADD A COUNTERCLAIM DEFENDANT**</u>

COMES NOW, the Plaintiff Professional Facilities Management, Inc. ("PFMI") in opposition to Defendant/Counterclaim Plaintiff Emcor Facilities Services, Inc.'s ("Emcor") Motion for Leave to Amend it's counterclaim to add a claim of tortious interference with a business and contractual relation against PFMI and to add a counterclaim defendant, the president of PFMI, Mr. Greg Littlefield. In support of it's opposition, PFMI states as follows:

I.      <u>**Introduction and Summary**</u>

This action arises out of a failure by Emcor to pay PFMI for janitorial subcontractor work done on a project Emcor was doing with Branch Bank and Trust ("BB&T"). This case was filed on November 17, 2006 in Circuit Court in Montgomery County. Emcor removed the action on December 22,

2006. On January 23, 2007, this Court entered its uniform scheduling order (doc. 8) which set the deadline to amend pleadings and add parties as April 13, 2007.

Emcor attempts to amend its counterclaim and add a party five months after the Court's April deadline by arguing that it only learned of payments by PFMI to its former employee, Alan Cristal as of September 4, 2007.    This argument fails because Emcor's own documents produced through discovery and attached to its Motion for Leave to Amend, as Exhibit F have been in its possession since the day this case was filed.  Exhibit F to Emcor's Motion is an email from Alan Cristal to Greg Littlefield dated November 30, 2005 which thanks PFMI for his commission.  Emcor cannot argue that they only learned of the payment of a commission to Alan Cristal in his deposition when this document has been in their possession and was produced through discovery months before the September 4, 2007 deposition.

Emor also relies on another document for the proposition that PFMI had been negotiating to hire Alan Cristal for over a year prior to his leaving Emcor to work for PFMI.  The document which they rely on for this proposition is attached to their Motion as exhibit D and dated March 21, 2005.  Alan Cristal indicated in his deposition that 2005 was a "typo".  See Statement of Facts 5.  Greg Littlefield, in his second deposition, stated that this date was a typographical error and that the letter was actually a March 21, **2006** letter and that no negotiations had been ongoing for over a year regarding the hiring of Alan Cristal.

Emcor attempts to stretch the payment of a commission to Alan Cristal into the tort of tortious interference by claiming that the payment by PFMI to Alan

Cristal resulted in the hiring of PFMI and further stretches this argument to say that the hiring of PFMI in July of 2005 led to the eventual loss of their contract with BB&T in 2007. Emcor has presented no evidence that Alan Cristal was the decision maker in determining what company would be hired to perform the janitorial portion of the BB&T project. In fact, as director of business management, Alan Cristal was essentially a salesman for Emcor's services.

Allowing such an untimely amendment and addition of a party would unduly prejudice PFMI and Greg Littlefield. With a trial date less than 45 days away, and being past the discovery cut-off, Greg Littlefield would have no opportunity to provide himself any defense to this claim of tortious interference, nor would PFMI, as discovery was two weeks from completion when Emcor filed its motion to amend.

## II.    Statement of facts in opposition to Motion to Amend

1.    No discussion of payments by PFMI or Greg Littlefield to Alan Cristal took place prior to Emcor's hiring PFMI.

Deposition of Alan Cristal, page 87, line 25 to page 88, line 4.

Q.    Prior to the execution of
       the contract, did you ever discuss receiving
       a commission if you got PFMI on board with
       BB&T account?
A.    No.

2.    Emcor did not first learn of a payment to Alan Cristal at his deposition. In discovery, Emcor produced the document identified as Exhibit F in its Motion to Amend. The email is dated November 30, 2005 and bate stamped E041686 evidencing its production by Emcor.

3.    Alan Cristal did not hire PFMI.  The operations department within

Emcor actually chose PFMI not Cristal.

Alan Cristal, page 34 lines 7 through 15.

Q.    (By Mr. Sawyer)  Were you given
      the responsibility to look at subcontractors
      for the janitorial component?
A.    I don't know that I was given the
      responsibility.  I put forth my opinion.
Q.    Okay.  What was –
A.    Operations in EMCOR, as with most
      facility management companies, is the driver.
      It's really not sales.

Alan Cristal, page 39 lines 11 through 19.

A.    My job was not really to find out
      whether they were responsible or not.  I
      think mine was more strategic rather than
      tactical.
            As I told you earlier, operations is
      the driver at most facilities management
      companies.  How they are going to ultimately
      operate the contract is really their purview
      and not mine.

Alan Cristal, page 39 line 24 through page 40 line 6.

Q.    When you say your role was
      strategic, what do you mean?
A.    I was a salesman.  I had to sell
      BB&T on the idea that EMCOR could indeed take
      on this project, carry it through, provide
      all the services that BB&T required and do it
      in a timely fashion and an economical
      fashion.

Alan Cristal, page 41 line 8 through line 20.

A.    …And we
      explored choosing the national company.  We
      explored using - - continuing to use mom and
      pops.  We knew that wasn't efficient.  And

4

ultimately they  - - chose PFMI as the
company to go with in order to provide these
services.

Q.    When you say "we explored," who
was exploring with you?

A.    I guess the operations folks at - -
at EMCOR and at Aircond.  There was certainly
interviews with Greg and his group.  I guess
the main driver was Debi Crosby….

4.      Alan Cristal testified that he had permission to request a

commission payment from both PFMI and another subcontractor.

Deposition of Alan Cristal, page 85, line 15 to page 86, line 24.

Q.    Who, at EMCOR, knew that you were
Receiving money from Mr. Littlefield for—

A.    Ray Stribling.

Q.    I'm sorry.  Let me finish the
question.
Who, at EMCOR, knew that you were
receiving a commission from Mr. Littlefield
for getting him on the BB&T account?

A.    Ray Stribling.  I asked permission
first, before I asked Mr. Littlefield for it.

Q.    So you asked Mr. Littlefield for
the commission?

A.    I asked Ray Stribling if I could
ask Littlefield for a commission, yes.

Q.    Okay.  And what was
Mr. Stribling's response?

A.    He had no problem with it.

Q.    When would you have asked Greg for
a commission for—

A.    After the contracts were signed.

Q.    And what was Mr. Littlefield's
Response?

A.    He didn't have a problem with it.
I also was to receive one from U.S. Lawns,
but it never happened.

Q.    So U.S. Lawns was also supposed to
give—give you a commission?

A.    Yes.

Q.    Did Mr. Stribling also approve that?

A.    Yep.

5.    PFMI and Greg Littlefield did not engage in negotiations with Alan

Cristal for employment until well after Emcor hired PFMI and well after the project

was underway.

Deposition of Alan Cristal, page 94, line 5 to page 95, line 1.

Q.    Well, here's the – here's the
      question.  Is it possible that during the
      same time you're engaging in the request for
      proposal with trying to get the BB&T account
      that you're—
A.    This is after the fact.  This is
      after we have already secured BB&T.
Q.    That's –that's what I thought.
A.    Yeah.
Q.    I didn't think that, at the same
      time that you were negotiating the BB&T
      account, that you would be trying to get
      employed with PFMI.
A.    No.
Q.    An so it's a fair statement that
      the March 21, 2005 is probably a typographical error; right?
A.    When was BB&T signed?
Q.    June—Or I'm sorry.  July 13th, 2005.
A.    No.  Then it's definitely a typo, yeah.


6.    Alan Cristal began working for PFMI on June 15, 2006.

Deposition of Greg Littlefield, page 204, line 17-21

Q.    Okay.  And Mr. Cristal, I guess if we
      look back at this, actually started
      working for you on June 15th, 2006; is
      that right?
A.    That's correct.

III.    **Legal Argument**

   A.    **Applicable standard**

Pursuant to Fed. Civ. P. 15 (a):

A party may amend a party's pleadings once as a matter of course at any time before a responsive pleading is served or, if the pleading is one to which no responsive pleading is permitted and the action has not been placed upon the trial calendar, the party may still amend at any time within 20 days after it is served. Otherwise, the party may amend the party's pleading only by leave of court or by written consent by the adverse party; and leave shall be freely given when justice so requires.

**B.    Emcor has been aware of the payment to Alan Cristal throughout this litigation.**

Emcor cannot claim that it only discovered the payment to Alan Cristal at his September 4, 2007 deposition when the document identified as Exhibit F has been in its possession throughout this litigation.    Defendant's Exhibit F, the email from Alan Cristal to Greg Littlefield thanking him for his commission, dated November 30, 2005 was produced by Emcor and has been in its possession throughout this litigation as a business record.    Emcor filed its amended counterclaim, September 18, 2007, 10 days before the discovery cut-off, despite the fact that they had been in possession of Exhibit F throughout the litigation.

Allowing this amendment would unduly prejudice PFMI and Greg Littlefield.    PFMI has aggressively undertaken discovery of all known claims throughout this litigation.    However, since this amendment was made at end of discovery, PFMI had no opportunity to explore discovery as to the tortious interference with a business relation claim.    At no time prior to the end of discovery was Greg Littlefield on notice that he might be a party to this litigation. Therefore, at no time during discovery did PFMI undertake any discovery regarding Greg Littlefield's involvement or lack thereof personally.    As discovery

has been completed, Greg Littlefield and PFMI would have no opportunity to provide any defense against the tortious interference claim brought by Emcor. The existing counterclaims against PFMI were breach of contract, indemnity and negligence solely against PFMI.  Discovery as to those counts would not encompass the claims of tortious interference against PFMI and Greg Littlefield. Specifically, tortious interference is an intentional tort and factually the decision making as to who hired PFMI and when they were hired would be relevant to a defense to tortious interference and those facts were not relevant to the three existing counterclaims.

> ### C.    Emcor's claims of tortious interference would not survive a Motion for Summary Judgment and should not be allowed.

Under Alabama Law, to establish the tort of an intentional interference with contractual or business relations, the pleader must prove the following: "(1) the existence of a contract or business relation; (2) the defendant's knowledge of the contract or the business relation; (3) intentional interference with the contract or business relation; and (4) damage to the plaintiff as a result of the interference." *MAC East, LLC v. Shoney's, LLC* 2007 W.L. 60922 (M.D. Ala.) (citing *Century 21, Acad. Realty, Inc. v. Breland*, 571 So. 2d 296, 297 (Ala. 1990).  "In addition, to demonstrating that the interference was intentional, a Plaintiff must [also] produce substantial evidence of fraud, force, or coercion on the Defendant's part." *Id.* (citing *Teitel v. Wal-Mart Stores, Inc.*, 287 F.Supp. 2d 1268, 1282 (M.D. Ala. 2003) (Albritton, J.)(quoting *Barber v. Bus. Prods. Ctr.*, 677 So. 2d 223, 227 (Ala. 1996)).  Further, "it is essential to a claim of tortious

interference with contractual relations that the Plaintiff establish that the Defendant is a "third party," i.e., a "stranger" to the contract with which the Defendant allegedly interfered." *Tom's Food, Inc. v. Carn*, 896 So. 2d 443, 454 (Ala. 2004)

The Alabama Supreme Court has cited with authority longstanding Georgia law which recognizes as an additional element to interference with contractual relations that "the Plaintiff established that the Defendant is a third party." *Waddell & Reed, Inc. v. United Investors Life Ins. Co.*, 875 So. 2d 1143, 1153 (Ala. 2003) (citing *Atlanta Market Ctr. Management Co. v. McLane*, 503 S.E. 2d 278, 282 (1998)). This is so, because "a party to a contract cannot, as a matter of law, be liable for tortious interference with the contract." *Id.* (quoting *Lolley v. Howell*, 504 So. 2d 253, 255 (Ala. 1987)).

"One is not a stranger to the contract just because one is not a party to the contract…" Id. (quoting *McLane*, 503 S.E. 2d at 282) In *Waddell v. Reed, Inc.* supra, the Alabama Supreme Court recognized that a "Defendant is a party in interest to a [business or contractual] relationship if a Defendant has any beneficial or economic interest in, or control over, that relationship." 875 So. 2d at 1154. "A Defendant is a party in interest to a relationship if the Defendant has any beneficial or economic interest in, or control over, that relationship." *Id.* citing *Parsons v. Aaron*, 849 So. 2d 932, 937 (Ala. 2002)). In *Parsons*, the Alabama Supreme Court held that where a contract would not have been consummated without the participation of a certain party, that party is "anything but a stranger to a relationship." 814 So. 2d at 214. In reaching its decision in *Parsons*, The

9

Alabama Supreme Court relied upon Georgia law.  In the McLane case, the Georgia Supreme Court held that "in order for a Defendant to be liable for tortious interference with contractual relations, the Defendant must be a stranger to both the contract and the business relationship giving rise to and underpinning the contract." 503 S.E. 2d at 283.

Emcor's claim of tortious interference fails for two reasons.  First, Emcor has presented no evidence that any payments made to Alan Cristal caused Emcor to hire PFMI.  To the contrary, the evidence shows that, to the contrary Emcor had hired PFMI and PFMI was already performing janitorial work before Alan Cristal requested a payment from PFMI and before PFMI made any payments to Alan Cristal.  In its amended counterclaim, at paragraph 106, Emcor states "PFMI and its President intentionally interfered with Emcor's contract with Mr. Cristal and its business relationship with BB&T by, among other things, paying Emcor's Director of Business Development for retaining PFMI as the janitorial service contractor for the BB&T project."  For there to have been an interference caused by this payment, the payment would have had to be made or promised prior to the hiring of PFMI.  Payment after the fact could not have induced Cristal to hire PFMI.  Emcor has not presented and cannot present any evidence of a payment or a promise of a payment prior to the hiring of PFMI.

The second way in which Emcor fails to satisfy the elements of intentional interference is that they have not plead that PFMI or Greg Littlefield are strangers to the business or contractual relationship which is an essential element under Alabama law.  PFMI and Greg Littlefield had a direct economic interest in the

10

business relationship between Emcor and BB&T as they were Emcor's subcontractor on that contractual relationship. "A person with a direct economic interest is not a stranger to the contract. Parties to an interwoven contractual arrangement are not liable for tortious interference with any of the contracts or business relationships." 875 So. 2d at 1157 (quoting *LaSonde v. Chase Mortgage Co.*, 577 S.E. 2d 822 (2003)). Clearly, BB&T, Emcor and PFMI were part of a tripartite relationship in which there was a business relationship between Emcor and BB&T and a business relationship between Emcor and PFMI all regarding the same project and that those contracts were interwoven to a point where PFMI could not be called a stranger. Finally, Emcor's claim that PFMI and Greg Littlefield interfered with its contract with Alan Cristal, its employee fails as Alabama Law does not allow a tortious interference claim of an at will contract. *Tom's Foods, Inc. v. Carn* 896 So. 2d at 458, 459.

## IV. Conclusion

Based upon the foregoing, PFMI respectfully asks the Court to deny Emcor's Motion for Leave to Amend its Counterclaim to add a tortious interference claim against PFMI and to add Greg Littlefield as a party. In the alternative, should this Court allow this amendment, PFMI requests a continuance of the trial date to allow PFMI and Greg Littlefield to conduct further discovery so as to mitigate the prejudice that this untimely amendment will cause.

s/  Scarlette M. Tuley
Rhon E. Jones (JON093)
Scarlette M. Tuley (TUL007)
Attorney for Plaintiff

OF COUNSEL:
BEASLEY, ALLEN, CROW,
METHVIN, PORTIS & MILES, P.C.
Post Office 4160
Montgomery, Alabama 36103-4160
Phone:  (333) 269-2343
Fax:  (334) 954-7555

## CERTIFICATE OF SERVICE

    I hereby certify that I have served a copy of the foregoing document upon all counsel of record as listed below either by virtue of electronic filing or by placing a copy of same in the United States Mail, first class, postage prepaid, a true and correct copy of the above and foregoing document on this the 17th day of October, 2007.

                             s/  Scarlette M. Tuley
                             OF COUNSEL

Mr. Jack Owen
Ball, Ball, Matthews & Novak, PA
Post Office Box 2148
Montgomery, Alabama 36102-2148
ccowen@ball-ball.com

Mr. Benjamin H. Sawyer
Mr. Lee C. Davis
Sutherland, Asbill & Brennan, LLP
999 Peachtree Street, NE
Atlanta, Georgia 30309
(404) 853-8188
ben.sawyer@sablaw.com
lee.davis@sablaw.com

## 33

1   learned through maybe the second or third
2   call what they were actually looking for, and
3   that's how we developed our proposal.
4       Q.  And who informed you of what BB&T
5   was looking for?
6       A.  Steve Paige, I think it was.
7       Q.  And part of what they were looking
8   for was janitorial component; correct?
9       A.  Yes.
10      Q.  What -- Well, strike that.
11      Let me ask you this way.  Did EMCOR
12  intend to ever self-perform any of the
13  janitorial component?
14      A.  No.
15      Q.  And how do you know -- how do you
16  have that understanding?
17      A.  They've just never done it.
18      Q.  So, in this case, you had no
19  reason to think that janitorial would be
20  something that EMCOR would sub for them?
21      A.  No.  Janitorial is kind of a
22  unique business.  It's difficult to --
23      THE WITNESS:  Sorry.
24      THE COURT REPORTER:  That's okay.
25      THE WITNESS:  It's difficult to make

## 34

1   money at.  EMCOR didn't have the expertise
2   and understanding of how to hire and retain
3   low wage earners and -- and make money in
4   janitorial.  I think that most, if not all,
5   of their janitorial business that they
6   managed was subcontracted.
7       Q.  (By Mr. Sawyer)  Were you given
8   the responsibility to look at subcontractors
9   for the janitorial component?
10      A.  I don't know that I was given the
11  responsibility.  I put forth my opinion.
12      Q.  Okay.  What was --
13      A.  Operations in EMCOR, as with most
14  facility management companies, is the driver.
15  It's really not sales.
16      Q.  Okay.  What -- what was your
17  opinion that you put forth concerning it?
18      A.  Well, we needed a company that
19  would take on the responsibility of a very
20  large geographic area and very dispersed
21  locations.  I think their footprint covered
22  from Maryland down to Georgia and out through
23  Alabama taking in Virginia, West Virginia,
24  Carolinas, et cetera.  So it had to be a
25  company that had some kind of national

## 35

1   presence that was willing to take on this
2   project.
3       Q.  Okay.  What subcontractors to
4   perform the janitorial component did you
5   consider?
6       A.  I actually only considered one,
7   and that was PFMI.  I think there was some
8   other considerations about a company called
9   ABM, and one of the problems with choosing
10  ABM is the fact that they tell you up front
11  that they basically subcontract all of their
12  work.  And ABM was somewhat of a competitor
13  to EMCOR in that they provided some
14  mechanical maintenance services to various
15  clients, and I just didn't like giving work
16  to competitors.
17      Q.  You said one of the problems with
18  ABM, well, among others, was that they
19  subcontract all their work?
20      A.  Yes.
21      Q.  Okay.  And they were up front
22  about it?
23      A.  Yeah.  That -- that's how they do
24  business.  That's their business motto.
25      Q.  Are you aware of any work that

## 36

1   PFMI self-performed on -- self-performed on
2   this job, the BB&T job?
3       A.  I really don't know.  They may
4   have.
5       Q.  Did PFMI ever make any
6   representations to you concerning the amount
7   of work they were going to self-perform?
8       A.  They said that they were taking in
9   five partners.  Each one of the partners
10  would take a specific area of the country,
11  and PFMI, as far as I knew, was taking a part
12  of the portfolio.
13      Q.  Okay.  And when you say
14  "partners," is that the same thing as a
15  subcontractor?
16      A.  Yes, it -- in essence, it really
17  is.
18      Q.  Okay.  When did they tell you
19  that?  And when I say "they," I mean PFMI.
20  When did they tell you that they were going
21  to subcontract with five partners?
22      A.  I think right from the very
23  beginning.
24      Q.  Okay.  And the very beginning of
25  this, was it -- Well, you tell me.  Was it



BROWN & GALLO
LLC

Telephone   (404) 495-0777   (404) 876-8979
Toll Free   (877) 495-0777   (800) 637-0293
Fax (404) 495-0766

101 Marietta Street, Suite 2700
Atlanta, GA 30303

1740 Peachtree Street, NW
Atlanta, GA 30309

www.galloreporting.com

37

1  March of 2006 or -- Strike that. March of
2  2005?
3      A.  I don't know. I have no idea. I
4  am really not good with dates unless I got
5  them in front of me.
6          It was our understanding from PFMI
7  though that they would self-perform, and then
8  their five chosen partners would also
9  self-perform. Didn't turn out that way, but
10  that's -- that was the original premise.
11      Q.  And would you have got that
12  understanding from Mr. Littlefield?
13      A.  Yes.
14      MR. SAWYER: Can we go off the record
15  for a second?
16      THE VIDEOGRAPHER: The time is 12:06
17  p.m. We are now off the video record.
18      (Recess was taken.)
19      THE VIDEOGRAPHER: The time is 12:10
20  p.m. We are back on the video record.
21      Q.  (By Mr. Sawyer) All right.
22  Mr. Cristal, I think we left off with we were
23  talk- -- discussing and talked about the
24  janitorial component for the BB&T account.
25      A.  Yes.

38

1      Q.  What were some of the
2  qualifications you looked for when you -- you
3  were preparing sales package to provide the
4  janitorial?
5      A.  Well, the sales package was for
6  all services, not just janitorial. I don't
7  think that originally that BB&T was concerned
8  about the details of who was going to
9  provide. They were basically looking to
10  EMCOR as the prime contractor, anything
11  within EMCOR's service agreement, if it went
12  wrong or if it was good or bad, was EMCOR's
13  problem and not anyone else's.
14      Q.  And you worked for EMCOR at this
15  time; correct?
16      A.  It may have started out as Aircond
17  and during the time it could have been
18  switched to EMCOR.
19      Realize, Aircond was a division of
20  EMCOR at all times.
21      Q  Okay.
22      A  So, to me, the fact that it was
23  one or the other really doesn't matter.
24      Q.  Okay.
25      A.  It's all one company.

39

1      Q.  So it would have been one EMCOR
2  entity?
3      A.  Yes.
4      Q.  And you, at the time, you had the
5  responsibility to look out for EMCOR's
6  interest; correct?
7      A.  Yes.
8      Q.  And part of that decision would
9  have been to get a responsible janitorial
10  contractor; correct?
11      A.  My job was not really to find out
12  whether they were responsible or not. I
13  think mine was more strategic rather than
14  tactical.
15          As I told you earlier, operations is
16  the driver at most facilities management
17  companies. How they are going to ultimately
18  operate the contract is really their purview
19  and not mine.
20      Q.  Okay. You say your role was
21  tactical and strategic?
22      A.  No. Mine was more strategic and
23  not tactical.
24      Q.  When you say your role was
25  strategic, what do you mean?

40

1      A.  I was a salesman. I had to sell
2  BB&T on the idea that EMCOR could indeed take
3  on this project, carry it through, provide
4  all the services that BB&T required and do it
5  in a timely fashion and an economical
6  fashion.
7      Q.  At some point in time -- Strike
8  that.
9          And I believe we discussed that one of
10  the components that EMCOR was going to be
11  providing was janitorial; correct?
12      A.  That is right.
13      Q.  And we've also discussed that
14  EMCOR does not perform janitorial?
15      A.  They do not self-perform.
16      Q.  So you had a dilemma; correct?
17      A.  Well, we had to provide the
18  services.
19      Q.  Right.
20      A.  We knew that the only way to do
21  that would be to subcontract.
22      Q.  Okay. And you, as the salesman,
23  when you know you have this void you have to
24  fill, what -- what did you do?
25      A.  Well, again, I -- There is only a



BROWN & GALLO
LLC

Telephone  (404) 495-0777  (404) 876-8979
Toll Free  (877) 495-0777  (800) 637-0293
Fax (404) 495-0766

101 Marietta Street, Suite 2700
Atlanta, GA 30303

1740 Peachtree Street, NW
Atlanta, GA 30309

www.galloreporting.com

### 41

1 few choices that you have in providing these
2 services. You can continue with 1,000 mom
3 and pops at each of these locations. You
4 could try to consolidate into smaller
5 companies that could provide the services
6 regionally, or you could look to one of maybe
7 two to three national companies to provide
8 the services for all of the sites. And we
9 explored choosing the national company. We
10 explored using -- continuing to use mom and
11 pops. We knew that wasn't efficient. And
12 ultimately they -- they chose PFMI as the
13 company to go with in order to provide these
14 services.
15     Q. When you say "we explored," who
16 was exploring with you?
17     A. I guess the operations folks at --
18 at EMCOR and at Aircond. There was certainly
19 interviews with Greg and his group. I guess
20 the main driver was Debi Crosby. And PFMI
21 brought some things to the table that we felt
22 like -- I know that I felt like, in my own
23 mind, that were fairly unique.
24     At the time, he was the president of
25 BSCAI, which is the largest, I guess, trade

### 42

1 organization of janitors that there is, and
2 he had these contacts in each of the
3 geographic areas that BB&T was located who
4 were ultimately going to be his five or so
5 partners.
6     Q. And you say there were interviews
7 with Greg, and referring to Greg Littlefield?
8     A. Yeah, I'm sure there was.
9     Q. Who -- who interviewed Greg?
10     A. I -- I would bet that Debi had
11 conversations with him. I bet that pretty
12 much anybody on the operations team would
13 have interviewed him.
14     Q. Were you ever a part of any of
15 these interviews?
16     A. Probably. I probably sat in on
17 them. The interviews were also conducted by
18 BB&T. When we made our final presentation,
19 both EMCOR and BB&T were party to that --
20 that presentation.
21     Q. Was PFMI also a party of that
22 presentation?
23     A. Yes.
24     Q. Who from PFMI was a part of that
25 presentation?

### 43

1     A. Greg Littlefield, Jim Wohlers, and
2 I am not sure who else might have been there.
3     Q. Okay. And not to repeat your
4 testimony, but is there any other reason -- I
5 -- I understand that PFMI was a national
6 contractor providing janitorial services;
7 correct?
8     A. Well, they really weren't a
9 national contractor. They were more of a
10 regional player. We didn't go with a
11 national contractor such as an ABM or a One
12 Source.
13     Q. Can you me why the national -- Or
14 strike that.
15     Can you tell me why EMCOR or you
16 specifically did not want to go the route of
17 a national service provider?
18     A. Well, both of those companies were
19 competitors, and we really didn't want to
20 give opportunity for a competitor to -- to be
21 at this project. Strong feelings about
22 giving competitors work.
23     Q. And again, you've mentioned some
24 things that PFMI brought to the table.
25     A. (Witness nods head.)

### 44

1     Q. Is that correct?
2     A. Yes.
3     Q. Okay. Such as their foot- --
4 footprint. You recall that?
5     A. The things that I thought that
6 they brought to the table was their contacts
7 throughout the janitorial business from their
8 -- the fact that Greg was president of BSCAI.
9     Q. To the best of your recollection,
10 is there any other reason that -- that you
11 determined that PFMI was or should be part of
12 the BB&T account?
13     A. Well, they came up with some cost
14 estimates that looked very -- very good.
15 There is some standards in the industry, I
16 think, for janitorial work, cost per square
17 foot, and they were, as I recall, under what
18 the average would have been.
19     I also think -- And this is just my
20 observation on my own -- that BB&T had some
21 previous work with ABM and One Source. I
22 don't think that it was a good experience. I
23 think that they might have been or we might
24 have been influenced by what BB&T thought of
25 the national groups. They actually liked



# BROWN & GALLO
LLC

Telephone  (404) 495-0777    (404) 876-8979
Toll Free  (877) 495-0777    (800) 637-0293
Fax (404) 495-0766

101 Marietta Street, Suite 2700
Atlanta, GA 30303

1740 Peachtree Street, NW
Atlanta, GA 30309

www.galloreporting.com

**45**

1  this idea of five regionals doing the work.
2      We knew going in that janitorial is a
3  difficult service to please everyone. BB&T
4  was going through some philosophical changes
5  on how they did business, growing rapidly
6  from a small regional bank to a pretty large
7  player. They bought several groups of banks,
8  and each one of the banks brought their own
9  set of contractors with them that -- that
10  provided services; and each one was a little
11  bit different in how they billed and how they
12  costed.
13      So there was no -- BB&T wasn't getting
14  any bang for the buck, you might say. Their
15  buying power was basically driven down all
16  the way to the branch level. Didn't take
17  into account their 1400 branches. And in
18  doing this outsourcing initiative, they felt
19  like that they could take advantage of their
20  huge buying power.
21      Q.  And I believe you've referenced
22  some cost estimates that PFMI performed that
23  looked good.
24      A.  (Witness nods head.)
25      Q.  Do you recall what those cost

**46**

1  estimates were based on?
2      A.  I'm sure they were based on a cost
3  per square foot, what they felt like they
4  could do the work for. That's typically how
5  janitorial services are provided.
6      Q.  Well, first let me ask you this.
7  Do you know who prepared the scope of work
8  for the BB&T account?
9      A.  BB&T.
10      Q.  Does the name Matt LLewellyn ring
11  any bells?
12      A.  No.
13      MR. SAWYER:  Okay.  Let me mark this as
14  the next in order.  It will be deposition
15  Exhibit Number 60 because Ms. Tuley and I
16  don't remember what the last one was.
17      (Exhibit-60 was marked for
18  identification.)
19      Q.  (By Mr. Sawyer) Go ahead and take
20  a look at this.
21      You read it?
22      A.  Yes.
23      Q.  Okay.  A couple of things. One,
24  does this refresh your recollection about the
25  time when the project was getting kicked off?

**47**

1      A.  I -- I'd say this was well into
2  it, not kicked off.
3      Q.  When you say "well into it," what
4  came before this?
5      A.  I'd say many meetings with EMCOR
6  and PFMI and BB&T, or this could have been
7  from the -- the actual RFP.  So it could have
8  been early into it.
9      Q.  Well, let me ask you this way.
10      A.  I'm not really sure.
11      Q.  Let me ask it this way.  Do you
12  remember the date that the contract was
13  executed?
14      A.  I do not.
15      I can tell you that EMCOR started work
16  without a signed contract.
17      Q.  With BB&T?
18      A.  Yes.
19      Q.  Do you recall when they -- when
20  EMCOR started working this job?
21      A.  I don't recall, no.
22      Q.  After taking a look at what's been
23  marked as Exhibit Number 60, can you identify
24  that for -- that document for the record?
25      A.  Looks like an e-mail that was sent

**48**

1  from me to Debi, Doug, people at EMCOR,
2  copied Greg and Jim and Hutcheson at U.S.
3  Lawns.  This looks like they're referring to
4  a cost proposal that had already been given
5  to them and then requesting changes in that
6  cost proposal.
7      Q.  Okay.  And it references an
8  Exhibit C.  This -- this document that you're
9  looking at references an Exhibit C.5 in the
10  first paragraph.  Are you with me?
11      A.  Yes.
12      Q.  Where it says the "janitorial
13  pricing by site"?
14      A.  Yes.
15      Q.  And is it your recollection that
16  -- that cost proposals that looked good by
17  PFMI would have been based on this Exhibit C
18  referenced in here?
19      A.  Without looking at Exhibit C, I
20  have no idea.  I -- I couldn't tell you what
21  Exhibit C is.
22      Q.  Okay.  If you go to the middle of
23  the paragraph, and I'm reading from right
24  here.  I'll just read it for the record.
25      "The original adjusted square footage

BROWN & GALLO
LLC

Telephone  (404) 495-0777    (404) 876-8979
Toll Free   (877) 495-0777    (800) 637-0293
Fax (404) 495-0766

101 Marietta Street, Suite 2700
Atlanta, GA 30303

1740 Peachtree Street, NW
Atlanta, GA 30309

www.galloreporting.com

| 81 | 83 |
|---|---|
| 1  Q.  So it's your recollection that<br>2 PFMI performed the landscaping?<br>3  A.  Yes.<br>4  Q.  Do you recall dealing with anyone<br>5 directly with U.S. Lawns?<br>6  A.  Yeah, the guys whose name was on<br>7 here, Ken Hutcheson.<br>8  Q.  But you didn't believe that EMCOR<br>9 entered into a direct contract with U.S.<br>10 Lawns; do you?<br>11  A.  I'm not sure.<br>12  Q.  That's fair.<br>13  Do you recall any issues regarding the<br>14 amount of square footage on this project?<br>15  A.  Changed several times from<br>16 original in the RFP to cleanable to cleanable<br>17 minus -- What did they call them?  Equipment<br>18 rooms, elevator shafts, et cetera.<br>19  Q.  When you said it "changed several<br>20 times," the square footages changed several<br>21 times?<br>22  A.  Yes.<br>23  Q.  Would one of those changes have<br>24 been on -- We have looked at Exhibit 60.  Go<br>25 ahead and take a look at that. | 1  Q.  Okay.  Did he also price the<br>2 landscaping?<br>3  A.  No.<br>4  Q.  Okay.  Would he also have priced<br>5 the janitorial scope?<br>6  A.  No.  He would have included it in<br>7 our bid and made it a part of our cost,<br>8 realized the cost to BB -- BB&T included all<br>9 services.  So BB&T got a lump sum cost<br>10 composed of all of the different components<br>11 of this service.<br>12  Q.  And do you recall whether EMCOR<br>13 marked up the janitorial component of these<br>14 services at all?<br>15  A.  I do not know.<br>16  MR. SAWYER: I am going to mark this as<br>17 the next order, Exhibit 65.<br>18  (Exhibit-65 was marked for<br>19 identification.)<br>20  Q.  (By Mr. Sawyer)  If you would go<br>21 ahead and take a look at all of that.<br>22  A.  (Witness complies)  Okay.<br>23  Q.  I know we talked earlier about the<br>24 commission, I guess, or incentive award on<br>25 this.  Does that refresh your recollection as |

| 82 | 84 |
|---|---|
| 1  A.  Yeah.  That would have been one of<br>2 them.<br>3  Q.  Were there subsequent changes to<br>4 this square footage?<br>5  A.  Could have been previous.  Could<br>6 have been subsequent.<br>7  Q.  Did you provide those, to the best<br>8 of your recollection, to PFMI?<br>9  A.  Yes.  If they were sent to me and<br>10 I was to pass them on, they got passed on.<br>11  Q.  To your knowledge, did any person<br>12 from EMCOR, including yourself, prepare any<br>13 analysis of the square footage on this job,<br>14 or was that just PFMI's responsibility?<br>15  A.  I believe Steven King was in<br>16 charge of all of that.<br>17  Q.  What was Steven King in charge of?<br>18  A.  Pricing.  He was the pricing guy<br>19 for EMCOR.<br>20  Q.  What did he price for EMCOR?<br>21  A.  I'm sure he priced what services<br>22 EMCOR provided.<br>23  Q.  Which would have been the mobile<br>24 maintenance; correct?<br>25  A.  Yes. | 1 far as the amount of money you were paid for<br>2 this or not?<br>3  A.  It's about what I thought, $6,000.<br>4  Q.  Okay.  So the back end of that<br>5 $60,000, although there's a proof of payment,<br>6 you didn't receive that?<br>7  A.  No.  I got the 6520.<br>8  Q.  What happened to the $6,000 or<br>9 $60,000?<br>10  A.  I have no idea.<br>11  Q.  Why didn't you receive it?<br>12  A.  I didn't know that's what I was<br>13 supposed to get.  Are you telling me now that<br>14 that's what I was supposed to get?<br>15  Q.  I'm EMCOR's attorney, but what I<br>16 read on that is that there's been an approval<br>17 of commission.  EMCOR never told you what you<br>18 were going -- what you were approved for?<br>19  A.  That's right.<br>20  Q.  But all you received is $6,500?<br>21  A.  About that, yeah.<br>22  Q.  Okay.  How much did<br>23 Mr. Littlefield pay you as a commission for<br>24 getting the BB&T work?<br>25  A.  $2,000. |



BROWN & GALLO
LLC

Telephone  (404) 495-0777   (404) 876-8979
Toll Free  (877) 495-0777   (800) 637-0293
Fax (404) 495-0766

101 Marietta Street, Suite 2700
Atlanta, GA 30303

1740 Peachtree Street, NW
Atlanta, GA 30309

www.galloreporting.com

## 85

1    MR. SAWYER:  And we'll mark this as the
2  next order.  Is this 66?
3    (Exhibit-66 was marked for
4  identification.)
5    Q.  (By Mr. Sawyer) Take a look at
6  what's been marked as Exhibit 66.
7    A.  Yep.
8    Q.  When did Mr. Littlefield pay you
9  $2,000 for getting him on board the BB&T
10  account?
11    A.  I think it was over a period of
12  several months, while I was still working at
13  EMCOR with the knowledge of the people at
14  EMCOR.
15    Q.  Who, at EMCOR, knew that you were
16  receiving money from Mr. Littlefield for --
17    A.  Ray Stribling.
18    Q.  I'm sorry.  Let me finish the
19  question.
20    Who, at EMCOR, knew that you were
21  receiving a commission from Mr. Littlefield
22  for getting him on the BB&T account?
23    A.  Ray Stribling.  I asked permission
24  first, before I asked Mr. Littlefield for it.
25    Q.  So you asked Mr. Littlefield for

## 86

1  the commission?
2    A.  I asked Ray Stribling if I could
3  ask Littlefield for a commission, yes.
4    Q.  Okay.  And what was
5  Mr. Stribling's response?
6    A.  He had no problem with it.
7    Q.  When would you have asked Greg for
8  a commission for --
9    A.  After the contracts were signed.
10    Q.  So it would have been sometime
11  summer of 2005?
12    A.  Whenever the contracts were
13  signed.
14    Q.  And what was Mr. Littlefield's
15  response?
16    A.  He didn't have a problem with it.
17  I also was to receive one from U.S. Lawns,
18  but it never happened.
19    Q.  So U.S. Lawns was also supposed to
20  give -- give you a commission?
21    A.  Yes.
22    Q.  Did Mr. Stribling also approve
23  that?
24    A.  Yep.
25    Q.  Did anyone else from EMCOR know

## 87

1  that you were receiving these commissions?
2    A.  I don't know.
3    Q.  Did Mr. Littlefield also provide
4  you with a commission for the Colonial Bank
5  work?
6    A.  Yes.
7    Q.  Were you employed by EMCOR at that
8  time?
9    A.  No.
10    Q.  Were you employed by Aircond at
11  that time?
12    A.  No.
13    Q.  Were you employed by PFMI at that
14  time?
15    A.  Yes.
16  EMCOR paid me a commission for Colonial
17  when I was working for EMCOR.
18    Q.  Well, let me just ask this.  When
19  you approached Mr. Littlefield, did you
20  discuss the amount of compensation you would
21  receive for getting him on board?
22    A.  Nope.
23    Q.  You did not?
24    A.  I did not.
25    Q.  Okay.  Prior to the execution of

## 88

1  the contract, did you ever discuss receiving
2  a commission if you got PFMI on board with
3  BB&T account?
4    A.  No.
5    MR. SAWYER: Let me just mark this as
6  the next in order.
7    (Exhibit-67 was marked for
8  identification.)
9    Q  (By Mr. Sawyer) It's -- you can
10  identify it.  I just want to see if you
11  recognize the document.
12    A.  Yep.
13    Q.  Take your time.
14    A.  I recognize it.
15    Q.  Can you identify it for the
16  record?
17    A.  It looks like my offer letter from
18  Aircond to me for employment.
19  Oh, no.  I take that back.
20    Q.  Take your time and review it --
21  review the whole document, if you need.
22    A.  This looks like PFMI's offer to me
23  for employment.
24    Q.  And what's the date of the
25  document?


101 Marietta Street, Suite 2700
Atlanta, GA 30303

1740 Peachtree Street, NW
Atlanta, GA 30309

www.galloreporting.com

Telephone  (404) 495-0777   (404) 876-8979
Toll Free   (877) 495-0777   (800) 637-0293
Fax (404) 495-0766

89

1    A.  February 10th, 2006.
2    Q.  And that was, to the best of your
3  recollection, during the time of the project;
4  correct?
5    A.  Yes.
6    Q.  And, in fact -- Well, there's a
7  couple of -- You can take a look at Exhibit
8  64 if you like, but it's a couple of days --
9  approximately a week after the meeting with
10  the trash, which you may have been at;
11  correct?  It's Exhibit 64.
12    A.  This is January 20th was when it
13  was sent.  The meeting was February 2nd.
14  This is February 10th.
15    Q.  So about eight days?
16    A.  Yeah.  It wasn't really signed
17  until the 21st.
18    Q.  So you started working for PFMI on
19  February 21st, 2006?
20    A.  I don't think so.  I think it was
21  much later than that even though I accepted
22  this position.
23    Q.  Did you inform anyone at EMCOR
24  that you had accepted this position February
25  21, 2006?

90

1    A.  I told them that I was
2  contemplating leaving, and that's when --
3  that's when I had the meeting with Alan
4  Junior, and he asked me to stay.
5    Q.  And Alan Junior would have been --
6    A.  Alan Barnes, Jr.
7    I didn't want to leave.  I wanted to
8  stay, if we could have gotten a couple of
9  things ironed out.
10    Q.  When you say you wanted to stay, I
11  believe you -- And correct me if I'm wrong
12  here, but the prior testimony was it was
13  driving -- or they weren't compensating you
14  driving?
15    A.  Gas -- gas compensation and the
16  fact that they held my commissions for a
17  year.
18    In fact, I don't think I started -- it
19  was much later that I started, even though
20  this was signed.
21    Q.  Because you resigned from EMCOR
22  May --
23    A.  May.
24    Q.  -- 2006; right?
25    A.  Right.

91

1    (Exhibit-68 was marked for
2  identification.)
3    Q.  (By Mr. Sawyer) This is -- The
4  next in order is Exhibit 68.  Would you take
5  a look at that?
6    Let me just first ask you, the top --
7  at the top of the page it's dated March 21,
8  2005.  Is that a typo?
9    A.  I'm not sure.
10    Q.  Could it be that in March 2005 you
11  were in discussions with working at PFMI?
12    A.  It's possible.
13    Q.  And I am going to read from the --
14  this is the first paragraph.  It says, "In
15  retrospect, we have been discussing and
16  contemplating this scenario for over a
17  year-and-a-half.  Obviously, we both agree
18  and realize that I can make a major
19  contribution to your organization in a very
20  short time."
21    Do you recall this employment proposal
22  letter that you -- that was sent to
23  Mr. Littlefield at PFMI?
24    A.  Yes.
25    Q.  If you'll turn to the back, the

92

1  third page of this.
2    A.  (Witness complies.)
3    Q.  And I'm under the heading
4  compensation expectations.  You with me?
5    A.  Yes.
6    Q.  Okay.  If you look at number 3, it
7  says, "Proposal and contracts brought to PFMI
8  prior -- prior to my acceptance of employment
9  count towards revenues provided.  A contract
10  is signed, examples BB&T and Colonial Bank."
11    Does that refresh your recollection as
12  to when this letter was sent?
13    A.  No.
14    Q.  So --
15    A.  The object was that he wanted me
16  to do $4 million worth of business my first
17  year.
18    Q.  That's a lot of business; isn't
19  it?
20    A.  Actually not.
21    Q.  Really?
22    A.  It's very, very common.
23    As an example, yesterday I signed a $20
24  million contract.  So --
25    Q.  Good day yesterday.



BROWN & GALLO
LLC

Telephone  (404) 495-0777    (404) 876-8979
Toll Free  (877) 495-0777    (800) 637-0293
Fax (404) 495-0766

101 Marietta Street, Suite 2700
Atlanta, GA 30303

1740 Peachtree Street, NW
Atlanta, GA 30309

www.galloreporting.com

**93**

1    A.  It was, but that's typical in our
2  business.
3    I wanted him to count BB&T and Colonial
4  toward that first 4 million.  So in essence,
5  my -- my base, if you will, had already been
6  fulfilled.  He didn't want to pay me a
7  commission until after 4 million and not
8  including the 4 million.
9    Q.  So -- Okay.  Let me make sure I'm
10  -- I'm clear on this.  The negotiations and
11  the request for proposal, what we've looked
12  at here today, were ongoing in March 2005.
13  If you're looking at paragraph --
14    A.  Which -- which proposal?
15    Q.  The BB&T account.
16    A.  Okay.
17    Q.  Okay?
18    If you're looking here at paragraph 3,
19  which says that the BB&T account on your bank
20  will be included as far as the bench mark
21  that you need to make, does that influence
22  you one way or another whether this
23  employment proposal letter went out in 2005
24  or 2006?
25    A.  No, it doesn't influence me one

**94**

1  way or the other.  I -- You're asking -- You
2  originally asked me was this a typo.
3    Q.  Yes.
4    A.  And I say I don't know.
5    Q.  Well, here's the -- here's the
6  question.  Is it possible that during the
7  same time you're engaging in the request for
8  proposal with trying to get the BB&T account
9  that you're --
10    A.  This is after the fact.  This is
11  after we have already secured BB&T.
12    Q.  That's -- that's what I thought.
13    A.  Yeah.
14    Q.  I didn't think that, at the same
15  time that you were negotiating the BB&T
16  account, that you would be trying to get
17  employed with PFMI.
18    A.  No.
19    Q.  And so it's a fair statement that
20  the March 21, 2005 is probably a
21  typographical error; right?
22    A.  When was BB&T signed?
23    Q.  June -- Or I'm sorry.  July 13th,
24  2005.
25    A.  No.  Then it's definitely a typo,

**95**

1  yeah.
2    Q.  That's what I suspected.
3    A.  Okay.  I wouldn't -- I wouldn't
4  have left EMCOR --
5    Q.  Sure.
6    A.  -- without receiving my commission
7  for this big account that I just sold;
8  supposedly, I'm supposed to get 60 grand off.
9  That's kind of interesting to me.
10    Q.  And to the best of your
11  recollection, all you received on that
12  commission is six grand as you sit here
13  today; right?
14    A.  Yeah.
15    Q.  Okay.  Give me one second.  I am
16  about done, Mr. Cristal.
17    MR. SAWYER:  Can we go off the record?
18    THE VIDEOGRAPHER:  The time is 1:56
19  p.m.  We are now off the record.
20    (Recess was taken.)
21    THE VIDEOGRAPHER:  The time is 2:01
22  p.m.  We are back on the video record.
23    Q.  (By Mr. Sawyer) I have just a few
24  more questions, Mr. Cristal.
25    A.  Okay.

**96**

1    Q.  Why -- why did you leave PFMI?
2    A.  The original premise was that we
3  were going to grow the operations of
4  maintenance services that PFMI might provide.
5  A couple of reasons that I had left.  Number
6  one, I don't think it was Greg's intention
7  ever to grow that business.  I think it was
8  always to subcontract, and that really wasn't
9  my vision of what I wanted to do.  I did not
10  want to sell janitorial contracts.
11    And the second reason is, again, I got
12  one of those offers that -- from Linc that I
13  could not refuse.  I went back to work for my
14  former boss at -- who was my boss at EMCOR
15  and who is now president of Linc.
16    Q.  Who is that?
17    A.  Phil Rodgers -- not Bill.  Phil
18  Rodgers.
19    Q.  Because there is a Bill?
20    A.  Yeah.  Well, there was.  I guess
21  he's still alive, but he is just no longer
22  part of EMCOR.
23    Q.  Did Phil originally hire you at
24  EMCOR?
25    A.  Yes.  Well, again, it was actually

BROWN & GALLO
LLC

Telephone  (404) 495-0777   (404) 876-8979
Toll Free  (877) 495-0777   (800) 637-0293
Fax (404) 495-0766

101 Marietta Street, Suite 2700
Atlanta, GA 30303

1740 Peachtree Street, NW
Atlanta, GA 30309

www.galloreporting.com