IN THE DISTRICT COURT OF THE UNITED STATES FOR THE

MIDDLE DISTRICT OF ALABAMA, NORTHERN DIVISION

```
PROFESSIONAL FACILITIES        )
MANAGEMENT, INC.,              )
                              )
     Plaintiff,               )
                              )      CIVIL ACTION NO.
     v.                       )      2:06cv1136-MHT
                              )          (WO)
EMCOR FACILITIES SERVICES,    )
INC.,                         )
                              )
     Defendant.               )
```

OPINION

Plaintiff Professional Facilities Management, Inc.

(PFMI) brought this lawsuit in state court against

defendant EMCOR Facilities Services, Inc. (EMCOR), which

had awarded PFMI a contract to perform janitorial services

as part of EMCOR's contract with Branch Bank & Trust

(BB&T).  PFMI charged EMCOR with, among other things,

fraud and breach of contract with regard to the provision

of such services.  EMCOR removed this lawsuit to federal

court on the basis of diversity-of-citizenship

jurisdiction, 28 U.S.C. § 1332(a), and filed a

counterclaim alleging breach of contract, indemnity,

negligence, and interference with contractual and business relations.

This lawsuit is currently before the court on EMCOR's motion for partial summary judgment.[1] For the reasons that follow, the motion will be granted in part and denied in part.

## I. STANDARD FOR SUMMARY JUDGMENT

Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Under Rule 56, the party seeking summary judgment must first inform the court of the basis for the motion, at which point the burden then shifts to the non-moving party to demonstrate

_____

1. EMCOR's motion for summary judgment challenges Counts I, II, III, and IV; these counts set forth fraud and breach-of-contract claims arising out of the janitorial-services dispute. Counts V and VI involve a different dispute, regarding garbage removal, that is not currently at issue.

why summary judgment would not be proper.  <u>Celotex Corp.</u>
<u>v. Catrett</u>, 477 U.S. 317, 323 (1986); <u>see also</u> <u>Fitzpatrick</u>
<u>v. City of Atlanta</u>, 2 F.3d 1112, 1115-17 (11th Cir. 1993)
(discussing burden-shifting under Rule 56).  The non-
moving party must affirmatively set forth specific facts
showing a genuine issue for trial and may not rest upon
the mere allegations or denials in the pleadings.  Fed. R.
Civ. P. 56(e).

     The court's role at the summary-judgment stage is not
to weigh the evidence or to determine the truth of the
matter, but rather to determine only whether a genuine
issue exists for trial.  <u>Anderson v. Liberty Lobby, Inc.</u>,
477 U.S. 242, 249 (1986).  In doing so, the court must
view the evidence in the light most favorable to the non-
moving party and draw all reasonable inferences in favor
of that party.  <u>Matsushita Elec. Indus. Co. v. Zenith</u>
<u>Radio Corp.</u>, 475 U.S. 574, 587 (1986).

## II. FACTS

On July 13, 2005, PFMI and EMCOR executed a letter of intent in which they agreed that, as part of EMCOR's contract to provide centralized maintenance, landscaping, and janitorial services for BB&T, PFMI would provide the janitorial services at BB&T's approximately 1,440 branches.[2]  PFMI then subcontracted with other vendors to perform the actual janitorial services.

The mess of accusations between PFMI and EMCOR boils down to a single point of controversy: the square footage figure to be used in calculating pricing.  During negotiations, both parties knew that PFMI would ultimately be paid based on the not-yet-ascertained actual square footage to be cleaned, which excludes closets, equipment and mechanical rooms, elevator shafts, vacant offices, and vaults.  PFMI was responsible for performing accurate measurements of cleanable square

_____

2.  The parties have not presented the court with the "definitive agreement" contemplated by the letter of intent they executed on July 13, 2005.

4

footage within 90 days of beginning performance on the contract.

At the outset of negotiations in March 2005, PFMI and EMCOR made their bidding calculations with the figures included in the BB&T bid packet, which were the only figures then available. These numbers, known as Exhibit A, listed gross square footage measurements for the BB&T branches as 6.9 million and 'adjusted square footage' as 6.7 million.[3] Later during the parties' negotiations, BB&T provided EMCOR with another set of figures, this set based on a sampling of measurements of cleanable square footage at its branches. This spreadsheet, designated as Exhibit C, provided that the estimated cleanable square footage was 5.4 million, roughly 20 % less than the adjusted figure in Exhibit A.[4]

---

[3]. It is not clear from the record how BB&T arrived at the adjusted square footage figure.

[4]. In some instances, the Exhibit C square footage number is referred to as "actual" square footage. Nevertheless, the court does not regard Exhibit C as representing the actual cleanable square footage, because (continued...)

EMCOR based its bid to BB&T on the 5.4 million figure in Exhibit C, while PFMI placed its bid to EMCOR using the 6.7 million figure in Exhibit A.    This is the misunderstanding that seems to be at the root of the parties' dispute.

PFMI began performing on the contract in September 2005.    Conflict first arose in December 2005, when PFMI's subcontractors were due to submit their cleanable square footage measurements.    PFMI and EMCOR agree that some of these measurements were late and that 30-40 % were inaccurate--some found, impossibly, that the cleanable number was the same as gross, and others, even more impossibly, found the cleanable number to be higher than gross.    Willis Depo. (Doc. No. 28), at 13.    The parties diverged in their understanding of the proper procedure

---

4.    (...continued)
Exhibit C was based on a sample and because PFMI was still to conduct its own measurements of each branch as part of the agreement.    See also Defs.' Reply Br. (Doc. No. 37), at 4 ("These space reductions reduce the total square footage to an estimated 5.4 million square feet.") (emphasis added).

that was to follow the submission of the inaccurate measurements. EMCOR, at the behest of BB&T, took its own measurements with a BB&T representative. PFMI, however, maintains that it had the right to perform new measurements itself and to send a representative to accompany EMCOR and BB&T during their measuring.

PFMI also asserts that it was entitled to reach an agreement with EMCOR on the final cleanable square footage number before it was to be paid using that number. It argues that EMCOR had instructed that, until such an agreement on the measurements, it was to bill using gross square footage. PFMI does not dispute that once an actual number was finalized, all payments after November 1, 2005, would be based on that number and would be retroactively adjusted to account for EMCOR's overpayments--that is, paying for gross and not cleanable square footage--during the previous months. But in March 2006, before any agreement on a final number, EMCOR used its new measurements to deduct approximately 20 % from

7

its payment to PFMI.  It similarly reduced PFMI's payments in April and May 2006.

In June 2006, the parties ended their initial contract and entered into a new one, an oral agreement. In this second contract, PFMI and EMCOR agreed to reduce the size of the geographic area for which PFMI would be responsible.  Payment on this contract was to be based on the new EMCOR and BB&T measurements, although PFMI continued to object to the propriety of those measurements.  EMCOR withheld PFMI's entire payment for June, leading PFMI to terminate the second contract on July 14, 2006.  EMCOR ultimately lost the BB&T account.

PFMI filed this lawsuit in December 2006, claiming misrepresentation based on EMCOR's failure to inform it of Exhibit C and its 20 % reduction of the estimated cleanable square footage.  According to PFMI, this failure caused it to rely, to its detriment, on the original, higher number in Exhibit A from BB&T's bid package.  PFMI also claimed breach of contract on both

the initial contract and on the second, oral agreement.[5] EMCOR counterclaimed with breach of contract, indemnity for a payment that BB&T exacted from EMCOR as a result of an alleged theft from the bank by a relative of a PFMI cleaner, and an allegation that EMCOR's loss of the BB&T contract was the proximate result of PFMI's negligence in performing its work and in supervising and hiring its workers.  PFMI later added another counterclaim, against PFMI and its president, Greg Littlefield, for interference with contractual and business relations.

## III. DISCUSSION

PFMI asserts three claims, one sounding in fraud and two sounding in breach of contract.  They are for (1) PFMI's detrimental reliance on EMCOR's misrepresentation of estimated cleanable square footage prior to forming

---

5.  The complaint does not explicitly state that PFMI's breach-of-contract claims, as set forth in Count I, include both contracts, but count refers to its performance between July 2005 and June 2006--a time period that encompasses both contracts.

9

the initial contract; (2) EMCOR's breach of the first contract by unilaterally adjusting PFMI's payments during performance of the first contract; and (3) EMCOR's breach of the second contract by nonpayment.[6]

## A. Fraud: Reliance and Misrepresentation

When PFMI and EMCOR began discussing a potential contract to perform janitorial services for EMCOR's contract with BB&T, EMCOR provided information from BB&T's bid package that contained the amounts of gross and adjusted square footage for all of its locations, totaling 6.9 million square feet and 6.7 million square feet, respectively.  The parties agreed that the adjusted number was not correct and that payment would eventually be adjusted to reflect the actual square footage that PFMI would clean.

---

6.  PFMI's complaint does not lay out its claims in this fashion, but the court has extrapolated from the record that these are the specific points of dispute.

According to PFMI, EMCOR knew, and intentionally withheld from PFMI, that BB&T had later determined the adjusted square footage number in the bid package, Exhibit A, to be at least 20 % too high. By withholding this information, PFMI argues, EMCOR allowed it to bid based on this erroneously high number. EMCOR maintains that it gave Exhibit C, the source of the lower number, to PFMI. It further argues that the Exhibit C number should have been without consequence, since both parties understood that PFMI would conduct its own measurements of cleanable square footage, which EMCOR assumed would be similar to those in Exhibit C. PFMI President Littlefield stated that PFMI did not learn of the Exhibit C number until he learned, two weeks before performance was due to begin, that one of PFMI's subcontractors was using Exhibit C to pay its own subcontractors. Littlefield Depo. (Doc. No. 28), at 24. Immediately upon receiving this news, Littlefield told Sean Brookins, the EMCOR manager for the PFMI account, that PFMI could not

11

perform on the contract if "there was going to be 20 percent less square footage in the banks." Id. at 38. PFMI nevertheless continued onward with the contract.

### 1. Import of PFMI's claim

EMCOR repeatedly insists that any misunderstanding resulted in no net loss. Despite this refrain, PFMI's use of the 6.7 million square footage number in Exhibit A, rather than the 5.4 million number in Exhibit C, has substantial implications. EMCOR seems to misunderstand or mischaracterize PFMI's reliance argument as concerning payment for performance, when the complaint makes clear that the fraud claim is about the bidding process prior to performance. Because PFMI thought it was entering a contract with approximately 6.7 million square feet of cleanable space, it bid with a lower price per square foot than it would have had it known that the cleanable square footage was only 5.4 million. Compl. (Doc. No. 1), at 9.

One need not know advanced economics to understand why businesses sometimes give a discount to customers purchasing a higher volume of goods or services. See, e.g., Brooke Group Ltd. v. Brown & Williamson Tobacco Corp., 509 U.S. 209, 215 (1993) (manufacturer was a threat to competitors because it gave larger volume discounts to wholesalers); United States v. Williams, 144 F.3d 1397, 1403 (11th Cir. 1998) (drug dealer told customer that "the price would continue to get lower as the volume of their transactions increased"); Conference Am., Inc. v. Conexant Sys., Inc., 508 F.Supp.2d 1005, 1006-07 (M.D. Ala. 2007) (Watkins, J.) (high-volume customers received services at below-standard rates). As such, if PFMI believed that it was selling a larger volume of services, it may have furnished a per-unit discount that it would have not have offered if it were selling only 80 % of that volume. The question now becomes whether PFMI's dependence on Exhibit A was reasonable.

13

## 2. PFMI's knowledge of Exhibit C

The crucial factual issue is whether PFMI had Exhibit C before it calculated its bid. PFMI professes that it was unaware of Exhibit C at that time, <u>see</u> Littlefield Depo. (Doc. No. 28), at 24; as the complaint notes, "PFMI would not have ... priced the work as they did had PFMI been correctly informed of the square footage numbers. In fact had PFMI known the true numbers they would not have bid for the job." Compl. (Doc. No. 1), at ¶ 44. But the evidence reflects that EMCOR did, in fact, give Exhibit C to PFMI. The key piece of evidence is a March 24, 2005, email--containing Exhibit C as an attachment-- that BB&T employee Matthew Llewelyn sent to EMCOR Director of Business Development Alan Cristal, who then forwarded it to PFMI President Littlefield and PFMI Vice President Jim Wohlers, Pl.'s Ex. 18 (Doc. No. 28). The text of the forwarded email provides that the

> "original adjusted square footage has
> been    modified    to    reflect
> usable/cleanable square feet. Your
> pricing quotes should be based upon this

14

> cleanable square footage. ... These
> space reductions reduce the total square
> footage to an estimated 5.4 million
> square feet."

Id. The copy of the email in evidence was printed from Wohlers's email account.

At first glance, the email seems to pull the rug out from under PFMI's contention that it did not have access to Exhibit C's 5.4 million square footage number prior to placing its bid. But the email is not as straightforward as it seems. Notably, it was not addressed directly to Littlefield or Wohler. A BB&T employee created the spreadsheet and emailed it to Cristal, who then forwarded the spreadsheet to other EMCOR personnel, copying Littlefield and Wohlers. The email therefore does not unambiguously communicate to PFMI that a major change had occurred at the very foundation of any potential contract. As such, PFMI's mere receipt of the spreadsheet cannot prove that PFMI knew that it was to calculate its bid on the new adjusted estimate of 5.4 million square feet. Cf. Al Makaaseb Gen. Trading Co. v.

15

U.S. Steel Int'l, Inc., 412 F.Supp.2d 485, 491 (W.D. Pa. 2006) (Schwab, J.) (plaintiff cannot show creation of a contract with defendant if defendant was only carbon-copied on the pertinent email; "to the contrary, the 'agreement' was reached between" the sender and primary receiver of the email); Missigman v. USI Ne., Inc., 131 F.Supp.2d 495, 516-17 (S.D.N.Y. 2001) (McMahon, J.) (employee could not show employer fraud based on an email sent "not to [the plaintiff], but in an email to six other employees on which [the plaintiff] was sent a carbon copy").

But two other factors, when considered together, unmistakably lead to the conclusion that PFMI was on notice of Exhibit C.  First, PFMI knew from the start that the numbers in Exhibit A did not reflect the actual square footage to be cleaned, since it also knew that it was responsible for conducting accurate measurements within 90 days of performance.  Knowing how much money was at stake, PFMI should have been exceedingly alert to

any information regarding updated numbers.[7]  Second, the

email was marked with unmistakable indicia of relevance.

Its subject line, "Update to BB&T's Maintenance Manager

RFP 3/23/05," announced that there has been some kind of

change.  Furthermore, the email in Wohler's account had

been marked as "Importance: High."   Whether Cristal

flagged the email in sending it or Wohlers flagged it

upon receipt, the existence of the flag supports that

Wohlers either knew or should have known that he needed

---

    7.   While PFMI knew the Exhibit A numbers were wrong
from the start, it may not have had reason to suspect
that they would be as substantially wrong as they turned
out to be.   The initial gross and adjusted figures in
Exhibit A, 6.9 million and 6.7 million, differed by only
3 %, which comports with the 3-4 % difference between
gross and cleanable that Littlefield says is standard in
the banking cleaning industry.   Littlefield Depo. (Doc.
No. 28), at 38-39.   Littlefield also reports that
Brookins told him that the difference "wouldn't be any
more than 4 or 5 percent, if not a wash."   Id. at 30.
(Littlefield's articulation of Brookins's statement is
not clear, but the context of the statement suggests that
he was comparing the bid packet adjusted square footage
and the final measurements of cleanable square footage,
and not comparing gross to cleanable square footage.)
Other sources, however, do state that the standard
difference between gross and adjusted square footage is
closer to 20 %.   Green Depo. (Doc. No. 28), at 7.

to pay close attention to the email.  The email is also
marked "follow up completed," which indicates that
Wohlers did read the email and took care of whatever he
thought he needed to do.[8]    PFMI thus had either
constructive or actual notice of Exhibit C, and no
reasonable jury could find that PFMI reasonably
overlooked the information contained in Exhibit C.


### 3. Misrepresentation

Nevertheless, assuming <u>arguendo</u> that a jury could
find that PFMI acted reasonably in overlooking the
importance of the March 24 email, the court would still
conclude that PFMI is unable to prevail on its fraud
claim.  The email renders the claim implausible to the
extent it is based on willful and negligent
misrepresentation, since it is now evident that EMCOR did
provide PFMI with the updated square footage numbers in

---

8.    There is no evidence concerning Littlefield's
receipt of the email.

Exhibit C.  The only question, then, concerns whether EMCOR innocently misrepresented the adjusted numbers.

PFMI's innocent misrepresentation theory of fraud proves as groundless as its willful and negligent misrepresentation theories.  A plaintiff cannot prove fraud in the context of an innocent mistake unless, among other factors, it can show that the representation was actually false.  Mahoney v. Forsman, 437 So.2d 1030, 1033 (Ala. 1983).  PFMI simply cannot meet this requirement.  EMCOR may not have made the imperativeness of using Exhibit C as clear as PFMI might have wished, but EMCOR had no obligation to trumpet it.  In the absence of special circumstances, silence is not fraudulent unless "active concealment or misrepresentation [is] present." Berkel & Co. Contractors v. Providence Hosp., 454 So.2d 496, 505 (Ala. 1984) (interpreting 1975 Ala. Code § 6-5-102).  As a sophisticated player in the janitorial industry, PFMI should have been able to recognize the importance of the information in the email.  See Bank of

19

<u>Red Bay v. King</u>, 482 So.2d 274, 285 (Ala. 1985) ("When both parties are intelligent and fully capable of taking care of themselves ... mere silence is then not a fraud.").

### B. Breach of First Contract: EMCOR's Unilateral Adjustment of PFMI's Payments

PFMI's assertion that EMCOR improperly withheld portions of its payments under the first contract rests on several disputed issues of fact and, apparently, on one weighty misunderstanding that must be addressed before moving on to PFMI's specific allegations.

### 1. The central misunderstanding of square footage to be used in billing

One of the most perplexing quarrels between EMCOR and PFMI is PFMI's assertion that, shortly before performance was to begin, EMCOR responded to PFMI's concerns about Exhibit C by telling PFMI not to worry about the Exhibit C number, because the number was "probably a wash," a

"non-issue," and "for budgeting purposes only."  Wohlers
Depo. (Doc. No. 28), at 16-17; Littlefield Depo. (Doc.
No. 28), at 30.  PFMI seems to have understood these
comments to mean that it could ignore Exhibit C and
instead proceed under the Exhibit A adjusted square
footage number.  This confusion harkens back to PFMI's
initial misunderstanding about which square footage
estimate--5.4 million or 6.7 million--would be used as
the basis for pricing the job.

EMCOR's statements are logical only when construed in
relation to the 5.4 million figure.  For example, in an
email from EMCOR employee Steven King to Wohlers on July
11, 2005, King noted that the listed square footage to be
used in pricing "has changed from total to estimated
cleanable."  Pl.'s Ex. 19 (Doc. No. 28).  In this email--
presumably thinking that PFMI understood 5.4 million to
be the proper estimate--EMCOR called Exhibit C a "non-
issue" because it would soon be replaced by PFMI's actual
number.  The 5.4 million figure, which represented

approximately 20 % fewer square feet than the 6.7 million
adjusted figure included in the bid package, was based on
a sampling of locations. Armed with this knowledge,
EMCOR expected only a negligible difference between the
5.4 million figure and the cleanable square footage
measurements that PFMI would complete in its first 90
days of performance. It was thus using the 5.4 million
estimate as a proxy "for budgeting purposes." The
phrase "budgeting purposes" implies that the number is
being used to calculate billing and pricing, which
indicates that the number is, in fact, quite important;
oddly, PFMI took the phrase to mean its exact opposite.


### 2. Remaining factual questions concerning billing and payment

#### a. Did PFMI suffer losses because EMCOR told it to bill based on gross square footage pending remeasurements?

Both parties agree that PFMI was to be <u>paid</u> only on
square footage that it actually cleaned. Their argument
centers on a variant of this question--whether the

parties agreed that PFMI should initially <u>bill</u> only for square footage it actually cleaned. PFMI contends that EMCOR repeatedly insisted that PFMI continue to bill based on gross, even as PFMI's new cleanable square footage measurements came in from its subcontractors. Pl.'s Br. (Doc. No. 28), at 4; EMCOR denies any such instruction. While BB&T states that it directed EMCOR to bill on the adjusted number from the beginning, Willis Depo. (Doc. No. 28), at 27, there does not seem to be any dispute that EMCOR did pay PFMI based on gross pending completion of the cleanable square footage measurements and that payments after November 1, 2005, would be adjusted to take account of those measurements.

At first glance, then, this dispute seems silly: What difference does it make, if both parties know that the only money ultimately to change hands would be for actual square footage cleaned? Indeed, this question would be insignificant if the only players in the BB&T janitorial service plan were PFMI and EMCOR. But the

source of the concern is PFMI's subcontractors, who, it seems, were also to be paid on gross square footage until their measurements were completed. From March to July 2006, PFMI thus may have suffered a recurring loss from having to pay its vendors for gross square footage while receiving either payment based on the lower Exhibit C number or no payment at all. If, as PFMI contends, EMCOR directed PFMI, or led PFMI to believe, that it must initially bill for gross square footage whether or not it had cleanable square footage measurements, PFMI had reason to believe that it should tell its subcontractors to do the same. Because PFMI used its gross payment from EMCOR to pay its own contractors for gross, PFMI received no windfall from EMCOR.

This dispute could have been entirely avoided if the parties had cleared up their apparent misunderstanding about the number on which PFMI was to bill. Therefore, what EMCOR and PFMI said or did not say about the method of billing substantially affects whether PFMI may

24

recover, and it is thus a genuine issue of material fact to be determined by a factfinder.

### b. Was PFMI entitled to accompany EMCOR and BB&T in remeasuring branch locations and not bill on cleanable square footage until both parties agreed to the numbers?

Once again, PFMI and EMCOR agree that PFMI was ultimately to be paid only on square footage that it actually cleaned; that PFMI was paid on gross square footage pending its measurements of the branches' cleanable square footage; and that, once the cleanable square footage was finalized, EMCOR was to adjust PFMI's payments going back to November 2005. They differ, however, in their conceptions of what would happen if PFMI's subcontractors did not return reliable measurements after 90 days.

PFMI, doubting the accuracy of some of the measurements it received from its contractors in the first 90 days, asked for a chance to remeasure. Pl.'s Ex. 17 (Doc. No. 28). PFMI says that it believed that

EMCOR agreed that, if BB&T and EMCOR representatives were to remeasure sites, a PFMI representative could accompany them.    Littlefield    Depo.    (Doc.    No.    28),    at    6. Furthermore, PFMI argues that, based on its understanding of its continued involvement in the measurement process, it believed that both parties would agree on a final cleanable square footage figure before EMCOR would take deductions from PFMI's bills. <u>Id</u>. PFMI protests that it was denied both these contractual rights. <u>See</u> Pl.'s Ex. 17 (Doc. No. 28).

The evidence does not currently provide enough information to determine whether the parties made these agreements and, if so, whether the agreements were breached.    These questions should be decided by a factfinder at trial.


3. Damages for breach of the first contract

PFMI contends that EMCOR breached the first contract when it unilaterally reduced PFMI's payments in March,

April, and May 2006.   EMCOR, on the other hand, blames PFMI for the breach, based on PFMI's alleged failure to measure accurately the cleanable square footage; overbilling; failure to perform work in a timely manner; and failure to supervise properly its labor force.

The court cannot say, as a matter of law, that one party or the other is responsible for the breach of the first contract.   Failure to pay and failure to perform are both plausible theories for breach, and both parties have suffered substantial and potentially compensable losses.[9]   Which party caused the breach of this contract and which party may receive damages are therefore genuine issues of material fact to be determined at trial.

---

9.   PFMI submitted an expert report (Doc. No. 28) that calculates its lost profits through July 2006 as $ 419,332 and finds that it lost $ 321,008 on the job from September 2005 to July 2006.  (The latter figure was obtained by subtracting the cost of garbage removal, which is not at issue in this case, from the expert's overall loss assessment.).   The expert did not separate the two contracts in making his calculations.

27

## C. Breach of Second Contract: Nonpayment

PFMI contends that the parties agreed that the second contract would be a "clean slate"--EMCOR would make no further deductions--and Sean Brookins, the EMCOR manager for the PFMI account, seemed to confirm the agreement. See Brookins Depo. (Doc. No. 28), at 39.  But BB&T, concerned about its losses from having previously paid EMCOR based on gross square footage, did not provide EMCOR with funds for payments, see id. at 39-40, and EMCOR thus never paid PFMI for its performance under the second contract.  PFMI now seeks that payment, as it is still liable for payments to its subcontractors.  Wohlers informed PFMI executives of the need for payment in an email sent July 13, 2006, in which he stated that the withholding "goes completely against what we, PFMI, had been told and agreed to--that is when EMCOR cancelled the previous contract that all previous issues would not roll over into the new project and invoices would no longer be adjusted due to square footage issues."  Pl.'s Ex. 14

(Doc. No. 28).  When EMCOR and BB&T did not immediately confirm payment, PFMI terminated the second contract, stating that it "cannot afford to continue servicing this account without payment."  Pl.'s Ex. 15 (Doc. No. 28).

PFMI seems to assert two grounds for recovery under the second contract: loss of future profits and restitution for work already performed.  First, because the parties did not create a written, signed document, PFMI is incontrovertibly barred from receiving lost profits by 1975 Ala. Code § 8-9-2(1), which declares non-written contracts void if the agreement "by its terms, is not to be performed within one year from the making thereof."  See also Ala. Agr. & Mech. Univ. v. Jones, 895 So.2d 867, 871 (Ala. 2004); Ex parte Ramsay, 829 So.2d 146, 155 (Ala. 2002).[10]

But while partial performance of the contract does not insulate it from the statute of the frauds, PFMI may

_____

    10. PFMI's expert report, Pl.'s Ex. 16 (Doc. No. 28), at 6, calculates PFMI's projected future profit from the two-year contract as $420,614.

recover for work already performed.  As stated in 1921, "while an action cannot be maintained for a breach of the contract which is void, under the statute, a recovery at law may be had for services rendered under it." <u>Farrow v. Burns</u>, 92 So. 236, 237 (Ala. App. 1921).  <u>See also Bethune v. City of Mountain Brook</u>, 300 So.2d 350, 352 (Ala. 1974) ("[I]t is well settled in Alabama that an executory agreement which is void under the statute of frauds cannot be made effectual by estoppel merely because it has been acted on by the promisee.").

Because PFMI may recover for work already performed on the second contract, questions concerning any such recovery should be decided by a factfinder.


***


Summary judgment therefore will be granted in favor of EMCOR on PFMI's fraud claim and on PFMI's breach-of-contract claim on the second contract to the extent PFMI

seeks contractual damages for future profits.  Summary judgment will be denied on PFMI's breach-of-contract claim on the first contract and on its breach-of-contract claim on the second contract to the extent PFMI seeks to recover for work performed.

An appropriate order will be entered.

DONE, this the 20th day of December, 2007.

____/s/ Myron H. Thompson____
UNITED STATES DISTRICT JUDGE